UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re: Alibaba Group Ltd. Securities Litigation | Master File No. 1:20-CV-09568-GBD-JW<br><br>AMENDED CONSOLIDATED<br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |
| --- | --- |

TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..........................................................................................1

II.     JURISDICTION AND VENUE...................................................................................10

III.    PARTIES .....................................................................................................................11

        A.      Plaintiffs..........................................................................................................11

        B.      Defendants ......................................................................................................11

IV.     SUBSTANTIVE ALLEGATIONS .............................................................................13

        A.      Defendants Disregard and Conceal Business Practices that Violate Chinese
                Law .................................................................................................................13

                1.      Background of Alibaba's Business, the Alibaba Partnership, and Ma's
                        Continued Influence, Control, and Power to Direct Alibaba Management
                        and Policies Throughout the Class Period ..................................................13

                2.      The Chinese Communist Party Controls China's Government, Commerce,
                        and Is Integrated Into the Structure of All Companies; Businesses Are
                        Expected to Heed All Regulators' Directives and Strictly Comply With
                        Laws and Regulations..................................................................................20

                3.      Alibaba Abuses Its Market Dominance and Violates Chinese Law by
                        Imposing Exclusive and Restrictive Dealing Requirements on Merchants,
                        Even As SAMR Explicitly Declares Such Policies Illegal........................29

                4.      Undisclosed Risks Materialize and the Truth of Alibaba's Unlawful and
                        Anti-Competitive Practices Is Revealed In a Series of Partial Corrective
                        Disclosures..................................................................................................45

                5.      Post-Class Period Events: SAMR Determines Alibaba Had Been Illegally
                        Abusing Its Market Dominance and Restricting Competition Through
                        Various Exclusive Dealing Requirements and Policies Since 2015, Slaps
                        Alibaba With The Largest Ever Anti-Trust Fine In PRC History.............48

        B.      Defendants Disregard and Conceal Material Regulatory and Political Risks
                Relating to the Ant IPO ...................................................................................58

                1.      Background of Ant Group .........................................................................58

                2.      The Ant IPO...............................................................................................59

                3.      Ma and Alibaba's Controlling Interest In Ant...........................................60

i

4.      Ant Skirts Banking Rules, Regulatory Tensions Build as PRC Financial Regulators Work to Rein In Fintech In the Lead-UP to the Ant IPO........63

5.      Defendants Obscure Ant's Controversial Ownership Structure Prior to the IPO...............................................................................................70

6.      Undisclosed Risks Relating to the Ant IPO Materialize ..........................79

7.      Post-Class Period Events: Ant Group Restructures..................................84

C.     Defendants Had An Affirmative Duty Under Item 5(D) Of Form 20-F And Item 303 Of Regulation S-K To Disclose The Omitted Facts .......................................85

V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD (LIABILITY UNDER RULE 10b-5(b)).........88

A.     Defendants' False And Misleading Statements And Omissions Relating to Alibaba's Undisclosed Unlawful Acts During the Class Period ..........................88

1.      Alibaba's FY 2020 Form 20-F ................................................................88

2.      Alibaba's 1Q 2021 (June Quarter 2020) Results......................................92

3.      Alibaba's September 28-30 Investor Day Presentation............................93

4.      Alibaba's 2Q 2021 (September Quarter 2020) Results ............................94

5.      Alibaba's Hong Kong Interim Report ......................................................96

B.     Defendants' False And Misleading Statements And Omissions Relating to Ant Group During the Class Period................................................................................97

1.      Defendants' Statements About the Ant IPO.............................................97

2.      Misleading Statements in the Preliminary Ant IPO Prospectus................99

3.      Misleading Statements in the Final Ant IPO Prospectus........................104

VI.     ALIBABA'S AND MA'S LIABILITY UNDER RULE 10b-5(a) and RULE 10b-5(c) ........................................................................................................109

A.     Ant's Ownership Structure And Key Events In Its Capitalization History.........111

B.     Jack Ma's Pre-Existing Relationships And Dealings With Jiang Zhicheng And Li Botan...................................................................................................................114

C.     Pre-Existing Conflicts Between Xi Jinping And The Political Families Of Jiang Zhicheng And Li Botan ..............................................................................117

D.    The Ownership Structure Of Beijing Jingguan Was A Deceptive Device Used To Conceal The Investment Of Jiang Zhicheng Into Ant Group..............................119

E.    The Ownership Structure Of Shanghai Zhongfu Equity Was A Deceptive Device Used To Conceal The Investment Of Li Botan Into Ant Group .........................125

F.    Defendants Were Aware Of The Risks To Regulatory Approval Associated With The Identities Of The Hidden Investors And Engaged In Deceptive Acts To Conceal The Identities Of Those Investors ........................................................132

VII.    MA'S LIABILITY UNDER RULE 10b5-1 ..................................................135

VIII.    LOSS CAUSATION ........................................................................................135

IX.    ADDITIONAL SCIENTER ALLEGATIONS .............................................137

A.    Alibaba Explicitly Acknowledged And Committed To Comply With China's Prohibition On Anti-Monopoly Practices Like Forced Exclusivity Or Restricting Merchant Operations .......................................................................137

B.    Alibaba Admittedly Knew Regulatory Enforcement by "PRC anti-monopoly enforcement agencies" Was Increasing but Continued to Employ "Clearly Prohibited" Business Practices Anyway.............................................................138

C.    Requiring Exclusive Dealing Was Alibaba's Company Pattern and Practice; Many Of Alibaba Illegal Exclusive Dealing Practices Were Explicit Requirements Of Its Customer Agreements .........................................................................139

D.    Alibaba's Unlawful Business Practices Directly Implicated Its Core Operations.....................................................................................................140

E.    Alibaba's Corporate Scienter.........................................................................140

F.    Additional Scienter Facts Relating to the Omission of Regulatory Risks and Obfuscation of Ant's Ownership .......................................................141

X.    PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................142

XI.    NO SAFE HARBOR ......................................................................................143

XII.    CAUSES OF ACTION....................................................................................144

XIII.    PRAYER FOR RELIEF .................................................................................147

XIV.    DEMAND FOR TRIAL BY JURY.................................................................147

EXHIBIT LIST....................................................................................................150

Lead Plaintiff Salem Gharsalli and additional plaintiffs Laura Ciccarello, Dineshchandra Makadia, and Yan Tongbiao (collectively, "Plaintiffs") individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. Lead Counsel's investigation has included, among other things, a review of: (a) regulatory filings made by Alibaba Group Holding Limited ("Alibaba" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) regulatory filings made by Alibaba, certain of its subsidiaries and affiliates, and certain related parties with the Chinese State Administration for Market Regulation ("SAMR"), Stock Exchange of Hong Kong ("SEHK"), and/or the Shanghai STAR Market; (c) Defendants' public documents, conference calls, statements, and announcements; (d) wire and press releases published by and regarding Alibaba; (e) news articles and analysts' reports about the Company; and (f) other publicly available information concerning Defendants.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Alibaba's American Depositary Shares ("ADS") during the period July 9, 2020 through and including December 23, 2020 (the "Class Period"), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (the "Class").[1]

---

[1] Excluded from the Class are Defendants, the present and former officers and directors of Alibaba; Ant Group Co., Ltd. f/k/a Ant Small and Micro Financial Services Group Co., Ltd. ("Ant" or "Ant Group"), members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any of the excluded parties have or had a controlling interest.

2.     Headquartered in the People's Republic of China ("PRC" or "China"), Alibaba is the largest e-retailer in the world, operating online marketplaces and mobile e-commerce platforms including Alibaba.com, Tmall.com, and Taobao.com. For fiscal year ended March 31, 2020, Alibaba's gross merchandise value ("GMV") topped $1 trillion and it generated approximately $72 billion in revenue.[2]

3.     The Chinese Communist Party ("CCP" or "Party") has complete control not only over all branches of government in China, but also controls Chinese commerce, the internet in China, and internet-based businesses. In recent years, the Chinese government has enacted numerous laws and regulations designed to further tighten the Party's grip over large internet-based companies in China, particularly e-commerce giants like Alibaba.

4.     The State Administration for Market Regulation ("SAMR") is the Chinese government agency that regulates commerce and internet-based e-commerce businesses in China, including, in particular, the enforcement of China's e-commerce and anti-monopoly laws. Under the Party's mandate, the SAMR has immense power to regulate commerce in China. This includes, among other things, the power to impose steep fines, shut down or suspend websites, revoke or suspend a company's business license, and break up or even close down businesses. Because the SAMR has wide discretion to mete out punishments, it has tremendous power to enforce the laws and regulations under its jurisdiction. A bulletin issued by international law firm Ropes & Gray observed that "the Chinese leadership has tapped the SAMR as the single most powerful market regulator." SAMR was Alibaba's market regulator during the Class Period.

5.     Prior to and during the Class Period, Alibaba employed a tactic known as "二选一"

---

[2] Alibaba's fiscal year ends on March 31. Alibaba's FY 2020 ran from April 1, 2019 through March 31, 2020.

or "Er Xuan Yi"—which translated means "Choose One Of Two"—by which Alibaba employed a number of business practices that required or coerced merchants to sell exclusively on Alibaba platforms, and/or punished the merchants if they sold on competitor platforms.

6.       On November 5, 2019 SAMR called an official "Administrative Guidance Forum on Regulating Online Operating Activities," summoning several large internet companies, including Alibaba, during which meeting the SAMR explicitly instructed that "Choose One of Two" practices requiring exclusive or restrictive selling violated Chinese law. Accordingly, the SAMR unambiguously directed the companies, including Alibaba, to stop using such practices. Wen Jia—Alibaba's Vice President, Office of the Chairman, its President of Public Affairs, and a member of the Alibaba Partnership—attended and spoke at the meeting on behalf of Alibaba.

7.       Also on November 5, 2019, an official Party news outlet, The Paper, reported on the Administrative Guidance meeting noted above wherein "Aifu Liang, Director of the Department of Supervision and Administration of Online Trading of the State Administration for Market Regulation, said that *'Choose One of Two' and 'exclusive trading' in the Internet field are clearly prohibited by the Electronic Commerce Law and also violate the Anti-Monopoly Law and the Anti-Unfair Competition Law*."[3] According to The Paper, SAMR further advised that individual company investigations by SAMR into the illegal practices were imminent, stating "[t]he State Administration for Market Regulation will pay close attention to the relevant behaviors and will carry out anti-monopoly investigations on 'Choose One of Two' (against which many people have complained) in accordance with the law."

8.       Following the SAMR administrative guidance meeting, Alibaba and 19 other e-commerce platform operators agreed with the SAMR to abide by the "Commitment of Internet

---

[3] Unless otherwise noted, all emphasis is added throughout.

Platform Enterprises on Maintaining a Good Market Order and Promoting the Healthy Development of the Industry" in which Alibaba pledged to "*comply with the laws and regulations*" and explicitly agreed to "*not force platform operators to conduct 'exclusive cooperation'*" and to "*not impose any unreasonable restrictions or make any unreasonable requirements on the selections of platforms by the operators*."

9.      Unbeknownst to investors, however, Alibaba continued to utilize unlawful "Choose One of Two" policies and related restrictive dealing practices even after the November 5, 2019 administrative guidance meeting and at all relevant times during the Class Period.

10.     The Class Period begins on July 9, 2020, when Alibaba filed its annual report on Form 20-F for the fiscal year ended March 31, 2020 (the "2020 Form 20-F). Among other things, the 2020 Form 20-F stated "our business practices do not violate anti-monopoly or unfair competition laws." This statement was materially false and misleading because (i) the SAMR explicitly told Alibaba in November 2019 that "Choose One of Two" and related exclusive or restrictive trading practices were "clearly prohibited" and violated Chinese law, including anti-monopoly and unfair competition laws; and (ii) Alibaba continued to employ such policies and practices during the Class Period.

11.     Alibaba also owns a 33% equity interest in Ant Group, a Chinese financial technology (or "fintech") company perhaps best known for operating Alipay, a mobile and online payment platform akin to PayPal. Ant originated as Alibaba's electronic payment and escrow services provider to facilitate payments across Alibaba's e-commerce platforms. Ant was spun off from Alibaba in 2011.

12.     At all relevant times, Ant was explicitly controlled by Alibaba founder Jack Ma, who remains at the top of the Alibaba empire as a lifetime member of the Alibaba Partnership and

who served as an Alibaba board member during the Class Period. Through entities he owned or controlled, Ma controlled 50.5% of Ant during the Class Period, and Ant referred to Ma as its "ultimate controller." Additionally, according to Ant's regulatory filings, Alibaba's 33% stake meant it was a "controlling shareholder" of Ant during the Class Period.

13.     On July 8, 2020, Reuters published an "Exclusive" report revealing that Ant was planning a Hong Kong IPO with a target valuation of over $200 billion, citing "two sources with knowledge of the matter." The article described Ant Group as "[t]he world's most valuable tech 'unicorn[,]'" and noted that "***recent years have seen it emphasize its technology prowess amid increased regulatory scrutiny of financial risk***. The company wants to be referred to in English as 'Ant Group Co,' its spokeswoman said. It won regulatory approval in May to change its legal name in Chinese to Ant Technology Group Co."[4]

14.     Despite Ant calling itself a tech company instead of a financial company, the range of Ant's financial services grew substantially in the years preceding the Class Period. By the time of the Class Period, Ant's services included not only enabling users to make mobile payments, but to open checking accounts, obtain loans, open credit cards, make investments, and buy insurance. Two of Ant's most important business units during the Class Period were its online consumer credit platforms Huabei (or "Just Spend"), which functions like a credit card to facilitate online shopping, and Jiebei (or "Just Lend"), a loan platform. Ant's credit division was a main driver of Ant's growth and accounted for approximately 40% of its revenue leading up to the IPO.

15.     On July 20, 2020, Alibaba filed a Form 6-K officially announcing that Ant Group was indeed planning an initial public offering in a joint listing on the Stock Exchange of Hong

---

[4] *Exclusive: Alibaba's Ant Plans Hong Kong IPO, Targets Valuation Over $200 Billion, Sources Say*, REUTERS, July 8, 2020, https://www.reuters.com/article/us-ant-financial-ipo-exclusive-idUSKBN2491JU.

Kong ("SEHK") and the Shanghai STAR Market (the "Ant Group IPO" or "Ant IPO").

16.     Aiming to raise a record **$35 billion**, the Ant IPO was staked to be **the world's largest ever IPO**, trumping Alibaba's own historic $25 billion IPO in 2014, which at that time was the largest IPO ever in the United States, as well as oil giant Saudi Aramco's historic $29.4 billion offering in 2019.

17.     Immediately prior to and during the Class Period, Ant Group boasted over 1 billion users and Alipay reportedly held more than 55% of the mobile payments market.[5] Ant was hailed as the world's largest financial technology company and one of two leading companies in the online/mobile payments and consumer credit business in China (the other, its rival, Tencent).

18.     Alibaba's 33% stake in Ant Group translated to profits of approximately 4.68 billion yuan (approximately $689 million) and 4.8 billion yuan (approximately $735 million) to Alibaba in the quarters ending September 30, 2020 and December 31, 2020, respectively.

19.     Defendants represented that the Ant IPO would be a significant boon to the Company because of Alibaba's financial stake in Ant Group. For example, at Alibaba's September 30, 2020 Investor Day, Alibaba's CFO, Defendant Wu, asserted that "the market is also assigning very little value to our stake in Ant Group" and that Alibaba's stake in Ant was a "strong growth driver[]" for Alibaba's growth.

20.     Eager to push the Ant IPO through, both Alibaba and Ma concealed and failed to disclose material regulatory risks that threatened the consummation of the Ant IPO. Alibaba, and in particular Ma, were acutely aware of the fact that Ant had built its massive consumer credit businesses in the leadup to the IPO by skirting regulatory capital requirements and other onerous

---

[5] *Jack Ma's Ant Group brought in $2.3 billion quarterly profit before abrupt halt to IPO*, FORTUNE, February 2, 2021, https://fortune.com/2021/02/02/jack-ma-ant-group-ipo-quarterly-profits/.

financial regulations applicable to traditional lenders—and thus had drawn the ire of financial regulators. As Ant and Ma prepared for the Ant IPO during the Class Period, they rushed to get it done even as Ant's regulators were clamping down and imposing strict new requirements on Ant's credit and online lending practices. In so doing, Ma omitted and failed to disclose the specific changes Ant would need to make to its business in order to come into compliance with recently-enacted regulatory measures, and the risks associated with the failure to comply.

21.      In addition, as detailed *infra*, Alibaba, Ant, and Ma took great pains to conceal the identities of certain controversial pre-IPO investors in Ant, including members of well-connected political families whose interests are antagonistic to those of CCP General Secretary Xi Jinping (and who stood to gain hundreds of millions of dollars if the IPO were successful). These individuals obscured their ownership interests using a complex web of investment vehicles, and Alibaba and Ma participated in their artifice by helping structure certain of these investment vehicles and providing misleading disclosures concerning the entities in Ant's IPO Prospectus. This obscured ownership structure posed further risk of harsh regulatory intervention against Ant, and an additional undisclosed material risk to the consummation of its IPO.

22.      Alibaba's ADRs reached a Class Period high of $319.32 in intraday trading on October 27, 2020, and a Class Period high closing price of $317.14 per share on October 27, 2020, corresponding to a market cap of approximately $858 billion.

23.      On November 3, 2020, Alibaba stunned the market by announcing that the Ant Group IPO had been suspended because Ant Group "may not meet listing qualifications or disclosure requirements due to material matters relating to the regulatory interview of its ultimate controller, executive chairman and chief executive officer by the relevant regulators…."

24.      In response to this news, the price of Alibaba's ADS fell $25.27 per share from the

prior day's closing price, to close at $285.57 per share on November 3, 2020 (a drop of about 8.13%), on heavy trading volume.

25.     A second blow to Alibaba investors came on November 10, 2020, when SAMR published rules bolstering the prohibition of anti-competitive practices on online platforms, including Alibaba's "Choose One of Two" and other restrictive dealing practices. As Bloomberg News reported the same day, the action was viewed by the market as targeting Alibaba, "as Beijing seeks to curtail the growing dominance of corporations like Alibaba Group Holding Ltd. and Tencent Holdings Ltd."

26.     In response to this news, Alibaba's ADS fell $23.99 per share from the prior day's closing price, to close at $266.54 per share on November 10, 2020 (a drop of about 8.26%), on heavy trading volume.

27.     Bloomberg wrote on November 12, 2020, regarding the November 10, 2020 antitrust rules, "Big Tech has been aggressive and unwilling to share profits with small businesses on their sites. ***In the antitrust draft, Beijing placed a heavy focus on the so-called 'pick one of the two' tactic, the practice of forcing merchants into exclusive arrangements with one platform***. Alibaba Group Holding Ltd. and Tencent Holdings Ltd., longtime competitors, even asked powerful investment banks to pick sides."

28.     According to the Bloomberg report, Ma was reportedly "***well aware of an approaching avalanche of rules*** when he infamously called out 'pawn shop' Chinese lenders, regulators who don't understand the internet, and the 'old men' of the global banking community during the speech in Shanghai.[6] Seen as an attempt to deflect the impending regulatory onslaught, the speech set in motion an unprecedented series of events. First came the suspension of the

---

[6] This comment refers to a speech given by Ma on October 24, 2020. *See infra* at ¶¶239-40.

world's largest IPO, a late-night announcement on Nov. 3 that stunned financiers from New York to Shanghai. A week later the antitrust authority issued 22 pages of proposed anti-monopoly rules, which many read as a veiled warning to Ma and fellow entrepreneurs to tone down the swagger. There are also new guidelines to grapple with for some large conglomerates like Ant that are involved in finance, as well as online lenders and insurers. As the attacks mounted, China's Politburo, the top decision-making body of the Communist Party, in December emphasized the need for stronger antitrust oversight and to prevent the 'disorderly expansion of capital'—a signal that private enterprises can expect stricter controls."[7]

29.     Commentators noted that "Ma's empire is in crisis mode. His top executives are part of a task force that has almost daily interactions with watchdogs. Meanwhile, regulators, including the China Banking and Insurance Regulatory Commission, are weighing which businesses Ant should give up control of to contain the risks it poses to the economy, according to officials with knowledge of the matter. They haven't settled on whether to carve up its different lines of operation, split its online and offline services, or pursue a different path altogether."[8]

30.     Finally, after the close of trading on December 23, 2020, Chinese authorities revealed that they had launched a targeted antitrust probe specifically focused on Alibaba's alleged monopolistic practices. As The New York Times reported, "In a terse statement, the State Administration for Market Regulation said it had started the investigation amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants or other users of its platforms."[9]

---

[7] *How China Lost Patience With Jack Ma, Its Loudest Billionaire*, BLOOMBERG BUSINESSWEEK, December 22, 2020, https://www.bloomberg.com/news/features/2020-12-22/jack-ma-s-empire-in-crisis-after-china-halts-ant-group-ipo.

[8] *Id.*

[9] *China Opens Antitrust Investigation Into Alibaba, the E-commerce Giant*, THE NEW YORK

31.    In response to this news, Alibaba's ADS fell 13%—the largest one-day drop in the history of the Company's trading on the NYSE—to close at $222.00 per share on December 24, 2020, on extremely heavy trading volume, with a corresponding market cap of $606.65 billion. In short, investors saw approximately $257.35 billion in shareholder equity erased from Alibaba's Class Period high in less than two months as previously undisclosed regulatory risks materialized and the truth of Alibaba's unlawful business practices was revealed.

## II.    JURISDICTION AND VENUE

32.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.l0b-5).

33.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

34.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

35.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including interstate telephone communications, and the facilities of a national securities exchange.

---

TIMES, December 23, 2020, https://www.nytimes.com/2020/12/23/business/alibaba-antitrust-jack-ma.html.

### III. PARTIES

#### A. Plaintiffs

36. Lead Plaintiff Salem Gharsalli, as set forth in the Certification filed at Docket No. 8-2, incorporated by reference herein, acquired Alibaba ADS at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

37. Additional plaintiff Laura Ciccarello, as set forth in the Certification filed at Docket No. 1, incorporated by reference herein, acquired Alibaba ADS at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

38. Additional plaintiff Dineshchandra Makadia, as set forth in the Certification filed at Docket No. 20-5, incorporated by reference herein, acquired Alibaba ADS at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

39. Additional plaintiff Yan Tongbiao, as set forth in the Certification filed at Docket No. 20-5, incorporated by reference herein, acquired Alibaba ADS at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

#### B. Defendants

40. Defendant Alibaba is a Cayman Islands corporation with its headquarters located in Hangzhou, China. Alibaba ADS trade on the NYSE under the ticker symbol "BABA."

41. Defendant Daniel Yong Zhang ("Zhang") is a founding member of the Alibaba Partnership, has served as Chief Executive Officer ("CEO") of Alibaba since May 2015, as a director (nominated by the Alibaba Partnership) since September 2014, and as Chairman of the Board since September 2019. Prior to Zhang's current role as CEO, he served as Chief Operating Officer of Alibaba from September 2013 until May 2015. Zhang joined Alibaba in August 2007 as chief financial officer of Taobao Marketplace and served in this position until June 2011, when

he was appointed president of Tmall.com. During the Class Period, Zhang was also a member of Ant Group's investment committee. During the Class Period, Zhang also served on the board of Weibo Corp., a company listed on Nasdaq. Prior to joining Alibaba, from 2002 to 2005, he was a senior manager of PricewaterhouseCoopers' Audit and Business Advisory Division in Shanghai.

42.     Defendant Maggie Wei Wu ("Wu") served as Chief Financial Officer ("CFO") of Alibaba from May 2013 until March 30, 2022. She also has served as Alibaba's head of strategic investments since June 2019, she is a member of the Alibaba Partnership, and she has also served as a director (nominated by the Alibaba Partnership) since in September 2020. Wu joined Alibaba in July 2007 as chief financial officer of Alibaba.com. Before joining Alibaba, Wu was an audit partner at KPMG in Beijing. She is a member of the Association of Chartered Certified Accountants (ACCA).

43.     Defendant Jack Yun Ma ("Ma") is a founding and lifetime member of the Alibaba Partnership and during the Class Period, Ma served as one of the Alibaba directors nominated by the Alibaba Partnership until September 30, 2020. Ma founded Alibaba in 1999 and served as its executive chairman and CEO until September 2019 and May 2013, respectively. At all times relevant here to, Ma has been a member of the Chinese Communist Party.

44.     Defendants Zhang, Wu, and Ma are referred herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Alibaba's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.  Defendants Disregard and Conceal Business Practices that Violate Chinese Law

#### 1.  Background of Alibaba's Business, the Alibaba Partnership, and Ma's Continued Influence, Control, and Power to Direct Alibaba Management and Policies Throughout the Class Period

45.     Founded by Ma in 1999, and based in Hangzhou, China, Alibaba is the largest e-commerce company in the world. In 2014, Alibaba conducted a record-breaking $25 billion IPO on the NYSE—then the largest IPO in history—and the Company's valuation grew to over $500 billion during the Class Period here. In a presentation filed with the SEC on July 13, 2020, Alibaba claimed that it was "the largest retail commerce business in the world in terms of GMV in the twelve months ended March 31, 2020[.]"

46.     Alibaba operates several highly popular online marketplaces where independent third party merchants sell products to wholesale and retail buyers around the world. Alibaba's e-commerce marketplaces include: Tmall.com, which facilitates business-to-consumer (B2C) transactions providing a platform for branded products; Taobao Marketplace, which is primarily a consumer-to-consumer (C2C) platform for small businesses and individual entrepreneurs to open small online stores; Alibaba.com, an international wholesale mobile marketplace for global trade; 1688.com, a domestic wholesale marketplace within China; and AliExpress, an international retail consumer marketplace.

47.     Alibaba's customers are its marketplace vendors, and its revenue driven by its e-

commerce marketing and advertising services paid for by merchants. Alibaba's FY 2020 Form 20-F stated: "We derive most of our revenue from our core commerce segment, which accounted for 86%, 86% and 86% of our total revenue in fiscal year 2018, 2019 and 2020, respectively, while cloud computing, digital media and entertainment, and innovation initiatives and others contributed in aggregate 14%, 14% and 14% in fiscal year 2018, 2019 and 2020, respectively."

48.    Alibaba's China retail marketplaces, consisting of Taobao and Tmall, are the largest and most important of Alibaba's core commerce platforms. According to the Company's 2020 Form 20-F, "[t]he Alibaba digital economy generated RMB7,053 billion (US$1 trillion) in GMV in the twelve months ended March 31, 2020, which mainly included GMV of RMB6,589 billion (US$945 billion) transacted through our China retail marketplaces.

49.    Alibaba's primary competitors are Chinese e-retailers JD.com, Inc. (a business-to-consumer e-retailer) ("JD.com"), Pinduoduo Inc. (an agriculture-focused technology and e-commerce platform) ("Pinduoduo"), and Chinese social media, technology, and gaming company Tencent Holdings Ltd. ("Tencent"), which also facilitates e-commerce through its streaming and chat apps, including WeChat. Together with Amazon, Alibaba, JD.com, and Pinduoduo make up the four largest e-commerce companies in the world.

50.    Alibaba competes with these companies to attract, engage and retain consumers to drive consumption, and to retain brands and retailers on its platforms.

51.    Alibaba operates under the purview of the Alibaba Partnership. The Alibaba Partnership was co-founded by Jack Ma, Joe Tsai, and Daniel Zhang. These founding members retained the power to control Alibaba at all times relevant hereto. Ma, Tsai, and Zhang each were members of the Alibaba Partnership during the Class Period and held top leadership positions at Alibaba during the Class Period: Ma was an Alibaba Board member during the Class Period; Tsai

was Alibaba's Executive Vice Chairman during the Class Period; and Zhang was Alibaba's CEO during the Class Period.[10]

52.     Alibaba's 2020 Form 20-F further explains the Alibaba Partnership as follows:

> Since our founders first gathered in Jack Ma's apartment in 1999, they and our management have acted in the spirit of partnership. We view our culture as fundamental to our success and our ability to serve our customers, develop our employees and deliver long-term value to our shareholders. In July 2010, in order to preserve this spirit of partnership and to ensure the sustainability of our mission, vision and values, we decided to formalize our partnership as Lakeside Partners, named after the Lakeside Gardens residential community where Jack and our other founders started our company. We refer to the partnership as the Alibaba Partnership.

53.     Ma, Zhang, and Wu all were members of the Alibaba Partnership during the Class Period. Ma is a lifetime member of the Alibaba Partnership.[11]

54.     While Ma officially retired as Alibaba's Executive Chairman in September 2019, he retained significant control and influence over Alibaba during the Class Period vis-à-vis his lifetime membership in the Alibaba Partnership and his seat on the board of directors during the Class Period. As The New York Times reported when announcing his retirement on September 10, 2019:

> Mr. Ma, however, will remain a considerable force at the company. He is a lifetime member of the Alibaba Partnership, a group of a few dozen employees with tremendous power over the company's board and leadership, as well as its bonus pool.
>
> The partnership also holds sway over key licenses that Alibaba requires in order to do business on the mainland. While Alibaba is traded in New York and its shares

---

[10] According to Alibaba's 2020 Form 20-F, the Alibaba Partnership was formed by Ma and other Alibaba executives in 2010 "to preserve [their] spirit of partnership and to ensure the sustainability of [their] mission, vision, and values" for Alibaba. The Alibaba Partnership controls Alibaba's board of directors. During the Class Period, as reflected in the 2020 Form 20-F, there were 36 members of the Alibaba Partnership.

[11] *Alibaba Group Announces Executive Chairman Succession Plan*, Alibaba press release, September 10, 2018 ("Mr. Ma is a lifetime partner in the Alibaba Partnership and is a member of its partnership committee.").

are held by global investors, Beijing requires Chinese nationals to control licenses that many companies need to keep doing business there.

Perhaps most crucially, Mr. Ma will still control the parent company of Alipay, the Chinese online payment system used in many of Alibaba's digital marketplaces.[12]

55.     Related to his continued control over Alibaba during the Class Period, Ma explicitly controlled Ant during the Class Period. The Ant Group IPO Prospectus described Ma as "the lead founder, one of the directors and principal shareholders of Alibaba, and our ultimate controller."

56.     An August 11, 2020 article in the *Harvard Law School Forum on Corporate Governance*, titled "Alibaba: A Case Study of Synthetic Control," described Ma's continued control over Alibaba as follows:

Alibaba is known for its unique governance structure: a majority of Alibaba's board is nominated or appointed by the so-called Alibaba Partnership, which consists of several dozen individuals. Thus, ***the Partnership controls Alibaba***. However, as Lin and Mehaffy (2016) show, ***the Partnership itself is effectively controlled by a much smaller Partnership Committee that includes Ma as a perpetual member***. Control of Alibaba is therefore in much fewer hands than might first appear.

Our paper digs even deeper into Alibaba's control arrangements and reveals a surprising fact: ***Ma, who owns less than 5% of Alibaba, effectively controls Alibaba by himself***—control that would persist even if his equity stake declined further. The reason is that Ma's control over Alibaba is not based on his equity but rather on his control of a different firm, Ant Group.

We show that Ma's control of Ant Group gives him two sources of power over Alibaba.

First, Ma can effectively control the Partnership Committee, and thus the Partnership, and ultimately a majority of Alibaba's board. Lin and Mehaffy (2016) have already demonstrated that the Committee controls the Partnership, which in turn controls Alibaba's board. We show that Ma controls the Committee because several of its members are employed by Ma-controlled Ant Group, and thus Ma can cause them to be terminated (from Ant Group, the Partnership, and the Committee).

Second, Ma can use individuals he dominates to at least temporarily cut off (if not

---

[12] *Jack Ma Is Retiring From Alibaba. He Won't Go Far.*, THE NEW YORK TIMES, September 10, 2019, updated January 20, 2021, https://www.nytimes.com/2019/09/10/business/alibaba-jack-ma-retire.html.

permanently seize) licenses that are critical for Alibaba's business but are held by other firms. The ability to seize these licenses gives Ma substantial holdup leverage over Alibaba. The reason Alibaba's key assets are held by other firms is that Chinese regulations prohibit foreign entities like Cayman-domiciled Alibaba from possessing business licenses in sensitive sectors, like the internet and media. To get around this prohibition, Alibaba keeps these licenses in so-called variable-interest entities (VIEs) that are 100%-owned by Chinese nationals and that, via a set of contracts, purport to give Alibaba effective control and ownership over these assets.

The ten individuals who own Alibaba's VIEs include nine Alibaba executives (all but one of whom are partners in the Alibaba Partnership) and one Ant Group executive (who is also a partner in the Alibaba Partnership). Because Ma's position as the controller of Ant Group enables him to dominate not only Ant Group executives but also any member of the Alibaba Partnership and any Alibaba executive who is not a partner, Ma dominates all of the individuals who own the VIEs.[13]

57.     Alibaba's 2020 Form 20-F likewise makes clear that the Alibaba Partnership retains

significant control over the Company, and explicit control over the Company's board of directors:

Our Articles of Association allow the Alibaba Partnership to nominate or, in limited situations, appoint a simple majority of our board of directors. If at any time our board of directors consists of less than a simple majority of directors nominated or appointed by the Alibaba Partnership for any reason, including because a director previously nominated by the Alibaba Partnership ceases to be a member of our board of directors or because the Alibaba Partnership had previously not exercised its right to nominate or appoint a simple majority of our board of directors, the Alibaba Partnership will be entitled (in its sole discretion) to nominate or appoint such number of additional directors to the board as necessary to ensure that the directors nominated or appointed by the Alibaba Partnership comprise a simple majority of our board of directors.

58.     Alibaba's 2020 Form 20-F further explained that

In addition, we have entered into a voting agreement pursuant to which SoftBank, Altaba, Jack Ma and Joe Tsai have agreed to vote their Shares in favor of the Alibaba Partnership director nominees at each annual general shareholders meeting for so long as SoftBank owns at least 15% of our outstanding ordinary shares.

---

[13] Jesse M. Fried and Ehud Kamar, *Alibaba: A Case Study of Synthetic Control*, Harvard Law School Forum on Corporate Governance, Aug. 11, 2020, https://corpgov.law.harvard.edu/2020/08/11/alibaba-a-case-study-of-synthetic-control/.     An expanded version of the "Synthetic Control" case study on Alibaba was published by the European Corporate Governance Institute, February 2021. *See* n.14, *infra*.

Moreover, subject to certain exceptions, pursuant to the voting agreement SoftBank and Altaba have agreed to give Jack and Joe a proxy over, with respect to SoftBank, any portion of its shareholdings exceeding 30% of our outstanding shares and, with respect to Altaba, all of its shareholdings up to a maximum of 972 million of our ordinary shares, after having accounted for the subdivision of each of our ordinary shares into eight ordinary shares, with effect from July 30, 2019, which we refer to as the Share Split. Based on publicly disclosed information, as of the date of this annual report, Altaba no longer holds any Shares. These proxies will remain in effect until Jack Ma owns less than 1% of our ordinary shares on a fully diluted basis or we materially breach the voting agreement.

59.     In other words, the Alibaba Partnership—and in particular Jack Ma—had and has firmly cemented control over Alibaba's board of directors and the Alibaba Partnership and Ma actually exercised that control during the Class Period.

60.     In addition to Ma's control over Alibaba vis-à-vis (i) his explicit control over Ant and (ii) his control and influence over the Alibaba Partnership, Ma further exercised control over Alibaba during the Class Period via his role as the chairman of Alibaba's nominating and corporate governance committee. According to Alibaba's 2020 Form 20-F, Ma's responsibilities in that role included "selecting the board nominees (other than the director nominees to be nominated by the Alibaba Partnership and SoftBank) for election by the shareholders or appointment by the board."

61.     And Ma indeed exercised his board member selection powers. During the Class Period, there were only five directors *not* nominated by the Alibaba Partnership—and those five were all nominated by Ma. As observed in the full paper on Alibaba's "Synthetic Control":

The five current directors not nominated by the Partnership are Chee Hwa Tung (Tung), Walter The Ming Kwauk (Kwauk), Jerry Yang (Yang), Börje Eckholm (Eckholm), and Wan Ling Martello (Martello). *See* Alibaba Form 20–F (2020), at 170. ***All five were nominated by the three-person Nomination Committee, which consists of Tung, Yang, and Ma (who serves as chair)***. *See id*. at 189. ***Tung and Yang were put on the board by Ma and the Alibaba Partnership before the 2014 IPO***. *See* Toh Han Shih & Bien Perez, Tung Cheehwa set to join Alibaba board, S.

CHINA MORNING POST (Jun. 17, 2014)[.][14]

The "Synthetic Control" paper concluded, "All five non-Partnership directors thus owe, directly or indirectly, their positions to Ma." *Id.*

62.     In addition to Ma's roles as (i) Board director and chair of Alibaba's nominating and corporate governance committee, (ii) lifetime member of the Alibaba Partnership, with control over Alibaba's board, and (iii) Ant controller, he was Alibaba's single largest individual investor during the Class Period, thereby wielding additional power and influence over the Company. Ma held approximately 4.8% of Alibaba's outstanding shares during the Class Period. The next largest individual shareholder was Joe Tsai, owning 1.6% of outstanding shares. All directors and executives combined owned a total of 7.4% of outstanding shares.[15] In the year prior to the Class Period, Ma owned approximately 6.2% of Alibaba's outstanding shares.

63.     While Ma owned just under 5% of Alibaba's stock during the Class Period, his continued control over Alibaba was summarized as follows:

> Although Alibaba is one of the world's most valuable companies, its governance arrangements do not appear to be fully understood by investors, analysts, or academics. Analyzing these arrangements, we have shown that Jack Ma effectively controls Alibaba even though he owns less than 5% of its stock, and that this control will persist even if his equity stake drops.
>
> Ma's control can persist because it is based entirely on his control of a completely different firm: privately-held Ant Group. Control of Ant Group enables Ma to dominate Ant Group executives who, along with Ma, make up a majority of the [sic] powerful Partnership Committee of the Alibaba Partnership. Control of the Committee, in turn, provides effective control of the Partnership, which appoints a majority of the directors on Alibaba's board. Domination of Ant Group executives also enables Ma to effectively control Alibaba's key VIE-held assets, giving him holdup power over Alibaba that is independent from his influence over the board.

---

[14] Jesse M. Fried and Ehud Kamar, *Alibaba: A Case Study of Synthetic Control*, European Corporate Governance Institute, February 2021, at 8 n.45, https://ecgi.global/sites/default/files/working_papers/documents/friedkamarfinal.pdf.

[15] Hong Kong Annual Report for FY 2020, filed on Form 6-K dated July 13, 2020, at p.185.

Alibaba is a useful case study of how a single entrepreneur can control a firm not through equity, but rather through a mixture of employment, contractual, and commercial arrangements. We do not know how Ma will wield his power in the future or whether public investors will be harmed. But control matters, and it is important to understand who controls Alibaba.[16]

> **2.** **The Chinese Communist Party Controls China's Government, Commerce, and Is Integrated Into the Structure of All Companies; Businesses Are Expected to Heed All Regulators' Directives and Strictly Comply With Laws and Regulations**

> **(a)** **The Absolute Control of the Chinese Communist Party**

64. The CCP is the founding and sole ruling party in modern China.[17] In furtherance of Party General Secretary Xi Jinping's commonly-repeated dictum that "the party leads all," the CCP has set up an array of key central policy committees to oversee economy and finance, comprehensive reforms, foreign affairs, national security, the internet and cybersecurity, and other sectors.

65. Under Xi Jinping, the CCP aims to bring big business into line,[18] and it does so, in part, by installing "Party committees" or "cells" within private companies to ensure compliance with Chinese laws, regulations, and any/all CCP directives.[19] Contrary to the American private sector, comprised of for-profit businesses with no official ties to the U.S. government, the CCP requires that all entities in China—including non-state-owned entities like Alibaba—employing

---

[16] Jesse M. Fried and Ehud Kamar, *Alibaba: A Case Study of Synthetic Control*, European Corporate Governance Institute, February 2021, p.22.

[17] *The Chinese Communist Party*, COUNCIL ON FOREIGN RELATIONS, last updated June 23, 2021, https://www.cfr.org/backgrounder/chinese-communist-party.

[18] *China's Communist Party at 100: the secret of its longevity*, THE ECONOMIST, June 26, 2021, https://www.economist.com/leaders/2021/06/26/chinas-communist-party-at-100-the-secret-of-its-longevity.

[19] *See, e.g.*, *Structure of China's Communist Party: party cells, decision-making process, concentration of power*, SOUTH CHINA MORNING POST, May 11, 2021, https://www.scmp.com/news/china/politics/article/3132921/how-chinas-communist-party-structured.

three or more Party members, form a Party committee or committees within the company to "communicate to the public and carry out" CCP's policies. The leader of a CCP committee within a corporation has the title of "Secretary." According to Su Wei, a professor at the Party School of the CPC Chongqing Municipal Committee, "Party cells are set up to make sure the company's operations are in line with the principles and policies of the CPC [Communist Party of China]."[20]

66.     Soon after Alibaba's founding, in 2000, the Company established its CCP branch and, in 2008, upgraded it to a Party committee due to the Company's growing number of Party members.[21] Prior to the start of the Class Period, Alibaba maintained nearly 200 Party branches and employed approximately 7,000 Party members.[22] Additionally, Alibaba maintains CCP representation on its board of directors.[23]

67.     During the Class Period, the CCP continued to tighten its already firm grip over companies. On September 15, 2020, the Party's Central Committee, the highest political organ in China, published directives titled, *Opinions on Strengthening the United Front Work of the Private Economy in the New Era*, which called for an even closer and more direct role of the CCP in supervising China's private sector enterprises.[24] In the directives, the CCP stated its intention "to thoroughly implement the major decisions and plans of the Party Central Committee" and "further

---

[20] *Concerns Over Alibaba Founder's Party Membership Reflect Lack of Knowledge of CPC Grass-Roots Functions: Experts*, PEOPLE.CN, November 28, 2018, http://en.people.cn/n3/2018/1128/c90000-9522707.html.

[21] *Id.*

[22] *Id.*

[23] *Cages Giants: Why China's Big Tech Can't Escape the Communist Party*, AXIOS, June 8, 2018, https://www.axios.com/china-big-tech-alibaba-tencent-communist-party-xi-jinping-c9de0516-1315-41e8-9daa-932c57f7faec.html.

[24] *The CCP's New Directives for United Front Work in Private Enterprises*, THE JAMESTOWN FOUNDATION, September 28, 2020, https://jamestown.org/program/the-ccps-new-directives-for-united-front-work-in-private-enterprises/.

strengthen the Party's leadership over united front work in the private economy[.]"[25] The CCP also stated that it would "continuously strengthen [its] leadership over the private economy, bring the majority of private economy practitioners closer to the Party, and gather the majestic forces (磅礴力量) that work together to build the Chinese Dream."[26] The "Basic principles" of the directive were to "[u]phold the Party's leadership over united front work in the private economy and always plan and advance this work from a political and comprehensive perspective. Uphold the 'Two Unswervings' (两个毫不动) and further strengthen the Party's leadership of, and cohesive effect on, private economy practitioners."[27]

68.     As the largest e-commerce company in the world, Alibaba was of special concern to the CCP as an important symbol of (1) Chinese commerce and (2) the Party's ultimate control over even the biggest and most seemingly powerful private enterprises. Alibaba was not a company that could fly under the radar of the Party, its legal and regulatory violations unnoticed.

> **(b)     The Powerful SAMR, Alibaba's Market Regulator, Was Keenly Focused On Anti-Competitive Practices Of Large Companies, Such as Alibaba, Prior to and During the Class Period**

69.     In March 2018, China announced the creation of the State Administration for Market Regulation ("SAMR"). The SAMR is China's ministerial-level agency in charge of regulating areas such as market competition, anti-monopoly/anti-trust and price supervision, intellectual property, and drug safety. The SAMR merged with and undertook the responsibilities previously held by China's State Administration for Industry and Commerce (the "SAIC"), and is an extremely important ministry in China wielding great power and influence over the Chinese

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

economy and markets. A bulletin issued by international law firm Ropes & Gray observed that "***the Chinese leadership has tapped the SAMR as the single most powerful market regulator***" and "[a]s such, the SAMR will have a broad mandate, overseeing everything from drug safety supervision, quality inspection, fair competition and commercial bribery, issuance of business registrations, certifications and accreditations, management of intellectual property rights and comprehensive supervision and management of the market order."[28]

70.     Indeed, because the CCP can exert absolute control over all political and economic life, Chinese regulatory agencies such as the SAMR have tremendous power over the corporations they regulate.

71.     Relatedly, businesses are expectedly to strictly comply with CCP and government agency directives. If an individual or business fails to follow a directive from a government official or agency, whether a formal administrative order or an informal one, the official or agency will not overlook such non-compliance and likely will implement a broad array of enforcement mechanisms and/or punishments.

> (c)     **To Carry Out President Xi and the Party's Directives, China Has Enacted a Series of Laws Governing E-Commerce and Market Competition**
>
> (i)     **China's Anti-Monopoly Law ("the "AML")**

72.     China initially enacted its first comprehensive set of anti-monopoly laws, the AML, in 2008. Among other things, the AML prohibited monopoly agreements, including both "horizontal" agreements (agreements between competitors) and "vertical" agreements (agreements between parties at different levels of the supply or retail chain, *i.e.*, agreements

---

[28] *China's New State Administration for Market Regulation: What to Know and What to Expect*, ROPES & GRAY, April 3, 2018, https://www.ropesgray.com/en/newsroom/alerts/2018/04/Chinas-New-State-Market-Regulatory-Administration-What-to-Know-and-What-to-Expect.

between Alibaba and a vendor) that have the effect of restricting competition.

73.     Chapter I, Article 6 of the AML mandated that any undertaking with a dominant position shall not abuse its dominant position to eliminate or restrict competition.

74.     Chapter II of the AML expressly prohibited any monopoly agreements, and provided "The term 'monopoly agreements' as mentioned in this Law refers to the agreements, decisions or other concerted behaviors that may eliminate or restrict competition." Article 13(2) prohibited "[r]estricting the output or sales of commodities[.]"

75.     Chapter III, Article 17 of the AML also explicitly prohibited abusive behavior by an entity with a dominant market position. A non-exhaustive list of abuses that dominant firms were expressly prohibited from engaging in included:

(1) Selling commodities at unfairly high prices or buying products at unfairly low prices;

(2) Selling commodities at prices below cost without any justifiable causes;

(3) Refusing to trade with a trading party without any justifiable causes;

(4) ***Requiring a trading party to trade exclusively with itself or trade exclusively with a designated undertaking(s) without any justifiable causes***;

(5) Tying products or imposing unreasonable trading conditions at the time of trading without any justifiable causes;

(6) Applying dissimilar prices or other transaction terms to counterparties with equal standing without any justifiable causes; or

(7) Other conducts determined as abuse of a dominant position by the State Council's Anti-Monopoly Enforcement Authority.

For the purposes of this Law, "dominant market position" refers to a market position held by undertakings that have the ability to control the price or quantity of commodities or other trading conditions in the relevant market or to hinder or affect the entry of other undertakings into the relevant market.

### (ii)     SAMR's September 2019 Targeted Anti-Monopoly Regulations

76.     Prior to the Class Period, SAMR indicated its increasing focus on enforcement of

China's AML, particularly with respect to the actions of large and powerful internet companies like Alibaba. For example, on September 1, 2019, SAMR enacted three new sets of anti-monopoly regulations (the "New AML Regulations"), intended to provide guidance for companies as well as the SAMR and the provincial market supervision departments in their enforcement of the AML, particularly with respect to prohibited monopoly agreements, abuse of dominant market positions, and abuse of administrative power. The New AML Regulations established stricter supervision and enforcement mechanisms "with the expectation of comprehensively unified standards and procedures and practice" for ensuring compliance with China's AML.[29]

77.     The New AML Regulations included:

- Interim Provisions on Prohibiting Monopoly Agreements ("IPP-MA"),

- Interim Provisions on Prohibiting Abuse of Dominant Market Positions ("IPP-AD"), and

- Interim Provisions on Prohibiting the Acts of Eliminating or Restricting Competition by Abuse of Administrative Power ("IPP-AAP").

78.     The New AML Regulations "further clarify the standards for identifying violation acts and imposing penalties, grant the AML enforcement agencies relatively full power and authority to conduct investigations, collect evidence and sanction violating parties, which is expected to better guide and regulate enforcement activities and more effectively combat monopolistic behaviors."[30] In other words, in September 2019, the SAMR communicated that it was keenly focused on curbing monopolistic and anti-competitive behavior by large, powerful Chinese companies like Alibaba.

---

[29] *SAMR New Anti-Monopoly Regulations In Force In China*, ORRICK, September 19, 2019, https://blogs.orrick.com/antitrust/tag/samr/#_ftn1.

[30] *Id.*

## Prohibition of Monopoly Agreements (IPP-MA)

79.     The IPP-MA consisted of 36 Articles additional rules to clarify the existence and prohibition of monopolistic agreements. The IPP-MA states that voluntary compliance known as the "commitment system" may save law enforcement resources but that it is also prone to problems. Thus, the IPP-MA "particularly stipulates that the commitment system shall not be applied to monopoly agreements for (i) fixing prices, (ii) restricting the number of goods produced or sold, or (iii) segmenting market; moreover, if the AML enforcement agency concludes after investigation that a monopoly agreement exists, it shall no longer accept an application for suspension of investigations, which is conducive to maintaining the authority of AML enforcement."[31] In other words, voluntary enforcement would be unavailable to companies involved in restricting the sale of goods, segmenting the market, and/or where a monopoly agreement has been found to exist. This signified the SAMR's clear intent to crack down on such anti-competitive practices.

## Prohibition of Abuse of Dominant Market Positions (IPP-AD)

80.     The IPP-AD set forth 39 Articles aimed at tackling large entities, like Alibaba, that are prone to abuse their dominant market positions. The IPP-AD explicitly acknowledged the rise in recent years of "***the abuse of dominant market position in the Internet*** and intellectual property fields" and "***in order to strengthen the AML enforcement regarding dominant market position*** in the above two areas, the IPP-AD clearly clarifies the special factors that need to be considered in determining the dominant market position of operators in these two areas."[32]

---

[31] *Id.*; *see also* A Chart to Understand the Interim Provisions on Prohibiting Monopoly Agreements, *available at* http://gkml.samr.gov.cn/nsjg/xwxcs/201908/t20190830_306388.html.

[32] *SAMR New Anti-Monopoly Regulations In Force In China*, ORRICK, September 19, 2019, https://blogs.orrick.com/antitrust/tag/samr/#_ftn1;

81.     Clause 16 of the IPP-AD prohibited businesses with dominant market position from refusing to conduct transactions with counterparties in the following ways without "justifiable" reasons: 1.) Substantially reducing the number of existing transactions with counterparties; 2.) delaying or interrupting the existing transaction with the counterparty; 3.) refusing to conduct new transactions was with the counterparty; 4.) ***setting restrictive conditions to make it difficult for the counterparty to conduct trade***; 5.) refusing to let counterparty use its necessary facilities under reasonable conditions in its production and business activities. The "justifiable reasons" that may allow the foregoing practices under the AML include: 1.) if the transaction cannot be carried out due to objective reasons such as force majeure; 2.) The counterparty of the transaction has a bad credit record or the business situation deteriorates, which affects the safety of the transaction; and/or 3.) The transaction with the counterparty would cause unreasonable damage to business's interests.

82.     Similarly, Clause 17 of the IPP-AD prohibited businesses with a dominant market position from engaging in the following types of restrictive practices without justification: 1.) ***Restricting a counterparty to deal/transact only with it***; 2.) Restricting the counterparty to deal/transaction only with a specific business; and/or 3.) Restricting a counterparty to trade with a specific business. The IPP-AD made clear that engaging in the above-mentioned behavior can be accomplished by direct restrictions by the dominant actor, or it can in a disguised or indirect form by setting transaction conditions—whether direct or indirect, such restrictive practices are unlawful.

---

*see also* Interim Provisions on Prohibiting Abuse of Dominant Market Positions, https://gkml.samr.gov.cn/nsjg/fgs/201907/t20190701_303057.html.

**Prohibition of Acts of Eliminating or Restricting Competition by Abuse of Administrative Power (IPP-AAP)**

83.     Finally, the IPP-AAP consisted of 25 new Articles aimed at curtailing abuse of administrative power. Law enforcement procedures were improved to clarify that AML enforcement of suspected violations may be initiated in a broad array of ways, including through agencies performing their powers, whistleblowers, assignments by higher authorities, cases transferred by other organs, and reports of lower-level organs.[33]

### (iii)     January 2019 E-Commerce Law

84.     Enacted in January 2019, Article 22 of China's e-commerce law – which defines electronic commerce as any "business activities related to selling goods and services via information networks, such as the Internet" – dictates that "[e]-commerce operators with market dominant position due to their technical advantage, number of users, controlling capacity of relevant industry or the dependence of other operators upon such e-commerce operators in transactions or the like *shall not abuse their market dominant position to exclude or restrict competition*."

85.     Additionally, Article 35 of China's e-commerce law dictates "[e]-commerce platform operators *shall not* take advantage of the service agreement, transaction rules, technology or other means to *impose unreasonable restrictions or conditions on the transactions of operators* on [the] platform within the platform, the price of such transactions and the transactions with other operators, or collect unreasonable fees against operators on platform."

### (iv)     Anti-Unfair Competition Law ("AUCL")

86.     Originally enacted in 1993, and then amended in 2017 and again in 2019, the AUCL

---

[33] Interim Provisions on Prohibiting the Acts of Eliminating or Restricting Competition by Abuse of Administrative Power, *available at* https://gkml.samr.gov.cn/nsjg/fgs/201907/t20190701_303058.html.

was "enacted for the purposes of promoting the sound development of the socialist market economy, encouraging and ***protecting fair competition, preventing acts of unfair competition***, and safeguarding the lawful rights and interests of businesses and consumers."[34] As defined by Article 2 of the AUCL, an "act of unfair competition" means "in its production or distribution activities, a business disrupts the order of market competition and causes damage to the lawful rights and interests of the other businesses or consumers, in violation of this Law."[35]

87.     Additionally, Article 12 subparts (2) & (4) of the AUCL address production or distribution activities of online business stating:

> No business may, by technical means to affect users' options, among others, commit the following acts of interfering with or sabotaging the normal operation of online products or services legally provided by another business:
>
> (2) Misleading, defrauding, or ***forcing users into altering, shutting down, or uninstalling an online product or service legally provided by another business***.
>
> (4) Other ***acts of interfering with or sabotaging the normal operation of online products or services legally provided by another business***.[36]

### 3.     Alibaba Abuses Its Market Dominance and Violates Chinese Law by Imposing Exclusive and Restrictive Dealing Requirements on Merchants, Even As SAMR Explicitly Declares Such Policies Illegal

#### (a)     "Choose One of Two"—Alibaba's Forced Exclusivity

88.     Leading up to and during the Class Period, Alibaba abused its market dominant position and violated Chinese law by imposing unreasonable and unlawful restrictions on vendors. Most notably, Alibaba engaged in a tactic called "Choose One of Two," by which Alibaba forced merchants to choose only one platform—Alibaba—as their exclusive distribution channel, or face

---

[34] Anti-Unfair Competition Law of the People's Republic of China (2019 Amendment), *available at* https://www.hongfanglaw.com/wp-content/uploads/2019/10/Anti-Unfair-Competition-Law-of-the-Peoples-Republic-of-China-2019-AmendmentEnglish.pdf.

[35] *Id.*

[36] *Id.*

punishment if the merchant operated online stores or ran promotions on both Alibaba and any of Alibaba's rival platforms. As Alibaba was China's single largest e-commerce platform, vendors were faced with the draconian choice of giving up their presence on Alibaba or giving up all other sales venues.

89.     Alibaba employed a number of practices by which it implemented "Choose One of Two," or forced exclusivity, on vendors. For example, Alibaba would rate its merchants based on their brands, sales, and other performance, and would prohibit high-rated merchants from running stores on rival platforms, either by written contracts or by oral requests during negotiations. Alibaba also would prohibit its top merchants from participating in promotional activities of rival platforms during big shopping festivals—*e.g.*, "Double 11" (also referred to as "Singles Day"), a popular year-end online shopping spree similar to Black Friday, and "618," a June shopping festival—when online platforms compete most fiercely. Alibaba also took a variety of measures, including rewards and punishments, to ensure implementation of its exclusivity requirements. Alibaba punished non-complying merchants by, *inter alia*, cancelling their promotion displays, expelling them from sales promotions, lowing their search rankings, or downgrading their ratings.

90.     Alibaba's "Choose One of Two" policy was described in an article on *technode* as follows:

> Many Chinese tech giants have been accused of different forms of "forced exclusivity," also known as "choose one of two." Alibaba's version forces merchants to sell exclusively on its marketplaces, such as Taobao and Tmall. Changing to a multi-platform format means its merchants can now sell on rival platforms like Pinduoduo and JD.com.
>
> Vendors already operating on multiple platforms are prohibited to join rivals' promotional events, such as the June shopping festival known as "618" and year-end shopping spree Singles Day. Merchants who don't comply face punishment such as reduced marketing resources, decreased search result rankings, and even

bans from Alibaba's marketplaces.[37]

**(b)** **Alibaba's Forced Exclusivity Is Challenged In Multiple Private Lawsuits**

91.     In November 2017, Alibaba was sued by competitor, JD.com, in the Beijing Municipal High People's Court. JD.com alleged that Alibaba's Tmall abused its dominant position in the B2C online retail platform market by utilizing its "Choose One of Two" practice (*e.g.*, forbidding apparel and houseware vendors from participating in JD.com's "6.18" shopping day and "11.11" shopping promotional events). According to a legal document from the case, JD.com said Alibaba's Tmall sought commitments from merchants to not open stores on JD.com's platform.[38]

92.     Following the initiation of the lawsuit, VIPshop, another Alibaba competitor, filed an application to join the lawsuit against Alibaba.[39] In November 2019, Pinduoduo also accused Alibaba of demanding sellers to make a choice – sellers who don't close their Pinduoduo operations face having shopper traffic directed away from their Tmall store. During an analyst call in November 2019, Pinduoduo reported that more than 10,000 sellers on Pinduoduo had seen their businesses affected as victims of 'forced exclusivity' and as a result it had joined the lawsuit initiated by JD.com against Alibaba for abusing its market position through this practice.[40]

---

[37] *What is 'forced exclusivity'? And why did it get Alibaba fined $2.8 billion?*, TECHNODE, April 15, 2021 https://technode.com/2021/04/15/what-is-forced-exclusivity-and-why-did-it-get-alibaba-fined-2-8-billion/.

[38] *China's Antitrust Probe Zeroes In On Vendor Claims Of Alibaba Pressure*, THE WALL STREET JOURNAL., December 24, 2020, https://www.wsj.com/articles/chinas-antitrust-probe-zeroes-in-on-vendor-claims-of-alibaba-pressure-11608827917.

[39] *Alibaba's Tmall slapped with another lawsuit over abuse of market power on the eve of "Double 11"*, KRASIA, November 6, 2019, https://kr-asia.com/alibabas-tmall-slapped-with-another-lawsuit-over-abuse-of-market-power-on-the-eve-of-double-11.

[40] *Alibaba-Pinduoduo Battle Intensifies*, WARC, January 15, 2020, https://www.warc.com/newsandopinion/news/alibaba-pinduoduo-battle-intensifies/43116.

93.     In or around June 2019, Galanz, the world's largest manufacturer of microwaves and a Tmall vendor, accused Alibaba of penalizing it for refusing to stop selling on Alibaba competitor platforms.

94.     As reported by Chinese market analyst firm Red Pulse on November 6, 2019, Galanz accused Alibaba of abusing its dominant position by attempting to force exclusivity on Galanz and preventing Galanz from selling on Alibaba competitor, JD.com, and punishing Galanz when it continued to list its products on JD.com:

> Alibaba Group Holding [BABA:US] received a lawsuit from Guangdong Galanz Group, a Chinese home electronics manufacturer, which claims the ecommerce company abuses its market dominance to request exclusivity for Galanz's products, as reported by Caixin Global on November 6. In the suit that was filed on October 28, Galanz stated that its annual mid-June sales event, 618 shopping festival, was heavily dampened due to its products not appearing on Tmall's platform, a subsidiary of Alibaba.

> The legal encounters of the two companies started in June as Galanz first accused Tmall of intentionally concealing its home appliances products from the search results of the e-commerce platform. According to Galanz's platform on Weibo, over 200,000 products were hidden during the 618 shopping festival. Dating back to 2012, speculation circulated around Alibaba, accusing the e-commerce company of exerting its market position to force its merchants in signing exclusive contracts. The company reportedly demanded business owners to choose between Tmall or JD.com [JD:US], which was their long-time rival in the e-commerce industry. Unsurprisingly, subsequent to rejecting Tmall's request, Galanz's products were blocked from Tmall's platform during an earlier shopping festival, 520. Technode indicated that it utilized technical inferences to restrict the Guangdong-based firm's access to six stores for product sales on its platform.

95.     A January 19, 2020 report in The Motley Fool explained that:

> Galanz claims that after it signed a partnership with Pinduoduo last May, Alibaba started diverting traffic away from its Tmall store and removing its product listings. Galanz claims that Alibaba's move halved its sales year-over-year in June.

> * * *

> Earlier this month, China started revising its anti-monopoly law to target domestic firms with harsher penalties and higher fines. The proposed revisions will allow regulators to impose fines of up to 10% of a company's annual revenue or 50 million yuan ($7.2 million), whichever is higher, if antitrust laws are violated.

96. The January 19, 2020 report in The Motley Fool further observed that Alibaba relied on and exploited exclusive dealing practices in an effort to maintain its dominance in the increasingly competitive e-commerce sector, and why China's crackdown on exclusive dealing was "bad news" for Alibaba:

> Alibaba is still the top e-commerce company in China by revenue and annual active shoppers, which hit 693 million last quarter. However, *the growth of its core commerce business is decelerating as rivals like Pinduoduo and JD attract more shoppers*.
>
> Pinduoduo surpassed JD in total shoppers (but not revenue) last year, and finished last quarter with 429.6 million active buyers. JD generates more revenue than Alibaba or Pinduoduo, since it's a direct retailer, but it ranked third in shoppers with 334.4 million active buyers last quarter.
>
> Alibaba needs to keep growing its core commerce business, since its higher-margin revenue subsidizes the growth of its unprofitable cloud platform, digital media, and innovative initiatives businesses.[41]

97. In response to the lawsuits, Alibaba did not deny that it utilized "Choose One of Two" policies or otherwise required exclusivity from, or restricted the trading activity of, vendors. Instead, in a statement on Chinese social media platform, Weibo, on October 14, 2019, the Chairman of Alibaba's Marketing and Public Relations Committee, Wang Shuai—also a member of the Alibaba Partnership—reportedly claimed that the policy was "a normal market practice"[42] and dismissed concerns of "so-called forced exclusivity [as] a non-issue."[43]

98. Wang Shuai (screen name "horsetigerbaba") stated, in full:

---

[41] *Are Alibaba's New Tactics Against Pinduoduo Anticompetitive?*, THE MOTLEY FOOL, January 19, 2020, https://www.fool.com/investing/2020/01/19/are-alibabas-new-tactics-against-pinduoduo-anticom.aspx.

[42] *Alibaba's Tmall slapped with another lawsuit over abuse of market power on the eve of "Double 11"*, KRASIA, November 6, 2019, https://kr-asia.com/alibabas-tmall-slapped-with-another-lawsuit-over-abuse-of-market-power-on-the-eve-of-double-11.

[43] *What is 'forced exclusivity'? And why did it get Alibaba fined $2.8 billion?*, TECHNODE, April 15, 2021, https://technode.com/2021/04/15/what-is-forced-exclusivity-and-why-did-it-get-alibaba-fined-2-8-billion/.

Healthy legs are always bitten by mosquitoes,

1. We genuinely appreciated the public hearing on the matter of Choose One of Two in Beijing. The hype on this topic is already getting tiresome. We respect any decision made by the court and we are not willing to passively cooperate in the bottomless and endless hype of some companies anymore.

2. The so-called "Choose One of Two" has never been a false proposition. If you remember, the 'Choose One of Two' was originally a means used by some enterprises to compete, but this has changed faster than one can take off his pants.

3. Choose One of Two is a normal market practice and a way to expel the bad with the good. The platform had to invest a lot of resources and money to organize large promotional activities, which makes it reasonable to require merchant brands to have equal strength in terms of goods and prices to fully protect the interests of consumers. The platform is not a tycoon and the costs do not get blown in by wind. The resources for the promotion are naturally scarce and can only tilt towards the most sincere and active brand merchants who participate in the promotion. It's the simplest business rules.[44]

> (c) **SAMR Instructs "Choose One of Two" Policies Are Illegal And Orders Companies, Including Alibaba, To Cease Such Practices, Including In A November 5, 2019 Formal Administrative Guidance Meeting**

99.     The SAMR made clear to Alibaba in 2019 that practices or policies requiring exclusive or restrictive dealing violated Chinese law and trained its sights on combatting such anti-competitive practices in e-commerce—including, in particular, "Choose One of Two."

100.     On September 22, 2019, Reuters reported that "***China's top technology hub Hangzhou plans to assign government officials to work with 100 private companies including e-commerce giant Alibaba, according to state media reports, in a move likely to raise concerns over the growing role of the state***." The article further quoted Alibaba's response to the Party initiative: "'We understand this initiative... aims to foster a better business environment in support of Hangzhou-based enterprises. The government representative will function as a bridge to the

---

[44] *New Progress in the case of JD Vs. Tmall for Abuse of Dominant Market Position, Saying No to "Choose One of Two"*, IJIWEI.COM, October 16, 2019; *see* Ex. 1 (English translation).

private sector, and will not interfere with the company's operations,' Alibaba said in a statement."[45]

101.    Then, on November 5, 2019, SAMR called approximately twenty large e-commerce companies, including Alibaba, to a formal "administrative guidance" meeting wherein SAMR (i) specifically instructed that forced exclusivity and preventing merchants from selling products on rival platforms—*i.e.*, Alibaba's "Choose One of Two" practices—were "clearly prohibited" by Chinese law, and (ii) unambiguously ordered the companies, including Alibaba, to cease using such practices.

102.    An administrative guidance meeting is a well-recognized proceeding in China used by the Party and its agencies, like the SAMR, to direct businesses to comply with Chinese laws and regulations. Administrative guidance is a form of law enforcement that has been extensively applied by Chinese market regulators, including the SAIC (SAMR's predecessor), since 2009. Administrative guidance is often characterized as a "soft" form of legal and regulatory enforcement in China, because it typically seeks to obtain voluntary compliance before punitive actions in response to legal/regulatory violations are assessed. The aim of administrative guidance is to clearly instruct companies on how to comply with Chinese law and/or Party directives, and the expectation is that administrative guidance be followed. Thus, if a company or entity fails to accept and follow instructions given in the context of administrative guidance from SAMR or other regulatory agency, and the company continues to violate the law and/or regulators' directives, it will very likely face severe administrative penalties.

103.    On November 5, 2019, the day of the administrative guidance meeting, SAMR

---

[45] *China to send state officials to 100 private firms including Alibaba*, REUTERS, September 22, 2019, https://www.reuters.com/article/us-alibaba-china-party/china-to-send-state-officials-to-100-private-firms-including-alibaba-idUSKBN1W80DO.

posted an article on its official PRC website by Xinhua News Agency, the official state news

agency of the PRC, describing the meeting and SAMR's instructions as follows:

> Xinhua News Agency, Hangzhou, Nov. 5 (Lingyan Qu and Qucheng Xu) The State Administration for Market Regulation held the "Administrative Guidance Forum on Regulating Online Operating Activities" in Hangzhou on November 5, convening more than 20 platform enterprises such as Jingdong, Kwai, Meituan, Pinduoduo, Suning, Alibaba, Yunji, Vipshop, and 111, Inc.

> At the forum, relevant responsible personnel of the State Administration for Market Regulation pointed out that there had been problems that stood out in recent online operating activities, such as the intensification of platform competition with "Choose One of Two" being a prominent problem, sparking concern from all sides. ***The behaviors of "Choose One of Two" and "exclusive trading" in the Internet sector***, which break the order of fair competition and harm the rights and interests of consumers, ***are <u>clearly prohibited</u> by the Electronic Commerce Law and also violate the Anti-Monopoly Law and Anti-Unfair Competition Law, among other laws and regulations. Meanwhile, the market regulatory authorities will conduct anti-monopoly investigations in accordance with the law into the "Choose One of Two" behaviors heavily reported by all parties***.[46]

104. The November 5, 2019 Xinhua News Agency article further stated that the SAMR

instructed the companies that:

> ***Participants in online promotional activities shall strictly comply with relevant laws, take initiative to fulfill obligations, and operate in compliance according to law***. Platforms shall strictly carry out basic obligations such as entity audits and information disclosures, and strictly review qualifications. ***Platforms shall actively carry out platform governance obligations and fulfill their statutory responsibilities***. Platforms shall supervise and urge the operators of promotions to actively fulfill their obligations in promotional activities, and to comply with legal provisions such as "seven-day no-reason returns". Using standard terms to infringe on the legitimate rights and interests of consumers is prohibited. ***Platforms shall compete in a fair and orderly manner. Damaging the business reputations of competitors, and <u>restricting and excluding other operators from carrying out promotional activities</u>, are <u>prohibited</u>***. Platforms shall adopt the necessary

---

[46] *State Administration for Market Regulation Interviews Platform Enterprises and Will Conduct Anti-Monopoly Investigations into "Choose One of Two" Behaviors in Accordance with the Law*, XINHUA NEWS AGENCY, November 5, 2019; *see* Ex. 2 (English translation).

technical means to ensure normal operations.[47]

105.    China Central Television ("CCTV"), one of China's biggest news outlets, reported the following about the November 5, 2019 administrative guidance meeting in a November 8, 2019 newscast:

> [female reporter]: The State Administration for Market Regulation recently summoned a number of e-commerce platform enterprises to a "Symposium on Administrative Guidance for Regulating Online Business Activities", *requiring all platforms to conscientiously fulfill relevant obligations*. Meanwhile, market regulators will, according to law, conduct an anti-monopoly probe into the practices of "pick one from two" and "exclusive dealing" that have caused a public outcry.

> [male reporter]: On November 5, the State Administration for Market Regulation held a "Symposium on Administrative Guidance for Regulating Online Business Activities", which brought together more than 20 platform enterprises, including JD.com, Kuaishou, Meituan, Pinduoduo, Suning, Alibaba, Yunji, and Vipshop. *At the meeting, it was pointed out that the practices of "pick one from two" and "exclusive dealing" in the Internet domain are <u>explicitly prohibited</u> by e-commerce law, and may also run afoul of the anti-monopoly law, the anti-unfair competition law and other laws and regulations. They not only undermine the order of fair competition, but also harm the rights and interests of consumers.*[48]

106.    The CCTV report on the November 5, 2019 SAMR administrative guidance meeting included a video clip of the meeting, featuring Xu Lefu, deputy director of the Anti-Monopoly Bureau of the SAMR, stating the following:

> The practice of "pick one from two" on the part of Internet platforms is essentially an act of excluding competitors by limiting the options of counterparties. It sets up obstacles and barriers for the market, hinders the free flow of resources and information, and contravenes the fundamental philosophy of openness and sharing of the Internet. We believe that the practice of "pick one from two" harms the

---

[47] *State Administration for Market Regulation Interviews Platform Enterprises and Will Conduct Anti-Monopoly Investigations into "Choose One of Two" Behaviors in Accordance with the Law*, XINHUA NEWS AGENCY, November 5, 2019; *see* Ex. 2 (English translation).

[48] *State Administration for Market Regulation: "Choose One of Two" of E-Commerce Platforms Is Suspected To Be Illegal*, CCTV NETWORK, November 8, 2019, https://app.www.gov.cn/govdata/gov/201911/08/450608/article.html; *see* Ex. 3 (English translation of news broadcast).

interests of platforms, partners and consumers.[49]

107. Asian news outlet KrASIA similarly on November 6, 2019, reported that SAMR cautioned it would begin company-specific anti-trust investigations in the e-commerce sector soon to ensure compliance with Chinese law and SAMR's directives:

> On November 5, ahead of the annual shopping extravaganza on November 11, known as "Double 11," the State Administration for Market Regulation held a meeting in the eastern technology hub of Hangzhou, state media The Paper reported, with the participation of China's main online retailers, including Alibaba, JD.com, Meituan Dianping, Pinduoduo and Vipshop.

> During the meeting, *officials underlined that "choosing one out of two," or "exclusive trading" is a behavior violating China's E-commerce Law, as well as the Antitrust Law and Anti Unfair Competition Law*. Besides, *the authority announced that it will start antitrust investigations in the sector soon*, without disclosing a specific timetable.

> Previously, JD.com sued Tmall for RMB 1 billion, arguing the latter has been prohibiting some of its merchants to participate in competitors' sales activities since 2015.

> Recently, the JD-Tmall lawsuit was brought to the Beijing Municipal High People's Court. Vipshop and Pinduoduo have both filed applications for joining the case as a third party member. Alibaba's archrival Tencent is a backer of JD.com, Vipshop, and Pinduoduo.[50]

108. On November 5, 2019, a Chinese digital news outlet ThePaper.cn ("The Paper") reported that "The State Administration for Market Regulation made an 'iron fist' action before "Double Eleven" or Singles Day and publicly *announced that the 'choose one from two' was illegal*."[51] The article reported that on November 1, 2019, in anticipation of the Double 11 shopping festival, local branches of the SAMR in Shanghai and Beijing conducted interviews and

---

[49] *Id.*

[50] *Alibaba's Tmall slapped with another lawsuit over abuse of market power on the eve of "Double 11"*, KrASIA, November 6, 2019, https://kr-asia.com/alibabas-tmall-slapped-with-another-lawsuit-over-abuse-of-market-power-on-the-eve-of-double-11.

[51] *State Administration for Market Regulation Conducts Antitrust Investigation of "Choose One From Two*," THE PAPER, November 5, 2019; *see* Ex. 4 (English translation).

administrative guidance for certain "key e-commerce companies."[52] Following those interviews, the SAMR conducted its November 5, 2019 administrative guidance meeting where SAMR made clear that the "'choose one from two' and 'exclusive transactions' in the Internet field **were definitely prohibited by the electronic commerce law; in addition, they also violated the 'anti-monopoly law,' 'anti-unfair competition law,' and other laws and regulations**."[53]

109.    The November 5, 2019 article in The Paper also referred to a June 2019 "Special Action Plan for Internet Market Supervision (the Net Sword Action)" issued by SAMR and other departments which set forth six clear requirements of internet sales platform operators, including that "[t]he platforms must compete in a fair and orderly manner, and must not damage the business reputation of competitors, and **must not restrict or exclude other operators from conducting promotional activities**."[54]

110.    A separate November 5, 2019 article in The Paper reported that "The State Administration for Market Regulation Conducts Administrative Guidance Forum in Hangzhou on Regulating Online Operating Activities" and further recounted the SAMR administrative guidance meeting as follows, in relevant part:

> Prior to "Double 11", the State Administration for Market Regulation held the "Administrative Guidance Forum on Regulating Online Operating Activities" on November 5 in Hangzhou, convening more than 20 e-commerce platform enterprises including Jingdong, Kwai, Meituan, Pinduoduo, Suning, Alibaba, Yunji, Vipshop, 111, Inc. to attend the seminar. *Aifu Liang, Director of the Department of Supervision and Administration of Online Trading of the State Administration for Market Regulation, said that "Choose One of Two" and "exclusive trading" in the Internet field are <u>clearly prohibited</u> by the Electronic Commerce Law and also violate the Anti-Monopoly Law and the Anti-Unfair Competition Law. The State Administration for Market Regulation will carry out, in accordance with the law, anti-monopoly investigations into the "Choose One*

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

*of Two" behaviors, against which many people have complained*.

During the forum, Jingdong, Pinduoduo, Alibaba and other e-commerce platforms gave speeches respectively. The person in charge of Jingdong said Jingdong resolutely resisted "Choose One of Two" and never restricted merchants from doing promotional activities on other platforms. The person in charge of Pinduoduo said Pinduoduo was under the pressure from "Choose One of Two".

"Choose One of Two" generally means that the platform requires merchants to enter into an exclusive agreement with the platform, or through other methods make the merchants objectively choose only one platform for cooperation and operation.

*The person in charge of Alibaba did not explicitly mention "Choose One of Two". She said*: "Because of the scaling effect, we cooperate with outstanding merchants to provide consumers with the best consumer experience and the lowest prices, while the platform provides these merchants with the best traffic resources, forming a pattern that benefits multiple parties. However, *some competitors still slander the exclusive partnership model. Such behavior is a malicious hype*."

*After the speeches by the enterprises*, Aifu Liang, Director of the Department of Supervision and Administration of Online Trading of the State Administration for Market Regulation, and Lefu Xu, Deputy Director of the Anti-monopoly Bureau, gave speeches respectively. *"'Choose One of Two' and 'exclusive trading' in the Internet field are <u>clearly prohibited</u> by the Electronic Commerce Law and also violate the Anti-Monopoly Law and the Anti-Unfair Competition Law. Both conducts undermine the order of fair competition and damage consumer rights and interests." Aifu Liang said that the State Administration will pay close attention to the relevant behaviors and will carry out anti-monopoly investigations on "Choose One of Two" (against which many people complained) in accordance with the law to create a fair and orderly market environment*.[55]

111.    The CCTV footage of the November 5, 2019 SAMR administrative guidance meeting reflects that the person speaking at the meeting on behalf of Alibaba was Wen Jia, Alibaba's Vice President, Office of the Chairman, Alibaba's President of Public Affairs,[56] and a member of the Alibaba Partnership. Wen Jia was a long-established member of Alibaba leadership,

---

[55] *Director of the Department of Supervision and Administration of Online Trading of the State Administration for Market Regulation: Anti-Monopoly Investigation Will be Conducted on "Choose One of Two" According to the Law*, THE PAPER, November 5, 2019; *see* Ex. 5 (English translation).

[56] https://www.alibabagroup.com/tc/ir/governance_9. Alibaba's "Public Affairs" group encompasses government affairs.

having joined the Company in 2007—the same year as CEO Daniel Zhang. The following are CCTV footage screenshots of Ms. Jia attending and participating in the November 5, 2019 SAMR administrative guidance meeting on behalf of Alibaba:





112.　　Significantly, Alibaba did not deny that it used "Choose One of Two" practices requiring exclusive dealing of its vendors. Instead, consistent with Wang Shuai's statement in

October 2019 downplaying the JD.com and Galanz lawsuits, Alibaba's spokesperson, Wen Jia, seemingly lashed out at those who criticize Alibaba and the practice, diminishing the concerns as "slander" and "malicious hype."

113. Notably, *after* Ms. Wen's speech on behalf of Alibaba, Aifu Liang, Director of the Department of Supervision and Administration of Online Trading of the SAMR reiterated that "Choose One of Two" and exclusive dealing practices were "clearly prohibited" by Chinese law.

114. Following the November 5, 2019 administrative guidance meeting, the SAMR continued to reiterate its instructions. SAMR held another conference in or around early July 2020, again convening around 20 major Chinese e-commerce companies—again including Alibaba—during which the deputy director (minister level) of the SAMR cautioned the companies to:

> thoroughly study and implement the spirit of General Secretary XI Jinping's series of important speeches on the Internet, ***implement the decisions and deployments of the Party Central Committee and the State Council on the development of the Internet economy, strictly regulate company actions to be an example of fair competition, strictly abide by the laws and regulations, [and] implement the platform's legal responsibilities***….[57]

115. The SAMR also reportedly "promoted the supervision of platform enterprises to fulfill their commitments," and at the same time warned that it would "***punish violations of laws such as 'the anti-monopoly law,' 'the anti-unfair competition law,' and 'the electronic business law.'***"[58]

116. In connection with this meeting, the 20 companies in attendance, including Alibaba, all agreed to the "Commitment of Internet Platform Enterprises on Maintaining a Good Market

---

[57] *20 Internet platform companies makes a joint commitment: maintain a good market order and promote the healthy development of the industry*, Baidu, July 17, 2020, Ex. 6 (English translation).
[58] *Id.*

Order and Promoting the Healthy Development of the Industry" (the "Commitment Letter").[59] In the Commitment Letter, Alibaba explicitly acknowledged that "[v]iolations of laws and regulations would be investigation and punished in accordance with the law to maintain a good order in the industry."[60]

117. The Commitment Letter further stated the following, in relevant part:

In order to continuously optimize the business environment, promote the sustainable and healthy development of the platform economy, ***protect the legitimate rights and interests of consumers*** and all parties involved in the platform economy, and ***maintain a good consumption environment and fair competition order in the Internet field, we have fully negotiated the issue and now solemnly make the following commitments to the society:***

1. ***Comply with the laws and regulations***, and promote the orderly development of the industry.

\* \* \*

2. Adhere to the principle of mutual benefit to achieve common development. ***We should abide by the basic principles of voluntariness, equality, fairness, honesty, and credit, respect the independent rights of platform operators, and <u>do not force platform operators to conduct "exclusive cooperation," "exclusive authorization," and should not impose any unreasonable restrictions or make any unreasonable requirements on the selections of platforms by the operators</u>***.

3. Participate in market competition fairly to maintain a good competition order. ***We should not use technical means to influence users' choices, or otherwise obstruct or undermine other operators' legitimately provided network products or normal services***.[61]

---

[59] *Id.*

[60] *Id.*

[61] *Id.*

**(d)** **Following the November 5, 2019 Administrative Guidance Meeting, SAMR Signals an Even Tighter Grip Over Alibaba and Other E-Commerce Companies with Draft Amendments to the AML In Early 2020**

118.     On January 2, 2020, SAMR published draft amendments to the AML, signaling an ever-increasing focus on reining in the market dominance of internet operators. For example, the amendments codified factors used to determine whether an internet company is a dominant actor, for example:

> The AML amendments also codify additional factors that can be used to determine whether Internet companies hold a dominant position. With this amendment, Chinese courts would need to consider network effects, economies of scale, lock-in effects, and the ability of these companies to understand and process relevant data. This amendment could lead to increased scrutiny of Internet companies, at the same time that many antitrust authorities across the globe are increasing their scrutiny of tech companies.[62]

119.     Legal commentators noted the apparent direction of the draft provisions at Alibaba and other large internet companies, for example:

> Since promulgation of the AML in 2008, China's Internet sector has rapidly expanded. Leading Internet companies like Alibaba, Tencent, Baidu, JD, Meituan, Pinduoduo, Ctrip and Didi Chuxing have gained market influence across a variety of sectors including retail, fintech, logistics, sharing economy, food delivery, ride-hailing, healthcare, on-line entertainment and travel. Various practices in the Internet sector may present new challenges for AML enforcement. These practices can include control over and the abuse of consumer information and big data, market concentration whereby competitive markets and even duopolies effectively become monopolies, tying, and the deployment of new technologies which discretely lock in consumers and lock out competitors.[63]

120.     One Chinese legal commentator observed on February 20, 2020 that "monopoly issues in the e-commerce sector have attracted widespread attention. SAMR has launched antitrust

---

[62] *China Antitrust Review 2019*, DAVIS POLK, January 31, 2020, https://www.davispolk.com/sites/default/files/2020-01-31_china_antitrust_review_2019.pdf.

[63] *China Publishes Draft Amendments to Its Anti-Monopoly Law*, WILMER HALE, January 14, 2020, https://www.wilmerhale.com/en/insights/client-alerts/20200114-china-publishes-draft-amendments-to-its-anti-monopoly-law.

investigations into platform enterprises for the alleged 'choose one from two' (exclusive dealing) behaviors."[64]

121.    SAMR continued to crack down on abuse of market dominant positions—particularly, those imposing restrictive selling requirements—throughout 2020. For example, on April 9, 2020, the SAMR fined three domestic pharmaceutical companies Shandong Kanghui Medicine Company Limited ("Kanghui"), Weifang Puyunhui Pharmaceutical Company Limited ("Puyunhui") and Weifang Taiyangshen Company Limited Pharmaceutical ("Taiyangshen"), a total of RMB 325.5 million (approx. USD $46.2 million) for abuse of dominance (*i.e.*, excessive pricing and imposing unfair trading conditions) in the sale of injectable calcium gluconate active pharmaceutical ingredient.[65] At the time, this was the largest ever anti-trust fine in the Chinese pharmaceutical industry.

122.    Still, Alibaba continued to ignore SAMR's explicit instructions and warnings and, instead, continued to use unlawful "Choose One of Two" practices throughout 2020 and throughout the Class Period.

> **4.    Undisclosed Risks Materialize and the Truth of Alibaba's Unlawful and Anti-Competitive Practices Is Revealed In a Series of Partial Corrective Disclosures**

123.    On November 10, 2020, the SAMR published draft rules aimed at curtailing anti-competitive practices on online platforms, including Alibaba's exclusive cooperation requirements. As Bloomberg News reported, "Beijing seeks to curtail the growing dominance of

---

[64] *China's Anti-Monopoly Law Enters Its Second Decade*, KING & WOOD MALLESONS, February 20, 2020, https://www.chinalawinsight.com/2020/02/articles/antitrust/chinas-anti-monopoly-law-enters-its-second-decade/.

[65] *China SAMR Imposes Record Antitrust Fines For Abuse Of Dominance By Pharma API Distributors*, May 12, 2020, https://www.bakermckenzie.com/en/insight/publications/2020/05/china-samr-record-antitrust-fines.

corporations like Alibaba Group Holding Ltd. and Tencent Holdings Ltd.."[66]

124.    Bloomberg News also reported that "The new rules were proposed in accordance with and build on China's Anti-Monopoly Law, which in January [2020] included broad language governing internet companies for the first time. They restrict targeting specific customers through their online behavior, a common practice adopted by players both at home and abroad. ***Under the regulations unveiled by the State Administration of Market Regulation, violators may be forced to divest assets, intellectual property or technologies, open up their infrastructure and adjust their algorithms***."[67]

125.    In response to this news, the price of Alibaba's ADSs fell $23.99 per share from the prior day's closing price, to close at $266.54 per share on November 10, 2020 (a drop of about 8.26%).

126.    The timing of SAMR's announcement—just a week after the Ant IPO was halted and the day before "Singles Day," the biggest shopping day of the year in China—underscores the forcefulness and severity of its message aimed at reining in Alibaba and other large internet companies.

127.    As Business Insider reported on November 10, 2020, "Alibaba's blowout Singles Day sales wasn't enough to stem investor concerns of increased regulatory pressure as shares slid as much as 9% on Tuesday."[68]

---

[66] *China Turns Up Heat on Internet Giants With New Antitrust Rules*, BLOOMBERG NEWS, November 10, 2020, https://www.straitstimes.com/business/economy/china-turns-up-heat-on-its-internet-giants-with-new-antitrust-rules.

[67] *China clampdown on Big Tech puts more billionaires on notice*, BLOOMBERG NEWS, November 10, 2020. https://www.yahoo.com/now/china-turns-heat-internet-giants-051755139.html.

[68] *Alibaba slides 9% as regulatory pressure overshadows Singles Day*, BUSINESS INSIDER NEWS, November 10, 2020, https://markets.businessinsider.com/news/stocks/alibaba-stock-price-regulatory-pressure-overshadows-singles-day-blowout-2020-11-1029788690.

128.     Bloomberg wrote on November 12, 2020, regarding the November 10, 2020 anti-trust rules, specifically calling out Alibaba and observing that "Big Tech has been aggressive and unwilling to share profits with small businesses on their sites. ***In the antitrust draft, Beijing placed a heavy focus on the so-called 'pick one of the two' tactic, the practice of forcing merchants into exclusive arrangements with one platform.***"[69]

129.     And a November 12, 2020 Seneca ESG analyst report observed that in a November 6, 2020 SAMR meeting with 27 companies, preceding the November 10, 2020 announcement, SAMR "***reiterated*** that online platforms are prohibited from abusing their dominant market positions and forcing merchants to 'choose one between two'".

130.     Then, after the close of the market on December 23, 2020, Chinese authorities revealed that they had launched an antitrust investigation into Alibaba's monopolistic practices. As The New York Times reported, "In a terse statement, the State Administration for Market Regulation said it had started the investigation amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants or other users of its platforms."[70]

131.     On this news, the price of Alibaba's ADSs fell $34.18 per share (approximately 13%)—marking the Company's biggest one-day decline since going public in 2014.

132.     Analysts noted "The action has been simmering for a while, after the top leadership

---

[69] *Why China Risked $290 Billion to Rein In Big Tech*, BLOOMBERG OPINION, November 12, 2020.

[70] *China Opens Antitrust Investigation Into Alibaba, the E-commerce Giant*, THE NEW YORK TIMES, December 23, 2020, https://www.nytimes.com/2020/12/23/business/alibaba-antitrust-jack-ma.html.

several times emphasized enforcement of the antitrust law."[71]

      **5.    Post-Class Period Events: SAMR Determines Alibaba Had Been Illegally Abusing Its Market Dominance and Restricting Competition Through Various Exclusive Dealing Requirements and Policies Since 2015, Slaps Alibaba With The Largest Ever Anti-Trust Fine In PRC History**

     133.    On or about April 6, 2021, SAMR published a notice of its findings of Alibaba's AML violations, again ordered Alibaba to "operate in compliance with the law," and announced it had made its "decision of administrative penalty according to the law."[72] Among other things, SAMR ordered Alibaba to no longer "take advantage of technical means, platform rules, data, or algorithms, implement monopoly agreements, or abuse your company's dominant market position to exclude or restrict market competition."[73] SAMR further ordered Alibaba to "provide operators on the platform and consumers with comprehensive, truthful, accurate, and timely transaction information in accordance with the law and fully safeguard operators' and consumers' right to be informed, right to fair trade, and right to free choice."[74] Alibaba accepted the penalty and waived its rights to defend itself or request a hearing following the penalty.

     134.    On or about April 10, 2021, the SAMR published its full report and letter of administrative penalties against Alibaba.[75] Among other things, the SAMR's full report revealed that Alibaba, incredibly, challenged SAMR's characterization of Alibaba as a dominant actor. The

---

[71] *Reaction to China's antitrust probe into Alibaba Group*, REUTERS, December 24, 2020, https://www.reuters.com/article/uk-china-antgroup-quotebox/reaction-to-chinas-antitrust-probe-into-alibaba-group-idUKKBN28Y0M7.

[72] Administrative Guidance Letter of the State Administration for Market Regulation, April 6, 2021; *see* Ex. 7 (English translation).

[73] *Id.*

[74] *Id.*

[75] Ex. 8 (SAMR Letter of Administrative Penalties dated April 10, 2021) (English translation).

report clarified that the relevant marketplace to consider when assessing whether Alibaba is a dominant actor is the online retail platform services market.[76] The SAMR also confirmed, over Alibaba's protestation, that Alibaba indeed has a dominant position because, among other things:

> From 2015 to 2019, the shares of [Alibaba's] online retail platform service revenue of the combined service revenue of the ten major online retail platforms within the territory of China were 86.07%, 75.77%, 78.51%, 75.44% and 71.17%, respectively. **Second, in terms of the merchandise volume of the platforms.** The merchandise volume of the platforms refers to the amount of merchandise transactions on online retail platforms, and is a comprehensive reflection of the operating status of all operators and consumer consumption on the platforms. From 2015 to 2019, the merchandise volume on [Alibaba's] online retail platforms made up 76.21%, 69.96%, 63.58%, 61.70% and 61.83%, respectively, of the total online retail merchandise volume within the territory of China.[77]

135.    Notably, while Alibaba indeed boasted the greatest share of platform service revenue and merchandise volume as compared to its competitors from 2015 to 2019, the figures also reflect a year-over-year trend creeping downward in both metrics—a trend that Alibaba tried to fend off with exclusive dealing requirements.

136.    The SAMR report also detailed the findings of Alibaba's legal violations, including its abuse of its dominant market position and its restriction of market competition.[78] SAMR stated:

> *since 2015, in order to restrict the development of other competitive platforms, and maintain and consolidate its market position, [Alibaba] has abused its dominant position in the online retail platform services market within the territory of China, implemented "Choose One of Two" to restrict on-platform operators to carrying out transactions only with [Alibaba], by means such as prohibiting them from opening shops and participating in promotional activities on other competitive platforms*. It also used various incentives and penalties to ensure the implementation of the practice. These actions are in violation of the provision of Article 17 (1) (iv) of the [AML].[79]

---

[76] *Id.* at 1-5.

[77] *Id.* at 6 (emphasis in original).

[78] *Id.* at 8-15.

[79] *Id*. at 8.

137.    The SAMR further detailed the reasons *why* Alibaba relied on exclusive dealing practices, and *how* it implemented them:

> *As an online retail platform service provider, the operators on [Alibaba's] platforms are a key element in attracting consumers and improving competitiveness. The more operators gathered on the platform, the more consumers it can attract, creating a positive feedback effect and enabling the platform to maintain its competitive advantage and market power.* Additionally, different categories of on-platform operators make different degrees of contributions to the competitiveness of the platform. In general, the higher the operator's brand awareness and market share, the greater the contribution to the competitiveness of the platform. [Alibaba] classified the on-platform operators into seven levels, from high to low, including SSKA, SKA, KA, core middle, middle, long tail and bottom, based on factors such as sales growth, merchandise capability, user operation, brand power, service capability and compliance operation, among which operators of levels KA and above (hereinafter collectively referred to as "core merchants") are the key competitive edge of online retail platforms. *In order to enhance its own competitiveness and weaken the market power of other competitive platforms, [Alibaba] required the core merchants not to open shops on other competitive platforms*.

138.    In addition, the SAMR report make clear that Defendants not only *knew* that Alibaba utilized exclusive dealing policies and practices, Alibaba "**directly prescribes in the agreements that opening shops on other competitive platforms is prohibited**" and otherwise "**verbally required core merchants not to operate on other competitive platforms.**"[80] In other words, illegal exclusive dealing was a central aspect of its core agreements with vendors:

> Since 2015, in the various agreements with some core merchants, such as the *Strategic Merchant Framework Agreement*, the *Joint Business Plan*, and the *Strategic Cooperation Memorandum*, [Alibaba] has explicitly provided that the core merchants are not allowed to enter other competitive platforms and are to focus on conducting online retail business on [Alibaba's] platforms, or that the merchants are to use [Alibaba's] platforms as the only online sales channels within the territory of China, to rule out conducting transactions on their own or by agents through other online retail platforms, and to require its consent to change the existing online retail channel, so as to achieve the purpose that core merchants only operate on its platforms.[81]

---

[80] *Id.* at 9 (emphasis in original).

[81] *Id.* at 9.

139.    In addition, the SAMR report found that Alibaba's written and verbal policies also

explicitly prevented merchants from participating in promotional activities on other platforms:

> Since 2015, in the various agreements with some core merchants, such as the *Strategic Merchant Framework Agreement*, the *Joint Business Plan* and the *Strategic Cooperation* Memorandum, [Alibaba] has explicitly provided that the core merchants are not allowed to participate in promotional activities organized by other competitive platforms, or conduct promotions by themselves through other online retail platforms without the consent of [Alibaba], so as to lower the influence of other competitive platforms.[82]

140.    The SAMR made the following finding about Alibaba's "Choose One of Two"

practices, specifically:

> **[Alibaba] has adopted various incentive and penalty measures to ensure the implementation of the "Choose One of Two" requirements.** [Alibaba] encourages the operators on its platforms to implement the "Choose One of Two" requirements through incentives such as traffic support, while it also monitors the on-platform operators on their shop openings or participation in promotional activities on other competitive platforms through various methods including manual inspections and monitoring with Internet technology. With the help of market power, platform rules, and technical means such as data and algorithms, [Alibaba] has imposed penalties, including the reduction of resource support for promotional activities, disqualification from participating in promotional activities, search downgrading, and the cancellation of other significant rights and benefits on the platforms, on on-platform operators who do not implement its relevant requirements. The above penalties have significantly reduced the attention from consumers to the penalized on-platform operators, resulting in a significant adverse impact on their regular operations. Additionally, these penalties have a strong deterrent effect, forcing more operators on the platforms to implement the "Choose One of Two" requirements put forward by [Alibaba].[83]

141.    SAMR further described some of Alibaba's unlawful "Choose One of Two"

practices as follows:

> During large promotional activities, the Party [i.e., Alibaba] required the operators on its platforms to withdraw from promotional activities on other competitive platforms, among other things, and implemented penalty measures against on-platform operators, such as the cancellation of promotion resources and search downgrading, which seriously affected the regular operations of the on-platform

---

[82] *Id.* at 10.

[83] *Id.* at 10 (bold emphasis in original).

operators, resulting in a lack of stability and fairness in trading and directly harming the legitimate interests of the on-platform operators. By requiring the operators on its platform to open shops only on its platforms or participate in promotional activities only on its platform, the Party caused the loss of potential revenue that the operators could have earned from operating on other platforms.[84]

142.    Alibaba was ordered to "carry out comprehensive rectification and reform in the areas such as strict implementation of the main responsibilities of the platform enterprises, strengthening internal control and compliance management, and protecting the rights and interests of consumers, so as to operate in compliance with the law." In addition, SAMR imposed a fine in the amount of 4% of Alibaba's 2019 sales in China, equivalent to approximately $2.8 billion.[85]

143.    On the afternoon of Friday, April 9, 2021, *The New York Times* reported that SAMR had announced it would impose a $2.8 billion fine on Alibaba for its legal violations, and further explained that:

> China's market watchdog in December began investigating whether Alibaba had broken the country's antimonopoly law by preventing merchants from selling their goods on other shopping platforms. On Saturday, the regulator said it had concluded that Alibaba's exclusionary practices had hindered competition in online retail, affected innovation in the internet economy and harmed consumers' interests.[86]

144.    According to the article, it was the largest ever anti-monopoly fine by Chinese regulators, far exceeding the $975 million antitrust penalty that China imposed on American telecommunications giant, Qualcomm, in 2015.[87]

145.    NPR similarly reported on the fine on April 10, 2021, reporting that "The Chinese

---

[84] *Id.* at 14.

[85] *Id.* at 16.

[86] *China Fines Alibaba $2.8 Billion in Landmark Antitrust Case*, THE NEW YORK TIMES, April 9, 2021, updated September 1, 2021, https://www.nytimes.com/2021/04/09/technology/china-alibaba-monopoly-fine.html.

[87] *Id.*

government says it is issuing a $2.8 billion fine on the e-commerce company Alibaba Group for violating its anti-monopoly regulations."[88] The article further reported that "[i]n a statement Saturday, China's State Administration for Market Supervision described the company's behaviors as having "eliminated and restricted competition in the online retail platform service market" as well as having "infringed on the business of the merchants on the platform."[89]

146.    In an April 10, 2021 "Letter to Our Customers and to the Community," Alibaba stated "Today Alibaba Group received the Administrative Penalty Decision issued by the State Administration for Market Regulation (SAMR) of the People's Republic of China. We accept the penalty with sincerity and will ensure our compliance with determination." The Alibaba Letter also stated that "The penalty issued today served to alert and catalyze companies like ours," and "It is an important action to safeguard fair market competition and quality development of Internet platform economies."[90]

147.    In an April 11, 2021 press release filed with an April 12, 2021 Form 6-K, Alibaba stated "In the Decision, the SAMR found that Alibaba Group had violated Article 17(4) of the Anti-Monopoly Law of the People's Republic of China (the "Anti- Monopoly Law"). Article 17(4) of the Anti-Monopoly Law states that a business operator that has a dominant market position is prohibited from restricting business counterparties through exclusive arrangements without justifiable cause." Alibaba's April 11, 2021 press release also stated "We accept the penalty with sincerity and will ensure our compliance with determination. To serve our responsibility to society,

---

[88] *China Fines Alibaba $2.8 Billion For Breaking Anti-Monopoly Law*, NPR, April 10, 2021, https://www.npr.org/2021/04/10/986112628/china-fines-alibaba-2-8-billion-for-breaking-anti-monopoly-law.

[89] *Id.*

[90] https://www.alizila.com/a-letter-to-our-customers-and-to-the-community/.

we will operate in accordance with the law with utmost diligence, continue to strengthen our compliance systems and build on growth through innovation."

148.    While the fine was substantial—representing about 4% of Alibaba's 2019 sales and about 14% of Alibaba's FY 2020 net income—analysts and investors alike were relieved to finally have clarity. "Despite the record fine amount, we think this should lift a major overhang on BABA and shift the market's focus back to fundamentals," Morgan Stanley wrote in a note on Sunday, April 11, 2021. Indeed, despite its record amount, the fine could have been even larger; the maximum fine for Alibaba's AML violations was 10% of sales.

149.    On April 12, 2021, Alibaba hosted a business update call to discuss the fine and SAMR's findings. Speaking on behalf of the Company, Joe Tsai explained:

> The penalty decision was the result of an investigation that was commenced in December 2020, relating to activities that would be prohibited under the AML. Specifically, under Article 17, Clause 4 of the AML, a business operator that has a dominant market position is prohibited from restricting business counterparties by requiring exclusive arrangements without justifiable cause. The penalty decision describe the results of SAMR's investigation and concluded that Alibaba was in violation of Article 17, Clause 4 of the AML.

150.    Joe Tsai further explained that in connection with Alibaba's violation of the AML, the SAMR issued two main actions against Alibaba: "Number one, Alibaba as a platform operator shall not restrict merchants from doing business or running promotions on competitor platforms." And, "[t]he second action that the SAMR imposed on Alibaba is a monetary penalty of RMB18.2 billion, or approximately $2.8 billion."

151.    Finally, Alibaba did not dispute any of the characterizations or findings made by the SAMR about Alibaba's business practices and did not contest the legal violations. Instead, Alibaba admitted to the conduct and, on behalf of Alibaba, Tsai pledged that the Company would now comply with the law:

> In response to the penalty decision, we have publicly stated that we accept the

penalty with sincerity, and will ensure our compliance with determination. Thus, we do not plan to appeal the penalty decision. We have also said that to serve our responsibility to society, we will operate in accordance with law, with utmost diligence, continue to strengthen our compliance systems and build on growth through innovation.

152.    In Alibaba's FY 2021 earnings call held on May 13, 2021, Zhang similarly stated:

We have stated that we accept the penalty with sincerity and will ensure our compliance with determination. As a result of the anti-monopoly fine of RMB 18.2 billion leveled by the SAMR, we recorded an operating loss this quarter for the first time since our history as a public company.

The penalty decision motivated us to reflect on the relationship between a platform economy and society as well as our social responsibilities and covenants. We believe the self-reflection and adjustments we've made will help us better serve our community of consumers, merchants and partners and position us well in the future.

153.    In a June 2021 interview of Wu Zhenguo, Director General, Anti-Monopoly Bureau of the State Administration for Market Regulation (SAMR), People's Republic of China, Mr. Wu highlighted SAMR's enforcement action against Alibaba for its "Choose One of Two" exclusive dealing policies, stating "We imposed an administrative penalty of RIO 18.228 billion against Alibaba Group for its monopolistic conduct of forcing merchants to 'choose one from two' in the online retail platform service market in China, and completed 13 cases relating to the unlawful implementation of a concentration by platform businesses such as Alibaba and Tencent, which marks China's contribution to the global discussions of the regulation of the platform economy."[91]

154.    During the same interview, Wu Zhenguo expanded on SAMR's Alibaba investigation:

ANTITRUST SOURCE: Is there any progress you can share about SAMR's investigation into Alibaba and other digital players? What are the general considerations of China's anti-monopoly law enforcement on platform economy?

---

[91] *Interview with Wu Zhenguo, Director General, Anti-Monopoly of the State Administration for Market Regulation (SAMR), People's Republic of China*, THE ANTITRUST SOURCE, June 2021, www.antitrustsource.com.

WU ZHENGUO: In response to a tip-off, the SAMR followed the relevant laws and, on December 24, 2020, initiated an investigation into Alibaba Group's suspected monopolistic conducts including the "choose one from two" practice. Digital platforms have complex business models, intensive expertise, and diverse competition forms. This case was the world's first monopoly case in online retail platform services, and was quite challenging. In the process of case investigation and handling, we focused on studying and grasping the development patterns of the digital platform economy. We conducted extensive investigations and evidence collection to ascertain the facts of the case. We organized in-depth research and demonstrations, and fully listened to the opinions of the enterprises involved to protect their legitimate rights.

On April 10, 2021, we issued an administrative penalty decision in accordance with the law, which ordered Alibaba Group to stop the illegal conduct and impose a fine of RMB 18.228 billion, representing 4 percent of RMB 455.712 billion, i.e., its 2019 domestic sales value.[92]

155.    Alibaba's sales and growth suffered when Alibaba finally ceased its illegal practice of forced exclusivity, with the Company reporting lower than expected sales in 2020 and its share of China's e-commerce market dropping below 50% for the first time in the Company's history. News reports observed that Alibaba had "lost access to some of the techniques that is has used to maintain its dominance," specifically citing the need to abandon exclusivity requirements:

Alibaba recently announced lower-than-expected sales figures for 2020, leading us to revise down our calculations for the company both last year and going forward. *This revision has dropped Alibaba's share of the China ecommerce market below 50% for the first time in its history*.

China's ecommerce titans, and China's ecommerce market in general, are maturing, and it is becoming harder to produce the outlandish growth figures of years past. And if organic slowing isn't enough of a concern, China's economic regulators are on the prowl as well, which doesn't bode well for the continued domination of the largest players.

Alibaba has been in the news for all the wrong reasons in China for nearly a year, and the situation shows little sign of improving. *Alibaba and its affiliated properties—including most notably Ant Financial and AliPay—have been squarely in the crosshairs of China's financial regulators and antimonopoly watchdogs since mid-summer 2020*, and a massive corporate restructuring remains in process.

---

[92] *Id.*

Enormous fines have been levied and paid, IPOs have been canceled, senior-most executives have been reshuffled, and Alibaba founder Jack Ma has been largely silenced as a public figure.

No one knows what the ecommerce portion of the Alibaba empire will look like once everything shakes out, but **the company will certainly have lost access to some of the techniques that it has used to maintain its dominance**.[93]

156.     Indeed, with vendors now free to sell across multiple platforms, Alibaba faced new competitive threats that impacted its business.

157.     On May 10, 2021, Seeking Alpha reported on the impact on Alibaba as merchants would be able to sell across rival platforms

Recent developments show that the Chinese government would not give any leeway to any company when it comes to misconduct. According to the State Administration for Market Regulation (SAMR), besides Alibaba, other Chinese internet giants such as Tencent Holding (OTCPK:TCEHY), Meituan (MEIT), as well as other e-commerce companies including Pinduoduo (PDD), JD.com (JD) were among the companies hauled in for a meeting with the antitrust watchdog, cyberspace administration and the tax authorities. **The regulators made clear their stance against the anti-competitive behavior of forcing merchants to pick one platform, abusing their market position and misusing consumer data. The meeting stressed the requirements for these companies to heed their advice and conduct self-inspections of their business practices in the coming month and to publicly disclose their commitment to complying with the laws governing fair business practices.**

* * *

**We expect the impact of the Alibaba specifically to be negative in terms of potential market share leadership erosion as merchants would be able to sell on its competitors' platforms**, potentially redirecting some activity there.[94]

158.     Seeking Alpha reported further on the ongoing impact of Alibaba losing the ability to force vendor exclusivity in a March 23, 2022 post titled "*Alibaba: Lost Its Growth, Lost Its*

---

[93] *Is Alibaba losing its dominance in China?*, INSIDER INTELLIGENCE, July 29, 2021, https://www.emarketer.com/content/alibaba-losing-its-dominance-china.

[94] *Alibaba: Resiliency Amid Increased Regulatory Clampdown*, SEEKING ALPHA, May 10, 2021, https://seekingalpha.com/article/4426681-alibaba-resiliency-amid-increased-regulatory-clampdown.

*Value*":

> Alibaba still dominates the Chinese e-commerce market with Taobao, the country's largest C2C platform and Tmall. Notwithstanding, ***the competition faced by the company continued to increase with its market share eroding in 2021***.
>
> * * *
>
> Overall, while Alibaba had experienced tremendous growth in its China e-commerce segment, we see it continuing to face mounting regulatory risks based on our analysis of the company with a net negative impact. As we forecasted the China e-commerce growth to slow and adjusted for regulatory risks, ***we see Alibaba's core e-commerce revenues in China slowing down at a 5-year forward rate of 9.7% as it loses market share to fierce competitors***.[95]

### B.     Defendants Disregard and Conceal Material Regulatory and Political Risks Relating to the Ant IPO

#### 1.     Background of Ant Group

159.    Ant Group traces its origins to Alibaba's launch of Alipay in December of 2004. Alibaba created Alipay in the relatively early days of online shopping in China to facilitate transactions by providing digital payment services on Alibaba's e-commerce platforms (much as PayPal was to eBay).

160.    In 2011, Alibaba spun off Alipay into a new company called Zhejiang Alibaba E-Commerce Company, to be wholly-owned by PRC citizens in order to enable Alipay to obtain a payments business license. Shortly thereafter, that name was changed to Ant Financial, and then changed again to Ant Small and Micro Financial Group Services Co. Ltd. in December 2016.

161.    By the time of the Class Period, Ant's services had grown tremendously, to include facilitating payments for online shopping, sending payments to people (like Venmo), storing money in a checking account, obtaining loans, opening credit cards, making investments, and buying insurance. During the Class Period, more than 1 billion Chinese citizens used Ant's

---

[95] *Alibaba: Lost Its Growth, Lost Its Value*, SEEKING ALPHA, March 23, 2022, https://seekingalpha.com/article/4497306-alibaba-stock-lost-growth-value-buy.

services.

162.     At all relevant times hereto, two of Ant's main products were and are its online consumer lending platforms Huabei (Just Spend), which functions like a credit card, and Jiebei (Just Lend), a loan platform. According to a November 4, 2020 Bloomberg News article, "Ant helped provide small unsecured loans to about 500 million people over the past year through two platforms: Huabei (Just Spend) and Jiebei (Just Lend). The former focuses on quick consumer loans for small purchases, while the latter finances everything from travel to education. Ant typically charges annualized interest rates of about 15% to consumers. Its more than 20 million small business borrowers pay an average lending rate of about 11%, almost double the average 5.94% small borrowers can get from banks.

163.     Ant's expansion from a mere electronic payment facilitator to a credit and lending institution was the driving force of its growth in the period leading up to the planned IPO, with nearly 40% of Ant's revenue during the six months ending June 30, 2020 reportedly derived from its CreditTech division (its loan/credit division).

164.     But despite its focus on financial services, Ant purposely attempted to position itself as a technology company rather than a financial company. Shortly before the IPO, Ant dropped "Financial" from its name and rebranded itself Ant Group Co., Ltd. in July 2020 ("Ant Group").

### 2.     The Ant IPO

165.     On July 20, 2020, both Alibaba and Ant Group announced that Ant Group had commenced the process of its IPO. Ant Group filed a draft prospectus with the Hong Kong Stock Exchange on August 25, 2020 and the final prospectus on October 27, 2020 (the "Ant Group IPO Prospectus" or "Ant IPO Prospectus"). Ant's shares were to begin trading on the Shanghai Stock Exchange STAR Market and Hong Kong Stock Exchange on November 5, 2020.

166.    It was estimated that Ant's valuation would reach approximately $300 billion following the IPO, putting Ant in the league of the world's most established banks. For example, at the time of the planned Ant IPO, JP Morgan's market cap was approximately $293 billion. Had the Ant IPO proceeded, Alibaba's Ant stake could have been worth over $100 billion.

167.    As of October 30, 2020, the day subscription for the Ant IPO closed, it was reported that "Retail investors, on October 30, bid for a record $3 trillion worth of shares in Ant's dual listing, the equivalent of Britain's gross domestic product, as they bet on demand for Ant's financial technology services in China."[96]

### 3.    Ma and Alibaba's Controlling Interest In Ant

168.    Pursuant to a share and asset purchase agreement between Ant and Alibaba (the "SAPA"), beginning in September 2019, and continuing at all relevant times prior to and during the Class Period, Alibaba, through its wholly-owned subsidiaries Hangzhou Alibaba and Taobao Holding Limited, owned a 33% equity interest in Ant.

169.    On its financial statements, Alibaba recognizes its investment in Ant as an asset and records Ant-related income as equity income.

170.    According to Alibaba's 2020 Form 20-F, "As of March 31, 2020, Junhan and Junao held approximately 50% of Ant Group's equity interest, [Alibaba] held 33% and other shareholders held the remaining equity interest." Moreover, "Jack Ma is able to exercise the voting power of Junao and Junhan, two of the major shareholders of Ant Group, because he owns 100% of the general partner of both Junao and Junhan." According to the Ant Group IPO Prospectus, "Jack Ma has ultimate control over [Ant Group]."

---

[96] *Anti-monopoly charges against Alibaba: What led to the probe?*, MINT, December 24, 2020, https://www.livemint.com/companies/news/anti-monopoly-charges-against-alibaba-what-led-to-the-probe-11-facts-11608783276169.html.

171.    According to the Ant Group IPO Prospectus, "Under the SAPA, Alibaba has certain special rights including but not limited to the right to recommend a certain number of our Directors, customary information rights, approval rights over the size of our Board and certain actions of our Company and Alipay China."

172.    The Ant Group IPO Prospectus further stated the following of Alibaba's continued involvement in and control over Ant Group:

> Alibaba is a major Shareholder of ours and is considered to be a Controlling Shareholder of the Company strictly in accordance with the definition under the Hong Kong Listing Rules only. Mr. Jack Ma, a Controlling Shareholder of the Company, is also the lead founder of Alibaba and a partner of the Alibaba Partnership. In addition, three members of Alibaba's senior management also serve as our Directors (including two Directors nominated by Alibaba).

173.    The three members of Alibaba's senior management who also serve as Ant Directors are: Alibaba co-founder and Executive Vice Chairman, Joseph C. Tsai (who serves on Ant Group's Audit Committee); Alibaba Director, Eric Xiandong Jing (who serves as Ant Group's Executive Chairman); and Alibaba Chief Technology Officer, Li Cheng (Ant Group Director).

174.    In addition, numerous Ant Group executives were members of the Alibaba Partnership during the Class Period, further establishing the overlap of the entities. Those members are: Simon Xiaoming Hu, Ant Group's CEO and Director; Felix Xi Hu, Ant Group Vice President; Eric Xiandong Jing, Ant Group's Executive Chairman; Xingjun Ni, Ant Group's Chief Technology Officer; Lucy Lei Peng, Ant Group Director; Sabrina Yijie Peng, Ant Group's Chief Marketing Officer; Sam Songbai Zeng, Ant Group's Chief People Officer; and Angel Ying Zhao, Ant Group's President of International Business. Of 36 members of the Alibaba Partnership, eight (over 22%) were Ant Group executives. Ant Director, Lucy Peng, and Ant Executive Chairman, Eric Jing, also served on the exclusive partnership committee of the Alibaba Partnership (along with Jack Ma, Joseph Tsai, Jian Wang, and Daniel Zhang) during the Class Period.

175.     In addition to Alibaba being a controlling shareholder of Ant Group, and exerting influence and control over Ant via the Alibaba Partnership, Alibaba also continued to drive a material amount of Ant Group's revenue in the lead up to the Ant IPO. According to the Ant Group IPO Prospectus, in 2017, 2018, 2019 and the six months ended June 30, 2020, Ant Group generated revenues of RMB5,816 million, RMB7,849 million, RMB9,773 million and RMB4,470 million, respectively, from Alibaba, representing approximately 8.9%, 9.2%, 8.1% and 6.2% of Ant Group's revenues for the respective periods.[97]

176.     In turn, Alibaba also continues to derive a significant financial benefit from its 33% stake in Ant Group. For FY 2020, Alibaba recognized recorded RMB71.6 billion (US$10.1 bn as of July 9, 2020) of investment income from its stake in Ant Group.

177.     The continued relationship between Alibaba and Ant is straight forward: "Ant's payments platform is used for most of Alibaba's online transactions, and its lending services drive consumption on [Alibaba's] sites."[98]

178.     Alibaba explained the ongoing relationship with Ant in its 2020 Form 20-F as follows: "Alipay provides payment processing and escrow services to us. These services enable settlement of transactions on our marketplaces through a secure payment platform and escrow process. We pay Alipay a fee for these services on terms that are preferential to us. These preferential terms enable us, with certain exceptions, to make available basic payment processing and escrow services to consumers and merchants on our marketplaces free of charge. We believe that these services provide us with a competitive advantage that otherwise would be diminished

---

[97] These amounts equate to approximately USD $930.5 mm, $1.255 bn, $1.563 bn, and $715.2 mm, respectively, based on current exchange rates.

[98] *Jack Ma Goes Quiet After Ant Group's Spectacular Undoing*, BLOOMBERG NEWS, December 22, 2020, https://news.bloomberglaw.com/crypto/jack-ma-goes-quiet-after-ant-groups-spectacular-undoing?context=article-related.

without the preferential terms of the Alipay commercial agreement."

179.    Alibaba's 2020 Form 20-F further stated the following about the importance of Ant and Alipay to Alibaba's business:

> Given the significant transaction volume on our platforms, Alipay provides convenient payment processing and escrow services to us through contractual arrangements on preferential terms. These services are critical to our marketplaces and the development of our digital economy. In the twelve months ended March 31, 2020, approximately 70% of the GMV of our China retail marketplaces was settled through Alipay's escrow and payment processing services. We rely on the convenience and ease of use that Alipay provides to our users.

**4.      Ant Skirts Banking Rules, Regulatory Tensions Build as PRC Financial Regulators Work to Rein In Fintech In the Lead-UP to the Ant IPO**

180.    The China Banking and Insurance Regulatory Commission ("CBIRC") regulates and supervises the banking and insurance sectors in China in accordance with PRC laws and regulations. Among other things, the CBIRC is responsible for research and strategic planning on regulatory reforms; developing rules for financial consumer protection; issuing banking licenses and approving a business's scope of banking, financial, and insurance institutions in accordance with PRC law; supervising corporate governance; conducting on-site examinations and off-site surveillance on banking and insurance institutions; and cracking down on illegal financial activities.

181.    The People's Bank of China ("PBOC") is the central bank of the PRC responsible for carrying out monetary policy and regulation of financial institutions in mainland China, as determined by People's Bank Law and Commercial Bank Law. It is a cabinet-level executive department of the Party's State Council.

182.    Both CBIRC and PBOC served as Ant's regulators prior to and during the Class Period.

183.    Partially in an effort to skirt onerous PRC banking regulations and to avoid the ire

of regulators if Ant Group were seen to be in competition with PRC-controlled state banks, Alibaba positioned Ant Group as a technology company instead of a financial institution.

184.    Ma reportedly cultivated a culture of skirting the rules to grow his massive internet companies, including Ant. According to former Ant insiders, "In the early days, when Alipay operated in a legal gray zone-private companies were technically not allowed in finance-Ma encouraged his employees to press on, telling them, 'If someone has to go to jail, I'll go.'"[99]

185.    Early in Ant's history, Ma reportedly "drew the ire of banks, which held emergency meetings to discuss tactics to curb Ant's expansion. Niu Wenxin, a prominent commentator for China Central Television, attacked Ant on his blog, labeling it a 'vampire' and 'financial parasite.' Soon regulators, concerned that state-backed banks would be crippled by an exodus of deposits and by the huge amount of money sloshing around outside the central bank's purview, rushed in to curb inflows. Ma blasted out a pithy public statement accusing banks of tampering with people's freedom on where to put their deposits. But he underestimated the power of China's state-owned enterprises, whose entreaties to regulators resulted in rules restraining Ant's activities."[100]

186.    Commentators noted that the tenuous "peace" that Ma had obtained with Chinese regulators in more recent years "was broken ***in September*** of this year [2020] in the lead-up to Ant's IPO. Heavyweight investors lined up for a piece of the financial-services powerhouse at a

---

[99] *Ant Alumni Who Cashed Out Before IPO Flop Have Big Ambitions*, BLOOMBERG NEWS, November 18, 2020, https://www.bloomberg.com/news/features/2020-11-18/ant-alumni-who-cashed-out-before-ipo-flop-have-big-ambitions. A December 22, 2020 Bloomberg News article similarly reports that Jack Ma recalled the line "If someone has to go to jail, I'll go" at the World Economic Forum in 1998. *Jack Ma Goes Quiet After Ant Group's Spectacular Undoing*, BLOOMBERG NEWS, December 22, 2020, https://news.bloomberglaw.com/crypto/jack-ma-goes-quiet-after-ant-groups-spectacular-undoing?context=article-related.

[100] *Jack Ma Goes Quiet After Ant Group's Spectacular Undoing*, BLOOMBERG NEWS, December 22, 2020, https://news.bloomberglaw.com/crypto/jack-ma-goes-quiet-after-ant-groups-spectacular-undoing?context=article-related.

time when China's banks were sacrificing profits to support an economy ravaged by the coronavirus pandemic."[101]

187.    Based on the various financial services Ant provided, the Chinese government viewed Ant as functioning like a bank, and thus moved to regulate it like a bank. Defendants knew this problem was coming—indeed, PBOC reportedly started investigating Ant's lending practices in the summer of 2020[102]—and Defendants thus tried to portray Ant as a tech company rather than a financial one.

188.    For example, the Letter From Chairman, attached to the Ant IPO Prospectus, claimed "Today, Ant Group is not a financial institution, nor simply a mobile payments company. We are a technology company using the best technologies and resources to empower banks and financial institutions to serve every consumer and small business."

189.    But the growth engine of Ant in the lead-up to the Ant IPO was its credit division— which offers a credit card as well as micro-loans (without collateral) through Alipay—not its e-payment services. As Ant disclosed in its IPO Prospectus, Ant's credit division had grown rapidly over the year preceding the IPO, and during the Class Period made up 40% of Ant's revenue. Ant's lending business was its value driver, not its payments app, and Ant profited handsomely from those financial services.

190.    Indeed, Ant operated as a bank by performing many traditional banking services like maintaining checking accounts and extending loans, credit cards, and other methods of

---

[101] *Jack Ma Goes Quiet After Ant Group's Spectacular Undoing*, BLOOMBERG NEWS, December 22, 2020 https://news.bloomberglaw.com/crypto/jack-ma-goes-quiet-after-ant-groups-spectacular-undoing?context=article-related.

[102] *Jack Ma's Ant Remains in Regulators' Crosshairs Ahead of Giant IPO*, THE WALL STREET JOURNAL, August 27, 2020, https://www.wsj.com/articles/jack-mas-ant-remains-in-regulators-crosshairs-ahead-of-giant-ipo-11598524447?mod=article_inline

financing, but billed itself as a "pure-play" financial technology company to avoid strict traditional banking regulations.

191.    Prior to the planned Ant IPO, Ant came under increased scrutiny and tighter regulation as it expanded the range of financial services it offers.

192.    Indeed, Ant was squarely in Chinese regulators' "crosshairs" in advance of the Ant IPO. As the Wall Street Journal reported, the PBOC began investigating Ant's loan origination, and the risks associated therewith, in the summer of 2020:

> Ant Group Co., the startup controlled by billionaire Jack Ma that is gearing up for a blockbuster two-part initial public offering, wants potential investors to see it as a technology company and not a financial-services firm.
>
> The company, however, remains in focus with China's financial regulators—which isn't surprising given that Ant's mobile-payments network, Alipay, has a billion users in China and in just a few years, Ant has changed how many people spend, borrow, save and invest.
>
> * * *
>
> The Hangzhou-based company has tried to style itself as a partner to banks, supplying technology and enabling lending to clients who have long been shunned by traditional banks. In its fast-growing digital-finance business, about 500 million people and more than 20 million small businesses obtained credit through Ant's lending platforms during the 12 months ending in June, the company's preliminary listing prospectus said.
>
> Outstanding loans made via Ant's platforms stood at 2.15 trillion yuan ($312 billion) at the end of June, of which 80% were to individuals. Just 2% were funded with Ant's own money and the rest were funded by banks or asset-backed securities.
>
> Our approach is not to use our own balance sheet or provide guarantees," the company said.
>
> The People's Bank of China this summer asked some commercial lenders to report their outstanding balances of online consumer loans and specify how much was originated in conjunction with Ant, according to a person who saw the survey

notice.[103]

193.    Bloomberg further reported how Ant's lending—in particular whether its direct lending business was too highly leveraged and undercapitalized—was the specific subject of Chinese regulators' attention in the lead-up to the Ant IPO:

> In the U.S., the federal securities laws governing IPOs are "disclosure"-based and not "merit"-based. That is, though the SEC will review a company's IPO prospectus and provide comments as to the disclosures and form requirements, the SEC will not approve or disapprove of an IPO or address the merits of investing in a specific company.
>
> ***Regulators in Shanghai use an "approval" -based system. Accordingly, the review of Ant's IPO appears to ultimately have considered such issues as whether Ant's direct lending business is too highly levered and undercapitalized and whether the valuation that Ant Group is seeking from the public markets is too high***.[104]

194.    This regulatory attention was backed by specific regulatory action in the form of new banking regulations applicable to Ant.  For example, on or about July 12, 2020, CBIRC issued new Provisional Regulatory Measures for Commercial Banks' Online Lending Business (the new "Online Lending Regulations"). [105] According to the CBIRC website, the Online Lending Regulations came into force on July 12, 2020. In a Q&A posted to the CBIRC website, the agency explained the need for the new rules as follows:

> In recent years, the Internet loan business of commercial banks has developed rapidly, and various commercial banks have carried out Internet loan business in different ways and to varying degrees. Compared with the traditional offline loan model, Internet loans have the characteristics of relying on big data and models for risk assessment, online automatic operation of the whole process, no manual or minimal manual intervention, and extremely fast loan approval. It has played a

---

[103] *Jack Ma's Ant Remains in Regulators' Crosshairs Ahead of Giant IPO*, THE WALL STREET JOURNAL, August 27, 2020, https://www.wsj.com/articles/jack-mas-ant-remains-in-regulators-crosshairs-ahead-of-giant-ipo-11598524447?mod=article_inline.

[104] *What's Ahead for Ant Group's Now-Delayed IPO: Legal Insight*, BLOOMBERG LAW, November 18, 2020, https://news.bloomberglaw.com/securities-law/whats-ahead-for-ant-groups-now-delayed-ipo.

[105] http://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=916525&itemId=928

positive role in expanding the coverage of financial customers. ***At the same time, the Internet loan business has also exposed problems and hidden risks such as imprudent risk management***, insufficient financial consumer protection, and inadequate monitoring of the use of funds.

195.     In Articles 12-14 of the new Online Lending Regulations, the CBIRC emphasized that the senior executives and members of the board of directors of companies providing lending services have ultimate responsibility for risk management.

196.     Commentators noted that new online lending regulations, including the CBIRC's July 12, 2020 Online Lending Regulations, appeared to be aimed at addressing unhedged systemic risks created by the activities of microlenders like Ant:

> Currently, different from banks, micro loan companies do not have leverage ratio limits, which, through joint loans with banks, push up leverage ratios for the overall financial system, creating opportunities systemic risk. For instance, ***the leverage ratio of Alibaba [BABA:US]-backed Ant Group is estimated to be at around 50-60 times, which contributes to the high profit of the group***.[106]

197.     In addition to the new Online Lending Regulations, on or about September 11, 2020, China further "issued new rules to regulate financial holding companies, with the central bank saying there had been a loophole in regulations for such companies. Ant was among companies named by the People's Bank of China." (the "Financial Holding Company Regulations").[107]

198.     The new Financial Holding Company Regulations published by PBOC on September 11, 2020, to take effect on November 1, 2020, required that firms operating two or more financial businesses in China—*i.e.*, Ant—would be classified as financial holding

---

[106] CBIRC, PBoC Solicit Opinions for Online Microlending Administration Measures, Seneca ESG, November 11, 2020, https://www.senecaesg.com/es/insights/cbirc-pboc-solicit-opinions-for-online-microlending-administration-measures/.

[107] *Anti-monopoly charges against Alibaba: What led to the probe?*, Mint, December 24, 2020, https://www.livemint.com/companies/news/anti-monopoly-charges-against-alibaba-what-led-to-the-probe-11-facts-11608783276169.html.

companies. Accordingly, they would be required to maintain substantially higher capital levels to back their lending, credit, payments, and other banking- and finance-related operations.

199.    As Reuters reported, "China has issued new rules to regulate financial holding companies, in its latest move to prevent systematic risks to the nation's vast financial sector." The article cited Pan Gongsheng, PBOC's vice governor as having called out Ant specifically:

> The new rules, announced on Sunday, were rolled out as a small number of companies expanded blindly into the financial sector without isolation mechanisms and while accumulating risks, the People's Bank of China (PBOC) said in a statement.
>
> "Financial holding companies have already existed in our country, but those companies have not been included in the supervision framework, and there is a loophole in regulations," Pan Gongsheng, PBOC's vice governor, told a briefing in Beijing on Monday.
>
> Pan named the state-owned CITIC Group, China Everbright Group and China Merchants Group as eligible financial holding entities, as well as local government-backed Shanghai International Group, Beijing Financial Holdings Group, and the fintech giant Ant Financial.
>
> Jack Ma's Ant Financial, now renamed Ant Group, is seeking dual listings in Hong Kong and Shanghai.[108]

200.    In addition, the Reuters article explained that "companies that hold banking units will need to have at least 500 billion yuan in total assets, and those that do not hold banking units should have at least 100 billion yuan."

201.    Ant held banking units and offered banking services during the Class Period. For example, Ant officially launched Ant Bank (Hong Kong) on September 28, 2020. As the analyst firm Red Pulse noted in a September 28, 2020 analyst report, Ant Bank "became the sixth branchless bank to provide services in the area. Similar to its rivals, Ant Bank is also offering high interest rates to attract users. For example, deposits of up to HKD20,000 will receive an interest

---

[108] *China issues new rules to tighten control over financial holding firms*, REUTERS, September 13, 2020, https://www.reuters.com/article/us-china-finance-holding-firms-idCAKBN2640FV.

[rate] of 2.5%."

202.    Ant filed its final IPO Prospectus on October 27, 2020, including its most recent financial reporting for the period ending June 30, 2020. The Ant IPO Prospectus reported 315.8 billion RMB of total assets as of June 30, 2020—the latest financial reporting period available.[109]

203.    On November 2, 2020, the People's Bank of China, the China Banking and Insurance Regulatory Commission, China Securities Regulatory Commission, and China's State Administration of Foreign Exchange called a rare joint meeting with Ant's controller Jack Ma, Ant's chairman Xiandong "Eric" Jing, and Ant's CEO Xiaoming "Simon" Hu. The topic of the meeting was Ant's compliance with the recently enacted regulations relating to its consumer lending business.[110]

204.    Following the meeting, the Ant IPO was suspended because Ant "may not meet listing qualifications or disclosure requirements due to material matters relating to the regulatory interview" of Ma, Jing, and Hu. *See* Sec. IV.B.6, *infra*. Ant Group thereafter pledged that it "will implement the meeting opinions in depth, and continue to follow the guidelines of 'stable innovation, embracing supervision, service to the real economy and openness for mutual benefit,' in order to continuously improve the ability of inclusive service, and assist the development of the economy and people's livelihood."

### 5.    Defendants Obscure Ant's Controversial Ownership Structure Prior to the IPO

205.    Another undisclosed risk that threatened the consummation of the Ant IPO was the

---

[109] RMB and yuan are the same currency. RMB is the official currency of the PRC, while yuan specifically refers to one unit of measurement of that currency.

[110] *China Tells Ant To Expect Scrutiny Of Credit Business Ahead Of Record Listing: Sources*, REUTERS, November 3, 2020, https://www.reuters.com/article/us-ant-group-ipo-china-regulator-idUSKBN27J14I.

concealed identity of certain of the private investors in Ant who stood to benefit from the IPO. Behind Ant's complex ownership structure were a number of Jack Ma's friends who came from powerful families associated with the Chinese Communist Party and whose economic interests were seen as antagonistic to the political interests of Chinese President Xi Jinping. When the Chinese government discovered the identity of these undisclosed investors in an investigation leading up to the Ant IPO, the government halted the IPO.

206.    The existence of this Chinese government investigation and the underlying financial interests of the undisclosed Ant investors did not become public until February 16, 2021, when the Wall Street Journal published an article entitled, "China Blocked Jack Ma's Ant IPO After Investigation Revealed Likely Beneficiaries" (the 2/16/2021 WSJ article).[111]  According to the article, the Wall Street Journal's reporting was based on interviews of more than a dozen Chinese officials and government advisors, as well as commercial records viewed by the Wall Street Journal.

207.    According to the 2/16/2021 WSJ article, in the weeks before Ant was scheduled to go public, an investigation by the Chinese central government "found that Ant's IPO prospectus obscured the complexity of the firm's ownership."  According to the article, "[b]ehind layers of opaque investment vehicles that own stakes in the firm are a coterie of well-connected Chinese power players, including some with links to political families that represent a potential challenge to President Xi and his inner circle."

208.    The 2/16/2021 WSJ article further stated that as regulators dove into the details of the Ant prospectus, the identity of certain of the investors and the circuitous manner in which their

---

[111] A copy of the 2/16/2021 WSJ article is attached hereto as Ex. 9 and incorporated by reference herein.

investments were structured set off alarm bells for regulators.  As detailed below, certain of the large Ant investors that stood to gain from the Ant IPO included "princelings"—descendants of prominent and influential senior officials of the Chinese Communist Party[112]—and others with ties to political families who presented potential challenges to the authority of President Xi.  According to the 2/16/2021 WSJ article, these undisclosed ownership interests were a "key reason" that President Xi quashed the Ant IPO.  In other words, the Chinese government's suspension of the Ant IPO was not due solely to concerns about financial system risks (as discussed *supra*), but also due to personal and political conflicts between President Xi and the undisclosed Ant investors.

209.    The two individuals who were the primary focus of the 2/16/2021 WSJ article were Jiang Zhicheng and Li Botan.  Jiang Zhicheng is the grandson of former Chinese leader Jiang Zemin and a founding partner of Boyu Capital, a leading Chinese private-equity firm.  Li Botan is the son-in-law of Jia Qinglin, a former member of the Politburo Standing Committee, the top echelon of the Chinese Communist Party.  Jia Qinglin has strong ties to Jiang Zemin, and both are part of what is sometimes referred to as the "Shanghai faction," the "Shanghai Gang," or the "Jiang faction" in Chinese politics.  As described in more detail in Section VI.B.C, *infra*, Chinese President Xi Jinping has had a history of conflict with the Shanghai faction and has been attempting to curtail their influence over a period of several years in order to limit their ability to threaten his authority.

---

[112] According to Professor Bo Zhiyue, "There are princelings by birth — sons and daughters of former high ranking officers and officials of the Chinese Communist Party (CCP) — and princelings by marriage. … The sons-in-law and daughters-in-law of former high ranking officers or officials of the CCP can also be considered princelings."  See Bo Zhiyue, *Who Are China's 'Princelings'?*, The Diplomat (Nov. 24, 2015), *available at* https://thediplomat.com/2015/11/who-are-chinas-princelings/.  Professor Zhiyue is the Director of the New Zealand Contemporary China Research Centre and a Professor of Political Science at Victoria University of Wellington and is an authority on Chinese elite politics.

210. According to the 2/16/2021 WSJ article, Jiang Zhicheng and Li Botan each invested into Ant using multiple layers of investment vehicles (more fully described below) that obscured their ownership interests.

211. With respect to Jiang Zhicheng, the 2/16/2021 WSJ article claims that Boyu Capital (the private-equity firm founded by Jiang Zhicheng) became an early investor in Ant Group in 2016 in a "roundabout way." As the WSJ article explained, Boyu's base in Hong Kong presented "a potentially stick issue at a time when Chinese regulations restricted 'off shore,' or outside the mainland, ownership of payment services, a core part of Ant's business."

212. According to the article, Boyu "first set up a subsidiary in Shanghai, which invested in a Shanghai-based investment firm. That firm then invested in a private-equity firm called Beijing Jingguan Investment Center, which in turn bought shares in Ant."

213. The WSJ summarized the layers of investment vehicles used to effectuate the investment with the following chart:



214. As explained in further detail in Section VI.D, *infra*, Plaintiffs' review of the

SAMR records of the companies in question corroborates the WSJ's conclusions, although the ownership structure is even more complex than suggested by the WSJ's chart. While it is clear that Shanghai Tiancen Investment Management controls and indirectly owns an interest in Beijing Jingguan, the relationship between Boyu Taoran (Shanghai) and Shanghai Tiancen Investment Management is less direct. As detailed *infra*, the relationship between those entities is not one of direct ownership (or indirect ownership through a series of parent-subsidiary relationships), but instead is based on a VIE structure or other informal arrangement approximating a VIE structure.

215.    A VIE, or a variable-interest entity, is an entity in which an investor holds a controlling interest that is not based on a majority of voting rights. VIE investors typically exercise control through contractual arrangements with the owners of the VIE, rather than through ownership of shares of the VIE. Numerous Chinese companies use VIEs to get around certain Chinese laws that prohibit foreigners from owning businesses in certain industries. The VIE structure gives foreign investors *de facto* control over business entities that are technically owned by Chinese citizens.

216.    As detailed in Section VI.D, *infra*, the SAMR records of the entities in question (and several related entities) provide strong circumstantial evidence that Shanghai Tiancen Investment Management is a VIE that is controlled by Boyu and its affiliates (or that there is an informal arrangement between these entities approximating a VIE structure). These records, combined with other evidence, support the conclusion that Jiang Zhicheng did in fact invest in Ant Group through Beijing Jingguan in the manner described in the 2/16/2021 WSJ article, even though the actual chain of control is not readily discernable from the ownership structure itself.

217.    With respect to Li Botan, the 2/16/2021 WSJ article claims that Li Botan invested into Ant Capital through a series of investment vehicles summarized in the following chart:



218. As explained in further detail in Section VI.E, *infra*, Plaintiffs' review of the SAMR records of the companies in question corroborates the WSJ's conclusions, although once again the ownership structure is even more complex than suggested by the WSJ's chart. While it is clear that Fu Qing Qi Sheng III Investment has an ownership interest in Shanghai Zhongfu Equity Investment Management Center and that Tibet Hongde Century Investment Co. has an ownership interest in Fu Qing Qi Sheng III Investment, the relationship between Beijing Zhaode Investment Group and Tibet Hongde Century Investment Co. is less direct.

219. As detailed in Section VI.E, *infra*, the SAMR records of the entities in question (and several related entities) provide strong circumstantial evidence that Tibet Hongde Century Investment Co. is a VIE that is controlled by Beijing Zhaode Investment Group (or that there is an informal arrangement between these entities approximating a VIE structure). These records, combined with other evidence, support the conclusion that Li Botan did in fact invest in Ant Group through Shanghai Zhongfu Equity Investment Management Center in the manner described in the

2/16/2021 WSJ article, even though the actual chain of control is not readily discernable from the ownership structure itself.  Furthermore, the SAMR records of the entities in question (and several related entities) provide strong circumstantial evidence that Defendants themselves participated in the structuring of certain of these investment vehicles and that they engaged in deceptive acts to help conceal Li Botan's role in the ownership structure.

220.    Both Jiang Zhicheng and Li Botan declined to comment to the WSJ concerning its allegations about their concealed investments in Ant Group.  Neither Jiang Zhicheng nor Li Botan subsequently attempted to deny or refute those allegations, despite the fact that multiple international media outlets followed up on the story and reiterated the WSJ's allegations over the course of the following days.

221.    The Ant IPO Prospectus did not disclose the identities of Jiang Zhicheng or Li Botan or their roles as persons controlling the investment vehicles that had directly purchased shares of Ant.  Instead, the Ant IPO Prospectus provided materially misleading disclosures concerning the nature and ownership of the investment vehicles that misdirected regulators and misled investors about the risks associated with the investments by the concealed owners.

222.    According to the Ant IPO Prospectus, Beijing Jingguan Investment Center (Limited Partnership) ("Beijing Jingguan Investment Center") was one of a group of investors that provided financing to Ant in 2016 (referred to in the Prospectus as the 2016 Equity Transactions).  In addition, Beijing Jingguan Investment Center participated in another round of financing in 2018 (referred to in the Prospect as the 2018 Equity Transactions).  As of the date of the Prospectus, Beijing Jingguan Investment Center owned a total of 218,337,790 shares of Ant, comprising a 0.92% ownership stake in Ant.[113]

---

[113] While this percentage may appear small, Beijing Jingguan Investment Center was one of Ant's

223.    The Prospectus also stated that "Beijing Jingguan Investment Center (Limited Partnership) is a China-based limited partnership engaged in investment activities."  This statement was materially misleading because it failed to disclose the roles of Jiang Zhicheng and Boyu Capital as the persons with the ultimate control over and financial interest in Beijing Jingguan Investment Center and that the entity operated to conceal their investments.  This omission further misled investors as to the risks that the IPO would not be completed if regulators discovered the true identities of the persons behind Beijing Jingguan Investment Center.

224.    According to the Ant IPO Prospectus, Shanghai Zhongfu Equity Investment Management Center (Limited Partnership) ("Shanghai Zhongfu Equity") was one of a group of investors that provided financing to Ant in 2015 (referred to in the Prospectus as the 2015 Equity Transactions).  In addition, Shanghai Zhongfu Equity participated in the 2018 Equity Transactions.  As of the date of the Prospectus, Shanghai Zhongfu Equity owned a total of 307,611,214 shares of Ant, comprising a 1.29% ownership stake in Ant.[114]

225.    The Prospectus also stated:

> Shanghai Qizhan Investment Center (Limited Partnership), ***Shanghai Zhongfu Equity Investment Management Center (Limited Partnership)***, Shanghai Jingyi Investment Center (Limited Partnership), Shanghai Qihong Investment Center (Limited Partnership) and Shanghai Yunfeng Xincheng Investment Center (Limited Partnership) ***are China-based limited partnerships engaged in investment activities and controlled by Shanghai Zhongfu Asset Management Center (Limited Partnership)***.

---

top ten shareholders as of the date of the Prospectus, and if the IPO had been successfully completed at the approximately $10.30 price (using historical exchange rates) contemplated at the time of the Prospectus, Beijing Jingguan Investment Center's position would have been worth approximately $2.25 billion.

[114] While this percentage may appear small, Shanghai Zhongfu Equity was one of Ant's top six shareholders as of the date of the Prospectus, and if the IPO had been successfully completed at the approximately $10.30 price (using historical exchange rates) price contemplated at the time of the Prospectus, Shanghai Zhongfu Equity's position would have been worth approximately $3.17 billion.

226.     This statement was materially misleading because it failed to disclose the roles of Li Botan and Beijing Zhaode Investment Group as the persons with the ultimate control over and financial interest in Shanghai Zhongfu Equity and that the entity operated to conceal their investments.  This omission further misled investors as to the risks that the IPO would not be completed if regulators discovered the true identities of the persons behind Shanghai Zhongfu Equity.

227.     In addition, the Prospectus stated that Shanghai Qizhan Investment Center (Limited Partnership) was "a limited partnership established in China which focuses on private equity investment and is ***an independent third party***."  This statement was materially false and misleading because, as explained in greater detail in Section VI.E, *infra*, Shanghai Qizhan Investment Center (Limited Partnership) was not an independent third party.  Instead, Shanghai Qizhan Investment Center (Limited Partnership) was an entity that was controlled by the same entity that controlled Shanghai Zhongfu Equity, it was part of the same VIE structure, and Defendants had a financial interest in the profits arising from the VIE.

228.     Beyond the investments by Jiang Zhicheng and Li Botan, the 2/16/2021 WSJ article also described investments in Ant by other wealthy individuals with relationships with Jack Ma, who also invested in Ant using investment vehicles that obscured their ownership interests.  These individuals included: real-estate developer Wang Xiaoxing;[115] property tycoon Lu Zhiqiang; Shi Yuzhu, chairman of the online gaming firm Giant Interactive; and Guo Guangchang, co-founder of Fosun International Ltd.  A report by todaychina corroborated and expanded on this claim:

> Reports also indicate that many of Ma's friends invested in Ant Group through a
> third-party fund in a hidden capacity. These friends include Lu Zhiqiang, chairman

---

[115] According to the 2/16/2021 WSJ article, Ms. Wang raised funds from peer-to-peer lending firms that have been accused by Chinese regulators of channeling the life savings of some mom-and-pop investors into high-risk financing schemes.

and president of China's Pan Ocean Holdings Group, Shi Yuzhu, chairman of Giant Network, and Guo Guangchang, chairman of Fosun Group. For example, Xiao Feng, vice chairman of Wanxiang Holdings Co., has his wife, Huang Rongping, take a stake in the company, which in turn takes a stake in Ant Group.[116]

### 6.    Undisclosed Risks Relating to the Ant IPO Materialize

229.    On November 3, 2020, Alibaba filed a Form 6-K announcing that the Ant Group IPO had been suspended because Ant Group "may not meet listing qualifications or disclosure requirements due to material matters…." The full Form 6-K stated:

> Ant Group Co., Ltd. ("Ant Group"), an unconsolidated related party of Alibaba Group Holding Limited, announced that it was notified by the relevant regulators in the PRC today that its proposed A share listing on the Shanghai Stock Exchange STAR board is suspended as Ant Group *may not meet listing qualifications or disclosure requirements due to material matters relating to the regulatory interview of its ultimate controller, executive chairman and chief executive officer by the relevant regulators and the recent changes in the Fintech regulatory environment*. Consequently, Ant Group's concurrent proposed H share listing on the Main Board of The Stock Exchange of Hong Kong Limited is also suspended.

230.    Ant Group's "ultimate controller" referred to in the announcement was Jack Ma. Its executive chairman and chief executive officer was Eric Jing.

231.    A November 3, 2020 article in *The New York Times* reporting on the halted IPO noted that Ant had drawn the ire of Chinese banking regulators, stating "Ant has challenged the dominance of China's state-run banks and other institutions, which have long enjoyed a privileged place in the country's financial and political system. Regulators have looked warily upon Ant's fast growth in certain areas, fearful it might become too big to rescue in the event of a meltdown."[117] The article further revealed the concerns of China's banking regulators about Ant's

---

[116] *See Wall Street Journal: Jiang Zemin's grandson Jia Qinglin's son-in-law to take a stake in Ant Cancel listing or related to power struggle*, todaychina (Feb. 18, 2021), *available at* https://todaychina.cc/18020.html (some internal quotation marks omitted).

[117] *China Halts Ant Group's Blockbuster I.P.O.*, THE NEW YORK TIMES, November 3, 2020.

lending practices, quoting Guo Wuping, the head of consumer protection at China's banking regulator:

> Mr. Guo argued that online finance products were not fundamentally different from traditional ones, and that financial technology companies should therefore be regulated in the same way as established institutions.

> Huabei, a credit function in Alipay, is no different from a credit card issued by a bank, Mr. Guo wrote. And Jiebei, an Alipay loan feature, is no different from a bank loan. Ant has called Huabei and Jiebei the most widely used consumer credit products in China.

> Loose regulation has allowed financial technology companies to charge higher fees than banks, Mr. Guo wrote. This, he said, "has caused some low-income people and young people to fall into debt traps, ultimately harming consumers' rights and interests and even endangering families and society."

> Ant declined to comment on Mr. Guo's article.

232.    Following this news, the price of Alibaba's ADSs fell $25.27 per share from the prior day's closing price, to close at $285.57 per share (a drop of about 8.13%) on November 3, 2020.

233.    The impact of the halted Ant IPO was the topic of many news articles over the ensuing days. For example, a November 4, 2020 Bloomberg article observed:

> Alibaba Group Holding Ltd., which owns a third of Ant, took an immediate hit Tuesday, falling by a record 9.7% for its New York-listed shares. It was down as much as 9.3% Wednesday in Hong Kong. Making too much money may not be the real sin - as Deng Xiaoping famously stated, to get rich is glorious. But having too much power over the nation's financial levers intrudes on government territory. China's state-owned banks are a policy tool. Not only does Ant control a growing payments platform, Alipay, but its loans and wealth management businesses have climbed to dominate their rivals.

> China's financial regulator plans to discourage lenders from using Ant's platforms, which act as a conduit for loans from banks to consumers, Bloomberg News reported Wednesday, citing people familiar with the matter whom it didn't name. On the surface, that looks really bad. Yet ensuring banks comply with new rules is what we'd expect from a regulator and puts pressure on Ant's executives to quickly

bring its own business model into line.[118]

234. Another November 4, 2020 Bloomberg News article reported that "[c]hanges in fintech industry regulations have a 'huge impact' on Ant's operational structure and profit model, China Securities Regulatory Commission said in a statement Wednesday. The move protects investors' rights and ensures accurate, transparent information disclosure, according to the statement [by the CSRC]."[119]

235. A separate November 4, 2020 Bloomberg News article reported a Jefferies analyst response that "From the perspective of regulators and investors, they all need Ant to provide a better disclosure on the co-lending business, said Chen Shujin, Hong Kong-based head of China financial research at Jefferies Financial Group Inc. 'Ant needs to be aligned with regulations going forward and show that its business model can help lower borrowing costs for the economy rather than raising them with some kind of monopoly.'"[120]

236. On November 5, 2020, outlets reported that it would take as long as six months to get the Ant IPO back on track. For example, at 6:03am EST on November 5, 2020, the Financial Times reported that "Ant Group's IPO could be delayed by at least six months and its valuation sharply lowered after Beijing halted its trading debut this week….."[121]

---

[118] *Here's How Ant Can Rise Again After That IPO Shock*, BLOOMBERG OPINION, November 4, 2020, https://www.yahoo.com/video/ant-rise-again-ipo-shock-051929192.html. This article was updated on November 5, 2020 to report that "A new listing date could be at least six months away because Ant needs to respond to regulators' demands and submit a new prospectus,…."

[119] *Chinese Regulator Says It Backs Suspension of Ant's 'Hasty' IPO*, BLOOMBERG NEWS, November 4, 2020, https://news.bloomberglaw.com/crypto/chinese-regulator-says-it-backs-suspension-of-ants-hasty-ipo.

[120] *China Plans Deeper Ant Crackdown With Bank Funding Curbs*, BLOOMBERG NEWS, November 4, 2020, https://www.bloomberg.com/news/articles/2020-11-04/china-is-planning-a-bigger-ant-crackdown-with-bank-funding-curbs.

[121] *Ant Group IPO faces at least six-month delay after Beijing intervention*, FINANCIAL TIMES, November 5, 2020, https://www.ft.com/content/35a95455-338a-4ede-bab3-fd0f098ac268.

237.    Also on November 5, 2020 a Bloomberg article explained that "[i]f the Ant IPO gets back on track, analysts are predicting a much lower valuation with multiples closer to banks, as the regulatory risks show it's more 'fin' than 'tech.'"[122] The November 5, 2020 Bloomberg article further explained the impact of the rules on Ant as follows:

> Ant's CreditTech unit, which includes its two microlenders, is its biggest earnings driver. Revenue jumped 59% to 29 billion yuan in the first six months of the year, contributing 40% to the group's total. In the 12 months ending June 30, Ant helped provide small, unsecured loans to about 500 million people through the microlenders: Huabei (Just Spend) and Jiebei (Just Lend). Out of the about 1.7 trillion yuan in consumer loans it has underwritten, only about 2% were kept on its own balance sheet, with the rest funded by third parties or packaged as securities and sold on. ***The new 30% minimum co-lending requirement would mean Ant needs to underwrite 520 billion yuan of loans on its own, according to an estimate by Bernstein. With the leverage ratio capped at 5 times for online microlenders, a minimum of 104 billion of net assets will be required, or three times its current level of 35 billion yuan***.

238.    On the evening of Sunday, November 8, 2020, Bloomberg News reported that "Increased capital needs may lower [Ant's] valuation by half.[123]

239.    While some commentators cited Ma's criticism of Chinese regulators in an October 24, 2020 speech as the reason for the pulled IPO, the reality is not so simple. As described above, the regulatory tension (and risks) had been increasing between Ant/Alibaba and Chinese regulators for months. As a Bloomberg article noted, "While Ma's remarks may have served as a final catalyst for China's delaying the IPO, these developments highlight the complicated and evolving Chinese regulatory framework applicable to Ant, and the struggle over the extent to which its business is treated more like a bank or a technology company in China." The article continued, "Previously

[122] *Why China Changed the Rules on Jack Ma's Ant Group: QuickTake*, BLOOMBERG, November 5, 2020, https://www.bloomberg.com/news/articles/2020-11-05/why-china-changed-the-rules-on-jack-ma-s-ant-group-quicktake.

[123] *Ant Group's Stalled PO Seen Slashing Its Value by $140 Billion*, BLOOMBERG NEWS, November 8, 2020, https://www.bloomberg.com/news/articles/2020-11-09/ant-group-s-stalled-ipo-seen-slashing-its-value-by-140-billion.

known as Ant Financial, Ant's core business was spun out of Alibaba Group in 2011. Both Ma and Alibaba continue to hold large equity stakes in the company, and the businesses of Ant and Alibaba remain intertwined through significant commercial arrangements. Ant Group, perhaps best known for its Chinese digital payment service app, Alipay, notably also has a significant direct lending business, originating short-term loans to consumers and businesses through the app. It is this lending business that is thought to have attracted scrutiny from banking regulators in the lead-up to Ant's planned IPO."[124]

240.    In addition, the 2/16/21 Wall Street Journal article further revealed that in addition to previously undisclosed risks relating to Ant's regulatory compliance, the Party's discovery of Ant's obscured ownership structure had contributed to the suspension of the IPO:

> When China's leader Xi Jinping late last year quashed Ant Group's initial public offering, his motives appeared clear: He was worried that Ant was adding risk to the financial system, and furious at its founder, Jack Ma, for criticizing his signature campaign to strengthen financial oversight.
>
> There was another key reason, according to more than a dozen Chinese officials and government advisers: growing unease in Beijing over Ant's complex ownership structure—and the people who stood to gain most from what would have been the world's largest IPO.
>
> In the weeks before the financial-technology giant was scheduled to go public, a previously unreported central-government investigation found that Ant's IPO prospectus obscured the complexity of the firm's ownership, according to the officials and government advisers, who had knowledge of the probe. Behind layers of opaque investment vehicles that own stakes in the firm are a coterie of well-connected Chinese power players, including some with links to political families that represent a potential challenge to President Xi and his inner circle.
>
> Those individuals, along with Mr. Ma and the company's top managers, stood to pocket billions of dollars from a listing that would have valued the company at more than $300 billion.

---

[124] *What's Ahead for Ant Group's Now-Delayed IPO: Legal Insight*, BLOOMBERG LAW, November 18, 2020 https://news.bloomberglaw.com/securities-law/whats-ahead-for-ant-groups-now-delayed-ipo.

\* \* \*

Before the probe, regulators at the central bank were already worried about Ant's business model. The company owns a mobile payments app called Alipay that is used by more than a billion people. It gives Ant voluminous data on consumers' spending habits, borrowing behaviors and bill- and loan-payment histories, which the company has used to build a financial-services giant.

It has made loans to close to half a billion people, operates the country's largest money-market fund and sells scores of other financial products. But it hasn't had to follow the tough regulations and capital requirements that commercial banks are subject to. It makes profits from the transactions, while state-owned banks supply the majority of the funding and take on most of the risk.

"On one hand, you got a bunch of individuals potentially amassing large amounts of wealth," one of the people familiar with the probe into the shareholders said. "Then on the other hand, much of the risk has been transferred to the state side."

In a late-October speech, Mr. Ma harshly criticized regulators for rules he said were unnecessary and held back technology innovation. He infuriated top financial officials—some of whom were in the room for the speech.

The public blast of the state's regulatory powers, coupled with the investigation into Ant's ownership structure—which had started even before Mr. Ma's speech—formed the basis for Mr. Xi's decision to shut down Ant's IPO and force the company to scale back lending and other banklike services, according to the people familiar with the probe.

### 7. Post-Class Period Events: Ant Group Restructures

241.    On December 29, 2020, The Wall Street Journal reported that under a restructuring road map that China's financial regulators had laid out, Ant Group "would return to its roots as an online-payment provider akin to PayPal Holdings Inc., while its more profitable investment and loan businesses would be curtailed." The article further reported that the Chinese "regulators, led by the central bank, also ordered Ant to form a separate financial holding company that would be subject to the kind of capital requirements applied to banks."[125]

---

[125] *China Eyes Shrinking Jack Ma's Business Empire*, THE WALL STREET JOURNAL, December 29, 2020, https://www.wsj.com/articles/china-eyes-shrinking-jack-mas-business-empire-11609260092.

242. On Monday, April 12, 2021—at the same time the market was digesting the news of SAMR's historic $2.8 billion fine on Alibaba—Ant announced "that it would undertake a sweeping, government-ordered overhaul of its business to allay regulators' concerns about the way it competes with rivals, its large-scale collection of user data and the risks its business may pose to the wider financial system."[126]

## C. Defendants Had An Affirmative Duty Under Item 5(D) Of Form 20-F And Item 303 Of Regulation S-K To Disclose The Omitted Facts

243. Part I, Item 5(D) of Form 20-F for foreign issuers, requires registrants to disclose:

> any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

244. Item 303 of Regulation S-K, 17 C.F.R. §229.303(a), similarly requires domestic issuers to disclose any "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Item 303, 17 C.F.R. §229.303(b)(2)(i), specifically requires domestic issuers to:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

245. The SEC has instructed that Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".

246. Furthermore, pursuant to Item 303, issuers must disclose actual and contemplated regulatory action or "changes in" the "regulatory environment[.]" *In Re Comm'n Guidance*

---

[126] *Ant Group Announces Overhaul as China Tightens Its Grip*, THE NEW YORK TIMES, April 12, 2021, https://www.nytimes.com/2021/04/12/technology/ant-group-alibaba-china.html.

*Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27. The 2003 Guidance states that "although this release refers primarily to Item 303 of Regulation S-K, it also is intended to apply to MD&A drafted pursuant to Item 5 of Form 20-F."[127]

247.    In the 2003 Guidance, the SEC explained the important and intention of MD&A discussion and analysis:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication.
>
> * * *
>
> **The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."**[128]

248.    As a foreign issuer, Alibaba was further subject to heightened obligations to disclose potential governmental or regulatory action in its home country. Item 303 specifically instructs foreign private issuers to "***discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals***." 17 C.F.R. § 229.303(b) & Instruction ¶9. Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact, must be disclosed.

249.    In its 2020 Form 20-F, Item 5(D), Alibaba stated "Other than as disclosed in this

---

[127] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303.…" FRM §9410.1. FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows: … d. Trend information – Item 5.D."

[128] 2003 WL 22996757, *1-*2.

annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our net revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial conditions."

250.    Alibaba's Form 20-F, however, failed to disclose that it had been engaged in and was continuing to engage in unlawful business practices—in particular, "Choose One of Two" and related business practices of forced vendor exclusivity and anti-competitive behavior—after the SAMR, during the November 5, 2019 administrative guidance meeting, had specifically instructed that "Choose One of Two" practices were "clearly prohibited" under Chinese law, after SAMR had demanded all e-commerce companies, including Alibaba, to cease the practice, and after Alibaba had committed to SAMR that it would cease such practices (*i.e.*, the "Omitted Exclusive Dealing Facts" or "Omitted Facts").

251.    The Omitted Exclusive Dealing Facts constituted a "trend, uncertainty, or demand" that was reasonably likely to materially impact Alibaba's sales or future operating results because to come into compliance with Chinese law by ending forced vendor exclusivity, Alibaba would have to abandon a key business practice of its core platforms, which would in turn pose a material undisclosed risk to its ability to show expected sales growth and maintain its market dominance. The Omitted Exclusive Dealing Facts further constituted important governmental or regulatory events or uncertainties that were reasonably likely to materially affect Alibaba's business, financial performance, and/or operations because Alibaba, in failing to come into compliance with Chinese law by ceasing the practice, as specifically instructed by SAMR, and by continuing the unlawful practices in contravention of SAMR's clear order, was at extremely heightened risk of harsh regulatory action and/or penalties. As such, Alibaba had an affirmative duty to disclose the

Omitted Exclusive Dealing Facts pursuant to Item 5(D) in its Class Period SEC filings.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD (LIABILITY UNDER RULE 10b-5(b))

252. Rule 10b-5(b) proscribes that it is unlawful "To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" Defendants violated that provision as detailed herein. With respect to each of the challenged statements and omissions alleged herein, Defendants made those statements or omissions with knowledge or severe recklessness as to their false or misleading nature.

### A. Defendants' False And Misleading Statements And Omissions Relating to Alibaba's Undisclosed Unlawful Acts During the Class Period

#### 1. Alibaba's FY 2020 Form 20-F

253. Alibaba's 2020 Form 20-F, filed on July 9, 2020 and signed by Defendant Zhang, purported to warn that "***Anti-monopoly and unfair competition claims or regulatory actions against us may result in our being subject to fines, constraints on our business and damage to our reputation***" (emphasis in original). The Form 20-F went on to state, in relevant part:

> ***The PRC anti-monopoly enforcement agencies have in recent years strengthened enforcement under the PRC Antimonopoly Law***, including levying significant fines, with respect to concentration of undertakings and cartel activity, mergers and acquisitions, as well as abusive behavior by companies with market dominance.
>
> The PRC Anti-monopoly Law provides a private right of action for competitors, business partners or customers to bring anti-monopoly claims against companies. In recent years, an increased number of companies have been exercising their right to seek relief under the PRC Anti-monopoly Law. Some of these companies, including our competitors, business partners and customers, have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private litigation that targets our prior and current business practices, such as our market approach with traffic resource allocation on our e-commerce platforms, which we base on multiple factors, and our ***alleged prior narrowly-deployed exclusive partnerships***. Although ***we believe that our business practices do not violate anti-monopoly or unfair competition laws, due to our large scale of business and close media attention, there can be***

*no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted.*

*Any anti-monopoly lawsuit, regulatory investigations or administrative proceedings initiated against us could also result in our being subject to regulatory actions* and constraints on our investments and acquisitions, which could include forced termination of any agreements or transactions that may be determined by governmental authorities to be in violation of anti-monopoly laws or the relevant filing requirements, required divestitures, limitations on certain pricing and business practices and/or significant fines.[129]

254.    The foregoing purported risk warning was materially misleading because it presented as hypothetical regulatory and legal risks relating to Alibaba's compliance with China's anti-monopoly laws and/or unfair competition laws while omitting and failing to disclose that Alibaba was in fact employing practices that SAMR had already declared to be a violation of Chinese law and unambiguously ordered Alibaba to cease from doing.

255.    In addition, a number of additional specific statements within the purported risk warning quoted in ¶253 are independently materially false and/or misleading, including:

(a) The statement that "The PRC anti-monopoly enforcement agencies have in recent years strengthened enforcement under the PRC Antimonopoly Law" was materially misleading and extremely reckless where Defendants knew and failed to disclose that Alibaba was then violating the AML by utilizing illegal exclusive dealing business practices.

(b) The statement "we believe that our business practices do not violate anti-monopoly or unfair competition laws" was materially false and misleading, baseless, and contrary to fact, because it falsely claimed that Alibaba's business practices complied with China's AML when they did not, including with respect to Alibaba's "Choose One of Two"

---

[129] Alibaba repeated this purported risk warning in its Hong Kong Annual Report for FY 2020, filed with the SEC on a Form 6-K dated July 13, 2020, signed by Company Secretary Timothy Steinert, and these statements repeated therein were false and misleading for the same reasons.

practices, which the SAMR unambiguously stated were unlawful and "clearly prohibited" under Chinese laws at least as early as November 5, 2019. The statement thus did not fairly align with the information in Alibaba's possession at the time and directly conflicted with what a reasonable investor would take from the statement, to wit, that Alibaba was not employing practices that violated China's anti-monopoly or unfair competition laws.

(c) The statement "due to our large scale of business and close media attention, there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted" was materially misleading because it misrepresented and failed to disclose that due to Alibaba's knowing and ongoing violations of Chinese law in contravention of SAMR directives, regulators were extremely likely to initiate anti-monopoly investigations into specific business practices that Alibaba employed, including its "Choose One of Two" practices, forced exclusivity, and related anti-competitive behavior.

(d) The statement that "Any anti-monopoly lawsuit, regulatory investigations or administrative proceedings initiated against us could also result in our being subject to regulatory actions" was materially misleading where Defendants failed to disclose that because Alibaba continued to employ "Choose One of Two" and related exclusive or restrictive dealing practices and policies in violation of Chinese law and the SAMR's clear orders, Alibaba was *already* at heightened risk of a regulatory investigation, proceeding, or action.

(e) Finally, the statement "alleged prior narrowly-deployed exclusive partnerships" was materially false and misleading because it suggested: (1) that Alibaba's exclusivity requirements were "narrowly-deployed" when, in fact, Alibaba's exclusive and restrictive

dealing requirements were a deeply engrained and regular part of Alibaba's business practices (*see* Sec. IX.C, *infra*); and (2) that Alibaba's exclusivity requirements were "prior" business practices, falsely suggesting that Alibaba had ceased the practices by the time of the 2020 Form 20-F when, in fact, Alibaba had continued to utilize unlawful exclusive and restrictive dealing requirements *throughout* 2020 (*see* Sec. IX.C, *infra*).

256. Alibaba's 2020 Form 20-F stated the following about the Company's "Core Commerce" and "China Commerce Retail" revenue:

**Core Commerce**

Our core commerce segment is primarily comprised of our China commerce retail, China commerce wholesale, retail commerce – cross-border and global, wholesale commerce – cross-border and global, logistics services, local consumer services and others. ***The marketplaces of our core commerce business attract and retain a large number of consumers and merchants. We primarily generate revenue from merchants.***

**China Commerce Retail**

***We generate revenue from merchants by leveraging our data technology and consumer insights which enable brands and merchants to attract, retain and engage consumers, complete transactions, improve their branding, enhance operating efficiency, and offer various services***. The revenue model of our China commerce retail business is primarily performance-based marketing services that are typically set by market-based bidding systems. Revenue from this model primarily consists of customer management revenue, commission and other revenue.[130]

257. Alibaba's explanations of how the Company's marketplaces "attract and retain a large number of…merchants" and how it generated its revenue from merchants were materially misleading because they omitted and failed to disclose that Alibaba "retain[ed]" many of its most important merchants, and derived its revenue, in substantial part, based on its illegal business

---

[130] Alibaba repeated these statements in its Hong Kong Annual Report for FY 2020, filed with the SEC on a Form 6-K dated July 13, 2020, signed by Company Secretary Timothy Steinert, and these statements repeated therein were false and misleading for the same reasons.

practices that forced its customers (*i.e.*, merchants) into exclusive selling arrangements, or punished them for selling on competitor platforms, which practices the SAMR instructed before the Class Period were "clearly prohibited" and ordered Alibaba to cease using them.

258.     Alibaba's 2020 Form 20-F also certified that "Other than as disclosed in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our net revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial conditions."

259.     The foregoing statement was materially false and/or misleading because the Omitted Exclusive Dealing Facts—including SAMR's specific instruction on November 5, 2019 that exclusive dealing was unlawful, SAMR's orders that all e-commerce companies cease exclusive dealing practices, and the fact that Alibaba ignored the directive and continued to utilize forced vendor exclusivity practices after November 5, 2019 and throughout the Class Period— constituted a "trend," "uncertaint[y]," or "demand[]" that was reasonably likely to have a material impact on Alibaba's revenues or future operating results or financial conditions.

260.     Finally, Alibaba's 2020 Form 20-F was materially false and misleading because it omitted and failed to disclose, in violation of Item 303 of Regulation S-K and Item 5(D) of Form 20-F, the Omitted Exclusive Dealing Facts, which Alibaba had an affirmative duty to disclose pursuant to Item 5(D) of Form 20-F.

### 2.     Alibaba's 1Q 2021 (June Quarter 2020) Results

261.     On August 20, 2020, Alibaba filed a Form 6-K with the SEC reporting its financial results for the quarter ending June 30, 2020 (1Q 2021), signed by Defendant Wu. The financial results attached to the filing stated, in relevant part:

**Core commerce**

*• China commerce retail business*

Revenue from our China commerce retail business in the quarter ended June 30, 2020 was RMB101,321 million (US$14,341 million), an increase of 34% compared to RMB75,601 million in the same quarter of 2019. Revenue from our China retail marketplaces recorded a strong recovery compared to March 2020 quarter. Combined customer management and commission revenues grew 21% year-over-year, reflecting an increase of 23% in customer management revenue and an increase of 17% in commission revenue. The growth of customer management revenue was primarily due to increased revenue contribution from new monetization formats, including recommendation feeds, as well as the increase in volume of paid clicks in search monetization.

262. Alibaba's statements about the nature and source of its "customer management and commission revenues" were materially misleading because they omitted and failed to disclose that Alibaba derived this revenue, in part, based on its illegal business practices that forced its customers (*i.e.*, merchants) into exclusive selling arrangements, or punished them for selling on competitor platforms, which practices the SAMR instructed before the Class Period were "clearly prohibited" and ordered Alibaba to cease using them.

### 3. Alibaba's September 28-30 Investor Day Presentation

263. From September 28-30, 2020, Alibaba hosted its annual investor day conference. During the conference, Defendant Wu stated the following about Alibaba's supposed "value proposition" to its merchants:

Next, I would like to dedicate a session to talk about our value proposition to consumers and merchants. This is our core value, and this is how we make it easy to do business anywhere and how we could achieve sustainable growth.

* * *

There is a uniqueness about Alibaba digital economy. There are many businesses within this ecosystem, so that longer the people stay, more activities they have conducted. And you see synergy actually could increase our consumer engagement.

* * *

Now, let's take a look at our value creation for merchants. Merchants are customers who pays us directly,….

* * *

Taobao and Tmall, they are not only providing distribution value to our merchants to help them reach GMV, but they're also providing services to help them acquire new consumers, retain these consumers, help their brand building, and help their new products launching. So there, a whole set of the value at the sales and marketing and customer service that we provided to the merchants. We also provide IT infrastructures to these merchants. For example, AliCloud, where we offered differentiated solutions to these customers across all of these industries, and our DingTalk also enhanced the office communication and collaborations. So you can tell that GMV is not our TAM [or "total addressable market"]. Merchants costs and expenditures, these are our TAM. We aim to enable these merchants to operate at a higher efficiency, and when they realize and recognize this value we provided to them, they will pay us and our revenue will grow. As of now, we have run 3.9 million of paying merchants in our China retail marketplaces….

264.    Wu's statements about the value proposition, value creation, how Alibaba "helps" its merchants, and how Alibaba "enable[s]" its merchants "to operate at a higher efficiency" were materially misleading because they omitted and failed to disclose that in connection with the services Alibaba provided to merchants, it also utilized illegal business practices that forced merchants into exclusive selling arrangements, or punished them for selling on competitor platforms, which practices the SAMR instructed before the Class Period were "clearly prohibited" and ordered Alibaba to cease using.

### 4.    Alibaba's 2Q 2021 (September Quarter 2020) Results

265.    On November 5, 2020, Alibaba filed a Form 6-K with the SEC reporting its financial results for the quarter ending September 30, 2020 (2Q 2021), signed by Defendant Wu. The filing attached a press release quoting Zhang and Wu stating, in relevant part:

"Alibaba had another strong quarter. We continued to help businesses recover and find new opportunities for growth through digitalization in the post-pandemic landscape. ***The solid performance of our core commerce and robust growth of Alibaba Cloud are the direct results of our commitment to value creation for customers***," said Daniel Zhang, Chairman and Chief Executive Officer of Alibaba Group. "We remain focused on our three long-term growth engines — domestic

consumption, cloud computing and data intelligence, and globalization — to effectively capture opportunities from the ongoing changes in consumer demand and acceleration of digitalization of businesses across our digital economy."

"We delivered another solid quarter, with revenue growth of 30% year-over-year and adjusted EBITDA up 28% year-over-year," said Maggie Wu, Chief Financial Officer of Alibaba Group. "***Our domestic core commerce business continued to grow steadily*** during the post-COVID-19 environment in China through higher purchase frequency and consumer spending,…"

266.    Zhang's statement that "the solid performance of our core commerce…[is] the direct result[] of our commitment to value creation for customer," and his statement about how Alibaba "effectively capture[s] opportunities" in its core China marketplace sector, and Wu's statement that "[o]ur domestic core commerce business continued to grow steadily during the post-COVID-19 environment in China through higher purchase frequency and consumer spending" were materially misleading because they omitted and failed to disclose that Alibaba's core China commerce business was based, in substantial part, on its illegal business practices that forced its customers (*i.e.*, merchants) into exclusive selling arrangements, or punished them for selling on competitor platforms, which practices the SAMR instructed before the Class Period were "clearly prohibited" and ordered Alibaba to cease using them.

267.    The financial results attached to the November 5, 2020 Form 6-K also stated, in relevant part:

**Core commerce**

**• *China commerce retail business***

Revenue from our China commerce retail business in the quarter ended September 30, 2020 was RMB95,470 million (US$14,061 million), an increase of 26% compared to RMB75,786 million in the same quarter of 2019. Customer management revenue grew 20% year-over-year, primarily due to robust growth in revenue from new monetization formats, such as recommendation feeds, an increase in the volume of paid clicks in search monetization, as well as the 21% year-over-year growth of Tmall online physical goods GMV, excluding unpaid orders.

268. Alibaba's statements about the nature and source of its "customer management revenue" were materially misleading because they omitted and failed to disclose that Alibaba derived this revenue, in substantial part, based on its illegal business practices that forced its customers (*i.e.*, merchants) into exclusive selling arrangements, or punished them for selling on competitor platforms, which practices the SAMR instructed before the Class Period were "clearly prohibited" and ordered Alibaba to cease using them.

### 5. Alibaba's Hong Kong Interim Report

269. On December 18, 2020, Alibaba filed a Form 6-K with the SEC, signed by Company Secretary Timothy Steinert, attaching the Company's Hong Kong Interim Report for the six months ended September 30, 2020 (the "Hong Kong Interim Report"). The Hong Kong Interim Report purported to warn that the Company faced risks to its business, including "Alibaba's ability to continue to compete effectively and maintain and improve the network effects of its digital economy" and "changes in laws, regulations and regulatory environment that affect Alibaba's business operations."

270. The foregoing purported risk warnings were materially misleading because they presented as hypothetical regulatory and legal risks that could affect Alibaba's business operations without disclosing that Alibaba that was in fact employing practices that SAMR had already declared to be a violation of Chinese law and unambiguously ordered Alibaba to cease from doing. Moreover, it was materially false or misleading to purport to warn investors about hypothetical risks relating to "Alibaba's ability to continue to compete effectively" while at the same time omitting and failing to disclose that Alibaba had already been instructed by SAMR that the very business practices Alibaba used to fend off competition (*i.e.*, exclusive dealing practices) were illegal and that the SAMR had ordered Alibaba to cease engaging in these practices.

271. The financial results reported in the Hong Kong Interim Report also stated, in relevant part:

**Core commerce**

• *China commerce retail business*

Revenue from our China commerce retail business for the six months ended September 30, 2020 was RMB196,791 million (US$28,984 million), an increase of 30% compared to RMB151,387 million for the same period of 2019. Customer management revenue grew 21% year-over-year, primarily due to robust growth in revenue from new monetization formats, such as recommendation feeds, an increase in the volume of paid clicks in search monetization, as well as the 24% year-over-year growth of Tmall online physical goods GMV, excluding unpaid orders.

272. The Hong Kong Interim report further stated that "We presented our commission revenue as part of customer management revenue in order to better reflect our value proposition to merchants on our platforms."

273. Alibaba's statements in ¶¶271-72 about the nature and source of its "customer management revenue" and its "value proposition to merchants on our platforms" were materially false and misleading because they omitted and failed to disclose that Alibaba derived this revenue, in substantial part, based on its illegal business practices that forced its customers (*i.e.*, merchants) into exclusive selling arrangements, or punished them for selling on competitor platforms, which practices the SAMR instructed before the Class Period were "clearly prohibited" and ordered Alibaba to cease using.

**B.    Defendants' False And Misleading Statements And Omissions Relating to Ant Group During the Class Period**

**1.    Defendants' Statements About the Ant IPO**

274. On October 21, 2020, Alibaba filed a Form 6-K signed by Company Secretary Tim Steinert announcing, in part:

Ant Group Co., Ltd. ("Ant Group"), an unconsolidated related party of Alibaba Group Holding Limited ("Alibaba"), today published an announcement on the Shanghai Stock Exchange regarding the arrangements for its initial public offering and listing on the Shanghai Stock Exchange STAR board (the "A Share Offering") and certain information regarding its concurrent initial public offering and listing on The Stock Exchange of Hong Kong Limited (the "H Share Offering" and together with the A Share Offering, the "Offering").

Alibaba currently holds ordinary shares of Ant Group and Class C shares of Ant International Co., Limited ("Ant International"), a subsidiary of Ant Group, that together represent 33% of the equity interest in Ant Group, assuming the completion of the redemption and subscription arrangement described below.

* * *

Alibaba has agreed to subscribe for 730 million A shares as part of the placement to strategic investors in the A Share Offering, subject to receipt of required regulatory approvals and fulfillment of other customary conditions precedent.

275.    The foregoing statement was materially misleading because Defendants concealed and failed to disclose material regulatory risks to the Ant IPO, including risks relating to the obfuscation of Ant's ownership structure, which posed material risks to the consummation of the Ant IPO and thus materially threatened the value proposition of the Ant IPO to Alibaba.

276.    On October 26, 2020, Alibaba filed a Form 6-K signed by Company Secretary Timothy Steinert announcing, in part:

Ant Group Co., Ltd. ("Ant Group"), an unconsolidated related party of Alibaba Group Holding Limited ("Alibaba"), today announced the launch of its concurrent initial public offerings in Shanghai (the "A Share Offering") and Hong Kong (the "H Share Offering" and together with the A Share Offering, the "Offering"), in each case with a fixed price. The offer prices for the A Share Offering and H Share Offering have been set at RMB68.80 per share and HK$80.00 per share, respectively.

As previously announced on October 21, 2020, Alibaba has agreed to subscribe for 730 million A shares as part of the placement to strategic investors in the A Share Offering (the "Subscription"). Based on the offer price of RMB68.80 per share, the total consideration for the Subscription would be approximately RMB50.2 billion. The Subscription is subject to receipt of required regulatory approvals and fulfillment of other customary conditions precedent. Based on the subscription of 730 million A shares, Alibaba expects to hold approximately 31.8% of the equity interest in Ant Group following the Offering, or 31.2% of the equity interest in Ant

Group if the underwriters exercise in full their options to purchase additional shares in both the A Share Offering and H Share Offering.

277. The foregoing statement was materially misleading because Defendants concealed and failed to disclose material regulatory risks to the Ant IPO, including risks relating to the obfuscation of Ant's ownership structure, which posed material risks to the consummation of the Ant IPO and thus materially threatened the value proposition of the Ant IPO to Alibaba.

### 2. Misleading Statements in the Preliminary Ant IPO Prospectus

278. On August 25, 2020, Ant Group's "Application Proof" (the "Preliminary IPO Prospectus" or the "Preliminary Prospectus") was filed with the Stock Exchange of Hong Kong.

279. The Preliminary Ant IPO Prospectus is not signed by any individual. For purposes of §10(b) and Rule 10b-5, Defendant Ma is a maker of statements in the Preliminary Ant IPO Prospectus because, according to the Preliminary Ant IPO Prospectus itself, "Mr. Jack Ma has ultimate control over our Company." Ant also identifies Ma as "the lead founder, one of the directors and principal shareholders of Alibaba, and [Ant's] ultimate controller."

280. Ma is the only Defendant alleged herein to be liable for the materially misleading statements and omissions alleged in the Preliminary Ant IPO Prospectus.

281. In the "History and Development" section, the Preliminary Prospectus purported to "set[] out the shareholding structure of our Company and Ant International as of the date of this prospectus and our shareholding structure upon completion of the H Share Issuance and the A Share IPO," and included the following descriptions of Ant's major shareholders, in relevant part:

> Shanghai Qizhan Investment Center (Limited Partnership), ***Shanghai Zhongfu Equity Investment Management Center (Limited Partnership)***, Shanghai Jingyi Investment Center (Limited Partnership), Shanghai Qihong Investment Center (Limited Partnership) and Shanghai Yunfeng Xincheng Investment Center (Limited Partnership) ***are*** China-based limited partnerships engaged in investment activities and ***controlled by Shanghai Zhongfu Asset Management Center (Limited Partnership)***.

282.     The foregoing statement was materially false or misleading because it failed to disclose (1) the roles of Li Botan and Beijing Zhaode Investment Group as the persons with the ultimate control over and financial interest in Shanghai Zhongfu Equity and (2) that Shanghai Zhongfu Equity and certain related entities identified in its SAMR filings (and the SAMR filings of its affiliates), including Fuqing and Tibet Hongde, operated to conceal the investments of Li Botan and Beijing Zhaode Investment Group, as described at Section VI.E, *infra*. These omissions further misled investors as to the risks that the IPO would not be completed if regulators discovered the true identities of the persons behind Shanghai Zhongfu Equity.

283.     The Preliminary Ant IPO Prospectus also stated that "Beijing Jingguan Investment Center (Limited Partnership) is a China-based limited partnership engaged in investment activities."

284.     The foregoing statement was materially false or misleading because it failed to disclose (1) the roles of Jiang Zhicheng and Boyu Capital as the persons with the ultimate control over and financial interest in Beijing Jingguan Investment Center and (2) that Beijing Jingguan Investment Center and certain related entities identified in its SAMR filings (and the SAMR filings of its affiliates), including Shanghai Tiancen Asset Management and Shanghai Tiancen Investment Management, operated to conceal the investments of Jiang Zhicheng and Boyu Capital, as described in Section VI.D, *infra*. These omissions further misled investors as to the risks that the IPO would not be completed if regulators discovered the true identities of the persons behind Beijing Jingguan Investment Center.

285.     In addition, the Preliminary Prospectus stated that Shanghai Qizhan Investment Center (Limited Partnership) was "a limited partnership established in China which focuses on private equity investment and is ***an independent third party***."

286. This statement was materially false and misleading because, as explained in greater detail in Section VI.E, *infra*, Shanghai Qizhan Investment Center (Limited Partnership) was not an independent third party and instead was a related party to each of Ant, Jack Ma, and Alibaba, as well as Li Botan and Beijing Zhaode Investment Group. This statement was further materially misleading because it (1) failed to disclose the role of Jack Ma and Alibaba in structuring the chain of investment vehicles that operated to conceal the financial interests of each of Li Botan and Beijing Zhaode Investment Group in Shanghai Zhongfu Equity (as described in ¶¶VI.E, *infra*), an entity that was purportedly controlled by the same entity that controlled Qizhan, (2) failed to disclose the common financial interest that Alibaba, Li Botan, and Beijing Zhaode Investment Group had in Shanghai Zhongfu Equity, as described in ¶¶286, *infra*, and (3) misled investors as to the risks that the IPO would not be completed if regulators discovered the true identities of the persons behind Shanghai Zhongfu Equity.

287. The Preliminary Ant IPO Prospectus also stated the following with respect to Ant's purported regulatory risks, in part:

> ***We and our partners are subject to a broad range of laws and regulations, and future laws and regulations may impose additional requirements and other obligations that could materially and adversely affect our business, financial condition and results of operations.***[131]
>
> We have created a vibrant ecosystem and a platform that offers a broad range of digital payment, digital finance and digital daily life services. As such, we and our subsidiaries, associates, joint ventures and affiliates, as well as businesses, partner financial institutions and other participants on our platform, are subject to a broad range of laws, rules and regulations…. As we further expand into other markets, we increasingly become subject to additional legal and regulatory compliance requirements as well as political and regulatory challenges, including scrutiny on data security and privacy and AML compliance, or on national security grounds or for other reasons.

---

[131] Bold/italic emphasis in original.

288.    The Preliminary Ant IPO Prospectus further stated, in part:

***The financial services industry is subject to evolving and extensive regulation.***[132]

We provide digital payment services, and we partner with a large number of financial institutions and enable them to provide services in consumer and SMB credit, investments and insurance. As such, our business model and these financial institutions, as well as our cooperation model with them are subject to evolving and extensive regulation governing the financial services industry. Moreover, the intersection of finance and digital services is a new phenomenon but one that has attracted significant regulatory attention. See "Appendix IV — Regulations" for further details.

* * *

***Our partner financial institutions are also subject to continuously evolving regulations*** on the financial services industry and tightened scrutiny from the regulators, which may be difficult for our partners to comply with or affect their cooperation model with us. ***Potential scrutiny includes more stringent capital requirements, risk weighting requirements***, data security and privacy requirements, limitation on reliance on any single platform, tighter operational standards or more stringent conduct requirements of financial services industry.

289.    The Preliminary Ant IPO Prospectus further stated, in part:

***The laws and regulations governing the online lending and consumer finance industry in China are evolving, and our business operations have been and may need to continue to be modified to ensure full compliance with relevant laws and regulations.***[133]

The online lending and consumer finance industry in China, similar as the overall financial services industry, is subject to evolving regulation. Our CreditTech services address the unmet credit demands of unserved and underserved consumers and small businesses in China, which entails partnering with a large number of financial institutions in China to provide consumer and SMB credit through our platform. The way financial institutions collaborate with their partners, including us, may subject them to regulatory uncertainties.

* * *

The PRC government and relevant regulatory authorities have issued various laws and regulations governing the online lending and consumer finance industry as described in the section headed "Appendix IV — Regulations." For example, the CBIRC issued the Provisional Regulatory Measures for Commercial Banks' Online

---

[132] Bold/italic emphasis in original.

[133] Bold/italic emphasis in original.

Lending Business on July 12, 2020 to provide for the regulatory requirements on the extension of credit by commercial banks via online channels in various aspects. In addition, ***our partner banks are also subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings for various credit assets. Any increase in risk weightings for loans enabled through our platform will increase our partner banks' capital required***, which may reduce the attractiveness of these loans or reduce or eliminate their interests in cooperating with us.

290.    The foregoing statements in ¶¶287-89 were materially misleading because they failed to disclose the material risks that the new Online Lending Regulations posed to Ant's ability to complete the IPO. In particular, the statement omitted and failed to disclose any specific changes Ant would need to make to its business in order to come into compliance with the new measures, and the risks associated with a failure to comply. Moreover, Ant misleadingly pointed to the specific risk posed to its "partner banks" that are "subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings" and that potential scrutiny of its "partner financial institutions" includes "more stringent capital requirements, risk weighting requirements" but omitted and failed to disclose the then-existing risks relating to *Ant's* capital requirements and other risk weightings that threatened to materially impact its business and posed undisclosed material risks to its ability to consummate the IPO.

291.    Finally, the Preliminary Ant IPO Prospectus stated the following about Ant's compliance with applicable laws and regulations relating to online lending and consumer finance:

> ***To comply with existing laws, regulations, rules and government policies relating to the online lending and consumer finance industry, we have implemented and will continue to implement various policies and procedures*** to conduct our business in collaboration with partner financial institutions. During the Track Record Period and as of the Latest Practicable Date, we have not been subject to any material fines or other material penalties under any PRC laws or regulations, including those governing the online lending and consumer finance industry in China.

292.    The foregoing statement was materially false and misleading because it suggested that Ant was in compliance with all applicable banking laws, regulations, rules and government

policies relating to online lending and consumer finance when, in fact, Ant suffered from material regulatory matters relating to its consumer lending business that prevented it from meeting its listing qualifications and/or disclosure requirements, and thus posed a material undisclosed risk to the completion of the Ant IPO.

### 3. Misleading Statements in the Final Ant IPO Prospectus

293. Ant's final IPO prospectus was filed with the Stock Exchange of Hong Kong on October 27, 2020 (the "Final Ant IPO Prospectus").

294. The Final Ant IPO Prospectus is not signed by any individual. For purposes of §10(b) and Rule 10b-5, Defendant Ma is a maker of statements in the Final Ant IPO Prospectus because, according to Ant itself, "Mr. Jack Ma has ultimate control over our Company." Ant also identifies Ma as "the lead founder, one of the directors and principal shareholders of Alibaba, and [Ant's] ultimate controller."

295. Ma is the only Defendant alleged herein to be liable for the materially misleading statements and omissions alleged in the Final Ant IPO Prospectus.

296. The Final Ant IPO Prospectus included the same statements about Ant's purported ownership as stated in ¶¶281 and 283, *supra*, and those statements are misleading for the same reasons as those identified in ¶¶284 and 286, *supra*.

297. The Final Ant IPO Prospectus included the same statement that Shanghai Qizhan Investment Center (Limited Partnership) was an "independent third party" set forth in ¶285, *supra*, and that statement was materially false and misleading for the same reasons as those identified in ¶286, *supra*.

298. The Final Ant IPO Prospectus also stated the following with respect to Ant's purported regulatory risks, in part:

***We and our partners are subject to a broad range of laws and regulations, and future laws and regulations may impose additional requirements and other obligations that could materially and adversely affect our business, financial condition and results of operations.***[134]

We have created a vibrant ecosystem and a platform that offers a broad range of digital payment, digital finance and digital daily life services. As such, we and our subsidiaries, associates, joint ventures and affiliates, as well as businesses, partner financial institutions and other participants on our platform, are subject to a broad range of laws, rules and regulations…. As we further expand into other markets, we increasingly become subject to additional legal and regulatory compliance requirements as well as political and regulatory challenges, including scrutiny on data security and privacy and AML compliance, or on national security grounds or for other reasons.

299.     The Final Ant IPO Prospectus further stated, in part:

***The financial services industry is subject to evolving and extensive regulation.***[135]

We provide digital payment services, and we partner with a large number of financial institutions and enable them to provide services in consumer and SMB credit, investments and insurance. As such, our business model and these financial institutions, as well as our cooperation model with them are subject to evolving and extensive regulation governing the financial services industry. Moreover, the intersection of finance and digital services is a new phenomenon but one that has attracted significant regulatory attention. See "Appendix IV — Regulations" for further details.

* * *

***Our partner financial institutions are also subject to continuously evolving regulations*** on the financial services industry and tightened scrutiny from the regulators, which may be difficult for our partners to comply with or affect their cooperation model with us. ***Potential scrutiny includes more stringent capital requirements, risk weighting requirements***, data security and privacy requirements, limitation on reliance on any single platform, tighter operational standards or more stringent conduct requirements of financial services industry.

300.     The Final Ant IPO Prospectus further stated, in part:

***The laws and regulations governing the online lending and consumer finance industry in China are evolving, and our business operations have been and may***

---

[134] Bold/italic emphasis in original.

[135] Bold/italic emphasis in original.

***need to continue to be modified to ensure full compliance with relevant laws and regulations.***[136]

The online lending and consumer finance industry in China, similar as the overall financial services industry, is subject to evolving regulation. Our CreditTech services address the unmet credit demands of unserved and underserved consumers and small businesses in China, which entails partnering with a large number of financial institutions in China to provide consumer and SMB credit through our platform. The way financial institutions collaborate with their partners, including us, may subject them to regulatory uncertainties.

\* \* \*

The PRC government and relevant regulatory authorities have issued various laws and regulations governing the online lending and consumer finance industry as described in the section headed "Appendix IV — Regulations." For example, the CBIRC issued the Provisional Regulatory Measures for Commercial Banks' Online Lending Business on July 12, 2020 to provide for the regulatory requirements on the extension of credit by commercial banks via online channels in various aspects. In addition, ***our partner banks are also subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings for various credit assets. Any increase in risk weightings for loans enabled through our platform will increase our partner banks' capital required***, which may reduce the attractiveness of these loans or reduce or eliminate their interests in cooperating with us.

301.     The Final Ant IPO Prospectus further stated, in part:

***The laws and regulations governing the online lending and consumer finance industry in China are evolving, and our business operations have been and may need to continue to be modified to ensure full compliance with relevant laws and regulations.***[137]

The online lending and consumer finance industry in China, similar as the overall financial services industry, is subject to evolving regulation. Our CreditTech services address the unmet credit demands of unserved and underserved consumers and small businesses in China, which entails partnering with a large number of financial institutions in China to provide consumer and SMB credit through our platform. The way financial institutions collaborate with their partners, including us, may subject them to regulatory uncertainties.

\* \* \*

---

[136] Bold/italic emphasis in original.

[137] Bold/italic emphasis in original.

The PRC government and relevant regulatory authorities have issued various laws and regulations governing the online lending and consumer finance industry as described in the section headed "Appendix IV — Regulations." For example, the CBIRC issued the Provisional Regulatory Measures for Commercial Banks' Online Lending Business on July 12, 2020 to provide for the regulatory requirements on the extension of credit by commercial banks via online channels in various aspects. In addition, ***our partner banks are also subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings for various credit assets. Any increase in risk weightings for loans enabled through our platform will increase our partner banks' capital required***, which may reduce the attractiveness of these loans or reduce or eliminate their interests in cooperating with us.

302. The foregoing statements in ¶¶298-301 were materially misleading because they failed to disclose the material risks that the new Online Lending Regulations and new Financial Holding Company Regulations posed to Ant's ability to complete the IPO on the stated schedule. In particular, the statement omitted and failed to disclose the specific changes Ant would need to make to its business in order to come into compliance with the new measures, and the risks associated with the failure to comply. Moreover, Ant misleadingly pointed to the specific risk posed to its "partner banks" that are "subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings" and that potential scrutiny of its "partner financial institutions" includes "more stringent capital requirements, risk weighting requirements" but omitted and failed to disclose the then-existing risks relating to *Ant's* capital requirements and other risk weightings that threatened to materially impact its business and posed undisclosed material risks to its ability to consummate the IPO.

303. Moreover, Ant misleadingly pointed to the specific risk posed to its "partner banks" that are "subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings" and that potential scrutiny of its "partner financial institutions" includes "more stringent capital requirements, risk weighting requirements" but omitted and failed to disclose the then-existing risks relating to *Ant's* capital requirements and other risk weightings that threatened

to materially impact its business and posed undisclosed material risks to its ability to consummate the IPO.

304.    The Final Ant IPO Prospectus further stated, in part:

***Our licensed financial services subsidiaries and associates are subject to evolving and extensive regulation.***[138]

* * *

…our licensed financial services subsidiaries and associate are subject to capital, leverage ratio or solvency margin ratio requirements in the PRC. Any change in regulatory regime or additional requirements may constrain their businesses or result in additional compliance costs.

* * *

On September 11, 2020, the State Council issued the Decision on Implementing the Access Management of Financial Holding Companies…(the "FHC Decision"). The FHC Decision sets out circumstances under which entities or individuals are required to apply to the PBOC within 12 months after the FHC Decision comes into effect (i.e., November 1, 2020) and obtain approval from the PBOC to establish financial holding companies. On the same date, the PBOC issued the Provisional Administrative Measures on Financial Holding Companies…, which specify the entry requirements and procedures set forth in the FHC Decision, and ***set out regulatory requirements on certain key aspects of financial holding companies***, including shareholder eligibility, source of funds and use of funds, ***capital adequacy***, shareholding structure, corporate governance, related party transactions, ***risk management systems***, and risk segregation or firewalls mechanism.

305.    The Final Ant IPO Prospectus, in "Appendix IV — Regulations", also stated the following about the new Financial Holding Company Regulations:

On September 11, 2020, the State Council issued the Decision on Implementing the Access Management of Financial Holding Companies … (the "FHC Decision"), which will come into effect on November 1, 2020. Under the FHC Decision, non-financial companies, individuals or other eligible entities, which control through shareholdings or otherwise at least two cross-sector financial institutions and meet certain criteria, are required to apply to and obtain approval from the PBOC for establishing financial holding companies. The FHC Decision ***sets out various entry requirements for financial holding companies***, including requirements on registered capital, shareholders, controlling person, directors, supervisors, senior

---

[138] Bold/italic emphasis in original.

management, ***capital adequacy***, corporate organizations, ***risk management***, internal control and other prudential regulatory requirements.

306. The foregoing statements in ¶¶304-05 were materially misleading because they failed to disclose the material risks that the new Financial Holding Company Regulations and the FHC Decision posed to Ant's ability to complete the IPO on the stated schedule. In particular, the statement omitted and failed to disclose the specific changes Ant would need to make to its business in order to come into compliance with the new measures, and the risks associated with the failure to comply.

307. Finally, the Final Ant IPO Prospectus stated the following about Ant's compliance with applicable laws and regulations relating to online lending and consumer finance:

> ***To comply with existing laws, regulations, rules and government policies relating to the online lending and consumer finance industry, we have implemented and will continue to implement various policies and procedures*** to conduct our business in collaboration with partner financial institutions. During the Track Record Period and as of the Latest Practicable Date, we have not been subject to any material fines or other material penalties under any PRC laws or regulations, including those governing the online lending and consumer finance industry in China.

308. The foregoing statement was materially misleading because it suggested that Ant was in compliance with all applicable banking laws, regulations, rules and government policies relating to online lending and consumer finance—including the new requirements in the recently-enacted Financial Holding Company Regulations, when, in fact, Ant suffered from material regulatory matters relating to its consumer lending business that prevented it from meeting its listing qualifications and/or disclosure requirements, and thus posed a material undisclosed risk to the completion of the Ant IPO.

## VI. ALIBABA'S AND MA'S LIABILITY UNDER RULE 10b-5(a) and RULE 10b-5(c)

309. In addition to Defendants' public false and misleading statements identified in Section V, *supra*, Alibaba and Ma also engaged in devices, schemes, and artifices to defraud under

SEC Rule 10b-5(a) and acts, practices, and courses of business that operated as a fraud and deceit under SEC Rule 10b-5(c).

310.    SEC Rule 10b-5(a) makes it unlawful "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. §240.10b-5(a).

311.    SEC Rule 10b-5(c) makes it unlawful "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. §240.10b-5(c).

312.    These provisions cover misconduct beyond direct misrepresentations made to the investing public and can include actions such as misleading a company's auditor or its regulators as part of an overall scheme that operates as a fraud upon the securities markets.

313.    As described herein, Defendants and certain of Ant's pre-IPO investors engaged in a scheme to defraud regulators and the public by deliberately obscuring the ownership interests of these pre-IPO investors using a complex series of investment vehicles that operated as deceptive devices.  Defendants conducted a number of deceptive acts and practices in furtherance of this scheme, including, *inter alia*, (1) selecting the investors that would permitted to invest in Ant prior to the IPO, (2) coordinating with these investors in concealing their identities, including by funding and participating in the structuring of certain of the investment vehicles used to effectuate the scheme, (3) causing Ant's IPO Prospectus to omit the disclosure of the identity of the hidden investors, and (4) attempting to fast-track the regulatory approval of the IPO so that it would be

completed before the identity of the hidden investors became known to the Chinese government or the public at large.

## A. Ant's Ownership Structure And Key Events In Its Capitalization History

314. According to the Ant Group Prospectus dated October 27, 2020, the three largest shareholders of Ant Group as of the date of the prospectus were (1) Alibaba Group, which held a 32.65% equity interest in Ant Group, (2) Hangzhou Junhan, which held a 29.86% equity interest in Ant Group, and (3) Hangzhou Junao, which held a 20.66% equity interest in Ant Group. These three shareholders, therefore, together held 83.17% of Ant Group's total shares. Hangzhou Junhan and Hangzhou Junao—which, as described below, are both controlled by Jack Ma—held approximately 50.52% of Ant Group's total shares.

315. According to the Ant Group Prospectus, Hangzhou Yunbo is the executive partner and general partner of, and controls, Hangzhou Junhan and Hangzhou Junao. As of October 19, 2020, Jack Ma held a 34% equity interest in Hangzhou Yunbo and three other individuals—Eric Jing, Simon Hu and Fang Jiang—each held a 22% equity interest in Hangzhou Yunbo. Pursuant to a Concert Party Agreement dated August 21, 2020 between these individuals and the articles of association of Hangzhou Yunbo, Jack Ma has ultimate control over Ant Group.

316. Jack Ma not only controlled Ant Group at the time of the IPO Prospectus; he has also controlled Ant Group at all times since its inception. The predecessor to Ant Group, Zhejiang Alibaba E-Commerce Co., Ltd., was established in 2000 by Jack Ma, who held 80% of the company's equity interest, and Simon Shihuang Xie, who held 20% of the company's equity interest. The company took control of Alipay China in 2011.

317. In January 2013, Hangzhou Junao made a cash investment in the company and became the owner of 42.14% of the company's equity interest, and the equity interests owned by Jack Ma and Simon Shihuang Xie were diluted to 46.29% and 11.57%, respectively. On June 11,

2014, the company's name was changed to Zhejiang Ant Small and Micro Financial Services Group Co., Ltd. On the same date, Jack Ma and Simon Shihuang Xie transferred their respective equity interests in the company to Hangzhou Junhan, which became the owner of 57.86% of the company's equity interest.

318.    In January 2015, Hangzhou Junhan transferred 4.61% of equity interest in the company to Shanghai Qizhan Investment Center (Limited Partnership) ("Qizhan"). According to the Ant IPO Prospectus, Qizhan is "limited partnership established in China which focuses on private equity investment and *is an independent third party*." As described *infra* at ¶¶356-59, Qizhan is not in fact an independent third party but a related party with whom Ant, Alibaba and Jack Ma had a preexisting relationship and common interest prior to the Ant IPO Prospectus.

319.    In 2015, the predecessor to Ant Group conducted a round of equity financing and Qizhan transferred part of its equity interest in the company to certain new investors (the "2015 Equity Transactions"). The company's registered capital increased to approximately RMB1,353 million. In 2016, the company conducted another round of equity financing while Hangzhou Junhan and Hangzhou Junao transferred part of their equity interests in the company to certain new investors (the "2016 Equity Transactions"). The company's registered capital further increased to approximately RMB1,459 million.

320.    On December 28, 2016, the company converted into a joint-stock limited company under the laws of the PRC and was renamed Ant Small and Micro Financial Services Group Co., Ltd.

321.    In July 2018, the company conducted another round of equity financing and issued an aggregate of 201,247,162 Shares. At the same time, Hangzhou Junhan and Hangzhou Junao transferred an aggregate of 266,358,322 Shares to certain investors that participated in the 2015

Equity Transactions and the 2016 Equity Transactions and certain new investors at around the same time (the "2018 Equity Transactions"). In July 2018, the company also issued 560,000,000 Shares at par value of RMB1.00 per Share to Hangzhou Junhan for the purpose of supporting its Share Economic Rights Plan and the company's registered capital increased to approximately RMB15,761 million

322. The company's name was changed to Ant Group Co., Ltd. on July 13, 2020.[139]

323. Due to his control of Ant Group and the principal shareholders of Ant Group (Hangzhou Junhan and Hangzhou Junao), Jack Ma controlled all decisions with respect to the sale of shares to new investors, including the selection of those investors and the price at which the shares were sold. For example, when Hangzhou Junhan transferred 4.61% of equity interest to Qizhan in January 2015, Jack Ma controlled Hangzhou Junhan and therefore made the decision to engage in this transfer. As detailed *infra* in ¶¶356-59, Qizhan is controlled by an entity that also controls Shanghai Zhongfu Equity Investment Management Center (Limited Partnership), the investment vehicle through which Li Botan invested into Ant Group. Similarly, Jack Ma controlled the 2016 and 2018 Equity Transactions, which involved Hangzhou Junhan and Hangzhou selling some of their shares to outside investors. It was during those transactions that Jiang Zhicheng invested through Beijing Jingguan. Jack Ma's direct role and personal financial interest in those transactions, along with his prior personal and business relationships with the principals behind these investment vehicles, support the conclusion that he knew the identities of those principals and the manner in which their investment vehicles were structured.

---

[139] The foregoing paragraphs provide only a partial history concerning the capitalization structure of Ant Group and selected key events relating to early investors. The company also engaged in additional share issuances, including, *inter alia*, a round of offshore equity financing in June 2018 (the "2018 Offshore Equity Financing") and the issuance of shares to Alibaba Group in September 2019.

## B. Jack Ma's Pre-Existing Relationships And Dealings With Jiang Zhicheng And Li Botan

324.     Jiang Zhicheng—also known as Alvin Jiang—is the grandson of former Chinese leader Jiang Zemin.  Jiang Zemin served as General Secretary of the Chinese Communist Party from 1989 to 2002, as Chairman of the Central Military Commission of the Chinese Communist Party from 1989 to 2004, and as President of the People's Republic of China from 1993 to 2003.  His grandson Jiang Zhicheng was educated at Harvard, and after working briefly as an analyst at Goldman Sachs, he founded Boyu Capital in 2010.

325.     In 2012, Jiang Zhicheng formed a relationship with Jack Ma by assisting him in buying out half of Yahoo's stake in Alibaba.[140]  At the time, Yahoo owned 40% of Alibaba.  A consortium of investors consisting of Boyu Capital, China Investment Corp., and the private-equity arms of China Development Bank and Citic Group raised $7.1 billion that Jack Ma needed to buy back the Alibaba shares.  Jiang Zhicheng played a key role in the negotiations.  As a result of the deal, the consortium received about a 5% stake in Alibaba.  At the time of the deal, Alibaba was valued at approximately $38 billion, and Boyu's stake "soared in value when [Alibaba] listed on the New York Stock Exchange two years later."[141]  The deal helped "cement[] Boyu's reputation for having the influence to find its way into profitable, high-profile assets."[142]  In addition, the deal established a solid relationship between Jack Ma and Jiang Zhicheng.

---

[140] *See* Ex. 9 (2/16/2021 WSJ article) at 5; Stephen Aldred and Irene Jay Liu, *Special Report: The princeling of private equity*, REUTERS, April 9, 2014, https://www.reuters.com/article/us-china-privateequity-special-report/special-report-the-princeling-of-private-equity-idUSBREA3900D20140410.

[141] *See* Ex. 9 (2/16/2021 WSJ article) at 5.

[142] *Special Report: the Princeling of Private Equity*, REUTERS, April 9, 2014, https://www.reuters.com/article/us-china-privateequity-special-report/special-report-the-princeling-of-private-equity-idUSBREA3900D20140410.

326.     Li Botan is the son-in-law of Jia Qinglin, a former member of the Politburo

Standing Committee, the top echelon of the Chinese Communist Party.  Jia Qinglin has strong ties

to Jiang Zemin, and both are part of what is sometimes referred to as the "Shanghai faction," the

"Shanghai Gang," or the "Jiang faction" in Chinese politics.

327.     Li Botan is married to Jia Qinglin's daughter Jia Qiang (also known as Lin Qing).

Li Botan was a trader in the head office of the Bank of China and the head of Asia for Harlow

Butler, a British company operating in Hong Kong.  Li Botan is also the founder and chairman of

Beijing Zhaode.  However, according to the 2/16/2021 WSJ article,

> [a]mong China's business and political elites, [Li Botan] is best known for having
> helped establish in 2009 the Maotai Club, a private club in a historic house near
> Beijing's Forbidden City that had been a haunt for princelings and their patrons
> until recent years.

> Since he took power in late 2012, Mr. Xi has directed his ire at corruption in the
> party and the tales of members' lavish banquets and harems of mistresses that had
> turned ordinary Chinese into cynics. Events like those held by Mr. Li's Maotai Club
> were seen by the leader as harmful to the party. "You people, you either eat and
> drink yourselves into the grave, or die between the sheets," he said at a meeting
> with senior officials earlier in his tenure, according to people briefed on the
> remarks.

328.     The Maotai Club is the clubhouse of the Beijing National Wine Maotai Culture

Research Association (the "Maotai Association").  The Maotai Club has more than 600 members,

who "include the art world, the cultural world and many business elites."[143]

329.     Starting in 2013, President Xi instituted a crackdown against the Maotai Club and

associated clubs, not just because he saw the lavish events at those clubs as unseemly and contrary

to the image that the CCP wanted to project, but also because those events facilitated deal-making

---

[143] *See The "Maotai Club" Under Xi Jinping's Watchful Eye – Jia Qinglin's Family Corruption
Insider is on the Table Again*, todaychina, Feb. 25, 2021, https://todaychina.cc/19265.html.

and influence peddling among a class of political and economic elites that presented a potential

threat to Xi's power.

330. According to a 2/25/2021 story by todaychina:

In 2013 and 2014, the Communist Party of China (CPC) launched a high-profile campaign to "fix clubs" and strictly forbade officials from visiting private clubs. However, according to media investigations, the "Maotai Club" has been "de-licensed" but is still operating in secret.

Informed sources in Beijing have revealed that Li Botan's best "investment" tactic over the past decade has been to rely on such connections and political backstage to make a lot of money.[144]

331. Jack Ma's connection to Li Botan stems from his investment into the "Jiangnan

Club" in Hangzhou, a club that is associated with the Maotai Club and the Maotai Association.

According to the todaychina story:

"Jiangnan Club" is a clubhouse invested [in] by Jack Ma, whose initiators include Jack Ma, Ding Lei, Chen Tianqiao, Feng Gensheng, Shen Guojun, Song Weiping, Lu Weiding and Guo Guangchang, eight business tycoons from Zhejiang. *"Jiangnan Club" is also regarded as a branch of the "Maotai Club"* ….

In January 2014, the Standing Committee of the CPC Zhejiang Provincial Committee held a special meeting to convey Xi Jinping's instructions on the issue of high-end "clubs" in the West Lake scenic area, and asked the Hangzhou Municipal Government to rectify and shut down the high-end "clubs" in the West Lake scenic area.

After that, the "Jiangnan Club" and other high-end business premises [started an] "initiative to shut down".

332. Based on the foregoing, Plaintiffs allege on information and belief that (1) Li Botan

had a pre-existing relationship with Jack Ma at the time that Jack Ma began to sell equity interests

in Ant Group to private investors prior to the Ant IPO, (2) both Li Botan and Jack Ma knew, based

on, among other things, their experiences with the Maotai Club and Jiangnan Club, that President

Xi was hostile to the interests of the Shanghai faction, and (3) both Li Botan and Jack Ma knew

---

[144] *Id.*

that if the Chinese central government were to become aware of investments by Li Botan (or Jiang Zhicheng) in Ant Group, such knowledge could present a material threat that the Chinese government might engage in a regulatory crackdown and prevent Ant Group from going public. Plaintiffs' information and belief with respect to these allegations is based on, *inter alia*, (1) the affiliation of the Jiangnan Club with the Maotai Club, (2) the government's previous crackdown on those clubs, and (3) the additional facts and circumstances set forth in Section VI.E, *infra*, including those relating to Alibaba's participation in the structuring of the investment vehicles controlled by Li Botan.

C.    **Pre-Existing Conflicts Between Xi Jinping And The Political Families Of Jiang Zhicheng And Li Botan**

333.    The same political dynamics that drove the Chinese government's crackdown on the Maotai Club and the Jiangnan Club in 2013-14 also played a key role in the Chinese government's suspension of the Ant IPO.  According to the 2/25/2021 today china story:

> Hua Po, an observer of Beijing's current affairs, said that the crackdown on the Ant Group is really about cracking down on Jiang Zemin, Jia Qinglin and other Jiang faction forces behind it. ***These people have formed a vested interest group for decades, and Xi Jinping wants to break up a class like them and take their interests away***.

334.    The underlying conflicts between President Xi and the Shanghai faction are long-standing but have intensified in recent years.  On February 22, 2021, the Wall Street Journal reported that Boyu had moved certain of its operations from Hong Kong to Singapore—and that certain of Boyu's co-founders and key executives had likewise moved to Singapore—in order to obtain "greater distance from potential scrutiny or adverse action by authorities in Beijing."[145] According to the 2/22/2021 WSJ article:

---

[145] *See* Chun Han Wong, *Co-Founders of Chinese Private-Equity Firm Boyu Build Singapore Base*, Wall Street Journal (Feb. 22, 2021) (the "2/22/2021 WSJ article").

Boyu's tilt toward the Southeast Asian city-state of Singapore was mainly driven by concerns over the ebbing clout of the elder Mr. Jiang, 94 years old, whose patronage has buttressed the firm's success, the people said.

*The transition, which began in late 2019, has coincided with Chinese leader Xi Jinping's efforts to curb the influence of retired Communist Party elders* and tighten Beijing's control over the Chinese territory of Hong Kong. …

The elder Mr. Jiang was Communist Party chief for 13 years until 2002 and a patron to a group of officials—known as the "Shanghai clique"—that rose to senior posts under his tutelage. Many of these officials have since faded from view and some have been purged in Mr. Xi's anticorruption drive.

Party insiders say Mr. Xi, in centralizing power, has curtailed the influence of retired elders who seek to steer decision-making to suit their own interests. ***Though the elder Mr. Jiang's sway diminished as Mr. Xi grew dominant, the former leader's eventual passing could further alter power dynamics within the party and leave his family and allies more vulnerable to purges, the insiders say***.

335.    Similarly, the 2/25/2021 todaychina article reported that in recent years, members of the Shanghai faction, including Jia Qinglin, have been moving their funds to Cambodia and Singapore:

In 2019, Taiwanese scholar Wu Jialong said in an interview that since the outbreak of the "anti-Sino" movement in Hong Kong, the Communist Party's Jiang faction power elites have moved their funds to Cambodia and Singapore.

Wu Jialong disclosed that "Jia Qinglin, the former chairman of the Chinese People's Political Consultative Conference, hired a private plane with Gold, U.S. dollars, euros, etc., and flew it to Cambodia, as a Taiwanese businessman told me."

336.    The 2/25/2021 todaychina article claimed that Xi Jingping was "go[ing] after" Jia Qinglin's family and noted that multiple individuals associated with Jia Qinglin or Li Botan had been investigated and/or prosecuted for alleged corruption:

- In June 2017, Huang Ruyun, the chairman of Century Gold Group, "who is alleged to be one of Jia's family moneybags," was "revoked" from the Fujian Provincial Committee of the Chinese People's Political Consultative Conference for allegedly offering bribes.

- In March 2017, it was confirmed by Central Commission for Discipline Inspection that Sun Huaishan, a former deputy secretary-general of the Chinese People's Political Consultive Conference (CPPCC) who worked under CPPCC Chairman Jia

Qinglin, was being investigated for corruption. In September 2018, Sun was sentenced to 14 years in prison for taking bribes.

- "To date, at least a dozen executives of the [Maotai Group] have been investigated [in relation to corruption allegations], including Yuan Renguo, one of the founders of the Maotai Association, and Liu Zili, vice chairman and general manager of Guizhou Maotai Brewery, who was once vice chairman of the Maotai Association."

337.     The 2/25/2021 todaychina article also claimed that "[s]ince the second half of 2013, Li Botan has rarely appeared in public as the secretary general of the Maotai Association, only using the title of chairman of Beijing Zhaodu to go around." Notably, Xi Jinping assumed office as President of the P.R.C. in March 2013, shortly before Li Botan began to engage in this modification of his public image. In addition, the article noted that Li Botan was elected as an independent director of Guizhou Maotai, one of the listed subsidiaries of the Maotai Group, in December 2014, but that in December 2020 (following a series of anti-corruption investigations of Maotai Group executives), Li Botan resigned from his position as an independent director of Guizhou Maotai.

### D.     The Ownership Structure Of Beijing Jingguan Was A Deceptive Device Used To Conceal The Investment Of Jiang Zhicheng Into Ant Group

338.     As explained *supra*, the 2/16/2021 WSJ article described Jiang Zhicheng's investment into Ant Financial using the following chart:



339.    The Ant IPO Prospectus confirms that Beijing Jingguan Investment Center did in fact invest into Ant Group.  *See supra* at ¶339.

340.    In addition, Plaintiffs' review of the SAMR records of the applicable entities has confirmed that Shanghai Tiancen Investment Management indirectly owns and controls Beijing Jingguan Investment Center, thereby corroborating the first rung of the WSJ's chart.

341.    More specifically, according to records and data stored on the SAMR's official website, (1) the executive partner of Beijing Jingguan Investment Center is Beijing Jingguan Tiancen Asset Management Partnership Enterprise (Limited Partnership) ("Beijing Jingguan Tiancen"); (2) two other partners of Beijing Jingguan Investment Center are Ningbo Yuanxuan Investment Management Partnership Enterprise (Limited Partnership) ("Ningbo") and Shanghai Tiancen Yujing Investment Center (Limited Partnership) ("Shanghai Tiancen Yujing"); (3) the executive partner of Ningbo is Beijing Jingguan Tiancen; (4) the executive partner of Shanghai Tiancen Yujing is Shanghai Tiancen Asset Management Partnership Enterprise (Limited Partnership) ("Shanghai Tiancen Asset Management"); (5) the executive partner of Beijing Jingguan Tiancen is Shanghai Tiancen Investment Management Co. Ltd. ("Shanghai Tiancen

Investment Management"); and (6) the executive partner of Shanghai Tiancen Asset Management is Shanghai Tiancen Investment Management.  This chain of ownership is summarized in the following chart:



342.    However, the relationship between Shanghai Tiancen Investment Management and Boyu Capital is not as direct and straightforward.  Boyu Capital's control over and financial interest in Shanghai Tiancen Investment Management (and the investment vehicles in which it has invested) is not based on a relationship of direct ownership or indirect ownership through a series of parent-subsidiary relationships.  Instead, Boyu Capital exercises control over and possesses a financial interest in Shanghai Tiancen Investment Management through a VIE structure or other

121

informal arrangement approximating a VIE structure.

343.     Even without a formal contract, a VIE or similar arrangement can be based on an informal agreement between a foreign investor (or a domestic Chinese investor seeking to conceal his identity) and a Chinese citizen or citizens who own the Chinese company.  By way of analogy, former stockbroker and convicted felon Jordan Belfort has used the term "rathole" to describe an arrangement whereby a third-party, or nominee, secretly (and illegally) holds stock in his own name on behalf of another.[146]  The VIE structure (or an informal agreement approximating a VIE structure) is structurally similar to a "rathole" in that the legal owners of the company identified in the company's SAMR filings are not the true parties in interest, and the identity of the true owners is not apparent on the face of those regulatory filings.

344.     According to the data and records in the SAMR website, the sole shareholders of Shanghai Tiancen Investment Management are two individuals: Chen Weiwei and Wu Guifang. Therefore, these two individuals are the legal owners of Shanghai Tiancen Investment Management, and the investment by Boyu Capital into Ant Group through Shanghai Tiancen Investment Management and Beijing Jingguan Investment Center is not readily discernable from the ownership structure disclosed in the companies' SAMR filings.

345.     Nevertheless, a number of facts and circumstances support the conclusion that Boyu Capital (and its affiliates and agents) did in fact structure these investment vehicles, control them, and possess a financial interest in their revenues or earnings.  These facts and circumstances include, *inter alia*, the following:

(a)     The contact email address for Shanghai Tiancen Asset Management on the

---

[146] The 2013 film *The Wolf of Wall Street* is based on Jordan Belfort's 2007 memoir of the same name.

SAMR's website is a Boyu Capital email address: slu@boyucapital.com. That same email address is the contact email address listed on the SAMR website for a number of Boyu-affiliated entities, including Boyu Taoran (Shanghai) Equity Investment Management Co. Ltd. ("Boyu Taoran (Shanghai)")—the same entity identified in the WSJ's chart.[147]

(b)     The contact phone number for Shanghai Tiancen Asset Management on the SAMR's website (010-56903888) is also the contact phone number listed on the SAMR website for a number of Boyu-related entities, including Boyu Guangqu Taoran (Shanghai) Investment Management Partnership (Limited Partnership) ("Boyu Guangqu Taoran (Shanghai)"). That entity's name appears in a story published by todaychina, which stated:

> As overseas companies including Hong Kong companies are not allowed to invest in payment business, Boyu Capital, as a "Hong Kong company", first set up "Boyu Guangqu Taoran (Shanghai) Investment Management Partnership" subsidiary in Shanghai. The subsidiary invested in a company called Shanghai Tiancen [I]nvestment Management, which then invested in a private equity fund, Beijing Jingguan Investment Center … , which invested in Ant Group.[148]

(c)     According to the data in the SAMR website, Boyu Guangqu Taoran (Shanghai) was registered on January 13, 2015, Shanghai Tiancen Investment Management was

---

[147] It is also the contact email address listed on the SAMR website for CDB Boyu (Shanghai) Investment Management Co. Ltd and Boyu Capital Advisory Co. Ltd. (Beijing).

[148] *See Wall Street Journal: Jiang Zemin's grandson Jia Qinglin's son-in-law to take a stake in Ant Cancel listing or related to power struggle*, todaychina (Feb. 18, 2021), *available at* https://todaychina.cc/18020.html (some internal quotation marks omitted). The todaychina story appears to be principally based on the 2/16/2021 WSJ article. It is unclear, however, whether the entity named Boyu Guangqu Taoran (Shanghai) Investment Management Partnership was derived from the 2/16/2021 WSJ article or todaychina's own research. That entity's name does not appear in the version of the 2/16/2021 WSJ article that Plaintiffs were able to access.

123

registered on January 14, 2015, and Shanghai Tiancen Asset Management was registered on January 16, 2015.  The close proximity of these dates, along with the overlapping phone numbers and email addresses, suggest that these entities were set up by the same people.

(d)     The 2/16/2021 WSJ article reported that Jiang Zhicheng invested into Ant Group through the layers of investment vehicles described *supra*.  The WSJ's reporting was based not only on public SAMR records but interviews with multiple individuals with inside knowledge of the government's investigation into Ant's ownership structure.  That investigation concluded that Jiang Zhicheng stood to benefit from the Ant IPO.

(e)     Jiang Zhicheng declined to comment to the WSJ and did not provide any public denial or refutation of the WSJ's allegations.  The WSJ story was picked up by multiple international news outlets who published multiple stories repeating and expanding upon the WSJ's original allegations.  The silence of Jiang Zhicheng and Boyu Capital in response to these allegations implicitly confirms that the allegations are true and that Jiang Zhicheng and Boyu Capital were in no position to challenge the findings of the Chinese regulators.

346.     Based on the foregoing, Plaintiffs allege, on information and belief, that (1) Jiang Zhicheng did in fact invest in Ant Group through the chain of investment vehicles described in the 2/16/2021 WSJ article and described in greater detail *supra*; (2) Boyu Capital and/or its subsidiaries or affiliates exercised control over and possessed a financial interest in Shanghai Tiancen Investment Management and Shanghai Tiancen Asset Management, through either a VIE relationship or an informal arrangement approximating a VIE relationship; (3) the chain of

investment vehicles used to effectuate Jiang Zhicheng's investment into Ant Group operated to conceal Jiang Zhicheng's identity as the principal behind the investment from regulators and the public at large; and (4) the investment vehicles operated as deceptive devices and artifices and constituted part of a scheme to defraud.

347.    Plaintiffs further allege, on information and belief, that Defendants Jack Ma and Alibaba were aware of and participated in the foregoing scheme to defraud.  Plaintiffs' information and belief in this regard is based on, *inter alia*, (1) Jack Ma's control of Ant Group and personal role in the selection of pre-IPO investors as described *supra* at Section VI.A; (2) the shares obtained by Beijing Jingguan Investment Center in the 2016 Equity Transactions and 2018 Equity Transactions were obtained from Hangzhou Junhan and Hangzhou Junao, entities directly controlled by Jack Ma, which suggests that Jack Ma and his agents negotiated the sales price and deal terms with the principals who controlled Beijing Jingguan Investment Center; (3) Jack Ma had a pre-existing relationship with Jiang Zhicheng as described *supra* at Section VI.B; (4) Jack Ma was aware of the pre-existing political conflicts between President Xi Jinping and the Shanghai faction and the efforts of President Xi to undercut the power and influence of the Shanghai faction and the princelings, as described *supra* in Sections VI.B and VI.C; (5) Jack Ma caused the Ant IPO Prospectus to omit disclosure of Jiang Zhicheng's interest in Beijing Jingguan Investment Center; and (6) Jack Ma took steps to attempt to fast-track regulatory approval of the IPO, as described in Section VI.F, *infra*, which supports the conclusion that he was trying to avoid discovery of the concealed ownership interests of Jiang Zhicheng (and Li Botan, amongst others) by regulators before the consummation of the IPO.

E.    **The Ownership Structure Of Shanghai Zhongfu Equity Was A Deceptive Device Used To Conceal The Investment Of Li Botan Into Ant Group**

348.    As explained *supra*, the 2/16/2021 WSJ article described Li Botan's investment

into Ant Financial using the following chart:



349.    The Ant IPO Prospectus confirms that Shanghai Zhongfu Equity did in fact invest into Ant Group.  *See supra* at ¶224.

350.    Plaintiffs' review of the SAMR records of the applicable entities has confirmed that (1) Fuqing Qisheng No. 3 Investment Partnership Enterrpise (Limited Partnership) ("Fuqing") is a shareholder of Shanghai Zhongfu Equity, and (2) Tibet Hongde Century Investment Co. Ltd. ("Tibet Hongde") is a shareholder of Fuqing, thereby corroborating the first two rungs of the WSJ's chart.

351.    However, just as with the investment structure discussed in Section VI.D, *supra*, the relationship between Tibet Hongde and Beijing Zhaode Investment Group Co. Ltd. ("Beijing Zhaode") is not as direct and straightforward.  Beijing Zhaode's control over and financial interest in Tibet Hongde (and the investment vehicles in which it invested) is not based on a relationship of direct ownership or indirect ownership through a series of parent-subsidiary relationships.

Instead, Beijing Zhaode exercises control over and possesses a financial interest in Tibet Hongde (and the investment vehicles in which it invested) through a VIE structure or other informal arrangement approximating a VIE structure.

352. According to the data and records in the SAMR website, the sole shareholder of Tibet Hongde is Beijing Hongde Century Investment Co. Ltd. ("Beijing Century"), and the sole shareholders of Beijing Century are two individuals: Li Xin and Han Guang. Therefore, these two individuals are the legal owners of Beijing Century (which in turn is the legal owner of Tibet Hongde), and the investment by Beijing Zhaode into Ant Group through Shanghai Zhongfu Equity is not readily discernable from the ownership structure disclosed in the companies' SAMR filings.

353. Nevertheless, a number of facts and circumstances support the conclusion that Beijing Zhaode (and its affiliates and agents) did in fact control and operate these investment vehicles and possess a financial interest in their revenues or earnings. These facts and circumstances include, *inter alia*, the following:

(a)  According to the data and records in the SAMR website, (1) Tibet Hongde is a 20% shareholder of Xinjiang Beikong New Energy Development Co. Ltd. ("Xinjiang Beikong"); and (2) Beijing Zhaode is a 90% shareholder of Shenzen Jinshi Mineral Investment Co. Ltd. ("Shenzen"), which in turn is a 30% shareholder of Xinjiang Beikong. In addition, Gong Xiang, a director of Beijing Zhaode, is also a director of Xinjiang Beikong. Han Guang, the legal representative and executive director of Tibet Hongde, is also a director of Xinjiang Beikong. These facts suggest Tibet Hongde and Beijing Zhaode are related parties.

(b)  According to the 2/25/2021 todaychina article, Li Botan publicly holds himself out as the chairman of Beijing Zhaodu (an alternative spelling of Beijing Zhaode).

According to the data and records in the SAMR website, Li Botan is a 99% shareholder of Beijing Xinjia Culture and Art Co. Ltd. ("Beijing Xinjia"), which in turn is a 95% shareholder of Beijing Zhaode.

(c)    The 2/16/2021 WSJ article reported that Li Botan invested into Ant Group through the layers of investment vehicles described *supra*. The WSJ's reporting was based not only on public SAMR records but interviews with multiple individuals with inside knowledge of the government's investigation into Ant's ownership structure. That investigation concluded that Li Botan stood to benefit from the Ant IPO.

(d)    Li Botan declined to comment to the WSJ and did not provide any public denial or refutation of the WSJ's allegations. The WSJ story was picked up by multiple international news outlets who published multiple stories repeating and expanding upon the WSJ's original allegations. The silence of Li Botan and Beijing Zhaode in response to these allegations implicitly confirms that the allegations are true and that Li Botan and Beijing Zhaode were in no position to challenge the findings of the Chinese regulators.

354.    Based on the foregoing, Plaintiffs allege, on information and belief, that (1) Li Botan did in fact invest in Ant Group through the chain of investment vehicles described in the 2/16/2021 WSJ article and described in greater detail *supra*; (2) Beijing Zhaode and/or its subsidiaries, affiliates or agents exercised control over and possessed a financial interest in Tibet Hongde, through either a VIE relationship or an informal arrangement approximating a VIE relationship; (3) the chain of investment vehicles used to effectuate Li Botan's investment into Ant Group operated to conceal Li Botan's identity as the principal behind the investment from regulators and the public at large; and (4) the investment vehicles operated as deceptive devices

and artifices and constituted part of a scheme to defraud.

355.    Additional facts and circumstances support the conclusion that Defendants Jack Ma and Alibaba not only were aware of Li Botan's scheme to conceal his identity as an investor in Ant Group, but that they actively assisted him in this artifice by participating in the structuring of certain of the investment vehicles used to effectuate the scheme.

356.    As described *supra*, Fuqing is a shareholder of Shanghai Zhongfu Equity, the investment vehicle Li Botan used to invest in Ant Group. Specifically, according to the data and records in the SAMR website, Fuqing owns 39.8634% of the shares of Shanghai Zhongfu Equity. Another entity called Shanghai Yunfeng Qitai Investment Center (Limited Partnership) ("Shanghai Yunfeng Qitai") owns 21.7788% of the shares of Shanghai Zhongfu Equity. Alibaba (China) Network Technology Co. Ltd. ("Alibaba Network Technology") owns 34.1841% of the shares of Shanghai Yunfeng Qitai. Thus, an Alibaba affiliate jointly invested with Li Botan into Shanghai Zhongfu Equity, the VIE/investment vehicle that Li Botan used to conceal his investment into Ant Group. Li Botan is therefore a related party to Alibaba, because both share a common interest in the profitability of Shanghai Zhongfu Equity. A chart summarizing this joint ownership structure is set forth below:



357.    Furthermore, Qizhan—which, as discussed earlier, played an important role in conveying Ant shares to a range of early pre-IPO investors—is a related party to Alibaba, Jack Ma, and Ant.

358.    According to the Ant IPO Prospectus:

*Shanghai Qizhan Investment Center (Limited Partnership)* [*i.e.*, "Qizhan], ***Shanghai Zhongfu Equity Investment Management Center (Limited Partnership)***, Shanghai Jingyi Investment Center (Limited Partnership), Shanghai Qihong Investment Center (Limited Partnership) and Shanghai Yunfeng Xincheng Investment Center (Limited Partnership) ***are*** China-based limited partnerships engaged in investment activities and ***controlled by Shanghai Zhongfu Asset***

130

*Management Center (Limited Partnership)*.

359.     Thus, Shanghai Zhongfu Asset Management Center (Limited Partnership) ("Shanghai Zhongfu Asset") controls both Shanghai Zhongfu Equity—the VIE used by Li Botan to conceal his investment into Ant—and Qizhan, the entity that was used to parcel out a portion of Jack Ma's Ant shares to an early set of hand-picked pre-IPO investors. While the Ant IPO Prospectus stated that Qizhan was an "independent third party," that assertion was not true because Alibaba and Li Botan share a common interest in the profitability of Shanghai Zhongfu Equity, and both Shanghai Zhongfu Equity and Qizhan are controlled by Shanghai Zhongfu Asset which manages the entities within the VIE structure used to conceal Li Botan's investment into Ant. These facts and circumstances suggest that Li Botan, Jack Ma, and Alibaba (which Jack Ma, as Alibaba's Executive Chairman of the Board in 2015, controlled at the time) all worked together in connection with the structuring and operation of the investment vehicles used by Li Botan to conceal his identity and that Qizhan is a related party to each of Li Botan, Jack Ma, Alibaba, and Ant.

360.     Plaintiffs allege, on information and belief, that Defendants Jack Ma and Alibaba were aware of and participated in the scheme to defraud Chinese regulators and the public at large concerning Li Botan's investment into Ant Group.  Plaintiffs' information and belief in this regard is based on, *inter alia*, (1) Jack Ma's control of Ant Group and personal role in the selection of pre-IPO investors as described *supra* at Section VI.A; (2) the Ant shares obtained by Shanghai Zhongfu Equity in the 2015 Equity Transactions were obtained from Qizhan, which is a related party to each of Li Botan, Jack Ma, and Alibaba; (3) Alibaba holds an indirect ownership interest in Shanghai Zhongfu Equity, indicating that Alibaba actively participated in the structuring and funding of the VIE structure used to disguise Li Botan's investment into Ant; (4) Jack Ma had a pre-existing relationship with Li Botan as described *supra* at Section VI.B; (5) Jack Ma was aware

of the pre-existing political conflicts between President Xi Jinping and the Shanghai faction and the efforts of President Xi to undercut the power and influence of the Shanghai faction and the princelings, as described *supra* in Sections VI.B and VI.C; (6) Jack Ma caused the Ant IPO Prospectus to omit disclosure of Li Botan's interest in Shanghai Zhongfu Equity; and (7) Jack Ma took steps to attempt to fast-track regulatory approval of the IPO, as described in Section VI.F, *infra*, which supports the conclusion that he was trying to avoid discovery of the concealed ownership interests of Li Botan (and Jiang Zhicheng, amongst others) by regulators before the consummation of the IPO.

### F. Defendants Were Aware Of The Risks To Regulatory Approval Associated With The Identities Of The Hidden Investors And Engaged In Deceptive Acts To Conceal The Identities Of Those Investors

361. Jack Ma was keenly aware of the political risks associated with the hidden ownership interests of Jiang Zhicheng and Li Botan in Ant and understood that if those hidden ownership interests were discovered by Chinese regulators, the consummation of the Ant IPO could be threatened.[149] According to Gary Rieschel, a venture capitalist who helped manage SoftBank's investments in Asia in the early 2000s, "Jack is very politically savvy."[150] One demonstration of that savvy was Ma's efforts to recruit "strategic investors" into Ant:

> To fend off growing regulatory pressure as Ant became bigger, Mr. Ma made stakes in Ant available to an array of state stalwarts such as the national pension fund and China Investment Corp., the country's massive sovereign-wealth fund, as well as its largest insurers.
>
> Having such "strategic investors" on board—all poised to profit from the IPO— helped Ant's stock-listing application sail through various levels of securities regulators last summer, the people familiar with the matter said.[151]

---

[149] Because Jack Ma's knowledge is imputed to Alibaba, Alibaba was also aware of these risks.

[150] *See* Ex. 9 (2/16/2021 WSJ article) at 7.

[151] *Id.*

362.     Ma took additional measures to ensure that the regulatory approval of the Ant IPO would be as seamless and rapid as possible, including efforts to enlist the assistance of Communist Party officials, like Shanghai Communist Party chief Li Qian, and an internal plan for completing the IPO listing, which had a codename of "Project Star." These steps were largely successful (at least until the Chinese central government's investigation uncovered the hidden ownership interests of Jiang Zhicheng, Li Botan, and others), as the Ant IPO was able to secure various levels of regulatory approval in an expedited timeframe:

> In 2018, the Shanghai government signed a strategic-cooperation agreement with both Ant and Alibaba Group Holding Ltd., the e-commerce giant founded by Mr. Ma. In a meeting with Mr. Ma around that time, according to a release by the Shanghai government, Mr. Li and Shanghai's mayor both pledged to "fully support" Mr. Ma's business in the city. *Inside Ant, the code name for the company's listing plans was "Project Star." And Mr. Ma's plan to list Ant on the new Shanghai board sailed through the regulators*.
>
> *The local securities watchdog in Zhejiang spent about a week in mid-2020 reviewing and advising on the IPO plan. On Aug. 25, Ant submitted its listing prospectus to the STAR Market and to the stock exchange in Hong Kong. Less than a month later, Shanghai regulators completed their audit of the application, enabling Ant to jump ahead of earlier applicants*.[152]

363.     Following the suspension of the Ant IPO, the Chinese central government launched another investigation, focused on how Jack Ma was able to obtain these regulatory approvals in such a quick timeframe. According to the Wall Street Journal:

> The central-government investigation, which started early this year, focuses on regulators who greenlighted the initial public offering, local officials who advocated it and big state firms that stood to gain from it. Mr. Ma's relationships with these state stalwarts are being examined as part of the scrutiny, according to the people.[153]

---

[152] *See* Lingling Wei, *Ant IPO-Approval Process Under Investigation by Beijing*, Wall Street Journal (Apr. 27, 2021), *available at* https://www.wsj.com/articles/ant-ipo-approval-process-under-investigation-by-beijing-11619532022.

[153] *Id.*

364.     Jack Ma's efforts to fast-track the approval of the Ant IPO did not arise in isolation but were part of a coordinated long-term strategic plan that Ma began to implement in 2015 as he started to sell a portion of his Ant shares to various pre-IPO investors, including the "strategic investors" associated with the Chinese government and the other investors like Jiang Zhicheng and Li Botan (and other friends) whose identities were hidden using complex chains of investment vehicles and undisclosed VIE arrangements. As detailed *supra*, Jack Ma and Alibaba actively participated in this scheme to defraud by, among other things, (1) using Qizhan, Hangzhou Junao, and Hangzhou Junhan as intermediaries to transfer portions of Jack Ma's Ant stock to a hand-picked group of investors consisting largely of Jack Ma's friends and business associates; (2) coordinating with the principals behind the hidden investments to structure the investments in a way that would avoid disclosure of the principals' identities; (3) structuring and cross-funding Shanghai Zhongfu Equity using a shared ownership structure involving a VIE controlled by Li Botan and an affiliate of Alibaba; (4) causing the Ant IPO Prospectus to misleadingly omit any disclosure of the hidden ownership interests while describing the pre-IPO investors; and (5) causing the Ant IPO Prospectus to provide misleading disclosures concerning the related party nature of Qizhan and the transactions it facilitated.

365.     Defendants had a powerful motive to engage in this scheme to defraud and the deceptive acts underlying this scheme, because had the hidden ownership interests of Jiang Zhicheng and Li Botan (among others) been disclosed, it would have drawn the ire of the Party and, thus, Ant's regulators. That is the precise risk that came to pass when the central government's investigation uncovered the identity of the concealed investors. Defendants were well aware of this risk, but recklessly chose to disregard it in a gamble that regulatory approval could be secured and the IPO could be consummated before the hidden ownership interests were discovered. The

plan almost worked.

## VII.    MA'S LIABILITY UNDER RULE 10b5-1

366.    Ma had an affirmative duty to disclose the omitted facts based on his sales of Alibaba ADS during the Class Period.

367.    Ma sold 10 million shares of Alibaba ADS beneficially owned by him,  generating proceeds of approximately $2,920,150,000.00. The below table reflects the sales:

| Reported Sale Date | Ma-Controlled Reporting Entity | Shares Sold | Gross Proceeds |
|---|---|---|---|
| 9/30/2020 | Ying Capital Limited | 2,500,000 | $734,950,000 |
| 9/30/2020 | Yun Capital Limited | 2,500,000 | $734,950,000 |
| 10/1/2020 | JSP Investment Limited | 5,000,000 | $1,450,250,000 |
| **CLASS PERIOD TOTAL** | | **10,000,000** | **$2,920,150,000** |

368.    At the time the sales were made, Ma was aware of the Omitted Exclusive Dealing Facts described above. At the same time, he was aware of the increasing regulatory risks that threatened the Ant IPO, as described in Section IV.B.4, *supra*, but he failed to disclose them. In addition, Ma was aware of (1) the hidden ownership interests in Ant Group of Jiang Zhicheng, Li Botan and the other individuals described in ¶228, *supra*; (2) the facts concerning the design and structure of the investment vehicles described in Sections IV.B.5, VI.D, and VI.E, *supra*; and (3) the risks that these concealed ownership interests presented to the consummation of the IPO if they were discovered by Chinese regulators, as described in Section IV.B.5 and VI.F, *supra*.

369.    As the seller of Alibaba ADS during the Class Period, Ma had an affirmative duty under Rule 10b5-1 (17 C.F.R. §240.10b5-1), regarding trading on the basis of material non-public information, to either (a) refrain from selling stock, or (b) clearly disclose the above-described omitted facts to the market.

## VIII.   LOSS CAUSATION

370.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased Alibaba's ADS at artificially inflated prices and were damaged thereby. The price of Alibaba's ADS declined when the concealed risks materialized and/or when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

371. Specifically, artificial inflation in Alibaba's ADS share price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions, as detailed above, was partially revealed to the public on: November 3, 2020; November 10, 2020; and December 23, 2020.

372. On November 3, 2020, at approximately 8:01 a.m. EST, Bloomberg reported that Ant's Shanghai IPO listing would be suspended, "citing [Ant's] inability to fulfill conditions for listing amid changes in regulatory environment." In a Form 6-K filed at approximately 9:18 a.m. EST the same day, Alibaba announced that Ant suspended its IPO because Ant "may not meet listing qualifications or disclosure requirements due to material matters…." In response to this news, as the previously undisclosed regulatory and political risks threatening Ant's IPO materialized, Alibaba's shares fell $25.27 per share, approximately 8.13%, to close at $285.57 per share on November 3, 2020.

373. On November 10, 2020, multiple news outlets reported that China's SAMR had published draft rules aimed at curtailing anti-competitive practices on online platforms, including exclusive cooperation requirements like those imposed on merchants by Alibaba. In response to this news, as the previously undisclosed regulatory risks relating to Alibaba's use of illegal business practices (such as its "Choose One of Two" policy and related exclusive or restrictive

dealing practices) began to materialize, Alibaba's shares fell $23.99 per share, approximately 8.26%, to close at $266.54 per share on November 10, 2020.

374. Finally, after the close of trading on December 23, 2020, Chinese authorities revealed that they had launched an antitrust investigation into Alibaba's monopolistic practices. As The New York Times reported in an article published at 11:32 p.m. EST on December 23, 2020, "[i]n a terse statement, the State Administration for Market Regulation said it had started the investigation amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants or other users of its platforms." In response to this news, as the market learned that Alibaba had engaged in unlawful monopolistic conduct and was, as a result, the direct target of a formal SAMR investigation, Alibaba's shares fell $34.18 per share, approximately 14.32%, to close at $222.00 on December 24, 2020.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Alibaba Explicitly Acknowledged And Committed To Comply With China's Prohibition On Anti-Monopoly Practices Like Forced Exclusivity Or Restricting Merchant Operations

375. During the Class Period, Alibaba knew that its forced exclusivity practices were illegal and acknowledged as much. Following the November 5, 2019 SAMR administrative guidance meeting, during which SAMR unambiguously told Alibaba and other e-commerce companies that "Choose One of Two" practices were "strictly prohibited" under Chinese law, Alibaba agreed to The Commitment of Internet Platform Enterprises on Maintaining a Good Market Order and Promoting the Healthy Development of the Industry ("Commitment Letter"). By agreeing to the Commitment Letter, Alibaba, among other things, explicitly acknowledged that exclusive and restrictive dealing practices violated Chinese law. More specifically, Alibaba made a commitment to not force platform operators to conduct "exclusive cooperation" and to not

impose any unreasonable restrictions or make any unreasonable requirements on the selections of platforms by the operators.

376. On the heels of the November 5, 2019 SAMR administrative guidance meeting, Alibaba was preparing to conduct a share offering of up to $15 billion worth of securities on the Hong Kong stock exchange. That offering was completed on November 25, 2019, with Alibaba ultimately raising approximately US$11.3 billion. It was the year's largest public offering of stock worldwide (followed by Uber's $8.1 billion offering on the NYSE in May 2019). Among other things, Alibaba stated that it planned to use the funds "for implementation of its strategies to drive user growth and engagement." Alibaba was motivated by this offering (i) not to change its restrictive dealing business practices, which helped Alibaba to obtain and retain its market dominance, and (ii) not to disclose that it was informed by the SAMR that the practices were unlawful and ordered by SAMR to cease such practices, which were a central component of its merchant agreements.

**B. Alibaba Admittedly Knew Regulatory Enforcement by "PRC anti-monopoly enforcement agencies" Was Increasing but Continued to Employ "Clearly Prohibited" Business Practices Anyway**

377. Alibaba's 2020 Form 20-F acknowledged that "The PRC anti-monopoly enforcement agencies have in recent years strengthened enforcement under the PRC Antimonopoly Law," which supports the inference of scienter because Defendants knew that PRC anti-monopoly enforcement agencies were increasing enforcement of the AML, but Alibaba continued to utilize forced exclusive dealing policies and practices even after the SAMR explicitly instructed at the November 5, 2019 administrative guidance meeting that such practices were illegal and in violation of Chinese e-commerce, anti-monopoly, and/or anti-unfair competition laws and instructed companies to cease such practices.

378. Alibaba insiders were admittedly aware of the looming anti-monopoly and unfair

business practices regulatory crackdown. For example, as Bloomberg reported, "Liu Bo, Alibaba's general manager of Tmall marketing and operations, said on the sidelines of the company's Singles' Day celebration on Wednesday [November 10, 2021] that he wasn't surprised by the new rules and that the government was 'improving' oversight across various industries."[154]

C.     **Requiring Exclusive Dealing Was Alibaba's Company Pattern and Practice; Many Of Alibaba Illegal Exclusive Dealing Practices Were Explicit Requirements Of Its Customer Agreements**

379.    The April 10, 2021 SAMR report exhaustively details that Alibaba employed a plethora of abusive practices during the Class Period to ensure vendor exclusivity, restrict competition, and related anti-competitive practices, including many that were explicit components of Alibaba's customer agreements since 2015, including but not limited to the following:

- **Alibaba prohibits on-platform operators from opening shops on other competitive platforms.**

- **Alibaba directly prescribes in the agreements that opening shops on other competitive platforms is prohibited.**

- **Alibaba has verbally required core merchants not to operate on other competitive platforms.**

- **Alibaba has prohibited on-platform operators from participating in promotional activities on other competitive platforms.**

- **Alibaba directly prescribes in the agreement that participating in promotional activities on other competitive platforms is prohibited.**

- **Alibaba has verbally required core merchants not to participate in promotional activities on other competitive platforms.**

- **Alibaba has adopted various incentive and penalty measures to ensure the implementation of the "Choose One of Two" requirements.**

- **Alibaba reduced resource support for promotional activities.**

---

[154] *Down $290 Billion, China Tech Investors Mull Nightmare Scenarios*, BLOOMBERG NEWS, November 11, 2020, https://news.bloomberglaw.com/business-and-practice/down-290-billion-china-tech-investors-mull-nightmare-scenarios?context=article-related.

- **Alibaba disqualified the on-platform operators from participating in promotional activities.**

- **Alibaba implemented search downgrading.**

- **Alibaba canceled other major platform rights and interests of the on-platform operators.**[155]

380.    Alibaba's customer agreements were not publicly available during the Class Period.

**D.    Alibaba's Unlawful Business Practices Directly Implicated Its Core Operations**

381.    During the Class Period, Alibaba derived the vast majority of its revenue (86%) from its retail platforms; more specifically, from fees for advertising, management, and marketing services, paid to Alibaba by merchants, as well as fees paid to Alibaba by merchants as commissions on transactions. As such, Alibaba's relationship with merchants, and its written and verbal agreements with and requirements of merchants, constituted its core operations during the Class Period.

**E.    Alibaba's Corporate Scienter**

382.    The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of respondeat superior and common law principles of agency, including, for example, statements made in SEC filings signed by Company Secretary Time Steinert, because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

383.    The scienter of the Individual Defendants and other employees and agents of the Company—including, but not limited to, Wen Jia and Wang Shuai—is similarly imputed to the Company under the corporate scienter doctrine, respondeat superior, and agency principles.

---

[155] Ex. 8 (April 10, 2021 SAMR decision on penalties), at 9-11 (bold emphasis in original).

**F. Additional Scienter Facts Relating to the Omission of Regulatory Risks and Obfuscation of Ant's Ownership**

384. During the Class Period, Alibaba and Ma were all too familiar with how stifling new regulations could be to Ant's growth—in particular regulations that impacted Ant's credit business—and they were thus motivated to push the Ant IPO through as quickly as possible, even as the regulatory risks mounted, without fully explaining the impact of those risks, including risks associated with the increasing regulatory crackdown in the months preceding the IPO. As reported by Forbes in a May 30, 2018 article:

> [I]t should be noted Ant Financial has faced regulation previously. For example, government regulations introduced in 2017 stated that money market fund managers had to set aside at least 0.5% of net assets to control for bad debt. Additional regulations also reduced sales of debt backed consumer loans. This impacted Ant Financial's Huabei and Jiebei online microloan services, since the company could no longer continue to make loans and move them off balance sheet into asset backed securities. At the time, Huabei and Jiebei were considered to have excessive total financing to total capital ratios, which this move aimed to correct. The regulations reduced the profitability of these microlenders, as the volume of asset backed securities sold by Ant declined from 31 billion RMB in the first quarter of 2017 to 10.7 billion RMB by the middle of March 2018.[156]

385. Likewise, Alibaba and Ma had a powerful motive to conceal the hidden ownership interests of Jiang Zhicheng and Li Botan in Ant (and the ownership interests of other elites and friends of Ma who were aligned with those individuals). As detailed *supra*, Alibaba and Ma were well aware of the personal, political and economic conflicts between President Xi Jinping and the Shanghai faction, including the families of Jiang Zhicheng and Li Botan. Ma was acutely aware of the risk of a regulatory crackdown based on his personal experience with the Jiangnan Club. Ma knew that if the Chinese government were to become aware that Jiang Zhicheng and Li Botan

---

[156] *How Will Ant Financial, China's Fintech Giant, Be Impacted By New Regulations?* FORBES, May 30, 2018, https://www.forbes.com/sites/sarahsu/2018/05/30/how-will-ant-financial-chinas-fintech-giant-be-impacted-by-new-regulations/?sh=647fbcde3df4.

141

stood to gain hundreds of millions or billions of dollars from the Ant IPO, there was a high risk that the Chinese government would not allow the IPO to proceed.

386.     As detailed *supra*, Alibaba held a 32.65% equity interest in Ant, and Ma controlled entities holding approximately a 50.52% equity interest in Ant.  Accordingly, Alibaba and Ma stood to gain tens of billions of dollars if the Ant IPO were successfully completed.  Defendants were therefore incentivized to take whatever steps they could to avoid disclosure and discovery by the Chinese authorities of the hidden ownership interests of Jiang Zhicheng and Li Botan, because such discovery could derail what was expected to be the largest IPO in history.

## X.     PLAINTIFFS' CLASS ACTION ALLEGATIONS

387.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities other than Defendants who or which purchased or otherwise acquired Alibaba ADS during the period July 9, 2020 through December 23, 2020, inclusive, and who were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

388.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alibaba ADS actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.

389.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein. Plaintiffs have retained counsel competent and experienced in class and securities

litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs. Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

390.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

391.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)    whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and the proper measure of such damages.

392.    Individualized issues of reliance will not predominate over common issues. The presumption of reliance applies because at all relevant times, the market for Alibaba ADS was an efficient market.

## XI.    NO SAFE HARBOR

393.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged herein to be misleading were not identified as "forward-looking

143

statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

394.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Romeo who knew that those statements were false when made.

## XII.    CAUSES OF ACTION

<u>**FIRST CLAIM**</u>
**Violations Of Section 10(b) Of The Exchange Act And**
**Rule 10b-5 Promulgated Thereunder**
**Against Alibaba And Individual Defendants**

395.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

396.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

397.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Alibaba ADS in an effort to maintain

artificially high market prices for Alibaba ADS in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

398.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Alibaba's financial well-being and prospects, as specified herein.

399.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alibaba's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alibaba and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Alibaba ADS during the Class Period.

400.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the

other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

## SECOND CLAIM
### Violations Of Section 20(a) Of The Exchange Act
### Against Individual Defendants

401.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

402.    Individual Defendants acted as controlling persons of Alibaba within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of Zhang's and Wu's high-level positions, and by virtue of Ma's ownership interests and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

403.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

404. As set forth above, Alibaba, Zhang, Wu, and Ma each violated Section l0(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person of Alibaba, and because of their culpable participation in the misleading statements/omissions and/or the fraudulent scheme alleged herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

405. As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a) Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

(b) Awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 22, 2022

GLANCY PRONGAY & MURRAY LLP

By: */s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
Melissa C. Wright (*pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
kwolke@glancylaw.com
mwright@glancylaw.com

*Lead Counsel*

Jeremy A. Lieberman
Jonathan D. Park
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
jpark@pomlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
pdahlstrom@pomlaw.com

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
peretz@bgandg.com

Frank R. Cruz (*pro hac vice forthcoming*)
THE LAW OFFICES OF FRANK R. CRUZ
1999 Avenue of the Stars
Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
info@frankcruzlaw.com

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024  Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel*

### Exhibit List

| Exhibit | Document |
|---------|----------|
| 1 | *New Progress in the case of JD Vs. Tmall for Abuse of Dominant Market Position, Saying No to "Choose One of Two"*, IJIWEI.COM, October 16, 2019 (English translation). |
| 2 | *State Administration for Market Regulation Interviews Platform Enterprises and Will Conduct Anti-Monopoly Investigations into "Choose One of Two" Behaviors in Accordance with the Law*, XINHUA NEWS AGENCY, November 5, 2019 (English translation). |
| 3 | *State Administration for Market Regulation: "Choose One of Two" of E-Commerce Platforms Is Suspected To Be Illegal*, CCTV NETWORK, November 8, 2019, newscast available at https://app.www.gov.cn/govdata/gov/201911/08/450608/article.html (English translation of news broadcast). |
| 4 | *State Administration for Market Regulation Conducts Antitrust Investigation of "Choose One From Two,"* THE PAPER, November 5, 2019 (English translation). |
| 5 | *Director of the Department of Supervision and Administration of Online Trading of the State Administration for Market Regulation: Anti-Monopoly Investigation Will be Conducted on "Choose One of Two" According to the Law*, THE PAPER, November 5, 2019 (English translation). |
| 6 | *20 Internet platform companies makes a joint commitment: maintain a good market order and promote the healthy development of the industry*, BAIDU, July 17, 2020 (the "Commitment Letter") (English translation). |
| 7 | Administrative Guidance Letter of the State Administration for Market Regulation dated April 6, 2021 (English translation). |
| 8 | SAMR Letter of Administrative Penalties dated April 10, 2021 (English translation). |
| 9 | *China Blocked Jack Ma's Ant IPO After Investigation Revealed Likely Beneficiaries*, February 16, 2021, THE WALL STREET JOURNAL. |

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On April 22, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 22, 2022, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke