# EXHIBIT 8

# State Administration for Market Regulation

# Letter of Administrative Penalties

G.SH.J.CH. [2021] No.28

## I. Basic Information of the Party

The Party: Alibaba Group Holding Limited

Domicile: 4/F, Capital Place I, George Town, Grand Cayman, Cayman Islands

Basic information: Alibaba Group Holding Limited (hereinafter referred to as the "Party") was established in 1999, with Yong Zhang being the current Chairman of the Board of Directors and Chief Executive Officer. Its main businesses include online retail platform services, retail and wholesale business, logistics services, life services, cloud computing, digital media and entertainment, and innovation business.

## II. Source of the Case and Investigation

Based on report(s), since December 2020, the Authority has conducted an investigation into the Party on suspected abuse of its dominant market position in accordance with the *Anti-Monopoly Law of the People's Republic of China* (hereinafter referred to as the *Anti-Monopoly Law*). During the period, the Authority conducted on-site inspections, investigative inquiries and obtained relevant evidential materials; extensively investigated into other competitive platforms and operators on the platforms for evidence collection; thoroughly verified the evidential materials of the case and carried out big data analysis; organized experts to repeatedly conduct in-depth analysis and argumentation of the case, and listened to the Party's statements several times to protect its legal rights.

On April 6, 2021, in accordance with the *Law of the People's Republic of China on Administrative Penalties* (hereinafter referred to as the *Administrative Penalties Law*), the Authority served the Party the *Notice of Administrative Penalties*, informing it of the facts of the suspected violation of the *Anti-Monopoly Law*, the proposed administrative penalty decision, its reasons and basis, as well as the Party's legal rights to make representations, defend itself and request a hearing. The Party waived the rights to make representations, defend itself and request a hearing.

## III. Relevant Market in the Case

According to the provisions of the *Anti-Monopoly Law* and the *Guidelines on Defining the Relevant Market by the Anti-Monopoly Commission of the State Council*, and based on the characteristics of the platform economy and the specific situations of this case, the relevant market in this case is defined as the online retail platform services market within the territory of China.

### i. The relevant commodity market in this case is the online retail platform services market.

During the investigation, the Party proposed that the relevant commodity market in this case should be defined as the B2C online retail platform services market, on the grounds that B2C online retail platform services and C2C online retail platform services have a fair amount of differences in terms of commercial positioning and business models, thus lacking a reasonable substitution relationship.

The Authority holds that the relevant commodity market in this case should be defined as the online retail platform services market. Online retail platform services refer to the online business places, transaction matchmaking, information dissemination and other services provided by online retail platform operators for commodity transactions between operators and consumers on the platform, specifically including commodity information displays, marketing and promotions, searches, order processing, logistics services, payment and settlement, commodity reviews, and after-sales support. The online retail platform services market is a two-sided market, serving both the operators and consumers on the platform. Its distinctive characteristic is that it has cross-side network effects, making the demands of users on both sides for online retail platform services closely related. Therefore, defining the relevant market in this case requires consideration of the connection between the users on both sides of the platform. The relevant commodity market of this case was defined as the online retail platform services market through the demand substitution analysis and supply substitution analysis from the perspectives of operators and consumers, respectively.

**1. Online retail platform services and offline retail business services do not belong to the same relevant commodity market.** Offline retail business services provide physical business places, merchandise displays, related ancillary services, etc., for commodity transactions between operators and consumers, and are functionally similar to online retail platform services, but are not close substitutes.

**(1) Based on the analysis of operator demand substitution, the two do not have a close substitution relationship.**

**First, the coverage of areas and service hours are different.** Due to the restrictions such as the geographical locations and traffic of business places, offline retail business services can generally only enable operators to accomplish transactions with consumers in a certain surrounding area, so their geographical coverage is limited. However, online retail platform services can use the Internet to break through geographical and spatial limitations in terms of scope of service, and enable on-platform operators to accomplish transactions with consumers nationwide through the logistics system. Additionally, offline retail business services generally have the restriction of fixed business hours, while online retail platform services can enable on-platform operators to run business 24/7 through virtual trading venues.

**Second, the compositions of the operating costs for the operators served are different.** The business places provided by offline retail business services are generally physical shops, and the operating costs of operators mainly include rent of the shop, remodeling costs, labor costs, storage costs, etc. Online retail platform services provide virtual trading venues for on-platform operators, and their operating costs are mainly variable costs such as marketing costs and commission draws, with relatively low trial-and-error costs.

**Third, the ability to support operators in matching potential consumers is different.** Online retail platform services can aggregate and analyze market demand information such as consumer preferences through technical means like big data analysis and algorithms to "profile" consumers, enabling on-platform operators to precisely match target customers and push products to more potential consumers through marketing and promotions, which reduces their costs of targeted consumer searches and matching, and improves the speed and extent that the supply of commodities is able to match consumer demand. Without corresponding data and technical support, it is difficult for offline retail business services to provide operators with services such as precise consumer matching.

**Fourth, the efficiency of feedback on market demand provided to operators is different.** Online retail platform services can utilize the massive data accumulated from transactions, such as user reviews, to thoroughly analyze market demand and its changes, so that on-platform operators can better adjust their production and supply of commodities with market demand as the guide. Offline retail business services provide operators with relatively limited feedback on market demand, which makes it relatively less efficient for operators to adjust their production and supply of commodities based on the feedback.

**(2) Based on the analysis of consumer demand substitution, the two do not have a close substitution relationship.**

**First, the range of commodities available for consumers is different.** Online retail platform services are not restricted by the physical space of the business places, and can provide a wider variety of commodities to consumers. The variety of commodities available to consumers with offline retail business services is not as rich as with online retail platform services due to the physical space restrictions of the physical business places.

**Second, the extent of shopping convenience provided to consumers is different.** Online retail platform services are not restricted by time and space, enabling consumers to shop anytime and anywhere, and are closely connected to logistics systems to provide home delivery services for consumers, improving the convenience of shopping. However, offline retail business services require consumers to shop in the corresponding physical shops, and consumers usually need to compare multiple shops to find suitable commodities. The time cost is higher and home delivery services are usually not provided.

**Third, the efficiency of comparing and matching commodities for consumers is different.** Online retail platform services can present more abundant and detailed commodity information, alleviating the problem of asymmetric information, enabling consumers to compare commodities conveniently and search for intended commodities quickly, enhancing the efficiency of comparing and selecting commodities for consumers. Offline retail business services provide relatively limited commodity information and are restricted by factors such as the geographical locations of the business places and transportation times. Consumers usually need to spend more time and effort on searching for intended commodities, and the efficiency of comparing and selecting commodities is lower.

**(3) Based on the analysis of supply substitution, the two do not have a close substitution**

**relationship.**

**First, the profit models are different.** Online retail platform services mainly make profits by means of charging commissions on transactions, collecting marketing and promotion fees, etc., from operators on the platform. Offline retail business services mainly make profits by means such as charging fixed shop rent from operators.

**Second, it is fairly difficult to transform offline retail business services into online retail platform services.** Effective entry into the market of online retail platform services requires not only meeting the infrastructure and technical support requirements necessary to provide online retail platform services, but also reaching the critical mass essential for the platform economy, making it very costly for operators of offline retail business services to transform into online retail platforms. In recent years, there have been relatively few cases of offline retail business service operators actually developing into online retail platforms.

Therefore, based on the analyses of demand substitution and supply substitution, offline retail business services and online retail platform services do not have a close substitution relationship and do not belong to the same relevant commodity market.

**2. Online retail platform services constitute a separate relevant commodity market.**

**First, the online retail platform services provided to different types of operators belong to the same relevant commodity market.** Based on different on-platform operators, online retail can be divided into B2C online retail and C2C online retail. B2C online retail refers to the retail model of corporate sellers to individual buyers, while C2C online retail refers to the retail model of individual sellers to individual buyers. The sellers in both models are on-platform operators, to whom the online retail platforms mainly provide services such as online business places, transaction matchmaking, and information dissemination, helping the on-platform operators to accomplish transactions with consumers. Therefore, there is no essential difference between the platform services under the B2C and C2C online retail models, and online retail platforms can realize the conversion between the two models by adjusting platform rules. As a result, the online retail platform services provided to different types of on-platform operators belong to the same relevant commodity market.

**Second, online retail platform services provided for different methods of selling merchandise belong to the same relevant commodity market.** In the traditional online retail model, platforms usually provide shelf-style virtual commodity display venues for on-platform operators, and consumers generally have fairly explicit shopping needs and will take initiative to search for and browse commodities on the platforms. The emerging online retail model mainly uses multiple content display methods such as live streaming, short videos, and graphics and text, to recommend commodities to consumers and guide them in shopping. Under these two methods of selling merchandise, online retail platforms provide services such as online business places, transaction matchmaking and information dissemination to on-platform operators, meeting consumers' online shopping needs in either case. Therefore, online retail platform services provided for different methods of selling merchandise belong to the same relevant commodity market.

**Third, online retail platform services provided for different categories of commodities belong to the same relevant commodity market.** Based on different categories of commodities on the platforms, online retail commodities can be divided into sub-categories including clothing, electronics and digital products, household appliances, food, cosmetics, household supplies, and home furnishing materials, and each sub-category can be further divided. However, there is no essential difference in the content of online retail platform services for operators and consumers on the platforms. Therefore, online retail platform services provided for different categories of commodities belong to the same relevant commodity market.

**In summary, the relevant commodity market in this case is defined as the online retail platform services market.**

**ii. The relevant geographical market in this case is within the territory of China.**

**First, based on the analysis of operator demand substitution, the market within the territory of China does not have a close substitution relationship with the market outside the territory of China.** On-platform operators within the territory of China mainly sell goods to domestic consumers through online retail platforms within the territory of China. If an operator intends to sell goods to consumers within the territory of China through an online retail platform, it generally won't choose an online retail platform outside the territory of China but will consider an online retail platform operating within the territory of China.

**Second, based on the analysis of consumer demand substitution, the market within the territory of China does not have a close substitution relationship with the market outside the territory of China.** If consumers within the territory of China purchase commodities through an online retail platform outside the territory of China, they will not only face barriers such as service language, payment and settlement, and after-sales services, but will also have to pay a certain amount of import duties, and the delivery time of commodities is relatively long. Therefore, consumers within the territory of China usually purchase commodities through online retail platforms within the territory of China and generally won't treat online retail platforms outside the territory of China as a substitute when making their purchases.

**Third, based on the analysis of supply substitution, the market within the territory of China does not have a close substitution relationship with the market outside the territory of China.** Online retail platform service is an Internet value-added telecom service. Online retail platforms outside the territory of China need to apply for business licenses in accordance with relevant laws and regulations in order to conduct business within the territory of China, and at the same time, they need to build the logistics system, payment system, data system and other facilities necessary for conducting business, which makes it difficult for them to enter the domestic market of China in a timely and effective manner, forming a competitive constraint on the existing online retail platforms within the territory of China.

**Fourth, online retail platform services provided for different regions within the territory of China belong to the same relevant geographical market.** Online retail platforms within the territory of China can provide services to operators and consumers nationwide through the Internet, and there are no significant differences in regulatory policies for online retail platform

services in all domestic regions.

In summary, the relevant geographical market in this case is defined as within the territory of China.

The above facts are evidenced by the financial reports of the Party, minutes of the president's meetings, chat records of internal DingTalk groups, work summaries, documents such as investigative inquiry records of relevant personnel, and investigative inquiry records of relevant personnel of competitors and on-platform operators, etc.

**IV. The Party Has a Dominant Position in the Relevant Market**

During the investigation, the Party proposed that it did not have a dominant market position for the following reasons: First, the indicators for measuring the market share of online retail platform services are diverse and inconsistent, and the Party shall not be presumed to have a dominant position based on a single indicator. Second, the platform services market is highly dependent on the development of information technology. The rapid development of third-party payments and logistics socialization has greatly lowered the industry entry threshold. New competitors continue to enter and grow rapidly. Third, the development of emerging platforms has diversified the sales channels of operators and limited their reliance on a single platform, lowering the switching costs for operators.

The Authority holds that the analysis and determination of whether the Party has a dominant market position requires a comprehensive consideration of relevant factors. The Party has long held a relatively high market share and has a very high degree of market recognition and customer stickiness. The switching costs for on-platform operators are relatively high. Therefore, the reasons put forward by the Party are not valid. In accordance with the provisions of Articles 18 and 19 of the *Anti-Monopoly Law*, the Authority has determined that the Party has a dominant position in the online retail platform services market within the territory of China.

**i. The market share of the Party exceeded 50%. First, in terms of the platform service revenue.** From 2015 to 2019, the shares of the Party's online retail platform service revenue of the combined service revenue of the ten major online retail platforms within the territory of China were 86.07%, 75.77%, 78.51%, 75.44% and 71.17%, respectively. **Second, in terms of the merchandise volume of the platforms.** The merchandise volume of the platforms refers to the amount of merchandise transactions on online retail platforms, and is a comprehensive reflection of the operating status of all operators and consumer consumption on the platforms. From 2015 to 2019, the merchandise volume on the Party's online retail platforms made up 76.21%, 69.96%, 63.58%, 61.70% and 61.83%, respectively, of the total online retail merchandise volume within the territory of China.

**ii. The relevant market is highly concentrated.** Based on the market share of the revenue from platform services, from 2015 to 2019, the HHI index (Herfindahl-Hirschman Index) of the online retail platform services market within the territory of China was 7,408, 6,008, 6,375, 5,925 and 5,350, respectively, and the CR4 index (market concentration index) was 99.68, 99.46, 98.92, 98.66 and 98.45, respectively, indicating that the relevant market is highly concentrated with a relatively small number of competitors. In the past five years, the market share of the Party has

been stable and the Party has maintained a relatively strong competitive advantage for a long time. Other competitive platforms have limited competitive constraints on the Party.

**iii. The Party has a very strong control over the market. First, the Party has the ability to control the service price.** In business negotiations with on-platform operators, the Party usually directly sets the commission rates for transactions and the level of annual marketing and promotion expenditures through standard format contracts. The on-platform operators have relatively weak powers of negotiation. **Second, the Party has the ability to control the on-platform operators' access to traffic.** The Party controls the traffic available to the on-platform operators by establishing platform rules and setting algorithms to determine the search ranking of the on-platform operators and commodities and their positioning on the platforms, playing a decisive role in the operation of on-platform operators. **Third, the Party has the ability to control the sales channels of the on-platform operators.** The merchandise volume of Taobao and Tmall platforms operated by the Party account for more than 50% of the total online retail merchandise volume within the territory of China and are the most important sales channels for operators to conduct online retailing, holding a very strong influence on the operators.

**iv. The Party has strong financial strength and advanced technological conditions. First, the Party has strong financial strength.** From 2015 to 2019, the net profits of the Party were (omitted), respectively, with an average annual growth rate of 24.1%; its market capitalization grew from RMB1.32 trillion in December 2015 to RMB4.12 trillion in December 2020. The Party's strong financial strength can support its the business expansion in the relevant market and associated markets. **Second, The Party has advanced technological conditions.** By virtue of the first-mover advantage in entering the online retail platform services market, the Party has accumulated a large number of operators and consumers on its platforms, and has massive data on transactions, logistics, payments, etc. Compared with other competitive platforms, the Party has clear advantages. The Party has advanced algorithms that enable personalized search and sorting strategies through data processing technology to target consumers' needs and accurately monitor the operations of on-platform operators on other competitive platforms. Additionally, the Party is the largest public cloud service provider within the territory of China, with strong computing power to provide a full set of cloud services such as large-scale computing and big data analysis for its online retail platform services. The Party also has advanced AI technology and has established a reliable security system. The above financial and technological conditions have consolidated and enhanced the Party's market power.

**v. Other operators are highly dependent on the Party for their transactions. First, the Party's platforms have a very strong network effect and lock-in effect on on-platform operators.** Evidence shows that the Party's platforms have a large number of consumer users and their average consumption level far exceeds that of other competitive platforms. Additionally, the Party's consumer users are highly sticky, with a 98% retention rate across years. Therefore, the Party has a strong cross-side network effect and lock-in effect on its on-platform operators, and it is difficult for these operators to give up the large consumer base and huge traffic on the Party's platforms. **Second, the Party's platforms are important channels for brand image display.** In the online retail platform services market, the Party's platforms receive high recognition from operators and consumers, and are important carriers for brand image display. During the

investigation, the on-platform operators generally indicated that, compared with other online retail platforms, the Party's platforms are more influential and more recognized by consumers, and giving up operating on the Party's platforms would not only affect revenue, but also have a fairly negative impact on their brand image. **Third, it is very costly for operators on the Party's platforms to switch to other platforms.** The investigation shows that the Party's platforms are the most important online sales channels for most on-platform operators, and generally account for a fairly high proportion of their online sales. Operators on the platforms have acquired many regular users on the Party's platforms, accumulated a large amount of data on transactions, payments, user reviews, etc., and rely on these data to carry out business activities. Users and data are important resources and intangible assets that are difficult to migrate to other competitive platforms, and it is fairly costly for operators on the platforms to switch to other competitive platforms.

**vi. It is difficult to enter the relevant market.** Entering the online retail platform services market requires not only substantial capital investments in building the platform and establishing the logistics system, payment system, data system and other facilities, but also continuous investments in brand credit, marketing and promotions, etc., making it fairly costly to enter the relevant market. Additionally, online retail platforms must acquire a sufficient number of users on the platforms in order to achieve effective market entry. Currently, the cost of customer acquisition for online retail platforms within the territory of China is increasing year by year and it is becoming increasingly difficult for potential entrants to reach a critical mass.

**vii. The Party has significant advantages in associated markets.** The Party has made an ecosystem layout in fields including logistics, payments, and cloud computing, providing strong logistics service support, payment protection and data processing capabilities for its online retail platform services, further consolidating and enhancing its market power.

In summary, it was determined that the Party has a dominant position in the online retail platform services market within the territory of China in accordance with the provisions of Articles 18 and 19 of the *Anti-Monopoly Law*.

The above facts are evidenced by the financial reports, work summaries and other documents of the Party, agreements signed with some of the on-platform operators, as well as statistical data from national statistical departments, statistical data from third-party institutions, investigative inquiry records of relevant personnel of on-platform operators, operation data of competitive platforms and investigative inquiry records of their relevant personnel, etc.

**V. Facts and Basis of the Abuse of the Dominant Market Position by the Party**

It was found that, since 2015, in order to restrict the development of other competitive platforms, and maintain and consolidate its market position, the Party has abused its dominant position in the online retail platform services market within the territory of China, implemented "Choose One of Two" to restrict on-platform operators to carrying out transactions only with the Party, by means such as prohibiting them from opening shops and participating in promotional activities on other competitive platforms. It also used various incentives and penalties to ensure the implementation of the practice. These actions are in violation of the provision of Article 17 (1) (iv) of the *Anti-*

*Monopoly Law* related to "requiring a trading party to trade exclusively with itself without any justifiable cause", constituting an abuse of the dominant market position.

**i. The Party prohibits on-platform operators from opening shops on other competitive platforms.** As an online retail platform service provider, the operators on the Party's platforms are a key element in attracting consumers and improving competitiveness. The more operators gathered on the platform, the more consumers it can attract, creating a positive feedback effect and enabling the platform to maintain its competitive advantage and market power. Additionally, different categories of on-platform operators make different degrees of contributions to the competitiveness of the platform. In general, the higher the operator's brand awareness and market share, the greater the contribution to the competitiveness of the platform. The Party classified the on-platform operators into seven levels, from high to low, including SSKA, SKA, KA, core middle, middle, long tail and bottom, based on factors such as sales growth, merchandise capability, user operation, brand power, service capability and compliance operation, among which operators of levels KA and above (hereinafter collectively referred to as "core merchants") are the key competitive edge of online retail platforms. In order to enhance its own competitiveness and weaken the market power of other competitive platforms, the Party required the core merchants not to open shops on other competitive platforms.

**First, The Party directly prescribes in the agreements that opening shops on other competitive platforms is prohibited.** Since 2015, in the various agreements with some core merchants, such as the *Strategic Merchant Framework Agreement*, the *Joint Business Plan*, and the *Strategic Cooperation Memorandum*, the Party has explicitly provided that the core merchants are not allowed to enter other competitive platforms and are to focus on conducting online retail business on the Party's platforms, or that the merchants are to use the Party's platforms as the only online sales channels within the territory of China, to rule out conducting transactions on their own or by agents through other online retail platforms, and to require its consent to change the existing online retail channel, so as to achieve the purpose that core merchants only operate on its platforms.

**Second, the Party has verbally required core merchants not to operate on other competitive platforms.** It was found that the Party, during the signing of relevant cooperation agreements or negotiations on promotional activities, more frequently verbally indicated to core merchants that they operate only on its platforms, required the core merchants not to open flagship shops on other competitive platforms, or required them to downgrade flagship shops on other competitive platforms to non-flagship shops, to control the number of exclusive franchises on other competitive platforms, and to take off all commodities, withhold delivery, limit inventory, etc. As the Party has a dominant market position and the on-platform operators are fairly highly dependent on the Party's online retail platform services, the above requirements are relatively highly binding. Evidence shows that the Party's verbal requirements of not operating on other competitive platforms have been generally implemented relatively well.

**ii. The Party has prohibited on-platform operators from participating in promotional activities on other competitive platforms.** In order to attract consumers and increase the sales of commodities on the platform, online retail platforms regularly conduct centralized promotional

activities every year, such as "Double 11" and "618", which have a significant impact on the sales of commodities and have become an important focal point of competition for online retail platforms. In order to obtain a competitive advantage, the Party highlighted the requirement to the core merchants on its platforms that they are not allowed to participate in important promotions on other competitive platforms.

**First, the Party directly prescribes in the agreement that participating in promotional activities on other competitive platforms is prohibited.** Since 2015, in the various agreements with some core merchants, such as the *Strategic Merchant Framework Agreement*, the *Joint Business Plan* and the *Strategic Cooperation Memorandum*, the Party has explicitly provided that the core merchants are not allowed to participate in promotional activities organized by other competitive platforms, or conduct promotions by themselves through other online retail platforms without the consent of the Party, so as to lower the influence of other competitive platforms.

**Second, the Party has verbally required core merchants not to participate in promotional activities on other competitive platforms.** Since 2015, during annual promotional activities such as "Double 11" and "618", the Party has adopted explicit or implicit methods, such as explicit oral requirements and sending screenshots of the core merchants' promotional pages on other competitive platforms, to require the core merchants not to participate in promotional activities on other competitive platforms, including participating in the promotional venues of other competitive platforms, labeling products with promotional tags on other competitive platforms, and creating a promotional atmosphere in their shops. Evidence shows that the above requirements made orally by the Party have been generally implemented fairly well.

**iii. The Party has adopted various incentive and penalty measures to ensure the implementation of the "Choose One of Two" requirements.** The Party encourages the operators on its platforms to implement the "Choose One of Two" requirements through incentives such as traffic support, while it also monitors the on-platform operators on their shop openings or participation in promotional activities on other competitive platforms through various methods including manual inspections and monitoring with Internet technology. With the help of market power, platform rules, and technical means such as data and algorithms, the Party has imposed penalties, including the reduction of resource support for promotional activities, disqualification from participating in promotional activities, search downgrading, and the cancellation of other significant rights and benefits on the platforms, on on-platform operators who do not implement its relevant requirements. The above penalties have significantly reduced the attention from consumers to the penalized on-platform operators, resulting in a significant adverse impact on their regular operations. Additionally, these penalties have a strong deterrent effect, forcing more operators on the platforms to implement the "Choose One of Two" requirements put forward by the Party.

**First, the Party reduced resource support for promotional activities.** During promotional activities, online retail platforms generally add specific tags to the operators and commodities on the platforms participating in the promotion and give priority display to specific operators or commodities on the promotion page, which is an important way for on-platform operators to participate in the platform's promotional activities and increase their sales of commodities. The

Party penalized some on-platform operators for breaching the "Choose One of Two" requirements by canceling resource support for them during promotions. Evidence shows that some on-platform operators were removed from the priority display location in the promotional venue by the Party for participating in promotions such as "Double 11" and "618" on other competitive platforms.

**Second, the Party disqualified the on-platform operators from participating in promotional activities.** The Party has established a "grey list" system, included the on-platform operators who opened shops or participated in promotional activities on other competitive platforms on the penalty list, and disqualified them from participating in its large promotional activities. Evidence shows that some on-platform operators have been added to the grey list and penalized for failing to comply with the Party's "Choose One of Two" requirements, and their registration qualifications for participation in the platforms' large promotions and daily promotional activities such as "Juhuasuan" and "Tiantiantemai" can be resumed only after they have complied with the Party's requirements and have been verified and approved by the Party. Evidence shows that most of the on-platform operators on the "grey list" have complied with the Party's "Choose One of Two" requirements.

**Third, the Party implemented search downgrading.** The core of the search algorithm is to improve the search conversion rate to attract more attention from consumers for better sales, which involves the core rights and interests of operators on platforms. Search downgrading directly leads to lower rankings of the commodities of on-platform operators or even making them unsearchable on the platform, seriously affecting merchandise sales. For some operators on its platforms who failed to comply with the "Choose One of Two" requirements, the Party lowered their search weighting as a severe punishment. Evidence shows that some on-platform operators have been penalized by search downgrading for failing to comply with the Party's "Choose One of Two" requirements.

**Fourth, the Party canceled other major platform rights and interests of the on-platform operators.** For on-platform operators who did not stop operations on other competitive platforms or withdraw from promotional activities on other competitive platforms after repeated requests, the Party took measures such as canceling their KA qualifications or terminating relevant cooperation to deprive them of relevant service guarantees and other major rights and interests. Evidence shows that some on-platform operators have been disqualified from KA or have had their relevant cooperation terminated for failing to comply with the Party's "Choose One of Two" requirements.

During the investigation, the Party proposed that the operators on its platforms voluntarily entered into the cooperation agreements, and it would provide unique resources to them as a consideration, which was an incentive and therefore justified. The restrictive measures taken by the Party were in response to the failure of the on-platform operators in carrying out the agreements, and the implementation of relevant acts was necessary to protect the specific inputs for the transaction.

The Authority holds that the reasons put forward by the Party are not valid and there is no justifiable reason for implementing the relevant actions. **First**, most of the cooperation agreements containing the "Choose One of Two" content were not voluntarily entered into by the operators on the platforms. The investigation shows that the on-platform operators often tend to open shops

and sell commodities on multiple platforms at the same time, and that the relevant agreements were not signed voluntarily. The fact that the on-platform operators were penalized by the Party for breaching the requirements of the cooperation agreements proves that they did not voluntarily enter into the relevant cooperation with the Party. **Second**, the investigation found that some operators on the platform did not receive consideration for their compliance with the Party's verbal requirements, and the cancellation of consideration was only one of the means by which the Party penalized the on-platform operators. **Third**, the exclusive transaction was not a measure that must be taken to protect specific inputs. The funds and traffic resources invested by the Party during daily operations and promotions are inputs required for the platforms' operations, not for specific on-platform operators. The incentive measures taken by the Party can be rewarded in multiple ways, and the implementation of "Choose One of Two" is not a must.

The above facts are evidenced by the investigative inquiry records of the relevant personnel of the Party, chat records of internal DingTalk groups, emails, cooperation agreements entered into with some operators on the platforms, development plans and work summaries of various business departments, merchant acceptance standards for "Double 11" and "618", documents such as meeting briefings, self-investigation reports of the Party, and investigative inquiry records of relevant personnel of competitive platforms and operators on the platforms.

## VI. The Conduct of the Party Excluded and Restricted Market Competition

The Party restricted the operators on its platforms from opening shops or participating in promotional activities on other competitive platforms, which formed a lock-in effect to reduce its competitive pressure, improperly maintaining and consolidating its market position, and deviated from the development philosophy of openness, inclusiveness and sharing of the platform economy. As a result, it excluded and restricted relevant market competition, harmed the interests of operators and consumers on its platforms, weakened the motivation for innovation and vitality for development of platform operators, and hindered the innovative and healthy development of the platform economy in a standardized and orderly manner.

### i. The Party excluded and restricted competition in the online retail platform services market within the territory of China.

The Party restricted the operators on its platforms to exclusively trading with it and from entering other competitive platforms or conducting promotional activities on other competitive platforms, which directly weakened the ability of other competitive platforms to compete fairly with the Party and the level of competition in the relevant market, improperly raised the barriers to market entry for potential competitors, and damaged the fair and orderly order of market competition.

**First, it excluded and restricted fair competition among operators in the relevant market.** By requiring operators on its platforms not to open shops or participate in promotional activities on other competitive platforms, the Party unfairly inhibited the supply of operators that may be available to other competitive platforms, weakened the competitiveness of other competitive platforms, and excluded and restricted fair competition in the market. Additionally, as the platform economy has a cross-side network effect, the relevant conduct will further reduce the number of consumers on other competitive platforms while directly leading to the loss of operators on other

competitive platforms, resulting in a feedback loop with a reduction in the number of both operators and consumers on the platforms, weakening the competitive ability of other competitive platforms, and seriously excluding and restricting fair competition among operators in the relevant market.

Evidence shows that the Party targeted the "Choose One of Two" requirements at some categories of operators or key brand operators to inhibit the relevant business development of other competitive platforms or hinder their brand upgrades for competitive reasons, and achieved the corresponding effect.

**Second, the Party excluded and restricted potential competition in the relevant market.** As the platform economy is characterized by network effects and economies of scale, newly entered platform service providers need to accumulate a certain amount of users to effectively enter the market. The requirements put forward by the Party for some operators on the platform not to enter other competitive platforms, to use the Party as the only online sales channel within the territory of China, etc., locked the operators on its own platforms while unfairly increasing the difficulty for potential entrants to the relevant market to reach cooperation agreements with relevant operators, making it difficult for them to obtain the necessary resources required to enter the market for competition, raising the barriers to market entry, and excluding and restricting potential competition in the relevant market.

**ii. The Party harmed the interests of operators on its platforms.**

The relevant conduct of the Party directly restricted the right to operation autonomy of operators on its platforms, weakened the intra-brand competition of commodities and harmed the interests of operators on its platforms.

**First, it harmed the right to operation autonomy of operators on its platforms.** As different platforms focus on different groups of consumers, the operators on the platforms usually tend to be multi-homing, aiming to enhance their operational efficiency, obtain more diverse sales channels and reach a wider range of consumers through multi-platform operations to achieve greater sales. By requiring the on-platform operators to open shops only on its platforms or participate in promotional activities only on its platforms, the Party deprived the on-platform operators of their right to independently choose partnering platforms for trading and restricted their right to operation autonomy.

**Second, it unfairly impaired the legitimate interests of the operators on its platforms.** Before promotional activities, on-platform operators generally need to stock a large number of commodities and pay for costs such as marketing and promotion expenses. During large promotional activities, the Party required the operators on its platforms to withdraw from promotional activities on other competitive platforms, among other things, and implemented penalty measures against on-platform operators, such as the cancellation of promotion resources and search downgrading, which seriously affected the regular operations of the on-platform operators, resulting in a lack of stability and fairness in trading and directly harming the legitimate interests of the on-platform operators. By requiring the operators on its platform to open shops only on its platforms or participate in promotional activities only on its platform, the Party caused

the loss of potential revenue that the operators could have earned from operating on other platforms.

**Third, it weakened the intra-brand competition.** Operators of same-brand products operating on different platforms can create competition among different sales channels within the brand. In particular, during promotional activities, online retail platforms often enable on-platform operators to offer more favorable prices by subsidizing them. By requiring the on-platform operators to open shops only on its platforms or participate in promotional activities only on its platforms, the Party restricted the sales channels and promotional channels of products of the same brand and weakened intra-brand competition.

### iii. The Party hindered the optimal allocation of resources, and restricted the innovation and development of the platform economy.

The relevant conduct of the Party hindered the optimal allocation of resources in the online retail platform services market, inhibited the vitality of market entities, and restricted the innovation and development of the platform economy.

**First, it hindered the free flow of factors and reduced the efficiency of resource allocation.** On-platform operators can freely choose platforms according to their operational efficiency, service prices, management levels, service capabilities, etc., and allocate resources appropriately. The implementation of "Choose One of Two" by the Party hindered the free flow of production factors among different online retail platforms, affected the effective matching of the supply and demand of commodities, and reduced the efficiency of economic circulation.

**Second, it restricted the diversified and differentiated innovative operations of operators on its platform.** According to the characteristics of the users on different platforms, on-platform operators can adopt different competitive strategies based on opportunities through different means and channels such as flagship shops, franchised shops, and exclusive shops to carry out differentiated operations, thereby providing consumers with more choices. The Party restricted the operators on its platform to trading with it only, which inhibited the motivation and vitality of the on-platform operators in innovation and development.

**Third, it inhibited the vitality of market entities and affected the innovation and development of the platform economy.** The sustainable and healthy development of the platform economy relies on fair competition and technological innovation. The Party maintained and consolidated its competitive advantages through improper means, weakening the motivation of platform operators to carry out technological and business model innovations, affecting the desire of other platforms and potential competitors to innovate, which is not conducive to the innovative and healthy development of the platform economy.

### iv. The Party harmed the interests of consumers.

The relevant conduct of the Party restricted the consumers' freedom of choice and right to fair exchange, and harmed the interests of consumers.

**First, it restricted the consumers' freedom of choice.** In an online retail environment, consumers' search and comparison costs are significantly reduced, making it easier for them to

compare commodities and prices across different platforms and make optimal choices. The relevant conduct of the Party reduced the brands and commodities available on other competitive platforms, limited the range of brands and commodities accessible to consumers, and restricted consumers' freedom of choice.

**Second, it restricted the consumers' right to fair exchange.** Online retail platforms provide consumers with diverse services and promotions based on their business strategies. The Party restricted the operators on its platforms from opening shops or participating in promotions on other competitive platforms, leaving consumers with no choice but to passively accept its trading conditions and making them unable to enjoy more competitive prices and services on other platforms, restricting the consumers' right to fair exchange and harming their interests.

**Third, it will bring potential damage to the overall social welfare in the long run.** The relevant conduct of the Party excluded and restricted market competition, lowered the operational efficiency of platforms, hindered innovation in platform business models, prevented potential competitors from entering the market, improperly reduced the intensity and level of market competition, and affected the continuous optimization and development of online retail platform services in full competition. The effect of the damage will be transmitted all the way down the chain of consumption, which will harm the current and expected interests of consumers and impair the overall level of social welfare.

The above facts are evidenced by documents such as the development plans of the Party's business departments, competitive strategies, work summaries, chat records of internal DingTalk groups, emails, self-inspection reports of the Party, and investigative inquiry records of relevant personnel of the competitive platforms and operators on the platforms.

## VII. Basis for Administrative Penalties and Decisions

It was found that, since 2015, the Party has abused its dominant position in the online retail platform services market within the territory of China to prohibit operators on its platforms from opening shops or participating in promotional activities on other competitive platforms, which excluded and restricted competition in the relevant market, infringed upon the legitimate rights and interests of operators on its platforms, harmed the interests of consumers, and hindered the innovation and development of the platform economy, without justifiable reasons, constituting an abuse of dominant position prohibited by Article 17 (1) (iv) of the *Anti-monopoly Law* "requiring a trading party to trade exclusively with itself without any justifiable cause".

In accordance with the provisions of Articles 47 and 49 of the *Anti-Monopoly Law*, and based on the nature, extent and duration of the illegal acts of the Party, as well as the fact that the Party was able to conduct an in-depth self-inspection as required, stop its illegal acts and actively carry out rectification and reform, the Authority made the following decisions on the Party:

## i. Order the cessation of the illegal acts.

1. The Party must not restrict operators on its platforms from operating on other competitive platforms, and must not restrict promotional activities of the on-platform operators on other competitive platforms.

2. The Party shall submit to the Authority a report on the rectification of the violations within fifteen days from the date of receipt of this Letter of Administrative Penalties.

3. In accordance with the principle of combining punishment with education by the *Administrative Penalties Law* and based on the problems found during the investigation, the Authority produced the *Administrative Guidance Letter*, requiring the Party to carry out comprehensive rectification and reform in the areas such as strict implementation of the main responsibilities of the platform enterprises, strengthening internal control and compliance management, and protecting the rights and interests of consumers, so as to operate in compliance with the law.

**ii. Impose a fine of 4% of the Party's sales of RMB455.712 billion within the territory of China in 2019, amounting to RMB18.228 billion (in words: Eighteen Billion Two Hundred and Twenty-Eight Million yuan).**

According to Article 46 of the *Administrative Penalties Law*, the Party shall pay the fine at any outlets or online banking of the 12 central finance non-tax revenue collection correspondents (ICBC, ABC, BOC, CCB, BoCom, CITIC Bank, CEB, CMB, PSBC, HXB, Ping An Bank and Industrial Bank) with the payment code within fifteen days from the date of receipt of the Letter of Administrative Penalties, as required by the Letter. The payment code is: ***.

According to Article 51 of the *Administrative Penalties Law*, in the event that the Party fails to execute the administrative penalty decision within the time specified, the Authority may take the following measures: i. impose an additional fine at the rate of three percent of the fine amount per day if the Party fails to pay the fine by the due date; ii. apply to the People's Court for compulsory execution.

If the Party refuses to accept the above administrative penalty decision, it may apply to the State Administration for Market Regulation for administrative reconsideration within sixty days from the date of receipt of the Letter of Administrative Penalties, or file administrative litigation with the People's Court in accordance with the law within six months from the date of receipt of the Letter of Administrative Penalties. The execution of the administrative penalties will not be suspended during the administrative reconsideration or litigation.

State Administration for Market Regulation

April 10, 2021

国家市场监督管理总局

行政处罚决定书

国市监处〔2021〕28 号

一、当事人基本情况

当事人：阿里巴巴集团控股有限公司

住　所：开曼群岛大开曼岛乔治城 Capital Place 一期 4 楼

基本情况：阿里巴巴集团控股有限公司（以下称当事人）于 1999 年成立，现任董事局主席兼首席执行官张勇，主营业务包括网络零售平台服务、零售及批发商业、物流服务、生活服务、云计算、数字媒体及娱乐、创新业务等。

二、案件来源及调查经过

根据举报，2020 年 12 月起，本机关依据《中华人民共和国反垄断法》（以下简称《反垄断法》)对当事人涉嫌实施滥用市场支配地位行为开展了调查。期间，本机关进行了现场检查、调查询问，提取了相关证据材料；对其他竞争性平台和平台内经营者广泛开展调查取证；对本案证据材料进行深入核查和大数据分析；组织专家反复深入开展案件分析论证；多次听取当事人陈述意见，保障当事人合法权利。

2021 年 4 月 6 日，本机关按照《中华人民共和国行政处罚法》（以下简称《行政处罚法》）的规定，向当事人送达了《行政处罚告知书》，告知其涉嫌违反《反垄断法》的事实、拟作出的行政处罚决定、理由和依据，以及其依法享有陈述、申辩和要求举行听证的权利。当事人放弃陈述、申辩和要求举行听证的权利。

- 1 -

三、本案相关市场

根据《反垄断法》和《国务院反垄断委员会关于相关市场界定的指南》规定，同时考虑平台经济特点，结合本案具体情况，本案相关市场界定为中国境内网络零售平台服务市场。

**（一）本案相关商品市场为网络零售平台服务市场。**调查过程中，当事人提出，本案相关商品市场应界定为 B2C 网络零售平台服务市场，理由是 B2C 网络零售平台服务与 C2C 网络零售平台服务在商业定位和商业模式上存在较大差异，不具有合理的替代关系。

本机关认为，本案相关商品市场应界定为网络零售平台服务市场。网络零售平台服务是指网络零售平台经营者为平台内经营者和消费者进行商品交易提供的网络经营场所、交易撮合、信息发布等服务，具体包括商品信息展示、营销推广、搜索、订单处理、物流服务、支付结算、商品评价、售后支持等。网络零售平台服务市场属于双边市场，服务平台内经营者和消费者两个群体，其显著特征是具有跨边网络效应，使双边用户对网络零售平台服务的需求具有紧密关联。因此，界定本案相关市场，需要考虑平台双边用户之间的关联影响。从经营者和消费者两个角度分别进行需求替代分析和供给替代分析，界定本案相关商品市场为网络零售平台服务市场。

**1. 网络零售平台服务与线下零售商业服务不属于同一相关商品市场。**线下零售商业服务为经营者和消费者进行商品交易提供实体经营场所、商品陈列及相关配套等服务，与网络零售平台服务在功能上具有一定相似性，但二者不具有紧密替代关系。

**（1）从经营者需求替代分析，二者不具有紧密替代关系。**

**一是覆盖地域和服务时间不同。**线下零售商业服务由于经营场所地理位置和交通等方面的限制，通常只能使经营者与周边一定区域内的消费者达成交易，覆盖地域范围有限。网络零售平台服务则能够借助互联网，在服务范围上突破地理空间限制，并通过物流体系使平台内经营

者与全国范围内的消费者达成交易。同时，线下零售商业服务一般有固定营业时间限制，网络零售平台服务通过虚拟交易场所可以使平台内经营者实现全天候营业。

**二是所服务经营者的经营成本构成不同。**线下零售商业服务提供的经营场所一般是实体店铺，经营者经营成本主要包括店铺租金、装修费用、人工成本及仓储成本等。网络零售平台服务为平台内经营者提供的是虚拟交易场所，其经营成本主要为营销费用和佣金抽成等可变成本，试错成本相对较低。

**三是支持经营者匹配潜在消费者的能力不同。**网络零售平台服务借助大数据分析和算法等技术手段，可以汇总分析消费者偏好等市场需求信息，为消费者"画像"，使平台内经营者能够精准匹配目标客户，并通过营销推广将商品推送给更多潜在消费者，降低其对消费者针对性搜索和匹配成本，提升商品供应对消费者需求的匹配速度和程度。线下零售商业服务由于缺少相应的数据和技术支撑，难以为经营者提供精准匹配消费者等服务。

**四是为经营者提供的市场需求反馈效率不同。**网络零售平台服务可以利用交易积累的用户评价等海量数据，深入分析市场需求及其变化，使平台内经营者更好地以市场需求为导向进行商品生产和供应的调整。线下零售商业服务为经营者提供的市场需求反馈信息较为有限，经营者借此调整商品生产和供应的效率相对较低。

**（2）从消费者需求替代分析，二者不具有紧密替代关系。**

**一是可供消费者选择的商品范围不同。**网络零售平台服务不受营业场所物理空间限制，可以提供更多种类的商品供消费者选择。线下零售商业服务由于实体经营场所受物理空间限制，可供消费者选择的商品种类没有网络零售平台服务丰富。

**二是为消费者提供的购物便捷程度不同。**网络零售平台服务不受时间和空间限制，可以使消费者实现随时随地购物，并与物流系统紧密连接，为消费者提供送货上门服务，提高消费者

- 3 -

购物便捷性。线下零售商业服务则需要消费者前往相应的实体店铺进行选购，且通常需要实地比较多家店铺才能选购到合适商品，时间成本相对较高，并且一般不提供送货上门服务。

**三是为消费者比较和匹配商品的效率不同。**网络零售平台服务能够呈现更为大量和丰富精细的商品信息，缓解信息不对称问题，使消费者便捷地进行商品比较，快速搜索意向商品，提升消费者比较和选择商品的效率。线下零售商业服务提供的商品信息相对有限，且受到营业场所地理位置、交通时间等方面限制，消费者通常需要花费更多的时间和精力搜寻意向商品，比较和选择商品的效率较低。

**（3）从供给替代分析，二者不具有紧密替代关系。**

**一是盈利模式不同。**网络零售平台服务主要通过向平台内经营者收取交易佣金、营销推广费等盈利。线下零售商业服务主要通过向经营者收取固定的店铺租金等盈利。

**二是线下零售商业服务转变为网络零售平台服务难度较大。**有效进入网络零售平台服务市场，不仅需要满足提供网络零售平台服务所必需的基础设施、技术支撑等方面要求，还需达到平台经济所必需的临界规模，线下零售商业服务经营者转为网络零售平台的成本很高。近年来，线下零售商业服务经营者实际发展为网络零售平台的情况较少。

因此，从需求替代和供给替代分析，线下零售商业服务与网络零售平台服务不具有紧密替代关系，不属于同一相关商品市场。

**2. 网络零售平台服务构成单独的相关商品市场。**

**一是为不同类别经营者提供的网络零售平台服务属于同一相关商品市场。**根据平台内经营者不同，网络零售可分为 B2C 网络零售和 C2C 网络零售两种模式。B2C 网络零售是指企业卖家对个人买家的零售模式，C2C 网络零售是指个人卖家对个人买家的零售模式。两种模式中的

卖家均为平台内经营者，网络零售平台向其均主要提供网络经营场所、交易撮合、信息发布等服务，帮助平台内经营者与消费者达成交易。因此，B2C 和 C2C 两种网络零售模式下的平台服务并无本质区别，网络零售平台通过调整平台规则，即可以实现两种网络零售模式的转换。因此，为不同类别平台内经营者提供的网络零售平台服务属于同一相关商品市场。

**二是为不同商品销售方式提供的网络零售平台服务属于同一相关商品市场。**传统网络零售模式中，平台通常为平台内经营者提供货架式商品虚拟展示场所，消费者一般具有较为明确的购物需求，会主动到平台上搜索、浏览商品。新兴网络零售模式则主要通过直播、短视频、图文等多种内容展示方式向消费者推荐商品，引导消费者购物。在两种商品销售方式下，网络零售平台对平台内经营者提供的均为网络经营场所、交易撮合、信息发布等服务，均可以满足消费者网络购物需求。因此，为不同商品销售方式提供的网络零售平台服务属于同一相关商品市场。

**三是为不同商品品类提供的网络零售平台服务属于同一相关商品市场。**根据平台内商品品类不同，网络零售商品可分为服装、电子数码、家用电器、食品、化妆品、家居用品、家装建材等细分品类，各个细分品类又可进一步划分，但对平台内经营者和消费者而言，网络零售平台服务内容并无本质区别。因此，为不同商品品类提供的网络零售平台服务属于同一相关商品市场。

**综上，本案相关商品市场界定为网络零售平台服务市场。**

**（二）本案相关地域市场为中国境内。**

**一是从经营者需求替代分析，中国境内市场与境外市场不具有紧密替代关系。**中国境内平台内经营者主要通过境内网络零售平台，将商品销售给中国境内消费者。如果经营者有意通过网络零售平台向中国境内消费者销售商品，一般不会选择境外网络零售平台，而是考虑在中

国境内运营的网络零售平台。

**二是从消费者需求替代分析，中国境内市场与境外市场不具有紧密替代关系。**中国境内消费者通过境外网络零售平台购买商品不仅面临服务语言、支付结算、售后保障等方面的障碍，还要支付一定的进口关税，且商品配送时间相对较长。因此，中国境内消费者通常通过境内网络零售平台购买商品，一般不会将境外网络零售平台作为其购买商品的替代选择。

**三是从供给替代分析，中国境内市场与境外市场不具有紧密替代关系。**网络零售平台服务属于互联网增值电信业务，境外网络零售平台在中国境内开展业务需要按照相关法律法规要求申请业务许可，同时需要搭建开展业务所需的物流体系、支付系统、数据系统等设施，难以及时、有效地进入中国境内市场，对现有的中国境内网络零售平台形成竞争约束。

**四是为中国境内不同地域提供的网络零售平台服务属于同一相关地域市场。**中国境内网络零售平台借助互联网可以为全国范围的经营者和消费者提供服务，且境内各地对网络零售平台服务的监管政策不存在较大差异。

综上，本案相关地域市场界定为中国境内。

以上事实，有当事人财务报告、总裁会会议纪要、内部钉钉群聊天记录、工作总结、相关人员调查询问笔录等文件、竞争性平台和平台内经营者相关人员调查询问笔录等证据证明。

四、当事人在相关市场具有支配地位

调查过程中，当事人提出其不具有市场支配地位，理由：一是衡量网络零售平台服务市场份额的指标多元且不统一，不能以单一指标推定当事人具有支配地位；二是平台服务市场高度依赖信息技术发展，第三方支付和社会化物流等快速发展，大大降低了行业准入门槛，新竞争者持续进入并快速发展；三是新兴平台的发展使经营者销售渠道多元化，对单一平台的依赖性有限，降低了经营者的迁移成本。

本机关认为，分析认定当事人是否具有市场支配地位需对有关因素进行综合考虑。当事人长期占有较高市场份额，且具有很高的市场认可度和消费者黏性，平台内经营者迁移成本较高，当事人提出的理由不成立。根据《反垄断法》第十八条、第十九条的规定，本机关认定，当事人在中国境内网络零售平台服务市场具有支配地位。

**（一）当事人的市场份额超过 50%。一是从平台服务收入情况看**。2015—2019 年，当事人网络零售平台服务收入在中国境内 10 家主要网络零售平台合计服务收入中，份额分别为 86.07%、75.77%、78.51%、75.44%、71.17%。**二是从平台商品交易额看。** 平台商品交易额是指网络零售平台上的商品成交金额，是平台上所有经营者经营状况和消费者消费状况的综合反映。2015—2019 年，当事人网络零售平台商品交易额在中国境内网络零售商品交易总额中，份额分别为 76.21%、69.96%、63.58%、61.70%、61.83%。

**（二）相关市场高度集中。** 根据平台服务收入市场份额，2015—2019 年，中国境内网络零售平台服务市场的 HHI 指数（赫芬达尔—赫希曼指数）分别为 7408、6008、6375、5925、5350，CR4 指数（市场集中度指数）分别为 99.68、99.46、98.92、98.66、98.45，显示相关市场高度集中，竞争者数量较少。近 5 年来，当事人市场份额较为稳定，长期保持较强竞争优势，其他竞争性平台对当事人的竞争约束有限。

**（三）当事人具有很强的市场控制能力。一是当事人具有控制服务价格的能力。** 当事人在与平台内经营者的商业谈判中，通常以格式合同方式，直接规定交易佣金费率和年度营销推广费支出水平，平台内经营者谈判能力较弱。**二是当事人具有控制平台内经营者获得流量的能力。** 当事人通过制定平台规则、设定算法等方式，决定平台内经营者和商品的搜索排名及其平台展示位置，从而控制平台内经营者可获得的流量，对其经营具有决定性影响。**三是当事人具有控制平台内经营者销售渠道的能力。** 当事人经营的淘宝和天猫平台商品交易额在中国境内网

络零售商品交易总额中占比超过 50%，是经营者开展网络零售最主要的销售渠道，对经营者具有很强影响力。

（四）当事人具有雄厚的财力和先进的技术条件。一是当事人具有雄厚的财力。2015—2019 年，当事人净利润分别为（略），年均增长率 24.1%；市值从 2015 年 12 月的 1.32 万亿元增长至 2020 年 12 月的 4.12 万亿元，强大的财力可以支持当事人在相关市场及关联市场的业务扩张。二是当事人具有先进的技术条件。当事人凭借进入网络零售平台服务市场的先发优势，积累了大量的平台内经营者和消费者，拥有海量的交易、物流、支付等数据，对比其他竞争性平台优势明显。当事人具有先进的算法，能够通过数据处理技术实现个性化搜索排序策略，针对性满足消费者需求，并精准监测平台内经营者在其他竞争性平台上的经营情况。同时，当事人是中国境内最大的公有云服务提供商，具有强大的算力，为当事人网络零售平台服务提供大规模计算、大数据分析等一整套云服务。当事人还具有先进的人工智能技术，并建立了可靠的安全系统。上述财力和技术条件巩固和增强了当事人的市场力量。

（五）其他经营者在交易上高度依赖当事人。一是当事人平台对平台内经营者具有很强的网络效应和锁定效应。证据表明，当事人平台拥有大量消费者用户，且平均消费水平远超其他竞争性平台。同时，当事人的消费者用户黏性很强，跨年度留存率达 98%。因此，当事人对平台内经营者具有很强的跨边网络效应和锁定效应，平台内经营者难以放弃当事人平台上的庞大消费者群体和巨大流量。二是当事人平台是品牌形象展示的重要渠道。在网络零售平台服务市场，当事人平台拥有很高的经营者和消费者认可度，是品牌形象展示的重要载体。调查过程中，平台内经营者普遍表示，与其他网络零售平台相比，当事人平台的影响力更大，消费者更为认可，放弃在当事人平台经营不仅影响营收，还会对其品牌形象产生较大不利影响。三是平台内经营者从当事人平台转换到其他平台的成本很高。调查显示，当事人平台是大多数平台内经营者最主要的网络销售渠道，在其网络销售额中的占比普遍较高。平台内经营者在当事人平台获

- 8 -

得了众多固定用户，积累了大量的交易、支付、用户评价等数据，并依赖这些数据开展经营活动。用户和数据是重要资源和无形资产，难以迁移到其他竞争性平台，平台内经营者转换至其他竞争性平台面临较高成本。

**（六）相关市场进入难度大。** 进入网络零售平台服务市场不仅需要投入大量资金建设平台，建立物流体系、支付系统、数据系统等设施，还需要在品牌信用、营销推广等方面持续投入，进入相关市场成本较高。同时，网络零售平台须在平台一边获得足够多的用户，才能实现有效的市场进入。目前中国境内网络零售平台获客成本逐年提高，潜在进入者达到临界规模的难度不断增大。

（七）**当事人在关联市场具有显著优势。** 当事人在物流、支付、云计算等领域进行了生态化布局，为当事人网络零售平台服务提供了强大的物流服务支撑、支付保障和数据处理能力，进一步巩固和增强了当事人的市场力量。

综上所述，根据《反垄断法》第十八条、第十九条规定，认定当事人在中国境内网络零售平台服务市场具有支配地位。

以上事实，有当事人财务报告、工作总结等文件、与部分平台内经营者签订的协议以及国家统计部门统计数据、第三方机构统计数据、平台内经营者相关人员调查询问笔录、竞争性平台经营数据及其相关人员调查询问笔录等证据证明。

五、当事人实施滥用市场支配地位行为的事实和依据

经查，2015 年以来，当事人为限制其他竞争性平台发展，维持、巩固自身市场地位，滥用其在中国境内网络零售平台服务市场的支配地位，实施"二选一"行为，通过禁止平台内经营者在其他竞争性平台开店和参加其他竞争性平台促销活动等方式，限定平台内经营者只能与当事人进行交易，并以多种奖惩措施保障行为实施，违反《反垄断法》第十七条第一款第（四）项

关于"没有正当理由，限定交易相对人只能与其进行交易"的规定，构成滥用市场支配地位行为。

（一）禁止平台内经营者在其他竞争性平台开店。当事人作为网络零售平台服务提供者，平台内经营者是其吸引消费者、提升竞争力的关键要素。平台上聚集的经营者越多，越能够吸引更多消费者，形成正向反馈效应，使平台保持竞争优势和市场力量。同时，不同类别的平台内经营者对于平台竞争力的贡献度不同。一般情况下 经营者品牌知名度越高、市场份额越大，对平台竞争力的贡献越大。当事人根据销售增长、商品能力、用户运营、品牌力、服务能力、合规经营等因素将平台内经营者由高到低划分为 SSKA、SKA、KA、核腰、腰部、长尾、底部等七个层次，其中 KA 及以上经营者（以下统称为核心商家）是网络零售平台的关键竞争力。为增强自身竞争力，削弱其他竞争性平台的市场力量，当事人对核心商家提出禁止在其他竞争性平台开店的要求。

**一是在协议中直接规定不得在其他竞争性平台开店。**2015 年以来，当事人在与部分核心商家签订的《战略商家框架协议》、《联合生意计划》、《战略合作备忘录》等多种协议中，明确规定核心商家不得进驻其他竞争性平台、专注于在当事人平台开展网络零售业务，或者将当事人平台作为中国境内唯一的网络销售渠道、不考虑自行或由代理商通过其他网络零售平台进行交易、改变现有网络零售渠道需经当事人同意等，达到使核心商家仅在当事人平台经营的目的。

**二是口头提出不得在其他竞争性平台经营要求。**经查，当事人更多是在签署相关合作协议或者促销活动谈判过程中，对核心商家口头提出仅在当事人平台经营，要求核心商家不在其他竞争性平台开设旗舰店，或者要求核心商家将其他竞争性平台上的旗舰店降为非旗舰店、控制其他竞争性平台专卖专营店数量、下架全部商品、不予发货、限制库存等。由于当事人具有市场支配地位，平台内经营者对当事人网络零售平台服务具有较强依赖性，上述要求具有较强约

束力。证据显示，当事人口头提出的不得在其他竞争性平台经营的要求普遍得到较好执行。

（二）禁止平台内经营者参加其他竞争性平台促销活动。为吸引消费者，增加平台的商品销量，网络零售平台每年定期开展集中促销活动，如"双 11""618"等，对商品销量影响很大，成为网络零售平台开展竞争的重要节点。为获取竞争优势，当事人重点对平台内核心商家提出不得参加其他竞争性平台重要促销活动的要求。

**一是在协议中直接规定不得参加其他竞争性平台促销活动。** 2015 年以来，当事人在与部分核心商家签订的《战略商家框架协议》、《联合生意计划》、《战略合作备忘录》等多种协议中，明确规定其不得参加其他网络零售平台组织的促销活动，或者未经当事人同意不得通过其他网络零售平台自行开展促销等，以减少其他竞争性平台的影响力。

**二是口头提出不得参加其他竞争性平台促销活动要求。** 2015 年以来，在每年"双 11""618"等促销活动期间，当事人均通过口头明确要求、发送核心商家在其他竞争性平台促销页面截屏等明示或暗示方式，要求核心商家不得参加其他竞争性平台的促销活动，包括不得参加其他竞争性平台的促销会场、不得在其他竞争性平台为商品打促销标签、不得在店铺内营造促销活动氛围等。证据显示，当事人口头提出的上述要求普遍得到较好执行。

（三）当事人采取多种奖惩措施保障"二选一"要求实施。当事人一方面通过流量支持等激励性措施促使平台内经营者执行"二选一"要求，另一方面通过人工检查和互联网技术手段监控等方式，监测平台内经营者在其他竞争性平台开店或者参加促销活动情况，并凭借市场力量、平台规则和数据、算法等技术手段，对不执行当事人相关要求的平台内经营者实施处罚，包括减少促销活动资源支持、取消参加促销活动资格、搜索降权、取消在平台上的其他重大权益等。上述处罚措施大幅降低消费者对被处罚平台内经营者的关注度，对其正常经营造成重大不利影响，同时具有很强的威慑效果，使得更多平台内经营者不得不执行当事人提出的"二选一"要求。

**一是减少促销活动资源支持。**促销活动中，网络零售平台一般会给参加促销的平台内经营者和商品打上特定标识，并在活动页面对特定经营者或商品予以优先展示，这是平台内经营者参加平台促销活动、增加商品销量的重要方式。当事人对违反"二选一"要求的部分平台内经营者，采取了取消其促销活动期间资源支持的处罚手段。证据显示，部分平台内经营者因参加其他竞争性平台"双 11""618"等促销活动，被当事人取消了促销会场优先展示位置。

**二是取消促销活动参加资格。**当事人制定"灰名单"制度，将在其他竞争性平台开店或者参加其他竞争性平台促销活动的平台内经营者列入处罚名单，取消其参加当事人大型促销活动资格。证据显示，部分平台内经营者因未执行当事人"二选一"要求而被列入"灰名单"，进而遭到处罚，只有执行当事人要求并经当事人审核通过后，方能恢复参加当事人大型促销活动和"聚划算""天天特卖"等日常促销活动的报名资格。证据表明，大部分被列入"灰名单"的平台内经营者执行了当事人"二选一"要求。

**三是实施搜索降权。**搜索算法的核心是提升搜索转化率，使商品得到消费者更多关注，从而提高商品销量，涉及平台内经营者的核心权益。搜索降权直接导致平台内经营者的商品在平台上排序靠后甚至无法被搜索到，严重影响商品销售。对部分未执行"二选一"要求的平台内经营者，当事人调低其搜索权重，以示严厉处罚。证据显示，部分平台内经营者因未执行当事人"二选一"要求受到了搜索降权的处罚。

**四是取消平台内经营者在当事人平台上的其他重大权益。**当事人对经多次要求仍不停止在其他竞争性平台经营或者仍不退出其他竞争性平台促销活动的平台内经营者，采取取消 KA 资格或者终止相关合作等手段，剥夺其相关服务保障等重大权益。证据显示，部分平台内经营者因未执行当事人"二选一"要求，被取消 KA 资格或者被终止相关合作。

调查过程中，当事人提出签订合作协议为平台内经营者自愿，会给予平台内经营者独特资源作为对价，属于激励性措施，具有正当理由。当事人采取限制性措施是针对平台内经营者没有按照约定执行的情况，实施有关行为是保护针对交易的特定投入所必须。

本机关认为，当事人提出的理由不能成立，实施有关行为没有正当理由。**一是**大部分含有"二选一"内容的合作协议并非平台内经营者自愿签订。调查显示，平台内经营者往往倾向于在多个平台同时开设店铺、销售商品，签订相关协议并非出于自愿。平台内经营者因违反合作协议要求而被当事人处罚，证明其并非自愿与当事人开展相关合作。**二是**调查发现，部分平台内经营者并未因执行当事人口头要求而获得对价，取消对价只是当事人对平台内经营者进行处罚的手段之一。**三是**排他性交易并非保护特定投入所必须。当事人在日常经营和促销期间投入的资金和流量资源是平台自身经营所需的投入，并非为特定平台内经营者进行的投入。当事人采取的激励性措施，可以通过多种方式得到回报，实施"二选一"行为并不是必须选择。

以上事实，有当事人相关人员调查询问笔录、内部钉钉群聊天记录、电子邮件、与部分平台内经营者签订的合作协议、各业务部门发展规划、工作总结、"双 11""618"招商规则、会议简报等文件、当事人自查报告以及竞争性平台和平台内经营者相关人员调查询问笔录等证据证明。

六、当事人行为排除、限制了市场竞争

当事人限制平台内经营者在其他竞争性平台开店或者参加其他竞争性平台促销活动，形成锁定效应，以减少自身竞争压力，不当维持、巩固自身市场地位，背离平台经济开放、包容、共享的发展理念，排除、限制了相关市场竞争，损害了平台内经营者和消费者的利益，削弱了平台经营者的创新动力和发展活力，阻碍了平台经济规范有序创新健康发展。

（一）排除、限制了中国境内网络零售平台服务市场竞争。

当事人限定平台内经营者只能与其进行交易，不能进驻其他竞争性平台或者在其他竞争性

- 13 -

平台开展促销活动，直接削弱了其他竞争性平台与当事人进行公平竞争的能力和相关市场竞争程度，不当提高了潜在竞争者的市场进入壁垒，破坏了公平、有序的市场竞争秩序。

**一是排除、限制了相关市场经营者之间的公平竞争。**当事人要求平台内经营者不得在其他竞争性平台开店或者不得参加其他竞争性平台的促销活动，不当抑制了其他竞争性平台可能获得的经营者供给，削弱了其他竞争性平台的竞争能力，排除、限制了市场公平竞争。同时，由于平台经济具有跨边网络效应，相关行为在直接导致其他竞争性平台上经营者流失的同时，也会进一步减少其他竞争性平台上的消费者数量，使平台内经营者和消费者数量减少形成循环反馈，削弱其他竞争性平台的竞争能力，严重排除、限制相关市场经营者之间的公平竞争。

证据表明，当事人出于竞争需要，有针对性地对部分品类经营者或重点品牌经营者提出"二选一"要求，压制其他竞争性平台相关业务发展或阻碍其品牌升级，并实现了相应效果。

**二是排除、限制了相关市场潜在竞争。**由于平台经济具有网络效应和规模经济特点，新进入的平台服务提供者需要积累一定规模的用户才能有效进入市场。当事人对部分平台内经营者提出不得进驻其他竞争性平台、将当事人作为中国境内唯一线上销售渠道等要求，在将经营者锁定在自身平台的同时，不当增加了相关市场潜在进入者与相关经营者达成合作协议的难度，使其难以获取进入市场开展竞争所需的必要资源，提高了市场进入壁垒，排除、限制了相关市场的潜在竞争。

（二）损害了平台内经营者的利益。

当事人有关行为直接限制了平台内经营者的经营自主权，削弱了商品的品牌内竞争，损害了平台内经营者利益。

**一是损害了平台内经营者的经营自主权。**由于不同平台侧重的消费者群体有所不同，通常情况下平台内经营者具有多栖性倾向，希望通过多平台经营，提升经营效率，获得更丰富的销

- 14 -

售渠道，更广泛地接触消费者，以实现更大的销售额。当事人要求平台内经营者仅在当事人平台开店或者仅参加当事人平台的促销活动，剥夺了平台内经营者自主选择合作平台的交易权利，限制了其经营自主权。

**二是不当减损平台内经营者合法利益。**促销活动前，平台内经营者一般需要大量备货，并投入营销推广费等成本。当事人在大型促销活动期间向平台内经营者提出退出其他竞争性平台促销活动等要求，对平台内经营者实施取消促销活动资源、搜索降权等惩罚措施，严重影响平台内经营者正常经营，导致交易缺乏稳定性和公平性，直接损害平台内经营者的正当利益。当事人要求平台内经营者仅在当事人平台开店或者仅参加当事人平台的促销活动，也使其损失了原本可以在其他平台开展经营获得的收益。

**三是削弱了品牌内竞争程度。**同一品牌产品的经营者在不同平台上开展经营，可以在品牌内形成不同销售渠道之间的竞争。特别是在促销活动期间，网络零售平台往往通过对平台内经营者进行补贴，使其能够提供更为优惠的价格。当事人要求平台内经营者仅在当事人平台开店或者仅参加当事人平台的促销活动，限制了同一品牌商品的销售渠道和促销渠道，削弱了品牌内的竞争。

（三）阻碍资源优化配置，限制了平台经济创新发展。

当事人有关行为妨碍了网络零售平台服务市场的资源优化配置，抑制了市场主体活力，限制了平台经济创新发展。

**一是阻碍了要素自由流动，降低资源配置效率。**平台内经营者可以根据不同平台的经营效率、服务价格、管理水平、服务能力等在不同平台间自由选择，合理分配资源。当事人实施"二选一"行为，阻碍了生产要素在不同网络零售平台间的自由流动，影响了商品供需有效匹配，降低了经济循环流通效率。

**二是限制了平台内经营者多样化差异化创新经营。**平台内经营者可以根据不同平台用户特点，通过旗舰店、专营店、专卖店等不同形式和渠道，相机采取不同的竞争策略，开展差异化经营，从而为消费者提供更多选择。当事人限定平台内经营者只能与其进行交易，抑制了平台内经营者创新发展的动力和活力。

**三是抑制了市场主体活力，影响平台经济创新发展。**平台经济持续健康发展有赖于公平竞争和技术创新。当事人通过不正当手段维持和巩固自身竞争优势，削弱了平台经营者开展技术和商业模式创新的动力，影响了其他平台和潜在竞争者的创新意愿，不利于平台经济创新健康发展。

（四）损害了消费者利益。

当事人有关行为限制了消费者自由选择权和公平交易权，损害了消费者利益。

**一是限制了消费者的自由选择权。**在网络零售环境下，消费者的搜寻和比价成本大幅降低，更容易在不同平台间进行商品和价格比较，作出最优选择。当事人有关行为减少其他竞争性平台上可选择的品牌及商品，限缩了消费者可接触的品牌和商品范围，限制了消费者的自由选择权。

**二是限制了消费者的公平交易权。**网络零售平台根据自身经营策略，为消费者提供多元化的服务和促销活动。当事人限制平台内经营者在其他竞争性平台开店或参加促销活动，使消费者只能被动接受当事人的交易条件，无法享受其他平台更具竞争力的价格和服务，限制了消费者的公平交易权，损害了消费者利益。

**三是从长远看会对社会总体福利水平带来潜在损害。**当事人有关行为排除、限制了市场竞争，降低了平台经营效率，妨碍平台经营模式创新，阻碍潜在竞争者进入市场，不当降低了市场竞争的强度和水平，影响网络零售平台服务在充分竞争中不断优化和发展，损害效果会传递

到消费终端，不仅损害消费者现实利益，也会损害消费者期待利益，减损社会总体福利水平。

以上事实，有当事人各业务部门发展规划、竞对策略、工作总结、内部钉钉群聊天记录、电子邮件等文件、当事人自查报告以及竞争性平台和平台内经营者相关人员调查询问笔录等证据证明。

七、行政处罚依据和决定

经查，当事人自 2015 年以来，滥用其在中国境内网络零售平台服务市场的支配地位，禁止平台内经营者在其他竞争性平台开店或者参加促销活动，排除、限制了相关市场竞争，侵害了平台内经营者的合法权益，损害了消费者利益，阻碍了平台经济创新发展，且不具有正当理由，构成《反垄断法》第十七条第一款第（四）项禁止"没有正当理由，限定交易相对人只能与其进行交易"的滥用市场支配地位行为。

根据《反垄断法》第四十七条、第四十九条规定，综合考虑当事人违法行为的性质、程度和持续的时间，同时考虑当事人能够按照要求深入自查，停止违法行为并积极整改等因素，本机关对当事人作出如下处理决定：

**（一）责令停止违法行为。**

1. 不得限制平台内经营者在其他竞争性平台开展经营；不得限制平台内经营者在其他竞争性平台的促销活动。

2. 当事人应当自收到本行政处罚决定书之日起十五日内，向本机关提交改正违法行为情况的报告。

3. 根据《行政处罚法》坚持处罚与教育相结合的原则，本机关结合调查过程中发现的问题，制作《行政指导书》，要求当事人从严格落实平台企业主体责任、加强内控合规管理、保

护消费者权益等方面进行全面整改，依法合规经营。

**（二）对当事人处以其 2019 年度中国境内销售额 4557.12 亿元 4%的罚款，计 182.28 亿元（大写：壹佰捌拾贰亿贰仟捌佰万元）。**

根据《行政处罚法》第四十六条规定，当事人应当自收到本行政处罚决定书之日起十五日内，根据本行政处罚决定书，携缴款码到 12 家中央财政非税收入收缴代理银行（工、农、中、建、交、中信、光大、招商、邮储、华夏、平安、兴业）任一银行网点或者网上银行缴纳罚款。缴款码为：***。

根据《行政处罚法》第五十一条规定，当事人逾期不履行行政处罚决定的，本机关可以采取以下措施：（一）到期不缴纳罚款的，每日按罚款数额的百分之三加处罚款；（二）申请人民法院强制执行。

当事人如对上述行政处罚决定不服，可以自收到本行政处罚决定书之日起六十日内，向国家市场监督管理总局申请行政复议；或者自收到本行政处罚决定书之日起六个月内，依法向人民法院提起行政诉讼。行政复议或者行政诉讼期间，本行政处罚决定不停止执行。

市场监管总局

2021 年 4 月 10 日

## DECLARATION AND CERTIFICATION

We, <u>Ko & Martin - Certified Interpreters and Translators</u>, declare that we are

( ✓ )    Certified Court Interpreters as described in GC68565

We are certified to interpret and translate <u>from the Chinese language to the English language and from the English language to the Chinese language.</u>

We further declare that we have translated the attached document <u>from the Chinese language to the English language.</u>

We declare to the best of our abilities and belief, that this is a true and accurate translation of the Chinese language text of **State Administration for Market Regulation Letter of Administrative Penalties.**

### Specific Description of the Document

### <u>State Administration for Market Regulation Letter of Administrative Penalties</u>

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is signed this <u>6th of April 2022</u> in <u>Los Angeles</u>, California.


<u>Lingling Men Martin</u>
President
Ko & Martin - Certified Interpreters and Translators


<u>Signature</u>

KO & MARTIN – Certified Interpreters and Translators
www.komartin.com
Email: chinese.division@komartin.com