**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: ALIBABA GROUP HOLDING LTD.
SECURITIES LITIGATION

No.: 1:20-cv-09568-GBD-JW

### MEMORANDUM OF LAW IN SUPPORT OF
### ALIBABA DEFENDANTS' MOTION TO DISMISS
### PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

Jonathan K. Youngwood
jyoungwood@stblaw.com
425 Lexington Avenue
New York, New York   10017
Telephone: (212) 455-3539
Facsimile: (212) 455-2502

James G. Kreissman
jkreissman@stblaw.com
Stephen P. Blake
sblake@stblaw.com
Bo Bryan Jin (*pro hac vice*)
Bryan.jin@stblaw.com
2475 Hanover Street
Palo Alto, California   94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Counsel for Defendants Alibaba Group Holding
Limited, Daniel Yong Zhang, Maggie Wei Wu,
and Jack Yun Ma*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

ARGUMENT ......................................................................................................................... 12

I.      PLAINTIFFS FAIL TO STATE A CLAIM REGARDING THE ANT
        IPO. ......................................................................................................................... 13

        A.      Alibaba Had No Duty To Disclose The Allegedly Omitted
                Information ................................................................................................... 13

        B.      The Complaint Fails To Plead A Strong Inference Of Scienter For
                The Ant IPO Claim. ...................................................................................... 14

II.     PLAINTIFFS FAIL TO STATE A CLAIM RELATED TO ANTITRUST
        RISK ......................................................................................................................... 15

        A.      Plaintiffs Fail To Plead Any Actionable Misstatement Or
                Omission. ..................................................................................................... 15

                1.      Plaintiffs Fail To State A Claim Based On Alibaba's
                        Statement Of Opinion That Its Business Practices Did Not
                        Violate The AML. ............................................................................. 15

                2.      Alibaba Fairly Disclosed Regulatory Scrutiny And Risks
                        Related To Its Business Practices. .................................................... 17

                3.      Alibaba Did Not Mislead Investors About Its Business
                        Practices. ........................................................................................... 18

        B.      Plaintiffs Fail To Plead A Strong Inference Of Scienter. ..................... 20

                1.      The Complaint Includes No Coherent Motive And
                        Opportunity Allegation. .................................................................... 21

                2.      The Complaint Lacks Any Strong Circumstantial Evidence
                        Of Conscious Misbehavior Or Recklessness. ................................... 21

                3.      Balancing Of Inferences Strongly Favors Dismissal. ...................... 22

        C.      Plaintiffs Fail To Plead Loss Causation. ..................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Basic Inc. v. Levinson*,
   485 U.S. 224 n.17 (1988) ........................................................................................... 14

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
   565 F. Supp. 3d 478 (S.D.N.Y. 2021) ......................................................................... 18

*City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ......................................................................... 20

*City of Roseville Employees' Retirement Sys. v. Nokia*,
   10CV00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) .......................................... 14

*Hou Liu v. Intercept Pharm., Inc.*,
   No. 17CV7371, 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ..................................... 22

*In re AT&T/DirecTV Now Sec. Litig.*,
   No. 19CV2892, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) *appeal filed*, No.
   21-2698 (2d Cir. Oct. 27, 2021) .................................................................................. 22

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008) ............................................................. 12, 17, 20

*In re Ideanomics, Inc., Sec. Litig.*,
   No. 20CV4944, 2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) ........................... passim

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................... 15, 17

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
   No. 01CV4388, 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ....................................... 21

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ......................................................................... 18

*In re Omnicom Grp. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ........................................................................................ 24

*In re Open Joint Stock Co. Vimpel-Commc'ns*,
   No. 04CV9742, 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ...................................... 23

*In re Progress Energy, Inc. Sec. Litig.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005) ......................................................................... 18

*In re Refco Cap. Mkts., Ltd. Brokerage Customer Sec. Litig.*,
   586 F. Supp. 2d 172 (S.D.N.Y. 2008) ......................................................................... 22

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ........................................................ 17

*In re Travelzoo Inc. Sec. Litig.*,
  No. 11CV5531, 2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ............................ 13, 14, 23, 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ........................................................ 24

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ........................................................ 13

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ........................................................ 12, 25

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
  873 F. Supp. 2d 1070 (D. Minn. 2012) ........................................................ 25

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*,
  886 F. Supp. 2d 328 (S.D.N.Y. 2012) ........................................................ 24

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
  898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) ........................ 25

*Thesling v. Bioenvision*,
  374 Fed. Appx. 141 (2d Cir. 2010) ........................................................ 14

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ........................................................ 16, 17

## Statutes

15 U.S.C. § 78u-4(B)(1)(B) ........................................................ 12

15 U.S.C. § 78u-4(B)(2) ........................................................ 13

## Federal Rules

Fed. R. Civ. P. 9(b) ........................................................ 12

## PRELIMINARY STATEMENT

Defendant Alibaba Group Holding Limited ("Alibaba" or the "Company") is a technology company based in the People's Republic of China ("PRC") that trades on both the New York and Hong Kong stock exchanges.   This suit brings two sets of claims against Alibaba, its CEO, and its former CFO (the "Alibaba Defendants").   ***First***, Plaintiffs claim that the Alibaba Defendants failed to disclose PRC regulatory risks that led to an abrupt suspension of the planned Shanghai and Hong Kong initial public offering ("IPO") of Ant Group Co. Ltd. ("Ant"), a non-party affiliate of Alibaba in the financial technology or "FinTech" sector (the "Ant IPO Claim").   ***Second***, Plaintiffs allege that the Alibaba Defendants falsely claimed compliance with evolving PRC antitrust laws, including those regarding business practices commonly referred to as "choose one of two," and that Alibaba's failure to comply led it to be investigated and fined (the "Antitrust Claim").

The Amended Consolidated Class Action Complaint ("Complaint" or "AC") alleges that these developments unfolded "as Beijing [sought] to curtail the growing dominance of," and impose "stricter controls" over, technology companies.   AC ¶¶ 25, 28.   Despite the prolix Complaint, the issue before this Court is simple—should the fact that Alibaba was impacted by an industry-wide PRC regulatory tightening on "Big Tech" give rise to a U.S. securities fraud claim?   The Court need only review Alibaba's detailed risk disclosures and the plethora of publicly known facts (which are catalogued at length in the Complaint) to conclude that Alibaba fairly apprised its investors of its evolving regulatory risks and did not act with scienter.

**The Ant IPO Claim:**   On November 2, 2020, three days before Ant was supposed to launch its IPO, PRC regulators announced a new FinTech regulation, resulting in a last-minute suspension of Ant's IPO.   The Complaint—which glosses over this new regulation—speculates instead that the IPO was suspended because of certain Ant investors' political affiliation, and

claims that Alibaba's investors were not adequately warned of the associated risk to the Ant IPO. This claim is not well-pleaded, as discussed in Defendant Jack Yun Ma's separate brief.   It is also particularly untenable against the **Alibaba** Defendants, who had no duty to disclose the identity of **Ant's** investors.   Plaintiffs also allege no fact showing that the Alibaba Defendants were at all aware of these purported Ant investors.   Moreover, Alibaba sought to **buy** billions of dollars of additional Ant shares in the IPO, directly undercutting any inference of scienter.

**The Antitrust Claim:**   On December 24, 2020, PRC antitrust regulators launched an investigation of Alibaba, and later imposed a significant fine.   These facts do not, however, give rise to a securities fraud claim—particularly where nearly every detail about the PRC regulatory tightening found in the Complaint is sourced from public information.   Indeed, Alibaba repeatedly warned its U.S. investors of both the general risks posed by increasing PRC antitrust scrutiny, and specific risks related to certain exclusivity practices prevalent in the Chinese e-commerce sector—known as "choose one of two."   While Alibaba for years vigorously contended that its own practices—incentivizing merchants to sell exclusively on its e-commerce platforms by offering them improved visibility and promotional opportunities—were permissible, the Company also cautioned investors that "there can be no assurance that regulators will not initiate anti-monopoly investigations into [its] business practices."   AC ¶ 255.

The Antitrust Claim fails for multiple reasons.   **First**, Plaintiffs fail to plead falsity. Although Plaintiffs challenge Alibaba's statement of opinion that its business practices were lawful, they allege no fact showing Alibaba's belief was not honestly held when that statement was made.   Plaintiffs also contend that Alibaba misleadingly downplayed its antitrust risk, but the Complaint demonstrates that investors were well aware of both Alibaba's practices and the PRC regulators' criticisms.   Plaintiffs' assertion that the regulators—in the midst of an industry-

wide tightening—ultimately fined Alibaba is a non-actionable claim of "fraud by hindsight."

*Second*, Plaintiffs fail to plead scienter.   The Complaint cites no internal document, confidential witness, or other source that suggests Alibaba or its executives did not believe the Company's public pronouncements or sought to mislead investors.   Instead, Plaintiffs again rely on hindsight pleading and essentially ask the Court to draw the unjustifiable inference that Alibaba was reckless in not accurately predicting future regulatory developments.   However, the Complaint—stripped of rhetoric—can only lead to an inference that, faced with a sharp turn in the PRC regulatory environment, Alibaba acted transparently and without intent to defraud.

*Finally*, Plaintiffs cannot plead loss causation.   The two stock price drops at issue were neither corrective disclosures nor materializations of previously undisclosed risks.   Instead, the stock movement was caused by new events relating to risks that were disclosed and well-known.

## FACTUAL BACKGROUND[1]

Defendant Alibaba is a Chinese technology company.   Ex. A ("20-F") at 69–70.[2] Alibaba's American depository shares ("ADSs") trade on the New York Stock Exchange and its common shares trade on the Hong Kong Stock Exchange ("HKSE").   AC ¶¶ 45, 376.   Alibaba has repeatedly cautioned investors about "[r]isks [r]elated to [d]oing [b]usiness in the [PRC]," including warning that "[c]hanges in the political and economic policies of the PRC government may materially and adversely affect [its] business" and that there are significant "uncertainties regarding the interpretation and enforcement of PRC laws."   20-F at 50.

During the COVID-19 pandemic, technology companies' valuations appreciated markedly, which in China reportedly led to political concerns with "widening inequality."   Ex. B at 1.   These concerns and what media reports cited in the Complaint described as "a broader

---

[1]   Based on the Complaint and exhibits, documents incorporated by reference, and judicially noticeable facts.

[2]   Unless otherwise noted, "Ex. _" citations refer to exhibits to the concurrently-filed Declaration of Stephen Blake.

China government sentiment that internet platforms [were] becoming too powerful," Ex. C at 2, allegedly resulted in a regulatory focus on "prevent[ing] 'the disorderly expansion of capital,'" Ex. D at 4, or, as characterized by another news article cited in the Complaint, "Beijing's pushback against Big Tech."   Ex. E at 1.   Indeed, commentators observed that "toughen[ed PRC] regulation over an internet sector that [had been] growing in size and impact," Ex. F at 3, combined with other global turmoil, wiped out "more than $1.1 trillion in market value" from the ten largest Chinese companies trading in the United States.   Ex. G at 3; *see also* Exs. H1–H10.

### The Ant IPO Claim[3]

Alibaba owns approximately 33% of Ant.   AC ¶ 11.   Ant is "best known for operating Alipay, a mobile and online payment platform akin to PayPal," but Ant also provides a broader range of FinTech services including "online consumer credit" and loan platforms.   *Id.* ¶¶ 11, 14.

On July 20, 2020, Ant announced its plan for a concurrent IPO on the Shanghai Stock Exchange and HKSE (the "Ant IPO"), which was expected to launch on November 5, 2020.   *Id.* ¶ 165.   Alibaba disclosed Ant's plans to Alibaba's U.S. investors, and cautioned that "there can be no assurance as to if and when [the Ant IPO] will be completed."   *Id.* ¶¶ 274, 276; Ex. I at Ex. 99.1.   In the Ant IPO, Alibaba subscribed to buy an estimated US$7.5 billion in additional Ant shares.   AC ¶¶ 274, 276.

On November 2, 2020, PRC regulators released the draft *Interim Regulatory Measures on Online Small Loan Businesses* (the "*Interim Measures*"), which Bloomberg reported ***"[c]hanged the [rules]"*** applicable to Ant's online loan business.   *Id.* ¶ 234, 237 (emphasis added).   On November 3, 2020, Chinese regulators notified Ant of an abrupt suspension of the Ant IPO, citing "recent changes in the Fintech regulatory environment."   *Id.* ¶ 229 (emphasis omitted).

---

[3]   The Alibaba Defendants refer the Court to Defendant Jack Yun Ma's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (the "Ma MTD") for additional factual background regarding the Ant IPO Claim.

Following this announcement, the price of Alibaba's ADS appreciably declined.   *Id.* ¶ 24.

## The Antitrust Claim

*Alibaba's Well-Known Traffic-for-Exclusivity Practices:*   Alibaba primarily operates businesses in e-commerce, cloud computing, and digital media and entertainment.   AC ¶ 45–46; 20-F at 69–70.   Alibaba's e-commerce platforms facilitate trillions of dollars in transactions annually by connecting consumers with third-party merchants—including individuals and small business merchants on free-to-use Taobao (which is often referred to as a "consumer-to-consumer" or "C2C" platform) and established brands and retailers on commission-based Tmall (which is instead referred to as a "business-to-consumer" or "B2C" platform).   *See* AC ¶¶ 46–48; 20-F at 83, 133.   Merchants purchase marketing services from Alibaba that direct customer "traffic" to their storefronts.   20-F at 83–84.   For example, merchants pay to have their storefronts displayed at prominent positions on the platforms or their listings ranked higher in search results.   *Id.* at 132.   Alibaba faces fierce competition from other e-commerce platforms such as JD.com, which is backed by Chinese Internet giant Tencent.   AC ¶¶ 25, 27, 157.

The Complaint describes "choose one of two" as an overarching term for "a number of business practices that required or coerced merchants to sell exclusively" on a single e-commerce platform.   AC ¶¶ 5, 89.   The term, which is not defined by PRC law, was originally used to describe an unconditional exclusivity requirement—where, for example, Tencent allegedly forced consumers to use either its software or its competitors', but not both.   *See* Ex. J at 5; Ex. K at 2.   The e-commerce industry's adoption of "choose one of two" practices was widely covered in the media.   AC ¶¶ 91–96.   For example, in August 2015, Tmall reportedly "signed exclusive partnerships with more than 20 apparel brands" to "become the only third-party online sales platform for the apparel brands in China."   Ex. L at 1.   Other platforms reportedly entered into similar arrangements.   *See, e.g.*, Ex. M at 1; Ex. N at 1; Ex. O at 1.

Competitors have, for years, attacked Alibaba's business practices as illegal "choose one of two" arrangements.   In July 2017, JD.com publicly accused Tmall of both "block[ing]" non-exclusive merchants (*i.e.*, unconditional "choose one of two") and allocating more traffic resources to exclusive merchants and less to non-exclusive merchants (*i.e.*, a softer form of "choose one of two" utilizing incentives).   Ex. P at 1–2; *see also* Ex. J at 5.   Five months later, JD.com filed a high-profile lawsuit alleging Tmall "abused its dominant position" in violation of Article 17 of the PRC Anti-Monopoly Law (the "AML") for seeking "commitments from merchants to not open stores on JD.com's platform."   AC ¶ 91.

As was later found by PRC antitrust regulator the State Administration for Market Regulation ("SAMR") (*see infra* at 11), Alibaba's exclusivity practices were based on "various incentive and penalty measures" such as traffic allocation, rather than outright blocking of non-exclusive merchants.   AC, Ex. 8 ("SAMR Op.") at 10 (emphasis omitted).   In particular, Tmall provided select "core merchants" that had the highest "sales growth, merchandise capability, user operation, band power, service capability and compliance operations" with free "traffic support" through promotional events, higher search result ranking, and/or other means.   *Id.* at 9–10.   In return, these merchants agreed to either be exclusive to Tmall, or to forfeit the allocated traffic resources, which could result in "reduced resource support," disqualification from "promotional activities," "search downgrading," and/or other diminished benefits.   *Id.* at 10–11 (emphasis omitted).   Alibaba's traffic-for-exclusivity practices had been subject to public challenge for years.   *See* AC ¶¶ 89, 90, 92–96.   For example, as the Complaint—citing media coverage—explains, Alibaba's competitor Pinduoduo in November 2019 accused Alibaba of telling sellers to "close their Pinduoduo [stores or] face having shopper traffic directed away from their Tmall stores."   *Id.* ¶ 92.   The Complaint—citing further media coverage—also describes that Galanz,

a microwave oven manufacturer, in June 2019 accused Alibaba of "diverting traffic"—
"penalizing it for refusing to stop selling on Alibaba's competitor platforms."   AC ¶¶ 93–95.

 *Alibaba Publicly Stood By Its Practices:* Alibaba publicly acknowledged its traffic-for-exclusivity practices, but disputed whether such practices violated AML Article 17, *see* AC ¶¶ 97, 112, Ex. 1, which prohibits "businesses with dominant market position[s]" from "[r]equiring a trading party to trade exclusively with itself . . . without any justifiable causes."   *Id.* ¶ 75 (emphasis omitted).   Moreover, prior to and during the putative Class Period, Chinese legal scholars noted the ambiguity and vigorous debate surrounding Article 17, including how relevant markets and dominant positions should be determined for e-commerce platforms, whether incentivizing exclusivity using traffic resource allocation falls within the scope of Article 17, and, if so, whether the provision of such resources as consideration constitutes a "justifiable cause."   *See*, *e.g.*, Ex. Q at 50 (noting traffic resource allocation as neither "absolutely legal or illegal" and difficulty in determining relevant market and market dominant position); Ex. R at 67–70 (discussing commercial and legal justifications of the practices, complexity of the issues, and the lack of judicial precedent).   Indeed, even to this day, no Chinese court has found Alibaba's traffic-for-exclusivity practice illegal under the AML.   *See* Ex. S at 4.

 *Alibaba Cautioned Its Investors About Legal Challenges To Its Practices:* Despite its belief in the legality of its practices, Alibaba was transparent with its investors about risks related thereto, including the possibility that regulators could initiate anti-monopoly investigations:

> [O]ur competitors, business partners and customers, have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private litigation that targets our prior and current business practices, such as our market approach with traffic resource allocation on our e-commerce platforms, which we base on multiple factors, and our alleged prior narrowly-deployed exclusive partnerships. ***Although we believe that our business practices do not violate anti-monopoly or unfair competition laws . . ., there can be no assurance that regulators will not initiate anti-***

***monopoly investigations into specific business practices we have adopted***.

20-F at 39 (emphasis added).    Stock analysts also cautioned investors that Alibaba's practices

"[c]ould [c]ause [b]acklash," including "fines" and "changes to this practice."    Ex. T at 2.

***PRC Anti-Monopoly Enforcement Continued To Develop***:    As Alibaba warned its

investors, "the interpretation and enforcement of [PRC laws] involve uncertainties and can be

inconsistent and unpredictable" including situations where legal developments have "retroactive

effect."    20-F at 50–51.    Although the AML was originally promulgated in 2008, Plaintiffs

acknowledge that "[i]n recent years, . . . numerous laws and regulations [have] tighten[ed] the

Party's grip over large internet companies."    AC ¶ 3.    Alibaba, which had consistently

identified antitrust as a key risk, further cautioned investors that the SAMR had since 2018

begun to "strengthen[] enforcement under the [AML], including levying significant fines, with

respect to . . . abusive behavior by companies with market dominance."    20-F at 39.

On November 5, 2019, the SAMR held a widely-publicized administrative guidance[4]

meeting with twenty technology platform operators, including Alibaba.    AC ¶¶ 103–11.    At

this open meeting—where both regulators and company representatives shared perspectives—a

SAMR official reportedly expressed his general view that some unspecified forms of "choose

one of two" violated the AML.    *Id.*    He also publicly stated that the SAMR would initiate

investigations into certain, unspecified "choose one of two" practices.    *Id.*    However, he is not

alleged to have implicated any particular company in his remarks.    *See id.*    Moreover, and

importantly, he is not alleged to have specified whether he believed traffic-for-exclusivity

arrangements—such as Alibaba's—violate the AML.    Alibaba's representative at the meeting

---

[4]   Administrative guidance is a type of "voluntar[y]" and "non-compulsory" interaction, where the SAMR acts "to guide citizens, legal persons, and other organizations . . . in voluntarily committing or not committing an act by such non-compulsory means as proposal, tutorship, reminding, persuasion, demonstration, publicity and talk . . . ."    Ex. U at 3*; see also* AC ¶ 102.    Administrative guidance creates no legal obligation, and "shall be implemented on the premise of [the recipient's] voluntariness."    Ex. U at 4.

acknowledged that it "provide[d] [cooperating] merchants with the best traffic resources," and indicated her belief that these practices were legal.   *Id.* ¶ 110.   These statements are quoted in the Complaint from contemporaneous public reports and video of the meeting.   *Id.* ¶¶ 103–11. Alibaba also specifically disclosed this meeting to its investors, highlighting the SAMR's indication of its intention to investigate "choose one of two" practices:

> On several recent occasions, including at ***administrative guidance meetings*** attended by Internet platform companies including our company, the SAMR has indicated its view that certain business arrangements adopted by e-commerce platforms, including arrangements seen as ***exclusivity arrangements, may constitute violation of the anti-monopoly … laws***. ***The SAMR also indicated its intention of initiating investigations into these arrangements.***

20-F at 39 (emphases added).[5]   Notwithstanding the SAMR official's statements, by November 2019, the SAMR had still not formally clarified the applicability of Article 17 to any "choose one of two" practices, let alone to Alibaba's specific traffic-for-exclusivity practices.   Indeed, just two months earlier on September 1, 2019, the SAMR had promulgated the *Interim Provisions on Prohibiting Abuse of Dominant Market Positions* (the "*IPP-AD*"), which provided no clarification as to whether traffic-for-exclusivity arrangements fall within the scope of Article 17 or whether the provision of traffic as an incentive can "prove the justifiability" of otherwise prohibited exclusivity arrangements.   *See* AC ¶¶ 76–77.[6]

New regulatory pronouncements continued in 2020, including draft amendments to the AML, which the Complaint explains outlined "factors used to determine whether an internet company is a dominant actor."   *Id.* ¶¶ 118.   It was not, however, until November 10, 2020, that

---

[5]   The SAMR allegedly held similar administrative guidance meetings on July 17 and November 6, 2020, further reminding the businesses that "[v]iolations of laws and regulations," including the AML, "would be investigated and punished."   AC ¶¶ 114–15, 129, Ex. 6 at 6.   These meetings are similarly not alleged to have specifically referenced Alibaba's practices or clarified what types of "choose one of two" practices could be problematic.   *Id.*

[6]   Also, the *IPP-AD* acknowledges the complexity of relevant market determination by listing a number of factors that should be considered, including "competition characteristics, business mode, number of users, network effect, lock-in effect, technical feature, market innovation and the capacity for grasping and processing relevant data in relevant industry as well as the market strength of the business operator at relevant market."   Ex. V, Art. 11.

the SAMR issued the draft *Anti-Monopoly Guidelines for the Platform Economy Sector* (the "*Platform Guidelines*"), which subsequently took effect on February 7, 2021.   Ex. W at 10; *see also* AC ¶ 123.   The SAMR described the *Platform Guidelines* as "further clarif[ying] the principles for anti-monopoly law enforcement in the platform economy sector and refin[ing] the analytical approach, thus providing clearer guidance to undertakings in the platform sector on how to conduct their operations legally and compliantly."   Ex. W at 10; *see also* AC ¶ 124 ("The **new rules** were proposed in accordance with and build on China's Anti-Monopoly Law, which in January [2020] included broad language governing internet companies **for the first time**.") (emphasis added).   The *Platform Guidelines*, for the first time, formally addressed "choose one of two" practices and explicitly stated that such practices enforced through "traffic restriction" "can generally be deemed as" falling within Article 17.   Ex. X, Art. 15.   It also established a framework for determining a relevant platform market and provided six factors for ascertaining a dominant market position.   *Id.*, Arts. 4, 11.   The promulgation of the *Platform Guidelines* was perceived by the market as materially increasing the likelihood of enforcement actions against PRC platform operators.   AC ¶¶ 25, 27, 373.   On that day, Alibaba's ADS price dropped 8.26%, *id.* ¶ 26; the stock prices of other major Chinese platform companies including JD.com experienced a comparable decline.   Exs. Y1–Y4.

**The SAMR Investigated And Later Penalized Alibaba:**   On December 23, 2020, the SAMR announced it was initiating an investigation into Alibaba, including specifically whether Alibaba engaged in any prohibited "choose one of two" practices.   AC ¶ 130.   Alibaba's ADS price dropped 14.32% after the announcement.   *Id.* ¶¶ 131, 374.

Over the next several months, the SAMR "conducted extensive investigations," which it described as "the first major monopoly case in the platform economy sector in China" and "quite

challenging." AC ¶ 154; Ex. W at 5, 11.    In view of e-commerce platforms' "complex business

models" and "diverse competition forms," AC ¶ 154; Ex. W at 11, the SAMR "conducted on-site

inspections," "extensively investigated into other competitive platforms and operators," "carried

out big data analysis," and "organized expert[] . . . analysis."    SAMR Op. at 1.

On April 10, 2021, the SAMR concluded that Alibaba's "choose one of two" practices

violated Article 17 of the AML.    AC ¶¶ 134, 142; SAMR Op. at 15–16.    In reaching this

finding, the SAMR analyzed and decided a number of novel issues that had, until this point, not

been ruled upon in any judicial or regulatory proceedings:

- <u>Relevant Market</u>:    SAMR determined the relevant market to include both B2C
  and C2C, as opposed to only B2C, which Alibaba proposed based on differences
  between the two platform models.    SAMR Op. at 2, 4–5.[7]

- <u>Dominant Position</u>: Alibaba was found to have a dominant position in the
  combined B2C and C2C platform market.    *Id.* at 6.    This finding was reached
  only after "a comprehensive consideration of relevant factors" including market
  share, market concentration, market control, market recognition, and customer
  stickiness.    *Id.* at 6–8.    The SAMR did not determine whether Alibaba had a
  dominant position in the narrower B2C market, where Alibaba faced fierce
  competition from, *inter alia,* its biggest competitor JD.com.    *See* AC ¶¶ 49, 91.

- <u>Prohibited Exclusivity Arrangements</u>:    Alibaba's traffic-for-exclusivity
  arrangements were found to fall within Article 17's prohibition against "requiring
  a trading party to trade exclusively with itself without any justifiable cause,"
  causing harm to competition.    SAMR Op. at 8–15.

- <u>No Justifiable Cause</u>:    The SAMR rejected Alibaba's argument that the
  provision of traffic resources to the merchants as incentive for exclusivity
  constituted exculpatory "justifiable cause."    *Id.* at 11–12.

Based on these findings, the SAMR ordered Alibaba to cease its offending practices and

imposed a fine in the amount of RMB18.228 billion (approximately US$2.8 billion), 40% of the

maximum fine permitted.    *Compare* AC ¶ 142 (fine assessed representing 4% of Alibaba's

---

[7]   Indeed, JD.com, in its lawsuit against Alibaba, also proposed B2C as the relevant market for Tmall, which
further demonstrates the reasonableness of Alibaba's position.    Ex. Z at 3.    Moreover, the SAMR also considered,
but ultimately rejected, a relevant market that includes offline, brick-and-mortar retail and/or international e-
commerce platforms.    SAMR Op. at 2–6.

2019 sales) with Ex. AA, Art. 47 (up to 10% permitted).    In determining to impose substantially

less than the maximum fine, the SAMR considered "the nature, extent and duration" of the

violation.    SAMR Op. at 15; *see also* Ex. AA, Art. 49.    In particular, SAMR did not find that

Alibaba had knowingly or willfully violated the law.    *See* SAMR Op. at 8–15.

Alibaba chose not to challenge the SAMR's decision, AC ¶¶ 146–47, explaining that it

did not "rely on exclusivity to retain [its] merchants," the practices only implicated a small

number of Tmall stores, and the Company did not "expect material negative impact" from the

ruling.    Ex. BB at 6.    Investors agreed; Alibaba's ADS price rose 9.27% upon the

announcement of the SAMR's penalty decision and Alibaba's acceptance thereof.    Ex. CC.

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege, among other

things, (1) misstatements or omissions of material fact, *i.e.*, falsity, (2) scienter, and (3) loss

causation.    *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).    Securities fraud

claims are subject to heightened pleading standards.    Under Rule 9(b), Plaintiffs must "state

with particularity the circumstances constituting fraud."    *In re Ideanomics, Inc.*, *Sec. Litig.*, No.

20CV4944, 2022 WL 784812, at *6 (S.D.N.Y. Mar. 15, 2022) (Daniels, J.) (citing Fed. R. Civ.

P. 9(b)).    The Private Securities Litigation Reform Act ("PSLRA") further requires that

Plaintiffs "specify each statement alleged to have been misleading [and] the reason or reasons

why the statement is misleading."    15 U.S.C. § 78u-4(b)(1)(B).    In assessing the pleading's

sufficiency, the court is "not required to credit conclusory statements unsupported by factual

allegations."    *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008).

Plaintiffs also have the burden to plead "with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), by

alleging facts that either "show that defendants had both motive and opportunity to commit

fraud" or "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ideanomics*, 2022 WL 784812, at *9.   In addition, a "court must consider plausible, nonculpable explanations for the defendant's conduct," *In re Travelzoo Inc. Sec. Litig.*, No. 11CV5531, 2013 WL 1287342, at *7 (S.D.N.Y. Mar. 29, 2013) (Daniels, J.), and "an inference of scienter . . . must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."   *Ideanomics*, 2022 WL 784812, at *9.

Moreover, Plaintiffs must plead loss causation—"the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."   *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260–61 (2d Cir. 2016).   Plaintiffs must show that they suffered injury when "the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud."   *Id.* at 262.

## I.   PLAINTIFFS FAIL TO STATE A CLAIM REGARDING THE ANT IPO.

The Complaint alleges that the Alibaba Defendants are liable for ***Ant's*** purported failure to disclose that two individuals allegedly affiliated with an out-of-favor political faction were indirect, minor investors in Ant, which allegedly contributed to the suspension of the Ant IPO. AC ¶¶ 275, 277; *see also* ¶¶ 20–21, 208–09, 214.[8]   As explained in Section II(A)(2) of the Ma MTD, which the Alibaba Defendants join, this allegation is speculative, implausible, and not well-pleaded.[9]   The Ant IPO Claim also suffers from two additional fatal defects specific to the Alibaba Defendants, providing separate grounds for dismissal.

### A.   Alibaba Had No Duty To Disclose The Allegedly Omitted Information.

"Silence, absent a duty to disclose, is not misleading."   *Travelzoo*, 2013 WL 1287342, at

---

[8]   The Complaint appears to allege that Mr. Ma, and ***not*** the Alibaba Defendants, are liable for a second undisclosed regulatory risk—Ant's purported failure to disclose its violation of two specific PRC regulations.   *See* AC ¶¶ 20-21.   In any event, as discussed in Mr. Ma's brief, this claim fails for multiple reasons.

[9]   The Alibaba Defendants further join Section III of the Ma MTD, which addresses Plaintiffs' additional scheme liability claim based on the same allegations.

*6 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).   "A duty to disclose may exist expressly pursuant to an independent statute or regulation or as a result of the ongoing duty to avoid rendering existing statements misleading . . . ."   *City of Roseville Employees' Ret. Sys. v. Nokia*, No. 10CV00967, 2011 WL 7158548, at *8 (S.D.N.Y. Sept. 6, 2011) (Daniels, J.) (quoting *Thesling v. Bioenvision*, 374 Fed. Appx. 141, 143 (2d Cir. 2010)).

The Complaint does not allege that Alibaba had an independent legal duty to disclose the two Ant investors.   Instead, it alleges that the purported omission rendered statements in Alibaba's Form 6-Ks filed with the U.S. Securities and Exchange Commission ("SEC") on October 21 and October 26, 2020 materially misleading.   AC ¶¶ 274–77.   But the challenged statements merely disclosed Ant's announced plan of an IPO and Alibaba's agreement to purchase additional Ant shares; they did not address Ant's "regulatory risks" or "ownership structure."   *See id.* ¶¶ 274–77.   The 6-Ks also noted that the transaction was "subject to receipt of required regulatory approvals" and that "there can be no assurance as to if and when the [Ant IPO] will be completed."   Ex. I at Ex. 99.1.   The Complaint does not—and cannot— dispute these statements' accuracy or "demonstrate with specificity why and how they are" misleading, mandating dismissal.   *Ideanomics*, 2022 WL 784812, at *7.

### B.   The Complaint Fails To Plead A Strong Inference Of Scienter For The Ant IPO Claim.

The Complaint alleges that, because of its equity interest in Ant, Alibaba "stood to gain tens of billions of dollars if the Ant IPO were successfully completed" and was thus motivated to push the Ant IPO through at an inflated price.   AC ¶¶ 365, 384–86.   But the Complaint does not allege that a successful Ant IPO would "benefit [the Alibaba Defendants] in some concrete and personal way," dooming this motive-and-opportunity allegation.   *Ideanomics*, 2022 WL 784812, at *9.   Indeed, Alibaba was ***buying*** $7.5 billion worth of Ant stocks in the IPO.   *See*

*supra* at 4.   The scienter inference that Alibaba hid damning information so it could spend

billions of dollars on artificially-inflated Ant stocks is not cogent.[10]   The much stronger

inference is that Alibaba believed in Ant's success and the surprising suspension of the Ant IPO

resulted from the new regulation that was announced the day before the suspension.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM RELATED TO ANTITRUST RISK.

### A.    Plaintiffs Fail To Plead Any Actionable Misstatement Or Omission.

#### 1.    Plaintiffs Fail To State A Claim Based On Alibaba's Statement Of Opinion That Its Business Practices Did Not Violate The AML.

Plaintiffs primarily contend that Alibaba "falsely claimed" that "we believe that our

business practices do not violate anti-monopoly or unfair competition laws."   AC ¶ 255(b).

Plaintiffs base this claim on the fact that the SAMR determined—months after the end of the

putative Class Period—that Alibaba's "choose one of two" practices violated the AML and

imposed a fine on Alibaba for such violations.   *Id.* ¶¶ 10, 253 (citing 20-F at 39), 255(b).

These allegations are insufficient to plead securities fraud.

As a threshold matter, despite Plaintiffs' selective quotation in Paragraph 10 of the

Complaint, Alibaba's disclosure is unquestionably a statement of opinion, as it begins with the

qualifier "we believe." *Compare* AC ¶ 10 *with* 20-F at 39.   It is well-established that a

reasonable investor "does not understand statements of opinion as guarantees."   *In re Inv. Tech.*

*Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 619 (S.D.N.Y. 2017) (quotations omitted).   Instead,

a statement of opinion is only actionable if Plaintiffs assert well-pleaded facts showing that it

was actually "disbelieved by the defendant at the time it was expressed."   *Id.* at 618 (citations

omitted).   The Complaint is completely devoid of well-pleaded factual allegations showing that

---

[10]   Plaintiffs' other scienter allegations are even weaker.   Although the Complaint alleges, in conclusory fashion, that Alibaba was "aware of" the two purported Ant investors, it does not identify which Alibaba officers were, or how they became, aware of such information.   *See Ideanomics*, 2022 WL 784812, at *10 (rejecting similar scienter allegations for failure to "specifically identify the reports or statements containing [the] information" at issue).

Alibaba believed its practices violated the law.    To the contrary, the Complaint alleges that:

- Alibaba defended the legality of its practices in the JD.com lawsuit, AC ¶ 97;

- Alibaba executives repeatedly described the challenged arrangements as "normal market practice" and dismissed criticisms thereof, *id.* ¶¶ 97–98, 112; and

- Alibaba's representative at the November 2019 meeting publicly shared with regulators her belief that Alibaba's practices were lawful, *id.* ¶ 110.

These allegations are all consistent with Alibaba's disclosed belief in the legality of its business practices and the truthfulness of the challenged statement of opinion.

The Complaint nonetheless speculates that Alibaba could not have believed in the legality of its practices, because a SAMR representative allegedly described "choose one of two" as "clearly prohibited" by the AML during an administrative guidance meeting.    *See* AC ¶¶ 110, 255(b).    This allegation does not render Alibaba's opinion statement false or misleading for multiple reasons.    **First**, Alibaba did not give an unqualified opinion.    Alibaba's full disclosure continues to read "there can be no assurance that regulators will not initiate anti-monopoly investigations against us."    20-F at 39.    And, as discussed below, Alibaba explicitly disclosed the administrative guidance, which itself was delivered in a widely-covered public meeting. *See infra* at 17–18.    Alibaba's disclosure is thus appropriately calibrated to caution that regulators may disagree with Alibaba's view.    *See Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (emphasizing "the need to examine the context of an allegedly misleading opinion" and finding opinion statement not misleading in light of context).    **Second**, because the regulator's comment was made at a voluntary administrative guidance meeting, it had no binding legal effect.    *See supra* at 8–9, n.4.    **Finally,** the comment was vague in its scope.    In condemning "choose one of two" practices generally, it is unclear whether the SAMR official intended to encompass Alibaba's specific traffic-for-exclusivity practices, which are not alleged to have excluded merchants who also sold on other platforms, only to have provided them with fewer

16

traffic resources.   *See supra* at 6–7.[11]

Nor can Plaintiffs rely on the SAMR's post-Class Period finding of Alibaba's AML violation to establish falsity, because that finding, which was made nine months after the statement of opinion at issue, is not probative on "the knowledge Defendants did (or did not) possess **at the time** the opinion statements were made."   *In re Inv. Tech.*, 251 F. Supp. 3d at 619 (emphasis added).   Importantly, after its in depth investigation, the SAMR did **not** find that Alibaba's violation was knowing or willful and only imposed 40% of the maximum statutory fine.   *See supra* at 11–12.   The Court should reject Plaintiffs' fraud-by-hindsight pleading.[12]

## 2. Alibaba Fairly Disclosed Regulatory Scrutiny And Risks Related To Its Business Practices.

Plaintiffs allege that Alibaba misled investors by failing to disclose "the SAMR explicitly told Alibaba in November 2019 that 'Choose One of Two' [was] 'clearly prohibited.'"   AC ¶¶ 10; 255(b).   Not true.   **First,** Alibaba—in a disclosure that Plaintiffs conveniently excised from Paragraph 253 of the Complaint—explicitly warned investors of the SAMR's administrative guidance meetings and its potential investigations:

---

[11]   Alibaba's belief in the legality of its practices was more than reasonable in view of the AML's significant ambiguities regarding the application of Article 17 to Alibaba's traffic-for-exclusivity practices and key elements such as relevant market, dominant market position, and justifiable causes, none of which had been clarified by any judicial decision or regulation at the time the challenged disclosure was made.   *See supra* at 7, 9–10.   The SAMR investigation further demonstrated the reasonableness of Alibaba's belief.   As the SAMR noted, Alibaba presented colorable defenses including that the relevant market should be limited to B2C (in which Alibaba was not found to have a dominant position), that it did not have a dominant position in the combined B2C and C2C market, and that the exchange of traffic resources for exclusivity constituted a "justifiable cause" allowing for an exception to any applicable prohibition under Article 17.   SAMR Op. at 2, 6.   While the SAMR eventually rejected Alibaba's position on these issues of first impression, it did so only after extensive research and analysis, while recognizing that these issues made the investigation "quite challenging."   *See supra* at 10–11.   The challenged statement of opinion thus "had ample basis in fact," further supporting dismissal.   *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

[12]   The Complaint also alleges that Alibaba violated the PRC E-commerce Law and the Anti-Unfair Competition Law, based purely on the SAMR official's alleged statement at the November 5, 2019 administrative guidance meeting.   AC ¶¶ 7, 103, 105, 107, 108, 110.   But that statement did not implicate any particular company, and the SAMR never found that Alibaba violated these laws, despite its extensive investigation, and the Complaint does not otherwise allege any judicial or regulatory finding to the contrary.   The complaint thus lack any factual basis to support this claim.   *See, e.g., In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) (citation omitted) (holding court "not required to credit conclusory statements unsupported by factual allegations.")

> On several recent occasions, including at administrative guidance meetings
> attended by Internet platform companies including our company, the SAMR has
> indicated its view that certain business arrangements adopted by e-commerce
> platforms, including arrangements seen as exclusivity arrangements, may
> constitute violation of the anti-monopoly and unfair competition laws. The SAMR
> also indicated its intention of initiating investigations into these arrangements.

2020 20-F at 39.   Alibaba thus "disclosed the very risks about which [Plaintiffs] claim[] to have

been misled." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d

478, 493 (S.D.N.Y. 2021).

**Second,** Alibaba's disclosures were supplemented by extensive public coverage of the

SAMR official's statements.   Indeed, the Complaint itself recounts well-publicized,

contemporaneous coverage of the November 5, 2019 administrative guidance meeting.   *See* AC

¶¶ 103–04 (Xinhua, Nov. 5, 2019); ¶¶ 105–06 (CCTV, Nov. 8, 2019); ¶ 107 (KrASIA, Nov. 6,

2019); ¶¶ 108–10 (ThePaper.cn, Nov. 5, 2019).   The Complaint even includes screenshots from

the November 8 CCTV televised coverage of the meeting.   *See id.* ¶ 111.   Because the

regulator's statements were public and widely covered, investors were well aware of the

SAMR's position and of its possible scrutiny of Alibaba.   Alibaba "cannot be held liable for

failing to disclose . . . publicly available information." *In re Merrill Lynch & Co., Inc. Rsch.*

*Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 249–50 (S.D.N.Y. 2003); *see also In re Progress Energy,*

*Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2005) ("It is well-established law that

the securities laws do not require disclosure of information that is publicly known.").

**Finally**, as discussed above, because the SAMR official's statement was not specific to

Alibaba or its traffic-for-exclusivity practices, Plaintiffs' claim that Alibaba was told that its

practices were "clearly prohibited" is not well-pleaded.   *See supra* at 8–9.

### 3.      Alibaba Did Not Mislead Investors About Its Business Practices.

Plaintiffs further claim that Alibaba misled investors about its "continued . . .

employ[ment] [of "choose one from two"] policies and practices."   AC ¶¶ 10; 255(e).

However, as the Complaint alleges, Alibaba's practices were widely covered in media reports,

public accusations, and lawsuits.   *Id.* ¶¶ 91–112; *see supra* at 5–7, 18.   Moreover, Plaintiffs

allege that "Alibaba did not deny that it used 'Choose One of Two' practices" and instead

defended those practices publicly.   *Id.* ¶¶ 112, 97–98.   Thus, investors were not misled.

Plaintiffs in particular claim that Alibaba's specific disclosure of allegations made against

it by JD.com and others somehow minimized Alibaba's disclosure of its practices:

> The PRC Anti-monopoly Law provides a private right of action . . . .   Some of . .
> . our competitors, business partners and customers[] have [initiated] and may
> continue . . . initiating private litigation that targets our prior and current business
> practices, such as our market approach with traffic resource allocation on our
> ecommerce platforms . . . and our alleged prior narrowly deployed exclusive
> partnerships.

20-F at 39.   Plaintiffs claim that the phrase "alleged prior narrowly deployed exclusive

partnerships" was misleading because "Alibaba's exclusive and restrictive dealing requirements

were a deeply engrained and regular part of Alibaba's business practices" and "Alibaba had

continued to utilize unlawful exclusive and restrictive dealing requirements *throughout* 2020."

*Id.* ¶ 255(e) (emphasis in original).   Plaintiffs misconstrue this disclosure, which refers to

***allegations*** that Alibaba employed unconditional "choose one of two" practices (*i.e.*, absolute

exclusion) that were not based on traffic resource allocation, a claim that was contested by

Alibaba and is not supported by the SAMR's findings.   *See supra* at 5–7, 12.   Plaintiffs fail to

plead that Alibaba was deploying any non-traffic allocation-based exclusivity arrangements

when it made this disclosure in July 2020.   Indeed, Plaintiffs—who readily acknowledge that

"choose one of two" covers "a number of business practices" (AC ¶¶ 5, 89)—cannot seriously

contend that Alibaba's candid acknowledgement of its "traffic resource allocation" practices and

other allegations was misleading, particularly in light of the plethora of public statements relating

to its practices and the next sentence in the disclosure that "there can be no assurance that regulators [including SAMR] will not initiate anti-monopoly investigations."   20-F at 39.

Plaintiffs similarly allege that Alibaba somehow misled investors by entering into a "Commitment Letter" in connection with the SAMR's July 17, 2020 industry-wide administrative guidance meeting.   AC ¶¶ 116–17.   The Commitment Letter—which was discussed extensively in the media—stated, among other things, that the businesses should not "force" merchants into "exclusive cooperation" or "exclusive authorization" and should not "impose any unreasonable restrictions or make any unreasonable requirements on the [merchants'] selections of platforms."   *Id.* ¶ 117.   Signing this letter, which did not condemn—or even discuss—the use of traffic-for-exclusivity measures, was fully consistent with Alibaba's position that its ongoing practices were lawful and justifiable.   *See supra* at 7–9.[13]

**B.**     **Plaintiffs Fail To Plead A Strong Inference Of Scienter.**

As an initial matter, "[b]oth Rule 9(b) and the PSLRA require that in a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."   *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (quotations omitted). The Complaint includes ***no scienter allegation whatsoever against Mr. Zhang or Ms. Wu***—Plaintiffs do not allege that either Mr. Zhang or Ms. Wu had a motive to commit fraud, knew that

---

[13]   Plaintiffs also challenge a number of other general statements about Alibaba's anti-monopoly risks, revenues, and value to merchants.   AC ¶¶ 250, 253–55, 270, 256–57, 261–68, 271–73.   The Complaint, however, includes no coherent explanation as to how the purported "choose one of two" practice rendered these general statements false or misleading.   Plaintiffs' "conclusory statements unsupported by factual allegations" must be rejected. *Elan*, 543 F. Supp. 2d at 206.

The Complaint further alleges that Alibaba had an affirmative duty under Regulation S-K Item 303 and Form 20-F 5(d) to disclose that (1) it continued to deploy "choose one of two" practices; (2) such practices violated Chinese law; (3) the SAMR directed Alibaba to cease such practices; (4) Alibaba falsely committed to SAMR that it would cease the practices; and (5) the SAMR was extremely likely to initiate an investigation into Alibaba's "choose one from two" practices.   AC ¶¶ 243-49.   This claim fails because, as explained above, the alleged omissions are either not well-pleaded or were disclosed and well-known to investors.   *See supra* at 5–10, 15–20.

any challenged statement was false or misleading, or recklessly disregarded the accuracy thereof. As a result, the Section 10(b) claim against these individual defendants must be dismissed for this reason alone and no scienter can be imputed from them to Alibaba.    The Complaint's attempt to otherwise plead scienter as to Alibaba also fails, as explained below.

### 1.      The Complaint Includes No Coherent Motive And Opportunity Allegation.

The Complaint alleges that because Alibaba conducted a secondary stock offering in Hong Kong in November 2019, it had a motive to conceal risks associated with its "choose one of two" practices so that the offering could succeed.    AC ¶ 376.   This allegation fails because "general motives common to most corporate officers do not constitute motive for the purpose of establishing scienter."   *Ideanomics*, 2022 WL 784812, at *9.   Indeed, courts have specifically found that a company's "hope[] to secure additional financing on the most favorable terms possible" was "the type[] of generalized motive[] that the Court of Appeals has concluded do[es] not suffice to establish scienter, because [it] 'could be imputed to any publicly-owned, for-profit endeavor.'"   *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01CV4388, 2004 WL 376442, at *6 (S.D.N.Y. Feb. 27, 2004).[14]

### 2.      The Complaint Lacks Any Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness.

As discussed above, the Complaint's claim that Alibaba knowingly violated the AML (AC ¶¶ 375, 377) was not supported by any well-pleaded factual allegation and was, indeed, contradicted by Alibaba's alleged actions and statements indicating its belief in the legality of its business practices.   *See supra* at 15–16.   Plaintiffs' "[g]eneral, conclusory allegations need not be credited" as they "are belied by more specific allegations of the complaint."   *In re Refco*

---

[14]   The Complaint also fails to explain why Alibaba would have any motive to commit fraud in the second half of 2020, long after it had completed the November 2019 Hong Kong offering.   *See* AC ¶¶ 253–73 (challenging statements made between July and December 2020).

*Cap. Mkts., Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 177–78 (S.D.N.Y. 2008).

Plaintiffs' remaining scienter allegations are not probative.   For example, the Complaint relies on a Tmall employee's alleged statement that "he wasn't surprised by the [the *Platform Guidelines*]."   AC ¶ 378.   The individual, however, did not state that he, or anyone else at Alibaba, believed the Company's business practices were illegal either before or after the promulgation of the *Platform Guidelines*.   Similarly, Plaintiffs contend that Alibaba's decision to accept the SAMR's April 2021 penalty decision was an admission of knowingly violating PRC law at the time the alleged misstatement was made.   AC ¶ 151.   It was not.   Indeed, even the SAMR did not find Alibaba's later-determined violation was knowing, but instead acknowledged that its decision was complex and unprecedented and imposed only 40% of the maximum penalty in view of the "nature" of the violation.   *See supra* at 11–12.[15]

### 3.   Balancing Of Inferences Strongly Favors Dismissal.

In essence, Plaintiffs ask the Court to infer that Defendants either knew, or were reckless in not knowing, that Alibaba's traffic-for-exclusivity practices violated the AML, because in hindsight the SAMR so concluded.   But such an inference is not supported by any internal document, confidential witness statement, or other factual allegations.   Indeed, the Complaint, which lacks these typical hallmarks of sufficient scienter allegations, instead shows that there were multiple, significant ambiguities in the law, that Alibaba believed in, and publicly defended, the legality of its practices, and that the SAMR reached its conclusion only after

---

[15]   Plaintiffs' reliance on the so-called "core operations" doctrine is also misplaced.   *See* AC ¶ 381.   Numerous recent decisions in this Circuit "have cast doubt on the continued viability of the doctrine, which pre-dates the PSLRA by several years."   *In re AT&T/DirecTV Now Sec. Litig.*, No. 19CV2892, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020), *appeal filed*, No. 21-2698 (2d Cir. Oct. 27, 2021); *see also Hou Liu v. Intercept Pharm., Inc.*, No. 17CV7371, 2020 WL 1489831, at *19 & n.194 (S.D.N.Y. Mar. 26, 2020) (collecting cases).   In particular, as this Court recently held, where, as here, the Complaint does not include "allegations that independently give rise to a strong inference of scienter," Plaintiffs "cannot rely on the core operations doctrine to establish scienter."   *Ideanomic*s, 2022 WL 784812, at *11.

resolving multiple issues of first impression against Alibaba.   *See supra* at 7–12.

Meanwhile, the allegations demonstrate "plausible, nonculpable explanations for the defendant's conduct."   *Travelzoo*, 2013 WL 1287342, at *7.   Among other things:

- Both before and during the putative Class Period, the Company candidly acknowledged its practices and the associated regulatory risks and expressly warned investors of public and regulatory criticism and the prospect of investigations, *see* 20-F at 39; *supra* at 7–9;

- The PRC regulators' evolving attitude towards the business practices at issue was disclosed to the Company and the public simultaneously through open meetings and published regulations, *see supra* at 8–9;

- The PRC regulators' focus on the "disorderly expansion of capital," including in particular the promulgation of the *Platform Guidelines*, affected not only Alibaba, but the entire industry, *see supra* at 4, 10; and

- Although investors reacted negatively to regulatory uncertainties, Alibaba's ADS price rose significantly upon the announcement of the SAMR's findings, which the investors obviously did not view as revelation of any fraud, *see supra* at 12.

As a result, the far more cogent and compelling inference is that the Company faithfully complied with its disclosure obligations in the face of an uncertain and rapidly changing regulatory environment.   *See In re Open Joint Stock Co. Vimpel-Commc'ns*, No. 04CV9742, 2006 WL 647981, at *8 (S.D.N.Y. Mar. 14, 2006) (finding allegations insufficient to establish scienter where "Russian tax laws present an uncertain terrain for individuals and companies doing business there," and "[n]one of the facts set forth in the [complaint] support the conclusion that [company] officers knew (or should have known) that . . . the company's interpretation of tax laws related to VAT was 'highly unreasonable.'").

### C.     Plaintiffs Fail To Plead Loss Causation.

"To establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."   *Ideanomics*, 2022 WL 784812, at *11 (quotations omitted).     In particular, the "plaintiff must allege that when truthful

word revealing the falsity of defendant's representation reached the public, the market reacted

negatively causing plaintiff to suffer an injury." *Id.* (citations omitted).   Alternatively, loss

causation "may also be shown by the materialization of risk method, whereby a concealed risk . .

. comes to light in a series of revealing events that negatively affect stock price over time." *In

re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011).

Plaintiffs allegedly suffered losses relating to the Antitrust Claim when Alibaba's ADS

price dropped in response to two events: (i) the promulgation of the *Platform Guidelines* on

November 10, 2020 and (ii) the announcement of the SAMR investigation on December 24,

2020.   The Complaint fails to demonstrate loss causation based on these events under either the

corrective-disclosure theory or the materialization-of-undisclosed-risk theory.

*First,* the stock price drops were not caused by any corrective disclosures, because the

two events at issue did not "reveal some then-undisclosed fact with regard to the specific

misrepresentations alleged." *Ideanomics*, 2022 WL 784812, at *11.   The *Platform Guidelines*

was a new, industry-wide regulation; it did "not reveal the falsity of any prior statements made

by Defendants." *Travelzoo*, 2013 WL 1287342, at *10.   Similarly, the SAMR's investigation

announcement at most indicated that it was examining whether Alibaba deployed a prohibited

form of the "choose one of two" practice.   However, because Alibaba's practices were already

"known to the market," that announcement cannot give rise to loss causation.   *In re Omnicom

Grp. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *see also Plumbers, Pipefitters & MES Local

Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328 (S.D.N.Y.

2012) (disclosure of SEC investigation insufficient to demonstrate loss causation).

*Second,* neither of the two events was a materialization of hitherto undisclosed risks.

The promulgation of the *Platform Guidelines* was a new regulatory development that caused

24

stock price drops across the internet platform industry in China in the context of a regulatory focus on preventing "the disorderly expansion of capital." *See supra* at 4, 10. Plaintiffs' losses, which "coincide[] with a marketwide phenomenon causing comparable losses to other investors," were thus demonstrably "caused by . . . intervening events," *i.e.*, the new regulation, as opposed to any prior misrepresentation or omission by Defendants. *Lentell,* 396 F.3d 161 at 173; *see also Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1086 (D. Minn. 2012) (finding no loss causation where defendant's stock price, "as well as the stock prices of others in the . . . industry fell in reaction to governmental announcements that signaled a likely change in the regulation of that industry.").

The SAMR investigation announcement was also not the materialization of a concealed risk, because the SAMR's intent to initiate such an investigation was well known to investors. *See supra* at 9. Indeed, Alibaba explicitly disclosed that the SAMR had "in recent years strengthened enforcement under the [AML]" and that "there can be no assurance that regulators [including the SAMR] will not initiate anti-monopoly investigations into specific business practices [the Company] ha[d] adopted." 20-F at 39. Moreover, SAMR officials repeatedly stated in public that the SAMR would initiate investigations into "choose one of two" practices, which Alibaba faithfully disclosed. *See supra* at 8–9, 17–18. As a result, "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk," dooming Plaintiffs' loss causation allegation. *Lentell*, 396 F.3d at 177; *see also Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 685–86 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) (rejecting loss causation allegations where pertinent event was materialization of previously disclosed risks).[16]

---

[16]   As explained in Section IV of the Ma MTD, which Mr. Zhang and Ms. Wu join, Plaintiffs' Section 20(a) control person liability claim must also be dismissed.   The Complaint fails to plead either a primary violation by Alibaba, *see supra* at 13–25, or any culpable participation in the alleged fraud by Mr. Zhang or Ms. Wu, *see* Ma MTD at 25.

DATED:   July 21, 2022                    SIMPSON THACHER & BARTLETT LLP

                                          By:   /s/ *Stephen P. Blake*
                                              Jonathan K. Youngwood
                                              jyoungwood@stblaw.com
                                              425 Lexington Avenue
                                              New York, New York    10017
                                              Telephone: (212) 455-3539
                                              Facsimile: (212) 455-2502

                                              James G. Kreissman
                                              jkreissman@stblaw.com
                                              Stephen P. Blake
                                              sblake@stblaw.com
                                              Bo Bryan Jin (*pro hac vice*)
                                              Bryan.jin@stblaw.com
                                              2475 Hanover Street
                                              Palo Alto, California    94304
                                              Telephone: (650) 251-5000
                                              Facsimile: (650) 251-5002

                                              *Counsel for Defendants Alibaba Group Holding*
                                              *Limited, Daniel Yong Zhang, Maggie Wei Wu,*
                                              *and Jack Yun Ma*