**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE: ALIBABA GROUP HOLDING LTD.
SECURITIES LITIGATION

No.: 1:20-cv-09568-GBD-JW

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**JACK YUN MA'S MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Jonathan K. Youngwood
jyoungwood@stblaw.com
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-3539
Facsimile: (212) 455-2502

James G. Kreissman
jkreissman@stblaw.com
Stephen P. Blake
sblake@stblaw.com
Bo Bryan Jin (*pro hac vice*)
bryan.jin@stblaw.com
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Counsel for Defendants Alibaba Group Holding*
*Limited, Daniel Yong Zhang, Maggie Wei Wu,*
*and Jack Yun Ma*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL BACKGROUND ........................................................................................3

ARGUMENT ...............................................................................................................8

I.    PLAINTIFFS' CLAIMS AGAINST MR. MA ARE FUNDAMENTALLY
      DEFECTIVE.......................................................................................................8

      A.    The Court Lacks Personal Jurisdiction Over Mr. Ma. .............................8

      B.    The Alleged Fraud Falls Outside The Territorial Limit Of Section 10(b)............10

      C.    Plaintiffs Have No Standing To Challenge The HKSE Prospectuses. ..................12

      D.    Mr. Ma Is Not The Maker Of The Challenged Disclosures. ..................................13

II.   THE ANT PROSPECTUSES CLAIMS ARE NOT WELL-PLEADED. ........................14

      A.    The Complaint Fails To Plead Any Actionable Misrepresentation Or
            Omission. ..................................................................................................14

            1.    Ant Fully Disclosed Risks Associated With The Pre-IPO
                  Regulations. ..................................................................................14

            2.    Plaintiffs' Ant Investor Claim Is Speculative And Implausible. ...............15

      B.    The Complaint Fails To Plead Facts Giving Rise To A Strong Inference
            Of Scienter. ...............................................................................................18

            1.    Plaintiffs Fail To Adequately Allege Motive And Opportunity. ...............18

            2.    The Complaint Includes No Strong Circumstantial Evidence Of
                  Conscious Misbehavior Or Recklessness. ..................................................20

            3.    Balancing Of Inferences Weighs Against A Finding Of Scienter. ............21

III.  PLAINTIFFS' ALTERNATIVE SECTION 10(b) CLAIMS FAIL FOR THE SAME
      AND ADDITIONAL REASONS. .......................................................................21

      A.    The Scheme Liability Claim Fails Because It Merely Repackages The Ant
            Prospectuses Claims....................................................................................21

      B.    Plaintiffs' Additional Scheme Allegations Fail For Multiple Reasons. ................22

IV.   PLAINTIFFS' SECTION 20(a) CLAIM MUST ALSO BE DISMISSED. .....................24

# TABLE OF AUTHORITIES

**Cases**

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP*,
   No. 17CV1235, 2018 WL 1627266 (Mar. 30, 2018)............................................................. 23

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019)..................................................................................... 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................................ 14

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)................................................................................................................ 12

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).................................................................................................................. 9

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
   986 F.3d 161 (2d Cir. 2021).................................................................................................... 11

*Chapman v. Mueller Water Prods.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020)..................................................................................... 19

*Erie Grp. LLC v. Guayaba Cap., LLC*,
   110 F. Supp. 3d 501 (S.D.N.Y. 2015)..................................................................................... 24

*Fishbaum v. Liz Claiborne, Inc.*,
   189 F.3d 460 (2d Cir. 1999).................................................................................................... 19

*Geiger v. Solomon-Page Grp.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996)........................................................................................ 18

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................................... 18

*Harbinger Capital Partners LLC v. Deere & Co.*,
   632 F. App'x 653 (2d Cir. 2015) ............................................................................................ 12

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
   529 F. Supp. 3d 111 (S.D.N.Y. 2021)................................................................................. 8, 10

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................................... 25

*In re Aphria Sec. Litig.*,
   No. 18CV11376, 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) (Daniels, J.)......................... 8

*In re Avon Products., Inc. Sec. Litig.*,
    No. 05CV6803, 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) ................................. 19

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006) ...................................................................... 19

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017) ................................................................... 9, 10

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018) ...................................................................... 25

*In re Carter-Wallace, Inc. Sec. Litig.*,
    No. 94CV5704, 1999 WL 1029713 (S.D.N.Y. Nov. 9, 1999) ................................. 19

*In re Gildan Activewear, Inc.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................. 19, 20

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
    No. 20CV4420, 2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) ............................. 16

*In re Ideanomics, Inc., Sec. Litig.*,
    No. 20CV4944, 2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) (Daniels, J.) ..................... 18, 20

*In re KeySpan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 ................................................................................................. 19

*In re Kirkland Lake Gold Ltd. Sec. Lit.*,
    No. 20CV4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) ............................. 23

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)
    *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ................................................................. 20

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020) ...................................................................... 22

*In re Optimal U.S. Litig.*,
    No. 10CV4095, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ................................. 14

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 449 (S.D.N.Y. 2005) ...................................................................... 9

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011) (Daniels, J.) ................................................. 25

*In re Sibanye Gold Ltd. Sec. Litig.*,
    No. 18CV3721, 2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020) ......................... 16, 17

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020)......................................................................... 14

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................................... 13

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
    No. 12CV3419, 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) (Daniels, J.) .......... 9

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013).......................................................................................... 8

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)....................................................................... 13

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    No. 19CV6536, 2021 WL 1199035 (S.D.N.Y. March 30, 2021)........................... 12

*Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................... 16

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)....................................................................................... 10, 11, 12

*Ont. Pub. Serv. Emp. Union Pension Tr. Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004)......................................................................................... 12

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)....................................................................................... 24

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ................................................................................... 21, 23

*Plumbers & Pipefitters Loc. Union No. 630*
    *Pension-Annuity Tr. Fund v. Arbitron Inc.*,
    741 F. Supp. 2d 474 (S.D.N.Y. 2010)....................................................................... 20

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ........................................................................... 19

*S.E.C. v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)....................................................................... 23

*Schoenbaum v. Firstbrook*,
    405 F.2d 200 (2d Cir. 1968)....................................................................................... 11

*SEC. v. Rio Tinto PLC*,
    No. 21-2042, 2022 WL 2760323 (2d Cir. July 15, 2022)................................... 22, 23

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008)............................................................................................ 13, 23, 24

*Tarsavage v. Citic Tr. Co.*,
    3 F. Supp. 3d 137 (S.D.N.Y. 2014) ......................................................................... 9

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011)..................................................................... 19

*Wilson v. Comtech Telecommunications Corp.*,
    648 F.2d 88 (2d Cir. 1981)...................................................................................... 24

## PRELIMINARY STATEMENT

Jack Yun Ma is a founder of Defendant Alibaba Group Holding Limited ("Alibaba") and a significant shareholder of non-party Ant Group Co. Ltd. ("Ant"), a financial technology ("FinTech") company based in the People's Republic of China ("PRC"). In October 2020, Ant obtained regulatory approval for a simultaneous listing of its shares on the Hong Kong Stock Exchange ("HKSE") and the Shanghai Stock Exchange ("SHSE"), in what would have been the world's largest initial public offering (the "Ant IPO"). On November 2, 2020, three days before Ant was set to begin trading, PRC regulators issued a new FinTech regulation that was reported to significantly impact Ant's key online lending business. The next day, the Ant IPO was abruptly suspended on account of this regulatory change, to the significant surprise of the international financial community. The American depositary share ("ADS") price of Alibaba, which owns 33% of Ant, declined appreciably. Lawsuits against Alibaba and its executives soon followed.

Plaintiffs' Amended Consolidated Class Action Complaint ("Complaint" or "AC") alleges that the draft and final IPO prospectuses Ant filed with the HKSE (collectively, the "HKSE Prospectuses") failed to disclose that (i) Ant's purported violations of two PRC financial regulations posed a material risk to the completion of the Ant IPO (the "Ant Regulatory Claim"), and (ii) two individuals supposedly from an out-of-favor Chinese political faction held minor, indirect pre-IPO investments in Ant, the discovery of which by PRC authorities is rumored to have played a role in the suspension of the Ant IPO (the "Ant Investor Claim" and, together with the Ant Regulatory Claim, the "Ant Prospectuses Claims"). Based on these allegations, Plaintiffs have now named Mr. Ma as a Defendant in this action, claiming that, by virtue of his alleged control of Ant, Mr. Ma has committed securities fraud against Alibaba's U.S. investors

due to the alleged misrepresentations and omissions in Ant's HKSE Prospectuses. The Complaint also claims that Mr. Ma and Alibaba engaged in a scheme to defraud Alibaba's U.S. investors by concealing the identity of the two purported Ant investors from PRC authorities (the "Scheme Liability Claim"). These claims are both unprecedented and untenable, and should be dismissed for at least five reasons.

***Lack Of Personal Jurisdiction:*** Plaintiffs are suing the alleged controller of a non-party foreign issuer, whose securities Plaintiffs never owned, for purported fraud in connection with the proposed listing of that issuer on two foreign stock exchanges, on the theory that the fraud is somehow actionable by U.S. investors trading in another issuer's U.S.-listed ADS. Mr. Ma lacks minimum contacts with the United States, because the alleged fraud took place in China and, according to the Complaint, was directed to PRC regulators rather than U.S. investors.

***Outside U.S. Territorial Reach:*** Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") only applies to securities transactions on American stock exchanges and U.S. transactions in other securities. By contrast, Plaintiffs seek to hold Mr. Ma liable based on statements in Ant's HKSE Prospectuses, relating to a planned sale of Ant's shares—a foreign security—on the HKSE—a foreign exchange. Plaintiffs thus attempt an unprecedented and entirely impermissible expansion of the Exchange Act. Plaintiffs cannot claim that Section 10(b) should apply because the events surrounding the suspension of the Ant IPO may have impacted the price of Alibaba's ADS; the Supreme Court has explicitly foreclosed such an argument.

***Lack Of Standing:*** Plaintiffs do not allege that they ever purchased or held Ant securities. As a result, they lack standing to challenge the accuracy of Ant's disclosures, even if those disclosures had an indirect negative impact on the price of Alibaba ADSs they purchased.

***Not A Maker:*** Plaintiffs concede that the HKSE Prospectuses were not signed by or

attributed to Mr. Ma.  Plaintiffs fail to allege any facts showing that Mr. Ma had the ultimate

authority over, or indeed played any role in connection with, the challenged Ant disclosures.  Mr.

Ma is thus not the maker of the challenged Ant disclosures and cannot be held liable under

Section 10(b) for any of Ant's alleged misrepresentations and/or omissions.

    ***Failure To State A Claim***:  While dismissal of the claims against Mr. Ma is appropriate

because of each of the above-discussed threshold issues, Plaintiffs also fail to state a claim,

including because:

- The Complaint fails to plead any materially false or misleading disclosure—
  Plaintiffs' allegations are speculative, illogical, and implausible;

- The Complaint fails to plead a strong inference of scienter—Mr. Ma's alleged
  sales of 1% of his Alibaba stock, which coincided with his retirement from
  Alibaba, is neither suspicious nor unusual;

- The Scheme Liability Claim merely repackages the Ant Prospectuses Claims and
  fails for many of the same reasons;

- The additional acts Defendants allegedly performed in furtherance of the scheme
  are not well-pleaded, not inherently deceptive, and not relied upon by Plaintiffs;
  and

- The other miscellaneous claims against Mr. Ma derive from, and fail along with,
  Plaintiffs' primary fraud allegations.

As a result, the Court should dismiss all claims against Mr. Ma.

## FACTUAL BACKGROUND[1]

    ***Defendant Ma:***  Mr. Ma is a founder and the former Executive Chairman of Defendant

Alibaba.  AC ¶ 43.  In September 2018, Mr. Ma announced his planned retirement.  Ex. DD at

1.[2]  One year later, in September 2019, Mr. Ma stepped down as Alibaba's Executive Chairman.

AC ¶ 43.  He remained a director of Alibaba until September 30, 2020.  *Id.*  After that date, he

---

[1] Based on the Complaint and exhibits, documents incorporated by reference, and judicially noticeable facts.

[2] Unless otherwise noted, "Ex. _" citations refer to exhibits to the concurrently-filed Declaration of Stephen Blake.

held no further executive or board positions at Alibaba.  Mr. Ma is also a partner of the Alibaba

Partnership, a group of several dozen individuals whose "main duty . . . as partners is to embody

and promote [Alibaba's] mission, vision and value."  *Id.* ¶¶ 51–54; Ex. A at 176.  The partners,

collectively, have the right to appoint a simple majority of Alibaba's directors.  AC ¶¶ 51–54;

Ex. A at 177–78.

     ***Non-Party Ant:***  In 2004, Alibaba created Alipay, an online and mobile payment

platform that complemented Alibaba's e-commerce business.  AC ¶ 159; Ex. EE ("Final

Prospectus") at 135, 163.  After a series of corporate transactions, the Alipay business ultimately

became non-party Ant.  AC ¶ 160; Ex. A at 198; Final Prospectus at 137.  Alibaba owned 33%

of Ant during the putative Class Period.  AC ¶ 11.  Mr. Ma has not been an officer or director of

Ant at any time relevant to this lawsuit.  *See* Final Prospectus at 123–25.  Mr. Ma indirectly

owns approximately 11% of Ant's shares,[3] and through Junhan and Junao—two pooled

investment vehicles holding a combined 50.52% of Ant's shares on behalf of numerous current

and former employees of Ant and Alibaba—Mr. Ma indirectly controls Ant.  AC ¶ 314; Final

Prospectus at 145, 160, 288–89.

     Ant provides products and services across multiple areas, including payments, online

lending, investments, and insurance.  *See* Final Prospectus at 6–7; AC ¶¶ 162–63.  The "driving

force of [Ant']s growth" was allegedly its "CreditTech" online lending business, AC ¶ 163,

where Ant's technology platform connects underserved consumers and small businesses with

approximately 100 banks and many additional partner financial institutions.  Final Prospectus at

166, 189.  Loans originated on Ant's CreditTech platform are primarily underwritten by Ant's

partner financial institutions.  *Id.* at 191.  As of June 30, 2020, 98% of Ant's CreditTech loan

---

[3]  As noted in the Ant Prospectuses, Mr. Ma plans to donate approximately 23% of his Ant holdings to charitable organizations, which will reduce his ownership to less than 9%.  *See* Final Prospectus at 289–90.

balance was underwritten by its partner financial institutions or securitized.  *Id.*[4]

On July 20, 2020, Ant announced its plan for the Ant IPO, a concurrent listing on the HKSE and the SHSE.  AC ¶ 165.  Under China's merit-based IPO system, the China Securities Regulatory Commission (the "CSRC") reviewed Ant's planned IPO and considered issues ranging from Ant's regulatory compliance to its valuation.  *Id.* ¶ 193.  After the review, the CSRC granted regulatory approval of the Hong Kong and Shanghai legs of the Ant IPO on October 16 and 20, 2020, respectively.  Exs. FF and GG.  Ant's shares were expected to begin trading on November 5, 2020.  AC ¶ 165.  The Ant IPO was set to raise $35 billion, making it the largest IPO in history.  *Id.* ¶ 16.

**Ant Operates In A "Continuously Evolving" Regulatory Environment:**  Ant, like other Chinese FinTech companies, "is subject to evolving and extensive regulation."  Final Prospectus at 55.  As Ant explained in the HKSE Prospectuses, "the intersection of finance and digital services is a new phenomenon but one that has attracted significant regulatory attention."  *Id.* Ant's financial institution partners, such as commercial banks, are also "subject to continuously evolving regulations on the financial services industry and tightened scrutiny from the regulators," including "more stringent capital requirements."  *Id.*  The "broad range of laws and regulations" that Ant and its partners are subject to were described in detail in both the "Risk Factors" section and a dedicated, 21-page "Regulations" section of the HKSE Prospectuses.  *See id.* at 54–56, 65–66, IV-1 to IV-21.  Ant cautioned investors that these laws and regulations "are highly complex, continuously evolving and could change or be reinterpreted to be burdensome or difficult to comply with or increase our compliance costs."  *Id.* at 55.  Ant also warned that the PRC government was "likely to continue to issue new laws, rules and regulations . . . , which

---

[4]  Ant funds the remaining CreditTech loans through two licensed small loan subsidiaries.  Final Prospectus at 195.

[Ant] may not be able to . . . comply with." *Id.*

 ***Ant Disclosed Several New Regulations:*** This continuous regulatory evolution included a number of new regulations during the period in which Ant was preparing for its planned dual-listed IPO on the SHSE and HKSE. On July 12, 2020, the China Banking and Insurance Regulatory Commission ("CBIRC") publicly issued the *Provisional Regulatory Measures for Commercial Banks' Online Lending Business* (the "*Bank Measures*"), which regulate "the extension of credit by commercial banks via online channels" such as Ant's CreditTech platform. *Id.* at 65; *see also* AC ¶ 194. As explained in the HKSE Prospectuses, although the *Bank Measures* are not applicable to Ant, they affect "[t]he way that [Ant] cooperate[s] with [its] partner financial institutions." Final Prospectus at IV-15. For example, the *Bank Measures* set limits on the use of proceeds, maximum amount, and maturity date for loans Ant's commercial bank partners extend through Ant's CreditTech platform. *Id.* Ant also informed investors that the *Bank Measures* "tighten the requirement on the co-lending business between banks and online lend[ers]" such as Ant, which "may increase [Ant's] compliance costs." *Id.*

 On September 11, 2020, PRC regulators publicly issued the *Decision on Implementing the Access Management of Financial Holding Companies* and the companion *Provisional Administrative Measures on Financial Holding Companies* (collectively, the "*FHC Rules*" and, together with the *Bank Measures*, the "Pre-IPO Regulations"). *Id.* at 56, IV-18; *see also* AC ¶¶ 197–98 . Under the *FHC Rules*, which took effect on November 1, 2020, FinTech companies like Ant are "required to apply to and obtain approval from the [People's Bank of China ("PBOC")] for establishing financial holding companies." Final Prospectus at IV-18; *see also* AC ¶ 198. Ant disclosed its plan to submit an application by November 1, 2021, in accordance with the timeline set forth in the *FHC Rules*. Final Prospectus at 56, IV-18.

***A Subsequent Regulatory Development Led To An Abrupt Suspension Of The Ant***

***IPO:***  On November 2, 2020—three days before Ant's shares were expected to begin trading—the CBIRC and the PBOC jointly released the draft *Interim Regulatory Measures on Online Small Loan Businesses* (the "*Interim Measures*").  *See* Ex. HH at 1; Ex. II at 1; Ex. JJ at 1-2.  As noted by a number of online commentators, the *Interim Measures* required that Ant underwrite 30% of its CreditTech loans, Ex. HH at 1–2; Ex. II at 2; Ex. JJ at 1, up from Ant's alleged practice of underwriting 2% of the loans, AC ¶ 192.  This change was significant, because "different from banks," Ant until this point did "not have leverage ratio limits."  *Id.* ¶ 196.  On the same day, the CSRC and other PRC regulators met with Mr. Ma and both Ant's Chairman and its then-CEO to discuss the *Interim Measures* (the "Nov. 2 Meeting").  *Id.* ¶ 203.

On November 3, the SHSE announced the suspension of the Ant IPO, citing "the recent changes in the Fintech regulatory environment" and the Nov. 2 Meeting.  AC ¶ 229; *see also* Ex. HH at 2.  The CSRC confirmed the suspension on November 4, noting that "the recent change in the financial technology regulatory environment may have a material impact on Ant Group's business structure and profit model" and deemed this "material change" and the Nov. 2 Meeting, "material events before listing" necessitating the suspension.  Ex. KK.  The media similarly noted that "Ant can't proceed with an IPO until after it complies with new capital requirements and other restrictions imposed" by the *Interim Measures*.  Ex. LL.  Alibaba's ADS price dropped appreciably following the news of the Ant IPO suspension.  *See* AC ¶ 232.

***Speculation About The Ant IPO Suspension:***  The eleventh-hour suspension of what would have been the largest IPO in history shocked the international financial community and the media.  Multiple western media outlets, including the New York Times, Bloomberg, and the Wall Street Journal theorized that certain comments Mr. Ma made in October 2020, which they

characterized as a criticism "about the backwardness of Chinese financial regulators," may have drawn the ire of the regulators and led to the promulgation of the *Interim Measures*, resulting in the suspension of the Ant IPO.  Ex. MM at 2; *see also* Ex. NN at 2; Ex. JJ at 1–2; Ex. OO at 1; Ex. F at 3.  A later-published Wall Street Journal article (the "Feb. 16 Article") also speculated that the PRC government suspended the Ant IPO because it discovered that Jiang Zhicheng and Li Botan, two individuals who are supposedly affiliated with an out-of-favor political faction called the "Shanghai Faction," held pre-IPO investment in Ant.  AC ¶ 209, Ex. 9 at 1, 4–6.[5]

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS AGAINST MR. MA ARE FUNDAMENTALLY DEFECTIVE.

### A.    The Court Lacks Personal Jurisdiction Over Mr. Ma.

"[T]he plaintiff has the burden of making a prima facie showing," based on factual allegations, "that personal jurisdiction over the defendant exists."  *In re Aphria Sec. Litig.*, No. 18CV11376, 2020 WL 5819548, at *5 (S.D.N.Y. Sept. 30, 2020) (Daniels, J.).  For Exchange Act claims against a foreign defendant like Mr. Ma, a key inquiry is whether, under the Due Process Clause of the Constitution, the defendant had "minimum contacts" with the United States.  *See id.*[6]  Minimum contacts require that "the defendant ha[ve] purposefully directed his

---

[5] Mr. Ma refers the Court to the concurrently-filed Memorandum of Law in Support of the Alibaba Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (the "Alibaba MTD") for additional factual background.

[6] Personal jurisdiction may be established by showing either (i) general jurisdiction over a defendant who is domiciled in the forum State; or (ii) specific jurisdiction where "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 135 (S.D.N.Y. 2021) (citation omitted).  The Complaint does not allege general jurisdiction.

In assessing specific jurisdiction, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction," and whether exercise of personal jurisdiction is consistent with due process under the Constitution. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 129–30 (2d Cir. 2013).  This Motion focuses on the constitutional due process requirement, which entails a two-step inquiry "to determine (1) whether each of the Defendants has sufficient 'minimum contacts' with the forum, and (2) whether the exercise of jurisdiction is 'reasonable' as to each defendant under the circumstances." *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12CV3419, 2017 WL 1113080, at *1 (S.D.N.Y. Mar. 10, 2017) (Daniels, J.).  Where, as here, "the contacts are not

activities at residents of the forum, and the litigation result[] from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotations omitted).  A defendant cannot be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Laydon*, 2017 WL 113080, at *2.

The Complaint does not allege Mr. Ma had any contacts with the United States concerning the Ant IPO or otherwise.  *See* AC ¶ 35 (boilerplate allegations regarding use of "the means and instrumentalities of interstate commerce").  Instead, Plaintiffs allege that Mr. Ma committed U.S. securities fraud through (i) his indirect control of foreign non-party Ant, which allegedly issued materially false and/or misleading disclosures to prospective investors in the HKSE Prospectuses and (ii) participation in a scheme to conceal the identity of two purported non-U.S. Ant investors from PRC regulators.  *See id.* ¶¶ 55, 226.  Both allegations are insufficient to establish minimum contacts.

Mr. Ma is not subject to personal jurisdiction with respect to the disclosure allegations because Plaintiffs do not allege Mr. Ma "played any role in making, proposing, editing or approving" any disclosure directed to U.S. investors, in the absence of which his alleged controller status does not give rise to minimum contacts.[7]  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) (finding allegations that defendant "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company" "not enough to support personal jurisdiction"); *see also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) ("[S]tatus [as controller] alone would be insufficient

---

sufficient, the due process inquiry ends" and the claims must be dismissed.  *Id.* at *2.

[7]  For the same reasons, the Court also does not have personal jurisdiction over the Section 20(a) control person claim against Mr. Ma based on his alleged control of Alibaba and Alibaba's alleged Section 10(b) violation.  *See Tarsavage v. Citic Tr. Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014) (dismissing 20(a) claim because "[c]ontrol person status alone is insufficient" to confer personal jurisdiction) (quotations omitted).

to warrant the conclusion that [defendant's] contacts with the United States satisfied the requirements of due process.").

The scheme allegations also fail to support a finding of minimum contacts, because the Complaint concedes that the alleged scheme was directed at PRC regulators, *see* AC ¶¶ 347, 360, 386, and that Mr. Ma's alleged actions in furtherance of the scheme took place solely in China, *see id.* ¶¶ 313, 360.  Where, as here, the alleged scheme occurred "entirely outside of the United States" and "there [was] no support for the proposition that [the defendant] directed his conduct toward the United States," there can be no minimum contacts.  *Aegean*, 529 F. Supp. 3d at 137; *see also Braskem*, 246 F. Supp. 3d at 768, 770 (no personal jurisdiction where the defendant's fraudulent conduct was not "designed to violate United States securities regulations" and was not "necessarily directed towards the United States").

**B.    The Alleged Fraud Falls Outside The Territorial Limit Of Section 10(b).**

"Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 273 (2010).  Plaintiffs' Section 10(b) claims against Mr. Ma clearly fall outside of this scope.

The Complaint alleges that Mr. Ma committed U.S. securities fraud because the HKSE Prospectuses included materially false and/or misleading statements.  AC ¶¶ 278–308.  But the HKSE Prospectuses were filed with the HKSE in connection with the Hong Kong leg of the Ant IPO, a sale of foreign securities on a foreign exchange.  *See id.* ¶¶ 278, 293.  Indeed, Ant explicitly stated that the HKSE Prospectuses "may not be used for . . . any security *in any other jurisdiction*."  Final Prospectus at vi (emphasis added).  The purported fraud thus concerned securities that "are listed on no U.S. exchange and are not otherwise traded in the United States,"

mandating dismissal under *Morrison*. *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d

161, 167 (2d Cir. 2021) (dismissing Section 10(b) claim based on an offering between a foreign

investor and a foreign issuer as extraterritorial). Indeed, the Complaint does not claim that a

single part of the alleged fraud took place in the United States; instead it alleges a fraudulent

scheme that was directed to PRC regulators and occurred entirely in China. *See* AC ¶¶ 313, 360.

As a result, this "is a rare case of prohibited extraterritorial application that lacks *all* contact with

the territory of the United States." *Morrison*, 561 U.S. at 266 (emphasis in original).

Plaintiffs' allegation that the purported fraud affected Alibaba's ADS price does not

change the extraterritorial nature of their Section 10(b) claims. Such an allegation may have

been able to meet the Second Circuit's pre-*Morrison* "effects test," under which "[i]t sufficed to

apply § 10(b) that, although the transactions in treasury shares took place in Canada, they

affected the value of the common shares publicly traded in the United States." *Id.* at 256

(abrogating *Schoenbaum v. Firstbrook*, 405 F.2d 200, 208–09 (2d Cir. 1968)). But, in *Morrison*,

the Supreme Court explicitly rejected the "effects test," holding that Section 10(b) applies to

"only transactions in securities listed on domestic exchanges, and domestic transactions in other

securities" and thus foreclosed any argument based on the alleged fraud's effect on Alibaba's

ADS. *Morrison*, 561 U.S. at 255–70. Notably, the Supreme Court observed:

> Like the United States, foreign countries regulate their domestic securities
> exchanges and securities transactions occurring within their territorial jurisdiction.
> And the regulation of other countries often differs from ours as to what constitutes
> fraud, what disclosures must be made . . . and many other matters.

*Id.* at 269. This case offers a perfect illustration of that principle. The Ant IPO was reviewed,

approved, and later suspended by PRC regulators under PRC laws and regulations. *See supra* at

5, 7. The regulators did not find Ant's disclosure insufficient, but instead suspended the IPO

because of a material regulatory change in China. *See id.* Plaintiffs' attempt to second-guess the

sufficiency of Ant's HKSE disclosures under U.S. securities law will both "interfere[] with foreign securities regulation" and defy the Supreme Court's clear mandate to limit the application of Section 10(b) to U.S. exchanges and U.S. transactions. *Morrison*, 561 U.S. at 269–70.

### C.    Plaintiffs Have No Standing To Challenge The HKSE Prospectuses.

Section 10(b) claims are subject to a statutory standing requirement, which "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975). In particular, an investor lacks standing "under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Ont. Pub. Serv. Emp. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004).

Here, the Section 10(b) claims against Mr. Ma are premised on alleged misrepresentations and/or omissions in the HKSE Prospectuses. *See* AC ¶¶ 278–308. Plaintiffs do not allege that they ever purchased or held Ant stocks; instead, they allegedly traded the ADSs of Alibaba. *Id.* ¶¶ 36–39. But Section 10(b) does not permit a plaintiff to sue just any defendant who makes "misrepresentations that happened to affect the price of a security purchased or sold by the investor." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19CV6536, 2021 WL 1199035, at *29 (S.D.N.Y. Mar. 30, 2021) ("*IFF*"). As the Second Circuit has held in similar cases, the connection between the challenged Ant statements regarding Ant itself and plaintiffs' purchase of Alibaba ADSs is "too remote to sustain an action." *Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015); *see also IFF*, 2021 WL 1199035, at *30 ("[P]laintiffs, who have never purchased or sold

Frutarom securities, lack standing to sue the Frutarom Defendants for statements relating to

Frutarom.").  Plaintiffs' attempt to radically expand Section 10(b) standing must be rejected,

because it runs contrary to both decades of binding precedents and the Supreme Court's caution

against extending the private cause of action under Section 10(b) "beyond its present

boundaries."  *Stoneridge Inv. Partners, LLC v. Sci.-Atl.*, 552 U.S. 148, 165 (2008).

###       D.       Mr. Ma Is Not The Maker Of The Challenged Disclosures.

To be liable under Rule 10b-5(b), Mr. Ma "must have 'made' the [alleged] material

misstatements" in the HKSE Prospectuses.  *Janus Capital Grp., Inc. v. First Derivative Traders*,

564 U.S. 135, 141 (2011).  "[T]he maker of a statement is the person or entity with ultimate

authority over the statement, including its content and whether and how to communicate it."  *Id.*

at 142.  "[I]n the ordinary case, attribution within a statement or implicit from surrounding

circumstances is strong evidence that a statement was made by—***and only by***—the party to

whom it is attributed."  *Id.* at 142–43 (emphasis added).

Plaintiffs contend that, although the HKSE Prospectuses were not signed by, or otherwise

attributed to, Mr. Ma, he was nevertheless a "maker" of the challenged statements in the HKSE

Prospectuses because he controlled Ant.  AC ¶¶ 279, 294.  The pertinent inquiry under *Janus*,

however, is whether the defendant had the "ultimate authority over ***the misstatement***," not

whether he controlled ***the entity*** that issued the misstatement.  *McIntire v. China MediaExpress*

*Holdings, Inc.*, 927 F. Supp. 2d 105, 136–38 (S.D.N.Y. 2013) (finding the defendant not a maker

despite its "dominat[ion] and control[]" over the maker entity) (emphasis added).  The Complaint

does not allege that Mr. Ma, who was not an Ant officer or director, took part in drafting,

reviewing, or approving the challenged statements or, for that matter, any portion of the HKSE

Prospectuses.  Absent such allegations, "Plaintiffs' attempt to avoid *Janus* by conflating

shareholder control with 'ultimate authority' is unavailing."  *In re Optimal U.S. Litig.,* No.

13

10CV4095, 2011 WL 4908745, at *5 (S.D.N.Y. Oct. 14, 2011) (rejecting attribution of an

entity's statements to its 100% owner); *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, 504

F. Supp. 3d 224, 262 (S.D.N.Y. 2020) (rejecting attribution based on equity ownership and right

to place directors).

## II.    THE ANT PROSPECTUSES CLAIMS ARE NOT WELL-PLEADED.[8]

### A.    <u>The Complaint Fails To Plead Any Actionable Misrepresentation Or Omission.</u>

#### 1.    Ant Fully Disclosed Risks Associated With The Pre-IPO Regulations.

The Ant Regulatory Claim alleges that Ant failed to disclose its unspecified violations of

the Pre-IPO Regulations, which led to the suspension of the Ant IPO and rendered its disclosures

of these regulations in the HKSE Prospectuses materially misleading.  AC ¶¶ 287–90, 298–306.

The very documents upon which the Complaint relies, however, identify the *Interim Measures*,

as opposed to the Pre-IPO Regulations, as the cause of the Ant IPO suspension, contradicting

Plaintiffs' claim.  *See supra* at 7.[9]  Indeed, PRC regulators reviewed Ant's regulatory compliance

and ***approved*** the Ant IPO in October 2020 ***after*** the Pre-IPO Regulations were announced in

July and September.  *See supra* at 5–6.  The approval was then reversed immediately after the

promulgation of the *Interim Measures*, which the regulators referred to as "a material change in

the regulatory . . . environment" necessitating the suspension.  *See* Ex JJ.  Plaintiffs' allegations

are simply implausible.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (requiring

plaintiffs to "nudge[] their claims across the line from conceivable to plausible").

---

[8]  Mr. Ma refers the Court to the authorities cited on pages 12–13 of the Alibaba MTD regarding the heightened pleading standards for Section 10(b) claims.

[9]  Indeed, the Complaint simply ignores the *Interim Measures*, which is understandable in view of the skepticism the Court expressed about whether the events on November 2 and 3, 2020 constituted an actionable corrective disclosure in its ruling on PSLRA Lead Plaintiff motions.  *See* ECF No. 48 at 6.  Rather than dropping this claim, however, Plaintiffs have put forward unconvincing alternative explanations that are directly contradicted by the public reports and materials they relied on in making their claims.

In any event, the Complaint fails to allege any well-pleaded violations of the Pre-IPO Regulations. The Complaint concedes that the *Bank Measures* apply to commercial banks, AC ¶ 194, and Ant is a FinTech company that collaborates with, and operates "different[ly] from[,] banks." *Id.* ¶ 196; *see supra* at 4–6. Thus, despite Plaintiffs' insinuation that Ant was somehow "skirting" a capital requirement imposed by the *Bank Measures*, AC ¶¶ 290, 302–03, the Complaint acknowledges that Ant was not subject to such a requirement until the promulgation of the *Interim Measures* immediately before the suspension of the Ant IPO. *Id.* ¶ 196.[10]

Ant also could not have violated the *FHC Rules*, which did not take effect until November 1, 2020 and, after that, provided another year of transition period for Ant to become compliant and submit its application. *See supra* at 6. Ant fully disclosed how it planned to comply with the new rules, including details such as which entity would hold the required license, which Ant warned it "may not be able to obtain." Final Prospectus at 55–56.[11]

**2.    Plaintiffs' Ant Investor Claim Is Speculative And Implausible.**

Plaintiffs' alternative theory—that the PRC government's last-minute discovery of the so-called Shanghai Faction's investments in Ant led to the Ant IPO suspension—is even weaker. *See* AC ¶¶ 240, 365. The Complaint alleges that such investment was secretly made through Mr.

---

[10]  The Complaint cites a November 11, 2020 article to suggest that the *Bank Measures* applied to Ant. *See* AC ¶ 196, n. 106. Not true. That article instead discusses the impact of the *Interim Measures*. Ex. PP at 1.

[11]  The Complaint also challenges Ant's disclosures relating to its regulatory compliance efforts in general. Specifically, the HKSE Prospectuses state that (i) "[t]o comply with existing laws, regulations, rules and government policies," Ant had "implemented and will continue to implement various policies and procedures"; and (ii) for approximately the past three and half years, Ant "ha[d] not been subject to any material fines or other material penalties under any PRC laws or regulations." AC ¶¶ 291, 307. Plaintiffs contend that these disclosures "suggested that Ant was in compliance with all applicable banking laws, regulations, rules and government policies relating to online lending and consumer finance" while Ant was in fact in violation of the Pre-IPO Regulations. *Id.* ¶¶ 292, 308. But as explained above, the Complaint fails to plead any violations of the Pre-IPO Regulations at the time of the disclosures. Moreover, Ant did not in any way claim full regulatory compliance. Instead, Ant cautioned that the Pre-IPO Regulations "are highly complex, continuously evolving and could change or be reinterpreted to be burdensome or difficult to comply with" and that it "cannot assure [investors] that [it] will be able to make adjustments to [its] business in the future in a timely manner to respond to such additional scrutiny and requirements." Final Prospectus at 55.

15

Jiang's private equity firm Boyu Capital. *Id.* ¶¶ 211–20. But Boyu Capital's investment in Ant, which was made in 2018, was both reported by contemporaneous news articles and explicitly disclosed in the HKSE Prospectuses. *See* Ex. QQ at 2–3; Final Prospectus at 148, 153. Why would PRC regulators abruptly reverse their approval and suspend the Ant IPO for the so-called Shanghai Faction's investment in Ant, when such investment was known for years?[12] Once again, this theory is simply not plausible.

Moreover, this alternative theory, which is solely based on the Feb. 16 Article, is not well-pleaded. The Feb. 16 Article describes its sources as "Chinese officials and government advisers" including "people familiar with [a purported PRC government] investigation" into Ant's ownership structure. AC, Ex. 9 at 1, 6. Neither the Feb. 16 Article nor Plaintiffs identified these individuals. Neither provided the positions these individuals supposedly held, their job responsibilities, or any reason that they might be "familiar" with the investigation. Such bare-bone description of anonymous sources cannot satisfy the heightened pleading standards under Rule 9(b) and the PSLRA. *See In re Sibanye Gold Ltd. Sec. Litig.*, No. 18CV3721, 2020 WL 6582326, at *16–17 (E.D.N.Y. Nov. 10, 2020) (rejecting reliance on "anonymously sourced newspaper article" without "sufficient information about the confidential source allegedly relied upon by the newspaper article"); *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 797-99 (S.D.N.Y. 2020) (declining to credit statements of anonymous sources "whose descriptions do not suggest that they had been in position to know the facts attributed to them").[13]

---

[12] Also, Boyu's other PRC investees have been permitted to complete their IPOs. *See, e.g.*, Ex. RR at 154–55, 228–29 (2018 IPO of WuXi AppTec Co. Ltd., a 20.32% Boyu investee), Ex. SS (same); Ex. TT at 406, SS2 (2020 IPO of Antengene Corporation Limited, a 61.69% Boyu investee), Ex. UU (same).

[13] There is also no indication that Plaintiffs took any step to identify the anonymous sources, to confirm their knowledge, or to otherwise vet the Feb. 16 Article's speculation regarding the reason of the Ant IPO suspension. *See In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20CV4420, 2021 WL 4341500, at *19 (S.D.N.Y. Sept. 22, 2021) (dismissing allegations based on statements not vetted by plaintiffs' counsel because "[t]he caselaw reflects skepticism by courts of attributions to people 'with whom plaintiffs' counsel have not themselves interacted.'");

Additionally, the premise of Plaintiffs' alternative theory—that Messrs. Jiang and Li secretly held 0.92% and 1.29% of Ant, respectively, is not well-pleaded. *See* AC ¶¶ 338-41, 348–54. ***First***, the Complaint alleges that Mr. Jiang's private equity firm, Boyu Capital, through unspecified contractual arrangements, indirectly controlled Beijing Jingguan, a 0.92% Ant shareholder. *See* AC ¶¶ 338–46. These allegations are speculative; but even assumed to be true, they would not support Plaintiffs' claim that Mr. Jiang owned 0.92% of Ant. Instead, they at most suggest that Mr. Jiang's firm managed an ***investment fund*** that held 0.92% of Ant's shares for its investors. Plaintiffs do not allege what interest, if any, Mr. Jiang held in this fund.[14]

***Second***, the allegation that Mr. Li owned 1.29% of Ant is even less well founded. The AC alleges that Mr. Li partially owned an entity named Beijing Zhaode, that Beijing Zhaode had "control over and financial interest in" another entity named Tibet Hongde, and that Tibet Hongde indirectly invested in a fund that held the 1.29% Ant shares at issue. AC ¶¶ 348–54. But the Complaint concedes that the ***only*** connection between Beijing Zhaode and Tibet Hongde is that they both invested in, and held seats on the board of, another business that has nothing to do with this lawsuit. AC ¶ 253. There is thus no well-pleaded factual allegation supporting Beijing Zhaode's supposed "control over and financial interest in" Tibet Hongde, which alone breaks the chain of the alleged connection between Mr. Li and Ant. Moreover, there is again no allegation as to the portion of the fund allegedly owned by Mr. Li.[15]

---

*Sibanye Gold*, 2020 WL 6582326, at *16–17 ("Plaintiffs do not indicate that they have conducted their own investigation nor otherwise provided the court with sufficient information about the confidential source allegedly relied upon by the newspaper article. As a result, the court cannot find that the newspaper article provides particularized facts that support Plaintiff's claim.").

[14]  Indeed, Beijing Jingguan had at least dozens of individual and institutional investors through feeder funds including Ningbo Yuanxuan and Tiancen Yujing. *See* AC ¶ 341; Ex. VV1 at 2–3; Ex. VV2 at 2–4.

[15]  Similarly, Zhongfu Equity, the fund that holds 1.29% of Ant shares, had dozens of direct investors and indirect investors through feeder funds including Fuqing Qisheng. *See* Ex. VV3 at 2–3, Ex. VV4 at 2–3.

The Complaint also claims that Qizhan, an investment fund with a 1.6% stake in Ant, is not, as Ant disclosed, an "independent third party," but is instead a "related party" to Alibaba, Ant, and Mr. Ma, because (1) Qizhan's fund

**B.    The Complaint Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter.**

**1.    Plaintiffs Fail To Adequately Allege Motive And Opportunity.**

The Complaint alleges that Mr. Ma was motivated to "push the Ant IPO through as quickly as possible," because he "stood to gain tens of billions of dollars."  AC ¶¶ 384, 386.  But Mr. Ma is not alleged to be a selling shareholder in the Ant IPO.  In fact, Junhan, through which Mr. Ma holds his Ant shares, agreed to a 12-month post-IPO lock-up in Hong Kong and an at-least-36-month post-IPO lock-up in Shanghai.  Final Prospectus at 282.  Plaintiffs thus fail to allege that a successful Ant IPO would "benefit [Mr. Ma] in some concrete and personal way," *In re Ideanomics, Inc., Sec. Litig.*, No. 20CV4944, 2022 WL 784812, at \*9 (S.D.N.Y. Mar. 15, 2022) (Daniels, J.), absent which the ordinary motive to ensure the success of an IPO cannot give rise to a strong inference of scienter.  *See Geiger v. Solomon-Page Grp.*, 933 F. Supp. 1180, 1189-90 (S.D.N.Y. 1996).  Also, even if Mr. Ma were to realize profits in the Ant IPO (which he was not), that fact would not present a motive to defraud ***U.S. investors***.  *See supra* at 5, 9–12.

The Complaint also relies on Mr. Ma's alleged sales of Alibaba ADSs on September 30 and October 1, 2020 to plead scienter.  AC ¶ 367.  But "the mere fact that insider stock sales occurred does not suffice" in pleading a strong inference of scienter.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).  Plaintiffs "must establish that the sales were 'unusual' or 'suspicious.'"  *Id*.  Here, the stock sales are not, for the following reasons.[16]

---

manager also manages Zhongfu Equity, and (2) an Alibaba subsidiary invested in a separate fund called Yunfeng Qitai that, in turn, invested in Zhongfu Equity (and numerous other companies).  AC ¶¶ 357–59; *see also* Ex. VV5 at 19–20.  The AC does not define "related party."  But under no reasonable definition can Qizhan be considered related to Alibaba, let alone Ant or Mr. Ma.  Otherwise, any investor in a Vanguard fund would be a related party to the hundreds of other Vanguard funds.  Also, the investments at issue were all publicly disclosed and thus cannot give rise to a valid claim.  *See* AC ¶ 356; *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019) ("A defendant has no duty to disclose information that is within the public domain through publication in the news media.").

[16]  At the outset, the Complaint does not allege net profits Mr. Ma made from the alleged sales, which is "necessary information" for pleading scienter based on stock sales.  *Glaser*, 72 2d 573 at 587.  Plaintiffs' allegations regarding

*First*, the alleged sales represented approximately **one percent** of Mr. Ma's Alibaba holdings. *Compare* AC ¶ 367 *with* Ex. A at 191. This district has consistently found sales of less than 10% of holdings insufficient to support an inference of scienter. *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) (collecting cases); *see also In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384–85 (sale of less than 20% of holdings not sufficient for pleading scienter because courts "have found no inference of scienter involving even greater percentages of sales"); *In re Gildan Activewear*, *Inc.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (no scienter based on sale of 22.5% of holdings). Indeed, "total sales amounting to a relatively low percentage of an insider's percentage of stock holdings militate against an inference of scienter." *Gildan*, 636 F. Supp. 2d at 270.

*Second*, Mr. Ma made the alleged sales on the day of his retirement from Alibaba's Board of Directors and the day after, which "undercuts the theory that [the sales were] motivated by a desire to take advantage of fraudulently inflated market price." *In re Avon Products, Inc. Sec. Litig.*, No. 05CV6803, 2009 WL 848017, at *21 (S.D.N.Y. Feb. 23, 2009) (finding disposition of even "a significant portion of shares" upon retirement inconsistent with an inference of scienter). Courts have routinely deemed stock sales upon retirement "a normal and expected transaction" and "a frequent occurrence." *In re Carter-Wallace, Inc. Sec. Litig.*, No. 94CV5704, 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 9, 1999); *see also Chapman v. Mueller Water Prods.,* 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020) (reasoning that a retiring defendant "might have wanted to use his shares to finance other personal or business prospects upon has

---

the number of shares sold and the gross proceeds "are not suspicious per se." *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 59 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999)*; see also Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 335 (S.D.N.Y. 2011) ("Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to *gross proceeds*, as well as overall percentage changes in defendants' holdings.") (emphasis in original).

retirement" or "might have been engaged in estate planning").  Moreover, after announcing his

retirement, Mr. Ma sold at least 20 million Alibaba ADSs in 2019 and an additional 17 million

earlier in 2020 before the putative Class Period.  Exs. WW1–WW15.  The alleged sales of 10

million ADSs during the putative Class Period were thus not "dramatically out of line with prior

trading practices."  *Gildan*, 636 F. Supp. 2d at 270; *see also Plumbers & Pipefitters Loc. Union

No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010),

as corrected (Sept. 30, 2010) (deeming sales in "a regular pattern" not unusual).[17]

### 2.    The Complaint Includes No Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness.

The Complaint lacks all the hallmarks of adequate scienter allegations, such as internal

documents or confidential witnesses showing that Mr. Ma knew the challenged disclosures were

materially false or recklessly disregarded such knowledge.  In particular, the Complaint includes

no well-pleaded factual allegations regarding Mr. Ma's knowledge of Ant's supposed violation

of the Pre-IPO Regulations.  *See* AC ¶ 384 (vaguely alleging Mr. Ma was "all too familiar with

how stifling new regulations could be to Ant's growth.").  Similarly, although Plaintiffs claim, in

conclusory fashion, that Mr. Ma knew of Messrs. Jiang's and Li's secret investment in Ant, the

Complaint fails to "specifically identify the reports or statements containing [the] information" to

which Mr. Ma may have had access.  *Ideanomics*, 2022 WL 784812, at *10; *see also In re

Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir.

2015) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically

identify the reports or statements containing this information.").[18]

---

[17]  Also, Mr. Ma's alleged stock sales were made pursuant to Rule 10b5-1 trading plans.  *See* Exs. XX1–XX3.  "[I]t is well established that trades under 10b–5–1 plan[s] do not raise a strong inference of scienter."  *Glaser*, 772 F. Supp. 2d at 592.

[18]  The Complaint also fails to plead that Mr. Ma knew that the PRC government's alleged discovery of the secret ownership interest would lead to the suspension of the IPO.  Even if Mr. Ma was, as alleged, aware of the political

3.    **Balancing Of Inferences Weighs Against A Finding Of Scienter.**

Plaintiffs ask the Court to infer that Mr. Ma knew that the Ant IPO was doomed due to Ant's regulatory violations and Messrs. Jiang's and Li's Ant investments, but nevertheless caused Ant to incur significant efforts and costs to pursue its IPO. Such an inference lacks logic and plausibility, especially given that (i) the Pre-IPO Regulations were published more than a month before the regulatory approval of the Ant IPO; and (ii) the purported Shanghai Faction's investment in Ant had been public knowledge for years. *See supra* at 6, 15–17. The much stronger inference is that, as confirmed by regulators and widely reported by the media, the Ant IPO was on track to completion until the unexpected issuance of the *Interim Measures* on the day before the suspension. *See supra* at 5, 7.

III.    **PLAINTIFFS' ALTERNATIVE SECTION 10(b) CLAIMS FAIL FOR THE SAME AND ADDITIONAL REASONS.**

Based on the same allegations underlying the Ant Prospectuses Claims, Plaintiffs also assert the Scheme Liability Claim against Mr. Ma and Alibaba under Rules 10b–5(a) and (c). AC ¶ 209. To state such a claim, Plaintiffs must show, among other things, "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quotations omitted).

A.    **The Scheme Liability Claim Fails Because It Merely Repackages The Ant Prospectuses Claims.**

The linchpin of the Scheme Liability Claim is Plaintiffs' allegation that Mr. Ma somehow "caus[ed]" Ant to issue the disclosures underlying the Ant Prospectuses Claims. AC ¶ 313. As explained above and in the Alibaba MTD, this allegation fails because:

---

rivalries, it does not follow that he could have predicted that the alleged minor investment would have led to the suspension of the Ant IPO. *See supra* at 15–17.

- The Court lacks personal jurisdiction over Mr. Ma, *see supra* at 8–10;

- Plaintiffs' claims are outside the territorial reach of Section 10(b), *see supra* at 10–12;

- Plaintiffs lack standing to challenge the Ant disclosures at issue, *see supra* at 12–13;

- The Complaint fails to allege that Mr. Ma played any role in drafting, approving, or otherwise "causing" the issuance of challenged Ant disclosures, *see supra* at 13–14;

- The disclosures at issue were neither false nor misleading, *see supra* at 14–17; Alibaba MTD at 13–14; and

- Plaintiffs fail to plead a strong inference of scienter, *see supra* at 18–20; Alibaba MTD at 14–15.

Plaintiffs should not be permitted to sidestep these fatal defects by "labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216–17 (S.D.N.Y. 2020) (dismissing scheme liability claim because "it is indistinguishable from the misstatements and omissions"); *see also S.E.C. v. Rio Tinto PLC*, No. 21-2042, 2022 WL 2760323, at *7 (2d Cir. July 15, 2022) (rejecting scheme liability claim as an attempt to hold "the defendant . . . liable for the misleading statements because he or she was a participant in a scheme through which the statements were made") (quotations omitted).

### B.    Plaintiffs' Additional Scheme Allegations Fail For Multiple Reasons.

The Complaint asserts that Mr. Ma and Alibaba, in addition to "causing" the issuance of the challenged statements in the HKSE Prospectuses, committed deceptive acts in furtherance of a fraudulent scheme by assisting Messrs. Jiang and Li to "obscur[e] the[ir] ownership interests [in Ant] using a complex series of investment vehicles." AC ¶ 313. These allegations are not actionable. *First,* Plaintiffs' assertion that Defendants were involved in Messrs. Jiang's and Li's purported indirect investments in Ant is not supported by any document, witness statement, or other non-conclusory factual allegation and is thus speculative and not well-pleaded. *See Danske*

*Bank*, 11 F.4th at 105 (dismissing scheme liability claim based on "conclusory assertion"). As a result, Plaintiffs' "effort to shoehorn [their] allegations into a claim for scheme liability" fails. *Rio Tinto*, 2022 WL 2760323, at *4.

**Second**, the Complaint does not adequately allege the "performance of an ***inherently deceptive act*** that is ***distinct from an alleged misstatement***." *In re Kirkland Lake Gold Ltd. Sec. Lit.*, No. 20CV4953, 2021 WL 4482151, at *6 (S.D.N.Y. Sept. 30, 2021) (quoting *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)) (emphases added). Even if Defendants, as Plaintiffs claim, facilitated Messrs. Jiang's and Li's alleged indirect investment in Ant, the Complaint still fails to show that these transactions "would operate to mislead or defraud investors ***in the absence of" Ant's alleged misrepresentations*** regarding its shareholders. *Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP*, No. 17CV1235, 2018 WL 1627266, at *12 (Mar. 30, 2018) (deeming actions not inherently deceptive because "[t]he resulting fraud, rather, was a product of [subsequent] public representations"); *see also Kelly*, 817 F. Supp. 2d at 344 (dismissing scheme liability claim because alleged transactions were deceptive "only because of . . . subsequent public misrepresentations").

**Third**, Plaintiffs do not allege that, when purchasing Alibaba ADSs, they relied upon the purported scheme to hide Messrs. Jiang's and Li's investment from PRC regulators. Section 10(b) "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Stoneridge*, 552 U.S. at 162. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element" of a scheme liability claim. *Id.* at 159. Here, the scheme was allegedly not disclosed until months after the Ant IPO was suspended. *See* AC ¶ 206. As the Supreme Court made clear, deceptive acts that "were not disclosed to the investing public," such as Defendants' alleged involvement in Messrs. Jiang's and Li's purported

23

investments, "are too remote to satisfy the requirement of reliance." *Stoneridge*, 522 U.S. at 160–61 (rejecting reliance argument that challenged statement "was a natural and expected consequence of [the] deceptive acts"); *see also Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) (finding the mere fact that the alleged scheme impacted another party's disclosure "insufficient to show reliance on the secondary actor's *own* deceptive conduct.") (emphasis in original). The Scheme Liability Claim should be dismissed.[19]

## IV. PLAINTIFFS' SECTION 20(a) CLAIM MUST ALSO BE DISMISSED.

The Complaint also asserts a Section 20(a) claim, seeking to impose on Messrs. Ma and Zhang and Ms. Wu (the "Individual Defendants") secondary liability for Alibaba's alleged Section 10(b) violation, on the theory that they controlled Alibaba. AC ¶¶ 401–05. To state a Section 20(a) claim, Plaintiffs must show (1) "a primary violation by the controlled person," (2) "control of the primary violator," and (3) that the controller "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Erie Grp. LLC v. Guayaba Capital, LLC*, 110 F. Supp. 3d 501, 508 (S.D.N.Y. 2015) (quotations omitted). Here, the Complaint fails to plead a primary violation by Alibaba, demanding dismissal. *See* Alibaba MTD at 13–25.

Also, the Complaint includes no well-pleaded factual allegation showing Mr. Ma had "actual control" over Alibaba "*and the transactions in question*," both "necessary for control person liability." *In re Alstom SA*, 406 F. Supp. 2d 433, 486–87 (S.D.N.Y. 2005) (emphasis in

---

[19] Plaintiffs further allege that Mr. Ma's sales of Alibaba ADSs on September 30 and October 1, 2020 were based on material nonpublic information regarding Alibaba's antitrust violations, Ant's violation of the Pre-IPO Regulations, and the purported "Shanghai Faction" Ant investors in violation of Section 10(b)'s prohibition against insider trading. AC ¶¶ 366–69. This claim fails because the Complaint fails to allege that (i) any such material nonpublic information existed and (ii) Mr. Ma was aware of such information. *See supra* at 14–21; Alibaba MTD at 15–20. Moreover, Lead Plaintiff allegedly purchased Alibaba ADSs between November 5 and December 23, 2020, ECF No. 8-2, more than one month after Mr. Ma's sales. Because Lead Plaintiff did not trade Alibaba ADSs contemporaneously with Mr. Ma, he had no standing to pursue an insider trading claim. *See Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 94–95 (2d Cir. 1981) (dismissing Section 10(b) insider trading claim because the defendant's sales and the plaintiff's purchase "approximately one month after" were not contemporaneous).

original) (quotations omitted).  Plaintiffs do not allege that Mr. Ma was involved in Alibaba's underlying PRC antitrust violations, "made . . . the [challenged Alibaba] statements," or "played some discernible role in the making of those statements."  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011) (Daniels, J.).  Without control over the alleged fraud, there can be no controller liability for even an officer or a director, let alone someone like Mr. Ma, whose only remaining affiliation with Alibaba is indirectly through the Alibaba Partnership.  *See Alstom*, 406 F. Supp. 2d at 487 (noting that "courts have held that officer or director status alone does not constitute control for the purposes of Section 20(a) liability").[20]

Moreover, the Complaint does not allege "particularized facts" of the Individual Defendants' "conscious misbehavior or recklessness" and, as a result, none of them was a "culpable participant."  *Sanofi-Aventis*, 774 F. Supp. 2d at 572; *see also Alstom*, 406 F. Supp. 2d at 491 (holding "culpable participation must be pled with particularity").  The mere general allegation that they were "the decision-making officials or had access to material information is inadequate circumstantial evidence that does not indicate involvement in perpetrating the fraud." *Sanofi-Aventis*, 774 F. Supp. 2d at 572; *see also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 242 (S.D.N.Y. 2018) (dismissing Section 20(a) claim because "[p]laintiffs' generic and conclusory allegation that [defendant] did influence and control, directly or indirectly, the decision-making of the Company. . . is not sufficient" to plead culpable participation) (quotations omitted).

---

[20]  Indeed, the Complaint also fails to plead that Mr. Ma had actual control over Alibaba.  Plaintiffs rely on an academic paper for the assertion that Mr. Ma continued to control Alibaba after his retirement.  AC ¶¶ 56–63.  The lynchpin of this theory is that Mr. Ma controls "Ant Group executives who, along with Ma, make up a majority of the the [sic] powerful Partnership Committee of the [Alibaba] Partnership."  *Id.* ¶ 63.  This is incorrect.  The academic paper concedes that, during the putative Class Period, only 2 out of the 6 members of the Partnership Committee were Ant directors or officers.  AC ¶ 174; Ex. A at 179.  Mr. Ma thus does not control, even according to the logic of the paper, the Partnership Committee, the Alibaba Partnership, or Alibaba itself.

DATED:  July 21, 2022                    SIMPSON THACHER & BARTLETT LLP

By:___/s/ *Stephen P. Blake*_____
    Jonathan K. Youngwood
    jyoungwood@stblaw.com
    425 Lexington Avenue
    New York, New York  10017
    Telephone: (212) 455-3539
    Facsimile: (212) 455-2502

    James G. Kreissman
    jkreissman@stblaw.com
    Stephen P. Blake
    sblake@stblaw.com
    Bo Bryan Jin (*pro hac vice*)
    Bryan.jin@stblaw.com
    2475 Hanover Street
    Palo Alto, California  94304
    Telephone: (650) 251-5000
    Facsimile: (650) 251-5002

    *Counsel for Defendants Alibaba Group Holding
    Limited, Daniel Yong Zhang, Maggie Wei Wu,
    and Jack Yun Ma*