# EXHIBIT A

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 20-F

**(Mark One)**

☐   **REGISTRATION STATEMENT PURSUANT TO SECTION 12(B) OR 12(G) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended March 31, 2020**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☐   **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report…………….

**For the transition period from          to**

**Commission file number 001-36614**

## Alibaba Group Holding Limited

(Exact name of Registrant as specified in its charter)

**Cayman Islands**

(Jurisdiction of incorporation or organization)

**26/F Tower One, Times Square**
**1 Matheson Street, Causeway Bay**
**Hong Kong**

(Address of principal executive offices)

**Timothy A. Steinert, Esq., Company Secretary**
**Telephone: +852-2215-5100**
**Facsimile: +852-2215-5200**
**Alibaba Group Holding Limited**
**26/F Tower One, Times Square**
**1 Matheson Street, Causeway Bay**
**Hong Kong**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary Shares, par value US$0.000003125 per share | 9988 | The Stock Exchange of Hong Kong Limited |
| American Depositary Shares, each representing eight Ordinary Shares | BABA | New York Stock Exchange |

Securities registered or to be registered pursuant to Section 12(g) of the Act: **None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: **None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report: 21,491,994,944 Ordinary Shares

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☒ Yes   ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

☐ Yes   ☒ No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued by the International Accounting Standards Board ☐          Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

☐ Item 17   ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934).

☐ Yes   ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

☐ Yes   ☐ No

Table of Contents

***Anti-monopoly and unfair competition claims or regulatory actions against us may result in our being subject to fines, constraints on our business and damage to our reputation.***

The PRC anti-monopoly enforcement agencies have in recent years strengthened enforcement under the PRC Anti-monopoly Law, including levying significant fines, with respect to concentration of undertakings and cartel activity, mergers and acquisitions, as well as abusive behavior by companies with market dominance. In March 2018, the SAMR was formed as a new governmental agency to take over, among other things, the anti-monopoly enforcement functions from the relevant departments under the MOFCOM, the NDRC and the SAIC, respectively. The SAMR stated that its tasks are to safeguard consumer interests, and to ensure quality and safety through enhanced market regulation. The SAMR has said that it will adopt an encouraging and cautious approach in regulating new technology, new industries, new business models and new practices, with a goal of stimulating market viability and innovation, promoting development and creating room for future growth.

Since its inception, the SAMR has continued to strengthen its anti-monopoly enforcement. The SAMR issued a new set of guidelines with respect to merger control review in September 2018, and issued the Notice on Anti-monopoly Enforcement Authorization on December 28, 2018, which grants authorizations to the SAMR's province-level branches for anti-monopoly enforcement within their respective jurisdictions. The SAMR also imposed several administrative penalties on various companies for failing to duly make filings as to their transactions subject to merger control review by the SAMR. The scope of the companies that were penalized is broad, and covers a variety of different industries. On several recent occasions, including at administrative guidance meetings attended by Internet platform companies including our company, the SAMR has indicated its view that certain business arrangements adopted by e-commerce platforms, including arrangements seen as exclusivity arrangements, may constitute violation of the anti-monopoly and unfair competition laws. The SAMR also indicated its intention of initiating investigations into these arrangements.

The PRC Anti-monopoly Law provides a private right of action for competitors, business partners or customers to bring anti-monopoly claims against companies. In recent years, an increased number of companies have been exercising their right to seek relief under the PRC Anti-monopoly Law. Some of these companies, including our competitors, business partners and customers, have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private litigation that targets our prior and current business practices, such as our market approach with traffic resource allocation on our e-commerce platforms, which we base on multiple factors, and our alleged prior narrowly-deployed exclusive partnerships. Although we believe that our business practices do not violate anti-monopoly or unfair competition laws, due to our large scale of business and close media attention, there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted.

Any anti-monopoly lawsuit, regulatory investigations or administrative proceedings initiated against us could also result in our being subject to regulatory actions and constraints on our investments and acquisitions, which could include forced termination of any agreements or transactions that may be determined by governmental authorities to be in violation of anti-monopoly laws or the relevant filing requirements, required divestitures, limitations on certain pricing and business practices and/or significant fines. As a result, we may be subject to significant difficulties in pursuing our investment and acquisition strategy.

These allegations, claims, actions or proceedings, regardless of their merits, have, and may continue to, cause us to change some of our business practices and hinder our business operations, which could decrease the popularity of our businesses, products and services, cause our revenue and net income to decrease materially, and could lead to additional regulatory inquiries, investigations or actions against us, such as profit disgorgement, heavy fines and various restrictions on our businesses or investment activities. Any of the above circumstances could materially and adversely affect our business, operations, reputation, brand and the trading price of our ADSs and/or Shares.

Table of Contents

***The contractual arrangements with our variable interest entities may be subject to scrutiny by the PRC tax authorities. Any pricing adjustment of a related party transaction could lead to additional taxes, and therefore substantially reduce our consolidated net income and the value of your investment.***

The tax regime in China is rapidly evolving and there is significant uncertainty for taxpayers in China as PRC tax laws may be interpreted in significantly different ways. The PRC tax authorities may assert that we or our subsidiaries or the variable interest entities or their equity holders are required to pay additional taxes on previous or future revenue or income. In particular, under applicable PRC laws, rules and regulations, arrangements and transactions among related parties, such as the contractual arrangements with our variable interest entities, may be subject to audit or challenge by the PRC tax authorities. If the PRC tax authorities determine that any contractual arrangements were not entered into on an arm's length basis and therefore constitute a favorable transfer pricing, the PRC tax liabilities of the relevant subsidiaries and/or variable interest entities and/or variable interest entity equity holders could be increased, which could increase our overall tax liabilities. In addition, the PRC tax authorities may impose late payment interest. Our net income may be materially reduced if our tax liabilities increase.

### Risks Related to Doing Business in the People's Republic of China

***Changes in the political and economic policies of the PRC government may materially and adversely affect our business, financial condition and results of operations and may result in our inability to sustain our growth and expansion strategies.***

Although we have operating subsidiaries located in various countries and regions, our operations in China currently contribute the large majority of our revenue. Accordingly, our financial condition and results of operations are affected to a significant extent by economic, political and legal developments in the PRC.

The PRC economy differs from the economies of most developed countries in many respects, including the extent of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. A substantial portion of productive assets in China is still owned by the government. In addition, the PRC government regulates industry development by imposing industrial policies. The PRC government also plays a significant role in China's economic growth by allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, regulating financial services and institutions and providing preferential treatment to particular industries or companies.

While the PRC economy has experienced significant growth in the past four decades, growth has been uneven, both geographically and among various sectors of the economy. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall PRC economy, but may also have a negative effect on us. Our financial condition and results of operations could be materially and adversely affected by government control over capital investments or changes in tax regulations that are applicable to us. In addition, the PRC government has implemented in the past certain measures, including interest rate increases, to control the pace of economic growth. These measures may cause decreased economic activity. Any prolonged slowdown in the Chinese economy could lead to a reduction in demand for our services and consequently have a material adverse effect on our businesses, financial condition and results of operations.

***There are uncertainties regarding the interpretation and enforcement of PRC laws, rules and regulations.***

Most of our operations are conducted in the PRC, and are governed by PRC laws, rules and regulations. Our PRC subsidiaries are subject to laws, rules and regulations applicable to foreign investment in China. The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions may be cited for reference but have limited precedential value.

Table of Contents

China has not developed a fully integrated legal system, and recently enacted laws, rules and regulations may not sufficiently cover all aspects of economic activities in China or may be subject to a significant degree of interpretation by PRC regulatory agencies and courts. In particular, because these laws, rules and regulations are relatively new, and because of the limited number of published decisions and the non-precedential nature of these decisions, and because the laws, rules and regulations often give the relevant regulator significant discretion in how to enforce them, the interpretation and enforcement of these laws, rules and regulations involve uncertainties and can be inconsistent and unpredictable. Therefore, it is possible that our existing operations may be found not to be in full compliance with relevant laws and regulations in the future. In addition, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all, and which may have a retroactive effect. As a result, we may not be aware of our violation of these policies and rules until after the occurrence of the violation.

Any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversion of resources and management attention. Since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. These uncertainties may impede our ability to enforce the contracts we have entered into and could materially and adversely affect our business, financial condition and results of operations.

***PRC regulations regarding acquisitions impose significant regulatory approval and review requirements, which could make it more difficult for us to pursue growth through acquisitions.***

Under the PRC Anti-monopoly Law, companies undertaking certain investments and acquisitions relating to businesses in China must notify the anti-monopoly enforcement agency, in advance of any transaction where the parties' revenues in the China market exceed certain thresholds and the buyer would obtain control of, or decisive influence over, the other party. In addition, on August 8, 2006, six PRC regulatory agencies, including the MOFCOM, the SASAC, the STA, the SAIC, the CSRC, and the SAFE, jointly adopted the M&A Rules, which came into effect on September 8, 2006 and was amended on June 22, 2009. Under the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules, the approval of MOFCOM must be obtained in circumstances where overseas companies established or controlled by PRC enterprises or residents acquire domestic companies affiliated with PRC enterprises or residents. Applicable PRC laws, rules and regulations also require certain merger and acquisition transactions to be subject to security review.

Due to the level of our revenues, our proposed acquisition of control of, or decisive influence over, any company with revenues within China of more than RMB400 million in the year prior to any proposed acquisition would be subject to the SAMR merger control review. As a result of our size, many of the transactions we undertook and may undertake could be subject to SAMR merger review. Complying with the requirements of the relevant regulations to complete these transactions could be time-consuming, and any required approval processes, including approval from SAMR, may be uncertain and could delay or inhibit our ability to complete these transactions, which could affect our ability to expand our business maintain our market share or otherwise achieve the goals of our acquisition strategy.

According to the Regulations on Enterprise Outbound Investment issued by the NDRC in December 2017, which came into effect on March 1, 2018, we may also need to report to the NDRC relevant information on overseas investments with an amount of US$300 million or more in non-sensitive areas, and obtain the NDRC's approval for our overseas investments in sensitive areas, if any, before the closing of the investments. Accordingly, these regulations may restrict our ability to make investments in some regions and industries overseas, and may subject any proposed investments to additional delays and increased uncertainty, as well as heightened scrutiny, including after the investments have been made.

Table of Contents

**Share Repurchase Program**

In May 2019, our board of directors authorized a share repurchase program for an amount of up to US$6.0 billion over a period of two years. As of the date of this annual report, we have not made any repurchases under this share repurchase program.

**B.  Business Overview**

**Our Mission**

Our mission is to make it easy to do business anywhere.

Our founders started our company to champion small businesses, in the belief that the Internet would level the playing field by enabling small enterprises to leverage innovation and technology to grow and compete more effectively in domestic and global economies. We believe that concentrating on customer needs and solving their problems – whether those customers are consumers, merchants or enterprises – ultimately will lead to the best outcome for our business. We have developed a large digital economy that enables participants to create and share value on our platforms. Our decisions are guided by how they serve our mission over the long term, not by the pursuit of short-term gains.

**Our Vision**

We aim to build the future infrastructure of commerce. We envision that our customers will meet, work and live at Alibaba, and that we will be a good company that lasts for 102 years.

*Meet @ Alibaba.* We enable commercial and social interactions among hundreds of millions of users, between consumers and merchants, and among businesses every day.

*Work @ Alibaba.* We empower our customers with the fundamental infrastructure for commerce and new technology, so that they can build businesses and create value that can be shared among our digital economy participants.

*Live @ Alibaba.* We strive to expand our products and services to become central to the everyday lives of our customers.

As we continue to expand our businesses from commerce to cloud computing, digital media and entertainment, among other sectors, Alibaba has evolved into a digital economy that is unique, energetic and innovative. We have set five-year goals to continue to expand our globalization efforts, serve more than one billion Chinese consumers, and facilitate more than RMB10 trillion of consumption on our platforms. We believe the five-year goals put us closer to achieving our vision for 2036: serve 2 billion global consumers, enable 10 million businesses to be profitable and create 100 million jobs.

*102 Years.* We do not pursue size or power; we aspire to be a good company that will last for 102 years. For a company that was founded in 1999, lasting for 102 years means we will have spanned three centuries, an achievement that few companies can claim. Our culture, business models and systems are built to last, so that we can achieve sustainability in the long run.

**Our Values**

Our values are fundamental to the way we operate and how we recruit, evaluate and compensate our people.

Our six values are:

- *Customers first, employees second, shareholders third* – This reflects our choice of what's important, in order of priority. Only by creating sustained customer value can employees grow and shareholders achieve long-term benefit.

69

Table of Contents

- ***Trust makes everything simple*** – Trust is both the most precious and fragile thing in the world. The story of Alibaba is a story of building and cherishing trust. Complexity begets complexity, and simplicity breeds simplicity. Aliren (阿里人) are straightforward – what you see is what you get. With trust, there is no second-guessing or suspicion, and the result is simplicity and efficiency.

- ***Change is the only constant*** – Whether you change or not, the world is changing, our customers are changing and the competitive landscape is changing. We must face change with respect and humility. Otherwise, we will fail to see it, fail to respect it, fail to understand it and fail to catch up with it. Whether you change yourself or create change, both are the best kinds of change. Embracing change is the most unique part of our DNA.

- ***Today's best performance is tomorrow's baseline*** – In Alibaba's most challenging times, this spirit has helped us overcome difficulties and survive. In bad times, we know how to motivate ourselves; in good times, we dare to set "dream targets" (stretch goals). Face the future, or we regress. We must shoot for the moon, challenge ourselves, motivate ourselves and exceed ourselves.

- ***If not now, when? If not me, who?*** – This was a tagline in Alibaba's first job advertisement and became our first proverb. It is not a question, but a call of duty. This proverb symbolizes the sense of ownership that each Aliren must possess.

- ***Live seriously, work happily*** – Work is now, life is forever. What you do in your job is up to you, but you have responsibility to the ones who love you. Enjoy work as you enjoy life; treat life seriously as you do work. If you live with purpose, you will find reward. You make Alibaba different and make your loved ones proud. Everyone has their own view of work and life; we respect each person's choice. Whether you live by this value depends on how you live your life.

**Company Overview**

To fulfill our mission "to make it easy to do business anywhere," we enable businesses to transform the way they market, sell and operate and improve their efficiencies. We provide the technology infrastructure and marketing reach to help merchants, brands and other businesses to leverage the power of new technology to engage with their users and customers and operate in a more efficient way.

Our businesses are comprised of core commerce, cloud computing, digital media and entertainment, and innovation initiatives. In addition, Ant Group, an unconsolidated related party, provides payment services and offers financial services for consumers and merchants on our platforms. A digital economy has developed around our platforms and businesses that consists of consumers, merchants, brands, retailers, third-party service providers, strategic alliance partners and other businesses. The Alibaba digital economy generated RMB7,053 billion (US$1 trillion) in GMV in the twelve months ended March 31, 2020, which mainly included GMV of RMB6,589 billion (US$945 billion) transacted through our China retail marketplaces, as well as GMV transacted through our international retail marketplaces and local consumer services. The U.S. dollar amounts of annual GMV for fiscal year 2020 represent the sum of GMV in U.S. dollars for the quarters ended June 30, September 30 and December 31, 2019 and March 31, 2020, each converted from the RMB amounts at the average daily exchange rate for each relevant quarter.

Table of Contents

### China Retail Marketplaces

#### Taobao Marketplace

Taobao means "search for treasure" in Chinese. Through the Taobao app and the website at www.taobao.com, we have positioned Taobao Marketplace as the starting point and destination portal for the shopping journey. Consumers from both large cities and less developed areas come to Taobao Marketplace to enjoy an engaging, personalized shopping experience, optimized by our big data analytics and technology. Through highly relevant and engaging content and real-time updates from merchants, consumers can learn about products and new trends. They can also interact with each other and their favorite merchants and key opinion leaders. Taobao Marketplace has a broad offering of interactive features such as live broadcast and short-form videos. Taobao Marketplace is China's largest mobile commerce destination with a large and growing social community, in terms of GMV for the twelve months ended March 31, 2020, according to Analysys.

Taobao Marketplace provides a top-level traffic funnel that directs users to the various marketplaces, channels and features within our digital economy. For example, a search result on Taobao Marketplace displays listings not only from Taobao Marketplace merchants but also from Tmall merchants and brands, thereby generating traffic for Tmall. Through Taobao Marketplace, consumers can also access platforms that focus on offering products at attractive price points, such as Juhuasuan, which is a platform dedicated to offering value-for-money branded products. In addition to general merchandise, through Taobao Marketplace consumers can also enter Idle Fish as well as other products and consumer services platforms, which may also be accessed through their respective independent mobile apps.

Merchants on Taobao Marketplace are primarily individuals and small businesses. Merchants can create storefronts and listings on Taobao Marketplace free of charge. The escrow payment services provided by Alipay are free of charge to consumers and merchants unless payment is funded through a credit product such as a credit card, in which case Alipay charges a fee to the merchant based on the related bank fees charged to Alipay. Taobao Marketplace merchants can purchase P4P, in-feed marketing and display marketing services to direct traffic to their storefronts. In addition, merchants can acquire additional traffic from third-party marketing affiliates. Taobao Marketplace merchants can also pay for advanced storefront software that helps to upgrade, decorate and manage their online storefronts.

#### Tmall

Tmall caters to consumers' ever-growing demand for high-quality products and premium shopping experience. A large number of international and Chinese brands and retailers have established storefronts on Tmall. We have positioned Tmall as a trusted platform for consumers in China and overseas to buy both homegrown and international-branded products as well as products not available in traditional retail outlets. As the brands and offerings on Tmall continue to grow and diversify, we continue to improve our ability to accurately target and meet different consumer demands. In the twelve months ended March 31, 2020, Tmall was the largest third-party online and mobile commerce platform for brands and retailers in the world in terms of GMV, according to Analysys, and continues to grow quickly. Tmall online physical goods GMV, excluding unpaid orders, grew 23% year-over-year in the year ended March 31, 2020.

In 2009, Tmall pioneered the 11.11 global shopping festival. 11.11 has become the most important shopping event in China and we believe it generated the highest one-day retail sales volume in the world in 2019. On November 11, 2019, our China retail marketplaces, Lazada, AliExpress, Kaola, New Retail and consumer services platforms generated GMV of RMB268.4 billion settled through Alipay within a 24-hour period, reflecting the strength of our infrastructure and the scale of our entire digital economy in China and around the world.

Table of Contents

Tmall is the partner of choice for brands. Brands and retailers operate their own storefronts on the Tmall platform with unique brand identities and look and feel, accompanied by full control over their own branding and merchandising. As of March 31, 2020, there were over 250,000 brands and merchants on Tmall, including 80% of the consumer brands ranked in the Forbes Top 100 World's Most Valuable Brands for 2019. Because of the presence of a large number of global brands and the stringent standards required for merchants, brands and retailers to join and operate on Tmall, a presence on Tmall has become a validation of quality, allowing merchants, brands and retailers to take advantage of our significant traffic to extend and build brand awareness and customer engagement. Major international brands that have physical operations in China are well represented on Tmall.

Brands and retailers turn to Tmall not only for its broad user base, but also for its data insights and technology. Tmall has driven the digitalization and transformation of brands and retailers by enabling them to digitalize their operations, engage, acquire and retain consumers, increase brand recognition, innovate product offerings, manage supply chains and enhance operational efficiency. In particular, Tmall offers a variety of one-stop brand marketing and promotional products to help brands and retailers quickly acquire new users, enhance brand awareness and launch new products.

We also seek to build our mind-share among consumers to position Tmall as the premier shopping destination for everyday items, highlighting value and convenience. Apparel, consumer electronics and FMCG are among Tmall's most popular product categories, which continue to grow quickly. We have also strengthened consumer recognition of Tmall's value proposition in consumer electronics and home appliances through promotional events and strategic partnerships.

Like merchants on Taobao Marketplace, brands and merchants on Tmall have access to P4P, in-feed marketing and display marketing services as well as storefront software, which they can use to fully engineer, customize, and even code the software behind their storefronts.

### Branding and Monetization Platforms

#### Alimama

Alimama is our monetization platform. Using data technology, this platform matches the marketing demands of merchants, brands and retailers with the media resources on our own platforms and third-party properties, and enables us to monetize our core commerce, digital media and entertainment and other businesses. The platform supports P4P marketing services based on keyword search rankings, in-feed marketing targeting different groups of consumers, or display marketing in fixed positions that are bid on through auctions, as well as cost per thousand impression (CPM)-based, time-based marketing formats, or individual campaigns at fixed cost, through the display of photos, graphics, videos and live streaming.

The ranking of P4P search results on our core commerce platforms is based upon proprietary algorithms that take into account the bid price of keywords, the popularity of an item or merchant, customer feedback ranking of merchants and quality of product displays. Our in-feed marketing takes these factors into consideration, along with other insights, to further deliver an engaging and relevant content discovery process and shopping experience for our consumers. For display marketing, the Alimama platform delivers marketing messages based on data insights generated across our digital economy. The relevance and comprehensiveness of data based on commercial activity and user activity in our digital economy provide a unique advantage for Alimama to deliver the most relevant information to users, which in turn enables merchants to improve their marketing and operational efficiency.

Alimama also has an affiliate marketing program that places marketing displays on third-party apps and websites, thereby enabling marketers, if they so choose, to extend their marketing and promotional reach to properties and users beyond our own platforms. Our affiliate marketing program not only provides additional traffic to our core commerce platforms, but also generates revenue to us.

84

Table of Contents

The revenue model of our China commerce retail business is primarily performance-based marketing services that are typically set by market-based bidding systems. Revenue from this model primarily consists of customer management revenue, commission and other revenue. The following table sets forth the revenue from our China commerce retail business, in absolute amounts and as percentages of our total revenue, for the fiscal years presented:

| | Year ended March 31, | | | | | | |
| | 2018 | | 2019 | | 2020 | | |
| | RMB | % of revenue | RMB | % of revenue | RMB | US$ | % of revenue |
| | (in millions, except percentages) | | | | | | |
|---|---|---|---|---|---|---|---|
| China commerce retail | | | | | | | |
| Customer management | 114,285 | 46% | 145,684 | 39% | 175,396 | 24,771 | 34% |
| Commission | 46,525 | 19% | 61,847 | 16% | 71,086 | 10,039 | 14% |
| Others | 15,749 | 6% | 40,084 | 11% | 86,268 | 12,183 | 17% |
| Total | 176,559 | 71% | 247,615 | 66% | 332,750 | 46,993 | 65% |

*Customer management*

We derive a majority of our China commerce retail revenue from customer management, which primarily consists of:

- *P4P marketing services*, where merchants primarily bid for keywords that match product or service listings appearing in search results through our online auction system on a cost-per-click, or CPC, basis. Whether and where the listing will be displayed, and the corresponding prices for the display are determined by the algorithm of our online auction system based on a number of factors with various weights and through a market-based bidding mechanism.

- *In-feed marketing services*, where merchants primarily bid to market to groups of consumers with similar profiles that match product or service listings appearing in browser results through our online auction system on a cost-per-click, or CPC, basis. Whether and where the listing will be displayed, and the corresponding prices for the display are determined by the algorithm of our online auction system based on a number of factors with various weights and through a market-based bidding mechanism.

- *Display marketing services*, where merchants bid for display positions at fixed prices or prices established by a market-based bidding system on a cost-per-thousand impression, or CPM, basis.

In addition to the above-mentioned P4P marketing services, in-feed marketing services and display marketing services directly provided on our marketplaces, we also provide these services through collaboration with other third-party marketing affiliates. These third parties are primarily third-party online media, such as search engines, news feeds and video entertainment websites and mobile apps. These third-party online media enter into agreements with us to connect their designated online resources to our online auction system so that the merchants' listings or other marketing information can be displayed on those third-party online resources.

- *Taobaoke program*, where we collaborate with shopping guide platforms, medium- and small-sized websites and mobile apps, individuals and other third parties, collectively "Taobaokes," to offer marketing services. Taobaokes display the marketing information of our merchants on their media which facilitate our merchants to market and transact. Merchants pay commissions to the Taobaokes based on a percentage of transaction value generated from users under the Taobaoke program. Commissions to the Taobaokes are set by the merchants.

Table of Contents

*Commissions on transactions*

In addition to purchasing customer management services, merchants also pay a commission based on a percentage of transaction value generated on Tmall and certain other marketplaces. The commission percentages typically range from 0.3% to 5.0% depending on the product category.

*Others*

Other revenue from our China commerce retail is primarily generated by our New Retail and direct sales businesses, mainly Freshippo, Tmall Supermarket, direct import and Intime, and primarily consists of revenue from product sales, commissions on transactions and software service fees.

### China Commerce Wholesale

We generate revenue from our China commerce wholesale business primarily through membership fees, value-added services and customer management services. Revenue from membership fees are primarily fixed annual fees from the sale of China TrustPass memberships for paying members to reach customers, provide quotations and transact. Paying members may also purchase additional value-added services, such as premium data analytics and upgraded storefront management tools, the prices of which are determined based on the types and duration of the value-added services. Revenue from customer management services is primarily derived from P4P marketing services.

### International Commerce Retail

We generate revenue from our international commerce retail businesses primarily through direct sales, commissions, logistics and customer management services from Lazada and AliExpress. Merchants pay a commission based on a percentage of the transaction value they generate, mainly on AliExpress. The commissions on AliExpress are typically 5% to 8% of the transaction value. In addition, we generate revenue from logistics services provided by Lazada and customer management services, primarily from AliExpress's collaboration with third-party websites and mobile apps.

### International Commerce Wholesale

We generate revenue from our wholesale commerce – cross-border and global primarily through membership fees, value-added services and customer management services. Revenue from membership fees are primarily fixed annual fees from the sale of Gold Supplier memberships for paying members to reach customers, provide quotations and transact. Revenue from value-added services primarily consists of fees for services such as customs clearance services, the prices of which are determined based on the types, usage and duration of the value-added services. Revenue from customer management services is primarily derived from P4P marketing services.

### Logistics Services

We charge merchants and third-party logistics service providers fees based on the number of contracted orders completed and other value-added services we provide.

### Local Consumer Services

We generate revenue from local consumer services primarily through platform commissions and on-demand delivery service fees by Ele.me.

### Cloud Computing

We primarily generate cloud computing revenue from enterprise customers based on the duration and usage of the services.

133

Table of Contents

*Nomination and Election of Partners*

The Alibaba Partnership elects new partners annually after a nomination process whereby existing partners propose candidates to the partnership committee, or the partnership committee, as described below. The partnership committee reviews the nominations and determines whether the nomination of a candidate will be proposed to the entire partnership for election. Election of new partners requires the approval of at least 75% of all of the partners.

To be eligible for election, a partner candidate must have demonstrated the following attributes:

- a high standard of personal character and integrity;

- continued service with Alibaba Group, our affiliates and/or certain companies with which we have a significant relationship, such as Ant Group, for not less than five years;

- a track record of contribution to the business of Alibaba Group; and

- being a "culture carrier" who shows a consistent commitment to, and traits and actions consonant with, our mission, vision and values.

We believe the criteria and process of the Alibaba Partnership applicable to the election of new partners, as described above, promote accountability among the partners as well as to our customers, employees and shareholders. In order to align the interests of partners with the interests of our shareholders, we require that each partner maintain a meaningful level of equity interests in our company during his or her tenure as a partner. Since a partner nominee must have been our employee or an employee of one of our related companies or affiliates for at least five years, as of the time he or she becomes a partner, he or she will typically already own or have been awarded a personally meaningful level of equity interest in our company through our equity incentive and share purchase or investment plans.

*Duties of Partners*

The main duty of partners in their capacity as partners is to embody and promote our mission, vision and values. We expect partners to be evangelists for our mission, vision and values, both within our organization and externally to customers, business partners and other participants in our digital economy.

176

Table of Contents

*Partnership Committee*

The partnership committee must consist of at least five but no more than seven partners, including partnership committee continuity members, and is currently comprised of Jack Ma, Joe Tsai, Daniel Zhang, Lucy Peng, Eric Jing and Jian Wang. The partnership committee is responsible for administering partner elections and allocating the relevant portion of the annual cash bonus pool for all partner members of management, with any amounts payable to partners who are our executive officers or directors or members of the partnership committee subject to approval of the compensation committee of our board of directors. Either one or two partners may be designated as partnership committee continuity partners, and currently the partnership committee continuity members consist of Jack Ma and Joe Tsai. Other than partnership committee continuity members, the partnership committee members serve for a term of five years and may serve multiple terms. Elections of partnership committee members are held once every five years. Partnership committee continuity members are not subject to election, and may serve until they cease to be partners, retire from the partnership committee or are unable to discharge duties as partnership committee members as a result of illness or permanent incapacity. A replacement partnership committee continuity partner is either designated by a retiring or, as the case may be, the remaining, partnership committee continuity member. Prior to each election, the partnership committee will nominate a number of partners equal to the number of partnership committee members that will serve in the next partnership committee term plus three additional nominees less the number of the serving partnership committee continuity members. Each partner votes for a number of nominees equal to the number of partnership committee members that will serve in the next partnership committee term less the number of the serving partnership committee continuity members, and all except the three nominees who receive the least votes from the partners are elected to the partnership committee.

*Director Nomination and Appointment Rights*

Pursuant to our Articles of Association, the Alibaba Partnership has the exclusive right to nominate or, in limited situations, appoint up to a simple majority of the members of our board of directors.

The election of each director nominee of the Alibaba Partnership will be subject to the director nominee receiving a majority vote from our shareholders voting at an annual general meeting of shareholders. If an Alibaba Partnership director nominee is not elected by our shareholders or after election departs our board of directors for any reason, the Alibaba Partnership has the right to appoint a different person to serve as an interim director of the class in which the vacancy exists until our next scheduled annual general meeting of shareholders. At the next scheduled annual general meeting of shareholders, the appointed interim director or a replacement Alibaba Partnership director nominee (other than the original nominee) will stand for election for the remainder of the term of the class of directors to which the original nominee would have belonged.

If at any time our board of directors consists of less than a simple majority of directors nominated or appointed by the Alibaba Partnership for any reason, including because a director previously nominated by the Alibaba Partnership ceases to be a member of our board of directors or because the Alibaba Partnership had previously not exercised its right to nominate or appoint a simple majority of our board of directors, the Alibaba Partnership will be entitled (in its sole discretion and without the need for any additional shareholder action) to appoint such number of additional directors to the board as necessary to ensure that the directors nominated or appointed by the Alibaba Partnership comprise a simple majority of our board of directors.

In determining the Alibaba Partnership director nominees who will stand for election to our board, the partnership committee will propose director nominees who will be voted on by all of the partners, and those nominees who receive a simple majority of the votes of the partners will be selected for these purposes. The director nominees of the Alibaba Partnership may be partners of the Alibaba Partnership or other qualified individuals who are not affiliated with the Alibaba Partnership.

177

Table of Contents

The Alibaba Partnership's right to nominate or appoint up to a simple majority of our directors is conditioned on the Alibaba Partnership being governed by the partnership agreement in effect as of the completion of our initial public offering in September 2014, or as may be amended in accordance with its terms from time to time. Any amendment to the provisions of the partnership agreement relating to the purpose of the partnership, or to the manner in which the Alibaba Partnership exercises its right to nominate a simple majority of our directors, will be subject to the approval of the majority of our directors who are not nominees or appointees of the Alibaba Partnership and are "independent directors" within the meaning of Section 303A of the NYSE Listed Company Manual. The provisions relating to nomination rights and procedures described above are incorporated in our Articles. Pursuant to our Articles, the Alibaba Partnership's nomination rights and related provisions of our Articles may only be changed upon the vote of shareholders representing 95% of the votes present in person or by proxy at a general meeting of shareholders.

Our board of directors currently consists of ten members, and five of these directors are Alibaba Partnership nominees. Pursuant to its right to nominate or appoint directors as discussed above, the Alibaba Partnership is entitled to nominate or appoint one additional director to our board, which would increase the total number of directors to eleven. We have entered into a voting agreement pursuant to which both SoftBank and Altaba have agreed to vote their shares in favor of the Alibaba Partnership director nominees at each annual general shareholders meeting so long as SoftBank owns at least 15% of our outstanding ordinary shares. See "Item 7. Major Shareholders and Related Party Transactions — B. Related Party Transactions — Transactions and Agreements with SoftBank — Voting Agreement."

178

Table of Contents

*Current Partners*

The following table sets forth the names, in alphabetical order by surname, and other information regarding the current partners of the Alibaba Partnership as of the date of this annual report.

| Name | Age | Gender | Year Joined Alibaba Group | Current position with Alibaba Group or related/affiliated companies |
|---|---|---|---|---|
| Jingxian CAI (蔡景现) | 43 | M | 2000 | Senior Researcher |
| Li CHENG (程立) | 45 | M | 2005 | Chief Technology Officer |
| Trudy Shan DAI (戴珊) | 44 | F | 1999 | President, B2B Business |
| Luyuan FAN (樊路远) | 47 | M | 2007 | President, Digital Media and Entertainment Group |
| Yongxin FANG (方永新) | 46 | M | 2000 | Senior Director, DingTalk |
| Felix Xi HU (胡喜) | 39 | M | 2007 | Vice President, Ant Group |
| Simon Xiaoming HU (胡晓明) | 50 | M | 2005 | Director and Chief Executive Officer, Ant Group |
| Jane Fang JIANG (蒋芳) | 46 | F | 1999 | Deputy Chief People Officer |
| Jiangwei JIANG (蒋江伟) | 38 | M | 2008 | Senior Researcher |
| Eric Xiandong JING (井贤栋) † | 47 | M | 2007 | Executive Chairman, Ant Group |
| Zhenfei LIU (刘振飞) | 48 | M | 2006 | President, Amap |
| Jack Yun MA (马云)† | 55 | M | 1999 | Founder and Director |
| Xingjun NI (倪行军) | 43 | M | 2003 | Chief Technology Officer, Ant Group |
| Lucy Lei PENG (彭蕾)† | 46 | F | 1999 | Director, Ant Group |
| Sabrina Yijie PENG (彭翼捷) | 41 | F | 2000 | Chief Marketing Officer, Ant Group |
| Xiaofeng SHAO (邵晓锋) | 54 | M | 2005 | Secretary-General |
| Jie SONG (宋洁) | 41 | F | 2000 | Vice President |
| Lijun SUN (孙利军) | 43 | M | 2002 | General Manager of Social Responsibility |
| Judy Wenhong TONG (童文红) | 49 | F | 2000 | Chief People Officer |
| Joseph C. TSAI (蔡崇信)† | 56 | M | 1999 | Executive Vice Chairman |
| Jian WANG (王坚)† | 57 | M | 2008 | Chairman, Technology Steering Committee |
| Lei WANG (王磊) | 40 | M | 2003 | President, Local Services |
| Shuai WANG (王帅) | 45 | M | 2003 | Chairman, Marketing and Public Relations Committee |
| Winnie Jia WEN (闻佳) | 43 | F | 2007 | Vice President, Office of the Chairman |
| Sophie Minzhi WU (吴敏芝) | 44 | F | 2000 | Chief Customer Officer |
| Maggie Wei WU (武卫) | 52 | F | 2007 | Chief Financial Officer |
| Eddie Yongming WU (吴泳铭) | 45 | M | 1999 | Senior Vice President |
| Zeming WU (吴泽明) | 40 | M | 2004 | President, New Retail Technology |
| Sara Siying YU (俞思瑛) | 45 | F | 2005 | General Counsel |
| Yongfu YU (俞永福) | 43 | M | 2014 | Chairman, Amap |
| Sam Songbai ZENG (曾松柏) | 53 | M | 2012 | Chief People Officer, Ant Group |
| Jeff Jianfeng ZHANG (张建锋) | 47 | M | 2004 | President, Alibaba Cloud Intelligence |
| Daniel Yong ZHANG (张勇)† | 48 | M | 2007 | Chairman and Chief Executive Officer |
| Yu ZHANG (张宇) | 50 | F | 2004 | Vice President |
| Angel Ying ZHAO (赵颖) | 46 | F | 2005 | President of International Business, Ant Group |
| Jessie Junfang ZHENG (郑俊芳) | 46 | F | 2010 | Chief Risk Officer and Chief Platform Governance Officer |

†      Member of the partnership committee.

Table of Contents

*Committee Observer*

In accordance with our Articles and the voting agreement entered into among us, Jack Ma, Joe Tsai, SoftBank and Altaba, we have agreed that the director nominated by SoftBank is entitled to receive notices and materials for all meetings of our committees and to join as an observer in meetings of the audit committee, the compensation committee, the nominating and corporate governance committee and/or our other board committees we may establish upon notice to the relevant committee.

**D.  Employees**

As of March 31, 2018, 2019 and 2020, we had a total of 66,421, 101,958 and 117,600 full-time employees, respectively. The increase in our employees was primarily due to our recent acquisitions and consolidation of certain businesses, as well as our organic business growth. A substantial majority of our employees are based in China.

We believe that we have a good working relationship with our employees and we have not experienced any significant labor disputes.

**E.  Share Ownership**

For information regarding the share ownership of our directors and officers, see "Item 7. Major Shareholders and Related Party Transactions — A. Major Shareholders." For information as to stock options granted to our directors, executive officers and other employees, see "Item 6. Directors, Senior Management and Employees — B. Compensation — Equity Incentive Plans."

**ITEM 7.    MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS**

**A.  Major Shareholders**

The following table sets forth information with respect to beneficial ownership of our ordinary shares as of July 2, 2020, except otherwise noted, by:

- each of our directors and executive officers;

- our directors and executive officers as a group; and

- each person known to us to beneficially own 5% or more of our ordinary shares.

190

Table of Contents

Beneficial ownership is determined in accordance with the rules and regulations of the SEC and includes the power to direct the voting or the disposition of the securities or to receive the economic benefit of the ownership of the securities. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included Shares underlying the ADSs and Shares in CCASS held by the person, as well as Shares that the person has the right to acquire within 60 days of this annual report, including through the vesting of RSUs and the exercise of any option, or other right or interest. These Shares, however, are not included in the computation of the percentage ownership of any other person. The calculations of percentage ownership in the table below are based on 21,637,305,224 ordinary shares outstanding as of July 2, 2020.

| Name | Ordinary shares beneficially owned | Percent |
|---|---|---|
| Directors and Executive Officers: | | |
| Daniel Yong ZHANG | * | * |
| Jack Yun MA[1] | 1,043,831,112 | 4.8% |
| Joseph C. TSAI[2] | 347,617,584 | 1.6% |
| J. Michael EVANS | * | * |
| Eric Xiandong JING | * | * |
| Chee Hwa TUNG | * | * |
| Walter Teh Ming KWAUK | * | * |
| Jerry YANG | * | * |
| E. Börje EKHOLM | * | * |
| Wan Ling MARTELLO | * | * |
| Maggie Wei WU | * | * |
| Judy Wenhong TONG | * | * |
| Li CHENG | * | * |
| Jeff Jianfeng ZHANG | * | * |
| Sophie Minzhi WU | * | * |
| Sara Siying YU | * | * |
| Jessie Junfang ZHENG | * | * |
| Chris Pen-hung TUNG | * | * |
| Trudy Shan DAI | * | * |
| Fan JIANG | * | * |
| Luyuan FAN | * | * |
| All directors and executive officers as a group | 1,596,978,496 | 7.4% |
| Greater than 5% Beneficial Owners: | | |
| SoftBank[3] | 5,390,066,968 | 24.9% |

Notes:

\*      This person beneficially owns less than 1% of our outstanding ordinary shares.

191

Table of Contents

(1)     Represents (i) 3,712,256 ordinary shares held directly by Jack Ma, (ii) 280,000,000 ordinary shares held by APN Ltd., a Cayman Islands company with its registered address at Fourth Floor, One Capital Place, P.O. Box 847, Grand Cayman, KY1-1103, Cayman Islands, in which Jack holds a 70% equity interest, which ordinary shares, together with Jack's equity interest in APN Ltd., have been pledged to us to support certain obligations under the SAPA, (iii) 68,847,192 ordinary shares held by Yun Capital Limited, a British Virgin Islands company with its registered address at Woodbourne Hall, Road Town, Tortola, British Virgin Islands, which has granted Jack a revocable proxy over these shares and which is wholly-owned by The Jack Ma Philanthropic Foundation, (iv) 68,847,192 ordinary shares held by Ying Capital Limited, a British Virgin Islands company with its registered address at Woodbourne Hall, Road Town, Tortola, British Virgin Islands, which has granted Jack a revocable proxy over these shares and which is wholly owned by The Jack Ma Philanthropic Foundation, (v) 340,131,624 ordinary shares held by JC Properties Limited, a British Virgin Islands company with its registered address at Woodbourne Hall, Road Town Tortola, British Virgin Islands, which is wholly-owned by a trust the beneficiaries of which are Jack and his family and (vi) 282,292,848 ordinary shares held by JSP Investment Limited, a British Virgin Islands company with the address of P.O. Box 916, Woodbourne Hall, Road Town, Tortola, British Virgin Islands, which is wholly-owned by a trust the beneficiaries of which are Jack's family. Excludes shares held by SoftBank representing SoftBank's share ownership in excess of 30% of our outstanding ordinary shares as of the most recent record date with respect to any shareholders action, over which Jack and Joe will share voting power pursuant to the voting agreement that we, Jack, Joe, SoftBank and Altaba entered into as described in "Item 7. Major Shareholders and Related Party Transactions — B. Related Party Transactions — Transactions and Agreements with SoftBank — Voting Agreement." Jack has historically voted the ordinary shares held by the family trusts and he is deemed a beneficial owner of the ordinary shares held by the family trusts. Jack does not have any pecuniary interests in the 137,694,384 ordinary shares held by Yun Capital Limited and Ying Capital Limited. Jack's business address is 969 West Wen Yi Road, Yu Hang District, Hangzhou 311121, the People's Republic of China.

(2)     Represents (i) 34,400 ordinary shares held directly by Joe Tsai, (ii) 120,000,000 ordinary shares held by APN Ltd., in which Joe holds a 30% equity interest and serves as a director, which ordinary shares, together with Joe's equity interest in APN Ltd., have been pledged to us to support certain obligations under the SAPA, (iii) 32,658,344 ordinary shares held by Joe and Clara Tsai Foundation Limited, a company incorporated under the law of the Island of Guernsey with its registered address at Helvetia Court, South Esplanade, St. Peter Port, Guernsey GY1 4EE, that has granted Joe a revocable proxy over these shares and which is wholly-owned by Joe and Clara Tsai Foundation, (iv) 153,385,672 ordinary shares held by Parufam Limited, a Bahamas corporation with its registered address at Suite 200B, 2nd Floor, Centre of Commerce, One Bay Street, P.O. Box N-3944, Nassau, Bahamas, and over which, Joe, as a director of Parufam Limited, has been delegated sole voting and disposition power and (v) 41,539,168 ordinary shares held by PMH Holding Limited, a British Virgin Islands corporation with its registered address at Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands, and over which, Joe, as sole director of PMH Holding Limited, has voting and dispositive power. Excludes shares held by SoftBank representing SoftBank's share ownership in excess of 30% of our outstanding ordinary shares as of the most recent record date with respect to any shareholders action, over which Joe and Jack will share voting power pursuant to the voting agreement that we, Jack, Joe, SoftBank and Altaba have entered into as described in "Item 7. Major Shareholders and Related Party Transactions — B. Related Party Transactions — Transactions and Agreements with SoftBank — Voting Agreement." Joe does not have any pecuniary interests in the 32,658,344 ordinary shares held by Joe and Clara Tsai Foundation Limited. Joe's business address is 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong S.A.R., the People's Republic of China.

(3)     Represents (i) 2,558,316,568 ordinary shares owned by SoftBank Group Corp. with its registered office at 1-9-1 Higashi-Shimbashi, Minato-ku, Tokyo 105-7303, Japan, (ii) 102,590,400 ordinary shares owned by West Raptor Holdings, LLC with its registered office at 251 Little Falls Drive, Wilmington, New Castle County, DE 19808, (iii) 1,360,000,000 ordinary shares owned by Skywalk Finance GK with its registered office at 1-9-1 Higashi-Shimbashi, Minato-ku, Tokyo 105-7303, Japan, (iv) 532,468,840 ordinary shares owned by Skybridge LLC with its registered office at 103 Foulk Road, Suite 202, Wilmington, Delaware 19803, (v) 108,160,000 ordinary shares owned by Skylark 2020 Holdings Limited with its registered office at Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands, (vi) 288,000,000 ordinary shares owned by West Raptor Holdings 2, LLC with its registered office at 103 Foulk Road, Suite 202, Wilmington, Delaware 19803, and (vii) 440,531,160 ordinary shares owned by SoftBank Group Japan Corporation with its registered office at 1-9-1 Higashi-Shimbashi, Minato-ku, Tokyo 105-7303, Japan.

We have one class of ordinary shares, and each holder of our ordinary shares is entitled to one vote per share.

As of July 2, 2020, 21,637,305,224 of our ordinary shares were outstanding. To our knowledge, 13,223,981,592 ordinary shares, representing approximately 61% of our total outstanding shares, were held by 189 record shareholders with registered addresses in the United States, including brokers and banks that hold securities in street name on behalf of their customers. We are not aware of any arrangement that may at a subsequent date, result in a change of control of our company.

192

Table of Contents

**B.   Related Party Transactions**

**Our Related Party Transaction Policy**

In order to prevent risks of conflicts of interest or the appearance of conflicts of interest, all of our directors and employees are subject to our code of business conduct and other policies which require, among other things, that any potential transaction between us and an employee or director, their relatives and closely connected persons and certain entities in which they, their relatives or closely connected persons have an interest be approved in writing by an appropriate supervisor or compliance officer.

We have also adopted a related party transaction policy to which all of our directors, senior management and other key management personnel, all close family members (as defined in the policy) of the foregoing individuals, Ant Group and its subsidiaries as well as the Alibaba Partnership and certain other related entities are subject. Related party transactions defined under this policy, as required by Form 20-F, include transactions with our directors, senior management and major shareholders and their affiliates, as well as transactions with parties that do not pose risks of conflicts of interest, such as transactions with our investee companies that are not otherwise affiliated with any of the foregoing individuals. This policy is intended to supplement the procedures set forth in our code of business conduct and our other corporate governance policies and does not exempt any person from more restrictive provisions that may exist in our existing procedures and policies.

This related party transaction policy provides, among other things, that, unless otherwise pre-approved by our board of directors:

- each related party transaction, and any material amendment or modification to a related party transaction, shall be adequately disclosed to, and reviewed and approved or ratified by, our audit committee or any committee composed solely of disinterested independent directors or by the disinterested members of such committee; and

- any employment relationship or similar transaction involving our directors or senior management and any related compensation shall be approved by the disinterested members of our compensation committee or recommended by the disinterested members of the compensation committee to our board for its approval.

Our related party transaction policy, code of business conduct and our other corporate governance policies are subject to periodic review and revision by our board.

**Summary of Major Related Party Transactions**

As disclosed in greater detail in the following paragraphs, the table below summarizes the major related party transactions in fiscal years 2018, 2019 and 2020.

| Related Party | Transaction Description |
|---|---|
| SoftBank | • Voting agreement among us, Jack Ma, Joe Tsai, SoftBank and Altaba which, among others, provides that SoftBank, Altaba, Jack Ma and Joe Tsai will vote their shares in favor of the Alibaba Partnership director nominees, and provides SoftBank with the right to nominate a director. |
| | • Various investments involving SoftBank. |
| Ant Group and its affiliates | • Alipay provides payment and escrow services to us. |
| | • The SAPA, which was amended in 2018 and 2019, provides a series of transactions, including our acquisition of the 33% equity interest in Ant Group. |

193

Table of Contents

| Related Party | Transaction Description |
|---|---|
| | ● The 2014 IPLA, an amendment to which was subsequently entered into in 2019 upon our receipt of the 33% equity interest in Ant Group, or the Amended IPLA, provides that we and our subsidiaries license to Ant Group and/or its subsidiaries certain intellectual property rights and provide various software technology services, and, prior to our receipt of the 33% equity interest in Ant Group, Ant Group paid us profit share payments; pursuant to the SAPA, a cross-license agreement was entered into in September 2019 upon our receipt of the 33% equity interest in Ant Group. |
| | ● We, Ant Group, our controlled affiliates and certain other affiliates, contribute all data collected or generated (subject to applicable law, industry rules and contractual requirements) to a data platform that we operate and maintain, and to which all of the full data sharing participants will have access. |
| | ● We and Ant Group cooperate with each other with respect to the enforcement of each other's rights and the provision of certain financial services to our customers and merchants in connection with the SME loan business. |
| | ● We granted Ant Group a license for it to continue to use certain trademarks and domain names. |
| | ● We and Ant Group provide certain administrative and support services to each other and our respective affiliates. |
| | ● We and Ant Group provide various other services to each other. |
| | ● Various investments involving Ant Group. |
| | ● We have awarded RSUs and granted options to acquire our ordinary shares to employees of Ant Group; Junhan, a major equity holder of Ant Group has granted share-based awards linked to the valuation of Ant Group to certain of our employees; Ant Group, has granted RSUs and share appreciation rights tied to the value of Ant Group to certain of our employees. |
| | ● In June 2020, we, Ant Group and Junhan entered into equity-based awards grant and settlement agreements pursuant to which the parties will settle with each other the cost associated with the equity-based awards granted to each other's employees. |
| Alibaba Pictures | ● We subscribed for newly issued ordinary shares of Alibaba Pictures in March 2019 and it became our consolidated subsidiary upon the completion of the transaction. |
| Jack Ma, Joe Tsai, and J. Michael Evans | ● We agreed to assume the cost of maintenance, crew and operation of their respective personal aircrafts of these directors and officers where the cost is allocated for business purposes. |
| Investment funds affiliated with Jack Ma | ● Various investments involving the Yunfeng Funds, investment funds affiliated with Jack Ma. |

194

Table of Contents

| Related Party | Transaction Description |
|---|---|
| Jack Ma | ● Jack Ma made certain commitments to us relating to his interest in Ant Group, the Yunfeng Funds and other entities. |
| Cainiao Network | Before Cainiao Network became our consolidated subsidiary in October 2017:<br><br>● Cainiao Network provided logistics services to us; and<br><br>● We provided Cainiao Network with various administrative and support services. |
| Investees | ● We have commercial arrangements with certain of our investees and other related parties to provide and receive certain cloud computing, marketing, traffic acquisition, logistics and other services.<br><br>● We extended loans to and provided a guarantee for certain of our investees.<br><br>● We have made co-investments with certain of our investees. |
| Variable interest entities and variable interest entity equity holders | ● We operate certain of our businesses in China through contractual arrangements between our wholly-owned entities, our variable interest entities and variable interest entity equity holders. |
| Directors and executive officers | ● We entered into indemnification agreements with our directors and executive officers.<br><br>● We entered into employment agreements with our directors and executive officers.<br><br>● We grant equity incentive awards to our directors and executive officers. |

The following table summarizes the services fees paid to certain related parties in fiscal years 2018, 2019 and 2020.

| | | Year Ended March 31, | | | |
|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | |
| Related Party | Transaction | RMB | RMB | RMB | US$ |
| | | (in millions) | | | |
| Ant Group and its affiliates | Payment processing and escrow services fee | 6,295 | 8,252 | 8,723 | 1,232 |
| | Administrative and support services | 84 | 80 | 124 | 18 |
| | Marketplace software technology services fee and others [1] | 1,810 | 1,248 | 2,619 | 370 |
| Cainiao Network | Logistics service fee | 3,437 | N/A [2] | N/A [2] | N/A [2] |

Notes:

(1) Marketplace software technology services fee and others primarily relates to marketing support services in connection with our retail marketplaces.

(2) In October 2017, our equity interest in Cainiao Network increased to approximately 51% and it became one of our consolidated subsidiaries. We currently own approximately 66% of the equity interest in Cainiao Network.

195

Table of Contents

Certain of our investees have entered into commercial arrangements with us in connection with certain logistics services they provide to us. In fiscal years 2018, 2019 and 2020, we incurred costs and expenses of RMB5,608 million, RMB12,933 million and RMB8,265 million (US$1,167 million), respectively, for these logistics services. In fiscal year 2020, these costs and expenses accounted for 2% of our costs and expenses.

Certain of our investees have also entered into commercial arrangements with us in connection with certain marketing services they provide to our business. In fiscal years 2018, 2019 and 2020, we incurred costs and expenses of RMB760 million, RMB907 million and RMB1,146 million (US$162 million), respectively, for these marketing services. In fiscal year 2020, these costs and expenses accounted for 0.3% of our costs and expenses.

Other than the foregoing, the aggregate service fees we paid to other related parties accounted for less than 1% of total costs and expenses in each of fiscal years 2018, 2019 and 2020.

The following table summarizes the services fees received from related parties in fiscal year 2018, 2019 and 2020.

| Related Party | Transaction | Year Ended March 31, | | | |
| | | 2018 | 2019 | 2020 | |
| | | RMB | RMB | RMB | US$ |
| | | (in millions) | | | |
| Ant Group | Software technology services fee and license fee | 3,444 | 517 | 3,835 | 542 |
| | Reimbursement payment for software technology services fee | 37 | 106 | — | — |
| Ant Group and its affiliates | Annual fee for SME loan business | 956 | 954 | 954 | 135 |
| | Administrative and support services | 676 | 1,017 | 1,224 | 173 |
| | Cloud computing services fee | 482 | 761 | 1,872 | 264 |
| | Marketplace software technology services fee and others | 1,026 | 1,489 | 2,075 | 293 |
| Cainiao Network | Administrative and support service fee | 123 | N/A [1] | N/A [1] | N/A [1] |

Note:

(1)     In October 2017, our equity interest in Cainiao Network increased to approximately 51% and it became one of our consolidated subsidiaries. We currently own approximately 66% of the equity interest in Cainiao Network.

We have entered into commercial arrangements with certain of our investees related to logistics services. In fiscal years 2018, 2019 and 2020, we recognized revenue of RMB72 million, RMB261 million and RMB1,400 million (US$198 million), respectively, in connection with these services. In fiscal year 2020, this revenue accounted for 0.3% of our revenue.

We have also entered into commercial arrangement with certain of our investees related to cloud computing services. In fiscal years 2018, 2019 and 2020, we recognized revenue of RMB689 million, RMB1,111 million and RMB1,548 million (US$219 million), respectively, for these cloud computing services. In fiscal year 2020, this revenue accounted for 0.3% of our revenue.

Other than the related party transactions summarized above, the aggregate payments we received from other related parties accounted for less than 1% of total revenue in each of the fiscal years 2018, 2019 and 2020.

Table of Contents

**Transactions and Agreements with SoftBank**

*Voting Agreement*

We have entered into a voting agreement with Jack Ma, Joe Tsai, SoftBank and Altaba, which provides SoftBank with the right to nominate one director to our board of directors who will, subject to certain conditions, have the right to receive notices and materials for all meetings of our committees and to join these meetings as an observer, which rights are also reflected in our Memorandum and Articles of Association. These nomination rights will terminate when SoftBank's shareholding declines below 15% of our outstanding shares. The voting agreement also contains provisions to the effect that:

- SoftBank agrees to:

  - vote its shares in favor of the election of the Alibaba Partnership's director nominees at each annual general shareholders meeting until SoftBank's shareholding declines below 15% of our outstanding shares, and

  - grant the voting power of any portion of its shareholdings exceeding 30% of our outstanding ordinary shares to Jack and Joe by proxy;

- Jack and Joe will vote their shares and any other shares over which they hold voting rights in favor of the election of the SoftBank director nominee at each annual general shareholders meeting in which the SoftBank nominee stands for election until SoftBank's shareholding declines below 15% of our outstanding ordinary shares;

- Altaba agrees to:

  - vote its shares in favor of the election of all of the Alibaba Partnership's director nominees and the SoftBank director nominee, if so standing for election, at each annual general shareholders meeting until SoftBank's shareholding declines below 15% of our outstanding shares, and

  - grant the voting power over any shares it owns, up to 972 million of our ordinary shares, to Jack and Joe by proxy;

- each party to the voting agreement will use its commercially reasonable efforts to cause any other person with whom it jointly files a statement (or an amendment to a statement) on Schedule 13D or Schedule 13G pursuant to the U.S. Exchange Act to become a party to the voting agreement and vote its shares in favor of SoftBank's and the Alibaba Partnership's director nominees pursuant to the foregoing; and

- SoftBank and Altaba will receive certain information rights in connection with the preparation of their financial statements.

197

Table of Contents

SoftBank's and Altaba's proxy obligations described in the second sub-bullet under each of the first and third bullets above, respectively, shall (a) not apply in respect of any proposal submitted to our shareholders that may result in an issuance of shares or other equity interests of us, including securities exchangeable or convertible into shares, that would increase the amount of our then-outstanding shares by 3% or more and (b) terminate when Jack owns less than 1% of our outstanding shares on a fully diluted basis or if we materially breach the voting agreement. Based on publicly disclosed information, as of the date of this annual report, Altaba no longer holds any Shares.

### Investments Involving SoftBank

We have invested in businesses in which SoftBank or one or more of its affiliates is a shareholder or co-invested with SoftBank or one or more of its affiliates in other businesses. SoftBank has also invested in businesses in which we or our controlled entities are shareholders. For instance, in April 2017, SoftBank participated in a new round of equity financing completed by Didi Chuxing, in which we hold an equity interest. In September 2017, we sold a portion of our investment in Didi Chuxing to SoftBank for cash consideration of US$639 million. In December 2018, an investment fund affiliated with SoftBank agreed to acquire a minority equity interest in our local services holding company. We may continue to co-invest with SoftBank, invest in businesses in which SoftBank is already an existing investor, and may also bring SoftBank as an investor into our new businesses or businesses in which we are an existing investor.

**Agreements and Transactions Related to Ant Group and Its Subsidiaries**

### Ownership of Ant Group and Alipay

We originally established Alipay in December 2004 to operate our payment services business. In June 2010, the PBOC issued new regulations that required non-bank payment companies to obtain a license in order to operate in China. These regulations provided specific guidelines for license applications only for domestic PRC-owned entities. These regulations stipulated that, in order for any foreign-invested payment company to obtain a license, the scope of business, the qualifications of any foreign investor and any level of foreign ownership would be subject to future regulations to be issued, which in addition would require approval by the PRC State Council. Furthermore, the regulations required that any payment company that failed to obtain a license must cease operations by September 1, 2011. Although Alipay was prepared to submit its license application in early 2011, at that time the PBOC had not issued any guidelines applicable to license applications for foreign-invested payment companies. In light of the uncertainties relating to the license qualification and application process for a foreign-invested payment company, our management determined that it was necessary to restructure Alipay as a company wholly-owned by PRC citizens in order to avail Alipay of the specific licensing guidelines applicable only to domestic PRC-owned entities. Accordingly, we divested all of our interest in and control over Alipay in 2011, which resulted in deconsolidation of Alipay from our financial statements. This action enabled Alipay to obtain a payment business license in May 2011 without delay and without any detrimental impact to our China retail marketplaces or to Alipay.

Following the divestment of our interest in and control over Alipay, effective in the first calendar quarter of 2011, the ownership structure of Alipay's parent entity, Ant Group, was changed so that Jack Ma held a substantial majority of the equity ownership interest in Ant Group. The ownership structure of Ant Group has subsequently been further restructured. Ant Group has also completed several rounds of equity financing. Pursuant to the SAPA entered into in August 2014 and amended in February 2018 and September 2019, we agreed to acquire a 33% equity interest in Ant Group and terminate the profit share payments that we were receiving from Ant Group at the time, subject to the satisfaction of closing conditions set forth in the SAPA. In September 2019, we received a newly issued 33% equity interest in Ant Group following the satisfaction of the closing conditions set forth in the SAPA. As of March 31, 2020, Junhan and Junao held approximately 50% of Ant Group's equity interest, we held 33% and other shareholders held the remaining equity interest.

Table of Contents

Economic interests of Ant Group through Junhan are owned by Jack Ma, Simon Xie and other employees of us and Ant Group and its affiliates and investee companies. These economic interests are in the form of limited partnership interests and interests similar to share appreciation rights tied to potential appreciation in the value of Ant Group. The economic interests in Junao are held in the form of limited partnership interests by certain members of the Alibaba Partnership.

We understand that it is the intention of the shareholders of Ant Group that:

- Jack Ma's direct and indirect economic interest in Ant Group (for the avoidance of doubt, other than the equity stake in Ant Group held by our company) will be reduced over time to a percentage that does not exceed his and his affiliates' interest in our company as of the time immediately prior to the completion of our initial public offering (the percentage of our ordinary shares Jack and his affiliates beneficially owned immediately prior to the completion of our initial public offering was 8.8%) and that this reduction will be caused in a manner by which neither Jack nor any of his affiliates would receive any economic benefit. See "— Commitments of Jack Ma to Alibaba Group." We have been informed by Ant Group that the proposed reduction of Jack's economic interest is expected to be accomplished through a combination of future equity-based incentive awards to employees and dilutive issuances of equity in Ant Group, among others;

- from time to time, additional economic interests in Ant Group in the form of interests similar to share appreciation rights issued by Junhan will be transferred to employees of Ant Group and our employees; and

- Ant Group may raise equity capital from investors in the future in order to finance its business expansion, with the effect that the shareholding of Junao and Junhan in Ant Group will be reduced through dilution (the amount of dilution would depend on future valuations and the amount of equity capital to be raised).

Jack Ma is able to exercise the voting power of Junao and Junhan, two of the major shareholders of Ant Group, because he owns 100% of the general partner of both Junao and Junhan.

### Our Commercial Arrangements with Ant Group and Alipay

After the divestment of our interest in and control over Alipay, we entered into a framework agreement in July 2011, or the 2011 framework agreement, with SoftBank, Altaba, Alipay, Ant Group, Jack Ma and Joe Tsai and certain of their affiliates. At the same time, we also entered into various implementation agreements that included a commercial agreement, or the Alipay commercial agreement, an intellectual property license and software technology service agreement, or the 2011 IPLA, and a shared services agreement, which together governed our financial and commercial relationships with Ant Group and Alipay.

#### Alipay Commercial Agreement

Under the Alipay commercial agreement among us, Alipay and Ant Group, which agreement still remains in place following the 2014 restructuring and the 2018 and 2019 amendments to our agreements with Ant Group, each as described below, Alipay provides payment processing and escrow services to us. These services enable settlement of transactions on our marketplaces through a secure payment platform and escrow process. We pay Alipay a fee for these services on terms that are preferential to us. These preferential terms enable us, with certain exceptions, to make available basic payment processing and escrow services to consumers and merchants on our marketplaces free of charge. We believe that these services provide us with a competitive advantage that otherwise would be diminished without the preferential terms of the Alipay commercial agreement.

199

Table of Contents

The fees that we pay Alipay are based on fee rates and actual payment volumes processed on our marketplaces. The fee rates reflect, among other things, Alipay's bank-processing costs and operating costs allocable to the services provided to us, and accordingly are subject to adjustment on an annual basis to the extent these costs increase or decline. In connection with the 2014 restructuring, the Alipay commercial agreement was amended to provide that a special independent committee formed by our independent directors and the director designated by SoftBank, or the Independent Committee, must approve the fee rates in advance on an annual basis. The fee rates for the immediately preceding year remain in effect until such time as the annual approval by the Independent Committee has been obtained. In fiscal years 2018, 2019 and 2020, service fees in connection with the payment services provided by Alipay amounted to RMB6,295 million, RMB8,252 million and RMB8,723 million (US$1,232 million), respectively, under this agreement. The Alipay commercial agreement has an initial term of 50 years, and is automatically renewable for further periods of 50 years, subject to our right to terminate at any time upon one year's prior written notice. If the Alipay commercial agreement is required by applicable regulatory authorities, including under stock exchange listing rules, to be modified in certain circumstances, a one-time payment may be payable to us by Ant Group to compensate us for the impact of the adjustment. Certain conforming amendments were made to the Alipay commercial agreement as part of the relevant amendments to our agreements with Ant Group and Alipay described below.

### *2014 Restructuring of Our Relationship with Ant Group and Alipay, Subsequent Amendments and 2019 Equity Issuance*

On August 12, 2014, we entered into a share and asset purchase agreement, which together with all subsequent amendments, we refer to as the SAPA, and entered into or amended certain ancillary agreements including an amendment and restatement of the 2011 IPLA, or the 2014 IPLA. Pursuant to these agreements, we restructured our relationships with Ant Group and Alipay and terminated the 2011 framework agreement. On February 1, 2018, we amended both the SAPA and the Alipay commercial agreement, and agreed with Ant Group and certain other parties on forms of certain ancillary agreements. On September 23, 2019, we further amended the SAPA. The relevant amendments were entered into or agreed to facilitate our acquisition of a 33% equity interest in Ant Group.

Apart from the amended provisions described below, the key terms of our agreements with Ant Group and Alipay from the 2014 Restructuring remain substantially unchanged.

#### *Sale of SME Loan Business and Certain Other Assets*

Pursuant to the SAPA, we sold certain securities and assets primarily relating to our SME loan business and other related services to Ant Group in February 2015. In addition, pursuant to software system use and service agreements relating to the know-how and related intellectual property that we agreed to sell together with the SME loan business and related services, we will receive annual fees for a term of seven years, commencing in 2015. These fees, which are recognized as other revenue, are determined as follows: for calendar years 2015 to 2017, the entities operating the SME loan business paid an annual fee equal to 2.5% of the average daily balance of the SME loans provided by these entities, and in calendar years 2018 to 2021, these entities will pay an annual fee equal to the amount of the fees paid in calendar year 2017. In fiscal years 2018, 2019 and 2020, the annual fees we received from Ant Group and its affiliates in connection with the SME loan business amounted to RMB956 million, RMB954 million and RMB954 million (US$135 million), respectively.

For regulatory reasons, we retained approximately RMB1,225 million of the existing SME loan portfolio upon the completion of the transfer of the SME loan business. These loans have been repaid. We will not conduct any new SME loan business going forward.

#### *Issuance of Equity Interest*

In September 2019, following the satisfaction of the closing conditions, we received through an onshore PRC subsidiary the issuance of a 33% equity interest in Ant Group pursuant to the SAPA, or the Issuance. We believe that the acquisition of the 33% equity interest in Ant Group will strengthen our strategic relationship pursuant to the series of agreements initially reached with Ant Group in 2014.

Table of Contents

Pursuant to the SAPA, the consideration we paid to receive the newly issued 33% equity interest in Ant Group was fully funded by payments from Ant Group and its subsidiaries to us in consideration for certain intellectual property and assets that we transferred under the SAPA.

In connection with the receipt of the Issuance, we entered into a cross license agreement with Ant Group providing for a license by each of Ant Group and us to each other of certain patents, trademarks, software and other technologies (including but not limited to patents and software transferred at the Issuance closing). The cross license agreement also contains provisions relating to cooperation and coordination between Ant Group and us on various intellectual property matters, including prosecution, enforcement, acquisition, and joint defense arrangements, among other matters.

Upon closing of the Issuance, we entered into the previously agreed form of amendment and restatement of the 2014 IPLA, or the Amended IPLA, and the profit share payment arrangement under the 2014 IPLA automatically terminated. For more information, see "— Alipay Intellectual Property License and Software Technology Services Agreement" below.

*Financial and Accounting Treatment Upon Issuance of Equity Interest in Ant Group*

There is no material operational and economic impact on us as a result of our receipt of the 33% equity interest in Ant Group, but we have changed our accounting for our relationship with Ant Group. The primary accounting impact and changes in accounting treatment resulting from the completion of the Issuance consist of the following:

*Termination of profit share and cash flow impact*

Upon the Issuance, and our transfer of certain intellectual property to Ant Group and its subsidiaries, the profit share arrangement under the 2014 IPLA was terminated. For the years ended March 31, 2018, 2019 and 2020, the profit share payments recorded in "Other income, net" in our consolidated income statements amounted to RMB3,444 million, RMB517 million and RMB3,835 million (US$542 million), respectively. Following our receipt of the Issuance, we will no longer receive these cash inflows from Ant Group.

*Equity method accounting*

Upon the Issuance, we account for our equity interest in Ant Group under the equity method and record it in "Investment in equity investees" on our consolidated balance sheet. In fiscal year 2020, we recognized a one-time gain of RMB71.6 billion (US$10.1 billion) in relation to the receipt of the 33% equity interest in Ant Group. Subsequent to the Issuance, we will record our proportionate share of results of Ant Group in "Share of results of equity investees" in our consolidated income statements on a one quarter in-arrears basis.

201

Table of Contents

*Regulatory Unwind*

The SAPA provides that, if a relevant governmental authority prohibits us from owning all or a portion of our equity interest in Ant Group after the equity issuance has occurred through enactment of a law, rule or regulation, or explicitly requires Ant Group to redeem this equity interest, and the prohibition or request is not subject to appeal and cannot otherwise be resolved, then to the extent necessary, Ant Group will redeem the equity interest; the related intellectual property and asset transfers, and ancillary transactions under the SAPA will be unwound; and the terms of the SAPA, the 2014 IPLA, and other related agreements will be restored, including the prior profit share payments and liquidity event payment (which would be payable to us in the event of a qualified IPO of Ant Group or Alipay, in an amount equal to 37.5% of the equity value of Ant Group as a whole, immediately prior to the qualified IPO). If there is a partial unwind where we retain a portion of our equity interest in Ant Group, but less than the full 33%, then pursuant to the terms of the SAPA and the 2014 IPLA, the prior profit share payment arrangement and liquidity event payment amount will be proportionately reduced based on the amount of equity interest retained by us.

Jack Ma and Joe Tsai contributed 280,000,000 and 120,000,000 of our Shares, after having accounted for the Share Split, held by them to APN Ltd., a vehicle they established to hold these shares. The shares of APN Ltd., as well as the 400,000,000 Shares, after having accounted for the Share Split, held by APN Ltd., were pledged to us to secure the liquidity event payment and certain other obligations of Ant Group under the SAPA and the Alipay commercial agreement, as well as the direct liability of APN Ltd. for up to US$500 million of the liquidity event payment if any liquidity event payment becomes due. These Shares remain pledged to us to secure certain obligations of Ant Group under the SAPA and the Alipay commercial agreement.

*Pre-emptive Rights*

Following our receipt of equity interest in Ant Group, we have pre-emptive rights to participate in other issuances of equity securities by Ant Group and certain of its affiliates prior to the time of a qualified IPO of Ant Group. These pre-emptive rights entitle us to maintain the equity ownership percentage we hold in Ant Group immediately prior to any such issuances. In connection with our exercise of our pre-emptive rights we are also entitled to receive certain payments from Ant Group, effectively funding our subscription for these additional equity interests, up to a value of US$1.5 billion, subject to certain adjustments, or the pre-emptive rights funded payments. In addition to these pre-emptive rights and the pre-emptive rights funded payments, under the SAPA, in certain circumstances we are permitted to exercise pre-emptive rights through an alternative arrangement that will further protect us from dilution.

*Certain Restrictions on the Transfer of Ant Group Equity Interests*

Under the SAPA and the Amended IPLA, certain parties thereto, including us in some cases, are subject to restrictions on the transfer of equity interests in Ant Group, including:

- following our receipt of the Issuance and until the earlier of a qualified IPO of Ant Group or the termination of the independent director rights provided in the SAPA, none of Jack Ma, Joe Tsai (if he holds any equity interest at that time), Junao, Junhan or Ant Group may knowingly transfer any equity in Ant Group to a third-party who would thereby acquire more than 50% of the voting or economic rights in, or assets of, Ant Group; and

- any transfer of equity interests in Ant Group by Junao or Junhan, on the one hand, or our company, on the other hand, will be subject to a right of first refusal by the other party.

202

Table of Contents

*Non-competition Undertakings*

Under the SAPA, subject to certain limitations and unless both parties agree, Ant Group may not engage in any business conducted by us from time to time or logical extensions thereof, and we are restricted from engaging in specified business activities within the scope of business of Ant Group, including the provision and distribution of credit facilities and insurance, the provision of investment management and banking services, payment transaction processing and payment clearing services, leasing, lease financing and related services, trading, dealing and brokerage with respect to foreign exchange and financial instruments, distribution of securities, commodities, funds, derivatives and other financial products and the provision of credit ratings, credit profiles and credit reports. Each party may, however, make passive investments in competing businesses below specified thresholds, in some cases after offering the investment opportunity to the other party.

*Corporate Governance Provisions*

The SAPA provides that we and Ant Group will recommend one independent nominee who Ant Group will nominate as a member of its board, and Jack Ma, Joe Tsai (as long as he holds any equity interest in Ant Group), Junhan and Junao will agree to vote the equity interests in Ant Group controlled by them in favor of the nomination. If this independent director resigns or the director's seat otherwise becomes vacant, so long as SoftBank owns at least 20% of our outstanding ordinary shares, and certain other conditions are satisfied, SoftBank and Jack, acting jointly, will select on our behalf the individual to be designated as a replacement director, subject to the approval of the Independent Committee. This Independent Committee, which was formed pursuant to the SAPA, is required to approve certain actions that we may take in connection with the SAPA and related agreements.

Upon the Issuance in September 2019, we nominated two of our officers who have been elected to the board of Ant Group pursuant to our rights under the SAPA.

In each case, these director nomination rights will continue unless required to be terminated by applicable laws and regulations or listing rules in connection with an Ant Group qualified IPO process or we cease to own a certain amount of our post-issuance equity interests in Ant Group.

*Additional Alibaba Rights*

In addition to the rights discussed above, the SAPA provided us with certain other rights with respect to Ant Group. These included, among others:

- customary information rights;

- approval rights over certain Ant Group or Alipay actions; and

- rights to ensure our ability to participate in any qualified IPO of Ant Group.

Except as otherwise discussed "— Termination of Alibaba Rights" below, these rights have been substantially retained in the SAPA. Following the Issuance in September 2019, the SAPA also provides the Independent Committee with approval rights over:

- increases to the size of the Ant Group board resulting in the number of board seats exceeding a certain specific number; and

- any Alipay IPO or equity issuance (other than in the context of an IPO).

*Termination of Alibaba Rights*

Under the SAPA certain of our rights with respect to Ant Group terminated upon our receipt of the Issuance.

203

Table of Contents

In addition, the SAPA provides that, in connection with Ant Group or Alipay commencing an IPO process, we and Ant Group will discuss in good faith the amendment or termination of our rights to the extent necessary or advisable to achieve an efficient and successful IPO. Certain of our rights that would be incremental to the rights of other shareholders of Ant Group as of the consummation of the IPO (excluding, among other things, our information rights) will terminate if required by a relevant stock exchange or governmental authority, or if necessary to obtain a legal opinion in connection with the IPO application. If the IPO application is withdrawn or rejected by the relevant authorities, or if the IPO is not consummated within a certain period of time, then any of our rights that were terminated or amended in anticipation of the IPO will be restored.

### Ancillary Agreements

In connection with our entry into the original SAPA in 2014, we also entered into the 2014 IPLA, a data sharing agreement, an amended and restated shared services agreement, a SME loan cooperation framework agreement and a trademark agreement, each of which is described below.

Pursuant to the SAPA, upon the Issuance we also entered into the Amended IPLA, a cross license agreement and various intellectual property transfer agreements in connection with, and to implement, the contemplated intellectual property and asset transfers described in "— Issuance of Equity Interest" above.

### Alipay Intellectual Property License and Software Technology Services Agreement

#### 2014 IPLA

Pursuant to the original 2011 framework agreement, we entered into the 2011 IPLA, pursuant to which we and our subsidiaries licensed to Alipay certain intellectual property rights and provided various software technology services to Alipay and its subsidiaries. In August 2014, we entered into the 2014 IPLA.

Under the 2011 IPLA, Alipay paid us a royalty and software technology services fee equal to the sum of an expense reimbursement plus 49.9% of the consolidated pre-tax income of Alipay and its subsidiaries until a liquidity event of Alipay or Ant Group. The calculation of the profit share percentage was subject to downward adjustments upon certain dilutive equity issuances by Alipay or Ant Group. Under the 2014 IPLA, we received, in addition to a software technology service fee, royalty streams related to Alipay and other current and future businesses of Ant Group, which we refer to collectively as the profit share payments. The profit share payments were paid at least annually and equal the sum of an expense reimbursement plus 37.5% of the consolidated pre-tax income of Ant Group (subject to certain adjustments), including not only Alipay but all of Ant Group's subsidiaries.

In fiscal years 2018, 2019 and 2020, under the 2014 IPLA, we recognized royalty and software technology services fees, net of costs incurred by us, amounting to RMB3,444 million, RMB517 million and RMB3,835 million (US$542 million), respectively, as other income, and the relevant expense reimbursement amounted to RMB37 million, RMB106 million and nil, respectively, over the same periods.

Upon our receipt of the Issuance in September 2019, we entered into the Amended IPLA and terminated the 2014 IPLA.

#### Amended IPLA

Pursuant to the SAPA, we, Ant Group and Alipay entered into the Amended IPLA upon our receipt of the Issuance, at which time we also transferred certain intellectual property and assets to Ant Group and its subsidiaries and the profit share payment arrangement was terminated, as described in "— Issuance of Equity Interest" above.

While the profit share payments have terminated under the Amended IPLA, Ant Group may in certain circumstances continue to make certain royalty payments to us (as agreed to by Ant Group and the Independent Committee), which may be used as pre-emptive rights funded payments under the SAPA, as described in "— Pre-emptive Rights" above.

204

Table of Contents

Additionally, pursuant to the Amended IPLA, Ant Group and its subsidiaries will receive expanded rights to apply for, register and manage certain intellectual property related to their businesses, subject to certain continuing restrictions and our rights, and we will cease to provide certain software technology services to Ant Group and its subsidiaries.

The Amended IPLA will terminate upon the earliest of:

- the full payment of all pre-emptive rights funded payments under the SAPA;

- the closing of a qualified IPO of Ant Group or Alipay; and

- our transfer to Ant Group of any remaining intellectual property we own that is exclusively related to the business of Ant Group.

### Data Sharing Agreement

We and Ant Group entered into a data sharing agreement in August 2014.

Pursuant to the data sharing agreement, we, our controlled affiliates and certain other affiliates, such as Ant Group, which we refer to hereinafter as full data sharing participants, will contribute all data collected or generated as a result of the use by users of our or their respective products or services (subject to applicable law, industry rules and contractual requirements) to a data platform that we operate and maintain, and to which all of the full data sharing participants will have access. A data platform management committee established by us and Ant Group may also approve noncontrolled affiliates of us and Ant Group and unaffiliated third parties to have certain access to and contribute data to the platform, subject to execution of a data platform participation agreement containing the terms and restrictions on access to and use of the data sharing platform and shared data as the data management committee shall determine. No fees or other compensation are required to be paid by any of the full data sharing participants for access to the data platform, other than the obligation for participants to share in the costs of the operation of the data platform on a fair and reasonable basis. The data sharing agreement provides that none of the participants may reproduce any of the data on the data platform for transfer to their own servers, except that a participant may retain its own data that it has contributed to the data platform.

The data sharing agreement initially had a minimum term of ten years. In May 2015, our board approved the extension of the term of the agreement to a total of 50 years.

### SME Loan Cooperation Framework Agreement

We and Ant Group entered into a SME loan cooperation framework agreement in August 2014, pursuant to which each party agreed to cooperate with, and provide certain services with respect to, the other party's enforcement of certain rights of the other party against users of its platforms and services and with respect to the provision of certain financial services to our customers and merchants. In particular, we agreed, upon Ant Group's request, to close down or suspend online storefronts and restrict marketing activities on our platforms of persons defaulting on loans made by Ant Group and persons in violation of Alipay rules and regulations, and to publish notices on our platforms and provide information regarding these persons, in each case in a manner to be further agreed upon from time to time. Ant Group agreed, upon our request, to make loans and/or extensions of credit and related financial services available to our users, freeze and pay over to us funds in accounts of users violating our rules and regulations or agreements with us, accelerate loans and terminate credit facilities of these users, restrict marketing activities on its platforms by these users, and provide information regarding these users, in each case in a manner to be further agreed upon from time to time. Neither party is required to pay any fees in consideration for the services provided by the other party, and apart from the provision of these services, there will be no other exchange of value in connection with this agreement. The cooperation agreement has an initial term of five years, with automatic renewals upon expiry for additional five-year periods.

From time to time, we expect to enter into similar commercial arrangements with respect to cooperation matters and the provision of services between us and Ant Group and to our respective customers.

Table of Contents

*Trademark Agreement*

We and Ant Group entered into a trademark agreement in August 2014, pursuant to which we granted Ant Group a non-transferable, non-assignable and non-sublicensable (except to its subsidiaries) license for it and its sublicensed subsidiaries to continue to use certain trademarks and domain names based on trademarks owned by us, in connection with their payment services business and the SME loan business transferred by us to them, and in the same manner of use as in August 2014, and a non-transferable, non-assignable and non-sublicensable (except to its subsidiaries) license to use other trademarks and domain names based on trademarks owned by us, and in that manner, as we may agree to allow in the future. Pursuant to the trademark agreement, each of the parties further agreed to the rights and limitations that each would have to use the "Ali" name or prefix and the "e-commerce" (and its Chinese equivalent) name, prefix or logo as part of a trademark or domain name in each party's and its subsidiaries' respective businesses. Neither party is required to pay any fees under this agreement, and, apart from the licenses and rights set forth in the agreement, there will be no other exchange of value in connection with this agreement. Pursuant to the SAPA, following our receipt of the Issuance, we transferred to Ant Group ownership of several of the trademarks and domain names licensed by us to Ant Group. However, the trademark agreement will remain in effect in accordance with its terms following the transaction to provide for a continued license of other trademarks that we will continue to own.

*Shared Services Agreement with Ant Group*

We and Ant Group entered into a shared services agreement, which was amended and restated in August 2014 in connection with the SAPA. Pursuant to the shared services agreement, we and Ant Group provide certain administrative and support services to each other and our respective affiliates.

Service fees in connection with the administrative and support services provided by us to Ant Group and its affiliates under the agreement amounted to RMB676 million, RMB1,017 million and RMB1,224 million (US$173 million) in fiscal years 2018, 2019 and 2020, respectively. Service fees in connection with the administrative and support services provided by Ant Group and its affiliates to us amounted to RMB84 million, RMB80 million and RMB124 million (US$18 million) in fiscal years 2018, 2019 and 2020, respectively.

*Other Commercial Arrangements with Ant Group*

We also provide Ant Group and its affiliates with cloud computing services, marketplace software technology services and other services. In fiscal years 2018, 2019 and 2020, under these arrangements, service fees in connection with various services provided by us to Ant Group and its affiliates amounted to RMB1,503 million, RMB2,250 million and RMB3,947 million (US$557 million), respectively. Meanwhile, Ant Group and its affiliates provide us with marketplace software technology services and other services. In fiscal years 2018, 2019 and 2020, service fees in connection with the marketplace software technology services and other services provided by Ant Group amounted to RMB1,810 million, RMB1,248 million and RMB2,619 million (US$370 million), respectively.

*Investments Involving Ant Group*

We have invested in businesses in which Ant Group is a shareholder or co-invested with Ant Group in other businesses. For instance, in September 2015, we established a joint venture under the brand name Koubei with Ant Group. We and Ant Group injected certain related businesses into Koubei and each invested RMB3.0 billion in this joint venture. In April and August 2017, we and Ant Group invested in the preferred shares of Ele.me, with our investment totaling US$864 million. In December 2018, Ant Group participated in the integration of Ele.me and Koubei, and became a minority shareholder of our local consumer services holding company. In addition, in May 2019, Ant Group agreed to invest HK$454 million (US$59 million) for a 0.5% equity interest in Alibaba Health, our subsidiary listed on the Hong Kong Stock Exchange. Ant Group is also a shareholder of both Paytm, a mobile payment platform in India, and Paytm Mall, an e-commerce platform in India, both of which are our minority investees.

206

Table of Contents

*Equity-based Award Arrangements*

In order to encourage mutually beneficial cooperation, we have awarded RSUs and granted options to acquire our Shares to employees of Ant Group. As of March 31, 2018, 2019 and 2020, there were 13,026,472, 15,051,708 and 15,655,840 of our Shares, after having accounted for the Share Split, respectively, underlying unvested RSUs and outstanding options held by employees of Ant Group.

We understand that Jack Ma, who effectively controls approximately 50% of the voting interest in Ant Group, believes that providing equity-related awards to our employees tied to the success of Ant Group will enhance the value of our business because of the strategic importance of Alipay to our marketplaces and because, through our strategic and financial relationship with Ant Group, we have a significant participation in the profits and value accretion of Ant Group.

Since March 2014, Junhan, the general partner of which is an entity controlled by Jack Ma, has granted share-based awards linked to the valuation of Ant Group to certain of our employees. In addition, Ant Group has granted RSUs and share appreciation rights tied to the valuation of Ant Group to certain of our employees since April 2018. The awards granted by Junhan will be settled by Junhan upon disposal of these awards by the holders. The awards granted by Ant Group will be settled by Ant Group upon vesting or exercise of these awards. Junhan and Ant Group have the right to repurchase the vested awards (or any underlying equity for the settlement of the vested awards) granted by them, as applicable, from the holders upon an initial public offering of Ant Group or the termination of the holders' employment with us at a price to be determined based on the then fair market value of Ant Group.

Subsequent to our initial offering in 2014, we, Junhan and Ant Group entered into an arrangement, under which the parties agreed that none of them had any obligation to pay any other party any expense relating to the cross-grant of equity-based awards. In June 2020, we, Junhan and Ant Group entered into equity-based awards grant and settlement agreements pursuant to which the parties will settle with each other the cost associated with the awards that will be granted to each other's employees. The payment amounts will depend on the relative values of Ant Group equity-based awards that will be granted to our employees and our equity-based awards that will be granted to employees of Ant Group under these arrangements.

**Transactions with Alibaba Pictures**

In March 2019, we subscribed for newly issued ordinary shares of Alibaba Pictures for a cash consideration of HK$1,250 million. Upon the completion of the transaction, our equity interest in Alibaba Pictures increased from approximately 49% to approximately 51%, and Alibaba Pictures became our consolidated subsidiary.

**Transactions with Entities Affiliated with Our Directors and Officers**

Jack Ma, one of our directors, Joe Tsai, our executive vice chairman, and J. Michael Evans, our president and director, have purchased their own aircraft for both business and personal use. The use of the above-mentioned directors' and executive officers' own aircrafts in connection with the performance of their duties is free of charge to us, and we have agreed to assume the cost of maintenance, crew and operation of the aircraft where the cost is allocated for business purposes.

**Relationship with Investment Funds Affiliated with Jack Ma**

Jack Ma currently holds minority interests in the general partners of a number of Yunfeng investment funds, in which he is entitled to receive a portion of carried interest proceeds. We refer to these funds collectively as the Yunfeng Funds. He also holds minority interests in certain investment advisor entities of certain Yunfeng Funds. In addition, Jack, his wife, certain trusts established for the benefit of his family and certain entities controlled by Jack and his wife have committed, or are expected to commit, funds to the general partners or as limited partners of certain Yunfeng Funds.

Table of Contents

Jack has either non-voting interests or has waived the exercise of his voting power with respect to his interests in each of the investment advisor entities and the managing entities of certain Yunfeng Funds. Jack has also agreed to donate all distributions of (x) carried interest proceeds he may receive in respect of the Yunfeng Funds and (y) dividends he may receive with respect to his holdings of shares in any investment advisor entity of the Yunfeng Funds, which we collectively refer to as the Yunfeng GP Distributions, to, or for the benefit of, the Alibaba Group Charitable Fund or other entities identified by Jack that serve charitable purposes. In addition, Jack has agreed that, other than his income tax obligations arising from recognition of income from Yunfeng GP Distributions, he will not claim any charitable deductions with respect to donations of his Yunfeng GP Distributions against his other income tax obligations. See "—Commitments of Jack Ma to Alibaba Group." We believe that, through its expertise, knowledge base and extensive network of contacts in private equity in China, Yunfeng Capital will assist us in developing a range of relevant strategic investment opportunities.

The Yunfeng Funds have historically entered into co-investment transactions with us and third parties, such as our co-investment in Beijing Easyhome Furnishing Chain Group Co., Ltd., one of the largest home improvement supplies and furniture chains in the PRC (which subsequently became Easyhome New Retail Group Co., Ltd. following the completion of a reverse takeover in December 2019). We have also invested in other businesses in which the Yunfeng Funds are shareholders, such as our acquisition in March 2017 of all of the issued and outstanding shares of Damai, a leading online ticketing platform for live events in China, in which an Yunfeng Fund was a shareholder.

**Commitments of Jack Ma to Alibaba Group**

Jack Ma, one of our directors, has confirmed the following commitments to our board of directors:

- He intends to reduce and thereafter limit his direct and indirect economic interest in Ant Group over time (for the avoidance of doubt, other than the equity stake in Ant Group held by our company), to a percentage that does not exceed his and his affiliates' interest in our company immediately prior to our initial public offering and that the reduction will occur in a manner by which neither Jack nor any of his affiliates would receive any economic benefit;

- He will donate all of his Yunfeng GP Distributions to, or for the benefit of, the Alibaba Group Charitable Fund or other entities identified by him that serve charitable purposes;

- Other than his income tax obligations arising from recognition of income from Yunfeng GP Distributions, he will not claim any charitable deductions with respect to donations of his Yunfeng GP Distributions against his other income tax obligations; and

- If required by us, while he remains an Alibaba executive, he will assume for our benefit legal ownership of investment vehicles, holding companies and variable interest entities that further our business interests in Internet, media and telecom related businesses and, in this case, he will disclaim all economic benefits from his ownership and enter into agreements to transfer any benefits to us (or as we may direct) when permitted by applicable law.

**Pledge for the Benefit of and Loan Arrangement with a Related Party**

In May 2015, we entered into a pledge with a financial institution in the PRC in connection with certain wealth management products with an aggregate principal amount of RMB7.3 billion we invested in to secure a RMB6.9 billion financing provided by this financial institution to Simon Xie, one of our founders, to finance the minority investment by a PRC limited partnership in Wasu, a company listed on the Shenzhen Stock Exchange and engaged in the business of digital media broadcasting and distribution in China. In addition, we entered into a loan agreement for a principal amount of up to RMB2.0 billion with Simon Xie in April 2015 to finance the repayment by Simon of the principal and interest under this financing. These arrangements strengthened our strategic business cooperation with Wasu to enhance our entertainment strategy. Our loan to Simon was made at an interest rate equal to SHIBOR as specified by us from time to time and had a term of five years. The loan was secured by a pledge of Simon's limited partnership interest in the PRC limited partnership.

208

Table of Contents

In March 2020, the pledge on our wealth management products in favor of the financial institution, as well as the pledge on Simon's limited partnership interest in the PRC limited partnership in favor of us, have been removed upon repayment by Simon Xie of the above loans. As of March 31, 2020, the balance of our loan to Simon was nil.

**Transactions with Cainiao Network**

In October 2017, our equity interest in Cainiao Network increased to approximately 51% and it became one of our consolidated subsidiaries. We currently own approximately 66% of the equity interest in Cainiao Network.

Before Cainiao Network became our consolidated subsidiary in October 2017,

- we had commercial arrangements with Cainiao Network to receive certain logistics services that are conducted on an arm's length basis. Service fees in connection with the logistics services provided by Cainiao Network in fiscal year 2018 (prior to its becoming our consolidated subsidiary) amounted to RMB3,437 million; and

- we also provided Cainiao Network with various administrative and support services. Service fees in connection with the administrative and support services we provided to Cainiao Network amounted to RMB123 million in fiscal year 2018 (prior to its becoming our consolidated subsidiary), respectively.

**Transactions with Other Investees**

We have commercial arrangements with certain of our investees related to cloud computing services. Revenue recognized in connection with the cloud computing services we provided to our investees amounted to RMB689 million, RMB1,111 million and RMB1,548 million (US$219 million) in fiscal years 2018, 2019 and 2020, respectively.

We have commercial arrangements with certain of our investees related to marketing services. Cost of revenue and sales and marketing expenses recognized in connection with the marketing services provided by these investees to us amounted to RMB760 million, RMB907 million and RMB1,146 million (US$162 million) in fiscal years 2018, 2019 and 2020, respectively.

We have commercial arrangements with certain of our investees related to logistics services. Revenue recognized in connection with the logistics services we provided to our investees amounted to RMB72 million, RMB261 million and RMB1,400 million (US$198 million) in the period from the date of consolidation of Cainiao Network in October 2017 to March 31, 2018, fiscal year 2019 and fiscal year 2020, respectively. Fees incurred in connection with the logistics service provided by our investees to Cainiao Network, after it became one of our consolidated subsidiaries, and certain of our other businesses in fiscal years 2018, 2019 and 2020 amounted to RMB5,608 million, RMB12,933 million and RMB8,265 million (US$1,167 million), respectively.

We have extended loans to certain of our investees for working capital and other uses in conjunction with our investments. As of March 31, 2020, the aggregate outstanding balance of these loans was RMB4,352 million (US$615 million), with durations generally ranging from one year to ten years and interest rates of up to 6% per annum.

We have agreed to provide a guarantee for a term loan facility of HK$7.7 billion (US$1.0 billion) in favor of Cingleot, a company that is partially owned by Cainiao Network, in connection with a logistic center development project at the Hong Kong International Airport. As of March 31, 2020, HK$358 million (US$46 million) was drawn down by that entity under this facility.

We have also co-invested with certain of our investees in other businesses. For example, we have made co-investments with Hangzhou Hanyun Xinling Equity Investment Fund Partnership and New Retail Strategic Opportunities Fund, L.P. – both of which are our investees that focus on retail-related businesses – in a number of companies, including Red Star Macalline Group Corporation Limited, Sun Art, Beijing Easyhome Furnishing Chain Group Co., Ltd. (which subsequently became Easyhome New Retail Group Co., Ltd. following the completion of a reverse takeover in December 2019), ZTO Express (Cayman) Inc., and Focus Media Information Technology Co., Ltd.