# EXHIBIT K

Case 1:20-cv-09568-GBD-JW   Document 64-20   Filed 07/21/22   Page 2 of 7



# *China Publishes Draft Amendments to Its Anti-Monopoly Law*

January 14, 2020

*C*hina's competition regulator, the State Administration for Market Regulation (SAMR), on January 2, 2020 published the Draft Amendments to the Anti-Monopoly Law for comment (Draft Amendments) 《中华人民共和国反垄断法》修订草案(公开征求意见稿), with comments due by January 31.[1]

The Draft Amendments would expand the AML from 57 articles to 64 articles across the same eight chapters.  Most notably, the Draft Amendments would (i) institute a "fair competition" review mechanism; (ii) prohibit participation in monopoly agreements; (iii) clarify the factors to be considered when determining market dominance by Internet operators; (iv) improve the merger review process; and (v) enhance deterrence by raising penalties for violations.

**I. Fair competition review**

Authorities would be mandated when formulating regulations and policies regarding market operations to take into consideration the prevention of local protectionism, regional blockades, industry entry barriers, corporate monopolies, political favoritism and other measures that exclude or restrict market competition. Fair competition review was proposed by the State Council in June 2016 in the Opinions to Establish a Fair Competition Review System in the Construction of the Market System and has been encapsulated in the new Foreign Investment Law and the Regulations on Optimizing the Business Environment, both effective January 1, 2020.  The emphasis on fair competition review in the Draft Amendments reflects recognition of fair competition as the basic principle of a market economy in a country where competition has been introduced only in recent years, specifically:

Article 4 would enhance the status of competition policy.

New Article 9 would provide that China establishes and implements a fair competition review mechanism to regulate government activities, and also prohibits the issuance of any policy measures that excludes or restricts competition.

Article 10 would grant fair competition review power to the multi-agency Anti-Monopoly Commission which operates under the State Council and above SAMR, which is the enforcement agency.

Article 42 would require administrative and other public authorities to conduct fair competition reviews when making regulations involving market players' economic activity.

## II. Monopoly agreements

Article 14 would prohibit business operators from concluding monopoly agreements.

New Article 17 would further prohibit business operators from organizing or assisting others to conclude monopoly agreements.

These provisions constitute across-the-board prohibitions of horizontal monopolies (cartels formed by competitors, *e.g.*, price-fixing, output restriction, market allocation and transaction boycotts), and arguably also vertical monopolies (agreements between businesses and their distributors, wholesalers and/or retailers regarding price maintenance or RPM), as well as conspiracies embodied in hub-and-spoke arrangements.

If adopted in its current form, vertical monopolies would appear to be treated the same as horizontal monopolies, *i.e.*, illegal per se by the enforcement agency. To rebut such allegations, the business operators would need to prove that the pro-competitive benefits (*e.g.*, improvement in technology, quality, efficiency, or reduction of cost and waste) of a monopoly agreement outweigh the anti-competitive effects, or by invoking an exemption under Article 18 of the Draft Amendments. This would be in line with the December 2018 ruling by the Supreme People's Court (SPC) in an RPM case in Hainan, which appears to be inconsistent with the rule of reason doctrine adopted by major competition law regimes like the US with respect to vertical monopolies. The SPC ruled that it is not improper for courts to employ a rule of reason approach to determine if a vertical agreement excludes or restricts competition. But given relatively immature market conditions in China, the enforcement agency by contrast should treat vertical agreements including RPM as monopoly agreements and per se violations of the AML without the burden of showing that the anticompetitive effects outweigh the benefits.[2]

## III. Market dominance of Internet operators

Since promulgation of the AML in 2008, China's Internet sector has rapidly expanded. Leading Internet companies like Alibaba, Tencent, Baidu, JD, Meituan, Pinduoduo, Ctrip and Didi Chuxing have gained market influence across a variety of sectors including retail, fintech, logistics, sharing economy, food delivery, ride-hailing, healthcare, on-line entertainment and travel. Various practices in the Internet sector may present new challenges for AML enforcement. These practices can include control over and the abuse of consumer information and big data, market concentration whereby competitive markets and even duopolies effectively become monopolies, tying, and the deployment of new technologies which discretely lock in consumers and lock out competitors. It can be particularly difficult to assess market dominance in the Internet sector.

For example, Qihoo 360, a leading anti-virus software developer, lost a lawsuit in 2013 against Tencent alleging abuse of dominance to prevent customers using QQ services from using Qihoo anti-virus software. The local court ruled that Qihoo failed to prove that Tencent had a market dominant position in instant messaging and therefore all of Qihoo's claims were rejected. The judgement drew wide criticism in the industry, but more importantly reflected a broad concern that the AML lacked the statutory basis to regulate monopoly conduct in the rapidly growing Internet sector.

Moreover, the Internet sector has witnessed dozens of large-scale mergers and acquisitions among domestic companies in the past decade, including Alibaba's acquisition of Youku Tudou (content/media), Didi's acquisition of Kuaidi and Uber China (car-hailing), the acquisition by Tongcheng (with investments by Ctrip and Tencent) of eLong (on-line travel services), the merger between Baidu Waimai and Ele.me (online food-ordering and delivery services) and Tencent's investments in Shanda Games (online gaming). While many of these transactions presented potentially significant competition concerns, most were consummated without undergoing merger review under the AML.

In Article 1, the objective of "encouraging innovation" would be added to AML's purposes after the objective of "protection of fair competition in the market". This reflects the regulator's recognition of the benefits of innovation and hesitance to overly burden the digital economy with anti-monopoly enforcement.

More importantly, Article 21 would include a provision which aims to clarify the factors to be considered when determining market dominance by Internet operators: (a) network effects; (b) economies of scale; (c) lock-in effects; and (d) capacity to master and process relevant data. The same factors have previously been included in several anti-monopoly regulations in effect since September 2019.[3] The elevation of such factors to statutory form would provide a clearer legal basis for enforcement. However, terms such as network effects and economies of scale remain to be defined.

### IV. Merger review

Since the AML took effect in August 2008, the merger review agency (Ministry of Commerce until May 2018, and SAMR since then) has decided thousands of concentration cases, some of which have resulted in the imposition of remedies ("conditions" in Chinese) while only a few concentrations have been prohibited outright (some have been withdrawn in advance of likely rejection). Based on experience accumulated over the years, the Draft Amendments propose several changes in the merger review sector.

**First**, Article 23 would clarify that a "controlling right" obtained by a business operator through contract or other means constitutes direct or indirect, sole or joint, actual or possible ability or status to exert decisive influence on another business operator's production activities or other major decisions.

**Second**, Article 24 would grant SAMR power to stipulate and revise filing thresholds based on economic development level and economy of scale and publish the same to the public in a timely manner. Article 24 would also require that SAMR proactively initiate investigations if business operators fail to notify a merger when a notification threshold is reached. Additionally, even if a notification threshold has not been reached, SAMR may still initiate an investigation *sua sponte* into the transaction if it deems that such transaction presents potential anti-competitive effects. Article 34 would further allow SAMR to impose restrictive conditions on or terminate a transaction that has not crossed a revenue threshold for mandatory review but is nonetheless actually or potentially anti-competitive.

SAMR has since 2018 imposed penalties in several cases for failure-to-file when the revenue thresholds have been crossed. SAMR has not initiated any investigations into concentrations (contemplated or completed) if the revenue thresholds have not been met. The above-mentioned proposed changes are especially significant in the Internet era where anti-competitive concentrations may involve companies that have not generated substantial revenues. With these proposed changes, SAMR would have even more sweeping investigative power into any business concentration (merger, acquisition, joint venture or

other contractual arrangement) regardless of revenue or deal value, on top of its already powerful extraterritorial reach.

*Third*, Article 30 would institute tolling mechanism for merger reviews. The traditional review time limits (up to 30 calendar days for Phase I review, 90 days for Phase II, and 60 days for extended Phase II, *i.e.*, Phase III) would be tolled when (a) business operators apply for or agree to a suspension of the review; (b) business operators are asked to supplement materials; or (c) while restrictive conditions are being negotiated.

Until now, notifications must be withdrawn and refiled if SAMR is unable to complete its review within the statutory review period, *i.e.*, by the end of Phase III, typically because the parties are reluctant to agree to SAMR's demand for remedies. If the parties wish to continue to pursue the transaction, they must withdraw and file for a new review restarting the clock in Phase I. With the above tolling mechanism, SAMR and business operators would have more latitude to suspend the clock and avoid the need for such withdrawal and refiling, but it would not necessarily translate into a faster review.

*Fourth*, to implement the merger review system, SAMR on January 7 published the Draft Interim Regulations on Merger Review 《经营者集中审查暂行规定》(征求意见稿) (Draft Regulations), with comments due by February 7. The Draft Regulations would encompass all prior and still effective rules and guidelines regarding merger notifications. The Draft Regulations would clarify measures for calculation of revenue, specify filing document requirements and review procedures for regular reviews, illustrate qualifications for the simplified (Phase I) review procedure, and provide detailed explanations about factors to be considered when conducting a review, such as market share, level of market concentration and barriers to entry. The Draft Regulations would also clarify rules for imposing, supervising and implementing remedies. Investigative power into illegal concentrations would also be specified to cover investigative timeline, penalties and manners.

## V. Enhanced enforcement and higher penalties

Article 44 would provide that the public security authorities when necessary shall assist the anti-monopoly enforcement agencies (SAMR and its provincial and local counterparts) to conduct investigations into monopolistic activities.

Articles 42, 46 and 52 would aim to prevent public authorities from abusing their administrative power to restrict or exclude competition and require that anti-monopoly enforcement agencies protect personal privacy when engaged in law enforcement.

Legal liability for companies, individuals and trade associations would be substantially increased:

- For companies that have reached monopoly agreements but have yet to implement them or have yet to generate revenue, the penalty would be increased 100 times to a maximum of RMB 50 million from the current RMB 500,000 (Article 53).
- Companies that organize or help others to conclude monopoly agreements would be newly penalized up to a maximum of 10% of their revenue in the previous year (Article 53).
- Trade associations that organize business operators to conclude monopoly agreements would be subject to fines of up to RMB 5 million, ten times higher than the current maximum of RMB 500,000, as well as an order to cease the illegal action (Article 53).

- Companies that fail to notify mergers, merge without approval, or violate merger decisions would be fined up to 10% of their total revenue in the previous year instead of the current maximum of RMB 500,000, and face additional restrictive conditions (Article 55).

- Business operators would potentially be subject to criminal liability if the conduct reaches the level of criminality under the Criminal Law (Article 57).

- Fines for obstruction of an investigation would also be raised to a maximum of 1% of revenue in the previous year; where revenue has yet to be earned or is difficult to calculate, the maximum fine would be raised from RMB 1 million to RMB 5 million, or by ten-fold for individuals from RMB 100,000 to RMB 1 million.

**Conclusion**

China's business community has long urged that the AML be amended, and some proposed provisions would certainly be welcomed, *e.g.*, fair competition review, attempted clarification on Internet market dominance, a more streamlined merger review procedure, and curtailed abuse of administrative power. However, despite the reforms promised in the Draft Amendments, the immunity enjoyed by central state-owned enterprises under Article 7 with respect to monopolistic behavior not available to privately-owned and foreign-owned competitors would remain undisturbed.

Moreover, certain substantive provisions are not in line with international best practice, *e.g.*, apparently treating vertical monopolies illegal *per se* as opposed to applying the rule of reason. The issue of market dominance by Internet operators in the digital economy would begin to be addressed, but legal enforcement would largely be left to provincial and local regulators with uncertain effectiveness.

Further efficiency and checks, such as consistent and detailed review standards, should be incorporated into the merger review system to prevent the initiation of investigations and the politicization of enforcement in the interest of industrial policy.

1. http://www.samr.gov.cn/hd/zjdc/202001/t20200102_310120.html.

2. For our analysis of the Supreme People's Court ruling on RPM, please refer to https://www.wilmerhale.com/en/insights/client-alerts/20190703-chinas-supreme-peoples-court-rules-rpm-is-illegal-per-se.

3. See Article 11 of the Interim Provisions on Prohibition of the Abuse of Market Dominance, SAMR, June 26, 2019.

## *Contributors*



### Lester Ross

**PARTNER**

Partner-in-Charge, Beijing Office



### Kenneth Zhou

**PARTNER**

✉ lester.ross@wilmerhale.com
☎ +86 10 5901 6588

✉ kenneth.zhou@wilmerhale.com
☎ +86 10 5901 6588



**Tingting Liu**

COUNSEL

✉ tingting.liu@wilmerhale.com
☎ +86 10 5901 6588