# EXHIBIT Q

Applied Law of China | No.1, 2020

### Application of Laws to "Choose One of Two" of E-Commerce Platforms and Analysis Method

Jiao Haitao *

**Abstract:** "Choose One of Two" may constitute a monopoly agreement or a behavior of abuse of market dominant position in China's "Anti-Monopoly Law", and may also violate Article 35 of the "E-Commerce Law" and Article 12 of the "Anti-Unfair Competition Law". The "Anti-Monopoly Law" is a general law of market competition that can theoretically regulate all kinds of "Choose One of Two", but it usually focuses only on monopolistic behaviors with serious illegality. If a behavior constitutes a monopoly, it should no longer be recognized as an unfair competition, so Article 12 of the "Anti-Unfair Competition Law" and the "Anti-Monopoly Law" should not be applied simultaneously. Article 35 of the "E-Commerce Law" is not a competition law norm, but a legal norm for dealing with the transaction relationship between e-commerce platforms and operators in the platforms, therefore, it does not constitute a special law of the "Anti-Monopoly Law" and is independent from and run parallel to the "Anti-Monopoly Law" and Article 12 of the "Anti-Unfair Competition Law", and they can also be applied simultaneously. Since different laws have different standards for the illegality, the legality of "Choose One of Two" can only be judged on the basis of applying different laws. In applying the "Anti-Monopoly Law", it is very important to investigate the market position of an actor. And in evaluating competition damage of "Choose One of Two", it is necessary to consider whether the competition between brands is damaged or when there is only damage to the among-brand competition, whether there are greater cumulative effects. **Keywords:** Choose One of Two; law application; illegality standards

"Choose One of Two" has attracted a lot of attention in recent years. This behavior mainly refers to some e-commerce platforms restricting settled merchants from opening stores on other platforms at the same time, for example, they explicitly request that the merchants cannot settle on other platforms, or even if there is no explicit request, they take restriction measures such as search authority downgrading and store shielding when the merchants choose other platforms at the same time. Opinions on the legality and the regulatory path of "Choose One of Two" are quite different. In the theory of the "Anti-Monopoly Law", "Choose one of two" is used to describe exclusive dealings, which is a traditional monopoly that also generally exists in the offline market. When "Choose One of Two" occurs in the e-commerce field or is implemented by technical means, it is also related to the "E-Commerce Law" and the "Anti-Unfair Competition Law".

* Professor of the Civil, Commercial and Economic Law School of the China University of Political Science and Law.

This article was the phased objectives of "Determination and Regulation of Common Market Dominant Position in the Anti-Monopoly Law" (19SFB3040) of the National Rule of Law and Legal Theory Research Project of the Ministry of Justice in 2019, and was funded by the "Qian Duansheng Outstanding Scholar Support Program Funding Project" of the China University of Political Science and Law.

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China | No.1 2020

## I. Law application of "Choose One of Two"

At present, the understanding of people on the legality of "Choose One of Two" has not been unified, but they basically accepted that "Choose One of Two" should not be considered to be absolutely legal or illegal. The important reason is that whether it is legal or not is a strict legal judgment and must be based on legal rules. Relevant norms in China's "Anti-Monopoly Law", the "E-Commerce Law" and the "Anti-Unfair Competition Law" may all constitute the normative basis of "Choose One of Two", which in turn means legal regulations of "Choose One of Two" present three paths, but analytical frameworks may be different due to different standards for the illegality in different laws.

In the "Anti-Monopoly Law", "Choose One of Two" may constitute a vertical monopoly agreement or a behavior of abuse of market dominant position. However, China's "Anti-Monopoly Law" only lists a price agreement when stipulating the vertical monopoly agreement, and "Choose One of Two" is a non-price agreement, so the normative basis is not clear, and the possibility of law application is low. In contrast, a restricted transaction in the behavior of abuse of market dominant position is clearly stipulated in the "Anti-Monopoly Law", that is, "restricting a transaction counterparty to only conduct transactions with it or only conduct transactions with operators designated by it without justifiable reasons". "Choose One of Two" is essentially the restricted transaction, that is, the market is locked by locking customers, thereby crowding out competitors. To regulate "Choose One of Two" with a restricted transaction system, the analytical framework includes three essential steps: firstly, to prove that the actor has the market dominant position; secondly, to prove that "Choose One of Two" constitutes abuse of market dominant position; and thirdly, to prove there are no justifiable reasons. All three steps are not easy to do, and the determination of the market dominant position is the most difficult step. On one hand, the determination of the market dominant position is premised on the definition of relevant market, which is relatively clear or easier in traditional offline fields, but in online market (such as the e-commerce field), some people have always advocated the application of the two-sided market theory and the blurring of market boundaries, so that few of relevant markets defined are generally accepted; and on the other hand, the second-instance judgment of the "3Q" case as a "directive case" has a significant impact on the determination of the market dominant position in the Internet field, and the weakening of the market share factor and the emphasis on dynamic competition in this case further exacerbate the difficulty of determining the market dominant position. Therefore, in general, the system of abuse of market dominant position in China's "Anti-Monopoly Law" can become the normative basis for "Choose One of Two", but it is a difficult path.

If "Choose One of Two" occurs in the e-commerce field, Articles 22 and 35 of the "E-Commerce Law" also have prohibitive provisions, but the two are applied in different ways. Article 22 is a transfer provision, which only adds specific factors such as technological advantages, the number of users and control ability over related industries in the determination of the market dominant position, and its application still needs to return to the system of abuse of market dominant position in the "Anti-Monopoly Law", so it does not break through the analytical framework of the "Anti-Monopoly Law". Article 35 is a creation provision, which has complete behavior models and legal consequences and can be applied independently. [1] This article prohibits e-commerce platforms from "using service agreements, transaction rules, technologies and other means" to "unreasonably restrict or impose unreasonable conditions" on "transactions with other

---

[1] Zhu Li: "Connection of the Electronic Commerce Law and the Competition Law: System Logic and Prospects for Law Enforcement", documented on "Journal of Graduate School of Chinese Academy of Social Sciences" No. 2, 2019.

50

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

operators" by operators in the platforms. The analytical framework established by this article mainly has two points: one is that the restricted behavior occurs between the e-commerce platforms and the operators in the platforms; the second one is that the restriction is "unreasonable". The first point is easier to judge, and the focus of analysis is whether the restricted behavior is reasonable. This is basically consistent with the judgment of "justifiable reasons" for abuse of market dominant position in the "Anti-Monopoly Law". From this point of view, the application of Article 35 of the "E-Commerce Law" is relatively easy, any behavior which can apply the provision for abuse of market dominant position in the "Anti-Monopoly Law" can apply Article 35 of the "E-Commerce Law", but behaviors that meet the application conditions of the "E-Commerce Law" do not necessarily constitute the abuse of market dominant position.

In provisions on Internet unfair competition behaviors on Paragraph 2 of Article 12 of the "Anti-Unfair Competition Law", Paragraphs (2) and (3), namely "misleading, deceiving and forcing users to modify, shut down and uninstall network products or services legally provided by other operators" and "malicious incompatibility with network products or services legally provided by other operators" may also include "Choose One of Two". When these articles are applied, it is firstly necessary to prove that a "commonality element" is met, that is, they should conform to the general statement of Article 12 before behavior enumeration: firstly, in terms of behavior realization, it must be implemented by "using technical means" and "by affecting user choice or other manners"; secondly, in terms of behavior results, it must "obstruct or destruct the normal operation of network products or services legally provided by other operators." In addition, it is necessary to prove that "Choose One of Two" conforms to the behavioral expressions listed in Article 12, while Paragraphs (2) and (3) also use subjective expressions such as "misleading, deceiving and forcing" and "malicious" when enumerating the behavioral expressions, which requires that behaviors must be "malicious". The standard for "malicious" here is obviously stricter than a "fault" element in general torts,[2] even higher than "no justifiable reasons" in the abuse of market dominant position, that is, it is not only required to have no justifiable reasons, but also needs to prove that the actor has bad motives to harm others. From this point of view, the application standard of the "Anti-Unfair Competition Law" is rather special, and when whether "Choose One of Two" constitutes the unfair competition is judged, it is necessary to judge one by one from the maliciousness of the subjective aspect, the technicality of the behavior style, the hindrance or destructiveness of the damage result, etc. It also means that the scope of "Choose One of Two" that can be regulated by the "Anti-Unfair Competition Law" is narrow, is limited to technical restrictions in the Internet field, and is mainly used for exclusionary behaviors between software.

## II. Application Relationship of the Three Laws

Although all three laws have the potential to regulate "Choose One of Two", they differ in aspects of areas of application, application standard and legal consequence. Not all "choose one of two" practices will meet the elements of the three laws. Even if they meet the elements in form, the laws may not necessarily apply. Choosing to apply different laws may have different impacts; the application of some may even be better than the others..

(i) Application of the "Anti-Monopoly Law"

---

[2] Professor Wang Liming believes that there are two types of "viciousness" in the civil law: one is conceptual viciousness, which refers to the condition of knowing the existence of a certain situation and focusing on the actor's cognition of facts; and the other one is expressionism viciousness, which refers to bad motives, that is, the aim is to harm the interests of others, and it focuses on the culpability of the behavior on subjective will. See Wang Liming: "Research on the Tort Law", China Renmin University Press, 2004 edition, page 456.

51

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China| No.1, 2020

The "Anti-Monopoly Law" is the general law of market competition, and it can even be said to be a basic law of market economy. As long as the market economy system is implemented, competition should be presumed to have universal value, and the "Anti-Monopoly Law" is indispensable. Therefore, in the absence of special provisions of the laws (narrow sense), the "Anti-Monopoly Law" should be applicable to all market fields in principle. "Choose One of Two" may occur both online and offline, and it should be regulated by the "Anti-Monopoly Law" no matter who implements it or where it occurs.

A monopolistic behavior prohibited by the "Anti-Monopoly Law" destructs the market competition mechanism and is a behavior which has serious illegality and damages the public interests, therefore, the typical feature of regulations by the "Anti-Monopoly Law" is the heavy legal responsibility. Once "Choose One of Two" is identified as the monopolistic behavior, either it is the monopoly agreement or the abuse of market dominant position, it is possible in China to suffer a fine of 1% to 10% of the previous year's sales. Correspondingly, the application threshold of the "Anti-Monopoly Law" is relatively high, and the determination of the illegality of the monopolistic behavior usually needs to prove that the behavior has caused or may cause serious effect of damaging competition. The generation of the damage effect is often premised on the actor having a certain market power, or there are a large number of similar restrictions (market coverage) in the market. Even in a monopoly agreement, the market power or market coverage is also an important factor for analysis, if the market power of the actor is too small and the market coverage of similar agreements is low, even if the monopoly agreement is implemented, adverse effects on the market competition will be ignored, and intervention with the "Anti-Monopoly Law" does not necessarily to be conducted. In regulations of the behavior of abuse of market dominant position, this element is more obvious, and it is an indispensable step to prove that the actor has the market dominant position.

It can be seen that the "Anti-Monopoly Law" is mainly suitable for dealing with "Choose One of Two" implemented by large enterprises, or the circumstance that the actor may not have the strong market power, but "Choose One of Two" is common. The former mainly relies on the system of abuse of market dominant position, while the latter can also apply the system of monopoly agreement. The current analysis of the "Anti-Monopoly Law" for "Choose One of Two" in the practical and academic circles mainly focuses on the aspect of abuse of market dominant position, the determination of the market dominant position is more complicated, the difficulty in the Internet field is more difficult, and it also depends on evidence in civil litigations, so it is difficult to have a clear answer when asked in a general way about whether "Choose One of Two" violates the "Anti-Monopoly Law".

(ii) Application of Article 35 of the "E-Commerce Law"

Although Article 35 of the "E-Commerce Law" also only prohibits "unreasonable" restrictions, the directive meaning of the rules is much clearer than that of the "Anti-Monopoly Law". This article is mainly used to deal with the relationship between the e-commerce platforms and the operators in the platforms, the relationship is a vertical relationship, as long as the platforms have a certain dominant position relative to the operators in the platforms, the platforms may request that the operations "choose one of two".. For this special purpose, the application of this article does not involve horizontal comparison between the actor and its competitors, that is, it does not require the actor to have the market dominant position. Therefore, if "choose one of two" is implemented by an e-commerce platform, no matter what the market power of the platform is, and as long as there is no apparent justifiable reason, its illegality is mostly uncontroversial. Therefore, the advantages of Article 35 of the "E-Commerce Law" are more obvious—the content is relatively certain and the threshold for application is low. However, from the perspective of regulatory effect, this article also has shortcomings: firstly, the application fields are limited, and it can only be applied to the e-commerce field limited by Article 2 of the "E-Commerce Law"; secondly, the scope of application is limited, as the nature of this article is a legal norm for dealing with the internal relationship, it is more suitable for dealing with the individual and occasional "choose one of two", and if "choose one of two" is generalized and normalized, this article will basically fail; and thirdly, the legal liability is

52

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

low, and the maximum fine set by this article in the "E-Commerce Law" is only 2 million yuan. [3]

In terms of law application, what is the relationship between Article 35 of the "E-Commerce Law" and the "Anti-Monopoly Law"? From the perspective of legislative purposes, the nature of Article 35 of the "E-Commerce Law" is mainly the legal norm for dealing with the internal relationship between e-commerce platforms and operators in the platforms, rather than a purely competition law norm, so it has different legislative purposes and applicable objects from the "Anti-Monopoly Law", and they are independent of and run parallel to each other in the law application, and also can be applied simultaneously. The reason why the legal liability for violating Article 35 of the "E-Commerce Law" is relatively light is also determined by the nature of the article; and if it deals with the competitive relationship between platforms, the legal liability cannot be so light. However, after all, the unreasonable restrictions imposed by the e-commerce platforms on the operators in the platforms will also affect the competition between the platforms, so its application also deals with the competition relationship to a certain extent.

Then, can Article 35 of the "E-Commerce Law" be regarded as the special law of the "Anti-Monopoly Law" when the competition relationship is all involved? Some scholars tend to understand the relationship between the two laws in this way,[4] which can explain why the "E-Commerce Law" can make provisions inconsistent with the "Anti-Monopoly Law". However, the theories of general law and special law mainly solve the situation that general rules cannot be applied to special fields, special industries and special subjects, the two still deal with the same problem or the same type of behavior, and there is no difference in the problem type or behavior type. For example, the competition rules established by the "Anti-Monopoly Law" are the general law, but some industries are too special to introduce competition, so the application of competition rules is excluded from the industry supervision law, at this time, they deal with competition issues rather than two unrelated issues. That is to say, if two legal norms address different issues that are independent of each other, there is no such thing as general and special. From this point of view, although Article 35 of the "E-Commerce Law" may also regulate "Choose One of Two", this is only a "by-product", and its main purpose is to solve the internal relationship between the e-commerce platforms and the operators in the platforms, so it is completely different from the competition relationship regulated by the "Anti-Monopoly Law", and cannot be said to be the special law of the latter.

In addition, in the application of general law and special law, the special law has priority, that is, the application of special law excludes the application of general law. In other words, it is precisely because the general law is not suitable for special fields or special subjects that the special law needs to be created, since the special law is applicable, the general law has no room for application, and this is an important reason for the creation of the special law. If two legal norms have different purposes, it is obvious that the application of one legal norm cannot exclude the application of the other one. The application of Article 35 of the "E-Commerce Law" and the "Anti-Monopoly Law" is like this, it is necessary to apply the former to solve the unequal relationship between the e-commerce platforms and the operators in the platforms, it is also necessary to apply the latter to solve the competition relationship between different platforms, and solving one problem does not mean that the other problem is also solved, so these two legal norms can and should be applied simultaneously.

---

[3] The maximum fine of 2 million yuan has no deterrent effect on many e-commerce platforms, so in practice, if the plaintiff may choose the "Anti-Monopoly Law" with the larger application difficulty to pursue the social effect of the behavior, not just to terminate the illegal behavior. Regarding Article 35 of the "E-Commerce Law", some scholars pointed out that it still had a deficiency, that is, it only stipulates the administrative penalty liability, but not the civil liability, so it is difficult to be used as the basis for the restricted party to initiate a civil compensation lawsuit. In fact, this issue does not exist, in addition to citing this article, the parties will naturally cite the relevant provisions of the "Contract Law" or the "Tort Liability Law" when filing a civil lawsuit, that is to say, civil lawsuits filed under Article 35 of the "E-Commerce Law" are mainly tort lawsuits or contract lawsuits.

[4] Wang Xianlin: "Law Application of Restricted Transaction Behaviors in the E-Commerce Field", documented on "China Market Supervision and Administration", No. 9, 2019.

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China| No.1, 2020

(iii) Application of Article 12 of the "Anti-Unfair Competition Law"

Unfair competition behavior is a kind of anti-competitive behavior that is slightly less illegal than the monopolistic behavior. Article 12 of the "Anti-Unfair Competition Law" does not require the actor to have the market dominant position when regulating "Choose One of Two", which is the same as other unfair competition behaviors in requirement. However, similar to the "E-Commerce Law", the "Anti-Unfair Competition Law" has a narrow scope of application, which is mainly limited to technical "Choose One of Two"; and the legal liability is also low, and the maximum fine is only 3 million yuan.

Then, when "Choose One of Two" is involved at the same time, what is the relationship between the "Anti-Monopoly Law" and the "Anti-Unfair Competition Law"? Are they general laws or special laws? Since they are special laws, they must have "special" features, such as the application field, the application area and the application subject, but these two laws obviously belong to the category of general laws, and are both applicable in principle to competition behaviors of market subjects in all fields and areas. Although Article 12 of the "Anti-Unfair Competition Law" specifically targets the Internet field, the "Anti-Monopoly Law" is also applicable to the Internet field, and the competition behaviors in the Internet field should be prohibited no matter it is monopoly or unfair competition. Therefore, these two laws both establish universal regulations, and there is no issue of who is general and who is special.

In terms of law application, the "Anti-Monopoly Law" and the "Anti-Unfair Competition Law" jointly regulate the competition behavior, and the two have a clear division of labor and should complement each other without overlapping. However, even if the same type of behavior is regulated, different characterizations may be made due to the severity of the violation, and thus different legal responsibilities may be set. From a theoretical point of view, the monopolistic behavior is an unfair competition behavior with the more serious illegality, while the unfair competition is an unfair competition behavior with relatively minor illegality, and based on the illegal absorption theory, the behavior constituting a monopoly should no longer be regarded as an unfair competition behavior. In other words, if it is determined that certain "Choose One of Two" complies with the provisions of the "Anti-Monopoly Law" and constitutes the monopoly, no matter it is an abuse of market dominant position or a monopoly agreement, Article 12 of the "Anti-Unfair Competition Law" has no room for application. That is to say, the two laws should not be applied at the same time, which is completely different from the application relationship of Article 35 of the "E-Commerce Law" and the "Anti-Monopoly Law". The relationship between the unfair competition behavior and the monopolistic behavior can be compared to the relationship between public security violations and criminal offenses-once a certain behavior is identified as a crime to receive criminal penalties, there is no need to impose public security penalties. [5]

As for the application relationship of Article 12 of the "Anti-Unfair Competition Law" and Article 35 of the "E-Commerce Law", it is the same as that of the "Anti-Monopoly Law" and Article 35 of the "E-Commerce Law", and because they deal with different issues, they are mutually independent legal norms and can be applied simultaneously.

### III. Investigation of the Market Position of the Actor

---

[5] It is common in the law application that an illegal behavior has multiple attributes at the same time, for example, the behavior of infringing on another's trade secrets may be a behavior of infringement or breach of contract, a behavior of unfair competition, or a criminal behavior, but generally, multiple laws at the same level of violation will not be applied at the same time to impose cumulative liability or cumulative penalties. The reason why the infringement of trade secrets can obtain three illegal attributes at the same time is because it infringes multiple legal interests at different levels at the same time, constitutes illegal behaviors at different levels, and also needs to bear corresponding legal responsibilities at the same time. However, tort liability and liability for breach of contract cannot be assumed at the same time, and if it is determined to constitute unfair competition, it will not be determined to constitute a monopoly.

54

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.     http://www.cnki.net

Does the determination of the legality of "choose one of two" require the actor to have a certain market position? In the "E-Commerce Law" and the "Anti-Unfair Competition Law", the market position of the actor is not a key element indicative of illegality, but when the "Anti-Monopoly Law" is applied, investigation of the market position of the actor is very important.

(i) Standard for Market Position in the "E-Commerce Law" and the "Anti-Unfair Competition Law"

Article 35 of the "E-Commerce Law" mainly adjusts the transaction relationship between the e-commerce platforms and the operators in the platforms, as long as the e-commerce platforms have the transaction advantage position over the operators in the platforms, it may impose unreasonable restrictions on the latter, and as for how is the market power of the e-commerce platforms compared with other e-commerce platforms as their competitors, there is no impact on the illegality of the behavior. As long as this article is aimed at resolving the unequal relationship between the e-commerce platforms and the operators in the platforms, it should not make special requirements on the market power of the actor. However, e-commerce platforms that can usually impose various unreasonable restrictions will have a certain market power, but this power may not reach the level of market dominant position, and the market dominant position is a result of horizontal comparison, that is, the market position of the actor compared to his competitors.

The "Anti-Unfair Competition Law" prohibits those behaviors using "unfair" means to conduct competition, the unfairness of the means is the focus of its attention, and the market position of the actor is not important. Many unfair competition behaviors are implemented by small enterprises, or are implemented against larger and more threatening enterprises, because the illegality of the unfair competition behaviors is usually much more obvious than that of monopolistic behaviors, and only small enterprises do not hesitate to destroy their reputation to commit such illegal behaviors. The severity of the illegality of the behavior is also a division of labor between the "Anti-Unfair Competition Law" and the "Anti-Monopoly Law", or a clear distinction of them. Both of them regulate the competition behavior, but the destructiveness of the monopolistic behaviors is obviously much greater than that of unfair competition behaviors. The "Anti-Monopoly Law" ensures the existence of competition, the "Anti-Unfair Competition Law" ensures the legality of competition, obviously, the existence of competition is more important than the legality of competition means, the former is fundamental, and if the competition is excluded or restricted, the market mechanism itself is difficult to function effectively, which is a devastating disruption. This is why the "Anti-Monopoly Law" basically only prohibits those illegal behaviors that have the effect of severely restricting competition, and pays less attention to minor illegal behaviors, only serious illegal behaviors will shake the foundation of competition and require the intervention of the "Anti-Monopoly Law". [6] The function of the "Anti-Unfair Competition Law" is to allow the market subjects to participate in competition more fairly on the basis of guaranteeing the competition mechanism, so it establishes a relatively lower standard for the illegality; and correspondingly, the unfair competition behaviors will not eliminate competition, and even if it restricts competition, the degree will not be serious, so that its legal responsibility will be lighter.

According to Article 12 of the "Anti-Unfair Competition Law", as long as the actor "obstructs or destructs normal operation of network products or services legally provided by other operators" in an improper way, it constitutes an illegal behavior, and as for how much market damage will be caused, the law does not clearly require it. Therefore, even if the actor is only a small enterprise, or only "destructs" or "obstructs" a few or even certain products or services of others, the establishment of unfair competition is not affected.

---

[6] Some people may say that the prohibition of monopoly agreements by the anti-monopoly law does not require the actor to have a certain market position, so even if some monopoly agreements are slightly illegal, the "Anti-Monopoly Law" will prohibit them. From the perspective of legal norms, this may be the case, but from the perspective of the "Anti-Monopoly Law", if an agreement has a relatively minor impact on competition, it should not be deemed to constitute an illegal monopoly agreement. The European Court of Justice made it clear in its judgment that the provisions of Article 101 of "Treaty on the Functioning of the European Union" should not be applicable if an agreement has only an insignificant effect on the market. Relevant cases are as follows: Case 5/69, Völk v Vervaecke [1969] ECR 295, para. 7; Case C-7/95, P John Deere v Commission [1998] ECR I-3111, para. 77; Joined Cases C-215 /96 and C-216/96, Bagnasco and Others [1999] ECR I-135, para. 34; Case C-238/05, As nef-Equifax and Administración del Estado [2006] ECR I-11125, para, 50; Case C-226/11, Expedia, ECLI:EU:C:2012:795, para. 16

55

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China| No.1, 2020

(ii) The Standard for Market Position in the "Anti-Monopoly Law"

"Choose One of Two" may constitute a vertical monopoly agreement in the "Anti-Monopoly Law", or it may constitute the behavior of abuse of market dominant position. In the determination of the vertical monopoly agreement, although the market power of the actor does not seem to be important from a legislative point of view, in fact, the market power of the actor affects not only the legality of the monopoly agreement, but also the degree of damage of the monopoly agreement. [7] In the determination of abuse of market dominant position, the importance of the market power is self-evident.

The definition of the relevant market is usually the premise of judging the market power of the actor. It is relatively easy to define the relevant market in the offline traditional field, but when defining the relevant market in the Internet field, the current academic circle seems to be caught in a dilemma: the definition of the relevant market cannot be circumvented, and once it is defined, theoretical problems such as bilateral markets, blurred market boundaries and platform economics will be faced. In fact, the definition of the relevant market itself is only a means rather than a purpose, and the definition of the relevant market is inevitably affected by subjective factors, which does not mean that there must be an objective relevant market waiting for us to discover it. Therefore, in individual cases, we can only define a relatively objective relevant market based on existing materials or evidence, rather than exhausting all possibilities and analyzing every possible alternative.

As far as "Choose One of Two" of the e-commerce platforms, the following two points should be paid special attention to when defining the relevant market:

Firstly, the definition of the relevant market mainly relies on alternative analysis, but any alternative is relative, and there is no absolute alternative. Alternative is a subjective judgment, and everyone's perception of alternative is different. If a product involved is A, whether a candidate product B can replace A can only be determined based on all potential buyer groups, not one or some buyers, and not only consumers, because individual buyers or consumers are small in purchase, and changes in subtle factor can affect alternative results. In addition, in the overall judgment, it does not mean that 90% or even 100% of buyers believe that B can replace A before they can think that the two are in the same relevant market. An absolute proportion standard cannot be set on laws, and in fact there is no such standard. There are more or less problems whether it is 50% or higher proportion, and it will become the point of contention for the plaintiff and the defendant, so the results of the alternative analysis can only provide us with a relatively reliable reference, rather than a correct answer. In other words, we can only say that the vast majority of demanders believe that B can replace A, so B and A should be in the same relevant market. Whether B and A should be defined as the same market ultimately depends on evidentiary materials provided by the plaintiff and the defendant.

Secondly, the definition of the relevant market should start from the market where the actor is located, and then the alternative of other markets to the market where the actor is located should be considered rather than contrary. Precisely because the definition of the relevant market is not an end in itself, but only a means to assess the market power of the actor, it is meaningless and impossible to define the relevant market in isolation from individual cases to define the relevant market. In the individual cases, the size of the relevant market depends on the alternative of the candidate market on the current market, and the current market is the market where the actor is located, which is determined and the starting point for defining the relevant market. If the product involved in the case (with the same geographical market) is A, then A constitutes the starting point for the definition of the product market, then we should analyze the alternative of B and C to A, rather than the alternative of A to B and C.

---

[7] For details of this part, please refer to Jiao Haitao: " Analysis of the Anti-Monopoly Law on "Choose One of Two" Behaviors," documented on "Finance and Economics Law", No. 5, 2018

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

For example, if a telecom enterprise is accused of abuse of market dominant position in the mobile communication service market, the relevant product market should be defined from the mobile communication service (A) as the starting point, and we need to analyze whether the fixed-line service (B) can replace the mobile communication service, I believe most people think it is not possible, so the two are not in the same relevant market in this case; but if the actor is accused of abuse of fixed-line service, it is necessary to analyze whether the mobile communication service can replace the fixed-line service, the point of view should be yes, so the two are in the same relevant market at this time. It can be seen that the alternative in the definition of the relevant market does not require mutual alternative, but only requires a single alternative, that is, the alternative of the candidate market for the current market. [8] The definition of the relevant market in the e-commerce field should also follow this principle-if the behavior involved in the case occurs in the online market, we should analyze whether the offline market can replace the online market when defining the relevant market, and the alternative of the online market and the offline market should have nothing to do with the behavior involved.

After the relevant market is defined, it is necessary to assess the market power of the actor. The determination of the market dominant position in the Internet industry currently faces the challenge of dynamic competition, especially after the "3Q" case, most scholars advocate the dynamic nature of the Internet industry, so the determination of the dominant position must be cautious. In fact, any market is dynamic, as long as there is competition, there must be survival of the fittest. The essence of the market dominant position is the possibility of user transfer, if most users are unable to switch to alternative operators, it is determined that dominant position does not differentiate between offline or online markets. In addition, the dynamic nature of the Internet industry itself means that the current Internet development situation is very different from ten or five years ago, it is true that some Internet enterprises are no longer prosperous, but there are also Internet enterprises that are getting bigger and bigger. In the face of dynamic competition, we can stick to the long-term standard, and if an enterprise has a high market share for a long period of time, then the market share can largely represent the existence of the dominant position.

### IV. Judgment and Measurement of Damage Effect

(i) The Damage Effect of "Choose One of Two"

The damage effect is a common element of illegal behaviors, including damage that has occurred or may occur, but different laws protect different legal interests, so the illegal behaviors that produce different damage effects need to be regulated by different laws. As far as "Choose One of Two" is concerned, it can produce multiple damages. When the e-commerce platforms require the operators in the platforms to conduct "Choose One of Two", it damages the freedom of transactions of the operators in the platforms, thus constituting the violation of Article 35 of the "E-Commerce Law". This article mainly adjusts the transaction relationship, is the protection of the operators in the platforms, and is more suitable to remedy the individual damage suffered by the operators in the platforms. If "Choose One of Two" destructs or hinders the normal operation of Internet products or services legally provided by others, it will not only cause direct damage to others, but also disrupt the fair competition order, thereby constituting the unfair competition behavior, and Article 12 of the "Anti-Unfair Competition Law" mainly addresses this issue. If "Choose One of Two" is very serious, it may also exclude or restrict market competition, and then anti-monopoly intervention is required.

---

[8] In the first-instance judgment of the 3Q monopoly case, the court made such a mistake in defining the geographical market. The court of first instance held that Tencent's QQ has installed versions in different languages, so overseas users can also use QQ, so the geographical market of this case should be global. The court here takes the alternative of the Chinese mainland market to the overseas market as the criterion for defining the geographical market. The author believes that this is a misunderstanding of alternative.

57

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China| No.1, 2020

As far as the system of abuse of market dominant position in the "Anti-Monopoly Law" is concerned, although Article 17 of China's "Anti-Monopoly Law" uses the word "prohibition" when enumerating the behavior of abuse, and collectively refers the various behaviors listed in Paragraph 1 of Article 17 as the "behaviors of abuse of market dominant position", which seems to mean that as long as the actor performs the listed behaviors, it constitutes "abuse" regardless of the result, but from the principle of the "Anti-Monopoly Law", only when the behavior suspected of abuse has caused or may cause the exclusion or restriction of competition, can law enforcement agencies be necessary to intervene in such behaviors. In other words, the key to judge what is abuse is whether the actor uses its market dominant position to harm competition; if the relevant behavior does not have the effect of exclusion of competition, it does not belong to "abuse" in the sense of the "Anti-Monopoly Law". [9] Article 6 of China's "Anti-Monopoly Law" stipulates: "an operator with the market dominant position shall not abuse its market dominant position to exclude or restrict competition." The "exclude or restrict competition" here should be understood as the effect element of the behavior of abuse of market dominant position.

The emphasis on damaging the competition effect is also clearly reflected in the European Commission's "Enforcement Key Guidelines on the Application of Article 82 of the Treaty on the European Communities to Investigate Enterprises with Market Dominant Positions for Abuse of Exclusionary Conduct". Paragraph 20 of the Guidelines makes it clear that the European Commission will generally only rely on Article 82 of the Treaty on the European Communities (now Article 102 of the Treaty on the Functioning of the European Union) only if there is tangible and convincing evidence that the alleged abuse behavior could lead to an anti-competitive blocking effect; the Guidelines also establish the "General approach to exclusionary conduct" in Part III, which mainly includes three steps: firstly, to analyze whether there is the market dominant position; secondly, to analyze whether anti-competitive foreclosure is led; and finally to analyze whether there are justifiable reasons. [10] Among them, "anti-competitive foreclosure" refers to the damage effect of the behavior of abuse of market dominant position.

It is generally believed that the damage effects of the behavior of abuse of market dominant position mainly include two types: one is the direct exploitation of clients and consumers; and the other one is blockade of competition in the relevant market (what the European Commission calls as the anticompetitive blockade). [11] The behaviors of abuse are thus also divided into exploitative abuse and exclusive abuse. The competition damage of "Choose One of Two" is mainly to crowd out competitors, that is, block competitors in an anti-competitive manner, resulting in the exclusion of effective competition in the market in which the behavior involved is located or upstream and downstream markets, and specifically, it means that the effective market expansion or market entry of competitors of the actor (actual or potential) or competitors in upstream and downstream markets is hindered or excluded.

(ii) Measurement of the Market Blockade Effect

In terms of the "Anti-Monopoly Law", judging the competition damage of "Choose One of Two" can start from the following two aspects:

1. Analysis of the competition damage of "Choose One of Two" must be combined with the behavior types

The so-called behavior types mainly refer to either "Choose One of Two" restricts intra-brand competition or among-brand competition. In the theory of the "Anti-Monopoly Law", competition is divided into "intra-brand competition" and "among-brand competition", the former is the competition between different sales channels (such as retailers) of the same brand, and the latter is the competition among different brands. The "Anti-Monopoly Law" mainly maintains the among-brand competition-if the

---

[9] Xu Guangyao: General Theory of European Community Competition Law, Wuhan University Press, 2006, P 384.

[10] Guidance on the Commission's enforcement priorities in applying Article 82 of the EC Treaty to abusive exclusionary conduct by dominant undertakings (2009/C 45/02), OJ [2009] C 45/7, paras.9-31.

[11] The ultimate purpose of blocking market competition is also to exploit clients or consumers, that is, by excluding or restricting the effective market expansion or market entry of competitors, the subject with the dominant market position can increase product prices without causing consumers transferring to its competitors

58

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

competition among brands is fierce, the reduction of competition in brands is unlikely to weaken the market competition situation, nor is it likely to have a damage effect on consumers, because the pressure of competition among brands makes the retailers of a certain brand to be afraid to raise prices or reduce supply even if there is no competition, otherwise consumers will move to other competing brands. [12] For example, even if there is no competition among the different retailers of the A brand, as long as there are enough competitors of the A brand in the market, consumers will have enough choice, even if the retailers of the A brand raise prices at the same time, it is not necessary to buy the A brand by the customers. However, the competition in the brands becomes important when the among-brand competition is insufficient. In the above example, if there are few competitors of the A brand in the market, the price raise of the retailers of the A brand will bring damage to the consumers, at this time, it is very necessary to maintain the competition among the retailers of the A brand.

"Choose One of Two" may restrict both in-brand competition and among-brand competition, and to analyze its damage effect, it is necessary to first determine which kind of competition it damages.

Firstly, "Choose One of Two" restricting in-brand competition can be divided into two types according to the transaction link: one is exclusive sourcing that occurs in the procurement link, which refers that for commodities of a specific brand, the commodity supply channels of buyers are restricted, that is, they can only be purchased from a specific supplier, for example, an A brand mobile phone manufacturer requires that the retailers can only buy A brand mobile phones from its designated supplier, and it doesn't matter whether the retailers also sell mobile phones of other brands; and the second one is exclusive distribution that occurs in the sales process, which means that in a specific region, a specific period or for a specific customer group, the supplier only sells commodities in one channel, resulting in the exclusive distribution of this sales channel, for example, the A brand mobile phone manufacturer ensures or is required to hand over the mobile phones to the sole dealer for sale within an administrative area.

Secondly, "Choose One of Two" restricting among-brand competition also includes two situations due to different transaction links: one is exclusive supply that occurs in the procurement process, which means that suppliers of intermediate products such as raw materials and components are required or induced to only or mainly sell commodities to one buyer, for example, the A brand mobile phone manufacturer requires component suppliers to only supply accessories to itself, but not to their competitors-the "Choose One of Two" dispute between Luckin Coffee and Starbucks in 2018 belongs to this; and the second one is exclusive purchasing in the sales process, or called as single branding, which means that the retailers are required or induced to only or mainly purchase and sell commodities of a specific brand, but cannot sell competing brands, for example, the A brand mobile phone manufacturer requires its retailers to sell only A brand mobile phones, but not other-brand mobile phones.

The current hotly debated "Choose One of Two" of e-commerce platforms is mainly due to the aforementioned second restriction of the first type, that is, exclusive distribution that restricts competition within brands. The e-commerce platforms provide sales channels, the operators in the platforms represent the manufacturers, the manufacturers are restricted from opening stores on other e-commerce platforms, and in fact, the sales channels of the same brand are restricted, that is, the competition within the brand is restricted. At this time, as long as the competition among brands is sufficient, the damage effect of such behavior is relatively limited, which may be an important reason why many people think that "Choose One of Two" of e-commerce platforms does not require the intervention of the "Anti-Monopoly Law". However, judging the type of competition damage is only the first step.

---

[12] Jiao Haitao: "Anti-monopoly Law Regulation of Vertical Non-price Monopoly Agreements: Dilemma and Solution", Modern Law, No. 4, 2019.

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China | No.1, 2020

2. Analysis of the competition damage of "Choose One of Two" must consider the "cumulative effect"

The cumulative effect refers to how many similar restrictions exist in the market, popularly speaking, it is to add up similar restrictions in the market. Even if "Choose One of Two" only restricts the in-brand competition, the greater the cumulative effect is, the weaker the in-brand competition is, and at this time, even if only in-brand competition is restricted, it may become a problem.

We imagine such an example: a certain type of commodities have four competitive brands including A, B, C and D, and a sales platform requires that the A brand can only be sold on this platform, which limits the sales channels of the A brand and is a kind of "Choose One of Two" restricting in-brand competition, if the competitors B, C and D of the A brand are not restricted, that is, they can be sold on other platforms besides this platform, then "Choose One of Two" will not have any damage to consumers, because even if the price of the A brand in the platform increases, and even A, B, C and D all raise the price, consumers still have B, C and D brands to buy on other platforms. However, if the platform also implements the same "Choose One of Two" for B, C and D at the same time, consumers will be got in the neck, because the platform can completely raise the price of A, B, C and D at the same time, and at this time, consumers have no other way to buy.

In the first case of the above example, in-brand competition exists, so the restriction of in-brand competition will not cause much problem; in the second case, although there are multiple brands in the market, one retailer has obtained the exclusive sales rights of these brands, the in-brand competition is severely weakened, and the damage effect will appear at this time. At present, "Choose One of Two" of the e-commerce platforms is mainly in the case, that is, the actor implements "Choose One of Two" for many or even the vast majority of brands at the same time. Of course, the above example is too extreme, that is, all brands are restricted in sales channels, and the cumulative effect reaches 100%. If A, B, C and D have a combined market share of 60%, the cumulative effect is 60%, and there is effective competition for 40% of the market share. Generally speaking, the more brands that were forced to implement "Choose One of Two", the greater the cumulative effect is, the weaker the in-brand competition is, and the greater the damage of "Choose One of Two" is. Therefore, in order to accurately assess the damage of "Choose One of Two", we must consider the proportion of blocked customers.

The above-mentioned cumulative effect is reflected in that the same actor imposes the same restrictions on most customers, and the cumulative effect may also have a second manifestation in the market, that is, multiple actors (competitors) impose same restrictions on their respective groups of customers. We can slightly change the previous example to illustrate this situation: assuming that the market share of competitive brands A, B, C and D is 80%, a first sales platform requires that the A brand can only be sold on this platform, and second, third and fourth sales platforms required B, C and D brands to be sold only on their platforms, that is, the first second, third and fourth sales platforms implement the same "Choose One of Two" on the A, B, C and D brands respectively, which is also a kind of cumulative effect. In this case, the degree of weakening of among-brand competition is not as obvious as in the previous example, but it is also limited, because the four platforms all implement "Choose One of Two", consumers can only buy the A brand on the first platform A, and buy B, C and D only on the second, third and fourth platforms respectively. Although the competition among the four brands still exists, the intensity is obviously much weaker than when there is no "Choose One of Two".

In addition, regardless of which type of cumulative effect it is, "Choose One of Two" will have an impact on the competitors of the actor, thereby restricting the competition between the actor and its competitors. The direct purpose of the actor for implementing "Choose One of Two" is to block the competitors. In the first example, if 100% of market share of a certain category of commodity is controlled by one platform, the competitors of the platform are completely blocked, and there are no similar commodities to sell. In the second example, the blocked market share reaches 80%, and other sales platforms can only compete for the remaining 20% share. If A, B, C and D are relatively well-known in the market and consumers have the recognition on them, even if the remaining 20% of share is all sold by another platform, it is actually not enough to compete effectively with A, B, C and D.

60

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

It can be seen that "Choose One of Two" may damage both in-brand competition and among-brand competition. Generally speaking, if "Choose One of Two" excludes competing manufacturers, it will directly damage the competition between brands; even if "Choose One of Two" only restricts the sales channels, in addition to directly harming competition among retailers, it will directly damage the competition among brands under the condition of considering the cumulative effect. Assessing the competitive damage of "Choose One of Two", the behavior types must be combined with the cumulative effect. Of course, there may also be justifiable reasons for "Choose One of Two", such as solving the free-rider problem or lock-up problem, which also needs to be analyzed and weighed in individual cases. [13]

## Conclusions

"Choose One of Two" is an figurative expression, and has different attributes in different laws. In the "Anti-Monopoly Law", "Choose One of Two" mainly refers to exclusive transactions, the kind of restricted competition behavior occurring between transaction subjects, such as where upstream or downstream operators are required or induced to only conduct transactions with the actor or not to conduct transactions with the competitors of the actor. Legally speaking, "Choose One of Two" may be a monopoly agreement or a behavior of abuse of market dominant position. In the e-commerce field, "Choose One of Two" may be manifested as an unreasonable restriction an e-commerce platform imposes on its operators in choosing transaction partners, which constitutes a violation of Article 35 of the "E-Commerce Law". In the Internet field, "Choose One of Two" may be manifested as maliciously "obstructing or destructing the normal operation of network products or services legally provided by other operators" by technical means, which may constitute unfair competition. As the elements for showing violations of each law differ, there can be no general conclusions on the legality of "Choose One of Two," which can only be determined depending on which laws are applicable.

The application relationship of the three laws is more complicated. The "Anti-Monopoly Law" is the general law of market competition, and all kinds of "Choose One of Two" can be regulated by the "Anti-Monopoly Law"; and however, since the "Anti-Monopoly Law" only prohibits those monopolistic behaviors that are more illegal, so many kinds of "Choose One of Two" may not meet the standard for illegalities of the "Anti-Monopoly Law". The "Anti-Monopoly Law" is mainly suitable for dealing with "Choose One of Two" implemented by an enterprise with the dominant position, or the circumstance that the "Choose One of Two" is common even though the actor does not have the dominant position. Article 35 of the "E-Commerce Law" itself is not a norm of competition law, but a legal norm to deal with the transaction relationship between e-commerce platforms and operators in the platforms, therefore, it has different legislative purposes and applicable objects from the "Anti-Monopoly Law" and does not constitute the special law of the "Anti-Monopoly Law", and the two are independent of and run parallel to each other in terms of law application, and can be applied at the same time. The "Anti-Unfair Competition Law" and the "Anti-Monopoly Law" have similar functions and both regulate the competition behavior, but unfair competition is less illegal than the monopoly behavior, and one behavior constituting the monopoly should not be regarded as the unfair competition, so that Article 12 of the "Anti-Unfair Competition Law" and the "Anti-Monopoly Law" should not be applied at the same time. However, Article 12 of the "Anti-Unfair Competition Law" and Article 35 of the "E-Commerce Law" deal with different issues and are independent legal norms, and there is no obstacle to application at the same time.

---

[13] "Choose One of Two" sometimes indeed has positive effects. For example, in a highly technical field, in order to motivate the counterparty to purchase its professional equipment or technology, the supplier may provide the counterparty with expensive technical training and other pre-sales services, and at this time, as the supplier naturally hopes that the counterparty will only cooperate with itself. Under the framework of "Anti-Monopoly Law," such practice is called "exclusive investment", which is a necessary means to solve the "lock-up" problem, thereby constituting justifiable reasons for exclusive transactions. However, the premise of applying this rule is that the actor's investment must be exclusive, that is, it is only aimed at the counterparty and cannot be transferred for other purposes, in other words, as long as the counterparty conducts transaction with a third party, the actor's investment becomes a sunk cost. For related content, please refer to Jiao Haitao: "Analysis of Anti-Monopoly Laws on 'Choose One of Two'", documented on "Financial Law", No. 5, 2018.

61

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Applied Law of China| No.1, 2020

In the determination of the illegality of "Choose One of Two", the market position of the actor is not an illegal element in the "E-Commerce Law" and the "Anti-Unfair Competition Law", but when the "Anti-Monopoly Law" is applied, investigation of the market position of the actor is very important. Especially in the system of abuse of market dominant position, the definition of the relevant market and the determination of the market dominant position are essential steps.

The damage effect of "Choose One of Two" is closely related to its nature. "Choose One of Two" implemented by the e-commerce platforms mainly damages the transaction freedom of the operators in the platforms. "Choose One of Two" as the unfair competition behavior not only directly destructs and hinders the normal operation of Internet products or services legally provided by others, but also destructs the fair competition order. If "Choose One of Two" is very serious, it may also have the effect of excluding and restricting market competition, which is a concern of the "Anti-Monopoly Law". The "Anti-Monopoly Law" assesses the competitive damage of "Choose One of Two", which needs to be combined with its behavior type and cumulative effects. If "Choose One of Two" directly damages in-brand competition, or only damages among-brand competition but has the great cumulative effect, the intervention with the "Anti-Monopoly Law" is necessary.

**Abstract:** Exclusive dealing may constitute a monopoly agreement or abuse of dominance in China's anti-monopoly law (AML), and may also violate Art·35 of the E-commerce Law of the People's Republic of China (ECL) and Art·12 of the Law of the People's Republic of China on Anti-Unfair Competition (AUCL)· The AML is the general law of market competition that regulates all exclusive dealings, but it usually focuses only on serious violations· If a behavior is recognized as monopoly, it should no longer be recognized as unfair competition, so the AML and Art·12 of AUCL should not be applied simultaneously· Art·35 of the ECL is not a competition law norm, but a norm dealing with the transaction relationships between the e-commerce platform and the operators within the platform· Therefore, it does not constitute a special law of the AML and is independent from the AML and Art·12 of the AUCL· These norms can be applied simultaneously, because different laws have different requirements, the legality of exclusive dealing can only be judged on the basis of different law application· In the application of the AML, it is very important to investigate the market power of the actor, while the evaluation of the competition harm of exclusive dealing needs to see whether it damages the Inter-brand Competition or whether it has greater cumulative effects when only the Intra-brand Competition is damaged·

**Keywords:** exclusive dealing; law application; illegal standards

(Editor in charge: Niu Kai)

62

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

*中国应用法学* ▍ 2020 年第 1 期

# 电商平台"二选一"的法律适用与分析方法

焦海涛 *

**内容摘要** "二选一"可能构成我国《反垄断法》中的垄断协议或滥用市场支配地位行为，也可能违反《电子商务法》第 35 条和《反不正当竞争法》第 12 条。反垄断法是市场竞争的一般法，理论上能够规范所有的"二选一"，但反垄断法通常只关注违法性较为严重的垄断行为。一种行为构成垄断的，就不应再认定为不正当竞争，所以《反不正当竞争法》第 12 条与《反垄断法》不应同时适用。《电子商务法》第 35 条并非竞争法规范，而是处理电商平台与平台内经营者之间交易关系的法律规范，它不构成《反垄断法》的特别法，与《反垄断法》及《反不正当竞争法》第 12 条相互独立、并行不悖，亦可同时适用。由于不同法确立的违法性标准并不相同，"二选一"的合法性只能基于不同的法律适用来判断。在适用《反垄断法》时，考察行为人的市场地位非常重要，而评估"二选一"的竞争损害，则需要看其是否损害品牌间竞争，或在仅损害品牌内竞争时是否具有较大的累积效果。

**关键词** "二选一" 法律适用 违法性标准

"二选一"近年来引起较大关注。这种行为主要是指某些电商平台对入驻商家同时在其他平台开店行为予以限制，如明确要求不能入驻其他平台，或虽未明确要求，但在商家同时选择其他平台时施以搜索降权、屏蔽店铺等限制措施。对"二选一"的合法性与规制路径，观点差异较大。在反垄断法理论上，"二选一"被称为排他交易

---

\*    中国政法大学民商经济法学院教授。
    本文为 2019 年司法部国家法治与法学理论研究项目"反垄断法上共同市场支配地位的认定与规制"（19SFB3040）的阶段性成果，并受"中国政法大学钱端升杰出学者支持计划资助项目"资助。

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

中国应用法学 ▎2020 年第 1 期

（exclusive dealing），是一种线下市场也普遍存在的传统垄断行为。当"二选一"发生在电商领域或以技术手段实施时，又与电子商务法和反不正当竞争法发生关联。

## 一、"二选一"的法律适用

目前人们对"二选一"的合法性认识还未统一，但基本认可不应绝对地说其合法或违法。重要原因是，合法与否是一种严格的法律判断，必须建立在法律规则之上，我国《反垄断法》《电子商务法》和《反不正当竞争法》中的相关规范都可能构成"二选一"的规范依据，进而使得"二选一"的法律规制呈现三条路径，但不同法律中的违法性标准并不相同，分析框架也会有所区别。

在反垄断法中，"二选一"可能构成纵向垄断协议或滥用市场支配地位行为。不过，我国《反垄断法》规定纵向垄断协议时只列举了价格协议，而"二选一"是非价格协议，故规范依据不太明确，法律适用的可能性较低。相比而言，滥用市场支配地位行为中的限定交易在《反垄断法》上有明确规定，即"没有正当理由，限定交易相对人只能与其进行交易或者只能与其指定的经营者进行交易"。"二选一"本质上就是限定交易，即通过锁定客户来封锁市场，进而排挤竞争对手。以限定交易制度来规制"二选一"，分析框架包括必不可少的三步：一是证明行为人具有市场支配地位；二是证明"二选一"构成市场支配地位的滥用；三是证明不存在正当理由。三个步骤都不容易，而市场支配地位的认定又是最为困难的一步。一方面，市场支配地位的认定以相关市场界定为前提，这在线下传统领域相对明确或容易一些，但在线上市场（如电商领域），有人一直主张双边市场理论的适用、市场边界的模糊性，故界定出来的相关市场很少能得到普遍接受；另一方面，作为"指导性案例"的"3Q"案二审判决对互联网领域市场支配地位的认定具有重大影响，而该案对市场份额因素的淡化及动态竞争的强调，会进一步加剧市场支配地位的认定难度。所以总的来说，我国《反垄断法》中的滥用市场支配地位制度能够成为"二选一"的规范依据，但这是一条较难的路径。

如果"二选一"发生在电商领域，则《电子商务法》第 22 条和第 35 条也有禁止性规定，但两条的适用方式不同。第 22 条属于转致条款，只在市场支配地位的认定上增加了技术优势、用户数量、对相关行业的控制能力等具体因素，其适用仍须回到反垄断法中的滥用市场支配地位制度上来，所以并未突破反垄断法的分析框架。第 35 条则属于创制条款，它有完整的行为模式和法律后果，可以独立适用。[1] 该条禁止电商平台"利用服务协议、交易规则以及技术等手段"，对平台内经营者"与其他

---

[1] 朱理：《电子商务法与竞争法的衔接：体系逻辑与执法展望》，载《中国社会科学院研究生院学报》2019 年第 2 期。

50

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

专题策划：电子商务领域不正当竞争纠纷研究

经营者的交易"进行"不合理限制或者附加不合理条件"。该条确立的分析框架主要是两点：一是限制行为发生在电商平台与平台内经营者之间；二是该限制具有"不合理"性。第一点比较容易判断，分析重点是限制行为是否具有合理性。这与反垄断法中滥用市场支配地位的"正当理由"判断基本一致。从这点看，《电子商务法》第35条的适用相对容易，凡能够适用《反垄断法》中滥用市场支配地位条款的，基本都能适用《电子商务法》第35条，但满足《电子商务法》适用条件的，未必构成市场支配地位的滥用。

《反不正当竞争法》第12条第2款关于互联网不正当竞争行为的规定中，（二）（三）两项即"误导、欺骗、强迫用户修改、关闭、卸载其他经营者合法提供的网络产品或者服务"和"恶意对其他经营者合法提供的网络产品或者服务实施不兼容"，也可能包含"二选一"。适用该条时，首先要证明"共通性要件"得到满足，即符合第12条在行为列举前的总体性表述：一是行为实现上，必须是"利用技术手段"，"通过影响用户选择或者其他方式"来实施；二是行为结果上，必须"妨碍、破坏其他经营者合法提供的网络产品或者服务正常运行"。此外，还要证明"二选一"符合第12条列举的行为表现，而（二）（三）两项在列举行为表现时还使用了"误导、欺骗、强迫""恶意"等主观性表述，即要求行为必须"恶意"为之。这里的"恶意"标准显然比一般侵权行为中的"过错"要件更加严格，[2]甚至比滥用市场支配地位中的"没有正当理由"还要高，即不仅要求没有正当理由，还应证明行为人具有损害他人的不良动机。由此看来，《反不正当竞争法》的适用标准较为特殊，判断"二选一"是否构成不正当竞争时，需要从主观方面的恶性、行为方式的技术性和损害结果的妨碍或破坏性等方面逐一判断。这也意味着，《反不正当竞争法》能够规范的"二选一"范围较窄，仅限于互联网领域的技术性限制，主要是软件之间的排斥行为。

## 二、三部法律的适用关系

尽管三部法律都有可能规范"二选一"，但它们在适用领域、适用标准和法律后果等方面存在差异。不是所有的"二选一"都会符合三部法律的规范要件，即便形式上符合，也未必都能适用，选择适用不同的法律，也会产生不同影响，甚至呈现出优劣之别。

（一）《反垄断法》的适用

---

〔2〕王利明教授认为，民法上的"恶意"包括两种：一是观念主义的恶意，指明知某种情形的存在，侧重于行为人对事实的认知；二是意思主义的恶意，指动机不良，即以损害他人利益为目的，侧重于行为人主观意志上的应受谴责性。参见王利明：《侵权行为法研究》，中国人民大学出版社2004年版，第456页。

51

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

中国应用法学 ┃ 2020 年第 1 期

　　反垄断法是市场竞争的一般法，甚至可以说是市场经济的基础法。只要实行市场经济体制，竞争就应被推定为具有普遍性价值，反垄断法就是必不可少的。因此，在没有法律（狭义）的特别规定时，反垄断法应原则性地适用所有的市场领域。"二选一"在线上线下都有可能产生，不论由谁实施、发生在哪个领域，都应受到反垄断法规制。

　　反垄断法禁止的垄断行为，是对市场竞争机制的破坏，是一种违法性较为严重的损害公共利益行为，所以反垄断法规制的典型特点是法律责任重。"二选一"一旦被认定为垄断行为，不论是垄断协议还是滥用市场支配地位，在我国就有可能承受上一年度销售额 1% 至 10% 的罚款。与此相对应，反垄断法的适用门槛较高，垄断行为的违法性认定通常需要证明行为已经或可能产生严重的损害竞争效果。损害效果的产生，往往又以行为人具有一定的市场力量为前提，或者市场上存在大量的类似限制（市场覆盖率）。即便是垄断协议，市场力量或市场覆盖率也是一个重要的分析因素，如果行为人市场力量过小，而类似协议的市场覆盖率又很低，则垄断协议即便被实施，市场竞争受到的不利影响也可忽略不计，反垄断法也就未必需要介入。在滥用市场支配地位行为规制上，这一要素体现得更为明显，证明行为人具有市场支配地位是必不可少的步骤。

　　可见，反垄断法主要适合用来处理那些大企业实施的"二选一"，或者行为人未必具有很强的市场力量，但"二选一"普遍存在的情形。前者主要依靠滥用市场支配地位制度，后者还可适用垄断协议制度。实务界与学界目前对"二选一"的反垄断法分析，主要集中在滥用市场支配地位方面，而市场支配地位的认定较为复杂，互联网领域难度更大，在民事诉讼中还取决于证据情况，所以笼统地问"二选一"是否违反反垄断法，很难有明确的答案。

　　(二)《电子商务法》第 35 条的适用

　　《电子商务法》第 35 条尽管也只禁止"不合理"的限制，但相比反垄断法，规则的指示意义要明确得多。该条主要用来处理电商平台和平台内经营者之间的关系，这是一种纵向关系，只要平台相对于平台内经营者具有一定的优势地位，就可能要求后者"二选一"。基于这一特殊目的，该条的适用不涉及行为人与其竞争对手的横向比较，即不要求行为人具有市场支配地位。所以，如果"二选一"由电商平台实施，不论平台的市场力量如何，只要没有明显的正当理由，则其违法性基本没有争议。可见，《电子商务法》第 35 条的优点比较明显——内容较为确定，适用门槛也低。不过，从规制效果看，本条也有不足：一是适用领域有限，只能适用于《电子商务法》第 2 条所限定的电商领域；二是适用范围有限，由于本条性质是一种处理内部关系的法律规范，故其更适合用来处理那些个别的、偶然的"二选一"，如果"二选一"普遍化、常态化，则该条基本失灵；三是法律责任较低，《电子商务法》对本条设定的最高罚

52

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net



款额仅有 200 万元。[3]

在法律适用上，《电子商务法》第 35 条和《反垄断法》是什么关系呢？从立法目的看，《电子商务法》第 35 条的性质主要是处理电商平台与平台内经营者之间内部关系的法律规范，而非纯粹的竞争法规范，所以它与《反垄断法》具有不同的立法目的和适用对象，在法律适用上相互独立、并行不悖，亦可同时适用。违反《电子商务法》第 35 条的法律责任之所以较轻，也是由该条的性质定位决定的；如果它处理的是平台间的竞争关系，则法律责任不可能如此之轻。不过，毕竟电商平台对平台内经营者的不合理限制也会影响平台间竞争，故其适用一定程度上也在处理竞争关系。

那么，在都涉及竞争关系时，《电子商务法》第 35 条能否看作《反垄断法》的特别法？有学者倾向于这样去理解两法的关系，[4]这样就能解释为何《电子商务法》能够作出与《反垄断法》不一致的规定。但是，一般法与特别法理论主要解决一般性规则不能适用于特殊领域、特殊行业、特殊主体的情况，二者处理的仍是同一个问题或者说同一类行为，不存在问题种类或行为类别上的差异。例如，反垄断法确立的竞争性规则是一般法，但有些行业过于特殊不宜引入竞争，所以在行业监管法中排除竞争性规则的适用，这时它们处理的都是竞争问题，而非两个不相关的问题。也就是说，如果两个法律规范解决的是相互独立的不同问题，也就不存在谁一般谁特别。从这个角度看，《电子商务法》第 35 条尽管也可能规范"二选一"，但这只是"副产品"，它主要目的还是解决电商平台与平台内经营者之间的内部关系，所以它与《反垄断法》规范的竞争关系完全不同，谈不上是后者的特别法。

此外，在一般法和特别法的适用上，特别法具有优先性，即特别法的适用就排除了一般法的适用。换言之，正因为一般法不宜适用于特殊领域或特殊主体，才需要创立特别法，既然适用特别法，一般法就没有适用余地了，这正是创设特别法的重要原因。如果两个法律规范具有不同目的，显然不能因一个法律规范适用了就排除了另一法律规范的适用。《电子商务法》第 35 条和《反垄断法》的适用就是如此，既需要适用前者解决电商平台和平台内经营者的不平等关系，也需要适用后者解决不同平台之间的竞争关系，解决了一个问题并不意味着另一个问题也解决了，所以这两个法律规范完全可以也应当同时适用。

---

[3] 最高 200 万元的罚款额对很多电商平台来说丝毫没有威慑力，所以实践中，如果为了追求行为的社会效果，而不仅仅是终止违法行为的话，原告可能选择适用难度更大的《反垄断法》。关于《电子商务法》第 35 条，有学者指出其还有一个不足，即只规定了行政处罚责任，而未规定民事责任，所以难以作为被限制方提起民事赔偿诉讼的依据。这个问题其实不存在，当事人提起民事诉讼除了援引本条，自然还会引用《合同法》或《侵权责任法》的相关规定，即依据《电子商务法》第 35 条提起的民事诉讼主要还是侵权诉讼或合同诉讼。

[4] 王先林：《电子商务领域限定交易行为的法律适用》，载《中国市场监督管理》2019 年第 9 期。

53

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

中国应用法学 ▎ 2020 年第 1 期

**（三）《反不正当竞争法》第 12 条的适用**

不正当竞争行为是一种违法性较垄断行为稍轻的不当竞争行为，《反不正当竞争法》第 12 条规范 "二选一" 时也不要求行为人具有市场支配地位，这与其他不正当竞争行为的要求一样。不过，与《电子商务法》类似，《反不正当竞争法》的适用范围也较窄，主要限于技术性 "二选一"；法律责任也偏低，最高罚款数额只有 300 万元。

那么，同时涉及 "二选一" 时，《反垄断法》与《反不正当竞争法》是什么关系，是一般法与特别法吗？既为特别法，必有 "特别" 之处，如适用领域、适用区域、适用主体等方面具有特殊性，但这两部法律显然都属于一般法的范畴，都原则性地适用于所有领域和区域内市场主体的竞争行为。《反不正当竞争法》第 12 条尽管专门针对互联网领域，但反垄断法显然也适用于互联网领域，互联网领域的竞争行为，不论是垄断还是不正当竞争都应是禁止的。所以说，这两部法律确立的都是普遍性规制，不存在谁一般、谁特别的问题。

在法律适用上，《反垄断法》与《反不正当竞争法》共同规范竞争行为，二者有明确分工，理应互相补充、无须交叉。不过，即便规范同一类行为，也可能因违法程度的轻重区分而做不同的定性，进而设置不同的法律责任。从理论上看，垄断行为是一种违法性更严重的不当竞争行为，不正当竞争则是一种违法性相对偏轻的不当竞争行为，基于违法性吸收理论，一种行为构成垄断的，就不应再认定为不正当竞争行为。换言之，如果认定某种 "二选一" 符合《反垄断法》的规定，已经构成垄断了，不论是滥用市场支配地位还是垄断协议，《反不正当竞争法》第 12 条就没有了适用余地。也就是说，这两部法律不应当同时适用，这与《电子商务法》第 35 条和《反垄断法》的适用关系完全不同。不正当竞争行为和垄断行为的关系，可以类比治安违法与刑事犯罪——某种行为一旦被认定为犯罪而接受刑事处罚，就无须再施以治安处罚了。[5]

至于《反不正当竞争法》第 12 条和《电子商务法》第 35 条的适用关系，与《反垄断法》和《电子商务法》第 35 条的适用关系一样，由于二者处理不同问题，属于相互独立的法律规范，完全可以同时适用。

## 三、行为人市场地位的考察

认定 "二选一" 违法是否要求行为人具有一定的市场地位？在《电子商务法》和

---

[5] 一种违法行为同时具备多种属性的情况在法律适用上比较常见，如侵犯他人商业秘密行为既可能是侵权或违约行为，也可能是不正当竞争行为，还可能是犯罪行为，但同一违法层级上一般不会同时适用多个法律而对其施以累计责任或累加处罚。侵犯商业秘密之所以可同时获得三个违法属性，是因为其同时侵害不同层次的多重法益，构成了不同层级上的违法行为，也需要同时承担相应的法律责任。但是，侵权责任与违约责任不可能同时承担，认定其构成不正当竞争，也就不会认定其构成垄断。

54

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

专题策划：电子商务领域不正当竞争纠纷研究

《反不正当竞争法》中，行为人市场地位并非违法性要件，但在适用《反垄断法》时，对行为人市场地位的考察非常重要。

（一）《电子商务法》和《反不正当竞争法》中的市场地位标准

《电子商务法》第 35 条主要调整电商平台与平台内经营者之间的交易关系，只要电商平台相对于平台内经营者具有交易上的优势地位，它就可能会对后者施加不合理限制，至于电商平台与其竞争对手即其他电商平台相比市场力量如何，对行为的违法性没有影响。只要该条目的在于解决电商平台和平台内经营者间的不平等关系，它就不应对行为人的市场力量进行特别要求。不过，通常能够施加各种不合理限制的电商平台，都会具有一定的市场力量，但这种力量未必达到市场支配地位的程度，市场支配地位是一种横向比较的结果，即行为人与其竞争对手相比的市场地位。

《反不正当竞争法》禁止那些采用"不正当"手段进行竞争的行为，手段的不正当性才是其关注重点，行为人的市场地位并不重要。很多不正当竞争行为恰恰是小企业实施的，或者是针对更大、更有威胁的企业实施的，因为不正当竞争行为的违法性通常比垄断行为明显得多，只有小企业才不惜自毁声誉而实施这类违法行为。行为违法性的轻重，也是反不正当竞争法和反垄断法的一个分工，或者说一个明显区分。二者都规范竞争行为，但垄断行为的破坏性显然比不正当竞争行为大得多。反垄断法确保竞争的存在，反不正当竞争法确保竞争的正当性，很显然，竞争的有无比竞争手段的正当与否更加重要，前者是基础性的，如果竞争被排除或限制了，市场机制本身就难以有效发挥作用，这是一种毁灭性的破坏。这也是为什么反垄断法基本只禁止那些具有严重限制竞争效果的违法行为，而不太关注轻微的违法行为，因为只有严重违法行为才会动摇竞争基础，才需要反垄断法的介入。[6] 反不正当竞争法的功能是在竞争机制已得到确保的基础上，让市场主体更加公平地参与竞争，所以它确立的违法性标准相对更低；相应地，不正当竞争行为不会消灭竞争，即便限制竞争，程度也不会严重，因而其法律责任也就更轻。

在《反不正当竞争法》第 12 条中，只要行为人以不当方式"妨碍、破坏其他经营者合法提供的网络产品或者服务正常运行"就构成违法，至于结果上造成多大市场

---

〔6〕有人可能说，反垄断法禁止垄断协议并不要求行为人具有一定的市场地位，所以即便某些垄断协议违法性轻微，反垄断法也会禁止它。从法律规范角度看可能如此，但从反垄断法原理看，如果某协议对竞争的影响比较轻微，是不应认定其构成违法垄断协议的。欧洲法院在判决中清楚地表明，如果某项协定对市场竞争的影响不大（it has only an insignificant effect on the market），《欧盟运行条约》第 101 条的规定不适用。相关案例如 Case 5/69, Völk v Vervaecke [1969] ECR 295, para· 7; Case C-7/95, P John Deere v Commission [1998] ECR I-3111, para· 77 ; Joined Cases C-215/96 and C-216/96, Bagnasco and Others [1999] ECR I-135, para· 34 ; Case C-238/05, As-nef-Equifax and Administració n del Estado [2006] ECR I-11125, para, 50 ; Case C-226/11, Expedia, ECLI:EU:C:2012:795, para· 16·

55

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

中国应用法学 ┃ 2020 年第 1 期

损害，法律并未明确要求。所以即便行为人只是一个小企业，或者仅对少数甚至某个他人产品或服务进行了"破坏""妨碍"，也不影响不正当竞争行为的成立。

（二）《反垄断法》中的市场地位标准

"二选一"在反垄断法中可能构成纵向垄断协议，也可能构成滥用市场支配地位行为。在纵向垄断协议认定中，尽管从立法看，行为人的市场力量似乎并不重要，但实际上，行为人的市场力量既影响垄断协议的合法与否，也影响垄断协议的损害大小。[7] 在滥用市场支配地位认定中，市场力量的重要性更是不言而喻。

相关市场界定通常是判断行为人市场力量的前提。线下传统领域的相关市场界定相对容易，而在界定互联网领域相关市场时，目前学界似乎陷入了一个进退两难的境地：无法绕开相关市场界定，而一旦界定又面临双边市场、市场边界模糊、平台经济等理论难题。其实，相关市场界定本身只是手段而非目的，且相关市场界定不可避免受到主观因素影响，并不是说必然存在一个客观的相关市场等着我们去发现它。所以在个案中，我们只能基于已有材料或证据，界定一个相对客观的相关市场，而非穷尽一切可能性，对每个可能存在的替代物都要分析一遍。

就电商平台"二选一"来说，界定相关市场应特别注意以下两点：

第一，界定相关市场主要依靠替代性分析，但任何替代性都是相对的，没有绝对替代。替代性是一种主观判断，每个人对替代性的认知并不相同。如果涉案产品是 A，判断候选产品 B 能否替代 A，只能基于所有的潜在购买者群体，而非某个或某些购买者，更非只考虑消费者，因为单个购买者或消费者的购买量很小，细微因素的变化都可能影响替代性结果。此外，在整体判断时，也不是说 90% 甚至 100% 的购买者认为 B 可以替代 A 时才能认为二者处于同一相关市场。法律上无法设置一个绝对的比例标准，事实上也不会存在这样一个标准。不论是 50% 还是更高的比例，都或多或少存在一些问题，也会成为原被告的争论点，所以替代性分析的结果只能给我们提供一个相对可靠的参考，而非正确答案。换言之，我们只能说绝大多数需求者认为 B 能够替代 A，所以 B 和 A 应该处在同一相关市场。究竟 B 和 A 是否应被界定为同一市场，最终取决于原被告提供的证据材料。

第二，界定相关市场应当以行为人所在的市场为起点，然后看其他市场对行为人所在市场的替代性而非相反。正因为相关市场界定本身不是目的，而只是评估行为人市场力量的手段，所以脱离个案界定相关市场没有意义，也无法界定出相关市场。在个案中，相关市场的大小取决于候选市场对当前市场的替代性，而当前市场即行为人所在的市场，这是确定的，也是界定相关市场的起点。如果涉案行为发生的产品（地域市场相同）是 A，A 就构成了产品市场界定的起点，接下来应当分析 B、C 对 A 的替代性，而非分析 A 对 B、C 的替代性。例如，假设某电信企业被指控在移动通信

---

〔7〕这部分内容详见焦海涛：《"二选一"行为的反垄断法分析》，载《财经法学》2018 年第 5 期。

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

专题策划：电子商务领域不正当竞争纠纷研究

服务市场上滥用市场支配地位，则相关产品市场界定应以移动通信服务（A）为起点，我们需要分析固话服务（B）能否替代移动通信服务，相信大多人认为不可以，所以本案中二者不处于同一相关市场；但如果行为人被指控在固话服务中实施滥用行为，则需要分析移动通信服务能否替代固话服务，大多人的观点应该是可以，所以这时二者又处于同一相关市场。可见，相关市场界定中的替代性并非要求互相替代，而仅要求单项替代，即候选市场对当前市场的替代。[8]在电商领域界定相关市场也要遵循这一原理——如果涉案行为发生在线上市场，我们界定相关市场时就应分析线下市场是否能够替代线上市场，至于线上市场对线下市场的替代性，应与涉案行为无关。

相关市场界定之后，就需要评估行为人的市场力量。互联网行业市场支配地位的认定，目前面临动态竞争的难题，尤其"3Q"案之后，大多数学者都主张互联网行业的动态性，因而支配地位的认定必须慎重。其实，任何市场都是动态的，只要有竞争，必然有优胜劣汰。市场支配地位的本质是用户转移的可能性，如果大多数用户都无法转向替代性的经营者，则认定支配地位不因线下或线上市场而有所区别。另外，互联网行业的动态性本身意味着，当前互联网发展状况已与十年前、五年前大不相同，的确有互联网企业风光不再，但也有互联网企业越做越大。面对动态竞争，我们可以坚持长期标准，如果某个企业在很长一段时期一直拥有较高的市场份额，那么市场份额很大程度上就能代表支配地位的存在。

## 四、损害效果的判断与衡量

### （一）"二选一"的损害效果

损害效果是违法行为的共同要件，包括已经发生或可能发生的损害，但不同法保护的法益不同，因而产生不同损害效果的违法行为需要进入不同法的规制范围。就"二选一"来说，它可能产生多种损害。当电商平台要求平台内经营者"二选一"时，它损害了平台内经营者的交易自由，因而构成对《电子商务法》第35条的违反。该条主要调整交易关系，是对平台内经营者的保护，更加适合用来救济平台内经营者遭受的个体损害。如果"二选一"破坏、妨碍了他人合法提供的互联网产品或服务的正常运行，则不仅对他人造成直接损害，还破坏了正当竞争秩序，进而构成不正当竞争行为，《反不正当竞争法》第12条主要解决这个问题。如果"二选一"非常严重，还可能排除、限制市场竞争，这时就需要反垄断的介入。

---

[8] 在3Q垄断案的一审判决书中，法院在界定地域市场时就犯了这样的错误。一审法院认为，腾讯的QQ有不同语言的安装版本，故境外用户也可使用QQ，所以本案的地域市场应当为全球。法院在这里就将中国大陆市场对境外市场的替代性作为界定地域市场的标准，笔者认为，这是对替代性的误解。

57

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

中国应用法学 ▌ 2020 年第 1 期

就反垄断法上的滥用市场支配地位制度来说，尽管我国《反垄断法》第 17 条列举滥用行为时使用了"禁止"一词，且将第 17 条第 1 款列举的各种行为统称为"滥用市场支配地位的行为"，这似乎意味着只要行为人实施了列举的行为即构成"滥用"，而不论造成的结果如何，但从反垄断法原理看，只有涉嫌滥用的行为已经或可能导致排除、限制竞争效果时，执法机构才有必要去干涉这类行为。换言之，判断什么是滥用，关键是看行为人是否利用其市场支配地位损害竞争；如果相关行为不会产生排斥竞争效果，也就不属于反垄断法意义上的"滥用"。[9]我国《反垄断法》第 6 条规定："具有市场支配地位的经营者，不得滥用市场支配地位，排除、限制竞争。"这里的"排除、限制竞争"应被理解为滥用市场支配地位行为的效果要件。

对损害竞争效果的强调，在欧盟委员会《关于适用欧共体条约第 82 条查处市场支配地位企业滥用排他行为的执法重点指南》中也有明确体现。该指南第 20 段明确指出，只有切实和令人信服的证据表明，涉嫌滥用的行为可能导致反竞争封锁效果，欧盟委员会通常才会依据《欧共体条约》第 82 条（现在的《欧盟运行条约》第 102 条）进行干预；指南还在第三部分确立了"排他行为的基本分析方法"（General approach to exclusionary conduct），主要包括三个步骤：先是分析是否存在市场支配地位；其次分析是否导致反竞争性的市场封锁（Anti-competitiveforeclosure）；最后分析是否存在正当理由。[10]其中，"反竞争性的市场封锁"即滥用市场支配地位行为的损害效果。

一般认为，滥用市场支配地位行为的损害效果主要包括两种：一是对客户和消费者的直接剥削；二是对相关市场竞争的封锁（欧盟委员会所称的反竞争性封锁）。[11]滥用行为由此也被分为剥削性滥用和排他性滥用。"二选一"的竞争损害主要是排挤竞争对手，即以反竞争的方式封锁竞争对手，导致涉案行为所在市场或上下游市场上的有效竞争受到排斥，具体是指行为人（实际或潜在的）竞争对手或上下游市场上的竞争者的有效市场扩张或市场进入受到阻碍或被排除。

（二）市场封锁效果的衡量

在反垄断法上，判断"二选一"的竞争损害可以从以下两方面着手：

1. 分析"二选一"的竞争损害必须结合其行为类型

所谓行为类型，主要指"二选一"到底限制品牌内竞争还是品牌间竞争。在反垄断法理论上，竞争被分为"品牌内竞争"和"品牌间竞争"，前者为同一品牌不同销售渠道（如销售商）之间的竞争，后者为不同品牌之间的竞争。反垄断法主要维持

---

[9] 许光耀：《欧共体竞争法通论》，武汉大学出版社 2006 年版，第 384 页。

[10] Guidance on the Commission's enforcement priorities in applying Article 82 of the EC Treaty to abusive exclusionary conduct by dominant undertakings (2009/C 45/02), OJ [2009] C 45/7, paras·9-31·

[11] 封锁市场竞争的最终目的也是实现对客户或消费者的剥削，即具有市场支配地位的主体通过排除或限制竞争对手的有效市场扩张或市场进入，从而可以提高产品价格而不至于让消费者转向其竞争对手。

58

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

专题策划：电子商务领域不正当竞争纠纷研究

品牌间竞争——如果品牌间竞争激烈，品牌内竞争的减少不大可能削弱市场竞争状况，也不大可能对消费者产生损害效果，因为品牌间竞争的压力，使得某品牌的销售商间即便不存在竞争，也不敢提高价格或减少供应，否则消费者会流向其他竞争性品牌。[12]例如，即便 A 品牌的不同销售商间不存在竞争，只要市场上还存在足够的 A 品牌的竞争对手，消费者就有足够的选择余地，即便 A 品牌的销售商同时提价，消费者也不是非要购买 A 品牌。不过，当品牌间竞争不充分时，品牌内竞争就变得重要。在上例中，如果市场上 A 品牌的竞争对手很少，则 A 品牌销售商提价就会对消费者带来损害，这时，维持 A 品牌销售商间的竞争就非常必要。

"二选一"既可能限制品牌内竞争，也可能限制品牌间竞争，分析其损害效果需要先判断其到底损害哪种竞争。

第一，限制品牌内竞争的"二选一"可根据交易环节分为两种：一是发生在采购环节的排他货源（exclusive sourcing），指就特定品牌的商品来说，买家的货源渠道被限制了，即只能从特定的供应商处购买，如 A 品牌手机生产商要求销售商只能在其指定的供货商处购买 A 品牌手机，至于销售商是否同时销售其他品牌的手机则在所不问；二是发生在销售环节的排他销售（exclusive distribution），指在特定地域、特定时期或针对特定客户群，供应商只在一个渠道销售商品，导致该销售渠道具有排他性，如 A 品牌手机生产商保证或被要求在某行政区域内只将手机交由唯一经销商销售。

第二，限制品牌间竞争的"二选一"也因交易环节的不同包括两种情况：一是发生在采购环节的排他供应（exclusive supply），指原材料、零部件等中间品的供应商被要求或者诱导，只能或者主要向一个购买商销售商品，如 A 品牌手机生产商要求零部件供应商只能向自己供应配件，而不能将配件提供给自己的竞争对手——2018 年爆出的瑞幸与星巴克"二选一"之争就属这种；二是发生在销售环节的排他采购（exclusive purchasing），或者称单一品牌限制（single branding），指销售商被要求或者诱导，只能或者主要采购、销售特定品牌商品，而不能销售竞争性品牌，如 A 品牌手机生产商要求其销售商只能销售 A 品牌手机，而不能销售其他品牌手机。

目前热议的电商平台"二选一"，主要是前述第一类第二种限制，即限制品牌内竞争的排他销售。电商平台提供的是销售渠道，平台内经营者代表生产商，生产商被限制在其他电商平台开店，实际上是同一品牌的销售渠道受到限制，即限制的是品牌内竞争。这时，只要品牌商间竞争充分，这类行为的损害效果比较有限。这可能正是目前很多人认为电商平台"二选一"无需反垄断法干预的重要原因。不过，判断竞争损害的类型只是第一步。

---

〔12〕焦海涛：《纵向非价格垄断协议的反垄断法规制：困境与出路》，载《现代法学》2019 年第 4 期。

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

中国应用法学 ▎2020 年第 1 期

2. 分析"二选一"的竞争损害还必须考虑"累积效果"

累积效果即市场上存在多少同类限制，通俗来说，就是将市场上类似限制加起来考虑。即便"二选一"仅限制品牌内竞争，但累积效果越大，则品牌间竞争就越弱，这时，即便只是品牌内竞争受到限制，也可能成为问题。

我们设想这样的例子：某类商品有 A、B、C、D 四个竞争性品牌，某销售平台要求 A 品牌只能在本平台销售，这限制了 A 品牌的销售渠道，是一种限制品牌内竞争"二选一"，如果 A 品牌的竞争对手 B、C、D 没有受到限制，即除该平台外，还可在其他平台销售，则该"二选一"对消费者不会有什么危害，因为即便该平台上的 A 品牌涨价，甚至 A、B、C、D 都涨价，消费者在其他平台仍有 B、C、D 品牌可以购买。但如果该平台同时也对 B、C、D 实施同样的"二选一"，则消费者就遭殃了，因为该平台完全可以对 A、B、C、D 同时涨价，这时消费者已没有了别的购买渠道。

在上例的第一种情况下，品牌间竞争是存在的，所以品牌内竞争的限制不会带来太大问题；在第二种情况下，尽管市场上存在多个品牌，但同一个销售商获得了这些品牌的排他销售权，品牌间竞争被严重削弱，这时损害效果就会呈现出来。目前电商平台"二选一"主要就是这种情况，即行为人同时对多个甚至绝大多数品牌实施"二选一"。当然，上面的例子过于极端，即所有品牌都被限制了销售渠道，累积效果达到了 100%。如果 A、B、C、D 合计市场份额 60%，则累积效果为 60%，还有 40% 的市场份额存在有效竞争。一般来说，被实施"二选一"的品牌越多，累积效果就越大，品牌间竞争就越弱，"二选一"的危害性也就越大。所以，要准确评估"二选一"的危害性，必须看其封锁的客户比例到底有多少。

上述累积效果体现为同一行为人对大多数客户实施同样的限制，累积效果在市场上还可能有第二种表现，即多个行为人（竞争对手）分别对各自的一批客户实施相同限制。我们可以将前例稍作改变来说明这种情况：假设竞争性品牌 A、B、C、D 市场份额合计 80%，甲销售平台要求 A 品牌只能在本平台销售，乙、丙、丁销售平台以同样方式分别要求 B、C、D 品牌也只能在自己平台销售，即甲、乙、丙、丁分别对 A、B、C、D 实施了同样的"二选一"，这也是一种累积效果。这种情况下，品牌间竞争的削弱程度不如前例中明显，但也受到了限制，因为四个平台都在实施"二选一"，消费者购买 A 品牌只能在甲平台，购买 B、C、D 也只能分别在乙、丙、丁平台，四个品牌间的竞争虽依然存在，但激烈程度显然比不存在"二选一"时要弱不少。

此外，不论哪种累积效果，"二选一"都会对行为人竞争对手带来影响，进而限制行为人和其竞争对手之间的竞争。行为人实施"二选一"的直接目的，大多都是封锁竞争对手。在第一个例子中，如果市场上某类商品的 100% 份额都被一个平台控制了，则该平台的竞争对手完全被封锁了，已无同类商品可卖。在第二个例子中，被封锁的市场份额达到 80%，其他销售平台只能就剩下的 20% 份额中进行竞争，如果 A、B、C、D 在市场上较为知名，消费者对其认可度高，则即便剩下的 20% 份额全部由

60

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

专题策划：电子商务领域不正当竞争纠纷研究

另一个平台销售，其实际上也不足以与甲、乙、丙、丁展开有效竞争。

可见，"二选一"既可能损害品牌间竞争，也可能损害品牌内竞争。一般来说，如果"二选一"排斥了竞争性生产商，则其直接损害品牌间竞争；即便"二选一"只是限制了销售渠道，除直接损害销售商间的竞争外，在考虑累积效果的情况下，也可能会导致品牌间竞争受损。评估"二选一"的竞争损害，必须将行为类型与累积效果综合起来。当然，"二选一"也可能存在正当理由，如解决搭便车或套牢问题，这也需要在个案中分析与权衡。[13]

## 结 语

"二选一"是一种形象说法，在不同法上具有不同属性。"二选一"在反垄断法上主要指排他交易，它是发生在交易主体之间的一种限制竞争行为，即上游或下游经营者被要求或诱导只能与行为人进行交易或不得与行为人的竞争对手进行交易。法律性质上，"二选一"可能是一种垄断协议，也可能是一种滥用市场支配地位行为。在电商领域，"二选一"可能体现为电商平台对平台内经营者选择交易对象的一种不合理限制，进而构成对《电子商务法》第35条的违反。在互联网领域，"二选一"可能体现为以技术手段，恶意"妨碍、破坏其他经营者合法提供的网络产品或者服务正常运行"，这又可能构成不正当竞争行为。由于不同法确立的违法要件并不相同，所以"二选一"的合法性无法笼统地给出结论，只能基于不同的法律适用来判断。

三部法律的适用关系较为复杂。反垄断法是市场竞争的一般法，所有"二选一"都可适用反垄断法规制，但由于反垄断法只禁止那些违法性较为严重的垄断行为，所以很多"二选一"未必达到反垄断法的违法性标准。反垄断法主要适合处理具有支配地位的企业实施的"二选一"，或者行为人虽未具有支配地位但"二选一"普遍存在的情形。《电子商务法》第35条本身并非竞争法规范，而是处理电商平台与平台内经营者之间交易关系的法律规范，所以它与《反垄断法》具有不同的立法目的和适用对象，不构成《反垄断法》的特别法，在法律适用上二者相互独立、并行不悖，亦可同时适用。反不正当竞争法与反垄断法功能类似，都规范竞争行为，但不正当竞争相比垄断行为违法性偏轻，一种行为构成垄断的，就不应再认定为不正当竞争，所以《反不正当竞争法》第12条与《反垄断法》不应同时适用。不过，《反不正当竞争法》第

---

[13]"二选一"有时的确具有积极效果。例如，在技术性较强的领域，供应商为激励相对人购买其专业设备或技术，可能给对方提供成本巨大的技术培训等售前服务，这时供应商自然希望对方只与自己合作。在反垄断法上，这被称为"专属性投资"，是解决"套牢"问题的必要手段，因而构成排他交易的正当理由。但是，适用该规则的前提是，行为人的投资必须具有专属性，即只针对相对人而无法转移为其他用途，换言之，只要相对人与第三方交易，行为人的投资便成为沉没成本。相关内容可参见焦海涛：《"二选一"行为的反垄断法分析》，载《财经法学》2018年第5期。

61

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

*中国应用法学* ┃ 2020 年第 1 期

12 条和《电子商务法》第 35 条处理不同问题，属于相互独立的法律规范，并不存在同时适用的障碍。

在"二选一"的违法性认定上，行为人的市场地位在《电子商务法》和《反不正当竞争法》中并非违法性要件，但在适用《反垄断法》时，行为人市场地位的考察非常重要。尤其在滥用市场支配地位制度中，相关市场的界定和市场支配地位的认定是必不可少的步骤。

"二选一"的损害效果与其性质密切相关。电商平台实施的"二选一"主要损害平台内经营者的交易自由。作为不正当竞争行为的"二选一"不仅直接破坏、妨碍了他人合法提供的互联网产品或服务的正常运行，还破坏了正当竞争秩序。如果"二选一"非常严重，还可能对市场竞争产生排除、限制效果，这是反垄断法关注的问题。反垄断法评估"二选一"的竞争损害，需要结合其行为类型和累积效果。如果"二选一"直接损害品牌间竞争，或虽只损害品牌内竞争但具有较大累积效果时，反垄断法的介入就是必要的。

**Abstract:** Exclusive dealing may constitute a monopoly agreement or abuse of dominance in China's anti-monopoly law (AML), and may also violate Art·35 of the E-commerce Law of the People's Republic of China (ECL) and Art·12 of the Law of the People's Republic of China on Anti-Unfair Competition (AUCL)· The AML is the general law of market competition that regulates all exclusive dealings, but it usually focuses only on serious violations· If a behavior is recognized as monopoly, it should no longer be recognized as unfair competition, so the AML and Art·12 of AUCL should not be applied simultaneously· Art·35 of the ECL is not a competition law norm, but a norm dealing with the transaction relationships between the e-commerce platform and the operators within the platform· Therefore, it does not constitute a special law of the AML and is independent from the AML and Art·12 of the AUCL· These norms can be applied simultaneously, because different laws have different requirements, the legality of exclusive dealing can only be judged on the basis of different law application· In the application of the AML, it is very important to investigate the market power of the actor, while the evaluation of the competition harm of exclusive dealing needs to see whether it damages the Inter-brand Competition or whether it has greater cumulative effects when only the Intra-brand Competition is damaged·

**Keywords:** exclusive dealing; law application; illegal standards

（责任编辑：牛凯）

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net



City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "**Jiao Haitao 2020_电商平台二选一的法律适用与分析方法**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Shayna Himelfarb

Sworn to before me this
July 19, 2022

_____
Signature, Notary Public



_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE