# EXHIBIT R

Journal of Henan University of Economics and Law                                                                                                    No.2. 2020 (Total No. 178)

## Theoretical Clarification of "Choose One of Two" Behavior in the Competition Context of Digital Economy Platform

Yang Dong  LinYuqi

(Law School, Renmin University of China, Beijing 100871)

Abstract: Due to the fierce competition among Internet platforms and public opinion misleading of media, there is a certain misunderstanding from various circles of society to an "Choose One of Two" behavior. The "Choose One of Two" behavior should not be simply evaluated as a monopoly or unfair competition, instead the specific circumstances of implementing the behavior need to be investigated, including whether a business has a dominant position or comparatively dominant position, the impact of the behavior on the competition order, the impact on consumer welfare etc. Under the framework of the "Anti-Monopoly Law", the "Choose One of Two" behavior may constitute a vertical monopoly agreement and a restricted transaction behavior. Under the theoretical framework of the comparatively dominant position, the "Choose One of Two" behavior may constitute the behavior of abuse of comparatively dominant position that the subject uses to impose unreasonable conditions on a counterparty so as to hinder fair competition. Due to the incomplete status of the comparative dominant market position rules in China's current law, the "Choose One of Two" behavior cannot be effectively regulated. Therefore, it is necessary to learn from foreign legislative experience to add provisions addressing comparative dominant position in the "Anti-Unfair Competition Law" and formulate appropriate implementation and penalty rules.

Keywords: comparatively dominant position; E-Commerce Law; exclusive agreement; competition order

[Chinese library classification number] D922.22          [Document code] A          [Article code] 2095-3275(2020) 02-0066-08

### I. Presentation of Issue

At present, the competition between platforms is increasingly fierce, the means are increasingly diverse, and among the various exclusion and restriction behaviors adopted by the platforms for competition, the more common one is the "Choose One of Two" behavior. There is currently no precise conceptual definition of the "Choose One of Two" behavior. It is generally believed that the "Choose One of Two" behavior refers to the behavior performed by the behavior subject to require the counterparty to only choose to transact and cooperate with him or not transact and cooperate with a specific competitor. The reason why the behavior subject implements the "Choose One of Two" behavior is usually that he is in a dominant position over the counterparty, that is, the counterparty is dependent on the behavior subject in terms of transaction and cooperation and is forced to make a choice. With the rapid development of the digital economy and the increasingly fierce competition in the Internet industry, the "Choose One of Two" behavior has attracted widespread attention from all sectors of the community, and legislation has also responded to this, for example, the promulgation of the "E-commerce Law" and the revision of the "Anti-Unfair Competition Law". There are different opinions in academic circles about either the "Choose One of Two" behavior is an unfair competition behavior even a competition exclusion or restriction behavior or free operation. The author believes that the "Choose One of Two" behavior should not be simply evaluated to be justifiable or improper, but the specific circumstances of implementing the behavior need to be investigated, which include the market position of the behavior subject, the impact of the behavior on the competition, the impact of the behavior on welfare of consumers, etc. In addition to the traditional competition law theory, the "Choose One of Two" behavior can also be analyzed by referring to the theory of the comparatively dominant position outside the territory. In addition, in terms of application of laws, besides the traditional competition law, the "E-commerce Law" may be applicable for regulating the "Choose One of Two" behavior implemented by e-commerce platforms.

### II. Historical Origin and Misleading Public Opinion of the "Choose One of Two" Behavior

*  [Received Date] November 13, 2019

Funding Project: This article is the research result of the "Risks, Potential and Changes of China's Informal Finance" of the International (Regional) Cooperation and Exchange Project of National Natural Science Foundation of China (Project No.: 71661137006).

[Brief introduction to the author] Yang Dong, male, the professor of the Law and Technology Institute, Law School, Renmin University of China, with the research direction of Economic Law; Lin Yuqi, male, the graduate student of Law School, Renmin University of China, with the research direction of Economic Law

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

In recent years, the "Choose One of Two" phenomenon has emerged in various fields of society, and more and more people have begun to pay attention to "Choose One of Two" through the competition between Internet platform enterprises. With the rapid development of Internet enterprises today, the issue of "Choose One of Two" is not only a hot issue focused on by the academic circles, but also inevitably becomes an object of media hyping to attract the public's attention. Therefore, it is indeed necessary to conduct a theoretical analysis on the hot topic of "Choose One of Two" to eliminate misunderstandings from the outside world.

(i) Production and Current Situation Analysis of the "Choose One of Two" Behavior

It is generally believed that "Choose One of Two" first appeared in the "3Q War" that occurred in 2010. In this competitive conflict, Tencent released a "Letter to the majority of QQ users" on the main interface of QQ, declaring that "QQ software would be stopped running on computers with 360 software", and adopted other technical means to prohibit users from visiting Qzone on the 360 browser. At that time, QQ software was the largest client software in China, and Tencent used the advantage of the chat tool as a traffic portal to secretly induce or force users to uninstall the 360 software and give up using 360 related products, which is a typical "Choose One of Two" behavior. In 2018, at Wuxi, Jiangsu, Meituan required merchants and riders to conduct "Choose One of Two", as long as the merchants choose to settle on the Didi Takeaway platform, they would be "banned" by Meituan, and stores would be forcibly removed from the shelves of Meituan if the merchants opened stores on the Didi Takeaway platform; even if the stores were later put on the shelves again, their rankings were downgraded to the back row, and Meituan forced the merchants to make exclusive choices between platforms through various manners. In the same year, Toutiao and Tencent launched a series of competitions for traffic, Tencent began to block and shield content sharing from "Toutiao series" software within WeChat, QQ and other software. Since WeChat and QQ had actually become important portals for citizens to socialize online [1], content shielding generated a great negative impact on the promotion of Toutiao's products, and Tencent's "Choose One of Two" behavior was not aimed at the merchants but directly at end users. In addition, the competition between Tencent's QQ Music with NetEase Cloud Music, Xiami Music, etc. in the field of online music is also with the meaning of "Choose One of Two" obviously. The non-Tencent-series music platforms, such as NetEase Cloud Music and Xiami Music, were shielded through WeChat as the traffic portal, which enabled QQ Music to gain a large number of users. Before the implementation of the behavior, QQ Music had already occupied about half of the users in the online music market, but Tencent still chose to shield interfaces of Alibaba-series Tiantiandongting and Xiami Music as well as NetEase Cloud Music for sharing through WeChat and other methods and means to make users using non-Tencent-series online music platforms unable to share music from the platforms to WeChat, which made many users of non-Tencent-series music platforms such as NetEase Cloud Music and Xiami Music forced to choose QQ Music, thereby increasing the active users of QQ Music and competing for user attention.

In recent years, the increasingly fierce e-commerce platform competition between Jingdong and Tmall has pushed the controversial behavior of "Choose One of Two" to a climax. Jingdong claimed that since 2013, Tmall and the Alibaba Group behind it had implemented various means to notify many brand merchants opening stores in Tmall and focusing on clothing and home furnishing not to participate in promotional activities such as 618 and Double Eleven of JD.com, forbidden the merchants opening stores in JD.com for business operation, and required the merchants to open stores on the platform of Tmall.com only, otherwise the merchants would be downgraded, that is, their products would be adjusted backwards in the search ranking, or even users could be unable to search for products of the merchants, which resulted in a large number of merchants forced to choose to close their stores in JD.com because they could not ignore the huge profits brought by the Tmall platform.

In fact, the "Choose One of Two" behavior that has been common in the Internet industry in recent years has become more common offline. Taking the coffee industry as an example, the new brand Luckin Coffee accused Starbucks, saying that it received news from many suppliers of machinery and equipment, packaging materials, food raw materials, etc. [2] that Starbucks asked the suppliers to choose partners and stop continuing to supply goods to Luckin Coffee. In addition, there is the "Choose One of Two" behavior broadly in all walks of life, such as large-scale real estate development, supermarkets, catering services, clothing manufacturing and sales.

(ii) Misleading Public Opinion on the "Choose One of Two" Behavior

The escalating competitions and conflicts among enterprises have brought the issue of "Choose One of Two" between the enterprises into the public's eyes, converting "Choose One of Two" from an industry phenomenon to an object of excessive hype by the mass media. In order to cater to the tastes of readers and obtain more clicks and reviews, the media will deliberately carry out one-sided and controversial reports on the "Choose One of Two" phenomenon; and in terms of language style, the traditional reporting style is changed, and some colloquialisms and buzzwords are preferred to be used.

The concept of "Choose One of Two" is more of an easy-to-understand term used by the media in reporting news about the competition of Internet platforms, its generalization of events is relatively one-sided, and the reports are also biased. Some media reports emphasizes that the "Choose One of Two" behavior may restraint competitions, lead to the monopoly, reduce the overall interests of society, and infringe on the rights and interests of consumers to varying degrees; enterprises in emerging industries also habitually use the "Choose One of Two" behavior or other means to prevent customers from using multiple platforms at the same time to achieve the purpose of acquiring more customers. Other media insist that the "Choose One of Two" behavior is an ordinary business practice that falls under normal business behaviors. For example, Tmall only uses the scale advantage in exchange for more cooperation with merchants and uses traffic to stabilize high-quality sources of goods, thereby providing users with more goods, which is a normal market behavior.

However, the media ignores the substantive issues behind "Choose One of Two" in the process of news hype:

Firstly, "Choose One of Two" is not a legal concept, nor does it have concrete content. However, the media only pays attention to the impact of "Choose One of Two" in the field of market competition, but often ignore the reality of rapid growth of the digital economy and the platform economy in China in recent years.

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Journal of Henan University of Economics and Law                                                                                                                           No.2. 2020

It is shown in "White Paper on China's Digital Economy Development and Employment (2019)" that the digital economy aggregate in China in 2018 was 31.3 trillion yuan, the digital economy nominal growth in China in 2018 was 20.9%, accounting for more than 1/3 of GDP and reaching 34.8%, and the proportion increased by 1.9 percentage points year-on-year. The digital economy is the backbone of economic development in China and an important driving force for the development of the national economy, it uses data as a new production factor to effectively integrate traditional production factors such as capital, land and technology, which can not only reshape the new industrial pattern to promote the optimization and upgrading of the economic structure, but also can reconstruct the international competition pattern to enable China to occupy a favorable position in the new round of international competition.

As an important form of the new economy, the platform economy in China has brought a huge positive impact on the development of industries, which is conducive to promoting the opening and sharing of resources, blurring the boundaries of industries, and realizing cross-border integration of industries. In particular, the integration of the Internet and new technologies (artificial intelligence, big data, etc.) with traditional industries [3] has greatly promoted industrial ecological innovation and inspired a large number of new formats. It is precisely because of the important role of the digital economy and the platform economy in the economic development in China that the "E-Commerce Law" also leaves a room for innovation and development. The laws can neither leave the market behavior alone nor over-regulate to the extent that the creativity of market subjects and the vitality of industry development are suppressed.

Secondly, the "Choose One of Two" behavior does not necessarily constitute a monopoly. Whether the conduct is suspected of being illegal should focus on whether it has adverse effects on consumer welfare, in addition to examining whether the contracting parties were dealing based on their own free will and whether there are coercive behaviors in the process of contracting or transaction.

Protecting the interests of consumers is one of the main purposes of the "Anti-Monopoly Law" [4], and it should be more considered from the perspective of consumers' interests to consider whether it violates relevant legal norms when evaluating the "Choose One of Two" behavior. Generally speaking, the "Choose One of Two" behavior directly aimed at consumers and users should be strictly restricted because of the possibility of infringing on consumers' right to choose. For example, the aforementioned behavior that Tencent took the advantage of the traffic portal of WeChat to shield links shared from non-Tencent music platforms and force users to choose to use QQ Music directly aims to users in the online music market and should be restricted in accordance with the laws. "Choose One of Two" aimed to the merchants generally does not involve consumer choice, and has less adverse impact on welfare of the consumers; and on the contrary, consumers can still enjoy the benefits of low-price competition, and in this case, the exclusive transaction can be regarded as a normal commercial arrangement. Therefore, "Choose One of Two" is not necessarily illegal, and requires law enforcement departments to make comprehensive judgments and considerations based on professional knowledge, and the mass media who blindly follow the trend and hype will lead the public to misunderstand the original normal competition behavior, and may even affect judgments of the law enforcement agency and the judicial organization.

At present, the development of the Internet industry in China is extremely fast, so the judgement of constantly changing and developing competition behavior of market subjects should remain modest and restrained. In addition, the current competition culture in China is not yet mature, the judicial practice experience is insufficient, and the one-sided interpretation and excessive publicity of the media can easily lead the public to fall into misunderstandings and cause unnecessary confusion.

**III. Theoretical Clarification of the "Choose One of Two" Behavior**

The "Choose One of Two" behavior has caused a series of phenomena that reflect the existence of significant chaos in the Internet competition market. The media's excessive publicity and misleading further deepen misunderstanding of the public on the "Choose One of Two" phenomenon. In view of this, the author makes a theoretical analysis on the "Choose One of Two" behavior from the perspective of the market dominant position in the "Anti-Monopoly Law" and the "E-Commerce Law" based on an objective and neutral standpoint.

(i) Analysis of the "Choose One of Two" Behavior under the Framework of "Anti-Monopoly Law"

From the perspective of the "Anti-Monopoly Law", the "Choose One of Two" behavior is expressed as an exclusive agreement. Generally speaking, traditional exclusive agreements are considered legitimate in law and belong to normal business behaviors, and such agreements can help enterprises better achieve business goals and obtain business value, and are a legitimate competition means commonly used by the enterprises in the market competition. When an exclusive agreement exists between two parties in the form of contract, it can help strengthen the obligations of the both parties to the agreement, effectively stabilize supply channels, minimize the free-rider behavior, help improve the quality of products and services, and ensure better consumer experience. Therefore, an exclusive agreement that violates the "Anti-Monopoly Law" may be suspected of two types of behaviors, one is the restricted transaction, and the other one is the vertical monopoly agreement [5].

The restricted transaction refers to the behavior that one party of the transaction requires the counterparty to only transact with him and transactions with others are not allowed. This behavior is a typification behavior of abuse of market dominant position with the establishment premise that an implementation subject needs to be in the market dominant position in the relevant market. Specifically speaking, firstly, if an enterprise does not have the market dominant position and the purpose of restricted transaction is difficult to achieve, the counterparty of the transaction may not accept the additional restrictions, and instead seek to cooperate with other transaction parties and accept the most suitable transaction arrangement. Secondly, in terms of the scope of influence, even if an enterprise that does not have the market dominant position implements a certain limited transaction behavior, because it does not have the dominant position and has a low market share, its scope of influence is relatively limited, and it cannot become an object regulated by the "Anti-Monopoly Law".

In view of the above two points, the restricted transaction behavior must require the implementation subject to have the market dominant position in the relevant market field, otherwise it is difficult to be evaluated as a monopoly behavior to be subject to the adjustment of the "Anti-Monopoly Law". Of course, even if the enterprise is in the market dominant position in the relevant market, whether it constitutes abuse of market dominant position still needs to be analyzed in light of the specific circumstances, the exclusive agreement does not necessarily have a negative effect on the fair competition in the market, it will also have many beneficial effects. Therefore, it cannot be simply assumed that the restricted transaction behavior must be illegal.

In addition, the determination of abuse of market dominant position by Internet platform enterprises also has its particularity, and it is necessary to pay attention to the market data and the structural characteristics of the platforms themselves [6]. The Internet platforms are typical "two-sided markets", and more participants will attract further more participants. The benefits of suppliers of goods or services in the two-sided markets increase along with increase of the number of buyers, and vice versa [7].

68

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

E-commerce platforms have a lot of consumers through various ways and means, many consumers attract a large number of high-quality merchants, more and more high-quality merchants can attract more consumers for shopping on the platforms, and after the platforms have a large number of merchants and consumers, they charge the merchants for technical services, loads advertisements on the APP startup page, etc. to achieve profitability. Massive users and good data assets will become the core competitiveness of future Internet enterprises [8]. Thus, it is necessary to fully consider the characteristics of the Internet platforms when defining the relevant market, and whether the enterprises have the dominant market positions is determined on the basis of accurately defining the relevant market.

In terms of the current situation, due to the difficulty in determining the market dominant position of Internet platform operators, it is difficult to identify exclusive agreements with platform operators as restricted transaction behavior under the Anti-Monopoly Law, but it may be regulated as a vertical monopoly agreement. The exclusive agreement exists in the form of agreement, so that there is a contractual relationship between the actor and the restricted party, and this mutually agreed behavior meets the formal requirements of the vertical monopoly agreement. When it has the negative effect of excluding and restricting competitions, the relevant provisions for regulating the vertical monopoly agreement in the "Anti-Monopoly Law" in China can be applied.

(ii) Analysis of the "Choose One of Two" Behavior under the "Comparatively dominant position" Framework

It is impossible to determine that an enterprise with the market dominant position may have the comparatively dominant position, and there is a possibility of abusing its market dominant position to compete unfairly.

1. The history of the comparatively dominant position. The theory of the comparatively dominant position is originated in Japan. In the early 1950s, a large-scale economic depression spread across Japan after World War II, the large-scale domestic enterprise operators forced small and medium-sized enterprise operators having transaction relationships to accept many obviously unreasonable transaction conditions for the needs of transferring their operational risks, which directly led to serious business crisis and even bankruptcy of a large number of small and medium-sized enterprises. As a result, in order to protect the legitimate rights and interests of the small and medium-sized enterprises, the Japanese government revised the "Monopoly Prohibition Act" in 1953, Article 19 of the act clearly stipulates that "enterprises shall not implement unfair transaction methods", and the prohibitive regulation of "improper use of the transaction position" is added in Paragraph 5 of Section 9 of Article 2 [9]. In addition, Section 14 of General Designation the "Unfair Trading Methods" issued by the Japan Fair Trade Commission is used for clarifying the types of illegal behaviors related to abuse of comparatively dominant position in the above-mentioned Paragraph 5 of Section 9 of Article 2 [10].

2. The normative idea of the comparatively dominant position. There are differences in academic circles on whether to regulate the behavior of abuse of comparatively dominant position. The opposing view is that based on the pursuit of the enterprises to maximize their own interests, uneven distribution of the two parties at the asymmetric market transaction positions should belong to the normal state of general transactions, if one party considers that the transaction conditions are obviously unfavorable, he may refuse the transaction based on his free will. Moreover, the purpose of competition law is to ensure the free competition and fair competition order of the market and achieve the improvement of resource allocation efficiency and social benefits, and the realization of this purpose may be damaged by regulating it.

However, from the perspective of Japanese legislative theories and practice, it is indeed necessary to regulate the behavior of abuse of comparatively dominant position. In market economic activities, the continuous transaction relationship developed by both parties based on long-term good cooperation or sufficient mutual trust will bring common interests such as stable supply and demand, cost saving, strengthening of supply channels and minimization of free-riding behaviors for both parties. However, if one party depends too much on this transaction relationship so that the counterparty gains the comparatively dominant position, the counterparty may force it to accept a series of unequal or unreasonable transaction conditions in order to transfer transaction risks. As far as the reality of the transaction is concerned, the excessive reliance of one party is mainly for the consideration of avoiding significant interest loss. There are two main factors that cause such interest loss: firstly, for one party, the continuous transaction relationship is unilaterally suspended in order to obtain short-term benefits, its behavior will definitely destroy the trust relationship between market subjects, which will lead to its reputation loss, so that it is more difficult to find alternative transaction partners in the market. Secondly, from the perspective of economics, in the current transaction, the production process, machinery and equipment, market information, etc. prepared by the parties for the completion of this transaction may not be applicable to other transactions, that is, the existing production conditions cannot be used for conducting transactions with others except for the counterpart, which is a "hostage" effect that makes it impossible for the parties to easily change the transaction objects, otherwise they will suffer unnecessary losses.

In addition, the legislative purpose of "Monopoly Prohibition Act" of Japan is to "promote the fair and free competition" and "ensure the interests of general consumers and promote the sound development of democracy in the national economy". In order to protect the rights and interests of ordinary consumers and the interests of relatively weak parties in the transaction, when the market mechanism fails in the process of resource allocation, public power needs to be introduced to restrict the behavior of the market subject with the comparatively dominant position to a certain extent so as to ensure the healthy development of the society as a whole.

3. Constitutive elements of the comparatively dominant position. Based on the author's analysis of the relevant Japanese laws, the constitutive elements of the comparatively dominant position regulated by them can be divided into formal elements and substantive elements.

(1) Formal elements: firstly, the advantage position. According to the general theory of Japanese law, the acquisition of the advantage position only considers that one operator has the relative advantage over the other parties, which is not based on the operator's extremely high market share and market power. In terms of identification standards, it needs to be measured from the perspective of economic dependence, that is, if one party cannot continue to maintain the transaction relationship with the counterparty, it may lead to losses and difficulties in its own business operation, so it is forced to accept the obviously unfair or unreasonable transaction conditions provided by the counterparty. Secondly, a normal commercial custom. The determination of abuse of advantage position needs to consider whether the transaction behavior between operators is the normal commercial custom, and whether the transaction behavior is the normal commercial custom should generally be judged from the perspective of maintaining the fair competition order, if the transaction behavior between the operators cannot promote and maintain the fair competition order, even if it is the normal commercial custom, it is not a legitimate commercial behavior.

69

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Journal of Henan University of Economics and Law                                                                                                No.2. 2020

Thirdly, a behavior of abuse. The evaluation and determination criteria for whether there is the behavior of abuse of advantage position need to consider economic rationality and specific circumstances of the transaction conditions given by one party of the operators to the counterparty, that is, whether the transaction conditions make the rights and obligations of the both parties unequal, and whether the counterparty of the transaction bears huge operational risks.

(2) Substantive elements: Generally speaking, the substantive elements of the advantage position should be based on the obstacle to the fair competition, that is, the competitive behavior between operators has the effect of hindering the fair competition, and the effect is not conditional on the occurrence of obstacle to the fair competition, and it is established as long as there is a significant level of abstract danger that restricts the competition. To evaluate whether a behavior hinders the fair competition, several conditions for maintaining the fair competition needs to be firstly clarified: firstly, the competition among operators is free and does not prevent other operators from entering the market. Secondly, operators establish the good competition order in accordance with legitimate competition means. Thirdly, the choice and decision rights of market subjects, that is, in the transaction, whether one party of the market subjects has the right to choose and decide the transaction object and the transaction content [11]. Any behavior that violates one of the above three conditions is deemed to have the obstacle to the fair competition. The harm of the behavior of abuse of comparatively dominant position is as follows: firstly, the behavior of abuse of comparatively dominant position in the market damages the fair competition in the market [12], the actor uses the advantage position to force the counterparty of the transaction to accept the unfair and unreasonable transaction conditions, which damages the interests of the counterparty and is a typical extraction behavior; and secondly, this kind of extraction behavior strengthens and stabilizes the economic advantage position of the actor, and exacerbates the unfair competition state; and meanwhile, the competitive position of the extracted party is correspondingly weakened to be at a competitive disadvantage. Therefore, the behavior of abuse of comparatively dominant position has great obstacle to the establishment of the fair competition order.

4. Analysis of the comparatively dominant position of the "Choose One of Two" behavior. Operators and consumers have the right to freely choose whether and how to conduct transactions, only when this right to freely choose is improperly violated, will there be the obstacle to the fair competition. The behavior of violating the right to freely choose is generated based on the comparatively dominant position in the transaction. Whether the "Choose One of Two" behavior is the behavior of abuse of comparatively dominant position should be determined according to whether it is an obstacle to the fair competition. If the subject implementing the "Choose One of Two" behavior does not have the market dominate position, but takes advantage of its comparatively dominant position in the transaction to force the counterparty to perform the designated transaction or attach unreasonable obligations, it may constitute abuse of comparatively dominant position, so that it should be regulated by the laws to maintain the fair competition order and build a fair market competition environment.

IV. Essence of Digital Economy Platform Competition

The premise of a platform to implement the "Choose One of Two" behavior is to have a certain dominant and advantage position, the platform takes the advantage position through a series of competitive behaviors, and the essence of the current competition between platforms is the competition of data and traffic portals. Data has become a new production factor that cannot be ignored in economic activities. The digital economy platform uses its data collection position to obtain or strengthen the power of a certain market influence or advantage position by designing and operating the digital technology and various algorithms through rapid and effective analysis and decision put and use. In the environment of the development of the digital economy, the platform can easily collect user data by virtue of its role as the center of data collection, and quickly connect and analyze a large amount of data through use of algorithms so as to generate or enhance the competitive advantage and even dominate position in the relevant market. The value of data needs to be effectively mined by platforms and enterprises by using scientific and technological means, the platform uses its own technological advantages to collect massive data for analysis, the value of data can be maximized, and efficient use of data traffic in related fields can be achieved.

Currently, some large digital economy platforms such as Google and Tencent control search, social and other traffic ports to exclude and restrict other enterprises, which hinders opening and sharing of data. The platform provides users with free services on one hand, and monetizes user data in other businesses on the other hand. Most data with competitive value are held by a few platforms in the market, or only a few large platforms have the ability to obtain sufficiently fast and diverse data. This not only causes vicious competition between platforms and disrupts the market competition order, but also the welfare of consumers and the data right of users are seriously damaged. The competition of data has become the core of the competition of digital economy platforms. The current "Anti-Monopoly Law" has difficulty determining whether large-scale digital economy platforms' control of traffic ports to restrict competition is abuse of market dominant position. The "Anti-Monopoly Law" in China was formed during the industrial revolution period, and when it is applied to the digital economy, some aspects appear to be somewhat lag, so regulatory means and concepts need to be innovated. In competition law enforcement, it is indeed difficult to determine the market dominant position, while the determination of the comparatively dominant position and the definition of the behavior of abuse of comparatively dominant position are more operational and flexible than the market dominant position.

V. Comments on Relevant Laws and Regulations for Abuse of the Comparatively dominant position

In 1992, China established the socialist market economy, since the second year, the "Anti-Unfair Competition Law", the "Anti-Monopoly Law" and other relevant laws and regulations for regulating the market competition behavior were successively promulgated in China, and the "Anti-Unfair Competition Law" was revised in 2018. Under comprehensive consideration of the legislative content involved, the author found that the current competition law in China lacks regulations on the behavior of abuse of comparatively dominant position, and especially the "Anti-Unfair Competition Law" and "Anti-Monopoly Law" contain no relevant provision. Even though there are scattered provisions in individual regulations, they lack detailed rules that are practical for implementation.

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

(i) Abuse of the Comparatively dominant position and the "Anti-Monopoly Law"

The types of behaviors regulated by the "Anti-Monopoly Law" are divided into four parts: abuse of market dominant position, monopoly agreement, concentration of operators and administrative monopoly. Among various specific behaviors of abuse of market dominant position, even if there are similar behaviors of abuse of market dominant position, a premise must be satisfied when determining the illegality and degree of illegality of the behaviors, that is, the actor must have the market dominant position. The market dominant position generally refers to a certain degree of dominant or control power that an enterprise has in a specific market [13], it is different from the advantage position, and there are obvious differences between them. According to the relevant provisions of Articles 18 and 19 of the "Anti-Monopoly Law", as for whether the actor has the market dominant position, the relevant market involved in the behavior of restricting the competition should firstly specified, that is, the relevant market needs to be accurately defined. Further, the actor needs to occupy a high market share in the relevant market. However, the determination of the market comparatively dominant position does not need to locate the relevant market and examine the market share, and it is only needed that one party has the advantage position in the transaction compared with the counterparty in the transaction relationship. It can be seen that the current "Anti-Monopoly Law" does not involve the behavior of abuse of market comparatively dominant position within the scope of adjustment.

(ii) Abuse of the Comparatively dominant position and the "Anti-Unfair Competition Law"

Abuse of the comparatively dominant position is different from abuse of market dominant position, it is not a behavior adjusted by the "Anti-Monopoly Law", but is the object regulated by the "Anti-Unfair Competition Law" [14]. In order to maintain the fair competition order, the types of behaviors regulated by the "Anti-Unfair Competition Law" are unfair competition behaviors, the unfair competition behaviors include counterfeiting others' registered trademarks, forging famous and high-quality logos, infringement on trade secrets, commercial bribery, false propaganda, Bonus sales, commercial defamation, etc. Article 6 of the "Anti-Unfair Competition Law" (revised draft for review) promulgated by the Legislative Affairs Office of the State Council in 2015 stipulates: "an operator shall not take advantage of his comparatively dominant position to carry out the following unfair transaction behaviors." However, under the considerations of the difficulty of defining the relevant market and the certainty and predictability of the laws, the provision for the comparatively dominant position was not retained in the final past "Anti-Unfair Competition Law", so that the current "Anti-Unfair Competition Law" lacks specific stipulations on the behavior of abuse of comparatively dominant position.

(iii) Abuse of the Comparatively dominant position and the "E-Commerce Law"

On August 31, 2018, the 5th meeting of the Standing Committee of the National People's Congress voted to pass the "E-commerce Law", which came into force on January 1, 2019. The norms for regulating abuse of advantage position in the "E-commerce Law" are mainly in Article 35, which specifically stipulates as follows: operators of E-commerce platforms shall not uses service agreements, transaction rules, technologies and other means to unreasonably restrict transactions in the platform, transaction prices, transactions with other operators, or attach unreasonable conditions or charge unreasonable fees to operators in the platform. We analyze its provisions in detail to get to the core of its meaning:

1. Use service agreements, transaction rules, technologies and other means. The operators of the e-commerce platforms are an aggregator of network fragmented resources and a market subject that maximizes its own interests. However, due to the development of network technology, in the process of maximizing its own interests, the network platforms formulate, publish and implement a large number of rules for the internal market, and invisibly become an important subject of market regulations [15]. The convenience of the technologies of the network platforms gives them an inherent advantage in the formulation and release of rules. The network platforms have the "legislative power", "enforcement power" and "judicial power" similar to other market regulation subjects, and various new regulatory measures are created. Therefore, when the rule-making power of the platforms becomes stronger and stronger and their advantage position become more and more obvious, abuse of this position may happen to attach the unfair obligations on the operators in the platform and affect the normal competition order of the market. Therefore, it is necessary to strictly restrict the rights of the e-commerce platforms.

2. Unreasonably restrict transactions in the platform, transaction prices, transactions with other operators, etc. of operators in the platforms means that operators of the e-commerce platforms sign service contracts, set transaction rules or use technologies and other means to sell goods or provide services on the network platforms, and meanwhile impose unreasonable restrictions on prices, sales targets, sales areas, etc. of the goods or services in the manners of standard terms, standard contracts, etc.. The behavior of attaching unreasonable conditions to the subjects of market transactions is a vertical control behavior of the e-commerce operators over buyers. Such behavior is not only inconsistent with the principle of autonomy and voluntariness, but also violates the principle of fairness.

3. Attach unreasonable conditions to the operators in the platform includes but not limited to the above-mentioned unreasonable restrictions related to transactions, means that the operators of the e-commerce platforms use their positions to sign service contracts, set transaction rules or use technologies and other means to force the other party to sign exclusive sales agreements, accept unreasonable entry conditions, etc., or add specific unfavorable conditions, such as reducing activity resources, reducing search rights, shielding, etc. in the manners of standard terms, standard contracts, etc. On one hand, it infringes on the independent management rights and freedom of transactions of operators in the platform; and on the other hand, it hinders the fair competition between e-commerce platforms and ultimately causes damage to the rights and interests of consumers and public interests.

4. Charge unreasonable fees to operators in the platform mainly refers to a horizontal control behavior carried out by the operators of the e-commerce platforms over other market subjects through service agreements, transaction rules, technologies and other means. Charging unreasonable fees will have the following adverse effects: firstly, operators in the platform tend to only engage in sales on specific e-commerce platforms, as if an exclusive sales agreement is signed; and secondly, by transferring their own transaction cost, the market share of the e-commerce platforms can be expanded. The sales behavior for the purpose of crowding out competitors or the behavior of taking advantage of monopoly positions to restrict other operators' freedom of transaction constitute threats and damage to the market structure and the fairness of competition.

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

Journal of Henan University of Economics and Law

No.2. 2020

Because the e-commerce platforms do have the comparatively dominant positions in the transaction process in the platforms, Article 35 of the "E-Commerce Law" aims to restrict the competitive behaviors and the transaction behaviors of the e-commerce platforms within the platforms, which is the core meaning of the article. This article is the legislative manifestation of regulating abuse of dominant position, indicating that Chinese legislators have noticed the possibility of abuse of dominant position to exclude competition in economic transactions, and have actively carried out relevant legislative exploration and practice. However, this article is limited to e-commerce platform operators, its scope of application is limited, and it lacks certain remedies. Moreover, this article is also the only one in the "E-Commerce Law" that involves the dominant position, and apart from that, there are no other articles in the "E-Commerce Law" to regulate the dominant position.

(iv) Abuse of the Comparatively dominant position and Departmental Regulations

Although there are currently no regulations for abuse of comparatively dominant position at the legal level in China, it has been preliminarily stipulated in departmental regulations.

In July 2006, five departments including the Ministry of Commerce, the National Development and Reform Commission, the Ministry of Public Security, the State Administration of Taxation and the State Administration for Industry and Commerce jointly promulgated the "Measures for the Administration of Fair Trade of Retailers and Suppliers" (hereinafter referred to as the "Measures"). Article 3 of the "Measures" stated that regulated subjects by the "Measures" are "large-scale retailers that sell goods directly to consumers and have the annual sales volume of more than 10 million yuan". Articles 6 and 7 provide detailed provisions for large retailers about abuse of comparatively dominant positions to engage in unfair transactions and conduct behaviors that impede fair competition. Articles 8 to 18 also provide provisions for unfair transactions between large retailers and suppliers. The above-mentioned provisions indicate that in the context of immature conditions for enacting laws against the behavior of abuse of comparatively dominant position in China, it is regulated first in the form of departmental regulations. However, the "Measures" have the following shortcomings:

1. In terms of the scope of application, the "Measures" are only applicable to the retail industry, ignoring the behavior of abuse of comparatively dominant position in various other industries, the scope of application is limited, and the adjustment object is single.

2. In terms of the legal hierarchy, the "Measures" are only departmental regulations after all, even if they are jointly promulgated by the five ministries and commissions, they still cannot have the same hierarchy and effect as laws and regulations.

3. In terms of the law enforcement efficiency, the "Measures" are jointly promulgated by the five ministries and commissions, even if they have enhanced coercive and deterrent power to a certain extent and indicates that the central government attaches great importance to the behavior of abuse of comparatively dominant position, they have also brought dilemmas to law enforcement. For example, Paragraph 1 of Article 21 of the "Measures" stipulates: "the departments of commerce, price, taxation, industry and commerce, etc., in various regions shall supervise and manage the behaviors stipulated by the "Measures" within their respective responsibilities in accordance with laws and regulations and the "Measures". Those being suspected of crime shall be investigated and punished by the public security organs according to the laws." According to provisions of this article, each department can only perform supervisory functions for the behavior of abuse of comparatively dominant position within its own function extent. If a business operator implements multiple behaviors of abuse of comparatively dominant position at the same time, he needs to be supervised and dealt with separately by different departments, which will inevitably lead to low administrative law enforcement efficiency.

From the above-mentioned laws and departmental regulations, it can be seen that the current legislation on abuse of comparatively dominant position in China is insufficient.

(v) Improvement Suggestions

Firstly, the types of behaviors regulated by the "Anti-Monopoly Law" are monopoly agreements, concentration of operators, administrative monopoly and the behavior of abuse of market dominant position, while the behavior of abuse of market comparatively dominant position does not fall within the scope of this law. The legal structure excludes the possibility of increasing regulation on behavior of abuse of market comparatively dominant position , so that the operability of revising the "Anti-Monopoly Law" to regulate the behavior of abuse of comparatively dominant position is low, and the theoretical basis is not sufficient.

Secondly, even if the aforementioned "Measures" promulgated by the five ministries and commissions are improved, the restrictions on behavior subjects are removed, and the scope of adjustment of the "Measures" is expanded, there are still problems such as multiple law enforcement agencies and shirking of responsibility, and the laws and regulations issued by the commission ranks low in the hierarchy of laws, which renders it powerless to effectively regulate abuses of comparative dominance.

Thirdly, "maintaining fair competition" and "maintaining free competition" are the exclusive and independent characters of the "Anti-Unfair Competition Law" and the "Anti-Monopoly Law" respectively, and the two laws act on market competition in different ways of protecting legal interests. The behavior of abuse of comparatively dominant position does not hinder free competition, but damages the fair competition order, therefore, the author suggests that the behavior of abuse of comparatively dominant position should be regulated by improving the "Anti-Unfair Competition Law". In this regard, we can learn from the above-mentioned legislative experience in Japan to add regulations on the relative advantage provision in the "Anti-Unfair Competition Law", and formulate implementation and punishment detailed rules for abuse of market comparatively dominant position. In addition, the administrative relief provisions of the "E-Commerce Law" should be appropriately increased, and the corresponding legal relief measures should be improved, so that the effective implementation of Article 35 of the "E-Commerce Law" is ensured.

VI. Conclusions

The healthy development of the market economy is inseparable from the fair competition order, and the most important thing to establish the fair competition order is to depend on development and perfection of the legal system and its effective implementation. Since 1993 when China established that it should implement the socialist market economy , a series of laws to maintain the market competition order and build a fair competition environment has been formulated, which have effectively regulated the monopoly behavior and the unfair competition behavior. However, with the development of the economy, the behavior of abuse of comparatively dominant position has widely existed in various industries and fields of society, and if it is not regulated by the laws, unfair competition behaviors such as "Choose One of Two" will continue to occur.

72

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

The behavior of abuse of comparatively dominant position not only damages the legitimate interests of the counterparty in the weak position, but also greatly hinders the construction and development of the fair competition order. Therefore, how to improve relevant laws to effectively regulate the behavior should be the focus of future research in competition law circles, and it is also a complex and arduous task in competition law legislation.

References:

[1] Chen Yongwei. Those Troublesome Problems in the "Toutiao-to-Tencent War" [J]. Small and Medium Enterprises in China, 2018, (7): 34.

[2] Guo Shihui, Zhao Chaoyue. The Competition Is Intensified, and Luckin Coffee and Starbucks Are at War [J]. Chinese Food, 2018, (11): 116.

[3] Mo Zhenzhen, Li Shiyang, Ban Zhifei. Platform Economy: The Engine of New Economic Development [J]. China Science and Technology Industry, 2017, (6): 76.

[4] Wang Xiaoye. Competition Law [M]. Beijing: Social Sciences Academic Press, 2007: 47.

[5] Yang Dong. Whether "Choose One of Two" Is a Monopoly Should Not Be Generalized [N]. Economic Information Daily, 2019-10-28 (07).

[6] Cao Yang. Determination and Regulation of Internet Platform Market Dominant Position from the Perspective of Data [J]. Electronic Intellectual Property, 2018, (10): 91.

[7] Chen Shuangquan. Definition of the Relevant Commodity Market in the Internet Industry-Taking the Case of Qihoo 360's Appeal for Tencent's Abuse of the Market Dominant Position as an Example [J]. Journal of Yichun University, 2013, (11): 31.

[8] Li Ronggang, Liu Qiang. Research on Internet Thinking Mode based on Grounded Theory [J]. Internet World, 2016, (1): 38.

[9] Wang Xiaoye, (Japan) Yi Congkuan. Competition Law and Economic Development [M]. Beijing: Social Sciences Academic Press, 2003: 48.

[10] [Japan] Lingmu Man. Interpretation of Japan's "Anti-Monopoly Law" [M]. Translated by Wu Jinwei, Wang Yuhui. Henan: Henan University Press, 2004: 26.

[11] Zhu Deli. Discussion on the Comparative Economic Advantage Position in Anti-Monopoly Law [J]. Business Times, 2011, (18): 95.

[12] Zhang Ya. Regulation Path of the Behavior of Abuse of Comparatively dominant position in China [J]. Journal of Social Sciences of Harbin Normal University, 2018(3): 45.

[13] Liu Jifeng. Legal Adjustment of the Behavior of Abuse of Advantage Position in Commodity Retailing-Also Comment on the Perfection of Anti-Unfair Competition Law (Revised Draft) [J]. China's Circulation Economy, 2012, (6): 110

[14] Wang Yongqiang. Network Platform: A New Member of the Market Regulation Subject-An Elaboration with Taobao's E-Commerce Platform as an Example [J]. Journal of Economic Law, 2014, (2): 57.

[15] Long Jun. Regulation Principle of Anti-Unfair Competition Law for Abuse of Comparatively dominant position [J]. Legal Science (Journal of Northwest University of Political Science and Law), 2017, (5): 49.

**Editor in charge: Li Fumin**

# Theoretical Clarification of Exclusive Choosing in the Competition Context of Digital Economy Platform

Yang Dong    LinYuqi

(*Law School, Renmin University of China, Beijing* 100871)

**Abstract**: Due to the fierce competition among internet platforms and misleading media opinion, there is a certain misunderstanding of exclusive choosing in various circles of society. The exclusive choosing cannot be simply evaluated as monopoly or unfair competition, since the specific circumstances of implementation of the behavior need to be examined, including whether the subject has a dominant or comparative advantage position, the impact of the behavior on the competitive order, and the influence of consumer welfare. Within the framework of the Anti-Monopoly Law, the exclusive choosing may constitute a vertical monopoly agreement and a restricted transaction. In the framework of comparative advantage position theory, exclusive choosing may constitute the subject's use of comparative advantage position to impose unreasonable conditions on the relative party, thus constitutes the behavour of abusing comparative advantage position hindering the fair competition. Due to the inperfect rules of comparative advantage status in China's current law, the exclusive choosing cannot be effectively regulated. Therefore, it is necessary to draw on foreign legislative experiencetoadd comparative advantage clauses to the Anti-Unfair Competition Law, and formulate supporting implementation and punishment rules.

**Keywords**: comparative advantage position; e-commerce law; exclusive agreements; competition order

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

2020    2 (    178 )

"                    "

( 100871)

: " "
" "。

、

。 《          》    "      "
" "

。    " "
。    《          》
。

:          ;          ;          ;

: D922.22          : A          : 2095-3275(2020)02-0066-08

、

"      "。    "      "                    " "

。    "      "
。

"    "                    《          》
《          》    。 "    "          、
。    "      "
、                    、                    。
"      "
。
"    "          《          》    。

"      "
、 "      "

"      "

＊          : 2019  11  13
          :                    (    )          "                    、                    " (          :
71661137006)          。
          :                              :    ;
          :          。

66

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

: " "

" "。 " " 。

。

( ) " "

" " 2010 "3Q " 。 QQ

《 QQ 》 " 360 QQ "

360 QQ 。 QQ

360 360

" " 。2018 " "

" "

;

。 、

QQ 、 " " 。 QQ

[1]

" " 。 QQ 、

" " 。

、 QQ 。 QQ

、 QQ

QQ 。

" "

2013

、 618 11

。

" " 。

、 、 [2]

。 、 、

" " 。

、

( ) " "

" " "

" 。

" " 、 ;

。

" "

。 " "

;

" "

。 " "

。

。

" " :

" " " "

。

《 (2019 ) 》 : 2018 31. 3

2018 20.9% GDP 1/3 34. 8% 1. 9

67

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.　http://www.cnki.net

2020    2

。

、    、                                                                          ;

。

。                            、        (              、

)                        3

《              》                                                        。

。

"        "                                                              。

。

4              "        "

"        "

。

。

QQ

"        "

。

。    "        "                                                          、

、                                      。

。

。

、  "        "

"        "

"        "                                      。

"        "                      。

( ) 《        》              "        "        。

"        "                              。

。

、

。                          《        》

5  。

。        :

。

。

。

。

6  。                          "        "

7  。

68

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

: "      "

APP
。                                                                    8 。

。

。

、                                                    《          》
。

(  ) "              "          "        "

。

1.                                        。                    20      50

。                                                              1953        《            》
19          : "                                    "            2      9      5    "
"                    9 。                              《                  》
14                            2      9      5                                      10 。
2.                                    。                                                。

。

。

、          、              、                                                。

。                                                      :

。

、          、
"        "
《          》                        "                          "        "
"                                          。

。

3.                                  。
。
(1)          :              。

。

。

。

。

69

2020    2

(2)

4. " "

Google、

1992

2018

70

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

：                                              “          ”

（   ）

（   ）                              《                    》
《          》                        《
》                  [14]

、            。2015                    《                 》（              ）
： “
”。

《                    》
《              》
（   ）                        《              》
2018    8    31                                              《              》          2019    1    1
：

：

1.            、                                。

“       ” “        ”  “       ”

2.                              、

3.

、            、        。

；

4.                                                      ：

；

71

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

2020    2

（　）

2006    7    、    、    、    《
　》（　《　》）。《　》    "
1000    "。

　《　》    :

1.    《　》

2.    《　》

3.    《　》

:  "    、    、    、
    。"。

（　）

《　　》

《　》    《　》

、

"    "    "    "    《　　》 《　　》

《　　　》

《　　　》

《　　》

《　　》

、

1993

"    "

72

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net

：                    "      "

。

。

：
1    ．" 　 　 "　　　　　　　　J ．　　　　　　 2018（7）：34.
2    ．　　　　　　　　　　　　　　　　J ．　　　　　J ．　　　2018（11）：116.
3    　　　　　．　　　：　　　　　　　J ．　　　　　　 2017（6）：76.
4    ．　　　　M ．　：　　　　　　　　　　2007：47.
5    ．"　　"　　　　　　　　N ．　　　　　 2019-10-28(07).
6    ．　　　　　　　　　　　　　　　　J ．　　　　 2018（10）：91.
7    ．　　　　　　　　　　　——　　360　　　　　　　　　　　J ．
    2013（11）：31.
8    　　　　．　　　　　　　　　　　　　J ．　　　　 2016（1）：38.
9    （　）　　．　　　　　M ．　：　　　　　　　　 2003：48.
10    　　　．　　　　　　M ．　　　　．　：　　　　　　 2004：26.
11    ．　　　　　　　　　　　　J ．　　2011（18）：95.
12    ．　　　　　　　　　　　　J ．　　　　　　　 2018(3)：45.
13    ．　　　　　　　　——　《　　　　（　　）》
    J ．　　　　 2012（6）：110
14    ．　：　　　　　　　——　　　　　　　　J ．
    2014（2）：57.
15    ．　　　　　　　　　　　　J ．　　（　　　　　　）
    2017（5）：49.

：

# Theoretical Clarification of Exclusive Choosing in the Competition Context of Digital Economy Platform

Yang Dong    LinYuqi

(*Law School  Renmin University of China  Beijing* 100871)

**Abstract**: Due to the fierce competition among internet platforms and misleading media opinion there is a certain misunderstanding of exclusive choosing in various circles of society. The exclusive choosing cannot be simply evaluated as monopoly or unfair competition since the specific circumstances of implementation of the behavior need to be examined including whether the subject has a dominant or comparative advantage position the impact of the behavior on the competitive order and the influence of consumer welfare. Within the framework of the Anti-Monopoly Law the exclusive choosing may constitute a vertical monopoly agreement and a restricted transaction. In the framework of comparative advantage position theory exclusive choosing may constitute the subject's use of comparative advantage position to impose unreasonable conditions on the relative party thus constitutes the behaviour of abusing comparative advantage position hindering the fair competition. Due to the inperfect rules of comparative advantage status in China's current law the exclusive choosing cannot be effectively regulated. Therefore it is necessary to draw on foreign legislative experiencetoadd comparative advantage clauses to the Anti-Unfair Competition Law and formulate supporting implementation and punishment rules.

**Keywords**: comparative advantage position; e-commerce law; exclusive agreements; competition order

73

(C)1994-2020 China Academic Journal Electronic Publishing House. All rights reserved.    http://www.cnki.net



City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "**数字经济平台竞争背景下二选一行为的理论廓清（2019 年）**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Shayna Himelfarb

Sworn to before me this
July 19, 2022

Signature, Notary Public



Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE