# EXHIBIT W

the**antitrust**source ■ www.antitrustsource.com ■ June 2021      1

# Interview with Wu Zhenguo, Director General, Anti-Monopoly Bureau of the State Administration for Market Regulation (SAMR), People's Republic of China

*Editor's note: Mr. Wu Zhenguo is the Director-General of the Anti-Monopoly Bureau of the State Administration for Market Regulation (SAMR). He graduated from the Shandong University with a Juris Doctor degree, and has worked in both the Ministry of Textile Industry and the State Economic and Trade Commission. After joining the Ministry of Commerce (MOFCOM), Mr. Wu has served successively as the Director of the Department of Treaty and Law, the Deputy Director-General of the Department of Treaty and Law, the Deputy Director-General of the Anti-Monopoly Bureau, and the Director-General of the Anti-Monopoly Bureau. He was interviewed in writing by the Editorial Board of the Antitrust Source in May 2021.*



**THE ANTITRUST SOURCE:** It has now been three years since the Anti-Monopoly Bureau of SAMR was created as a unitary entity from antitrust organs from NRDC, SAIC, and MOFCOM—the institution that you came from. Can you tell us how the process is going? Do you see synergies from the consolidation? Are there things you can do better than you could before? Are there still challenges?

**WU ZHENGUO:** First of all, thank you for the attention to China's anti-monopoly work. It is a great pleasure for me to have the opportunity to share with international colleagues the progress and achievements of China's anti-monopoly law enforcement. Strengthening and optimizing the government's anti-monopoly functions are important goals of the institutional reform within the Chinese government. China established the SAMR in 2018, which consolidated the anti-monopoly functions of the NDRC, the MOFCOM, and the former SAIC and leads to unified anti-monopoly law enforcement and improved efficiency and efficacy. Over the past three years, we have focused on consolidating anti-monopoly laws and regulations, unifying anti-monopoly working systems and rules, strengthening the efforts of anti-monopoly law enforcement, and efficiently carrying out international cooperation in combating anti-competitive conduct. The effectiveness of the institutional reform has been fully demonstrated.

In terms of improving the rules on market competition, we have completed the draft amendments to the Anti-Monopoly Law, or AML, and further improved the anti-monopoly legislation, based on China's AML enforcement practice and with reference to the practices and experience of other countries. We consolidated and optimized the anti-monopoly rules and regulations previously promulgated by different government departments, developed or amended five departmental regulations including interim provisions on monopoly agreements, abuse of dominance, abuse of administrative power, and concentrations; and provisions on intellectual property rights, which unified the anti-monopoly enforcement procedures, standards, and benchmarks. We developed

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

*We imposed an administrative penalty of RMB 18.228 billion against Alibaba Group for its monopolistic conduct of forcing merchants to "choose one from two" in the online retail platform service market in China.*

and promulgated six guidelines, including on intellectual property and the platform economy sector, and further enhanced the enforceability and predictability of the anti-monopoly legal regime.

In terms of strengthening anti-monopoly enforcement, as of April 16, 2021 and since the institutional reform, we have efficiently concluded 1,580 merger cases and concluded 299 monopoly cases with the total amount of fines and confiscation amounting to RMB 20.368 billion, effectively maintaining fair market competition and safeguarding people's livelihoods and welfare. We imposed an administrative penalty of RMB 325.5 million in the calcium gluconate API sector, an administrative penalty of RMB 100.7 million in the case of Simcere Pharmaceutical Group, and an administrative penalty of RMB 764 million on Yangtze River Pharmaceutical Group for implementing a monopoly agreement. Through these cases, fair competition in the pharmaceutical sector has been effectively protected. We imposed an administrative penalty of RMB 18.228 billion against Alibaba Group for its monopolistic conduct of forcing merchants to "choose one from two" in the online retail platform service market in China, and completed 13 cases relating to the unlawful implementation of a concentration by platform businesses such as Alibaba and Tencent, which marks China's contribution to the global discussions of the regulation of the platform economy. We made vigorous efforts in cracking down on administrative monopoly. We investigated and handled 152 cases of abusing administrative power to eliminate or restrict competition in accordance with the law, broke down geographical barriers and local protectionism, and maintained a unified national market.

In terms of deepening international exchanges and cooperation on combating monopoly, after the institutional reform, we signed and renewed 16 anti-monopoly cooperation documents with the European Union, Japan, South Korea, the Philippines, Serbia, Belarus, and the BRICS countries, which further expands the opportunity for cooperation and enhances the level of collaboration. We cooperated with our counterparts in a number of jurisdictions, including the United States, the European Union, Germany, Russia, Canada, India, and South Africa in law enforcement regarding dozens of significant cross-border M&A transactions, including the Dow/DuPont merger, and Bayer's acquisition of Monsanto, and played an important role in maintaining fair competition in the global market. We also sent personnel to attend international conferences and forums in the anti-monopoly field to share China's experiences and participate in the research of international best practices in the anti-monopoly field.

Of course, challenges coexist with opportunities. Compared to mature economies such as the United States and the European jurisdictions, China's anti-monopoly law enforcement authorities are still quite "young," and our law enforcement is far behind that of other countries in terms of staffing. Our anti-monopoly legal system needs further improvements, and our law enforcement expertise should be continuously enhanced. We should also continue to deepen communication and exchanges with the anti-monopoly law enforcement authorities in other countries and regions in the world.

In the meantime, we and the other authorities are facing many common challenges. For example, due to the rising tide of protectionism and unilateralism as well as the exacerbation of trade and investment conflicts, the world economy is facing significantly increased risks and uncertainties, especially in the phase of post-pandemic economic recovery. We need to think about the common problem of how to methodically implement competition policies and accurately and efficiently carry out anti-monopoly law enforcement so as to help achieve economic growth that can be shared with more people.

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

As we continue to see breakthroughs in the Internet, big data, artificial intelligence, and other modern information technologies, the digital economy continues to prosper and all types of new technologies, new industries, and new business forms constantly emerge. New competition issues and law enforcement challenges have arisen and need to be addressed by us, which requires our collective efforts in promoting the healthy and sustainable development of new economic and business forms and to inject new momentum into global economic growth.

**ANTITRUST SOURCE:** Compared to other competition authorities around the world, SAMR's staffing is relatively small. So under this circumstance how do you perform your duties to ensure the full effectiveness of antitrust enforcement?

**WU ZHENGUO:** Compared to other major anti-monopoly enforcement authorities in the world, the authorities in China currently have fewer staff, which needs to be changed in the future. But before then, we took the institutional reform as an opportunity to build a unified, efficient, and authoritative enforcement system with an aim to realize the full potential of China's anti-monopoly enforcement:

Firstly**,** we set up an anti-monopoly law enforcement system with responsible authorities set at two-levels, that is, the central and provincial levels. We authorized the provincial Administrations for Market Regulation to take charge of the anti-monopoly enforcement work within their respective administrative regions. The reporting and recording system was also improved so that the guidance given to local authorities is more effective and anti-monopoly enforcement is unified.

Secondly, we enhanced the role of the Anti-Monopoly Commission, or AMC, of the State Council. The new session of the AMC has been formed and the working rules of the AMC were revised and improved to strengthen its functions of organization, coordination, and guidance. The new Expert Advisory Board of the AMC and the SAMR's Anti-Monopoly Expert Pool have been set up to provide ongoing support for anti-monopoly work.

Thirdly, we made unified anti-monopoly law enforcement more standardized. In addition to the five departmental regulations and six antitrust guidelines, 30 working policies and 62 law enforcement document templates covering the whole process and the entire field of anti-monopoly work were formulated, and 15 model documents were issued to provincial Administrations for Market Regulation to improve the quality and efficiency of anti-monopoly law enforcement.

Fourthly, we strengthened capacity-building for anti-monopoly law enforcement. We compiled unified anti-monopoly training textbooks, a law enforcement manual, and a compilation of anti-monopoly regulations and guidelines, and held training sessions for key enforcement personnel. Since the establishment of the SAMR, nearly 1,000 people have been trained, as a result of which a high-quality and strong anti-monopoly law enforcement team has been built.

At present, the SAMR is considering future plans to increase the anti-monopoly regulatory resources, enhance the regulatory capacity and level, and strengthen the authoritativeness of its regulation.

**ANTITRUST SOURCE:** We are seeing increasing activity on the part of SAMR's provincial counterparts. What does SAMR see as the proper role of its local counterparts?

**WU ZHENGUO:** China's GDP exceeded RMB 100 trillion in 2020, and a very large domestic market has emerged. Accompanying this is increasing market concentration in certain industries and the gradual emergence of monopolistic practices by enterprises, which calls for immediate strengthening of anti-monopoly enforcement and optimization of government's anti-monopoly

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

functions. Administrations for Market Regulation at the provincial level are an important part of China's anti-monopoly law enforcement system, and have played an important role in maintaining fair market competition, protecting consumers' rights and interests, and safeguarding a unified national market.

In terms of anti-monopoly law enforcement, the provincial Administrations for Market Regulations are responsible for the anti-monopoly law enforcement work in their respective administrative regions in cases involving monopoly agreements, abuse of dominant market position, and abuse of administrative power to eliminate or restrict competition. They have been confident in taking responsibility and initiatives, and have investigated and completed a number of influential monopoly cases. At the same time, for key sectors where monopolistic behavior is frequently occurring, the SAMR will organize targeted law enforcement across the country. The Administrations for Market Regulation at central and provincial levels have worked together and achieved very good results.

For example, to address the frequent occurrence of monopolistic conduct in the API sector that harmed the interests of downstream pharmaceutical manufacturing enterprises and patients, the SAMR launched targeted and sustained law enforcement against monopoly conduct in the API sector around the country in 2020, and guided local authorities to investigate and handle API monopoly cases, which effectively deterred monopolistic conduct in the API sector.

In terms of fair competition review, in September 2019, the fair competition review system was implemented among governments at four levels: the national, provincial, municipal, and county levels. The local Administrations for Market Regulation led the establishment of the "joint review system" for fair competition review in their respective regions so that the system can serve the role of overall planning and coordinating. In 2020, a total of 1.07 million policies and measures were reviewed nationwide, and nearly 6,000 were abolished or revised to effectively safeguard the environment for fair competition. At present, 31 provinces, including autonomous regions and municipalities, have established a mechanism for supervision and sampling inspection of local policies and measures, and 22 provinces including Hebei, Liaoning, and Tibet have carried out third-party evaluation of the implementation of the fair competition review systems, facilitating the establishment of a unified national market featuring high levels of efficiency, standardization, and fair competition.

In terms of strengthening the implementation of competition policies, there have been pilot programs for various competition policies in certain parts of the country, such as the pilot free trade zones. These pilot programs provide valuable experience for innovating implementation mechanisms of the competition policies and promoting the actual implementation of competition policies.

In terms of competition advocacy, the local Administrations for Market Regulation guided enterprises within their jurisdictions to carry out anti-monopoly compliance work in accordance with local conditions, and organized a variety of activities to advocate competition, thus improving the local competition ecosystems and effectively safeguarding a unified national market.

**ANTITRUST SOURCE:** In delegating enforcement authority to the provincial and local authorities, how do you ensure consistency of interpretation and application of provisions of the AML, such as monopoly agreement and abuse of dominance?

**WU ZHENGUO:** In practice, through the unification of rules, standards, and benchmarks regarding anti-monopoly enforcement, we have strengthened the guidance to our local counterparts and coordination of the anti-monopoly work across the country, ensuring that our local counterparts

the**antitrust**source ■ www.antitrustsource.com ■ June 2021                    5

perform their duties in strict accordance with the law. The regulations, guidelines, policies, and rules that I mentioned earlier will ensure the fundamental consistency of law enforcement standards, benchmarks, and procedures.

Regarding work standardization, we have circulated 15 types of legal document templates to provincial Administrations for Market Regulation to ensure the standardization of the work on the antitrust law enforcement.

Regarding working procedures, the provincial Administrations for Market Regulation shall file a case with the SAMR within the specified period after the case is initiated. The local Administrations for Market Regulation shall also make relevant reports and submit the draft documents to the SAMR for SAMR's guidance and supervision before they decide to close a case, issue a notification of an administrative penalty, decide on an administrative penalty, decide to suspend, resume, or terminate an investigation, or provide their opinions on conduct involving the abuse of administrative power to eliminate or restrict competition. The provision of such opinions should also be in accordance with the laws. Moreover, the local Administrations for Market Regulation also need to make timely reports to SAMR on other major or difficult matters in the investigation and handling of a case.

Also, we emphasize the disclosure of case information for better supervision from the public. The provincial Administrations for Market Regulations shall publicize case information in accordance with the relevant requirements and regulations and submit the legal documents to the SAMR within 5 working days after they have decided to impose an administrative penalty, to suspend or terminate an investigation, or after they have provided their opinions on conduct involving the abuse of administrative power to eliminate or restrict competition. The provision of such opinions should also be in accordance with the laws. The SAMR will change or revoke the authorization as the case may be if the provincial Administrations for Market Regulation fail to administer in accordance with the law or handle the case in violation of laws and regulations.

*[W]ith the unexpected outbreak of the Covid-19 pandemic, China's anti-monopoly law enforcement authorities responded quickly. We calmly dealt with the situation and dared to make a difference.*

**ANTITRUST SOURCE:** What do you believe are the most significant highlights of enforcement in the past year?

**WU ZHENGUO:** In the past year, with the unexpected outbreak of the Covid-19 pandemic, China's anti-monopoly law enforcement authorities responded quickly. We calmly dealt with the situation and dared to make a difference. The success of the anti-monopoly law enforcement work demonstrates how flexible and resilient China's antitrust enforcement regime can be in the face of risks and challenges. Throughout 2020, the anti-monopoly law enforcement authorities of China concluded 109 monopoly cases in total, with the fines and confiscations reaching RMB 451 million. Among them, 16 cases were about monopoly agreements, ten were about abuse of market dominance, 16 were about the illegal implementation of concentration of undertakings, and 67 were about abuse of administrative power to eliminate or restrict competition. 485 cases of concentration of undertakings were initiated with 473 concluded, and four of which were approved with conditions. The most significant highlights of the past year include the following:

Firstly, breakthroughs were made in anti-monopoly law enforcement in the platform economy sector. In 2020, the case of Alibaba Group Holding Co., Ltd., where the company was suspected of monopolistic conduct by implementing the "choose one from two" practice, was initiated and investigated in accordance with the laws and the company was fined RMB 18.228 billion on April 10, 2021. This is the first major monopoly case in the platform economy sector in China and is an important benchmark for preventing platform monopoly and maintaining competition. As of

April 16, 2021, penalties were imposed and publicly announced in 13 cases where platform enterprises failed to notify a concentration in accordance with the laws, which effectively protected the competition landscape. The Anti-Monopoly Guidelines on Platform Economy Sector was also promulgated to ensure the anti-monopoly regulation is forward-looking and targeted.

Secondly, significant efforts were made to support the prevention and control of the pandemic and the resumption of work and production. The Announcement on Adjusting Work Methods Including Reception during Pandemic Prevention and Control Period and the Announcement on Anti-Monopoly Law Enforcement to Support Pandemic Prevention and Control and Resumption of Work and Production were issued in a timely manner. A package of policies and measures were developed regarding review of concentrations, agreement exemptions, fair competition review, and corporate compliance support to support pandemic prevention and control and the resumption of work and production. An online notification and receipt mechanism was established for anti-monopoly review of concentration of undertakings and a green channel was opened for the review of concentrations, which expedited the review process, reduced the transaction costs of enterprises, and were highly praised by the enterprises.

Thirdly, anti-monopoly enforcement was continuously strengthened in sectors involving people's livelihoods. Anti-monopoly law enforcement was strengthened in pharmaceuticals, public utilities, automobiles, building materials and other sectors involving people's livelihoods, and breakthroughs were achieved in the investigation and handling of major and typical cases. In the case of calcium gluconate API monopoly, an aggravated administrative penalty was imposed in accordance with the law, with the fines and confiscations reaching RMB 325.5 million. We guided local authorities to investigate and handle the monopoly cases involving 12 types of API, including camphor API and magnesium trisilicate API, thereby effectively maintaining the proper functioning of the pharmaceutical market and ensuring the stable supply of common drugs during the pandemic. Provincial Administrations for Market Regulation investigated and handled a number of typical monopoly cases in the sectors of public utilities, building materials and automobiles, and effectively protected the interests of consumers.

Fourthly, a unified national market was safeguarded with great resolution. Law enforcement was strengthened regarding the abuse of administrative power to eliminate or restrict competition. Efforts have been made to eradicate local protectionism and designated transactions, and 67 cases of abuse of administrative power to eliminate or restrict competition were concluded. These efforts greatly promoted fair competition, safeguarded a unified national market, and created a business environment that is market-oriented, law-based, and friendly to international participants.

**ANTITRUST SOURCE:** Please tell us how SAMR has adapted its work to the Covid-19 pandemic?

**WU ZHENGUO:** After the outbreak of the pandemic, we immediately issued the Announcement on Adjusting Work Methods Including Reception during Pandemic Prevention and Control Period and the Announcement on Anti-Monopoly Law Enforcement to Support Pandemic Prevention and Control and Resumption of Work and Production, and developed a package of policies and measures regarding anti-monopoly enforcement, fair competition review, and corporate compliance support. We established the online notification and the green channel for the review of concentration of undertakings that I already mentioned.

We resolutely protected fair competition in the market for pandemic prevention and control supplies, promptly launched inspections on evidence of suspected joint price increases and price-fixing by manufacturers of forehead thermometers, non-contact thermometers, and API, and

properly dealt with fair competition issues in policies and measures relating to the export of medical supplies and the issuance of consumption vouchers. We quickly answered the demands of enterprises by announcing the contact information for anti-monopoly business and setting two business days as the time limit for response. We received more than 3,800 telephone consultations from enterprises and the public, and provided enterprises with an efficient and convenient service.

We strengthened the "policy support," encouraging undertakings to actively participate in pandemic prevention and control to accelerate the resumption of work and production, and explicitly announced that we will grant exemptions to undertakings' cooperative agreements that comply with the provisions of the AML. We further improved the fair competition review mechanism, optimized the review process, and made best efforts to create a unified, open, competitive, and orderly market system to provide "policy support" for the resumption of work, production, commerce and market.

Due to the rapid responses and effective adjustments we made, in the first half of 2020 (when the pandemic prevention and control situation was the most severe), China's anti-monopoly enforcement authorities handled and concluded 62 monopoly cases, a year-on-year increase of 306 percent; the fines and confiscations reached RMB 350 million, a year-on-year increase of 64 percent; the authorities received 217 notifications of concentration of undertakings, initiated 215 cases and concluded 219 cases, a year-on-year increase of 2.8 percent, 6.4 percent, and 11.2 percent, respectively. The average time for initiating and concluding a case was shortened by 20.9 percent and 14.5 percent compared to 2019.

**ANTITRUST SOURCE:** Some have suggested that SAMR significantly improved the efficiency of its enforcement in 2020, despite the Covid-19 situation. Do you agree, and if so, do you have any useful tips to share?

**WU ZHENGUO:** I am very happy that the efforts and achievements made by Chinese anti-monopoly enforcement authorities during the pandemic can be seen and recognized by the international community. I think this comment is objective and fair. As I mentioned just now about the antitrust enforcement work in China in 2020, take the review of concentration of undertakings as an example, the number of merger cases initiated and concluded last year grew by 3.4 percent and 5.0 percent, respectively, and the average time for case initiating and concluding was reduced by 27.0 percent and 14.5 percent, respectively. That was a great improvement in review efficiency. We received thank-you letters from many enterprises, including American companies like Coca-Cola and Intel.

The main reasons why we were able to effectively cope with the challenges of the pandemic include our practices of building an anti-monopoly enforcement regime covering both central and local levels, improving the system of laws and regulations, reinforcing anti-monopoly law enforcement, and giving full play to the synergistic effect of the whole system. But there are two tips that are the most important.

Firstly, the Chinese government attaches great importance to the vital role of fair competition in the post-pandemic economic recovery and growth. The Covid-19 pandemic is the most serious pandemic of infectious disease in the world in a century, and has also caused severe damage to the global economy. At this difficult time, the Chinese government emphasized the important role of fair competition in supporting the survival and development of enterprises, protecting consumer interests, and promoting economic recovery and growth post-pandemic, and has made a series of arrangements on anti-monopoly work since last year. For example, the 5th Plenary Session of the

**the antitrust** source ■ www.antitrustsource.com ■ June 2021

19th Central Committee of the Communist Party of China set the improvement of the fair competition system as an important goal of economic and social development during the 14th "Five-Year Plan" period. This includes breaking up industry monopolies and local protectionism and forming a truly national economy, building a high-standard market system, improving the fair competition review mechanism, and stepping up anti-monopoly law enforcement. The Central Economic Work Conference held on December 16 regarded the strengthening of anti-monopoly and preventing of disorderly expansion of capital as one of the eight key tasks this year, emphasizing that anti-monopoly is an inherent requirement for improving the socialist market economy system and promoting high-quality development. All these have pointed out the direction and laid the foundation for our efforts to strengthen the anti-monopoly work.

Secondly, we have a strong team for anti-monopoly law enforcement. I noticed that Richard A. Powers, Acting Assistant Attorney General of the Department of Justice Antitrust Division stated in the 2021 Annual Newsletter that thanks to the dedication of the division's employees, they have continued their efforts on behalf of American consumers, workers, and taxpayers despite the crisis posed by Covid-19. I feel exactly the same way. With an average age of 39, my colleagues showed strong commitment and courage in front of the huge challenges never seen before. In the most difficult time of the pandemic prevention and control, many of them put aside their personal circumstances and immediately returned to work with best efforts to help enterprises resume work and production. They worked around the clock in investigating and handling cases of monopoly and solved many problems. China's anti-monopoly work could not have been improved during the pandemic without their dedication, commitment, and devotion.

**ANTITRUST SOURCE:** We note that in 2020, SAMR issued eight antitrust guidelines, including exposure drafts, on such areas as automobiles, intellectual property, digital platforms, active pharmaceutical ingredients, leniency, as well as consolidated merger filing rules. What is the background and impetus for such an active legislation agenda?

**WU ZHENGUO:** Since the implementation of the AML in 2008, China's anti-monopoly law enforcement authorities have always attached great importance to legislation. After the institutional reform, in accordance with the decisions and deployments of the CPC Central Committee and the State Council and as required by high-quality economic development and unified anti-monopoly law enforcement, the SAMR has worked on strengthening antitrust legislation and improving the system of antitrust laws and regulations, and kept on enhancing the level of rule of law-based antitrust enforcement. The enforcement practice shows that the promulgation of the antitrust guidelines has played an important role in effectively preventing and stopping monopolistic conduct and creating a fair competition-based market environment. It is against this backdrop that we have issued antitrust guidelines (eight in total as of today, including the drafts for comments). Among them, six guidelines have been already issued for implementation, including on the automobile sector, intellectual property rights, leniency, undertakings' commitments, compliance, and the platform economy sector. Two guidelines, on active pharmaceutical agreements and compliance guidelines for overseas business operations, are still in formulation. We hope the implementation of these guidelines will provide undertakings with clear and scientific rules and guidance, enhance their awareness of anti-monopoly laws, unify anti-monopoly law enforcement standards, improve law enforcement transparency, reduce administrative enforcement costs, and improve the enforceability and predictability of the AML.

In terms of next steps, we will firmly implement the anti-monopoly guidelines that have been issued, strengthen anti-monopoly oversight in related sectors, protect fair competition in the market, and safeguard the legitimate rights and interests of consumers. At the same time, we will continue to follow the work arrangements of the AMC of the State Council, grasp the development of the laws and characteristics of related industries, continue to enrich the anti-monopoly guideline system, continue to improve the rule-based anti-monopoly oversight in related sectors, and guide the sustained and healthy development of related industries.

**ANTITRUST SOURCE:** Guidelines published by SAMR often go through several rounds of "draft for comments" before final publication. What types of comments has SAMR found to be most useful? Can you give some examples?

**WU ZHENGUO:** According to the provisions of the AML, the AMC is responsible for studying and formulating anti-monopoly guidelines, and the Office of the AMC is responsible for the specific drafting work. In accordance with the AMC's work deployments, the Office of the AMC strictly followed the requirement for scientific, democratic, law-based and open legislation process in drafting the antitrust guidelines. Based on academic research and surveys, the Office of the AMC has extensively solicited opinions from government departments, judicial organs, experts and scholars, enterprises, business associations, and law firms through a variety of methods, and openly solicited opinions from the general public and other antitrust enforcement authorities to comprehensively improve the legislative quality of anti-monopoly guidelines.

The opinions and suggestions came in different types. They were representative and professional, and each had its own emphasis. Some opinions focused on enforcement procedures, some suggestions focused on substantive rules, and some other opinions focused on the protection of the rights of undertakings. We attached great importance to these opinions in the legislative process, carefully sorted out and studied the opinions of all parties, and adopted the reasonable ones to the extent possible. These opinions and suggestions played an important role in improving the legislative quality of the antitrust guidelines.

It is noteworthy that in the process of amending the AML and drafting the Anti-Monopoly Guidelines on Platform Economy Sector and other guidelines, the U.S. Department of Justice and the Federal Trade Commission, the American Chamber of Commerce in China, the European Union Chamber of Commerce in China, the American Bar Association, and multinational companies have provided us with some very good opinions, which we have studied and adopted to the extent reasonable. I would like to extend my special thanks to those of you outside China who have been concerned about the process of anti-monopoly legislation in China. I hope that in the future, we can continue to get your attention and support in the process of continuously improving China's anti-monopoly legal system.

*I would like to extend my special thanks to those of you outside China who have been concerned about the process of anti-monopoly legislation in China.*

**ANTITRUST SOURCE:** We understand that amendments to the AML are currently under consideration, and have been listed as one of the 2021 work priorities for National People's Congress. Can you introduce the highlights of the amendments? When do you expect that proposed amendments will be enacted by the NPC?

**WU ZHENGUO:** The highlights of the amendments to the AML are mainly reflected in three aspects: Firstly, the decisions and deployment of the CPC Central Committee and the State Council will be implemented by giving better play to the functions of the AML in promoting high-quality economic

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

development. For example, the AML will include contents regarding "encouragement of innovation," "strengthening of the fundamental position of competition policy," and the "fair competition review system." It will also provide specific regulations on fair competition in the platform economy sector to enhance the targeted nature of the legal regime.

Secondly, anti-monopoly systems and rules are further improved to address the prominent issues in antitrust law enforcement. For example, new provisions are introduced on prohibiting acts of organizing or assisting enterprises in reaching monopoly agreements, safe harbor provisions are introduced, and the system of "stopping the clock" is established for the review of concentration of undertakings to enhance the operability and predictability of the legal regime.

Thirdly, systems and rules will be implemented with intensive efforts to effectively enhance the deterrence effect of the AML. For example, the law enforcement authorities will be empowered to ensure unified anti-monopoly law enforcement, new rules will be introduced regarding the rights of anti-monopoly enforcement authorities to investigate and handle conduct involving abuse of administrative power to eliminate or restrict competition and regarding the obligations of the party under investigation to cooperate in investigations, the legal liabilities for certain monopolistic acts will be reinforced, and penalties will be increased for acts of refusing and hindering reviews and investigations to effectively strengthen the deterrence effect of the law.

According to the arrangement made by the Standing Committee of the NPC, the amending of the AML has been included in this year's work plan. We will fully cooperate with the Standing Committee in the amendment work and try to facilitate the promulgation and implementation of the new AML.

*For a long time, the Chinese anti-monopoly law enforcement authorities have kept an eye on competition issues in the digital platform economy.*

**ANTITRUST SOURCE:** Antitrust guidelines for the digital sector were published for comments in November 2020, and were then formally promulgated in February 2021, less than three months later. Does this short time frame reflect China's increasing scrutiny in digital sector?

**WU ZHENGUO:** The digital economy has developed rapidly in recent years. While the digital economy improves the quality of economic development and provides consumers with greater convenience, competition issues also emerge gradually, which is a common problem faced by global antitrust enforcement authorities.

For a long time, the Chinese anti-monopoly law enforcement authorities have kept an eye on competition issues in the digital platform economy. They have conducted a comprehensive assessment of the competition landscape in the digital sector and studied the anti-monopoly law enforcement practices in this sector globally. On this basis, the Chinese law enforcement authorities reviewed China's enforcement experience and referred to international practices, fully respected and grasped the development status, operating characteristics, and operating rules of the digital economy, and developed and issued the Anti-Monopoly Guidelines on Platform Economy Sector this January. The guidelines further clarified the principles for anti-monopoly law enforcement in the platform economy sector and refined the analytical approach, thus providing clearer guidance to undertakings in the platform sector on how to conduct their operations legally and compliantly.

The fast promulgation of the guidelines is in fact based on detailed research and fact-finding and shows that the Chinese anti-monopoly law enforcement authorities have been paying attention to the competition issues in relation to digital platforms. The guidelines help create a market environment featuring competition for all platforms and help promote a sustainable and healthy digital economy, representing China's contribution of its wisdom to the global anti-monopoly law enforcement in digital sector.

the**antitrust**source ▪ www.antitrustsource.com ▪ June 2021

**ANTITRUST SOURCE:** Is there any progress you can share about SAMR's investigation into Alibaba and other digital players? What are the general considerations of China's anti-monopoly law enforcement on platform economy?

**WU ZHENGUO:** In response to a tip-off, the SAMR followed the relevant laws and, on December 24, 2020, initiated an investigation into Alibaba Group's suspected monopolistic conducts including the "choose one from two" practice. Digital platforms have complex business models, intensive expertise, and diverse competition forms. This case was the world's first monopoly case in online retail platform services, and was quite challenging. In the process of case investigation and handling, we focused on studying and grasping the development patterns of the digital platform economy. We conducted extensive investigations and evidence collection to ascertain the facts of the case. We organized in-depth research and demonstrations, and fully listened to the opinions of the enterprises involved to protect their legitimate rights.

On April 10, 2021, we issued an administrative penalty decision in accordance with the law, which ordered Alibaba Group to stop the illegal conduct and imposed a fine of RMB 18.228 billion, representing 4 percent of RMB 455.712 billion, i.e., its 2019 domestic sales value. At the same time, in accordance with the Law on Administrative Penalty, which adheres to the principle of combination of punishment and education, we issued the Administrative Instructions to Alibaba Group, requiring it to make comprehensive rectifications to fulfill its responsibilities as a platform enterprise, tighter internal control and compliance management, protect fair competition and the legitimate rights and interests of the merchants and consumers on the platform. We also requested the company to submit self-examination and compliance reports to us for three consecutive years.

As an emerging economic form, digital economy brings about competition issues while promoting economic development and social progress. In digital platforms, the "winner-takes-all effect" is prominent, and strong players normally grow even stronger. This is an area prone to an oligopoly situation where one or several players dominate. In addition, platform enterprises have the dual attributes of enterprise and market, and can easily implement monopoly conduct that restricts or eliminates competition, harms consumer interests, and hinders industry innovation and development. They can do so by manipulating market forces, their position as platform managers, and their advantages in data, capital, and technology.

So, in recent years, antitrust authorities in major jurisdictions have actively studied and explored relevant mechanisms and measures to carry out scientific and effective antitrust supervision in the digital economy. The Chinese anti-monopoly law enforcement authorities have noticed the competition issues in the digital platforms and have taken actions to regulate competition in this area and maintain fair competition in the market. On the one hand, they actively carried out enforcement activities to effectively prevent and stop monopolistic conduct and resolve competition issues in digital platforms and, on the other hand, they focused on strengthening the legal framework by continuously improving the anti-monopoly systems and rules in the digital sector, regulating and guiding platform enterprises in a targeted way to operate in compliance with laws and regulations, ultimately promoting a market structure based on fair competition.

**ANTITRUST SOURCE:** China's internet economy has grown in parallel with those around the world, but its major players are in many instances different from those in other parts of the world—Tencent instead of Facebook, Baidu instead of Google, Alibaba instead of Amazon, etc. When assessing the conduct of the major Chinese platforms under the AML, are the experiences of other global enforcers with companies like Facebook, Google, and Amazon relevant?

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

**WU ZHENGUO:** The development of the internet economy in China is inseparable from that of the world. Chinese internet companies have both drawn on the successful experience of the global companies and embarked on a path that suits the Chinese environment in their development process. Since the implementation of the AML, the Chinese anti-monopoly authorities have referred to the anti-monopoly enforcement experience and widely-observed practices of different jurisdictions around the world. The Chinese anti-monopoly authorities also focused on accumulating their own practice experience to continuously improve the quality and level of anti-monopoly law enforcement.

Anti-monopoly in digital platforms is a new front. Global anti-monopoly authorities are actively studying and exploring in this regard, and the difficult issues involved are somewhat similar. We are observing the enforcement practices in other jurisdictions and appreciate the value of international experience. Meanwhile, the problems facing different jurisdictions in their enforcement process are not exactly the same. We focus on case-by-case analysis and conduct research and analysis on relevant market definition, determination of market dominance and identifying of anti-monopoly behavioral based on specifics of the cases, and work to discharge our enforcement duties in a scientific, effective, and prudent way, ultimately promoting the healthy and sustainable development of the digital platform economy.

**ANTITRUST SOURCE:** Moving on to merger review: There have been several mergers where SAMR has imposed conditions that include China-specific behavioral remedies rather than structural remedies. In comparison, the EU and United States have generally tried to avoid behavioral remedies. Under what circumstances does SAMR prefer behavioral remedies as opposed to structural remedies? How does SAMR go about enforcing behavioral remedies? Has it encountered any problems in doing so?

*[B]ehavioral*

*conditions can reduce*

*the adverse effects*

*of concentration*

*on competition*

*and maximize*

*the efficiency of*

*concentration, which*

*can effectively*

*maintain the market*

*competition order*

*and fully protect the*

*interests of the parties*

*concerned.*

**WU ZHENGUO:** According to Article 33 of the Interim Provisions on the Review of Concentration of Undertakings, restrictive conditions include structural conditions, behavioral conditions, and a combination of the two. Restrictive conditions shall be determined based on the competition assessment of the specific concentration of undertakings. Different types of concentrations may lead to different types of competition harm and shall thus require different types of restrictive conditions. For example, in horizontal concentrations, the application of structural conditions is usually preferred. When structural conditions cannot be applied or cause obviously disproportional damage to the interests of the notifying party, behavioral conditions might be applied. In vertical or conglomerate concentrations, behavioral conditions will also be considered if they can more effectively reduce the adverse effects of concentration.

In the actual review process, the notifying party can propose a commitment if we believe the concentration will produce the effect of eliminating or restricting competition. We will evaluate the effectiveness, feasibility, and timeliness of the commitment plan and, if the plan can effectively reduce the adverse effects of concentration on competition, we can make a decision to approve the concentration with restrictive conditions.

Many jurisdictions also adopt both behavioral and structural conditions based on the actual competition issues in a specific case, and for some cases, only behavioral conditions are applied. In the practice of law enforcement, behavioral conditions have also achieved the expected results. In particular, behavioral conditions can reduce the adverse effects of concentration on competition and maximize the efficiency of concentration, which can effectively maintain the market competition order and fully protect the interests of the parties concerned. In some cases, as the market can

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

change rapidly and the competition issues are more complicated, behavioral conditions can be designed according to the specific circumstances of the cases. Also, in the process of monitoring the implementation of the restrictive conditions, behavioral conditions have their unique advantage because they can be adjusted in time with the change of the market.

The SAMR may monitor and inspect the obligor's implementation of the restrictive conditions on its own or through a trustee. We will use several methods, such as document review, video conferencing, on-site monitoring, and third-party interviews to ensure the restrictive conditions are effectively implemented. Specifically, we will regularly review the implementation report of the obligor and the monitor report of the monitoring trustee, work with the trustee to carry out on-site monitoring, and conduct interviews with major competitors, downstream customers and industry experts to extensively listen to the relevant parties' opinions and suggestions on the monitoring process. We will carry out in-depth surveys in industries and gain deeper understanding of the latest status of market competition to fully improve the targetedness and effectiveness of the subsequent monitoring. The SAMR will impose administrative penalties in accordance with the law if it finds the obligor violating the restrictive conditions in the monitoring process.

**ANTITRUST SOURCE:** SAMR has worked hard to speed up merger reviews, and has had some apparent success through the use of the "simple case" process. However, there have been a few cases of merger reviews that have lasted well more than 180 days, and sometimes over a year. What have been the reasons for those extended reviews, and do you expect that SAMR be able to reduce or eliminate such lengthy reviews?

**WU ZHENGUO:** The efficiency of merger review not only affects the transaction costs and process, but also represents the ability and level of the enforcers. It has always been an issue of great concern in all sectors. In the face of the rapid increase in the number of cases of concentration of undertakings during the decade since the implementation of the AML, Chinese antitrust enforcers have worked continuously to improve the efficiency of the review process through multiple measures including further optimizing case handling mechanism and improving the convenience of notification.

During the 13th "Five-Year Plan" period, China's anti-monopoly enforcement authorities received a total of 2,316 notifications of concentration, accepted 2,130 cases and concluded 2,147 cases, the transaction value of which has reached RMB 23 trillion, up by 86%, 82%, 92%, and 64% respectively compared with the 12th "Five-Year Plan" period. In 2020, the average time taken to accept a case and conclude a case was 17.8 days and 24.2 days, respectively, shortened by 23 days and 17 days, which was down by 58 percent and 42 percent, compared to the end of the 12th "Five-Year Plan" period. The significant improvement in review efficiency effectively reduced the transaction costs for enterprises. At the same time, we must also see that while the number of cases continues to increase, significant and difficult cases are also increasing, and the review of complex cases will require a longer time period.

Different from the merger review systems in Europe and the United States, the AML of China has not included the system of "stopping the clock" in the merger review procedures. Therefore, the time taken by the notifying party to prepare relevant materials will be counted into the review period although such time is beyond the control of the enforcers. That is why the review process in certain cases takes more than 180 days. These cases mainly fall into two categories: First, the merger involves competition concerns. The parties cannot propose effective solutions to the competition concerns within 180 days, and hope to continue to communicate with the SAMR; second,

the**antitrust**source ∎ www.antitrustsource.com ∎ June 2021    **14**

the merger is reviewed in various jurisdictions and to coordinate the review processes of the relevant jurisdictions, the review is extended with the consent or upon the application of the parties.

The SAMR has noticed this issue and while improving the efficiency of review, we will amend the AML to include the "stop the clock" system to address this issue.

**ANTITRUST SOURCE:** Some observers have noted that every merger with conditional approvals has involved at least one, and usually two, foreign businesses. Some say that this is because SAMR is targeting foreign firms. Do you agree with this observation, and if so, what do you think is the reason?

*All enterprises,*

*state-owned, private,*

*domestic, or foreign,*

*are treated equally,*

*fairly, and justly so*

*that all market players*

*compete fairly.*

**WU ZHENGUO:** Since the implementation of the Chinese AML, a total of 49 cases of concentrations have been approved with restrictive conditions, and 29 are currently under monitoring for the implementation of the conditions. Chinese antitrust enforcers are committed to protecting the legitimate rights and interests of undertakings in accordance with the law. The enforcement process and results are open and transparent. All enterprises, state-owned, private, domestic, or foreign, are treated equally, fairly, and justly so that all market players compete fairly. The Interim Provisions on the Review of Concentration of Undertakings issued by the SAMR also clearly stipulates that all undertakings are to be treated equally, and there is no "selective enforcement." The reason why the cases of conditional approvals more often than not involve foreign companies is that some of the foreign companies have significant competitive advantages and strong market power in certain industries and markets.

**ANTITRUST SOURCE:** Turning now to cartel enforcement, how successful has SAMR's leniency program been in encouraging cartel participants to report unlawful activities? Are you considering any changes to the program to increase its effectiveness?

**WU ZHENGUO:** Horizontal monopoly agreements can usually severely eliminate or restrict competition, and are at the same time highly secretive. If the cartel participants can actively assist with the investigation, it will greatly reduce the difficulty for law enforcers to discover such agreements and conduct investigations. Therefore, all antitrust enforcers in the world, including China, recognize the positive role of leniency program in saving administrative law enforcement costs and safeguarding consumer interests.

In order to guide the application of the leniency program and improve the transparency of law enforcement, on January 4, 2019, the SAMR formulated and issued the Guidelines of the Anti-Monopoly Commission of the State Council on the Application of the Leniency Program to Cases Concerning Horizontal Monopoly Agreements in accordance with the AML so that undertakings can apply for leniency accordingly. In terms of the implementation, the positive effect of the leniency program in the investigation and case handling has been well demonstrated. Of the 16 monopoly agreement cases concluded in 2020, five involve the application for the leniency program, accounting for 31.2 percent.

Currently, China's leniency program has relatively complete application rules and procedures. In particular, the Guidelines of the Anti-Monopoly Commission of the State Council on the Application of the Leniency Program to Cases Concerning Horizontal Monopoly Agreements include clear provisions on the scope of leniency, the application time, the materials to be submitted, the sequence system, the forms of application, the penalty abatement and exemption principle, and other substantive and procedural issues, which have played a very good guiding role. Of course,

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

in our enforcement practice, we also find that the current regulations need to be further refined and improved, which requires us to continue to explore and accumulate experience in the enforcement process and also to learn from enforcers in other jurisdictions such as the United States and the European Union.

**ANTITRUST SOURCE:** China has put significant resources into implementing the Fair Competition Review System. Can you update us on how that has been proceeding? Have there been significant challenges you have found so far in successful implementation?

**WU ZHENGUO:** The implementation of the Fair Competition Review System is a major decision for China to deepen the reform of its economic system. Its implementation has achieved positive effects since its establishment in June 2016. It successfully covers governments at national, provincial, municipal, and county levels. 1.89 million policies and measures were reviewed and nearly 30,000 were repealed or amended; 857,000 new policies and measures were reviewed, and more than 4100 were amended or adjusted, which effectively maintained a unified national market order and fair competition.

Specifically, to improve the Fair Competition Review System and strengthen the constraining effects of the system, we have focused on doing the following work:

Firstly, we facilitate building the legal basis for the system. We successively issued the Notice on Further Promoting Fair Competition Review, amended the Implementation Rules for the Fair Competition Review System, supported the Civil Aviation Administration and other departments in studying and formulating industry-specific review rules and guidelines, further clarified the scope of review, refined review standards, normalized review procedures, continuously improved the body of rules, further solidified the legal basis for the review system, and provided institutional guarantee for the thorough implementation of the Fair Competition Review System.

Secondly, we innovated and improved the review mechanism. In response to the problems and difficulties encountered in the implementation of the system, we adopted a reform-based perspective and approach to innovate and improve the third-party review mechanism. We successively supported Shenzhen in carrying out independent review pilot programs, guided Shandong, Anhui, and other regions to explore the establishment of a "joint review system" where policies and measures issued in the name of the government shall go through fair competition review by not only the drafting departments but also the market regulation authorities so as to continuously strengthen the constraining effects of the system. At the same time, we issued the Implementation Guidelines for Third-Party Evaluation of Fair Competition Review to provide clear guidance for the implementation of third-party evaluation of fair competition review and further improve the quality and effect of the review.

Thirdly, we effectively strengthened supervision and appraisal. In 2020, we supported 30 provinces, including autonomous regions and municipalities, in establishing a tip-off handling and response mechanism for fair competition review to accept the supervision of all sectors of society on issues that violate the requirements of the Fair Competition Review System, and to promptly correct and stop all rules and practices that hinder the unified national market and fair competition. At the same time, the SAMR explored the establishment of a fair competition review appraisal system. For the three consecutive years from 2018 to 2020, the SAMR carried out supervision programs on fair competition review and published a number of typical cases that violated the fair competition review standards, which greatly enhanced the authority and efficacy of the system.

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

China now proposes to build a new development pattern and a high-standard market system, and also puts forward higher requirements on the Fair Competition Review System. Innovations and greater breakthroughs need to be achieved regarding the review methods, review mechanisms, and supervision methods, and the system shall be implemented with higher quality and greater efforts. In the next step, we will adhere to systematic planning and overall advancement. We will take the initiative in making bold reforms and innovations. We will improve the fair competition review mechanisms, continue to strengthen the constraining effects of the system, and implement the Fair Competition Review System with high quality. We will make great contributions to building a high-standard market system, promoting high-quality development, and advancing the modernization of China's system and capacity for governance.

**ANTITRUST SOURCE:** SAMR and its provincial offices have brought a number of cases against administrative monopolies at the provincial and city level. So far, however, we have not seen a case regarding administrative monopoly at the national level. Do you see SAMR bringing such cases in the near future?

**WU ZHENGUO:** Preventing abuse of administrative power to eliminate or restrict competition in accordance with the law is an important content of the AML. It is an inherent requirement for protecting fair market competition and safeguarding consumer interests, and is also an effective measure to break local protectionism and build a high-standard market system. Since the institutional reform in 2018, the SAMR and its provincial counterparts have highly emphasized enforcement against the abuse of administrative power to eliminate or restrict competition. We developed and issued the Interim Provisions on Prevention of Abuse of Administrative Power to Eliminate or Restrict Competition, and in sectors concerning people's livelihoods and market business environment, we have handled more than 150 cases of abuse of administrative power to eliminate or restrict competition, and corrected typical illegal acts such as restricting transactions, obstructing the free flow of commodities, and applying differential treatment to non-local enterprises. Such work by us has restored fair market competition, maintained a unified national market, and protected the legitimate rights and interests of consumers.

To create synergy in our work, we focus on combining ex-ante fair competition review and ex-post enforcement against abuse of administrative power to eliminate or restrict competition. Through years of hard work, administrative agencies at all levels have been able to raise their awareness of fair competition, conduct fair competition reviews with high quality, and effectively prevent the abuse of administrative power to eliminate or restrict competition by reviewing new policies and measures as well as existing ones.

At the same time, we have continued to step up enforcement against abuse of administrative power to eliminate or restrict competition, and held high the anti-monopoly sword against those who slipped through the net of fair competition review. In the process of law enforcement, we insist on treating all levels of administrative agencies equally. Should administrative agencies, including national-level ones, violate the AML and abuse their administrative power to eliminate or restrict competition, we will bring investigations against them in accordance with the laws to effectively protect fair market competition and consumer interests and create a fair competition-based market environment for all market players.

**ANTITRUST SOURCE:** Can you tell us a bit about the background for the Antitrust Guidelines for Intellectual Property Rights? Were they formulated primarily based on China's enforcement

*[W]e focus on*

*combining ex-ante*

*fair competition*

*review and ex-post*

*enforcement*

*against abuse of*

*administrative power*

*to eliminate or restrict*

*competition.*

the**antitrust**source ▪ www.antitrustsource.com ▪ June 2021

experience in IP field, or was it a forward-looking perspective based on the practice of other jurisdictions, such as the European Union or the United States?

**WU ZHENGUO:** Article 55 of the AML clearly provides that the AML does not apply to acts of undertakings to exercise IP rights in accordance with relevant IP laws and administrative regulations; however, the AML applies to the acts of abusing IP rights to eliminate or restrict competition. This article sets out the principles for the anti-monopoly regulation over the abuse of IP rights. In order to fully protect IP rights and also effectively regulate abuse of IP rights to eliminate or restrict competition, reduce law enforcement costs and undertakings' compliance cost, and provide guidelines for applying the AML to regulate abuses of IP rights, Chinese antitrust enforcers organized the drafting and formulation of the Anti-Monopoly Guidelines on Intellectual Property Rights, taking into account the law enforcement experiences, the opinions solicited from all parties, and the experience and practice in other jurisdictions.

**ANTITRUST SOURCE:** How do you view the interaction between government/administrative enforcement and private enforcement of antitrust laws in China?

**WU ZHENGUO:** Administrative enforcement and civil action are the two primary ways to implement the AML. Administrative enforcement is a remedy via public power, and civil action is a private remedy. They have the same goals and value in terms of their implementation. The two types of remedies operate independently and also complement each other in maintaining the order of market competition. Lacking either of them will be to the disadvantage of the comprehensive and effective implementation of the AML.

**ANTITRUST SOURCE:** The Supreme People's Court has decided a number of important cases under the AML in recent years, and it also has issued judicial interpretations of the AML. In some cases, such as resale price maintenance, the SPC's approach appears to have some differences with that of SAMR. As administrative enforcement agency, what's SAMR's attitudes towards vertical price restraints and why is that?

**WU ZHENGUO:** Not all vertical price restrictions are monopoly agreements and subject to the regulation of the AML. In China's legislative framework, the provisions directly on vertical agreements are Articles 14 and 15 of the AML and Article 12 of the Interim Provisions on Prohibition of Monopoly Agreements. Only the "hardcore" agreements that fix resale prices and set minimum resale prices in vertical price agreements have been directly identified as monopoly agreements and expressly prohibited. For other conduct in vertical price agreements, such as setting maximum resale price and recommending resale price as well as all vertical non-price agreements, a case-by-case approach for determination and regulation shall be adopted, the result of which is subject to the evidences on elimination or restriction of competition. This can be clearly seen from Articles 12 and 13 of the Interim Provisions on Prohibition of Monopoly Agreements.

   In enforcement, we also adopt a "dichotomous approach." For the "hardcore" vertical price agreements, our approach can be summed up as "prohibition in principle plus exemption." In other words, if a vertical agreement fixes resale price and sets minimum resale price, it will be identified by the enforcers as a monopoly agreement and should be prohibited in accordance with the law. This is "prohibition in principle." At the same time, Article 15 of the AML stipulates that the above-mentioned vertical price monopoly agreement, though determined as a monopoly

agreement, can be exempted from prohibition if it meets certain circumstances. This is "plus exemption."

The enforcement approach of "prohibition in principle plus exemption" will inevitably cause issues of sharing the burden of proof. For administrative enforcers, they just need to prove that the agreement or concerted action between undertakings is a "hardcore" vertical price agreement that actually exists; while the undertakings shall bear the burden of proof and provide evidence to prove that such agreement or action will not severely restrict competition but instead can be reasonably justified and benefit consumers and therefore shall not be prohibited, and the enforcers shall determine whether to accept or not.

We do not think the aforesaid enforcement approach is completely the same as the "illegal per se rule" or "rule of reason" adopted in other jurisdictions. The latter essentially gives parties the right of defense, but the requirement for the burden of proof is quite high. We adopt the "prohibition in principle plus exemption" approach mainly based on the following considerations: First, it meets the original legislative intent of the legislators of the current AML and is self-consistent legally and logically. Second, it can save a large amount of law enforcement costs for conducting comprehensive investigations and complex economic analyses. Third, it provides a relatively clear legality benchmark for the economic activities of market entities. Fourth, it is a prudent choice of enforcement approach under the circumstances where the theoretical and empirical experience of efficiency defense regarding vertical "hardcore" price agreements are relatively inadequate. Fifth, it is consistent with the enforcement principles of most jurisdictions in the world.

*Chinese antitrust enforcers attach great importance to international exchanges and cooperation on competition policies and anti-monopoly work . . .*

**ANTITRUST SOURCE:** That is a good lead-in for our next question. How does SAMR work with competition enforcers in other jurisdictions? Can you highlight any helpful interactions with enforcers in other jurisdictions?

**WU ZHENGUO:** Our anti-monopoly work is highly market-oriented, law-based and internationalized. Strengthening international exchanges and cooperation in combating monopoly and strengthening global competition governance are of great significance to deepening international economic and trade cooperation and to achieving common prosperity and progress worldwide. Chinese antitrust enforcers attach great importance to international exchanges and cooperation on competition policies and anti-monopoly work and have built all-aspect, multi-level, and extensive anti-monopoly cooperation with their counterparts globally.

Up to now, we have signed 55 cooperation documents with anti-monopoly enforcement authorities in 33 countries and regions including the United States, the European Union, Russia, the United Kingdom, and Japan, and established a normalized international anti-monopoly cooperation mechanism. Through the continuous improvement of multilateral and bilateral cooperation mechanisms, we have worked with competition authorities in jurisdictions such as the United States, the European Union, Germany, Russia, Canada, India, and South Africa on dozens of major cross-border M&A transactions, including the Dow/DuPont merger case and Bayer's acquisition of Monsanto, where international cooperation played an important role in avoiding conflicting review results and maintaining fair competition globally. Among them, the merger case of Dow Chemical and DuPont was recognized as a model of Sino-European competition cooperation by the European Union.

At the same time, international cooperation on antitrust enforcement also gradually expanded to enforcement cooperation in cases involving monopoly agreements and abuse of dominance. In May 2019, the SAMR and the Directorate-General for Competition of the European Commission

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

(EU DG Comp) signed the Practical Guidance for Cooperation on Investigating Anti-Monopoly Cases, laying the framework for bilateral cooperation in law enforcement against monopoly agreement and abuse of market dominance. In October 2020, at the Eighth United Nations Conference on Competition and Consumer Protection, China and Russia proposed as co-sponsors to list "combating cross-border cartels" as one of the working priorities of the UNCTAD Intergovernmental Group of Experts on Competition Law and Policy in the 2020–2025 term.

We are also active in various international anti-monopoly conferences and forums organized by the leading multilateral organizations, including the World Trade Organization, the United Nations Conference on Trade and Development, the Organization for Economic Cooperation and Development, and the Asia-Pacific Economic Cooperation, as well as a number of international seminars and symposiums held by, for example, the American Bar Association, the International Competition Conference of Germany, the East Asia Top Level Officials' Meeting on Competition Policy, and the St. Petersburg International Legal Forum, where the anti-monopoly enforcers in China gained understanding of the international competition's latest development, shared China's experiences, and took part in studies on best practices of the global anti-monopoly field.

We also had in-depth technical exchanges with competition authorities in other countries and regions including the European Union, the United States, Germany, and Japan, by organizing various international symposiums, competition policy weeks, and training sessions. Chinese anti-monopoly enforcers also had technical exchanges with the enforcement personnel from other jurisdictions by attending the anti-monopoly seminars sponsored by, for example, the OECD and George Mason University, which boosted China's law enforcement capabilities.

In 2020, the Covid-19 pandemic raged around the world, and the world economy suffered a severe shock, which seriously affected international communications and transportation in the traditional sense. At the same time, new communication methods such as remote conference and video meeting were popularized rapidly, which created favorable conditions for expanding the scope of cooperation and deepening the contents of cooperation. In 2020, we participated in more than 30 online foreign affairs events and over 30 law enforcement interactions with antitrust enforcers in other countries and regions. The international anti-monopoly cooperation has overcome the adverse impact of the pandemic and achieved valuable progress and results.

For example, the competition authorities of the BRICS countries, after overcoming the actual difficulties caused by the Covid-19 pandemic, signed the Statement by the Heads of BRICS Countries Competition Authorities as scheduled through diplomatic channels, confirming that the Memorandum of Understanding between the BRICS Countries Competition Authorities on Cooperation in the Field of Competition Law and Policy shall be extended indefinitely, signaling the beginning of a new chapter of cooperation in the field of competition laws and policies among the BRICS countries. Gan Lin, the Vice Minister of SAMR, attended the ministerial level video conference of the BRICS Anti-Monopoly Policy Coordination Committee. A Joint Statement of BRICS Competition Authorities on Addressing COVID-19 Pandemic was released at the meeting, specifying the positions of the competition authorities in further deepening competition cooperation and jointly responding to the economic challenges caused by the pandemic in the critical time of jointly combating the pandemic and promoting economic recovery.

Despite many difficulties, China and the EU DG Comp held the competition week by virtual conference for the first time. This competition week event has been held for ten years. The two sides had deep and full communication and discussions on issues including China's fair competition review system, the White Paper on Foreign Subsidies of the EU DG Comp, the amendments to

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

the AML and the Interim Provisions on the Review of Concentration of Undertakings, international cooperation in the implementation of merger remedies and cartel investigations, and the threshold for notification of concentrations of undertakings, which showcased the strong commitment of both sides to strengthen cooperation in the field of competition.

Last year, we also held department-level video meetings first with the Competition Commission of Pakistan and then with the UK Competition and Markets Authority, which further deepened bilateral communication and cooperation in the field of competition.

**ANTITRUST SOURCE:** Does the geopolitical climate, such as trade tension between China and U.S., have any impact on how SAMR interacts with its counterparts in other jurisdictions? Does it affect SAMR's antitrust enforcement within in China?

**WU ZHENGUO:** In the past few years, China-US relations have indeed encountered serious difficulties, which have adversely affected both countries and the rest of the world. However, China and the United States also share wide-ranging common interests and can cooperate in many areas. An example is that the anti-monopoly authorities in the two countries have always maintained close and pragmatic cooperation in the anti-monopoly field. We feel deeply touched that when China was facing the most severe situation of the pandemic last year, Mr. Joseph Simons, the Chairman of the U.S. Federal Trade Commission, and Mr. Makan Delrahim, the Assistant Attorney General for the Antitrust Division of the United States Department of Justice, sent a joint letter to Madame Gan Lin, the Vice Minister of SAMR, to express their sincere regards to the Chinese colleagues and the good willingness to deepen cooperation in the anti-monopoly field with China and to promote the negotiation and signing of a new memorandum of understanding on anti-monopoly cooperation between China and the United States. In order to facilitate continuous and in-depth cooperation in anti-monopoly cases before the actual signing of the new memorandum of understanding, the parties have exchanged letters to reiterate the relevant confidential clauses in the 2011 Memorandum of Understanding.

There is an old saying in China that we must not fear if our vision is blocked by floating clouds. We always believe that cooperation leads to win-win and confrontation leads to loss on both sides. Fair competition is the common principle for the economic operation in countries with a market economy, and anti-monopoly law is the fundamental institution in international trade and economy. Despite the multiple shocks last year, trade between China and the United States still reached RMB 4.1 trillion, an increase of 8.8 percent. Strengthening communication and cooperation between China and the United States in the anti-monopoly field is in the common interests of enterprises and people of both countries. We hope to work with our counterparts in the United States to accelerate the negotiation and signing of a new Sino-U.S. memorandum of understanding on antitrust cooperation and hold the fifth high level dialogue between Chinese and U.S. anti-monopoly authorities at the right time and in the proper way.

As for whether the tense geopolitical climate will affect China's anti-monopoly law enforcement, I think you can reach a conclusion from my previous answers. Our enforcement principle is that we conduct enforcement activities strictly according to the law and always treat all entities, whether state-owned, foreign, or private enterprises, equally and fairly. In our law enforcement practices, the focuses last year, whether in sectors involving people's livelihoods or in the platform economy sector, were on domestic enterprises, and our enforcement on administrative monopoly also targeted domestic government departments.

*Strengthening communication and cooperation between China and the United States in the anti-monopoly field is in the common interests of enterprises and people of both countries.*

the**antitrust**source ■ www.antitrustsource.com ■ June 2021    21

*China has never*

*and will never make*

*antitrust enforcement*

*a tool for geopolitics.*

China has never and will never make antitrust enforcement a tool for geopolitics. At the same time, we feel that Chinese companies' business operations overseas should be treated fairly, and not be subject to unprovoked investigations, accusations, and blockades that harm not only Chinese companies, but also American companies. In the future, we will strengthen Chinese companies' overseas anti-monopoly compliance and provide them with necessary guidance and assistance.

**ANTITRUST SOURCE:** This is very helpful. To close, may we ask what plans do you have for the Year of the Ox? Do you have any particular priorities for the coming year?

**WU ZHENGUO:** China just released the 14th Five-Year Plan, covering the years 2021–2025, for National Economic and Social Development and the Long-Range Objectives Through the Year 2035, making special deployments for strengthening the foundational position of competition policy. The requirements include encouraging competition, opposing monopoly, improving the competition policy framework, establishing a competition policy implementation mechanism that covers ex ante, in-event, and ex post phases, and stepping up anti-monopoly enforcement efforts. This year is the Year of Ox in China, and also marks the opening of the 14th "Five-Year Plan" period. We will fully carry forward the spirit represented by the Ox, that is, serving the people, making innovations for development, and working hard. Our work priorities will be as follows.

The first is to strengthen anti-monopoly law enforcement in key sectors. We will, in accordance with the law, investigate and handle cases of monopoly by platform enterprises, actively monitor the obligation of platform enterprises to notify M&A acts in accordance with the laws, improve laws and regulations such as determination of monopoly by platform enterprises, and promote the normalized, orderly, innovative, and healthy development of platform economy. We will continue to carry out law enforcement in key sectors involving people's livelihoods, such as medicine, public utilities, and automobiles to improve people's livelihoods and welfare. Efforts will be made to investigate and handle abuses of administrative power to eliminate or restrict competition, such as restricting transactions and obstructing the free flow of commodities and elements between regions, so as to maintain a unified national market.

The second is to improve the anti-monopoly legal system. We will cooperate with the Ministry of Justice and the Legislative Affairs Commission of the NPC Standing Committee to accelerate the amending process of the AML and strengthen the legal protection of fair competition. We will develop and issue the Anti-Monopoly Guidelines in the Sector of Active Pharmaceutical Ingredients and the Anti-Monopoly Compliance Guidelines for Enterprises' Overseas Business Operations to promote undertakings to operate in compliance with laws and regulations. We will publish the Annual Report of Anti-Monopoly Law Enforcement in China (2020) and select ten typical cases of anti-monopoly law enforcement in 2020 to enhance the society's awareness of anti-monopoly laws.

The third is to strengthen the foundational position of competition policy. We will speed up the formulation of the Guiding Opinions on Strengthening the Implementation of Competition Policies and step up the implementation of competition policies in pilot free trade zones across the country. We will introduce the Implementation Rules for the Fair Competition Review System to strengthen the constraining effects of the system. We will issue the working rules for assessment of market competition conditions, carry out market competition assessments in key industries, and give full play to the supporting role of the assessment results in strengthening anti-monopoly enforcement and deepening market-oriented reforms.

the**antitrust**source ■ www.antitrustsource.com ■ June 2021

The fourth is to deepen international dialogue and cooperation in the anti-monopoly field. According to the rotation mechanism of the conference, the 7th BRICS International Competition Conference will be held in Chengdu, Sichuan Province of China, from November 9 to 10. This is the second time for China to host the conference, and also the first time for the SAMR to act as the organizer since its establishment. We are currently making careful preparations for the conference and are expecting to have face-to-face communication and discussion with guests from all over the world on hot issues in the field of competition. Meanwhile, we hope we can continue to strengthen communications and cooperation with antitrust enforcement authorities from other jurisdictions, including the United States, and create a fair and orderly institutional environment for the recovery of the world economy after the pandemic through effective alignment and coordination of international competition rules.

Finally, thank you again for your interview. Anti-monopoly law enforcement in China has always been fair, open, and transparent. We expect to have more opportunities to communicate with our global counterparts, and to jointly handle international monopolistic conduct and create a fair and orderly international market environment.

**ANTITRUST SOURCE:** Thank you very much for your time and for your very enlightening responses to our questions. ●