# EXHIBIT EE



**Stock Code:6688**
**H Share IPO**



Joint Sponsors, Joint Global Coordinators, Joint Bookrunners and Joint Lead Managers



(in alphabetical order)

Joint Global Coordinators, Joint Bookrunners and Joint Lead Managers



Joint Bookrunners and Joint Lead Managers



(in alphabetical order)

Senior Joint Lead Managers

(in alphabetical order)

Financial Advisor to the Company



## IMPORTANT

> **IMPORTANT: If you are in any doubt about this prospectus, you should obtain independent professional advice.**



# ANT GROUP CO., LTD.

# 螞 蟻 科 技 集 團 股 份 有 限 公 司

*(A joint stock company incorporated in the People's Republic of China with limited liability)*

## H SHARE IPO

| | | |
|---|---|---|
| **Number of Offer Shares under the H Share IPO** | : | **1,670,706,000 H Shares (subject to the H Share Over-allotment Option)** |
| **Number of Hong Kong Offer Shares** | : | **41,768,000 H Shares (subject to adjustment)** |
| **Number of International Offer Shares** | : | **1,628,938,000 H Shares (subject to adjustment and the H Share Over-allotment Option)** |
| **H Share Offer Price** | : | **HK$80.00 per H Share, plus brokerage of 1.0%, SFC transaction levy of 0.0027% and Hong Kong Stock Exchange trading fee of 0.005% (payable in full on application in Hong Kong dollars and subject to refund)** |
| **Nominal value** | : | **RMB1.00 per H Share** |
| **Stock code** | : | **6688** |

*Joint Sponsors, Joint Global Coordinators, Joint Bookrunners and Joint Lead Managers*

   

(in alphabetical order)

*Joint Global Coordinators, Joint Bookrunners and Joint Lead Managers*

 

*Joint Bookrunners and Joint Lead Managers*

        

(in alphabetical order)

*Senior Joint Lead Managers*

        

(in alphabetical order)

*Financial Advisor to the Company*



Hong Kong Exchanges and Clearing Limited, The Stock Exchange of Hong Kong Limited and Hong Kong Securities Clearing Company Limited take no responsibility for the contents of this prospectus, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever arising from or in reliance upon the whole or any part of the contents of this prospectus.

A copy of this prospectus, having attached thereto the documents specified in "Documents Delivered to the Registrar of Companies in Hong Kong and Available for Inspection — Documents Delivered to the Registrar of Companies" in Appendix VIII, has been registered by the Registrar of Companies in Hong Kong as required by Section 342C of the Companies (Winding up and Miscellaneous Provisions) Ordinance. The Securities and Futures Commission of Hong Kong and the Registrar of Companies in Hong Kong take no responsibility for the contents of this prospectus or any of the other documents referred to above.

The Joint Sponsors and the Joint Representatives (for themselves and on behalf of the Hong Kong Underwriters) may, where considered appropriate, reduce the number of Hong Kong Offer Shares and/or the H Share Offer Price that is stated in this prospectus at any time prior to the morning of the last day for lodging applications under the Hong Kong Public Offering. In such a case, notices of the reduction in the number of Hong Kong Offer Shares and/or the H Share Offer Price will be published in the South China Morning Post (in English) and the Hong Kong Economic Journal (in Chinese) as soon as practicable following the decision to make such reduction, and in any event not later than the morning of the day which is the last day for lodging applications under the Hong Kong Public Offering. Such notices will also be available on the website of the Company at **www.antgroup.com** and on the website of the Hong Kong Stock Exchange at **www.hkexnews.hk**. Further details are set forth in "Structure of the H Share IPO" and "How to Apply for the Hong Kong Offer Shares" in this prospectus.

We are incorporated in, and most of our revenues are derived from, mainland China. Potential investors should be aware of the differences in the legal, economic and financial systems between mainland China and Hong Kong, despite both being a part of PRC, and that there are different risk factors relating to investment in our Company. Potential investors should also be aware that the regulatory framework in mainland China is different from that in Hong Kong and should take into consideration the different market nature of the H Shares. Such differences and risk factors are set out in "Risk Factors," "Appendix V — Summary of Legal and Regulatory Matters" and "Appendix VI — Summary of Articles of Association" in this prospectus.

The obligations of the Hong Kong Underwriters under the Hong Kong Underwriting Agreement are subject to termination by the Joint Sponsors and the Joint Representatives (for themselves and on behalf of the Hong Kong Underwriters) if certain grounds arise prior to 8:00 a.m. on the H Share Listing Date. See "Underwriting — Underwriting Arrangements and Expenses — Hong Kong Public Offering — Grounds for Termination" of this prospectus.

The Offer Shares have not been and will not be registered under the U.S. Securities Act or any state securities law in the United States and may be offered and sold only (a) in the United States to "Qualified Institutional Buyers" in reliance on Rule 144A under the U.S. Securities Act or another exemption from, or in a transaction not subject to, the registration requirements under the U.S. Securities Act and (b) outside the United States in an offshore transaction in accordance with Regulation S under the U.S. Securities Act.

---

**ATTENTION**

**We have adopted a fully electronic application process for the Hong Kong Public Offering. We will not provide printed copies of this prospectus or printed copies of any application forms to the public in relation to the Hong Kong Public Offering.**

**This prospectus is available at the website of the Hong Kong Stock Exchange at www.hkexnews.hk and our website at www.antgroup.com. If you require a printed copy of this prospectus, you may download and print from the website addresses above.**

---

October 27, 2020

## IMPORTANT

**IMPORTANT NOTICE TO INVESTORS:**
**FULLY ELECTRONIC APPLICATION PROCESS**

**We have adopted a fully electronic application process for the Hong Kong Public Offering. We will not provide printed copies of this prospectus or printed copies of any application forms to the public in relation to the Hong Kong Public Offering.**

**This prospectus is available at the website of the Hong Kong Stock Exchange at www.hkexnews.hk under the "*HKEXnews > New Listings > New Listing Information*" section, and our website at www.antgroup.com. If you require a printed copy of this prospectus, you may download and print from the website addresses above.**

To apply for the Hong Kong Offer Shares, you may:

(1)  apply online through the **White Form eIPO** service at **www.eipo.com.hk**;

(2)  apply through the **CCASS EIPO** service to electronically cause HKSCC Nominees to apply on your behalf, including by:

   (i)   instructing your **broker** or **custodian** who is a CCASS Clearing Participant or a CCASS Custodian Participant to give **electronic application instructions** via CCASS terminals to apply for the Hong Kong Offer Shares on your behalf; or

   (ii)  (if you are an existing **CCASS Investor Participant**) giving **electronic application instructions** through the CCASS Internet System (**https://ip.ccass.com**) or through the CCASS Phone System by calling +852 2979 7888 (using the procedures in HKSCC's "An Operating Guide for Investor Participants" in effect from time to time). HKSCC can also input **electronic application instructions** for CCASS Investor Participants through HKSCC's Customer Service Centre at 1/F, One & Two Exchange Square, 8 Connaught Place, Central, Hong Kong by completing an input request.

If you have any question about the application for the Hong Kong Offer Shares, you may call the enquiry hotline of our H Share Registrar and **White Form eIPO** Service Provider, Computershare Hong Kong Investor Services Limited, both at +852 2862 8646 on the following dates:

**Tuesday, October 27, 2020    –   9:00 a.m. to 9:00 p.m.**
**Wednesday, October 28, 2020   –   9:00 a.m. to 9:00 p.m.**
**Thursday, October 29, 2020   –   9:00 a.m. to 9:00 p.m.**
**Friday, October 30, 2020    –   9:00 a.m. to 12:00 noon**

We will not provide any physical channels to accept any application for the Hong Kong Offer Shares by the public. The contents of the electronic version of this prospectus are identical to the printed prospectus as registered with the Registrar of Companies in Hong Kong pursuant to Section 342C of the Companies (WUMP) Ordinance.

If you are an **intermediary**, **broker** or **agent**, please remind your customers, clients or principals, as applicable, that this prospectus is available online at the website addresses above.

Please refer to the section headed "How to Apply for the Hong Kong Offer Shares" in this prospectus for further details of the procedures through which you can apply for the Hong Kong Offer Shares electronically.

## IMPORTANT

Your application through the **White Form eIPO** service or the **CCASS EIPO** service must be for a minimum of 50 Hong Kong Offer Shares and in one of the numbers set out in the table. You are required to pay the amount next to the number you select.

| No. of Hong Kong Offer Shares applied for | Amount payable on application HK$ | No. of Hong Kong Offer Shares applied for | Amount payable on application HK$ | No. of Hong Kong Offer Shares applied for | Amount payable on application HK$ | No. of Hong Kong Offer Shares applied for | Amount payable on application HK$ |
|---|---|---|---|---|---|---|---|
| 50 | 4,040.31 | 1,000 | 80,806.16 | 60,000 | 4,848,369.60 | 2,000,000 | 161,612,320.00 |
| 100 | 8,080.62 | 2,000 | 161,612.32 | 70,000 | 5,656,431.20 | 3,000,000 | 242,418,480.00 |
| 150 | 12,120.92 | 3,000 | 242,418.48 | 80,000 | 6,464,492.80 | 4,000,000 | 323,224,640.00 |
| 200 | 16,161.23 | 4,000 | 323,224.64 | 90,000 | 7,272,554.40 | 5,000,000 | 404,030,800.00 |
| 250 | 20,201.54 | 5,000 | 404,030.80 | 100,000 | 8,080,616.00 | 6,000,000 | 484,836,960.00 |
| 300 | 24,241.85 | 6,000 | 484,836.96 | 200,000 | 16,161,232.00 | 7,000,000 | 565,643,120.00 |
| 350 | 28,282.16 | 7,000 | 565,643.12 | 300,000 | 24,241,848.00 | 8,000,000 | 646,449,280.00 |
| 400 | 32,322.46 | 8,000 | 646,449.28 | 400,000 | 32,322,464.00 | 9,000,000 | 727,255,440.00 |
| 450 | 36,362.77 | 9,000 | 727,255.44 | 500,000 | 40,403,080.00 | 10,000,000 | 808,061,600.00 |
| 500 | 40,403.08 | 10,000 | 808,061.60 | 600,000 | 48,483,696.00 | 15,000,000 | 1,212,092,400.00 |
| 600 | 48,483.70 | 20,000 | 1,616,123.20 | 700,000 | 56,564,312.00 | 20,884,000[1] | 1,687,555,845.44 |
| 700 | 56,564.31 | 30,000 | 2,424,184.80 | 800,000 | 64,644,928.00 | | |
| 800 | 64,644.93 | 40,000 | 3,232,246.40 | 900,000 | 72,725,544.00 | | |
| 900 | 72,725.54 | 50,000 | 4,040,308.00 | 1,000,000 | 80,806,160.00 | | |

_____

(1)  Maximum number of Hong Kong Offer Shares you may apply for.

No application for any other number of the Hong Kong Offer Shares will be considered and any such application is liable to be rejected.

# EXPECTED TIMETABLE[1]

Hong Kong Public Offering commences . . . . . . . . .9:00 a.m. on Tuesday, October 27, 2020

Latest time for completing electronic applications
under **White Form eIPO** service through
the designated website **www.eipo.com.hk**[2] . . . . .11:30 a.m. on Friday, October 30, 2020

Application lists open[3] . . . . . . . . . . . . . . . . . . . . . .11:45 a.m. on Friday, October 30, 2020

Latest time for (a) completing payment for
**White Form eIPO** applications by effecting Internet
banking transfer(s) or PPS payment transfer(s)
and (b) giving **electronic application instructions** to HKSCC[4]. . . . . . . . .12:00 noon on
Friday, October 30, 2020

Application lists close[3] . . . . . . . . . . . . . . . . . . . . .12:00 noon on Friday, October 30, 2020

Announcement of:

- the level of applications in the Hong Kong Public Offering;

- the level of indications of interest in the International Placing; and

- the basis of allotment of the Hong Kong Offer Shares

to be published on the website of the
Hong Kong Stock Exchange at **www.hkexnews.hk**[5] and
the Company's website at **www.antgroup.com**[5] on . . . . . .Wednesday, November 4, 2020

Announcement of results of allocations in
the Hong Kong Public Offering (including
successful applicants' identification document numbers,
where appropriate) will be available through
a variety of channels (see "*How to Apply for
the Hong Kong Offer Shares — D. Publication
of Results*") from . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Wednesday, November 4, 2020

Results of allocations in the Hong Kong Public Offering
will be available at **www.iporesults.com.hk**
(alternatively: English **https://www.eipo.com.hk/en/Allotment**;
Chinese **https://www.eipo.com.hk/zh-hk/Allotment**)
with a "search by ID" function from . . . . . . . . . . . . . . . .Wednesday, November 4, 2020

H Share certificates in respect of wholly or
partially successful applications to be despatched or
deposited into CCASS on or before[6]. . . . . . . . . . . . . . . .Wednesday, November 4, 2020

## EXPECTED TIMETABLE[(1)]

White Form e-Refund payment instructions/refund cheques
   in respect of wholly or partially unsuccessful applications
   to be despatched on or before[(7)(8)] . . . . . . . . . . . . . . . . . . .Wednesday, November 4, 2020

Dealings in the H Shares on the Hong Kong Stock Exchange
   expected to commence at 9:00 a.m. on . . . . . . . . . . . . . . . . .Thursday, November 5, 2020

Notes:

(1)    All dates and times refer to Hong Kong local time, except as otherwise stated. For details of the structure of the H Share IPO, including conditions of the Hong Kong Public Offering, see "Structure of the H Share IPO."

(2)    You will not be permitted to submit your application to the White Form eIPO Service Provider through the designated website at **www.eipo.com.hk** after 11:30 a.m. on the last day for submitting applications. If you have already submitted your application and obtained an application reference number from the designated website prior to 11:30 a.m., you will be permitted to continue the application process (by completing payment of the application monies) until 12:00 noon on the last day for submitting applications, when the application lists close.

(3)    If there is a "black" rainstorm warning or a tropical cyclone warning signal number 8 or above and/or Extreme Conditions in force in Hong Kong at any time between 9:00 a.m. and 12:00 noon on Friday, October 30, 2020 the application lists will not open on that day. See "How to Apply for the Hong Kong Offer Shares — C. Effect of Bad Weather and Extreme Conditions on the Opening and Closing of the Application Lists" for further details.

(4)    Applicants who apply for the Hong Kong Offer Shares by giving electronic application instructions to HKSCC should see "How to Apply for the Hong Kong Offer Shares — A. Application for the Hong Kong Offer Shares — 6. Applying Through CCASS EIPO Service."

(5)    None of the website or any of the information contained on the website forms part of this prospectus.

(6)    No temporary documents of title will be issued in respect of the Offer Shares. H Share certificates will only become valid certificates of title provided that (i) the H Share IPO has become unconditional in all respects and (ii) the Underwriting Agreements have not been terminated in accordance with their respective terms prior to 8:00 a.m. on the H Share Listing Date. Investors who trade H Shares on the basis of publicly available allocation details prior to the receipt of share certificates or prior to the share certificates becoming valid certificates of title do so entirely at their own risk.

(7)    Applicants who have applied on **White Form eIPO** for 1,000,000 or more Hong Kong Offer Shares may collect any refund checks (where applicable) and/or Share certificates in person from our H Share Registrar, Computershare Hong Kong Investor Services Limited, at Shops 1712-1716, 17th Floor, Hopewell Centre, 183 Queen's Road East, Wanchai, Hong Kong, from 9:00 a.m. to 1:00 p.m. on Wednesday, November 4, 2020, or such other date as notified by us as the date of dispatch/collection of Share/e-Refund payment instructions/refund checks. Applicants being individuals who are eligible for personal collection may not authorize any other person to collect on their behalf. Individuals must produce evidence of identity acceptable to our H Share Registrar at the time of collection.

       Applicants who have applied for Hong Kong Offer Shares through CCASS EIPO service should refer to the section headed "How to Apply for the Hong Kong Offer Shares — G. Despatch/Collection of H Share Certificates/e-Refund Payment Instructions/Refund Checks — Personal Collection — If you apply through CCASS EIPO service" in this prospectus for details.

(8)    e-Refund payment instructions/refund cheques will be issued in respect of wholly or partially unsuccessful applications pursuant to the Hong Kong Public Offering.

## EXPECTED TIMETABLE[(1)]

The H Share certificates will only become valid certificates of title provided that the H Share IPO has become unconditional in all respects and neither the Hong Kong Underwriting Agreement nor the International Underwriting Agreement is terminated in accordance with its respective terms prior to 8:00 a.m. on the H Share Listing Date (which is expected to be on or about Thursday, November 5, 2020). Investors who trade the H Shares on the basis of publicly available allocation details prior to the receipt of H Share certificates or prior to the H Shares certificates becoming valid certificates of title do so entirely at their own risk.

The above expected timetable is a summary only. For details of the structure of the H Share IPO, including its conditions, and the procedures for applications for Hong Kong Offer Shares, see the sections headed "Structure of the H Share IPO" and "How to Apply for the Hong Kong Offer Shares" in this prospectus, respectively.

## CONTENTS

This prospectus is issued by our Company solely in connection with the Hong Kong Public Offering and the Hong Kong Offer Shares and does not constitute an offer to sell or a solicitation of an offer to subscribe for or buy any security other than the Hong Kong Offer Shares. This prospectus may not be used for the purpose of, and does not constitute, an offer to sell or a solicitation of an offer to subscribe for or buy any security in any other jurisdiction or in any other circumstances. No action has been taken to permit a public offering of the Offer Shares or the distribution of this prospectus in any jurisdiction other than Hong Kong. The distribution of this prospectus and the offering and sale of the Offer Shares in other jurisdictions are subject to restrictions and may not be made except as permitted under the applicable securities laws of such jurisdictions pursuant to registration with or authorization by the relevant securities regulatory authorities or an exemption therefrom. You should rely only on the information contained in this prospectus to make your investment decision. We have not authorized anyone to provide you with information that is different from what is contained in this prospectus. Any information or representation not included in this prospectus must not be relied on by you as having been authorized by us, the Joint Sponsors, the Joint Representatives, the Joint Global Coordinators, the Joint Bookrunners, the Joint Lead Managers, the Underwriters, any of our or their respective directors or advisors, or any other person or party involved in the H Share IPO. Information contained on our website, located at **www.antgroup.com**, does not form part of this prospectus.

**Expected Timetable** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

**Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    vi

**Letter from Chairman** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

**Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

**Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

**Glossary and Conventions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

**Forward-looking Statements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

**Risk Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

**Waivers from Compliance with the Hong Kong Listing Rules** . . . . . . . . . . . . . . .    104

**Information about this Prospectus and the H Share IPO** . . . . . . . . . . . . . . . . . . .    117

**Directors, Supervisors and Parties Involved in the H Share IPO** . . . . . . . . . . . . .    123

**Corporate Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    133

**History and Development** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    135

**Our Business** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    162

**Connected Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    228

## CONTENTS

**Directors, Supervisors and Senior Management** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

**Share Capital** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

**Substantial Shareholders** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

**Relationship with Controlling Shareholders** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

**Financial Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

**Future Plans and Use of Proceeds** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377

**Underwriting** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

**Structure of the H Share IPO** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 389

**A Share IPO** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

**How to Apply for the Hong Kong Offer Shares** . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

**Appendix I**       **Accountants' Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-1

**Appendix II**      **Unaudited Pro Forma Financial Information** . . . . . . . . . . . . . . . II-1

**Appendix III**     **Taxation and Foreign Exchange** . . . . . . . . . . . . . . . . . . . . . . . . . III-1

**Appendix IV**      **Regulations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV-1

**Appendix V**       **Summary of Legal and Regulatory Matters** . . . . . . . . . . . . . . . V-1

**Appendix VI**      **Summary of Articles of Association** . . . . . . . . . . . . . . . . . . . . . VI-1

**Appendix VII**     **Statutory and General Information** . . . . . . . . . . . . . . . . . . . . . . VII-1

**Appendix VIII**    **Documents Delivered to the Registrar of Companies
                      in Hong Kong and Available for Inspection** . . . . . . . . . . . . . VIII-1

## SUMMARY

- Financial institutions can access our platform to distribute credit, investment and insurance products, powered by our intelligent decisioning and dynamic risk management solutions as well as technology infrastructure. As a provider of technology, we collaborate with, rather than compete against, our partner financial institutions.

Consumers come to the Alipay app for digital payments and to access digital finance services and digital daily life services. Digital payments is the infrastructure that empowers nearly all consumer activities and digital finance use cases, which is important for broadening our customer reach online and offline. Easy access to a broad range of digital daily life services within the Alipay app plays an important role in user engagement and retention. Our digital finance services are highly innovative and attractive to users and highly synergistic with digital payments and digital daily life services. The interaction among digital payment, digital daily life services and digital finance creates a virtuous cycle that drives our growth.

We refer to this platform of comprehensive digital payment, digital finance and digital daily life services as our Alipay platform.

With China's economy shifting towards domestic consumption and the growth of small businesses, the financial services needs of consumers and small businesses have expanded considerably and demand for credit, investment and insurance products is projected to increase substantially. These needs are underserved by brick and mortar channels of the financial system because of the lack of reach and customer insights in the process of underwriting risk, for example in the case of a micro-loan or small-claims insurance.

We are well positioned, by working with our partner financial institutions and leveraging our proprietary technology and high-quality customer insights, to accelerate the digitalization of the financial services industry. This digitalization is creating opportunities to more efficiently serve a broader customer base by anticipating and addressing their needs real time.

Through the massive reach of the Alipay platform to all levels of the economy, we have established the "capillaries" of the financial system to complement the "arteries" operated by major financial institutions. Our platform model whereby banks can tap into our customer reach and technology to provide financial services facilitates efficient allocation of capital while achieving societal goals of inclusiveness and sustainability.

We provide the following capabilities to partner financial institutions: broad and targeted reach, intelligent decisioning systems, dynamic risk management systems, and technology infrastructure.

- *CreditTech*, serving consumer credit and SMB credit needs. We are the largest online consumer credit and SMB credit services provider in China in terms of total outstanding credit balance originated, according to Oliver Wyman. Our CreditTech services address the unmet credit demands of unserved and underserved consumers and small businesses in China. We openly collaborate with our partner financial institutions through our technology platform. We originate loans, which are then independently underwritten by our partner financial institutions. As of June 30, 2020, we worked with approximately 100 partner banks, including all policy banks, large national state-owned banks, all national joint stock banks, leading city and rural commercial banks, international banks that operate in China, as well as trust companies. We generate technology

– 6 –

**SUMMARY**

service fees from our partner financial institutions that are based on the credit balance originated through our platform. Our approach is not to use our own balance sheet or provide guarantees. As of June 30, 2020, approximately 98% of credit balance originated through our platform was underwritten by our partner financial institutions or securitized. To innovate new products and in certain limited situations, we also provide consumer and SMB credit through our licensed subsidiaries.

- *InvestmentTech*, serving investment needs. We are the largest online investment services platform in China by AUM matched and distributed, according to Oliver Wyman. Through our InvestmentTech services, we enable our partner asset managers to provide transparent, personalized and easy-to-understand investment options with low minimum investment amounts for a wide range of consumers. As of June 30, 2020, we worked with approximately 170 partner asset managers, including the vast majority of mutual fund companies as well as leading insurers, banks and securities companies in China. We leverage AI to provide intelligent matching of investment products with customers taking into account their risk tolerance. Our massive user base, technology, customer insights and the trust consumers place in our brand have helped our partner financial institutions to expand the reach of a broad range of innovative investment products to a wider customer segment. We generate technology service fees from our partner financial institutions that are based on the volume of investment products distributed through our platform. We also provide investment products through our licensed asset management subsidiary.

- *InsureTech*, serving insurance needs. We are the largest online insurance services platform in China in terms of premiums generated, according to Oliver Wyman. Through our InsureTech services, we enable our partner insurers to offer a wide range of innovative, customized and accessible insurance products, covering life, health and P&C insurance areas. As of June 30, 2020, we worked with approximately 90 partner insurance institutions in China. The ongoing digitalization of the economy presents transformative opportunities in the insurance sector, as any risk-bearing activity may be insured against where there is sufficient high-quality data. The massive scale and commercial nature of our platform and of the Alibaba ecosystem enable us to innovate and to develop new insurance products that address consumer and business needs. We receive technology service fees from our partner insurance institutions based on a percentage of the insurance premiums and contributions generated through our platform. We also provide insurance products through our licensed P&C insurance subsidiary.

## RISK FACTORS

institutions. If these financial institutions were to fail, our customers may suffer losses, and as a result, our reputation, business, results of operations and financial position could be materially and adversely affected.

***We and our partners are subject to a broad range of laws and regulations, and future laws and regulations may impose additional requirements and other obligations that could materially and adversely affect our business, financial condition and results of operations.***

We have created a vibrant ecosystem and a platform that offers a broad range of digital payment, digital finance and digital daily life services. As such, we and our subsidiaries, associates, joint ventures and affiliates, as well as businesses, partner financial institutions and other participants on our platform, are subject to a broad range of laws, rules and regulations as described in "Appendix IV — Regulations," among others, including the laws and regulations on Internet content providers, e-commerce, digital payments, data collection and data security and privacy and consumer protection and are required to obtain and maintain relevant licenses, permits or approvals in the PRC. These laws, rules and regulations are highly complex, and continuously evolving. They could change or be reinterpreted to be burdensome or difficult for us, businesses on our platform or our partners to comply with. As we further expand into other markets, we increasingly become subject to additional legal and regulatory compliance requirements as well as political and regulatory challenges, including scrutiny on data security and privacy and AML compliance, or on national security grounds or for other reasons.

Moreover, we cannot assure you that we and our partner financial institutions will be able to maintain existing licenses and permits, renew any of them when their current term expires or obtain additional licenses required to expand our and their businesses. If we or our partner financial institutions are unable to maintain and renew one or more of the current licenses and permits, or obtain such renewals or additional licenses requisite for future business expansion, the operations and prospects of our business could be materially disrupted. Furthermore, new PRC regulations promulgated in the future may require that we or our partner financial institutions obtain additional licenses or permits in order to continue to conduct our business operations and maintain the cooperation between us and our partner financial institutions. However, we can give no guarantee that we and our partner financial institutions would be able to obtain such licenses or permits in a timely fashion, or at all. If any of the foregoing were to occur, our business, financial condition and prospects would be materially and adversely affected.

We have from time to time been subject, and are likely again in the future to be subject, to PRC and foreign government inquiries, inspections and investigations, including those relating to AML, anti-terrorist financing and sanctions, data security and privacy, cybersecurity, foreign exchange control, consumer protection, anti-bribery, anti-corruption, advertising and content control laws and regulations.

We also face scrutiny, and have been subject and continue to be subject to inquiries, inspections and investigations, from PRC and foreign government authorities that focus on cross-border trade, tax, intellectual property protection, our investment activities and allegedly fraudulent or other criminal transactions. We may also face protectionist policies and regulatory scrutiny, on national security grounds or for other reasons, in foreign countries in which we conduct business or investment activities. As we continue to grow in scale and significance, we expect to face increased scrutiny, which will, at a minimum, result in our having to continue to increase our investment in legal and compliance and related capabilities and systems.

## RISK FACTORS

*The financial services industry is subject to evolving and extensive regulation.*

We provide digital payment services, and we partner with a large number of financial institutions and enable them to provide services in consumer and SMB credit, investments and insurance. As such, our business model and these financial institutions, as well as our cooperation model with them are subject to evolving and extensive regulation governing the financial services industry. Moreover, the intersection of finance and digital services is a new phenomenon but one that has attracted significant regulatory attention. See "Appendix IV — Regulations" for further details.

These laws, rules and regulations, such as the recent decision of China's Supreme People's Court to lower the cap for private lending rate, the CBIRC's Provisional Regulatory Measures for Commercial Banks' Online Lending Business and the Notice of the General Office of the CBIRC on Strengthening Regulation on Small Loan Companies, the Decision on Implementing the Access Management of Financial Holding Companies issued by the State Council and the Provisional Administrative Measures on Financial Holding Companies issued by the PBOC, as discussed elsewhere in this prospectus, are highly complex, continuously evolving and could change or be reinterpreted to be burdensome or difficult to comply with or increase our compliance costs. In the past, we had adjusted our business in response to the evolving regulatory environment with respect to digital payments, consumer and SMB credit, investments and insurance. In particular, our services cover various aspects of the financial services industry, and we are the leading digital payment services provider and leading digital finance platform in China. As such, we may be subject to additional scrutiny from regulators and subject to more stringent requirements. We cannot assure you that we will be able to make adjustments to our business in the future in a timely manner to respond to such additional scrutiny and requirements. Even if we are able to adapt and comply, increased regulatory requirements would have the effect of increasing the compliance burden, compliance costs and restrict our flexibility in operating and introducing new businesses. Government authorities in the PRC and other countries are likely to continue to issue new laws, rules and regulations governing the industries in which we operate in the PRC and other countries and enhance enforcement of existing laws, rules and regulations. They have imposed, and may continue to impose, requirements relating to, among other things, new and additional licenses, permits and approvals or governance or ownership structures on us, which we may not be able to obtain, maintain or comply with.

Our partner financial institutions are also subject to continuously evolving regulations on the financial services industry and tightened scrutiny from the regulators, which may be difficult for our partners to comply with or affect their cooperation model with us. Potential scrutiny includes more stringent capital requirements, risk weighting requirements, data security and privacy requirements, limitation on reliance on any single platform, tighter operational standards or more stringent conduct requirements of financial services industry. Furthermore, if new regulations or rules limit the overall debt balance in China, our partner financial institutions' ability to cooperate with us on consumer and SMB credit may be limited. There can be no assurance that they will be able to make adjustments to their businesses or their cooperation model with us in a timely manner. This in turn can result in reduced user engagement and merchant activity level on our platform, which could harm our business, prospects and results of operations.

## RISK FACTORS

***Our licensed financial services subsidiaries and associates are subject to evolving and extensive regulation.***

In addition to partnering with financial institutions to provide financial products and services, we also provide consumer and SMB credit, investment products, and insurance products through our licensed small loan subsidiaries Ant Shangcheng and Ant Small and Micro Loan, licensed commercial factoring subsidiary, Shangrong (Shanghai) Commercial Factoring Co., Ltd., licensed asset management subsidiary, Tianhong, licensed P&C insurance company, Cathay Insurance, and our associate MYbank. These licensed financial services subsidiaries and associate are subject to the same or similar regulations as our partner financial institutions. In particular, our licensed financial services subsidiaries and associate are subject to capital, leverage ratio or solvency margin ratio requirements in the PRC. Any change in regulatory regime or additional requirements may constrain their businesses or result in additional compliance costs. Local authorities in different regions of the PRC may interpret, apply and enforce the relevant rules and regulations in different ways. These various regulatory requirements and their interpretation, application and enforcement relating to our licensed financial services subsidiaries and associate may increase their compliance costs or limit their scale of operations unless we make additional capital contributions to them, or such requirements could restrict our expansion entirely without any possibility of increasing the capital contribution into these subsidiaries and associate. In addition, these licensed subsidiaries and associate are subject to regular and ad hoc regulatory inspections, and may be subject to actions, by the relevant regulators regarding the compliance with relevant laws and regulations.

On September 11, 2020, the State Council issued the Decision on Implementing the Access Management of Financial Holding Companies (《關於實施金融控股公司准入管理的決定》) (the "FHC Decision"). The FHC Decision sets out circumstances under which entities or individuals are required to apply to the PBOC within 12 months after the FHC Decision comes into effect (i.e., November 1, 2020) and obtain approval from the PBOC to establish financial holding companies. On the same date, the PBOC issued the Provisional Administrative Measures on Financial Holding Companies (《金融控股公司監督管理試行辦法》), which specify the entry requirements and procedures set forth in the FHC Decision, and set out regulatory requirements on certain key aspects of financial holding companies, including shareholder eligibility, source of funds and use of funds, capital adequacy, shareholding structure, corporate governance, related party transactions, risk management systems, and risk segregation or firewalls mechanism. Based on our understanding of the current regulatory intent and applicable laws and regulations, we plan to use Zhejiang Finance Credit Network Technology Co., Ltd. (浙江融信網絡技術有限公司), our wholly owned subsidiary, as the entity to apply for being a financial holding company subject to regulatory oversights and hold our licensed financial services subsidiaries. We may need to make adjustments to such plan in accordance with the implementation of the relevant regulations. See "Appendix IV — Regulations" for further details.

***If we cannot resolve any potential conflict between us and Alibaba in our favor, our business, financial condition, results of operations and prospects may be materially and adversely affected.***

We and Alibaba have established a strategic and synergistic partnership and comprehensive business cooperation. Alibaba relies on us to conduct substantially all of the payment processing and all of the escrow services on its marketplaces through long-term contract arrangements, and we derive a portion of our revenues from Alibaba and users on its marketplaces. Also, our strategic relationship with Alibaba enables us to access the users of Alibaba's ecosystem, which has facilitated, and is expected to continue to facilitate us, the

# RISK FACTORS

***Our profitability could be negatively affected if our transaction fees payable to financial institutions outgrow our revenues.***

A substantial portion of our cost of services is transaction fees, which are primarily fees paid to financial institutions for funds drawn to facilitate transactions on the Alipay platform. Transaction fees as a percentage of cost of services were 81.6%, 81.3%, 77.2% and 75.5% for the years ended December 31, 2017, 2018 and 2019 and the six months ended June 30, 2020. As such, any increase in transaction fees could adversely impact our profitability. For example, our gross margin decreased to 52.3% in 2018 from 63.7% in 2017, primarily due to an increase in the overall fee rate charged by financial institutions as a result of the renewal of agreements to reflect prevailing market rates in 2018. We cannot assure you that the transaction fee rate and any other fee or cost will not increase in the future, or that we will be able to pass any resulting incremental cost to our customers. This in turn could materially and adversely affect our results of operations.

***The laws and regulations governing the online lending and consumer finance industry in China are evolving, and our business operations have been and may need to continue to be modified to ensure full compliance with relevant laws and regulations.***

The online lending and consumer finance industry in China, similar as the overall financial services industry, is subject to evolving regulation. Our CreditTech services address the unmet credit demands of unserved and underserved consumers and small businesses in China, which entails partnering with a large number of financial institutions in China to provide consumer and SMB credit through our platform. The way financial institutions collaborate with their partners, including us, may subject them to regulatory uncertainties. To cope with the evolving regulatory regime, our partner financial institutions may need to adopt changes to the cooperation model with their business partners, including us, which may adversely affect our business. In addition, we cannot assure you that the business operations of our partner financial institutions currently are or will be in compliance with the relevant PRC laws and regulations, and in the event that our partner financial institutions do not operate their businesses in accordance with the relevant PRC laws and regulations, they will be exposed to various regulatory risks, and as a result, our cooperation model with them would be impacted and our business, financial condition and prospects would be materially and adversely affected. Furthermore, our licensed subsidiaries are also subject to evolving laws and regulations and local authorities' interpretation thereof and may need to respond and adapt to changes in regulatory requirements. See "— Our licensed financial services subsidiaries and associates are subject to evolving and extensive regulation."

The PRC government and relevant regulatory authorities have issued various laws and regulations governing the online lending and consumer finance industry as described in the section headed "Appendix IV — Regulations." For example, the CBIRC issued the Provisional Regulatory Measures for Commercial Banks' Online Lending Business on July 12, 2020 to provide for the regulatory requirements on the extension of credit by commercial banks via online channels in various aspects. In addition, our partner banks are also subject to changes to capital adequacy and other regulatory requirements that may affect the risk weightings for various credit assets. Any increase in risk weightings for loans enabled through our platform will increase our partner banks' capital required, which may reduce the attractiveness of these loans or reduce or eliminate their interests in cooperating with us. In addition, a large number of consumers and small businesses have no or only a limited credit history, fewer financial resources or a lower borrowing capacity than large entities, and may be more vulnerable to economic downturns. As such, regulators

## RISK FACTORS

may take steps to require lenders, including our partner financial institutions, to limit their exposure to these borrowers. Regulatory authorities may also require our partner financial institutions to undertake additional borrower suitability assessments. If our partner financial institutions were required to adopt changes to their cooperation models with us as a result of new laws and regulations, our business, financial condition, results of operation and prospects would be materially and adversely affected.

Furthermore, relevant regulatory and judicial authorities may change the private lending rate of interest that can be charged by unlicensed financial institutions from time to time. On August 20, 2020, China's Supreme People's Court (the "SPC") announced its decision to lower the cap for such private lending rate in a revised judicial interpretation. Under the revised judicial interpretation, such total annual percentage rates (inclusive of any default rate, default penalty and any other fee) exceeding four times that of China's benchmark one-year loan prime rate (the "LPR") as published on the 20th of each month will not be legally protected. Based on the LPR of 3.85% as published on October 20, 2020, such cap would be 15.4%. The revised judicial interpretation does not apply to licensed financial institutions. However, the SPC's prior rulings were inconsistent as to whether licensed small loan companies would qualify as licensed financial institutions. Accordingly, there is uncertainty as to whether our licensed small loan subsidiaries would be subject to the cap provided under the revised judicial interpretation. If our licensed small loan subsidiaries are subject to the cap, and if the rate cap is further lowered by any newly adopted, or by the application of any existing, laws, regulations or rulings, our licensed small loan subsidiaries may need to change our loan pricing or our business model, which may have a material and adverse effect on our business, financial condition, results of operation and prospects.

To comply with existing laws, regulations, rules and government policies relating to the online lending and consumer finance industry, we have implemented and will continue to implement various policies and procedures to conduct our business in collaboration with partner financial institutions. During the Track Record Period and as of the Latest Practicable Date, we have not been subject to any material fines or other material penalties under any PRC laws or regulations, including those governing the online lending and consumer finance industry in China. However, due to the lack of detailed rules and the expectation that the relevant laws, regulations and rules may continue to evolve, we cannot be certain that our existing practices would not be deemed by regulators in the future to violate any existing or future laws, regulations and rules.

In addition, new laws and regulations may be adopted, and existing laws and regulations may be interpreted in ways that are inconsistent with our existing business practices, which, along with any possible changes needed to fully comply with any existing or newly released regulations, could require us to further modify our business or operations. The cost to comply with such laws or regulations could force us to incur increased operating expenses, and modifications of our business may have a material and adverse impact on our business, financial condition and results of operations.

### *Our CreditTech business may not sustain its historically rapid growth.*

Revenues from our CreditTech services grew rapidly during the Track Record Period and have been a major driver of our overall revenues growth. Revenues from CreditTech services increased by 39% and 87% in 2018 and 2019, respectively, as compared to the previous year, and increased by 59% in the first half of 2020 as compared to the corresponding period in 2019. We cannot assure you that revenues from our CreditTech business can grow at a high rate going forward. The revenues growth of our CreditTech business is affected by the technology service fee rate we charge our partner financial

## Directors

### *Executive Directors*

| Name | Address | Country of Nationality |
| --- | --- | --- |
| Eric Xiandong JING (井賢棟) | 702, Unit 4<br>Building 4<br>Jinsejiayuan<br>16 Fuchun Road<br>Shangcheng District<br>Hangzhou, Zhejiang<br>The People's Republic of China | PRC |
| Simon Xiaoming HU (胡曉明) | 1001, Unit 2<br>Building 7<br>Hanyuan<br>Hejiayuan<br>Xihu District<br>Hangzhou, Zhejiang<br>The People's Republic of China | PRC |
| Xingjun NI (倪行軍) | Room 708<br>Building 8<br>Xixitianjie<br>Longhu<br>Hangzhou, Zhejiang<br>The People's Republic of China | PRC |

## DIRECTORS, SUPERVISORS AND PARTIES INVOLVED IN THE H SHARE IPO

*Non-executive Directors*

| Name | Address | Country of Nationality |
|---|---|---|
| Joseph C. TSAI (蔡崇信) | 70 Deep Water Bay Road<br>Hong Kong<br>The People's Republic of China | Canada |
| Li CHENG (程立) | 902, Unit 1<br>Building 10<br>Dicuiyuan<br>Chuntianjiayuan<br>Xianlin Street<br>Hangzhou, Zhejiang<br>The People's Republic of China | PRC |
| Fang JIANG (蔣芳) | 3-1-601<br>Yingxiayuan<br>Chunjianghuayue<br>158 Qianjiang Road<br>Shangcheng District<br>Hangzhou, Zhejiang<br>The People's Republic of China | PRC |

*Independent Non-executive Directors*

| Name | Address | Country of Nationality |
|---|---|---|
| Quan HAO (郝荃) | 12-1-802<br>Fenghuiyuan<br>Xicheng District<br>Beijing<br>The People's Republic of China | PRC |
| Fred Zuliu HU (胡祖六) | House 9 Rosecliff<br>20 Tai Tam Road<br>Hong Kong<br>The People's Republic of China | PRC |
| Yiping HUANG (黃益平) | 406<br>Building 6<br>Wanliu Service Apartment<br>Peking University<br>29 Wanliuzhong Road<br>Haidian District<br>Beijing<br>The People's Republic of China | PRC |

**Supervisors**

| Name | Address | Country of Nationality |
|---|---|---|
| Hang JIA (郟航) | 52 Lakeside Drive<br>#03-10<br>Caspian<br>Republic of Singapore | Canada |
| Hong XU (徐宏) | 1201<br>No. 25<br>1028 Chang Shou Road<br>Shanghai<br>The People's Republic of China | PRC |
| Quan YU (余泉) | 1-2-401<br>Shijiagu, Shanshui Renjia<br>Xihu District<br>Hangzhou, Zhejiang<br>The People's Republic of China | United States |

See "Directors, Supervisors and Senior Management" for more information on the Directors and Supervisors.

# HISTORY AND DEVELOPMENT

**Our Major Corporate Milestones**



## HISTORY AND DEVELOPMENT

***Development of Our Businesses — a History of Innovation***

### *Digital Payments*

Our origins date to 2004 when Alipay was created in the nascent days of e-commerce to solve the trust issue between buyers and sellers in online transactions. Our innovative payment solution bridged the trust gap, facilitated online transactions and underpinned the development of e-commerce in China. Having pioneered digital payments in China, we have since expanded our service offerings through technology and innovation to enable digital finance for consumers and businesses in China. In 2009, Alipay app, the first mobile payment app in China, was launched to provide fast, convenient and secure mobile payment solutions to consumers and merchants.

### *Digital Finance Technology Platform*

*CreditTech*

In 2014, we launched Huabei, which was among the first digital unsecured revolving credit products for daily expenditures offered to consumers in China. In 2015, we launched Jiebei, a short-term digital unsecured consumer credit product for larger consumption transactions, to meet the spending needs of users who either have already developed a credit history on our platform or those who are eligible for Huabei.

*InvestmentTech*

In 2013, we identified an opportunity to allow consumers to generate yield on their Alipay account balances. We created Yu'ebao, an innovative product that offers a simple and easy way for consumers to earn a return while allowing the funds to be instantly available for everyday purchases. Today, Yu'ebao remains the first financial investment product for many consumers and is the largest money market fund product in China.

*InsureTech*

In 2010, we launched shipping return insurance on Taobao, which was the first scenario-based online insurance product in China. This innovative and low-cost insurance product covers the purchaser's shipping cost for returning products purchased on Alibaba's marketplaces. In 2018, we launched Xianghubao, a mutual aid program that provides affordable and accessible health protection to participants.

### *Innovation Initiatives and Technology Infrastructure*

In 2018, we launched the AntChain cross-border remittance services leveraging blockchain technology and the Blockchain-as-a-Service (BaaS) open platform which supports diverse commercial applications.

## HISTORY AND DEVELOPMENT

**Formation of Our Group**

*Acquisition of Alipay China by Our Predecessor*

Alipay China was established under the laws of the PRC in December 2004 by Alibaba to provide digital payment services to consumers and merchants on Alibaba's platforms.

Our predecessor company, Zhejiang Alibaba E-Commerce Co., Ltd. (浙江阿里巴巴電子商務有限公司), which was established by Mr. Jack Ma and Mr. Simon Shihuang Xie (holding 80% and 20% of the company's equity interest, respectively), took control of Alipay China in 2011.

*Hangzhou Junhan and Hangzhou Junao Became Our Largest Shareholders*

In January 2013, Hangzhou Junao made a cash investment in our Company and became the owner of 42.14% of our Company's equity interest, and the equity interests owned by Mr. Jack Ma and Mr. Simon Shihuang Xie were diluted to 46.29% and 11.57%, respectively. On June 11, 2014, the Company's name was changed to Zhejiang Ant Small and Micro Financial Services Group Co., Ltd. (浙江螞蟻小微金融服務集團有限公司). On the same date, Mr. Jack Ma and Mr. Simon Shihuang Xie transferred their respective equity interests in our Company to Hangzhou Junhan, which became the owner of 57.86% of our Company's equity interest.

In January 2015, Hangzhou Junhan transferred 4.61% of equity interest in our Company to Shanghai Qizhan Investment Center (Limited Partnership), a limited partnership established in China which focuses on private equity investment and is an independent third party.

*2015 and 2016 Equity Transactions*

In 2015, we conducted a round of equity financing and Shanghai Qizhan Investment Center (Limited Partnership) transferred part of its equity interest in our Company to certain new investors (the "2015 Equity Transactions"). Our registered capital increased to approximately RMB1,353 million.

In 2016, we conducted another round of equity financing while Hangzhou Junhan and Hangzhou Junao transferred part of their equity interests in our Company to certain new investors (the "2016 Equity Transactions"). Our registered capital further increased to approximately RMB1,459 million.

See "— Pre-IPO Investments" and "— Capitalization of our Company" for further details.

*Conversion to Joint Stock Limited Liability Company*

On December 16, 2016, shareholders of our Company resolved to convert our Company from a limited liability company to a joint-stock limited liability company by way of promotion in accordance with the PRC Company Law. Upon completion of all the required procedures on December 28, 2016, our Company was converted into a joint-stock limited liability company and was renamed Ant Small and Micro Financial Services Group Co., Ltd. (浙江螞蟻小微金融服務集團股份有限公司). In connection with the conversion, we issued an aggregate of 15,000,000,000 Shares to our Company's then 23 shareholders, including Hangzhou Junhan, Hangzhou Junao, Shanghai Qizhan Investment Center (Limited

## HISTORY AND DEVELOPMENT

***Redemption of Ant International Class B shares and subscription of H Shares by holders of Ant International Class B shares***

In 2018, we restructured our offshore employee incentives with Ant International issuing Ant International Class B shares to support our offshore employee incentives. Ant International also implemented an ESOP plan, the Pre-IPO Offshore ESOP Plan, pursuant to which we granted awards in the form of RSUs and/or SARs to certain eligible participants of the ESOP plan including employees and directors of, and consultants engaged by, members of our Group and our associates and Alibaba and its subsidiaries, with Ant International Class B shares as the underlying shares. As of the Latest Practicable Date, there were 259,355,840 outstanding Ant International Class B shares and they will be held in trust or as nominee by BOCI Trustee (Hong Kong) Limited.

Pursuant to the terms of the Ant International Class B shares, Ant International will effect an exchange of Ant International Class B shares into H Shares on a one-for-one basis by way of redemption and the holders of the Ant International Class B shares shall subscribe for the same number of H Shares. Both the redemption and the subscription will be at the H Share Offer Price (the "Class B Redemption and Subscription," and together with the Class C Redemption and Subscription, the "Redemption and Subscription"). We intend to effect the Class B Redemption and Subscription on a group basis, with all H Shares issued in connection with the redemption of Ant International Class B shares to be held by BOCI Trustee (Hong Kong) Limited as trustee or nominee.

As a result of the Class B Redemption and Subscription, we will issue in aggregate 259,355,840 H Shares representing approximately 1.09% and 0.85% of our total issued share capital immediately prior to and immediately following the H Share Issuance and the A Share IPO (without taking into account any exercise of the Over-allotment Options), respectively and approximately 3.71% of our total number of issued H Shares immediately following the H Share Issuance (including 350,000,000 Domestic Shares held by Hangzhou Junhan, 120,000,000 Domestic Shares held by Hangzhou Junao, and 1,600,000,000 Domestic Shares held by Hangzhou Alibaba, respectively, to be registered as H Shares and without taking into account any exercise of the H share Over-allotment Option).

***Mechanism for effecting the Redemption and Subscription***

The redemption and subscription mechanisms for the Ant International Class C shares and the Ant International Class B shares are the same.

Ant International will use available resources from the Company, including utilizing funds from liquidity facilities provided by third parties, to redeem the Ant International Class C shares and Ant International Class B shares for cash, and the holders of such shares would use the redemption proceeds to subscribe for H Shares. The amount of redemption proceeds and the subscription amount are both equal to the H Share Offer Price multiplied by the number of H Shares subscribed for and issued, or approximately HK$260,516 million in aggregate (based on H Share Offer Price of HK$80.00). The funds paid for the redemption will be directly applied to the subscription of the H Shares, so that the Redemption and Subscription would be completed without holders of Ant International Class C shares and Ant International Class B shares paying any additional subscription amount. The proceeds from the subscription of H Shares will be fully utilized to settle the funding of the redemption amount. The Redemption and Subscription will take place at the same time as the completion of the H Share IPO.

## HISTORY AND DEVELOPMENT

### *Effect of the Redemption and Subscription*

Other than the payment of certain miscellaneous administrative fees, the Redemption and Subscription will have no cash impact on our Company, as the funds paid by Ant International to redeem the Ant International Class B shares and Ant International Class C shares will immediately be used by such holders to subscribe for our H Shares and such amounts are equal.

In connection with the Redemption and Subscription, we will issue 3,256,446,324 H Shares representing approximately 13.69% and 10.72% of our total issued share capital immediately prior to and immediately following the H Share Issuance and the A Share IPO (without taking into account any exercise of the Over-allotment Options), respectively and approximately 46.54% of our total number of issued H Shares immediately following the H Share Issuance (including 350,000,000 Domestic Shares held by Hangzhou Junhan, 120,000,000 Domestic Shares held by Hangzhou Junao, and 1,600,000,000 Domestic Shares held by Hangzhou Alibaba, respectively to be registered as H Shares and without taking into account any exercise of the H Share Over-allotment Option).

### Capitalization of Our Company

The following table sets out the shareholding structure of our Company and Ant International as of the date of this prospectus and our shareholding structure upon completion of the H Share Issuance and the A Share IPO, assuming the Over-allotment Options are not exercised:

| Shareholders | Timing of becoming a Shareholder or Round of Pre-IPO Investment | As of the date of this prospectus | | Immediately before the Redemption and Subscription | Upon completion of the H Share Issuance and the A Share IPO | | |
|---|---|---|---|---|---|---|---|
| | | Number of Shares owned | Ownership percentage | Number of Ant International Class B/ Class C shares owned | Number of A Shares owned | Number of H Shares owned | Ownership percentage |
| Hangzhou Junhan | June 2014 | 7,100,807,353 | 29.86% | – | 6,750,807,353 | 350,000,000[1] | 23.38% |
| Hangzhou Junao | January 2013 | 4,911,619,577 | 20.66% | – | 4,791,619,577 | 120,000,000[1] | 16.17% |
| Alibaba Group[3] | September 2019 | 7,763,002,334 | 32.65% | 1,158,572,686[3] | 6,163,002,334 | 2,758,572,686[2] | 29.37% |
| | A Share IPO | – | – | – | 730,000,000 | – | 2.40% |
| | | | | | | | Sub-total: 31.77% |
| Trustees/nominees[4] | N/A[4] | – | – | 259,355,840[4] | – | 259,355,840[4] | 0.85% |
| **Onshore Pre-IPO Investors:** | | | | | | | |
| National Council for Social Security Fund[5] | 2015 Equity Transactions | 698,966,840 | 2.94% | – | 698,966,840 | – | 2.30% |
| Zhifu (Shanghai) Investment Center (Limited Partnership)[6] | 2016 Equity Transactions | 461,354,708 | 1.94% | – | 461,354,708 | – | 1.52% |
| Shanghai Zhongfu Equity Investment Management Center (Limited Partnership)[7] | 2015 Equity Transactions and 2018 Equity Transactions | 307,611,214 | 1.29% | – | 307,611,214 | – | 1.01% |
| China Life Insurance (Group) Company[8] | 2015 Equity Transactions and 2016 Equity Transactions | 249,400,603 | 1.05% | – | 249,400,603 | – | 0.82% |

## HISTORY AND DEVELOPMENT

| Shareholders | Timing of becoming a Shareholder or Round of Pre-IPO Investment | As of the date of this prospectus | | Immediately before the Redemption and Subscription | Upon completion of the H Share Issuance and the A Share IPO | | |
|---|---|---|---|---|---|---|---|
| | | Number of Shares owned | Ownership percentage | Number of Ant International Class B/ Class C shares owned | Number of A Shares owned | Number of H Shares owned | Ownership percentage |
| Shanghai Qihong Investment Center (Limited Partnership)[7] | 2016 Equity Transactions | 247,947,076 | 1.04% | – | 247,947,076 | – | 0.82% |
| Shanghai Qizhan Investment Center (Limited Partnership)[7] | January 23, 2015[9] | 240,162,546 | 1.01% | – | 240,162,546 | – | 0.79% |
| Beijing Jingguan Investment Center (Limited Partnership)[10] | 2016 Equity Transactions and 2018 Equity Transactions | 218,337,790 | 0.92% | – | 218,337,790 | – | 0.72% |
| Hainan CCB Capital Conglin Fund Partnership (Limited Partnership)[11] | 2016 Equity Transactions | 190,284,963 | 0.80% | – | 190,284,963 | – | 0.63% |
| China Pacific Insurance Co., Ltd.[12] | 2015 Equity Transactions, 2016 Equity Transactions and 2018 Equity Transactions | 173,661,636 | 0.73% | – | 173,661,636 | – | 0.57% |
| Beijing China Post Investment Center (Limited Partnership)[13] | 2015 Equity Transactions, 2016 Equity Transactions and 2018 Equity Transactions | 164,172,335 | 0.69% | – | 164,172,335 | – | 0.54% |
| Shanghai Yunfeng Xincheng Investment Center (Limited Partnership)[7] | 2016 Equity Transactions | 155,687,692 | 0.65% | – | 155,687,692 | – | 0.51% |
| PICC Capital Investment Management Co., Ltd.[14] | 2015 Equity Transactions and 2016 Equity Transactions | 128,091,283 | 0.54% | – | 128,091,283 | – | 0.42% |
| New China Life Insurance Company Ltd.[15] | 2015 Equity Transactions and 2016 Equity Transactions | 99,479,107 | 0.42% | – | 99,479,107 | – | 0.33% |
| Shanghai Financial Sector Investment Fund II (I) (Limited Partnership)[16] | 2015 Equity Transactions, 2016 Equity Transactions and 2018 Equity Transactions | 84,698,808 | 0.36% | – | 84,698,808 | – | 0.28% |
| Beijing Innovative Growth Enterprises Management Co., Ltd.[17] | 2015 Equity Transactions, 2016 Equity Transactions and 2018 Equity Transactions | 71,199,073 | 0.30% | – | 71,199,073 | – | 0.23% |

## HISTORY AND DEVELOPMENT

| Shareholders | Timing of becoming a Shareholder or Round of Pre-IPO Investment | As of the date of this prospectus | | Immediately before the Redemption and Subscription | Upon completion of the H Share Issuance and the A Share IPO | | |
|---|---|---|---|---|---|---|---|
| | | Number of Shares owned | Ownership percentage | Number of Ant International Class B/ Class C shares owned | Number of A Shares owned | Number of H Shares owned | Ownership percentage |
| Chunhua Jingxin (Tianjin) Investment Center (Limited Partnership)[18] | 2015 Equity Transactions | 70,648,061 | 0.30% | – | 70,648,061 | – | 0.23% |
| Shanghai Jingyi Investment Center (Limited Partnership)[7] | 2015 Equity Transactions | 62,808,757 | 0.26% | – | 62,808,757 | – | 0.21% |
| China Life Insurance Co., Ltd.[8] | 2018 Equity Transactions | 56,689,342 | 0.24% | – | 56,689,342 | – | 0.19% |
| Suzhou Industrial Park Xinyuan Guangyi Investment Center (Limited Partnership)[19] | 2015 Equity Transactions, 2016 Equity Transactions and 2018 Equity Transactions | 47,999,714 | 0.20% | – | 47,999,714 | – | 0.16% |
| Chunhua Rongxin (Tianjin) Equity Investment Fund Partnership (Limited Partnership)[18] | 2018 Equity Transactions | 45,351,473 | 0.19% | – | 45,351,473 | – | 0.15% |
| Beijing Qianshun Investment Co., Ltd.[20] | 2018 Equity Transactions | 42,517,006 | 0.18% | – | 42,517,006 | – | 0.14% |
| China International Television Corporation[21] | 2018 Equity Transactions | 42,517,006 | 0.18% | – | 42,517,006 | – | 0.14% |
| Chunhua Jingxin Jingfu (Tianjin) Investment Center (Limited Partnership)[18] | 2016 Equity Transactions | 40,363,477 | 0.17% | – | 40,363,477 | – | 0.13% |
| Beijing CICC Alpha V Equity Investment Partnership (Limited Partnership)[22] | 2016 Equity Transactions | 28,831,046 | 0.12% | – | 28,831,046 | – | 0.09% |
| Tohigh Capital Investment & Management Co., Ltd.[23] | 2018 Equity Transactions | 28,344,671 | 0.12% | – | 28,344,671 | – | 0.09% |
| Tebon StarRay Co. Ltd.[24] | 2018 Equity Transactions | 17,006,802 | 0.07% | – | 17,006,802 | – | 0.06% |
| Beijing Yingyi Internet Technology Co., Ltd.[25] | 2018 Equity Transactions | 14,172,335 | 0.06% | – | 14,172,335 | – | 0.05% |
| Shanghai Shihong Investment Center(Limited Partnership)[26] | 2016 Equity Transactions | 9,225,934 | 0.04% | – | 9,225,934 | – | 0.03% |
| Hainan CCB Capital Project Fund I Partnership[27] | 2018 Equity Transactions | 5,668,934 | 0.02% | – | 5,668,934 | – | 0.02% |
| **Offshore Pre-IPO Investors:** | | | | | | | |
| Gamnat Pte. Ltd.[28] | 2018 Offshore Equity Financing[66] | – | – | 76,638,591 | – | 76,638,591 | 0.25% |
| Tetrad Ventures Pte Ltd[28] | 2018 Offshore Equity Financing[66] | – | – | 62,388,591 | – | 62,388,591 | 0.21% |

## HISTORY AND DEVELOPMENT

| Shareholders | Timing of becoming a Shareholder or Round of Pre-IPO Investment | As of the date of this prospectus | | Immediately before the Redemption and Subscription | Upon completion of the H Share Issuance and the A Share IPO | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Number of Shares owned | Ownership percentage | Number of Ant International Class B/ Class C shares owned | Number of A Shares owned | Number of H Shares owned | Ownership percentage |
| Pantai Juara Investments Limited[29] | 2018 Offshore Equity Financing[66] | – | – | 115,864,527 | – | 115,864,527 | 0.38% |
| WP Capital Investment, L.P.[30] | 2018 Offshore Equity Financing[66] | – | – | 101,614,527 | – | 101,614,527 | 0.33% |
| Canada Pension Plan Investment Board[31] | 2018 Offshore Equity Financing[66] | – | – | 106,951,871 | – | 106,951,871 | 0.35% |
| SL Elephant Holdco Limited[32] | 2018 Offshore Equity Financing[66] | – | – | 106,951,871 | – | 106,951,871 | 0.35% |
| CA Fourmi Investments[33] | 2018 Offshore Equity Financing[66] | – | – | 89,126,559 | – | 89,126,559 | 0.29% |
| Evans Investments Pte. Ltd.[34] | 2018 Offshore Equity Financing[66] | – | – | 53,475,935 | – | 53,475,935 | 0.18% |
| Glittertind Investments Pte. Ltd.[34] | 2018 Offshore Equity Financing[66] | – | – | 35,650,623 | – | 35,650,623 | 0.12% |
| General Atlantic Singapore Commander Pte. Ltd. [35] | 2018 Offshore Equity Financing[66] | – | – | 89,126,559 | – | 89,126,559 | 0.29% |
| Funds and accounts advised or subadvised by T. Rowe Price Associates, Inc. or T. Rowe Price Hong Kong Limited[36] | 2018 Offshore Equity Financing[66] | – | – | 89,126,559 | – | 89,126,559 | 0.29% |
| Giant Sports Limited[37] | 2018 Offshore Equity Financing[66] | – | – | 80,213,903 | – | 80,213,903 | 0.26% |
| Anchor Innovation Limited[38] | 2018 Offshore Equity Financing[66] | – | – | 71,301,247 | – | 71,301,247 | 0.23% |
| Clouse S.A., acting for the account of its Compartment 41[39] | 2018 Offshore Equity Financing[66] | – | – | 71,212,121 | – | 71,212,121 | 0.23% |
| Growth Succession Limited[40] | 2018 Offshore Equity Financing[66] | – | – | 62,388,591 | – | 62,388,591 | 0.21% |
| PV Orange Limited[41] | 2018 Offshore Equity Financing[66] | – | – | 62,388,591 | – | 62,388,591 | 0.21% |
| Funds and accounts managed by direct and indirect subsidiaries of BlackRock, Inc.[42] | 2018 Offshore Equity Financing[66] | – | – | 47,237,076 | – | 47,237,076 | 0.16% |

– 148 –

## HISTORY AND DEVELOPMENT

| Shareholders | Timing of becoming a Shareholder or Round of Pre-IPO Investment | As of the date of this prospectus | | Immediately before the Redemption and Subscription | Upon completion of the H Share Issuance and the A Share IPO | | |
|---|---|---|---|---|---|---|---|
| | | Number of Shares owned | Ownership percentage | Number of Ant International Class B/ Class C shares owned | Number of A Shares owned | Number of H Shares owned | Ownership percentage |
| Scottish Mortgage Investment Trust plc[43] | 2018 Offshore Equity Financing[66] | – | – | 44,563,279 | – | 44,563,279 | 0.15% |
| The Monks Investment Trust plc[43] | 2018 Offshore Equity Financing[66] | – | – | 2,139,037 | – | 2,139,037 | 0.01% |
| BPAF Limited[44] | 2018 Offshore Equity Financing[66] | – | – | 29,978,808 | – | 29,978,808 | 0.10% |
| PV Internet Holdings LLC[45] | 2018 Offshore Equity Financing[66] | – | – | 14,584,472 | – | 14,584,472 | 0.05% |
| DG-ANT LP[46] | 2018 Offshore Equity Financing[66] | – | – | 42,780,748 | – | 42,780,748 | 0.14% |
| Funds and portfolios advised or sub-advised by Fidelity Management & Research Company or its affiliate[47] | 2018 Offshore Equity Financing[66] | – | – | 42,350,267 | – | 42,350,267 | 0.14% |
| Antenna DF Holdings, LP[48] | 2018 Offshore Equity Financing[66] | – | – | 26,737,967 | – | 26,737,967 | 0.09% |
| SC GGF III Holdco, Ltd.[49] | 2018 Offshore Equity Financing[66] | – | – | 26,737,967 | – | 26,737,967 | 0.09% |
| Ample Era Investments Limited[50] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Fourmy Pte. Ltd[51] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Coatue PE Asia XIII LLC[45] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Intime International Holdings Limited[52] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Kofu International Limited[53] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Tahoe Ltd[54] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Credit Suisse AG, Singapore Branch[55] | 2018 Offshore Equity Financing[66] | – | – | 14,260,249 | – | 14,260,249 | 0.05% |

## HISTORY AND DEVELOPMENT

| Shareholders | Timing of becoming a Shareholder or Round of Pre-IPO Investment | As of the date of this prospectus | | Immediately before the Redemption and Subscription | Upon completion of the H Share Issuance and the A Share IPO | | |
|---|---|---|---|---|---|---|---|
| | | Number of Shares owned | Ownership percentage | Number of Ant International Class B/ Class C shares owned | Number of A Shares owned | Number of H Shares owned | Ownership percentage |
| Active Noble Limited[56] | 2018 Offshore Equity Financing[66] | – | – | 8,912,655 | – | 8,912,655 | 0.03% |
| Hutchison Whampoa Europe Investments S.à r.l.[57] | 2018 Offshore Equity Financing[66] | – | – | 8,912,655 | – | 8,912,655 | 0.03% |
| Moraine Master Fund, LP[58] | 2018 Offshore Equity Financing[66] | – | – | 6,238,859 | – | 6,238,859 | 0.02% |
| Falcon CI V, LLC[58] | 2018 Offshore Equity Financing[66] | – | – | 2,673,796 | – | 2,673,796 | 0.01% |
| Athena Investment Limited[59] | 2018 Offshore Equity Financing[66] | – | – | 6,238,859 | – | 6,238,859 | 0.02% |
| Sinovation Fortune Limited[60] | 2018 Offshore Equity Financing[66] | – | – | 5,347,593 | – | 5,347,593 | 0.02% |
| Domenick Limited[61] | 2018 Offshore Equity Financing[66] | – | – | 1,782,531 | – | 1,782,531 | 0.01% |
| GGV Capital Holdings, L.L.C.[62] | 2018 Offshore Equity Financing[66] | – | – | 3,565,062 | – | 3,565,062 | 0.01% |
| HS Investments AP10 Limited[63] | 2018 Offshore Equity Financing[66] | – | – | 28,520,499 | – | 28,520,499 | 0.09% |
| HS Investments WT Limited[63] | 2018 Offshore Equity Financing[66] | – | – | 4,456,328 | – | 4,456,328 | 0.01% |
| Platinum Lotus B 2018 RSC Limited[64] | 2018 Offshore Equity Financing[66] | – | – | 35,650,624 | – | 35,650,624 | 0.12% |
| Public Investment Fund[65] | 2018 Offshore Equity Financing[66] | – | – | 35,650,624 | – | 35,650,624 | 0.12% |
| Talent Science Limited[37] | 2018 Offshore Equity Financing[66] | – | – | 17,825,311 | – | 17,825,311 | 0.06% |
| Other A Share Holders | A Share IPO | – | – | – | 940,706,000 | – | 3.10% |
| Other H Share Holders | H Share IPO | – | – | – | – | 1,670,706,000 | 5.50% |
| **Total** | | 23,778,629,496 | 100.0% | 3,256,446,324 | 23,379,335,496 | 6,997,152,324 | 100.0% |

## HISTORY AND DEVELOPMENT

Notes:

(1)   Upon completion of the H Share Issuance and the A Share IPO, 350,000,000 Domestic Shares held by Hangzhou Junhan and 120,000,000 Domestic Shares held by Hangzhou Junao will be registered as H Shares.

(2)   Upon completion of the H Share Issuance and the A Share IPO, 1,600,000,000 Domestic Shares held by Hangzhou Alibaba will be registered as H Shares. The number assumes that Alibaba does not excise its anti-dilution right to subscribe for additional Shares in our Global IPO.

(3)   As of the Latest Practicable Date, Alibaba, through Hangzhou Alibaba, its wholly-owned subsidiary, held 7,763,002,334 Shares and through Taobao Holding Limited, its wholly-owned subsidiary, held 1,171,508,767 Ant International Class C shares. Certain Ant International Class C shares held by Taobao Holding Limited will be surrendered and cancelled so that a total of 1,158,572,686 Ant International Class C shares will be redeemed and the same number of H Shares will be issued to Taobao Holding Limited. Assuming the redemption and subscription arrangement described in "— Redemption and Subscription by Ant International Securities Holders" had been completed as of the Latest Practicable Date such that all the Ant International Class B shares and the Ant International Class C shares, including the Ant International Class C shares held by Taobao Holding Limited, are redeemed and the same number of H Shares are issued, Alibaba's equity interest through Hangzhou Alibaba and Taobao Holding Limited in our Company would be 33%. See "— Redemption and Subscription by Ant International Securities Holders" for further details. Pursuant to a Share Subscription Agreement for Strategic Investors dated September 21, 2020, Zhejiang Tmall Technology Co., Ltd. (浙江天貓技術有限公司), an indirect wholly-owned subsidiary of Alibaba, agreed to subscribe for 730,000,000 A Shares in the A Share IPO. Accordingly, Alibaba will be interested in an aggregate of 9,651,575,020 Shares through Hangzhou Alibaba, Taobao Holding Limited and Zhejiang Tmall Technology Co., Ltd. (浙江天貓技術有限公司) upon completion of the H Share Issuance and the A Share IPO.

(4)   BOCI Trustee (Hong Kong) Limited as trustee or nominee will hold 259,355,840 Ant International Class B shares immediately before the H Share Issuance. These Ant International Class B shares will be redeemed and the same number of H Shares will be subscribed for by and issued to BOCI Trustee (Hong Kong) Limited as trustee or nominee upon completion of the H Share IPO. See "— Redemption and Subscription by Ant International Securities Holders" for further details.

(5)   National Social Security Fund is a state-run investment fund established primarily to provide a fund reserve for China's social security system. The fund is managed by the National Council for Social Security Fund.

(6)   Zhifu (Shanghai) Investment Center (Limited Partnership) is a China-based limited partnership engaged in investment activities and managed by CICC Zhide Equity Investment Management Co., Ltd., an indirect wholly-owned subsidiary of China International Capital Corporation Limited, a company listed on the Hong Kong Stock Exchange (Stock Code: 3908).

(7)   Shanghai Qizhan Investment Center (Limited Partnership), Shanghai Zhongfu Equity Investment Management Center (Limited Partnership), Shanghai Jingyi Investment Center (Limited Partnership), Shanghai Qihong Investment Center (Limited Partnership) and Shanghai Yunfeng Xincheng Investment Center (Limited Partnership) are China-based limited partnerships engaged in investment activities and controlled by Shanghai Zhongfu Asset Management Center (Limited Partnership).

(8)   China Life Insurance (Group) Company is a state-owned financial and insurance company in China. China Life Insurance Co., Ltd., a company listed on the New York Stock Exchange (NYSE Ticker: LFC), the Shanghai Stock Exchange (Stock Code: 601628) and the Hong Kong Stock Exchange (Stock Code: 2628), is a subsidiary of China Life Insurance (Group) Company.

(9)   On January 23, 2015, Hangzhou Junhan transferred 4.61% of equity interest in our Company to Shanghai Qizhan Investment Center (Limited Partnership), a limited partnership established in China which focuses on private equity investment and is an independent third party. Part of the equity interest held by Shanghai Qizhan Investment Center (Limited Partnership) was subsequently transferred to other investors in the 2015 Equity Transactions.

(10)   Beijing Jingguan Investment Center (Limited Partnership) is a China-based limited partnership engaged in investment activities.

(11)   Hainan CCB Capital Conglin Fund Partnership (Limited Partnership) is a China-based limited partnership engaged in investment activities, the executive partners of which are CCB (Beijing) Investment Fund Management Co., Ltd. and Chunhua Jingshi Jingfu (Tianjin) Investment Management Partnership (Limited Partnership).

## HISTORY AND DEVELOPMENT

(12)  China Pacific Life Insurance Co., Ltd. is an insurance company in China. The majority shareholder of China Pacific Life Insurance Co., Ltd. is China Pacific Insurance (Group) Co., Ltd., a company listed on the Shanghai Stock Exchange (Stock Code: 601601), the Hong Kong Stock Exchange (Stock Code: 2601) and the London Stock Exchange (Stock Code: CPIC).

(13)  Beijing China Post Investment Center (Limited Partnership), a subsidiary of China Post Group Corporation Limited (China Post Group Co., Ltd.), is a China-based limited partnership engaged in investment activities.

(14)  PICC Capital Investment Management Co., Ltd. is a wholly-owned subsidiary of the People's Insurance Company (Group) of China Limited, a company listed on the Shanghai Stock Exchange (Stock Code: 601319) and the Hong Kong Stock Exchange (Stock Code: 1339).

(15)  New China Life Insurance Company Ltd. is an insurance company in China and is a company listed on the Shanghai Stock Exchange (Stock Code: 601336) and the Hong Kong Stock Exchange (Stock Code: 1336).

(16)  Shanghai Financial Sector Investment Fund II (I) (Limited Partnership) is a China-based limited partnership engaged in investment activities and controlled by Shanghai GP Financial Capital Co,. Ltd.

(17)  Beijing Innovative Growth Enterprises Management Co., Ltd is a China-based corporate management company and wholly-owned by China Development Innovation Capital Investment Co., Ltd., which is controlled by China Development Bank.

(18)  Chunhua Jingxin (Tianjin) Investment Center (Limited Partnership), Chunhua Jingxin Jingfu (Tianjin) Investment Center (Limited Partnership) and Chunhua Rongxin (Tianjin) Equity Investment Fund Partnership are China-based limited partnerships engaged in investment activities and managed by Chunhua Qiushi (Tianjin) Equity Investment Management Co., Ltd.

(19)  Suzhou Industrial Park Xinyuan Guangyi Investment Center (Limited Partnership) is previously known as Suzhou Industrial Park National Development Xinyuan Investment Center (limited Partnership). Suzhou Industrial Park Xinyuan Guangyi Investment Center (Limited Partnership) is a China-based limited partnership engaged in investment activities and managed by CDB Capital FOF Management Co., Ltd.

(20)  Beijing Qianshun Investment Co., Ltd. is a China-incorporated company engaged in investment activities and controlled by China Investment Corporation, a state-owned sovereign wealth fund.

(21)  The controlling shareholder and actual controller of China International Television Corporation is China Central Television, which is a public institution under the supervision of State Council of the PRC.

(22)  Beijing CICC Alpha V Equity Investment Partnership (Limited Partnership) is managed by Xinjiang CICC Alpha Equity Investment Management Co., Ltd., which is a wholly-owned subsidiary of CICC Alpha (Beijing) Investment Fund Management Co., Ltd., which is in turn a joint venture of CICC Capital Operations Co., Ltd., a wholly-owned subsidiary of China International Capital Corporation Limited, a company listed on the Hong Kong Stock Exchange (Stock Code: 3908).

(23)  Tohigh Capital Investment & Management Co., Ltd. is a China-incorporated company engaged in investment activities and is controlled by Tohigh Holdings Co., Ltd., a China-based conglomerate.

(24)  Tebon StarRay Co. Ltd. is a China-incorporated company engaging in investment activities and wholly-owned by Tebon Securities Co. Ltd., a securities firm.

(25)  Beijing Yingyi Internet Technology Co., Ltd., is a China-incorporated company engaging in investment activities and controlled by Shanghai Jukun Network Technology Co., Ltd.

(26)  Shanghai Shihong Investment Center (Limited Partnership) is a China-based limited partnership engaged in investment activities and managed by E fund overseas investment (Shenzhen) Co., Ltd.

(27)  Hainan CCB Capital Project Fund I Partnership is a China-based limited partnership engaged in investment activities and managed by CCB (Beijing) Investment Fund Management Co., Ltd.

(28)  Tetrad Ventures Pte Ltd. is a private limited company incorporated in Singapore. Tetrad Ventures Pte Ltd. is wholly-owned by GIC (Ventures) Private Limited and managed by GIC Special Investments Private Limited, which in turn is wholly-owned by GIC Private Limited ("GIC"). Gamnat Pte Ltd. is a private limited company incorporated in Singapore. Gamnat Pte Ltd. is wholly-owned by Eurovest Private Limited and managed by GIC Asset Management Private Limited, which in turn is wholly-owned by GIC.

## HISTORY AND DEVELOPMENT

(29)  Pantai Juara Investments Limited is a wholly-owned subsidiary of Khazanah Nasional Berhad ("Khazanah"). Khazanah is the sovereign wealth fund of Malaysia tasked with growing the long-term wealth of the nation. Khazanah invests in companies and assets across multiple sectors and geographies. Khazanah was incorporated under the Companies Act 1965 on 3 September 1993 as a public limited company. Except for one share owned by the Federal Lands Commissioner, all the share capital of Khazanah is owned by the Minister of Finance Incorporated, a body pursuant to the Ministry of Finance (Incorporation) Act 1957.

(30)  WP Capital Investment, L.P. is indirectly wholly-owned by private equity funds managed by Warburg Pincus LLC. Warburg Pincus LLC is a leading global private equity firm focused on growth investing.

(31)  Canada Pension Plan Investment Board ("CPP Investments") is a professional investment management organization that invests around the world in the best interests of the more than 20 million contributors and beneficiaries of the Canada Pension Plan.

(32)  SL Elephant Holdco Limited is an investment holding company incorporated under the laws of the Cayman Islands. SL Elephant Holdco Limited is controlled by its member, Silver Lake Partners V Cayman, L.P., which is controlled by its general partner, Silver Lake Technology Associates V Cayman, L.P., which is in turn controlled by its general partner, Silver Lake (Offshore) AIV GP V, Ltd., which is advised by Silver Lake Group, L.L.C. which is a global technology investment firm.

(33)  CA Fourmi Investments is wholly owned by CAP IV AIV Mauritius Limited, CAP IV Coinvest AIV Mauritius Limited and Carlyle Fourmi Co-Investment Limited (collectively, the "Funds"). The Funds are investment funds managed and advised by affiliated entities of the Carlyle Group Inc. ("Carlyle"). The Funds, by and through its control affiliates including their respective general partners, are ultimately controlled (directly or indirectly) by Carlyle, a public entity listed on Nasdaq (ticker symbol: CG).

(34)  Evans Investments Pte. Ltd. and Glittertind Investments Pte. Ltd. are wholly-owned entities of Temasek, which are used for investment holding activities. Temasek is an investment company with an investment portfolio covering a broad spectrum of industries, which include: financial services; telecommunications, media and technology; consumer and real estate; transportation and industrials; life sciences and agribusiness; and energy and resources.

(35)  General Atlantic Singapore Commander Pte. Ltd. is a private company limited by shares, incorporated under laws of Singapore. It is wholly-owned by General Atlantic Singapore Fund Pte. Ltd.

(36)  T. Rowe Price Associates, Inc. or T. Rowe Price Hong Kong Limited advised or subadvised these funds and accounts in respect of the 2018 Offshore Equity Financing. T. Rowe Price Associates, Inc. provides investment management services to mutual funds, pooled investment vehicles and individual and institutional accounts. For most clients, T. Rowe Price Associates, Inc. exercises investment discretion and has the authority to select securities consistent with clients' investment guidelines. T. Rowe Price Associates, Inc. is an investment advisor registered under the Investment Advisers Act of 1940, as amended and is a wholly-owned subsidiary of T. Rowe Price Group, Inc. (NASDAQ: TROW). T. Rowe Price Hong Kong Limited is an indirect wholly-owned subsidiary of T. Rowe Price Associates, Inc. Of such 89,126,559 Ant International Class C shares, 263,465 Ant International Class C shares were held by two accounts that were no longer advised by T. Rowe Price Associates, Inc. or T. Rowe Price Hong Kong Limited as of the Latest Practicable Date.

(37)  Giant Sports Limited, a company incorporated under the laws of the British Virgin Islands, is an investment holding company and a wholly-owned subsidiary of YF Fintech Fund I, L.P. Talent Science Limited, a company incorporated under the laws of the British Virgin Islands, is an investment holding company and a wholly-owned subsidiary of YF Fintech Fund II, L.P. The general partner of each of YF Fintech Fund I, L.P. and YF Fintech Fund II, L.P. is YF Fintech GP I, Ltd. Mr. Feng Yu is the sole shareholder of YF Fintech GP I, Ltd.

(38)  Anchor Innovation Limited is an investment company established in the Cayman Islands and advised by Janchor Partners Limited, a company licensed by the SFC to conduct asset management and a long-term industrialist investor.

(39)  Clouse S.A., for the account of its Compartment 41, is a public limited liability company existing under the laws of the Grand Duchy of Luxembourg as a securitization company.

(40)  Growth Succession Limited is wholly-owned by Boyu Capital Fund III, L.P., an exempted limited partnership registered in the Cayman Islands. Boyu Capital Fund III, L.P. is managed by Boyu Capital.

(41)  PV Orange Limited is owned by a Primavera Capital Group ("Primavera") managed investment partnership. Primavera is a leading China-based global investment management firm.

(42)  Such funds and accounts are managed by the investment subsidiaries of BlackRock, Inc. ("BlackRock"), which have investment management power over such funds and accounts. BlackRock is listed on the New York Stock Exchange (stock code: BLK).

## HISTORY AND DEVELOPMENT

**Shareholding Structure**

The following diagram illustrates the shareholding structure of our Group immediately prior to the completion of the H Share Issuance and the A Share IPO:



Notes:

(1)  Hangzhou Yunbo is the executive partner and general partner of both Hangzhou Junhan and Hangzhou Junao. Pursuant to the Concert Party Agreement dated August 21, 2020 and entered into among Mr. Jack Ma, Mr. Eric Jing, Mr. Simon Hu and Ms. Fang Jiang and the articles of association of Hangzhou Yunbo, Mr. Jack Ma can, through his control over resolutions passed at the general meetings of Hangzhou Yunbo which relate to the exercise of right by Hangzhou Junhan and Hangzhou Junao as Shareholders, effectively exercise control over the Shares held by Hangzhou Junhan and Hangzhou Junao and accordingly, has ultimate control over our Company. However, Mr. Jack Ma's indirect economic interest in our Company is limited to his interests as a limited partner of Hangzhou Junhan and the corresponding interests in the Shares held by Hangzhou Junhan.

(2)  As of the Latest Practicable Date, Alibaba, through Hangzhou Alibaba, its wholly-owned subsidiary, held 7,763,002,334 Shares and through Taobao Holding Limited, its wholly-owned subsidiary, held 1,171,508,767 Ant International Class C shares. Certain Ant International Class C shares held by Taobao Holding Limited will be surrendered and cancelled so that a total of 1,158,572,686 Ant International Class C shares will be redeemed and the same number of H Shares will be issued to Taobao Holding Limited. Assuming the redemption and subscription arrangement described in "— Redemption and Subscription by Ant International Securities Holders" had been completed as of the Latest Practicable Date such that all the Ant International Class B shares and the Ant International Class C shares, including the Ant International Class C shares held by Taobao Holding Limited, are redeemed and the same number of H Shares are issued, Alibaba's equity interest through Hangzhou Alibaba and Taobao Holding Limited in our Company would be 33%.

(3)  Ant International's Class A ordinary shares held by us are the only class of shares that have voting rights. Ant International also issued Ant International Class B shares to support our offshore employee incentives and Ant International Class C shares to the Offshore Pre-IPO Investors and Taobao Holding Limited. Ant International Class B shares and Ant International Class C shares have no voting rights.

## OUR BUSINESS

*Our Values*

Our values are fundamental to the way we operate and how we recruit, evaluate and compensate our people. Our six values are:

- **Customers first, employees second, shareholders third.** This reflects our choice of what's important in the order of priority. Only by creating sustained customer value can employees grow and shareholders achieve long-term benefit.

- **Trust makes everything simple.** Trust is both the most precious and fragile thing in the world. The story of Ant is a story of building and cherishing trust. Complexity begets complexity, and simplicity breeds simplicity. We are straightforward — what you see is what you get. With trust, there is no second-guessing or suspicion, and the result is simplicity and efficiency.

- **Change is the only constant.** Whether you change or not, the world is changing, our customers are changing and the competitive landscape is changing. We must face change with respect and humility. Otherwise, we will fail to see it, fail to respect it, fail to understand it and fail to catch up with it. Whether you change yourself or create change, both are the best kinds of change. Embracing change is the most unique part of our DNA.

- **Today's best performance is tomorrow's baseline.** In the company's most challenging times, this spirit has helped us overcome difficulties and survive. In bad times, we know how to motivate ourselves; in good times, we dare to set "dream targets" (stretch goals). Face the future, or we regress. We must shoot for the moon, challenge ourselves, motivate ourselves and exceed ourselves.

- **If not now, when? If not me, who?** This was a tagline in Alibaba's first job advertisement and became our first proverb. It is not a question, but a call of duty. This proverb symbolizes the sense of ownership that each employee must possess.

- **Live seriously, work happily.** Work is now, life is forever. What you do in your job is up to you, but you have responsibility to the ones who love you. Enjoy work as you enjoy life; treat life seriously as you do work. If you live with purpose, you will find reward.

**Who We Are**

We are the parent company of China's largest digital payment platform, Alipay, and the leader in the development of open platforms for technology-driven inclusive financial services. Through technology and innovation, we enable the digitalization of the modern service industry globally from financial services to services for everyday life. We are committed to working with partners in China and around the world to bring services to consumers and small businesses that are inclusive, green and sustainable. Our name is important to us. We call ourselves Ant because we believe that small is beautiful, small is powerful.

## OUR BUSINESS

We apply these capabilities to the three major areas of digital finance in China:

- ***CreditTech***, serving consumer credit and SMB credit needs. Our CreditTech services address the unmet credit demands of unserved and underserved consumers and small businesses in China. We openly collaborate with our partner financial institutions through our technology platform. We originate loans, which are then independently underwritten by our partner financial institutions. We generate technology service fees from our partner financial institutions that are based on the credit balance originated through our platform. Our approach is not to use our own balance sheet or provide guarantees. As of June 30, 2020, approximately 98% of credit balance originated through our platform was underwritten by our partner financial institutions or securitized.

  We were the largest online consumer credit and SMB credit services provider in China in terms of total outstanding credit balance originated, which totaled RMB1,732 billion for consumers and RMB422 billion for small businesses, as of June 30, 2020, according to Oliver Wyman. As of the same date, we worked with approximately 100 partner banks, including all policy banks, large national state-owned banks, all national joint stock banks, leading city and rural commercial banks, international banks that operate in China, as well as trust companies.

- ***InvestmentTech***, serving investment needs. Through our InvestmentTech services, we enable our partner asset managers to provide transparent, personalized and easy-to-understand investment options with low minimum investment amounts for a wide range of consumers. We leverage AI to provide intelligent matching of investment products with customers taking into account their risk tolerance. Our massive user base, technology, customer insights and the trust consumers place in our brand have helped our partner financial institutions to expand the reach of a broad range of innovative investment products to a wider customer segment. We generate technology service fees from our partner financial institutions that are based on the volume of investment products distributed through our platform.

  We were the largest online investment services platform in China by AUM matched and distributed, which totaled RMB4,099 billion as of June 30, 2020, according to Oliver Wyman. As of the same date, we worked with approximately 170 asset managers, including the vast majority of mutual fund companies as well as leading insurers, banks and securities companies in China.

- ***InsureTech***, serving insurance needs. Through our InsureTech services, we enable our partner insurers to offer a wide range of innovative, customized and accessible insurance products, covering life, health and P&C insurance areas. The ongoing digitalization of the economy presents transformative opportunities in the insurance sector, as any risk-bearing activity may be insured against where there is sufficient high-quality data. The massive scale and commercial nature of our platform and of the Alibaba ecosystem enable us to innovate and to develop new insurance products that address consumer and business needs. We receive technology service fees from our partner insurance institutions based on a percentage of the insurance premiums and contributions generated through our platform.

## OUR BUSINESS

***International Partners.*** We cooperate with a range of international partners, including e-wallets, merchant acquirers, banks and other third-party service providers. We have established partnerships with e-wallets across Asia, Europe and Africa. We bring our leading payment technology and risk management solutions to our e-wallet partners, enabling them to serve more merchants and consumers in an effective, secure and compliant way. We also partner with merchant acquirers, banks and other third-party service providers to extend our overseas coverage and bring our integrated payment and merchant service solutions to local markets.

### Digital Finance Technology Platform

We are the leading digital finance technology platform in China. We seek to meet the full range of credit, investment and insurance needs of our customers during the different stages of their lives, enabling us to serve them repeatedly and increase customer lifetime value. During the twelve months ended June 30, 2020, our platform had 729 million users who transacted in one or more of our digital finance services. The digital finance activity volume of Alipay users who had been with us since 2015 grew more than 10 times from 2015 to the twelve months ended June 30, 2020.

We empower our partner financial institutions with unparalleled insights, reach and capabilities through our services: CreditTech, InvestmentTech and InsureTech.

| Our Technology Services | Our Platform Scale | Our Partner Financial Institutions[1] | Our Market Position[2] |
|---|---|---|---|
| CreditTech | Consumer credit: RMB1,732 billion[3] | ~100 banks[4] | #1 |
| | SMB credit: RMB422 billion[3] | | #1 |
| InvestmentTech | AUM: RMB4,099 billion[5] | ~170 asset managers | #1 |
| InsureTech | Insurance premiums and contributions: RMB52 billion[6] | ~90 insurance institutions | #1 |

Notes:

(1)    As of June 30, 2020.

(2)    Market position in China according to Oliver Wyman, as measured by (i) consumer or SMB credit balance enabled as of June 30, 2020 for CreditTech, (ii) AUM enabled as of June 30, 2020 for InvestmentTech, and (iii) insurance premiums enabled in the twelve months ended June 30, 2020 for InsureTech.

(3)    Consumer or SMB credit balance enabled through our platform as of June 30, 2020, including balance of partner financial institutions (including MYbank) and our licensed financial services subsidiaries, as well as balance securitized.

(4)    In addition to banks, we also work with other partner financial institutions including trust companies.

(5)    AUM enabled through our platform as of June 30, 2020, including AUM of partner financial institutions and our licensed financial services subsidiary.

(6)    Insurance premiums enabled through our platform as well as contributions by Xianghubao participants during the twelve months ended June 30, 2020. Insurance premiums includes premiums of partner insurers and our licensed financial services subsidiary.

***Anticipating Needs through Intelligent Decisioning Systems***. Our intelligent decisioning systems, including our proprietary algorithms, use our unrivalled customer insights to anticipate customer needs and preferences. For example, the intelligent decisioning systems allow us to assess the likelihood of a potential borrower's ability and willingness to repay, to analyze the likelihood of a customer accepting a digital finance offer and to develop a user's risk profile to identify appropriate product features and pricing. As a result, our partner financial institutions can acquire customers, underwrite risks and distribute products more efficiently, while consumers and businesses have access to new digital finance products that are most suitable to meet their needs.

***Collaborative Risk Management with Financial Institutions***. We develop risk management solutions and risk-detection algorithms that enhance financial institutions' risk management decision-making. Our solutions and algorithms address the key risk components faced by financial institutions, including risks relating to KYC, fraud, AML, credit, liquidity, operations, security and data privacy. While leveraging our solutions, our partner financial institutions retain control over and responsibility for their risk management decisions.

## *CreditTech*

Credit is the lifeblood of economic development, allowing consumers and businesses to achieve their consumption and growth aspirations. Our goal is to address the unmet credit demands in China, particularly unserved and underserved consumers and small businesses. We provide technology services to partner financial institutions and enable them to deploy credit at scale.

Our CreditTech comprises innovative product development, customer reach, intelligent decisioning and dynamic risk management solutions. We were the largest online consumer credit and SMB credit services provider in China in terms of total outstanding credit balance enabled as of June 30, 2020, according to Oliver Wyman.

The rapid growth of our CreditTech services is largely driven by the massive credit demands of unserved and underserved consumers and small businesses in China, as well as consumers' increasing willingness to pay by credit to satisfy their rising consumption needs.

As of June 30, 2020, we partnered with approximately 100 banks, including all policy banks, large national state-owned banks, all national joint stock banks, leading city and rural commercial banks, international banks that operate in China, as well as trust companies. The loans originated on our platform are primarily independently underwritten by our partner financial institutions. Approximately 98% of the consumer and SMB credit balances enabled through our platform as of June 30, 2020 were underwritten by our partner financial institutions or securitized. We generate technology service fees from our partner financial institutions as a percentage of the interest income they earn on credit balance enabled through our platform.

### *CreditTech for Consumer Credit*



*Composition of Partner Financial Institutions*

Our technology services enable our partners to reach and serve new customers, grow their consumer credit business, improve credit performance of their loans and achieve superior economics. As a result, we have become the technology services partner of choice for banks in China. As of June 30, 2020, we partnered with a large number of leading banks in China which includes all policy banks, large national state-owned banks, all national joint stock banks, leading city and rural commercial banks, international banks that operate in China, as well as trust companies. Our partner banks contributed to the majority of the total consumer credit balance enabled through our platform as of the end of 2019 and the first half of 2020. We plan to continue to grow the number of our partner banks going forward.

We fund a small portion of the credit balance enabled through our platform through our small loan companies, Ant Shangcheng and Ant Small and Micro Loan, the substantial majority of which is subsequently sold through ABS. The majority of the ABS purchasers are banks and other licensed financial institutions. We choose to hold a small number of loans on our balance sheet primarily to innovate new products, expand into new categories of customers and in situations where we have a small co-lending arrangement with our partner banks. Consequently, the loans we hold on our balance sheet usually have higher credit costs than the loans we enable for partners. Other than the above, the products and services provided by Ant Shangcheng and Ant Small and Micro Loan are similar in nature to those provided by the third-party partner financial institutions.

As of June 30, 2020, total consumer credit balance enabled through our platform was RMB1,732 billion, 98% of which was underwritten by our partner financial institutions or securitized.

*Credit Monitoring, Servicing and Collection*

Once a loan is granted, we closely monitor the loan performance on a real-time basis.

We service loans enabled through our platform. The Alipay app sends out automatic repayment notifications to consumer borrowers. Most loans are set up for automated repayments from the borrowers' Alipay accounts. If a consumer fails to make a payment on a due date, we are contractually allowed to collect the principal and interest by directly deducting the amounts from the consumer's Alipay or Yu'ebao account balance, or from their linked debit cards.

We determine the priorities of our loan collection and the collection process based on the length of delinquency and other factors. The majority of our collection activities are conducted through automated digital processes such as payment reminder notifications in the Alipay app, text messages, voice messages or AI-initiated collection calls. If a loan remains overdue for a certain period, we typically outsource collection to third-party service providers to optimize collection efficiency. We carefully select third-party service providers and closely supervise them to ensure their collection processes comply with our internal policies and applicable laws and regulations.

Through our credit monitoring, servicing and collection activities, we gain additional analytical insights about credit trends and customers which allow us to continuously improve our intelligent decisioning solutions, credit risk management, underwriting processes and product capabilities.

(d) Subject to obtaining the approval of the Board and the Hong Kong Stock Exchange, we would then issue a notice to the H Share Registrar with instructions that, with effect from a specified date, our H Share Registrar is to issue the relevant holder with H Share certificates for such specified number of H Shares.

(e) The specified number of A Shares to be registered on the H Share register maintained in Hong Kong on the conditions that:

(i) our H Share Registrar lodges with the Hong Kong Stock Exchange a letter confirming the proper entry of the relevant H Shares on the H Share register and the due dispatch of H Share certificate; and

(ii) the admission of the H Shares (as the result of the registration of A Shares as H shares) to trade in Hong Kong will comply with the Hong Kong Listing Rules and the General Rules of CCASS and the CCASS Operational Procedures in force from time to time.

(f) Upon completion of the listing of A Shares on the Hong Kong Stock Exchange as H Shares, the shareholding of the relevant holder of A Shares in our A Share register will be reduced by such number of A Shares and the number of H Shares in our H Share register will correspondingly be increased by the same number of H Shares.

(g) We will comply with the Hong Kong Listing Rules to inform our Shareholders and the public by way of an announcement of such fact not less than three days prior to the proposed effective date of such conversion and transfer.

## Lock-up Undertakings

The following lock-up undertakings have been given by our existing Shareholders pursuant to applicable laws and regulations.

### Lock-up Undertakings pursuant to applicable PRC laws and regulations

#### *Hangzhou Junhan and Hangzhou Junao*

• Pursuant to applicable PRC laws and regulations, each of Hangzhou Junhan and Hangzhou Junao has undertaken, (a) not to transfer any H Shares held by it as the result of the registration of Domestic Shares as H shares immediately prior to completion of the H Share IPO during the period of 12 months from the H Share Listing Date; and (b) not to transfer, or entrust to others, or propose any repurchase by our Company of, any Domestic Shares held by it immediately prior to completion of the A Share IPO during the period of 36 months from the A Share Listing Date. If the closing price of our A Shares is lower than the offer price of our A Share for 20 consecutive trading days within a period of 6 months from the A Share Listing Date, or if the closing price of our A Shares on the date of expiry of the 6-month period from the A Share Listing Date is lower than the offer price of our A Share, the lock-up period stipulated in (b) will be extended to 42 months.

# SUBSTANTIAL SHAREHOLDERS

| Name of Shareholder | Nature of interest | Number and class of Shares held | Approximate percentage of shareholding in the relevant class of Shares immediately after the completion of the H Share Issuance and the A Share IPO (assuming the Over-allotment Options are not exercised) | Approximate percentage of shareholding in the total share capital of our Company immediately after the completion of the H Share Issuance and the A Share IPO (assuming the Over-allotment Options are not exercised) |
|---|---|---|---|---|
| Taobao (China) Software Co, Ltd. (淘寶(中國)軟件有限公司)[3] | Interest in controlled corporation | 1,600,000,000 H Shares | 22.9% | 5.3% |
| | Interest in controlled corporation | 6,163,002,334 A Shares | 26.4% | 20.3% |
| Hangzhou Tongxin Network Technology Co., Ltd. (杭州同欣網絡技術有限公司)[3] | Interest in controlled corporation | 1,600,000,000 H Shares | 22.9% | 5.3% |
| | Interest in controlled corporation | 6,163,002,334 A Shares | 26.4% | 20.3% |
| Hangzhou Alibaba[3] | Beneficial owner | 1,600,000,000 H Shares[5] | 22.9% | 5.3% |
| | Beneficial owner | 6,163,002,334 A Shares[5] | 26.4% | 20.3% |

Notes:

(1)    Hangzhou Junhan and Hangzhou Junao are two limited partnerships established under the laws of the PRC. They are controlled by Hangzhou Yunbo as their executive partner and general partner.

The direct and indirect limited partners of Hangzhou Junhan and Hangzhou Junao are certain existing and former senior management and employees of our Group and Alibaba. These direct or indirect limited partners of Hangzhou Junhan and Hangzhou Junao have no control or voting power over the Shares held by Hangzhou Junhan or Hangzhou Junao. None of them has any interests in the Shares that would fall to be disclosed pursuant to the provisions of Divisions 2 and 3 of Part XV of the SFO. Each of these direct and indirect limited partners (other than Mr. Jack Ma, Mr. Eric Jing, Mr. Simon Hu and Ms. Fang Jiang) is not, and together as a group they are not, Controlling Shareholders of the Company under the Hong Kong Listing Rules.

## SUBSTANTIAL SHAREHOLDERS

The table below sets out the cumulative contribution by the partners of Hangzhou Junhan and Hangzhou Junao and the economic interests of the direct and indirect limited partners (who hold their economic interests through other limited partnerships) of Hangzhou Junhan and/or Hangzhou Junao as represented by the corresponding number of Shares:

| Name of partner | Subscribed capital contribution (in RMB millions)[Note b] | Economic interests represented by number of Shares (in millions)[Note c] |
|---|---|---|
| **General partner** | | |
| Hangzhou Yunbo[Note a] | 20 | 4,981 |
| | | |
| **Limited partners** | | |
| Jack Yun MA (馬雲) | 20 | 2,677 |
| Lucy Lei PENG (彭蕾) | 2,077 | 504 |
| Eric Xiandong JING (井賢棟) | 2,184 | 303 |
| Zhaoxi LU (陸兆禧) | 52 | 230 |
| Xiaofeng SHAO (邵曉鋒) | 51 | 228 |
| Trudy Shan DAI (戴珊) | 48 | 189 |
| Eddie Yongming WU (吳泳銘) | 48 | 189 |
| Judy Wenhong TONG (童文紅) | 45 | 180 |
| Daniel Yong ZHANG (張勇) | 44 | 175 |
| Shuai WANG (王帥) | 42 | 167 |
| Yijie PENG (彭翼捷) | 33 | 164 |
| Simon Xiaoming HU (胡曉明) | 2,145 | 161 |
| Jian WANG (王堅) | 40 | 157 |
| Luyuan FAN (樊路遠) | 584 | 147 |
| Sara Siying YU (俞思瑛) | 35 | 140 |
| Maggie Wei WU (武衛) | 35 | 137 |
| Jianhang JIN (金建杭) | 33 | 131 |
| Li CHENG (程立) | 233 | 127 |
| Ming ZENG (曾鳴) | 29 | 115 |
| Fang JIANG (蔣芳) | 25 | 97 |
| Zhenfei LIU (劉振飛) | 25 | 97 |
| Yu ZHANG (張宇) | 24 | 94 |
| Sophie Minzhi WU (吳敏芝) | 23 | 92 |
| Peng JIANG (姜鵬) | 22 | 86 |
| Jeff Jianfeng ZHANG (張建鋒) | 20 | 80 |
| Xingjun NI (倪行軍) | 563 | 44 |
| Ying ZHAO (趙穎) | 563 | 44 |
| Songbai ZENG (曾松柏) | 522 | 33 |
| Jingxian CAI (蔡景現) | 352 | 28 |
| Yongxin FANG (方永新) | 352 | 28 |
| Lijun SUN (孫利軍) | 352 | 28 |
| Jessie Junfang ZHENG (鄭俊芳) | 352 | 28 |
| Yongfu YU (俞永福) | 352 | 28 |
| Winnie Jia WEN (聞佳) | 382 | 22 |
| Zeming WU (吳澤明) | 382 | 22 |
| Simon Shihuang XIE (謝世煌) | 5 | 20 |
| Lei WANG (王磊) | 243 | 14 |
| Jiangwei JIANG (蔣江偉) | 388 | 11 |
| Jie SONG (宋潔) | 388 | 11 |
| Cyril Xinyi HAN (韓歆毅) | 70 | 6 |
| **Total** | **13,204** | **12,012** |

## SUBSTANTIAL SHAREHOLDERS

Notes:

a.  Hangzhou Yunbo is not entitled to any economic interest derived from the Shares held by Hangzhou Junhan and Hangzhou Junao. As general partner and executive partner of Hangzhou Junhan and Hangzhou Junao, Hangzhou Yunbo has the right to direct the allocation of economic interests derived from the Shares held by Hangzhou Junhan and Hangzhou Junao and any transfer of economic interests by limited partners is subject to the approval of Hangzhou Yunbo. Such allocation includes economic interests to be donated in the future to charitable organizations designated by Mr. Jack Ma (representing 611,337,334 underlying Shares), economic interests attached to share economic rights (including economic interests attached to post-listing employee incentives in the future), economic interests for future limited partners of Hangzhou Junhan and Hangzhou Junao and economic interests that may be used for other future charitable donations.

b.  Refers to the cumulative amounts of capital subscribed by direct and indirect partners of Hangzhou Junhan and Hangzhou Junao as registered with the local counterparts of the State Administration for Market Regulation ("SAMR"). The subscribed capital of limited partners was determined with reference to the fair value of the Shares and such partners' entitlement to the economic interests that are represented by the number of Shares when they joined as partners. The fair value of the Shares varied over time; and partners' entitlement varies as to the economic interests that are represented by the number of Shares. As such, the amount of capital subscribed by a partner as registered with SAMR does not directly correlate to such partner's economic interests derived from the Shares; and such amount of subscribed capital as a percentage of the total amounts of subscribed capital by all partners does not directly correlate to such partner's economic interests as a percentage of the total economic interests derived from the Shares held by Hangzhou Junhan and Hangzhou Junao.

c.  Refers to economic interests of direct and indirect limited partners as determined by limited partner interests that are represented by number of Shares. According to the Law of the People's Republic of China on Partnerships, the economic interests of partners in a partnership shall be determined by agreement among the partners. The economic interests of the direct and indirect partners of Hangzhou Junhan and Hangzhou Junao derived from the Shares held by Hangzhou Junhan and Hangzhou Junao are determined by their limited partner interests that are represented by specified numbers of Shares.

(2)  Hangzhou Yunbo is held as to 34%, 22%, 22% and 22% by Mr. Jack Ma, Mr. Eric Jing, Mr. Simon Hu and Ms. Fang Jiang, respectively. Mr. Jack Ma, Mr. Eric Jing, Mr. Simon Hu and Ms. Fang Jiang entered into the Concert Party Agreement on August 21, 2020. Pursuant to such agreement and the articles of association of Hangzhou Yunbo, Mr. Jack Ma can, through his control over resolutions passed at the general meetings of Hangzhou Yunbo which relate to the exercise of right by Hangzhou Junhan and Hangzhou Junao as Shareholders, effectively exercise control over the Shares held by Hangzhou Junhan and Hangzhou Junao and accordingly, has ultimate control over our Company. However, although Mr. Jack Ma has control over the Shares held by Hangzhou Junhan and Hangzhou Junao, Mr. Jack Ma's indirect economic interests in our Company is limited to his interests as a limited partner of Hangzhou Junhan and the corresponding interests in the Shares held by Hangzhou Junhan. As such, each of Mr. Jack Ma, Mr. Eric Jing, Mr. Simon Hu and Ms. Fang Jiang is deemed to be interested in the H Shares and A Shares in which Hangzhou Junhan and Hangzhou Junao are interested. See "Relationship with Controlling Shareholders — Our Controlling Shareholders" of this prospectus for details.

(3)  Hangzhou Alibaba is wholly-owned by Hangzhou Tongxin Network Technology Co., Ltd. (杭州同欣網絡技術有限公司), a wholly-owned subsidiary of Taobao (China) Software Co, Ltd. (淘寶(中國)軟件有限公司). Taobao (China) Software Co, Ltd. (淘寶(中國)軟件有限公司) is in turn wholly-owned by Taobao China Holding Limited, a wholly-owned subsidiary by Taobao Holding Limited. Alibaba owns the entire issued share capital of Taobao Holding Limited. As a result, each of Alibaba, Taobao Holding Limited, Taobao China Holding Limited, Taobao (China) Software Co, Ltd. (淘寶(中國)軟件有限公司) and Hangzhou Tongxin Network Technology Co., Ltd. (杭州同欣網絡技術有限公司) is deemed to be interested in the same number of H Shares and A Shares held by Hangzhou Alibaba, and Alibaba is deemed to be interested in the same number of H Shares held by Taobao Holding Limited.

We conduct our business primarily in the PRC and therefore are required to comply with a variety of PRC laws, rules and regulations across a number of aspects of our business. This section summarizes the principal laws, rules and regulations applicable to our business and operations, primarily those of the PRC, because the PRC remains the country where we conduct the substantial majority of our business and generate the substantial majority of our revenues.

We offer a wide variety of services on our platform, and a wide array of information is disseminated on our platform. Accordingly, we are subject to various laws and regulations on (i) telecommunications and Internet information services (including those related to value-added telecommunication services, cybersecurity and data security, information compliance and privacy protection and anti-fraud), (ii) AML and anti-terrorism financing, (iii) consumer protections, (iv) digital payment and merchant services, (v) digital finance technology platform, and (vi) innovation initiative business.

**Regulations on Telecommunications and Internet Information Services**

Our telecommunications and Internet information services are primarily regulated by the MIIT and the Cyberspace Administration of China (the "CAC").

*Licenses for Value-added Telecommunications Services*

The Telecommunications Regulations of the PRC (《中華人民共和國電信條例》) (the "Telecommunications Regulations"), promulgated by the State Council on September 25, 2000 and last amended with immediate effect on February 6, 2016, provide the regulatory framework for telecommunications service providers in the PRC. The Telecommunications Regulations require telecommunications service providers to obtain an operating license prior to commencing their operations. The Telecommunications Regulations categorize telecommunications services into basic telecommunications services and value-added telecommunications services. Providers of value-added telecommunications services are required to obtain a license for value-added telecommunications services (the "VATS License"). According to the Catalog of Telecommunications Services (《電信業務分類目錄》), attached to the Telecommunications Regulations, which was last amended by the MIIT with immediate effect on June 6, 2019, information services provided via fixed network, mobile network and Internet fall within value-added telecommunications services. Our Alipay platform, through which we provide our digital finance technology platform, digital daily life services and digital merchant services, is classified as value-added telecommunications services.

The Administrative Measures for the Licensing of Telecommunications Business (《電信業務經營許可管理辦法》) (the "Telecom Licensing Measures") were promulgated by the MIIT on July 3, 2017 and came into effect on September 1, 2017. The Telecom Licensing Measures provide that there are two types of telecommunications operating licenses for operators in the PRC, namely, the license for basic telecommunications services and the VATS License. Telecommunications service providers should apply for a license, which will set out the licensed activities. A licensed value-added telecommunications service provider should conduct its business in accordance with the specifications of its VATS License which has a term of five years and can be renewed 90 days prior to the expiration of the term.

**APPENDIX IV**                                                      **REGULATIONS**

As a subcategory of the value-added telecommunications services, Internet information services are regulated by the Administrative Measures for Internet Information Services (《互聯網信息服務管理辦法》) (the "Internet Information Measures"), which were promulgated by the State Council on September 25, 2000 and amended with immediate effect on January 8, 2011. "Internet information services" are defined as services that provide information to online users through the Internet. Under the Internet Information Measures, commercial Internet information service providers are required to obtain an Internet information services license, from the MIIT or its provincial counterpart before engaging in any commercial Internet information services operations within the PRC. An Internet information services provider should conduct its business in accordance with the specifications approved by the competent authorities.

On June 28, 2016, the CAC promulgated the Administrative Provisions on Mobile Internet Applications Information Services (《移動互聯網應用程序信息服務管理規定》) (the "APP Provisions"), which became effective on August 1, 2016. Under the APP Provisions, mobile application providers are prohibited from engaging in any activity that may endanger national security, disturb social order, or infringe the legal rights of third parties, and may not produce, copy, issue or disseminate through Internet mobile applications any content prohibited by laws and regulations.

***Regulations on Cybersecurity and Data Security***

The Cybersecurity Law of the PRC (《中華人民共和國網絡安全法》) (the "Cybersecurity Law"), was promulgated by the Standing Committee of the National People's Congress on November 7, 2016 and came into effect on June 1, 2017. The Cybersecurity Law defines "networks" as systems comprised of computers or other information terminals and relevant facilities used for the purpose of collecting, storing, transmitting, exchanging and processing information in accordance with certain rules and procedures. "Network operators," which are broadly defined as owners and administrators of networks and network service providers, are required to take steps to ensure cybersecurity, network stability, to respond effectively security breaches, to guard against Internet crimes, and to maintain data integrity, confidentiality, and availability, including:

- complying with security obligations in accordance with tiered system protection requirements, which include formulating internal security management rules and manuals, appointing personnel responsible for cybersecurity, adopting technical measures to prevent computer viruses and cybersecurity endangering activities, adopting technical measures to monitor and record the status of network operation and cybersecurity events, retaining user logs for at least six months and adopting measures such as data classification, key data backup and encryption for the purpose of securing networks from interference, damage, or unauthorized visits, and preventing against leakage, theft or tampering of network data;

- verifying users' identities before entering into agreements or providing services such as network access, domain name registration, landline telephone or mobile phone access, information publishing or real-time communication services;

- formulating cybersecurity emergency response plans, timely handling security risks, initiating emergency response plans, taking appropriate remedial measures and reporting to regulatory authorities; and

- providing technical assistance and support to public security and national security authorities for protection of national security and criminal investigations in accordance with law.

According to the Cybersecurity Law, network operators must inform users about and report to the relevant authorities any known security defects and bugs, and must provide continuous security maintenance for their products and services. Network products should not contain any malware. Network service providers that do not comply with the Cybersecurity Law may be subject to fines, suspension of their businesses, shutdown of their websites, and revocation of their business licenses.

Under the Several Provisions on Regulating the Market Order of Internet Information Services (《規範互聯網信息服務市場秩序若干規定》) issued by the MIIT on December 29, 2011, which became effective on March 15, 2012, Internet information service providers are prohibited from collecting any personal data or providing any information to third parties without user consent unless the information is anonymous, not personally identifiable and unrecoverable. Internet information service providers must expressly inform their users of the methods, scope and purposes of collecting and processing user personal data and may only collect information necessary for provision of its services. Internet information service providers are also required to properly store user personal data, and in case of any leak or likely leak, Internet information service providers must report any material leak to the telecommunications regulatory authorities and take remedial measures immediately to improve system security and safeguard information uploaded by users.

Aside from the above regulations, Internet information service providers are guided by the Guidelines for Internet Personal Data Security Protection (《互聯網個人信息安全保護指南》) (the "Personal Data Security Guideline") issued by the Ministry of Public Security of the PRC and two other agencies on April 10, 2019. The Personal Data Security Guideline is non-binding standards and guidelines. The Personal Data Security Guideline applies to "personal data holders," defined as entities or individuals that control and process personal data through their provision of services using the Internet, private networks, or offline, and requires personal data holders to establish a personal data administrative control system, implement technical safeguards and protect personal data during their business processes.

***Regulations on Information Compliance and Privacy Protection***

The Cybersecurity Law requires network operators to abide by the principles of legality, appropriateness and necessity when collecting or using personal data. Network operators are prohibited from leaking, tampering with or damaging collected personal data, and they should adopt technical and other necessary measures to ensure security of personal data, safeguard against information leakage, damage or loss, improve information management with respect to data published by users and establish complaint and reporting mechanisms with respect to network data security.

In addition, the Decision on Strengthening Network Information Protection (《關於加強網絡信息保護的決定》), promulgated by the Standing Committee of the National People's Congress on December 28, 2012 with immediate effect, emphasizes the need to protect electronic information that contains personally identifiable information and other private data. This decision requires Internet information service providers to establish and publish policies regarding the collection and use of personal electronic information and to take necessary measures to ensure information security and to prevent any information leakage, damage or loss. Furthermore, the MIIT's Rules on the Protection of Personal Data of

**APPENDIX IV**                                                    **REGULATIONS**

Telecommunications and Internet Users (《電信和互聯網用戶個人信息保護規定》), which were promulgated on July 16, 2013 and came into effect on September 1, 2013, contain detailed requirements on the collection and use of personal data as well as the security measures to be taken by Internet information service providers. "Personal data" include the user's name, birth date, identification card number, address, phone number, account name, password and other information that can be used for identifying a user. The collection and provision of user personal data by Internet information service providers are subject to user consent and should abide by the principles of legality, appropriateness and necessity and be within the specified methods, scope and purposes that are required to be published by such Internet information service providers. Internet information service providers should safeguard users' personal data against any leakage, damage, tampering or loss and assess data security at least once a year. Internet information service providers should also provide their staff with knowledge and skills training on personal data protection and related liabilities.

The Law on the Protection of Consumers' Rights and Interests of the PRC (《中華人民共和國消費者權益保護法》) also provides principles of legality, appropriateness and necessity for collecting or using consumers' personal data. See "— Regulations on Consumer Protections" for details. In addition, the PBOC issued the Implementing Measures for Protection of Consumers' Rights and Interests (《中國人民銀行金融消費者權益保護實施辦法》) on September 15, 2020 (the "Measures for Protection of Financial Consumers"), which will come into effect on November 1, 2020 and replace a similar regulation in 2016. Under the Measures for Protection of Financial Consumers, banks and payment institutions shall follow the principles of willingness, equality, fairness and good faith, and protect the legitimate rights and interests of consumers of financial products and services when providing financial products or services to such consumers. Banks and payment institutions are required to establish and improve various internal control rules and full-process control mechanisms for the protection of consumers' rights and interests, provide suitable financial products or services to eligible consumers, respect consumers' dignity, ethnic customs and traditions as well as intention to purchase financial products or services, protect the rights of financial consumers to fair trading and independent choice, and regulate their marketing and publicity activities. The Measures for Protection of Financial Consumers also specify various requirements on banks and payment institutions to protect consumers' financial information, including requirements on the collection, disclosure, notification, use, management, storage and confidentiality of such information.

Internet information service providers may be subject to criminal penalty for failure to protect personal data. The Amendment IX to the Criminal Law of the PRC (《中華人民共和國刑法修正案(九)》) (the "Amendment IX"), which was promulgated by the Standing Committee of the National People's Congress on August 29, 2015 and came into effect on November 1, 2015, provides that selling or providing personal data in violation of laws and regulations is publishable by up to seven years' imprisonment.

In providing our services, we collect certain personal data from users primarily for the purpose of credit assessment and enhancing user experience. We have obtained consent from users to collect and use their personal data, and have also established data security systems to protect user information and abide by other network security requirements under such laws and regulations. However, there is uncertainty as to how the requirements for maintaining network security and protecting users' personal data will be interpreted and implemented. We cannot assure you that our existing policies and procedures will be deemed to be in full compliance with any laws and regulations that are applicable, or may become applicable, to us in the future. We may be subject to penalties for any violation of such laws and regulations.

*Anti-fraud Regulations*

The Notice of the MIIT on Further Preventing and Combating Telecommunications Fraud (《工業和信息化部關於進一步做好防範打擊通訊信息詐騙相關工作的通知》), which was promulgated by the MIIT with immediate effect on December 31, 2015, requires providers of value-added telecommunications services such as search engine, e-commerce platform, app store and social media platform to clean up "caller ID spoofing" software, which causes a caller ID display showing a phone number different from that of the telephone from which the call was placed, from their platforms. Platforms are required to take steps, such as blocking keywords and downloads, to stem the spread of such software. The Implementation Opinions of the MIIT on Further Preventing and Combating Telecommunications Fraud (《工業和信息化部關於進一步防範和打擊通訊信息詐騙工作的實施意見》), which were promulgated by the MIIT with immediate effect on November 17, 2016, reemphasizes the requirements to clean up "caller ID spoofing" software and requires value-added telecommunications service providers to improve personal data protection.

*Regulations on Foreign Investment*

Foreign direct investment in telecommunications companies in the PRC is primarily governed by the Administrative Provisions on Foreign-Invested Telecommunications Enterprises (《外商投資電信企業管理規定》), which were promulgated by the State Council on December 11, 2001 and last amended with immediate effect on February 6, 2016. These regulations provide the foreign investors may acquire up to 50% of the equity interests of foreign invested value-added telecommunications enterprises in the PRC, unless otherwise provided under applicable laws and regulations. In addition, the primary foreign investor must demonstrate a good track record and experience in operating a value-added telecommunications business. Moreover, foreign investors that meet these requirements must obtain approvals from the MIIT and the MOFCOM (or its authorized local counterparts) for conducting value-added telecommunications business in the PRC.

*Policies related to Internet Industry*

The Internet industry benefits from a series of policies that are designed to promote and regulate the industry's development.

The Decision of the State Council on Accelerating the Cultivation and Development of Strategic Emerging Industries (《國務院關於加快培育和發展戰略性新興產業的決定》), which was issued by the State Council on October 10, 2010 with immediate effect, encourages innovation and calls for developing emerging industries that have strategic value into the leading industries and pillar industries of the national economy. The decision also promotes strengthening service capabilities related to software services, Internet value-added services and other information services, accelerating intelligent upgrades to critical infrastructure facilities, and developing digital and virtual technologies as well as cultural and creative industries.

The Guidelines of the State Council on Promoting the Orderly and Healthy Development of the Internet of Things (《國務院關於推進物聯網有序健康發展的指導意見》), which were issued by the State Council on February 5, 2013 with immediate effect, promotes integrating IoT with technologies such as the next generation of mobile communication, cloud computing, the next generation of Internet and satellite communication. These guidelines also encourage exploring new cooperation models to achieve mutual benefits among upstream and downstream businesses along the IoT industry chain, support

businesses to develop IoT services and value-added services that can grow market demand and promote the commercialization of application services. In addition, pursuant to these guidelines, China will develop the service outsourcing industry and foster emerging services industries.

The Opinions of the State Council on Promoting the Innovative Development of Cloud Computing and Cultivating New Business Forms of the Information (《國務院關於促進雲計算創新發展培育信息產業新業態的意見》), which were issued by the State Council on January 6, 2015 with immediate effect, support integrating cloud computing with technologies and services such as IoT, mobile Internet, Internet finance and e-commerce and innovative applications thereof. The opinions also encourage cultivating new business formats and models, sharing platform resources by large businesses and building a mutually beneficial ecosystem for cloud computing services.

The Guidelines of the State Council on Vigorously Advancing the "Internet +" Action Plan (《國務院關於積極推進"互聯網+"行動的指導意見》) (the "Internet + Guidelines"), which were issued by the State Council on July 1, 2015 with immediate effect, encourage large Internet companies and basic telecommunication operators to leverage their technology and integration capabilities and promote small businesses and startups through:

- opening resources such as platform access, data and computing capacity;

- providing research and development tools, and support and services related to operations and marketing;

- increasing digitalization of small businesses; and

- fostering startups with promising commercial models.

These guidelines also promote the orderly development of the Internet finance industry, which improves the industry's service capabilities and degree of inclusion, and aim to foster influential innovators in the industry by encouraging businesses to offer innovative Internet-based banking, securities, insurance and fund products and services to satisfy distinct finance and investment demands of the real economy.

The Outline of the 13th Five-Year Plan for the National Economic and Social Development of the People's Republic of China (《中華人民共和國國民經濟和社會發展第十三個五年規劃綱要》) (the "13th Five-Year Plan Outline"), which was published by the National People's Congress on March 16, 2016 with immediate effect, supports, among other things, the development of new generation information technology and digital innovation. Pursuant to this outline, China will implement the "Internet +" initiative and promote wider application of Internet, which in turn drives the transformation of production models and the formation of a new pattern of industrial development that is Internet-based, intelligent, service-oriented, and coordinated. In addition, China will accelerate efforts to promote innovations in Internet-based business models, service models, management models, supply chains, and logistics chains, cultivate the "Internet +" ecosystem, as well as ensure the formation of a new pattern of Internet-based collaboration and division of work.

The Circular of the State Council on Issuing the 13th Five-Year National Plan for the Development of Strategic Emerging Industries (《"十三五"國家戰略性新興產業發展規劃》), which was issued by the State Council on November 29, 2016 with immediate effect, sets out additional policy support for the Internet industry. Pursuant to this circular, China will implement Internet power strategy, accelerate building "Digital China" and promote the

application and penetration level of technologies such as IoT, cloud computing and AI, with the aim of forming a new generation of the information technology industry that is connected, innovative, intelligent, collaborative, secured and controllable. In addition, China will carry out the "Internet +" action plan that is designed to promote the integration of the new generation of information technology with the economy and society, which entails the integration of technologies such as mobile Internet, cloud computing and IoT with agriculture, energy, finance, commerce and logistics and the integration of Internet with manufacturing. The concept contemplated in the "Internet +" action plan will be applied to areas of daily life and public services, which drives services related to healthcare, education, social security, employment, transportation and tourism becoming smart.

The 13th Five-Year National Plan for Informatization (《"十三五"國家信息化規劃》), which was issued by the State Council on December 15, 2016 with immediate effect, encourages Internet-based innovations and promotes the establishment of a digital market system that is fair, transparent, open, trusting and inclusive. The plan reiterates the "Internet +" action plan. Pursuant to this plan, China will promote the development and integration of new generation information technologies such as broadband network, mobile network, IoT, cloud computing, big data, and triple play as well as the orderly development of Internet finance and financial information services.

The Opinions on Promoting the Sound and Orderly Development of the Mobile Internet (《關於促進移動互聯網健康有序發展的意見》) (the "Mobile Internet Opinions"), which were issued by the Central Committee of the Communist Party of China and the State Council in January 2017 with immediate effect, provide more detail on the policy support for mobile Internet. In particular, these opinions aim to foster and regulate the newly emerged sharing economies such as mobile Internet-based ridesharing, property leasing and payment.

The Notice on Further Development of the Mobile Internet of Things (《關於深入推進移動物聯網全面發展的通知》), which was issued by the MIIT on April 30, 2020 with immediate effect, provides policy support for the development of mobile IoT. Pursuant to this notice, China will increase the application of mobile IoT in areas such as manufacturing, storage and logistics, smart agriculture and smart healthcare as part of the industry digitalization, which will improve data collection and production efficiency.

**Regulations on Anti-Money Laundering and Anti-Terrorism Financing**

AML and anti-terrorism financing obligations applicable to our digital payment services, our various licensed financial services subsidiaries, our associates and our partner financial institutions are primarily regulated by the PBOC. The CSRC and the CBIRC also have regulatory authority in this regard pursuant to their statutory mandate.

The Anti-Money Laundering Law of the PRC (《中華人民共和國反洗錢法》) (the "AML Law") was promulgated by the Standing Committee of the National People's Congress of on October 31, 2006 and came into effect on January 1, 2007. The AML Law sets out the legal framework for the AML regime, providing that financial institutions should comply with various AML requirements, including establishing an internal control system and designating an internal department to monitor and control money laundering actives. The Provisions on Anti-Money Laundering for Financial Institutions (《金融機構反洗錢規定》), which were promulgated by the PBOC on November 14, 2006 and came into effect on January 1, 2007, provide that the PBOC is the supervisory body for financial institutions' compliance with anti-money laundering requirements and sets out the PBOC's responsibilities on AML supervision and regulation. The Provisions also implement the

**APPENDIX IV**                                                    **REGULATIONS**

AML Law by setting out detailed requirements for financial institutions including the establishment of a sound internal control system, client identification system and record-keeping system for client identification information and transaction information and the reporting of large-value or suspicious transactions.

The PBOC's supervisory measures are further specified in the Anti-money Laundering Supervisory Measures for Finance Institutions (Provisional) (《金融機構反洗錢監督管理辦法(試行)》) (the "AML Supervisory Measures"), which were promulgated by the PBOC with immediate effect on November 15, 2014. The AML Supervisory Measures provide that financial institutions are required to have designated officers periodically report AML activities and related information to the PBOC or its local counterparts, which should truthfully reflect reporting entities' AML practice. the PBOC can conduct onsite and offsite inspections of financial institutions' compliance with AML requirements.

The Implementation Measures on the Anti-money Laundering by Securities and Futures Industry (《證券期貨業反洗錢工作實施辦法》) which took effect on October 1, 2010, further specifies the AML regulations for the securities and futures industry, as well as the AML responsibilities of the institutions engaging in sales of funds in their business operation. Securities and futures entities shall establish internal control systems for AML.

The requirements for client identification system and record-keeping system for client identification information and transaction information is further specified in the Measures on Administration of Identification of Clients and Preservation of Client Identity Information and Trading Records of Financial Institutions (《金融機構客戶身份識別和客戶身份資料及交易記錄保存管理辦法》), which were jointly issued by the PBOC, the CSRC and the former China Banking Regulatory Commission and the former China Insurance Regulatory Commission on June 21, 2007, and came into effect on August 1, 2007, as well as the PBOC's Notice on Strengthening the Client Identification for Anti-money Laundering (《中國人民銀行關於加強反洗錢客戶身份識別有關工作的通知》), which was promulgated by the PBOC on October 20, 2017 with immediate effect.

The reporting obligations are provided for in more detail in a series of measures and circulars published by the PBOC, including the Large-value Transactions and Suspicious Transactions Reporting Measures for Financial Institutions (《金融機構大額交易和可疑交易報告管理辦法》), which were initially promulgated on November 14, 2006 and last amended with immediate effect on July 26, 2018 by the PBOC. These measures detail the implementing measures for reporting large-value transactions and suspicious transactions by financial institutions, including, among other things, reporting standards, requirements for sound internal control and monitoring system, requirements for designated positions for AML, and obligations to monitor watch lists of suspected terrorist organizations and individuals.

Aside from the above obligations, the Provisional Guidance on Risk Management of Money Laundering and Terrorism Financing of Corporate Financial Institutions (《法人金融機構洗錢和恐怖融資風險管理指引(試行)》), which was promulgated by the PBOC on September 29, 2018 and came into effect on January 1, 2019, requires corporate financial institutions to establish a risk management system to detect and prevent money laundering and terrorism financing activities and sets out detailed requirements for various aspects of such system, including risk management structure, strategies, methodologies, implementing measures, information system, internal inspection, auditing, performance assessment and reward and penalty mechanisms.

APPENDIX IV                                                              REGULATIONS

**Regulations on Consumer Protections**

The Law on Protection of Consumers' Rights and Interests of the PRC (《中華人民共和國消費者權益保護法》) (the "Consumer Protection Law"), which was promulgated by the Standing Committee of the National People's Congress on October 31, 1993 and last amended on October 25, 2013 with effect from March 15, 2014, sets out the obligations of business operators and the rights and interests of the consumers. Business operators must guarantee the quality, function, usage and term of validity of the goods or services they sell or provide. The consumers whose interests have been damaged due to their purchase of goods or acceptance of services on online platforms may claim damages from the sellers or service providers. Online platform operators may be subject to liabilities if the lawful rights and interests of consumers are infringed in connection with consumers' purchase of goods or acceptance of services on online platforms and the platform operators fail to provide consumers with authentic contact information of the sellers or service providers. In addition, platform operators may be jointly and severally liable with the sellers and service providers if they are aware or should be aware that the sellers or the service providers are using the online platform to infringe upon the lawful rights and interests of consumers and fail to take measures necessary to prevent or stop this activity.

The Consumer Protection Law also provides principles of legality, appropriateness and necessity for collecting or using consumers' personal data. In particular, businesses operators should disclose the purposes, methods and scopes of collecting and using personal data and obtain consumers' consent. Business operators should also disclose the terms for its data collection and use and should not collect or use information in violation of laws, regulations or agreements with consumers. Businesses operators should main confidentiality of the personal data collected from consumers and should not leak or sell personal data and should not provide personal data in violation of laws to third parties. They should also adopt technical and other necessary measures to ensure security of personal data, and to safeguard against information leak and loss. In case of information leak or loss, remedial measures should be taken by the business operators.

**Regulations on Digital Payment**

Our digital payment business is primarily regulated by the PBOC, as well as the SAFE with respect to any cross-border foreign exchange payment transactions. See "—Regulations on Cross-Border Payment" for further details on the related regulations.

*Payment License*

According to the Administrative Measures on Non-Financial Institutions Payment Services (《非金融機構支付服務管理辦法》) ("the Decree No. 2 of PBOC"), which was promulgated by the PBOC on June 14, 2010 and came into effect on September 1, 2010, and the Implementation Rules for the Administrative Measures on Non-Financial Institutions Payment Services (《非金融機構支付服務管理辦法實施細則》), which were promulgated by the PBOC with immediate effect on December 1, 2010, "payment services provided by non-financial institutions" refers to all or a portion of the money transfer services provided by non-financial institutions as intermediaries between payers and payees, including online payment, issuance and acceptance of prepaid cards, bankcard acquiring and other payment services determined by the PBOC. Non-financial institutions are required to obtain a payment service license from the PBOC (《中華人民共和國支付業務許可證》) (the "Payment License") before engaging in payment business. A payment institution should only engage in business activities in accordance with the business scope approved in its Payment License and should refrain from engaging in payment services beyond the

approved business scope or assigning, leasing or lending its Payment License. The Payment License has a term of five years and can be renewed within six months prior to the expiration of the term. Our Payment License allows us to provide online payment services, mobile payment services, issuance and acceptance of prepaid cards (which is limited to top up authenticated online accounts) and bankcard acquiring services.

***Regulations on Online Payment***

The Administrative Measures on Online Payments by Non-bank Payment Institutions (《非銀行支付機構網絡支付業務管理辦法》) (the "Administrative Measures on Online Payment") were promulgated by the PBOC on December 28, 2015 and came into effect on July 1, 2016. According to the Administrative Measures on Online Payment, "online payment services" refer to money transfer services provided by payment institutions when a payer and a payee, through computers and mobile terminals, remotely initiate payment instructions relying on public network information systems with no interaction between the payer's electronic device and the payee's personal equipment.

The Administrative Measures on Online Payment set out requirements on various aspects of online payment, including business scope, limitations on payment, client management, risk management, supervision and penalty. Specifically, they require payment institutions to establish a "know your customer" system. Accounts should be opened on a real-name basis and payment institutions should take steps to verify clients' identification information and link different accounts of the same client. Personal payment accounts are divided into Type I, II and III depending on the identity verification methods and the reliability of such verification, and are regulated differently. Type I and Type II payment accounts can only be used for consumption and fund transfer. Type III payment accounts can be used for consumption, fund transfer and investments and have higher payment limits.

The Administrative Measures on Online Payment also require payment institutions to have risk management in place and to protect clients' rights and interests. They require payment institutions to establish a transaction risk management system and transaction monitoring system and take steps, such as investigation, delaying settlement and termination of services, to stop suspected fraud, illegal cash-out, money laundering, illegal financing, terrorist financing and the like. In addition, payment institutions are required to protect clients' funds security, data security, right of choice and information rights. Specifically, payment institutions should establish a sound risk control system and transaction compensation system, and should compensate clients for any loss of funds that are not attributable to such clients' negligence or bad faith.

The Guidance Letter on Promoting the Sound Development of Internet Finance (《關於促進互聯網金融健康發展的指導意見》) (the "Internet Finance Guidance Letter"), jointly issued by the PBOC and several other authorities with immediate effect on July 14, 2015, provides that banking financial institutions and third-party payment institutions that are engaged in online payment services should comply with applicable laws and regulations. When collaborating with other institutions, third-party payment institutions are required to clearly define each party's rights and obligations and establish effective risk insulation and mechanisms to protect clients' rights. Payment institutions should make adequate disclosure regarding their services and clear disclosure regarding risks related to their businesses and should avoid exaggerating the nature and functions of the payment service intermediaries. The Internet Finance Guidance Letter also confirms the PBOC as the supervisory body of online payment businesses.

The Notice on the Transfer of the Online Payment Business of Non-bank Payment Institutions from the Direct-Connection Mode to the NetsUnion Platform (《關於將非銀行支付機構網絡支付業務由直連模式遷移至網聯平臺處理的通知》) issued by the PBOC on August 4, 2017, requires all online payments involving bank accounts that are cleared through non-bank payment institutions to be processed via NetsUnion, which is a network payment and clearing platform for non-bank payment institutions developed by the Payment and Clearing Association of China.

### Regulations on Bankcard Acquiring Business

Under Administrative Measures on Bankcard Acquiring Services (《銀行卡收單業務管理辦法》) (the "Measures on Bankcard Acquiring"), which were promulgated by the PBOC on July 5, 2013 with immediate effect, bankcard acquiring services refer to transaction funds settlement services provided by bankcard acquirers to their merchant clients pursuant to the respective bankcard acceptance agreements between the bankcard acquirers and their merchant clients. The transaction funds settlement service is provided once the merchant clients have accepted cardholders' payment cards and closed transactions with cardholders. Bankcard acquirers include payment institutions which provide offline merchants with bankcard acceptance and settlement services under a Payment License of bankcard acquiring as well as payment institutions which provide Internet merchants with bankcard acceptance and settlement services under a Payment License of network payment.

The Measures on Bankcard Acquiring require bankcard acquirers to protect the legitimate rights and interests of the parties concerned, ensure data security and transaction security as well as comply with AML laws and regulations. In addition, the Measures on Bankcard Acquiring set out specific requirements with respect to merchant management, operations and risk management, including:

- to separately conduct risk ratings with respect to offline merchants and online merchants;

- to adopt inspection mechanisms with respect to merchants' transactions and business operations;

- to establish a risk monitoring system with respect to bankcard acquiring services; and

- to set up review mechanisms for merchants' designating and changing bank settlement accounts for accepting bankcards.

### Regulations on the Management of Client Reserve Funds

The Decree No. 2 of PBOC stipulates that the paid-in cash capital of a non-bank payment institution should be more than 10% of the daily average balance of client reserve funds. According to the Decree No. 2 of PBOC, (i) the client reserve funds received by payment institutions should not constitute such payment institutions' own assets; (ii) payment institutions should transfer client reserve funds pursuant to the payment instructions given by their clients; and (iii) payment institutions should not embezzle client reserve funds in any form. The Administrative Measures on the Custody of Client Reserve Funds of Payment Institutions (《支付機構客戶備付金存管辦法》) ("the Measures on the Custody of Reserve Funds"), which were promulgated by the PBOC with immediate effect on June 7, 2013, detail restrictions on the actions (including deposit, accumulation, usage and transfer)

that can be taken with respect to clients' reserve funds in the custody of payment institutions. The Measures on the Custody of Reserve Funds also set out the eligibility requirements for depository banks, supervisory measures with respect to payment institutions and penalties.

According to the Notice on the Implementation of Centralized Deposit of Clients' Reserve Funds of the Payment Institution issued by the General Office of the PBOC (《中國人民銀行辦公廳關於實施支付機構客戶備付金集中存管有關事項的通知》), which was promulgated by the General Office of the PBOC with immediate effect on January 13, 2017 and the Notice of the General Office of PBOC on Matters concerning the Centralized Deposit of the Full Amount of Clients' Reserve Funds of Payment Institutions (《中國人民銀行辦公廳關於支付機構客戶備付金全部集中交存有關事宜的通知》), which was promulgated by PBOC with immediate effect on June 29, 2018, payment institutions should deposit all clients' reserve funds received in connection with their payment services to designated deposit accounts opened with a local branch of the PBOC.

### Regulations on Barcode/QR code Payment Business Standard

According to the Rules for the Barcode Payment Business Standard (Provisional) (《條碼支付業務規範(試行)》) (the "Barcode Rules"), which were issued by the PBOC on December 25, 2017 and came into effect on April 1, 2018, barcode/QR code payment business refers to payment services offered by banking financial institutions or non-bank payment institutions in reliance on barcode/QR code technologies, which enables money transfers through scanning barcode/QR code, such as payment code or receipt code. The Barcode Rules provides that non-bank payment institutions engaging in barcode/QR code payment business should be licensed and comply with rules and regulations related to payment business. All barcode/QR code transactions will be settled via a clearing system supervised by the PBOC.

The Notice by the General Administration Department of PBOC for Enhancing the Security Management of QR Payment (《中國人民銀行辦公廳關於加強條碼支付安全管理的通知》), together with the Technical Specifications for Barcode Payment Security (Provisional) (《條碼支付安全技術規範(試行)》) and the Technical Specifications for Barcode Payment Terminals (Provisional) (《條碼支付受理終端技術規範(試行)》) included therein, which were promulgated by the PBOC with immediate effect on December 22, 2017, set out the operational standards and technical specifications for barcode/QR code payment services.

### Regulations on Cross-border Payment

The cross-border payment business is primarily regulated by the SAFE. The Circular on Administrative Measures for the Foreign Exchange Business of Payment Institutions (《支付機構外匯業務管理辦法》), which were promulgated by the SAFE with immediate effect on April 29, 2019, adopts a SAFE registration regime for foreign exchange business conducted by payment institutions. These measures also provide for requirements as to (i) trading parties' verification and management, such as "know your customer" and "know your business" procedures, (ii) underlying transaction review and verification, (iii) account management and (iv) information collection and reporting. In addition, cross-border payment is subject to the Regulation of the People's Republic of China on Foreign Exchange Administration (《中華人民共和國外匯管理條例》), which was promulgated by the State Council on January 29, 1996 and last amended with immediate effect on August 5, 2008 and the Procedures for Reporting Balance of International Payments (《國際收支統計申報辦法》), which were promulgated by the PBOC (as authorized by the State Council) on September 14, 1995 and amended on November 9, 2013 with effect from January 1, 2014.

*Regulations on AML and Anti-fraud in the Payment Industry*

In addition to generally applicable AML loans and regulations, payment institutions' AML obligations are further specified in the Anti-Money Laundering and Anti-Terrorism Financing Measures for Payment Institutions (《支付機構反洗錢和反恐怖融資管理辦法》) (the "AML and Anti-Terrorism Financing Measures for Payment Institutions"), which were promulgated by the PBOC with immediate effect on March 5, 2012. The AML and Anti-Terrorism Financing Measures for Payment Institutions stipulate that payment institutions are required to carry out the obligations of AML and anti-terrorism financing in accordance with the law. The main aspects of these obligations include client identification, client identification information and transaction record-keeping, suspicious transaction reporting and AML and anti-terrorism financing surveying.

The Notice of PBOC on Strengthening Payment and Settlement Management to Prevent New Telecommunications Crimes (《中國人民銀行關於加強支付結算管理防範電信網絡新型違法犯罪有關事項的通知》), which was promulgated by the PBOC with immediate effect on September 30, 2016, prohibits any non-bank payment institution from opening more than one Type III payment account for the same client starting from December 1, 2016. Each Type III payment account can be used for consumption, fund transfer and purchase of financial products, subject to an annual payment limit of RMB200,000. Non-bank payment institutions should strengthen their surveillance of suspicious transactions. If an account of any account holder is suspected of crimes as notified by local public security bureaus, non-bank payment institutions should suspend transactions of all accounts of such account holder.

*Policies related to Payment Industry*

Under the Opinions on Promoting Information Consumption and Boosting Domestic Demand (《關於促進信息消費擴大內需的若干意見》 (the "Expanding Consumption Opinions"), which were issued by the State Council on August 8, 2013 with immediate effect, China undertakes to promote cross-industry businesses such as mobile payment, improve Internet payment system, accelerate the pilot city program for e-commerce and implement a pilot policy program for Internet e-invoices and trusted transactions. China also supports Internet based financial innovations and normalized Internet based financial services. It also supports the development of a multi-layered payment system through measures such as certifying payment facilities of non-financial institutions and building a secured and trusted public service platform for mobile finance. Relatedly, China is committed to further develop a national basic database, credit information basic database and other databases to support the social credit system.

Pursuant to the Notice on Issuing the Plan for Advancing the Development of Inclusive Finance (2016-2020) (《關於印發推進普惠金融發展規劃(2016-2020年)的通知》) (the "Inclusive Finance Notice"), which was issued by the State Council on December 31, 2015 with immediate effect, China encourages Internet payment institutions to facilitate the development of e-commerce, providing small, speedy and convenient payment services and improving payment efficiency. In addition, Internet finance platforms are encouraged to address the financing needs of small businesses, farmers and disadvantaged groups.

**Regulations on Digital Finance Technology Platform**

Our digital finance technology platform businesses comprise: (i) CreditTech services; (ii) InvestmentTech services; and (iii) InsureTech services. We provide various technology services to our partner financial institutions to efficiently provide credit, investment and insurance products. We also provide these products through our various licensed financial services subsidiaries.

Our partner financial institutions, primarily banks, including MYbank, our associate, asset managers and insurance companies, are primarily regulated by the PBOC, the CBIRC and the CSRC according to various laws and regulations. These laws and regulations generally do not directly apply to us, but could potentially affect our cooperation with these partner financial institutions. See "Risk Factors — Risks Related to Our Business and Industry — The financial services industry is subject to evolving and extensive regulation," "— Our licensed financial services subsidiaries and associates are subject to evolving and extensive regulation," "— The laws and regulations governing the online lending and consumer finance industry in China are evolving, and our business operations have been and may need to continue to be modified to ensure full compliance with relevant laws and regulations," "— The PRC regulatory environment for asset management industry is evolving, and we are susceptible to changes in regulations and government policies," and "— The insurance industry is highly regulated in China. Non-compliance with the evolving laws and regulations may materially and adversely affect our business and prospects."

*CreditTech*

For our CreditTech services, we partner with financial institutions, primarily banks, to provide consumer credit and SMB credit on our platform. In addition, Ant Shangcheng and Ant Small and Micro Loan, our licensed small loan subsidiaries, also provide consumer credit loans through our platform and are regulated by Chongqing Local Financial Regulatory Bureau according to laws and regulations applicable to the microcredit industry.

These companies are primarily regulated by the provincial governments of where they are established, pursuant to the Guidance on the Pilot Program for Small Loan Companies (《關於小額貸款公司試點的指導意見》) (the "Small Loan Companies Guidance"), which was jointly issued by the PBOC and the former China Banking Regulatory Commission with immediate effect on May 4, 2008. The Small Loan Companies Guidance also sets out requirements on various aspects of small loan companies, including their legal forms, incorporation process, capital sources, capital utilization, interest rate, loss provision and supervisory policies. Under the Internet Finance Guidance Letter, Internet finance institutions should clearly define their role as information intermediary, which entails providing information services to the parties directly involved in credit transactions. Internet finance institutions are prohibited from proving credit enhancement services or conducting fundraising activities illegally. Internet small loan businesses should comply with the regulations on small loan business. As our licensed small loan companies were established in Chongqing municipality, they are subject to the rules and regulations adopted by the Chongqing municipal government with respect to small loan companies. The Provisional Regulatory Guidance of the Chongqing Municipality Government for Small Loan Companies' Online Lending Business (《重慶市小額貸款公司開展網絡貸款業務監管指引（試行）》) (the "Chongqing Guidance"), which was issued by the Financial Affairs Office of the Chongqing Municipality Government on December 25, 2015 with immediate effect, sets out the entry requirements and risk management requirements for small loan companies engaging in online lending business, as well as oversight measures for the

industry in Chongqing. Under the Chongqing Guidance, subject to filings with the local financial regulatory bureau, small loan companies licensed in Chongqing can conduct self-operated online lending business nationwide.

On September 7, 2020, the CBIRC issued the Notice of the General Office of the CBIRC on Strengthening Regulation on Small Loan Companies (《中國銀保監會辦公廳關於加強小額貸款公司監督管理的通知》) (the "Small Loan Companies Notice"). The Small Loan Companies Notice requires small loan companies to primarily engage in loan business and limits the amount of debt they can borrow. Specifically, the balance of debt borrowed from banks, shareholders and through other non-standard financings should not exceed small loan companies' net assets and the balance of debt raised via issuance of bonds, asset-backed securities and other standard debt instruments should not exceed four times of small loan companies' net assets. The Small Loan Companies Notice also sets out requirements on various aspects of small loan companies' business operations, including credit concentration, use of loan proceeds, territorial scope, interest rate and prohibited activities. In particular, small loan companies should strengthen funds management and improve credit process, including pre-loan approval check, loan approval review and post-loan monitoring, separation of loan application investigation and approval, and loan classification. Additionally, small loan companies are required to improve various practices, such as loan collection process, information disclosure, and customer data safekeeping and cooperate in regulatory reviews.

The way that we cooperate with our partner financial institutions is affected by rules and regulations on these partners. On July 12, 2020, the CBIRC issued the Provisional Regulatory Measures for Commercial Banks' Online Lending Business (《商業銀行互聯網貸款管理暫行辦法》) (the "Online Lending Measures") to provide for the regulatory requirements on the extension of credit by commercial banks via online channels in various aspects. The Online Lending Measures explicitly forbid borrowers from purchasing real property, stocks, bonds, futures, financial derivatives, and asset management products and making other riskier investments with bank loans issued online. In addition, according to the Online Lending Measures, commercial banks should cap online consumer credit lines for each customer at RMB200,000, and the credit extension period should not exceed one year if the principal is repaid in a lump sum upon maturity. Although the Online Lending Measures have not restricted the establishment of uniform quantitative indicators for local commercial banks to carry out cross-regional Internet loan business, commercial banks are required to conduct such business prudently based on their own risk control capability and build a comprehensive risk management system for online lending business (including co-lending business). Meanwhile, the Online Lending Measures tighten the requirement on the co-lending business between banks and online lending and consumer finance lenders and prohibit banks from co-lending to customers with institutions that do not possess proper lending licenses. As our subsidiaries engaging in co-lending business possess proper lending licenses and our partner financial institutions are also licensed and have independent risk management capability, we do not believe that the tightened requirement under the Online Lending Measures will have any material adverse impact on our co-lending business or our cooperation with our partner financial institutions, although the tightened requirement may increase our compliance costs.

*InvestmentTech*

For our InvestmentTech services, we partner with financial institutions, primarily asset management companies, to provide investment products through our platform. In addition, Tianhong, our licensed asset management subsidiary, also offers investment products through our platform and is regulated by the CSRC according to laws and regulations applicable to the asset management industry as detailed below.

The Securities Investment Fund Law of the PRC (《中華人民共和國證券投資基金法》) (the "Securities Investment Fund Law"), which was promulgated by the Standing Committee of the National People's Congress on December 28, 2012 and amended with immediate effect on April 24, 2015, provides the legal framework for regulating securities investment funds. The Securities Investment Fund Law sets out the eligibility requirements and responsibilities of publicly-offered funds' managers and of their directors, supervisors and senior management. It also regulates various aspects of publicly-offered funds' operations and organization, including offering process, trading of fund units, subscription and redemption.

In addition, the CSRC has adopted regulations that are applicable to securities investment fund management companies. The Measures for the Administration of Securities Investment Fund Management Companies (《證券投資基金管理公司管理辦法》), which came into effect on November 11, 2012 by the CSRC and were amended with immediate effect on March 20, 2020, provide for the qualification requirements of fund management companies and their shareholders, the requirements on effecting changes to shareholders and articles of association, etc. and dissolution, and the requirements on establishing subsidiaries and branches and on effecting changes to, or dissolving of, these entities. These measures also set out requirements on corporate governance and fund operation and administration. The Administrative Measures for the Operation of Publicly-offered Securities Investment Funds (《公開募集證券投資基金運作管理辦法》), which came into effect on August 8, 2014, set out various requirements related to publicly-offered securities investment funds' operations, including funds offering, subscription, redemption, trading of fund units, investment of fund assets and profit distribution.

Fund sales are regulated by the CSRC through a series of regulations, including the newly adopted Administrative Measures for Regulating Sales Agencies Selling Publicly-offered Securities Investment Funds (《公開募集證券投資基金銷售機構監督管理辦法》) (the "Sales Agencies Measures"), which were issued by the CSRC on August 28, 2020 and will come into effect on October 1, 2020. The Sales Agencies Measures set out various requirements on sales agencies selling publicly-offered securities investment funds, including registration, operational standards, internal control and risk management. In particular, sales agencies selling publicly-offered securities investment funds are required to obtain a license and are prohibited from commingling settlement proceeds from selling funds with their own assets. Additionally, fund sales agencies should establish comprehensive compliance and risk management systems, including centralized management systems for screening products before distribution, account management systems with respect to investors' funds trading accounts and cash accounts, internal review mechanisms, business scope control systems, record-keeping management systems and other internal control and risk management systems.

The investment products that our partner asset managers offer on our platform are affected by rules and regulations on these partners. The Guiding Opinions on Regulating the Asset Management Business of Financial Institutions (《關於規範金融機構資產管理業務的指導意見》) jointly issued by the PBOC, the CBIRC, the CSRC and the SAFE on April 27, 2018, impose new requirements on the asset management industry, and prohibit financial institutions from, among other things:

- guaranteeing principal or investment return in connection with the asset management business;

- providing direct or indirect, explicit or implicit guarantees, repurchase or other risk-bearing commitments to non-standard debt investments or equity investments underlying the asset management products they offer; and

- providing conduit services that can be used to circumvent restrictions on investments, leverage ratio or other requirements by asset management products offered by other financial institutions.

In addition, non-financial institutions are prohibited from using intelligent investment consulting services to exceed their permitted business scope or conducting disguised asset management business.

### *InsureTech*

For our InsureTech services, we partner with financial institutions, primarily insurance companies, to provide insurance products through our platform. In addition, Cathay Insurance, our licensed insurance subsidiary, also offers insurance products through our platform and is regulated by the CBIRC according to laws and regulations applicable to the insurance industry as detailed below.

The Insurance Law of the PRC (《保險法》) (the "Insurance Law"), which was promulgated by the Standing Committee of the National People's Congress on June 30, 1995 and last amended with immediate effect on April 24, 2015, sets out the legal framework for regulating the insurance industry. The Insurance Law comprises general principles, insurance contracts, insurance companies, insurance operational standards, supervision and regulation of the insurance industry, insurance agencies and insurance brokers, legal liabilities and supplementary provisions. Since the promulgation of the Insurance Law, the CBIRC and its predecessor have published a series of rules and regulations implementing the Insurance Law.

The organization of insurance companies is regulated by the Administrative Regulations for Insurance Companies (《保險公司管理規定》) (the "Administrative Regulations for Insurance Companies"), which were promulgated by the former China Insurance Regulatory Commission on September 25, 2009 and amended with immediate effect on October 19, 2015. The Administrative Regulations for Insurance Companies set out regulations on the organization of insurance companies, branch establishment, change in organization structure, dissolution and deregistration, branch management, insurance operations and supervision.

APPENDIX IV                                                                    REGULATIONS

The Interim Measures for the Supervision of the Internet Insurance Business (《互聯網保險業務監管暫行辦法》) (the "Internet Insurance Business Measures"), which were promulgated by the former China Insurance Regulatory Commission on July 22, 2015 and came into effect on October 1, 2015, set out regulations on "Internet insurance business," which refers to utilizing Internet, mobile communications, or other technologies to form insurance contracts or provide insurance services through self-operated network platforms or third-party network platforms. These interim measures provide for, among other things, qualifying criteria for operating network platforms and disclosure and operational standards for Internet insurance business.

On June 22, 2020, the CBIRC published the Notice on Regulating the Backtracking Management of Online Insurance Sales Behavior (《關於規範互聯網保險銷售行為可回溯管理的通知》) (the "Online Insurance Sales Notice") with effect from October 1, 2020. The Online Insurance Sales Notice sets out requirements on various aspects of online sales by insurance institutions, including sales practices, record-keeping for backtracking sales, and disclosure requirements. For example, the Online Insurance Sales Notice requires that online sales pages should be displayed only on insurance institutions' self-operated online platforms and should be separated from non-sales pages. Insurance institutions should keep records for five years after the expiry of the policy for policies with a term of one year or less and for ten years for policies with a term longer than one year for purposes of backtracking sales. It also requires that important insurance clauses should be presented on a separate page and be confirmed by policyholders or insureds.

### *Regulations on Financial Holding Companies*

On September 11, 2020, the State Council issued the Decision on Implementing the Access Management of Financial Holding Companies (《關於實施金融控股公司准入管理的決定》) (the "FHC Decision"), which will come into effect on November 1, 2020. Under the FHC Decision, non-financial companies, individuals or other eligible entities, which control through shareholdings or otherwise at least two cross-sector financial institutions and meet certain criteria, are required to apply to and obtain approval from the PBOC for establishing financial holding companies. The FHC Decision sets out various entry requirements for financial holding companies, including requirements on registered capital, shareholders, controlling person, directors, supervisors, senior management, capital adequacy, corporate organizations, risk management, internal control and other prudential regulatory requirements. Existing entities or individuals that are within the scope of the FHC Decision would be required to apply for establishing financial holding companies under the FHC Decision, and should submit application to the PBOC within 12 months after the FHC Decision comes into effect.

On September 11, 2020, the PBOC issued the Provisional Administrative Measures on Financial Holding Companies (《金融控股公司監督管理試行辦法》) (the "FHC Measures" and, together the FHC Decision, the "FHC Rules"), which will come into effect on November 1, 2020. The FHC Measures specify the entry requirements and procedures set forth in the FHC Decision, and clarify the regulatory scope and regulatory body with respect to financial holding companies. Under the FHC Measures, the PBOC will be in charge of regulating financial holding companies and financial institutions controlled by financial holding companies will continue to be regulated by their respective financial regulators pursuant to such regulators' jurisdictions. The FHC Measures also set out regulatory requirements on certain key aspects of financial holding companies, including shareholder eligibility, source of funds and use of funds, capital adequacy, shareholding structure, corporate governance, related party transactions, risk management systems, and risk segregation or firewalls mechanism.

**Policies related to Digital Finance Technology Platform**

Our digital finance technology platform business benefits from policy support. Pursuant to the Opinions on Promoting Informatization and Protecting Data Security (《關於大力推進信息化發展和切實保障信息安全的若干意見》), which were issued by the State Council on June 28, 2012 with immediate effect, China will promote information sharing across banking, securities and insurance industries and support innovations in financial products and services. China will also promote the development of consumer finance and improve financial services to small businesses, agriculture and rural areas.

Pursuant to the Expanding Consumption Opinions, China encourages financial institutions to provide small loans to small and medium sized e-commerce businesses and promotes the application of e-commerce by all small businesses. China will promote community e-commerce, e-commerce for agricultural products and encourage e-commerce businesses to expand into other jurisdictions through establishing platforms that facilitate cross-border e-commerce's clearance of customs and cross-border trade platforms as well as implementing regulatory measures tailored for cross-border e-commerce. Financial institutions should prioritize support to Internet small businesses in accordance with the financial policies supporting small businesses' development.

Pursuant to the Inclusive Finance Notice, China undertakes to promote innovative small loans to small businesses, college graduates, farmers and disadvantaged groups. In addition, Internet finance platforms are encouraged to leverage their broad user base and ready access to capital to address the financing needs of small businesses, farmers and disadvantaged groups.

Pursuant to the 13th Five-Year Plan Outline, China will support the development of new consumption models that connect online and offline activities and the development of inclusive finance. China also will establish a multi-layered, broad and differentiated banking system, expand investment from private capital in banking industry, promote inclusive finance and small and micro financial entities' presence across different business formats while bring the development of Internet finance into line with industry standards.

Pursuant to the Guidelines on Enhancing the Financial Support for New Consumption Areas (《關於加大對新消費領域金融支持的指導意見》), which were issued by the PBOC and the CBIRC on March 24, 2016 with immediate effect, China will promote the integration of consumer finance with Internet technologies, encourage bank financial institutions to design standardized Internet small loan products based on technologies such as big data analytics and promote revolving credit products as well as consumer loan platforms.

Pursuant to the Opinions on Accelerating the Development of Circulation Industry and Promoting Consumer Spending (《關於加快發展流通促進商業消費的意見》), which were issued by the State Council on August 16, 2019 with immediate effect, financial institutions are encouraged to design innovative consumer credit products and services. In addition, China seeks to increase policy support for financial services catering to new consumption areas and promote the development of businesses that are specialized in consumer finance.

Pursuant to the Guidelines on Promoting the High-Quality Development of the Banking and Insurance Industry (《關於推動銀行業和保險業高質量發展的指導意見》), which were issued by the CBIRC on December 30, 2019, China will increase its support to the refinancing needs of non-state owned businesses and small businesses and increase the proportion of credit loans and medium- and long-term loans provided to such businesses. China will seek to develop supply chain financing services and explore the application of financial technologies in areas such as credit assessment, credit approval and risk management, which will help expand the coverage of financial services. If the risks are controllable, loan protection insurance products can be provided to loans incurred by non-state owned businesses and small businesses.

**Regulations on our Innovation Initiatives Business**

We provide innovation technology services to various businesses and partners, including blockchain, cloud computing and database services. We have established an industry-leading blockchain ecosystem, that we call AntChain, with extensive large scale commercial applications. As such, our innovation initiatives business is subject to the following laws and regulations.

The Cyberspace Administration of China issued the Administrative Provisions on Blockchain Information Services (《區塊鏈信息服務管理規定》) (the "Blockchain Provisions") on January 10, 2019, which came into effect on February 15, 2019. The Blockchain Provisions are the first set of official rules to regulate the blockchain industry. It applies to blockchain information services, which are defined as information services delivered to the public by way of Internet or application programs based on blockchain technology or systems. Under the Blockchain Provisions, the central and local Cyberspace Administration of China authorities will take charge of supervision and management of blockchain services and blockchain services providers are required to register with the Cyberspace Administration of China. In addition, the Blockchain Provisions require blockchain service providers to:

- fulfill data security management responsibilities;

- establish a sound management system for user registration, information verification, emergency response and security;

- maintain technology capabilities that can meet the demands of the services provided;

- adopt and publish management rules and platform conventions;

- enter into services agreements with blockchain services users;

- verify the identity of blockchain service users; and

- report to the Cyberspace Administration of China or its local counterparts and go through a security assessment when launching any new products, new application programs or new functions.

**APPENDIX IV**                                              **REGULATIONS**

In addition, the Announcement on Preventing the Financing Risks of Initial Coin Offerings (《關於防範代幣發行融資風險的公告》), which was jointly issued by the PBOC, the Office of the Central Leading Group for Cyberspace Affairs, the MIIT and several other regulators on September 4, 2017 with immediate effect and the Risk Alert related to Illegal Fundraising in Disguise of Virtual Currency and Blockchain (《關於防範以"虛擬貨幣""區塊鏈"名義進行非法集資的風險提示》), which was announced by the CBIRC on August 24, 2018, prohibit any entities or individuals from conducting initial coin offerings illegally. Financial institutions and non-bank payment institutions should not directly or indirectly provide products or services related to accounts opening, registration, trading, clearance or settlement in connection with any initial coin offerings or virtual currency offerings.

Other than the regulations on data security, data compliance, personal data protection and other specialized areas that apply to the Internet industry, there has not been an universal regulatory regime on AI as an emerging subindustry of the Internet industry. As the AI industry continues to develop, the regulatory regime will evolve to provide oversight.

## APPENDIX V                 SUMMARY OF LEGAL AND REGULATORY MATTERS

This appendix sets forth summaries of certain aspects of PRC laws, PRC legal system and PRC corporate laws and regulations. Laws and regulations relating to taxation in the PRC are discussed separately in "Appendix III — Taxation and Foreign Exchange." This appendix also contains a summary of certain Hong Kong legal and regulatory provisions, including summaries of certain major differences between PRC and Hong Kong company laws, certain requirements of the Hong Kong Listing Rules and additional provisions required by the Hong Kong Stock Exchange for inclusion in the articles of association of PRC issuers.

**The PRC Legal System**

The PRC legal system is based on the PRC Constitution (《中華人民共和國憲法》) which was revised and took effect on March 11, 2018 (the "Constitution"), and is composed of laws, administrative regulations, local regulations, separate regulations, autonomous regulations, rules and regulations of departments, rules and regulations of local governments, international treaties to which the PRC Government is a signatory, and other regulatory documents. Judicial decisions do not constitute binding precedents. However, they may be used as judicial reference and guidance.

According to the Constitution and the Legislation Law of the PRC (《中華人民共和國立法法》) which was revised and took effect on March 15, 2015, the NPC and its Standing Committee are empowered to exercise the legislative power of the State. The NPC formulates and amends basic laws governing criminal and civil matters, state organs and other matters. The Standing Committee of the NPC formulates and amends laws other than those required to be enacted by the NPC and supplements and amends any parts of laws enacted by the NPC during the adjournment of the NPC, provided that such supplements and amendments shall not conflict with the basic principles of such laws.

The State Council is the highest administrative authority of the PRC and has the power to formulate administrative regulations based on the Constitution and laws. The people's congresses of provinces, autonomous regions and municipalities and their respective standing committees may formulate local regulations based on the specific circumstances and actual demands of their own respective administrative areas, provided that such local regulations do not contravene any provision of the Constitution, laws or administrative regulations.

The ministries and commissions of the State Council, the People's Bank of China, the National Audit Office, and institutions with administrative functions directly under the State Council, may formulate rules within the jurisdiction of their respective departments based on the laws and the administrative regulations, decisions and rulings of the State Council.

The people's congresses of cities divided into districts and their respective standing committees may formulate local regulations on aspects such as urban and rural construction and management, environmental protection and historical and cultural protection based on the specific circumstances and actual demands of such cities, provided that such local regulations do not contravene any provision of the Constitution, laws, administrative regulations and local regulations of their respective provinces or autonomous regions. However, if there are separate provisions by laws on the formulation of local regulations by cities divided into districts, those provisions shall prevail. Such local regulations will become enforceable after being reported to and approved by the standing committees of the people's congresses of the relevant provinces or autonomous regions. The people's