**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ALIBABA GROUP HOLDING LTD. SECURITIES LITIGATION | Master File No. 1:20-CV-09568-GBD |

**PLAINTIFFS' OPPOSITION TO ALIBABA DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS.....................................................................................4

     A.    Alibaba's Business And "Choose One Of Two" Restrictive Trading Practices.....4

     B.    SAMR's Role In Enforcing Internet Commerce Laws Applicable To Alibaba .....5

     C.    Pre-Class Period: SAMR Explicitly Instructs Alibaba And Other Platforms
           To Stop "Choose One" Exclusivity Practices Because They Violate The Law;
           Alibaba Agrees ....................................................................................................5

     D.    During The Class Period: Alibaba Flouts The SAMR, Continues
           "Choose One" .......................................................................................................7

     E.    At The Same Time Alibaba Was Concealing The Risks Of Its Ongoing
           Exclusivity Practices, It Concealed An Existing Regulatory Risk Threatening
           The Ant IPO.........................................................................................................8

     F.    Concealed Risks Materialize: China Halts The Ant IPO; SAMR Announces
           New Anti-Trust Rules Targeting Alibaba And Launches Anti-Trust Probe
           Of Alibaba...........................................................................................................9

III.  APPLICABLE PLEADING STANDARDS DISFAVOR DEFENDANTS'
     MOTION ...........................................................................................................10

IV.  THE COMPLAINT STATES A §10(b) CLAIM BASED ON ALIBABA'S IMPROPER
     BUSINESS PRACTICES AND RELATED UNDISCLOSED RISKS................................11

     A.    The Complaint Alleges Material Misrepresentations And Omissions ................. 11

           1.    Statements Regarding Alibaba's Use Of "Exclusive Partnerships" And The
                   Legality Of Alibaba's Business Practices Were Materially Misleading ........11

           2.    Alibaba's Purported Risk Disclosures Were Materially Misleading.............17

           3.    Statements About Alibaba's Core Commerce Were Materially
                   Misleading ...........................................................................................19

i

       4.     Defendants Had An Affirmative Duty To Disclose Alibaba's Improper Business Practices Pursuant To Item 303 ........................................................................20

   B.    The Complaint Alleges Scienter ........................................................... 21

       1.     SAMR Told Alibaba At The November 2019 Meeting To Stop Exclusivity Practices Because They Were Unlawful; Defendants Knew Or Recklessly Disregarded That Alibaba Continued To Use Them Anyway ........................21

       2.     Alibaba's Corporate Scienter Is Alleged .........................................................23

       3.     The Complaint Alleges Facts Sufficient To Infer Zhang And Wu's Scienter.........................................................................................................24

       4.     Exclusive Dealing Was A Central Business Practice And Alibaba Relied On It To Drive Revenue And Maintain Dominance .......................................................26

       5.     Plaintiffs' Allegations Form A Strong Inference Of Scienter That Is At Least As Compelling As Any Opposing Inference Of Non-Culpable Intent ...............27

V.    THE COMPLAINT STATES A CLAIM REGARDING UNDISCLOSED ANT IPO RISKS .............................................................................................................................28

   A.    The Complaint Alleges The Falsity Of Ant IPO-Related Statements .................. 28

   B.    The Complaint Alleges Scienter As To Alibaba And Ma For Concealing Ant's Banking Regulation Violations ............................................................................. 31

VI.   THE COMPLAINT ALLEGES LOSS CAUSATION ...........................................................33

VII.  THE COMPLAINT ALLEGES §20(a) LIABILITY AGAINST WU AND ZHANG ..........35

VIII. CONCLUSION ........................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................... 10

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................... 10

*Caiola v. Citibank, N.A., N.Y.*,
   295 F.3d 312 (2d Cir. 2002) ....................................................................................... 14

*Cambridge Ret. Syst. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ......................................................................... 20

*Chevron Corp. v. Donziger*,
   2013 WL 4045326 (S.D.N.Y. Aug. 9, 2013) .............................................................. 33

*Christine Asia Co. Ltd. v. Yun Ma*,
   2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................................................... 5

*Christine Asia Co., Ltd. v. Ma*,
   718 Fed. App'x. 20 (2d Cir. Dec. 5, 2017) ........................................................ *passim*

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ............................................................ 10

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Group PLC*,
   2022 WL 596679 (S.D.N.Y. Feb. 28, 2022) ............................................................... 19

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
   246 F. Supp. 3d 52 (D.D.C. 2017) .............................................................................. 12

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003) ....................................................................................... 34

*Fin. Guar. Ins. Co. v. Putnam Advisory Co. LLC*,
   783 F.3d 395 (2d Cir. 2015) ....................................................................................... 34

*Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ........................................................................ 12

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ....................................................................................... 19

*Gordon v. Vanda Pharms. Inc.*,
   2021 WL 911755 (E.D.N.Y. Mar. 10, 2021) ......................................................... 33

*Ho v. Duoyuan Global Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) ......................................................... 10, 17, 26

*Howard v. Arconic Inc.*,
   2021 WL 2561895 (W.D. Pa. June 23, 2021) ......................................................... 18

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y 2005) ......................................................... 26

*In re Aphria Inc. Sec. Litig.*,
   2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ......................................................... 21, 24, 25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................... 26

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) ......................................................... 14

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ......................................................... 22, 35

*In re BioScrip, Inc. Sec. Litig.*,
   95 F.Supp.3d 711 (S.D.N.Y. 2015) ......................................................... 13, 14

*In re BISYS Sec. Litig.*,
   397 F.Supp.2d 430 (S.D.N.Y. 2005) ......................................................... 24

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) ......................................................... 16

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ......................................................... 35

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ......................................................... 12

*In re Investment Tech. Group, Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ......................................................... 12

*In re JP Morgan Chase & Co. Sec. Litig.*,
   2014 WL 1297446 (S.D.N.Y. Mar. 31, 2014) ......................................................... 14

*In re JP Morgan Chase Sec. Litig.*,
  363 F.Supp.2d 595 (S.D.N.Y. 2005)........................................................................ 24

*In re Moody's Corp. Sec. Litig.*,
  599 F.Supp.2d 493 (S.D.N.Y. 2009)................................................................... 24, 27

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ....................................... 18, 20, 23, 25

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................................................... 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................................... 33

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010)................................................................................... 14

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  2022 WL 2114628 (S.D.N.Y. June 13, 2022) ................................................... 22, 25

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)............................................................. *passim*

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)........................................................................... *passim*

*Marsden v. Select Med. Corp.*,
  2007 WL 518556 (E.D. Pa. Feb. 12, 2007) ........................................................... 34

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).................................................................................................. 11

*Menaldi v. Och-Ziff Capital Management Group, LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)............................................................... 12, 19

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).......................................................................... 14, 18, 30

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................................... 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................... 12

*Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*,
    2019 WL 4674839 (D. Conn. Sept. 25, 2019) ......................................................... 25

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ................................................... 18, 31

*Patel v. L-3 Commc'ns Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ......................................................... 31

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ........................................................... 12

*Rosi v. Aclaris Therapeutics, Inc.*,
    2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ......................................................... 20

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ............................................................................... 18, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................. 21

*Thomas v. Shiloh Indus., Inc.*,
    2017 WL 2937620 (S.D.N.Y. July 7, 2017) .......................................................... 24

## REGULATIONS

17 C.F.R. § 229.303(b) ........................................................................................... 20

17 C.F.R. § 240.10b-5 ............................................................................................ 11

**GLOSSARY**

| Term | Definition |
|---|---|
| Alibaba (or the "Company") | Defendant Alibaba Group Holding Limited |
| AML | China's Anti-Monopoly Law |
| CBIRC | China Banking and Insurance Regulatory Commission |
| Complaint | Amended Consolidated Class Action Complaint (Dkt. No. 55) |
| FHC Regs | Financial Holding Company Regulations announced on September 11, 2020, and effective on November 1, 2020 |
| Interim Measures | Draft *Interim Regulatory Measures on Online Small Loan Businesses* announced on November 2, 2020 |
| Ma | Defendant Jack Yun Ma, Alibaba Founder and lifetime member of the Alibaba Partnership |
| New AML Regulations | New AML regulations enacted by the SAMR on September 1, 2019 |
| Online Lending Regulations | Provisional Regulatory Measure for Commercial Banks' Online Lending Business issued by the CBIRC on July 12, 2020 |
| PBOC | People's Bank of China |
| PRC or China | People's Republic of China |
| SAIC | China's State Administration for Industry and Commerce (the SAMR's predecessor) |
| SAMR | China's State Administration for Market Regulation |
| Wang Shuai | Chairman of Alibaba's Marketing and Public Relations Committee and member of the Alibaba Partnership |
| Wen Jia | Alibaba's V.P of the Office of the Chairman, President of Public Affairs, and member of the Alibaba Partnership |
| Wu or Defendant Wu | Defendant Maggie Wei Wu, Alibaba's CFO and member of the Alibaba Partnership |
| Zhang or Defendant Zhang | Defendant Daniel Yong Zhang, Alibaba's CEO and member of the Alibaba Partnership |

## I.      INTRODUCTION[1]

In November 2019, China's powerful State Administration for Market Regulation ("SAMR") summoned Alibaba and other large e-commerce companies to an official administrative guidance meeting and ordered them to stop using restrictive trading practices that had become popular among the companies, stating the practices were "clearly prohibited by the Electronic Commerce Law and also violate the Anti-Monopoly Law and the Anti-Unfair Competition Law." ¶¶6-7, 101-10. Known as "二选一" ("Er Xuan Yi") or "choose one of two" (hereafter, "choose one"), the subject practices encompassed a variety of incentives and punishments used to force or coerce merchants to transact exclusively on a company's platforms, restricted competition, and enabled top e-commerce companies, including Alibaba, to amass larger market share. ¶¶5, 88-90. In July 2020, Alibaba affirmed that it would "not force platform operators to conduct 'exclusive cooperation,'" or otherwise "impose any unreasonable restrictions…on the selections of platforms by the operators." ¶¶8, 117.

The Class Period begins on July 9, 2020, when Alibaba filed its 2020 Form 20-F with the SEC, telling investors that despite Alibaba's "alleged ***prior narrowly-deployed*** exclusive partnerships," its "business practices do not violate anti-monopoly or unfair competition laws…." ¶253. That statement was false. Contrary to Alibaba's assurances, its "exclusive partnerships" did not end at some "prior" time, and were not "narrowly-deployed" but deeply ingrained practices that Alibaba continued to use throughout the Class Period. ¶¶136-41, 379. Investors were thus stunned when on November 10, 2020, the eve of China's biggest shopping day, news outlets reported that Alibaba was the target of new rules governing restrictive trading, which carried severe punishment that "violators may be forced to divest assets, intellectual property or technologies." ¶¶123-28. In response, Alibaba's ADS price fell $23.99

---

[1] This brief primarily addresses arguments raised by Alibaba; its CEO, Daniel Zhang; and its Class Period CFO, Maggie Wu (the Alibaba Defendants' brief is cited herein as "MTD"). Jack Ma's arguments (cited as "Ma MTD"), and Plaintiffs' scheme claims against Alibaba and Ma (¶¶309-60), are addressed in the concurrently-filed Opposition to the Ma MTD. Unless otherwise noted, "¶_" and "Ex._" references are to the Complaint. Unless otherwise noted, all emphasis is added and internal case citations and quotations are omitted throughout.

per share, closing at $266.54. ¶125. On December 23, 2020, investors were stunned again when the SAMR announced an antitrust investigation into Alibaba, following reports that Alibaba imposed "unreasonable restrictions" on merchants. ¶130. In response, Alibaba's ADS price fell again, by $34.18 per share (13%), to close at $222.00—its biggest one-day drop since going public in 2014. ¶131. After the Class Period, the SAMR published the results of its investigation, confirming that Alibaba used restrictive "choose one" practices throughout the Class Period (Ex. 8, the "SAMR Report"), and fining Alibaba $2.8 billion—China's largest ever anti-trust fine. ¶¶134-45.

Separately during the Class Period, Defendants also concealed material regulatory risks that arose from the impending dual-listing IPO of Ant Group in Hong Kong and Shanghai (the "Ant IPO" or "IPO"), which was set to start trading on November 5, 2020. ¶165. Together, Alibaba and Ma controlled 33% and 50.5% of Ant, respectively. ¶12. Ant ran Alipay, which Alibaba used to facilitate payments on its shopping platforms. Important to the events at issue, Ant also had a lucrative credit and lending division that accounted for 40% of Ant's revenue and was seen as driving Ant's growth leading up to the IPO. ¶¶163, 188-89. Ant's expansion into these banking services drew the attention of China's banking regulators, the People's Bank of China ("PBOC") and the China Banking and Insurance Regulatory Commission ("CBIRC"). ¶¶187-92.

On September 11, 2019, China announced new Financial Holding Company Regulations (the "FHC Regs"), applicable to Ant, to take effect November 1, 2020. ¶¶197-98. Among other things, the new FHC Regs required companies like Ant to have at least RMB500 billion in assets. ¶¶200-01. When Ant filed its Final IPO Prospectus on October 27, 2020, it reported only RMB315.8 billion in assets. ¶202. On November 2, 2020, the PBOC, CBIRC and other regulators called Ant's executives, including Ma, to a meeting to address Ant's regulatory compliance and (it was later revealed) concerns regarding the concealment of certain controversial ownership interests in Ant. ¶203. The next morning, November 3, 2020, regulators suspended the IPO. ¶204. Alibaba's ADS price fell $25.27/share. ¶232.

Defendants argue that Alibaba had no duty to disclose Ant's regulatory risks (MTD 13) or, alternatively, that the risks were fairly disclosed (Ma MTD 5-6, 14). Alibaba, however, chose to speak about the Ant IPO and its value to Alibaba as a "strategic investor" in Ant. *E.g.*, ¶¶19, 276. Having chosen to speak on these topics, Alibaba had a duty to disclose the then-existing material risks that threatened the IPO and Alibaba's interests in it. The failure to disclose Ant's material asset shortfall in violation of the FHC Regs rendered risk disclosures that *were* made meaningless and misleading.

Plaintiffs' claims relating to Alibaba's exclusivity practices are even more straight-forward: Alibaba continued requiring "choose one" and "exclusive partnerships" after the SAMR told it to stop, and misrepresented to investors that it *had* stopped. Defendants' motion focuses almost entirely on just one exclusivity tactic that Alibaba admits to having used during the Class Period—"traffic-for-exclusivity"—to downplay and recast its practices as supposedly legitimate business incentives that Defendants believed were legal under Chinese law. MTD 2 (characterizing Alibaba's practices as "incentivizing merchants to sell exclusively on its e-commerce platforms by offering them improved visibility and promotional opportunities"). But this ignores all of the punitive "choose one" and "exclusive partnership" practices detailed in the Complaint. *E.g.* ¶¶89-90, 94, 136-41. Alibaba did not only reward loyal merchants with "improved visibility," it punished offending ones by, *inter alia*, "cancelling their promotion displays, expelling them from sales promotions, lowering their search rankings, or downgrading their ratings" and "even bans from Alibaba's marketplaces." ¶¶89-90.

Moreover, Alibaba did not merely get caught in an industry-wide regulatory tightening on "Big Tech." MTD 1. Alibaba was directed by the SAMR to stop using exclusivity practices that the SAMR declared to be illegal under existing Chinese law. Alibaba chose to ignore that directive. That other companies had *also* used "choose one" tactics and were *also* told to change their practices does not change the fact that ***Alibaba chose to ignore the SAMR and violate the law***.

Defendants alternatively (and incongruously) argue that (i) the November 2019 meeting did

3

not sufficiently inform Alibaba that its practices were illegal (MTD 16,18); and (ii) Alibaba fairly

disclosed to investors that it relied on practices that Alibaba was warned were illegal (*id*. 17-18). These

arguments not only contradict each other, they are belied by Plaintiffs' allegations: Alibaba was *clearly*

told that requiring exclusive partnerships was illegal (¶¶103-04), Alibaba falsely told investors it had

*stopped* using them (¶253), and Alibaba continued to require exclusivity during the Class Period (¶¶136-

41, 379). These facts give rise to a securities fraud claim. The motions to dismiss should be denied.

## II.   STATEMENT OF FACTS

### A.   Alibaba's Business And "Choose One Of Two" Restrictive Trading Practices

Alibaba's primary business is operating several popular online retail platforms. Alibaba's two

most important platforms are Tmall (for branded products) and Taobao (for small businesses and

entrepreneurs). ¶¶46, 48. Alibaba's customers are its marketplace merchants, and its revenue is

primarily derived from marketing and advertising fees paid by merchants. ¶47. Alibaba derived most

of its revenue from its core commerce segment (*i.e.*, its e-commerce platforms), accounting for 86%

of Alibaba's total revenue in fiscal years 2018, 2019 and 2020. *Id*.

Alibaba's valuation grew to over $500 billion during the Class Period, with Alibaba boasting

it was "the largest retail commerce business in the world." ¶45. It attained that growth, in large part, by

imposing "choose one" practices to force merchants to use one platform—Alibaba—as their exclusive

sales outlet. ¶137. Alibaba "used various incentives and penalties to ensure the implementation of the

practice" (¶136), providing "incentives such as traffic support" for exclusive merchants (¶140) and

punishing non-exclusive merchants by, *inter alia*, cancelling promotion displays, expelling them from

promotions on popular shopping holidays, lowering or hiding their search results, downgrading store

ratings, reducing marketing resources and other contracted services, and "even bans from Alibaba's

marketplaces." ¶90; *see also* ¶¶88-95, 135-41; Defs Ex. P at 1-2. The penalties had a "strong deterrent

effect, forcing more operators on the platforms to implement" Alibaba's exclusivity requirements. ¶140.

**B.      SAMR's Role In Enforcing Internet Commerce Laws Applicable To Alibaba**

In March 2018, China created the SAMR, the ministry-level agency in charge of market regulation. ¶69. Regarded as China's "single most powerful market regulator," the SAMR wields great power over Chinese commerce. *Id.* Given Alibaba's notoriety as the world's largest e-commerce retailer, Alibaba (and, in particular Alibaba's compliance with Chinese law) was of particular concern to the SAMR. ¶68. Alibaba understood the importance of complying with government directives: Alibaba had nearly 200 Communist Party branches to interface with government officials. ¶66.

Still, the events of the Class Period here were not the first time Alibaba ignored the directives of its market regulators in order to preserve its business practices and dominance. Two months before Alibaba's historic $25 billion IPO in 2014, SAMR's predecessor, China's State Administration for Industry and Commerce ("SAIC"), held an administrative guidance meeting to tell Alibaba that the proliferation of counterfeit goods on its platforms violated Chinese laws and directed Alibaba to rectify its practices to stop the sale of counterfeits, or face significant fines. *Christine Asia Co., Ltd. v. Ma*, 718 Fed. App'x. 20, *22-*23 (2d Cir. 2017) ("*Alibaba I*"). Alibaba did not disclose the SAIC's warning prior to the IPO, nor did it remedy its practices as instructed by the SAIC. When the market learned the truth, Alibaba's stock price plummeted, prompting a securities class action that settled for $250 million. *Christine Asia Co. Ltd. v. Yun Ma*, 2019 WL 5257534, *6 (S.D.N.Y. Oct. 16, 2019).

**C.      Pre-Class Period: SAMR Explicitly Instructs Alibaba And Other Platforms To Stop "Choose One" Exclusivity Practices Because They Violate The Law; Alibaba Agrees**

China's Anti-Monopoly Law ("AML") prohibits agreements that restrict competition. ¶72. AML Article 17 prohibits an entity with a dominant market position, like Alibaba, from restricting the trading practices of a counter-party without justification. ¶75. Leading up to the Class Period, China's anti-trust regulation increased, particularly regarding Internet companies. ¶76. On September 1, 2019, SAMR enacted new regulations ("New AML Regulations"), including rules to specifically counteract

"abuse of dominant market position in the Internet." ¶¶76-78, 80. The rules prohibited dominant firms, like Alibaba, from "*setting restrictive conditions to make it difficult for the counterparty to conduct trade*" and "*restricting a counterparty to deal/transact only with it*." ¶¶81-82.

On November 5, 2019, the SAMR held an industry-wide administrative guidance meeting for the explicit purpose of instructing online retailers—including Alibaba—that "choose one" violated Chinese law. ¶¶99-117. "Administrative guidance" is a proceeding whereby Chinese regulators instruct companies on how to comply with the law to obtain voluntary compliance before imposing penalties. ¶102. China's state news reported that during the meeting, the SAMR stated that "*'Choose One of Two' and 'exclusive trading' in the Internet sector…are clearly prohibited by the Electronic Commerce Law and also violate the Anti-Monopoly Law and Anti-Unfair Competition Law*" and warned that it would investigate any suspected continued use of "choose one" by the companies. ¶¶103-04. Alibaba was featured prominently at the meeting, represented by Wen Jia, Alibaba's V.P of the Office of the Chairman, President of Public Affairs, and member of the Alibaba Partnership. ¶111.

In July 2020, the SAMR held another administrative guidance meeting on "fair competition" in Internet commerce. ¶¶114-17; Ex. 6.[2] During the meeting—attended by 20 large Internet companies, including Alibaba, and six major SAMR bureaus—SAMR's deputy director invoked the authority of President Xi, the Party, and the State Council in admonishing the companies to "strictly abide by the laws and regulations" governing competition, including the AML and the E-Commerce Law. Ex. 6 at 5. In connection with the meeting, Alibaba agreed to the "Commitment Letter" attesting that it would not "force platform operators to conduct 'exclusive cooperation' or 'exclusive authorization'" and would not otherwise "impose any unreasonable restrictions or make any unreasonable requirements on the selections of platforms by the operators." ¶116-17; *see also* Ex. 6 (the Commitment Letter).

---

[2] Alibaba says this meeting was held on July 17, 2020 (MTD 9, n.5, 20), but that date is not in the record. Rather, the publication of the Commitment Letter stating the meeting had occurred "recently" is dated July 17. Ex. 6.

**D.      During The Class Period: Alibaba Flouts The SAMR, Continues "Choose One"**

Despite the foregoing, Alibaba continued to require exclusivity during the Class Period. ¶122. The SAMR Report found that "since 2015," Alibaba "implemented 'Choose One of Two' to restrict on-platform operations to carrying out transactions only with [Alibaba], by means such as ***prohibiting them from opening shops and participating in promotional activities on other competitive platforms***." ¶136 (emphasis added).[3] Not only did Alibaba's agreements "**directly prescribe…that opening shops on other competitive platforms is prohibited**," Alibaba also "**verbally required core merchants not to operate on other competitive platforms**." ¶138[4] (emphasis in original). Alibaba's verbal coercion was "relatively highly binding" due to its dominance. Ex. 8 at 9.

The SAMR Report revealed that Alibaba monitored merchants with "various methods including manual inspections and monitoring with Internet technology" (¶140), used intimidation like "sending screenshots of the core merchants' promotional pages on other competitive platforms," and kept a "gray list" of offending merchants. Ex. 8 at 10-11. It also summarized the punishments Alibaba levied against merchants found on other sites, including "the reduction of resource support for promotional activities, disqualification from participating in promotional activities, search downgrading, and the cancellation of other significant rights and benefits on the platforms[.]" ¶140.[5]

Finally, the SAMR Report listed the evidence supporting its findings, including "investigative inquiry records of the relevant personnel…, chat records of internal DingTalk groups, emails, cooperation agreements…, development plans and work summaries of various business departments, merchant acceptance standards for 'Double 11' and '618', documents such as meeting briefings, self-

---

[3] The Report is the culmination of the investigation launched on Dec. 23, 2020, details Alibaba's practices "since 2015", and is the basis for the remedial measures Alibaba was ordered to take. In sum, the practices had not stopped prior to the investigation. Alibaba conceded it violated the AML and did not contest any of the SAMR's factual findings. ¶¶146-47.

[4] Alibaba classified merchants in levels, from high to low, as SSKA, SKA, KA, core middle, middle, long tail, and bottom. ¶137. Generally, KA and above were considered Alibaba's "core merchants" and subject to exclusivity requirements. *Id.*

[5] *See also* ¶¶141, 379; Ex. 8 at 11 ("[Alibaba] took measures such as canceling their KA qualifications or terminating relevant cooperation to deprive them of relevant service guarantees and other major rights and interests.").

investigation reports…, and investigative inquiry records of relevant personnel of competitive platforms

and operators on the platforms." Ex. 8 at 12. The SAMR rejected Alibaba's argument that its exclusivity

requirements were voluntary and backed by consideration, *i.e.*, the same arguments Alibaba advances

here. Ex. 8 at 11 (exclusivity "not voluntarily entered into" and "the reasons put forward by [Alibaba]

are not valid and there is no justifiable reason for implementing the relevant actions.").

> ### E.       At The Same Time Alibaba Was Concealing The Risks Of Its Ongoing Exclusivity Practices, It Concealed An Existing Regulatory Risk Threatening The Ant IPO

Ant Group Holding ("Ant") grew out of Alibaba's Alipay e-payment platform. ¶¶159-60. By

2020, Ant's financial services had grown substantially and included traditional banking services like

checking accounts and lending. ¶161. For the six months ending June 30, 2020, 40% of Ant's revenue

was derived from its CreditTech division, which housed online consumer lending platforms Huabei

(Just Spend), akin to a credit card, and Jiebei (Just Lend), an online loan platform. ¶¶162-63, 189.

On July 20, 2020, Alibaba announced that Ant had commenced its IPO process. ¶165. Ant

filed its Final IPO Prospectus on October 27, 2020, with Ant's shares set to start trading on the Hong

Kong and Shanghai exchanges on November 5, 2020. *Id*. Ant's valuation was estimated to reach $300

billion following the IPO, putting Alibaba's 33% stake in Ant at an estimated $100 billion. ¶¶166-67.

Ant's expansion into financial services drew the ire of the CBIRC and PBOC, concerned about

Ant's previously unchecked growth into online lending. ¶¶191-94. In the summer of 2020, the PBOC

began to investigate Ant-originated loans. ¶¶155, 192-93. The regulators' attention on Ant was backed

by new Online Lending Regulations enacted on July 12, 2020 (¶¶194-96) and the FHC Regs, published

September 11, 2020, to take effect November 1, 2020—just days before the IPO was to close.[6] The

PBOC specifically identified Ant as a target of the FHC Regs, which required firms like Ant, because

it held banking units, to maintain substantially higher capital. ¶198-99. Under the FHC Regs, Ant was

---

[6] Plaintiffs do not "gloss[] over" banking regulations in their scheme claims. MTD 1. The failure to disclose Ant's violation of the FHC Regs forms a basis of Ant-related Rule 10b-5(b) claims against Alibaba and Ma. ¶¶197-204, 274-77, 298-308.

required to have RMB500 billion in assets. ¶¶200-01. Going into the IPO, Ant had only RMB315.8 billion (¶202)—a *$27.5 billion deficiency*.[7]

**F.**    **Concealed Risks Materialize: China Halts The Ant IPO; SAMR Announces New Anti-Trust Rules Targeting Alibaba And Launches Anti-Trust Probe Of Alibaba**

On November 2, 2020, the PBOC, CBIRC, the China Securities Regulatory Commission, and other regulators called Defendant Ma, Ant's chairman Eric Jing, and Ant's CEO Simon Hu to a meeting to discuss Ant's compliance with the FHC Regs. ¶203. The following day, November 3, 2020, Alibaba filed a Form 6-K with the SEC announcing that the Ant IPO was suspended because Ant "may not meet listing qualifications or disclosure requirements due to material matters relating to the regulatory interview" held November 2. ¶¶204, 229.[8] On this news, Alibaba's ADSs fell $25.27 per share, to close at $285.57 per share (a drop of about 8.13%) on November 3, 2020. ¶¶232, 372.

Ma argues that the November 2 meeting related only to a *separate* set of new rules, the "Interim Measures," which were announced *later* in the day after the meeting, and asserts that the Interim Measures—rather than the FHC Regs—was the reason for the Ant IPO suspension. Ma MTD 7. Ma cites Defs Ex. LL in support, but he omits a key phrase from the article quote and instead inserts his own reference to the Interim Measures. In fact, Ex. LL states: "Ant can't proceed with an IPO until after it complies with new *capital requirements* and other restrictions *imposed* on the country's financial conglomerates *at the start of the month*"—referring to the RMB500 bn requirement imposed by the FHC Regs on November 1, *not* the Interim Measures. The Interim Measures were not yet "imposed" and were open for public feedback until December 2. Defs Ex. JJ at 2.[9] The timing also

---

[7] On October 27, 2020, the final Ant IPO Prospectus date, the exchange rate was 6.7055 yuan to US$1. Thus, RMB500 bn was roughly US$74.6 billion. Ant's RMB315.8 bn asset balance was worth about US$47.1 billion.

[8] As alleged in the Complaint and discussed in the Ma Opp., the obfuscated ownership of certain controversial investors in the Ant IPO also was a reason for the IPO suspension, but this fact did not become public until months after the combined risks of Ant's regulatory problems and concealed ownership materialized on Nov. 3, 2020. ¶¶206-08.

[9] Further, a Reuters article describing the Nov. 2 meeting (¶203) details reports of inside sources familiar with the meeting and *then* states, toward the end of the article, that "China's central bank and banking regulator *separately* published draft micro-lending rules on Monday which seek to increase the bar for micro-lenders…." Wolke Decl. Ex. A.

shows that the FHC Regs were the issue: just days earlier, on October 27, Ant filed its Final IPO Prospectus, revealing the massive $27.5 billion asset deficiency.

Separately, on November 10, 2020, the SAMR published new rules under China's AML further targeting "choose one" practices. ¶¶123-24. While the rules set forth harsh new penalties for violators (¶124), commentators noted the prohibition against "choose one" was a reiteration of the SAMR's prior statements (¶129). As Bloomberg reported, Alibaba was a clear target, with Beijing seeking to "curtail" its "growing dominance." ¶123; ¶128. In response to this news, Alibaba's ADS fell $23.99 per share (a drop of 8.26%) to close at $266.54 per share. ¶125. Ignoring the September 2019 New AML Regulations, the November 2019 meeting, and the July 2020 Commitment Letter, Alibaba claims it was not until these rules were announced in November that it knew "for the first time" that "choose one" exclusivity practices were prohibited by Chinese law, including the AML. MTD 10.

Finally, on December 23, 2020, the SAMR announced an antitrust investigation into Alibaba's "monopolistic" practices. ¶130. In response, Alibaba's ADS fell $34.18 per share (approximately 13%)—Alibaba's biggest one-day decline since going public in 2014. ¶131.

## III.   APPLICABLE PLEADING STANDARDS DISFAVOR DEFENDANTS' MOTION

Rule 12(b)(6) requires courts to  accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Alibaba I*, 718 Fed. Appx. at 23; *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *8 (S.D.N.Y. Mar. 25, 2013). The complaint need only "contain sufficient factual matter...to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (complaint need only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting claims); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) ("The task of the Court in ruling on a motion to dismiss is to 'assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'").

## IV.    THE COMPLAINT STATES A §10(b) CLAIM BASED ON ALIBABA'S IMPROPER BUSINESS PRACTICES AND RELATED UNDISCLOSED RISKS

Section 10(b) Rule 10b-5(b) make it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made...not misleading." 17 C.F.R. § 240.10b-5. To state a claim, Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants challenge only falsity, scienter, and loss causation. As to these and all required elements, the Complaint is sufficient.

### A.    The Complaint Alleges Material Misrepresentations And Omissions

#### 1.    Statements Regarding Alibaba's Use Of "Exclusive Partnerships" And The Legality Of Alibaba's Business Practices Were Materially Misleading

Alibaba's FY 2020 Form 20-F, signed by Zhang, referred to recent "strengthened enforcement" by anti-monopoly authorities, misleadingly assured investors that "we believe that ***our business practices do not violate anti-monopoly or unfair competition laws***," and falsely described its "alleged" use of "exclusive partnerships" as "***prior***" and "***narrowly-deployed***[.]" ¶253. Defendants' attempts to muddle the SAMR's clear message and to mischaracterize Alibaba's actual exclusivity practices in an attempt to avoid liability for this false and misleading statement fail at every turn.

#### (a)    Defendants' Professed "Belief" Was Misleading Under *Omnicare*

Alibaba's primary defense is its supposed "belief" that *its* exclusivity practices (which Alibaba recasts as "traffic-for-exclusivity") did not violate PRC law. MTD 6-7, 15-17. But Alibaba cannot hide behind the word "believe" to recast its assurance of legal compliance as a mere opinion on which investors were not entitled to rely. When professing their "belief" that Alibaba's practices did not violate China's AML or unfair competition laws, Defendants concealed the material fact that Alibaba had already been told by the SAMR that "exclusive trading" practices were illegal under those laws

and to cease using them, ***but Alibaba continued to do it anyway***. That is misleading. *In re Investment Tech. Group, Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) (falsity alleged where company made an "'inaccurate, incomplete, or misleading' representation of compliance" with SEC regulation requiring confidentiality when, in fact, defendant's practices violated confidentiality); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (statement that Fiat was "substantially in compliance with the relevant global regulatory requirements" misleading where it was later revealed Fiat was not in compliance with U.S. Safety Act during the class period).[10]

Defendants mischaracterize the law on statements couched as opinions, claiming an opinion is "only actionable if" Plaintiffs allege it was "actually 'disbelieved by the defendant at the time it was expressed.'" MTD 15 (citing *Inv. Tech.*, 251 F. Supp. 3d at 618).[11] While alleging subjective disbelief is certainly *one* way to allege the falsity of opinions, Defendants ignore that their own cited authority says opinions also are actionable "if they omitted to state facts that would 'conflict with what a reasonable investor would take from the statement itself.'" *Inv. Tech.*, 251 F. Supp. 3d at 619 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)). As the court in *Inv. Tech.* observed, opinion statements are "***actionable where the plaintiff concretely alleged that the defendants, before making the opinion statement at issue, knew facts whose omission made the opinion statement misleading***." *Id.* (citing *Menaldi v. Och-Ziff Capital Management Group, LLC*, 164 F. Supp. 3d 568, 574-75, 583-84 (S.D.N.Y. 2016) (statements about regulatory proceedings actionable where company omitted it had received subpoenas from the SEC

---

[10] *Accord Bricklayers & Masons Loc. Union No. 5 Ohio Pens. Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 241 (S.D.N.Y. 2012) (compliance statement actionable where plaintiffs identified laws company violated); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013) (statements that issuer complied with Medicare regulations actionable); *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 86 (D.D.C. 2017) ("*EIG I*") (falsity alleged where statements were "plainly aimed at assuring investors that the shipyards would be expected to comply with the law.").

[11] In the portion of *Inv. Tech.* cited by Alibaba, the court held that the fact of an SEC investigation did not render the opinion that "no legal or regulatory matter was expected to have a 'material adverse effect'" misleading because plaintiffs failed to allege defendants knew about the SEC investigation before making the statement. 251 F. Supp. 3d at 619. Here, Alibaba knew the SAMR instructed that exclusive trading was illegal and to stop *long before* the statements at issue.

and requests for information from DOJ) and *In re BioScrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711, 729-32 (S.D.N.Y. 2015) (statements about periodic investigations misleading where company omitted that it had received a civil investigative demand)). Here, when Defendants expressed an opinion on Alibaba's compliance, they knew Alibaba was still using exclusivity practices that SAMR had told it to stop.[12]

The "qualification" Defendants tacked on the disclosure—"there can be no assurance that regulators will not initiate anti-monopoly investigations against us" (MTD 16)—makes the disclosure *more* misleading, not less. Where Defendants knew (and investors did not) that Alibaba was continuing to employ exclusive trading practices it had been told to cease, the risk of anti-monopoly investigations was *heightened* (and concealed). *See Bioscrip*, 95 F.Supp. 3d at 727 (warning must be read in context of "its ability to accurately inform rather than mislead" investors); *see also* Sec. IV.A.2, *infra*.

Because Defendants chose to speak on the legality of Alibaba's business practices and the potential for anti-monopoly investigations, but omitted that Alibaba was continuing to require exclusivity, falsity is alleged under *Omnicare **even if*** Defendants subjectively believed they would be able to prevail in convincing the SAMR that Alibaba's so-called "traffic-for-exclusivity" practices were legal. *BioScrip*, 95 F. Supp. 3d at 729. Where Alibaba chose to disclose some facts relating to the legality of its practices, it had a "duty to tell the whole truth," *i.e.*, that Alibaba was told by the SAMR to stop requiring exclusivity because it was illegal, and Alibaba continued to require exclusivity regardless, apparently hoping it could convince the SAMR *its* exclusivity practices were

---

[12] Defendants' argument that Alibaba's signing the Commitment Letter supports their supposed subjective belief that Alibaba's "traffic-for-exclusivity measures" were "lawful and justifiable" (MTD 20) ignores the Complaint's allegations ***that contrary to its promise*** to not "force" merchants into "exclusive cooperation," that is exactly what Alibaba did. *Compare* ¶117 (what Alibaba promised) *with* ¶¶136-41 (what Alibaba did). Moreover, that Alibaba had used exclusivity practices "for years" and described them as "normal market practice" (MTD 2, 16) is irrelevant, where, in November 2019, it was told by the SAMR that it was illegal and to stop doing it. Indeed, it was *because* forced exclusivity had become a popular practice among Internet companies that the SAMR held the November 2019 meeting. ¶103.

Alibaba also argues that its belief was "reasonable" because the law on exclusivity was complicated (MTD 11), and it supposedly raised "colorable defenses" that the SAMR considered before fining it $2.8 billion (MTD n.11). Defendants' suggestion that the law was unclear because Alibaba may not have been a "dominant" actor (*id.*) lacks credibility. In a July 2020 investor presentation filed with the SEC, Alibaba boasted it was "the largest retail commerce business in the world[.]" ¶45. And the SAMR flatly rejected Alibaba's so-called "colorable defenses" as wholly unsupported. Ex. 8 at 11-12.

justified. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.")); *BioScrip*, 95 F. Supp. 3d at 727 (similar).[13]

> **(b)**     **Alibaba Falsely Described Its "Exclusive Partnerships" As "Prior" And "Narrowly-Deployed"**

In attesting to their "belief" that Alibaba's practices did not violate Chinese law, Defendants falsely characterized Alibaba's use of "exclusive partnerships" as "prior" and "narrowly-deployed[.]" ¶253. This context matters. Whereas the Complaint alleges that Alibaba continued to broadly require exclusivity during the Class Period (¶¶136-42), claiming the practices were "prior" and "narrowly-deployed" when discussing Alibaba's current anti-trust legal compliance was materially misleading.

Indeed, falsity is alleged "where defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 661 (S.D.N.Y. 2017).[14] Defendants' statements here misleadingly maintained that, to the extent exclusivity agreements violated Chinese law (which they did), investors should be assured by the fact that Alibaba no longer required them.

Defendants obfuscate the truth and argue that Alibaba's reference to "alleged prior narrowly deployed exclusive partnerships" referred solely to "unconditional" "choose one" practices requiring "absolute exclusion" and that Alibaba was telling investors that it no longer required "absolute

---

[13] Defendants also argue that Plaintiffs' citation to the April 2021 SAMR Report and fine means Plaintiffs plead fraud by hindsight. MTD 15, 17. Not so. Plaintiffs' claims are not premised on the Report's *outcome*, but on its details of the exclusivity practices Alibaba used during the Class Period. The SAMR findings and fine are the result of Alibaba *ignoring* the SAMR's warnings after November 2019 and *throughout the Class Period*. It confirms Plaintiffs' allegations of Alibaba's Class Period exclusivity practices, and certainly supports a finding that Plaintiffs' claims are plausible at this stage. *Cf. Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143, n.13 (2d Cir. 2010).

[14] *See also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 236 (S.D.N.Y. 2006) (claim that Goldman issued "truly independent investment research" actionable because it concealed improper business practices, including that research was beset by pervasive conflicts of interest); *In re JP Morgan Chase & Co. Sec. Litig.*, 2014 WL 1297446, *8 (S.D.N.Y. Mar. 31, 2014) (statements downplaying risk of derivative instruments actionable because "[h]ad the Defendants disclosed all of the material facts that they were allegedly in possession of, it would have significantly altered the information available to investors").

exclusion" during the Class Period. MTD 19; *see also* MTD 5-6 (arguing that "choose one" originally referred only to "unconditional exclusivity" or "outright blocking"). Nonsense. Notably, the phrases Defendants would have this Court rely upon, *i.e.*, "unconditional 'choose one of two'" and "absolute exclusion," to redefine Alibaba's use of the term "exclusive partnerships" ***do not appear anywhere*** in either Alibaba's Form 20-F or elsewhere in the record. Defendants cannot ignore the facts alleged to claim that "exclusive partnerships" has only one extremely narrow meaning to avoid liability.[15]

But even if the Court were to accept Alibaba's narrow definition of "exclusive partnerships" (which it should not), Plaintiffs clearly allege that the exclusivity practices Alibaba used during the Class Period encompassed a host of punitive measures, *up to and including* what Defendants refer to as "absolute exclusion." For example, "[m]erchants who don't comply [with Alibaba's exclusivity demands] face punishment such as reduced marketing resources, decreased search result rankings, ***and even bans from Alibaba's marketplaces***." ¶90; *see also* ¶94 ("Galanz's products were ***blocked from Tmall***'s platform"). Alibaba's merchant agreements "***directly prescribe[]…that opening shops on other competitive platforms is prohibited***," "***explicitly provided*** that the core merchants are ***not allowed to enter other competitive platforms***," and stated "merchants are to use ***[Alibaba's] platforms as the only online sales channels*** within the territory of China[.]" *¶*138; *see also* ¶¶137, 139.[16]

A reasonable jury could interpret these facts to mean that Alibaba had indeed required "absolute" or "unconditional" exclusivity during the Class Period, rendering the statement that its

---

[15] The exhibits Alibaba cites do not support its argument about "unconditional exclusivity," and certainly do not support Alibaba's claim in its 2020 Form 20-F that it had stopped requiring it. Defs Ex. J notes there are "different forms of 'forced exclusivity,' also known as 'choose one of two'" and "Alibaba's version forces merchants to sell exclusively on its marketplaces, such as Taobao and Tmall." *Id.* at 4; ¶90. Defs Ex. K generally refers to measures that "exclude or restrict" competition, and notes Alibaba was a target of SAMR's anti-trust crackdown. *Id.* at 1, 2; ¶119. Defs Ex. S also supports Plaintiffs' allegations that "choose one" meant not only "absolute" exclusion, but included many restrictive practices used to engender the result of preventing merchants from selling on other platforms. Ex S at 4. *See also* ¶¶5, 27, 89, 110.

[16] Defendants also falsely assert that "Plaintiffs fail to plead that Alibaba was deploying any non-traffic allocation-based exclusivity arrangements when it made this disclosure in July 2020." MTD 19. This again ignores the Complaint. ¶140 (while Alibaba "encourage[d]" exclusivity "through incentives such as traffic support," it also monitored merchants for exclusivity violations and imposed a variety of penalties); Ex. 8 at 10-12 (detailing punitive measures).

"exclusive partnerships"—under *any* definition—were "prior" and "narrowly-deployed" misleading. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 761 (S.D.N.Y. 2017) (no dismissal where "[a] reasonable jury could find these statements...to have been misleading to a reasonable investor, in light of the circumstances under which they were made."); *Lapin*, 506 F. Supp. 2d at 238 (dismissal only if "no reasonable investor could have been misled about the nature of the risk").

### (c)    The Exclusivity Practices Alibaba Used During The Class Period Were Covered By SAMR's November 2019 Instruction, Which Was Both Sufficiently Clear and "Binding"

Alibaba's other protestations that the SAMR's instruction "was vague in its scope" and not "binding" fail. MTD 16. While Defendants claim to have been confused about whether Alibaba's "traffic-for-exclusivity" practices constituted the types of unlawful "choose one" practices SAMR was targeting (*id.*), they conveniently ignore SAMR's explicit instruction that "***exclusive trading***" and "***restricting and excluding*** other operators from carrying out promotional activities are ***prohibited***." ¶¶103-04. Restricting or excluding merchants from opening shops and participating in promotions on Alibaba's competitor platforms, however, is precisely what Alibaba did. ¶¶136-39. Alibaba's own motion concedes that its "traffic for exclusivity" practices were done for the purpose of extracting merchants' agreements to be "exclusive to Tmall" (MTD 6)—*i.e.*, to restrict or exclude them from selling on other platforms. Alibaba's semantic games and feigned confusion do not support dismissal.

Nor can Alibaba avoid liability by redefining its "choose one" practices as mere incentives provided as consideration for voluntary exclusivity[17]—an argument squarely rejected by the SAMR after reviewing Alibaba's evidence (Ex. 8 at 11)—and ignoring the Complaint's detailed allegations of the many *punitive* tactics Alibaba used to *force* merchant exclusivity. *See, e.g.*, ¶¶140-41 (noting that Alibaba used its "market power, platform rules, and technical means such as data and algorithms"

---

[17] *E.g.* MTD 2 ("…Alibaba for years vigorously contended that its own practices—incentivizing merchants to sell exclusively on its e-commerce platforms by offering them improved visibility and promotional opportunities—were permissible,…"); *id.* at 9 (referring to "traffic as an incentive"); *id.* at 11 ("SAMR rejected Alibaba's argument that the provision of traffic resources to the merchants as incentive for exclusivity constituted exculpatory 'justifiable cause.'").

to "impose penalties" on merchants who did not adhere to Alibaba's exclusivity demands). These practices clearly ran afoul of the SAMR's directive that "exclusive trading" was prohibited. ¶103.

Alibaba's attempt to explain its perception of the legality of *one* restrictive tactic, traffic-for-exclusivity, in the face of the many forced exclusivity practices detailed in the Complaint is an insufficient basis for dismissal. *Duoyuan Water*, 887 F. Supp. 2d at 568 (defendants' explanation of discrepancies between SEC and SAIC filings, where plaintiffs alleged SAIC filings showed SEC filings were misleading, was "an insufficient reason to dismiss"). Indeed, *even if* "the provision of traffic as an incentive [could have] 'prove[d] the justifiability' of otherwise prohibited exclusivity arrangements" (MTD 9), the fact that **some** of Alibaba's exclusive partnerships **may** have been justified as legitimate business agreements supported by consideration fails to address the obvious illegality of the many punitive measures taken against merchants who did not agree to exclusivity.

Defendants also cannot escape liability by describing the November 2019 meeting as "voluntary." MTD 16. Administration guidance is the official mechanism by which Chinese regulators seek legal compliance, to give a company a chance to rectify violations *before* imposing penalties. ¶102. The November 2019 meeting was China's most powerful market regulator telling Alibaba to stop requiring exclusive trading because it was anti-competitive and illegal. Alibaba was not free to ignore it. Indeed, the *form* within which the SAMR's delivered its message—at a "voluntary" meeting with other companies present (MTD 16, 18)—is irrelevant where the *substance* was abundantly clear: "choose one" and "exclusive trading" behaviors "are clearly prohibited" by Chinese law. ¶103.[18]

### 2.    Alibaba's Purported Risk Disclosures Were Materially Misleading

Alibaba's 2020 Form 20-F purported to warn that "[a]nti-monopoly and unfair competition

---

[18] That the SAMR's instruction to stop using "choose one" practices was "not specific to Alibaba" (MTD 18) is likewise irrelevant. A claim is stated here because Alibaba misled *its* investors about *its* exclusive dealing practices and the risks associated therewith. If anything, that the SAMR *also* warned other e-commerce companies in an industry-wide Administrative Guidance meeting to stop using "choose one" practices only underscores how serious the SAMR was.

claims or regulatory actions" against the Company "may result in our being subject to fines, constraints on our business and damage to our reputation." ¶253. Alibaba added that "there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted" and "[a]ny anti-monopoly lawsuit, regulatory investigations or administrative proceedings initiated against us could also result in our being subject to regulatory actions[.]" *Id.*; ¶¶255(c) & (d).[19]

These purported "warnings"—which concealed or misrepresented that Alibaba was continuing to require exclusive trading practices that it had been told were illegal and to stop—are misleading and actionable. *Alibaba I*, 718 Fed. Appx. at 23 ("Defendants had a duty to disclose these facts, in a manner that accurately conveyed the seriousness of the problems Alibaba faced, so as not to render Defendants' public disclosures 'inaccurate, incomplete, or misleading.'") (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *9-10 (S.D.N.Y. Mar. 28, 2018) (risk statement that "a governmental authority may take a contrary" position misleading where authority had already taken a contrary position).[20]

Defendants argue that they fairly disclosed the risks Alibaba faced because they mentioned the administrative guidance meetings wherein the SAMR "indicated its view" that "exclusivity arrangements[] ***may*** constitute violation" of China's AML and/or unfair competition laws. MTD 17-18. Far from a fair warning, this statement was itself misleading where the SAMR had earlier told Alibaba that "choose one" and "exclusive trading" requirements were "***illegal***", "***clearly prohibited by***", and "***violate***" Chinese law, including the AML and unfair competition laws. ¶¶103-10. Further,

---

[19] *See also* ¶269 (in its HK Interim Report filed 12/18/20, Alibaba vaguely warned of risks relating to "changes in laws, regulations and regulatory environment" that may impact its "ability to continue to compete effectively" or "affect Alibaba's business operations." This was misleading because it did not disclose Alibaba's ongoing exclusivity practices).

[20] *See also Jinkosolar*, 761 F.3d at 251 (actionable omission where company "warned of a financial risk to the company from environmental violations," but failed to disclose ongoing pollution abatement problems); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, *13 (S.D.N.Y. Sept. 27, 2020) (warnings about consumer loans failed to disclose "that financial services providers operating on Jianpu's platform were not in compliance with existing regulations"); *Howard v. Arconic Inc.*, 2021 WL 2561895, *6 (W.D. Pa. June 23, 2021) (undisclosed "regular and systematic practice of [improper] sales" rendered "statements warning about potential compliance issues and safety risks" misleading).

while Alibaba referred to "certain business arrangements adopted by e-commerce platforms, including arrangements seen as exclusivity arrangements" and indicated the SAMR intended to investigate such hypothetical arrangements (MTD 18), Defendants concealed that Alibaba *itself* was then-using "exclusivity arrangements" and falsely assured that its "exclusive partnerships" were a thing of the past.

Alibaba's other argument that it did not mislead investors because Chinese media reported on the November 2019 meeting and Alibaba defended its practices there, claiming Alibaba "cannot be held liable for failing to disclose…publicly available information" (MTD 18-19), is a red herring. There is no indication that the *Chinese* coverage of the meeting reached the U.S. market at the time. But even if it had, Defendants again ignore the salient point: ***they failed to tell investors that Alibaba was still requiring exclusivity in July 2020 and through the Class Period***. *Lapin*, 506 F. Supp. 2d at 238 (disclaimer misleading where it failed to inform investors of Goldman's improper practices).[21]

      **3.**      **Statements About Alibaba's Core Commerce Were Materially Misleading**

A company misleads its investors where, as here, it "puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Menaldi*, 164 F. Supp. 3d at 581; *Lapin*, 506 F. Supp. 2d at 240. Here, Defendants put the reasons for Alibaba's success at issue by touting, for example, its ability to "attract and retain a large number of…merchants" to drive revenue (¶256), the "growth of customer [*i.e.*, merchant] management revenue" (¶261), that its "domestic core commerce business continued to grow steadily" (¶265), and the "solid performance of our core commerce" (¶265).

Having put the "source of its success" at issue, Alibaba had a duty to disclose that a source of that success was *also* rooted, at least in part, in improper and anti-competitive exclusivity practices. *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Group PLC*, 2022 WL 596679,

---

[21] *See also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (to avail themselves of the truth-on the market defense, defendants must show that the "the truth of the matter" was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.").

*15 (S.D.N.Y. Feb. 28, 2022) ("defendants' statements that described strong revenue and growth" actionable because "Reckitt's results were due at least in part to an anticompetitive scheme that misled reasonable investors"); *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, *16 (S.D.N.Y. Mar. 29, 2021) ("courts have sustained where a company reports positive sales results without disclosing that those results were due, even if in part, to bribery, antitrust violations, or some other illegal conduct").[22]

### 4. Defendants Had An Affirmative Duty To Disclose Alibaba's Improper Business Practices Pursuant To Item 303

An Item 303 violation can give rise to §10(b) liability. *Stratte-McClure*, 776 F.3d at 101. Item 303 required Alibaba to discuss any trends or uncertainties that were reasonably likely to have a material adverse impact on its financial results or operations. *Id.*; *see also* ¶¶243-45 (Item 5.D for foreign issuers imposes substantially the same requirements). As a foreign issuer, Alibaba also was required to discuss pertinent government factors that "could materially affect, directly or indirectly, their operations or investments by United States nationals." ¶248 (citing 17 C.F.R. § 229.303(b)).

Alibaba's decision to continue requiring exclusivity during the Class Period constituted a known trend or uncertainty that was reasonably likely to have a material adverse effect because the continued use of such practices put the Company at heightened risk of harsh regulatory action. Alibaba thus had an affirmative duty to disclose that it was continuing to use exclusivity practices, and the risks associated therewith, in its 2020 Form 20-F. ¶¶243-51. These facts are similar to the case against Alibaba following its 2014 IPO. There, the plaintiffs alleged Alibaba violated Item 303 because it failed to disclose that it continued to rely on practices that allowed the proliferation of counterfeit goods on its platforms after the SAIC warned Alibaba to rectify its practices or face massive penalties. *Alibaba I*, 718 Fed. Appx. at 23. Here, Alibaba again faced a choice between (i) complying with the

---

[22] *See also Mylan*, 2018 WL 1595985, at *6 (statements "explaining income" as "a result of favorable pricing" "put it sources of income at issue" such that the failure to disclose that sales figures were "*also* due to anticompetitive agreements" was actionable) (emphasis in original); *Cambridge Ret. Syst. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 962-63 (E.D. Va. 2020) (actionable statements and omissions attributing company's success to pricing and quality products while failing to disclose their anticompetitive conduct).

SAMR by changing key practices that Alibaba relied on for its revenue, or (ii) taking the material

undisclosed risk of harsh regulatory action and penalties for failing to heed the SAMR's instructions.

Again, Alibaba chose the latter, misleading investors in violation of Item 303 and §10(b).

**B.      The Complaint Alleges Scienter**

Scienter can be alleged by showing "motive and opportunity" to commit fraud *or* by facts

"constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *Lapin*, 506

F. Supp. 2d at 241. Recklessness is alleged by showing "defendants' knowledge of facts or access to

information contradicting their public statements" or "defendants knew or, more importantly, should

have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*,

216 F.3d 300, 308 (2d Cir. 2000); *In re Aphria Inc. Sec. Litig.*, 2020 WL 5819548, at *7-9 (S.D.N.Y.

Sept. 30, 2020) (recklessness is shown where defendants "knew facts or had access to information

suggesting that their public statements were not accurate" or "failed to check information they had a

duty to monitor."). Scienter requires a holistic review and is satisfied if "a reasonable person would

deem the inference of scienter cogent and *at least as compelling as* any opposing inference one could

draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

**1.      SAMR Told Alibaba At The November 2019 Meeting To Stop Exclusivity Practices Because They Were Unlawful; Defendants Knew Or Recklessly Disregarded That Alibaba Continued To Use Them Anyway**

Despite Defendants' quibbling about the supposed vagueness of the SAMR's instruction to

stop "exclusive trading," and their *post hoc* dissembling that *Alibaba's* "choose one" practices were

justified "traffic-for-exclusivity" incentives, the following facts must be taken as true: (i) at the

November 2019 meeting, the SAMR explicitly said "exclusive trading" was "clearly prohibited" and

instructed companies to stop using such practices (¶¶103-04); (ii) *after* Alibaba representative, Wen

Jia, defended Alibaba's "exclusive partnership model" at the meeting (MTD 19), SAMR's Director of

Online Trading emphasized that "exclusive trading" practices were "clearly prohibited" and warned

that the SAMR would investigate any suspected continued use of such practices (¶110); (iii) Alibaba understood the importance of complying with government directives, including administrative guidance (¶¶64-71, 102); (iv) at or near the beginning of the Class Period, the SAMR again instructed that exclusive trading was illegal and Alibaba affirmed its understanding that it must "not force platform operators to conduct 'exclusive cooperation,' [or] 'exclusive authorization,'" (¶¶116-17); (v) Alibaba told investors it no longer required "exclusive partnerships" (¶253); and (vi) despite the foregoing, Alibaba continued to require exclusivity anyway (¶¶136-41, 379).

Alibaba's disregard of the SAMR's warnings alleges scienter. *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 501 (S.D.N.Y. 2011) (defendants "disregarded warnings from the SEC"); *Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628, at *11 (S.D.N.Y. June 13, 2022) ("Relevant warnings from…regulators are widely recognized to be evidence of scienter"). Moreover, despite Defendants' claims about their supposed "belief" that Alibaba's practices were legal, the application of the law to the companies at the meeting—the largest Internet companies in China, including the biggest, Alibaba—was not a mystery: ***the SAMR specifically told them that their use of "exclusive trading" was illegal***. ¶¶103-11. That was the whole *point* of the meeting. ¶¶103-04. Signing the Commitment Letter demonstrated Alibaba's understanding that it could no longer require exclusivity. ¶¶116-17, 375; *see also* Sec. IV.A.1.a, *supra*. On these facts, Defendants "'knew or, more importantly, should have known that they were misrepresenting material facts related to [Alibaba],' and scienter is adequately plead." *Lapin*, 506 F. Supp. 2d at 241-42.

Defendants also try to negate scienter by arguing that regulators had an "evolving attitude toward the business practices at issue." MTD 23. If anything, regulators' attitudes evolved steadily in the clear direction of cracking down on exclusivity requirements like Alibaba's. Existing laws already made such requirements illegal: Article 17 of the AML prohibited dominant firms from "[r]equiring a trading party to trade exclusively with itself" (¶75), and the January 2019 E-Commerce law stated that

platform operators "shall not abuse their market dominant position to exclude or restrict competition" (¶¶84-85). The September 2019 New AML Regulations singled out "the abuse of dominant market position in the Internet" and prohibited "setting restrictive conditions to make it difficult for the counterparty to conduct trade." ¶¶80-81. At the November 2019 meeting, the SAMR made clear these laws applied to exclusivity requirements of the biggest Internet firms in China, including Alibaba. ¶¶103-13. January 2020 AML amendments further singled out "dominant" Internet firms, including Alibaba. ¶¶118-19. The July 2020 meeting and Commitment Letter made clear the order to stop forced exclusivity came directly from the highest levels of government. ¶¶114-17. Publicly, Alibaba agreed to not require "exclusive cooperation" (¶117) while privately it continued to do so (¶¶138-41). And the SAMR warned that violations "would be investigated and punished in accordance with the law." ¶¶103, 116. On these facts, the danger of misleading investors as to Alibaba's exclusivity practices, legal compliance/violations, and the risks associated therewith "was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *Mylan*, 2018 WL 1595985, at *12.[23]

### 2. Alibaba's Corporate Scienter Is Alleged

Corporate scienter is alleged by "pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).

Alibaba sent one of its most senior executives, Wen Jia, to the November 2019 SAMR meeting. ¶¶6, 111. In addition to being Alibaba's V.P. of the Office of the Chairman, she was also a member of

---

[23] Alibaba's supposition about what the SAMR found to be "quite challenging" about the case against it does not tip the scienter scale in Defendants' favor. MTD 10-11, n.11. For example, the SAMR referred to the "extensive investigations and evidence collection" it did into Alibaba's practices. ¶154. A "quite challenging" aspect could be that Alibaba embedded its offending practices in complex models and data algorithms (¶140)—which would *support* scienter, not negate it.

the powerful and exclusive 36-member Alibaba Partnership and the President of Alibaba's Public Affairs Group, responsible for governmental and regulatory relations. *Id*. At the meeting, she demonstrated her familiarity with and defended Alibaba's "exclusive partnership model." ¶110.[24] In the weeks before the meeting, the Chairman of Alibaba's Marketing and Public Relations Committee, Wang Shuai, also a member of the Alibaba Partnership, conceded that Alibaba relied on "choose one" practices but defended them as a "normal market practice[.]" ¶98.

It is reasonably inferred from their familiarity with and defense of Alibaba's exclusive partnerships that Wen Jia and Wang Shuai also knew, or were extremely reckless in not knowing, that Alibaba continued to require exclusivity during the Class Period, and their scienter is imputed to Alibaba. ¶383; *Loreley*, 797 F.3d at 177 (scienter of managing director imputed to Wachovia). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.... Furthermore, the individual making an alleged misstatement and the one with scienter do not have to be one and the same." *In re Moody's Corp. Sec. Litig.*, 599 F.Supp.2d 493, 515-16 (S.D.N.Y. 2009); *Thomas v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) (noting Second Circuit and this district have imputed scienter to companies from the knowledge of senior analysts, assistant vice-presidents, vice-presidents, and executive directors) (citing cases).[25]

### 3.   The Complaint Alleges Facts Sufficient To Infer Zhang And Wu's Scienter

Wen Jia worked directly with Defendant Zhang, who was Alibaba's Chairman and CEO at the time of the meeting and during the Class Period. ¶41. CEO Zhang, CFO Wu, Wen Jia, and Wang Shuai all were members of the exclusive Alibaba partnership, the top echelon of power at Alibaba. ¶¶56, 97,

---

[24] Notably, Wen Jia did not refer to "traffic-for-exclusivity", as Alibaba tries to redefine its practices in its brief.

[25] *See also Aphria*, 2020 WL 5819548, at *9; *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 443 (S.D.N.Y. 2005) (knowledge of regional VP and department VP imputed to company); *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 627 (S.D.N.Y. 2005) (similar); *Lapin*, 506 F. Supp. 2d at 242.

111. While Wen Jia and Wang Shuai were the public face of Alibaba's attempt to defend its exclusivity practices in 2019 (¶¶97-98, 111), both the message delivered by the SAMR at the meeting and Alibaba's presence there were well-publicized in Chinese state media at the time. ¶¶103-11. On these facts, it is reasonable to infer that both Zhang and Wu were well-aware of the SAMR's instruction to stop requiring merchant exclusivity. It defies logic to believe that they were not.

It is also reasonably inferred that both Zhang and Wu were aware of Alibaba's continued use of exclusivity during the Class Period, given the practices were longstanding business practices, included in Alibaba's merchant agreements, and broadly required and effectively enforced. ¶¶138-40. Moreover, per the SAMR, a plethora of Alibaba company documents evidence use of exclusivity during the Class Period, including "cooperation agreements," "meeting briefings," "development plans," and "work summaries." Ex. 8 at 12. Zhang was aware (or should have ascertained) that Alibaba was still requiring exclusivity when he signed the 2020 Form 20-F characterizing Alibaba's "exclusive partnerships" as "prior" and assuring investors as to Alibaba's legal compliance. ¶253. Wu was aware (or should have ascertained) that Alibaba was still requiring exclusivity when she signed SEC filings omitting the impact of the improper practices on Alibaba's core commerce revenue. ¶¶261, 267.[26] *Aphria*, 2020 WL 5819548, at *9 ("It is at least as compelling an inference that Neufeld and Merton likewise had access to [contradicting non-public] information given their positions at Aphria.").[27]

Moreover, Alibaba has a history of concealing risks associated with ignoring regulatory warnings, particularly where, as here, complying with regulators' demands may fundamentally impact

---

[26] Zhang likewise touted the "solid performance of our core commerce" in Alibaba's 11/5/20 Form 6-K. ¶265.

[27] *See also Karimi*, 2022 WL 2114628, at *11 (inferring CEOs were "aware of these regulatory proceedings by virtue of their position as executives and as members of the management board"); *Mylan*, 2018 WL 1595985, at *12 ("It requires no stretch of the imagination to infer that, due to their positions at the company and the importance of EpiPen to [company's] operations, Defendants 'knew facts or had access to information suggesting that their public statements'…'were not accurate'"); *Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, 2019 WL 4674839, *1, *23 (D. Conn. Sept. 25, 2019) (scienter alleged where there was a significant "difference between what the [d]efendants told investors was driving Teva's financial success and the truth behind Teva's performance" and defendants had access to information that contradicted their statements).

the way Alibaba does business. As explained above, after its historic 2014 IPO, Alibaba's ADS price plummeted when investors learned that before its IPO, Alibaba had ignored warnings from the SAIC (SAMR's predecessor) to rectify its practices to stop the sale of counterfeit goods on its platforms or face the threat of fines. *Alibaba I*, 718 Fed. App'x. 20. Wu and Zhang, both of whom were involved in *Alibaba I*,[28] thus fully appreciated the risks associated with Alibaba's continued use of exclusivity practices in contravention of the SAMR's instructions. Scienter is even *stronger* here than in *Alibaba I*, where the government later withdrew its public criticism of Alibaba's practices with respect to counterfeits. Here, the SAMR's Report on Alibaba's "illegal acts" fully confirms Plaintiffs' theory.

### 4. Exclusive Dealing Was A Central Business Practice And Alibaba Relied On It To Drive Revenue And Maintain Dominance

Knowledge "can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004); *Duoyuan Water*, 887 F. Supp. 2d at 574-75 ("Park and Guo were CFO and CEO of a multinational corporation, and as such, were required to be aware of the Company's financials."); *In re Alstom SA*, 406 F. Supp. 2d 433, 459 (S.D.N.Y 2005) (scienter alleged where CEO, CFO signed SEC filings with misstatements about "extremely important" division).

While Plaintiffs do not "rely" on the core operations doctrine for scienter (MTD n.15), it certainly contributes to the strong inference of scienter alleged. In FY 2020, the vast majority of Alibaba's revenue (86%) came from its platforms, *i.e.*, merchant fees. ¶47. Exclusivity was a central practice of Alibaba's core commerce business, written into its contracts since 2015, and otherwise verbally required. ¶138. Alibaba grew and maintained its dominance by requiring exclusivity: "The more operators gathered on the platform, the more consumers it can attract, creating a positive feedback effect and enabling the platform to maintain its competitive advantage and market power." ¶¶136-37.

---

[28] Wu was the CFO and a named defendant in *Alibaba I*, while Zhang was the COO at the time (¶41).

Moreover, Alibaba "need[ed] to keep growing its core commerce business, since its higher-margin [core commerce] revenue subsidizes the growth of its unprofitable cloud platform, digital media, and innovative initiatives businesses." ¶96. But leading into the Class Period, Alibaba was facing fierce competition from fellow Chinese tech giants Pinduoduo, JD.com, Tencent and Vipshop (¶50), and had been losing market share in terms of both its overall market share of retail platform revenue and in terms of its merchandise volume sold (although its share of the market was still massive). ¶¶134-35. Thus, Defendants took the reckless gamble of defying the SAMR and concealing Alibaba's continued use of exclusivity, in order to cling to the business practices that had previously served Alibaba well. Indeed, after Alibaba finally ended its exclusivity practices, its market share quickly fell. ¶¶155-58 (July 2021 article reporting "Alibaba's share of the China e-commerce market [fell] below 50% for the first time in its history.").

### 5. Plaintiffs' Allegations Form A Strong Inference Of Scienter That Is At Least As Compelling As Any Opposing Inference Of Non-Culpable Intent

The Individual Defendants argue that they had no motive to deceive investors (MTD 20), but motive is not required to allege scienter where, as here, knowledge or recklessness is alleged. *Lapin*, 506 F.Supp.2d at 242 n.6; *Moody's*, 599 F.Supp.2d at 493.

Defendants also argue that a fine of "only" ***$2.8 billion***—China's biggest-ever anti-trust fine—negates scienter. MTD 22. Defendants argue that the fine, 40% of the maximum penalty available, suggests the SAMR found Alibaba's violations were not "knowing" (*id.*), but that inference is not supported in the record. Instead, the SAMR said that "since 2015" Alibaba had "abused its dominant position" and cited the "nature, extent, and duration of the illegal acts" in imposing the historic fine. Ex. 8 at 15. That the fine could have been worse does not change the conclusion that Defendants were at least extremely reckless with respect to their representations about Alibaba's practices and legal compliance during the Class Period. Alibaba's defense by hindsight argument about the fine does not raise a *more* compelling inference than the strong inference of scienter alleged by the totality of the

27

facts. *Cf. Alibaba I*, 718 Fed. Appx. at 23 (reversing dismissal where the court improperly credited Alibaba's downplayed version of regulatory events over "*all* of the facts alleged, taken collectively").[29]

Indeed, that Defendants knowingly or recklessly misled investors regarding Alibaba's exclusivity practices and the risks associated therewith is *at least as likely as* Defendants' proffered inference, that they believed Alibaba's "traffic-for-exclusivity" was lawful. Notably, Defendants' proffered inference does not grapple with the clear language of Alibaba's merchant agreements *requiring* exclusivity or the numerous *punitive* measures taken against vendors who did not agree to exclusivity. Defendants do not even attempt to defend the legality of those practices. Certainly Defendants cannot raise a *more* compelling inference of non-fraudulent intent by *ignoring* key facts alleged about Alibaba's improper and unlawful business practices during the Class Period.

Defendants' final proffered inference—that Alibaba "candidly" disclosed the risks (MTD 23)—also fails. Defendants did not candidly disclose the risk, they misrepresented and concealed the risk because they did not tell investors that Alibaba continued to require exclusivity during the Class Period. They falsely told investors the opposite: that "exclusive partnerships" were a thing of the past, and a minor thing at that. ¶253. For all the reasons stated above, scienter is alleged.

## V.      THE COMPLAINT STATES A CLAIM REGARDING UNDISCLOSED ANT IPO RISKS

The Complaint alleges that Alibaba and Ma are liable for misrepresentations and omissions regarding the Ant IPO in violation of §10(b) and SEC Rule 10b-5(b).[30]

### A.      The Complaint Alleges The Falsity Of Ant IPO-Related Statements

On October 21, 2020, Alibaba filed a Form 6-K announcing Ant's impending IPO. ¶274. On

---

[29] Nor does the stock price reaction following the SAMR Report negate scienter. MTD 23. The market was relieved to see the regulatory overhang lifted and that the fine was not worse. ¶148. This has no bearing on Defendants' scienter.

[30] Plaintiffs' scheme claims against Alibaba and Ma based on Ant's concealed ownership (¶¶309-65, 397-99) are addressed at Ma Opp. Sec. VIII. False statement claims against Ma in connection with the ownership structure are addressed at Ma Opp. Sec. VII, and Ma as a maker of statements in the Ant IPO Prospectuses (¶¶294-95) is discussed at Ma Opp. Sec. VI.

October 26, 2020, Alibaba filed another Form 6-K, announcing the Ant IPO pricing (RMB68.80 per share) and that Alibaba would hold just over 31% of the equity interest in Ant after the IPO. ¶276.[31] And on October 27, 2020, the Ant Final IPO Prospectus was filed, generally identifying regulatory risks, but failing to disclose Ant's current violation of the FHC Regs. ¶¶298-308.

Alibaba's announcements were misleading because they failed to disclose then-existing material regulatory risks that threatened the Ant IPO and, by extension, misrepresented the supposed value proposition of the Ant IPO to Alibaba. ¶¶275, 277. By the time of these statements in late October 2020, Alibaba and Ma knew that Ant was not in compliance with the new FHC Regs, set to take effect on November 1, 2020—just four days before Ant was to begin trading. *See* ¶¶200-02; Sec. II.E & n.7, *supra* (detailing $27.5 billion asset deficiency under FHC Regs). This posed a material concealed risk to the Ant IPO, and Alibaba's interest in it.

Alibaba and Ma cannot escape liability by claiming banking regulatory uncertainty (MTD 1-2, Ma MTD 5)—the PBOC stated that the new FHC Regs were aimed at Ant. ¶199. Ma concedes Ant was required to comply. Ma MTD 6; *see also* ¶305 (Ant IPO Prospectus discloses FHC Regs and effective date of November 1, 2020). Ma suggests that Ant had a year to come into compliance with the asset requirements because Ant was required to submit its holding company application to the PBOC by November 2021. Ma MTD 6, 15. But the application deadline does not mean Ant was free to disregard the asset requirements in the meantime. Indeed, the regulators' actions after seeing Ant's *massive* asset shortfall on the eve of the IPO—ordering that Ant "can't proceed with an IPO until after it complies with ***new capital requirements*** and other restrictions ***imposed*** on the country's financial conglomerates ***at the start of the month***" (Defs Ex. LL)—show it was not.

Nor can Alibaba and Ma obtain dismissal by ignoring Ant's non-compliance with the FHC Regs and claiming—contrary to the facts alleged in the Complaint and their own exhibits—that a

---

[31] The filing of a Form 6-K, which is only required when information is material, demonstrates that Alibaba understood the materiality of the Ant IPO to Alibaba's investors, and chose to discuss Alibaba's interest in the IPO.

"subsequent" regulatory development of the new Interim Measures announced on November 2 caused the Ant IPO suspension. Ma MTD 7, 14. None of Defendants' arguments support the conclusion that the Interim Measures published for comment on November 2—as opposed to Ant's existing non-compliance with the FHC Regs—was the reason the regulators halted the IPO. *See* Sec. II.F, *supra*.

Alibaba argues that it had no duty to disclose Ant's problems, ignoring the undisclosed FHC Reg violations. MTD 13-14.[32] But where Alibaba chose to make announcements about the IPO and Alibaba's interest therein, it had a duty to disclose the then-existing material risks that threatened it. Alibaba argues that it warned investors that the IPO was subject to "required regulatory approvals" (MTD 14) but such a warning is meaningless when *at the time* Ant was in violation of an important banking regulation that directly threatened regulatory approval. *Jinkosolar*, 761 F.3d at 251.

Ma claims that falsity is lacking because the regulatory risks were fairly disclosed in the Ant IPO Prospectus. Ma MTD 14. But Ant filed its Final IPO Prospectus just days before the new FHC Regs were to become effective, with trading to begin just days *after* the new FHC Regs would be effective. ¶293. None of Ant's risk disclosures warned that Ant's asset balance was RMB184.2 billion (***$27.5 billion***) short of the requirement set forth in the new FHC Regs. Ma MTD 5-6; *see also* ¶¶298-301, 304-05. Instead, Ant warned that "***[p]otential*** scrutiny includes more stringent capital requirements" (¶299) and that "our partner banks are also subject to changes to capital adequacy" (¶301), but failed to disclose the *massive* new capital requirement *Ant* needed to (but did not) satisfy. *See also ¶*305 (stating new FHC Regs would be effective November 1, 2020 and had "requirements for…capital adequacy", but failed to disclose then-existing deficiency). Presenting as hypothetical a risk that already exists is misleading. *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d

---

[32] In disclaiming Alibaba's duty to disclose, Alibaba mistakenly focuses on the ownership issue, ignoring the financial regulation violations. The Complaint makes clear that alleged misstatements and omissions about the concealed ownership risk in the Ant IPO Prospectuses are alleged against Ma only. ¶¶280, 295. For clarity, Plaintiffs allege Alibaba is liable for the misleading omission of the existing Ant financial regulatory risks in Alibaba's Forms 6-K announcing the Ant IPO (¶¶274-77) and that Ma is liable for misrepresentations and omissions regarding financial regulatory risks in Ant's Final IPO Prospectus (¶295); *see also ¶*20, alleging both Alibaba and Ma's knowledge of Ant's financial regulatory problems.

388, 400 (S.D.N.Y. 2005) (risk warnings actionable where they warned of potential regulatory violations but failed to disclose violations already existed); *Panther Partners*, 2020 WL 5757628, *13 (warnings about consumer loans misleading where they failed to disclose "that financial services providers operating on Jianpu's platform were not in compliance with existing regulations").

### B.    The Complaint Alleges Scienter As To Alibaba And Ma For Concealing Ant's Banking Regulation Violations

In the summer of 2020, during the lead-up to the Ant IPO, the CBIRC and the PBOC were significantly tightening regulation of Ant's banking services. ¶¶186-87, 191-99. Alibaba and Ma knew the new FHC Regs went into effect on November 1, they knew the RMB500 billion requirement, and they knew Ant's assets fell billions short. ¶¶198-202; ¶305. Despite Ant's current regulatory problems, Ma and Alibaba (who controlled 50.5% and 33% of Ant, respectively) tried to push the IPO forward anyway, rushing to get it done before even more onerous regulations were enacted. ¶20. This is consistent with Ma's culture of prioritizing growth over compliance. ¶184 (Ma reportedly told employees in Alipay's early days, "If someone has to go to jail, I'll go.").

Alibaba's scienter in concealing Ant's regulatory violations is supported by its 33% stake in Ant. ¶168. *Cf. Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, *15 (S.D.N.Y. Apr. 21, 2016) (scienter of CFO of a subsidiary that comprised 36% of parent's business attributed to parent).

Moreover, the overlapping leadership between Alibaba and Ant further supports an inference that the Alibaba executives with authority over its Ant IPO announcements on October 21 and 26 would have, or should have, also known about Ant's asset deficiency under the FHC Regs. Ant's Executive Chairman, Eric Jing, was on the Alibaba Board and a member of the Alibaba Partnership (where he served on the exclusive partnership committee with Ma, Joseph Tsai, and Defendant Zhang). ¶¶173-74. Ant's CEO, Simon Hu, also was a member of the Alibaba Partnership. ¶174. Alibaba co-founder and Executive Vice Chairman of the Alibaba Board during the Class Period, Joe Tsai, was on Ant's Audit Committee. ¶173. Jing and Hu were summoned along with Ma to the November 2 meeting

to discuss Ant's regulatory violations. ¶203. And Ma is alleged to have exercised control over both Ant and Alibaba during the time that Ant would have been preparing its IPO Prospectuses. ¶¶51-63, 172. From these facts, it is strongly inferred that Ma, Jing, and Hu were not only the Ant individuals responsible for and knowledgeable of its regulatory violations, their scienter can be imputed to Alibaba as high-ranking members of Alibaba's executive leadership. *Loreley*, 797 F.3d at 177-78.

Ma argues that he did not recklessly misled investors because "PRC regulators reviewed Ant's regulatory compliance and approved the Ant IPO in October 2020" (Ma MTD 14), but he cites no facts that Ant's banking regulatory compliance was reviewed or approved. Instead, he cross-references his own discussion of the "evolving" regulatory environment. *Id.*[33] The facts support Plaintiffs' theory: when banking regulators reviewed Ant's Final IPO Prospectus filed October 27, they identified the material asset shortfall under the FHC Regs existing at the time of the impending IPO and immediately summoned Ma and Ant's top brass to an emergency meeting. As a result of the massive asset shortfall, as well as the discovery of Ant's concealed controversial ownership structure, the IPO was halted.

Alibaba alternatively claims that its commitment to buy Ant shares in the Ant IPO negates scienter. MTD 14-15. But while Alibaba committed to buy $7.5 billion worth of Ant as a "strategic investor" (¶276), it was "poised to profit from the IPO" (¶361). With an estimated post-IPO Ant valuation of approximately $300 billion, Alibaba's approximate one-third stake translated to ***$100 billion***. ¶166. Alibaba rolled with the gamble for its significant upside. ¶19 (per Wu, Ant was a "strong growth driver" for Alibaba and the market undervalued Alibaba's interest in Ant). Ma's attempt to downplay his financial interest in the Ant IPO also fails. Ma MTD 18. The share lockup doesn't negate

---

[33] Defendants' Ex. JJ (Ma MTD 14) does not change the analysis. This article discusses the Interim Measures as well as the "blows" dealt to Ant by the "new licensing and capital demands" revealed in September (*i.e.*, the FHC Regs). At best, Defendants have pointed to facts that suggest *both* sets of new regulations may have been discussed at the meeting. But they cannot, particularly on this motion, point to the "subsequent" announcement of the Interim Measures, and ignore Ant's existing problems under the recently-enacted FHC Regs, as the sole topic of the November 2 meeting and the reason for the halted IPO. In fact, Exhibit JJ supports Plaintiffs' theory: it points out that the Interim Measures announced after the meeting on November 2 had been under consideration "for at least a year." On the facts alleged, it is reasonable to infer that Ant's massive asset shortfall under the capital requirements in the FHC Regs was not only the impetus for blocking the Ant IPO, it was also the trigger that pushed the regulators to announce the additional measures on November 2.

his massive personal financial interest in seeing the IPO completed. *See* Ma Opp. Sec. VII.B.3.

## VI.   THE COMPLAINT ALLEGES LOSS CAUSATION

At the pleading stage, Plaintiffs need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind, not make a conclusive proof of that causal link." *Loreley*, 797 F. 3d at 189 (cleaned up). Plaintiffs can satisfy loss causation by showing either "the reaction of the market to a 'corrective disclosure'" or a "materialization of risk", where concealed risks emerge in events that negatively impact the company's stock price. *In re Vendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011). Loss causation is "governed by the traditional 'short and plain statement' rule laid out in Rule 8." *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, *3 (E.D.N.Y. Mar. 10, 2021).

Plaintiffs allege loss causation in connection with the November 3, 2020 news of the halted Ant IPO. In response to the news, Alibaba's ADS price fell $25.27 per share (8.13%) to close at $285.57 on November 3. ¶¶23-24, 372. Defendants concede that this price drop was caused by the halted Ant IPO. Ma MTD 7. No Defendant challenged loss causation for the November 3 drop, and thus they have waived any such argument. *See Chevron Corp. v. Donziger*, 2013 WL 4045326, at *1 n.3 (S.D.N.Y. Aug. 9, 2013) ("Chevron has waived this argument by failing to develop it.").[34]

Instead, elsewhere in their briefs, Defendants dispute the cause of the halted Ant IPO, ignoring the FHC Regs and insisting it was due entirely to the Interim Measures announced on November 2. Ma MTD 7, 14; MTD 1. But, *at most*, Defendants' version of events suggests that the Ant IPO suspension may have *also* been due, in part, to the Interim Measures. Ma MTD 7. Even if true, it would not defeat loss causation where Plaintiffs allege facts that the IPO suspension and subsequent Alibaba

---

[34] The closest Defendants come to challenging the Nov. 3 drop is a cursory mention in the Ma MTD, n.9, referring to prior "skepticism" expressed by the Court in the lead plaintiff order as to whether the regulators' Nov. 2 meeting with Ma could serve as a corrective disclosure. Dkt. No. 48 at 6. But that order made no holding on loss causation and did not discuss whether the Ant IPO suspension constituted a materialization of risk sufficient to allege loss causation, as the operative Complaint alleges. Chinese regulators halting the IPO was certainly within the "zone of risk" created by Ant's alleged non-compliance with the FHC Regs and concealed ownership structure. *Vivendi*, 765 F.Supp. 2 dat 555-56.

ADS price drop was caused, at least in part, by Ant's violation of the FHC Regs. *Loreley*, 797 F.3d at 189 (need to "plead *a* causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations") (emphasis in original).

Plaintiffs also allege loss causation for the November 10 and December 23, 2020, price drops. When the SAMR published the new platform rules on November 10, 2020, Alibaba's ADS fell $23.99 per share (8.26%). ¶125. Defendants argue that loss causation is lacking because the rules applied industry-wide and, Defendants assert, coincided with a market-wide downturn. MTD 24-25. But Plaintiffs plausibly allege that the new rules, which commentators noted as targeting Alibaba (¶¶123, 127-28) and "reiterat[ing]" the SAMR's prior warnings that "choose one" was prohibited (¶129), constituted a partial materialization of the undisclosed risk of Alibaba continuing to use improper exclusivity practices. In *Lapin*, the plaintiff alleged loss causation based on the market's reaction to the New York Attorney General's announcement of a probe into ethical wall breaches at Wall Street firms, including Goldman, and to the announcements by the SEC and DOJ two weeks later that they would conduct similar investigations. 506 F. Supp. 2d at 231, 243. That sufficed, even though the announcements were not specific to Goldman: "Drawing all reasonable inferences in Plaintiffs' favor," the court concluded the announcements could have revealed to the market that Goldman's research reports were not "independent as touted[.]" *Id.* at 243. Indeed, that the new platform rules here applied industry-wide does not defeat loss causation. *Id.*; *Marsden v. Select Med. Corp.*, 2007 WL 518556, at *3 (E.D. Pa. Feb. 12, 2007) (loss causation alleged where stock drop occurred on announcement of proposed regulatory changes applicable to all long-term acute care hospitals).[35]

---

[35] Alibaba's reference to a "marketwide phenomenon causing comparable losses" is unsupported. MTD 4, 25. Most of the extraneous market cap data provided (Defs Exs. H2-H8, which is itself improper on a motion to dismiss) is from February 2021 and March 2022; *none* of it corresponds to *any* of the three drops alleged in this case, let alone shows the Nov. 10, 2020 drop was caused by a marketwide downturn. It goes without saying that stock price drops of other e-commerce companies *after* the Class Period cannot defeat loss causation. But even if the Nov. 10, 2020 drop *did* "coincide with a marketwide phenomenon," which it did not, that would not defeat loss causation. *Fin. Guar. Ins. Co. v. Putnam Advisory Co. LLC*, 783 F.3d 395, 404 (2d Cir. 2015) (industry-wide MBS downturn in 2008 financial crisis did not defeat loss causation); *Loreley*, 797 F.3d at 181-82, 187-88 (same, loss causation sufficiently pled where allegations were "much less detailed than those in *Financial Guaranty*" and holding "where a ***potential*** causal link is evident, it is not necessary for the

Finally, after market close on December 23, 2020, Chinese authorities announced the launch of an antitrust investigation into Alibaba "amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants…." ¶130. This news caused a $34.18 (13%) decline in Alibaba's ADS price. ¶131. Defendants contend loss causation is lacking because Alibaba's illegal practices were already "known to the market." MTD 24. On the contrary, Alibaba misled the market to believe it had previously stopped requiring merchant exclusivity. ¶¶116-17, 253. For the same reasons, Alibaba cannot cite its own misleading risk disclosures to negate loss causation. MTD 25. Investors may have known that the SAMR planned to conduct investigations into any ongoing "choose one" practices (*id.*), but they did not know Alibaba was continuing to use the offending practices during the Class Period. Loss causation is alleged. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164 (S.D.N.Y. 2008) ("disclosure of the Justice Department investigation" alleged loss causation because it revealed defendants had not complied with obligation to present accurate information to regulators resulting in the investigation).

## VII.   THE COMPLAINT ALLEGES §20(a) LIABILITY AGAINST WU AND ZHANG

As set forth in Secs. IV & V, *supra*, Plaintiffs have alleged a primary violation of the Exchange Act. Wu and Zhang do not dispute that they were control persons of Alibaba. Moreover, the strong inference of scienter as to Zhang and Wu is sufficient to allege culpable participation for purposes of §20(a) liability. *Bear Stearns*, 763 F. Supp. 2d at 510.

## VIII.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions in their entirety. If the Court grants all or part of the motions, Plaintiffs request an opportunity to amend pursuant to Rule 15.

---

plaintiff to plead loss causation in detail to render her fraud claim ***plausible*** at the motion-to-dismiss stage."). Whether "a general fall in the price of Internet stocks" breaks "the chain of causation" is "a matter of proof at trial and not to be decided on a…motion to dismiss." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Dated: October 21, 2022                    GLANCY PRONGAY & MURRAY LLP

                                           By: *s/ Kara M. Wolke*
                                           Kara M. Wolke (admitted *pro hac vice*)
                                           Jason L. Krajcer (admitted *pro hac vice*)
                                           Melissa C. Wright (admitted *pro hac vice*)
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
                                           Telephone: (310) 201-9150
                                           kwolke@glancylaw.com
                                           mwright@glancylaw.com

                                           *Lead Counsel for Plaintiffs and the Putative Class*

                                           Jeremy A. Lieberman
                                           Jonathan D. Park
                                           POMERANTZ LLP
                                           600 Third Avenue
                                           New York, New York 10016
                                           Telephone: (212) 661-1100
                                           jalieberman@pomlaw.com
                                           jpark@pomlaw.com

                                           Patrick V. Dahlstrom
                                           POMERANTZ LLP
                                           10 South LaSalle Street, Suite 3505
                                           Chicago, Illinois 60603
                                           Telephone: (312) 377-1181
                                           pdahlstrom@pomlaw.com

                                           Peretz Bronstein
                                           BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
                                           60 East 42nd Street, Suite 4600
                                           New York, New York 10165
                                           Telephone: (212) 697-6484
                                           peretz@bgandg.com

Frank R. Cruz
THE LAW OFFICES OF FRANK R. CRUZ
1999 Avenue of the Stars
Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
info@frankcruzlaw.com

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024  Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel*

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 21, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 21, 2022, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke
