**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: ALIBABA GROUP LTD.
SECURITIES LITIGATION

Master File No. 1:20-CV-09568-GBD-JW

**PLAINTIFF'S OPPOSITION TO JACK YUN MA'S MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ........................................................ 2

     A.     Ma Has Always Controlled And Continues To Control Alibaba .......................... 2

     B.     Background Of Ant And Its Pre-IPO Capitalization ............................... 3

     C.     Additional Relevant Pre-IPO Events ..................................................... 5

III.   MA IS SUBJECT TO PERSONAL JURISDICTION ...................................... 6

     A.     The Complaint Pleads Sufficient Contacts Between Ma And The United States To Support The Court's Exercise Of Personal Jurisdiction Over Him ....................... 8

        1.     Ma's Trades Of Alibaba ADS On The NYSE Establish Jurisdiction ......... 8

        2.     Ma's Misleading Statements And Deceptive Acts Establish Jurisdiction .. 9

     B.     The Court's Exercise Of Personal Jurisdiction Over Ma Is Reasonable ............. 12

IV.   PLAINTIFFS' CLAIMS FALL WITHIN THE TERRITORIAL LIMITS OF §10(b) BECAUSE THEIR PURCHASES WERE MADE ON THE NYSE ............................. 13

V.     PLAINTIFFS HAVE STANDING TO SUE MA FOR FALSE AND MISLEADING STATEMENTS IN THE ANT PROSPECTUSES .......................................... 15

VI.   MA IS THE MAKER OF THE STATEMENTS IN THE ANT PROSPECTUSES ....... 17

VII.   PLAINTIFFS ALLEGE MA'S LIABILITY UNDER RULE 10b-5(b) FOR MISSTATEMENTS IN THE ANT PROSPECTUSES ............................................ 19

     A.     Ma Made Materially False And Misleading Statements Concerning The Financial Interests Of The Undisclosed Ant Investors ..................................... 19

        1.     Plaintiffs Are Entitled To Rely On The February 16, 2021 WSJ Article . 19

        2.     Ma's Additional Challenges Regarding The Ant Investor Claims Fail .... 25

B.     Plaintiffs Allege Ma's Scienter Regarding The Concealed Ownership Interests ............................................................................................................ 29

        1.     The Facts Raise A Strong Inference That The VIE Structures Used To Facilitate Jiang's And Li's Investments Were Deceptive Devices ........... 29

        2.     The Facts Raise A Strong Inference That Ma Knew About The Concealed Ownership Interests Of Jiang and Li ........................................................ 31

        3.     Ma Had A Motive To Conceal Information From Chinese Regulators.... 33

        4.     Ma's Insider Trading Further Bolsters The Inference Of Scienter ........... 35

        5.     Balancing Of Inferences Weighs In Favor Of Finding Of Scienter.......... 37

VIII.    THE COMPLAINT ALLEGES MA'S LIABILITY UNDER RULES 10b-5(a) & (c) ... 38

IX.     THE COMPLAINT ALLEGES MA'S LIABILITY UNDER RULE 10b5-1 ................. 43

X.      MA IS LIABLE AS A CONTROL PERSON UNDER SECTION 20(a) ........................ 44

XI.     CONCLUSION .......................................................................................................... 45

# TABLE OF AUTHORITIES

<u>**CASES**</u>

*Alpha Cap. Anstalt v. New Generation Biofuels, Inc.*,
  2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ........................................ 11

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ............................................... 21, 25

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ....................................................... 15

*Calder v. Jones*,
  465 U.S. 783 (1984) ......................................................... 8

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
  986 F.3d 161 (2d Cir. 2021) ........................................... 13, 14

*Chiarella v. U.S.*,
  445 U.S. 222 (1980) ....................................................... 43

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................... 17

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ..................................... 18

*CompuDyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006) .................................... 45

*Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ............................................. 36

*Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*,
  928 F. Supp. 2d 735 (S.D.N.Y. 2013) ..................................... 6

*Freudenberg v. E*Trade Fin'l Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................... 36

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ............................... 36

*Harbinger Cap. Partners LLC v. Deere & Co.*,
  632 F. App'x 653 (2d Cir. 2015) ......................................... 16

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y. 2014) ............................................................ 20

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ............................................................ 8, 9

*In re Aphria Sec. Litig.*,
   2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ...................................... 31

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
   390 F. Supp. 3d 432 (S.D.N.Y. 2019) .................................................. 15

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................. 44

*In re Boeing Co. Aircraft Sec. Litig.*,
   2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) .......................... 34, 35, 37

*In re Braskem S.A. Securities Litigation*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................. 10

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2020 WL 3026564 (D.N.J. June 5, 2020) ............................................ 40

*In re Connetics Corp. Sec. Litig.*,
   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ...................................... 24

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................... 36

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017) .................................................. 42

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Ore. 2015) .................................................. 42

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
   2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) ................................ 24, 28

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................ 20, 21

*In re Insys Therapeutics Sec. Litig.*,
   2018 WL 2943746 (S.D.N.Y. June 12, 2018) ...................................... 34

*In re JPMorgan Chase & Co. Sec. Litig.*,
  2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ........................................... 21

*In re JWP Inc. Sec. Litig.*,
  928 F. Supp. 1239 (S.D.N.Y. 1996) ..................................................... 45

*In re Kirkland Lake Gold Ltd. Sec. Lit.*,
  2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) ......................................... 41

*In re Lehman Bros. Sec. and ERISA Litig.*,
  903 F. Supp. 2d 152 (S.D.N.Y. 2012) ................................................... 35

*In re Loewen Grp. Inc. Sec. Litig.*,
  2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ........................................... 21

*In re Longfin Corp. Sec. Class Action Litig.*,
  2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) ............................................. 8

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
  2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ............................................. 24

*In re Mylan N.V. Sec. Litig.*,
  379 F. Supp. 3d 198 (S.D.N.Y. 2019) ................................................... 20

*In re Mylan N.V. Sec. Litig.*,
  2020 WL 1673811 (S.D.N.Y. Apr. 6, 2020) ............................................. 41

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007) .......................................................... 15, 16

*In re Optimal U.S. Litig.*,
  2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ............................................ 18

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) .............................................. 36, 37, 44

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 449 (S.D.N.Y. 2005) ......................................... 6, 7, 8, 41

*In re Pfizer Inc. Sec. Litig.*,
  584 F. Supp. 2d 621 (S.D.N.Y. 2008) ................................................... 44

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................... 44

*In re Sibanye Gold Ltd. Sec. Litig.*,
2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020) ......................................................... 24

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) ............................................................. 22, 34

*In re Synchrony Fin. Sec. Litig.*,
2020 WL 4436787 (2d Cir. 2020) ........................................................................ 21

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) .......................................................................... 21, 23

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................. 44

*In re Tenaris S.A. Sec. Litig.*,
493 F. Supp. 3d 143 (E.D.N.Y. 2020) ................................................................ 45

*In re Tronox, Inc. Sec. Litig.*,
769 F. Supp. 2d 202 (S.D.N.Y. 2011) ................................................................ 45

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ................................................. 15, 16

*In re Under Armour Sec. Litig.*,
2020 WL 363411 (D. Md. Jan. 22, 2020) ........................................................... 21

*In re Vale S.A. Sec. Litig.*,
2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ............................................... 17, 19

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020) ................................................................ 19

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ........................................................................ 42

*In re WorldCom, Inc. Sec. Litig.*,
2004 WL 1435356 (S.D.N.Y. June 28, 2004) .................................................... 15

*In re XL Fleet Corp. Sec. Litig.*,
2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ................................................. 22, 42

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*,
91 F. Supp. 3d 456 (S.D.N.Y. 2015) .................................................................. 18

*Itoba Ltd. v. LEP Group PLC*,
   930 F. Supp. 36 (D. Conn. 1996) ........................................................................ 6

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ............................................................................... 10, 17

*Kasilingam v. Tilray, Inc.*,
   2022 WL 4537846 (S.D.N.Y. Sept. 28, 2022) .................................................... 36

*Katz v. Image Innovations Holdings, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008) .............................................................. 45

*Landry v. Price Waterhouse Chartered Accts.*,
   715 F. Supp. 98 (S.D.N.Y. 1989) ................................................................... 12

*Lea v. TAL Educ. Grp.*,
   837 F. App'x 20 (2d Cir. 2020) ..................................................................... 29

*Leasco Data Processing Equip. Corp. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1972) ......................................................................... 7

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .......................................................................... 39

*Lewis v. Curtis*,
   671 F.2d 779 (3d Cir. 1982) .......................................................................... 21

*Lewy v. SkyPeople Fruit Juice, Inc.*,
   2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ................................................... 24

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ........................................................................... 38, 39

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ......................................................................... 37

*Mateo v. Bristow*,
   2013 WL 3863865 (S.D.N.Y. July 16, 2013) .................................................... 27

*McIntire v. China MediaExpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013) .............................................................. 19

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
   2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .................................................... 17

*Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................... 20, 24

*Montoya v. Mamma.Com Inc.*,
2006 WL 770573 (S.D.N.Y. Mar. 28, 2006) ............................................................... 27

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010)..................................................................................................... 13, 14

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................... 20, 41

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ....................................................................................... 35

*Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*,
2014 WL 4678046 (N.D.N.Y. Sept. 18, 2014) ................................................................. 7

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
369 F.3d 27 (2d Cir. 2004)............................................................................................. 15

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
603 F.3d 144 (2d Cir. 2010)......................................................................................... 41, 42

*Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ................................................................. 36

*Poof-Slinky, LLC v. A.S. Plastic Toys Co., Ltd.*,
2020 WL 5350537 (S.D.N.Y. Sept. 4, 2020)................................................................. 13

*Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*,
2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ............................................................... 44

*Reingold v. Deloitte Haskins & Sells*,
599 F. Supp. 1241 (S.D.N.Y. 1984)................................................................................. 7

*Rudani v. Ideanomics*,
2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020)............................................................... 31

*SEC v. First Jersey Secs., Inc.*,
101 F.3d 1450 (2d Cir. 1996)......................................................................................... 45

*SEC v. Jammin Java Corp.*,
2016 WL 11783918 (C.D. Cal. Oct. 28, 2016) ................................................................. 8

*SEC v. Langford*,
   2013 WL 1943484 (D. Neb. May 9, 2013)................................................................ 40

*SEC v. Obus*,
   693 F.3d 276 (2d Cir. 2012)...................................................................................... 43

*SEC v. PlexCorps*,
   2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018)............................................................ 13

*SEC v. Rio Tinto plc*,
   41 F.4th 47 (2d Cir. 2022) ........................................................................................ 39

*SEC v. Sharef*,
   924 F. Supp. 2d 539 (S.D.N.Y. 2013)........................................................................ 8

*SEC v. Softpoint, Inc.*,
   2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ................................................................. 7

*SEC v. Straub*,
   921 F. Supp. 2d 244 (S.D.N.Y. 2013)................................................................ *passim*

*SEC v. Straub*,
   2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016)............................................................ 7

*SEC v. Stubos*,
   2022 WL 6776741 (S.D.N.Y. Oct. 11, 2022) ........................................................... 41

*SEC v. Unifund SAL*,
   910 F.2d 1028 (2d Cir. 1990).............................................................................. 6, 7, 8

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021)........................................................................................ 33

*Spitzberg v. Hous. Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) .................................................................................... 33

*Steginsky v. Xcelera Inc.*,
   741 F.3d 365 (2d Cir. 2014)...................................................................................... 43

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
   552 U.S. 148 (2008) ...................................................................................... 17, 41, 42

*Taormina v. Thrifty Car Rental*,
   2016 WL 7392214 (S.D.N.Y. Dec. 21, 2016) ............................................................ 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................... 34

*U.S. v. Canfield*,
   212 F.3d 713 (2d Cir. 2000) ............................................................................... 24

*U.S. v. Colton*,
   231 F.3d 890 (4th Cir. 2000) .............................................................................. 29

*U.S. v. Martoma*,
   2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) .................................................... 13

*U.S. v. O'Hagan*,
   521 U.S. 642 (1997) ........................................................................................... 43

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................ 36

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   57 F. Supp. 3d 950 (D. Minn. 2014) .................................................................. 42

## STATUTES

15 U.S.C. §78t(a) .................................................................................................... 45

## RULES

Fed. R. Civ. P. 12(g) .............................................................................................. 27

Fed. R. Civ. P. 15(a)(2) .......................................................................................... 45

## REGULATIONS

17 C.F.R. §240.10b-5(a) ............................................................................. 36, 38, 43

## OTHER AUTHORITIES

Restatement (Second) Conflict of Laws §37 (1971)................................................ 7

# GLOSSARY

| Term | Definition |
|------|------------|
| 2/16/2021 WSJ Article | Lingling Wei, *China Blocked Jack Ma's Ant IPO After Investigation Revealed Likely Beneficiaries*, Wall Street Journal (Feb. 16, 2021) |
| Alibaba | Defendant Alibaba Group Holding Limited |
| Alibaba Network Tech | Alibaba (China) Network Technology Co. Ltd. – Alibaba subsidiary and 34.2% shareholder of Qitai |
| Ant or Ant Group | Ant Group Co., Ltd. and its predecessors |
| Ant International | Ant International Co., Limited – a Cayman Islands-incorporated subsidiary of Ant Group |
| Beijing Jingguan | Beijing Jingguan Investment Center (Limited Partnership) – holds 0.92% interest (~218 million shares) in Ant Group |
| Beijing Zhaode | Beijing Zhaode Investment Group Co. Ltd. – controlled by Li and controller of SZE |
| BJTAM | Beijing Jingguan Tiancen Asset Management Partnership Enterprise (Limited Partnership) – executive partner of Beijing Jingguan |
| Boyu Capital | A private equity firm founded by Jiang |
| Boyu Capital III | Boyu Capital Fund III., L.P. – a Cayman Islands limited partnership managed by Boyu Capital and owner of Growth Succession |
| Concert Party Agreement | Concert Party Agreement among Jack Ma, Eric Jing, Simon Hu, and Fang Jiang, dated Aug. 21, 2020 |
| Fuqing | Fuqing Qisheng No. 3 Investment Partnership Enterprise (Limited Partnership) – controlled by Li and 39.9% shareholder of SZE |
| Growth Succession | Growth Succession Limited – offshore pre-IPO Ant investor owned by Boyu Capital III that obtained Class C shares of Ant International in 2018 Offshore Equity Financing |
| Hu | Simon Hu – CEO of Ant Group |
| Jiang | Jiang Zhicheng – grandson of former Chinese leader Jiang Zemin and a founding partner of Boyu Capital |
| Jing | Eric Jing – Chairman of Ant Group |
| JSP Investment | JSP Investment Limited – Ma-controlled reporting entity |

| | |
|---|---|
| Junao | Hangzhou Junao – entity controlled by Ma that holds 20.66% equity interest in Ant Group |
| Junhan | Hangzhou Junhan – entity controlled by Ma that holds 29.85% equity interest in Ant Group |
| Li | Li Botan – son-in-law of Jia Qinglin (a former member of the Politburo Standing Committee) and controller of Beijing Zhaode |
| Ma | Defendant Jack Yun Ma |
| PBOC | People's Bank of China |
| Qitai | Shanghai Yunfeng Qitai Investment Center (Limited Partnership) – 21.8% shareholder of SZE |
| Qizhan | Shanghai Qizhan Investment Center (Limited Partnership) – entity used by Ma to distribute Ant shares in 2015 Equity Offering that is nominally controlled by SZA |
| SAMR | China's State Administration for Market Regulation |
| Shanghai Tiancen | Shanghai Tiancen Investment Management Co. Ltd. (& affiliates) – executive partner of BJTAM and VIE of Boyu Capital |
| SZA or Shanghai Zhongfu Asset | Shanghai Zhongfu Asset Management Center (Limited Partnership) – nominal controller of Qizhan and SZE |
| SZE or Shanghai Zhongfu Equity | Shanghai Zhongfu Equity Investment Management Center (Limited Partnership) – holds 1.29% interest (~307 million shares) in Ant Group |
| Tibet Hongde | Tibet Hongde Century Investment Co. Ltd. – shareholder of Fuqing and VIE of Beijing Zhaode |
| Wu | Defendant Maggie Wei Wu |
| Xi | China's President Xi Jinping |
| Xinjiang Beikong | Xinjiang Beikong New Energy Development Co. Ltd. – related party to Beijing Zhaode and Tibet Hongde |
| Ying Capital | Ying Capital Limited – Ma-controlled reporting entity |
| Yun Capital | Yun Capital Limited – Ma-controlled reporting entity |
| Yunbo | Hangzhou Yunbo – executive partner and general partner of Junhan and Junao – owned by Jack Ma (34%) and Eric Jing, Simon Hu and Fang Jiang (22% each) |
| Zhang | Defendant Daniel Yong Zhang |
| Zhejiang | Zhejiang Alibaba E-Commerce Co., Ltd. – predecessor to Ant that obtained Alipay in 2011 – owned by Ma (80%) |

## I.     INTRODUCTION

This securities class action concerns two distinct sets of misstatements and omissions. The first concerns Alibaba's use of improper and unlawful exclusive trading practices during the Class Period.[1] The second concerns a series of undisclosed risks relating to the planned dual-listing IPO of Ant Group in Hong Kong and Shanghai, which was set to start trading on November 5, 2020. This brief focuses on the latter category of misrepresentations and a related scheme to defraud by Jack Ma and Alibaba.[2]

Ma is the founder, former CEO, and former Chairman of Alibaba, and he controlled Alibaba during the Class Period through his membership in the Alibaba Partnership and his control of Ant. Ant is a "financial technology" company that was spun off from Alibaba in 2011. At all relevant times, Alibaba owned a 33% equity interest in Ant and two entities controlled by Ma owned a 50.5% equity interest. On July 20, 2020, Alibaba announced that Ant had commenced its IPO process, and the market responded with great enthusiasm. Poised to raise a record $35 billion, the Ant IPO was widely expected to be the biggest IPO in history.

During the Class Period, Ma and Alibaba made a series of coordinated misrepresentations that concealed material risks threatening the Ant IPO. These risks concerned (a) Ant's compliance with financial regulations, and (b) ownership interests of certain politically sensitive Ant investors whose interests are antagonistic to President Xi. Further, Ma and Alibaba engaged in a series of deceptive acts designed to mislead Chinese regulators and the investing public about these concealed ownership interests. Hoping to sidestep the mounting risks, Ma sought to fast-track regulatory approval of the IPO by using his influence and connections with certain officials of the Chinese Communist Party.

---

[1] Capitalized terms are defined in the Glossary. *See supra* at xi-xii. Unless otherwise noted, "¶_" and "Ex._" citations are to the Complaint, "Ma MTD" refers to the memorandum in support of Defendant Ma's motion to dismiss (Dkt No. 63), all emphasis has been added, and all internal citations, quotation marks, and alterations have been removed.

[2] This brief should be read in tandem with, and incorporates in its entirety, Plaintiffs' concurrently-filed opposition to the Alibaba Defendants' motion to dismiss ("Pls Alibaba Opp."). Statements relating to Ant's compliance with Chinese financial regulations are discussed in Pls Alibaba Opp. at 28-32.

On September 30 and October 1, 2020, Ma sold 10 million shares of Alibaba ADS while in possession of material nonpublic information, including his knowledge of the undisclosed risks relating to the Ant IPO. These sales generated more than $2.9 billion in gross proceeds and were timed to coincide with Alibaba's statements touting the value of Ant during its Investor Day.

On November 2, 2020, Chinese regulators called Ant's executives, including Ma, to a meeting to address Ant's regulatory compliance. ¶203. The next morning, November 3, 2020, Chinese regulators suspended the IPO. Alibaba's ADSs fell $25.27 per share. It was later revealed that discovery of the concealed ownership interests of certain Ant investors played a material role in regulators' decision to suspend the IPO.

Based on the foregoing, Plaintiffs allege securities claims against Ma for (1) making false and misleading statements in violation of §10(b) of the Exchange Act and Rule 10b-5(b); (2) scheme and act liability claims under Rule 10-b(a) and (c); (3) insider trading under Rule 10b5-1; and (4) control person liability under §20(a). Ma raises a litany of defenses, ranging from personal jurisdiction and extraterritoriality to substantive challenges to the Complaint. None of these defenses merits dismissal.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Ma Has Always Controlled And Continues To Control Alibaba

Ma founded Alibaba in 1999. ¶43. He served as its CEO until May 2013 and Executive Chairman until September 2019. *Id.* He continued to serve as a director until September 30, 2020. *Id.* Ma is also a founding and lifetime member of the Alibaba Partnership. ¶¶43, 51-59. Pursuant to Alibaba's articles of association, the Alibaba Partnership has the ability to nominate or appoint a simple majority of Alibaba's board of directors. ¶57. This "unique governance structure" gives the Partnership control of Alibaba. ¶56. During the Class Period, the Partnership had 36 members, but it was controlled by a much smaller Partnership Committee consisting of six members. ¶51 n.10; Wolke Decl., Ex. B (Jesse M. Fried and Ehud Kamar, *Alibaba: A Case Study of Synthetic Control*). Those six

members include Ma and two representatives of Ant, Eric Jing and Lucy Peng, whom Ma dominates as a result of his control of Ant. *Id.* at 10. The other three individuals are reliable Ma allies.[3]

Ma wields additional levers of control. ¶¶54-63. Several licenses critical to Alibaba's business are held by variable-interest entities ("VIEs") owned by ten individuals over whom Ma exercises significant influence. ¶56.[4] "The ability to seize these licenses gives Ma substantial holdup leverage over Alibaba." ¶56. Further, Ma was chairman of Alibaba's nominating and corporate governance committee, whose duties included selecting Board nominees. ¶60. During the Class Period, only five Alibaba directors were *not* nominated by the Partnership; each was nominated by Ma. ¶61. These individuals all "owe, directly or indirectly, their positions to Ma." *Id.* "[E]ven if Ma lacked financial levers over them, these individuals would likely follow Ma's instructions, out of gratitude, friendship, loyalty, and respect…." Wolke Decl., Ex. B at 2 n.14.

### B.      Background Of Ant And Its Pre-IPO Capitalization

In 2004, Alibaba created Alipay, an online and mobile payment platform. ¶159. In 2011, Alibaba spun off Alipay to a company called Zhejiang, in which Ma held an 80% ownership interest. ¶¶160, 316. After a series of transactions, Zhejiang became Ant. ¶¶316-22.

By August 2020, Alibaba owned a 32.65% equity interest in Ant, and Junhan and Junao—two entities controlled by Ma—owned a 50.52% equity interest. ¶314. Another entity called Yunbo is the executive partner and general partner of Junhan and Junao. ¶315. Ma owns 34% of Yunbo and three

---

[3] One is Alibaba co-founder Joe Tsai, "described in the financial media as Ma's 'indispensable right-hand man and alter ego.'" Wolke Decl., Ex. B at 10. The other two are Defendant Zhang, Alibaba's CEO, and Jian Wang, Chairman of Alibaba's Technology Steering Committee. ¶61. Wang was added to the previous five-person Committee at a time when Ma had authority to block the addition of a sixth member. Wolke Decl., Ex. B at 10 ("That Ma agreed to add Wang as a sixth member suggests that Ma did not see this as a threat to his control."). Both Wang and Zhang are based in China and unlikely to break with Ma "[b]ecause there is little to gain and much to lose from opposing Ma." *Id.*

[4] A VIE "is an entity in which an investor holds a controlling interest that is not based on a majority of voting rights. VIE investors typically exercise control through contractual arrangements with the owners of the VIE, rather than through ownership of shares of the VIE. Numerous Chinese companies use VIEs to get around certain Chinese laws that prohibit foreigners from owning businesses in certain industries. The VIE structure gives foreign investors de facto control over business entities that are technically owned by Chinese citizens." ¶215.

other individuals each own 22%. *Id.*[5] Pursuant to a Concert Party Agreement dated August 21, 2020 between Ma and these individuals, Ma has ultimate control over Ant. *Id.*

In 2015, Ma began to lay the groundwork for what would ultimately become Ant's attempt at an IPO. ¶¶318-21. In 2015, Junhan transferred a 4.61% interest in Ant to an entity called Qizhan, which Ma claims is an "independent third party." ¶318. Later in 2015, Ant conducted a round of equity financing and Qizhan transferred part of its interest in Ant to several new investors (the "2015 Equity Transactions"). ¶319. In 2016, Ant conducted another round of equity financing while Junhan and Junao transferred part of their interests in Ant to additional new investors (the "2016 Equity Transactions"). *Id.* In 2018, Ant conducted another round of equity financing and Junhan and Junao transferred more shares to investors who had participated in the 2015 and 2016 Equity Transactions, as well as new investors (the "2018 Equity Transactions"). ¶321. In addition, in 2018, Ant for the first time allowed offshore investors to invest in Ant by offering non-voting Class C shares of Ant International, a Cayman Islands-incorporated subsidiary of Ant Group (the "2018 Offshore Equity Financing"). Wolke Decl., Ex. C at 28, 138.

The pre-IPO investors allowed to participate in the 2015-2018 Equity Transactions were a select group of investors hand-picked by Ma. ¶¶323, 347, 359, 361, 364. These parties consisted principally of (1) "strategic investors," *i.e.*, important state-related entities, like the national pension fund, whose investments were seen as helpful in smoothing the path for regulatory approval of the IPO, and (2) Ma's friends and business associates, who were being given a historic opportunity to get in on the ground floor of what was expected to be the largest IPO in history. ¶¶205, 228, 361, 364.

As revealed by a Wall Street Journal article published several months after the IPO's suspension (the "2/16/2021 WSJ article"), two pre-IPO investors were of particular note. ¶209. One was Jiang Zhicheng, grandson of former Chinese leader Jiang Zemin and founding partner of Boyu

---

[5] One of these three individuals is Eric Jing, one of the six members of the Alibaba Partnership Committee. ¶315.

Capital, a leading Chinese private-equity firm. *Id.* The other was Li Botan, son-in-law of Jia Qinglin, a former member of the Politburo Standing Committee. *Id.* These "princelings" were associated with the Shanghai faction, a group of former high-ranking Communist Party officials and their patrons whose political and economic interests are antagonistic to those of President Xi. ¶¶208-09, 324-37.

As detailed by the 2/16/2021 WSJ article, Jiang and Li's Ant investments were effectuated using a complex series of vehicles that disguised their interests. ¶¶205-28, 338-60. According to the WSJ, Chinese regulators discovered these concealed interests during their review of Ant's prospectus, and this discovery played a material role in their decision to suspend the IPO. ¶¶206-08. Plaintiffs' investigation of the SAMR filings of these entities largely corroborated the WSJ's account. ¶¶338-60. The details of these ownership structures and Plaintiffs' corroboration are discussed *supra* in Sec. VII.A.1. and VII.B.1., and set forth graphically in Appendix A and Appendix B to this brief.

### C.   Additional Relevant Pre-IPO Events

On July 20, 2020, Alibaba announced that Ant began its IPO process. ¶165. On August 25, 2020 (four days after the Concert Party Agreement formalized Ma's control of Ant), Ant filed its Preliminary IPO Prospectus with the Hong Kong Stock Exchange ("HKSE"). *Id.* It contained misleading statements about the ownership of the Ant investors controlled by Jiang and Li. ¶¶281-86.

Three days later, on August 28, 2020, Ma amended the trading plans of three entities under his control that hold Alibaba ADS. Defs Exs. XX1-XX3. Pursuant to those amended plans, Ma's entities sold 10 million shares of Alibaba ADS on September 30 and October 1, 2020, grossing more than *$2.9 billion*. ¶367. Also on September 30, Alibaba conducted its Investor Day conference. ¶19. At that event, Defendant Wu told investors that "the market is also assigning very little value to [Alibaba's] stake in Ant Group" and that Alibaba's stake in Ant was a "strong growth driver[]" for Alibaba's growth." ¶19. Alibaba's stock price rose significantly, from a closing price of $276.93 on September 29 to a closing price of $293.98 on September 30.

On October 27, 2020, Ant filed its Final IPO Prospectus with the HKSE. ¶165. Ant shares were to start trading on the HKSE and in Shanghai on November 5. *Id.* The Final IPO Prospectus repeated the misleading statements concerning Jiang and Li's ownership interests and made misleading statements concerning Ant's regulatory compliance. ¶¶296-308; Pls Alibaba Opp. Secs. II.E, V.

On November 2, 2020, Chinese regulators called Defendant Ma, Ant's chairman Eric Jing, and Ant's CEO Simon Hu to a meeting to discuss, *inter alia*, Ant's non-compliance with Chinese financial regulations. ¶203; Pls Alibaba Opp. Secs. II.F, V.A. On November 3, 2020, Alibaba announced that the Ant IPO had been suspended because Ant "may not meet listing qualifications or disclosure requirements due to ***material matters relating to the regulatory interview of its ultimate controller [i.e., Ma]***...." ¶23. In response to this news, Alibaba's ADS fell $25.27 per share, to close at $285.57 per share on November 3, 2020 (a drop of about 8.13%), on heavy trading volume. ¶24.

## III.   <u>MA IS SUBJECT TO PERSONAL JURISDICTION</u>

"Where, as here, no discovery has taken place, the plaintiff need make only a *prima facie* showing of jurisdiction by pleading in good faith...legally sufficient allegations of jurisdiction." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005). "All allegations are to be construed in the light most favorable to plaintiff and all doubts resolved in plaintiff's favor, notwithstanding controverting evidence by defendants." *Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 40 (D. Conn. 1996).[6]

Section 27 of the Exchange Act permits the exercise of personal jurisdiction to the "limit of the due process clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). The due process test for personal jurisdiction contains a "minimum contacts" inquiry and a "reasonableness" inquiry. *SEC v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013). "The Court must

---

[6] "On a motion to dismiss for lack of personal jurisdiction…, the Court may look beyond the four corners of the complaint and consider all pleadings and accompanying affidavits and declarations, while still resolving all doubts in plaintiff's favor." *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 737 n. 1 (S.D.N.Y. 2013). In addition, "the Court may take judicial notice of public records for the purposes of evaluating personal jurisdiction" on a motion to dismiss. *Taormina v. Thrifty Car Rental*, 2016 WL 7392214, at *5 n.6 (S.D.N.Y. Dec. 21, 2016).

first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.* For purposes of the Exchange Act, minimum contacts are assessed with respect to the United States as a whole. *See, e.g.*, *SEC v. Softpoint, Inc.*, 2001 WL 43611, at *3 (S.D.N.Y. Jan. 18, 2001). "If such contacts are found, the court may assert personal jurisdiction so long as it is reasonable to do so under the circumstances of the particular case." *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, 2014 WL 4678046, at *20 (N.D.N.Y. Sept. 18, 2014).

As to minimum contacts, "[a] court may exercise specific jurisdiction where a suit arises out of or relates to the defendant's contacts with the forum." *SEC v. Straub*, 2016 WL 5793398, at *7 (S.D.N.Y. Sept. 30, 2016).[7] A plaintiff may establish minimum contacts by showing that a defendant's actions abroad caused a foreseeable effect in the United States. *See, e.g.*, *Parmalat*, 376 F. Supp. 2d at 454 ("It long has been recognized that effects in the United States attributable to conduct abroad may be sufficient predicate for the exercise of personal jurisdiction over the actor."); *Softpoint*, 2001 WL 43611, at *5 ("[A] district court may exercise its personal jurisdiction in a securities action so long as the defendant's activities had an unmistakably foreseeable affect within the United States, and could reasonably be expected to be visited upon United States shareholders.").[8] The exercise of jurisdiction is appropriate if (1) the effect "occurs as a direct and foreseeable result of the conduct outside the territory" and (2) the defendant "know[s], or ha[s] good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Leasco*, 468 F.2d at 1341.[9]

This effects test may be satisfied by a showing that "defendants expressly aimed their

---

[7] For purposes of this motion, Plaintiffs rely on specific jurisdiction. With respect to general jurisdiction, Plaintiffs presently take no position but reserve their rights pending discovery.

[8] *See also Unifund SAL*, 910 F.2d at 1033 (exercise of jurisdiction appropriate where a defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have caused consequences in the forum state."); *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972) (discussing Restatement (Second) Conflict of Laws §37 (1971)).

[9] *See also Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1255, 1259 (S.D.N.Y. 1984) (adopting this formulation of effects test in securities class action); *Parmalat*, 376 F. Supp. 2d at 455 (same).

intentional actions at the forum and consequently knew that the brunt of the injury would be felt in that forum." *Straub*, 921 F. Supp. 2d at 254 n.7. "However, while 'express aim' is certainly sufficient to confer jurisdiction, it has not generally been found to be a requirement, particularly in the securities context." *SEC v. Sharef*, 924 F. Supp. 2d 539, 545 n.57 (S.D.N.Y. 2013).[10]

### A. The Complaint Pleads Sufficient Contacts Between Ma And The United States To Support The Court's Exercise Of Personal Jurisdiction Over Him

#### 1. Ma's Trades Of Alibaba ADS On The NYSE Establish Jurisdiction

On September 30 and October 1, 2020, three entities controlled by Ma sold 10 million shares of Alibaba ADS on the NYSE, generating $2.9 billion in gross proceeds. ¶367.[11] The Complaint alleges Ma possessed material inside information at the time of the trades. *See* Sec. IX, *infra*.

These allegations alone establish the Court's personal jurisdiction over Ma. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1068 (9th Cir. 2000) (personal jurisdiction exists where a defendant is "alleged to have knowingly traded **on an American exchange** on the basis of inside information"); *Unifund*, 910 F.2d at 1033 ("Insider trading … has serious effects that can reasonably be expected to be visited upon United States shareholders where … the securities are those of a United States company traded exclusively **on a United States exchange**.").[12]

The same analysis applies here. Because Alibaba's ADS trade on the NYSE, Alibaba and its officers and directors are required to comply with U.S. securities laws and SEC reporting

---

[10] *See also Straub*, 921 F. Supp. 2d at 254 n.7 ("[T]he conditions [*i.e.*, express aim of actions toward forum and brunt of injury felt within forum] are merely *sufficient* to bestow jurisdiction.") (emphasis in original); *Parmalat*, 376 F. Supp. 2d at 455 n.34 (Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984) "held only that these were sufficient conditions for the exercise of personal jurisdiction. It did not suggest that they were necessary conditions.").

[11] *See also* Defs Exs. XX1-XX3 (Form 144s filed by Ying Capital, Yun Capital, and JSP Investment, indicating all trades were made on the NYSE). On September 30, 2020, Ying Capital and Yun Capital each sold 2.5 million shares of Alibaba ADS, each generating gross proceeds of about $735 million. ¶367. On October 1, 2020, JSP Investment sold 5 million shares of Alibaba ADS, generating gross proceeds of about $1.45 billion. *Id.* The shares held by each of these entities were beneficially owned by Ma. *See* Wolke Decl., Ex. D at 191-92.

[12] *See also SEC v. Jammin Java Corp.*, 2016 WL 11783918, at *6 (C.D. Cal. Oct. 28, 2016) ("Courts routinely find personal jurisdiction over foreign defendants **where the fraud claims against them are tied to the trading of securities on a U.S. market**."); *In re Longfin Corp. Sec. Class Action Litig.*, 2019 WL 1569792, at *10 (S.D.N.Y. Apr. 11, 2019) ("The Defendants' alleged participation in a securities fraud in connection with an alleged New York issuer and **through trading on a New York-based exchange** make the exercise of jurisdiction reasonable and appropriate.").

requirements. The NYSE was the primary listing for Alibaba securities during the Class Period. Wolke Decl., Ex. E. Ma's trades took place on the NYSE, affecting U.S. investors in Alibaba.[13] The Ma-controlled entities were required to, and did, file Form 144s with the SEC to report these trades. Defs Exs. XX1-XX3. Ma thus "purposefully availed himself of the instrumentalities of United States commerce and can reasonably expect to be haled into an American court." *Everex*, 228 F.3d at 1068.

### 2.    Ma's Misleading Statements And Deceptive Acts Establish Jurisdiction

Ma is also subject to personal jurisdiction due to his misleading statements and deceptive acts that foreseeably affected U.S. shareholders and the trading price of Alibaba's ADS on the NYSE. Ma's statements in the Ant prospectuses concealed the identities of politically sensitive Ant investors and misled investors about the risks that the IPO would not be completed if regulators discovered those identities. The challenged disclosures include statements made in the Preliminary Ant IPO Prospectus filed one month before Ma executed his insider trades. *See supra* at 5.

Ma knew or had good reason to know that the information in the Ant prospectuses would be reviewed by U.S. investors and would materially affect the trading price of Alibaba ADS on the NYSE. The Ant IPO was expected to be the world's largest-ever IPO, and Alibaba owned 33% of Ant. ¶¶16, 18. Thus, Ant was material to the value of Alibaba, and the Ant IPO was expected to unlock that value. On September 30, 2020—the same day that Ma executed his first set of insider trades—Wu told investors that "the market is…assigning very little value to our stake in Ant Group" and that Alibaba's stake in Ant was a "strong growth driver[]" for Alibaba. ¶19.[14] Thus, at the very same time that Ma was trading while in possession of material inside information about Ant, Alibaba's CFO was directing the market to look at the value of Ant for a more accurate (higher) valuation of Alibaba.

---

[13] The trades were substantial in volume. Ma's 9/30/2020 trades comprised about 20% of the volume of Alibaba ADS traded on the NYSE that day; his 10/1/2020 trades comprised about 31% of the volume that day. Wolke Decl., Ex. X.
[14] In fact, U.S. investors did base a material part of their valuation of Alibaba on its ownership interest in Ant and the perceived likelihood of a successful Ant IPO, as confirmed by the material drop in Alibaba's ADS price when Alibaba announced the suspension of the Ant IPO. ¶23.

In October 2020, Alibaba's SEC filings provided information about the expected timing and pricing of the Ant IPO, while concealing material regulatory risks that jeopardized the completion of that IPO. ¶¶274, 276. These same filings characterized Ant as "an unconsolidated related party of Alibaba." ¶¶274, 276. U.S. investors in Alibaba interested in assessing the value that Ant would contribute to Alibaba and the risks of the Ant IPO predictably would turn to the Ant prospectuses.[15]

In light of the foregoing, as well as the timing of Ma's sales, it is reasonable to infer not only that Ma knew that statements in the Ant prospectuses would affect Alibaba's ADS price, but that Ma intended as much. Personal jurisdiction exists under an effects theory when "an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders in violation of federal regulations requiring disclosure of accurate information to holders of securities traded in the United States." *Straub*, 921 F. Supp. 2d at 255.

Ma argues that the Complaint fails to allege he "played any role in making, proposing, editing or approving" the statements in question and that his status as control person is insufficient to confer jurisdiction. Ma MTD 9. Ma misconstrues the Complaint's allegations and applicable case law. As detailed in Sec. VI, *infra*, Ma was the "maker" of the statements in Ant prospectuses under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).

Moreover, the attribution of the challenged statements to Ma is based on more than his *ability* to control the contents of the prospectuses; it is based on his specific actions in overseeing and managing every aspect of the Ant IPO.[16] As the Complaint details, Ma has been the controlling

---

[15] Ma points out that the Ant prospectuses, which were filed with the HKSE, stated that the information contained in those prospectuses "may not be used for...any security in any other jurisdiction." Ma MTD 10. Notwithstanding this statement, Ma had good reason to know that U.S. investors in Alibaba would review the Ant prospectuses and rely on them in assessing both the value of Ant and, derivatively, the value of Alibaba. Those prospectuses were written in English, Alibaba's CFO was directing investors to look to Ant in valuing Alibaba, Alibaba's SEC filings provided information concerning the expected timing and pricing of the Ant IPO, and the only place where investors could obtain substantive economic information about the value of Ant and the risks and benefits of the IPO was by reviewing the Ant prospectuses.

[16] This factor distinguishes this case from *In re Braskem S.A. Securities Litigation*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017) (Ma MTD 9). In *Braskem*, the court found a conclusory allegation that the defendant "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company" insufficient to support

shareholder of Ant since its inception, he continued to control the company as it went through various corporate transformations, and at every step of the way, he carefully selected which individuals and companies were allowed to become shareholders of Ant, including during the 2015-2018 Equity Transactions. ¶¶314-23. Ma recruited strategic investors into Ant to help smooth the path for regulatory approval of the IPO and leveraged his relationships with Chinese Communist Party officials to fast-track the approval process. ¶¶361-64.[17]

Further, the challenged statements in the Ant prospectuses are consistent with other deceptive acts taken by Ma in furtherance of a scheme to defraud Chinese regulators and the public at large about the identities of certain Ant investors. For example, Plaintiffs allege that (1) Ma caused the Ant prospectuses to omit disclosure of Li's interest in Shanghai Zhongfu Equity and (2) Ma and Alibaba assisted Li in hiding his investment in Ant by participating in the structuring and funding of a VIE structure that operated to conceal Li's investment in Shanghai Zhongfu Equity. ¶¶355-60. The details underlying these allegations, including, *inter alia*, Ma's connections with Li and their shared experience of crackdowns by President Xi of the Maotai Club and associated clubs, support a strong inference that the misleading statements and omissions about ownership in the Ant prospectuses were intentional and done at Ma's direction. *Id.*; ¶¶327-32.

Courts in this Circuit have held that foreign defendants are subject to personal jurisdiction when they participate in a scheme to defraud U.S. investors, *even if* they do not personally make actionable misstatements. *Straub*, 921 F. Supp. 2d at 256 (personal jurisdiction over foreign defendant who concealed bribery scheme from company's auditors); *Alpha Cap. Anstalt v. New Generation*

---

jurisdiction. 246 F. Supp. 3d at 770. Here, the Complaint alleges that Ma *exercised* such power to cause specific omissions in the Ant prospectuses, and it bolsters this allegation with factual details concerning Ma's involvement in the IPO process, Ma's relationships with the other principals in the scheme, and Ma's additional acts taken in furtherance of the scheme.

[17] Following the suspension of the IPO, the Chinese central government launched an investigation into the approval process for the Ant IPO, which included scrutiny into Ma's relationships with strategic investors and the reasons why preliminary regulatory approvals had been obtained in such an accelerated timeframe. ¶363.

*Biofuels, Inc.*, 2014 WL 6466994, at *7 (S.D.N.Y. Nov. 18, 2014) (personal jurisdiction over foreign defendant who "never signed any of the relevant SEC filings" because he signed company's patent applications and approved valuations of license agreement that were the basis of values disclosed in SEC filings); *SEC v. Stanard*, No. 1:06-cv-07736-GEL (S.D.N.Y. May 16, 2007) (unpublished transcript of ruling) (Tr. 3:2-18) (personal jurisdiction over foreign defendant who designed and implemented sham transaction intended to result in false statements in SEC filings) (Wolke Decl. Ex. F); *Landry v. Price Waterhouse Chartered Accts.*, 715 F. Supp. 98, 100-02 (S.D.N.Y. 1989) (personal jurisdiction over foreign defendant who was director and control person of company and "behind the scenes player" in transaction at issue).[18]

Ma also argues that the scheme allegations are insufficient to support personal jurisdiction because "the alleged scheme was directed at PRC regulators." Ma MTD 10. The Complaint, however, alleges that the scheme was directed *both* at PRC regulators and the investing public at large, including U.S. holders of Alibaba ADS. ¶¶346-47, 354, 360. Even if Ma's primary intention was to deceive PRC regulators, personal jurisdiction over him is still appropriate if he knew or had good reason to know that his actions would also deceive U.S. investors. *See Straub*, 921 F. Supp. 2d at 256 ("[E]ven if Defendants' alleged primary intent was not to cause a tangible injury in the United States, it was nonetheless their intent, which is sufficient to confer jurisdiction.").

**B.    The Court's Exercise Of Personal Jurisdiction Over Ma Is Reasonable**

"Once minimum contacts are shown, the exercise of jurisdiction is favored unless defendants present a compelling case that the presence of some other considerations would render jurisdiction

---

[18] Citing *Parmalat*, Ma argues that status as a control person is insufficient to confer jurisdiction. Ma MTD 9-10. *Landry*, however, holds otherwise. *Landry*, 715 F. Supp. at 102 ("The plaintiff's argument concerning Chisholm's involvement in REC and Calgroup demonstrates the requisite prima facie showing that he was a 'control person' of Calgroup and *thus amenable to suit in this forum*."). In any event, Plaintiffs are not claiming that personal jurisdiction over Ma arises from his *status* as a control person. It arises from his *actions*, including his insider trading, his issuance of materially false and misleading statements, and his additional actions taken in furtherance of a scheme to defraud.

unreasonable." *Poof-Slinky, LLC v. A.S. Plastic Toys Co., Ltd.*, 2020 WL 5350537, at *6 (S.D.N.Y.

Sept. 4, 2020). Ma raises no argument concerning this part of the jurisdictional analysis; he only

challenges minimum contacts. *See* Ma MTD 8-9, n.6. He has thus waived any argument that personal

jurisdiction would be unreasonable. Indeed, exercising jurisdiction over Ma is reasonable. Few courts

"have ever declined jurisdiction, on fairness grounds, in securities cases." *SEC v. PlexCorps*, 2018

WL 4299983, at *19 (E.D.N.Y. Aug. 9, 2018). This case should be no different. Ma engaged in insider

trading on the NYSE; he made materially false and misleading statements that he had good reason to

know would harm U.S. investors; and he committed deceptive acts that operated to mislead U.S.

investors in addition to Chinese regulators.

## IV.   PLAINTIFFS' CLAIMS FALL WITHIN THE TERRITORIAL LIMITS OF §10(b) BECAUSE THEIR PURCHASES WERE MADE ON THE NYSE

Plaintiffs purchased their shares of Alibaba ADS on the NYSE, satisfying the bright-line rule

for territoriality established by the Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561

U.S. 247 (2010). *See id.* at 267 ("[I]t is in our view only [1] transactions in securities listed on domestic

exchanges, and [2] domestic transactions in other securities, to which § 10(b) applies."). "Because the

[Alibaba] ADRs[19] are securities that are listed and traded on the NYSE, the first prong of *Morrison* is

satisfied." *U.S. v. Martoma*, 2013 WL 6632676, at *3 (S.D.N.Y. Dec. 17, 2013). Ma has not cited a

single case in which a court dismissed on extraterritoriality grounds a claim by investors who

purchased ADS or ADR on a domestic exchange,[20] and Plaintiffs are aware of none.[21]

*Morrison* abrogated the Second Circuit's "conduct" and "effects" tests for territoriality,

---

[19] "An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ('ADSs') …. The terms ADR and ADS are often used interchangeably by market participants." *SEC Investor Bulletin: American Depositary Receipts* (Aug. 2012), https://www.sec.gov/investor/alerts/adr-bulletin.pdf.

[20] *Morrison* involved claims of foreign purchasers of a foreign bank's stock on foreign security exchanges. *See* 561 U.S. at 251-52 & n.1. The other extraterritoriality decision cited by Ma involved the claims of a foreign company that purchased another foreign company's stock in a private offering; the seller's "shares did not trade on a domestic or foreign exchange." *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 164 (2d Cir. 2021) (Ma MTD 11).

[21] *See, e.g.*, *Martoma*, 2013 WL 6632676, at *4 ("[Defendant] has cited no case in which a court has concluded that Section 10(b) does not apply to transactions in ADRs that are listed and traded on a domestic exchange.").

replacing that imprecise "methodology of balancing interests and arriving at what seemed the best policy," 561 U.S. at 259, with a simplified "transactional test" focused solely on the ***location of the securities transaction*** giving rise to the claim instead of the location of the alleged misconduct. Ma's territoriality argument is based on the location of the misconduct. *See* Ma MTD 10-11 (arguing the misstatements were made in prospectuses filed with the HKSE and the fraudulent scheme "was directed to PRC regulators and occurred entirely in China"). The focus of the territoriality analysis, however, "is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 561 U.S. at 266. Ma's argument relies entirely on "vestiges from [the Second Circuit's] now-defunct conduct and effects test." *Cavello Bay*, 986 F.3d at 167.

Ma relies on a passage in the Ant prospectuses stating that those prospectuses "may not be used for…any security in any other jurisdiction." Ma MTD 10. This statement, however, does not insulate Ma from the reach of the U.S. securities laws. *Morrison* focuses on the location of the securities transaction, not the location of the misstatement. The thicket of policy considerations raised by Ma are the *reason* the Supreme Court issued a bright-line rule in *Morrison*.[22] Nothing in *Morrison* suggests that a person in Ma's position can avoid his obligations under the Exchange Act by packaging a misstatement affecting the value of a U.S.-listed company (that he controls) into the regulatory filings of an affiliated company (that he also controls) that does not trade on a U.S. exchange.

Finally, even if Ma's extraterritoriality arguments were valid, at most they would apply to misstatement claims under Rule 10b-5(b). They do not apply to Plaintiffs' insider trading claims under Rule 10b5-1 or Plaintiffs' "scheme" and "act" claims under Rule 10b-5(a) and 10b-5(c), because

---

[22] Ma quotes an excerpt from *Morrison* discussing policy considerations, stating that "'foreign countries regulate their *domestic securities exchanges* and *securities transactions occurring within their territorial jurisdiction*. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made ... and many other matters.'" Ma MTD 11. These concerns are inapplicable. This case does not involve any securities transactions on a foreign exchange. Nor does it involve any disclosure obligations Ma owed to prospective purchasers of Ant securities. This case involves obligations Ma owed to purchasers of Alibaba ADS on the NYSE, during a period when Ma was a director and control person of Alibaba and engaging in insider sales of Alibaba ADS.

neither sets of claims are based on the challenged statements in the Ant prospectuses.

## V.   PLAINTIFFS HAVE STANDING TO SUE MA FOR FALSE AND MISLEADING STATEMENTS IN THE ANT PROSPECTUSES

Plaintiffs have statutory standing to bring claims against Ma because they are actual purchasers of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975). Ma relies on *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), which held that investors did not have standing to sue when they purchased the security of a company different than the one that made the misstatement. The Second Circuit, however, later clarified this decision, noting that *Nortel* "contains language that could be read to suggest that a purchaser of a security may bring a fraud action under Rule 10b-5 only against the issuer of the security purchased," but that "[t]hat is not what *Nortel Networks* held." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007) (Sotomayor, J.); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *15 (S.D.N.Y. Sept. 2, 2022) (*NYSE Specialists* "confined the potential reach of *Nortel*'s holding substantially").[23]

In *Nortel*, the Second Circuit held that investors in one company lacked standing to sue another company that was buying a portion of the first company's business. "[N]othing in the record indicate[d] that the companies shared any management structures." *Nortel*, 369 F.3d at 29. They merely had a "business relationship." *Id.* at 32. There was no "direct link between the value" of the two companies, and the Second Circuit stated that such a link (which is present here) might compel a different result. *Id.* at 34. For these reasons, *Nortel* held that "the connection between [one company's] false statements about itself and the plaintiff's purchase of [the other company's] stock was too remote

---

[23] *See also In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 447 (S.D.N.Y. 2019) ("despite [*Nortel*'s] apparent holding," the Second Circuit "has since clarified that it is not the case that an action under Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable"); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1435356, at *9 (S.D.N.Y. June 28, 2004) (*Nortel* inapplicable where "one security's value was directly and contractually linked to another's").

to sustain an action under Rule 10b–5." *NYSE Specialists*, 503 F.3d at 102.

In this case, the relationship between Ma's statements and Plaintiff's purchases is not remote. Unlike the "particular circumstances" of *Nortel* (*NYSE Specialists*, 503 F.3d at 102), Ant and Alibaba are highly related companies that share more than just a "business relationship." *See Turquoise Hill*, 2022 WL 4085677, at *14-18 (purchasers of stock of public company had standing to sue parent entities and their executives for misstatements made by those parent entities and executives). Alibaba owns 33% of Ant and refers to it as "an unconsolidated related party of Alibaba." ¶¶274, 276. Alibaba's value is directly and materially linked to Ant's value, as Alibaba's CFO conceded. ¶19. Moreover, Ma is a control person of both Alibaba and Ant, and Ma owed fiduciary duties and other duties to Alibaba shareholders, arising from his roles as director, control person, and insider who traded Alibaba ADS on the NYSE while in possession of material inside information.

Moreover, *Nortel* did not address whether plaintiffs have standing to sue an ***individual*** who exercises control over two related companies. Ma knew or had reason to know that the Ant prospectuses he controlled would mislead US investors in Alibaba's ADS, and thus should not be permitted to artificially partition his public statements, so that some are directed only to Alibaba shareholders and others only to Ant shareholders. *See supra* at 9-10.[24]

The other cases cited by Ma are inapposite. *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015) held that an investor lacked standing to sue suppliers of the company in which the investment was made because there was no relationship between the suppliers and the investors, "let alone a special relationship of trust or confidence." *632 F. App'x* at 657. In this case,

---

[24] In *Turquoise Hill*, the court held that a broad reading of *Nortel* would "leave out a number of third-party actors whose false statements about a company could easily have been relied upon by investors in the issuer." 2022 WL 4085677, at *16. The court rhetorically asked, "Could [a] majority shareholder avoid such a lawsuit if she cleverly avoids a board seat and, from a position of presumed authority, uses a megaphone to make the misstatements rather than a corporate filing?" *Id.* A corporate insider should not be able to avoid liability by using a megaphone or by using the corporate filings of an affiliated company that he also controls.

16

Ma owed a duty of disclosure to Plaintiffs because he was a director of Alibaba and owed fiduciary duties to Alibaba ADS holders, and he traded Alibaba ADS while in possession of material inside information.  In *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ("*IFF*"), there was no relationship between the Frutarom Defendants and IFF investors at the time of the alleged misstatements.

Plaintiffs are not seeking to "extend[] the private cause of action under Section 10(b) 'beyond its present boundaries.'" Ma MTD 13 (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008)). Corporate officers and directors are already subject to potential liability under Section 10(b) for any statements they make to the investing public. Ma is seeking a special exception for corporate insiders to make alleged misstatements via related companies also subject to the insiders' control.  Ma does not a single case that has applied *Nortel* in such a context.

Even if Ma's standing arguments were to be accepted—and they should not be, at most those arguments would apply to Plaintiffs' claims based on the statements in the Ant prospectuses. They would not apply to Plaintiffs' scheme and act liability claims under Rule 10b-5(a) and 10b-5(c), nor to Plaintiffs' insider trading claims under Rule 10b5-1, which are not based on statements.

## VI. <u>MA IS THE MAKER OF THE STATEMENTS IN THE ANT PROSPECTUSES</u>

Ma was a "maker" of the challenged statements in the Ant prospectuses pursuant to the Supreme Court's decision in *Janus*, because he had "ultimate authority over the statement[s], including [their] content[s] and whether and how to communicate [them]." 564 U.S. at 142. An individual need not sign a statement to be its maker.[25] Attribution of a statement may be "implicit from surrounding circumstances." *Janus*, 564 U.S. at 142.

---

[25] *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 375 (S.D.N.Y. 2012) (executive in charge of division whose misconduct was at issue was maker of company's public misstatements, even though she did not sign them); *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *32 (S.D.N.Y. Mar. 23, 2017) (executive at mining company was maker of statements in sustainability reports, even though he did not sign them).

Multiple factors support attribution of Ant's statements to Ma. First, the prospectuses admit that "Ma has ultimate control" over Ant (¶170), tracking *Janus*'s "ultimate authority" standard. Second, no one signed the prospectuses (¶¶279, 294), confirming that no one other than Ma—Ant's "ultimate controller" (¶55)—was responsible for the statements. Third, Ant's history and the events leading up to the IPO support a strong inference that Ma controlled not just Ant, but the ***entire offering process***. *E.g.*, ¶¶314-23, 347, 360-65. The decision to take Ant public, the terms of the IPO, and the disclosures made in the prospectuses all hinged on Ma's say-so. Fourth, several of the misstatements in the prospectuses relate directly to Ma, including a false representation that a related party of Ma was an "independent third party." ¶¶285, 297. These facts support an inference that Ma was directly involved in and responsible for the relevant disclosures and omissions.[26] Given the "many indicia of control," Plaintiffs plausibly allege Ma was the maker of statements. *See City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (sole stockholder of issuer was maker of statements in registration statements because it had "direct control over all corporate transactions" and "authority to determine when and whether to sell the shares being sold.").[27]

None of the cases cited by Ma (Ma MTD 13-14) involved circumstances similar to this case (or *Roseville*). None addressed statements made by a dominant shareholder who controlled the issuer's offering process and controlled the decision of whether the shares would be sold.  *See, e.g.*, *In re Optimal U.S. Litig.*, 2011 WL 4908745, at *5 (S.D.N.Y. Oct. 14, 2011) (Ma MTD 13-14) (shareholder not "maker" of alleged misstatements because board of directors explicitly had "authority to alter the

---

[26] In addition, the Concert Party Agreement gives Ma a veto right over all matters relating to Ant, including any dilutions of the ownership interests of Junhan and Junao. Wolke Decl., Ex. C at 292. Because the planned Ant IPO involved the issuance of new shares and would have diluted the ownership interests of Junhan and Junao, Ma had a right to veto the transaction and thus had ultimate control over the offering.

[27] *See also IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456, 473-74 (S.D.N.Y. 2015) (plaintiff sufficiently pled that holding company was maker of corporation's statements where holding company owned "overwhelming majority" of corporation's shares and "decided whether to sell" the corporation to acquirer).

[statements] without consulting shareholders").[28]

At the pleading stage, a plaintiff only needs to plead facts sufficient to raise a plausible inference that the defendant had ultimate authority over the statements. *See, e.g.*, *Vale*, 2017 WL 1102666, at *33 (evidence that the "defendant did in fact have ultimate authority over the statements" is not necessary until summary judgment and trial). The Complaint does this.

## VII.   PLAINTIFFS ALLEGE MA'S LIABILITY UNDER RULE 10b-5(b) FOR MISSTATEMENTS IN THE ANT PROSPECTUSES

### A.   Ma Made Materially False And Misleading Statements Concerning The Financial Interests Of The Undisclosed Ant Investors

The Ant IPO prospectuses made misleading statements concerning the financial interests of Jiang and Li in Beijing Jingguan and Shanghai Zhongfu Equity, respectively (and undisclosed related party relationships with Qizhan). ¶¶281-86, 296-97. These statements concealed Jiang and Li's interests in Ant, thereby concealing risks that the IPO would not be completed if regulators discovered their undisclosed financial interests.[29] Ma challenges these allegations by (i) arguing that Plaintiffs impermissibly rely on a WSJ article that cites anonymous sources, and (ii) trying to attack the plausibility of the underlying allegations and arguing that the allegations fail to satisfy the particularity requirements of the PSLRA. Each of these arguments fails.

### 1.   Plaintiffs Are Entitled To Rely On The February 16, 2021 WSJ Article

Ma argues that Plaintiffs' allegations concerning the hidden ownership interests of the princelings are based "solely" on the 2/16/2021 WSJ article and that this article is unreliable because it is based on anonymous sources. Ma MTD 15-17. Neither contention is correct. Plaintiffs' claims are

---

[28] *See also In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262 (S.D.N.Y. 2020) (allegations provided no "clear indicia of control"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 112, 136-38 (S.D.N.Y. 2013) (maker of statement was accounting firm that issued audit report concerning issuer, not auditor's parent company or other member firm of parent company).

[29] Plaintiffs also allege Ma made material misstatements about Ant's banking regulatory compliance and related risks in the Final Ant IPO Prospectus. ¶¶298-308. These statements are addressed at Pls Alibaba Opp. Secs. II.E-F, V, & VI.

based not just on the WSJ article, but additional reports from other news outlets and Plaintiffs' own investigation, which corroborated critical portions of the WSJ's reporting. In addition, the WSJ article is independently reliable and based on multiple sources.

Ma's argument implicates two bodies of law: one concerning a plaintiff's use of anonymous sources and another concerning a plaintiff's reliance on a third party's allegations. In the Second Circuit, plaintiffs may rely on confidential sources if **either** (i) they are described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," **or** (ii) other facts corroborate their statements. *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000). "What facts and what level of particularity are sufficient…will vary from case to case." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 358 (S.D.N.Y. 2003) ("*In re IPO*").

With respect to third-party allegations, courts in this Circuit have addressed the issue in a variety of contexts involving different types of sources, including complaints filed by private litigants, short-seller reports, and news articles. The weight of authority holds that plaintiffs may base their allegations on a third party's factual allegations, at least where plaintiffs' investigation corroborates the third party's allegations or where the third-party source has other indicia of reliability. *E.g.*, *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (Ma MTD 16) ("where courts have found that well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints").[30]

News articles are generally seen as more objective and reliable than other types of third-party sources. *Miao*, 442 F. Supp. 3d at 800 n.22 ("[T]he probative value of an independent news article or

---

[30] *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings"); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (Rule 11 allows "incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations.").

government report is much greater than that of confidential witness statements recounted in another complaint."); *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007) ("A reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting."). The Second Circuit has twice recently held that securities fraud plaintiffs may rely on information from news articles, even when anonymously sourced. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) (plaintiffs entitled to base their allegations on two anonymously sourced WSJ articles: "financial publications, such as the WSJ, which also corroborated [the] alleged timeline of events, play an important role in informing investors about public corporations");[31] *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 148, 150 (2d Cir. 2021) (allegations from two news articles satisfied Rule 9(b) and PSLRA).

Multiple factors support Plaintiffs' reliance on the 2/16/2021 article. First, the article was published in the Wall Street Journal, a well-respected newspaper, which itself indicates reliability.[32] The 2/16/2021 WSJ article was a detailed investigative piece, based on interviews with "more than a dozen Chinese officials and government advisers" and a review of "commercial records" concerning the controversial Ant investors. ¶206; Ex. 9. The large number of sources adds credibility to the story. *Cf. In re IPO*, 241 F. Supp. 2d at 359 ("[T]he sheer volume of the corroboration obviates the need for absolute particularity."). That the WSJ did not identify its sources does not undermine its reliability. *Synchrony*, 988 F.3d at 169; *In re Under Armour Sec. Litig.*, 2020 WL 363411, at *5 (D. Md. Jan. 22, 2020) (granting securities fraud plaintiffs relief from judgment based in substantial part on two WSJ articles reporting that defendant was subject to DOJ and SEC investigations; the WSJ's sources were described as "people familiar with the matter" and "a person familiar with the matter").

---

[31] *See In re Synchrony Fin. Sec. Litig.*, 2020 WL 4436787, at *37-38 (2d Cir. 2020) (appellees' brief) ("Plaintiffs' allegations primarily rely on ***anonymously sourced WSJ articles***, citing 'people familiar with the matter.'").

[32] *See In re Loewen Grp. Inc. Sec. Litig.*, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004) ("The articles plaintiffs rely upon were published in … reputable newspapers (e.g. *The Wall Street Journal*) and meet the requirements of being independent and reliable."); *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) (approving reliance on WSJ).

In addition, the 2/16/2021 article was one of many stories about the Ant IPO that the WSJ published over a period of months, covering all aspects of the transaction. ¶¶187, 192, 206, 241, 363; Wolke Decl., Exs. G – O, Y. The substantial resources dedicated by the WSJ over an extended period support the conclusion that its reporting was reliable. The article was followed by stories from international news outlets that picked up and expanded on the WSJ story. ¶¶220, 353(d); Wolke Decl., Exs. P – V. Among others, todaychina published articles on February 18 and 25, 2021 that corroborated the WSJ's story and provided additional details and context, including background on the political conflicts between Xi Jinping and the two princeling investors in Ant, Jiang and Li. ¶¶228, 330-31, 335-37, 345(b), 353(b). The WSJ published a follow-up story on April 27, 2021, revealing that the Chinese government was conducting a second investigation into the approval process for the Ant IPO (because initial approvals were secured on an accelerated timeframe) and Ma's relations with strategic investors. ¶¶362-63. This second investigation supports the WSJ's prior reporting about the reasons why the Ant IPO was suspended, *i.e.*, the Ant prospectuses "obscured the complexity of the firm's ownership" and concealed the interests of Jiang and Li. ¶¶207-20.

Jiang and Li both declined to comment to the WSJ, and neither offered a public response after the story was published or following the subsequent flurry of coverage. This silence bolsters the conclusion that the story is reliable. *See In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022) (issuer's failure to deny certain allegations in short-seller report was one "indicia of reliability" suggesting plaintiffs were entitled to rely on the report).[33]

 Most importantly, Plaintiffs have corroborated key portions of the 2/16/2021 WSJ article through their own investigation. Through SAMR records and data, Plaintiffs were able to confirm the WSJ's conclusion that Jiang and Li did in fact invest in Ant through the complex and obfuscatory

---

[33] *Cf. In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (defendant's "non-denial" of allegations raised in public reporting about the defendant's conduct "provide a strong inference of scienter").

chain of investment vehicles described in the 2/16/2021 article. ¶¶338-60.

With respect to Jiang, Plaintiffs verified that Shanghai Tiancen was the executive partner of BJTAM, which in turn was the executive partner of Beijing Jingguan, which in turn owned a 0.92% interest in Ant with an estimated value of $2.25 billion. *See* Appendix A; ¶¶222, 338-41.[34] Plaintiffs also obtained evidence supporting a strong inference that Shanghai Tiancen was a VIE of Boyu Capital. ¶¶342-45. These facts include the use of a Boyu-associated email address and phone number as the official contact information for a Shanghai Tiancen affiliate and a close clustering of registration dates for a series of related Shanghai Tiancen and Boyu entities. ¶345. Taken together, these facts corroborate the WSJ's conclusion that Jiang invested in Ant through the chain of vehicles described in the article.

With respect to Li, Plaintiffs verified that Tibet Hongde was a shareholder of Fuqing, which in turn was a shareholder of Shanghai Zhongfu Equity, which in turn owned a 1.29% interest in Ant with an estimated value of $3.17 billion. ¶¶224, 348-50. Plaintiffs also obtained evidence supporting a strong inference that Tibet Hongde was a VIE of Beijing Zhaode. ¶¶351-60. These facts include common ownership by Tibet Hongde and Beijing Zhaode of an entity called Xinjiang Beikong, suggesting that these entities are related. ¶353.[35] Taken together, these facts corroborate the WSJ's conclusion that Li invested in Ant through the chain of vehicles described in the article.

Plaintiffs were not required to verify every detail of the article to rely on it in the Complaint. *Synchrony*, 988 F.3d at 164 (WSJ article reported that retail partner of financial institution solicited

---

[34] The full series of relationships and inter-connections between these entities is somewhat more complex than can be described here and is addressed more fulsomely in ¶341; *see* Appendix A.

[35] Ma states that "the Complaint concedes that the only connection between Beijing Zhaode and Tibet Hongde is that they both invested in, and held seats on the board of, another business that has nothing to do with this lawsuit." Ma MTD 17. This assertion mischaracterizes the Complaint's allegations and ignores, among other things, (1) the WSJ's claim that Beijing Zhaode invested in Ant via Tibet Hongde, (2) Li's failure to respond to the WSJ's allegations, and (3) evidence that Alibaba participated in the structuring of the VIE relationship between Beijing Zhaode and Tibet Hongde. *See* ¶¶353-60; *see also infra* at 32-33.

bids from institution's competitors; plaintiffs corroborated bids to "at least one" such competitor); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at \*5 (S.D.N.Y. Sept. 10, 2012) (allegations drawn from short-seller report reliable where second short-seller "corroborate[d] the [first short-seller's] numbers *in part*" and plaintiffs "obtained *partial* SAIC filings" to help corroborate report).[36]

      The authorities cited by Ma are in accord. For example, *Miao* cited favorably to *SkyPeople* and *Longwei*, both of which allowed plaintiffs to rely on anonymously sourced short-seller reports where plaintiffs partially corroborated the underlying facts. *Miao*, 442 F. Supp. 3d at 801-02. *Miao* only disallowed plaintiffs to rely on a short-seller report where plaintiffs "relie[d] *exclusively* on general statements credited to anonymous interviewees in a secondhand short-seller report which *contains demonstrable errors* and is *uncorroborated* by an independent investigation by counsel…." *Id.* at 804. In contrast, Plaintiffs here do not rely exclusively on the WSJ article, the article did not contain demonstrable errors, and Plaintiffs' investigation corroborated many of the material facts in the article. Similarly, in *In re Sibanye Gold Ltd. Sec. Litig.*, 2020 WL 6582326, at \*16-\*17 (E.D.N.Y. Nov. 10, 2020) (Ma MTD 16), the court disallowed plaintiffs to rely on a news article based on interviews with anonymous mineworkers for the allegation that management pressured employees to work in dangerous conditions. The court's ruling hinged on the fact that plaintiffs apparently had conducted no independent investigation of the claims in the article. *Id.* at \*17. This stands in stark contrast to Plaintiffs' investigation of the applicable SAMR filings and the material portions of the WSJ report that Plaintiffs were able to corroborate. ¶¶338-60.[37]

---

[36] *See also In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at \*4 (N.D. Cal. Aug. 14, 2008) (facts from SEC complaint reliable where plaintiffs "corroborate[d] *some, though not all*, of the allegations" and "certain information [was] found only in the SEC complaint"); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at \*4 (S.D.N.Y. Jan. 27, 2014) (allegations drawn from short-seller report reliable where plaintiffs did "not rely *solely*" on report); *cf. U.S. v. Canfield*, 212 F.3d 713, 719-20 (2d Cir. 2000) ("[I]f an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration.").

[37] *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at \*19 (S.D.N.Y. Sept. 22, 2021) (Ma MTD 16 n.13) is even further afield. There, the third-party "source" was the online CV of a human resources manager.

### 2.     Ma's Additional Challenges Regarding The Ant Investor Claims Fail

Ma first argues that Jiang's investment in Ant cannot have been an issue with the Chinese government because "Boyu Capital's investment in Ant…was made in 2018 [and] was both reported by contemporaneous news articles and explicitly disclosed in the HKSE Prospectuses." Ma MTD 16. Ma is referring to the investment of Growth Succession, an entity that, according to the Ant prospectuses, was owned by Boyu Capital III, a Cayman Islands limited partnership managed by Boyu Capital. Defs Ex. EE at 148, 153.

Importantly, however, Growth Succession was designated in the Ant prospectuses as an *offshore* pre-IPO investor, which had invested in Ant in the 2018 Offshore Equity Financing. *Id.* at 147-48. Beijing Jingguan (the entity through which Jiang concealed his earlier investment in Ant), on the other hand, was listed in the Ant prospectuses as an *onshore* pre-IPO investor that first invested in Ant in the 2016 Equity Transactions and increased its position in the 2018 Equity Transactions. ¶222; Defs Ex. EE at 145, 146. This distinction is important because, as explained by the WSJ article, Boyu is based in Hong Kong and at the time of its 2016 investment into Act, "Chinese regulations restricted 'off shore,' or outside the mainland, ownership of payment services, a core part of Ant's business." ¶211. Moreover, the shares held by Growth Succession (and all other offshore investors) were Class C shares of Ant International, an offshore subsidiary of Ant Group incorporated in the Cayman Islands. Wolke Decl., Ex. C at 28, 138, 160. Those shares had no voting rights. *Id*. In contrast, the shares received by the onshore pre-IPO investors were ordinary shares of Ant Group, the parent entity, which was organized under the laws of the PRC. *Id.* at 30, 137, 160.

In addition, Growth Succession held approximately 62 million shares, roughly three and a half times less than the approximately 218 million shares held by Beijing Jingguan, which was one of Ant's top ten shareholders. ¶222 & n.13; Wolke Decl., Ex. C at 146, 148. These facts demonstrate a marked difference between Boyu's investment through Growth Succession, which was designated as an

offshore investor and in which Boyu's ownership was clearly disclosed, and Beijing Jingguan, which was designated as an offshore investor and in which Boyu's interests were ***undisclosed*** and concealed through a complex, deceptive VIE structure. It is entirely plausible, as the WSJ reported, that the undisclosed and deceptive structure of Boyu's investment into Ant through Beijing Jingguan set off "alarm bells" with regulators and contributed to the regulators' decision to shut down the IPO. ¶208; Ex. 9 at 3.

Ma also argues that Plaintiffs' theory is implausible because the Chinese government has permitted the IPOs of other companies in which Boyu was an investor. Ma MTD 16 n.12 (referring to 2018 IPO of WuXi AppTec Co. Ltd. and 2020 IPO of Antengene Corp. Ltd.). There are important differences, however, between those IPOs and the Ant IPO. For one thing, those other IPOs were ***much*** smaller than Ant's planned IPO, with WuXi expected to raise $914 million,[38] and Antengene expected to raise $200 million,[39] compared to Ant's expected $35 billion. ¶16.[40] More importantly, there is no indication that Boyu concealed its financial interests in the WuXi AppTec or Antengene IPOs or that it used a complex VIE structure to evade Chinese rules on offshore investment. Plaintiffs' theory—consistent with the WSJ article—is not that Xi's government decided to indiscriminately punish Jiang and Li, irrespective of context, but that Chinese regulators were concerned that Jiang and Li had used complex investment vehicles to disguise their extremely lucrative interests in Ant, and this deceptive activity caused Chinese regulators concern great enough to suspend the IPO. That factional politics played an important role in the suspension of the Ant IPO does not require that the Chinese government's approach toward all matters involving Boyu be monolithic and unnuanced. Plaintiffs adequately allege a claim for securities fraud so long as the undisclosed financial interests

---

[38] https://www.fiercebiotech.com/cro/wuxi-apptec-gets-fast-tracked-approval-for-900m-plus-shanghai-ipo.

[39] https://seekingalpha.com/article/4371571-week-in-review-antengene-approved-hong-kong-exchange-for-200-million-ipo.

[40] *See also* https://www.reuters.com/article/us-ant-group-ipo/china-slams-the-brakes-on-ant-groups-37-billion-listing-idUSKBN27J1OS (describing expected Ant listing of $37 billion).

of Jiang and Li (and the deceptive devices they used to conceal their interests) presented a material risk to the completion of the IPO that was not known to the investing public.

At most, Ma's attempts to undercut the plausibility of Plaintiffs' claims implicate questions of loss causation, not falsity. *See, e.g.*, Ma MTD 16 ("Why would PRC regulators abruptly reverse their approval and suspend the Ant IPO for the so-called Shanghai Faction's investment in Ant, when such investment was known for years?"). This question is irrelevant at this stage, because (1) Ma has not raised the issue of loss causation and has waived it on this motion,[41] and (2) factual disputes about why the Chinese government acted as it did are not appropriate for resolution on a motion to dismiss.[42]

Ma next argues that Jiang does not own the entire 0.92% of Ant shares held by Beijing Jingguan, that Li does not own the entire 1.29% of Ant shares held by Shanghai Zhongfu Equity, and that Plaintiffs do not detail the specific financial interests these individuals held within the applicable contractual (or extra-contractual) arrangements. Ma MTD 17. Plaintiffs, however, are not required to plead such details, particularly since the very purpose of the VIE structures was to conceal the individuals' economic interests. *See Montoya v. Mamma.Com Inc.*, 2006 WL 770573, at *4 (S.D.N.Y. Mar. 28, 2006) ("It is not necessary for plaintiffs to allege an exact percentage of interest that [defendant] held in the company, nor the precise manner by which [defendant] exercised his allegedly 'secret' control. Indeed, to demand that level of specificity in this case would amount to a requirement that plaintiffs possess ultimate proof of their claims before filing suit."). Plaintiffs allege sufficient facts to support a strong inference that Jiang and Li invested in Ant through the obfuscatory vehicles detailed in the WSJ article, that their interests were material, and that the discovery of these concealed interests played a role in the Chinese government's suspension of the IPO.

---

[41] *See* Fed. R. Civ. P. 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) ("a court should not consider arguments that are raised for the first time in a reply brief").

[42] Plaintiffs need only allege a plausible theory of loss causation under Rule 8 notice pleading. Pls Alibaba Opp. Sec. VI.

Ma also argues that the Complaint does not adequately plead that Qizhan is a related party to himself, Alibaba, and Ant. Ma MTD 17 n.15. Qizhan is the entity that Ma used to distribute Ant shares to a tightly controlled set of private investors in the 2015 Equity Transactions. ¶¶318-19. The Ant prospectuses state that (1) Qizhan is controlled by Shanghai Zhongfu Asset ("SZA") and (2) SZA also controls Shanghai Zhongfu Equity ("SZE), the VIE that Li used to conceal his And IPO investment. ¶¶225, 358-59. Furthermore, the principal shareholders of SZE are (1) Fuqing, which owns 39.9% of SZE, and (2) Qitai, which owns 21.8% of SZE. *See* Appendix B; ¶356. A subsidiary of Alibaba owns 34.2% of Qitai. *Id.* Thus, Fuqing (an entity controlled by Li) and Qitai (an entity over which Alibaba exercises significant influence, if not outright control) together hold a controlling interest in SZE. Taken together, these facts support a strong inference that Ma and Alibaba assisted Li in structuring the chain of investment vehicles that underlie the VIE structure used to conceal Li's investment. ¶¶356-59; *see also infra* at 32-33. These facts also support a strong inference that Ma and Alibaba exercise control or significant influence over SZA, which in turn controls Qizhan. ¶¶356-59. Qizhan, therefore, is not an "independent third party," as stated in the Ant prospectuses.

Finally, Ma argues that under Plaintiffs' theory, "any investor in a Vanguard fund would be a related party to the hundreds of other Vanguard funds." Ma MTD 18 n.15. This analogy is not apt. Alibaba and Li are not two unrelated investors who happened to invest in the same fund. Instead, the facts here strongly suggest a shared control arrangement between Alibaba and Li in relation to SZE and Ma's control over Qizhan. The failure to disclose these facts rendered the representation that Qizhan was an "independent third party" materially misleading.[43]

---

[43] Ma notes that the Complaint does not define the term "related party." Ma MTD 18 n.5. "Related parties" are typically defined to include "affiliates of the entity;" a party that "***controls or can significantly influence the management or operating policies of the other*** to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests;" and "***other parties that can significantly influence the management or operating policies of the transaction parties***." *Hebron*, 2021 WL 4341500, at *11. In any event, the term used in the Ant prospectuses was not "related party" but "independent third party." ¶¶285-86, 297. The problem, therefore, was not just a failure to disclose that Qizhan was a "related party," but an affirmative representation that Qizhan was an "independent third party." *Id.*

**B.**     **Plaintiffs Allege Ma's Scienter Regarding The Concealed Ownership Interests**

Viewed holistically, the Complaint gives rise to a strong inference that Ma knew about the concealed ownership interests of Jiang and Li and knew, or was severely reckless in not knowing, that these concealed ownership interests presented a material risk to the approval of the IPO.

**1.     The Facts Raise A Strong Inference That The VIE Structures Used To Facilitate Jiang's And Li's Investments Were Deceptive Devices**

First, the chain of investment vehicles used by Jiang and Li to effectuate their investments into Ant themselves provide strong evidence of an intent to conceal their economic interests and deceive Chinese regulators. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20 (2d Cir. 2020) (structure and sequence of acquisition and investment transactions by Chinese company supported inference that transactions were deliberately designed to deceive, supporting strong inference of scienter); *U.S. v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) ("[T]he very structure of the transaction would allow a reasonable inference of an intent to defraud.").

Plaintiffs were able to confirm a direct chain of ownership for most of the links in the charts published by the WSJ using SAMR records, but the links (a) between Boyu and Shanghai Tiancen and (b) between Beijing Zhaode and Tibet Hongde were VIE relationships, not direct ownership. Although Plaintiffs found strong circumstantial evidence supporting the conclusion that these VIE relationships exist, *see* ¶¶342-45, 351-60, these relationships were not easy to discern from the SAMR records and required substantial and time-consuming research, even with the roadmap provided by the WSJ. It is not surprising that Chinese government's investigation "found that Ant's IPO prospectus obscured the complexity of the firm's ownership." ¶207.

These investments would not have been structured in such a convoluted manner if the ultimate investors had nothing to hide. But those investors did have something to hide. Jiang is the grandson of former Communist Party chief Jiang Zemin and a member of the Shanghai faction, whose interests

are antagonistic to President Xi. ¶¶209, 324, 334. In addition, at the time Boyu made its initial investment in Ant, it was illegal for offshore companies to own payment services in China.[44] Between the time of Boyu's initial investment in 2016 and the time that Ant issued its Preliminary Prospectuses in August 2020, the conflict between President Xi and the Shanghai Faction only intensified. ¶334. In 2019, Boyu began moving its operations from Hong Kong to Singapore to obtain "greater distance from potential scrutiny or adverse action by authorities in Beijing." *Id.*

Li is the son-in-law of of Jia Qinglin, a former high-ranking Politburo member with strong ties to Jiang Zemin. ¶326. Li is perhaps best known as the founder of Maotai Club, a wine club known for lavish events and its influence among China's elites. ¶¶327-28. From 2013 to 2014, President Xi cracked down on the Maotai Club and associated clubs, including the Jiangnan Club founded by Ma. ¶¶329-31.  Thus, at the time of Beijing Zhaode's initial investment into Ant in 2015, there was already an antagonistic relationship between Xi and Li. According to todaychina, Jia Qinglin began moving assets to Cambodia in 2019, including "a private plane with Gold, U.S. dollars, [and] euros." ¶335.

Ma claims that the investments by Jiang and Li were "minor." Ma MTD 21 n.18. But Beijing Jingguan's 0.92% interest had an estimated value of *$2.225 billion* and Shanghai Zhongfu Equity's 1.29% interest had an estimated value of *$3.17 billion*. ¶¶222, 224. Both entities were among Ant's top ten shareholders. ¶¶222-24, n.113 & n. 114. And while Ma argues that the specific financial interests of Jiang and Li in these entities are unknown (Ma MTD 17), the most plausible inference based on the totality of information available is that these individuals controlled the entities and derived a substantial portion of profits, if not the lion's share. The evidence concerning the structuring

---

[44] *See* ¶211; Dkt. No. 55-9 (2/16/2021 WSJ article) ("Boyu became one of the early investors in Ant in 2016….Its base in Hong Kong was a potentially sticky issue at a time when *Chinese regulations restricted "off shore," or outside the mainland, ownership of payment services, a core part of Ant's business*."); Wolke Decl., Ex. W (Anne Stevenson Yang, *Will The VIE Structure Die? What Hong Kong And Alibaba Have In Common*, Forbes (July 27, 2021) ("*The VIE structure is clearly illegal*. China's law makes it clear that domestic companies in restricted sectors may not write profit-sharing agreements with foreign-owned entities.").

and formation of the entities support a strong inference that these were VIEs designed for the very purpose of disguising the investments of Jiang and Li. That there were "dozens of investors" in these entities (Ma MTD 17 n.14 & n.15)—whose specific financial interests were not disclosed in the SAMR filings—merely bolsters the conclusion that these vehicles were designed to obfuscate and deceive.

Of course, the foregoing is not the end of the analysis, because the ultimate question is whether *Ma* knew about these concealed ownership interests and whether he was aware of, or recklessly disregarded, the risks they posed to the regulatory approval of the IPO. As discussed below, the totality of the facts pled in the Complaint support a strong inference that he did.

> **2.    The Facts Raise A Strong Inference That Ma Knew About The Concealed Ownership Interests Of Jiang and Li**

Ma tightly controlled and was directly involved in the 2015, 2016 and 2018 Equity Offerings. ¶323. He personally recruited strategic investors (like the national pension fund and China Investment Corp., the country's sovereign wealth fund) to smooth the way for regulatory approval. ¶361. The other investors permitted to take an early position in Ant consisted largely of Ma's powerful friends and business allies. ¶¶205, 228. These facts support the conclusion that Ma knew the identities of and personally selected the investors that participated in pre-IPO equity offerings.

Ma argues that there is no direct evidence showing that he knew about Jiang's and Li's investments. Ma MTD 20. Direct evidence of scienter, however, is not necessary. Knowledge may be inferred from the circumstances, particularly in situations where the information in question is critical to a transaction. *Rudani v. Ideanomics*, 2020 WL 5770356, at *7 (S.D.N.Y. Sept. 25, 2020) (inferring executives' knowledge where "[t]he information at issue…was critical to the…Acquisitions"); *In re Aphria Sec. Litig.*, 2020 WL 5819548, at *5 (S.D.N.Y. Sept. 30, 2020) (similar). The identity of the pre-IPO investors was critical to the success of the Ant IPO, and Ma knew it. Ma's recruitment of strategic investors in 2015 shows that he was concerned with having a roster of investors that would

survive regulatory scrutiny of an IPO. Under these circumstances, it would be highly unusual for Ma to allow private investors to invest into Ant without knowing the principals behind those entities.

Ma's previous dealings and associations with Jiang and Li bolster the inference that he was aware of their roles in Beijing Jingguan and Shanghai Zhongfu Equity. In 2012, Jiang assisted Ma in buying out half of Yahoo's stake in Alibaba by organizing a consortium of investors consisting of Boyu Capital, China Investment Corp., and the private-equity arms of China Development Bank and CITIC Group to raise the $7.1 billion that Ma needed to buy back the Alibaba shares. ¶325. This deal not only shows a close working relationship between Jiang and Ma, but it also suggests that Jiang and Boyu were important intermediaries who helped provide Ma with access to the strategic investors that Ma needed for Ant's pre-IPO offerings. Moreover, Ma is connected to Li through Ma's investment into the Jiangnan Club, a branch of Li's Maotai Club. ¶332. Ma and Li both experienced the pressure of the 2013-2014 regulatory crackdown on these clubs, providing Ma with important insight into the underlying political divisions. *Id.*

In addition, the facts suggest that Ma assisted Li in structuring and cross funding the VIE that Li used to effectuate his investment into Ant. *See* Appendix B. An Alibaba subsidiary called Alibaba Network Tech owns a 34.2% interest in Qitai, which in turn owns a 21.8% interest in Shanghai Zhongfu Equity, the VIE that Li used to invest into Ant. ¶356. Fuqing, another VIE controlled by Li, owns a 39.9% interest in Shanghai Zhongfu Equity. *Id.* These facts support the conclusion that Li and Alibaba jointly formed and control Shanghai Zhongfu Equity and that Alibaba and Ma actively assisted Li in concealing his investment into Ant. *See* Appendix B. The inference that Ma knew about and was directly involved in these arrangements is further supported by (1) Ma's control over both Alibaba and Ant, (2) Ma's previous dealings with Li through the Maotai Club, and (3) the identification of SZA in the Ant prospectuses as the entity with control over both Shanghai Zhongfu Equity and Qizhan, the entity that Ma used to distribute the initial set of Ant shares to outside private

investors. ¶¶51-63, 331, 358-59.

Ma's scienter is further bolstered by the Chinese government's investigation into the Ant IPO approval process following the suspension (which is distinct from the initial investigation into Ant's ownership structure and regulatory compliance that led to the suspension). ¶363. This investigation focused on (1) how Ma was able to obtain initial regulatory approvals for the Ant IPO so quickly[45] and (2) Ma's relationships with large state firms that made pre-IPO investments into Ant and stood to gain from the IPO. *Id.*; *see also* Wolke Decl., Ex. K. This investigation bolsters the inference that Ma was highly involved in both the IPO approval process and the selection of Ant's pre-IPO investors.[46]

Finally, Ma argues that even if he knew about the concealed ownership interests of Jiang and Li, the facts do not support an inference that he knew the risks that these concealed ownership interests posed to the IPO. Ma MTD 20-21 n.18. This argument is unavailing. Ma's prior dealings with members of the Shanghai Faction and his personal exposure to Xi's regulatory backlash vis-à-vis the Jiangnan Club put him on notice of the risks. ¶¶331-32. As outside observers have commented, Ma is "very politically savvy," as demonstrated by his campaign to recruit strategic investors. ¶361. Ma also assisted Li's effort to hide his investment, supporting an inference that Ma knew that disclosure of the investment could be dangerous.

### 3.    Ma Had A Motive To Conceal Information From Chinese Regulators

Although motive is not necessary to plead scienter, motive allegations can "meaningfully enhance the strength of the inference." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 685 (5th

---

[45] According to the WSJ, Ma implemented a plan called "Project Star" to help fast-track the approval process and he leaned on his close relationships with certain officials of the Communist Party to accomplish this end. ¶362. In addition to concealing the controversial ownership interests detailed herein, Ma had a reason to rush regulatory approval to attempt to skirt the substantial regulatory risks Ant was facing. Ma would have known—or, as Ant's ultimate controller, been extremely reckless in not knowing—that Ant did not have the RMB500 billion assets required by the new FHC Regs announced on September 11, to be enacted on November 1, 2020. ¶¶197-202. These facts support an inference that Ma was motivated to rush the IPO through regulatory approval in late October to begin trading in early November, concealing the regulatory and ownership risks, for fear that banking regulatory scrutiny would only increase under the new FHC Regs.

[46] *See, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 (2d Cir. 2021) (SEC's decision to investigate "strengthen[s] the inference that [plaintiff] asks us to draw").

Cir. 2014). Under the holistic analysis required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007), even weak allegations of motive, combined with other allegations can "turn what might be a weak inference standing alone into a strong one." *Silvercorp*, 26 F. Supp. 3d at 275; *accord In re Insys Therapeutics Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018).

Ma had an enormous financial incentive to ensure the completion of the Ant IPO. As Ma acknowledges, he "indirectly owns approximately 11% of Ant's shares." Ma MTD 4. If the Ant IPO had been completed at the approximately $10.30 price contemplated at the time of the Prospectus (using historical exchange rates), Ma's 11% interest in Ant would have been worth approximately ***$27.6 billion***.[47] Ma notes that he was not a selling shareholder in the IPO and that Junhan, the entity through which Ma holds his Ant shares, "agreed to a 12-month post-IPO lock-up in Hong Kong and an at-least-36-month post-IPO lock-up in Shanghai." Ma MTD 18. Nevertheless, completion of the IPO would have provided Ma with a huge financial benefit. The requirement for pleading motive— that the defendant expects to benefit "in some concrete and personal way" (*id.*)—does not require the benefit be immediate. Ma had been planning to take Ant public since at least 2015 when he conducted the first round of equity financing; that he would have to wait for the expiration of a lock-up before being able to freely trade his shares in no way diminishes his incentive to complete the IPO.

Ma also argues that "the ordinary motive to ensure the success of an IPO cannot give rise to a strong inference of scienter." *Id.* But this was no ordinary IPO, and Plaintiffs' motive allegations are highly particularized and contextual. The Ant IPO was expected to be the largest IPO in history; Ma was sitting on an equity position worth billions of dollars that he wanted to become publicly tradeable; and Ma's motive was not so much to maximize the IPO price as it was to make sure that the IPO got approved by Chinese regulators as soon as possible, so that the IPO would become a *fait accompli* before the regulatory environment changed. ¶384. *Cf. In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL

---

[47] Ma indirectly owns approximately 2.677 million shares. Wolke Decl., Ex. C at 289.

3595058, at *28 (N.D. Ill. Aug. 23, 2022) (former CEO had motive "to conceal damning information" from FAA regulators because he "believed he could pressure the FAA into acting faster so that the bad news of Boeing's having misled the FAA would be overtaken by the MAX [line of aircraft]'s return to service"). As in *Boeing*, Ma had a motive to conceal damning information from Chinese regulators because he believed there was a good likelihood that he could use his influence and connections to rush the Ant IPO through regulatory approval before the central government engaged in any further regulatory crackdown or discovered the concealed ownership interests of Xi's rivals.

Ma argues that even if he had a motive to deceive Chinese regulators, he did not have a motive to deceive U.S. investors. Ma MTD 18. That is irrelevant. Ma had a motive to make the misstatements and engage in the deceptive actions that he did. Even if his only intention was to deceive Chinese regulators, and he was simply indifferent to the risk that his words and actions might also deceive Alibaba's U.S. investors, that mental state constitutes an extreme form recklessness that is actionable as securities fraud. *See In re Lehman Bros. Sec. and ERISA Litig.*, 903 F. Supp. 2d 152, 169 (S.D.N.Y. 2012) (recklessness actionable if it is "an extreme departure from the standards of ordinary care … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").

### 4.    Ma's Insider Trading Further Bolsters The Inference Of Scienter

Entities controlled by Ma sold 10 million shares of Alibaba ADS on September 30 and October 1, 2020, generating gross proceeds of more than $2.9 billion. ¶367. Ma states that these sales represented only about 1% of his total Alibaba holdings. Ma MTD 19. "However, where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) (Larry Ellison's sales of 2.1% of his Oracle holdings for

$900 million supported strong inference of scienter).[48]

Moreover, "[i]nsider sales of stock may be evidence of scienter if the trades are unusual or suspicious in **_timing or amount_**." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999). Irrespective of amount, Ma's sales are suspiciously timed. He made the sales just five weeks after the issuance of the Ant Preliminary IPO Prospectus on August 25, 2020. While the sales were made pursuant to Rule 10b5-1 plans, those plans were amended on August 28, 2020, just three days after the prospectus (and its misstatements) entered the market. *See* Defs Exs. XX1-XX3. When Rule 10b5-1 plans are amended in the Class Period or after a misstatement, those facts support a strong inference of scienter. *See* 17 C.F.R. §240.10b5-1(c)(1)(i)(A) (trading plan provides affirmative defense only if entered into "[**b**]*efore* becoming aware of the information"); *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (sales made pursuant to 10b5-1 plans supported scienter where plan was made "after the Complaint alleges that Green Mountain's fraudulent growth scheme began.").[49] Ma knew about Jiang and Li's concealed ownership interests **_for years_** and was planning the Ant IPO since at least 2015. The trading plans do not support dismissal.

Perhaps most damning, half of the trades were executed on September 30, 2020, which was Alibaba's Investor Day, when Wu told investors that they were assigning too little value to Alibaba for its ownership stake of Ant. ¶19. Alibaba's stock price rose significantly that day from a closing

---

[48] Ma argues that Plaintiffs only allege the gross proceeds from the sales, not the profits. Ma MTD 18 n.16. Courts, however, have found insider trading allegations to be supportive of scienter even when plaintiffs only allege proceeds. *See, e.g.*, *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013). Moreover, Ma has not disclosed the information necessary to calculate his profits. The Form 144s submitted by Ma indicate that the source of the shares sold were (a) options acquired by Ma in August 2016 and January 2017, and (b) founder's shares and options acquired by Ma in June and October 2007, but they do not specify the exercise price for any of the shares. *See* Defs Exs. XX1-XX3.

[49] *See also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (defendant's stock sales supported strong inference of scienter where "he actively amended and modified his 10b5–1 plans"); *Kasilingam v. Tilray, Inc.*, 2022 WL 4537846, at *9 (S.D.N.Y. Sept. 28, 2022) (10b5-1 plan did not negate scienter where defendant "entered into his first plan merely two weeks before the Class Period started"); *Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) ("where 10b5-1 trading plans are entered into during the class period, they provide no defense to scienter allegations"); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (same); *Freudenberg v. E*Trade Fin'l Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (same) (collecting cases).

price of $276.93 on Sept. 29 to close at $293.98 on Sept. 30, a roughly 6% increase. Wolke Decl., Ex. X.[50] Ma claims that the timing is innocuous because the sales coincided with Ma's retirement from Alibaba's Board of Directors. Ma MTD 19-20. However, Ma's decision to synchronize his retirement and sales with Alibaba's Investor Day, during which the Company would be aggressively promoting itself to the market, is itself quite suspect. "The timing of these trades is 'suspicious' enough, along with the other evidence, to support a strong inference of scienter." *Oxford Health*, 187 F.R.D. at 139.

### 5.     Balancing Of Inferences Weighs In Favor Of Finding Of Scienter

According to Ma, Plaintiffs' theory is that "Ma knew that the Ant IPO was doomed due to Ant's regulatory violations and Messrs. Jiang's and Li's Ant investments, but nevertheless caused Ant to incur significant efforts and costs to pursue its IPO." Ma MTD 21. That is a ridiculous caricature of the allegations. Plaintiffs do not allege that Ma knew the IPO was doomed. Plaintiffs allege that he knew there were material undisclosed risks to the IPO, but that he believed there was a good chance he could push the IPO through if it was completed quickly enough, and he almost succeeded. Concealing the omitted information was necessary because revealing the regulatory violations and the identities of the concealed Ant investors would have guaranteed failure. Ma's actions present the classic case of a defendant who takes a calculated gamble but fails. *Boeing*, 2022 WL 3595058, at *27 (defendant's "alleged actions are consistent with him taking a gamble that he could cover up damning information until the MAX was back in operation. Such gambles need not be perfectly rational to support a 10b-5 claim, since the securities laws forbid foolish frauds along with clever ones.").[51]

Ma also argues that Plaintiffs' theory is illogical because "the purported Shanghai Faction's investment in Ant had been public knowledge for years." Ma MTD 21. What was publicly known,

---

[50] Ma's trades on September 30, 2020 comprised approximately 20% of the total volume of Alibaba ADS traded on the NYSE that day. *See* Wolke Decl., Ex. X.

[51] *See also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[T]hat a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

however, is that Boyu made an investment in Ant in 2018 as an ***offshore investor***. *See supra* at 25. What was not known was that Boyu made an ***illegal*** investment in Ant in 2016 under the purported guise of an ***onshore investor***, using a complex series of investment vehicles to hide its trail. Also unknown was that Li—whose family and associates have even more markedly found themselves in Xi's crosshairs—made an even larger investment in 2015, using a series of deceptive vehicles, and that Ma and Alibaba helped him with structuring and designing those vehicles in a way to help him evade detection. Viewed holistically, the facts create an inference of scienter that is at least as compelling as Ma's opposing non-culpable inference.

## VIII.   THE COMPLAINT ALLEGES MA'S LIABILITY UNDER RULES 10b-5(a) & (c)

In addition to claims under Rule 10b-5(b), Plaintiffs also allege claims against Ma and Alibaba for deceptive acts and a scheme to defraud under Rule 10b-5(a) and (c). *See* ¶¶309-65, 397-99; 17 C.F.R. §240.10b-5(a) (unlawful to "employ any device, scheme, or artifice to defraud"); 17 C.F.R. §240.10b-5(c) (unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person").

Ma argues that these claims are a mere repackaging of Plaintiffs' claims for misstatements and omissions. Ma MTD 21-22. While there is certainly overlap between the Complaint's misstatement claims and its act/scheme claims, the Complaint pleads several actions by Ma (and by Alibaba acting as Ma's agent and/or controlled person) that were independently deceptive, including his assistance to Jiang and Li in structuring the deceptive devices that disguised their ownership interests.

Ma misconstrues the legal framework for scheme liability claims and fails to address *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019). Most of the decisions cited by Ma were decided before *Lorenzo*, fail to mention it, or fail to address its pertinent holdings. In *Lorenzo*, the Supreme Court held that an individual who was not the "maker" of a statement under *Janus* could be liable under subsections (a) and (c) of Rule 10b-5 for knowingly "disseminating" to prospective investors a false or misleading

statement made by someone else. 139 S. Ct. at 1101. In so holding, the Supreme Court noted that there is a "considerable overlap" among the subsections of Rule and explained that the terms of subsections (a) and (c) are "expansive" and "capture a wide range of conduct." *Id.* at 1101-02.

In *SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022) (Ma MTD 22), the Second Circuit addressed the impact of *Lorenzo* on existing Second Circuit law. The SEC argued that *Lorenzo* abrogated the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005), which held that misrepresentations cannot form the "sole basis" of a scheme claim. The Second Circuit rejected this argument, reaffirming that a misstatement or omission cannot form the *sole* basis of a scheme claim. However, it also acknowledged that, under *Lorenzo*, a misstatement or omission "can form *part* of a scheme liability claim," so long as the plaintiff's allegations includes "something extra" like dissemination. *Rio Tinto*, 41 F.4th at 49, 54 (emphasis in original). The Second Circuit did not define what "extra" conduct would be needed and did not address whether the alleged conduct in the case—the failure to correct statements made to a company's audit committee and auditors that resulted in misstatements to investors—was sufficient to allege scheme liability. *Id.* at 53.

*Lorenzo* is relevant here, because even if the Court were to conclude that Ma is not the "maker" of statements in the Ant prospectuses, his conduct amounts to the "dissemination" of those statements under *Lorenzo* (or related conduct that falls within the "expansive" terms of subsections (a) and (c)). First, Alibaba took steps to direct Alibaba shareholders and analysts to the Ant prospectuses and to cause the information contained in those prospectuses to be incorporated into Alibaba's share price. *See supra* at 9-10. In taking these actions, Alibaba acted on Ma's behalf and pursuant to Ma's control. Second, Ma solicited regulatory approval of the Ant IPO in reliance on the Ant prospectuses and in so doing lent his imprimatur to those prospectuses. Ma was highly active in the IPO approval process, and his conduct included both formal actions, like sitting for an interview with Chinese regulators, and informal actions, like leaning on his political allies to fast-track the approval. ¶¶23, 203, 362-64. These

activities served to endorse the information in the prospectuses that Ma knew was misleading.[52]

In addition to Ma's actions in disseminating the false statements in the prospectuses, Ma engaged in additional deceptive conduct prior to the issuance of the prospectuses that were an integral part of the scheme to defraud. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) (*Lorenzo* "did not necessarily preclude from liability instances where the dissemination of a misstatement is **_preceded_** by *additional* allegedly deceptive conduct") (some emphasis in original).[53] Among other things, Ma's deceptive actions included (1) Ma's sales of Ant shares in the pre-IPO offerings to Beijing Jingguan and Shanghai Zhongfu Equity, when he knew that those entities were deceptive devices used to conceal the ownership interests of Jiang and Li, and (2) Alibaba's actions (as an agent and controlled person of Ma) in structuring Qitai and cross-funding Shanghai Zhongfu Equity, which helped conceal Li's ownership and control of Shanghai Zhongfu Equity and disguised the VIE nature of Shanghai Zhongfu Equity. ¶¶359-60, 364.

Ma argues that Plaintiffs' allegations that Defendants assisted Jiang and Li conceal their ownership interests are "not supported by any document, witness statement, or other non-conclusory factual allegation." Ma MTD 22. This characterization is not accurate. Plaintiffs' scheme allegations are based on a substantial body of facts, discussed in detail above in connection with falsity and scienter. The deceptive actions taken by Ma and Alibaba in furtherance of this scheme are tangible facts, not conclusory assertions: Ma sold Ant shares to Beijing Jingguan and Shanghai Zhongfu Equity, and Alibaba funded Shanghai Zhongfu Equity through Qitai. That the evidence of Defendants' scienter in relation to these actions is circumstantial does not preclude Plaintiffs from satisfying the PSLRA's

---

[52] Ma's transmittal of misleading information to regulators can itself predicate a scheme liability claim. *See, e.g.*, *SEC v. Langford*, 2013 WL 1943484, at *7 (D. Neb. May 9, 2013) (scheme liability alleged where "the conduct was inherently designed to deceive the Bank's regulators, regardless of whether the ultimate result was a public misstatement").

[53] In *Cognizant*, the court held that a defendant could be liable under subsections (a) and (c) where he (1) devised a scheme to disguise the nature of bribery payments, (2) knew that the manner in which the payments were disguised would result in financial misstatements, and (3) caused the false financial information to be reported to investors by concealing the bribery scheme from the company's auditors. *Id.*

pleading standards. The Second Circuit's standard for pleading scienter acknowledges that evidence of scienter is inherently circumstantial. *Novak*, 216 F.3d at 309-10.

Ma next argues that scheme liability requires the "'performance of an ***inherently deceptive act that is distinct from an alleged misstatement***.'" Ma MTD 23 (quoting *In re Kirkland Lake Gold Ltd. Sec. Lit.*, 2021 WL 4482151, at *6 (S.D.N.Y. Sept. 30, 2021)) (emphasis by Ma). This principle must be severely qualified by *Lorenzo*. Dissemination of a misstatement is inherently deceptive, but it is not necessarily "distinct" from the misstatement, because the underlying misstatement is still an integral part of the deception. While *Rio Tinto* requires a plaintiff to plead some additional conduct, that conduct may be satisfied by an act that is interconnected to and bound up with the misstatement.

In any event, the Complaint *does* plead inherently deceptive acts that are distinct from the misstatements in the Ant prospectuses. For example, Ma's decision to sell Ant shares directly to Beijing Jingguan and Shanghai Zhongfu Equity—which he knew were VIEs controlled by Jiang and Li—operated to conceal their interests from regulators and the market. Similarly, Alibaba's cross-funding of Shanghai Zhongfu Equity disguised the fact that it was a VIE controlled by Li. Market analysts and investors researching the ownership structure of Ant's pre-IPO investors were deceived by these actions independently of any misrepresentations in the Ant prospectuses. *Cf. SEC v. Stubos*, 2022 WL 6776741, at *15 (S.D.N.Y. Oct. 11, 2022) (defendant's actions sufficient to support scheme liability claim where he "used the Sharp Group and various nominee companies to conceal his majority ownership of Petrosonic and Ener-Core shares").[54]

Finally, Ma argues that Plaintiffs' scheme claims fail because Plaintiffs do not demonstrate reliance. Ma MTD 23-24 (citing *Stoneridge*, 552 U.S. at 159-62; *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) ("*PIMCO*"). Both *Stoneridge* and *PIMCO* involved scheme

---

[54] *Parmalat*, 376 F. Supp. 2d at 510 (defendant's entry into "deceptive transactions" sufficient to allege scheme liability); *In re Mylan N.V. Sec. Litig.*, 2020 WL 1673811, at *5 (S.D.N.Y. Apr. 6, 2020) (scheme claim pled against individual who submitted "cover bids to customers" that "were intended to produce the false impression that they were competitive").

claims against secondary actors, not corporate insiders.[55] Ma is an insider of both Alibaba and Ant, and *Stoneridge* and *PIMCO* therefore do not apply. *See, e.g.*, *XL Fleet*, 2022 WL 493629, at *8 (*Stoneridge* did not bar scheme claim against corporate insider who "had a central role in the scheme"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 472 n.14 (S.D.N.Y. 2017) ("Because [defendant's] alleged participation in the deceptive scheme was in his role as an officer…and not as a secondary actor, *PIMCO* is inapposite here."). Moreover, in both *Stoneridge* and *PIMCO*, the only mechanism through which deceptive information was disseminated to investors was through financial statements of the issuer. In this case, misleading information was disseminated to the market not only through the Ant prospectuses, but also through the SAMR filings of multiple affiliated and related parties. The SAMR filings of Beijing Jingguan and Shanghai Zhongfu Equity (and related entities) operated as deceptive devices and misled the market as to the true parties in interest behind these entities, thereby concealing material risks to the Ant IPO and artificially inflating the price of Alibaba's ADS.[56]

Ma's and Alibaba's actions deceived Alibaba shareholders because (1) Jiang and Li would not have been able to obtain their concealed interests in Ant without Ma's decision to sell to those entities (which he knew were fronts for Jiang and Li), and (2) Alibaba's cross-funding of Shanghai Zhongfu Equity disguised its nature as a VIE controlled by Li. These facts distinguish *Stoneridge* and *PIMCO*. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1198 (D. Ore. 2015) (*Stoneridge* inapplicable where defendants are "alleged to have directly engaged in conduct that resulted in allegedly misleading information being disseminated to the public and artificially inflating Galena's stock price."); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981

---

[55] In *Stoneridge*, the defendants were third-party suppliers who participated in sham transactions to help a company mislead its auditor and thereby issue false financial statements. The Supreme Court held that the chain of causation was "too remote" to satisfy reliance. 552 U.S. at 161. *PIMCO* involved scheme claims against outside counsel who facilitated sham transactions that helped a brokerage firm make false financial statements. *PIMCO*, 603 F.3d at 159-60.

[56] The Complaint alleges, and Ma does not dispute, that "the market for Alibaba ADS was an efficient market." ¶392. Thus, the Court must presume that "the market price of [its] shares reflects all publically available information." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013).

(D. Minn. 2014) (*Stoneridge* inapplicable "where Plaintiffs have alleged that Defendants' conduct…itself misled investors by inflating confidence in [company's product] and its sales").

## IX.   **THE COMPLAINT ALLEGES MA'S LIABILITY UNDER RULE 10b5-1**

The Complaint also pleads claims against Ma for insider trading under Rule 10b5-1. *See* ¶¶366-69; 17 C.F.R. §240.10b5-1(a) (prohibiting the "sale of a security ... on the basis of material nonpublic information about that security or issuer" and designating such conduct a "manipulative and deceptive device[]" under Section 10(b) and Rule 10b-5).

The Supreme Court has made clear that Section 10(b) and Rule 10b-5 are "violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *U.S. v. O'Hagan*, 521 U.S. 642, 651-52 (1997). Therefore, "a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella v. U.S.*, 445 U.S. 222, 227 (1980). "[I]f disclosure is impracticable or prohibited by business considerations or by law, the duty is to abstain from trading." *SEC v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012). "To establish an insider trading claim, it is not necessary to show that corporate insiders *used* the nonpublic information; it is sufficient to prove that they traded their corporation's securities while knowingly in possession of the material nonpublic information." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (emphasis in original).

The Complaint identifies three sets of material, adverse nonpublic information that Ma knew about and failed to disclose before executing his sales of 10 million shares of Alibaba ADS on September 30 and October 1, 2020: (1) information concerning Alibaba's improper exclusivity practices; (2) information concerning Ant's violation of the FHC Regs; and (3) information concerning the concealed ownership interests of Jiang and Li. ¶368. Ma disclaims knowledge of these material non-public facts (Ma MTD 24 n.19), but as discussed above and in Plaintiffs' Alibaba Opposition, the Complaint sufficiently alleges both the existence of the material nonpublic information and Ma's

knowledge of it. *See supra* at Sec. VII; Pls Alibaba Opp. 5-9.[57]

Finally, Ma argues that Lead Plaintiff lacks standing to pursue an insider trading claim, because his purchases are not contemporaneous with Ma's sales. Ma MTD 24 n.19. This ignores the fact that Ma's sales were contemporaneous with the purchases of additional Plaintiff Yan Tongbiao, who purchased Alibaba ADS within five trading days of Ma's sales, thereby satisfying the contemporaneity standard set by courts in this Circuit.[58] "In a class action suit with multiple claims, the only requirement as to each claim is that at least one named class representative must have standing with respect to each claim." *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, 2013 WL 6481195, at *10 (E.D.N.Y. Sept. 20, 2013).

## X.  MA IS LIABLE AS A CONTROL PERSON UNDER SECTION 20(a)

Ma is liable as a control person under §20(a) for Alibaba's primary violations of §10(b). To state a §20(a) claim, Plaintiffs must show (1) a primary violation, (2) control of the primary violator by the alleged control person, and (3) culpable participation by the controlling person.

*First*, Plaintiffs have adequately pled multiple primary violations of §10(b) by Alibaba. *See* Pls Alibaba Opp. Secs. IV & V. *Second*, Plaintiffs allege Ma's control over Alibaba, which is "governed by Rule 8's pleading standard." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007). Control is "broadly construed" as the control person provisions were "meant to

---

[57] Ma was at the helm as CEO when Alibaba's exclusivity practices were developed and enabled the Company to amass its enormous market share. At the time of the November 2019 meeting when the SAMR instructed that "exclusive dealing" was illegal and to stop doing it, Ma had recently stepped down as Alibaba's Chairman but was still a member of the board and the Alibaba Partnership. He was likewise a member of the board and the Alibaba Partnership when Alibaba falsely claimed in its 2020 Form 20-F that it no longer used "exclusive partnerships" and that its business practices complied with anti-monopoly laws. It is reasonably inferred from these facts that Ma knew Alibaba was still using exclusive trading on Sept. 30 and Oct. 1, 2020.

[58] Tongbiao purchased 16,000 shares of Alibaba ADS on October 6, 2020, four trading days after Ma's September 30 sales and three trading days after Ma's October 1 sales. Dkt. 20-5 at 4. Courts in this Circuit have generally found "five trading days…to be a reasonable period of time within which sales and purchases will be considered contemporaneous." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 509 (S.D.N.Y. 2011); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.51 (S.D.N.Y. 2008) (five business days); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 642-43 (S.D.N.Y. 2008) (six days); *Oxford Health*, 187 F.R.D. at 144 (five trading days).

expand the scope of liability under the securities laws." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). Control may be direct or indirect,[59] and "may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). The analysis is focused on the alleged control person's "practical ability to direct the actions of the controlled person." *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1259 (S.D.N.Y. 1996).[60] The Complaint alleges Ma's control of Alibaba under these standards. *See supra* at 2-3.[61] ***Third***, Plaintiffs allege Ma's scienter which "necessarily" shows culpable participation. *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 166 (E.D.N.Y. 2020).

## XI.   CONCLUSION

Ma's motion should be denied. Should the Court grant all or part of Ma's motion, Plaintiffs request an opportunity to re-plead, which should be "freely" given under Fed. R. Civ. P. 15(a)(2).

---

[59] *See* 15 U.S.C. §78t(a) ("Every person who, ***directly or indirectly***, controls any person liable under any provision of this chapter…shall also be liable jointly and severally with and to the same extent as such controlled person...is liable.").

[60] *See also In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 207 (S.D.N.Y. 2011) ("actual control requires only the *ability* to direct the actions of the controlled person, and not the *active exercise thereof*") (emphasis in original).

[61] Ma argues that Plaintiffs' control allegations hinge on the incorrect assumption that Ma and two Ant representatives make up a majority of the Partnership Committee, whereas they only represent three of the six members. Ma MTD 25 n.20. This ignores Ma's strong influence over the remaining three members. *See supra* at 2-3. Ma also ignores facts concerning his control of strategic licenses and his role as chairman of Alibaba's nominating and governance committee. ¶¶54, 56, 60. Ultimately, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).

Dated: October 21, 2022

**GLANCY PRONGAY & MURRAY LLP**

By: _s/ Kara M. Wolke_
Kara M. Wolke (*pro hac vice*)
Jason L. Krajcer *(pro hac vice)*
Melissa C. Wright (*pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
kwolke@glancylaw.com
jkrajcer@glancylaw.com
mwright@glancylaw.com

*Lead Counsel for Plaintiffs and Putative Class*

Jeremy A. Lieberman
Jonathan D. Park
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
jpark@pomlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
pdahlstrom@pomlaw.com

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
peretz@bgandg.com

Frank R. Cruz
THE LAW OFFICES OF FRANK R. CRUZ
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
info@frankcruzlaw.com

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024  Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel*

**Appendix A: Jiang Zhicheng's Undisclosed Investment Into Ant**



*¶338, Source:  2/16/2021 WSJ Article*

---

Shanghai Tiancen Investment
Management Co. Ltd.

上海天岑投资管理有限公司

Executive Partner

Shanghai Tiancen Asset
Management Partnership
Enterprise (Limited Partnership)
上海天岑资产管理合伙企业（有限合伙）

Executive Partner

Beijing Jingguan Tiancen Asset
Management Partnership
Enterprise (Limited Partnership)
北京京管天岑资产管理合伙企业（有限合伙）

Executive Partner

Executive Partner

Executive Partner

Ningbo Yuanxuan Investment
Management Partnership
Enterprise (Limited Partnership)
宁波元轩投资管理合伙企业（有限合伙）

Shanghai Tiancen Yujing
Investment Center (Limited
Partnership)
上海天岑渝憬投资中心（有限合伙）

Partner

Partner

Beijing Jingguan Investment Center
(Limited Partnership)
北京京管投资中心（有限合伙）

*¶341, Source: SAMR Filings*

**Appendix B: Li Botan's Undisclosed Investment Into Ant**



*¶348, Source:  2/16/2021 WSJ Article*

--------------------------------------------------------------------------------



*¶356, Source: SAMR Filings*

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 21, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 21, 2022, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke