# EXHIBIT B

european corporate governance institute



# Alibaba: A Case Study of Synthetic Control

Law Working Paper N° 533/2020

July 2020

Jesse M. Fried
Harvard University and ECGI

Ehud Kamar
Tel Aviv University and ECGI

© Jesse M. Fried and Ehud Kamar 2020. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

This paper can be downloaded without charge from:
http://ssrn.com/abstract_id=3644019

https://ecgi.global/content/working-papers

european corporate governance institute

ECGI Working Paper Series in Law

# Alibaba: A Case Study of Synthetic Control

Working Paper N° 533/2020

July 2020

Jesse M. Fried
Ehud Kamar

We thank Lucian Bebchuk, Robin Huang, Kobi Kastiel, Guo Li, Yu-Hsin Lin, Curtis Milhaupt, and several other individuals for very helpful comments on earlier drafts. We are also grateful to Yuan Dai, Cencen Feng, Xiatong Jia, Tyler Kohring, Jean Lee, Brandon Une, Michael Schwartz, William Tong, Steven Wang, Kun Xue, Anqi Zhang, Kevin Zheng, and Peiwen Zheng for research assistance. Special thanks to Justin Xu and, especially, Jake Laband. Our analysis is based on information publicly available as of early July 2020, when Alibaba released its 2020 Form 20–F.

© Jesse M. Fried and Ehud Kamar 2020. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

## Abstract

Alibaba, the NYSE-traded Chinese ecommerce giant, is currently valued at over $500 billion. But Alibaba's governance is opaque, obscuring who controls the firm. We show that Jack Ma, who now owns only about 5%, can effectively control Alibaba by controlling an entirely different firm: Ant Group. We demonstrate how control of Ant Group enables Ma to dominate Alibaba's board. We also explain how this control gives Ma the indirect ability to disable (and perhaps seize) VIE-held licenses critical to Alibaba, providing him with substantial additional leverage. Alibaba is a case study of how corporate control can be created synthetically with little or no equity ownership via a web of employment and contractual arrangements.

---

Keywords: Alibaba, Ant Group, China, Controlled Firms, Controlling Shareholder, Corporate Control, VIEs, Corporate Governance

JEL Classifications: G30, G32, G34, M12, M14

Jesse M. Fried*
Dane Professor of Law
Harvard University, Harvard School of Law
1563 Massachusetts Ave
Cambridge, MA 02138, United States
phone: +1 617 384 8158
e-mail: jfried@law.harvard.edu

Ehud Kamar
Professor of Law
Tel Aviv University, The Buchmann Faculty of Law
Ramat Aviv
Tel Aviv 6997801, Israel
phone: +972 3640 7301
e-mail: kamar@tau.ac.il

*Corresponding Author

# Alibaba: A Case Study of Synthetic Control

Jesse M. Fried[*] and Ehud Kamar[**]

July 22, 2020

## Abstract

Alibaba, the NYSE-traded Chinese ecommerce giant, is currently valued at over $500 billion. But Alibaba's governance is opaque, obscuring who controls the firm. We show that Jack Ma, who now owns only about 5%, can effectively control Alibaba by controlling an entirely different firm: Ant Group. We demonstrate how control of Ant Group enables Ma to dominate Alibaba's board. We also explain how this control gives Ma the indirect ability to disable (and perhaps seize) VIE-held licenses critical to Alibaba, providing him with substantial additional leverage. Alibaba is a case study of how corporate control can be created synthetically with little or no equity ownership via a web of employment and contractual arrangements.

[*]Harvard Law School.

[**]Tel Aviv University Faculty of Law. We thank Lucian Bebchuk, Robin Huang, Kobi Kastiel, Guo Li, Yu-Hsin Lin, Curtis Milhaupt, and several other individuals for very helpful comments on earlier drafts. We are also grateful to Yuan Dai, Cencen Feng, Xiatong Jia, Tyler Kohring, Jean Lee, Brandon Une, Michael Schwartz, William Tong, Steven Wang, Kun Xue, Anqi Zhang, Kevin Zheng, and Peiwen Zheng for research assistance. Special thanks to Justin Xu and, especially, Jake Laband. Our analysis is based on information publicly available as of early July 2020, when Alibaba released its 2020 Form 20–F. The paper was previously titled "Controlling Alibaba." Comments are welcome and can be directed to jfried@law.harvard.edu.

Electronic copy available at: https://ssrn.com/abstract=3644019

## I.    Introduction

Alibaba Group Holding Limited (Alibaba) conducted one of the world's largest IPOs on the New York Stock Exchange in 2014[1] and by mid-2020 was worth over $500 billion.[2]  Founded by Jack Ma (Ma) and others, Alibaba is now the most valuable Asian public company,[3] as well as the largest ecommerce firm[4] and the seventh most valuable firm in the world.[5]

Alibaba has a unique governance structure:  a majority of Alibaba's board is appointed by the so-called Alibaba Partnership (the Partnership), consisting of several dozen individuals.[6]  Thus, as is widely understood, the Partnership controls Alibaba.[7]  More probing analysis shows this power is actually concentrated in the hands of several people, as the Partnership itself is effectively controlled by a small Partnership Committee, of which Ma is a perpetual member.[8]

 In this paper, we dig even deeper into Alibaba's control arrangements, and reveal a surprising fact: Ma, who now owns less than 5% of Alibaba,[9] effectively controls Alibaba—control that would persist even if Ma's equity stake declined further.[10]  The reason is that Ma's control over Alibaba actually derives from his

---

[1] *See* Lucinda Shen, *These Are The 9 Biggest IPOs of All Time*, FORTUNE (Apr. 26, 2019), https://fortune.com/2019/04/26/biggest-ipos-history-uber/.

[2] *See* Matt Krantz, *Are Your Chinese Stocks on the U.S. Hit List?* INVESTOR'S BUSINESS DAILY (May 27, 2020), https://www.investors.com/etfs-and-funds/sectors/baba-stock-own-biggest-chinese-stocks-hit-list/.

[3] *See* Kentaro Iwamoto, *Alibaba becomes most valuable Asian company as market cap tops $500bn,* NIKKEI ASIAN REVIEW (Dec. 26, 2019),  https://asia.nikkei.com/Business/Markets/Alibaba-becomes-most-valuable-Asian-company-as-market-cap-tops-500bn.

[4] *See* Adam Levy, *The 7 Largest E-Commerce Companies in the World*, MOTLEY FOOL (Aug. 23, 2019, 5:13 PM), https://www.fool.com/investing/the-7-largest-e-commerce-companies-in-the-world.aspx.

[5] *See* Iwamoto, *supra* note x.

[6] *See infra* Part III.A.

[7] *See* Li Yuan, *Jack Ma Is Retiring From Alibaba.  He Won't Go Far*, N.Y. TIMES (Sept. 10, 2019), https://www.nytimes.com/2019/09/10/business/alibaba-jack-ma-retire.html (noting that the Partnership is "a group of a few dozen employees with tremendous power over the company's board and leadership. . .").  *See also* Liza Lin, *Alibaba's Daniel Zhang to Succeed Jack Ma as Chairman Next Year*, WALL ST. J. (Sep. 10, 2018), https://www.wsj.com/articles/daniel-zhang-to-succeed-jack-ma-as-alibaba-chairman-1536542559.

[8] *See* Yu-Hsin Lin & Thomas Mehaffy, *Open Sesame: The Myth of Alibaba's Extreme Corporate Governance and Control*, 10 BROOK.  J. CORP. FIN. & COM. L. 437, 454 (2016).

[9] *See infra* Part III.A.

[10] As will be explained, one of the links in Ma's chain of control is the Alibaba Partnership's right to

1

Electronic copy available at: https://ssrn.com/abstract=3644019

control of a different firm, Ant Group Co. (Ant Group[11]), which is based on assets spun out of pre-IPO Alibaba.[12]

In particular, we show that Ma can use Ant Group to (1) effectively control the Partnership Committee, and thus the Partnership, and ultimately Alibaba's board; and (2) at least temporarily cut off (and perhaps seize) business-critical licenses held in Alibaba's VIEs,[13] giving Ma substantial holdup leverage over Alibaba in addition to his effective control of Alibaba's board. Ma's control of Ant Group gives him the power to affect the pay and employment of every member of Alibaba's current board, every Alibaba executive, and the Alibaba and Ant Group executives who own Alibaba's VIEs.[14] Alibaba is thus a case study of what we call "synthetic control," in which an entrepreneur wields corporate control via a complex web of contractual and employment relationships rather than via equity.

Whether this is good news or bad news for investors depends on one's beliefs about Ma's future objectives. Investors who trust Ma to steer Alibaba to deliver value for American shareholders should be relieved. Investors concerned that a founder owning less than 5% of Alibaba's equity might one day siphon off substantial value for himself and his friends should worry.[15]

---

appoint a majority of Alibaba's board. *See infra* Part III.A. This right can be eliminated by Alibaba shareholders with approval of 95% of the shares being voted. *See infra* note x. If all shares were voted, Ma could defeat such a proposed change with slightly more than 5% of Alibaba's shares. However, not all shares would be voted, enabling Ma to prevail with far fewer shares. Moreover, other members of the Alibaba Partnership, who own about 3% of Alibaba's equity (*see infra* Part III.A), would join Ma in voting their shares to defeat any attempt to strip the Partnership of its power, either out of self-interest or because Ma can pressure them to do so (*see infra* Part III.B.). Thus, Ma's equity ownership could decline further without putting his control at risk.

[11] Until recently, the company's legal Chinese name had been Zhejiang Ant Small and Micro Financial Services Group Co. Ltd. *See* Stella Yifan Xie, *Jack Ma's Fintech Giant Ant to Drop 'Financial' From Its Name*, WALL ST. J. (Jun. 22, 2020), https://www.wsj.com/articles/jack-mas-fintech-giant-ant-to-drop-financial-from-its-name-11592822997. However, the company changed its Chinese name to "Ant Technology Group Co." and now seeks to be referred to in English as "Ant Group Co." *See id.* In this paper, we use the name "Ant Group." In July 2020, Ant Group announced it would conduct a concurrent IPO in Hong Kong and Shanghai. *See infra* note x. Our paper is based on information about Ant Group's governance arrangements that was publicly available as of July 2020.

[12] *See infra* Parts II, III.A. and IV.B.

[13] We define and discuss VIEs in Part IV.

[14] We assume that Ma exerts control over individuals only through identifiable employment-related carrots and sticks. This assumption substantially understates Ma's actual power. All of these individuals are co-founders of Alibaba, or were later hired by Ma, or were later appointed to their positions with his consent. Thus, even if Ma lacked financial levers over them, these individuals would likely follow Ma's instructions, out of gratitude, friendship, loyalty, and respect, at least as long as they were not unduly burdened. For an argument that directors in U.S. firms are often beholden to CEOs for similar reasons, *see* Jesse Fried & Lucian Bebchuk, PAY WITHOUT PERFORMANCE: THE UNFULFILLED PROMISE OF EXECUTIVE COMPENSATION 31–33 (Harvard University Press, 2004).

[15] Elsewhere, we explain why American investors and authorities cannot rely on securities or corporate

2

Electronic copy available at: https://ssrn.com/abstract=3644019

Whatever the answer, Alibaba makes clear that the separation of ownership from control in public firms, which has been at the center of all corporate governance debates in the last few decades, can arise without either pyramidal ownership structures or dual-class shares.[16] In particular, while entrepreneurs can use dual-class stock to control firms with only a tiny amount of equity,[17] we show that an entrepreneur can control a firm without any equity, but rather via a combination of charter provisions and arrangements entirely external to the firm that are all independent of the firm's capital structure.

The paper's roadmap is as follows: Part II describes Alibaba's business and structure, and Ant Group's control arrangement.  Part III explains how Ma effectively controls Alibaba's board via his control of Ant Group.  Part IV explains how Ma's control over Ant Group enables him to hold hostage the critical licenses held in Alibaba's VIEs.  Part V concludes.

## II.     Alibaba and Ant Group

We describe Alibaba's corporate and business structure and then briefly describe Ant Group's current control arrangement.

### A.  Alibaba's Corporate and Business Structure

Alibaba is a Cayman-domiciled company governed by its articles of association and the Companies Law of the Cayman Islands.[18] Its headquarters is in Hangzhou, China (PRC[19]), hometown of founder Ma.[20]  Alibaba's equity trades as American

---

law to prevent massive value extraction by insiders of China-based, U.S.-listed firms like Alibaba.  *See* Jesse M. Fried & Ehud Kamar, *China and the Rise of Law-Proof Insiders* (Working Paper, 2020).

[16] For an analysis of classical approaches to separating ownership and control in public firms, see Lucian A. Bebchuk et al., *Stock Pyramids, Cross-Ownership and Dual Class Equity: The Mechanisms and Agency Costs of Separating Control From Cash-Flow Rights, in* CONCENTRATED CORPORATE OWNERSHIP 445–460 (R. Morck, ed., 2000).

[17] *See generally* Lucian A. Bebchuk & Kobi Kastiel, *The Perils of Small-Minority Controllers*, 107 GEO. L.J. 1453 (2019).

[18] *See* Alibaba Grp. Holding Ltd., Annual Report (Form 20–F), at 68 (2020) [hereinafter Alibaba Form 20–F (2020)].

[19] We use "China" or "PRC" to denote Mainland China, excluding the Special Administrative Region of Hong Kong.

[20] *See* Alibaba Form 20–F (2020), at 68.

3

Electronic copy available at: https://ssrn.com/abstract=3644019

Depository Shares (ADSs) on the New York Stock Exchange (NYSE).[21] The firm is considered a foreign private issuer (FPI) under U.S. securities law and NYSE listing rules.[22] In 2019, Alibaba completed a secondary listing in Hong Kong.[23]

Alibaba's main business is providing internet platforms for retail and wholesale commerce both in the PRC and elsewhere.[24] Alibaba is a holding company: it has few assets other than shares of its wholly-owned offshore (non-PRC) subsidiaries.[25] These offshore subsidiaries, in turn, are themselves holding companies that directly or indirectly own shares in downstream subsidiaries. The most economically critical of these downstream subsidiaries are onshore (PRC based and domiciled) and part of so-called WFOE–VIE arrangements which we describe in Part IV.

Figure 1 below is a simplified diagram of Alibaba's structure, taken from one of the company's 2020 securities filings.[26] Below the dotted line are Alibaba's key operating businesses, all based and domiciled in China. The four entities at the bottom are VIEs, each of which is connected to a WFOE one row up.

---

[21] *See id.* at 213.

[22] *See id.* at 64, 222, 222.

[23] *See* Stu Woo, *Alibaba Shares Enjoy a Strong Start in Hong Kong*, WALL ST. J. (Nov. 26, 2019), https://www.wsj.com/articles/a-strong-open-sesame-for-alibaba-in-hong-kong-1574746859. *See also* Alibaba Form 20–F (2020), at iii, 158.

[24] *See* Alibaba Form 20–F (2020), at 69–74. Within China, Alibaba supports retail commerce through Tabao.com and Tmall.com and wholesale commerce via 1688.com. In cross-border and global commerce, Alibaba participates through AliExpress, Tmall Global, Lazada, and Alibaba.com. *See id.*

[25] *See id.* at 122. These wholly-owned direct and indirect offshore holding company subsidiaries include companies domiciled in the Cayman Islands, British Virgin Islands, and Hong Kong. *See id.*

[26] *See id.*

4

Electronic copy available at: https://ssrn.com/abstract=3644019

**FIGURE 1: ALIBABA'S CORPORATE STRUCTURE**



## B.  Ant Group and its Control

Ant Group is a privately-held, PRC-domiciled "fintech" company operating Alipay, an online payment service spun out of pre-IPO Alibaba.[27]  In September 2019, Alibaba converted a profit-sharing interest in Ant Group into a 33% equity stake.[28] In July 2020, Ant Group announced it would conduct  a concurrent IPO in Hong Kong and Shanghai.[29]

---

[27] For a discussion of this spinout, see *infra* Part IV.B.

[28] *See* Lulu Yilun Chen, *Alibaba Snags 33% of Jack Ma's Ant as Portfolio Tops $83 Billion*, BLOOMBERG (Sept. 24, 2019), https://www.bloomberg.com/news/articles/2019-09-24/alibaba-closes-acquisition-of-a-third-of-jack-ma-s-ant-financial?sref=IrXjXN7s; Alibaba Grp. Holding Ltd., Report of Foreign Private Issuer (Form 6–K) (Nov. 13, 2019) [hereinafter Alibaba Form 6–K (Nov. 13, 2019)], https://otp.investis.com/clients/us/alibaba/SEC/sec-show.aspx?Type=html&FilingId=13736066&CIK=0001577552&Index=10000.

[29] *See* Sherisse Pham, *Jack Ma's Ant Group chooses China for its IPO*, CNN BUSINESS (Jul. 21, 2020), https://www.cnn.com/2020/07/20/tech/ant-financial-jack-ma-ipo-hnk-intl/index.html.

5

Electronic copy available at: https://ssrn.com/abstract=3644019

Alibaba's public disclosures suggest that Ma controlled Ant Group before the September 2019 transaction and continued to control it afterwards. Based on the identities of directors reported to China's State Administration for Market Regulation, Ant Group appears to have a seven-seat board.[30] Before the transaction, Alibaba's June 2019 securities filings indicated that Ma controlled Ant Group.[31] However, one seat was reserved for, and filled by, an "independent director" jointly chosen by Alibaba and Ant Group.[32] As part of the September 2019 transaction, Alibaba gained the right to nominate to the board two additional officers or employees.[33] Accordingly, Alibaba has indicated that it will not, even after getting these nomination rights, have control over Ant Group or Alipay.[34] Based on the apparent size of Ant Group's board, Alibaba's nomination rights, and Alibaba's statement about its lack of control over Ant Group, we infer that after the September 2019 transaction Ma continued to control a majority of Ant Group's board.[35]

---

[30] Identities of firm directors can be found on the National Enterprise Credit Information Publicity System (maintained by the PRC Government at http://www.gsxt.gov.cn/), and the website of private data provider Tianyancha.com.

[31] Ma owns 100% of the general partner of two PRC limited partnerships (Junao and Jushan) that together own over 70% of the equity issued by Ant Group and through this general partner personally controls a "majority of the voting interests" in Ant [Group]. *See* Alibaba Form 20–F (2019)*, at 23, 191–192. In July 2020, Alibaba changed "majority of the voting interests" to "approximately 50% of the voting interests," presumably because Ant Group issued additional equity to other investors. *See* Alibaba Form 20–F (2020), at 29. While Ma may no longer directly control a majority of the voting interests in Ant Group, he could continue to control Ant Group through voting agreements and other arrangements, and we assume he has done so.

[32] *See* Alibaba Form 6–K (Nov. 13, 2019) ("[our arrangement with Ant Group provides that] we and Ant [Group] will recommend one independent nominee who Ant [Group] will nominate as a member of its board, and Jack Ma, Joe Tsai (as long as he holds any equity interest in Ant [Group]), Junhan and Junao will agree to vote the equity interests in Ant [Group] controlled by them in favor of the nomination"). This seat was filled. *See* Alibaba Grp. Holding Ltd., Report of Foreign Private Issuer (Form 6–K) (Feb. 1, 2018) https://www.sec.gov/Archives/edgar/data/1577552/000110465918005686/a18-5168 _2ex99d2.htm ("…we and Ant [Group] recommended one independent director whom Ant [Group] subsequently nominated and appointed as a member of its board"). The director appears to be Lucy Peng. *See infra* note x.

[33] *See* Alibaba Form 6–K (Feb. 1, 2018) ("…upon the closing of the [33%] Issuance, in addition to the above-referenced independent director, we will have the right to nominate two officers or employees of Alibaba or its subsidiaries for election to the board of Ant [Group]. In each case, these director nomination rights will continue unless required to be terminated in connection with an Ant [Group] qualified IPO process or we cease to own a certain amount of our post-Issuance equity interests in Ant [Group]"); Alibaba Form 6–K (Nov. 13, 2019), at 86 ("Upon the Issuance in September 2019, we nominated two of our officers who have been elected to the board of Ant [Group] pursuant to our rights…" ). These two directors appear to be Daniel Zhang and Maggie Wu. *See infra* note x.

[34] Alibaba Form 20–F (2020), at 29.

[35] Although Ant Group's board has seven seats, it appears that it currently has only six directors: Eric Jing (Executive Chair of Ant Group); Simon Hu (CEO of Ant Group); Daniel Zhang (Chair and CEO of Alibaba); Alibaba co-founder Joe Tsai; Alibaba co-founder Lucy Peng, and Maggie Wu (CFO of Alibaba). *See Our Management Our Board*, ANT GROUP, https://www.antfin.com/team.htm?category=board (last

6

Electronic copy available at: https://ssrn.com/abstract=3644019

In what follows, we explain that Ma's control over Ant Group has enabled him to dominate Alibaba's board (Part III) and given him a way to hold Alibaba up by depriving it, at least temporarily, of assets critical to its business (Part IV).

## III.    Ma's Effective Control Over Alibaba's Board

Below we explain that an entity called the Alibaba Partnership controls Alibaba's board. We then show how Ma effectively controls the Alibaba Partnership.

### A.    The Alibaba Partnership Controls Alibaba's Board

Alibaba currently has a single class of shares. In early July 2020, Ma owned 4.8% of the shares. Other directors and executives, including cofounder Joe Tsai (Tsai), owned about 2.6%, and SoftBank owned 24.9%.[36] Were it not for the special voting arrangements we describe below, SoftBank would be the largest shareholder and, absent coordination among other shareholders, could dominate Alibaba's board.[37]

However, as is well understood, Alibaba's articles of association give Lakeside Partners, L.P., commonly known as the "Alibaba Partnership" (the Partnership), the power to appoint a simple majority of Alibaba's directors.[38] The Partnership selects these directors by majority vote of the partners from nominees selected by the Partnership Committee, which we describe below.[39] As of early July 2020, there were 36 partners: Ma, 27 Alibaba executives (including Tsai), and eight executives of Ma-controlled Ant Group.[40] All but one (Tsai) appear to be PRC nationals.

visited Jul. 2, 2020). It appears that the "independent director" mutually appointed by Alibaba and Ant Group is Alibaba cofounder Lucy Peng and that the two Alibaba-nominated directors are Zhang and Wu. Peng, as a mutually appointed director, must stay in Ma's good graces to be renominated to the board. As explained *infra* Part III.B.2, Ma dominates Zhang and Wu via the Partnership Committee (which he controls, and which now has Zhang as one of six members). So even these three Alibaba-sponsored minority directors will be inclined to follow Ma's wishes.

[36] *See* Alibaba Form 20–F (2020), at 191.

[37]  In March 2020, SoftBank announced that it intended to sell about $14 billion of its Alibaba shares (around 10% of its stake) as part of an effort to shore up its businesses battered by the COVID-19 pandemic. *See* Lulu Chen & Giles Turner, *SoftBank Plans to Sell $14 Billion in Alibaba Shares*, BLOOMBERG (Mar. 23, 2020), https://www.bloomberg.com/news/articles/2020-03-23/softbank-is-said-to-plan-14-billion-sale-of-alibaba-shares. After this sale, SoftBank will still be Alibaba's largest shareholder.

[38] *See* Alibaba Form 20–F (2020), at 42, 175–79. For an explanation of the origins and purpose of the Partnership, see Lin & Mehaffy, *supra* note x, at 451–452.

[39] *See* Alibaba Form 20–F (2020), at 177–78.

[40] *See id.* at 178–79. One of the eight from Ant Group (Lucy Peng) was an executive but is now a director. *See infra* note x. We thus use the term "executive" here to mean executive or director.

7

Electronic copy available at: https://ssrn.com/abstract=3644019

This power gives the Partnership perpetual control of the board[41] regardless of the partners' collective equity ownership.[42] Separately, a voting agreement among Ma, Tsai, and SoftBank commits the parties to vote their collective shares for directors nominated by the Alibaba Partnership and, as long as SoftBank owns at least 15% of Alibaba's shares, for one director nominated by SoftBank.[43] As of early July 2020, Alibaba's board consisted of ten members, five of whom were Alibaba Partnership nominees and none of whom was a SoftBank nominee.[44] The remaining Alibaba directors also owe their positions to the Partnership, either directly or indirectly: they were nominated by either Alibaba insiders who were members of the Partnership before Alibaba's IPO, or were nominated by Ma and other members of the Alibaba board thereafter.[45]

---

[41] *See id.* at 42–43. To become a director of Alibaba, the Alibaba Partnership's director nominee must receive a majority vote at the shareholders meeting. However, if the Partnership nominee is not elected by Alibaba shareholders, or is elected but leaves the board, the Partnership may appoint a different person to serve as interim director until the next election. *See id.* at 177. This ensures that a majority of Alibaba's directors will be appointed by the Partnership regardless of the shareholder vote.

[42] *See* Lin & Mehaffy, *supra* note x, at 439, 458. The Partnership's nomination and appointment right can be eliminated only if (1) certain provisions of the Partnership agreement are amended without the consent of a majority of those Alibaba directors who are not nominees or appointees of the Partnership and are independent directors within the meaning of Section 303A of the NYSE Listed Company Manual; or (2) Alibaba's articles of association are amended to provide otherwise by a vote of shareholders representing at least 95% of shares voting. *See* Alibaba Form 20–F (2020), at 177–78. Even a change of control or a merger will not terminate the Partnership's nomination and appointment right. *See id.* at 42–43.

[43] *See id.* at 197. Until mid-2020, the SoftBank director was its head Masayoshi Son, an early backer and business partner of Ma's. In mid-2020, Son announced that he would step down from the board. *See* Phred Dvorak, *SoftBank CEO Masayoshi Son Quits Alibaba Board*, WALL ST. J. (Jun. 25, 2020), https://www.wsj.com/articles/softbank-ceo-masayoshi-son-says-he-will-resign-from-board-of-alibaba-11593055958. Presumably, he will be replaced by another director appointed by SoftBank. Until recently, Ma also served on the board of SoftBank. *See* Alibaba Grp. Holding Ltd., Annual Report (Form 20–F), at 165 (2019). In May 2020, Ma announced he would step down. *See* Kosaku Narioka, *Alibaba Co-Founder Jack Ma to Leave SoftBank's Board*, WALL ST. J. (May 17, 2020), https://www.wsj.com/articles/alibaba-co-founder-jack-ma-to-leave-softbanks-board-11589770260.

[44] *See* Alibaba Form 20–F (2020), at 178.

[45] The five current directors not nominated by the Partnership are Chee Hwa Tung (Tung), Walter Teh Ming Kwauk (Kwauk), Jerry Yang (Yang), Börje Eckholm (Eckholm), and Wan Ling Martello (Martello). *See* Alibaba Form 20–F (2020), at 170. All five were nominated by the three-person Nomination Committee, which consists of Tung, Yang, and Ma (who serves as chair). *See id.* at 189. Tung and Yang were put on the board by Ma and the Alibaba Partnership before the 2014 IPO. *See* Toh Han Shih & Bien Perez, Tung Chee-hwa set to join Alibaba board, S. CHINA MORNING POST (Jun. 17, 2014), https://www.scmp.com/business/companies/article/1534396/tung-chee-hwa-set-join-alibaba-board; *Bloomberg News, Yahoo founder Jerry Yang plays a key role in Alibaba's listing*, S. CHINA MORNING POST (Sept. 12, 2014), https://www.scmp.com/business/companies/article/1590503/yahoo-founder-jerry-yang-plays-key-role-alibabas-listing. All five non-Partnership directors thus owe, directly or indirectly, their positions to Ma.

8

Electronic copy available at: https://ssrn.com/abstract=3644019

### B. *Ma Effectively Controls the Alibaba Partnership*

We now explain how Ma uses his control of Ant Group to dominate the Alibaba Partnership, which consists almost entirely of Alibaba and Ant Group executives. To see how this works, it is helpful to divide the partners besides Ma into two groups: the eight Ant Group executives and the 27 Alibaba executives.

#### 1. Ma's Control Over Partners Who Are Ant Group Executives

Consider the first group, the eight Ant Group executives. To the extent Ma controls Ant Group, Ma can fire or cause the firing of any of these executives.[46] This would force the fired executive to exit the Partnership.[47] Ma can also increase or decrease any of these executives' pay, title, or responsibilities. Ma can thus dominate all of these partners.

#### 2. Ma's Control Over Partners Who Are Alibaba Executives

Next consider the second group, the 27 Alibaba executives. As we explain below, Ma dominates these executives through his control of the Partnership Committee, which (1) directly helps set their pay and (2) indirectly determines their employment situations at Alibaba.

##### a. Ma's Control Over the Partnership Committee

The Partnership Committee (the Committee) is subject to elections every five years.[48] Ma and Tsai, as Continuity Partners, are permanent members of the Committee.[49] Each Committee decides whether the next Committee will have five, six, or seven members, and nominates candidates.[50] All of the partners then select from the nominees who will fill the slots not occupied by Ma and Tsai.[51] Accordingly, to the extent that Ma controls the current Committee, he can also control the next Committee.

---

[46] One of the eight Ant executives in the Partnership is Lucy Peng, who was formerly Chair and President of Alipay China. *See* Alibaba Form 20–F (2020), at 179. Peng now appears to be connected to Ant Group solely through her director position. *See supra* note x. But because her serving in this position requires Ant Group's (and thus Ma's) approval, Ma still exerts control over her.

[47] *See id.* at 180.

[48] *See* Alibaba Form 20–F (2020), at 177.

[49] *See id.*

[50] *See id.*

[51] *See id.*

9

Electronic copy available at: https://ssrn.com/abstract=3644019

Currently, the Committee consists of Ma, Tsai, Daniel Zhang (Alibaba CEO and Executive Chair), [52] Jian Wang (Chairman of Alibaba's Technology Steering Committee), and two persons from Ant Group: Lucy Peng and Eric Jing. [53] Wang joined the Committee at some point during 2019-2020, expanding it from five to six members. [54]

Before Wang joined the Committee, Ma and the two Ant Group representatives constituted a majority of the five members, enabling Ma (via control of Ant Group[55]) to impose his will on the Committee. Tsai, described in the financial media as Ma's "indispensable right-hand man and alter ego," [56] was presumably another reliable ally.

That Ma agreed to add Wang as a sixth member suggests that Ma did not see this as a threat to his control. It is easy to see why. Even if Tsai turned against him, Zhang and Wang would be unlikely to join Tsai. Zhang and Wang appear to work at Alibaba's headquarters in Hangzhou. Tsai's family life is centered in the United States and his Asia business base is Hong Kong,[57] not Hangzhou. Joining Ma is thus more natural for Zhang and Wang than joining Tsai. Moreover, a bloc with Tsai would be unstable: it would constitute no more than half of the Committee, and would break if any bloc member defected and gave Ma majority control. Because there is little to gain and much to lose from opposing Ma, such opposition is unlikely.

### b.   The Partnership Committee's Levers Over Alibaba Executives

Control of the Partnership Committee enables Ma to dominate Alibaba executives via two levers.

---

[52] In September 2019, Zhang replaced Ma as Alibaba's Executive Chair. Thus, Ma no longer has an executive position at Alibaba. *See* Lily Kuo, *Jack Ma, China's richest man, steps down as chairman of Alibaba*, GUARDIAN (Sept. 10, 2019), https://www.theguardian.com/business/2019/sep/10/jack-ma-chinas-richest-man-steps-down-as-chairman-of-alibaba.

[53] *See* Alibaba Form 20–F (2020), at 177–79.

[54] *See* Alibaba Form 20–F (2019), at 171–73 (reporting as Committee members in June 2019 all of the July 2020 Committee members except Wang).

[55] *See supra* Part III.B.1.

[56] *See* Adam Lashinsky, *This Executive is Alibaba Chairman Jack Ma's Alter Ego*, FORTUNE (Apr. 4, 2017), https://fortune.com/2017/04/04/data-sheet-jack-ma-joe-tsai/.

[57] Kevin Acee, *Column: Is Joe Tsai the man to Net another big-league team for San Diego?*, SAN DIEGO UNION TRIB. (Oct. 27, 2017), https://www.sandiegouniontribune.com/sports/columnists/kevin-acee/sd-sp-acee-joe-tsai-nba-nhl-san-diego-1028-story.html.

10

Electronic copy available at: https://ssrn.com/abstract=3644019

First, the Partnership Committee helps set the pay of partners who are Alibaba executives.[58]  Ma can thus use his control of the Partnership Committee to exert influence over every such partner, including the two Alibaba executives (besides Tsai) serving on the Partnership Committee (Zhang and Wang).[59]

Second, Ma's control of the Partnership Committee gives him indirect influence over Alibaba executives' employment conditions.  The reason is that the Partnership-chosen Alibaba directors, who constitute a majority of the board, need the approval of the Ma-controlled Partnership Committee to be renominated. [60]  These directors can be expected to treat unfavorably (for example, by demoting or failing to promote) any executive disliked by the Committee.[61]

---

[58] The Committee is responsible for "allocating the relevant portion of the annual cash bonus pool for all partner members of management."  *See id.* at 177.  Amounts payable to Partners who are executive officers of Alibaba, Alibaba directors, or members of the Partnership Committee are subject to approval by the compensation committee of Alibaba's board.  *See id.*  But members of the compensation committee who are Partnership-appointed directors occupy their board seats because they have been nominated by the Partnership Committee.  *See id.*  They cannot expect to be re-nominated by the Partnership Committee if they fail to go along with its (that is, Ma's) wishes.

[59] The Partnership Committee also controls the nomination of new partners to the Partnership.  *See* Lin & Mehaffy, *supra* note x, at 453.

[60] *See* Alibaba Form 20–F (2020), at 177.

[61] *See* Lin & Mehaffy, *supra* note x, at 454.  Because Ma determines whether the Partnership-chosen directors are kept on the board, these directors can also be expected to do Ma's bidding on other matters as well.  As Part IV explains, Ma's control over Alibaba's VIEs gives him a separate and independent source of leverage over Alibaba's directors.

11

Electronic copy available at: https://ssrn.com/abstract=3644019

Figure 2 depicts Ma's chain of control via Alibaba's board.

**FIGURE 2: ALIBABA—MA'S CONTROL VIA BOARD**



### 3.  Can Ma Be Removed from the Partnership?

Ma's control of the Alibaba Partnership depends on his control of the Partnership Committee, which in turn depends on remaining a partner.  But Ma is at little risk of being forced out of the Partnership as long as he is alive and not incapacitated.

Any partner, including Ma, can be removed for cause by a vote of the partners.[62] But the likelihood that a majority of the partners will vote to oust Ma is slim: if several partners tried to organize against Ma, he could get them fired or otherwise retaliate against them, whether they work for Ant Group (using his control of Ant Group) or Alibaba (using his control of the Partnership Committee).[63]

---

[62] *See* Alibaba Form 20–F (2020), at 180.  By "for cause" we mean "violations of certain standards set forth in the Partnership agreement."

[63] *See supra* Part III.B.2.b; Lin & Mehaffy, *supra* note x, at 454.  In addition, and as we explain *infra* Part IV, Ma could threaten to use his indirect control over the VIEs to throw Alibaba's businesses into

12

Electronic copy available at: https://ssrn.com/abstract=3644019

Another possible type of forced exit is aging out. Almost all partners must retire at age 60 or upon termination of employment (at Ant Group or Alibaba).[64]  However, Ma and Tsai are "Continuity Partners" who can remain partners until age 70 unless they die or become incapacitated.[65]  Ma will turn 70 in 2034.[66]  Moreover, the age limit for Ma and Tsai can be extended by a majority vote of the partners.[67]  The same reasoning that suggests Ma can prevent his expulsion from the Partnership also suggests he could secure majority approval for extending the age limit applicable to him.

## IV.    Ma's Ability to Seize Alibaba's Key Licenses

Ma has another source of power over Alibaba: he indirectly controls key licenses undergirding Alibaba's businesses, enabling him to bring Alibaba's operations to a standstill (if not to walk away with valuable assets).  Section A describes how these assets are housed in variable-interest-entities (VIEs) arrangements that are connected to Alibaba through legally fragile arrangements. Section B explains how Ma, through his indirect control over the VIEs via Ant Group, can at least temporarily disable these assets, if not permanently expropriate them.

### A.  Alibaba's VIEs and Their Legal Fragility

Private Chinese technology firms have long looked to foreign public investors for financing because of the difficulty of conducting public offerings in China.[68]  PRC-registered companies seeking overseas listing must obtain approval from the State Council, a challenge for private firms.[69]  Thus, these businesses formed offshore companies, typically domiciled in the Cayman Islands, as overseas listing vehicles.[70]

---

disarray.

[64] *See* Alibaba Form 20–F (2020), at 180.

[65] *See id.*  Continuity Partners, like ordinary Partners, can of course also choose to resign.  *See id.*

[66] *See* Stu Woo, *Alibaba Sends Jack Ma Off With Birthday Extravaganza*, WALL ST. J. (Sept. 10, 2019), https://www.wsj.com/articles/alibaba-sends-jack-ma-off-with-birthday-extravaganza-11568127370.

[67] *See* Alibaba Form 20–F (2020), at 180.

[68] *See* Paul Gillis & Fredrik Oqvist, *Variable Interest Entities in China*, 1–2, GMT RESEARCH GUEST SERIES, (Mar. 13, 2019), https://www.chinaaccountingblog.com/weblog/2019-03-vie-gillis.pdf; Jesse M. Fried & Matthew Schoenfeld, *Will China Cheat American Investors?*, WALL ST. J. (Dec. 13, 2018), https://www.wsj.com/articles/will-china-cheat-american-investors-11544744711; Robin Hui Huang, SECURITIES AND CAPITAL MARKETS LAW IN CHINA 53 – 56 (Oxford University Press, 2014).

[69] Gillis & Oqvist, *supra* note x, at 1–2.  Specifically, the firm would need to obtain approval from the China Securities Regulatory Commission (CSRC), which operates under the control of the State Council.

[70] *See id.* at 2.

13

Electronic copy available at: https://ssrn.com/abstract=3644019

However, China prohibits foreign ownership and control of firms in strategically sensitive industries, including the internet.[71]  Alibaba, as a Cayman-domiciled firm providing internet-based services in China, thus cannot own key assets it needs,[72] including licenses.[73]  To work around this problem, Alibaba uses a structure that houses these assets in a PRC-registered firm owned by Chinese nationals, but then purports to give Alibaba and its foreign investors effective ownership and control over the assets through an elaborate series of contracts.

That structure is a variable-interest entity (VIE) arrangement.[74]  Under a VIE arrangement, a foreign-owned firm (such as a foreign-domiciled subsidiary of Alibaba) owns 100% of a PRC-registered wholly-foreign-owned enterprise (WFOE). The strategically sensitive asset is placed in a PRC-registered VIE owned by one or more Chinese nationals, usually including the entrepreneur.  The WFOE, the VIE and the VIE's owners then enter a series of contracts that purport to (a) enable the WFOE to effectively control the VIE and (b) transfer substantially all of the profits generated by the VIE to the WFOE.[75]  The contracts provide a basis  for including the VIE's results in the consolidated financial statements of the foreign firm.  In 2000, Sina was the first

---

[71] *See id. See also* Waishang Touzi Zhunru Tebie Guanli Cuoshi (Fumian Qingdan) (2020 Nianban) (外商投资准入特别管理措施(负面清单)(2020 负面清单)) [Special Administrative Measures on Access to Foreign Investment (Negative List) (2020 edition)] (promulgated by the National Development and Reform Commission, June 27 2020, effective July 23, 2020) http://images.mofcom.gov.cn/lczx/202006/20200627145842336.pdf.

[72] *See* Alibaba Form 20–F (2020), at 123.  *See infra* note x.

[73] *See infra* note x.

[74] For background, including how VIEs arose in the PRC, see generally Li Guo, *Chinese Style VIEs: Continuing to Sneak under Smog?*, 47 CORNELL INT'L. L. J. 569 (2014).

[75] The WFOE  typically loans money to the VIE and in connection with this transaction (1) prohibits asset or equity-interest transfers by the VIE;  (2) receives call options on the equity interest of the VIE and its assets (both of which can be assigned to third parties, presumably PRC residents legally able to control the assets) and a right to receive dividends and other distributions declared by the VIE; (3) obtains an irrevocable proxy by the VIE and its current equity holders authorizing any person designated by the WFOE to exercise rights as an equity holder; (4) receives a security interest in the VIE equity interests to secure the VIE's debts to the WFOE and the VIE's and its equity holders performance obligations under the arrangements; and (5) enters into an exclusive technical services agreement with the WFOE that is designed to transfer substantially all of the profits from the VIE to the WFOE.  *See generally* Guo, *supra* note x.

14

Electronic copy available at: https://ssrn.com/abstract=3644019

U.S.-listed firm to use a VIE arrangement.[76] As of 2017, about 200 (or half) of PRC-based firms listed in the United States used VIEs.[77]

Alibaba operates its China-based businesses through a series of WFOEs, each with a corresponding VIE, including four "material" VIEs.[78] While Alibaba does not reveal the exact holdings of each of these VIEs, the VIEs collectively hold various licenses that are critical to Alibaba's businesses and cannot be held solely by a WOFE, including a Value-Added Telecommunication Business Operation Permit (for online and mobile commerce business), a Network Culture Permit, and a License for Transmission of Audio-Visual Programs through Information Network.[79] Failure to comply with PRC regulations around the ownership of these licenses would subject Alibaba to severe penalties "including being prohibited from continuing operations"[80] —potentially "all" of them.[81]

As is well understood, the problem for Alibaba and its foreign investors is that the VIE arrangement is legally fragile: its enforceability in China is, at best, uncertain. The reason is that Chinese contract law invalidates contracts that seek to achieve an illegal objective under the guise of otherwise legal acts.[82] In fact, Chinese government

---

[76] *See* Brandon Whitehill, *Buyer Beware: Chinese Companies and the VIE Structure*, COUNCIL OF INSTITUTIONAL INVESTORS 2 (Dec. 2017), https://www.cii.org/files/publications/misc/12_07_17%20 Chinese%20Companies%20and%20the%20VIE%20Structure.pdf; Christopher W. Betts, Client Memorandum, *Recent Developments in the Use of Variable Interest Entities*, SKADDEN, ARPS, SLATE, MEAGHER & FLOM (June 28, 2016), https://www.skadden.com/insights/publications/2016/06/recent-developments-in-the-use-of-variable-interes.

[77] *See* Whitehill, *supra* note x, at 4; Justin Hopkins et al*., The Rise of U.S-Listed VIEs from China: Balancing State Control and Access to Foreign Capital* 3 (Darden Bus. Sch. Working Paper No. 3119912, Feb. 2018).

[78] Alibaba's most important VIEs are Zhejiang Taobao Network Co., Ltd., Zhejiang Tmall Network Co., Ltd., Alibaba Cloud Computing Ltd., and Youku Information Technology (Beijing) Co., Ltd. *See* Alibaba Form 20–F (2020), at 123.

[79] *See id.* at 46.

[80] *See id*. at 45, 49, 128.

[81] *See id.* at 45.

[82] A contract in China is invalid when "there is an attempt to conceal illegal goals under the disguise of legitimate forms." *See* Lin & Mehaffy*, supra* note x, at 447; Zhonghua Renmin Gongheguo Hetong Fa (中华人民共和国合同法) [Contract Law of the People's Republic of China] (enacted by the National People's Congress, Mar. 15, 1999, effective Oct. 1, 1999), https://www.wipo.int/edocs/lexdocs/laws /en/cn/cn137en.pdf. Because Alibaba uses VIEs to obtain permits and other licenses to do business in sectors forbidden to foreign entities pursuant to Article 28 of the Foreign Investment Law of the People's Republic of China, their contracts fall under this Article 52 provision. As one U.S. lawyer with expertise in PRC law puts it, "[t]o the extent a VIE contract structure is designed to circumvent the requirements of Chinese law, such contracts are void. Not voidable, void. It is as if they did not exist." *See* Hopkins et al., *supra* note x, at 11. *See also* Steve Dickinson, *China's New Foreign Investment Law does NOT Resuscitate VIEs*, CHINA L. BLOG (Apr. 10, 2019), https://www.chinalawblog.com/2019/04/

15

Electronic copy available at: https://ssrn.com/abstract=3644019

agencies have in the past indicated disapproval of VIE arrangements.[83]   And in several cases government officials have barred their use, required them to be dismantled, or found them to be invalid.[84]   Interestingly, in 1998 the PRC forced the dismantling of an arrangement similar to the VIE arrangement, the "China-China-Foreign" (CCF) structure, generating large shareholder losses.[85]

However, at present China lets most VIEs to operate without officially endorsing or prohibiting them, retaining discretion to treat some or all of them as illegal in the future.[86]   Thus, nothing prevents China from invalidating one or more of Alibaba's VIE structures and eliminating its foreign investors' economic interest in the VIE.[87]   For this reason, Alibaba's prospectus warns investors:

*[T]here are very few precedents and little formal guidance as how contractual arrangements in the context of a variable interest entity should be interpreted or*

---

chinas-new-foreign-investment-law-does-not-resuscitate-vies.html  (observing that the PRC "understands that the only reason VIEs exist is to evade the clear requirements of Chinese law... and has firmly concluded this behavior is wrong and … will not be tolerated…).

[83] *See* Guo, *supra* note x, at 580–84.  Tellingly, the PRC-based Fangda law firm, which was asked to provide an opinion on the legality of the VIE structure in Alibaba's registration statement, opined that the individual contracts did not violate PRC law but did not opine that the contracts, when taken together, complied with PRC law.  *See* Alibaba Grp. Holding Ltd., Registration Statement (Form F–1), 40–41, 74 (May 6, 2014) [hereinafter Alibaba Form F–1 (2014)].

[84] *See* Whitehill, *supra* note x, at 8 (describing the case of Baosheng Steel in 2011); Charles Comey et al., Client Alert, *China VIEs: Recent Developments and Observations*, MORRISON & FOERSTER (Aug. 15, 2013), http://media.mofo.com/files/uploads/Images/130716-Variable-Interest-Entities- China.pdf (describing a ruling invalidating the VIE structure of Gigamedia by the Shanghai Sub- Commission of China International Economic and Trade Arbitration Commission because it was designed "to enable the WFOE, which have online operation qualifications, to participate in the operation of online games in the PRC to obtain financial returns therefrom").

[85] *See* Samuel F. Ziegler, *China's Variable Interest Entity Problem: How Americans Have Illegally Invested Billions in China and How to Fix it,* 84 GEO. WASH. L. REV. 539, 552–53 (2016).

[86] *See* Paul Gillis & Michelle René Lowry, *Son of Enron: Investors Weigh the Risks of Chinese Variable Interest Entities*, 26 J. APPLIED CORP. FIN. 61 (2014).  In 2015, a draft proposal was issued by the State Council that would have "legalized" VIEs like Alibaba's, but revised rules proposed in 2018 omitted that solution.  *See* Gillis & Oqvist, *supra* note x, at 8.  China's recently enacted Foreign Investment Law, effective January 1, 2020, does not indicate one way or the other whether VIEs are legal.  *See* Paul D. McKenzie et al., Client Alert, *China's Foreign Investment Law: Are You Ready for It?*, MORRISON & FOERSTER (Jan. 3, 2020), https://www.mofo.com/resources/insights/200102-chinas-investment-foreign-law.html (noting that the current law likely deferred the issue, and that an "open-ended definition of foreign investment leaves ample room for the State Council to regulate VIEs in the future").

[87] Even if China deems a VIE to be legal, it can interpret its tax rules to subject payments flowing from the VIE to the foreign-domiciled and listed entity (ListCo) via the WFOE to a series of taxes that, collectively, would eat up over 50% of the payments.  *See* Whitehill, *supra* note x, at 11 (describing the various types of taxes that might be imposed along the way as the cash moves from the VIE to ListCo). China can also use capital controls to stop payments to ListCo.  *See* Hopkins et al., *supra* note x, at 12.

16

Electronic copy available at: https://ssrn.com/abstract=3644019

*enforced under PRC law, and as a result it may be difficult to predict how an arbitration panel or court would view such contractual arrangements.*[88]

But our interest here is not in the risk that Chinese officials will decide on their own to take such steps. Rather, our interest is in the possibility that Ma can exploit the legal fragility of Alibaba's VIE arrangements to exert control over Alibaba. To this we now turn.

### B. Ma's Ability to Exploit the VIEs' Legal Fragility

After Alibaba's initial public offering in 2014, Ma directly controlled the VIEs as owner of 80–90% of each VIE's equity; Simon Xie, Alibaba's cofounder, owned the remainder.[89] In 2019, Alibaba announced it was restructuring its VIEs so that by the end of 2019 all material VIEs would be controlled through various layers of PRC-registered entities by "selected members" of the Alibaba Partnership or Alibaba's management who are PRC nationals.[90] In July 2020, Alibaba revealed the identities of ten individuals controlling the VIEs.[91] All but one (Fan Jiang) are partners:[92] one of those nine individuals (Angel Ying Zhao) is an Ant Group executive, and the others are Alibaba executives.[93]

As we have seen, Ma's position as controller of Ant Group enables him to dominate not only partners who are Ant Group executives, but also any member of the Alibaba Partnership, including Alibaba executives, via Ma's control of the Partnership Committee.[94] Ma can also dominate any Alibaba executive who is not a partner. Thus, Ma dominates all those controlling the VIEs.[95]

---

[88] *See* Amendment No. 7 to Alibaba's Form F–1 (2014), at 51.

[89] *See* Alibaba Grp. Holding Ltd., Annual Report (Form 20–F), at 112 (2017).

[90] *See* Alibaba Form 20–F (2019), at 39, 117.

[91] *See* Alibaba Form 20–F (2020), at 124 ("For our major variable interest entities, these individuals are Daniel Yong Zhang, Jessie Junfang Zheng, Xiaofeng Shao, Judy Wenhong Tong and Angel Ying Zhao (with respect to each of Zhejiang Taobao Network Co., Ltd., Zhejiang Tmall Network Co., Ltd. and Alibaba Cloud omputing Ltd.), and Sophie Minzhi Wu, Trudy Shan Dai, Jeff Jianfeng Zhang, Fan Jiang and Winnie Jia Wen (with respect to Youku Information Technology (Beijing) Co., Ltd.)").

[92] *See id.* at 179.

[93] *See id.* at 175, 179.

[94] *See supra* Part III.

[95] Ma can also use his various sources of leverage over Alibaba's directors, including his control of the director-nominating Partnership Committee, to ensure that any changes in the VIE arrangements preserve or increase Ma's VIE-based leverage against Alibaba's directors, discussed next.

17

Electronic copy available at: https://ssrn.com/abstract=3644019

Ma could use exploit the legal fragility of the VIE arrangments to impose his will on Alibaba, even if he did not effectively control the board.  For example, he could have the VIEs threaten not to honor contracts with their associated WFOEs, which would cripple Alibaba's business.  Alibaba would not cause the WFOEs to sue in such a case for fear that the VIE arrangements would be declared illegal and therefore void.[96]  Even if Alibaba's board was otherwise independent of Ma, it might well bend to his wishes.[97]

Alternatively, Ma could use the threat of unfavorable Chinese regulatory action as an opportunity or pretext to renegotiate terms of Alibaba's VIEs with their WOFE counterparties.  As others have pointed out, Ma arguably followed this playbook when he unilaterally moved Alipay (now operated by Ant Group) from pre-IPO Alibaba, where its value had been shared with Alibaba investors Yahoo and SoftBank, to a firm he controlled.[98]

At that time, Alipay was held by one of Alibaba's VIEs, Zhejiang Alibaba, which was 80% owned by Ma,[99] and worth around $5 billion.[100]  In 2010, the People's Bank of China (PBOC) indicated that online payment services like Alipay needed to obtain a license, and such a license would be granted only to Chinese-owned (and domiciled) entities.[101]  In 2011, the PBOC asked Alipay by fax if it had a VIE arrangement with

---

[96] This appears to have happened at Nasdaq-listed GigaMedia.  The executive of one of its VIEs, T2CN, seized the VIE's business license and financial documents, paralyzing the business, after discovering that GigaMedia's stockholders wanted to remove him.  GigaMedia did not risk litigating the contractual arrangements between the T2CN and the paired WFOE, which might have been invalidated by a court, and instead settled with the executive, selling its ownership in the WFOE.  *See* Whitehill, *supra* note x, at 9.  As one commentator noted, "[i]t is telling that the company would rather settle with a manager who effectively took the company assets hostage than take the chance of having a court declare the entire operation illegal."  *See* Ziegler, *supra* note x, at 500.  *See also* Paul Gillis, *Testimony Before the U.S-China Security and Economic Commission* 7 (Jan. 26, 2017), https://www.chinaaccountingblog.com/gillis-january-26-testimony.pdf ("Attempts to enforce [VIE] . . . arrangements have generally failed since China's Supreme Court and arbitrators have held that VIE contracts are not enforceable under Chinese law because they attempt an illegal work around the foreign investment restrictions").

[97] A threat to disrupt a VIE-WOFE contract would be credible only if Ma expected to gain more from imposing his will on Alibaba than the permanent loss, if any, in the value of his equity that he expected would result from the disruption. Of course, to the extent the disruption caused the short-term stock price to fall below its long-term value,  Ma could buy additional stock at the temporarily depressed price and thereby profit directly from the disruption itself.

[98] *See, e.g.*, Whitehill, *supra* note x, at 9.

[99] *See* Wei Shen, *Deconstructing the Myth of the Alipay Drama—Repoliticizing Foreign Investment in the Telecommunications Sector in China*, 36 TELECOMM. POL'Y 929, 933 (2012), https://ssrn.com/abstract=2320389.

[100] *See* Gillis & Oqvist, *supra* note x, at 6.

[101] *See* Shen, *supra* note x, at 933 (2012).

18

Electronic copy available at: https://ssrn.com/abstract=3644019

any foreign investor, which may or may not have meant that Alipay's application would be denied if there was such an arrangement.[102] Ma then decided on his own to terminate the VIE arrangement with Alibaba, transferring Alipay to himself and the other co-owner of the VIE.[103] Major Alibaba shareholders Yahoo and SoftBank claimed they were not notified of the spinoff.[104] The parties settled the dispute by agreeing that Alipay (now Ant Group) would provide Alibaba with a profit-sharing or equity interest.[105] According to one estimate, the settlement reduced the value of Yahoo's stake in Alipay by over 60%.[106] In early 2020, Ant Group traded on secondary markets at a value exceeding $200 billion.[107]

The risk of Ma exploiting the VIEs' legal fragility is heightened for Alibaba's investors given how Ma arranged for disputes between Alibaba's WFOEs and VIEs to be resolved. Ordinarily, Chinese businesses and their foreign counterparties contract for dispute resolution via arbitration rather than via Chinese courts, as arbitration is thought to be more efficient and fair.[108] And while PRC courts cannot be expected to enforce judgments from U.S. courts,[109] they will enforce arbitration rulings pursuant to the New York Convention.[110] But Ma did not arrange for contracts between

---

[102] *See id.*

[103] *See id.*

[104] *See* Evelyn M. Rusli, *Yahoo and Alibaba Resolve Dispute Over Alipay*, N.Y. TIMES (Jul. 29, 2011), https://dealbook.nytimes.com/2011/07/29/yahoo-and-alibaba-resolve-alipay-dispute/.

[105] *See id.*

[106] *See* Whitehill, *supra* note x, at 9 (reporting that the seizure of Alipay devalued Yahoo's stake in Alipay by over 60%).

[107] See Julie Zhu et al., *Exclusive: China's Ant aims for $200 billion price tag in private share sales—sources*, REUTERS (Jan. 17, 2020), https://www.reuters.com/article/us-ant-financial-valuation-exclusive/exclusive-chinas-ant-aims-for-200-billion-price-tag-in-private-share-sales-sources-idUSKBN1ZG1C6.

[108] *See generally* Jerome A. Cohen, *Settling International Business Disputes with China: Then and Now*, 47 CORNELL INT'L L. J. 555 (2014) (concluding that arbitration in China is preferable to judicial proceedings but still leaves much to be desired); Shahla Ali & Hui Huang, *Financial Dispute Resolution in China: Arbitration or Court Litigation?*, 28 ARB. INT'L 77 (2012), https://academic.oup.com/arbitration/arbitration/article-abstract/28/1/77/229998.

[109] *See* Fried & Kamar, *supra* note x.

[110] *See* Zui Gao Renmin Fayuan Guanyu Zhixing Woguo Jiaru de "Chengren ji Zhixing Waiguo Zhongcai Cai Caijue Gongyue" de Tongzhi (最高人民法院关于执行我国加入《承认及执行外国仲裁裁决公约》的通知) [Notice of the Supreme People's Court on Implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards Acceded to by China] (issued by the Supreme People's Court, Apr. 10, 1987, effective Apr. 10, 1987), Judicial Interpretation No. 5 [1987] of the Supreme People's Court, http://en.pkulaw.cn/display.aspx?cgid=b96476088a462bafbdfb&lib=law; *see also* Weixia Gu, *Arbitration in China*, *in* INTERNATIONAL COMMERCIAL ARBITRATION IN ASIA 77–131 (Tom Ginsburg & Shahla

19

Electronic copy available at: https://ssrn.com/abstract=3644019

Alibaba and the VIEs to be arbitrated.  Rather, the disputes are to be resolved by a "people's court."  And not just any people's court: a people's court of Hangzhou City, Ma's hometown and where Alibaba is based.[111]

We do not claim that Ma plans to use the VIEs to transfer value to himself, only that he can.  Should Ma wish to get his way with Alibaba, the VIEs provide another channel beyond his domination of the board.[112]

Figure 3 depicts both of Ma's channels of control: via Alibaba's board and via the VIEs.

---

Ali eds., Juris Publishing, 3d ed. 2013) (University of Hong Kong Faculty of Law Research Paper No. 2013/022), https://ssrn.com/abstract=2263058.

[111] *See* Exhibits 10.10, 10.11, 10.12, 10.13, and 10.14 to Alibaba Form F–1 (2014), https://otp.investis.com/clients/us/alibaba/SEC/sec-show.aspx?FilingId=9968139&Cik=0001577552&Type=PDF&hasPdf=1, (requiring disputes to "be brought before the competent people's court of Hangzhou City for adjudication").

[112] Naturally, the VIEs provide a pre-carved channel for value-shifting.  Alibaba relies heavily on Alipay, owned by Ma-controlled Ant Group, for payment processing, through contractual arrangements that are currently "on preferential terms."  *See* Alibaba Form 20–F (2020), at 29.  Alibaba reports that approximately 70% of the GMV on its PRC retail marketplaces was settled through Alipay.  *See id.* at 27.  Alibaba thus highlights the risks associated with disruption of this relationship, including the loss of these preferential terms and the potential losses from Alipay pursuing opportunities that Alibaba might otherwise exploit.  *See id.* at 29–30.  As with the VIEs, Ma can use his control over Alipay both for extracting value and for exerting pressure on Alibaba's board to benefit him in other ways.

20

Electronic copy available at: https://ssrn.com/abstract=3644019

**Figure 3: Alibaba—Ma's Control via Board and via VIEs**



## V.    Conclusion

Although Alibaba is one of the world's most valuable companies, its governance arrangements do not appear to be fully understood by investors, analysts, or academics.  Analyzing these arrangements, we have shown that Jack Ma effectively controls Alibaba even though he owns less than 5% of its stock, and that this control will persist even if his equity stake drops.

Ma's control can persist because it is based entirely on his control of a completely different firm: privately-held Ant Group.  Control of Ant Group enables Ma to dominate Ant Group executives who, along with Ma, make up a majority of the the powerful

21

Electronic copy available at: https://ssrn.com/abstract=3644019

Partnership Committee of the Alibaba Partnership.  Control of the Committee,  in turn, provides effective control of the Partnership, which appoints a majority of the directors on Alibaba's board.  Domination of Ant Group executives also enables Ma to effectively control Alibaba's key VIE-held assets, giving him holdup power over Alibaba that is independent from his influence over the board.

Alibaba is a useful case study of how a single entrepreneur can control a firm not through equity, but rather through a mixture of employment, contractual, and commercial arrangements.  We do not know how Ma will wield his power in the future or whether public investors will be harmed.  But control matters, and it is important to understand who controls Alibaba.

22

Electronic copy available at: https://ssrn.com/abstract=3644019

european corporate governance institute

## about ECGI

The European Corporate Governance Institute has been established to improve *corporate governance through fostering independent scientific research and related activities.*

The ECGI will produce and disseminate high quality research while remaining close to the concerns and interests of corporate, financial and public policy makers. It will draw on the expertise of scholars from numerous countries and bring together a critical mass of expertise and interest to bear on this important subject.

The views expressed in this working paper are those of the authors, not those of the ECGI or its members.

www.ecgi.global

european corporate governance institute

ECGI Working Paper Series in Law

Editorial Board

| | |
|---|---|
| Editor | Amir Licht, Professor of Law, Radzyner Law School, Interdisciplinary Center Herzliya |
| Consulting Editors | Horst Eidenmüller, Freshfields Professor of Commercial Law, University of Oxford |
| | Martin Gelter, Professor of Law, Fordham University School of Law |
| | Geneviève Helleringer, Professor of Law, ESSEC Business School and Oxford Law Faculty |
| | Curtis Milhaupt, Professor of Law, Stanford Law School |
| | Niamh Moloney, Professor of Law, Department of Law, London School of Economics and Political Science |
| Editorial Assistant | Úna Daly, ECGI Working Paper Series Manager |

https://ecgi.global/content/working-papers

european corporate governance institute

**Electronic Access to the Working Paper Series**

The full set of ECGI working papers can be accessed through the Institute's Web-site (https://ecgi.global/content/working-papers) or SSRN:

| | |
|---|---|
| **Finance Paper Series** | http://www.ssrn.com/link/ECGI-Fin.html |
| **Law Paper Series** | http://www.ssrn.com/link/ECGI-Law.html |

https://ecgi.global/content/working-papers