# EXHIBIT F

Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

              v.                        06 CV 7736 (GEL)

JAMES N. STANARD, MARTIN J.
MERRITT, and MICHAEL W. CASH,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        May 16, 2007
                                        12:00 p.m.

Before:

                    HON. GERARD E. LYNCH,

                                        District Judge

                         APPEARANCES

UNITED STATES SECURITIES and EXCHANGE COMMISSION
BY:  PREETHI KRISHNAMURTHY

MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.
     Attorneys for Defendant Stanard
BY:  PAUL R. GRAND
     -and-
DLA PIPER US LLP
BY:  JAMES D. MATHIAS

SCHULTE ROTH & ZABEL, LLP
     Attorneys for Defendant Cash
BY:  MARTIN L. PERSCHETZ

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

(Case called)

MS. KRISHNAMURTHY:  Good afternoon, your Honor. Preethi Krishnamurthy, for the SEC.

THE COURT:  Good afternoon.

MR. PERSCHETZ:  Martin Perschetz, for Mr. Cash, your Honor.

MR. MATHIAS:  Jim Mathias, for James Stanard.

MR. GRAND:  Paul Grand, for Mr. Stanard.

THE COURT:  We're here to rule on a motion in this SEC enforcement action.  Defendants James Stanard and Michael Cash move to dismiss the claims against them.  The motion will be denied.

At the outset, Cash argues that the action should be dismissed for lack of personal jurisdiction over him.  To a considerable extent, this motion overlaps with his motion on the merits that the complaint fails to state a claim against him, because to the extent that the complaint does state a claim, his jurisdictional argument verges on the frivolous. The federal securities laws "permit the exercise of personal jurisdiction to the limit of the due process clause of the Fifth Amendment."  SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990).  It is well established that the Constitution permits the exercise of personal jurisdiction over a defendant who "has acted in such a way as to have 'caused consequences' in the forum state."  That's from the Unifund case of the same

page, quoting World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297 (1980). Where an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders in violation of federal regulations requiring disclosure of accurate information to holders of securities traded in the United States, such direct consequences have occurred. SEC regulations would be meaningless as applied to foreign issuers of U.S.-traded securities if the United States courts lacked jurisdiction over executives abroad who violate those regulations. The complaint here alleges that Cash conceived and implemented a strategy for entering a sham transaction and specifically intended that his work would result in false statements by RenRe in its publicly-filed financial statements in the United States. At least to the extent that this allegation states a claim for violation of the United States securities laws, this Court has jurisdiction over the persons alleged to have committed that violation.

The next overarching argument advanced by both Stanard and Cash is that all of the charges must be dismissed because the misstatements of earnings at the heart of the plaintiff's case are immaterial as a matter of law. This argument is insufficient to require dismissal at the pleading stage.

The sham transaction and resulting distortion of earnings statements alleged in this complaint are somewhat

unusual in that the SEC alleges that the purpose of the transaction was to understate rather than overstate RenRe's profits at the time the transaction was entered.  Of course, the Court has seen many more cases in which private plaintiffs or the SEC allege that companies in financial trouble engaged in sham activities in order to increase their apparent profitability, thus falsely luring investors to purchase securities that soon become less valuable.  Here, in contrast, the company was making huge profits and is accused of engaging in a transaction to "smooth" its earnings by shifting profits in fact made in 2001 into future years.  The motive for such maneuverings and their potential to harm investors is certainly less apparent than in the more conventional cases.

The complaint alleges, however, that the transactions which for purposes of this motion the Court must accept were essentially shams of no economic import, had the effect of misstating RenRe's net income, sometimes reducing it and sometimes increasing it, by percentages ranging from 7 percent to nearly 40 percent in various reporting periods.  Defendants would glide past this allegation, emphasizing that the initial impact was to reduce the apparent profitability of the company, noting that the company genuinely made large and dramatically increasing profits in the affected years, and pointing out that the amount of money involved in the transactions amounted to just 2.2 percent of the company's aggregate profits over the

5

three-year period.

Defendants also point out that the market did not react negatively to the eventual disclosure of the misstatement, suggesting that actual investors did not find the errors material. It is possible that these facts, which are not apparently disputed by the SEC, would ultimately support a conclusion by a fact finder that the alleged misstatements are not material.

But materiality is a mixed question of fact and law and rarely suitable for resolution on the pleadings. As the Second Circuit has held, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

The quote is from Ganino v. Citizens Utilities, 228 F.3d 154 at 162 (2d Cir. 2000), in turn quoting Goldman v. Belden, 754 F.2d 1059 at 1067 (2d Cir. 1985). The very facts I have just outlined, as presented by the defendants, are susceptible to different readings, showing how easily reasonable people may differ on the materiality or even the appropriate characterization of these facts.

First, the understatement of profits in one year is simply the flip side of the overstatement of profits in other years. To the extent defendants suggest that understating

6

profits can't hurt anyone, it is clear that the future overstatement of profits contemplated by the "smoothing" of profitability over a multiyear period could significantly distort a reasonable investor's picture of a company's health and of the trends that might suggest investment potential for future profits.

Second, the amounts of misstatement can easily be regarded as substantial. If, as defendants point out, only a small amount of profit was shifted relative to the overall profits in the relevant years, the effect on reported earnings in particular periods was sometimes quite substantial, rising, as alleged, to nearly a 40 percent overstatement of profits in the third quarter of 2002.

Third, while defendants emphasize that in the end RenRe was genuinely profitable in 2002 and 2003 and, in fact, that profits rose dramatically in those years, it is far from clear that this could have been anticipated in 2001 when the scheme was conceived and implemented. No one could know in 2001 what the company's profits really would be in 2002 or 2003. Had the company done badly in those years, the false appearance created by a $26 million infusion of phony profits from a previous year could have considerably distorted an investor's picture of the company.

Fourth, the lack of market reaction could be seen, given the nature of this scheme, as a post-hoc shrug, given

that by the time the fraud was revealed, the income shifting was in the past and the company's then current profits were no longer being affected.  The market might well have responded differently if the fraud had been revealed shortly after the announcement of the 2002 third quarter results, when the announcement would have required a substantial write-down of the company's most recent announced earnings.

Of course, it's premature to reach any conclusion about whether this is the correct explanation for the market's apparent indifference, but that is exactly the point.  The significance of these various factors is best addressed in the context of a full factual record.  At this point, reasonable people can easily disagree about the meaning and weight of each of these arguments.

Fifth, and finally, in a world in which investors are frequently believed to pay attention to whether profits meet projections or targets, it is not necessarily irrational for a manager seeking to manipulate share prices to consider profits in a given period as essentially excessive, if they exceed such targets, and to seek to save some for a future, potentially rainier day, or for such a manager to expect such a stratagem to have a favorable effect on investors -- that is, an effect that distorts their behavior.  Defendants confuse this point by suggesting that squirreling away money for a rainy day is conservative, desirable management.  Of course, it is.  But a

8

company saves for the future by reporting its profits accurately and putting some of those actual profits aside for future use.  The complaint here charges defendants not with saving actual funds for the future but with lying about profits in one year in order to make it appear that the money was not saved from 2001 profits but, instead, was earned in 2002 and 2003.

Whether this charge can be sustained is for the future, but it cannot be said on the basis of the pleadings that the alleged falsifications were immaterial as a matter of law.

Cash next argues that he cannot be liable as a primary violator of Rule 10b-5 and Section 10-b because no false statement was directly attributable to him, arguing that Second Circuit cases interpreting the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, (1994), which held that there was no liability under the securities laws for aiding and abetting violations of those laws, have established a bright-line rule that only the speakers themselves can be liable as primary violators.  As so broadly stated, this legal proposition seems to me very likely wrong.  The Second Circuit cases are less than fully consistent in this regard.  Compare Wright v. Ernst & Young, 152 F.3d 169 (1998) and Lattanzio v. Deloitte Touche, 476 F.3d 147 (2007), on which the plaintiffs rely, with In re Scholastic Corp., 252

F.3d 63, 76 (2d Cir. 2001) and SEC v. First Jersey Securities, 101 F.3d 1450, 1471 (2d Cir. 1996), which are cited by the plaintiff.

This Court has rejected such a bright-line view in the past. See In re Global Crossing, 322 F.Supp.2d 319 (S.D.N.Y. 2004) and In re Salomon Analyst AT&T Litigation, 350 F.Supp.2d 455 (S.D.N.Y. 2004), and nothing in Lattanzio or in defendants' briefs persuades me that I was wrong to do so.

On the other hand, it is not clear that Cash needs to take such a sweeping view in order to prevail on this point. In both Global Crossing and Salomon AT&T, this Court held that the plaintiffs had alleged facts suggesting that the defendants in question were moving forces in the fraud; arguably, the facts alleged here make out a purer case of mere aiding and abetting.

But however interesting is the question whether Cash could be charged as a primary violator, the issue is entirely academic in this case. I see no reason why this debate needs to be resolved in this case now or perhaps ever. This is not a private action for damages but an SEC enforcement action, and the SEC is expressly permitted by statute to move against aiders and abettors. See Exchange Act Section 20(e), 15, United States Code, Section 78t(e). In the complaint, the SEC expressly pleads its charged 10b violations in the alternative as primary violations and as aiding and abetting. See amended

complaint, paragraphs 106 and 107. Cash does not even attempt to suggest that the facts alleged would not make out a claim for aiding and abetting. Indeed, the entire thrust of his argument is to suggest that that is exactly what the SEC has pleaded.

No party has indicated any way in which it matters whether Cash is found to violate these rules as a principal or as an aider and abettor. Nor has any party suggested that whether Cash's name is stricken from paragraph 106, which charges Cash with primary violations, would make the slightest difference to how discovery is conducted or even how the case is tried. It is a well-established principle of criminal law that there is no need for an indictment even to specify whether a charge is laid under 18, United States Code, Section 2, or not. See, for example, United States v. Knoll, 16 F.3d, 1313, (2d Cir. 1994). The same practical principle seems to apply here. Accordingly, the Court declines to decide this question at this time, since the same causes of action will remain in the complaint whether Cash's reading of Second Circuit case law on primary violators is right or wrong.

For the same reason, there is no need to stay these proceedings pending the Supreme Court's resolution of Stoneridge Investment v. Scientific-Atlanta, Inc., a case in which certiorari was recently granted to decide whether claims for deceptive conduct may go forward under Rule 10b-5(a) and

(c) where a defendant engaged in transactions with a public corporation with no legitimate business or economic purpose except to inflate artificially the public corporation's financial statements, but where the defendant himself made no public statements concerning those transactions. See 2007 WL 879583, the order granting certiorari, 2006 WL 1909677, the petition with the question presented. Under the law as it now stands, the complaint adequately states violations of Rule 10b-5(a) and (c). See In re Global Crossing, 322 F.Supp.2d at 335-36, and In re Parmalat, 376 F.Supp.2d 472, 502 (S.D.N.Y. 2005). Even if the Supreme Court's decision in Stoneridge Investments changes the law in such a way that a claim against Cash can no longer be stated under Rule 10b-5(a) and (c), Cash's liability, if any, as an aider and abettor under 10b-5(b) will be unaffected.

Finally, Cash argues that the charges of books and records violations should be dismissed, because Cash did not have primary responsibility for maintaining the books and records. Unlike the argument under Section 10b, which does present interesting questions under the statutory and regulatory language, this claim is completely contrary to the language of the statute and rule. That language does not speak of the person who makes entries or devises accounting procedures. Rather, Section 13(b)(5) applies to anyone who, among other things "knowingly circumvents...a system of

internal accounting controls." The plain language covers someone who knows that internal accounting procedures would require something to be reported in a particular way, and then undertakes deliberately to devise a scheme that would avoid such proper reporting. Similarly, Rule 13b2-1 forbids anyone "directly or indirectly" to "cause to be falsified" the corporate books and records. Again, the plain language covers someone who engages in such a scheme to cause the records to be falsified, even if that person is not directly in charge of making the false entries themselves.

The complaint here clearly alleges that Cash designed the transactions in question with the specific intention of fooling the company's auditors with respect to their true nature. See amended complaint paragraph 70. Whether or not that is so remains to be seen, but the allegation squarely states a violation of the cited books and records provisions.

Accordingly, the defendants' motions will be denied.

All right. That's the ruling on the motions.

Now, as I understand the case management order, discovery is ongoing and is due to end on July 31. Does anybody think we need more time or that there is some problem with that?

MS. KRISHNAMURTHY: Your Honor, the discovery order that your Honor entered asked the parties to hold off on depositions until after the Court had ruled. And we haven't

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300