**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE: ALIBABA GROUP HOLDING LTD.
SECURITIES LITIGATION

No.: 1:20-cv-09568-GBD-JW

---

**JACK YUN MA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
**PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Jonathan K. Youngwood
jyoungwood@stblaw.com
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-3539
Facsimile: (212) 455-2502

James G. Kreissman
jkreissman@stblaw.com
Stephen P. Blake
sblake@stblaw.com
Bo Bryan Jin (*pro hac vice*)
bryan.jin@stblaw.com
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Counsel for Defendants Alibaba Group Holding*
*Limited, Daniel Yong Zhang, Maggie Wei Wu,*
*and Jack Yun Ma*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .........................................................................................................3

I.      PLAINTIFFS' CLAIMS AGAINST MR. MA ARE FUNDAMENTALLY
        DEFECTIVE.................................................................................................3

        A.      The Court Lacks Personal Jurisdiction Over Mr. Ma. ...........................3

        B.      The Alleged Fraud Falls Outside The Territorial Limit Of Section 10(b)..............6

        C.      Plaintiffs Have No Standing To Challenge Ant's HKSE Prospectuses.................8

        D.      Mr. Ma Is Not A Maker Of The Challenged Disclosures.....................10

II.     PLAINTIFFS FAIL TO STATE THE ANT PROSPECTUSES CLAIM. ........................11

        A.      Plaintiffs Fail To Allege That The Challenged Statements Are False Or
                Misleading........................................................................................11

                1.      The Regulatory Claim Is Contradicted By The Underlying
                        Regulations. .........................................................................11

                2.      Plaintiffs' Ant Investor Claim Is Speculative And Implausible. ..............14

                        i.      Plaintiffs' New Theory For the Ant Investor Claim Is—
                                Like The Original Theory Before It—Contradicted By
                                Undisputed Fact. ....................................................... 14

                        ii.     Plaintiffs Fail To Corroborate The Feb. 16 Article On
                                Which The Ant Investor Claim Is Based. ...................... 15

                        iii.    Plaintiffs Fail To Allege That Qizhan Is A Related Party. .......... 19

        B.      Plaintiffs Fail To Plead A Strong Inference Of Scienter. .....................20

                1.      Plaintiffs Fail To Adequately Allege Motive And Opportunity. ..............20

                2.      The Complaint Includes No Circumstantial Evidence Of Conscious
                        Misbehavior Or Recklessness. ...................................................22

                3.      Balancing Of Inferences Weighs Against A Finding Of Scienter. ............24

III.    PLAINTIFFS' ALTERNATIVE SECTION 10(b) CLAIMS FAIL FOR THE
        SAME AND ADDITIONAL REASONS..........................................................25

A.      The Scheme Liability Claim Fails Because It Merely Repackages The Ant Prospectuses Claim. ............................................................................25

B.      Plaintiffs' Additional Scheme Allegations Fail For Multiple Reasons. ...............26

C.      The Insider Trading Claim Fails. ...........................................................................28

IV.     PLAINTIFFS' SECTION 20(a) CLAIM MUST ALSO BE DISMISSED. .....................28

APPENDIX A: GLOSSARY ....................................................................................... A-1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ancile Inv. Co. Ltd. v. Arher Daniels Midland Co.*,
    538 F. App'x 19 (2d Cir. 2013) ................................................................................. 13

*ATSI Commus., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (S.D.N.Y) ........................................................................................... 5

*Barilli v. Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019) ................................................................. 28

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) ..................................................................................... 8, 9, 10

*Born v. Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021) ................................................................. 15

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)) ............................................................................................. 4

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) .................................................................................... 4

*City of Brockton Ret. Sys. v. Avon Prods.*,
    No. 11CV4665, 2014 WL 4832321 (S.D.N.Y Sept. 28, 2014) ........................... 16

*City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011) ................................................................. 11

*CompuDyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) ................................................................. 29

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ................................................................... 4

*Doubleline Capital LP v. Construtora Norberto Odebrecht, S.A.*,
    413 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................. 29

*Fin. Sec. Assurance, Inc. v. Stephens, Inc.*,
    500 F.3d 1276 (11th Cir. 2007) ............................................................................ 9

*First N.Y. Sec. L.L.C. v. United Rentals, Inc.*,
    648 F. Supp. 2d 256 (D. Conn. 2009) ................................................................. 20

*Goplen v. 51job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006) ................................................................. 21

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................... 29

*In re Am. Int'l Grp. Sec. Litig.*,
    689 F.3d 229 (2d Cir. 2012)............................................................................... 27

*In re Boeing Co. Aircraft Sec. Litig.*,
    No. 19CV02394, 2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ............................ 24

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)..................................................................... 5

*In re CannaVest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)................................................................... 11

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
    586 F. Supp. 3d 199 (E.D.N.Y. 2022) ................................................................. 28

*In re EHang Holding Ltd. Sec. Litig.*,
    No. 21CV1392, 2022 WL 17718546 (S.D.N.Y. Dec. 15, 2022) (Daniels, J.) ................. 5, 22

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)................................................................... 28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) ................................................................. 29

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ................................................................... 27

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017)................................................................... 16

*In re JWP Inc. Sec. Litig.*,
    928 F. Supp. 1239 (S.D.N.Y. 1996)..................................................................... 29

*In re Kirkland Lake Gold Ltd. Sec. Lit.*,
    No. 20CV4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) ............................ 26

*In re Lions Gate Ent. Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ..................................................................... 13

*In re Livent Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................... 12

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    No. 13CV214, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014).................................... 16

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020) .................................................................... 25

*In re NYSE Specialists Sec. Litig,*
    503 F.3d 89 (2d Cir. 2007) .................................................................................... 9

*In re Optimal U.S. Litig.*,
    No. 10CV4095, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ............................. 10

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 449 (S.D.N.Y. 2005) .................................................................... 5

*In re Philip Morris Int'l Inc., Sec. Litig.*,
    437 F. Supp. 3d 329 (S.D.N.Y. 2020) .................................................................... 21

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011) (Daniels, J.) ............................................. 29

*In re Tronox, Inc. Sec. Litig.*,
    769 F. Supp. 2d 202 (S.D.N.Y. 2011) .................................................................... 29

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    No. 20CV8585, 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ......................... 9, 10

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) .................................................................... 29

*In re XL Fleet Corp. Sec. Litig.*,
    No. 21CV2002, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ............................... 28

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*,
    91 F. Supp. 3d 456 (S.D.N.Y. 2015) .................................................................... 11

*Janus Capita Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ...................................................................................... 10, 11

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020) .................................................................... 13

*LaBranche Sec. Litig.*,
    405 F. Supp. 2d 333 (S.D.N.Y. 2005) .................................................................... 10

*Lewy v. Skypeople Fruit Juice, Inc.*,
    No. 11CV2700, 2012 WL 3957916 (S.D.N.Y. Sept. 7, 2012) ............................. 16

*Licci v. Lebanese Canadian Bank*,
    732 F.3d 161 (2d Cir. 2013) .................................................................................... 4

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................................... 16

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ................................................................................. 25, 26

*Makor Issues & Rights, Ltd. v. Tellab, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ......................................................................... 24

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
    54 F.4th 82 (2d Cir. 2022) ......................................................................... 8, 9

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    No. 19CV7536, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ............................. 8

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ........................................................................ 20

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) .................................................................................. 6, 7

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ......................................................................... 10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................... 15, 20

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..................................................................... 21

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
    No. 15CV8574, 2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) ............................. 11

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) (emphasis in original) ........................................ 27

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ......................................................................... 13

*Rapoport v. Asia Elecs. Holding Co., Inc.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000) ............................................................. 16

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
    245 F. Supp. 2d 543 (S.D.N.Y. 2003) ............................................................. 6

*Schoenbaum v. Firstbrook*,
    405 F.2d 200 (2d Cir. 1968) ......................................................................... 7

*SEC v. First Jersey Secs., Inc.*,
    101 F. 3d. 1450 (2d Cir. 1996) ............................................................. 29

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................... 25, 26, 27

*SEC v. Stubos*,
    No. 22CV04674, 2022 WL 6776741 (S.D.N.Y. Oct. 11, 2022) ............................ 27

*SEC. v. Langford*,
    No. 12CV344, 2013 WL 1943484 (D. Neb. May 9, 2013) ................... 26

*Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*,
    552 U.S. 148 (2008) ..................................................................... 7, 27

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004) ............................................................... 6

*Uddoh v. United Healthcare*,
    254 F. Supp. 3d 424 (E.D.N.Y. 2017) .................................................. 25

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) ..................................................... 14, 25

**Rules**

Fed. R. Civ. P. 44.1 ................................................................................. 13

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs allegedly purchased Alibaba ADSs on the NYSE.  Their claims under Section 10(b) of the U.S. Securities and Exchange Act, however, do not challenge Alibaba's disclosures to U.S. investors.  Instead, Plaintiffs seek to hold Mr. Ma liable for purported defects in the Hong Kong Stock Exchange disclosures that another company—Ant—made in connection with Ant's planned Hong Kong IPO.  Plaintiffs' opposition brief (ECF No. 75, the "Opposition" or "M-Opp.")[1] attempts to mask the unprecedented and unsupported nature of their claims by conflating Mr. Ma, Ant, and Alibaba, and painting Mr. Ma as the mastermind behind every act of the two companies.  This position finds no support in well-pleaded fact.  Indeed, Plaintiffs' 147-page Complaint does not allege, and their 45-page Opposition does not argue, that Mr. Ma:

- Held an executive position at either company during the putative class period;

- Drafted, reviewed, approved, distributed, or discussed the challenged disclosures in Ant's HKSE Prospectuses;

- Signed any documents, gave any instructions, or participated in any discussion regarding the risks that the HKSE Prospectuses supposedly failed to disclose; or

- Took any other concrete action in connection with the purported fraud.

Instead, Plaintiffs rely entirely on unsupported inferences drawn from Mr. Ma's alleged indirect control of Ant and Alibaba, speculating that Mr. Ma must have (i) overseen and managed every aspect of the Ant IPO, including causing, in unspecified ways, the alleged misstatements or omissions in the HKSE Prospectuses and (ii) hand-picked Ant's pre-IPO investors and helped them design investment vehicles aimed at evading PRC government scrutiny, for no apparent benefits to Ant or Mr. Ma and at a huge political risk.  This speculation

---

[1]  Capitalized terms not defined in this brief have the same meanings as in the Alibaba Defendants' and Mr. Ma's motions to dismiss ("A-MTD" and "M-MTD," respectively).  For the Court's convenience, a list of defined terms used in this brief is included as Appendix A.

has no basis in well-pleaded fact and defies common sense. Plaintiffs' claims against Mr. Ma must be dismissed on the following grounds.

***Lack Of Personal Jurisdiction:*** Plaintiffs argue that the HKSE Prospectuses' supposed effects on the trading of Alibaba ADSs in the United States satisfies the Constitutional minimum contacts requirement. Plaintiffs are mistaken. Under binding Second Circuit case law, which Plaintiffs ignore, the HKSE Prospectuses were not "expressly aimed" at the United States and thus cannot give rise to personal jurisdiction under the effects test. Moreover, Mr. Ma is not alleged to have taken part in making, proposing, editing, or approving the HKSE Prospectuses and therefore cannot be deemed to have had minimum contacts with the United States based on any effects caused by the HKSE Prospectuses.

***Outside U.S. Territorial Reach:*** Plaintiffs' argument that Ant issued fraudulent disclosures in the HKSE Prospectuses in connection with Plaintiffs' alleged Alibaba ADS purchases strains credulity. Plaintiffs' own allegations and Second Circuit precedent make it clear that the alleged fraud is in connection with the Ant IPO, which Plaintiffs admit falls outside Section 10(b)'s territorial limits contemplated by *Morrison*.

***Lack Of Standing:*** Plaintiffs undisputedly did not purchase Ant stock. As recently reaffirmed by the Second Circuit, Plaintiffs do not have statutory standing to challenge the self-referential disclosures Ant made in the HKSE Prospectuses. The Second Circuit has also squarely rejected Plaintiffs' argument that standing could instead be based on the alleged relationship between Alibaba and Ant.

***Not A Maker:*** Plaintiffs continue to argue that Mr. Ma is a maker of the challenged Ant statements because of his indirect control of Ant. But only those who have ultimate authority ***over the challenged statements*** can be deemed a maker of such statements; control over the

entity that made the statements is insufficient.  The Complaint simply does not allege, let alone

offer well-pleaded facts to support the position, that Mr. Ma had any authority over, involvement

in, or even knowledge of the challenged disclosures.

     ***Failure To State A Claim***:  Plaintiffs' substantive allegations are built upon unsupported

inferences.  When viewed in light of the heightened pleading standard governing securities fraud

claims, Plaintiffs' allegations fail at every turn, including that:

- Plaintiffs' only remaining theory for the Ant Regulatory Claim is demonstrably based on a mischaracterization of the regulation at issue;

- Plaintiffs' ever-shifting Ant Investor Claim remains implausible and not well-pleaded;

- Plaintiffs fail to plead either a motive to commit fraud or any evidence of conscious misbehavior or recklessness; and

- Plaintiffs' additional scheme liability allegations fail to plead an inherently deceptive act or reliance.

## <u>ARGUMENT</u>

I.    **PLAINTIFFS' CLAIMS AGAINST MR. MA ARE FUNDAMENTALLY DEFECTIVE.**

    A.    <u>**The Court Lacks Personal Jurisdiction Over Mr. Ma.**</u>

    Plaintiffs claim that, although Mr. Ma took no relevant action within the United States,

they can "establish minimum contacts by showing that [his] actions abroad caused a foreseeable

effect in the United States."  M-Opp. at 7.  Relying on older cases, Plaintiffs argue at length that

Mr. Ma's actions satisfy the so-called "effects test" because their effects in the United States

were "direct and foreseeable."  *Id.* at 7–12.  Plaintiffs are wrong.

    For nearly a decade, the Second Circuit has consistently held that to invoke the effects test

"the plaintiffs must establish that the [defendant] '***expressly aimed***' intentional tortious acts at

residents of the United States."  *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 172 (2d Cir.

2013) (emphasis added) (citation omitted); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (limiting the effects test to circumstances where "the defendant *expressly aimed* its conduct at the forum") (emphasis added).

By contrast, the law is clear that "[t]he foreseeability of causing injury in [the forum] will not suffice." *Charles Schwab*, 883 F.3d at 87 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).  Mere foreseeability, however, is exactly what Plaintiffs argue.  *See* M-Opp. at 9 ("Ma is also subject to personal jurisdiction due to his misleading statements and deceptive acts that *foreseeably affected* U.S. shareholders and the trading price of Alibaba's ADS on the NYSE.") (emphasis added).  Plaintiffs do not—and cannot—allege that the HKSE Prospectuses, which Ant, a Chinese company, issued for its Hong Kong IPO and filed with the HKSE, were expressly aimed at the United States, especially when the HKSE Prospectuses explicitly state that they "may not be used for . . . any security in any other jurisdiction."  Ex. EE at vi.[2]  Likewise, the purported scheme to conceal certain Ant investors was not expressly aimed at the United States, because Plaintiffs effectively concede that Mr. Ma's alleged "primary intention was to deceive PRC regulators."  M-Opp. at 12.

Even if the HKSE Prospectuses had been expressly aimed at the United States, which they were not, Plaintiffs' effects test theory would still fail because Mr. Ma is not alleged to have played any role in preparing the HKSE Prospectuses.  *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 802 (S.D.N.Y. 2018) (citation omitted) ("[A]bsent any alleged role … in preparing false financial statements the exercise of jurisdiction here exceeds the limits of due process.").  Instead, Plaintiffs urge the Court to infer that Mr. Ma "overs[aw] and manag[ed] every aspect of

---

[2] Citations to Ex. A through Ex. XX refer to the exhibits to Declaration of Stephen Blake in Support of Defendants' Motions to Dismiss, ECF No. 64.  Citations to Ex. S-A through Ex. S-I refer to the exhibits to the concurrently-filed Supplemental Declaration of Stephen Blake in Support of Defendants' Motions to Dismiss.

the Ant IPO" and somehow "caused" the alleged misstatements or omissions.  M-Opp. at 10–11.

But the Complaint at most alleges that Mr. Ma (i) at one point "recruit[ed] strategic investors"

who are not at issue in this case, AC ¶361, (ii) discussed his "business in the city" with a local

government official two years before the Ant IPO, *id.* ¶ 362, and (iii) attended a regulatory

meeting on the eve of the Ant IPO suspension, *id.* ¶ 203.  These allegations, even if tangentially

relevant to the Ant IPO, simply do not involve the "making, proposing, editing, or approving" of

the challenged statements.  *In re EHang Holding Ltd. Sec. Litig.*, No. 21CV1392, 2022 WL

17718546, at *6 (S.D.N.Y. Dec. 15, 2022) (Daniels, J.) (finding the lack of such allegations

"[c]ritical[]" in jurisdictional analysis); *accord In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d

731, 770 (S.D.N.Y. 2017).[3]  The inference Plaintiffs attempt to draw is thus impermissibly

speculative and unsupported.  *See ATSI Commus., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 103

(S.D.N.Y) (granting motion to dismiss where plaintiff "offered no specific allegations" and

relied on "speculative inferences").

    At the end of the day, what Plaintiffs are really arguing is that jurisdiction should be

premised on Mr. Ma's indirect control of Ant.  *See* M-Opp. at 10–11.  Such an argument can be

"readily disposed of," because "the Due Process Clause is 'made of sterner stuff' than a mere

allegation of control."  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005)

(citation omitted).[4]

---

[3]  Plaintiffs' attempt to distinguish *Braskem* is unpersuasive.  Plaintiffs claim that the court found no minimum contacts in *Braskem* because the complaint only made a conclusory allegation that the defendant had the power to influence and control the entity.  M-Opp. at 10 n.16.  Not so.  In *Braskem*, the complaint alleged that the defendant, a major shareholder, had (i) veto power over the company's corporate actions; (ii) power to appoint the company's CEO and CFO; and (iii) sole power to approve the company's business plan, and that the defendant participated in a bribery scheme aimed at influencing the company's share price.  *In re Braskem*, 246 F. Supp. 3d at 769–770.  The court nevertheless found those allegations insufficient for personal jurisdictional purpose: "Critical, however, is what the SAC does not allege.  It does not allege, concretely, that [the defendant] played any role in making, proposing, editing or approving [the company]'s public filings in the United States."  *Id.* at 770.

[4]  Plaintiffs also argue that Mr. Ma's trades of Alibaba ADSs establishes personal jurisdiction.  *See* M-Opp. at 8–9.  This allegation forms the basis of Plaintiffs' claim under Rule 10b5-1 (the "Insider Trading Claim") and "does not

**B.**     **The Alleged Fraud Falls Outside The Territorial Limit Of Section 10(b).**

Plaintiffs concede that Section 10(b) only applies to fraud "in connection with the purchase or sale of a security *on an American stock exchange*, and the purchase or sale of any other security *in the United States*."  *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 273 (2010) (emphases added); *see* M-Opp. at 13.  Plaintiffs also do not dispute that the Ant IPO involved the offering of a *foreign security* on a *foreign stock exchange*, thus falling outside Section 10(b)'s territorial limit.  *See* M-Opp. at 13–15.  Plaintiffs, however, take the position that Mr. Ma's alleged fraud pertained, not to the Ant IPO, but to Plaintiffs' alleged purchase of Alibaba ADSs, going as far as claiming that "[t]his case does not involve any securities transactions on a foreign exchange."  *Id.* at 13–14, n.22.  This argument defies credulity.

Indeed, Plaintiffs' argument is belied by their own allegations, which revolve, in every respect, around Ant's planned IPO on the HKSE.  For example, the Complaint alleges (i) that Ant failed to disclose, in connection with its IPO, certain risks regarding its regulatory compliance and pre-IPO investors, *see* AC ¶¶ 293–308, 347, 360, (ii) that Ant hid these risks to ensure the completion of the Ant IPO*, see id.* ¶¶ 302–08, 347, 360, and (iii) that these undisclosed risks did materialize, leading to the suspension of the Ant IPO, *see id.* ¶ 372.  By contrast, the allegations regarding Plaintiffs' Alibaba ADS purchases cannot be more boilerplate and remote from Mr. Ma's alleged fraud.  *See id.* ¶¶ 36–39 (alleging that Plaintiffs each "acquired Alibaba ADS at artificially inflated prices during the Class Period").

The Second Circuit's decision in *Schoenbaum*, which involved transactions of treasury

---

obviate the need to inquire whether jurisdiction exists over" the Ant Prospectuses Claims and the Scheme Liability Claim.  *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003); *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original) (quoting *SAS Grp., Inc.*, 245 F. Supp. 2d at 548) (holding that the plaintiffs must establish jurisdiction "with respect to *each* claim asserted").  Moreover, as discussed below, Plaintiff's Insider Trading Claim is premised on the same speculative and unsupported inferences of Mr. Ma's purported knowledge and involvement and as a result fails for similar reasons.  *See infra* at 28.

shares in Canada and common shares on a U.S. stock exchange, is instructive.  *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968), *abrogated on other grounds by Morrison*, 561 U.S. at 247.  The plaintiff, a U.S. shareholder, based his Section 10(b) claim on alleged use of material, non-public information in the Canadian treasury share sales.  *Id.* at 205–206. The Second Circuit concluded without hesitation that "the transactions which [the plaintiffs] alleged to violate the Act" were the treasury share sales, where the alleged fraud took place, as opposed to the U.S. common share purchases, where the alleged injury occurred.  *Id.* at 208.[5]  Similarly, the alleged fraud in this case took place in, and is thus in connection with, Ant's IPO on the HKSE.

Indeed, Plaintiffs' Section 10(b) claim alleging misrepresentations and/or omissions in a non-U.S. issuer's overseas IPO filings with a foreign securities regulator is, to Defendants' knowledge, unprecedented.  Such a claim represents an attempt to extend the private cause of action under Section 10(b) "beyond its present boundaries," against which the Supreme Court specifically warned.  *Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*, 552 U.S. 148, 165 (2008).  If permitted, it would also interfere with "foreign countries['] regulat[ion] [of] their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction," a key policy consideration underlying the Supreme Court's *Morrison* decision.  561 U.S. at 269.[6]

---

[5]  The *Schoenbaum* court went on to hold that the fraud was within the territorial limit of Section 10(b) because, under the Second Circuit's pre-*Morrison* "effects test," the alleged fraud in connection with the Canadian treasury share sales were "detrimental to the interests of American investors."  405 F.2d at 208.  The Supreme Court rejected the "effects test" in *Morrison*.  *See* M-MTD at 11 (citing *Morrison*, 561 U.S. at 255–70).

[6]  Plaintiffs claim that their extraterritorial Scheme Liability Claim and Insider Trading Claim should be spared from dismissal because, according to Plaintiffs, "neither sets of claims are based on the challenged statements in the [HKSE] [P]rospectuses."  M-Opp. at 14–15.  This assertion is directly contradicted by the allegations in the Complaint.  *See* AC ¶ 313 (basing the Scheme Liability Claim on the HKSE Prospectuses' alleged "omi[ssion] [of] the identity of the hidden investors"), ¶ 368 (alleging Mr. Ma used information omitted from the HKSE in trading Alibaba ADSs).  In any event, *Morrison*'s holding is not limited to claims under Rule 10b-5(b), but instead applies to Section 10(b) in its entirety, including claims under Rules 10b-5(a) and (c) and 10b5-1(a).  *See Morrison*, 561 U.S. at 273 (defining "Section 10(b)['s] reach[] [of] the use of a manipulative or deceptive device or contrivance").

C.      **Plaintiffs Have No Standing To Challenge Ant's HKSE Prospectuses.**

Plaintiffs claim that they have standing to sue Mr. Ma simply "because they are actual purchasers of [Alibaba] securities." M-Opp. at 15. Section 10(b) claims, however, cannot be premised on the purchase of just *any* securities. *See* M-MTD at 12–13. Plaintiffs must have "at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975). In other words, Plaintiffs must be "purchasers or sellers of securities *about which a misstatement was made*" in order to have standing to sue under Section 10(b). *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022) ("*Frutarom*") (emphasis added). Here, the challenged disclosures were not about Alibaba ADS—the securities Plaintiffs allegedly purchased. They were instead made by *Ant* in connection with *Ant*'s HKSE IPO and related to *Ant*'s regulatory environment and investors. *See* AC ¶¶ 278–308. "Plaintiffs did not purchase the securities about which misstatements were made, so they did not have standing to sue under Section 10(b) or Rule 10b-5." *Frutarom*, 54 F.4th at 89.[7]

Plaintiffs argue that they nevertheless had standing to challenge Ant's disclosures because "Ant and Alibaba are highly related companies" and "Alibaba's value is directly and materially linked to Ant's value." M-Opp. at 16. The Second Circuit recently rejected the same argument as "meritless," holding that "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies." *Frutarom*, 54 F.4th at 88.[8] *Turquoise Hill* does not support Plaintiffs' position, either. Although the court in that case

---

[7] Indeed, as Judge Buchwald noted, there is not a single case "in the 16-plus years since *Nortel* in which a court in this Circuit has sustained a Section 10(b) lawsuit by plaintiffs against a company whose stock they never purchased, sold, or had some other type of a direct investment interest in for misrepresentations the company made about itself." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19CV7536, 2021 WL 1199035, at *31 (S.D.N.Y. Mar. 30, 2021) ("*IFF*"), *aff'd sub nom. Frutarom*, 54 F.4th 82.

[8] The Second Circuit explained that "judicially created private rights of actions should be construed narrowly," and

noted the defendant's "substantial connection" to the issuer whose securities the plaintiffs purchased, it eventually found that the plaintiffs had standing because "more importantly, [the defendant] made statements *directly about the issuer's own securities*," as opposed to "self-referential" statements about the defendant.  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20CV8585, 2022 WL 4085677, at \*17 (S.D.N.Y. Sept. 2, 2022) (emphasis in original).  The challenged Ant disclosures are indisputably self-referential.[9]

Hedging their position, Plaintiffs argue that even if they do not have standing to sue Ant based on its self-referential statements, they have standing to sue Mr. Ma based on the same statements.  *See* M-Opp. at 16.  Plaintiffs identify no precedent supporting this position.  In fact, this District has granted, and the Second Circuit has affirmed, dismissal of similarly defective claims against both corporate and individual defendants based on the same standing requirement.  *See Frutarom*, 54 F.4th at 85, 89 (affirming dismissal of Section 10(b) claims asserted against Frutarom and "four of its officers" because the plaintiffs did not purchase Frutarom securities).  The Court should reject Plaintiffs' attempt to circumvent the statutory standing requirement by, on the one hand, claiming Mr. Ma is the "maker" of the challenged Ant statements, *see* M-Opp. at 17–19, and, on the other hand, arguing that Mr. Ma and Ant should be treated differently for standing purposes with regard to the very same disclosures.[10]

---

that adopting a relationship-based test for standing "would begin exactly the 'endless case-by-case erosion' of the purchaser-seller rule about which *Blue Chip Stamps* warned."  *Frutarom*, 54 F.4th at 87 (quoting *Blue Chip Stamps*, 421 U.S. at 755).  The statutory standing requirement "entails a 'formal' and not a 'functional' inquiry" so that courts would not employ a factual analysis to every new group of potential plaintiffs.  *Id.* (citing *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1283 (11th Cir. 2007)).

[9]  Plaintiffs' citation to *In re NYSE Specialists Sec. Litig.* is also misplaced.  *See* M-Opp. at 15.  As the Second Circuit recently noted, *In re NYSE* permitted investors to sue "underwriters, brokers, bankers, and non-issuer sellers" if those entities made material misstatements about the issuer.  503 F.3d 89, 102 (2d Cir. 2007).  But that does not change the requirement that the misstatements still must concern the issuer whose securities the plaintiffs bought.  *See Frutarom*, 54 F.4th at 87–88.

[10]  Plaintiffs' one-sentence argument that the standing requirement does not apply to the Scheme Liability Claim and the Insider Trading Claim, even though those claims are predicated on the same allegations as the Ant Prospectuses Claims, is without support.  *See* M-Opp. at 17.  In fact*,* the standing requirement set forth under *Blue Chip Stamps*

### D.      Mr. Ma Is Not A Maker Of The Challenged Disclosures.

As Mr. Ma's opening brief made clear, he is not a maker of Ant's challenged statements

in the HKSE Prospectuses under the Supreme Court's holding in *Janus* because the well-pleaded

fact do not allege he had "ultimate authority *over the statement[s]*" at issue.  *See* M-MTD at 13

(quoting *Janus Capita Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011))

(emphasis added).  Indeed, Mr. Ma was neither a director nor an executive of Ant, and the

Complaint undisputedly does not allege that Mr. Ma "directly wrote the [challenged statements],

controlled what the authors put into the [statements,] or even saw them before their publication,"

the absence of which prevents a finding that Mr. Ma had "ultimate authority" over the challenged

statements.  *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 104 (2d Cir. 2022).

Plaintiffs give lip service to *Janus*, but clearly misapply it by continuing to argue that Mr.

Ma is a maker of the challenged Ant statements because of his control of, not the statements

themselves, but Ant.  *See* M-Opp. at 18 (equating Mr. Ma's "'ultimate control' over Ant" with

"*Janus*'s ultimate authority" standard").  "Plaintiffs' attempt to avoid *Janus* by conflating

shareholder control with 'ultimate authority' is unavailing."  *In re Optimal U.S. Litig.*, No.

10CV4095, 2011 WL 4908745, at *5 (S.D.N.Y. Oct. 14, 2011).[11]  Indeed, Plaintiffs' "maker"

argument resembles control person liability, which "Congress has already created expressly

---

applies to "Rule 10b-5" claims as a whole and does not distinguish between misrepresentation-based allegations and other allegations.  *See Blue Chip Stamps*, 421 U.S. at 754; *see also In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 349 n.11 (S.D.N.Y. 2005) (finding that plaintiffs lacked standing to state a scheme liability claim under the purchaser-seller rule because they were not purchaser "of the securities that form[ed] the basis of the … deceptive conduct"); *In re Turquoise Hill*, 2022 WL 4085677 at *14–18 (citations omitted) (conducting the same standing analysis for both misrepresentation and scheme liability claims).

[11]  Similarly, Plaintiffs ask the Court to infer that Mr. Ma, because of his indirect control of approximately 50.5% of Ant's shares (*see* AC ¶ 314), controlled "[t]he decision to take Ant public, the terms of the IPO," and the "issuance of new shares," such that the "disclosures made in the [HKSE] [P]prospectuses" must have "hinged," in unspecified ways, "on Ma's say-so."  M-Opp. at 18 & n.26.  This inference is unsupported, because, among others, "the issuance of any types of shares" by Ant must be approved by "more than two-thirds of the voting rights," which Mr. Ma is not alleged to control.  Ex. S-E at V-11.

elsewhere" in Section 20(a). *Janus*, 564 U.S. at 146. Significantly, "the 'control' inquiry under [S]ection 20(a) is more forgiving than the 'maker' inquiry under *Janus* and Rule 10b-5." *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. 15CV8574, 2017 WL 3187688, at *7 (C.D. Cal. Jan. 17, 2017); *see also In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 254 n.11 (S.D.N.Y. 2018) ("[T]his Court's finding that Titus did not have 'ultimate authority' to 'make' the misstatements and omissions at issue does not preclude a finding that Plaintiffs have sufficiently pleaded control as to Titus.").[12]

The Opposition also argues that Mr. Ma must be "responsible" for challenged statements because no one signed the HKSE Prospectuses and "several of the misstatements in the prospectuses relate directly to Ma." M-Opp. at 18. These arguments, however, are not relevant to the pertinent inquiry under *Janus*. Moreover, Plaintiffs fail to mention that Ant's Directors, not Mr. Ma, "confirm[ed]" the HKSE Prospectuses' "accura[cy] and complete[ness]" and "accept[ed] full responsibility" for the challenged statements therein. Ex. S-E at 117; *see also infra* at 19 regarding the alleged Mr. Ma-related misrepresentation.

## II.   PLAINTIFFS FAIL TO STATE THE ANT PROSPECTUSES CLAIM.

### A.   Plaintiffs Fail To Allege That The Challenged Statements Are False Or Misleading.

#### 1.   The Regulatory Claim Is Contradicted By The Underlying Regulations.

The Complaint alleges that the HKSE Prospectuses failed to disclosed Ant's purported

---

[12] The cases on which Plaintiffs rely are inapposite. *See* M-Opp. at 18, n.27. In *Roseville*, the defendant was "the sole owner of outstanding stock" in the issuer, had "direct control over all corporate transactions" including when and whether to sell the shares being sold, and, more importantly, agreed to indemnify the issuer for material misstatements or omissions in the challenged registration statement, which sufficiently indicate that the defendant reviewed and approved the disclosures. *City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417–18 (S.D.N.Y. 2011). *IOP* is also distinguishable, as the alleged misrepresentations there were made in a contract that the defendant negotiated and signed. *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 474 (S.D.N.Y. 2015).

violations of two PRC regulations—the *Bank Measures* and the *FHC Rules*.  AC ¶¶ 287–90,

298–306.  Plaintiffs have now abandoned their claim based on the *Bank Measures*, which should

thus be dismissed.  *See* ECF No. 74 ("A-Opp.") at 28–31 (discussing only the *FHC Rules*); *see*

*also* M-MTD at 15 (explaining that the *Bank Measures* are not alleged to, and do not, apply to

Ant).  Plaintiffs instead press that, unbeknownst to investors, Ant violated the *FHC Rules* at the

time it issued the HKSE Prospectuses.  *See* A-Opp. at 29–31.  In particular, Plaintiffs claim that

"[u]nder the [*FHC Rules*] Ant was required to have RMB500 billion in assets" and "Ant had

only RMB315.8 billion."[13]  *Id.* at 8–9, 29.  This claim is not well-pleaded.

  ***First***, Plaintiffs' claim is flatly contradicted by the *FHC Rules*, which do not, as Plaintiffs

claim, impose a RMB500-billion-in-assets requirement.  *See* AC ¶¶ 200–01 (basing the

allegation purely on a news article without identifying any specific provisions in the *FHC Rules*).

Instead, the *FHC Rules* only reference RMB500 in providing that, for certain types of financial

institutions, "an application should be made to form a financial holding company" if, among

other things, "the total assets of the financial institutions are not less than [RMB]500 billion."

Ex. S-F ¶¶ I.3, I.3(1); *see also* Ex. S-G, Arts. 6, 6(1).  In other words, a minimum of RMB500

billion in assets is not a requirement, but a criterion in determining the applicability of the *FHC*

*Rules*.  Plaintiffs' claim that Ant violated the *FHC Rules* because of an "asset shortfall" (A-Opp.

at 3, 29, 32) is thus "contradicted . . . by documents upon which it[] . . . rel[ies]," compelling

dismissal.  *In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001);

---

[13]  PRC regulators published, on September 11, 2020, two regulatory documents concerning financial holding companies—the *Decision of the State Council on Implementing Access Administration of Financial Holding Companies* (the "*FHC Decision*") and the companion *Interim Measures for the Supervision and Administration of Financial Holding Companies* (the "*FHC Measures*"), which implements the *FHC Decision*.  *See* Ex. EE at 56, IV-18.  Plaintiffs define the term "FHC Regs," in general terms, as "Financial Holding Company Regulations announced on September 11, 2020."  A-Opp. at vii.  To avoid confusion and for completeness, Defendants refer to the *FHC Decision* and the *FHC Measures* collectively as the *FHC Rules*.

*see also Ancile Inv. Co. Ltd. v. Arher Daniels Midland Co.*, 538 F. App'x 19, 20–22 (2d Cir. 2013) ("[T]rial courts[] may find and apply foreign law" under Fed. R. Civ. P. 44.1).

**Second**, Plaintiffs' claim that Ant violated the *FHC Rules* is entirely based on contemporaneous public information, including Ant's own disclosures, which renders Plaintiffs' claim illogical.  Plaintiffs claim that the *FHC Rules*, which the PRC regulators publicly announced, imposed a RMB500 billion capital requirement.  *See* A-Opp. at 8–9; Ex. EE at 56, IV-18 (disclosing the *FHC Rules* and associated risks).  Plaintiffs also claim that the HKSE Prospectuses disclosed that Ant "had only RMB315.8 billion" in assets and thus did not meet this requirement.  A-Opp. at 9.  As a result, assuming *arguendo* that Ant had violated the *FHC Rules* because of an asset shortfall (which as explained above is not well-pleaded), it would still not have violated U.S. securities laws because it disclosed the purported violation.  *See Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020) (granting dismissal because the defendant "warned investors of exactly the risk the plaintiffs claim was not disclosed") (citation omitted).[14]

**Finally**, the PRC regulators' initial approval of the Ant IPO after the promulgation of the *FHC Rules* further renders Plaintiffs' claim implausible.  Ant publicly disclosed its total assets in August 2020.  *See* Ex. S-H at I-8.  PRC regulators promulgated the *FHC Rules* in September 2020, with an effective date of November 1, 2020.  *See* AC ¶¶ 304–05.  With knowledge of both the *FHC Rules* and Ant's total assets, the regulators then **approved** the Ant IPO in October 2020, before the IPO was subsequently suspended On November 3, 2022.  *See* M-MTD at 5, 7. Plaintiffs insinuate that the regulators approved the Ant IPO notwithstanding Ant's "massive

---

[14]  To the extent Plaintiffs argue that Ant should have additionally and explicitly accused itself of violating the *FHC Rules*, *see* A-Opp. at 30, Ant had no such duty.  "The federal securities laws do not require a company to accuse itself of wrongdoing." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15 (S.D.N.Y. 2016); *see also Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 95 (2d Cir. 2021) (holding that an issuer does "not have a duty to disclose uncharged, unadjudicated wrongdoing").

$27.5 billion asset deficiency," simply because the *FHC Rules* had not taken effect, even though the regulators knew that the *FHC Rules* would take effect, and Ant would thus be in violation, by the time of the IPO.  A-Opp. at 9–10.  Plaintiffs' speculation defies common sense.

### 2.   **Plaintiffs' Ant Investor Claim Is Speculative And Implausible.**

#### i.   Plaintiffs' New Theory For the Ant Investor Claim Is—Like The Original Theory Before It—Contradicted By Undisputed Fact.

The lynchpin of Plaintiffs' Ant Investor Claim is that Mr. Ma successfully concealed pre-IPO Ant investment made by persons affiliated with the so-called Shanghai faction, until such investment was revealed in a PRC government investigation, leading to the abrupt suspension of the Ant IPO.  *See* AC ¶ 205.  As Defendant pointed out, however, the supposed Shanghai faction's investment in Ant was, in fact, publicly reported by the media and disclosed by Ant, directly contradicting the very foundation of Plaintiffs' claim.  *See* M-MTD at 15–16.

Unable to reconcile the undisputed public knowledge of the supposed Shanghai faction's investment in Ant with their theory of fraud, Plaintiffs have hatched another new theory, now claiming that the PRC government halted the Ant IPO after discovering that the Shanghai faction held, not only economic interest in Ant through "offshore shares"—which Plaintiffs concede was publicly known, but also voting power through "onshore shares"—which Plaintiffs allege was concealed.  *See* M-Opp. at 25.  This new theory cannot save Plaintiffs' claim, because it "does not appear anywhere" in the Complaint or the Feb. 16 Article upon which they rely "and did not enter the case until [Plaintiffs] mentioned it for the first time in [their] opposition memoranda to the motion to dismiss."  *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  Indeed, the Ant Investor Claim, as pleaded in the Complaint and the Feb. 16 Article, is premised on the PRC government's alleged concern over "who stood to gain most from" the Ant IPO, not who controlled Ant.  AC ¶ 240; *see also* ECF No. 55-9 at 6 (claiming that the PRC government

"had little interest in having the Ant IPO funnel enormously lucrative financial stakes to" the Shanghai faction).

In any event, the Complaint alleges that Mr. Ma already controlled approximately 50.52% of Ant's voting power.  *See* AC ¶¶ 170, 314.  Messrs. Jiang's and Li's purported undisclosed voting power—no more than 0.92% and 1.29%, respectively (*see* AC ¶¶ 222, 224)—is not alleged to have any significance.  Plaintiffs thus fail to plead that the alleged omission thereof would mislead any reasonable investor.  *See Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 485 (S.D.N.Y. 2021) ("The touchstone of whether a statement is misleading under federal securities laws is whether a reasonable investor would find it to be so.").[15]

      ii.    <u>Plaintiffs Fail To Corroborate The Feb. 16 Article On Which The Ant Investor Claim Is Based.</u>

Plaintiffs concede that "anonymously sourced" "third-party allegations," such as those in the Feb. 16 Article, cannot form the basis of a well-pleaded securities fraud claim unless the sources were "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" or if the allegations are corroborated by other well-pleaded facts.  M-Opp. at 20 (citing *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000)).

---

[15] Plaintiffs other arguments can be easily disposed of.  ***First***, Plaintiffs insinuate that the supposedly undisclosed "onshore" investment was of a larger amount than the disclosed "offshore" investment.  M-Opp. at 25.  This argument is belied by Plaintiffs' admission that they have not pleaded "the specific financial interests" the Shanghai faction investors supposedly held "onshore" in secrecy.  *Id.* at 27.  ***Second***, Plaintiffs appear to suggest that investment from "offshore" investors may be illegal.  *See id.* at 25 (claiming that "offshore" investment was "restricted" in unspecified ways).  The fact that Ant had a large number of offshore investors and publicly disclosed those investments, however, conclusively contradicts this vague and unsupported allegation.  ***Third***, Plaintiffs argue that it was the investors' use of certain "investment vehicles" or "structure," rather than their "identity," that led to the suspension of the Ant IPO.  *Id.* at 25–26.  But it was public knowledge that many institutions and individuals invested in Ant through the investment funds at issue and their use of those "investment vehicles" is not alleged to have resulted in the suspension of the Ant IPO.  *See* Exs. VV1–4.  ***Finally***, Plaintiffs attempt to dodge the issue, claiming that the undisputed public knowledge of the so-called Shanghai faction's Ant investment relates solely to loss causation.  M-Opp. at 27.  Not so; it directly contradicts Plaintiffs' core falsity allegation that such investment was concealed.

Plaintiffs do not contest that the Feb. 16 Article's generic description of its anonymous sources as "officials and government advisors" or "people familiar with the investigation" are not sufficiently particular.  AC, Ex. 9 at 1, 6–7.  Indeed, this District has repeatedly rejected similar, or even more particular, descriptions.  *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623 (S.D.N.Y. 2017) (declining to "accord much weight" to allegation based on a WSJ article whose sources were "people familiar with the matter"); *City of Brockton Ret. Sys. v. Avon Prods.*, No. 11CV4665, 2014 WL 4832321, at *23 (S.D.N.Y Sept. 28, 2014) (holding that a WSJ article's "vague description" of its source as "a person familiar with the matter" "provide[d] no basis for the Court to evaluate its reliability"); *Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184–85 (S.D.N.Y. 2000) (finding a WSJ article's description of its source as an "unnamed Propaganda Bureau official from the local Communist Party" "vague and "unconvincing").[16]

Instead, Plaintiffs argue that they corroborated "key portions" of the Feb. 16 Article "[t]hrough SAMR records and data."  M-Opp. at 22.  Plaintiffs, however, demonstrably fail to corroborate the article's core allegation that Messrs. Jiang and Li made secret investment in Ant.[17]

***First***, Plaintiffs have failed to corroborate that Mr. Jiang owned an indirect interest in the Ant investee Beijing Jingguan.  The Feb. 16 Article claims that Mr. Jiang's private equity firm

---

[16]  The cases referenced in the Opposition (M-Opp. at 23–24, n.36) are inapposite as they involve third-party reports whose sources were both adequately described and corroborated.  *See, e.g.*, *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13CV214, 2014 WL 285103, at *3–4 (S.D.N.Y. Jan. 27, 2014) (allegation regarding certain fuel facilities based on interviews with residents living near the facilities and corroborated by pictures and surveillance footages); *Lewy v. Skypeople Fruit Juice, Inc.*, No. 11CV2700, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 7, 2012) (allegations supported by "affidavits from three Chinese lawyers" and corroborated by government records); *compare Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 804 (S.D.N.Y. 2020) (finding "general statements credited to anonymous interviewees" not reliable).

[17]  Plaintiffs do not claim that they corroborated another key allegation in the Feb. 16 Article—that the PRC government's discovery of Messrs. Jiang's and Li's supposed investment led to the suspension of the Ant IPO.

Boyu held, through Shanghai Tiancen, an unspecified ownership interest in Beijing Jingguan, a

0.92% Ant shareholder, as shown in Figure 1A (reproduced from the Feb. 16 Article and the

Complaint) below.  *See* AC ¶ 338.  The Feb. 16 Article does not, as Plaintiffs allege, base this

allegation on "interviews with multiple individuals with insider knowledge."  AC ¶ 345.  Instead,

the Feb. 16 Article attributes its conclusion to only unspecified "commercial records."  AC, Ex. 9

at 5.



**Fig. 1A** (AC ¶ 338)           **Fig. 1B** (AC ¶ 341, with dashed line added)

Plaintiffs' purported corroboration focuses on the relationship between Shanghai Tiancen

and Beijing Jingguan, as shown in Figure 1B (reproduced from the Complaint) above.  *See id.*

¶¶ 339–41.  As to the critical link between Boyu (and by extension Mr. Jiang) and Shanghai

Tiancen, Plaintiffs rely on circumstantial evidence such as shared email domains and telephone

numbers.  *See id.* ¶¶ 342–45.  But such evidence at most shows, in Plaintiffs' own words, "contractual arrangements," such as those between a private equity firm and its affiliated funds, but not economic ownership.  *Id.* ¶ 215.  Plaintiffs thus fail to corroborate Mr. Jiang's alleged investment in Ant.

  ***Second***, Plaintiffs have failed to corroborate that Mr. Li had an indirect economic interest in the Ant investee Zhongfu Equity.  The Feb. 16 Article claims Mr. Li's partially-owned entity Beijing Zhaode, through Tibet Hongde, owned Zhongfu Equity and its 1.29% interest in Ant, as shown in Figure 2A (reproduced from the Feb. 16 Article and the Complaint) below.  *See* AC ¶ 348.  The Feb. 16 Article does not identify any factual basis of this claim.  *See* AC, Ex. 9 at 5.



   **Fig. 2A** (AC ¶ 348)     **Fig. 2B** (AC ¶ 356, with dashed line added)[18]

---

[18]  Plaintiffs also claim that that Alibaba's and Tibet Hongde's indirect common investment in Zhongfu Equity, a third-party managed fund, somehow evidences Mr. Li's ownership interest in Tibet Hongde.  *See* M-Opp. at 23 n.35, 28.  But this allegation simply has nothing to do with Mr. Li.

As shown in Figure 2B (reproduced from the Complaint) above, Plaintiffs' purported corroboration mostly does not address Beijing Zhaode's alleged ownership interest in Tibet Hongde—a key link between Mr. Li and his supposed Ant investment.  *See id.* ¶¶ 349–50. Indeed, Plaintiffs claim that Beijing Zhaode and Tibet Hongde both invested in another, unrelated company.  *See id.* ¶ 353(a); M-Opp. at 23.  The alleged common investment certainly cannot show that Beijing Zhaode, or by extension Mr. Li, had "control over" or "financial interest in" Tibet Hongde, or by extension Zhongfu Equity's 1.29% interest in Ant.  AC ¶ 354. Plaintiffs thus also fail to corroborate Mr. Li's alleged investment in Ant.[19]

### iii.      Plaintiffs Fail To Allege That Qizhan Is A Related Party.

Plaintiffs continue to claim that Qizhan is not, as Ant disclosed, an "independent third party," but is instead a "related party" to Alibaba, Ant, And Mr. Ma.  AC ¶ 359; M-Opp. at 28. In particular, Plaintiffs insinuate that Qizhan is related to Ant and Mr. Ma because Junhan, an entity indirectly controlled by Mr. Ma, sold 4.61% of existing Ant shares to Qizhan as a part of Ant's 2015 equity financing round.  *See* AC ¶¶ 318–19; M-Opp. at 28.  But this publicly disclosed transaction renders Qizhan a counter-party, not a related entity.[20]

---

[19]  Plaintiffs also claim that certain other news articles corroborate the Feb. 16 Article.  *See* M-Opp. at 22.  They do not, as they either simply repeat, with attribution, the statements made in the Feb. 16 Article itself (*see, e.g.*, ECF. Nos. 76-13, 76-16–22) or do not mention the purported secret Ant investment at all (*see, e.g.*, ECF. Nos. 76-8–11, 76-14–15, 76-25; AC ¶ 186 n.101).

Moreover, Plaintiffs speculate that Messrs. Jiang's or Li's "silence" in the wake of the Feb. 16 Article indicates the article's reliability.  M-Opp. at 22.  This assertion is not supported by Plaintiffs' case law, which involved ***issuers' disclosure obligations*** in response to short-seller allegations.  *See id.* at 22 & n.33.

[20]  Plaintiffs also claim that Qizhan is related to Alibaba because Alibaba, together with Tibet Hongde, purportedly "hold a controlling interest in" Zhongfu Equity, which according to Plaintiffs is related to Qizhan because the two investment funds share the same manager.  *See* M-Opp. at 28.  This assertion is not well-pleaded and is contradicted by Plaintiffs' admission that Zhongfu Equity is controlled by its third-party manager, not its indirect limited partner Alibaba.  *See id.*; *see also* M-MTD at 17–18 n.15.

### B.      Plaintiffs Fail To Plead A Strong Inference Of Scienter.

At the outset, Plaintiffs essentially concede their failure to allege Mr. Ma's scienter for

the Ant Regulatory Claim.  Plaintiffs primarily argue that "Ma is alleged to have exercised

control over both Ant and Alibaba during the time that Ant would have been preparing its IPO

Prospectuses."  A-Opp. at 32.  But, as a matter of law, Mr. Ma's scienter cannot be assumed

from his alleged control of Ant.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.

1993) ("[T]he mere fact that the Directors were controlling persons . . . does not link them to the

statements; the plaintiffs also had to allege that the Directors *personally* knew of, or participated

in, the fraud.") (emphasis in original).  Plaintiffs also fail to sufficiently plead scienter for the

Ant Investor Claim, as discussed below.

### 1.      Plaintiffs Fail To Adequately Allege Motive And Opportunity.

*Ant IPO:*  Plaintiffs argue that Mr. Ma had "an enormous financial incentive" to

complete the Ant IPO at all costs, because of his 11% interest in Ant.  M-Opp. at 34 (claiming

that the "completion of the IPO would," in unspecified ways, "have provided Ma with a huge

financial benefit"); *see also* A-Opp. at 32–33 (similar argument for the Ant Regulatory Claim).

But Mr. Ma undisputedly was not selling any Ant shares in the Ant IPO.  Plaintiffs thus at most

allege a "general interest in maintaining a high stock price and successfully closing the [IPO],"

which is not a motive to commit fraud.  *First N.Y. Sec. L.L.C. v. United Rentals, Inc.*, 648 F.

Supp. 2d 256, 268–69 (D. Conn. 2009) (finding that plaintiffs failed to allege "concrete and

personal benefit" because the defendants were not alleged to "contrive[] to sell their own shares

before the allegedly material information became public") (citing *Novak*, 216 F.3d at 307–08).

Plaintiffs insinuate that, even though Mr. Ma was not selling his Ant shares in the IPO

and instead had agreed to a 12-month lock-up period, he ***could*** do so after the lock-up period

expires.  *See* M-Opp. at 32–33.  But Plaintiffs do not allege that Mr. Ma had any such plan or

intention, absent which stock ownership "does not provide sufficient motive to sustain the pleading burden under Rule 9(b)." *Goplen v. 51job, Inc*., 453 F. Supp. 2d 759, 772 (S.D.N.Y. 2006) ("Under Second Circuit case law, mere ownership of company stock is insufficient to show motive . . . ."). Moreover, Plaintiffs' argument is fundamentally in tension with their allegation that Mr. Ma knowingly engaged in a race against time to complete the Ant IPO before Chinese regulators laid siege to Ant's business. *See* M-Opp. at 29. Anyone in such a race against time would have certainly planned to sell their Ant shares in the IPO, as opposed to, as Plaintiffs now suggest, waiting for at least another year.

 *Alibaba ADS Sales:* Mr. Ma's sale of 1% of his Alibaba holdings upon his retirement from Alibaba also does not give rise to a strong inference of scienter, because the sale of such a small percentage of his holdings is "not unusual." *In re EHang Holding*, 2022 WL 17718546 at *10 (rejecting scienter allegation based on sale of 1.21% of holdings); *see also* M-MTD at 19– 20. Plaintiffs argue that Mr. Ma's sales, although *de minimis* in percentage, was sufficiently large in absolute amount to bolster the inference of scienter. M-Opp. at 35–36 (citing *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004)). The defendant in *Nursing Home*, however, made his "***first stock sale in five years***." *Nursing Home*, 380 F.3d at 1232 (emphasis added) (giving "less weight" to the percentage of shares sold because "timing of the stock sales" and the "inconsistency" of sales were suspicious). By contrast, Mr. Ma has sold a comparable amount of shares each year since he announced he was transitioning away from Alibaba. *See* M-MTD at 20. Sales made following "consistent patterns of trading" are not suspicious. *In re Philip Morris Int'l Inc., Sec. Litig.,* 437 F. Supp. 3d 329, 359 (S.D.N.Y. 2020). In addition, Plaintiffs concede that they do not identify Mr. Ma's net profit from the stock sale (M-Opp. at 36 n.48) and Mr. Ma was "the sole insider plausibly alleged to be selling," both of

which "strongly weigh against finding [Mr. Ma]'s stock sales to be unusual." *In re EHang Holding*, 2022 WL 17718546 at *10.[21]

> ### 2. The Complaint Includes No Circumstantial Evidence Of Conscious Misbehavior Or Recklessness.

Similar to what this Court recently observed in another case, "Plaintiffs have not alleged any facts indicating that [Mr. Ma was] involved in the drafting of the challenged [HKSE Prospectus] disclosures," undercutting any scienter allegation. *In re EHang Holding*, 2022 WL 17718546 at *11. Plaintiffs have also "not alleged there were any specific reports or statements, or that [Mr. Ma] had access to such reports, that would demonstrate the falsity of [Ant's] allegedly misleading statements." *Id.* Instead, Plaintiffs ask the Court to draw a chain of inferences, none of which is supported by particularized factual pleading.

***First***, the Opposition asks the Court to infer that Beijing Jingguan and Zhongfu Equity—the two investment funds through which Messrs. Jiang and Li allegedly invested in Ant—were "designed for the very purpose of disguising the investments of Jiang and Li." M-Opp. at 31. Plaintiffs' attempt to mischaracterize the two funds' commonly-used multi-level limited partnership structure is unsupported. Indeed, Plaintiffs concede that, as disclosed in publicly-available SAMR records, each of the two funds at issue had at least dozens of investors who are not alleged to be affiliated with Mr. Jiang or Mr. Li.[22] *See* M-MTD at 17 n.14 & n.15; M-Opp. at 31. As a result, even if Messrs. Jiang and Li had invested in those funds (which as explained above is not well-pleaded), each of them would have be merely one of many investors in a

---

[21] Plaintiffs' assertion that Mr. Ma "synchronize[d] his retirement and sales with Alibaba's Investor Day" is not supported by well-pleaded factual allegations. M-Opp. at 37. Mr. Ma announced his planned retirement in September 2018, long before any of the relevant events took place. *See* Ex. DD at 1.

[22] Plaintiffs argue that the SAMR records "bolster[] the conclusion that these vehicles were designed to obfuscate and deceive," because they did not disclose each investor's "specific financial interests." M-Opp. at 31. Plaintiffs do not allege that the SAMR had a duty or practice of disclosing the particular holding of each fund investor; the absence of such disclosure thus cannot support Plaintiffs' allegation of fraud.

pooled investment vehicle.  This undisputed fact directly contradicts Plaintiffs' claim that the funds were specifically formed for Messrs. Jiang and Li for some nefarious purposes.

*Second*, Plaintiffs argue that because Mr. Ma allegedly "recruited strategic investors" for Ant, he must also have been involved in Messrs. Jiang and Li's alleged Ant investment.  *See* M-Opp. at 31.  The alleged "strategic investors," however, refer to a "national pension fund," a "sovereign-wealth fund," and certain insurance companies, not Messrs. Jiang and Li or any other individuals.  AC ¶ 361.  This allegation thus does not support the inference Plaintiffs ask the Court to draw.  Indeed, the Complaint includes no well-pleaded fact showing Mr. Ma attended any meetings, sent or received any communications, reviewed or signed any documents, or performed any other acts in connection with Messrs. Jiang's and Li's alleged Ant investment.[23]

*Finally*, Plaintiffs ask the Court to draw yet another inference—that Mr. Ma must have known that the Shanghai faction's investment could lead to the suspension of the Ant IPO.  M-Opp. at 33.  To support this inference, Plaintiffs point to a report that, in 2014, the local government shut down a club in which Mr. Ma allegedly invested.  M-Opp. at 33 (citing AC ¶ 331).  The report, however, indicates that the government shut down the club, not because of any supposed connection to the Shanghai faction, but because of its location "in the West Lake scenic area."  AC ¶ 331 (reporting that all similar clubs in the area were shut down).  Plaintiffs also rely on a vague comment allegedly made by a foreign venture capitalist in the early 2000s

---

[23] Plaintiffs also claim that Mr. Ma had "previous dealings and associations" with Messrs. Jiang and Li.  *See* M-Opp. at 32.  But the Complaint does not allege any interaction between Mr. Ma and Mr. Li.  *See* AC ¶ 331 (merely alleging that both invested in social clubs).  Similarly, although Mr. Jiang was allegedly involved in a transaction concerning Alibaba eight years before the Ant IPO, Plaintiffs do not allege any specific interaction Mr. Jiang had with Mr. Ma, either then or in connection with the Ant IPO.  *See id.* ¶ 325.  These tenuous allegations do not support the inference that Mr. Ma somehow handpicked Messrs. Jiang and Li as secret Ant investors.

Moreover, the Opposition claims that a Chinese government investigation into the Ant IPO approval process focused on Mr. Ma's role and thus, in unspecified ways, bolsters the inference of Mr. Ma's scienter.  M-Opp. at 33.  Not true.  The alleged investigation focused "on regulators . . ., local officials . . . and big state firms" and had no relation to Messrs. Jiang and Li.  ECF. No. 76-11 at 1.  Furthermore, Plaintiffs' claim that Mr. Ma or Alibaba somehow "assisted Li in structuring and cross funding the VIE" is not well-pleaded.  *See supra* at 22–23.

that "Jack is very politically savvy," M-Opp. at 33 (AC ¶ 361), but that comment does not implicate the Shanghai faction or otherwise support Plaintiffs' inference.

### 3.    Balancing Of Inferences Weighs Against A Finding Of Scienter.

Plaintiffs' scienter theory boils down to their claim that Mr. Ma, while fully aware of the danger the Shanghai faction investors posed to Ant and its IPO, took a gamble in hopes that the IPO could be completed quickly enough without the investments being discovered. *See* M-Opp. at 37. But their pleading offers no plausible reason why Mr. Ma, who was, according to Plaintiffs, "very politically savvy" about the purported "long-standing" "conflicts" between the PRC administration and the Shanghai faction, AC ¶¶ 333–34, 361, would seek Shanghai faction investors for Ant in the first place, notwithstanding the alleged significant political risk. The concededly small shareholdings alleged owned by these individuals would not have been critical to funding Ant. Also, although Mr. Ma was allegedly racing against time to complete the Ant IPO, he did not rush to sell any Ant shares, but instead agreed to lock up his shares for a year. If the PRC regulators could, as Plaintiffs allege, suspend the Ant IPO at will upon the discovery of the Shanghai faction investors before the IPO, they could presumably take similar, if not more, draconian actions towards Ant upon making that same discovery during Mr. Ma's lock-up period, rendering Plaintiffs' theory implausible.[24]

As such, the inferences that Plaintiffs advocate—that Mr. Ma hand-picked Shanghai faction investors, with no apparent upside but a material risk to the completion of the important Ant IPO—is not cogent. The much stronger inference is that the Ant IPO was on track to

---

[24]  Plaintiffs' reliance on *Makor* and *Boeing* is misplaced. *See* M-Opp. at 37 & n.51. *Makor* and *Boeing* both involved an undisclosed risk that would dissipate if not immediately revealed. *See Makor Issues & Rights, Ltd. v. Tellab, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (sales slowing down that "would right itself"); *In re Boeing Co. Aircraft Sec. Litig.*, No. 19CV02394, 2022 WL 3595058 at *27 (N.D. Ill. Aug. 23, 2022) (damning information that, if disclosed later, would cause less reputational harm because of anticipated good news). Here, Plaintiffs do not claim that the alleged risk would dissipate after the Ant IPO.

completion until the PRC government's unexpected issuance of a new regulation on the day

before the suspension.  *See* M-MTD at 21.

## III.   PLAINTIFFS' ALTERNATIVE SECTION 10(b) CLAIMS FAIL FOR THE SAME AND ADDITIONAL REASONS.

### A.   The Scheme Liability Claim Fails Because It Merely Repackages The Ant Prospectuses Claim.

"[W]here the primary purpose and effect of a purported scheme is to make a public

misrepresentation or omission, courts have routinely rejected the [plaintiff's] attempt to bypass

the elements necessary to impose 'misstatement' liability . . . by labeling the alleged misconduct

a 'scheme' rather than a 'misstatement.'"  *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188,

216 (S.D.N.Y. 2020) (citing *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)).  To

manufacture a difference between the Ant Prospectuses Claim and the Scheme Liability Claim,

Plaintiffs claim, for the first time in their Opposition, that the Scheme Liability Claim is

premised on Mr. Ma's "actions in disseminating the false statements in the [HKSE]

[P]rospectuses" and is thus permitted under *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).  M-Opp. at

40.  This claim fails because the Complaint does not allege Mr. Ma disseminated the HKSE

Prospectuses, but instead claim that "Defendant Ma is a maker of statements" therein.  AC

¶¶ 279, 294.  Plaintiffs are "not permitted to interpose new factual allegations or a new legal

theory in opposing a motion to dismiss."  *Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429

(E.D.N.Y. 2017); s*ee also Wright*, 152 F.3d at 178 (affirming dismissal of legal theory that "does

not appear anywhere in the amended complaint and did not enter the case until [the plaintiff]

mentioned it for the first time in her opposition memoranda to the motion to dismiss").[25]

---

[25]  Indeed, the only conduct Plaintiffs identify as "amount[ing] to the 'dissemination' of those statements [in the HKSE Prospectuses] under *Lorenzo*" is Mr. Ma's alleged "solicit[ation] [of] regulatory approval of the Ant IPO." M-Opp. at 39.  Plaintiffs, however, do not allege that Mr. Ma sent, discussed, or otherwise disseminated any portion of the HKSE Prospectuses to PRC regulators.  They instead claim that Mr. Ma "lean[ed] on his political allies."  *Id.*

### B.  Plaintiffs' Additional Scheme Allegations Fail For Multiple Reasons.

Plaintiffs continue to assert that Mr. "Ma engaged in additional deceptive conduct" that supports the Scheme Liability, but struggle to identify any such conduct. M-Opp. at 40. Instead, Plaintiffs point to Ant's sales of pre-IPO shares to two investment funds and an Alibaba subsidiary's investment in another investment fund that, in turn, invested in Ant. *Id.* These allegations are defective for at least three reasons, as explained in Mr. Ma's opening brief. *See* M-MTD at 22–24. Plaintiffs' responses are unpersuasive.

*First*, these additional allegations cannot sustain Plaintiffs' Scheme Liability Claim because the Complaint does not include any well-pleaded factual allegation showing that Mr. Ma played a role in these transactions. *See* M-Opp. at 40 (conclusory arguments with no citation); *see also supra* at 22–23.

*Second*, the transactions at issue do not involve "performance of an ***inherently deceptive act*** that is ***distinct from an alleged misstatement***," a prerequisite for scheme liability. *In re Kirkland Lake Gold Ltd. Sec. Lit.*, No. 20CV4953, 2021 WL 4482151, at *6 (S.D.N.Y. Sept. 30, 2021) (quoting *Kelly*, 817 F. Supp. 2d at 344) (emphases added). Plaintiffs' argue that these two transactions "operated to conceal [Messrs. Jiang's and Li's] interests from regulators and the market." M-Opp. at 41. They thus admit that these transactions are allegedly deceptive only because Ant subsequently failed to disclose Messrs. Jiang's and Li's supposed connection to

---

The cases on which Plaintiffs rely (M-Opp. at 39–40, 52) are thus inapposite. *See Lorenzo*, 139 S. Ct. at 1104 (knowingly sending materially false or misleading statements to investors); *SEC. v. Langford*, No. 12CV344, 2013 WL 1943484, at *3–4 (D. Neb. May 9, 2013) (supplying false valuation information to auditors and regulators).

Plaintiffs also claim that Alibaba's public disclosure of Ant's planned IPO in its Forms 6-K somehow shows Mr. Ma's dissemination of the challenged statements in the HKSE Prospectuses, because "Alibaba acted on Ma's behalf and pursuant to Ma's control." M-Opp. at 39. This assertion is entirely unsupported and speculative. At best, Plaintiffs impermissibly conflate primary liability under Section 10(b) and control person liability under Section 20(a), as Mr. Ma was not alleged to have drafted, reviewed, approved, or signed the Forms 6-K. *See* AC ¶¶ 274, 276 (alleging that the 6-Ks were signed by Mr. Steinert, Alibaba's Secretary); *see also supra* at 10–11. In any event, Alibaba's Forms 6-K did not reference the challenged statements or, for that matter, any statements, in the HKSE Prospectuses. *See* Exs. I & S-I.

these transactions.  *See* AC ¶¶ 347, 360.  Because these transactions were allegedly deceptive "only because of . . . subsequent public misrepresentation," they cannot form the basis of a scheme liability claim.  *Kelly*, 817 F. Supp. 2d at 344.[26]

     ***Third***, the Opposition confirms Plaintiffs' failure to plead reliance, a key issue in scheme liability cases against secondary actors, *i.e.*, defendants who did not make the disclosures that were rendered misleading by the scheme.  *See Stoneridge*, 552 U.S. at 159.  While investors' reliance on public disclosures can generally be assumed, the same is not true for alleged deceptive acts that were not known to the public.  *See In re Am. Int'l Grp. Sec. Litig.*, 689 F.3d 229, 235 & n.6 (2d Cir. 2012) (noting that the fraud-on-the-market presumption of reliance does not apply to deceptive acts that were not communicated to the public) (citing *Stoneridge*, 552 U.S. at 159).  Plaintiffs' reliance theory boils down to their claim that Alibaba and Mr. Ma "have directly engaged in conduct that resulted in allegedly misleading information being disseminated to the public" ***by Ant*** through the HKSE Prospectuses.  M-Opp. at 42 (citing *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1198 (D. Or. 2015)).  Under binding precedents in this Circuit, the mere fact that the alleged scheme impacted Ant's disclosure is "insufficient to show reliance on [Defendants'] *own* deceptive conduct."  *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) (emphasis in original); *see also Stoneridge*, 522 U.S. at 160–61 (rejecting reliance argument that challenged third-party statement "was a natural and expected consequence of [the defendants'] deceptive acts").[27]

---

[26] The Opposition relies on *Stubos*, *see* M-Opp. at 41, but it fails to mention that the plaintiffs there not only concealed his majority ownership of the securities at issue using various shell companies ***in violation of securities laws***, but also engaged in a "pump and dump" scheme and used his ***illegal*** shareholding structure to avoid detection. *SEC v. Stubos*, No. 22CV04674, 2022 WL 6776741, at *15 (S.D.N.Y. Oct. 11, 2022).  By contrast, the investment transactions at issue in this action are not alleged to be illegal.

[27] Plaintiffs wrongly claim that *Stoneridge* and *Pac. Inv. Mgmt.* do not apply to insider defendants, purportedly relying on *XL Fleet*.  M-Opp. at 42.  In *XL Fleet*, however, the court found that reliance was sufficiently pleaded, not because the defendant was an insider, but because "his role [in the alleged scheme] was directly communicated to

### C.     <u>The Insider Trading Claim Fails.</u>

The Insider Trading Claim against Mr. Ma fails because Plaintiffs fail to plead that Mr. Ma was in possession of any material non-public information when he sold Alibaba ADSs on September 30 and October 1, 2020.  *See supra* at 11–25; ECF No. 77 ("A-Reply") at 6–16. Plaintiffs ask the Court to infer that Mr. Ma knew Alibaba deployed undisclosed exclusivity practices as of September 30 and October 1, 2020, purely based on his executive positions at Alibaba before September 2019 and his directorship thereafter.  *See* A-Opp. at 43–44.  But Plaintiffs do not contend that Mr. Ma was, at any point in time, involved in Alibaba's exclusivity practices; an inference of knowledge purely based on his prior positions is speculative and not well-pleaded.  *See Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 267 (S.D.N.Y. 2019) (finding that inference of knowledge cannot be "based on [defendant's] position as CFO and director"); *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 221 (E.D.N.Y. 2022) ("[P]leading access to information based on an individual defendant's executive position is insufficient to support an inference of scienter.").

## IV.     PLAINTIFFS' SECTION 20(a) CLAIM MUST ALSO BE DISMISSED.

Plaintiffs' Section 20(a) claim against Messrs. Ma and Zhang and Ms. Wu based on Alibaba's alleged violation of Section 10(b) violation must be dismissed because of Plaintiffs' failure to plead a primary violation by Alibaba.  *See* A-Reply at 3–20.

Separately, Plaintiffs' failure to plead Mr. Ma's control over Alibaba's alleged fraud relating to its exclusivity practices provides another grounds for dismissing the Section 20(a)

---

investors." *In re XL Fleet Corp. Sec. Litig.*, No. 21CV2002, 2022 WL 493629, at *8 (S.D.N.Y. Feb. 17, 2022). *Eletrobras* is also distinguishable, because there the court addressed a scheme liability claim that was asserted against the issuer who made the challenged disclosures.  *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 456 n.1 (S.D.N.Y. 2017) (noting that the individual defendant at issue had not been served and was not a party to the pending motion to dismiss).

claim against Mr. Ma. As Defendants explained, well-pleaded factual allegations showing Mr.

Ma's "actual control" over both Alibaba *and the transactions in question*" are "necessary for

control person liability." *In re Alstom SA*, 406 F. Supp. 2d 433, 486–87 (S.D.N.Y. 2005)

(emphasis in original) (quotations omitted).[28] Plaintiffs' pleading fails, because they do not

allege that Mr. Ma was involved in Alibaba's PRC antitrust violations, "made . . . the

[challenged Alibaba] statements," or "played some discernible role in the making of those

statements." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011)

(Daniels, J.) (dismissing Section 20(a) claim for failure to plead control).[29]

Furthermore, the Complaint fails to allege "particularized facts" of the Individual

Defendants' "culpable participation" in any alleged wrongdoing. Under established Second

Circuit law, pleading culpable participation requires well-pleaded allegations of "conscious

misbehavior or recklessness," *In re Sanofi-Aventis*, 774 F. Supp. 2d at 572; *see also Doubleline

Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 220 (S.D.N.Y. 2019)

("The heightened pleading standards of the PSLRA" apply to the pleading of "facts

demonstrating that the defendant was a culpable participant."). Plaintiffs attempt to rely on their

---

[28] Plaintiffs do not dispute the requirement for pleading actual control over the transactions in question. *See* M-Opp. at 57–58. Indeed, their own cases state that "the Section 20(a) defendant must [] have actual control over the *transaction* in question." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 207 (S.D.N.Y. 2011) (emphasis in original); *see also SEC v. First Jersey Secs., Inc.*, 101 F. 3d. 1450, 1472 (2d Cir. 1996) (control person received reports and was "consulted" regarding the alleged fraud); *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1266–67 (S.D.N.Y. 1996) (control person developed the accounting policy at issue and ordered specific accounting adjustments); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 830 (S.D.N.Y. 2006) (control person "authorize[d]" the primary violator's purchase of securities for the transaction in question).

[29] Mr. Ma's alleged control over Alibaba is also not well-pleaded. Indeed, the Opposition concedes that, during the putative class period, Mr. Ma had at most indirect "strong influence" over Alibaba. M-Opp. at 45 n.61; *see also* M-MTD at 25 n.20 (explaining the deficiencies in the academic paper on which Plaintiffs rely to allege control). But "the power to influence managerial decisions is not the same as power to direct the management and policies of the primary violator," which is required for pleading Mr. Ma's control over Alibaba. *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 263 (S.D.N.Y. 2020). Plaintiffs' other arguments, based on Mr. Ma's role on Alibaba's Board and his alleged indirect connection to certain Alibaba affiliates, similarly do not show that Mr. Ma had "the practical ability to direct the actions of" Alibaba's Board and executives. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005).

scienter allegations to establish culpable participation.  *See* A-MTD at 35; M-MTD at 45.  But

Plaintiffs do ***not*** plead scienter for Mr. Ma with respect to the Antitrust Claim.  *See* AC ¶¶ 375–

83 (only alleging scienter for Alibaba).  Plaintiffs also fail to plead scienter for Mr. Zhang and

Ms. Wu.  *See* A-Reply at 13.  As a result, Plaintiffs fail to plead culpable participation,

mandating the dismissal of their Section 20(a) claim.

## CONCLUSION

For the reasons stated above, Defendant Ma respectfully requests that the Court dismiss

Plaintiffs' Complaint with prejudice.

DATED:  December 21, 2022               SIMPSON THACHER & BARTLETT LLP

By:   /s/ *Stephen P. Blake*
　　　Jonathan K. Youngwood
　　　jyoungwood@stblaw.com
　　　425 Lexington Avenue
　　　New York, New York  10017
　　　Telephone: (212) 455-3539
　　　Facsimile: (212) 455-2502

　　　James G. Kreissman
　　　jkreissman@stblaw.com
　　　Stephen P. Blake
　　　sblake@stblaw.com
　　　Bo Bryan Jin (*pro hac vice*)
　　　Bryan.jin@stblaw.com
　　　2475 Hanover Street
　　　Palo Alto, California  94304
　　　Telephone: (650) 251-5000
　　　Facsimile: (650) 251-5002

　　　*Counsel for Defendants Alibaba Group Holding*
　　　*Limited, Daniel Yong Zhang, Maggie Wei Wu,*
　　　*and Jack Yun Ma*

## APPENDIX A: GLOSSARY

| Term | Definition |
|---|---|
| AC (or the "Complaint") | Amended Consolidated Class Action Complaint (ECF No. 55) |
| ADS | American Depository Shares |
| Alibaba (or the "Company") | Defendant Alibaba Group Holding Limited |
| Alibaba Defendants | Alibaba, its CEO Daniel Yong Zhang, and its former CFO Maggie Wei Wu |
| A-MTD | Memorandum of Law in Support of Alibaba Defendants' Motion to Dismiss Plaintiffs' Complaint (ECF No. 61) |
| A-Opp. | Plaintiffs' Opposition Brief to Alibaba Defendants' Motion to Dismiss Plaintiffs' Complaint (ECF No. 74) |
| A-Reply | Alibaba Defendants' Reply in Support of Motion to Dismiss Plaintiffs' Complaint (ECF No. 77) |
| Ant | Ant Group Co. Ltd. |
| Ant IPO | Ant's planned initial public offering on the Hong Kong Stock Exchange and the Shanghai Stock Exchange |
| Ant Investor Claim | Ant's alleged failure to disclose that two individuals supposedly from an out-of-favor Chinese political faction held minor, indirect pre-IPO investments in Ant, the discovery of which by PRC authorities is rumored to have played a role in the suspension of the Ant IPO |
| Ant Prospectuses Claims | Ant Regulatory Claim and Ant Investor Claim |
| Ant Regulatory Claim | Ant's alleged failure to disclose that its purported violations of two PRC financial regulations posed a material risk to the completion of the Ant IPO |
| *Bank Measures* | *Provisional Regulatory Measures for Commercial Banks' Online Lending Business*, issued by China Banking and Insurance Regulatory Commission on July 12, 2020 |
| Feb. 16 Article | Wall Street Journal article published February 16, 2021, entitled *China Blocked Jack Ma's Ant IPO After Investigation Revealed Likely Beneficiaries* |
| *FHC Rules* | *Decision of the State Council on Implementing Access Administration of Financial Holding Companies* (issued by the State Council) and the companion *Interim Measures for the Supervision and Administration of Financial Holding Companies* (issued by the People's Bank of China) both dated September 11, 2020 |

| **Term** | **Definition** |
|---|---|
| HKSE | Hong Kong Stock Exchange |
| HKSE Prospectuses | Ant's draft and final IPO prospectuses filed with the HKSE |
| M-MTD | Memorandum of Law in Support of Jack Yun Ma's Motion to Dismiss Plaintiffs' Complaint (ECF No. 63) |
| M-Opp. (or "Opposition") | Plaintiffs' Opposition Brief to Jack Yun Ma's Motion to Dismiss Plaintiffs' Complaint (ECF No. 75) |
| PRC | People's Republic of China |
| SAMR | PRC regulator the State Administration for Market Regulation |
| Scheme Liability Claim | Ma and Alibaba alleged engagement in a scheme to defraud Alibaba's U.S. investors by concealing the identity of the two purported Ant investors from PRC authorities |
| WSJ | Wall Street Journal |