UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: ALIBABA GROUP HOLDING LTD. SECURITIES LITIGATION,

Master File No. 20 Civ. 9568 (GBD)
------------------------------x

New York, N.Y.
January 11, 2023
10:30 a.m.

Before:

HON. GEORGE B. DANIELS,

District Judge

APPEARANCES

GLANCY PRONGAY & MURRAY LLP
Attorneys for Plaintiffs
BY: KARA M. WOLKE
JASON L. KRAJCER
MELISSA WRIGHT
-and-
POMERANTZ LLP
BY: PATRICK V. DAHLSTROM

SIMPSON THACHER & BARTLETT LLP
Attorneys for Defendants
BY: STEPHEN BLAKE
BO BRYAN JIN

(Case called)

MS. WOLKE: Good morning, your Honor. Kara Wolke with Glancy Prongay & Murray on behalf of the class plaintiffs.

THE COURT: Good morning.

MR. KRAJCER: Jason Krajcer on behalf of plaintiffs.

THE COURT: Good morning.

MS. WRIGHT: Good morning, your Honor. Melissa Wright on behalf of the plaintiffs.

THE COURT: Good morning.

MR. DAHLSTROM: Good morning, your Honor. Patrick Dahlstrom from Pomerantz on behalf of the plaintiffs.

THE COURT: Good morning.

MR. BLAKE: Good morning, your Honor. Steven Blake, from Simpson Thacher & Bartlett, on behalf of defendants Alibaba, Zhang, Wu, and Ma.

THE COURT: Good morning.

MR. JIN: Good morning, your Honor. Bryan Jin of Simpson Thacher for defendants.

THE COURT: Good morning. So why don't I hear defense on the motion, who is going to argue?

MR. BLAKE: I am, your Honor. Stephen Blake from Simpson Thacher. May it please the Court. Good morning.

We're here on two motions to dismiss, one brought by the Alibaba defendants, which is Alibaba the entity, Mr. Zhang and Ms. Wu, as well as a second motion brought by Mr. Ma.

If it's okay with the Court, not that there hasn't already been a significant number of papers submitted here, I do have a short presentation that hopefully mainly just puts the disclosures out there so that we can look at them while we're talking about them. With your permission, I would like to pass you a copy.

THE COURT: Yes.

MR. BLAKE: I have shared it with my colleagues.

Just to level set your Honor, turning to slide 2, we're dealing with multiple theories of misrepresentation here. The first two theories relate to the planned IPO of Ant Financial, which is a financial technology company that is affiliated with my client, Alibaba. That IPO was planned for the Shanghai stock exchange and the Hong Kong stock exchange in November of 2020. And several days before that IPO was supposed to launch, the IPO was suspended by the regulators in Shanghai and in Hong Kong.

There were two claims there, a claim related to a failure to disclose regulatory noncompliance by Ant, and a claim related to a failure to disclose certain investors in Ant that both allegedly had an impact on the suspension.

THE COURT: It was unclear to me whether you are alleging any affirmative misrepresentations as opposed to material omission.

MR. BLAKE: That may be a better question for the

plaintiffs than me, but the way I understood it, your Honor, is that there were affirmative disclosures that were made by Ant. To be clear, Ant is a different company than Alibaba in connection with the Hong Kong stock exchange. Alibaba is listed here in the New York stock exchange, but there was a prospectus that was prepared, and that prospectus included certain things about disclosure, who are our investors, what are our regulatory risks, and the plaintiffs are saying those disclosures are misleading. They didn't disclose enough.

THE COURT: Misleading doesn't answer my question. Misleading in what way? I mean, I reviewed the complaint, not every single page, but it seems to me that most, if not all of the allegations by the plaintiff, you can tell me if your understanding is different, I'm not sure, and I'll have them articulate it for me if they exist, but I'm not sure if there are affirmative misrepresentations, false statements made that they claim that were made as opposed to they had certain information that they should have given the public and they did not provide that information.

MR. BLAKE: In that case, I agree with you, your Honor. There are disclosures that were made and the theory is there were other facts that were not disclosed that rendered those disclosures misleading.

The third claim is a claim against Alibaba for its own disclosures, and that relates to an antitrust investigation,

which ultimately resulted in a fine against Alibaba.

There is a wide variety of legal theories that are being asserted here. This is on slide 3. The primary theories are disclosure against Alibaba for Alibaba's own disclosure and against Mr. Ma and Alibaba for Ant's disclosure. So we have two different companies' disclosure here.

Beyond the disclosure theories, there is a scheme theory, there is an insider theory, and there is various control person theory, so there is a lot. I'm going to proceed first with Alibaba's motion to dismiss, the company motion to dismiss, as well as the CPO and former CFO's motion.

As I said, there's a number of claims, we'll start with the Ant IPO-related claims. There was a claim about noncompliance with certain banking regulations. The plaintiffs have dropped that claim in their opposition brief. The primary theory proceeding against Alibaba in connection with the Ant IPO is the FHC rules claim. FHC stands for financial holding companies. It was a regulation that was promulgated by Chinese regulators on September 11th, 2020, so a little less than two months before the IPO was suspended.

Subsequent to the promulgation of this regulation, regulators approved the IPO and allotted its price. And on November 2nd, there was a new regulation that came out that is referred to in the papers as the interim measures. The interim measures imposed what is referred to in the coverage as capital

requirement. Ant is a lending business, a consumer lending business, and it previously was lending using 2 percent of its capital and leverage for the rest. The interim measures imposed a 30-percent capital requirement, which obviously presented a significant shift to how Ant was going to make money. That happened on November 2nd.

On November 2nd, there was a meeting in which Mr. Jack Ma and some non-defendants attended in Beijing to talk about the regulations, and then the next day, the regulators in both Shanghai and Hong Kong announced they were stopping the IPO process in light of these significant changes to the regulatory requirement. That's the interim measures, that's what's covered around the time of the IPO.

The plaintiffs have an alternative theory, which is a theory related to these FHC rules, the financial holding company rules. They say that Ant was operating in flagrant violation of those rules. They say that those rules imposed a $500 billion R&B requirement to be engaged in the lending business, that Ant only had something like $300 billion, and that it should have told investors were in blatant violation of these regulations.

Now, these regulations came out on September 10th. In October, regulators said the IPO could go forward. On November 2nd, these new interim measures come into play that impose a capital requirement, and on November 3rd, the IPO was

stopped. As far as I'm aware, there is no coverage that says these FHC rules were being violated or they're the reason the IPO blocked. The only time I see it is in the complaint here.

There is a couple of reasons why this claim should be dismissed, and this is a claim against Alibaba, the U.S. New York stock exchange trading company.

The first is very, very simple. Alibaba only made very minimal disclosure about this IPO, and that's what I have on slide 5. The challenged statements are two 6-Ks. We have the full text of them, they're on the page. And they are what I would call procedural. Ant has registered for an IPO. Ant is planning on listing. Ant has priced its IPO. The IPO is intended to go forward.

Under the securities laws, you either have to, I think as your Honor started to key into, you have to say something that is false or you have to have a duty to disclose. You can have a duty to disclose by an omission if it renders your disclosures inaccurate, if it renders your disclosures misleading. These disclosures don't say anything about the FHC rules. They don't say anything about regulatory compliance. They, in fact, say there can be no assurance as to when the offering will be completed.

So, the simplest way of dealing with this is that is there is no duty to disclose. My colleagues are undoubtedly going to say Ant and Alibaba spoke on the subject of the IPO,

and in speaking on the subject of the IPO, they had a duty to tell the risks to the IPO. I think that stretches the duty to disclose way too far. And the key case to look at is the *Jinkosolar* case from the Second Circuit. That's a case where the defendant promised affirmative regulatory compliance with a specific regulation at issue and didn't disclose noncompliant practices, and the court said yeah, that's a specific disclosure and you didn't tell us an omitted fact. That's close enough. This is too far.

Beyond the legal issues, the duty to disclose issues, the claim itself under the FHC rules is implausible and all you need to do to reach that conclusion is look at the FHC rules themselves, which is Exhibit SF of the exhibits that were submitted.

This $500 billion requirement isn't in the regulation, which is probably part of the reason why it isn't in the coverage of why the IPO was bought. It's not there. There's one reference to $500 billion which we put on slide 6. That is one of three criteria that a company would have to submit an application to be a financial holding company.

Criteria one is you have a bank and you have $500 million. Criteria two was you don't have a bank and you have $100 million. Criteria three was the People's Bank of China says you should submit an application. Ant Financial didn't think it was in the $500 billion category. There's, as

far as I can tell, no one saying that Ant Financial was in the $500 billion category. The sole basis for this claim is a Reuters article from months before, which says that the $500 billion requirement is a threshold, but doesn't say that Ant is subject to it. So, when you look at the details of this claim, it just doesn't fit together.

That, I think, really plays into the third basis for which this claim is dismissed, which is *scienter*. The requirement under the securities laws is to plead a strong inference of *scienter*. Here, there are no facts that support that. There are no internal documents, there are no articles, there's no real allegation of motive, other than that there was an IPO that was happening, but Alibaba, the company, which owned 33 percent of Ant, wasn't selling its shares into the market as part of the IPO. In fact, they were buying $7.5 billion worth of shares. Would you inject $7.5 billion into a company that you thought was in flagrant violation of this rule?

So, it really begs the question when you think about non-culpable inferences under *scienter*. This is a pretty flagrant alleged violation. It's an alleged violation that I can't tie to the statute, it's a violation that the plaintiffs don't tie to coverage. The question it asks is if this is the reason this IPO was blocked as opposed to the interim measures that all the coverage says is the reason it was suspended. If

this was such a big deal, why don't we have any evidence of it?

Pivoting to the antitrust claim, which is the claim against Alibaba for its own disclosures, its 20-F disclosures, which 20-Fs are, as your Honor may know, they're the foreign private issuer equivalent to 10-K annual reports.

This is a claim which is based almost exclusively on public information. You go through the complaint, there are articles that go year, by year, by year that talk about these issues going back 2015 and before.

What is clear from the public record, and you can look at exhibits P and J, look at the amended complaint, paragraph 91 to 97 to 112. What's clear is Alibaba was engaged in a type of practice that is referred to as choose one of two. It's also sometimes referred to as "either or." The idea is Alibaba operates e-commerce platforms where individual sellers post their products and then consumers buy them. It's a marketplace, an online marketplace.

These practices -- and it's a very competitive industry, there is a number of these different marketplaces that compete in China. And the practice, choose one of two, is a practice that describes a whole range of activities, but activities that are intended to say you should sell on our marketplace as opposed to another marketplace. That includes what we would call strict exclusivity, which is if you trade on another platform, we're knocking you off our platform.

It also includes a range of practices that Alibaba mentioned in its own disclosures as traffic resource allocation practices. This is the practice that the SAMR, the Chinese antitrust regulator ultimately found Alibaba had violated Chinese antitrust law for. Traffic resource allocation, which is a way of saying the algorithm, for example, has control over search results. If you search for a purse, somebody's going to come up at the top. If you are selling on another platform, you might find yourself at a lower part of that algorithm. That's traffic resource allocation. If you're a good partner, if you're a good merchant, higher search results. If you are selling under another platform, lower search results. This is a practice that was used in the Chinese e-commerce industry pretty broadly. If you look at the news articles, it was widely covered, it was also widely criticized, and at least four competitors and customers filed widely publicized lawsuits against Alibaba saying you're engaging in these practices and it violates Chinese law.

In response, Alibaba defends itself under Chinese law in response to these lawsuits. One of the arguments that they're making is that they have a justifiable reason for doing what they're doing. They're providing resources to sellers, and in exchange for that, they are asking for exclusivity. It's a little different than strictly kicking people off the platform, and it's an argument they advanced publicly for

years.

In 2019, you have the State Administration for Market Regulation, the SAMR saying they're increasing their focus on this, this is public. In November of 2020, you have a new Chinese regulation called the platform guidelines. The platform guidelines, for the first time, explicitly say "either or," choose one or choose two is illegal, and also expressly include this traffic for exclusivity practice.

About a month later, in December of 2020, the SAMR launches an investigation of Alibaba, which, at some point in 2021, results in a fine. All of this is public. The complaint pleads the basis for all of this history based upon public news articles. There is no confidential sources or anything like that. The theory that the plaintiffs are pursuing is against this backdrop, Alibaba failed to disclose its antitrust risk.

The focus of what plaintiffs allege is a risk factor, and I put the risk factor on page 7. The risk factor as quoted in the complaint is selective. It leaves out a lot of things that we would consider to be very important, which I think braces us within your Honor's prior decision, Lighthouse v. Royal Bank of Scotland, which is you can't take disclosures out of context.

If you turn to page 8, you will see the kind of key points from the disclosure. If you were to read it from beginning to end, you would see the state administration is

strengthening its enforcement efforts. They've told us our views on violations, they intend to investigate, we can give you no assurance that they won't investigate, and we may be subject to large fines. It's a pretty sobering disclosure about the antitrust risk and it's a disclosure that has to be read in light of all this public history where there are lawsuits about these issues that are being covered both in the Chinese media and the U.S. media.

In light of that disclosure, the plaintiffs are really left with quibbling with the words, so to speak. The first theory that they dwell on is that there was a meeting that was held with the SAMR in November of 2019. It's called an administrative guidance meeting. It's an informal meeting, regulators companies. In this case, there were, I believe, 24 commerce companies in China that attended this meeting. It's a public meeting. Cameras are there, there's news coverage in China, there's news coverage in the United States. Exhibit SA is a Reuters article about it. Exhibit SB is a Wall Street Journal article about it. Meeting's covered.

The theory is that Alibaba didn't disclose this meeting. The problem with that theory is that Alibaba did disclose the meeting. In fact, in a disclosure that came out shortly after the meeting, Alibaba says on several recent occasions, including at administrative guidance meetings, the SAMR has questioned these practices and has also indicated its

intention of initiating investigations into these arrangements.

So you've got a disclosure claim about a Chinese government meeting that was -- well, it was public. It was also pointed to in the disclosure. So anybody could go out and read exactly what the regulators said and in the order in which they read it. In that context, I don't see how you could possibly state a disclosure claim about it. We have public information and we've got disclosure that is pointing to it. So that's the SAMR guidance disclosure.

The second issue is the plaintiffs argue Alibaba didn't disclose -- you didn't disclose it, you were still engaged in these exclusivity practices. I think that's kind of hard to square with some of the plaintiffs' other allegations, including that Alibaba vociferously defended these practices to anyone who would listen, to courts in these lawsuits, to regulators at this meeting that we just talked about, and in public statements, social media, press statements, et cetera. Alibaba was saying to the market, we're doing this and we think it's justified. We think we have the better argument under Chinese antitrust law. The disclosure says very specifically this is what we do, our market approach with traffic resource allocation, the exact practice that the SAMR found that they were ultimately engaged in and ultimately in violation of Chinese law.

The plaintiffs latch onto one portion of this

disclosure, which references alleged prior narrowly deployed exclusive partnerships. This is referencing an allegation that's made in some of these lawsuits, made publicly, and it's referring to what we refer to in our papers as herd exclusivity, but what I was describing as if you trade under another platform, we kick you off our platform — a very different practice than what Alibaba was doing and a very different practice than what the SAMR found that Alibaba actually did.

So, when you put this in context, you've got a ton of public information, you've got a risk factor that deals with antitrust risks and says things like the government plans to investigate and we can give you no assurance that they're not coming after us. In that context, with all of these public facts, I don't think you can get to an argument that this is a misleading statement.

That then brings us to the *scienter* inquiry. The *scienter* inquiry asks a couple of questions. Was there a motive to defraud investors? Plaintiffs effectively concede that they don't have a motive here. They say a motive isn't needed. Plaintiffs also -- now I'm on page 13, your Honor, of the Power Point. Plaintiffs also effectively concede, and I give them credit for this, but that Alibaba honestly believed in the legality of its practices, and what plaintiff says on page 13 of their brief was Alibaba hoped it could convince the

SAMR its exclusivity practices were justified.

So what plaintiff ultimately argues on *scienter*, they're not pointing to documents that say Alibaba didn't have this honest belief, they're not pointing to documents that Alibaba says we've got a real problem here, they are saying Alibaba was reckless in defying the antitrust regulator. With the benefit hindsight, you, Alibaba, should have known that you are going to lose this battle that you are having with the antitrust regulator, and you gambled, you were reckless in taking that battle.

But that doesn't make a lot of sense to me because we're talking about securities disclosure. Violation of Chinese antitrust law is not securities fraud in the United States. If it was a one-to-one correlation, that would create all kinds of problems. What we're talking about is, was Alibaba reckless in the disclosures that it made to United States investors, and I just don't think you can square that with the risk factor that we're looking at. We're looking at a situation where Alibaba spoke on the topic, it disclosed the risk. To the extent the plaintiffs disagree with that or the Court was to disagree with that, at the end of the day, we spoke on the topics, and therefore we do not reach the high bar for recklessness, which under Jill, is an extreme departure from the standards of ordinary care.

And I would commend your Honor's attention to the

Merrill Lynch case, Auction Rate Securities case as cited in our papers and the Pretium Resources case cited in our papers. What Merrill Lynch says is the high bar for recklessness is not met where some disclosure happens, even if it's less robust than ideal. And so, we've got a situation here where we made a ton of disclosure on the topic. I think that disclosure is fair when judged in any way other than with the complete benefit of hindsight. And I think that disclosure put investors on notice of these issues, which is indicative of a lack of *scienter*, not *scienter*.

The final reason for dismissal of the antitrust claim is loss causation. This can be a fairly technical issue. It's described at length in the parties' papers. We're talking about two different disclosures, events, the platform guidelines on November 10th, the SAMR investigation on December 24th. I don't think either of these establish loss causation. Loss causation requires there to either be a corrective disclosure, facts come to the market that correct the prior disclosures that took place or the materialization of an unknown risk.

Platform guidelines are a generally applicable regulation. Platform guidelines don't say you, Alibaba, are violating the law, they say this is the law. And there is ample case law that says a generally applicable regulation, particularly in this case, a regulation that triggered stock

drops across the entire Chinese e-commerce industry. That is not a corrective disclosure or a materialization of the risk, it's an interveining event, that's the Lentell case that requires dismissal of that as a stock drop as part of the case.

The second disclosure is the SAMR's investigation, not the penalty, the investigation, the question of whether that revealed something. Well, it revealed the SAMR was investigating. Alibaba already said to the market the SAMR may investigate us. In fact, it said we can give you no assurance that the SAMR won't investigate us, and if the SAMR investigates us, we may be subject to big fines. So it's not the materialization of an unknown risk, it's a materialization of a risk that Alibaba primed the market for. If we are investigated, we could have big fines. There's an investigation that's in-house and the stock drops.

There is significant authority in this district, the Janbay case, the Meyer case, and the Moody case, which is cited in our papers, that deal with whether an investigation constitutes a corrective disclosure. I think your Honor's recent decision in EHang also touches on this, not on an investigation, but the question of is there something that's being corrected by the disclosure, and an investigation just doesn't get there.

That's Alibaba's motion.

Mr. Ma's motion is longer. There are a lot of issues.

THE COURT: The first motion is there is not jurisdiction for suing.

MR. BLAKE: Correct, your Honor, there is a personal jurisdiction defense, and that's based upon the following, that there are a lot of conclusions in the case. Mr. Ma is a controller, he was involved in everything. Those are conclusions, they're not well-pled facts. It's very clear that control is not enough for personal jurisdiction. When you dig into what the facts are alleged by Mr. Ma, Mr. Ma is a Chinese citizen. At this particular time, he is a director of Alibaba who has announced his retirement. And under plaintiffs' theory, which we contest, despite owning a very small amount of stock, plaintiffs contend that he controlled Alibaba.

But, at the end of the day, there's no alleged relevant conduct in the United States related to any of these disclosures, related to Ant's disclosures or related to Alibaba's disclosures. Mr. Ma is not alleged to have done anything in the United States related to those disclosures.

Going beyond that, there is also no allegation that he had a day-to-day role at either Ant or the Ant IPO or Alibaba, and there is no allegation whatsoever that he played a role in drafting any of the disclosures. Under your Honor's recent decision in EHang, playing a role, facts saying you played a role in the disclosures is kind of a litmus test for personal jurisdiction. So I don't understand how personal jurisdiction

exists for Mr. Ma in this context.

That being said, your Honor, I think perhaps there's a simpler way to cut through a lot of the legal argument on Mr. Ma's motion, and that is the Second Circuit's decision from this fall in Frutarom. The Frutarom decision deals with the question of statutory standing under the Supreme Court's decision, Blue Chip Stamps.

I'd ask your Honor to look at the graphic that we've got on slide 16. Your typical securities claim represented here in the blue is a claim by Alibaba's investors against Alibaba for Alibaba's SEC disclosures. That's what we just talked about with the antitrust claim. Alibaba's talking about its antitrust risks and its investors are suing and saying you didn't warn us about those antitrust risks. That's not what this is. This is Alibaba's United States ADS investors suing Mr. Ma for Ant Financial, a different company, disclosures on the Hong Kong stock exchange talking about itself, talking about its IPO and regulatory risks.

Under the Frutarom case, it is very clear, and this is a formal test, it's not a functional test, but plaintiffs, who did not purchase the securities about which the misstatements were made, do not have standing to sue under section 10(b) or 10b-5. What plaintiffs are alleging here is that Ant did not disclose in its disclosures where it talks about its shareholders and it talks about its regulatory risk under these

FHC rules that we talked about, it did not tell you that it was violating -- operating in violation of the law and it didn't tell you that some of these shareholders were potentially toxic. They're talking about themselves, they're talking about their own shareholders, they're talking about their own regulatory risks. So under Frutarom, Alibaba's ADS investors cannot sue for Ant's disclosures, and by extension, they cannot sue Mr. Ma for Ant's disclosures.

The plaintiffs make a couple arguments in response to this. The first is that it was foreseeable and that there is a relationship between Alibaba and Ant. Alibaba owns 33 percent of Ant, nobody can contest that, there is a connection between the two companies. This exact argument is made in Frutarom and the Second Circuit calls it meritless. Strong language from the Second Circuit. The Second Circuit also emphasizes the following, that this is a, quote, formal, not functional test. And what the Supreme Court was trying to accomplish in Blue Chip Stamps is that there not be a case-by-case review of these topics. Frutarom, in our opinion, wipes out the claim against Mr. Ma.

The second, the red side of this slide also deals with the concept of extraterritoriality, which is the Morrison decision from the Supreme Court. So we've got an Alibaba ADS investor that's suing on Ant's disclosures for Ant's disclosures that are made on the Hong Kong stock exchange.

Disclosures in connection with the Hong Kong stock exchange is exactly what the Supreme Court is saying in Morrison, we're not supposed to go there. The 10b-5, the implied right of action under the securities laws does not reach so far as to interfere with transactions amongst foreign securities disclosures. So I view Frutarom and Morrison as wiping out the claim against Mr. Ma. Personal jurisdiction, as we covered, is another reason.

There's a variety of other theories, dedicate a lot of paper to this. That is whether Mr. Ma was a maker under Janus, the Supreme Court case, that is whether Mr. Ma was involved in a scheme under Lorenzo, another Supreme Court case — Frutarom deals with all of them. Frutarom deals with a 10b-5 claim. The remaining claims against Mr. Ma are wiped out of that. If you want me to cite for that, your Honor, I draw your attention to the LaBranche case that's cited in our brief, as well as the Turquoise Hill case, which I believe is cited in the plaintiffs' brief.

The other problem with these claims is they don't work functionally, they are all an attempt to get around Frutarom and Morrison. The plaintiffs didn't sue Ant, the company, because they realized that they couldn't sue Ant, and so they're trying to get Ant for Ant's disclosures through Mr. Ma. It just doesn't make sense. These are kind of purpose-built tools by the Supreme Court controlling liability, deals with a

controller. Mr. Ma is a controller of Ant, but there can be no primary violation by Ant. Makers are intended to deal with people who have ultimate authority. Ultimate authority is something different than control. It's not enough to say control. That's control person liability. Ultimate authority means that you actually had functional control over the statement in question, and the Optimal case and the Weight Watchers case demonstrate that Mr. Ma didn't have that on the allegations that he controlled Ant.

And scheme deals with a very specific thing. The language of Sections A and C of 10(b) are somewhat amorphous, and Lorenzo and the cases that have followed Lorenzo, including Rio Tinto from the Second Circuit, they deal with a very specific issue. If you didn't control and you didn't have ultimate authority, did you disseminate. In Lorenzo, it's somebody who didn't write the disclosure and wasn't responsible for disclosure, but knowingly sent an email with the disclosure to another person. There's no allegation that Mr. Ma played any role whatsoever with these disclosures, let alone that he echoed them in some way or forwarded them to someone or sent them to someone in the United States, the allegation doesn't exist, and that deals with Lorenzo.

The last kind of core claim against Mr. Ma, and this is coming back to where we started, your Honor, the blocking or suspension of Ant IPO on November 3rd, 2020. As we talked

about, the coverage talks about these interim measures, which imposes a 30-percent leverage requirement. Plaintiffs presented an alternative theory, which is the theory under the FHC rules, the $500 billion yuan requirement, that isn't, in fact, a requirement.

They presented another theory, and this theory is based exclusively on a Wall Street Journal article that came out about four months later in February of 2021. The Wall Street Journal article said that there were two investors in Ant who were not disclosed. Those individuals are Mr. Zhang and Mr. Li. These two individuals, according to The Wall Street Journal article and the plaintiffs, were associated with an out-of-favor political faction in China. The article, which cites persons familiar with the probe and officials and government advisors, says that the fact that the government discovered that these two individuals were invested in Ant played a role in the blocking of the IPO. The IPO was blocked because these individuals' investment, which was hidden.

As with a lot of these other disclosure claims, there is kind of a fundamental problem, which is that Mr. Jiang's fund, like a hedge fund or a private equity fund, Boyu Capital was disclosed as being an investor in Ant. So the secret investor was not actually secret. It was disclosed both publicly as well as listed on the cap table in Ant's own disclosures.

So the question you got to ask in this allegation, which is based exclusively on The Wall Street Journal, is whether there's a sufficient indicia of reliability for anonymous sources. This is a pretty speculative article. But I would commend your Honor to look at the Investment Tech case from 2017, the City of Brockton case from 2013, and the Rapoport case from 2000. Each of those cases deal with articles, including The Wall Street Journal, that talk about persons familiar with and government officials and whether that type of speculative attribution is specific enough to plead a claim for a fraud under the securities laws with specificity.

I think this claim also gets knocked out for a lack of *scienter*. Your typical pleading of *scienter* has confidential witnesses, has internal documents, has non-conclusory allegations that persons involved attended meetings, were involved in the activities, circumstantial evidence from which you can draw a strong inference that there is *scienter*. Those claims just aren't there. What we have here is the Wall Street Journal article. We have the plaintiffs who, to their credit, have gone out and gotten some of the records for these companies. They're pooled investment vehicles. I'm not going to go through it in any significant depth, we've got some pictures taken from the complaint in our briefs, but they're pooled investment vehicles.

If you go through what The Wall Street Journal has

done and what the plaintiffs have done, they've verified some aspects of this structure. What they have not done is they have not actually verified that Mr. Zhang and Mr. Li are invested in Ant indirectly, and they haven't verified, if they were, how much they owned. At the most, it's 1 percent of Ant.

So, under those cases that I described, Wall Street Journal is not sufficiently reliable. You don't have kind of tangible evidence that Mr. Ma was involved in any of this. There is a number of allegations about how Mr. Ma may have known these people or may have been involved in business with them before, some allegations about how Mr. Ma was involved in other investors being brought in, including the state pension fund in China. No allegation that Mr. Ma -- factual allegation that Mr. Ma is involved with Mr. Zhang and Mr. Li. So really, it's just this implication, it's Mr. Ma controls everything, he must have known, he must have known that these guys were invested in Ant.

But even if you conclude that that's a fair inference, I don't think it is, but if you conclude that, there is no allegation that Mr. Ma knew that these people's investment, this alleged investment took place 2015, 2016, 2017, multiple years before the blocking of the IPO, no allegation that Mr. Ma knew that these people's investment would somehow impact the IPO. In fact, the plaintiffs' allegations goes to the opposite. They allege that Mr. Ma is a, quote, savvy political

operator and himself a member of the communist party. And you have to ask yourself in balancing culpable, non-culpable inferences if Mr. Ma is politically savvy and Mr. Ma is involved in bringing in important investors, including the state pension fund, which is the one that's specifically alleged. Why does Mr. Ma bring in two investors that pose this existential risk to the IPO? The theory doesn't make sense. Nor does the fact that this is the reason that the IPO is, in fact, suspended, because you've got the obvious right in front of you. The interim measures come out on November 2nd, Mr. Ma is summoned to meet with Chinese banking regulators on November 2nd, and on November 3rd, the IPO is suspended.

I'm going to read you the language, the announcement of the suspension. This is from the CSRC, the China Securities Regulatory Commission on November 4th. The IPO was suspended because, and I quote, the regulatory talk held by the financial regulators and the recent change, singular, in a financial technology regulatory environment may have a material impact on Ant group's business structure and profit model. That's the public statement by regulators as to why the IPO was blocked. And I would commend the Court to look at Exhibit KK, HH, II, JJ, and LL, which cover the public coverage of the blocking.

So the question really is when you're balancing nonplausible inferences and plausible inference, the far more plausible inference here is that as was the world financial

community when this IPO was suspended, Mr. Ma and Alibaba and Ant were also surprised by the abrupt regulatory change. No inference of *scienter*.

There's a couple of allegations in here about Mr. Ma's motive. I think it's clear under the law that just desiring to get an IPO through is not a sufficient motive for *scienter* purposes. There's also a focus on stock sales by Mr. Ma, which is slide 22 of the Power Point. Mr. Ma, in late September, sold about 1 percent of his holdings in Alibaba. That's well within the threshold that the Second Circuit has established for suspicious, which is under 10 percent. That being said, Mr. Ma had announced in 2019 that he was retiring from Alibaba and had been progressively selling stock over that time period. He sold about 1 percent during the class period, he sold about 3 percent in the roughly 18 months prior to the time period. A sell-down at the time of retirement is not evidence of *scienter*.

The plaintiffs cite a case from the Ninth Circuit, it's the Nursing Homes case it deals with Larry Ellison, the CEO of Oracle. Like Mr. Ma, Mr. Ellison is a wealthy person, and the absolute number of the stock sales is large. I think in Nursing Home is about $900 million, I think Mr. Ma's sales are about $1 billion. The Nursing Homes case looked at, amongst other things, the absolute value of the sale. But I think, more importantly, what the nursing home case looked at

was that Mr. Ellison had sold for the first time in about five years at a highly opportunistic time, which is a very stark difference. I don't think that there is any case law in the Second Circuit that justifies the absolute number being a factor that you're able to consider, but I assume my colleagues will emphasize that. So I wanted to just mention that the Nursing Home case is really dealing with a significantly different set of circumstances.

The insider trading claim against Mr. Ma, based on these stock sales, does not add up. You cannot have that claim on the basis of control only, and it's the Barilli case and the Chembio case. To state that claim, you also need to allege that Mr. Ma knew of these various risks. As I said, there is no concrete allegation that he's aware that these investors posed a risk to the Ant IPO, there is no concrete allegation that he believed the FHC allegations were a problem, in fact, no allegation that anyone believed the FHC regulations were a problem, other than the plaintiffs, and there is no allegation whatsoever that Mr. Ma was involved in Alibaba's antitrust practices. Mr. Ma stopped being the CEO of Alibaba at least five years before the time period that we're talking about as an outside director. Antitrust claim doesn't get there.

The last series of claims are control person claims. I believe your Honor's decision in Sanofi-Aventis, which is a decision from 2011, disposes of those claims, as does the

Weight Watchers case that's cited in our briefs. Control person claim is dismissed because there is no primary violation. In order to allege control, you have to allege actual control and not just control over the companies in question, you need to allege control over the transactions in question. We have no control over the day-to-day of Ant IPO or Ant IPO disclosures, and we have no allegations that Mr. Ma is in any way involved in Alibaba's securities disclosures. Brings you right within Sanofi-Aventis.

The last issue for control person and the issue for me now is you must be a culpable participant in the fraud. No allegations of *scienter*, no allegations of involvement equals no allegations of culpable participation.

With that, unless the Court has any questions, I will sit down.

THE COURT: Thank you, sir. Let me hear from the other side.

MS. WOLKE: Good morning, your Honor. If it pleases the Court, I will be addressing the claims related to Alibaba's exclusive trade trading practices, and my colleague, Jason, will be addressing the claims related to the Ant IPO.

So I'd like to start with the exclusive trading practices claims, your Honor. Mr. Blake said, during his presentation, that it was not until the November 10th, 2020 announcement of the new platform rules that Alibaba learned

that its exclusive trading practices were unlawful. But that's not quite right, your Honor. You'll see in paragraphs 81 and 82 of the complaint that the SAMR — which is, again, China's State Administration for Market Regulation, Alibaba's most important market regulator — enacted new regulations on September 1st, 2019 that specifically ordered that restricting a counter-party to deal or transact only with it is unlawful under the antimonopoly law.

And then on November 5th, 2019, the SAMR called Alibaba and other large platform operators in China to an administrative guidance meeting. It's important to pay attention to what Alibaba was told at that meeting, and I'd like to quote it, and this is from the Chinese State News Agency Xinhua, paragraph 103 of our complaint. Alibaba was told, quote, the behaviors of choose one of two in exclusive trading in the internet sector are clearly prohibited by the electronic commerce law and also violate the antimonopoly law and anti-unfair competition law, among other laws and regulations.

Now, moving into the class period. Alibaba files its 2020 form 20-F on July 9th, 2020, and Mr. Blake has brought up the risk disclosures. And in the context of a purported risk warning about Chinese antimonopoly enforcement and Alibaba's legal compliance with antimonopoly laws, Alibaba told its investors that its use of, quote, exclusive partnerships was

prior and narrowly deployed. It's telling investors we are no longer requiring exclusivity. And based on the statement that it's use of, quote, exclusive partnerships was over, defendants assured investors, quote, we believe our business practices do not violate antimonopoly or unfair competition laws.

Your Honor, these statements were misleading to reasonable investors for a very simple and fundamental fact, Alibaba's merchant exclusivity practices were not over, they were not prior. As demonstrated in the report issued by the SAMR on Alibaba's various violations, which was issued after the class period, it shows that Alibaba had continued to use a whole host of exclusivity practices during the class period, and this subjected the company to material undisclosed risks of regulatory enforcement and penalties and, indeed, that's what ultimately happened.

Your Honor, Mr. Blake also said that our theory is premised on a duty to disclose that November 2019 meeting. Our theory of falsity is not premised on a duty to disclose the meeting, it's premised on the failure to disclose when talking about that meeting and Alibaba's enforcement that the company was continuing to use the very exclusivity practices it was told to stop, that it was continuing to use those during the class period.

This brings us deeper into the disclosure, your Honor. Alibaba says that we ignored the language of the disclosure —

we did not. We quoted the full language, the pertinent part of the disclosure, including the reference to Alibaba's, quote, market approach with traffic resource allocation in paragraph 253 of our complaint. Mr. Blake also accused us of quibbling over the words that Alibaba used in that disclosure.

But, your Honor, the words that it uses to communicate its business practices and risks to investors are important. Alibaba's argument essentially comes down to this, they are making a truth on the market argument saying that they fully disclosed to investors that they were continuing to rely on exclusive tee practices during the class period. Your Honor, they did not. A fair reading of the disclosures shows they did not. What they told investors, and bear with me, because it is a little bit cumbersome, but what they told investors is this: Some companies, including our competitors, business partners, and customers have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private litigation that targets our prior and current business practices, such as our market approach with traffic resource allocation on e-commerce platforms, which we base on multiple factors, and are alleged prior narrowly deployed exclusive partnerships.

Your Honor, this disclosure said nothing about Alibaba continuing to use any sort of exclusivity practices during the class period. In fact, the only thing it said about

exclusivity was the false assurance that its use of exclusive partnerships was over.

THE COURT: What do you claim was the corrective disclosure?

MS. WOLKE: The corrective disclosures in this case, your Honor?

THE COURT: With regard to this issue.

MS. WOLKE: Later in the class period on November 10th, the first corrective disclosure, and it's, in fact, a materialization of the risk, is when -- so the SAMR announces the new platform rules on November 10th. Those rules provided new penalties for violating the AML, for violating the exclusivity prohibitions of the AML, and those penalties, under those penalties, quote, violators may be forced to divest assets, intellectually property or technologies, open up their infrastructure and adjust their algorithms. That's at paragraph 24. So the conduct was already illegal. Alibaba had already been told that the conduct of exclusivity was illegal. November 10th announced new penalties for the violations of it specifically aimed at this type of conduct.

THE COURT: That doesn't address the information that you say wasn't disclosed.

MS. WOLKE: It is the further materialization of the risk of Alibaba continuing to use it's undisclosed continued use of exclusivity practices during the class period.

THE COURT: But I'm trying to figure out, when you say it was undisclosed on whatever previous date, and then you say that, at this point, that the regulators laid out more specifically what the rules and penalties are, but that doesn't correct what you claim is a nondisclosure.

MS. WOLKE: Well, your Honor, it is a partial materialization of the risk because the market certainly interpreted this move as a crackdown on Alibaba and its practices.

THE COURT: Right, but what does it have to do with Alibaba, your statement that Alibaba failed to disclose that they were continuing to engage in this practice? That doesn't give the market information about their continued use of this practice that you say that they misrepresented and, therefore, the market reacted when they found out the correct information.

MS. WOLKE: Well, again, your Honor, November 10th is just the partial materialization of the risk. The reason why the market was reacting to this as a crackdown on these very practices is that Alibaba, at the time, was the largest e-commerce retailor in the world. This was clearly directed at Alibaba's practices.

THE COURT: I'm not sure I understand that why you say that's clearly directed at Alibaba. The question is, is whether or not the market reaction was in response to their finding out that Alibaba was continuing this practice. That

was your argument, that the misrepresentation is that they say this was a prior practice, not a current practice. But that doesn't say anything about -- that doesn't give the investor any more information about whether Alibaba's practice is a current practice or a prior practice.

MS. WOLKE: And this is why the November 10th drop is not alleged as a straight corrective disclosure, your Honor. It's alleged as a --

THE COURT: My original question was what was the corrective disclosure, and this is where you brought me to, where you say -- I'll ask that again. What do you say --

MS. WOLKE: Apologies for me confusing the record on that, your Honor.

The corrective information on Alibaba continuing to have used exclusivity practices during the class period comes on December 23rd, 2020.

THE COURT: In what form?

MS. WOLKE: There's the announcement by the SAMR that it was going to conduct an investigation into Alibaba upon allegations of Alibaba engaging in such monopolistic conduct, and that's at paragraph 130 of the complaint. It specifically revealed to investors that the SAMR was investigating reports that, quote, Alibaba had engaged in monopolistic conducts such as placing unreasonable restrictions on merchants and other users of the platforms.

THE COURT: That still doesn't tell me whether or not that's a prior practice or a current practice.

MS. WOLKE: It reveals to investors -- sure, your Honor, it does.

THE COURT: Where does it say that is a current ongoing practice?

MS. WOLKE: Because there were reports to the SAMR that Alibaba was engaging in this conduct after it had been told to stop, and the SAMR was announcing we are going to conduct that investigation into those --

THE COURT: Where is that, because that's not what you just quoted to me. Where is a disclosure that they're engaged or continued to be engaged in this practice?

MS. WOLKE: It's paragraph 130, your Honor. What it says was the SAMR launched the investigation amid reports that Alibaba had engaged --

THE COURT: Had engaged, not are engaged. It says has engaged. That's a reference to that prior conduct. There's not a reference to the current or future conduct necessarily. That doesn't say that they are engaging in or continue to engage in. I'm not quite sure I understand how that statement corrects the misinformation, that this was a prior practice rather than a current or ongoing practice.

MS. WOLKE: Well, your Honor, so there is law from the Lloyd case in the Ninth Circuit. In this type of announcement

of regulation or the announcement of an investigation where the announced conduct is later confirmed as it was here, that further supports loss causation for the drop. That's 811 F.3d 1200 in the Ninth Circuit.

THE COURT: I assume that if Alibaba had made such a disclosure itself in the language that you're quoting here, you would not be arguing that that was an accurate representation or disclosure of their ongoing practice, that they're continuing to engage in this practice.

MS. WOLKE: If Alibaba had --

THE COURT: Had said that language that you just read.

MS. WOLKE: That it was continuing to engage in monopolistic conduct, I think that would have caused a drop --

THE COURT: Is that what it says, it's continuing to engage in monopolistic conduct? I didn't hear that when you read it. Is that part of what it says?

MS. WOLKE: These were current reports made to the SAMR about Alibaba's conduct. There's nothing --

THE COURT: I know. But what you just said -- I'm trying to understand what you just said. That's not the quoted language. That language that you just quoted to me, those words are not in that announcement.

MS. WOLKE: I think it is fair to read this announcement as revealing to the market that Alibaba was --

THE COURT: I understand that argument, but I just

want to make sure that you are not saying that it was a direct statement about the fact that they were currently engaged in the practice that was being investigated that turned out to be the corrective disclosure of what you say was their statement, which misled the investors to believe that this was a prior practice. I don't read that language that says, well, this is not a prior practice, this is a practice in which they're currently engaged.

MS. WOLKE: Well, it was revealing to investors that there were current reports being made to the SAMR and --

THE COURT: Where's that, because that's not what you quoted to me. That's what I said. My question was very direct and simple, where's the corrective disclosure, and you read this to me, and this doesn't say anything about that, the timing of when they --

MS. WOLKE: It says, your Honor, quote, the SAMR said it, quote, had started the investigation amid reports that Alibaba -- so it is saying that --

THE COURT: And you didn't read the rest of that. Amid reports that Alibaba had engaged.

MS. WOLKE: Had engaged.

THE COURT: So that's an investigation of prior conduct. That doesn't say that that's necessarily an investigation of current conduct.

MS. WOLKE: Your Honor, it would include all conduct

up until December 23rd. December 22nd would be prior to December 23rd.

THE COURT: That's not the definition of the word "had," isn't it? There may be something more in conjunction with that that you say clearly indicates, corrects the misinformation that this was prior activity. If I say that I went to the bank last week and you say, well, you didn't disclose that you robbed the bank, and then there was a report saying, well, we're investigating this and trying to investigate whether he had robbed the bank, why would I assume that that's information telling me that I'm currently robbing the bank?

MS. WOLKE: Your Honor, I don't see why investors should be charged with fairly reading this to only reveal that Alibaba had engaged in such conduct prior to the start of the class period. That's also not a fair reading of the disclosure. And it's --

THE COURT: -- that the fair reading of that statement is that they're currently involved in this activity?

MS. WOLKE: Yes, I do, because that's --

THE COURT: Why would they use the word "had" instead of saying we're investigating their current or ongoing or continued use of this practice? You have to acknowledge that, grammatically, "had" is a reference to the past tense; right?

MS. WOLKE: And this is just one New York Times

article reporting what had happened. And why that reporter chose to use the word "had" as --

THE COURT: Again, I'm not wedding you to that. That's where you took me when I asked you what corrected the misinformation that it was a prior practice, not a current practice. You pointed me to that statement that they said they were involved in an investigation, about whether or not they "had" done this. Let's put it this way, if we were nonlawyers here, there's nobody that would react to that as being an investigation of a current practice as opposed to a prior practice.

MS. WOLKE: Well, your Honor, it is important to note that the SAMR found that the practices, in fact, were continuing to occur throughout the entirety --

THE COURT: Where is that, though?

MS. WOLKE: In the SAMR report. So the SAMR investigation is launched on December 23rd, it investigates Alibaba's conduct from -- the earliest that it discusses in the SAMR report, and this is exhibit --

THE COURT: Where does it say -- how is it a corrective disclosure if you claim it was a corrective disclosure?

MS. WOLKE: The SAMR report reveals that Alibaba had not stopped the conduct at any time prior to when the SAMR --

THE COURT: Is there some language that says that?

MS. WOLKE: The SAMR order that orders the company to stop the practices is what reveals the practices had been ongoing. If the company had voluntarily stopped this stuff at some point prior to the SAMR investigation and report, I'm sure that would have been reflected in the report, but they did not because Alibaba had not voluntarily stopped the practices is the very reason why the SAMR had to order it to stop.

THE COURT: And when did that occur?

MS. WOLKE: In April. April was when the report came out, but it's clear from the report that the practices had been ongoing up until the point that the investigation was launched and Alibaba was eventually ordered to stop.

Your Honor, so I have a translation of the SAMR announcement itself. I apologize because I don't know if this exact document is in the record. I'm happy to show it to counsel and to your Honor.

So what I discussed with you was one New York Times article reporting on the announcement, and this is what the SAMR said. Recently, the State Administration for Market Regulation acting on a tipoff has launched an investigation into Alibaba's alleged monopolistic practices including, quote, pick one from two. Your Honor, this is an investigation into the very practices that the plaintiffs allege had been concealed and misrepresented throughout the class period.

THE COURT: I understand that, but again, I don't see

that you're arguing there was any direct statement or you're not quoting to me any direct statement that clearly would indicate to an investor that this is an ongoing practice, that this is a current practice.

MS. WOLKE: I don't think it's a fair reading of the disclosure, your Honor, to give Alibaba the benefit thinking that it referred to some practices that were so stale to have occurred before the class period.

THE COURT: I'm only questioning that because that's the argument that you're making, that they misrepresented that it was a current practice, and your securities claim is that when the public found out that this information had been kept from them, they stopped, reacted in a negative way, and I'm trying to figure out what it is that put the public on notice of more information than they previously had when you say they made those statements.

MS. WOLKE: I think the fact that the SAMR launched its investigation in response to reports made to the SAMR about the company's monopolistic practices is what tipped off the market to say, wow, that stuff that they said that they stopped doing back in July, apparently they didn't stop doing it.

So, your Honor, going back a little bit, back to the defendant's argument that its use of exclusivity practices was they said indisputably disclosed. Your Honor, this essentially amounts to an improper truth on the market defense, which the

Second Circuit has held in the Gavino case, is intensely fact specific and rarely an appropriate basis to grant a motion to dismiss. Again, in the language, when Alibaba talked about its practices, the only thing it said about exclusivity at all was that it was prior, that it no longer continued to do it.

And again, in the Gavino case, the Second Circuit stressed that for supposedly, quote, corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counterbalance effectively any misleading information created by the alleged misstatements. Your Honor, defendants simply cannot show that here as a matter of law. The opaque reference in that disclosure to, quote, traffic resource allocation is not sufficient to warn reasonable investors that Alibaba was, in fact, continuing to employ a whole host of exclusivity practices during the class period in contravention of the SAMR's directive, and it's especially not sufficient to warn investors of that when, again, the only thing it said about exclusivity at all was that exclusivity was over.

Which brings us to the defendant's next argument, your Honor. They claim that with respect to the company's statement that it no longer used, quote, exclusive partnerships, that that was not a misleading statement because, according to Alibaba now, not in anything that they said at the time to investors, but according to Alibaba now, they define the term

"exclusive partnerships" to be so limited as to mean only practices of absolute exclusion, outright bans, outright blocking, or unconditional, choose one of two. Those are phrases that were never used at the time either by the SAMR or by Alibaba in discussing these issues with investors. Instead, the SAMR told Alibaba that, quote, the behaviors of choose one of two and exclusive trading were explicitly prohibited.

So now, on this motion to dismiss, Alibaba can't be allowed to so narrowly define its use of the term "exclusive partnerships" as to refer to only something that it now calls outright blocking of merchants to escape liability for misleading investors. The question is whether a reasonable investor would have been misled by Alibaba's statement that its use of exclusive partnerships was over, and we sufficiently allege that they would have been.

Moreover, your Honor, even if Alibaba were permitted to so narrowly read the term "exclusive partnerships" on this motion to mean that it had only stopped outright blocking or it stopped requiring absolute exclusivity, the record does not support the defendants' claim that such absolute practices had ended. In fact, the SAMR report found that during the class period, Alibaba — and this is a quote — directly prescribes in the agreements, and this is the court agreeing with core merchants, that opening shops on other competitive platforms is prohibited. That is in paragraph 138 of the complaint.

Your Honor, any reasonable jury could interpret that prohibition in Alibaba's customer agreements that it used with its merchants to require unconditional or absolute exclusivity and find that investors were thus misled on that point during the class period.

Your Honor, the defendants, both today and in their briefing, also entirely skip over plaintiffs' item 303 claims. I think I've sufficiently addressed why we think that the statements about the practices and legal compliance were misleading. They don't address item 303 at all. The only thing they say about it is that, quote, the alleged omissions are either not well pleaded or were well disclosed and well known to investors. That's in their motion to dismiss at note 13. The omissions are well pleaded and, as I've just discussed, they were not fairly disclosed to investors. The practices were concealed from investors.

Your Honor, the facts of this case are actually quite similar to a previous securities class action against Alibaba, and that's the Christine Asia v. Ma case that went up to the Second Circuit. In that case, the Second Circuit found there was a duty to disclose under item 303 because Alibaba had been called to a meeting with the SAMR. At that time, it was called the SAIC, same agency, different name. At that time, the regulator told Alibaba you need to clean up and fix the problems of selling counterfeit goods, counterfeit merchandise

on your websites, and if you don't, you're going to face the risk of material regulatory penalties. And leading up to Alibaba's IPO, it did not disclose the meeting or did not disclose the instruction and it did not disclose the threat of penalties and, importantly, that it had continued to allow the proliferation of counterfeit goods on its websites, despite the instruction to stop it.

This is very similar here, your Honor. The defendants continued to use the very practices it was instructed to stop, and the continued use of those practices exposed the company to material fines. Alibaba knew that those fines were up to 10 percent of the company's annual sales, and in so doing, Alibaba risked mass -- or failed to disclose the risk of massive impacts on the company. The facts of Alibaba, one, even put them on stronger notice of the item 303 duty to disclose here.

Now, your Honor, moving into *scienter*. Mr. Blake brought up the lack of motive, but the Supreme Court has thoroughly addressed this, Tellabs and Matrixx makes clear that motive is not required to allege *scienter* under the securities laws.

In fact, your Honor, this case provides even more of a reason not to attribute anything to the lack of motive here. As your Honor may be aware, U.S. issuers, insiders of U.S. issuers have a duty to electronically file with the SEC a

Form 4 within two days of transactions, disclosing their transactions in the company's stock. Insiders of foreign companies unfortunately do not have the same requirements. They get to file a Form 144 on paper, by mail, and it can often be long after the transactions at issue are made. Moreover, the SEC, under its rules, only keeps those paper filings for 90 days. So there can be no inference here drawn against the plaintiffs for the failure to allege any insider sales against defendants Zhang or Wu because we just may not have those facts yet, that would be a topic of discovery.

Moreover, defendants did allege material insider sales by defendant Ma during the class period.

THE COURT: Plaintiffs allege.

MS. WOLKE: Your Honor, this is one of those cases where the facts that show how investors were misled also support the facts that establish the company's *scienter*. Again, a brief review of what Alibaba knew when it told investors it no longer required exclusive partnerships as important. November 2019, it was told the behaviors of choose one of two and exclusive trading were clearly prohibited. July of 2020, Alibaba affirms that understanding in the commitment letter where it agrees it will not require, quote, exclusive cooperation or exclusive authorization of its merchants. In the 2020 form 20-F, Alibaba tells investors it no longer requires exclusive partnerships, and because of that,

it believes it's in compliance with the law. And despite all of that, we know from the SAMR report that Alibaba did continue to require merchant exclusivity during the class period.

On these facts, plaintiffs have alleged that Alibaba was at least extremely reckless with respect to its disclosures about Alibaba's business practices and about its compliance with the law. The facts viewed holistically also give rise to a strong inference that both Zhang, the CEO, and Ms. Wu, the CFO knew about the SAMR's instructions and also knew about the ongoing exclusivity practices during the class period.

The SAMR report makes clear that Alibaba had widely required exclusivity in its written merchant agreements and verbally required since at least 2015. It was embedded within Alibaba's platform rules, and it was also embedded within its data algorithms it used to run its platforms. This is sufficient to allege that Wu and Zhang, quote, knew facts or had access to information suggesting that the public statements about Alibaba's practices and its legal compliance were not accurate. Defendant Zhang was the COO until -- the chief operating officer until 2015 when he became the CEO. He would have been familiar with these business practices. This was Alibaba's standard method of business practice. Similarly, defendant Wu was the CFO from 2013 through 2022. She would have been familiar with what was in Alibaba's merchant agreements for its core merchants because that was how Alibaba

derived the vast majority of its revenue.

As Mr. Blake brought up, Alibaba had been sued earlier in 2019 about these practices, and Mr. Blake also brought up the fact that Alibaba publicly defended these practices. The defendants can't claim to have publicly defended the practices and then also claim to have had no knowledge of the practices. On this point, your Honor, the issue how they publicly defended the practices is important. Mr. Blake said they established there is no *scienter* because they publicly defended the practices. But it's important to know, and I'm looking at the chart 13 that he provided in his presentation to the Court, in the media, in the court, and before regulators, they say Alibaba defended these practices. There's no way they can be *scienter* there. Your Honor, all of those events were before November 2019 when the SAMR explicitly told Alibaba, clearly, you can no longer continue to use choose one of two and other exclusive trading practices. After that, there's nothing in the record about these public defenses of the practices. In fact, the only thing in the record that we have is in the 20-F when it tells investors falsely that it stopped requiring exclusivity practices. And we also have the commitment letter in July of 2020 where it reaffirms to the SAMR, Alibaba reaffirms to the SAMR that it would no longer require exclusivity practices. So the public defense of these practices does not defeat *scienter*, it establishes the

defendants' knowledge that this is how the company had been doing business for years.

Defendants also cite the Second Circuit case in Jackson v. Abernathy, to say that the *scienter* of the Alibaba official, her name is Wen Jia, that the company sent to attend the 2019 meeting with the SAMR on behalf of the company cannot be imputed to the company for purposes of *scienter* in connection with its disclosures and the 20-F. Your Honor, in Jackson, there's an important distinction here, in Jackson, the court declined to impute corporate *scienter* from an executive to the company because there, the court held that the plaintiffs had failed to allege the sufficient, quote, connective tissue between the employee's knowledge and the company's statements. Here, your Honor, plaintiffs clearly allege the connective tissue between when Wen Jia's knowledge and Alibaba's statements about its exclusive partnerships, about its interaction with the SAMR and about its purported legal compliance during the class period.

Ms. Wen was Alibaba's president of public affairs. Her job was to interface with the regulators on behalf of the company. Alibaba chose to send her to the SAMR meeting on the topic of exclusive dealing, and she gave prepared remarks on behalf of Alibaba at that meeting and she received the administrative guidance on behalf of the company at that meeting. Alibaba then turned around and made a specific

disclosure in it's 20-F about interactions with the SAMR, about exclusivity practices and about legal compliance. They can't turn around now and disclaim knowledge of everything Ms. Wen knew. These facts are specific connective tissue under Jackson and under previous older Second Circuit precedent like Lorelei to establish the company's *scienter*.

At the very, very least, your Honor, on all of these facts about what the company charged Ms. Wen with, it would have been extremely reckless for them to craft the disclosure on these specific topics without discussing with her what the company's interactions and what its ongoing practices actually were.

Your Honor, there is additional *scienter* allegations here. Again, these practices were deeply engrained and ongoing exclusivity practices that were enshrined in numerous of the company's written documents, including Alibaba's strategic merchant framework agreements, its joint business plans, and its strategic cooperation memorandum. That's at paragraph 138 of the complaint.

One other thing I wanted to mention about Alibaba, and in particular, Ms. Wen's public defense of the practices at the November 2019 meeting, it's important to note, and this is in paragraph 110 of the complaint, that it was after she defended Alibaba's exclusive partnerships that the SAMR official gave his remarks and reiterated to her that exclusive partnerships

and choose one of two practices were clearly prohibited. So that public defense was squarely shut down by the SAMR in November of 2019.

Finally, on the issue of *scienter*, your Honor, the defendants talk a lot about how they truly believed that Alibaba's use of, quote, traffic for exclusivity incentives were lawful. That cannot give rise to more compelling inference against *scienter* here, your Honor.

Number one, it ignores the SAMR's findings that the supposed traffic for exclusivity incentive were not incentives at all. What the SAMR said, and this is in Exhibit 8 to the complaint in the SAMR report at page 11 and page 12, it found that those supposed incentive agreements were not voluntarily entered into and did not receive adequate consideration. But even worse, your Honor, they tried to proffer an inference based on Alibaba's belief and its traffic for exclusivity incentives, but they ignored a whole host of findings in the SAMR report and alleged in the complaint that Alibaba went well beyond merely offering traffic for its exclusivity incentives, it explicitly required its merchants to agree to exclusivity and it punished merchants who didn't comply. It did this by monitoring their activity on other sites, it lowered them in search results, it did a whole host of punitive measures, and Alibaba doesn't even attempt to grapple with their supposed belief and the legality of those measures. They can't raise a

more compelling inference by ignoring so many of the facts alleged.

And finally, they make an argument about the AML was complex, they didn't quite know how to comply, but even if your Honor accepted that explanation, that would not even negate *scienter* at all with respect to the false claim that its use of exclusive partnerships was over, they continued to require merchant exclusivity throughout the class period.

So, your Honor, unless you have any other questions for me or want to delve back into the loss causation allegations, that's all that I had prepared to address on the question of exclusivity.

THE COURT: How much time did you want? Trying to figure out --

MR. KRAJCER: I apologize, your Honor, but I think it's actually about 45 minutes or so.

THE COURT: Then let's take the lunch break. I'll give you an opportunity to be heard. Let's come back at 2:15.

(Luncheon recess)

AFTERNOON SESSION

2:16 p.m.

THE COURT: Yes, sir.

MR. KRAJCER: Thank you, your Honor. I'd like to start by addressing the insider trading claims and then addressing the misstatement and scheme claims because the insider trading claims present a substantially narrower set of issues than the other claims. None of the threshold arguments that defendant Ma raises, personal jurisdiction, extraterritoriality, statutory standing, Janus, none of those apply to the insider trading claims.

First, with respect to personal jurisdiction. As we set forth in our opposition brief, the act of trading ADS on a U.S. stock exchange is itself a purposeful availment of the instrumentalities of United States commerce and, by itself, is a sufficient predicate for jurisdiction. Defendants don't dispute this. The only thing they say in footnote 4 of Ma's reply brief is jurisdiction needs to be established on a claim-by-claim basis. So the fact that we have jurisdiction for the insider trading claims doesn't automatically mean that we have jurisdiction for the other claims, and that's fair enough. They also say that the substantive pleading for the insider trading claims are defective. What that means is there is no jurisdictional issue with respect to the insider trading claims. Those claims will live or die just based on the

substantive pleading in those claims.

Secondly, with respect to extraterritoriality, defendants say that our claims are impermissibly extraterritorial because the challenged statements in the Ant prospectuses were followed on the Hong Kong stock exchanges and the acts in furtherance of the scheme all occurred within China, but the insider trading claims are not based on any statements in the prospectuses or any statements at all or on any act in furtherance of a scheme. Under rule 10b-5-1, a defendant in possession of material inside information has a duty to disclose or abstain from trading. So, Ma says, in footnote 6, that plaintiff's insider trading claims are nonetheless tied to the Ant prospectuses because they are tied to information that is alleged to have been omitted from the Ant prospectuses. But again, the insider trading claims are not anchored to any particular statement. It's simply a rule of disclose or abstain. So it doesn't matter whether the statement would have been made in Ant prospectuses or anywhere else. If he is in possession of material insider information, he has a duty not to trade or to disclose it. There is no reliance on the Ant prospectuses with respect to those claims.

Third, with respect to statutory standing, again, the argument here is that purchasers of Alibaba, ADS cannot sue about statements in Ant prospectuses because those are prospectuses of a different company. Again, the insider

trading claims have nothing to do with any statements in those prospectuses. Ma argues in footnote 10 of his reply brief that the statutory standing argument nonetheless applies to the insider trading claims because those claims are based on the same underlying factual allegations as the misstatement claims. Even if there is an overlap in the underlying factual allegations, the elements of the claims are different, and what we need to prove in connection with those claims are different. Again, even if there is nothing to do with the Ant prospectuses, the insider trading claims rest solely on whether or not Ma had material inside information at the time of his trades.

Finally, with respect to Janus, that has to do with who is the speaker or the maker of a particular statement, and again, the insider trading claims do not require any statements.

So, I'm going to now move over to the substance of the insider trading claims.

First, Ma raised a challenge in his motion to dismiss concerning the contemporaneousness of lead plaintiff's trades with Ma, but he does not dispute that Ma's trades were contemporaneous with the trade of additional plaintiff Yan Tongbiao. So that is all that we need in order to establish standing for these claims.

Now, the plaintiffs' insider trading claims are based

on three different sets of information. First, undisclosed risks in relation to the completion of the Ant IPO based on the concealed ownership interests of certain politically sensitive investors; secondly, undisclosed risk to the completion of Ant IPO based on violations of the FHC violations; and third, undisclosed risks of regulatory action against Alibaba based on its exclusivity practices. I'll address each in turn.

First, with respect to the Ant investor claims, a number of Ma's friends and business associates have invested into Ant during the early rounds of its pre-IPO financing. Two are of particular note. One is Jiang Zhicheng, the grandson of the former Chinese leader Jiang Zemin, and a founding partner of Boyu Capital.

The second was Li Botan, who is the son-in-law of Jia Qinglin, a former member of the Politburo Standing Committee. He was the founder and controller of Beijing Zhaode, and the founder of the Maotai Club. Both Jiang Zemin and Jia Qinglin are associated with the so-called Shanghai faction and their interests are -- generally seems antagonistic to those of President Xi. According to a February 16th, 2021 lawsuit journal article, Jiang and Li used a convoluted series of investment vehicles in order to disguise their investments into Ant.

So, a threshold issue here is whether or not or to what extent plaintiffs are entitled to rely on The Wall Street

Journal article. The leading Second Circuit authority on the use of anonymous sources is the Second Circuit's decision in Novak v. Kasaks. Under Novak, a plaintiff may rely on unconscious sources if either: One, the source is described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged; or two, other facts corroborate the source's statements. Plaintiffs satisfy both prongs of Novak.

First, with respect to particularity, what facts are sufficiently particular depends on the facts and circumstances. As acknowledged by the case Miao v. Fanhua, which is one of the cases defendant cites in his opening brief, the probative value of an independent news article is much greater than that of confidential witness statements recounted in another complaint. Ma cites awe number of district court decisions in both his opening brief and his reply brief in which district courts discounted allegations from newspaper articles, including The Wall Street Journal.

THE COURT: What's the specific information in that article that you're relying upon?

MR. KRAJCER: The article makes a number of factual allegations, but generally would be categorized into three things. First, it describes a particular set of investment vehicles that Jiang used to invest into Ant, and through those series of vehicles, ultimately there was an entity called

Beijing Jingguan, and that was the entity that purchased within Ant.

THE COURT: Why is there some requirement to disclose that publicly?

MR. KRAJCER: Well, there is several things. First of all, again, with respect to the misstatement claims, there is a number of misstatements that we say -- there are a number of statements in the Ant prospectuses that we say are misleading in the absence of that disclosure.

THE COURT: I know, but I'm trying to focus on what information you're getting out of the article, not what information you're getting out of the report.

MR. KRAJCER: Understood. But with respect to the insider trading claims, what's misleading, or again, for -- the reason why this states a claim for insider trading is that there were risks, material risks that threatened the consummation of an Ant IPO that Ma knew about that he did not disclose, and he had the duty to disclose that information or to abstain from trading.

THE COURT: That's what I'm trying to focus on, what specific information you're talking about, because there's significant risk of language, and that's not in and of itself actionable. Investors know that there are risks. Most of the public filings use the phrase "risk" and refer to "risk." So what information do you say is coming out of the newspaper

article that elucidates what the nature of the risk was that should have been disclosed?

MR. KRAJCER: The risk was that there were two investors who had political interests against President Xi and who presented a threat to the regulatory approval of the IPO, and that they invested in Ant using a series of investment vehicles that disguised their identity. Specifically, with respect to Jiang, that he did so in a way to violate Chinese law that restricted offshore investment into payment services companies.

THE COURT: Why would the political circumstances with regard to the government, why would that amount to inside information?

MR. KRAJCER: The reason, your Honor, is that --

THE COURT: I mean, first of all, that was not generally known?

MR. KRAJCER: Well, it was not generally known that these individuals invested into Ant.

THE COURT: Right. Well, that's a different question. The nature of the political climate was generally known?

MR. KRAJCER: Yes, precisely, your Honor.

THE COURT: You're saying that they did something to disguise the fact that they were the investors?

MR. KRAJCER: Yes.

THE COURT: And that, are you saying that, in and of

itself, is inside information?

MR. KRAJCER: It was inside information that these individuals had invested and that they had used a series of investment vehicles to hide the fact that they invested.

THE COURT: I'm not sure I know of any case that says it's inside information that these individuals invested. I never heard that theory. That, in and of itself, the fact that they invested rarely, if ever, is the inside information.

MR. KRAJCER: The specific facts of this case are unique, your Honor.

THE COURT: I know. You're saying that -- I'm not sure how you're trading on inside information if the inside information is that you're trading.

MR. KRAJCER: The inside information was that two investors who were political antagonists to President Xi had used illegal methods to invest into Ant, and our allegation is that Ma knew this and he knew that if regulators found out about it, that it presented a risk to the consummation of the merger --

THE COURT: What was the illegal methods and where did that come from, the newspaper article? Or are you saying you have some other independent evidence of that?

MR. KRAJCER: The newspaper article said that at the time Boyu made its initial investment, that offshore investors — and Boyu is considered an offshore investor — were not

permitted to invest in payment services companies.

Now, a VIE is an investment structure where the control is not exercised through the ownership of shares. Instead, it's exercised through a series of contractual or under-the-table arrangements whereby a person who's not the nominal owner of the company can control the company through these series of contractual or other under-the-table arrangements.

THE COURT: And you're saying that violated U.S. or Chinese law?

MR. KRAJCER: Chinese law.

THE COURT: Okay.

MR. KRAJCER: So our contention is this is what was illegal. So the defendants were not able to rely on this information at all, it's unreliable. It's just information that's unconsciously sourced in The Wall Street Journal and we can't rely on it, and they cited a number of cases on that.

THE COURT: But before they traded, what was the state of the inside information?

MR. KRAJCER: Before Ma traded?

THE COURT: Right.

MR. KRAJCER: These individuals invested into Ant before the IPO between 2015 and 2018.

THE COURT: And you say that Ma should have disclosed that they had made that investment?

MR. KRAJCER: Yes --

THE COURT: Without trading on that knowledge?

MR. KRAJCER: Right. Our argument is that Ma knew about this and he actually helped them structure these vehicles in a way that would hide their investments. But independent of that portion of our scheme claim, our allegation with respect to insider trading is just has knowledge of the fact that these investors had used these investment vehicles to conceal their interests, that he knew that it was illegal at least with respect to Boyu --

THE COURT: And you're getting this from where, from the newspaper article or are you getting this from some other independent source?

MR. KRAJCER: We're getting it principally through The Wall Street Journal, and that we've confirmed a large portion of that through plaintiff's own investigation of SAMR records, and also through reporting from a number of other news articles, including, principally, there is two articles we cite in the complaint from a website called Today China that provides a lot of background information about the political conflicts between these individuals and Ma's connections to these individuals.

THE COURT: But other than the newspaper article, what is the independent evidence that Mr. Ma traded on this information?

MR. KRAJCER: Well, unpacking that requires a bit. So first, I guess -- I mean, one thing to first is discuss is -- and I want to make sure what the Court is asking. One is, how did we confirm that what The Wall Street Journal said is correct about the investments themselves, that they occurred, and then separately is the question of Ma's knowledge of that. And I can go through each of those separately.

THE COURT: All right.

MR. KRAJCER: First, if you would like to refer to page 20 of the defendant's presentation, this is sort of what we did to confirm The Wall Street Journal's articles. So the table here that's on the left, this is the table that's reproduced from The Wall Street Journal. The other table on the right and below the dotted line, that is the chart that plaintiffs produced with respect to their own corroboration of the records that are -- of the SAMR records to confirm the allegation.

So, what the defendant is saying is that we haven't actually proven this because we've only, in essence, confirmed the information below the dotted line. We were able to trace the fact that Shanghai Tiancen did invest in Beijing Jingguan Tiancen asset management partnership, which, in fact, did invest in Beijing Jingguan Investment Center, which, according to the Ant prospectus, invested into Ant for an interest that was about 0.92 percent of Ant's total stockholdings, which

represented an estimated value of approximately $2 billion.

THE COURT: What is the evidence that Mr. Ma had anything to do with this?

MR. KRAJCER: I wanted to -- I can answer that question, but I wanted to, before skipping ahead, what the defendants say is that we don't show, we don't confirm the top part of the chart, the chart that shows that, in fact, Jiang invested into Shanghai Tiancen Investment. And the evidence that we use for that, it's in paragraph 345 of the complaint.

What it shows is that there is a Boyu-associated email address and phone number as the official contact information for Shanghai Tiancen affiliate, and that there is a close clustering of registration dates for a series of Shanghai Tiancen and Boyu entities, and that provides strong circumstantial evidence that Shanghai Tiancen was a VIE of Jiang.

What defendants are saying is there is no proof in the public records that, in fact, Jiang did invest in this company. But that wouldn't corroborate our allegations. It wouldn't be a secret investment vehicle if it was all in there in black and white in the public records.

What's alleged here is that you can discern clearly from the public records, bottom portion of this chart, but the top portion of this chart, there is evidence of a VIE, there is evidence that these people are the ones that are behind this

investment vehicle, even though there's not a directly proveable chain of ownership.

THE COURT: And what is your information and belief that that's based on?

MR. KRAJCER: Our information and belief is based on the fact that the information, the registration filings for Shanghai Tiancen and Shanghai Tiancen vehicles are a Boyu email address. So, to disguise their fingerprints on this deal, they didn't put their names down as the owners of this. Instead -- but there are people, the people who ran it were people from Boyu. Those were the people that set up these vehicles. They did it in such a way as to disguise their interests.

THE COURT: Okay.

MR. KRAJCER: Now to answer your second portion of your question, which is how did Ma know about it.

The first is that these are individuals with whom Ma had prior relationships, and I'll discuss each one separately because each one is different. So the first is Jiang, he's the owner or the founder, rather, of Boyu Capital. Boyu Capital was involved a prior deal with Alibaba in 2012 where he organized a consortium of investors, including China Investment Corp., which is a China sovereign wealth fund, and he helped pull together all of the money that helped Alibaba -- $7 billion, it helped Alibaba buy back stock that Yahoo had, and this was a previous relationship with Jiang.

Furthermore, in the current deal, Ma was -- and this is from The Wall Street Journal article, as well as from the Today China article, Ma recruited a series of these -- excuse me. Strategic investors, which are state affiliated companies to become investors into the -- into Ant, and he did that for the purpose of securing buy-in from the communist party. The entre point that Ma had to these companies was Jiang, was Boyu. These were the contacts that he was using to help recruit the strategic investors. He had a prior deal from this.

THE COURT: Where are you getting that from? Where is that information coming from?

MR. KRAJCER: It comes from a series of the Wall Street journal articles.

By the way, one of the things that the Wall Street Journal -- the defendants say is unreliable. This was not one Wall Street Journal article. There was an entire series of articles that was prepared over a series of months where they were covering, very heavily, the Ant IPO, which was expected to be the biggest IPO in history. So this was a very important story, significant story, and the Wall Street Journal dedicated a lot of time and resources to cover it. So part of this information is coming from a subsequent story from the Wall Street Journal afterwards that said after the IPO was canceled, there was an initial investigation which led to the cancellation in which the regulators discovered the interests

of these other investors, but then after that, there was a second investigation launched, and that second investigation was focused on Ma's relationship with the strategic investors. So a lot of this evidence, your Honor, is circumstantial, but that's permitted.

One of the things that I skipped over before was that the defendants cite a lot of cases that said you can't rely on unsourced information from the Wall Street Journal. They ignore the Second Circuit's opinion in Synchrony, which also, in that case, the plaintiffs relied on unconsciously sourced Wall Street Journal articles.

And one of the things there that the Court says is that you can rely on circumstantial evidence, it also was in the Second Circuit's decision in Altemeyo (ph.). All the cases that the defendants cite, all of the district court decisions that they cite concerning the newspaper articles were decided before the Second Circuit's decisions in Synchrony and Altemeyo (ph.), which make clear with respect to newspaper articles, the plaintiffs can rely upon them so long as they can partially corroborate what they're doing. And even in the absence of that corroboration, if there is other indicia of reliability, they can rely upon them. Here, there is strong circumstantial evidence, and we admit that it is circumstantial that shows that Ma was connected with these individuals, that these were his friends --

THE COURT: Can you slow down a little bit.

MR. KRAJCER: Sure.

THE COURT: And the court reporter --

MR. KRAJCER: -- these are the individuals that he was using to get access to the strategic investors, which shows that he did it.

Now with respect to the second individual, that individual was named Li Botan. He invested into -- if you could flip to page 21 of the defendant's presentation. The allegation in the Wall Street Journal is that Li Botan invested through Beijing Zhaode Investment Group, which is a company that he founded and controls and invested subsequently into a company called Tibet Hongde, into a company called -- which then invested into a company called Fuqing Qisheng 3 Investment, which then invested into a company called Shanghai Zhongfu Equity, which we sometimes refer to in the briefing as SZE. And then SZE is confirmed in Ant prospectuses to be an investor in Ant with a steak of approximately 1.29 percent that's worth approximately $3.17 billion.

What we were able to corroborate through the SAMR records is that Tibet Hongde invested into Fuqing, which invested into Shanghai Zhongfu. Again, the defendants raise the same types of criticisms that they raise with respect to Boyu and say that we haven't proven the top part of the chart, that Li Botan actually invested. Again, there is

circumstantial evidence here of a VIE relationship, that Beijing Zhaode was cross-invested in another company with Tibet Hongde, and this, in combination with the Wall Street Journal's articles' allegations, which we think are independently reliable, supports the conclusion that he did, in fact, invest through this secret chain of investment vehicles.

The other interesting part of this, though, is if you look at the left-hand portion of this chart, SZE was cross-funded with a separate entity that was controlled by Alibaba. The evidence here is suggestive of a joint-control relationship of SZE between Li and Alibaba, and we think that the evidence with these individuals supports the fact that Ma assisted Mr. Li in setting up this investment vehicle in this way to disguise his ownership interest.

Li, in addition to being the founder of Beijing Zhaode Investment Group is also the founder of something called the Maotai Club, which was this wine club in China that was known for lavish events, hosting political and business elites, and this was something that President Xi didn't like, he didn't like these events partly because he said these people are sort of drinking themselves to death. He thought it was unseemly that they were engaging in this lavish display of wealth, but also because there was power broking -- power broking and deal making occurring here with people he considered his political opponents. And so he cracked down on the Maotai Nightclub. At

the same time, he cracked down on another club, called the Jiang Non club, which was founded by Mr. Ma, and that is affiliated with the Maotai Club.

So, again, there is evidence here, circumstantial evidence, admittedly, that suggests that Li and Ma -- I'm sorry. That Li and Ma had a preexisting connection that they were involved in this deal together with the Maotai Club, that they were aware of a previous crackdown by the Chinese government on these clubs, and this -- then these political affiliates. And there is evidence here, through the public records, suggesting that Alibaba, together with Mr. Li, set up this SZE vehicle.

Furthermore, this is not clearly reflected in the chart. One of the allegations we make about false statements that's made in the Ant prospectus is another entity called Qizhan. The Ant prospectuses say that Qizhan is an independent third party. We allege that that is an affirmative flat false statement, that it is not an independent third party, that, in fact, it is a related party of Ma and it is a related party of Alibaba.

The information that we use to support this is that in the Ant prospectuses, Ant says that SZE is controlled by another entity called SZA, and also says that Qizhan is controlled by SZA.

Now, Qizhan was the entity that Ma used to parcel out

shares to the earliest set of pre-IPO investors back in 2015. He took a big chunk of his shares, he gave it to Qizhan so that Qizhan could start building it out to other private investors approved by Ma. So this entity, we allege, is a related party to Mr. Ma, a related party to Alibaba, and the evidence here suggests a power-sharing arrangement, there is 39.8 percent of SZE is controlled by Fuqing, 21.7 percent together, that's over 50 percent, and that is controlled together by Ma and by Mr. Li.

So speaking a little bit further about *scienter*. Part of the evidence of *scienter* is what I've already discussed, which is the information that's set forth in this series of Wall Street Journal articles, in these series of Today China articles about previous dealings between these individuals, and the fact that they engaged in constructing these secret investments.

Now, I wanted to point the Court's attention to the Ninth Circuit's decision in Capella Education. That was another securities fraud case involving a Chinese company and it is unpublished. What that court said is that sometimes the way a transaction is structured, in and of itself, is evidence of an intent to deceive, that the transaction structured itself.

And what we submit here, your Honor, is that these investment vehicles, as described in the Wall Street Journal

article, as corroborated through plaintiffs' investigation, clearly betray an intent to deceive. Yes, it's an intent to deceive by Li and by Jiang, but we contend that the supporting information supports that Ma knew this information, that he possessed this information about who these individuals were, what their interests were, and how they had structured their investments in order to evade Chinese law and in order to disguise their identity from Chinese government.

Now, in your Honor's own decision, you've indicated that information that's critical to a transaction -- you can infer *scienter* -- that if there is information that's critical to a transaction, you can infer that the control persons behind that transaction had that information. And that was in -- I'm sorry. The Rudani v. Ideanomics case. And there is one other that we cite in our papers that I don't have handy at the moment.

But here, the facts that we allege show that this information was critical to the transaction, that Ma knew that he needed buy-in from the Chinese government, and that's part of the reason he was recruiting these strategic investors, was because he knew that presenting a roster of investors that was politically acceptable to Xi's regime was necessary in order to obtain regulatory approval. So that suggests that he knew that his friends had engaged in these secret investment vehicles.

In addition, we present evidence of motive, which

further corroborates the inference of *scienter*, and there are two sets of motive allegations. The first concerns the IPO approval and the timing of the IPO approval.

The first point I wanted to raise is just a general matter of law, is that pursuant to Tellabs, even allegations of motive that are weak, even if allegations of motive that are insufficient to satisfy the Second Circuit's motive and opportunity test could be combined with other evidence of circumstantial evidence of conscious or reckless misconduct to together give rise to the requisite strong inference under Tellabs. We cite the Incest case for this and the Silvercorp case for this, and defendant Ma makes no response to those arguments in his reply brief.

So, Ma's motive to complete the IPO was that he owned approximately 11 percent of Ant shares indirectly, and the defendants say that he could not have had the concrete and personal motive that he needed to sell his shares because he was not a selling shareholder within the confines of the transaction and the IPO, and he agreed to a one-year lockup period for the Hong Kong stock exchange and a three-year lockup period for the Shanghai stock exchange. That's not such a long period to wait given the amount at steak. If the merger had been completed as originally scheduled, the one-year lockup period in Hong Kong would have already expired more than a year ago, and the three-year lockup period in Shanghai would be set

to expire ten months from now.

As we explained further in our opposition, Ma had a timing-based motive to complete the IPO on an accelerated schedule because what he wanted to do was to make sure that the IPO approved before the regulator shut down on him, and this is relating to both the banking regulations and also with respect to the discovery of these concealed interests of his friends. And circumstantial evidence bolsters the fact that this motive occurred because the second investigation launched by the Chinese government was partly based on how Ma was able to achieve obtaining the initial levels of the IPO approval so quickly and out of the ordinary schedule.

Defendant Ma argues that this risk would -- that we haven't adequately pleaded a motive because in the cases we cite, the Boeing and the May Port cases say that in those cases, there was a motive if the risk would dissipate immediately after -- afterwards.

But, in order for us to demonstrate a motive for him to complete the IPO on this rushed track, we don't need to show that the risk would completely dissipate, just that it would materially decrease. There are good reasons to believe the risk would materially decrease after the IPO was approved.

First, the Chinese government would not want to immediately reverse itself after approving the merger. And second, the strategic investors, the Chinese, state-owned

companies would have obtained a substantial benefit from the IPO. And if there was a delisting, that benefit would be removed. And third, if they were just, you know, engaged in a punitive action against Ma or against the Shanghai investors afterwards as opposed to doing it for a regulatory reason, that would look like a naked political attack on Xi's enemies. So it would be less patible for the Chinese government to do that. Finally, it's unlikely that the regulators would continue investigating into the ownership of the pre-IPO investors once the IPO is already approved.

A second set of motive allegations that we allege has to do with the insider trading. Because Ma was aware of the undisclosed risks to the completion of the IPO, he had an incentive to make his sales before those risks could materialize. Now, entities controlled by Ma sold 10 million shares of Alibaba ADS on September 30th and October 1st, 2020, generating gross proceeds of more than $2.9 billion. Defendant Ma claims that represented approximately 1 percent of his Alibaba holdings.

But, certainly, the amount here was material in absolute terms. Defendant Ma referenced the Oracle decision from the Ninth Circuit in which Larry Ellison sold approximately 2 percent of his shares for $900 millions, an amount that's substantially less than Ma traded here, and indicated that that was sufficient to support a strong

inference of *scienter*.

But here, the real interesting information with respect to the insider trading is not even the amount, but the specific facts about the timing. Under Second Circuit law, insider sales can be suspicious if either they're suspicious in amount or if they're suspicious in timing. Here, Alibaba first issued it's -- I'm sorry. Ant, on September -- on August 25th, Ant released its preliminary prospectus. On the same day, Alibaba announced the date of its annual meeting. This is important because the date of Ma's retirement was scheduled to coincide with the date of Alibaba's annual meeting, and that annual meeting did not occur on the same date or even the same month in each year. In 2018, it was in October; in 2019, it was in July; in 2020, it was in September; but this time, it was scheduled to coincide with Alibaba's Investor Day in which Alibaba would be spreading positive information into the market about itself and about Ant. During that -- during September 30th, which is the day of Ma's retirement and the day that he engaged in half of these sales, Alibaba's CEO told investors at Investor Day, the market is not giving us enough credit, it's not valuing Alibaba high enough because it's not counting Ant enough into the calculation. He was basically telling investors, go look at Ant, go look and revalue Alibaba based on the value of Ant. That day, Alibaba's stock went up materially, 6 percent, was statistically significant, and on

that day on those inflated prices, Ma traded 5 million of his shares.

Furthermore, he amended his 10b-5-1 trading plan just three days after the Ant prospectus was -- the initial Ant prospectus was filed. And the defendants, in their opening brief, they say that these sales are not suspicious, they were made pursuant to a 10b-5-1 trading plan, and then they abandoned that argument on the reply. And the reason is because there is substantial case law saying that when an individual amends their 10b-5-1 trading plan within the class period or after a misstatement is made, not only does that meant that the trading plan doesn't serve as an affirmative defense against insider trading, it actually affirmatively supports the inference of insider trading.

So you have your unusual circumstance in which Ma preannounced that he was going to retire, but he didn't say what specific day, and they end up scheduling it for September 30th, which happens to be Investor Day, and that was the first time -- in any of the previous years, Investor Day had never been scheduled on the day of Alibaba's general meeting.

So the facts here all support a strong inference that Ma carefully timed his sales to coincide with investor day, coincide with the time when the company would be spending -- spreading positive information about Alibaba.

Holistically, the defendants say that the balancing of

the inferences support -- do not support a strong inference of *scienter*. They say why would he have given steaks to these people in the first place. If he knew these people were toxic, why would he give money to them at all? And the answer is these were his friends. And he thought he could get away with it, and he thought that there was a good chance he could get away with it and he almost did. He was able to pressure his political allies, he was able to get initial levels of the Ant IPO approved in record time, and it just fell apart.

There is also evidence that suggests that the political landscape in 2015, in 2016, when these initial investments were made was not the same as the political landscape in 2020 when the IPO occurred.

According to another Wall Street Journal article and the series we cite in the complaint, in 2019, the rivalry between Xi and the Shanghai faction substantially intensified. And Boyu began to move all of its operations out of China into Singapore, and the other individual Jia Qinglin and other individuals associated with him begin moving their assets to Singapore and Cambodia. There is report of him taking a big airplane filled with cash and gold and just flying it out of the country. So at the time that the IPO had to be approved, these people were more dangerous than they were.

The other evidence that suggests he knew about is that these were concealed investment vehicles. There is no reason

why these people would have taken such great efforts to conceal their identities unless the fact that they knew that it was a risk. So we would submit that all these factors, considered together carefully, support a strong inference of *scienter*.

I next want to move to the banking regulation plans. These are the second bucket of information, and it also relates to second set of misstatement claims that have to do with Ant's regulatory compliance with the FHC regulations, which were the federal holding company regulations.

So the timeline on this is on September 11th, 2020, a Chinese government announced new financial holding company regulations and announced they would be taking effect on November 1st, 2020. And then on September 28th, 2020, Ant launched Ant Bit Hong Kong, and therefore it was operating a bank in addition to its other financial services and it would have to comply with these regulations, something that the defendants admit that Ant would have to be complying with these regulations.

On October 27th, 2020, Ant filed its final IPO prospectus indicating that it had approximately 315 billion yuan in assets, which was short of the 500 million yuan assets required by the regulations.

Now, defendants argue that that's not what the regulation really says, and he goes through and quotes the language and says that this was just a sort of criteria or

eligibility requirement in order to file an application, but that's not supported by the evidence. In fact, the document that the defendants themselves cite, Defendant's Exhibit LL, which is a Bloomberg article, it states Ant can't proceed with an IPO until after it complies with new capital requirements and other restrictions imposed on the country's financial conglomerates at the start of the month. That reference to "at the start of the month" was referring to the previous set of regulations. Defendants say that there were new regulations announced on November 2nd, which was when Ma and the other Ant executives were called in for a regulatory interview, but those were not actually operative regulations, those were just published for comment, they were not active regulations.

So the much stronger inference is five days before the IPO, the final prospectus is published, it says we only have 315 billion yuan, and the Chinese government sees this and says wait a minute, you're way short of the 500 billion you need. They called them in this for this and this -- again, the Wall Street Journal article says the reason why the IPO was shut down, one of the big reasons was because of the identity of these undisclosed investors, and the other reason was because there was this noncompliance with these regulations. And yes, the Chinese government started to add further regulations after this meeting on November 2nd, but Alibaba was not even in compliance with that first set of regulations.

So this was something that Alibaba failed to disclose, it was material information, material inside information that Ma relied upon.

THE COURT: What is it that you say they should have said?

MR. KRAJCER: They should have indicated -- Alibaba or Ant, rather, had a series of risk disclosures in its prospectus that talked about there is a series of financial regulations, including a bunch of capital requirements and we need to comply.

THE COURT: So what else do they need to say besides that?

MR. KRAJCER: They need to say that, right now, there is 500 billion in yuan assets and we are short of that and we're trying to make that up, but we're pretty materially far short of that. And defendants say, well, investors could have figured that out for themselves because they announced the number. But, according to the case law in this circuit, and we cite the VanDermeulen case in our reply to the Alibaba defendant's brief, it says that when there is a risk disclosure and it discloses a risk as a hypothetical, this might happen, without disclosing risk suggesting it is already happening or that the underlying predicate conditions for the risk to have occurred, that is a misleading risk disclosure. So we're saying that these risk disclosures were misleading. That's

with respect to the misstatement claims.

THE COURT: What did they disclose that gave the impression that they had already met that timing?

MR. KRAJCER: Again, our contention is that the risk disclosure was misleading because --

THE COURT: And I'm trying to focus on specifically how you say it was misleading. So what specifically was misleading about what they disclosed with regard to that risk? Under your scenario, any informed investor would know that they had to, as you say, meet that threshold. And there is public information already out there which would indicate whether or not they're in such a financial situation that they would meet that threshold.

MR. KRAJCER: I mean, our contention about this, your Honor, is that the information was not widely known. This was a --

THE COURT: Which information was not widely known?

MR. KRAJCER: The information about the regulation itself was not widely known, first of all, because it had just been announced, it was not widely covered in the press.

Beyond that, when they announced their final -- I mean, they announced first -- this regulation was announced after they filed their initial prospectus but before they filed their final prospectus. So they filed their initial prospectus, which said they had 315 billion yuan, then the

Chinese government adopts this regulation. Then they filed a final prospectus, which says we have 315 billion. So investors could have expected it would have increased.

THE COURT: So which part of that was untrue?

MR. KRAJCER: Our allegation is that -- we're not saying this is a direct false statement. Our allegation is that this was a misleading statement. The risk disclosures were misleading because they did not indicate -- they did not say that there was a shortfall.

THE COURT: You just said to me that they did clearly indicate that there was a shortfall. They said it was 315 billion. The threshold is what, 2 billion?

MR. KRAJCER: 500.

THE COURT: 500 billion. They said they had 315 billion, the threshold is 5 billion. After the regulation came out, they reiterated they had 315 billion. How is that not a disclosure that they don't have 500 billion?

MR. KRAJCER: I understand what you're saying, your Honor. The 500 billion number Was not widely publicized at that time. Our argument here is that defendant's argument is essentially a truth on the market defense that investors could have figured this out. They could have gone, looked at the regulation, figured that out. The timeframe here is there was a fairly short timeframe, October 27th, and only five days later until the IPO was suspended. If you look at the stock

price movement of the stock during that time period, it went down. So what there likely was -- what likely was occurring was that some investors, the ones that were more up on it were saying, jeez, there is this shortfall.

THE COURT: I don't understand. On this particular issue, if the mix of information was that before the regulation came into effect, they had 315 billion, that the threshold is 500, and then after the regulations went into effect, they reiterated that they had 315. How is that not a disclosure?

MR. KRAJCER: I understand what you're saying, your Honor. What we're saying is that they --

THE COURT: They should have said what else?

MR. KRAJCER: They should have more robustly said they didn't identify the $500 billion and it wasn't widely known. And we suggest that, given the timing of this --

THE COURT: How should they have disclosed it in a broader, more direct fashion?

MR. KRAJCER: The paragraph where we allege this is paragraph 304 of the complaint where we identify the relevant language in the Ant IPO prospectus, and they say there is new regulations that have come into effect. And these set out various regulatory requirements. And they indicate that -- what they don't say here is that it's $500 billion and they don't say, hey, we're way short of that line. We're suggesting that this disclosure -- and I understand your Honor's position

on that, but our allegation is that this risk disclosure here should have identified the threshold and should have identified the amount that they were south of that threshold.

THE COURT: But that's what I'm trying to understand. Didn't they elsewhere identify the threshold?

MR. KRAJCER: No, they refer to the regulation regularly, they just say there is a regulation out there, they don't say anything about 500 billion. They do mention the 315 billion number, but they don't mention the $500 billion number.

THE COURT: And no disclosures that they made did they indicate that this was the threshold, the 500 million?

MR. KRAJCER: Right, they don't say that. You know, you could say that they indirectly referenced the regulation and investors could have looked it up themselves, but they didn't say the 500 billion number.

THE COURT: So you say that the disclosure they should have made is that we now have, after the regulation was in effect, that the regulation requires 500 billion, and we don't have that much?

MR. KRAJCER: Yes, that is our allegation.

So I want to move back to the misstatement claims that deal with the all of the threshold arguments that the defendants have raised from jurisdiction on through.

So first, defendant Ma says that the jurisdiction test

only allows for jurisdiction if the defendants' express aim is to cause an effect in the United States. As we explain in our opposition, under the Second Circuit decision in LeaseCo, jurisdiction is appropriate under the effects test if: One, the test occurs as a direct and foreseeable result for the conduct outside the territory; and two, the defendant knows or had good reason to know that his conduct will have effects in the state seeking to assert jurisdiction.

So this is perhaps -- I don't know how much anyone's been quibbling between these two different standards. This is not a mere foreseeability standard, but there is two versions of the test. There is the version of the test the defendants cite saying you need to have an expressed aim of causing an effect in the United States, and there is the test under LeaseCo, which says you need to have a good reason to know that your conduct will have an effect in the United States. The defendants say that now the test under current Second Circuit authority is expressed aim, but if you look at these cases more closely, they don't support that broad proposition.

The first case they cite is the Licci case. That involved claims under the Antiterrorist Act and it followed the Second Circuit's decision in the September 11th, 2001 case. It didn't involve securities claims. We cite a number of cases that says this express aim test is sufficient to support jurisdiction, but it's not necessary to support jurisdiction

particularly in securities cases.

THE COURT: I know the Licci case, I decided it.

MR. KRAJCER: They cite the Schwab case, which did involve a securities claim. But if you look at the language in the Schwab case, it says that exercise of jurisdiction and circumstances may be constitutionally permissible if defendants expressly aimed --

THE COURT: You're still talking too fast.

MR. KRAJCER: I'm sorry. The Schwab case says exercise of jurisdiction in such circumstances may be constitutionally permissible if the defendant expressly aimed its conduct at the forum. So again, it supports that this is one way --

THE COURT: So different from a standard transaction on a foreign exchange where you can also transact business in the United States under certain vehicles, how is this somehow different than someone simply making these trades outside of the United States and some sort of blanket argument that they should have known that it was going to affect investors in the United States who wanted to make similar trade?

MR. KRAJCER: Understood. And by the way -- and perhaps the easiest way for me to answer your question is to say we believe the facts in this case satisfy either of those two standards. Let's assume that the stronger standard applies, the express aim standard. We satisfy the express aim

standard. If you look at the case, SEC v. Straub, the Court there held that the express aim test was satisfied because the plaintiff's allegations supported the inference that the defendants knew that false certifications made to the company's auditors would be incorporated into reports filed with the SEC.

Here, plaintiffs alleged facts supporting an inference that Ma knew that the misleading statements in the Ant prospectuses would be reviewed by U.S. investors in Alibaba and that the information would be incorporated into the price of Alibaba's ADS.

THE COURT: Who have you alleged this claim against?

MR. KRAJCER: The claim -- the claims -- so, let me be clear about the misstatement claims. With respect -- we allege that there are misstatements in the Ant prospectuses. Those claims are alleged only against defendant Ma.

THE COURT: Okay. So what did defendant Ma have to do with those statements? Are you just suing him in his capacity in the nature of his control?

MR. KRAJCER: No.

THE COURT: Or are you attributing these activities to him personally?

MR. KRAJCER: We're attributing these activities to him personally.

THE COURT: What's the basis for that?

MR. KRAJCER: So I'm going to skip ahead to Janus,

because I think these arguments are sort of best housed under the Janus standard. Janus has to deal with when a statement is being made, who is the maker of the statement. Our allegation is that Ma made these statements.

THE COURT: And what basis do you have?

MR. KRAJCER: The first thing I want to say is that Janus -- one way of showing that a person made a statement is if they signed the statement, then it's clear who signed it, but Janus says the attribution can be implicit from the circumstances. It doesn't need to be explicit. We cite two cases that suggest when a dominant shareholder who has complete control over an offering makes the decision of whether the offering is going to occur or not going to occur, that in those circumstances, the circumstances support the inference that that individual is the maker of those statements, even if they didn't sign the statements.

THE COURT: I still don't understand how that applies in this case. What are you claiming are the circumstances which would indicate that Mr. Ma is personally responsible for these statements?

MR. KRAJCER: So several things. First is the Ant prospectuses say that Ma is the ultimate control person of Ant.

THE COURT: But you're not arguing that simply because somebody is the control person that you're going to assert such a claim again?

MR. KRAJCER: No, but we allege facts that support the inference that he controlled the entire IPO process. So no one else signed these statements. These statements were interpreted by the market as Ma speaking to the market.

THE COURT: Again, those are conclusory words. What is it that you say supports that conclusion?

MR. KRAJCER: Well, several things. We say that Ma was -- he controlled the very offering process and that he selected, personally, all the pre-IPO investors. He had total -- pursuant to this concert party agreement -- the way that Ma controlled Alibaba -- rather Ant, excuse me, is that there are two entities called Junhan and Junao, and those two entities own 50.52 percent of Ant. The investors in these two vehicles, Junhan and Junao, entered into what was called a concert party agreement. That concert party agreement gave Ma the decision over any decision, corporate transactions it would affect on and, in particular, any transactions that would dilute the ownership interest of Junhan --

THE COURT: That seems to say he may have had the authority to make these representations, but it doesn't say that he, in fact, did so, that he had anything to do with these statements. You're relying solely on his interests and relationship to the company and not on any direct or circumstantial evidence that he is the author of these statements.

MR. KRAJCER: One of the pieces of circumstantial evidence that suggests that he was personally involved in these statements is that many of the challenged statements relate to him personally. So, for example, these statements about the ownership interest were about the concealed ownership interests of his buddies.

THE COURT: Well, that's not him personally, that's his buddies.

MR. KRAJCER: The other statement is that Qizhan is an independent third party, and we allege that that statement is false because it was a related party to Jack Ma.

THE COURT: Who are those statements attributed to?

MR. KRAJCER: They're attributed to Ant. It's just the company who makes the statements.

THE COURT: Well, who signed the --

MR. KRAJCER: No one signed the prospectus. It's unusual. I don't know, you know, how filings typically are done under the Hong Kong stock exchange and whether it's normally under those circumstances for no one to sign the prospectus, but this was a prospectus that no one signed.

THE COURT: Remind me, Ma doesn't have an official corporate position in the company?

MR. KRAJCER: That's correct, your Honor. He's not an officer of the company, he's not a director of the company, he's a controlling shareholder, but --

THE COURT: I hope that's not your argument, that because a person is a controlling shareholder, any statements made by the company and its officers or directors is personally attributed to him.

MR. KRAJCER: No, but this company has -- and I'm quoting this language slightly out of context because this was the language that appeared in a law review article about Alibaba which talked about how Alibaba has unique governing structure and how Ant has a unique governing structure. It has its party concert agreement that is set up between the shareholders such that someone who owns only effectively 11 percent of the company controls the company. This is not a company where Ma is a control person, this is a company where Ma is the control person --

THE COURT: I don't know if you cited any case law that says that the statements are attributable to that person simply on the basis that he is the controlling shareholder.

MR. KRAJCER: The two cases that we cite, and I'll talk in a bit more detail right now, are first the City of Roseville Emps.' Ret. Sys. v. Energy Solutions. That case, the sole stockholder of the issuer — and we agree, that that's distinguishable and that Ma was not the sole stockholder here — was the maker of the statements and the registration statements because it had direct -- according to the court had direct control over all corporate transactions and authority to

determine when and whether to sell the shares being sold. So we don't suggest that every single time a dominant shareholder sells that he is the maker, but we suggest under these circumstances where the controlling shareholder has direct control over corporate transactions --

THE COURT: What does that mean in this context, what portion of that do you say applies here?

MR. KRAJCER: What we're saying here is pursuant to the concert party agreement, Ma had direct control over all corporate transactions and he had the authority to determine when and whether to sell the shares being sold.

THE COURT: I'm not sure how that attributes everything that you want to attribute to him personally.

MR. KRAJCER: Again, some of these misstatements related to him personally. We think that circumstantial evidence supports the inference that he was involved in the process of drafting these statements or having him draft it in such a way that would protect his interests. We think that given his overwhelming control, not just his mere control, but the fact that he had control not just over the company, but control over the decision whether or not to enter into the IPO, what the price of the IPO would be, whether or not to have the offering at all supports the inference that he was the maker of the statements in the Ant prospectuses.

We cite a second case, which was IOP Cast Iron

Holdings, and the defendants attempt to distinguish that case by saying in that case, the holding company signed the statements, but that's not quite accurate. And that company -- I'm sorry. In that case, the individual who signed the contract, he signed it in his role as an officer of the holding -- I'm sorry. As an officer of the subsidiary, not the officer of the holding company. So in that case, it's not the case that the holding company signed the statement. So in that case, the Court said that when a holding company -- the holding company was a maker of the corporation statements where that company owned the overwhelming majority of the corporation shares and, quote, decided whether to sell the corporation to the acquirer.

So our position is that when an individual has the decision power of whether or not to sell the corporation or whether or not to sell -- to enter into the offering process, that shows it.

THE COURT: That shows what? That shows that he must have exercised such authority?

MR. KRAJCER: It shows that they were the maker of the statement. That is sufficient -- by the way --

THE COURT: I'm not sure one of the cases that you cited established that principle, even the second case that you cited, you say that he's personally signing the statement on behalf of the company. At least you have that. That's not

what you have in this case. I'm just trying to figure out whether or not I'm in a position to say that it's sufficient to allege a cause of action against him because he is a major shareholder so one can conclude from that that he is the author of these statements.

MR. KRAJCER: Understood, your Honor. One of the things I wanted to point out was that with respect to many of these elements for the claims, they need to be pled with a heightened standard.

With respect to Janus, with respect to whether or not an individual is maker, the case law says that that is something where you need to show plausible evidence at the motion to dismiss stage that he's the maker of the statement. We'll prove ultimately whether or not he was the maker, whether or not he was the maker, whether or not he actually was involved in this process. That's something that will be discovered in discovery, we have evidence to go on it.

But what Roosevelt said is, to use the language of clear indicia of control. If there are -- we've pled sufficient facts to indicate that there is sufficient indicia of control to raise a plausible inference that Ma was the maker of these statements. And we would need to prove that later on, that's not something that needs to be pled with high degree of particularity at this point. We just need to show plausible inference based on the facts alleged that he was the maker of

the statements. And I think based on the fact that no one else signed the statements, that he was admitted to, as the individual with -- who's ultimately in control of this company is sufficient to support the Janus standard, which says you need to have ultimate authority, whoever has ultimate authority is the maker of the statement. And yes, we would agree that -- with defendants, which says it's not just ultimate authority over the company, it's ultimate authority over the statements. But here, we believe that there's sufficient evidence to show that he is the ultimate authority over the statements being made. He had the decision to make the sale or not make the sale and, therefore, those statements can be attributed to him.

So now, with respect to the scheme claims.

So, first, defendant Ma says that we failed to plead the scheme claims because we failed to plead any specific facts showing that Ma had a role in the subject transactions. Again, this is going to be somewhat repetitive, so I'm not going to waste the Court's time --

THE COURT: I assume your argument is the same that you just made, that he's the controlling shareholder, so it's reasonable to assume he did.

MR. KRAJCER: Well, not only that --

THE COURT: Do you have anything else to add to that?

MR. KRAJCER: Yeah, because here, we're not just talking about the false statements, we're also talking about

these other transactions. We think that Ma's fingerprints are on these investment vehicles, and that's what I was going over earlier with the Court, which showed that Alibaba had cross-funded this investment structure with Li Botan. So we think that that is evidence that shows not just with respect to the making of the statements, but with respect to the design of these investment vehicles that he had a personal role involved. So to not waste the Court's time, I'm going to rest on the papers with respect to the scheme claims.

If the Court would indulge me, I would like to briefly go back to the loss causation issue that was being discussed earlier with respect to exclusivity.

So just to be really clear about what plaintiffs' position is here, there was a November 10th, 2020 disclosure. We allege that that is partial materialization of a concealed risk, the December 23rd, 2020 statement, which we allege is both a partial materialization of a concealed risk and a partial directive disclosure. And then there is, after the class period, the April 10th, 2021 report by the SAMR, which indicates its findings, and we submit that that is a confirmatory disclosure that can be considered as part of the overall picture on loss causation.

Again, Ms. Wolke referenced the Ninth Circuit's decision in Lloyd v. CBP. I just want to briefly discuss what the facts were in that case. In that case, there was an

announcement of an investigation by the SEC, and under prior Ninth Circuit law, there was a whole host of decisions saying the mere announcement of an investigation is not a corrective disclosure because it doesn't show that anything wrong happened.

But what the Court said there is that if there is a later disclosure that confirms that there was wrongdoing, the events can be considered together in the aggregate to plead loss causation altogether. We believe that that decision is consistent with the Second Circuit's general principles of loss causation as articulated in the (indiscernible) case. The Ninth Circuit also cited a Fifth Circuit case there called The Metasis that also had this theory that you can have a series of partial disclosures that culminate and together are considered corrective disclosure.

If your Honor wishes, we'd be happy to submit a supplemental brief or a letter --

THE COURT: I don't think that basic principle is in dispute.

MR. KRAJCER: If the Court has any more questions, but otherwise --

THE COURT: No, thank you. Let me see if there is any further reply, then we can wind up.

Mr. Blake, did you have anything you want to add?

MR. BLAKE: Your Honor, I appreciate your patience in

indulging us. I will be very brief, hopefully, at least by my standards. There is really two points I want to make.

First, to respond to my colleague who just sat down, what I didn't hear in the hour and fifteen minutes of argument that we just had is an argument for why Blue Chip Stamps and Frutarom don't dispose of the disclosure claims. That falls out of the case from my perspective. The argument that was made was that the insider trading claims are not susceptible to Blue Chip Stamps and Frutarom. I don't agree with that. I think it comes to the question of how much the insider trading claims are wound up in the Ant prospectus in order to get yourself out of the Supreme Court case law. My colleague said insider trading claims have nothing to do with the Ant prospectus. We then spent an hour arguing about what Ant disclosed and how it disclosed it and whether it was required to disclose it under Hong Kong law.

And your Honor asked the question early on in the last hour was in talking about these investor claims, you asked why was there a requirement to disclose this publicly. My colleague responded that's because there was a statement in the Ant prospectus that was misleading. This is all about the Ant prospectus. So when you have an Ant prospectus claim that's wound up in this, I think Blue Chip Stamps and Frutarom deals with it, I also think it deals with the insider trading claim. But the substance of the insider trading claim I think is far

easier to dispense with than my colleague let along.

There was a lot of discussion of pooled investment vehicles. It's pretty common in investing in private companies for there to be partnerships and partnerships stacked upon partnerships. That's how you do it in the non-publicly traded context. I don't think there is anything wrongful about it. I think the contention that that is somehow in violation of Chinese law, we talked about how VIE is non-founded. If you were to search for the SEC and VIEs, what you would see is the VIEs are the primary mechanism in which foreign investors invest in Chinese companies. In fact, Alibaba, my client has VIEs that are widely covered in our disclosures and the VIEs for Ant are also covered in their disclosures.

The simplest way of dealing with this claim, the claim that there were these secret investors is that Mr. Jiang, his private equity fund is a fund called Boyu Capital, and the Wall Street Journal article alleges that the Chinese government's discovery, that Boyu Capital was invested in Ant, is what caused the IPO to be suspended. If you look at the Ant prospectus, which is Exhibit EE, at pages 148 and 153, Boyu Capital's investment, supposed offshore illegal VIE investment, is disclosed. So we've got here a Wall Street Journal article that has concocted this entire universe of pooled investment vehicles, and is it secret, and what did the Chinese government do. The key fact that Mr. Jiang's private equity fund is

invested in Ant is right there in the disclosure, it's right there. And even putting that aside, my colleague concedes that if these investments were actually made, they were made years before the Ant IPO.

What I don't hear is anything that says Mr. Ma knew there was a risk in these people investing. Plaintiffs allege that these were Mr. Ma's friends, I don't know what the basis for that is, but plaintiffs also allege that Mr. Ma was incredibly politically savvy and recruited strategic investors that would not be toxic to his IPO efforts. The concept this wasn't about money, we're talking about 1 percent of the overall structure, you didn't need a capital. The contention that Mr. Ma knew that this was toxic, just -- it just isn't pleaded and it's implausible from my perspective.

That's all I have to say about the Ma claims.

On the Alibaba claims, I just wanted to talk about loss causation briefly. I agree with your Honor that neither the November 10th regulation or the December 24th investigation says anything about what Alibaba was doing during the class period. It doesn't say. But what I wanted to clarify is that Alibaba does not deny that we were engaged in traffic resource allocation practices. That's what we disclose and that's what the SAMR found that Alibaba was violating. And the plaintiffs have tried to make this argument that the words "exclusive partnership," as used in that portion of the disclosure,

somehow suggests that Alibaba wasn't engaged in these practices. You got to hold the sentence in its entirety. Alibaba's saying we're engaged in traffic resource allocation, but we're not engaged in this hard form of exclusivity. When you go through the regulations, plaintiffs said, I think, argued that basically the concept of the dichotomy between traffic research allocation or exclusivity is made up, it just doesn't really bear out.

So if you were to go to page 11 of our Power Point, this is the November 10th regulation, this is the first alleged corrective disclosure. Ms. Wolke, when she stood up, she said Alibaba's practices were a violation of the Chinese antitrust laws for the entire time after the anti-money laundering law was passed or -- excuse me, it's a different AML. That's U.S. AML. Antimonopoly law is the Chinese AML. So Ms. Wolke said it was always prohibited. What you heard from me earlier, your Honor, was it wasn't explicitly prohibited until the November 10th regulations.

So, if you look at slide 11, we've quoted from Article 15 of the platform, platform guidelines, and it came out on November 10th. What it says for the first time is, first, that "either or" practices are prohibited. And second, it says practices that involve, and I quote, promotion and support in traffic resources. Virtually the same language as Alibaba's disclosure on November 10th. Alibaba's saying we

engage in traffic resource allocation, and on November 10th, the SAMR is saying promotion and support in traffic resources is something that we are going to deem prohibited under the law. It's almost a one to one.

So the question then becomes, how could the market from this November 10th disclosure say, oh, my god, Alibaba was also engaged in some form of hard exclusivity, how could they gain that information. It doesn't say anything about it. But the stock does drop, right, that's why we have a securities claim. The stock drops because the market knows that Alibaba is engaged in these practices, and the market knows because Alibaba has said, we're engaged in traffic resource allocation and there's articles and there's lawsuits and there's a whole bunch of other things. It's not -- my colleague used the materialization of the risk. It's not a materialization of the risk, it's the market heard traffic resource allocation is now prohibited. That obviously is going to have an impact on a company that engages in traffic resource allocation.

It's really the same point, Your Honor, I think, about December 24th. There's case law that says an investigation is not enough. I don't need to belabor that.

The only other real point that I want to make about loss causation is in the question and answer, back and forth Ms. Wolke pointed to the SAMR's penalty decision. That penalty decision can't be a corrective disclosure here because it's

after the class period, class period on December 24th. The SAMR's penalty decision is April 2021. So that doesn't answer your Honor's question of when did the market learn that Alibaba was engaged in all of these practices that the SAMR understood, that's not the class period that we're dealing with, that's a later time period.

If you look at the SAMR's decision, which is on slide 12, Ms. Wolke argued that the SAMR found that Alibaba was engaged in these exclusive partnership practices, and she pointed to there being a contract that says you shouldn't -- thou shalt not trade on other platforms. What Ms. Wolke is missing is the second half of what is hard exclusivity. Hard exclusivity means if you trade on another platform, we kick you off our platform. What this SAMR decision says, and it's on slide 12, is that Alibaba adopted various incentive and penalty measures to ensure implementation. When you go a few more lines down there, about six lines down, through incentives such as traffic support — the same practice that Alibaba said that it was engaged in. So I think that's an unusual case.

We've got a lot of information that is publicly disclosed, we have theories by the plaintiffs, but I think when you drill down and you cut through some of the rhetoric, the rhetoric like these guys were Mr. Ma's friends, you cut through the rhetoric of he controlled everything, he was the puppet master and you actually look at the SAMR decisions, the

disclosures, et cetera, I think you will find that Alibaba and Mr. Ma behaved appropriately in these circumstances.

Thank you for your time.

THE COURT: I'll get back to you as quickly as I can --

MR. KRAJCER: Your Honor, can I raise one thing? I want to briefly address the Frutarom decision, because that's important and I forgot that.

THE COURT: Why don't you do that briefly.

MR. KRAJCER: So in both Frutarom and Nortel Networks, what the Second Circuit basically held was that shareholders of company A don't have standing to sue company B for statements that company B makes about itself. Neither of those cases, however, involved claims against an individual who was a control person of both company A and company B at the same time, and who owed fiduciary duties to the shareholders of both company A and company B. So this case presents an entirely different situation than Nortel and Frutarom.

Also, Nortel it emphasized the fact in that case, it says nothing in the record indicates the companies shared any management structures. In this case, there is evidence that the same person controlled both companies. So that was a question that was sort of carved out of Nortel.

Now, in Frutarom, the Court there said we are going to answer the unanswered question in Nortel, which says what

happens when you have a company that's acquiring another company in that specific situation, because there was also language in Nortel that left open that question, but the Frutarom didn't answer the other question that was left open in Nortel, which is what happens when you have an individual who -- when you have two different companies that are different companies, but they're both controlled by the same people at the same time.

If you look at the Turquoise Hill decision, that case involved a situation in which investors in companies sued the parent company for statements that the parent company made and certain executives of that parent company, and it went through an extensive analysis. Now Ma says in his reply brief that, ultimately, the Court in Turquoise Hill hung its hat on the fact that the statements were not self-referential, and that's true, but the Court there engaged in an extensive analysis of the statutory standing issue, and it noted that a broad reading of the Nortel case would apply to many other types of actors, including dominant shareholders, and in applying Nortel in those circumstances could have perverse consequences. It said, by the same token, the Rio defendants reading Nortel also admit no limiting principle. It would seem out to leave out a number of third-party actors who could have been relied upon by investors and the issuer, and whose conduct would constitute a primary violation of rule 10b-5. For example, when a majority

shareholder who makes misstatements about the company and whose shares he owns in order to drive up its share price and increase the value of our holdings, be immune from a private securities lawsuit by the person who relied on those statements, could the majority shared shareholder avoid such a lawsuit if she cleverly avoids a board seat and from her position of presumed authority uses a megaphone to make misstatements rather than a corporate filing.

So here, the question is can Ma avoid liability by packaging misstatements about one company he owns or one company that he controls into the filings of another company that he controls. Defendant Ma also states in his reply brief that Frutarom did involve claims against the individual defendants, but those individual defendants were very differently situated than Ma. Those were officers of a target corporation and a merger that was acquired by other companies. Those individuals didn't have any control over the acquirer, they didn't owe any fiduciary duties to the shareholders of the acquirer. We would submit this case is very different than Frutarom and Frutarom should not be extended to these circumstances.

THE COURT: Thank you all very much. I'll get back to you as quickly as possible.

* * *