UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: ALIBABA GROUP LTD. SECURITIES LITIGATION | Master File No. 1:20-CV-09568-GBD-JW |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF THIS MOTION ............................................. 1

II.  SUMMARY OF THE ALLEGATIONS ........................................................................ 4

    A.  Alibaba's Business And Its Use Of "Choose One Of Two" Exclusive And Restrictive Trading Practices ......................................................................................................... 4

    B.  Prior To The Class Period, The SAMR Repeatedly Instructs Alibaba And Other Large E-Commerce Platforms That "Choose One Of Two" Practices Are Unlawful ........ 5

    C.  Unknown To Investors, Alibaba Continues To Use Restrictive And Exclusive "Choose One of Two" Practices During The Class Period; Investors Are Damaged When The Truth Is Revealed And Undisclosed Risks Materialize .......................................... 7

III.  THE ORDER DENYING DEFENDANTS' MOTION TO DISMISS ............................. 8

IV.  THE PROPOSED CLASS REPRESENTATIVES ........................................................ 9

V.  THE CLASS SHOULD BE CERTIFIED ................................................................... 10

    A.  Applicable Standards Favor Certification Of This Securities Class Action ......... 10

    B.  The Class Is Ascertainable And The Requirements Of Rule 23(a) Are Met ........ 10

        1.  Plaintiffs Satisfy Rule 23(a)(1): Numerosity ........................................... 11

        2.  Plaintiffs Satisfy Rule 23(a)(2): Commonality ........................................ 11

        3.  Plaintiffs Satisfy Rule 23(a)(3): Typicality ............................................. 12

        4.  Plaintiffs Satisfy Rule 23(a)(4): Adequacy ............................................. 12

    C.  The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met .. 13

        1.  Common Questions Of Law And Fact Predominate ................................. 13

            (a)  Plaintiffs Are Entitled To The *Affiliated Ute* Presumption Of Reliance ........................................................................................ 13

            (b)  Plaintiffs Are Entitled To The *Basic* "Fraud-On-The-Market" Presumption Of Reliance ......................................................... 16

                (i)  Alibaba's ADSs Traded On The NYSE ........................... 17

                (ii)  The *Cammer* And *Unger/Krogman* Factors Demonstrate Market Efficiency ........................................................... 17

          (iii)    Alibaba Will Not Be Able To Rebut The *Basic* Presumption Of Reliance By A Preponderance Of The Evidence ................. 21

      2.     Potential Individual Questions Of Damages Do Not Predominate .......... 23

    D.     A Class Action Is Superior To Other Methods Of Adjudication .......................... 24

VI.    GLANCY PRONGAY & MURRAY SHOULD BE APPOINTED CLASS COUNSEL 25

VII.   CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Affiliated Ute Citizens of Utah v. United States*,
 406 U.S. 128 (1972)................................................................................................ 2, 3, 14

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 568 U.S. 455 (2013)...................................................................................................... 1, 16

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*,
 77 F.4th 74 (2d Cir. 2023) ......................................................................................... 16, 22

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988).......................................................................................... 2, 3, 15, 16, 17

*Billhofer v. Flamel Techs, S.A.*,
 281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................................. 18, 20

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
 2023 WL 2932485 (D. Conn. April 13, 2023)..................................................................... 22

*Brown v. Kelly*,
 609 F.3d 467 (2d Cir. 2010)..................................................................................................... 13

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ............................................................................. 17, 18, 19

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
 310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................. 17, 18, 21

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)..................................................................................................................... 23

*Dodona I, LLC v. Goldman, Sachs & Co.*,
 296 F.R.D. 261 (S.D.N.Y. 2014) ..................................................................................... 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011)........................................................................................................... 2, 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 134 S.Ct. 2398 (2014)............................................................................................................. 21

*In re Alibaba Group Holding Ltd. Sec. Litig.*,
 2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ................................................................. *passim*

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012) .................................................................. 2

*In re Aphria, Inc. Sec. Litig.*,
342 F.R.D. 199 (S.D.N.Y. 2022) ....................................................... 11, 12

*In re BancorpSouth, Inc.*,
2017 WL 4125647 (6th Cir. Sept. 18, 2017) ....................................... 23

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................... 23

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................... 23

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................... 24

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ............................. 11, 12, 21

*In re Deutsche Bank AG Sec. Litig.*,
328 F.R.D. 71 (S.D.N.Y. 2018) ........................................................... 13

*In re Dynex Capital, Inc. Sec. Litig.*,
2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ....................................... 16, 19

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ................................................. 14

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 1191048 n.15 (E.D.N.Y. Apr. 19, 2007) ................................. 1

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) ....................................... 23

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
241 F.R.D. 435 (S.D.N.Y. 2007) ......................................................... 24

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ..................................................... 16, 17

*In re Parmalat Sec. Litig.*,
2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ....................................... 16

iv

*In re Petrobras Secs.*,
 862 F.3d 250 (2d Cir. 2017)...................................................................... 10, 17, 18, 20

*In re Petrobras Sec. Litig.*,
 312 F.R.D. 354, 363 (S.D.N.Y. 2016) ............................................................ 20, 24

*In re Pfizer Inc. Sec. Litig.*,
 282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................. 2

*In re Sanofi-Aventis Sec. Litig.*,
 293 F.R.D. 449 (S.D.N.Y. 2013) ................................................................. *passim*

*In re Smith Barney Transfer Agent Litig.*,
 290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................ 10, 14

*In re Teva Sec. Litig.*,
 2021 WL 872156 (D. Conn. Mar. 9, 2021) ........................................................ 20

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ................................................. 10, 16

*In re Visa Check/MasterMoney Antitrust Litig.*,
 280 F.3d 124 (2d Cir. 2001).................................................................................. 25

*In re Winstar Comms. Sec. Litig.*,
 290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................. 12, 18, 19

*Krogman v. Sterritt*,
 202 F.R.D. 467 (N.D. Tex. 2001) .................................................................... 18, 21

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
 967 F.2d 742 (2d Cir. 1992)................................................................................. 13

*McIntire v. China MediaExpress Holdings, Inc.*,
 38 F. Supp. 3d 415 (S.D.N.Y. 2014)........................................... 18, 19, 20, 21, 23

*Meyer v. Jinkosolar Holdings Co.*,
 761 F.3d 245 (2d Cir. 2014)................................................................................. 15

*Pearlstein v. BlackBerry Ltd.*,
 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................................ 13

*Robidoux v. Celani*,
 987 F.2d 931 (2d Cir. 1993)................................................................................. 12

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    341 F.R.D. 542 (S.D.N.Y. 2022) ........................................................................... 1

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ........................................................................... 24

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .................................................................. 15, 17

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008) ............................................................................... 18

*Trinidad v. Breakaway Courier Sys., Inc.*,
    2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ....................................................... 12

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) .............................................................................. 18

*Villella v. Chem. and Mining Co. of Chile, Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) .......................................................................... 12

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) .......................................................................... *passim*

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ....................................................................... 23

*Williams v. KuCoin*,
    2022 WL 392404 (S.D.N.Y. Feb. 9, 2022) ........................................................ 24

RULES

Fed. R. Civ. P. Rule 23 ............................................................................... *passim*

Lead Plaintiff Salem Gharsalli, named plaintiffs Laura Ciccarello and Dineshchandra Makadia, and additional movant Wusheng Hu (collectively, "Plaintiffs" or proposed "Class Representatives") submit this memorandum in support of their motion pursuant to Fed. R. Civ. P. 23 seeking: (i) certification of the Class as defined herein; (ii) appointment of Plaintiffs as Class Representatives; and (iii) appointment of Glancy Prongay & Murray LLP ("GPM" or the "Glancy Firm") as Class Counsel.

## I.    INTRODUCTION AND SUMMARY OF THIS MOTION

Plaintiffs, on behalf of themselves and similarly situated investors, are pursuing claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 against defendants Alibaba Group Holding Limited ("Alibaba" or the "Company"); Alibaba's Class Period CEO, Daniel Yong Zhang ("Zhang"); and Alibaba's Class Period CFO, Maggie Wu ("Wu") (collectively, "Defendants").  Plaintiffs allege Defendants made false and misleading statements and omissions during the period July 10, 2020 through December 23, 2020.[1]  Plaintiffs now seek certification of the proposed Class, defined as:

> All persons and entities who or which purchased Alibaba American Depositary Shares ("ADSs") during the period July 10, 2020 through December 23, 2020, both dates inclusive, and who were damaged thereby.

> Excluded from the Class are Defendants and the present and former officers and directors of Alibaba, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any of the excluded parties have or had a controlling interest.

Both the United States Supreme Court and the Second Circuit have long held that securities cases are well suited to class-wide adjudication, and the class action mechanism is an important tool for enforcing securities laws.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478

---

[1] The operative Consolidated Amended Complaint (ECF No. 55, the "CAC") alleged a Class Period beginning on July 9, 2020, the date of Alibaba's FY 2020 Form 20-F, which Plaintiffs allege contained material misstatements and omissions. CAC ¶¶1, 10.  However, the Form 20-F was filed after hours on July 9, 2020.  *See* Declaration of Kara Wolke (the "Wolke Decl."), Ex. 1 (attaching Expert Report of David I. Tabak, Ph.D. (the "Tabak Report")) at ¶1.  Thus, the Class Period begins the next trading day.  *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 549 (S.D.N.Y. 2022) (class period begins first trading day after Form 10-K containing misstatements was filed); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, *5 n.15 (E.D.N.Y. Apr. 19, 2007) (when false statements are made after close of market, class period begins next trading day).

(2013) (noting "Congress, the Executive Branch, and this Court . . . have recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions") (cleaned up); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012) (Rule 23 predominance is "readily met" in securities cases).

The proposed Class satisfies all of the requirements of Fed. R. Civ. P. 23. Alibaba's ADSs traded on the New York Stock Exchange (NYSE:BABA) during the Class Period and the proposed Class numbers in the many thousands, readily satisfying numerosity under Rule 23(a)(1). The nature of the proposed Class Representatives' claims, which resulted from Defendants' common course of conduct, is identical to that of the proposed Class members such that no Class Representative suffers from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4). Moreover, the Glancy Firm has the skill, experience, and resources to successfully prosecute this action, further supporting adequacy under Rule 23(a)(4), and justifying its appointment as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3) predominance and superiority. The § 10(b) elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof. *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012). Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). Here, reliance may be presumed pursuant to (a) the presumption of reliance for alleged omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*"), and (b) the fraud-on-the-market presumption of reliance for alleged false statements under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"). Both presumptions apply and each independently satisfies predominance for class certification.

The Class is entitled to the *Affiliated Ute* presumption of reliance because at the core of this

2

case is Defendants' omission of material facts that they had a duty to disclose. *Affiliated Ute*, 406 U.S. at 153-54.  During the Class Period, Defendants omitted that Alibaba continued to use exclusive and restrictive trading practices in contravention of Chinese law and the explicit instructions of Alibaba's market regulator forbidding the use of such practices.  *See In re Alibaba Group Holding Ltd. Sec. Litig.*, 2023 WL 2601472, *8-*12 (S.D.N.Y. Mar. 22, 2023) (denying Defendants' motion to dismiss, noting that "[m]any of Plaintiffs' Exchange Act claims relate to the omission of material information, as opposed to an affirmative misstatement of fact[]" and holding that "a reasonable investor would be interested in knowing that Alibaba continued to require exclusivity, and would view that fact, if known, as altering the 'total mix' of information made available about Alibaba's practices").

The Class also is entitled to the *Basic* "fraud-on-the-market" presumption of reliance, which says that "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities [*i.e.*, an "efficient" market], the reliance of individual plaintiffs on the integrity of the market price may be presumed."  *Basic*, 485 U.S. at 247.  Plaintiffs allege that Defendants made materially misleading statements about Alibaba's exclusivity practices and associated risks, including, for example, by falsely describing exclusivity as a "prior" and "narrowly-deployed" practice. *E.g.* CAC ¶253; *Alibaba*, 2023 WL 2601472, *9-*10.  In this motion, Plaintiffs demonstrate that Alibaba's ADSs traded in an efficient market during the Class Period (*see* Tabak Report ¶¶16-56; Sec. V.C.1.b, *infra*), such that all Class members are presumed to have relied on the integrity of the market price.

Finally, a class action is a superior means of litigating Class members' claims because it is manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and least taxes judicial resources.

In sum, Plaintiffs' Motion for Class Certification should be granted in its entirety.

## II.   SUMMARY OF THE ALLEGATIONS

### A.   Alibaba's Business And Its Use Of "Choose One Of Two" Exclusive And Restrictive Trading Practices

Based in the People's Republic of China ("PRC" or "China"), Alibaba is one of the world's largest e-commerce companies.  Alibaba's customers are its marketplace merchants, and its revenue is largely driven by fees for e-commerce marketing and advertising services paid by merchants.  From FY 2018 through FY 2020, Alibaba derived 86% of its revenue from its "core commerce" segment (¶47[2]), which consisted of Alibaba's China retail marketplaces (Tmall and Taobao), China wholesale marketplaces (Alibaba.com and 1688.com), and other cross-border and global e-commerce services. ¶256.  Within Alibaba's "core commerce" segment, its China retail marketplaces—Tmall and Taobao—are by far the largest and most important.  In FY 2020, of the total $1 trillion in Gross Merchandise Value ("GMV") generated by Alibaba's digital economy, $945 billion—94.5%—was transacted through Tmall and Taobao.  ¶48.

In a presentation filed with the SEC on July 13, 2020, Alibaba claimed it was "the largest retail commerce business in the world in terms of GMV in the twelve months ended March 31, 2020[.]" ¶45.  It was decidedly the largest e-commerce company in China.  From 2015 to 2019, the merchandise volume on Alibaba's China retail marketplaces made up 76.21%, 69.96%, 63.58%, 61.70% and 61.83%, respectively, of the total online retail merchandise volume in China.  ¶134.  And from 2015 to 2019, Alibaba's share of the total online retail platform service revenue of the top ten major online retailers in China combined was 86.07%, 75.77%, 78.51%, 75.44% and 71.17%, respectively.  *Id.*

Alibaba attained that dominance, in large part, through practices commonly referred in the Chinese e-commerce industry as "Choose One of Two."  ¶¶136-37.  These practices effectively forced merchants to choose one platform—Alibaba—as their exclusive sales outlet.  *Id.*  Alibaba "used

---

[2] Unless otherwise noted, "¶_" references are to the CAC (ECF No. 55).

various incentives and penalties to ensure the implementation of the practice" (¶136), providing "incentives such as traffic support" for exclusive merchants (¶140) and penalizing non-exclusive merchants by, *inter alia*, cancelling promotion displays, expelling them from promotions on popular shopping holidays, lowering or hiding their search results, downgrading store ratings, and reducing marketing resources and other services.  ¶¶88-95, 140-41.  Alibaba's policies had a "strong deterrent effect, forcing more operators on the platforms to implement" its exclusivity requirements.  ¶140.

**B.  Prior To The Class Period, The SAMR Repeatedly Instructs Alibaba And Other Large E-Commerce Platforms That "Choose One Of Two" Practices Are Unlawful**

In the two years leading up to the Class Period, China's powerful State Administration for Market Regulation ("SAMR"), Alibaba's primary market regulator, set its sights on eliminating "Choose One of Two" restrictive and monopolistic practices in the Chinese e-commerce industry.  For example, in June 2018, the SAMR held a "Symposium on the Administrative Guidance of the '6·18' Network Promotion Activities, forbidding 'choosing one between two.'"  Wolke Decl. Ex. 6 at 2-3.[3] The SAMR instructed e-commerce platforms in attendance, including Alibaba, that they "cannot restrict or exclude vendors from taking part in promotional activities organized by rival platforms," warning that the use of "choose one between two" practices "restricts the fair competition between the platforms," and "violates the free choice right of merchants and consumers."  *Id*.

In June 2019, the SAMR, together with seven other PRC governmental agencies, issued a "Special Action for Internet Market Supervision" titled the "Net Sword Action."  Wolke Decl. Ex. 7. Among other things, the 2019 Net Sword Action warned that the SAMR and other regulators would "[i]nvestigate and penalize the e-commerce platform behavior of restricting platform vendors from participating in other third-party e-commerce platform operations."  *Id.* at 3 (part iii).  Commentators noted that the Net Sword Action warned that regulators would "Crack Down Hard" and "strictly

---

[3] "6-18" is a popular shopping festival in China, held annually on June 18. ¶¶89-90.

investigate such illegal acts as 'Choose One from Two' and 'click farming' on e-commerce platforms." Wolke Decl. Ex. 8 at 1-2. Following announcement of the Net Sword Action, in September 2019, the SAMR enacted new AML e-commerce regulations, including a measure that explicitly prohibited companies with a dominant market position—like Alibaba—from "[r]estricting a counterparty to deal/transact only with it."  ¶82.

On or about November 5, 2019, the SAMR convened an "Administrative Guidance Forum on Regulating Online Operating Activities" in Hangzhou, China (Alibaba's hometown), attended by about 20 large Chinese e-commerce companies, including Alibaba.  ¶103.  Therein, the SAMR instructed that "[t]he behaviors of 'Choose One of Two' and 'exclusive trading' in the Internet sector . . . are clearly prohibited by the Electronic Commerce Law and also violate the Anti-Monopoly Law [AML] and Anti-Unfair Competition Law [UCL], among other laws and regulations" and warned that "the market regulatory authorities will conduct anti-monopoly investigations in accordance with the law into the 'Choose One of Two' behaviors heavily reported by all parties."  *Id.*

Finally, on or about June 22, 2020—just before the start of the Class Period—the SAMR convened yet another forum, again attended by Alibaba and approximately 20 other large Chinese online retailers, wherein the SAMR again instructed that exclusive trading practices violated Chinese law.[4]  In connection therewith, Alibaba agreed to a "Commitment Letter" with the SAMR, affirming, *inter alia*, that Alibaba would not: "force platform operators to conduct 'exclusive cooperation'" or "use technical means to influence users' choices, or otherwise obstruct or undermine other operators' legitimately provided network products or normal services."  ¶117.

---

[4] The CAC alleged that this meeting occurred "in or around early July 2020."  ¶114.  Defendants have since clarified during the discovery process that this meeting in fact occurred on or about June 22, 2020.

**C.      Unknown To Investors, Alibaba Continues To Use Restrictive And Exclusive "Choose One of Two" Practices During The Class Period; Investors Are Damaged When The Truth Is Revealed And Undisclosed Risks Materialize**

Despite the SAMR's instructions to cease using "Choose One of Two" practices, and Alibaba's commitment to stop, Alibaba continued to use the practices throughout the Class Period. Defendants did not disclose Alibaba's continued use of exclusivity, however; instead, Defendants told investors in Alibaba's FY 2020 Form 20-F, in a purported risk warning about "strengthened enforcement under the PRC Antimonopoly Law," that Alibaba's "alleged" use of "exclusive partnerships" was "prior" and "narrowly-deployed." ¶253. Even as Defendants purported to warn about AML compliance risks and related regulatory risks (¶¶255, 269-70), they assured investors "we believe that our business practices do not violate anti-monopoly or unfair competition laws" (¶253) and omitted that Alibaba was continuing to use numerous "Choose One" practices during the Class Period (*see* ¶¶136-41). Defendants' failure to disclose the continued use of exclusivity practices during the Class Period also rendered their statements about Alibaba's "core commerce" revenue, growth, and its ability to "attract and retain a large number of…merchants" misleading. *E.g.*, ¶¶256-68, 271-73.

Defendants' misrepresentations and omissions maintained Alibaba's ADS price at artificially inflated levels during the Class Period. For example, on July 10, 2020, Alibaba's ADS price closed at $261.01 per share. Tabak Report Ex. 7. Then, the previously undisclosed risks of Alibaba's continued use of exclusive and restrictive trading practices materialized, and the truth of those practices was partially revealed, when, after market hours on December 23, 2020, the SAMR announced: "Recently, the State Administration for Market Regulation, acting on a tip-off, has launched an investigation into Alibaba Group's alleged monopolistic practices including 'Pick one from two'." Wolke Decl. Ex. 9. In response, Alibaba's ADS price fell $34.18 per share (approximately 13%), from a closing pricing of $256.18 on December 23, 2020, to close at $222.00 on December 24, 2020—marking ***Alibaba's biggest one-day decline since going public on the NYSE in 2014***. ¶131; Tabak Report ¶34.

The "alleged monopolistic practices" referred to in the SAMR's December 23, 2020 announcement were subsequently confirmed in the SAMR reports issued April 6 and April 10, 2021. ¶¶133-43; ECF No. 55-7 (April 6, 2021 SAMR Administrative Guidance Letter); ECF No. 55-8 (April 10, 2021 SAMR Letter of Administrative Penalties).  The April 2021 SAMR reports confirmed that "since 2015," Alibaba employed numerous "Choose One of Two" restrictive practices and that the practices were embedded within the Company's agreements and algorithms, found that the practices violated the AML, ordered Alibaba to cease the practices and "comprehensively rectify the problems," submit a rectification plan and compliance reports, and imposed an historic $2.8 billion fine. *Id*.  In response, Alibaba did not dispute the SAMR's findings about the Company's ongoing use of "Choose One" practices.  ¶¶146-47, 150-52.  Instead, Alibaba accepted the fine and agreed to change its business practices to "ensure our compliance" and "operate in accordance with the law[.]" *E.g.* ¶147.

## III.    THE ORDER DENYING DEFENDANTS' MOTION TO DISMISS

The Court held that the above-described misrepresentations and omissions regarding Alibaba's exclusive and restrictive practices were actionable.  *Alibaba*, 2023 WL 2601472, *9-*12 (finding "Prior" use of exclusive partnerships statement, growth and revenue/merchant retention statements, belief in legality of business practices statement, and risk disclosures were materially misleading); *see also id.* at *15 (Item 303 violation alleged because "Alibaba failed to disclose that it was continuing to require exclusivity, contrary to what it had disclosed to both investors and regulators, which materially increased the possibility of adverse regulatory action.").

The Court also held scienter was adequately alleged because, *inter alia*, "Wu and Zhang would have known or had access to facts indicating that Alibaba continued to engage in exclusivity practices, contrary to its representations to investors." *Id*. at *13.

Finally, the Court held loss causation was alleged with respect to the SAMR's December 23,

2020 announcement because "it is plausible that the announcement of an investigation into Alibaba's exclusivity practices 'marked the first in a series of corrective disclosures' that would reveal to the market that Alibaba had engaged in illegal exclusivity practices despite contrary disclosures." *Id.* at *14 (internal citation omitted).[5]

## IV.   THE PROPOSED CLASS REPRESENTATIVES

**Salem Gharsalli** is the Court-appointed Lead Plaintiff.  ECF No. 48.  Mr Gharsalli purchased 90,000 Alibaba ADSs during the Class Period and held those shares through the end of the Class Period.  ECF Nos. 8-2, 8-3 (Gharsalli certification and loss chart); Wolke Decl. Ex. 2.

**Laura Ciccarello** filed the first complaint and is an additional plaintiff in the CAC.  ECF Nos. 1, 55.  Ms. Ciccarello purchased 277 Alibaba ADSs during the Class Period and retained 70 shares at end of the Class Period.  ECF No. 97 (amended Ciccarello certification); Wolke Decl. Ex. 3.

**Dineshchandra Makadia** was a lead plaintiff movant and is an additional named plaintiff in the CAC.  ECF Nos. 13, 55.  Dr. Makadia (and his assignors) purchased 27,000 Alibaba ADSs during the Class Period and held those shares through the end of the Class Period.  ECF Nos. 20-1 (assignments), 20-3, 20-5 (Makadia certification and loss chart); Wolke Decl. Ex. 4.

**Wusheng ("Wilson") Hu** is a putative class member who seeks to be appointed as an additional Class Representative.[6]  Mr. Hu purchased 9,062 Alibaba ADSs during the Class Period and continued to hold 1,430 shares at the end of the Class Period.  ECF No. 98 (Hu certification); Wolke Decl. Ex. 5.

---

[5] The CAC also alleged a separate theory of liability relating to the planned IPO of Ant Group.  Those claims, including claims against Jack Ma, were dismissed.  *Alibaba*, 2023 WL 2601472 at *5-*8.  The CAC also alleged a partial corrective disclosure on November 10, 2020, which was dismissed for a failure to plead loss causation. *Id*. at *14.  The dismissed Ant-related claims and November 10, 2020 price drop are not at issue on this motion.

[6] A proposed Class Representative movant need not be a lead plaintiff or named plaintiff.  *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013) (Daniels, J.) (appointing previously unnamed class member to serve as sole class representative).

## V.   THE CLASS SHOULD BE CERTIFIED

### A.   Applicable Standards Favor Certification Of This Securities Class Action[7]

"The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014) (citing cases); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) ("Generally, claims alleging violations of Section 10(b) of the Exchange Act are especially amenable to class certification.") (cleaned up); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, *2 (S.D.N.Y. May 15, 2017) (same).

### B.   The Class Is Ascertainable And The Requirements Of Rule 23(a) Are Met

Fed. R. Civ. P. 23(a) sets forth four elements for class certification: a numerous class, common questions of law or fact, representatives with claims typical of the class, and adequate representation. In addition, the Second Circuit imposes an implied requirement of ascertainability. "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries. This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Secs.*, 862 F.3d 250, 269 (2d Cir. 2017). This is readily established in securities cases because "securities purchases identified by subject matter, timing, and location" are "clearly objective" criteria. *Id.*; *see also Sanofi*, 293 F.R.D. at 454 ("Whether a prospective class member purchased Sanofi ADRs during the class period and sold them after its end can be objectively determined by looking at brokerage or trading statements.").

The proposed Class is ascertainable because the Class Period is clearly defined and the Class

---

[7] Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

includes only those investors who purchased Alibaba's publicly traded ADSs during the Class Period. As such the identity of Class members can be objectively determined.

### 1.   Plaintiffs Satisfy Rule 23(a)(1): Numerosity

Rule 23(a)(1) requires that class is "so numerous that joinder of all members is impracticable." During the Class Period, Alibaba had more than 1.65 billion ADSs available for trading in its public float.  Tabak Report Ex. 7.  The average weekly trading volume during the 25-week Class Period was over 66.6 million ADSs/week.  *Id*. at ¶17.  Numerosity is easily satisfied.  *E.g.*, *Sanofi*, 293 F.R.D. at 454 (float of 241.4 million shares satisfied numerosity).

### 2.   Plaintiffs Satisfy Rule 23(a)(2): Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  In securities class actions, commonality is a "low hurdle" that is met "when plaintiffs allege that class members have been injured by similar material misrepresentations and omissions."  *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 204 (S.D.N.Y. 2022) (cleaned up); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, *11 (S.D.N.Y. Mar. 23, 2020) (similar).  Plaintiffs meet this standard as all Class members were injured similarly and the CAC raises numerous common questions, including:

(a) whether Defendants omitted or misrepresented material facts relating to Alibaba's business practices, merchant retention, legal compliance, and/or related risks during the Class Period;

(b) whether Defendants' failure to disclose Alibaba's continued use of "Choose One" trading practices gave rise to a trend, event, or uncertainty requiring disclosure under Item 303;

(c) whether Defendants acted with scienter in making misleading statements and omissions during the Class Period;

(d) whether Alibaba's ADS price traded at artificially inflated levels during the Class Period as a result of Defendants' material misrepresentations and omissions;

(e) whether Class members suffered damages when relevant truths were revealed and/or risks materialized on December 23, 2020, and, if so, the proper measure thereof; and

(f) whether the Individual Defendants "controlled" Alibaba for purposes of §20(a) liability.

11

### 3.  Plaintiffs Satisfy Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that the claims of the representatives are "typical" of those of the Class. As with commonality, the test for typicality "is not demanding."  *Villella v. Chem. and Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019); *Chicago Bridge*, 2020 WL 1329354, at *11 (same). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).  Thus, typicality "'should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.'" *Trinidad v. Breakaway Courier Sys., Inc*., 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007).

Here, each proposed Class Representative purchased Alibaba's ADSs during the Class Period at prices that were artificially inflated as a result of Defendants' alleged omissions and misstatements, and suffered damages when the truth about Alibaba's unlawful business practices was partially revealed, and/or the risks thereof materialized, causing Alibaba's ADS price to fall.  Wolke Decl. Exs. 2-5. Their claims are typical of the Class they seek to represent.  *In re Winstar Comms. Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (Daniels, J.) ("In securities cases alleging dissemination of allegedly false or misleading statements, the nature of the common injury generally satisfy typicality.").

### 4.  Plaintiffs Satisfy Rule 23(a)(4): Adequacy

Finally, Rule 23(a)(4) requires that "the class representatives…fairly and adequately protect the interests of the class."  Courts make two principal inquiries in assessing adequacy: "whether (1) plaintiff's interests are antagonistic to the interest of other members of the class; and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05.

Both inquiries are satisfied here.  The proposed Class Representatives' interests are entirely

aligned with the Class.  Each has demonstrated a commitment to pursuing this action on behalf of absent Class members.  All have produced discovery and have worked with counsel to advance the litigation for the benefit of the Class.  And all understand their duties to the Class and share an interest in trying to maximize any potential Class-wide recovery.  *See generally* Wolke Decl. Exs. 2-5.

"Moreover, as is always the case, in securities fraud class actions the best measure of whether a plaintiff will adequately represent the interests of a class is whether his lawyers are equipped to handle the matter."  *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, *13 (S.D.N.Y. Jan. 26, 2021).  The Glancy Firm has "extensive class action experience" and is well equipped to conduct the litigation.  *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 84 (S.D.N.Y. 2018) (appointing GPM co-lead counsel, finding the firm "will fairly and adequately represent the interests of the class"); Wolke Decl. Ex. 10 (Firm résumé of GPM detailing qualifications and experience in securities class actions).

### C.    The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met

#### 1.    Common Questions Of Law And Fact Predominate

"[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof."  *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010).  As discussed above, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  *Halliburton I*, 563 U.S. at 810.

Here, predominance is satisfied in two independent ways as reliance may be presumed on a class-wide basis pursuant to both (a) the *Affiliated Ute* presumption of reliance applicable to omissions, and (b) the *Basic* fraud-on-the-market presumption of reliance applicable to misstatements.

##### (a)    Plaintiffs Are Entitled To The *Affiliated Ute* Presumption Of Reliance

Reliance may be presumed under *Affiliated Ute* where, as here, "a plaintiff's claim is based on a defendant's failure to disclose material information."  *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb*

*Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (citing *Affiliated Ute*, 406 U.S. at 154) (additional citations omitted).  In such circumstances, individual reliance need not be proven, nor does market efficiency need to be shown.  *Sanofi*, 293 F.R.D. at 456 n.8 ("[I]f there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.");  *Smith Barney*, 290 F.R.D. at 47-49 (applying *Affiliated Ute* presumption of reliance where plaintiffs conceded the market was not efficient).  Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131.  The *Affiliated Ute* doctrine arises out of the fact that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013).  Indeed, "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *Smith Barney*, 290 F.R.D. at 47.

Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance because the alleged fraud here is rooted in material omissions, *i.e.*, that Alibaba continued to use "Choose One" exclusive and restrictive practices during the Class Period despite the SAMR's repeated admonishments to stop.

Indeed, at the motion to dismiss phase, the Court observed that Plaintiffs' case is largely centered on this omission, stating "[m]any of Plaintiffs' Exchange Act claims relate to the omission of material information, as opposed to an affirmative misstatement of fact." *Alibaba*, 2023 WL 2601472, *8.  The Court found each of the four categories of false statements were alleged to be misleading based on the omission of material information relating to Alibaba's exclusivity practices. For example, regarding Alibaba's characterization of its use of exclusivity as "prior" and "narrowly deployed," the Court held that "a reasonable investor would be interested in knowing that Alibaba

14

continued to require exclusivity, and would view that fact, *if known*, as altering the 'total mix' of information made available about Alibaba's practices." *Id.* at *9 (citing *Basic*, 485 U.S. at 232). Regarding Alibaba's growth and merchant retention statements, the Court held that "a reasonable investor could conclude that Alibaba had stopped requiring merchant exclusivity, and that its reported growth was due to organic retention, not exclusivity. ***Once Alibaba spoke on the issue, it had 'a duty to tell the whole truth'***—that these trends were due, at least in part, to the Company's ongoing, undisclosed use of merchant exclusivity." *Id.* at *10 (citing *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)).  Regarding Defendants' statements about the legality of Alibaba's business practices, the Court stated: "Plaintiffs emphasize that ***Alibaba omitted the critical context that it was continuing to employ certain exclusivity practices*** despite contrary representations to investors and regulators." *Id.* at *11.  And, finally, regarding Alibaba's purported regulatory risk disclosures, the Court held "[f]or the same reasons, Plaintiffs plausibly allege that Alibaba's risk disclosures were materially misleading. Plaintiffs emphasize that ***Alibaba omitted the material fact that it was continuing to rely on exclusivity practices when discussing the possible risk of adverse regulatory action*** by the SAMR.  As discussed above, once Alibaba spoke on possible investigations into its exclusivity practices, it had a duty to disclose the material omitted fact that it was continuing to engage in such practices, contrary to its representations to regulators and investors." *Id.* at *12.

With their claims thus rooted in material omissions about Alibaba's business practices, Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance. *See Sanofi*, 293 F.R.D. at 456 n.8 (*Affiliated Ute* applied because "[w]hen Sanofi representatives chose to speak," about the status of FDA approval, "they took on a 'duty to be both accurate and complete'" by disclosing FDA request for data regarding suicidality) (cleaned up); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 311 (S.D.N.Y. 2016) (*Affiliated Ute* applied based on allegations that defendants falsely "attributed [the LX fund's]

growth to Barclays' commitment to being transparent about how Barclays operates," while concealing "the amount of aggressive high-frequency trading in [the fund], and inappropriately over-routed client orders into [the LX fund]."); *Virtus*, 2017 WL 2062985, *6 (*Affiliated Ute* applied where "Virtus Partners cited proper drivers of 'sales and net flows' but omitted the misleading performance history") (cleaned up); *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011) (*Affiliated Ute* applied because "the heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld, and that information would have been important to a reasonable investor."); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, *8 (S.D.N.Y. Aug. 21, 2008) (*Affiliated Ute* applies where "allegedly fraudulent conduct spans a large set of misstatements and omissions").[8]

### (b)   Plaintiffs Are Entitled To The *Basic* "Fraud-On-The-Market" Presumption Of Reliance

Plaintiffs also are entitled to the "fraud-on-the-market" presumption of reliance, which holds that "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic*, 485 U.S. at 247.  To invoke the presumption at class certification, a plaintiff must show: "that the alleged misrepresentations were publicly known, that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed."  *Amgen*, 568 U.S. at 471-72 (cleaned up).[9]

---

[8] This case is thus readily distinguished from *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 (S.D.N.Y. 2011), where this Court held that *Affiliated Ute* did not apply, noting that at the motion to dismiss phase, the court "did not identify a single omission[,]" that the plaintiffs' theory of omissions were "plainly not omissions[,]" and that the case was "primarily built around misrepresentations[.]"

[9] The Supreme Court has made clear that materiality is *not* at issue at class certification.  *Amgen*, 568 U.S. at 467-78, 471.  *See also Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.* ("*Arkansas Teacher III*"), 77 F.4th 74, 81 (2d Cir. 2023) (citing *Amgen*'s holding that a "court *may not* resolve [materiality] at class certification.") (italic emphasis in original).

Here, there can be no dispute that (i) the alleged misrepresentations were public and (ii) the members of the proposed Class, by definition, purchased Alibaba ADSs during the Class Period after alleged misrepresentations were made and before the truth was revealed. The final requirement, that Alibaba's ADSs traded in an efficient market, is established in the Tabak Report, as discussed herein. As such, Plaintiffs are entitled to the fraud-on-the-market presumption of reliance.

### (i)     Alibaba's ADSs Traded On The NYSE

Alibaba's listing on the NYSE is, itself, evidence of efficiency. *Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 (2d Cir. 2017) ("it is unsurprising that the market for Barclays' ADS is efficient" as it traded on the NYSE and Barclays is one of the largest financial institutions in the world); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC* ("*Carpenters*"), 310 F.R.D. 69, 81, 91 (S.D.N.Y. 2015) (NYSE listing "is a good indicator of efficiency" as NYSE is "the world's largest and most liquid stock exchange."). The NYSE has long been recognized by courts as a "paradigmatic efficient market." *Moody's*, 274 F.R.D. at 489 n.3 (citing the Supreme Court assumption in *Basic* that "the shares at issue traded on a 'well-developed, efficient, and information-hungry market' when they traded on the NYSE") (citing *Basic*, 483 U.S. at 248 n.29); *Strougo*, 312 F.R.D. at 318 ("unusual circumstances" must exist for a security traded on the NYSE to not trade efficiently).

### (ii)    The *Cammer* And *Unger/Krogman* Factors Demonstrate Market Efficiency

Neither the Supreme Court nor the Second Circuit has adopted a formal test of market efficiency. *Petrobras*, 862 F.3d at 276. Courts in the Second Circuit and elsewhere, however, routinely consider the factors from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in assessing efficiency. *Petrobras*, 862 F.3d at 276-79. Those factors include:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

17

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer*, 711 F. Supp. at 1285-87); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *Petrobras*, 862 F.3d at 276.

Courts may also consider three additional factors identified in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (6) a high market cap, (7) a large float, and (8) narrow bid-ask spread.  *See Petrobras*, 862 F.3d at 276; *Billhofer v. Flamel Techs, S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012).

The foregoing factors "are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432; *see also Carpenters*, 310 F.R.D. at 83 ("While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive."); *Petrobras*, 862 F.3d at 277 (holding district court properly applied a "holistic analysis based on the totality of the evidence presented").  A collective evaluation of these factors shows that Alibaba's ADSs traded in an efficient market:

**(1) Trading Volume.**  During the Class Period, Alibaba's ADSs had an average weekly trading volume of 2.46% of the outstanding shares, or approximately 66.6 million shares traded weekly. Tabak Report ¶17 & Ex. 3 thereto.  That rate exceeds *Cammer*'s 2% threshold that establishes a "strong presumption" of market efficiency.  711 F. Supp. at 1286.

**(2) Analyst Coverage.**  Substantial analyst coverage "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446.  Here, there was an average of 22 substantive analyst reports published on Alibaba during each month of the six-month Class Period.  Tabak Report ¶21 & Ex. 4

thereto.  By comparison, the *Cammer* court found efficiency where the security at issue was the subject of fifteen research reports during the one-year class period.  711 F. Supp. at 1283 n.30, 1287.

**(3) Market Makers And Arbitrageurs.**  The presence of market makers and arbitrageurs indicates efficiency because "these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87; *McIntire*, 38 F. Supp. 3d at 431-32.  There were 107 market makers trading in Alibaba's ADSs during the Class Period, further supporting efficiency here. *Compare* Tabak Report ¶22 *with Winstar*, 290 F.R.D. at 447 (six market makers "weighs toward a finding of market efficiency"); *Dynex*, 2011 WL 781215 at *5 (thirteen market makers sufficient).

**(4) Form S-3 Eligibility.**  A company must have a $75 million float and meet certain other requirements to be eligible for Form S-3 registration, which allows companies to file a shortened form with the SEC to raise capital.  Tabak Report ¶29.  Form S-3 eligibility is relevant to market efficiency because Form S-3 registration is "predicated on the Commission's belief that the market operates efficiently for these companies." *Cammer*, 711 F. Supp. at 1284 (cleaned up).  Alibaba was eligible for Form F-3 (the foreign equivalent of Form S-3) and Alibaba's float exceeded ***$400 billion*** at all times during the Class Period, strongly evidencing efficiency.  Tabak Report ¶29 & Ex. 7 thereto.

**(5) Alibaba's ADS Price Responded To New, Company-Specific Information.**  Considered the only direct evidence of efficiency, this factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287; *Winstar*, 290 F.R.D. at 448.

The Tabak Report provides this evidence through event studies that show Alibaba's ADS price changed a statistically significant amount on "news" days more than on "non-news" days during the Class Period.  *See* Tabak Report ¶¶31-43.  Dr. Tabak's event study analyses show that the percentage

of "news" days with statistically significant changes in the price of Alibaba's ADSs was statistically

significantly greater than the percentage of "non-news" days with statistically significant price changes

during the Class Period.  *Id.* & Ex. 8a thereto.  Dr. Tabak thus concluded that the event study analyses

"provide strong evidence that Alibaba's ADS price responded to material new information" during the

Class Period.  Tabak Report ¶43.[10]

These types of event studies examining "news" days versus "non-news" days are routinely

accepted by courts in this Circuit as demonstrating direct evidence of market efficiency.  *See, e.g.*,

*McIntire*, 38 F. Supp. 3d at 492; *In re Teva Sec. Litig.*, 2021 WL 872156, *21-*23 (D. Conn. Mar. 9,

2021) (finding Dr. Tabak's "news" versus "no-news" event study reliable direct evidence of efficiency

and noting Dr. Tabak "was one of the pioneers of this method of event study.").

**(6) & (7) Large Market Cap And Float.**  A large market cap promotes efficiency because the

larger the market capitalization, the more likely the stock is to attract analyst and news media coverage,

and gain the attention of investors, including large institutional investors.  Tabak Report ¶45.  At all

times during the Class Period, the aggregate market value of Alibaba's ADSs exceeded *$600 billion*

(reaching as high as $858 billion), making its market capitalization greater than at 99% of all other

publicly traded companies in the United States.  Tabak Report ¶45 & Ex. 7 thereto.

The float is generally the number of shares available for trading by investors in the open

market.  A large public float helps support a finding of an efficient market.  At all times during the

Class Period, the market value of Alibaba's ADS float exceeded $400 billion.  Tabak Report ¶49 &

---

[10] These tests are analogous to the non-directional event studies conducted in *Petrobras*, which the district court and the Second Circuit found to show market efficiency, even without an event study assessing whether the stock's price moved in the "correct" direction in response to events.  *In re Petrobras Sec. Litig.,* 312 F.R.D. 354, 370 (S.D.N.Y. 2016)  ("Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking *Basic*'s presumption of reliance."); *Petrobras*, 862 F.3d at 279 (rejecting argument that courts must "rely on directional event studies and directional event studies alone").

Ex. 7 thereto; *Billhofer*, 281 F.R.D. at 154 (float exceeding $286 million supported efficiency).

**(8) Small Bid-Ask Spread.**  The bid-ask spread is the difference between the price at which market makers are offering to buy and sell the security.  Tabak Report ¶47.  The bid-ask spread tends to be narrow for actively traded securities where information is readily available, indicating efficiency. *Krogman*, 202 F.R.D. at 478.  The average bid-ask spread for Alibaba's ADSs during the Class Period was 0.04%, with a median figure of 0.02% (Tabak Report at ¶48), thus supporting efficiency. *McIntire*, 38 F. Supp. 3d at 433 (0.27% bid-ask spread supported efficiency).

In sum, *all* of the *Cammer* and *Unger/Krogman* factors provide strong evidence that Alibaba's ADSs traded in an efficient market during the Class Period, establishing that the Class is entitled to the "fraud-on-the-market" presumption of reliance.

        **(iii)**       **Alibaba Will Not Be Able To Rebut The *Basic* Presumption Of Reliance By A Preponderance Of The Evidence**

Plaintiffs' strong market efficiency showing gives rise to an equally strong presumption that the alleged statements and omissions at issue in this case impacted Alibaba's ADS price during the Class Period.[11]  While Defendants may attempt to rebut the *Basic* presumption of reliance by arguing that the alleged misrepresentations and omissions here did *not* actually impact Alibaba's ADS price during the Class Period, ***they will not be able to prove a complete lack of price impact by a preponderance of the evidence***, as is required to rebut the presumption and defeat class certification. In *Waggoner*, the Second Circuit held "'that it is incumbent upon the defendant to *show* the absence of price impact'" by a "preponderance of the evidence."  *Waggoner*, 875 F.3d at 101 (quoting *Halliburton II*, 134 S.Ct. at 2416 (Ginsburg, J., concurring)) (emphasis in original in *Waggoner*); *Chicago Bridge*, 2020 WL 1329354, *4 (referring to "the *Waggoner* rule that a party opposing class

---

[11] Plaintiffs' market efficiency showing gives rise to a presumption of price impact; Plaintiffs are not required to *prove* price impact with direct evidence.  *Carpenters*, 310 F.R.D. at 86; *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2414 (2014) ("*Halliburton II*").

certification bears the burden of persuasion when rebutting the *Basic* presumption and must demonstrate a complete lack of price impact by a preponderance of the evidence."). Defendants will not be able to make that showing here.

Plaintiffs allege Defendants misrepresented that Alibaba had stopped using exclusive trading, and misleadingly purported to caution about risks of "anti-monopoly investigations" and potential "regulatory actions," while omitting that Alibaba was continuing to use the very "Choose One" exclusive and restrictive trading practices that the SAMR told it to stop using. *E.g.*, ¶¶253-55. The continued use of these undisclosed practices in contravention of the SAMR's repeated instructions put Alibaba at an *extremely* heightened risk of regulatory investigations and actions. And that risk is precisely what materialized on December 23, 2020, when the SAMR announced that it had launched an investigation in response to a "tip-off" regarding Alibaba's use of "alleged monopolistic practices including 'Pick one from two.'" Wolke Decl. Ex. 9. There is "no question" "that the corrective disclosure directly implicated not just the same topic, but the alleged misstatements themselves[.]" *Arkansas Teacher III*, 77 F.4th at 97.

Indeed, Defendants cannot dispute that Alibaba's ADS share price declined a material 13% following the December 23, 2020 disclosure. CAC ¶¶30-31; Tabak Report ¶34. This precludes Defendants' ability to "sever the link" between (i) the alleged misrepresentations relating to Alibaba's business practices and associated regulatory risks and (ii) Alibaba's ADS price during the Class Period. *Waggoner*, 875 F.3d at 104-105 (price decline following disclosure of New York AG action alleging that Barclays was violating provisions of the New York Martin Act in operating "dark pool" investment funds for anonymous trading showed price impact of earlier statements regarding supposed transparency and oversight of the funds); *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, *12 (D. Conn. April 13, 2023) (price drop following alleged corrective disclosure "dooms Defendants'

attempt to rebut the presumption of reliance").[12]

### 2.    Potential Individual Questions Of Damages Do Not Predominate

Following the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Second Circuit has held that damages in securities cases present common questions because they can be calculated by measuring the impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See Waggoner*, 875 F.3d at 106 (holding that plaintiffs' damages model, which "examin[ed] the drop in price that occurred" when the "ongoing problems related to Barclay's management" were revealed, was "'directly linked with their underlying theory of classwide liability . . . and [was] therefore in accord with the Supreme Court's . . . decision in *Comcast*.'"); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast*[.]").[13]

Damages can be calculated on a class-wide basis in this action using the same kind of generally accepted event study methodology. Tabak Report at ¶¶57-61. Using an event study, the artificial inflation maintained in Alibaba's ADS price as a result of false statements and omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by the only remaining alleged corrective disclosure, on December 23, 2020. *Id.* A Class member's actual trading activity

---

[12] *See also McIntire*, 38 F. Supp. 3d at 435 (price drop after corrective disclosure "further evidence" of price impact); *In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 143 (S.D.N.Y. 2012) (price drop after corrective disclosure defeated defendant's price impact argument); *In re BancorpSouth, Inc.*, 2017 WL 4125647, *1 (6th Cir. Sept. 18, 2017) ("price impact may be demonstrated either at the time that the alleged misrepresentations were made, or at the time of their correction.").

[13] *See also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016) ("as required by *Comcast*, plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be  measurable on a class-wide basis"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, *8 (S.D.N.Y. Sept. 24, 2015) ("at the class certification stage, Plaintiffs must only show that their damages model actually measures damages that result from the Class's asserted theory of injury") (cleaned up).

can be used to mechanically calculate damages on an individual basis for each Class member in the claims administration process. *Id.* This methodology is consistent with the class-wide theory of liability and allows for measurement of damages on a class-wide basis. *Waggoner*, 875 F.3d at 106.

**D.    A Class Action Is Superior To Other Methods Of Adjudication**

Under Rule 23(b)(3), "[s]uperiority is established when a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (cleaned up). Superiority is typically found in cases in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010); *Williams v. KuCoin*, 2022 WL 392404, *3 (S.D.N.Y. Feb. 9, 2022) (Daniels, J.). The following factors are relevant to the superiority inquiry:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

Given that Alibaba is based in China, most relevant documents and evidence are in Chinese and most witnesses are located in China. It would be prohibitively difficult and expensive to prosecute this case on an individual basis. The alleged fraud here, like "most violations of the federal securities laws, . . . inflicted economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999) (cleaned up). Indeed, there is no indication here that absent Class members have a strong interest to individually control the litigation in separate actions. Finally, securities class actions generally raise no unusual manageability issues, and there is no evidence that

this case is any different.  *See, e.g.*, *Petrobras*, 312 F.R.D. at 363 (quoting *In re Visa Check/ MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).  In sum, a class action is the superior method for the efficient adjudication of the Class's claims.

## VI.   GLANCY PRONGAY & MURRAY SHOULD BE APPOINTED CLASS COUNSEL

Rule 23(g)(1)(A) sets forth the factors to consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to the case.

Under these criteria, the Glancy Firm (or GPM) is eminently qualified.  The Glancy Firm specializes in litigating securities fraud class actions, and the firm has recognized expertise and success in prosecuting securities class actions against PRC-based companies, including Alibaba.  *See* Wolke Decl. ¶12, Ex. 10.  Attorneys from GPM, including the undersigned, were deeply involved in the Exchange Act litigation arising out of Alibaba's 2014 Initial Public Offering, which ultimately settled in 2019 for $250 million.  *Christine Asia Co. Ltd. v. Ma et al.*, Case No 15-md-02631 (S.D.N.Y.). GPM's vigorous pursuit of the Class's interests already has been shown in this case, as GPM thoroughly investigated and prepared the CAC, prevailed against Defendants' motion to dismiss, and has conducted significant discovery.  GPM already has dedicated significant time and resources to the prosecution of this action, and it will continue to do so.  Wolke Decl. ¶12.

In sum, Plaintiffs respectfully submit that the requirements of Rule 23(g) are met, and thus request that the Court approve the Glancy Firm as Class Counsel.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the motion for class certification in its entirety.

Dated: October 6, 2023               **GLANCY PRONGAY & MURRAY LLP**

By: */s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
Melissa C. Wright (*pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
kwolke@glancylaw.com
mwright@glancylaw.com

*Lead Counsel and proposed Class Counsel*

Jeremy A. Lieberman
Jonathan D. Park
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
jpark@pomlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
pdahlstrom@pomlaw.com

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
peretz@bgandg.com

Frank R. Cruz
THE LAW OFFICES OF FRANK R. CRUZ
1999 Avenue of the Stars
Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
info@frankcruzlaw.com

Lesley Portnoy
THE PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: 310-692-8883
lesley@portnoylaw.com

*Additional Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 6, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 6, 2023, at Los Angeles, California.

  *s/ Kara M. Wolke*
Kara M. Wolke