**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE: ALIBABA GROUP HOLDING LTD.
SECURITIES LITIGATION

No.: 1:20-cv-09568-GBD-JW

**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Jonathan K. Youngwood
jyoungwood@stblaw.com
425 Lexington Avenue
New York, New York    10017
Telephone: (212) 455-3539
Facsimile: (212) 455-2502

Stephen P. Blake
sblake@stblaw.com
Bo Bryan Jin
Bryan.jin@stblaw.com
2475 Hanover Street
Palo Alto, California    94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Counsel for Defendants Alibaba Group Holding*
*Limited, Daniel Yong Zhang and Maggie Wei Wu*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 3

    A.    After Years Of Widespread Public Criticism, Alibaba Is
        Investigated And Fined For Exclusivity Practices.................................. 3

    B.    This Lawsuit Contends That Alibaba Misled Investors That It Had
        Ceased Exclusivity Practices ................................................................ 4

    C.    The Record Shows, However, That Investors Believed That
        Alibaba Continued To Practice Exclusivity And Faced Associated
        Antitrust Risk During The Putative Class Period .................................. 6

    D.    The Market Was "Not Surprised" By SAMR's Investigation ............... 7

ARGUMENT ....................................................................................................... 8

I.     DIRECT EVIDENCE ESTABLISHES NO PRICE IMPACT ......................... 10

II.    INDIRECT EVIDENCE ALSO SUPPORTS A FINDING OF NO PRICE
     IMPACT ....................................................................................................... 12

    A.    Application Of A Price Maintenance Theory Is Improper Where
        Plaintiffs Allege Misstatements Altered The *Status Quo* ..................... 13

    B.    Comprehensive Analysis Of Market Commentary Supports A
        Finding Of No Price Impact ................................................................. 15

        1.    The Challenged Misstatements Did Not Maintain A
            Mistaken Belief That Alibaba Had Ceased Using
            Exclusivity ................................................................................ 15

        2.    The Alleged Corrective Disclosure Did Not Reveal Any
            New Information About Alibaba's Exclusivity Practices.................... 16

        3.    The December 24, 2020 Price Movement Was The
            Market's Reaction To (i) A Disclosed Risk Creating
            Significant Uncertainty And (ii) Confounding News ............... 18

    C.    There Is A Fatal Mismatch Between The Challenged
        Misstatements And The Alleged Corrective Disclosure........................ 20

        1.    The Alleged Corrective Disclosure Did Not Contradict The
            Prior Practices Statement Or The Antitrust Risk
            Disclosures ................................................................................ 20

       2.      The Other Disclosures Are Generic Under *Goldman* ............................... 21

III.    THE *AFFILIATED UTE* PRESUMPTION DOES NOT APPLY .................................... 23

CONCLUSION ................................................................................................................................... 25

APPENDIX A ................................................................................................................................... A-1

APPENDIX B .................................................................................................................................... B-1

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) .................................................................................................. 10

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................ 8, 9

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................... 9

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ("*Goldman 2023*")................................................... passim

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................ 1, 9

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
  2023 WL 2932485 (D. Conn. April 13, 2023) ........................................................ 13

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021) ("*Goldman 2021*"). ....................................................... passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ("*Halliburton II*") ........................................................... 1, 9, 10

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016)............................................................................... 10, 12

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...................................................... 9, 17

*In re Dynex Capital, Inc. Sec. Litig.*,
  2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ............................................................. 24

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ........................................................... 15

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010)............................................................................. 21

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011)................................................................. 14, 24, 25

*In re Parmalat Sec. Litig.*,
  2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ........................................................ 24

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023)............................................................ 16, 17, 18

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013)................................................................................ 24

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017).............................................................. 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011)........................................................................ 13

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016)................................................................................ 24

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)..................................................................... 10, 13, 24, 25

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................ 9

Fed. R. Civ. P. 23(b) ................................................................................................ 10

Fed. R. Civ. P. 23(b)(3)............................................................................................ 8, 9

**GLOSSARY**

| Term | Definition |
|------|-----------|
| 20-F | Alibaba Group Holding Ltd.'s annual report for fiscal year 2020, filed with the SEC on Form 20-F on July 9, 2020 |
| AC (or the "Complaint") | Amended Consolidated Class Action Complaint (ECF No. 55) |
| ADSs | American Depository Shares |
| Alibaba (or the "Company") | Defendant Alibaba Group Holding Limited |
| AML | The PRC Anti-Monopoly Law |
| Ant Group | Ant Group Co. Ltd. |
| Challenged Misstatements | Statements alleged by Plaintiffs' as misleading in AC ¶¶ 253-73 |
| Defendants | Alibaba, its former CEO Daniel Yong Zhang, and its former CFO Maggie Wei Wu |
| HKSE | Hong Kong Stock Exchange |
| Hubbard Report (or "Rpt.") | Expert Report of Glenn Hubbard |
| MTD Order | Court's Motion to Dismiss Memorandum and Order (ECF No. 83) |
| MTD Opp. | Plaintiffs' Opposition to Alibaba Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (ECF No. 74) |
| MTD Tr. | January 11, 2023 Motion To Dismiss Hearing Transcript (ECF No. 81) |
| PRC | People's Republic of China |
| PBOC | People's Bank of China |
| Pls' Br. | Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 100) |
| SAMR | PRC regulator the State Administration for Market Regulation |
| SAMR Announcement | SAMR Investigation Announcement dated December 23, 2020 |
| Tabak Tr. | Deposition transcript of Dr. David Tabak, dated November 2, 2023 |

## PRELIMINARY STATEMENT

On December 23, 2020, China's antitrust regulator announced an investigation into Alibaba.   The investigation targeted Alibaba's "choose one of two" exclusivity practices that had "***long been a source of friction***" (Reuters) and "***long been a bone of contention***" (WSJ). Such practices had been the subject of lawsuits and extensively covered in media and analyst reports.   Alibaba's risk disclosures cautioned investors that its "prior ***and current*** business practices" were under attack; that it could give "no assurance that regulators will not initiate anti-monopoly investigations"; and that it could face "heavy fines."   20-F at 39.

At Motion to Dismiss, the Court acknowledged the "wide[] cover[age]" of Alibaba's exclusivity practices in the "months and years" ***before*** the putative Class Period.   MTD Order at 18-19.   At that preliminary stage, taking Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court held that the phrase "alleged prior narrowly-deployed exclusive partnerships" in the antitrust risk disclosure of Alibaba's July 9, 2020 Form 20-F annual report "could plausibly . . . mean[] that Alibaba was no longer requiring exclusivity[,]" because the word "prior" plausibly altered the *status quo* market understanding on this issue.   *Id.* at 18, 20, 22, 28.

At Class Certification, Plaintiffs must now establish that class questions predominate over individual questions.   To avoid the need for individualized proof of reliance on the Challenged Misstatements, Plaintiffs invoke the fraud-on-the-market presumption from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which assumes that the challenged disclosures were incorporated into the market price of the security at issue.   Defendants, however, can rebut this presumption by proving that the Challenged Misstatements "did not actually affect [Alibaba's ADS] market price[.]"   *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) ("*Halliburton II*").   As the Supreme Court recently instructed, courts must consider "all

1

probative evidence" and apply "a good dose of common sense" when assessing price impact at class certification.  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021) ("*Goldman 2021*").  Stated plainly, pleading-stage inferences and legal presumptions now give way to evidence of no price impact.

Defendants make precisely such an evidentiary showing here.  There was no statistically significant increase in Alibaba's ADS price when it used the phrase "alleged prior narrowly-deployed exclusive partnerships"—on July 10, 2020 or any other time.  There is also no evidence that investors viewed these six words in a nearly 700-word risk factor within an 180,000-word annual report to mean that Alibaba had ceased its exclusivity practices, further evidencing that the statement had no price impact.

An extensive review by Defendants' expert of over 2,000 analyst reports and more than 3,000 news articles published before, during and after the putative Class Period further demonstrates that there was no price impact.  There are no analyst reports or news stories citing the Prior Practices Statement to say that Alibaba had ceased using exclusivity practices.  Quite the opposite, news during the putative Class Period continued to report that Alibaba "sign[ed] exclusive agreements with business partners to avoid competition" and "force[d] [merchants] to sell exclusively on its platform" (Dow Jones; Financial Times).  Analysts similarly cited to "accus[ations] of forced exclusivity by merchants" and Alibaba's "practice of exclusive relationships," which they predicted would have "negative effect[s]" (JPMorgan).  Empirically, Alibaba's ADS price significantly declined when, on November 10, 2020, SAMR signaled heightened enforcement focus on choose one of two, demonstrating that the market was keenly aware of Alibaba's continued deployment of such practices and associated risks.

Plaintiffs cannot rely on the December 24, 2020 ADS price drop to salvage class

certification.    Because the market was well aware of Alibaba's use of exclusivity during the

putative Class Period, the stock drop lacks the requisite "link" to the Challenged Misstatements

to create an inference of price impact.    Rather than treating SAMR's announcement as

revelatory of prior undisclosed information, Alibaba analysts stated "*we are not surprised*"

(Raymond James) and it is "*not a big surprise*" (Bank of America).

In sum, evidence shows that Challenged Misstatements did not impact Alibaba's stock

price.    Individual questions of reliance thus predominate, and a class cannot be certified.

## STATEMENT OF FACTS

A.    **After Years Of Widespread Public Criticism, Alibaba Is Investigated And Fined For Exclusivity Practices**

Alibaba is a Chinese technology company with ADSs listed on the New York Stock

Exchange, and common shares on the Hong Kong Stock Exchange.    Ex. 1[1] ("20-F") at 68.

Alibaba's e-commerce platforms facilitate trillions of dollars in transactions annually by

connecting consumers with third-party merchants.    *Id.* at 69, 83, 133.

For several years before *and during* the putative Class Period (July 10, 2020 to

December 23, 2020), there were widespread reports that Alibaba and other players in the highly-

competitive Chinese e-commerce market engaged in exclusivity practices referred to as "choose

one of two" to force merchants to trade exclusively on their platform.    Ex. 2 ("Hubbard Report"

or "Rpt.") ¶¶ 73-90; *see also*, *e.g.*, Ex. 3 at 2.    This widespread coverage included analyst and

media reports on Alibaba's own practices and their associated antitrust risks.    Rpt. ¶¶ 73-90.

Between 2015 and 2020, at least four companies were engaged in litigation with Alibaba over its

exclusivity practices, or reported Alibaba's practices to regulators, with each effort garnering

---

[1]    Citations to Ex. __ refer to the exhibits to Declaration of Stephen Blake in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Blake Decl.").

meaningful press attention.   *Id.* ¶ 73; AC ¶¶ 91-94; *see also*, *generally*, Ex. 4.

Alibaba candidly acknowledged in its 2019 and 2020 SEC filings, including in filings near the start of the putative Class Period, that its "prior ***and current business practices***" were increasingly being challenged under the PRC Anti-Monopoly Law by "competitors, business partners, and customers."   *See*, *e.g.*, 20-F at 39; Ex. 5 at 250; Ex. 6 at 22 (emphasis added). Alibaba further warned that SAMR, the PRC antitrust regulator, was conducting administrative guidance on exclusivity issues and "inten[ded to] initiat[e] investigations into [exclusivity] arrangements"—cautioning that "there can be no assurance that regulators will not initiate anti-monopoly investigations into ***specific business practices we have adopted***" and that Alibaba could face "heavy fines and various restrictions on our businesses or investment activities."   *Id.* (emphasis added).

On December 23, 2020, after U.S. markets had closed, SAMR announced an investigation into Alibaba, stating tersely that "[r]ecently, based on complaints, [SAMR] launched an investigation into [Alibaba's] suspected monopolistic practices including 'Choose One From Two' in accordance with the law."   Ex. 7.   The following day, Alibaba's ADS price dropped 13.34%.   Rpt. ex. 2.   In April 2021, SAMR fined Alibaba roughly US$2.8 billion. Ex. 8.   At the news, Alibaba's ADS price rose 9.27%.   Rpt. ex. 2.

**B.     This Lawsuit Contends That Alibaba Misled Investors That It Had Ceased Exclusivity Practices**

Notwithstanding Alibaba's sober antitrust risk disclosures, Plaintiffs contend that Alibaba misled investors to believe it had ceased its exclusivity practices because Alibaba's lengthy antitrust risk disclosure mentioned both "alleged prior narrowly deployed exclusive partnerships" and its "market approach with traffic resource allocation."   AC ¶ 253 (quoting 20-F at 39) (the "Prior Practices Statement").   Plaintiffs argue:

4

> The Class Period begins [. . .] when Alibaba filed its 2020 Form 20-F with the
> SEC, telling investors that despite Alibaba's 'alleged **prior narrowly-deployed**
> exclusive partnerships,' its 'business practices do not violate anti-monopoly or
> unfair competition laws….' [AC] ¶253. That statement was false. Contrary to
> Alibaba's assurances, its 'exclusive partnerships' did not end at some 'prior' time,
> and were not 'narrowly-deployed' but deeply ingrained practices that Alibaba
> continued to use throughout the Class Period. [AC] ¶¶136-41, 379.

MTD Opp. at 3; *see also* Pls' Br. at 7.   The Court at Motion to Dismiss concluded that "a

reasonable investor could plausibly believe that Alibaba's description of its 'prior' exclusivity

practices meant that Alibaba was no longer requiring exclusivity from merchants at all."   MTD

Order at 18.   In so holding, the Court acknowledged that Defendants had shown "Alibaba had

publicly defended its exclusivity practices and . . . their use was 'widely covered'" prior to the

putative Class Period.   *Id.* at 18-19.   But the Court found that the Prior Practices Statement

could plausibly have changed the *status quo*, since reporting on Alibaba's exclusivity practices

came "months and years" before.   *Id.*

The Court also found that other Alibaba disclosures, including (i) additional statements in

Alibaba's 2020 Form 20-F antitrust risk factor (the "Antitrust Risk Disclosures"), and (ii) other

general statements about Alibaba's growth, merchants, and competitive position (the "Other

Disclosures") were plausibly misleading on the theory that Alibaba had misled investors to

believe that it had ceased exclusivity practices.   *See* MTD Order at 20, 22 (growth-related

statements plausibly misleading when "[t]aken together" with "Alibaba's characterization of

their 'prior' use of 'exclusive partnerships,'" risk-related statements plausibly misleading

because of Alibaba's "representation . . . regarding 'prior' use of exclusivity").[2]

Plaintiffs now ask this Court to certify a class of Alibaba ADS holders under Rule 23.

*See generally* Pls' Br.   They argue that individualized questions of reliance do not predominate

---

[2]   *See* Appendix A for a chart of the Challenged Misstatements.

because they are entitled to a presumption of class-wide reliance.   *Id.* at 16-17.

      C.     **The Record Shows, However, That Investors Believed That Alibaba
                Continued To Practice Exclusivity And Faced Associated Antitrust Risk
                During The Putative Class Period**

To determine whether the Challenged Misstatements artificially inflated Alibaba's ADS price, Professor Hubbard analyzed more than 5,000 analyst and news reports, which show that rather than being misled by the Prior Practices Statement into believing Alibaba has ceased its exclusivity practices, market participants continued to report on Alibaba's ongoing exclusivity practices throughout 2020 and the putative Class Period.   *See* Rpt. ¶¶ 52-53, 73, 84-90. Pertinent public information included, for example:

- "Alibaba is threatening merchants that it won't send shoppers to their products on Tmall if they also sell on Pinduoduo. . . . We believe this has the potential to ***result in fines for Alibaba, as well as changes to this practice.***"   Suntrust Robinson Humphrey, January 17, 2020 (Ex. 9 at 2) (emphasis added).

- Consumer sought ***injunctive*** relief against two Alibaba platforms for "repeatedly sign[ing] so-called 'exclusive cooperation agreements' with operators on the platform."   Judicial Decision dated October 19, 2020 (Ex. 4 at 1-2).

- "Some online sellers have said . . . that Alibaba unfairly forces them to sell exclusively on its platform, in a tactic known in China as *erxuanyi*, or 'pick one of two.'"   Financial Times, November 10, 2020 (Ex. 10 at 2).

The market's awareness of Alibaba's ongoing exclusivity practices is most clearly illustrated on November 10, 2020—in the middle of the putative Class Period—when SAMR issued draft Anti-Monopoly Guidelines for the Platform Economy Sector.   The Draft Guidelines, for the first time, formally addressed choose one of two practices and explicitly stated that "traffic restriction"-based choose one of two practices "can generally be deemed as" falling within AML Article 15.   Ex. 11 at 9-10.   The announcement was followed by an 8.26% decline in Alibaba's ADS price (*See* Rpt. ex. 2), which analysts attributed to the heightened risk that Alibaba would be impacted by enforcement of the Draft Guidelines:

- JP Morgan warned investors to "[e]xpect potential direct negative impact on [i]nternet platform leaders, especially Alibaba" based on its "dominant position[]" and because it has "been accused of forced exclusivity by merchants."   Ex. 12 at 1-2.

- Morningstar predicted that "Alibaba potentially faces a negative effect [from the Draft Guidelines] while JD and Tencent are relatively less affected."   Ex. 3 at 2.

- Morgan Stanley reported that "the draft mentions that the use of subsidies, discounts, and traffic support provided by platforms . . . could affect Alibaba's promotional activities."   Ex. 13 at 4.

- Raymond James noted that "BABA shares declined" after SAMR's new Draft Guidelines were announced and predicted the guidelines would "restrict the practice of exclusive relationships."   Ex. 14 at 1.

*See also* Rpt. ¶¶ 85-87.    In their commentary, no analyst pointed to Alibaba's Prior Practices

Statement to note that Alibaba had recently ceased its exclusivity practices—by contrast,

analysts treated Alibaba's active practices as an ongoing risk.    Rpt. ¶ 85.

News reports in mid-November 2020 similarly informed the public that Alibaba's

practices put it at significant risk of antitrust enforcement in the wake of the Draft Guidelines.

*See* Ex. 15 at 2 ("The e-commerce giant founded by Jack Ma looks particularly vulnerable [to the

Draft Guidelines]"); Ex. 16 at 2 ("Beijing's newly proposed regulations will prevent companies

from signing exclusive agreements with business partners to avoid competition, a move that

Alibaba has adopted to keep popular merchants and brands on its own platforms").    Plaintiffs

also acknowledge the market's awareness that Alibaba was at risk, noting that SAMR's

November 2020 "action was viewed by the market as targeting Alibaba[.]"    AC ¶ 25.    The risk

of a SAMR investigation—which Alibaba had warned investors of and which the market viewed

with concern—came to fruition six weeks later, when SAMR announced an investigation into

Alibaba for "behavior such as 'choose one of two.'"    Ex. 7.

### D.    The Market Was "Not Surprised" By SAMR's Investigation

The market did not treat SAMR's investigation as a revelatory of Alibaba's continued use

of exclusivity.   Rather, analysts widely indicated their lack of surprise at the news, pointing to

longstanding coverage of Alibaba's exclusivity practices and their attendant risks:

- Raymond James wrote: "As we noted in our November 10 published note, we felt the biggest risk from the Antitrust Guidelines was the practice of exclusive relationships. As such, *we are not surprised* by the announcement of the investigation."   Ex. 17 at 1.

- Bank of America also weighed in, stating: "it's *not a big surprise* to us that eCommerce (eC) emerged as a focus area" for SAMR because "there has been more media attention on the eC market's practices . . . especially forced exclusive supply deals with merchants."   Ex. 18 at 1.

- Truist noted "'picking one from the two,' a practice of forced exclusivity, [was something] *BABA ha[d] been accused of for several years already*."   Ex. 19 at 1.

*See also* Rpt. ¶¶ 106-08.   News reports similarly cast the investigation as the culmination of

longstanding "friction" and "contention" between SAMR and Alibaba: Reuters noted that the

investigation involved "[t]he practice of requiring a merchant to sell exclusively on one platform,

*which Alibaba had defended in the past*, [and which] ha[d] *long been a source of friction*,"

while the Wall Street Journal indicated that the practice had "*long been a bone of contention*"

and noted that "a former senior Alibaba executive called [it a] 'standard market practice' in a

social media post" the prior year.   Ex. 20 at 3 & Ex. 21 at 2.

The analyst and news coverage above indicates the market was primed for the possibility

of regulatory action against Alibaba.   Rpt. ¶¶ 106-08.   As discussed, this is due to Alibaba's

thorough risk disclosures as well as the regular, ongoing public coverage of Alibaba's exclusivity

practices before *and during* the putative Class Period.

## ARGUMENT

In order to certify their proposed class, Plaintiffs have the burden to prove that

"[common] questions of law or fact . . . predominate over any questions affecting only individual

members."   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622-24 (1997) (citing Fed. R. Civ.

P. 23(b)(3)); *Goldman 2021*, 141 S. Ct. at 1958-59.   The predominance requirement of Federal

Rule of Civil Procedure 23(b) is "far more demanding" than the commonality requirement of

Rule 23(a), which Plaintiffs also must satisfy.[3]   *Windsor*, 521 U.S. at 624.   Plaintiffs cannot

meet Rule 23(b)(3)'s requirements if individualized issues of reliance predominate.   *See*

*Halliburton II*, 573 U.S. at 267 ("To recover damages for violations of section 10(b) and Rule

10b–5, a plaintiff must prove . . . 'reliance upon the misrepresentation or omission[.]'") (internal

citations omitted).

Here, Plaintiffs have invoked *Basic*'s fraud-on-the-market theory to establish class-wide

reliance.   *See* Pls' Br. at 3.   Under the *Basic* presumption, because the price of a security

traded in an efficient market will reflect all publicly available information—including inflation

attributable to any material misstatements—all buyers "may be presumed to have relied" on

those misstatements and the misstatements are therefore reflected in the price at the time of

purchase.   *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 458 (2013).

However, the *Basic* presumption of reliance can be rebutted where Defendants show, by a

preponderance of the evidence, that "an alleged misrepresentation did not actually affect the

market price of the stock."   *Goldman 2021*, 141 S. Ct. at 1959, 1962 (citing *Halliburton II*, 573

U.S. at 284).   The *Basic* presumption may be rebutted by (i) direct evidence showing there was

no price reaction on the "front-end" when the misstatements were made or (ii) indirect evidence

showing there is no basis to infer that the "back-end" stock drop was triggered by dissipating

misstatement-related inflation.   *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL

1329354, at *3 (S.D.N.Y. Mar. 23, 2020).   Where there is no "price impact," "*Basic*'s . . .

presumption of [class-wide] reliance collapse[s]," individual issues of reliance predominate, and

---

[3]   Defendants do not challenge Plaintiffs' compliance with the requirements of Rule 23(a).

Rule 23(b) precludes class certification.   *Halliburton II*, 573 U.S. at 278.

When assessing price impact, courts "should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman 2021*, 141 S. Ct. at 1960 (internal citations omitted).   "[A] court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact," regardless of whether "that requires inquiry into the merits."   *Id.* at 1960-61.[4]

## I.   DIRECT EVIDENCE ESTABLISHES NO PRICE IMPACT

"[T]he absence of . . . price impact" at the time an alleged misstatement is made—often described as "front-end impact"—is "***direct*** evidence that investors did not rely" on that statement.   *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 776 (8th Cir. 2016) (emphasis added).   There is precisely such direct evidence here.   The record establishes that the Challenged Misstatements—and particularly the central Prior Practices Statement—did not cause a positive price reaction in Alibaba's ADS price.   *See* Rpt. ¶¶ 50, 59, 62; *see also* Rpt. ex. 2 (Plaintiffs' expert's event study confirmed no statistically significant positive price reaction on all but one Challenged Misstatement date).

Most critically, after Alibaba allegedly disclosed on July 9, 2020 that—contrary to public belief—it had ceased practicing exclusivity, Alibaba's ADS ***did not*** experience a statistically significant price reaction.   *See* Rpt. ¶ 50; Ex. 22 ("Tabak Tr.") 217:3-12.[5]   This runs directly

---

[4]   Plaintiffs also invoke the *Affiliated Ute* presumption, which, as discussed in Section III, *infra*, is plainly inapplicable because it only applies in the narrow circumstances where a plaintiff alleges "no positive statements," making "reliance as a practical matter [] impossible to prove." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95-96 (2d Cir. 2017) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972)).

[5]   July 9, 2020 was not the only date on which the market had the opportunity to react to Alibaba's Prior Practices Statement.   On November 13 and 15, 2019 (prior to the putative Class Period) and again on July 13, 2020 (during the putative Class Period) Alibaba used the phrase "prior narrowly-deployed exclusive partnerships" in antitrust risk disclosures.   Ex. 6 at 22; Ex.

counter to Plaintiffs' theory of the case.   As Plaintiffs' own expert explained: "[i]f there was an unexpected announcement by Alibaba that it was ceasing a [material] practice that the market believed it was engaging in," then "we would expect to see a statistically significant change in Alibaba's stock price."   Tabak Tr. 96:10-23.   But instead, the market registered no reaction to what Plaintiffs portray as a material about-face by Alibaba.[6]   Furthermore, not a single analyst or news article quoted, discussed, or even mentioned the Prior Practices Statement after it was made (*see* Rpt. ¶¶ 54-55), providing additional evidence that the statement did not impact price. *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("*Goldman 2023*") (880 analyst reports, "none of which reference[d]" an alleged misstatement, were evidence that that investors were not misled); *see also* Tabak Tr. 74:19-76:8 (whether analysts "described" a disclosure as "surprising or unsurprising" is primary evidence of change in market's expectation).

The lack of front-end impact associated with the Prior Practices Statement should be the end of the inquiry, as it is the only Challenged Misstatement the Court found independently misleading.   Nonetheless, review of the other challenged disclosure days further supports no price impact.   Four of the five other days had no statistically significant positive price reaction. The remaining day, September 30, 2020, is associated with a price increase, but a comprehensive review of analyst and news commentary shows that it was driven by Alibaba's announcement of surprising profit and cash flow guidance.   *See* Rpt. ¶¶ 63-65; *see also*, *e.g.*, Ex. 24 at 1 ("[T]he

---

23 at 103 & 5 at 250.   Yet *none* of these disclosures were followed by a statistically significant price reaction and *none* elicited market commentary.   Rpt. ¶¶ 76-77.   In other words, there is no direct evidence of price impact on any of the dates when the Prior Practices Statement was made.

[6]   While it is theoretically possible that a positive price reaction was offset by other negative news, Professor Hubbard's analysis finds no evidence to support such a theory.   *See* Rpt. at 28 n. 79.

*most important* incremental information" is that "Alicloud will turn profitable" and "Cainiao's operational cash flow will turn positive.") (emphasis added).    No analyst coverage indicated that Defendant Wu's statements regarding Alibaba's "value proposition to consumers and merchants" were surprising, or tied them in any way to Alibaba's antitrust issues.    Rpt. at 36 n. 105 (also finding that the Company had made similar statements in the past, reducing the likelihood that the market would consider the information material); *see also* App'x. A.    As a result, the challenged statement had no price impact.    *See Best Buy Co.*, 818 F.3d at 783 (no front-end price impact where other news caused the price reaction).

Altogether, the evidence establishes that none of the Challenged Misstatements caused direct front-end price impact.

## II.    INDIRECT EVIDENCE ALSO SUPPORTS A FINDING OF NO PRICE IMPACT

Perhaps aware that the direct evidence supports a finding of no price impact, Plaintiffs instead allude to a so-called "price maintenance" theory in their opposition brief.    *See* Pls' Br. at 7 ("Defendants' misrepresentations and omissions *maintained* Alibaba's ADS price at artificially inflated levels during the Class Period.") (emphasis added).    In essence, Plaintiffs by necessity argue not that the Challenged Misstatements themselves introduced inflation in Alibaba's stock price, but rather that they maintained the stability of Alibaba's ADS price at an inflated level when, had the truth been revealed, the price would have declined.    *See*, *e.g.*, *Goldman 2021*, 141 S. Ct. at 1961.    Plaintiffs appear to argue that Alibaba's ADS price drop on the alleged corrective disclosure date is indirect evidence of price impact, and thus ask the Court to infer that price inflation existed during the putative Class Period because Alibaba's price

dropped upon announcement of SAMR's investigation.[7]   Pls' Br. at 22; *see also Goldman 2023*, 77 F.4th at 93 ("[A] back-end price drop is, at most, 'backward-looking, indirect evidence'" of price impact).

However, the indirect evidence points to the same conclusion as the direct evidence: the Challenged Misstatements had no price impact.   ***First***, as Professor Hubbard explains in his Report, a price maintenance theory is incompatible with Plaintiffs' claim that the Prior Practices Statement altered the *status quo*.   ***Second***, the evidence shows that the Challenged Misstatements did not maintain an incorrect market belief and the alleged corrective disclosure did not reveal any new information.   ***Third***, there is a fatal mismatch between the Challenged Misstatements and the alleged corrective disclosure.   Each of these reasons precludes a finding of price impact based on indirect evidence.

### A.   Application Of A Price Maintenance Theory Is Improper Where Plaintiffs Allege Misstatements Altered The *Status Quo*

Price maintenance theory only applies where a plaintiff claims an alleged misstatement **preserved the *status quo*** by maintaining market expectations and thereby perpetuating price inflation.   *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 561 (S.D.N.Y. 2011) (explaining that under the theory, a misstatement will "***maintain[] existing market expectations***," rather than "actually cause the inflation in the stock price to increase on the day the statement is made.") (emphasis added); *see also* Rpt. ¶¶ 39-42.   By contrast,

---

[7]   Plaintiffs' caselaw (Pls' Br. at 22-23 and n. 12) does not, as Plaintiffs imply, support the proposition that their identification of a stock price drop alone is sufficient to show price impact—which, as discussed in further detail below, is contrary to controlling precedent including *Goldman 2021*, 141 S. Ct. at 1961.   *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017) (considering—but ultimately affirming insufficiency of—defendants' evidence of no price impact); *Boston Ret. Sys. v. Alexion Pharms., Inc*., 2023 WL 2932485, at *12 (D. Conn. April 13, 2023) (faulting defendants for failure to account for stock price drops on certain corrective disclosure dates *at all*).

misstatements that materially change the market's *status quo* understanding should result in a measureable price reaction.   *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492-93 (S.D.N.Y. 2011) (Daniels, J.) (distinguishing between misstatements that "just reflected the '*status quo*'" and would not be expected to cause a price reaction, and misstatements that "surprise" the market, creating a stock price reaction); Tabak Tr. 50:20-51:19 (misstatements that are "consistent with market expectation" can "maintain[] the stock price at roughly the prior level rather than allowing it to fall").

Plaintiffs' misrepresentation theory explicitly involves a change in *status quo*, which is incompatible with price maintenance.   Plaintiffs recognize (as they must) that prior to the start of the putative Class Period the market was aware that Alibaba engaged in exclusivity practices. *See* AC ¶¶ 91-98 (citing articles published in 2019 and early 2020 discussing Alibaba's exclusivity practices), ¶¶ 111-12 (in November 2019 "Alibaba did not deny that it used 'Choose One of Two' practices requiring exclusive dealing of its vendors."); *see also* Rpt. ¶73. Plaintiffs, however, claim the Prior Practices Statement "falsely suggest[ed] that Alibaba had ceased the practices by the time of the 2020 Form 20-F," changing the market's understanding to be that Alibaba no longer practiced exclusivity.   AC ¶ 255(e).   The Court accepted this theory in its Motion to Dismiss opinion, finding it plausible that the market knew of Alibaba's exclusivity practices before the putative Class Period, but that "Alibaba's description of its 'prior' exclusivity practices" had "***affirmatively created an impression*** of a state of affairs" that could lead investors to believe that "Alibaba was ***no longer*** requiring exclusivity from merchants at all."   MTD Order at 18-19 (emphases added).   In other words, Plaintiffs' theory of the case assumes that when Alibaba described its exclusivity practices as "prior", the market's *status quo* understanding shifted from believing that Alibaba practiced exclusivity to believing that it did

14

not.   This is fundamentally incompatible with the theory that Alibaba's ADS was maintained at an artificially inflated price, and precludes Plaintiffs from relying on price maintenance— evidenced by a stock drop—to show price impact.   *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7-8 (N.D. Cal. Dec. 5, 2017) (rejecting plaintiffs' reliance on back-end stock price drop when price maintenance theory was inconsistent with facts of case).

**B.      Comprehensive Analysis Of Market Commentary Supports A Finding Of No Price Impact**

**1.      The Challenged Misstatements Did Not Maintain A Mistaken Belief That Alibaba Had Ceased Using Exclusivity**

For Plaintiffs to avail themselves of the price maintenance theory, assuming *arguendo* it applied, Alibaba's ADS price must have somehow become inflated when the market first believed that Alibaba had stopped practicing exclusivity, and the Challenged Misstatements must then have maintained that expectation along with the inflation.   Pls' Br. at 7 (Alibaba's ADS price was "maintained" on July 10, 2020).   Yet there is no evidence of any pre-putative Class Period disclosure that introduced such a belief and the accompanying inflation into Alibaba's stock price.   *See* n. 5, *supra*.   And, as explained below, there is also no evidence that the Challenged Misstatements perpetuated that purported belief.

Indeed, Alibaba's ongoing practices were known to the market—not just in the "months and years before Alibaba's July 2020 disclosure," MTD Order at 18, but ***during*** the putative Class Period as well.   Rpt. ¶¶ 80-90; *see also*, *e.g.*, Ex. 16 at 2 (reporting on November 16, 2020 that "Alibaba has adopted [exclusivity practices] to keep popular merchants and brands on its own platforms").   Particularly, when SAMR published the Draft Guidelines on November 10, 2020—which defined anti-monopoly violations for e-commerce platforms—Alibaba's ADS price dropped more than 8% and numerous analyst reports and news articles pointed out the potential impact of the Draft Guidelines on Alibaba, which they tied to Alibaba's ***continued***

15

***engagement in exclusivity practices***.   *See*, *e.g.*, Ex. 3 at 2 ("Alibaba potentially faces a negative

effect" from the Draft Guidelines"); Ex. 13 at 4 ("the draft mentions that the use of subsidies,

discounts, and traffic support provided by platforms . . . could affect Alibaba's promotional

activities"); *supra* at 6-8.   Professor Hubbard's comprehensive review of commentary reflects

the market's belief that Alibaba's ongoing business practices during the putative Class Period put

it at risk of antitrust investigation or enforcement.   Rpt. ¶¶ 85-87.   In fact, immediately after

the SAMR Announcement —Plaintiffs' only alleged "corrective" disclosure—analysts

responded by acknowledging, "***we are not surprised by the announcement of the investigation***."

Ex. 17 at 1.

        While the Court found it "plausible" at the motion to dismiss stage that Defendants'

statements misled the market into believing that Alibaba did not practice exclusivity after July 9,

2020—Plaintiffs cannot continue to rely on this inference in light of Defendants' clear evidence

that the market believed during the putative Class Period that Alibaba's exclusivity practices

were ongoing and that it faced a serious risk of antitrust enforcement.   Without this inference,

there is no support for a finding that the Challenged Misstatements had price impact.

### 2.    The Alleged Corrective Disclosure Did Not Reveal Any New Information About Alibaba's Exclusivity Practices

        Against this backdrop, Plaintiffs cannot point to the December 23, 2020 SAMR

Announcement of its investigation to indirectly show price impact.   If the information alleged

to be corrective was not "new," then there is no link between the Challenged Misstatements and

the December 24, 2020 stock price drop from which to infer price impact.   *See In re Qualcomm*

*Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023).   This is because the

absence of "new" information forecloses the inference that the alleged corrective disclosure

dissipated inflation maintained by the Challenged Misstatements.   *See In re Chi. Bridge & Iron*

*Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 n.5 ("[A] court should review the 'newness' of a corrective disclosure [to assess price impact] at the class certification stage.").

The Second Circuit's 2018 Goldman decision is instructive, as the court found that the district court erred in not considering evidence of 34 dates on which various news sources purportedly revealed the same information contained in the alleged corrective disclosure. *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485-86 (2d Cir. 2018). Defendants have identified even stronger evidence here. As Professor Hubbard's analyses of more than 2,000 analyst reports and more than 3,000 news articles published before, during and after the putative Class Period shows, the "corrective" information that Plaintiffs allege was revealed on December 23, 2020 (Alibaba was practicing exclusivity during the putative Class Period) was known to the market prior to the SAMR Announcement. Rpt. ¶¶ 52-53, 91-95.

The same was true in *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023). There, defendants had stated that Qualcomm licensed "broadly" in a practice that was "fair, reasonable," or "non-discriminatory," allegedly misrepresenting the fact that the company improperly refused to license to chip-makers. *Id.* at *2. Plaintiffs claimed that antitrust investigations and lawsuits later revealed the truth of Qualcomm's unlawful licensing practices, causing a stock price drop. *Id.* at *3-4. At class certification, the *Qualcomm* court considered public information disclosing—before and during the class period—that Qualcomm refused to license to chip-makers. *Id.* at *5-6. The court recognized that "[i]f the corrective disclosures did not actually contain new information correcting the alleged misrepresentations, it becomes less likely that their announcement caused the back-end price drops and less reasonable to assume that Defendants' alleged misrepresentations caused front-end inflation in the first place." *Id.* at *13. The court denied class certification as to the licensing claims because

17

Defendants had shown a lack of price impact.   *Id.*

As in *Qualcomm*, price impact is rebutted here because any information about Alibaba's practices contained in the alleged corrective disclosure was not "new."[8]   The information in the announcement that Plaintiffs claim was "corrective" of the Challenged Misstatements—that Alibaba practiced exclusivity during the class period—had already been repeatedly disclosed and fully digested by the market (*see supra* at 6-8),[9]  foreclosing the inference that the back-end drop dissipated inflation introduced or maintained by the Challenged Misstatements.   *Id.*

### 3.   The December 24, 2020 Price Movement Was The Market's Reaction To (i) A Disclosed Risk Creating Significant Uncertainty And (ii) Confounding News

The clear market evidence that there was no "corrective" disclosure logically leads to the question of why Alibaba's ADS price dropped on December 24, 2020.   Professor Hubbard's analysis also addresses this issue: the market was reacting to both the uncertainty surrounding the SAMR investigation (which Alibaba had warned could result in material fines), as well as unrelated confounding information.

Defendants made no secret of Alibaba's investigation risks—disclosing that SAMR "inten[ded to] initiat[e] investigations into [exclusivity] arrangements; cautioning that "there can be no assurance that regulators will not initiate anti-monopoly investigations into ***specific business practices we have adopted***"; and warning that it could face "heavy fines and various

---

[8]   The Court found it "plausible" at pleading stage that the SAMR Announcement partially "***reveal[ed] to the market*** that Alibaba had engaged in illegal exclusivity practices ***despite contrary disclosures***." MTD Order at 28 (emphasis added).   Plaintiffs may no longer rely on this inference in light of Defendants' evidence that (i) the market knew during the putative Class Period that Alibaba practiced exclusivity, and (ii) the market was not mislead by the Prior Practices Statement. *See supra* Section II.B.1-2.

[9]   As Plaintiffs' expert acknowledged in his deposition, the fact that Alibaba was subject to an investigation could not have been disclosed prior to the SAMR Announcement.   *See* Tabak Tr. 38:3-20.   Therefore, the fact of the investigation itself is not "corrective" information.

restrictions on our businesses or investment activities."   20-F at 39 (emphasis added); *see also* Ex. 5 at 250 (same); Ex. 6 at 22 (same).   And, as discussed throughout this brief at length, the market that was well-aware of Alibaba's ongoing exclusivity practices and the risks posed by SAMR enforcement.   *See supra* at 6-8.

Even when a risk is properly disclosed, the announcement of government investigation will generally cause a negative price reaction as the market responds to bad news.   *See Goldman 2023*, 77 F.4th at 107 (Sullivan, J., concurring) ("the drop in Goldman's share price . . . was entirely attributable to the announcement of an SEC enforcement action against the company").   Here, the size of the drop is also attributable to the market's uncertainty as to timeline for resolution and expected severity of SAMR's punishment.   Rpt. ¶¶ 120, 126. SAMR's one-sentence announcement—which provided few details about the first-of-its-kind antitrust investigation—led analysts to comment that "it is very hard to predict the outcome of the Chinese government's ongoing investigation" and "uncertainty over the investigation outcome and impact on earnings" was "likely to drag the share price."   Ex. 25 at 1 & Ex. 26 at 1; *see also* Rpt. ¶¶ 118-19.   Professor Hubbard found that "the volatility embedded in Alibaba's ADS increased sharply on December 24, 2020," further evidencing that market uncertainty was a main driver behind the price reaction on that date.   Rpt. ¶ 121.   When SAMR's fine was announced in April of 2021, market uncertainty was reduced and Alibaba's ADS price rebounded 9.27%.   *Id.* ¶ 123.

Confounding news also played a role in the price reaction.   On December 24, 2020 the People's Bank of China announced that it planned to meet with Ant Group—in which Alibaba had a 33% stake—along with other regulators "in the near future."   Rpt. ¶ 127; Ex. 27. Market commentary indicates that the PBOC announcement created additional uncertainty,

"[p]utting investors more on edge" and, together with the SAMR Announcement, "mark[ing] the strongest enforcement action yet by Beijing against the country's biggest technology group." Ex. 28 at 2 & Ex. 29.   Professor Hubbard's analysis found that analysts identified Ant-related news as a factor in their revisions to Alibaba's target price.   Rpt. ¶¶ 129-32.

C.    **There Is A Fatal Mismatch Between The Challenged Misstatements And The Alleged Corrective Disclosure**

Recent Second Circuit guidance also makes clear that "when there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Goldman 2023*, 77 F.4th at 99 n.11, 102 (price impact analysis is "searching," and courts must look for an even "closer fit" between "front- and back-end statements" than for loss causation analysis). Here, mismatches support a finding of no price impact.

1.    **The Alleged Corrective Disclosure Did Not Contradict The Prior Practices Statement Or The Antitrust Risk Disclosures**

Plaintiffs' claims are premised on the theory that Alibaba inaccurately characterized its exclusivity practices as "prior," even while it continued to engage in such practices during the putative Class Period.   AC ¶ 253.   Plaintiffs argue that the SAMR announcement revealed to the market that Alibaba's practices were ongoing.   *Id.* ¶ 371.   But, as the Court and Plaintiffs' counsel discussed at length during the January 11, 2023 Motion to Dismiss hearing (MTD Tr. at 36-43), nothing in the SAMR Announcement revealed the existence of ***ongoing*** practices.

The announcement (which is in Chinese and lacks verb tenses) does not specify whether SAMR is investigating past or ongoing conduct.   *See* Ex. 7; App'x. B.   As a result, the announcement can be read consistently with the Challenged Misstatements as interpreted by Plaintiffs: that SAMR was investigating Alibaba's "prior" use of exclusivity practices.   In fact, the New York Times—as quoted by Plaintiffs in their Complaint—uses the past tense when

referring to the SAMR Announcement, stating that SAMR was investigating whether Alibaba "***had*** engaged in" misconduct.   AC ¶¶ 30, 374 (emphasis added).   In other words, nothing in the announcement disclosed to the market that Alibaba was engaged in unlawful exclusivity practices during the putative Class Period, the fact that the Court found to be plausibly misleading about Defendants' statements.[10]   *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 149-50 (S.D.N.Y. 2010) (an SEC investigation purportedly limited to 2005-2006 accounting practices did not put the market "on notice" that statements about practices prior to 2005 were false).

Because the "corrective" disclosure, and thus the stock price drop on December 24, 2020, is untethered from the central Prior Practices Statement and Antitrust Risk Disclosures, it cannot support a showing of price impact.   *See Goldman 2023*, 77 F.4th at 99 n.11.

### 2.      The Other Disclosures Are Generic Under *Goldman*

Although Plaintiffs' claims revolve around the Prior Practices Statement—Alibaba's characterization of its "alleged prior narrowly-deployed exclusive partnerships"—Plaintiffs also allege that certain Other Disclosures related to Alibaba's growth and general risk disclosures were misleading in light of the Prior Practices Statement.   *See* AC ¶¶ 256, 261, 265, 269; *see also* App'x. A.   For the same reasons discussed *supra* in Section I and II.A-B, these Challenged Misstatements also had no price impact.   In addition, the Other Disclosures are too generic to create an inference of price impact.   *Goldman 2021*, 141 S. Ct. at 1961 ("The generic nature of a misrepresentation often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory.").

In *Goldman 2023*, the Second Circuit found that a series of similar statements were too

---

[10]   Furthermore, as described *supra* at 6-7 and as Professor Hubbard explains in his report, "Alibaba specifically disclosed the risk (though, of course, not the certainty) of a SAMR investigation, and the market was aware of such risk. As such, the SAMR Investigation Announcement did not correct the Antitrust Risk Disclosure Statements either."   Rpt. ¶ 93.

generic to support plaintiffs' price impact theory.    77 F.4th at 104.    The rejected statements

included:

- [T]he basic reason for our success[] is our extraordinary focus on our clients.

- The SEC, the NYSE, FINRA, other federal and state regulators . . . have announced their intention to increase their scrutiny of potential conflicts of interest, including through detailed examinations of specific transactions.

- We have extensive procedures and controls that are designed to identify and address conflicts of interest, including those designed to prevent the improper sharing of information among our businesses.

*Id.* at 82.    The *Goldman* plaintiffs alleged that these statements were corrected through a series

of disclosures—including an SEC complaint and a DOJ investigation—revealing that "concealed

conflicts of interest [had] infect[ed] several collateralized debt obligation ('CDO') transactions."

*Id.* at 83.    The alleged corrective disclosures were associated with substantial stock price drops.

*Id.* at 83-84.    The Second Circuit found that it could not infer misstatement-caused price

inflation based on the back-end stock price drop because if Goldman had "spoken truthfully . . .

at an equally generic level"—rather than make the generic alleged misstatements—the resulting

hypothetical statement would not have impacted the stock price.    *Id.* at 99-100.    Therefore, the

court reasoned, the stock price drop associated to the specific disclosure could not be linked to

the generic misrepresentations, and the inference of price impact was rebutted.    *Id.*

Here, the Challenged Misstatements suffer from the same genericism as the statements in

*Goldman*.    For example, Plaintiffs challenge statements:

- We aim to enable these merchants to operate at a higher efficiency, and when they realize and recognize this value we provided to them, they will pay us and our revenue will grow.    Ex. 30 at 3.

- Our domestic core commerce business continued to grow steadily during the post-COVID-19 environment in China through higher purchase frequency and consumer spending . . . . Ex. 31 at 1.

- [Company faces risks to its business, including] Alibaba's ability to continue to

compete effectively and maintain and improve the network effects of its digital economy [and] changes in laws, regulations and regulatory environment that affect Alibaba's business operations. Ex. 32 at 16.

*See also* App'x A.   Statements attributing growth to consumer spending, touting Alibaba's benefits to merchants, or disclosing general regulatory risk are simply too generic to support price impact.   *See Goldman 2023*, 77 F.4th at 82, 104.   As in *Goldman*, these are the type of commonplace statements that "*as written*," would not "consciously influence investor behavior."   *Id.* at 96-96. 100.   Also as in *Goldman*, many of these statements had already appeared verbatim in prior Alibaba SEC filings.   App'x. A at A-2 to A-5.[11]

In order to demonstrate price impact, Plaintiffs will ask the Court to do exactly what the Second Circuit prohibits: read a hyper-specific "truth" in place of these generic statements.   But substituting equally generic "truths" in the place of the Challenged Misstatements at issue—as the *Goldman* court requires—would not yield statements that would impact price.   *Goldman 2023*, 77 F.4th at 99-102.   This is especially true because, as discussed *supra* at 6-8, Alibaba's practices were already known to the market during the putative Class Period.

Given all the contrary evidence described above in Section II, the court cannot infer price impact based on Alibaba's ADS price drop on December 24, 2020.

## III.   THE *AFFILIATED UTE* PRESUMPTION DOES NOT APPLY

In tacit recognition that the Challenged Misstatements in this case had no price impact,

---

[11]   Furthermore, "separately disseminated statements" which do "not obviously build off one and other" cannot be read together in order to save the statements from genericisim.   *Goldman 2023*, 77 F.4th at 94-95; *see also* Rpt. ¶ 60 (finding that no analyst reports linked the Prior Practices Statement to the Other Disclosures).   Even if the Court were to find, for example, that the Antitrust Risk Disclosures in Alibaba's 20-F are sufficiently specific to meet *Goldman*'s requirement, it must still independently assess the price impact of the remaining statements.   *Id.* ("Securities law provides no . . . cover" for inactionable general statements simply because a party points to actionable specific statements).

Plaintiffs also confusingly argue that they should be entitled to a different presumption of

reliance under *Affiliated Ute*.   Pls' Br. at 13-16.   But this presumption is squarely not available

to Plaintiffs, whose claims revolve around an alleged affirmative misstatement.   *See Waggoner*,

875 F.3d at 95-96 (2d Cir. 2017).   "*Affiliated Ute* applies only when the original rationale for

[the presumption] is present: when there are 'no positive statements,' and 'reliance as a practical

matter is impossible to prove.'"   *Schwab v. E\*TRADE Fin. Corp.*, 752 F. App'x 56, 59 (2d Cir.

2018) (citing *Waggoner*, 875 F.3d at 95).   The Second Circuit has repeatedly cautioned that

*Affiliated Ute* is inapplicable where: "'omissions' [are] 'simply the inverse'" of an affirmative

misstatement, *id.* at 58-60, or are "directly related to the earlier statements Plaintiffs also claim

are false."   *Waggoner*, 875 F.3d at 96.

　　　　Here, Plaintiffs' claims flow from one alleged affirmative misstatement,[12]  which they

repeat no fewer than eight times in their Motion to Dismiss opposition brief: Alibaba "falsely

characterized [its] use of 'exclusive partnerships' as 'prior' and 'narrowly-deployed'" when in

reality its practices were ongoing.   *See* MTD Opp. at 1, 11, 14, 16, 25; *see also In re Moody's

Corp. Sec. Litig.*, 274 F.R.D. at 494 (company representations that were alleged to be "the exact

opposite of . . . reality" were affirmative statements, making *Affiliated Ute* inapplicable).   In its

MTD Order, the Court held that this alleged affirmative misstatement supported its finding that

---

[12]    None of the many cases Plaintiffs cite in support—all of which pre-date the Second Circuit's
instruction in *Waggoner* and *Schwab*—contain a central affirmative misstatement.   *See, e.g. In
re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 452, 456 n.8 (S.D.N.Y. 2013) (plaintiffs alleged
defendants should have disclose an FDA request that Company reassess data linking its product
to suicides when it disclosed other unrelated communications with the FDA); *Strougo v.
Barclays PLC*, 312 F.R.D. 307, 311, 319 (S.D.N.Y. 2016) ("[T]he material omissions, not the
affirmative statements, [] are the heart of the case"); *In re Dynex Capital, Inc. Sec. Litig.*, 2011
WL 781215, at \*7 (S.D.N.Y. Mar. 7, 2011) (same); *In re Parmalat Sec. Litig.*, 2008 WL
3895539, at \*8 (S.D.N.Y. Aug. 21, 2008) (omissions must play a "independent, or at least
interdependent, role"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at \*6
(S.D.N.Y. May 15, 2017) (*Affiliated Ute* applied only to an independent omission-based claim).

other statements were misleading, quoting the word "prior" twelve times and connecting each of the remaining Challenged Misstatements back to it.   *See* MTD Order at 4, 17-20, 22, 28; *see also* MTD Order at 19, 20-22 (use of the term "prior" "affirmatively created an impression of a state of affairs" and when "[t]aken together" with the growth and risk related statements, "rendered" those statements plausibly misleading).   Even if some of the Challenged Misstatements are omission-based, *Affiliated Ute* would be inapplicable, because the Court has already made clear that the "heart" of Plaintiffs' claim is an affirmative alleged misstatement, and that all other Challenged Misstatements "directly relate[] to the earlier statement[] Plaintiffs also claim [is] false."   *See Waggoner*, 875 F.3d at 91, 96; *Schwab*, 752 F. App'x at 58-60.

As a result, Plaintiffs cannot claim that "no positive statements" exist, and "reliance . . . is impossible to prove."   *Waggoner*, 875 F.3d at 95.   *Affiliated Ute* is thus categorically unavailable to Plaintiffs under black-letter Second Circuit law.   *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. at 494.   Instead, like all other securities plaintiffs asserting that a defendant made affirmative misstatements, Plaintiffs are required to prove that they relied on the Challenged Misstatements and, for the purpose of class certification, to demonstrate that reliance can be proved on a class-wide basis.   *See id.*   They cannot do so here.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should deny Plaintiffs' Motion for Class Certification in its entirety.

DATED:   January 19, 2024

SIMPSON THACHER & BARTLETT LLP

By: _/s/ Stephen P. Blake_
     Stephen P. Blake

     Jonathan K. Youngwood
     jyoungwood@stblaw.com
     425 Lexington Avenue
     New York, New York   10017
     Telephone: (212) 455-3539
     Facsimile: (212) 455-2502

     Stephen P. Blake
     sblake@stblaw.com
     Bo Bryan Jin
     Bryan.jin@stblaw.com
     2475 Hanover Street
     Palo Alto, California   94304
     Telephone: (650) 251-5000
     Facsimile: (650) 251-5002

     *Counsel for Defendants Alibaba Group Holding*
     *Limited, Daniel Yong Zhang and Maggie Wei Wu*

**APPENDIX A**

Alleged Misstatements Identified by Complaint (AC ¶¶252-73)

| CATEGORY | Topic | Alleged Misstatements[1] | Source/ Date | Same/Similar Statement Appears In:[2] |
|---|---|---|---|---|
| **PRIOR PRACTICES STATEMENT** | Antitrust | "The PRC Anti-monopoly Law provides a private right of action for competitors, business partners or customers to bring anti-monopoly claims against companies. In recent years, an increased number of companies have been exercising their right to seek relief under the PRC Anti-monopoly Law. Some of these companies, including our competitors, business partners and customers, have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private litigation that targets our prior and current business practices, such as our market approach with traffic resource allocation on our e-commerce platforms, which we base on multiple factors, and our **alleged prior narrowly-deployed exclusive partnerships.**" AC ¶253. | Ex. 1 at 39, 20-F (7/9/2020) | Ex. 5 at 250, 6-K (7/13/2020)<br><br>Ex. 23 at 103, Global Offering Document (11/15/2019)<br><br>Ex. 6 at 22, 6-K ex. 99.1 (11/13/2019) |

---

[1]    Bolded portions of quotes are emphasized and/or discussed in the Complaint.

[2]    Select and non-exhaustive list.

| CATEGORY | Topic | Alleged Misstatements[1] | Source/ Date | Same/Similar Statement Appears In:[2] |
|---|---|---|---|---|
| **ANTITRUST RISK DISCLOSURE** | Antitrust | "**Anti-monopoly and unfair competition claims or regulatory actions against us may result in our being subject to fines, constraints on our business and damage to our reputation.**" AC ¶253.<br><br>"**The PRC anti-monopoly enforcement agencies have in recent years strengthened enforcement under the PRC Anti-monopoly Law**, including levying significant fines. . . ." AC ¶253.<br><br>"Although **we believe that our business practices do not violate anti-monopoly or unfair competition laws, due to our large scale of business and close media attention, there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted.**" AC ¶253.<br><br>"**Any anti-monopoly lawsuit, regulatory investigations or administrative proceedings initiated against us could also result in our being subject to regulatory actions** and constraints on our investments and acquisitions, which could include forced termination of any agreements or transactions that may be determined by governmental authorities to be in violation of anti-monopoly laws or the relevant filing requirements, required divestitures, limitations on certain pricing and business practices and/or significant fines." AC ¶253. | Ex. 1 at 39, 20-F (7/10/2020) | Ex. 5 at 250, 6-K ex. 99.1 (7/13/2020)<br><br>Ex. 23 at 102, Global Offering Document (11/15/2019)<br><br>Ex. 6 at 21, 6-K ex. 99.1 (11/13/2019) |

| CATEGORY | Topic | Alleged Misstatements[1] | Source/ Date | Same/Similar Statement Appears In:[2] |
|---|---|---|---|---|
| **OTHER DISCLOSURES** | General Business Risks | "Other than as disclosed in this annual report, we are not aware of any **trends, uncertainties, demands**, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our net revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial conditions." AC ¶258. | Ex. 1 at 168, 20-F (7/10/2020) | Ex. 5 at 156, 6-K ex. 99.1 (7/13/2020)<br><br>Ex. 33 at 163, 20-F (6/5/2019) |
| **OTHER DISCLOSURES** | Growth / Revenue | "The marketplaces of our core commerce business attract and retain a large number of consumers and merchants. We **primarily generate revenue from merchants**." AC ¶256.<br><br>"**We generate revenue from merchants by leveraging our data technology and consumer insights which enable brands and merchants to attract, retain and engage consumers**, complete transactions, improve their branding, enhance operating efficiency, and offer various services." AC ¶256. | Ex. 1 at 131, 20-F (7/10/2020) | Ex. 5 at 120-121, 6-K ex. 99.1 (7/13/2020)<br><br>Ex. 23 at 226, Global Offering Document (11/15/2019)<br><br>Ex. 33 at 123, 20-F (6/5/2019) |
| **OTHER DISCLOSURES** | Growth / Revenue | "The **growth of customer management revenue was primarily due to increased revenue contribution from new monetization formats**, including recommendation feeds, as well as the increase in volume of paid clicks in search monetization." AC ¶261. | Ex. 34 at 8, 6-K ex. 99.1 (8/20/2020) | Ex. 6 at 4, 6-K ex. 99.1 (11/13/2019)<br><br>Ex. 33 at 138, 20-F (6/5/2019) |

| CATEGORY | Topic | Alleged Misstatements[1] | Source/ Date | Same/Similar Statement Appears In:[2] |
|---|---|---|---|---|
| **OTHER DISCLOSURES** | Growth / Revenue | "Next, I would like to dedicate a session to talk about **our value proposition to consumers and merchants**. This is our core value, and this is how we make it easy to do business anywhere and how we could achieve sustainable growth." AC ¶263.<br><br>"There is a uniqueness about Alibaba digital economy. There are many businesses within this ecosystem, so that longer the people stay, more activities they have conducted. And you see synergy actually could increase our consumer engagement." AC ¶263.<br><br>"Now let's take a look at our **value creation for merchants**. ... Merchants are customers who pays us directly." AC ¶263.<br><br>"**We aim to enable these merchants to operate at a higher efficiency**. And when they realize and recognize this value we provided to them, they will pay us and our revenue will grow." AC ¶263. | Ex. 30 at 2-3, Alibaba Investor Day Transcript (9/30/2020) | Ex. 5 at 120, 63, 6-K (7/13/2020)<br><br>Ex. 23 at 192-193, 226, Global Offering Document (11/15/2019)<br><br>Ex. 33 at 66, 84, 20-F (6/5/2019) |
| **OTHER DISCLOSURES** | Growth / Revenue | "**The solid performance of our core commerce and robust growth of Alibaba Cloud are the direct results of our commitment to value creation for customers**'… 'We remain focused on our three long-term growth engines — domestic consumption, cloud computing and data intelligence, and globalization — to **effectively capture opportunities** from the ongoing changes in consumer demand and acceleration of digitalization of businesses across our digital economy.'" AC ¶265.<br><br>"**Our domestic core commerce business continued to grow steadily during the post-COVID-19 environment in China** | Ex. 31 at 1, 8, 6-K ex. 99.1 (11/5/2020) | |

| CATEGORY | Topic | Alleged Misstatements[1] | Source/ Date | Same/Similar Statement Appears In:[2] |
|---|---|---|---|---|
| | | through higher purchase frequency and consumer spending,…'" AC ¶265.<br><br>"**Customer management revenue** grew 20% year-over-year, **primarily due to robust growth in revenue from new monetization formats,** such as recommendation feeds, an increase in the volume of paid clicks in search monetization, as well as the 21% year-over-year growth of Tmall online physical goods GMV, excluding unpaid orders." AC ¶267. | | |
| **OTHER DISCLOSURES** | Growth / Revenue | "**Customer management revenue** grew 21% year-over-year, **primarily due to robust growth in revenue from new monetization formats,** such as recommendation feeds, an increase in the volume of paid clicks in search monetization, as well as the 24% year-over-year growth of Tmall online physical goods GMV, excluding unpaid orders." AC ¶271.<br><br>"We presented our commission revenue as part of customer management revenue in order to better reflect our **value proposition to merchants on our platforms**." AC ¶272. | Ex. 32 at 6, 5, 6-K ex. 99.1 (12/18/2020) | Ex. 23 at 192-193, Global Offering Document (11/15/2019)<br><br>Ex. 33 at 123, 66, 20-F (6/5/2019) |
| **OTHER DISCLOSURES** | General Business Risks | Alibaba disclosed that a number of factors could cause actual results to differ materially from those contained in any forward-looking statement, including "**Alibaba's ability to continue to compete effectively and maintain and improve the network effects of its digital economy**" and "**changes in laws, regulations and regulatory environment that affect Alibaba's business operations**." AC ¶269. | Ex. 32 at 16, 6-K ex. 99.1 (12/18/2020) | Ex. 34 at 18, 6-K (8/20/2020)<br><br>Ex. 31 at 18, 6-K ex. 99.1 (11/5/2020) |

**APPENDIX B**

**Corrective Disclosure**

| Source/Date | Alleged Corrective Disclosure |
|---|---|
| Ex. 7, SAMR Investigation Announcement (12/23/2020) | "Recently, based on complaints, the State Administration for Market Regulation launched an investigation into Alibaba Group Holding Co., Ltd.'s suspected monopolistic practices including 'Choose One From Two' in accordance with the law." |