Exhibit 6

QuickLinks -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 6-K

**Report of Foreign Private Issuer**
**Pursuant to Rule 13a-16 or 15d-16 of**
**the Securities Exchange Act of 1934**

**November 13, 2019**

**Commission File Number: 001-36614**

# Alibaba Group Holding Limited

(Registrant's name)

**c/o Alibaba Group Services Limited**
**26/F Tower One, Times Square**
**1 Matheson Street**
**Causeway Bay**
**Hong Kong**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:

Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K on paper as permitted by Regulation S-T Rule 101(b)(1): ☐

Indicate by check mark if the registrant is submitting the Form 6-K on paper as permitted by Regulation S-T Rule 101(b)(7): ☐

**INCORPORATION BY REFERENCE**

Exhibit 99.1 to this current report on Form 6-K are incorporated by reference into the registration statement on Form F-3 of Alibaba Group Holding Limited (File No. 333-234662), and shall be a part thereof from the date on which this report is furnished, to the extent not superseded by documents or reports subsequently filed or furnished.

**EXHIBITS**

Exhibit 99.1 —    Alibaba Group Supplemental and Updated Disclosures

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ALIBABA GROUP HOLDING LIMITED**

/s/ TIMOTHY A. STEINERT

Date: November 13, 2019

By:
Name:    Timothy A. STEINERT
Title:    General Counsel and Secretary

3

QuickLinks

INCORPORATION BY REFERENCE
EXHIBITS
SIGNATURES

Use these links to rapidly review the document
Table of Contents

**Exhibit 99.1**

**Alibaba Group Supplemental and Updated Disclosures**

Alibaba Group Holding Limited, or we, has/have filed an application, or the Listing Application, with the Stock Exchange of Hong Kong Limited, or the Hong Kong Stock Exchange, in connection with a proposed secondary listing, or the Listing, of our ordinary shares, or the Shares, on the Main Board of the Hong Kong Stock Exchange together with a Hong Kong initial public offering and a global offering, or the Offering, of the Shares.

The Listing Application contains supplemental descriptions and additional new descriptions of certain aspects of our business and financial information as required by the Hong Kong Stock Exchange Listing Rules as well as updated disclosure of certain information previously disclosed in our annual report on Form 20-F for the year ended March 31, 2019. This Supplemental and Updated Disclosure exhibit sets forth such new, supplemental and updated information and disclosures as described below. The disclosure herein supplements and should be read in conjunction with the disclosure in our Form 20-F and other disclosures furnished on Form 6-K.

As we have applied for a secondary listing on the Hong Kong Stock Exchange, the New York Stock Exchange will continue to be our primary listing venue. We have also applied for a number of waivers and/or exemptions from strict compliance with the Hong Kong Stock Exchange Listing Rules. If these applications are approved, we would be exempted from certain requirements to which other companies listed on the Hong Kong Stock Exchange are subject, as discussed in greater detail below. We do not expect the Listing to result in significant additional compliance or disclosure obligations for our company.

Save for the translation for financial information as of or for the three months ended September 30, 2019 and unless otherwise stated, all translations of Renminbi and Hong Kong dollars into U.S. dollars and from U.S. dollars into Renminbi in this document were made at a rate of RMB6.8650 to US$1.00, the exchange rate on June 28, 2019 set forth in the H.10 statistical release of the Federal Reserve Board.

There is no assurance as to if or when the Listing and Offering will take place. This communication is neither an offer to sell nor a solicitation of an offer to buy, nor shall there be any offer, solicitation or sale of our securities in any jurisdiction in which such offer, solicitation or sale would be unlawful.

– i –

**Table of Contents**

RECENT DEVELOPMENTS                                                              1

RISK FACTORS                                                                    18

INFORMATION ABOUT THE GLOBAL OFFERING                                           30

INFORMATION ABOUT THE LISTING                                                   31

BUSINESS                                                                        35

FINANCIAL INFORMATION                                                           43

DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES                                      73

ALIBABA PARTNERSHIP                                                             75

MAJOR SHAREHOLDERS                                                              76

RELATED PARTY TRANSACTIONS                                                      79

FORWARD LOOKING STATEMENTS                                                      92

– ii –

## RECENT DEVELOPMENTS

***Core commerce segment***

*China commerce retail*

Revenue from our China commerce retail business in the three months ended September 30, 2019 was RMB75,786 million (US$10,603 million), an increase of 40% compared to RMB54,151 million in the same period in 2018. Revenue from our China retail marketplaces continued to see strong growth. Combined customer management and commission revenues grew 25% year-over-year, which represents an increase of 25% in customer management revenue and an increase of 24% in commission revenue. The growth of customer management revenue was primarily the result of increases in the average unit price per click and to a lesser extent the volume of paid clicks. The growth of commission revenue was primarily due to the strong 26% year-over-year growth of Tmall physical goods GMV (excluding unpaid orders). "Others" revenue under China commerce retail business was RMB18,210 million (US$2,548 million), a significant increase compared to RMB8,095 million in the same period in 2018, primarily driven by contributions from direct sales businesses, including Tmall Supermarket and Freshippo, as well as our consolidation of Kaola starting in September 2019.

*China commerce wholesale*

Revenue from our China commerce wholesale business in the three months ended September 30, 2019 was RMB3,283 million (US$459 million), an increase of 31% compared to RMB2,497 million in the same period in 2018. The increase was primarily due to an increase in revenue from customer management services on 1688.com as well as an increase in revenue from Lingshoutong.

*International commerce retail*

Revenue from our international commerce retail business in the three months ended September 30, 2019 was RMB6,007 million (US$840 million), an increase of 35% compared to RMB4,464 million in the same period in 2018. The increase was primarily due to the growth in revenue generated from AliExpress and Lazada.

*International commerce wholesale*

Revenue from our international commerce wholesale business in the three months ended September 30, 2019 was RMB2,434 million (US$341 million), an increase of 20% compared to RMB2,022 million in the same period in 2018. The increase was primarily due to increases in the number of paying members and the average revenue from paying members on Alibaba.com.

*Cainiao logistics services*

Revenue from Cainiao logistics services was RMB4,759 million (US$666 million) in the three months ended September 30, 2019, an increase of 48% compared to RMB3,206 million in the same period in 2018, mainly due to the increase in the volume of orders fulfilled.

– 4 –

**RISK FACTORS**

well as investigations, fines, fees or settlements, which may be difficult to predict. We also could face increased compliance costs and risks as we expand globally and into additional businesses, such as cloud computing. In addition, our expanding network of investee companies, global business partners, joint venture partners or other parties that have collaborative relationships with us or our affiliates may engage in activities in or with Sanctioned Countries, Sanctioned Persons or persons targeted by export control restrictions, some of which, including some of our investee companies, have become subject to sanctions or export control restrictions, which might result in significant negative publicity, governmental investigations and reputational harm. Media reports on alleged violation of export control or economic and trade sanctions laws, or on uses of the technologies, systems or innovations we develop for purposes that could be perceived to be inappropriate or controversial, by our clients, business partners, investees or other companies, even on matters not involving us, could nevertheless damage our reputation and lead to regulatory investigations against us. If we are publicly named or investigated by any regulator on the basis of suspected or alleged violations of export control or economic and trade sanctions laws and rules, even in situations in which the potential amount or fine involved may be relatively small, our reputation could be significantly harmed. Any of these circumstances may cause the price of our Shares and/or ADSs to decline significantly, and materially reduce the value of your investment in our Shares and/or ADSs.

Certain institutional investors, including state and municipal governments in the United States and universities, as well as financial institutions, have proposed or adopted divestment or similar initiatives regarding investments in companies that do business with Sanctioned Countries. Accordingly, as a result of activities on our marketplaces or in connection with other business we operate that may involve users based in the Sanctioned Countries, certain investors may not wish to invest or may divest their investment in us, certain financial institutions may not wish to lend, extend credit or offer ordinary banking services to us, or seek early repayment of loans made to us, and certain financial institutions and other businesses with which we partner or may partner may seek to avoid business relationships with us. These divestment initiatives and terminations of business services may negatively impact our reputation, business and results of operations, and may materially and adversely affect the trading price of our Shares and/or ADSs.

**Risks Related to Doing Business in the People's Republic of China**

***Anti-monopoly and unfair competition claims or regulatory actions against us may result in our being subject to fines, constraints on our business and damage to our reputation.***

The PRC anti-monopoly enforcement agencies have in recent years strengthened enforcement under the PRC Anti-monopoly Law, including levying significant fines, with respect to concentration of undertakings and cartel activity, mergers and acquisitions, as well as abusive behavior by companies with market dominance. In March 2018, the PRC State Administration for Market Regulation, or the SAMR, was formed as a new governmental agency to take over, among other things, the anti-monopoly enforcement functions from the relevant departments under the MOFCOM, the NDRC and the SAIC, respectively. The SAMR has stated recently that its tasks are to safeguard consumer interests, and to ensure quality and safety through enhanced market regulation. The SAMR has said that it will adopt an encouraging and cautious approach in regulating new technology, new industries, new business models and new practices, with a goal of

– 21 –

**RISK FACTORS**

stimulating market viability and innovation, promoting development and creating room for future growth.

Since its inception, the SAMR has continued to strengthen its anti-monopoly enforcement. The SAMR issued a new set of guidelines with respect to merger control review in September 2018, and issued the Notice on Anti-monopoly Enforcement Authorization on December 28, 2018, which grants authorizations to the SAMR's province-level branches for anti-monopoly enforcement within their respective jurisdictions. The SAMR recently has also imposed several administrative penalties on various companies for failing to duly make filings as to their transactions subject to merger control review by the SAMR. The scope of the companies that were penalized is broad, and covers a variety of different industries. On several recent occasions, including at administrative guidance meetings attended by internet platform companies including our Company, the SAMR has indicated its view that certain business arrangements adopted by ecommerce platforms, including arrangements seen as exclusivity arrangements, may constitute violation of the anti-monopoly and unfair competition laws. The SAMR also indicated its intention of initiating investigations into these arrangements.

The PRC Anti-monopoly Law provides a private right of action for competitors, business partners or customers to bring anti-monopoly claims against companies. In recent years, an increased number of companies have been exercising their right to seek relief under the PRC Anti-monopoly Law. Some of these companies, including our competitors, business partners and customers, have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private ligation that targets our prior and current business practices, such as our market approach with traffic resource allocation on our ecommerce platforms, which we base on multiple factors, and our prior narrowly-deployed exclusive partnerships. Although we believe that our business practices do not violate anti-monopoly or unfair competition laws, due to our large scale of business and close media attention, there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted.

Any anti-monopoly lawsuit, regulatory investigations or administrative proceedings initiated against us could also result in our being subject to regulatory actions and constraints on our investments and acquisitions, which could include forced termination of any agreements or transactions that are determined by governmental authorities to be in violation of anti-monopoly laws, required divestitures and limitations on certain pricing and business practices. As a result, we may be subject to significant difficulties in pursuing our investment and acquisition strategy.

These allegations, claims, actions or proceedings, regardless of their merits, have, and may continue to, cause us to change some of our business practices and hinder our business operations, which could decrease the popularity of our businesses, products and services, cause our revenue and net income to decrease materially, and could lead to additional regulatory inquiries, investigations or actions against us, such as profit disgorgement, heavy fines and various restrictions on our businesses or investment activities. Any of the above circumstances could materially and adversely affect our business, operations, reputation, brand and the trading price of our Shares and/or ADSs.

– 22 –