# Exhibit 22

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:20-cv-09568-GBD-JW

- - - - - - - - - - - - - - - - - - - - - - - - - - -x


IN RE: ALIBABA GROUP HOLDING LTD. SECURITIES

LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - -x


CORRECTED

VIDEO DEPOSITION OF DAVID TABAK, Ph.D

NEW YORK, NEW YORK

THURSDAY, NOVEMBER 2, 2023


REPORTED BY:

DANIELLE GRANT

JOB NO.: 6168491

Page 1

Dr. Tabak

investigation?

Q    Yes.

        MS. WOLKE:  Same objection.

    A    The actual investigation obviously could not be disclosed before it occurred.

    Q    Okay.  So let me -- let me ask -- let me ask that again just so we're -- so we're clear.

        Could the SAMR's actual investigation announced on December 23rd have been disclosed by Alibaba prior to December 23rd?

        MS. WOLKE:  Objection.  Asked and answered.

    A    The answer is, no, if you're talking about the actual investigation.  It could not have been disclosed by Alibaba before December 23, 2020, assuming that Alibaba did not know of it.

    Q    You drew a distinction between the announcement of the investigation or the launching of the investigation and the conduct that was the basis for the investigation.

Page 38

Dr. Tabak

terms of the semi-strong form?

Is that based on your review of case law in this -- in this area?

A    It's actually kind of based on the logic of the allegation here, which is that there was a public misrepresentation or omission.

Q    And so the idea was it would be, if there was a material public misrepresentation, that that would impact the price of the stock?

A    Correct, including by impact if we mean potentially maintain the price of the stock to prevent it from falling.

Q    You're going to have to un-package that for me.

What -- what do you mean by "maintain the price of the stock"?

A    Mr. Blake, you've probably heard about price maintenance in these cases but, as an example, suppose that the market had been expecting a company to earn a dollar per share.  The truth that the company knows is that it was a bad quarter, and it only

Page 50

Dr. Tabak

actually earned 80 cents a share; nevertheless, the company reports a dollar share consistent with market expectations. Since the public report is consistent with prior market expectations, the stock price would not be expected to move very much; whereas a disclosure of the true lower earnings most likely would have caused the stock price to fall.

So when we talk about price impact there, that's often described as price maintenance, because the lie maintains the stock price at roughly the prior level rather than allowing it to fall, and that is still, my understanding, considered in the overall category of price impact, even though the observable impact is zero versus the unobserved impact that would have been seen.

Q    So if a lie is, quote, consistent with market expectations, closed quote, that could maintain the stock price, correct?

A    Correct.

Q    Okay.  If a lie is not consistent with market expectations, closed quote,

Page 51

Dr. Tabak

A    No.  Whether prior to -- I mean, for example, if Monday, the government says, Companies must cease this activity, and Tuesday, Alibaba says, We have ceased the activity, that Tuesday statement may not have a big effect on the market if everyone believes that, when the government speaks, companies will follow.

So I don't -- the question is before Alibaba's statement, what was the market thinking about the likelihood that the conduct would cease?

Q    So you've added a hypothetical to my hypothetical, it sounds like?

A    Well, I would say that your hypothetical wasn't complete enough for me to give an answer.

Q    Okay.  Let me see how you changed your -- what you added here.  All right.

So if the market understood that Alibaba was engaged in illegal conduct, and then Alibaba says something that gives the implication that the conduct has ceased, and the market believes that Alibaba has, in

Page 74

Dr. Tabak

fact, ceased the conduct, would that change the market's expectations?

MS. WOLKE:   Same objections.

A    Again, the question is whether, prior to Alibaba's statement, the market expected Alibaba to cease the conduct or not.

Q    And how would you know what the market expected in that context?

MS. WOLKE:   Objection.   Incomplete hypothetical.

Q    If you had to -- if you had to undertake an analysis, how would you undertake it?

A    I would look at documents such as analyst reports prior to and after to Alibaba's statement to see what they said about -- prior to whether they had any stated expectations about whether Alibaba would cease the conduct, and afterwards, whether they described the cessation of the conduct as either expected or unexpected or surprising or un-surprising.

Q    Okay.  So one of the primary

Page 75

Dr. Tabak

things you would look that is analyst coverage to see whether analysts took any change in position or expectation based upon the statements that are made?

A    Yes, but that seems to only imply after.  I would also look before to see if they had any expectations stated explicitly.

Q    Okay.  And what else -- what else would you -- would you look at?

Would you look at news articles, for example?

A    Yes.

Q    Blog posts?

A    Maybe, depends on the source and reputability of them.

Q    Other statements by the company?

A    Potentially, sure.

Q    Okay.  And how do you go from, I guess, looking at what I'll call kind of these qualitative things -- writings, reports -- to understanding whether, from a quantitative basis, that the market's expectation has changed in some way?

And I guess maybe I put it to you

Page 76

Dr. Tabak

MS. WOLKE:  Object to form.

A    I would have to say I can't answer.  Here's what I can say, would you like me to answer without the question, so to speak?

Q    Let me -- you want to take a crack at it from a blank sheet of paper?  Go for it.

A    Okay.  If there was an unexpected announcement by a Alibaba that it was ceasing a practice that the market believed it was engaging in that was resulting in material value through profits or cash flow to Alibaba, then, again, if this is unexpected and wasn't, for example, being replaced by anything else and if the market believed Alibaba, that would result in a change in the market's perceived value of Alibaba.  And if that change was large enough, we would expect to see a statistically significant change in Alibaba's stock price.

Q    Okay.  So if Alibaba put out an unexpected announcement that said, "We are

Page 96

Dr. Tabak

A    Or identifies that, yes.

Q    Okay.  So -- and just go to Row 3, since we were on Row 2 there.  We've got July 10, 2020, which would be the first day of your Newsday analysis.  It would be the day after the 20-F was published post-market.

There is not a statistically significant stock price movement on that day, correct?

A    Correct.

Q    Okay.  And if I was to look at Row 3B, which is the log of the --

A    I'm sorry.

There's -- what do you mean by "Row 3B"?

Q    Sorry.  Row 3, column B.

A    Ah, Cell 3B.

Q    Cell 3B.  If we look at Cell 3B, does Cell 3B indicate that the log of Alibaba stock's price returned on that day as negative?

A    That is correct.

Q    Okay.  Does that mean that

Page 217

Dr. Tabak

Alibaba's stock price went down?

A    Correct.

Q    Okay.  In this body of your report, we have a Footnote  27.

And in Footnote 27, you say here: There does not appear to be evidence that the initial day of the class period was chosen because of a stock price increase.

Do you see that?

A    I do.

Q    Okay.  And is that statement in your report based upon looking at the stock price movement on October -- or excuse -- me on July 10th and looking at whether there is a statistically significant change in the stock price?

A    No, actually it's based on my reading of the complaint.

Q    Just raw data?

MS. WOLKE:  Object to form.

A    If you're going to call the complaint "raw data."

Q    Okay.  So you're saying it is based upon the complaint -- or what in the

Page 218

Dr. Tabak

complaint?

A    The complaint doesn't say, for example, at the beginning of the class period, Alibaba falsely announced the following great information the -- and as a result, the stock price increased.

Q    Okay.  So in addition to it being alleged in the complaint, as we see in the cell -- in the -- in the Excel file, that the stock price did not, in fact, increase?

MS. WOLKE:  Object to form.

A    We do see that in the Excel file.

Q    Okay.  Let's look a few more rows here.

Let's do Row 20 -- oh, excuse me, no -- Row 32, which is August 20th.

Was there a statistically significant stock price change on August 20, 2020?

A    No, there was not.

Q    All right.  Let's do Row 60.

Is there a statistically significant stock price change on September 30, 2020?

Page 219

Dr. Tabak

A     Yes, there was.

Q     Okay.  Let us go to Row 89, which is November 10, 2020.

A     Okay, if you say so.  This isn't set up -- just --

MS. VEROSS:  Right in --

THE WITNESS:  Yeah.  No.  I'm just trying to do it with this pad.  Okay.  I know Excel.

A     Okay.  I'm with you.  Row 89.

MR. BLAKE:  He's used an Excel file once or twice.

Q     Row 89, 11/10/2020, was there a statistically significant stock price change on that day based on your analysis?

A     There was.

Q     Row 84?

A     There was also a statistically significant stock price change on Row 84.

Q     Which was -- what would be November 3, 2020.

Was there a statistically significant stock price change on that day?

A     Yes, there was.

Page 220

Dr. Tabak

Q    Okay.  And how about Row 116, December 18, 2020?

A    There was not.

Q    Okay.  There is a slightly different -- well, not even really slightly different, there is a -- there is a different set of date ranges that are expressed in the news test ranging from 7/10/2020 in Row 3 to 10/24/2020 in the Row 120 then --

A    I'm sorry.

Did you say 10/24/2020?

Q    12/24/2020.

Different date range relevant in the news test relative to the MM tab and then tab giving 2019 through 2023, news test being concentrated around the class period; is that fair.

A    I think so, yes.

Q    Okay.  Have you conducted a statistical significance analysis for any dates outside of this July 10, 2020 to December 24, 2020 range?

A    No.

Page 221

Dr. Tabak

Q    Okay.  Took you through a couple of different days, July 10, August 20th, September 30, November 3rd, November 10th, December 18th; have you conducted any kind of content analysis or specific news analysis related to the information that was available on the market on those days?

A    I don't know why you selected those days so I think the answer is no.

Q    Okay.

A    I just don't understand the context.

Q    Okay.  That's fine.

MR. BLAKE:  I think we've been going for about an hour, maybe a little more than that.

Why don't we take another break?

VIDEOGRAPHER:  The time is 14:56. We're off the record.

(Whereupon, at 14:56 p.m., a recess was taken to 15:56 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  Time is 15:56.

Page 222

CERTIFICATE

STATE OF NEW YORK )

                    )ss:

COUNTY OF RICHMOND)

I, DANIELLE GRANT, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That DAVID TABAK PH.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 6th day of November, 2023.

DANIELLE GRANT

Page 248