UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: ALIBABA GROUP LTD. SECURITIES LITIGATION | Master File No. 1:20-CV-09568-GBD-JW |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................................. 1

II.  DEFENDANTS CONCEDE THE *BASIC* PRESUMPTION OF RELIANCE APPLIES ..... 4

III. DEFENDANTS FAIL TO REBUT THE PRESUMPTION OF RELIANCE .................. 5

    A.   Standard: to Rebut the Presumption of Reliance, Defendants Must Show the Complete Absence of Price Impact by a Preponderance of the Evidence .............. 5

    B.   Defendants' *Status Quo* and "Front-End" Price Impact Arguments Fail ............... 5

        1.   The Form 20-F Prior Practices Statement Maintained Expectations.......... 5

        2.   The Lack of "Front-End" Price Impact Is *Not* Direct Evidence of the Absence of Price Impact ............................................................................. 6

        3.   Defendants Do Not Disprove Front-End Price Impact Associated with the September 30, 2020 Price Increase ....................................................... 9

    C.   Defendants Do Not Show the Market's Actual Knowledge of Alibaba's Ongoing Exclusivity Practices *During The Class Period* Such that the Challenged Statements Had No Impact on Alibaba's ADS Price ........................ 10

        1.   The November 10, 2020 Price Drop Does Not Show the Market Was Aware of Alibaba's Ongoing Exclusivity Practices ................................. 10

        2.   Defendants Ignore Public Statements Indicating Alibaba Was Not Using Exclusivity Practices During the Class Period ............................. 11

        3.   References to Alibaba's Alleged *Pre-Class Period Conduct* Does Not Prove the Market Knew Alibaba Was Continuing to Practice Exclusivity *During the Class Period* ....................................................... 13

    D.   The Price Drop Following the SAMR Announcement Is Evidence of Price Impact ................................................................................................................. 16

        1.   Defendants' Argument that the SAMR Announcement Was Neither Corrective Nor a Materialization of Concealed Risks Fails .................... 16

        2.   Defendants Fail to Prove the Price Drop Was Due Entirely to Confounding News ................................................................................. 19

        3.   There Is No "Fatal Mismatch" Between the Statements and the Price Drop Under *Goldman 2023* ................................................................... 20

4.      Market Commentary and a Price Increase *After* the Class Period Is Not Evidence of What the Market Believed *During* the Class Period .... 21

E.    The 'Growth And Revenue Statements' Are Not Impermissibly Generic Under *Goldman 2023* .................................................................................. 22

IV.   THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE ALSO APPLIES ............... 24

V.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

<u>CASES</u>

*AP-Fonden v. Goldman Sachs Grp., Inc.*,
  2024 WL 1497110 (S.D.N.Y. Apr. 5, 2024).......................................................... 16, 17, 19, 20

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020)................................................................................................ 19

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018)................................................................................................ 17

*Baliga v. Link Motion, Inc.*,
  2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022).................................................................. 24, 25

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ............................................................................................. *passim*

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)........................................................................................................... 2, 4

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................................ 7

*FindWhat Investor Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ............................................................................................ 7

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ................................................................................................ 7

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys*,
  594 U.S. 113 (2021)............................................................................................................ 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)............................................................................................................ 4, 5

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) ........................................................................................ 24

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
  818 F.3d 775 (8th Cir. 2016) ................................................................................................ 6

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)................................................................ 5, 9, 17

*In re Moody's Corp. Sec. Litig.*,
　　274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................................... 14

*In re NIO, Inc. Sec. Litig.*,
　　2023 WL 5048615 (S.D.N.Y. Aug. 8, 2023) ......................................................... 5

*In re Qualcomm Inc. Sec. Litig.*,
　　2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ....................................................... 18

*In re Vivendi, S.A. Sec. Litig.*,
　　838 F.3d 223 (2d Cir. 2016).................................................................... *passim*

*Local 703, I.B. of T. Grocery & Food Emp's Welfare Fund v. Regions Fin. Corp.*,
　　762 F.3d 1248 (11th Cir. 2014) ...................................................................... 8

*McIntire v. China MediaExpress Holdings, Inc.*,
　　38 F. Supp. 3d 415 (S.D.N.Y. 2014)................................................................ 7, 16

*Meyer v. Jinkosolar Holdings Co., Inc.*,
　　761 F.3d 245 (2d Cir. 2014)........................................................................ 23

*Pearlstein v. Blackberry Ltd.*,
　　2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ............................................ 9, 11, 17, 21

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
　　327 F.R.D. 38 (S.D.N.Y. 2018) ...................................................................... 7

*Puddu v. NYGG (Asia) Ltd.*,
　　2022 WL 2304248 (S.D.N.Y. June 27, 2022) ......................................................... 24

*Schwab v. E\*Trade Fin. Corp.*,
　　752 F. App'x 56 (2d Cir. 2018)....................................................................... 24

*Strougo v. Barclays PLC*,
　　312 F.R.D. 307 (S.D.N.Y. 2016) ...................................................................... 7

*Waggoner v. Barclays PLC*,
　　875 F.3d 79 (2d Cir. 2017)................................................................... *passim*

**GLOSSARY**

| Term | Definition |
|---|---|
| 20-F | Alibaba Group Holding Ltd.'s annual report for fiscal year 2020, filed with the SEC on Form 20-F on July 9, 2020 |
| AC (or the "Complaint") | Amended Consolidated Class Action Complaint (ECF No. 55) |
| ADSs | American Depository Shares |
| Alibaba (or the "Company") | Defendant Alibaba Group Holding Limited |
| AML | The PRC Anti-Monopoly Law |
| Ant Group | Ant Group Co. Ltd. |
| Challenged Misstatements | Statements alleged by Plaintiffs as misleading in AC ¶¶ 253-73 |
| Class Period | July 10, 2020 through and including December 23, 2020 |
| Defendants | Alibaba, its former CEO Daniel Yong Zhang, and its former CFO Maggie Wei Wu |
| Ex. D-__ | Exhibits attached to the Declaration of Stephen Blake in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 108) |
| Ex. P-__ | Exhibits attached to the Declaration of Kara M. Wolke in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 101) or the concurrently-filed Declaration of Kara M. Wolke in Support of Plaintiffs' Reply |
| Draft Guidelines | Draft Anti-Monopoly Guidelines for the Platform Economy Sector published by the SAMR on November 10, 2020 (ECF No. 108-11, Ex. D-11) |
| HKSE | Hong Kong Stock Exchange |
| Hubbard Report (or "Rpt.") | Expert Report of Glenn Hubbard, dated January 19, 2024 (ECF No. 108-2, Ex. D-2) |
| Hubbard Tr. | Deposition transcript of Dr. Robert Glenn Hubbard, dated March 21, 2024 (Ex. P-13) |
| MTD Order | Court's Motion to Dismiss Memorandum and Order (ECF No. 83) |
| MTD Opp. | Plaintiffs' Opposition to Alibaba Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (ECF No. 74) |
| MTD Tr. | January 11, 2023 Motion To Dismiss Hearing Transcript (ECF No. 81) |
| Opposition (or "Opp.") | Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 107) |

| PRC | People's Republic of China |
|---|---|
| PBOC | People's Bank of China |
| Pls' Br. | Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 100) |
| SAMR | PRC regulator called the State Administration for Market Regulation |
| SAMR Announcement | SAMR Investigation Announcement dated December 23, 2020 (ECF No. 101-9, Ex. P-9) |
| Tabak Report (or "Rpt.") | Expert Report of David I. Tabak, Ph.D., dated October 5, 2023 (ECF No. 101-1, Ex. P-1) |
| Tabak Reply | Expert Reply Report of David I. Tabak, Ph.D., dated April 19, 2024 (Ex. P-11) |
| Tabak Tr. | Deposition transcript of Dr. David Tabak, dated November 2, 2023 (Ex. P-12) |

## I.    **PRELIMINARY STATEMENT**[1]

For two years preceding the Class Period, the SAMR targeted restrictive trading practices in China's e-commerce industry—commonly referred to as "Choose One of Two," whereby companies coerced merchants to sell exclusively on one platform—as prohibited by Chinese law. ¶¶76-85; Exs. P-6–8, P-17. In November 2019, the SAMR instructed e-commerce platforms, including Alibaba, that "'Choose One of Two' and 'exclusive trading' in the Internet sector…are clearly prohibited by the Electronic Commerce Law and also violate the Anti-Monopoly Law and Anti-Unfair Competition Law." ¶¶103-10; Ex. P-17 at 2. Defendants thereafter assured investors that despite Alibaba's "alleged prior narrowly-deployed exclusive partnerships," its "business practices do not violate anti-monopoly or unfair competition laws…." ¶253. Just weeks before the Class Period, Alibaba publicly affirmed that it would not "force platform operators to conduct 'exclusive cooperation'" or "use technical means to influence users' choices." ¶¶114-17; Ex. P-22 at 2.

Despite those assurances, Defendants misled investors during the Class Period by concealing that Alibaba continued to use merchant exclusivity practices. Class Period investors bought Alibaba's ADSs at inflated prices maintained by Defendants' misrepresentations and omissions, and they suffered massive damages when, on December 23, 2020, the SAMR revealed that it had launched an antitrust investigation into Alibaba for its alleged use of Choose One of Two practices, triggering a statistically significant 13% drop in Alibaba's ADS price. ¶31; Ex. P-9; Tabak Rpt. ¶34.

This Court held Defendants' statements and related omissions about Alibaba's exclusivity practices and legal compliance and risks were actionable, stating that "[w]hile Alibaba disclosed the regulatory warning it had received and cautioned that investigatory action was possible, it omitted the material fact that it was not in compliance with the commitment pledge it had signed, nor with the representation it made to investors regarding 'prior' use of exclusivity." MTD Order 22; *id.* at 18-23.

---

[1] Unless otherwise noted, "¶_" refers to the AC and all emphasis is added and internal citations omitted throughout.

Plaintiffs now seek to certify the Class of those aggrieved investors who purchased Alibaba ADSs during the July 10, 2020, to December 23, 2020, Class Period. Plaintiffs support their motion with strong evidence demonstrating that the required elements of Rule 23 are met. Significantly, the expert report of Dr. David Tabak establishes market efficiency, demonstrating that Plaintiffs are entitled to the fraud-on-the-market presumption of reliance. According to that theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).

Defendants concede each element of Rule 23(a) and that market efficiency has been proven. Defendants attempt to defeat class certification by arguing that the presumption of reliance is rebutted by a lack of "price impact" associated with the alleged misrepresentations. Defendants are wrong.

Defendants' price impact argument rests on two faulty bases. First, Defendants incorrectly argue that the lack of a statistically significant price increase when the alleged misstatements were first made, also referred to as "front-end price impact," constitutes "direct evidence" of the absence of price impact. Opp. 10-11. This ignores that under a price maintenance theory, inflation is incorporated in the share price not because a misstatement causes a price increase, but because the concealment or misrepresentation of information keeps the price from falling. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259-60 (2d Cir. 2016); *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017).

Defendants' second and primary argument is that the market did not believe Alibaba when it said it stopped using exclusivity. Defendants ask this Court to hold that the market was so completely aware of Alibaba's ongoing exclusivity practices during the Class Period that the alleged misstatements and related omissions had *no* impact on Alibaba's share price. Defendants argue that the strongest evidence of this is the market's response to the SAMR release of Draft Guidelines on November 10, 2020. Opp. 2, 6, 15. Among other things, the Draft Guidelines again identified exclusive trading as prohibited. As Defendants tell it, the Draft Guidelines "signaled heightened enforcement

2

focus on choose one of two," such that the market's reaction "demonstrate[ed] that the market was *keenly aware* of Alibaba's continued deployment of such practices and associated risks." Opp. 2. But Defendants ignore that the Draft Guidelines covered many practices other than exclusivity and were seen as a general sign of regulatory tightening which caused share price drops across the Chinese e-commerce sector; the price drop after the Draft Guidelines does not prove the market knew about Alibaba's continued use of exclusivity practices during the Class Period.

Defendants also ignore market commentary that contradicts their argument that the market was "keenly aware" of Alibaba's ongoing exclusivity practices. For example, Wall Street powerhouse Goldman Sachs reported "Alibaba *remains compliant with all rules in the Draft Guidelines*" and specifically stated that "*no merchants are being restricted on [Alibaba's] platform*." Ex. P-35. Morgan Stanley said "[m]arket concerns around the draft appear to be less of a concern for Alibaba" and "*Alibaba highlights it does not operate business on exclusivity*." Ex. P-33. Moreover, internal Alibaba Investor Relations emails about messaging to analysts after the Draft Guidelines were explicit: "*We DO NOT run our businesses through exclusivity.* Merchants see the abudance [sic] of value on our platform and this is the reason they continue to do business on our platform." Ex. P-32 at 2; *see also* App'x A (statements indicating Alibaba was not practicing exclusivity during the Class Period).

Other information produced thus far in discovery further contradicts Defendants' argument that the market had actual knowledge of Alibaba's ongoing use of exclusivity during the Class Period. As the SAMR's mandate against exclusivity became starker in 2019, Alibaba tried to hide its use of the practices—from the public and from its regulators—and began imposing restrictions verbally. Per a January 2021 internal Alibaba report, Alibaba made no verbal exclusivity demands to any merchants in 2018, but it made such demands verbally to 729 merchants in 2019 and to 1,033 merchants in 2020.

Much of Defendants' proffer does not even relate to Class Period events at all. Rather, it largely concerns the same allegations by competitors and merchants relating to Alibaba's *pre-Class Period*

3

*conduct* that the Court previously said did not fairly inform investors of Alibaba's ongoing use of exclusivity practices *during the Class Period*. MTD Order 18-19; *see also* App'x B hereto (Alibaba's denials of allegations of exclusivity by JD.com and others).

Finally, the corrective disclosure itself belies Defendants' claim that Alibaba's ongoing use of exclusivity was widely known. The SAMR launched its investigation in response to a "tip-off." Ex. P-9; ¶154. If everyone knew Alibaba was continuing to practice exclusivity during the Class Period, as Defendants argue, then the SAMR would not have had to act in response to a "tip-off." ***Defendants ask this Court to believe that the entire world market for Alibaba securities knew about Alibaba's continued use of exclusivity, but the SAMR—Alibaba's regulator which was keenly interested in this issue and repeatedly warned it would investigate and punish any use of exclusivity—did not***.

Defendants have not borne their burden to prove a complete lack of price impact by a preponderance of the evidence. At most, Defendants cite potentially conflicting information in the market as to whether, and to what extent, Alibaba may have been using exclusivity practices during the Class Period. But, as Defendants concede, the market was efficient, such that all available public information—including information indicating that Alibaba was *not* practicing exclusivity—would have been incorporated into Alibaba's share price. Plaintiffs' motion should be granted.

## II.   DEFENDANTS CONCEDE THE *BASIC* PRESUMPTION OF RELIANCE APPLIES

*Basic* holds that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). Defendants concede market efficiency, and thus concede that Alibaba's ADS price reflected all publicly available information during the Class Period. Hubbard Tr. at 44:22-25.

III.   **DEFENDANTS FAIL TO REBUT THE PRESUMPTION OF RELIANCE**

   A.   **Standard: to Rebut the Presumption of Reliance, Defendants Must Show the Complete Absence of Price Impact by a Preponderance of the Evidence**

"Price impact is the concept that a misrepresentation, before corrected, resulted in a higher security price than would have otherwise been available, thus injuring the investors who purchased the security at this higher price." *In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, *14 (S.D.N.Y. Aug. 8, 2023) (citing *Halliburton II*, 573 U.S. at 263-64). To rebut the presumption of reliance, Defendants must prove that the "asserted misrepresentation (or its correction) did not affect the market price" of the security. *Halliburton II*, 573 U.S. at 280-81; *Waggoner v. Barclays PLC*, 875 F.3d 79, 101, 103 (2d Cir. 2017) (defendants "must demonstrate that the misrepresentations did not affect the stock's price by a preponderance of the evidence"). The "Second Circuit [has] held that the party opposing class certification bears the burden of persuasion on this issue and must demonstrate ***a complete lack of price impact***." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *6 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in relevant part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) (citing *Waggoner*, 875 F.3d at 99-103).

   B.   **Defendants' *Status Quo* and "Front-End" Price Impact Arguments Fail**

      1.   **The Form 20-F Prior Practices Statement Maintained Expectations**

Defendants incorrectly argue that this case is incompatible with a price maintenance theory because, according to Defendants, the Prior Practices Statement in the 2020 Form 20-F marked a change in market expectations regarding exclusivity. Opp. 1, 11, 13-15.

To support this argument, Defendants cite news articles from 2019 and early 2020 about exclusivity allegations made in lawsuits filed by JD.com and Galanz against Alibaba. Opp. 14 (citing AC ¶¶91-98, Hubbard ¶73).[2] But Defendants ignore that Alibaba publicly *denied* the allegations, thus

---

[2] JD.com first filed its lawsuit against Alibaba in 2015 then re-filed in 2017; Pinduoduo and Vipshop moved to join in September 2019. ¶¶91-92, n.39. Galanz filed in June 2019, and was dismissed in June 2020. ¶93, Ex. D-4 at 13.

5

influencing the market to believe prior to the Form 20-F that it did not use exclusivity practices. *See* App'x B; Ex. P-15 (9/28/2017 article states: "***Alibaba has denied pressuring brands to leave JD.com***" and "'***Brands have full autonomy***…*in choosing their distribution platforms*,' Alibaba said.").

The practices alleged in the JD.com and Galanz lawsuits also predate the November 5, 2019 SAMR meeting wherein the SAMR instructed that Choose One of Two was "clearly prohibited" by Chinese law. ¶¶103-10. Shortly after that meeting, Alibaba told investors that "[o]n several recent occasions, including at administrative guidance meetings attended by…our company, the SAMR has indicated its view that certain business arrangements adopted by e-commerce platforms, including arrangements seen as exclusivity arrangements, may constitute violation of the anti-monopoly and unfair competition laws." Ex. D-6 at 22; Ex. D-23 at 103. It was in the context of this disclosure in its November 13, 2019, Form 6-K that Alibaba first made the Prior Practices Statement and related Antitrust Risk Disclosures. *Id*. Alibaba repeated those statements in its 2020 Form 20-F. Ex. D-1 at 39.[3] Thus, the Form 20-F maintained market expectations regarding Alibaba's use of exclusivity and related regulatory risks during the Class Period. This is indeed a price maintenance case.

### 2. The Lack of "Front-End" Price Impact Is *Not* Direct Evidence of the Absence of Price Impact

The lack of a statistically significant price increase when the challenged statements were first made—*i.e.*, "front-end" price impact—is ***not***, as Defendants argue, "direct evidence" of the absence of price impact. Opp. 10-11, n.5, 15; Hubbard Rpt. ¶¶75-76. The Eighth Circuit decision in *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 776 (8th Cir. 2016) cited by Defendants both predates and conflicts with the Second Circuit's *Vivendi* decision, which clearly holds: "we agree with the Seventh and Eleventh Circuits that securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."

---

[3] Defendants themselves acknowledge that the Prior Practices and Antitrust Risk Disclosure Statements were made at least twice prior to the start of the Class Period. *See* Opp. 10, n.5 (citing Ex. D-6 at 22, Ex. D-23 at 103).

6

838 F.3d at 259 (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015) (inflation occurs when misrepresentations cause the price "to remain higher than it would have been had the statements been truthful."); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011) ("the inflation level need not change for new investors to be injured by a false statement. Fraudulent statements that prevent a stock price from falling can cause harm by prolonging the period during which the stock is traded at inflated prices."); *see also Waggoner*, 875 F.3d at 104.[4]

Defendants' "front-end" price impact arguments improperly conflate *inflation* with a *price increase*. The law in this Circuit is clear that *inflation* can be introduced or increase even if a share price does not rise. *See Vivendi*, 838 F.3d at 258-60. "***When an omission or misrepresentation prevents a non-inflated price from falling, that omission or misrepresentation introduces inflation into the stock***." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 325 (S.D.N.Y. 2016), *aff'd sub nom Waggoner*, 875 F.3d 79; *Pirnik*, 327 F.R.D. at 45 (inflation enters if a statement or omission "caus[es] the stock price 'to remain higher than it would have been had the statements been truthful'") (citing *Household*, 787 F.3d at 418-19); Tabak Reply ¶8.[5] Moreover, while Defendants suggest Plaintiffs must show exactly *when* inflation first entered the ADS price (Opp. 15), caselaw holds otherwise. *Pirnik*, 327 F.R.D. at 45 (rejecting argument that under a price maintenance theory, "Plaintiffs 'must identify when and how any alleged inflation would have entered the stock'"); *accord Household*, 787 F.3d at 418-19 (even at the merits stage, plaintiffs need not prove when or how inflation entered; instead, they need only prove "that the defendants' false statements caused the stock price to remain higher [during the class period] than it would have been had the statements been truthful.").

Struggling to equate the absence of a share price increase with the absence of price impact,

---

[4] *See also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp. 3d 415, 434 (S.D.N.Y. 2014).

[5] When pressed at deposition, Dr. Hubbard conceded that inflation need not necessarily be reflected in a share price increase when that inflation is introduced into a company's share price. Hubbard Tr. at 82:11-83:24.

Defendants argue that "As Plaintiffs' own expert explained: '[i]f there was an unexpected announcement by Alibaba that it was ceasing a [material] practice that the market believed it was engaging in,' then 'we would expect to see a statistically significant change in Alibaba's stock price.'" Opp. 11 (citing Tabak Tr. 96:10-23) (alterations by Defendants). This argument fails because the Prior Practices Statement in November 2019 and in the 2020 Form 20-F were not "unexpected." Given the SAMR's stark instructions at the November 5, 2019 meeting that exclusivity was illegal, investors would *expect* Alibaba to comply. And Plaintiffs allege that Alibaba falsely confirmed to the market that it had done what the SAMR instructed it to do: stop using exclusivity. Thus, Dr. Tabak's testimony is not "counter" to Plaintiffs' theory of the case. Opp. 11. Put another way, Alibaba's statement on November 13, 2019 indicating that it had stopped requiring exclusivity was entirely *consistent* with what the market would have expected at that time,[6] such that the absence of a statistically significant price increase is wholly unexceptional. This is what Dr. Tabak testified:

> for example, if Monday, the government says, Companies must cease this activity, and Tuesday, Alibaba says, We have ceased the activity, that Tuesday statement may not have a big effect on the market if everyone believes that, when the government speaks, companies will follow.

Tabak Tr. at 74:3-9; *Local 703, I.B. of T. Grocery & Food Emp's Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. 2014) ("Regions's disclosures were designed to prevent a more precipitous decline in the stock's price, not bring about any change to it. When a company releases expected information, truthful or otherwise, the efficient market hypothesis underlying *Basic* predicts that the disclosure will cause no significant change in the price.").[7]

---

[6] Further, as noted in Sec. III.B,1, *supra*, before November 13, 2019, Alibaba *denied* exclusivity allegations made by JD.com and others; the Prior Practices Statement was thus also consistent with those public denials. *See* App'x. B.

[7] For the same reasons, the lack of analyst commentary on the Prior Practices Statement is not evidence of the absence of price impact. Opp. 11. In a price maintenance case, one would not necessarily expect analyst commentary on a statement which was designed not to cause a price increase, but to prevent a decline. *Had Alibaba disclosed the truth in its November 13, 2019 Form 6-K or the 20-F—that it continued to use Choose One of Two practices despite the SAMR's instructions, thus clearly exposing the Company to a heightened risk of regulatory intervention and*

8

Finally, Dr. Hubbard failed to account for confounding news which could have offset any share price increase (which, again, is not required) when the Prior Practices Statement was first made on November 13, 2019. Tabak Reply ¶¶9-18.

### 3. Defendants Do Not Disprove Front-End Price Impact Associated with the September 30, 2020 Price Increase

During an investor conference, Defendant Wu purported to discuss Alibaba's "value proposition to consumers and merchants," claiming it "is our core value" and "how we could achieve sustainable growth." ¶263. The Court held these statements were actionable, stating that "[o]nce Alibaba spoke on the issue, it had 'a duty to tell the whole truth'—that these trends were due, at least in part, to the Company's ongoing, undisclosed use of merchant exclusivity." MTD Order 20.

Defendants admit there is a statistically significant price increase (*i.e.*, direct evidence of price impact) following the conference on September 30, 2020. Opp. 11; Hubbard Rpt. Ex. 2. Selectively quoting from *one* analyst report, Defendants argue that the price increase is entirely due to unrelated news and claim that they have thus proven a lack of price impact for that statement. Opp. 11-12 (Ex. D-24). But the report identified *three* pieces of "important incremental information," two of which related to Alibaba's "seeds for future growth" (AliCloud and Cainiao),[8] and the third to Alibaba's "core-core revenue" (*i.e.*, its China retail marketplaces). Ex. D-24. Defendants cite the first two pieces of "important incremental information" as non-fraud-related drivers of the price increase, but *conspicuously fail to mention the third*, which relates to the merchant revenue at issue in this case.

---

*fines—analyst and news coverage may have looked quite different*. *Cf. Vivendi*, 838 F.3d at 258 ("once a company chooses to speak, the proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*.") (emphasis in original). Moreover, as courts in this district hold, "the presence or absence of analyst commentary, while of interest, is not a scientifically accepted method of demonstrating price impact or its absence." *Pearlstein v. Blackberry Ltd.*, 2021 WL 253453, \*21 (S.D.N.Y. Jan. 26, 2021) (citing *Chicago Bridge*, 2019 WL 5287980, at \*36, *report and recommendation adopted in part*, 2020 WL 1329354).

[8] AliCloud is Alibaba's cloud computing business, while Cainiao is logistics and supply chain management. Both were Alibaba startups that operated at a loss for years before being predicted to turn profitable in 2021. Ex. D-24.

The report also emphasized that "domestic consumption" (China retail marketplaces) was Alibaba's number one "growth engine[]" and noted the importance of core revenue to support Alibaba's new businesses. *Id*. In short, Defendants fail to sever the link between the statement and the price increase.[9]

**C.    Defendants Do Not Show the Market's Actual Knowledge of Alibaba's Ongoing Exclusivity Practices *During The Class Period* Such that the Challenged Statements Had No Impact on Alibaba's ADS Price**

**1.    The November 10, 2020 Price Drop Does Not Show the Market Was Aware of Alibaba's Ongoing Exclusivity Practices**

Alibaba argues that the strongest evidence of investors' supposed knowledge of its ongoing use of exclusivity during the Class Period is the market's reaction to the Draft Guidelines. Opp. 2 (arguing "[e]mpirically, Alibaba's ADS price significantly declined when, on November 10, 2020, SAMR signaled heightened enforcement focus on choose one of two, demonstrating that the market was ***keenly aware*** of Alibaba's continued deployment of such practices and associated risks."); *id.* at 6, 15 (similar); Hubbard Tr. at 57:16-58:5 (claiming market response to the Draft Guidelines "puts a nail in the coffin" of price impact). But neither the price drop after the Draft Guidelines nor related market commentary shows the market was aware of Alibaba's ongoing use of exclusivity such that the full extent of risks was known and priced into Alibaba's ADS price during the Class Period.

Defendants attribute the November 10, 2020 price drop to the market's supposed knowledge of exclusivity based on Dr. Hubbard's faulty conclusion—drawn from his review of just ten analyst reports—that exclusivity was "the featured" aspect of the Draft Guidelines. *See* Hubbard Tr. at 98:23, 140:18-142:12. In so doing, Defendants ignore their own evidence that the Draft Guidelines covered a wide range of practices *other than* exclusivity likely to affect Alibaba, including limitations on the use of big data, pricing discrimination, and monopolistic payment apps (*i.e.*, AliPay). *See* Ex. D-15 (Draft Guidelines "cover everything from offshore structures to big data" and cover "a laundry list of

---

[9] The analyst reports cited in Hubbard Rpt. ¶¶63-64 do not change the analysis; as Dr. Hubbard concedes in n.104 of his report, most reports also discussed the importance of Alibaba's merchant revenue.

market abuses"); Ex. D-3 (Draft Guidelines cover "[a] wide range of anti-monopolistic practices"). By ignoring other aspects of the Draft Guidelines, Defendants overstate the portion, if any, of the November 10 price drop that relates to exclusivity and, further, baselessly assume that any such price drop indicated that the entire market believed that Alibaba was practicing exclusivity.

Unlike Dr. Hubbard, Dr. Tabak performed a thorough review of analyst commentary following the Draft Guidelines and found that analysts were *not* solely focused on exclusivity. Tabak Reply ¶¶43-58.[10] Instead, market commentators interpreted the Draft Guidelines as Chinese regulators reigning in big e-commerce companies *generally*, not as confirmation that Alibaba was practicing exclusivity. As *The Wall Street Journal* reported, "China has released new draft antimonopoly rules for its online platforms, signaling an increased appetite by Beijing authorities to rein in its dominant technology companies." Ex. P-27 at 1; Ex. P-28 at 1 ("Alibaba slides 9% as regulatory pressure overshadows Singles Day blowout").[11] The ADS price decline following the Draft Guidelines is not evidence of the market's actual knowledge of Alibaba's ongoing exclusivity practices during the Class Period, much less actual knowledge by all market participants.

### 2. Defendants Ignore Public Statements Indicating Alibaba Was Not Using Exclusivity Practices During the Class Period

Defendants cite a handful of analyst reports as a proxy for the market's supposed awareness of Alibaba's ongoing use of exclusivity. Opp. 6-7, 16 (citing Exs. D-3, D-13); Hubbard Rpt. ¶¶86-87. Defendants' cherry-picked market commentary, itself misconstrued or taken out of context (*see* Sec. III.C.3, *infra*), is insufficient to prove the absence of price impact. *Blackberry Ltd.*, 2021 WL 253453,

---

[10] Dr. Hubbard testified that he did not attempt to assess market reaction to other aspects of the Draft Guidelines, including price discrimination, limitations on algorithms and search functions, or VIE-related risks. Hubbard Tr. at 101:22-104:10.

[11] *See also* Ex. D-3 (guidelines "represent[] another wave of regulatory forces on the Chinese Internet giants in the past two years"); Ex. D-10 (guidelines are "the latest wing-clipping of high-flying digital platforms" and noting price drops among Meituan, Alibaba, and Tencent); Ex. D-12 ("the introduction of a series of new regulations in the internet space over the past few days indicates a further tightening of the online economy"); Ex. D-14 (attributing Alibaba's November 10, 2020 ADS price drop to "news of potential for increased antitrust regulation").

11

*21. Defendants' proffer is even less compelling upon review of what they omit. *See* App'x A.

Just days before the Class Period, a July 6, 2020, Goldman Sachs analyst report summarizing a meeting with Defendant Wu stated "[o]n competition, management acknowledges that merchants and brands will *always* try new sales channels, while BABA will remain focused on driving value-add across the whole Alibaba Economy, providing comprehensive solutions to both merchants and consumers." Ex. P-21 at 4 (emphasis in original). Defendant Wu's acknowledgement that merchants were *always* trying new sales channels aligns with the Prior Practices Statement indicating that Alibaba no longer required merchants to trade exclusively with Alibaba.

In addition, in reporting on the Draft Guidelines, multiple analysts reported that Alibaba was in compliance with the guidelines, including, specifically, the provision on exclusivity:

- Nov. 11, 2020, KeyBanc: "[a]ll of our [merchant] interviewees are positive about the guideline as *they can cooperate with other platforms without potential pressure from Alibaba*." Ex. P-31.

- Nov. 20, 2020, Morgan Stanley: "Market concerns around the draft appear to be less of a concern for Alibaba: 1) Concentration risk: eCommerce is one of the least concentrated sectors . . . ; 2) Exclusivity: *Alibaba highlights it does not operate business on exclusivity*. Most brands/merchants have multi-platform strategy but it creates more value add to them by means of continuous innovation in user engagement and supporting tools. In addition, *it sees the proposed guidelines as re-enforcement of existing rules and it already has the most stringent self-regulation in place vs. peers*." Ex. P-33.

- Nov. 25, 2020, Goldman Sachs: "A compliant BABA,…" reported "Alibaba **remains compliant with all rules** in the Draft Guidelines" and "*no merchants are being restricted on their platform*." Ex. P-35 (bold only emphasis in original, bold/italic emphasis added).

- Nov. 25, 2020, J.P. Morgan: "platform leaders (i.e. Alibaba and Tencent) are not too concerned about" the Draft Guidelines, as "their business model and key competitive advantages are *not built on misuse of dominant market position*." Ex. P-36.

Goldman Sachs's use of the phrase "remains compliant" suggests a pre-existing belief that Alibaba was *already* compliant with all rules in the Draft Guidelines, including the prohibition on exclusivity. Tabak Reply ¶23. Moreover, consistent with analyst commentary that Alibaba was *already* compliant with the Draft Guidelines, a November 23, 2020 Reuters article quoted Defendant Zhang embracing the rules as "*very timely and necessary*[.]" Ex. P-34. Zhang's response did not

12

convey to investors that Alibaba was continuing to use exclusivity practices that ran afoul of the rules.

Because the market was efficient, these reports stating that Alibaba did not use exclusivity during the Class Period would have been incorporated into Alibaba's ADS price, supporting price impact. Tabak Reply ¶¶29-37, 42. Indeed, Dr. Hubbard himself testified that major Wall Street firms like Goldman Sachs and Morgan Stanley have a large reach to inform the market. Hubbard Tr. at 108:9-21. And when asked about the Goldman Sachs report at his deposition, Dr. Hubbard gave no credible reason for rejecting it as information that informed the market (and thus impacted the price) other than to suggest, without support, that the market may not have believed the information in the report to the extent it appeared to have come from Alibaba itself and he thought—*incorrectly*—that the same Goldman Sachs analysts had reported contrary information two weeks earlier. Hubbard Tr. at 150:20-153:20, 155:7-156:13, 159:11-161:23; Tabak Reply ¶¶22-28.

To accept Defendants' argument that there is a complete lack of price impact, this Court would have to either (i) conclude that the information in the above reports was immaterial, or (ii) assume (as Dr. Hubbard apparently does) that the market put *zero* weight on it. Neither is supported. Indeed, neither argument is even *discussed* by Defendants or in the Hubbard Report.[12] Moreover, when pressed on whether the information in the November 25 Goldman Sachs report would be incorporated into Alibaba's ADS price, Dr. Hubbard could not deny it. Instead, he said "Maybe yes; maybe no." Hubbard Tr. at 152:13-153:3. "Maybe no" does not prove a complete lack of price impact.

### 3. References to Alibaba's Alleged *Pre-Class Period Conduct* Does Not Prove the Market Knew Alibaba Was Continuing to Practice Exclusivity *During the Class Period*

The other documents Defendants cite do not show the market was aware that Alibaba continued to use exclusivity during the Class Period. *E.g.*, Opp. 6-7; Defs. Exs. 3-4, 9-10, 12-16, 18-21; Hubbard Rpt. ¶¶85, 87-89. First, in contrast to the clear statements that Alibaba was ***not*** using exclusivity cited

---

[12] In the event Defendants try to make such arguments in connection with their sur-reply, the Court should reject it.

13

above, most of Defendants' exhibits refer to mere complaints, allegations, or accusations; they do not state what Alibaba was actually doing during the Class Period. Second, most of the referenced allegations were not even *current*, but rather alluded to pre-Class Period events, such as the 2017 JD.com or 2019 Galanz lawsuits. In other words, Defendants' exhibits largely concern the same pre-Class Period allegations against Alibaba of which the Court was well-aware—and rejected—at the motion to dismiss stage.[13] Defendants fail to show the market's actual knowledge of Alibaba's practices during the Class Period. *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 491-92 (S.D.N.Y. 2011) (Daniels, J.) (declining to certify on other grounds, and holding that public awareness of "potential for conflicts" did not show actual knowledge that Moody's had, in fact, succumbed to conflicts and issued inflated ratings because of it).

For example, Defendants' Exhibit 9 is an analyst report from January 2020—six months before the Class Period—stating, "Merchants this week told the Financial Times that Alibaba is threatening merchants that it won't send shoppers to their products on Tmall if they also sell on Pinduoduo, and that Alibaba is being sued for anti-competitive behavior. Pinduoduo and Vipshop joined a lawsuit that JD.com filed back in 2017." The referenced Financial Times ("FT") article is a January 13, 2020 report describing alleged exclusivity practices by Alibaba ***in June 2019 and earlier***, including the JD.com lawsuit. *See* Ex. P-20. Defendants' Exhibit 10 is a November 10, 2020 FT article on the Draft Guidelines stating, "China's ecommerce industry has long been known for its aggressive tactics. Some online sellers have said for instance that Alibaba unfairly forces them to sell exclusively on its platform, in a tactic known in China as erxuanyi, or 'pick one of two,…'" The words "have said" hyperlink back to the same January 13, 2020, FT article. *See* Ex. D-10 at 2; Wolke Reply Dec. ¶14.

---

[13] *Compare* Opp. 8 (arguing Alibaba's exclusivity practices had "long been a bone of contention") *with* MTD Order 17 (rejecting Defendants' argument "that Alibaba's exclusivity practices were well-known to investors and the public and had been 'subject to public challenge for years'") and *id*. at 18 (rejecting Defendants' arguments "that Alibaba had publicly defended its exclusivity practices and that their use was 'widely covered'").

Defendants' Exhibit 12 is a November 10, 2020 J.P. Morgan analyst report noting the Draft Guidelines "could be" "Potentially negative" for Alibaba and Meituan, as they "have dominant positions in their respective market segments" and "have been accused of forced exclusivity by merchants." Saying the Draft Guidelines *could be potentially negative* for Alibaba and that it *has been accused* of exclusivity in the past is not the same as saying Alibaba is actually continuing to practice exclusivity during the Class Period. A reasonable investor could interpret the report to mean that Alibaba *might* be impacted *if* it is still requiring exclusivity. Under *any* reasonable reading of this report, however, whether and to what extent Alibaba is continuing to require exclusivity is unclear.

Defendants also cite a November 11, 2020 Morgan Stanley report reference to "the use of subsidies, discounts, and traffic support" as aspects of the Draft Guidelines that "could affect Alibaba's promotional activities." Opp. 7, 16 (Ex. D-13). The reference to subsidies and discounts relates to pricing (not exclusivity), and the vague reference to "traffic support" would not inform the market that Alibaba was continuing to require merchant exclusivity.[14] Regarding exclusivity, the report states "complaints over merchant exclusivity have been raised *from time to time about and from platforms, large or small*" (Ex. D-13 at 4)—it does not state, as Defendants argue, that *Alibaba* was practicing exclusivity *at that time*. Instead, the report suggests the opposite, stating "*we think that this will not have as much impact [on Alibaba] as if it had been implemented years earlier. . . . we have seen increasing overlap among brands, merchants, and products over time among platforms despite news reports on 2-choose-1*." *Id*. Investors could interpret this to mean that Alibaba was *not* continuing to practice exclusivity, "despite" news reports of allegations. *See also* Tabak Reply ¶¶38, 41 n.49.

Finally, Defendants' Exhibit 4 is an October 19, 2020 Chinese judicial decision *dismissing* a case against Alibaba brought by a merchant seeking injunctive relief. The court held that the plaintiff

---

[14] Indeed, the Court already rejected Defendants' argument at the motion to dismiss phase that Alibaba's reference to "traffic resource allocation" in its Form 20-F fairly informed investors that Alibaba was continuing to require merchant exclusivity during the Class Period. *See, e.g.*, ECF 61 (Defendants' MTD) at 5-7, 19; MTD Order 18-19.

merchant failed to show that Tmall had performed any exclusive or restrictive conditions against the merchant as alleged. Opp. 6; Ex. P-23 at 15.[15] Not only was the case dismissed, the alleged exclusivity practices detailed therein related to events occurring in 2019, with one final exclusivity allegation in April 2020—*all before the Class Period in this case*. *See* Ex. D-4 at 2, 5, 6. Moreover, there is no evidence that this judicial decision was ever even published publicly.

### D.       The Price Drop Following the SAMR Announcement Is Evidence of Price Impact

The 13% price drop following the December 23, 2020 news that the SAMR, "acting on a tip-off, has launched an investigation into Alibaba Group's alleged monopolistic practices including 'Pick one from two'" is evidence of price impact. ¶30; Ex. P-9; *Vivendi*, 838 F.3d 257-60; *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys*, 594 U.S. 113, 123 (2021) (back-end price drop can evidence artificial inflation).[16] Defendants cannot explain away the price drop as unrelated to Alibaba's undisclosed use of exclusivity practices during the Class Period.

### 1.       Defendants' Argument that the SAMR Announcement Was Neither Corrective Nor a Materialization of Concealed Risks Fails

Defendants' argument that the SAMR Announcement did not reveal anything new about Alibaba's exclusivity practices and/or was the materialization of known risks (Opp. 16-18) merely regurgitates their failed loss causation argument from the motion to dismiss. *See* MTD Order 26-28 (rejecting Defendants' argument "that the December 23, 2020 does not constitute a corrective disclosure, as Alibaba's ongoing exclusivity practices were already known to the market") (internal

---

[15] Ex. D-4 at 14-15 contains a translation error omitting the relevant part of the court's holding that the claimant *had not provided* evidence of its claims. *Compare id. with* Ex. P-23 at 15 (claimant "*had not provided* factual evidence of actual transactions on the Taobao or Tmall platforms where [the] claimed 'choose one from two' behavior cause[d] undue restrictions and damage….").

[16] *See also Ajunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, *17-*24 (S.D.N.Y. Apr. 5, 2024) ("*AP7 v. Goldman*"), *report and recommendation by* Parker, Mag. J. (statistically significant price drop following news of Goldman Sachs executive meeting with architect of Malaysian Development fund scandal established price impact with respect to earlier statements disclaiming Goldman's culpability in scandal); *McIntire*, 38 F.Supp.3d at 435 (price drop after withdrawal of audit opinion "cuts against" defendant's argument that original audit opinion had no impact on stock price).

quotation marks omitted). It failed then, and it fails again now.[17]

Defendants base their argument on Dr. Hubbard's recycled opinion that the market was aware of Alibaba's ongoing exclusivity practices during the Class Period, which is disproven above in Sec. III.C. Moreover, in opining that the SAMR Announcement was neither corrective of any challenged statement nor the materialization of unknown risks (Hubbard Rpt. ¶¶96-105), Dr. Hubbard purports to answer the ultimate question of loss causation, which exceeds his role as an expert. Whether the SAMR Announcement corrected any aspect of the Prior Practices or Antitrust Risk Disclosure Statements, or constituted a materialization of any undisclosed risks embedded in those statements, is a question of loss causation for the finder of fact. *Blackberry*, 2021 WL 253453, *18 ("Plaintiffs argue that Defendants' 'correctiveness' arguments are inappropriate at the Rule 23 stage. Plaintiffs are correct."). While some courts have held that "an inquiry into correctiveness, like newness, is appropriate at the class certification stage," that inquiry is limited to "whether the information in the alleged corrective disclosure relates to the same subject matter [as the misrepresentation] or is wholly unrelated." *Chicago Bridge*, 2020 WL 1329354, at *5, *6; *see also* Tabak Reply ¶40.[18] Here, the alleged corrective disclosure is clearly related to the subject matter of the alleged misstatements.

Defendants' reliance on the Second Circuit's 2018 *Goldman* opinion also fails. Opp. 17 (citing *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485-86 (2d Cir. 2018)). Defendants argue "the court found that the district court erred in not considering evidence of 34 dates on which various news sources purportedly revealed the same information contained in the alleged corrective disclosure" and claim that "Defendants have identified even stronger evidence here." Opp. 17. They

---

[17] Defendants concede their argument is contrary to the Court's loss causation holding but claim the evidence changes the outcome. Opp. 18, n.8. As discussed in Sec. III.C, it does not. Moreover, discovery is still in its relatively early stages and the record on loss causation far from fully developed.

[18] As *Goldman 2023* recognizes, the "front- and back-end" matching inquiry for assessing price impact from a corrective disclosure is distinct from assessing the "causal link" element of loss causation, which includes determining whether a statement is corrective. *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) ("*Goldman 2023*")

17

point to "Professor Hubbard's analyses of more than 2,000 analyst reports and more than 3,000 news articles" to argue that the market knew prior to the SAMR Announcement that "Alibaba was practicing exclusivity during the putative Class Period." *Id.* Not only did Dr. Hubbard admit at his deposition to reviewing *nowhere close* to 5,000 analyst and news reports, instead reviewing only the handful of sources actually quoted in his expert report (*see* Hubbard Tr. 140:18-141:23), both Defendants and Dr. Hubbard blatantly ignore the most relevant and only directly on-point analyst reports during the Class Period that told the market that Alibaba was ***not*** practicing exclusivity. *See* Sec. III.C.2, *supra*; *see also* Tabak Reply ¶¶20-23, 28; App'x A. Defendants cannot argue the SAMR Announcement was not corrective by ignoring information during the Class Period that shows it was.[19]

Certainly, Defendants cannot show that the market knew and priced in the full magnitude and extent of Alibaba's exclusivity practices, and the risks thereof, which led to (and were ultimately confirmed by) the SAMR investigation. *Cf. Vivendi*, 838 F.3d at 255-56 (defendants did not prove a complete lack of price impact where full magnitude of Vivendi's liquidity risk was not known). Dr. Hubbard conceded that he made no attempt to discern whether the full extent of Alibaba's exclusivity practices was known to the market before the SAMR announcement. Hubbard Tr. at 187:7-188:11. Thus, the presence of fraud-related price impact has not been ruled out. Tabak Reply ¶39.

---

[19] Defendants' citation to Judge Sullivan's concurrence in *Goldman 2023* does not support a lack of price impact. Opp. 19. Judge Sullivan believed that certification could be denied on a simpler basis than the majority analysis, to wit, his determination that there were 36 news reports that "revealed Goldman's conflicts of interest (including ones concerning the Hudson and Abacus transactions specifically), and yet had no measurable impact on Goldman's share price." 77 F.4th at 107. In other words, Judge Sullivan believed the evidence supported a conclusion that the alleged misrepresentations had, in fact, been fully disclosed prior to the alleged corrective disclosure. By contrast here, they were not. *See* Sec. III.C.

Defendants' citation to *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023), Opp. 16-17, fails for the same reasons. *Qualcomm* examined whether price impact existed for alleged misstatements about Qualcomm's licensing activity. The plaintiffs alleged Qualcomm misled investors to believe it granted broad technology licenses to chip manufacturers, while the defendants argued the market knew that Qualcomm only licensed its technology for device-level use. The court found there was ample public evidence that the company used device-level licensing, such that there was no price impact for the challenged licensing statements. 2023 WL 2583306, *12-*13. By contrast here, the evidence does ***not*** show that the market was aware of Alibaba's ongoing use of exclusivity practices during the Class Period.

### 2.   Defendants Fail to Prove the Price Drop Was Due Entirely to Confounding News

Defendants next claim that "the size of the drop is *also* attributable to the market's uncertainty as to the timeline for resolution and expected severity of SAMR's punishment" as well as confounding news relating to Ant Group. Opp. 19 (citing Hubbard Rpt. ¶¶118-21, 126-27, Exs. D-25, D-26). But to prove the absence of price impact, Defendants must show the drop was due entirely to non-fraud-related news. Put another way, Defendants must show the price decline on December 24, 2020 was *completely unrelated* to the challenged statements about Alibaba's exclusivity practices and its related regulatory/legal compliance because the market had already fully priced in those risks. *E.g.*, *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n.18 (2d Cir. 2020), *rev'd on other grounds*, 141 S. Ct. 1951 (2021) (defendants "must demonstrate…that [ ] other events explain the entire price drop"); *AP7 v. Goldman*, 2024 WL 1497110, at *24. Defendants fail to do this.

Regarding the market's reaction to investigation "uncertainty," Dr. Hubbard merely states that uncertainty accounts for "*a portion*" of the December 24, 2020 price drop. Hubbard Rpt. ¶120. And as Dr. Tabak explains, such uncertainty about the timeline and severity of any investigation outcome would exist whether investors previously believed Alibaba was practicing exclusivity or not. Tabak Reply ¶¶63-64. Nothing about the analysts' reactions discussing regulatory uncertainty in Defendants' Exhibits D-25 ("Regulatory impact remains unclear") or D-26 (citing "uncertainty over the investigation outcome") is even *inconsistent* with a finding of price impact, let alone proves its absence. *Waggoner*, 875 F.3d at 106 ("the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered"). In fact, as Dr. Tabak explains, any uncertainty exhibited in high implied volatility is indicative of price impact: there would be more uncertainty and volatility in response to the SAMR investigation from a market previously unaware that Alibaba was continuing to practice exclusivity than a market that knew all along Alibaba was doing it and had thus priced in

19

the risk. Tabak Reply ¶64. To the extent any of the price drop was due to uncertainty, Defendants fail to prove that the uncertainty itself was unrelated to the alleged fraud.

Defendants' argument that news of an Ant Group regulatory meeting "also played a role" in the price drop likewise fails. Opp. 19. "[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Waggoner*, 875 F.3d at 105 (emphasis in original); *AP7 v. Goldman*, 2024 WL 1497110, at *21 ("Insofar as Defendants' own expert has not attempted to measure the extent to which this confounding news impacted the price drop on November 9, there is no economic evidence entirely disproving price impact for November 9. Even if the confounding news had some negative impact on the stock price, that does not fully rebut price impact as is required to avoid class certification."). Whereas Defendants fail to quantify that the *entirety* of the price drop was due to non-fraud-related factors, they fail to prove the complete absence of price impact. Tabak Reply ¶¶56-61.

### 3.    There Is No "Fatal Mismatch" Between the Statements and the Price Drop Under *Goldman 2023*

Defendants try to manufacture a "mismatch" where none exists. Opp. 20-21 (citing *Goldman 2023*, 77 F.4th at 80). To be sure, a mere lack of "verb tenses" in the SAMR Announcement does not create a "fatal mismatch" between the Prior Practices and Antitrust Risk Disclosure Statements (relating to Alibaba's exclusivity practices) and the investigation announcement (relating to Alibaba's exclusivity practices).

Defendants' own exhibits support that the SAMR was investigating current conduct. As *The Wall Street Journal* reported, "[t]he country's antimonopoly regulator said in its statement Thursday that it was ***acting on reports that Alibaba was pressuring merchants*** who sell goods on its platforms to commit to not selling on its competitors' platforms." Ex. D-21 at 2. There ***is no evidence*** to support Defendants' argument that the SAMR decided, unprompted by any contemporaneous report, to

20

suddenly act on years-old accusations. Instead, the most Defendants say is that their interpretation is "consistent[] with" a conclusion that the SAMR was investigating exclusively pre-Class Period conduct. Opp. 20. But an argument that the SAMR Announcement can be read "consistently with" Defendants' theory does not foreclose price impact. In fact, the *only* evidence in the record regarding Alibaba's use of exclusivity during the Class Period clearly shows that, unbeknownst to the public, Alibaba was still using various exclusivity practices during the Class Period, which prompted the SAMR to launch its investigation in late December 2020 when SAMR was "tipped off," and ultimately resulted in the SAMR having to order Alibaba to cease exclusivity practices in 2021. ECF No. 55-8 (April 10, 2021 SAMR Report, finding Alibaba used various exclusivity practices throughout 2020, and ordering Alibaba to cease using the practices). Like investors, the SAMR appears to have been fooled by Alibaba to believe it had stopped using merchant exclusivity practices—until the SAMR was "tipped off" otherwise and launched the investigation.

Far from "untethered" (Opp. 21), this case "present[s] a tight fit between corrective disclosure and misrepresentation" and there is "no question" "that the corrective disclosure directly implicated not just the same topic, but the alleged misstatements themselves." *Goldman 2023*, 77 F.4th at 97.

### 4. Market Commentary and a Price Increase *After* the Class Period Is Not Evidence of What the Market Believed *During* the Class Period

Analyst commentary after the Class Period also fails to show that the market was aware of Alibaba's exclusivity practices during the Class Period. Opp. 3, 8, 16; Ex. D-17–D-19. One analyst's professed lack of "surprise" about the investigation (Ex. D-17) does not prove that the market was aware during the Class Period that Alibaba was continuing to practice exclusivity. *Blackberry Ltd.*, 2021 WL 253453, *21. Defendants also misrepresent what a December 24, 2020 Bank of America report said. Opp. 3, Ex. D-18. Bank of America did not profess a lack of surprise as to the SAMR investigation into Alibaba's Choose One of Two practices. Rather, it stated with respect to ecommerce

*generally* that "it's not a big surprise to us that eCommerce (eC) emerged as a focus area" of regulators' anti-trust concerns, citing three reasons, including that "eC accounts for close to 30% of all retail sales," that it's "rational for the authorities to focus on the largest market to make a statement," and, finally, that "[t]here has been more media attention on the eC market's practices," referencing "predatory pricing, price discrimination, and especially, forced exclusive supply deals with merchants, are some of the frequently reported areas. *E.g. JD launched a complaint against Alibaba on forced exclusivity in Nov 17*." Ex. D-18. Thus, the Bank of America report merely referenced the same pre-Class Period exclusivity allegations against Alibaba as much of Defendants' other evidence.[20]

Finally, the ADS price increase in April 2021 after the fine was announced is not evidence of a lack of price impact. Opp. 4, 19. Investors were relieved the regulatory headwind had passed. *E.g.*, Ex. P-39 ("SAMR penalties bring closure, removing overhang"). That investors were relieved the investigation was over and that the SAMR imposed less than the maximum penalty is irrelevant to what they knew about Alibaba's exclusivity practices during the Class Period. Tabak Reply ¶65.

> E.    **The 'Growth And Revenue Statements' Are Not Impermissibly Generic Under** *Goldman 2023*

Defendants' final attack on price impact argues that under *Goldman 2023*, the challenged Growth and Revenue Statements are too generic to support an inference of price impact. Opp. 21-22. In so arguing, however, Defendants ignore most of the specific statements on merchant retention that Plaintiffs allege to be misleading. For example, Alibaba's Form 20-F stated "The marketplaces of our core commerce business attract and retain a large number of consumers and merchants. We primarily generate revenue from merchants." ¶256. Alibaba's 1Q 2021 Form 6-K claimed "The growth of

---

[20] Defendants' Exs. 19-21 similarly refer to the same pre-Class Period allegations which reveal nothing about the market's knowledge of Alibaba's exclusivity practices during the Class Period. Ex. D-19 ("BABA has been accused of [forced exclusivity] for several years"); Ex. D-20 ("In a lawsuit last year…."); Ex. D-21 (regarding JD.com and Pinduoduo allegations, noting "a former senior Alibaba executive called [the practices] 'standard market practice' in a social media post last year"—*i.e.*, in 2019).

customer management revenue was primarily due to increased revenue contribution from new monetization formats, including recommendation feeds, as well as the increase in volume of paid clicks in search monetization." ¶261. As the Court held, Alibaba's discussion of the source of its success and merchant retention in these statements gave rise to a duty to tell the whole truth, to wit, "that these trends were due, at least in part, to the Company's ongoing, undisclosed use of merchant exclusivity." MTD Order 20 (citing *Meyer*, 761 F.3d at 250).

These challenged statements about Alibaba's merchant retention and revenue are markedly more specific than the rosy statements about Goldman's reputation and its general conflicts-related risk disclosures at issue in that case. 77 F.4th at 101-02. Notably, the Second Circuit in *Goldman 2023* observed "the duty to disclose more is triggered only where that which is disclosed is sufficiently specific." *Id.* at 102. The Second Circuit held that what *was* disclosed in challenged risk disclosures was *not* sufficiently specific to give rise to a further duty to disclose specific wrongdoing. Here, by contrast, Defendants made *specific* statements about merchants and revenue that gave rise to a further duty to disclose Alibaba's continued use of exclusivity. MTD Order 20.

Moreover, the Second Circuit in *Goldman 2023* instructed that its "searching price impact analysis" must be conducted where "(1) there is a considerable gap in front-end–back-end genericness,…(2) the corrective disclosure does not directly refer…to the alleged misstatement, ***and*** (3) the plaintiff claims…that a company's generic risk-disclosure was misleading by omission." 77 F.4th 102. Two of the three conditions requiring a "searching price impact analysis" are not present here. There is no "considerable gap" in genericness between the Growth and Revenue Statements and the corrective disclosure; rather, both implicate Alibaba's exclusivity practices. Nor are the Growth and Revenue Statements generic risk disclosures that are misleading by omission. To the extent the Second Circuit instructs that courts should ask "whether the disclosure as written is specific enough to evoke investor reliance," 77 F.4th 101, this Court has already answered that question with respect

23

to the Growth and Revenue Statements in the affirmative, and it should continue to do so. Defendants fail to prove a lack of price impact with respect to these challenged statements.

## IV.   THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE ALSO APPLIES

In arguing that a case can *never* be suitable for both the *Basic* presumption of reliance for misstatements and the *Affiliated Ute* presumption of reliance for omissions, Defendants overstate the holding of *Waggoner*. Opp. 24. *Waggoner* does not stand for the broad proposition that a securities case can *never* be appropriate for certification under *Affiliated Ute* just because the case also involves misrepresentations. Rather, *Waggoner* held that the *Affiliated Ute* presumption did not apply "because the Plaintiffs' complaint is based ***primarily*** on allegations of affirmative misrepresentations, not omissions." 875 F.3d at 95. In *Schwab v. E\*Trade Fin. Corp.*, the Second Circuit reiterated that the *Affiliated Ute* presumption of reliance for plaintiffs alleging a violation of §10(b) or Rule 10b-5 "is appropriate in cases involving primarily a failure to disclose, where a defendant both (1) had a duty to disclose and (2) omitted a material fact." 752 F. App'x 56, 58-59 (2d Cir. 2018).

Indeed, even after *Waggoner* and *Schwab*, courts in the Second Circuit have continued to hold that cases alleging both misstatements and omissions may be amenable to both presumptions of reliance. *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't. Holdings, Inc.*, 338 F.R.D. 205, 216 (S.D.N.Y. 2021) (§10(b) claims that involved both misstatements and omissions could proceed under both *Affiliated Ute* and *Basic*); *Baliga v. Link Motion, Inc.*, 2022 WL 16707361, at \*11 (S.D.N.Y. Nov. 4, 2022) ("There is ample support post-*Waggoner* and *Schwab…*for the proposition that *Affiliated Ute* applies even 'when a complaint alleges both misstatements and omissions'" and holding *Affiliated Ute* applied even though the case alleged misstatements); *Puddu v. NYGG (Asia) Ltd.*, 2022 WL 2304248, at \*4 (S.D.N.Y. June 27, 2022) ("Wey's misrepresentations do not render the *Affiliated Ute* presumption inapplicable. As many courts in this District have recognized, the *Affiliated Ute* presumption can still apply when a complaint alleges both misstatements and omissions.").

24

The *Affiliated Ute* presumption of reliance is available to Plaintiffs here because, as this Court observed, Plaintiffs' claims are rooted in half-truths rendered misleading by omission. MTD Order 16 (stating "Many of Plaintiffs' Exchange Act claims relate to the omission of material information, as opposed to an affirmative misstatement of fact."); *id.* at 18- 23.

Moreover, the core omission at issue here is not merely the "inverse" of the challenged statements. *Cf. Baliga*, 2022 WL 16707361, *12. For example, the omitted truth—that Alibaba continued to use a host of Choose One of Two exclusivity practices during the Class Period after being explicitly instructed by the SAMR to stop—is not the mere inverse of the statement that "[a]lthough we believe that our business practices do not violate anti-monopoly or unfair competition laws, due to our large scale of business and close media attention, there can be no assurance that regulators will not initiate anti-monopoly investigations into specific business practices we have adopted." ¶¶253, 255(b), (c). Those statements were half-truths rendered misleading by the central omission that Alibaba was still practicing exclusivity, but those statements are not the mere inverse of that material fact.

In sum, all investors who bought during the Class Period were harmed by the same central omission which rendered the Challenged Misstatements misleading: throughout the Class Period, Alibaba continued to use unlawful Choose One of Two exclusivity practices which subjected it to an extremely heightened risk of regulatory intervention and penalties. Thus, in addition to the *Basic* presumption of reliance, Plaintiffs are entitled to invoke *Affiliated Ute*.

## V.    **CONCLUSION**

Defendants fail to prove a complete lack of price impact by a preponderance of the evidence. Plaintiffs' motion for class certification should be granted in its entirety.

Dated: April 19, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
Melissa C. Wright (*pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
kwolke@glancylaw.com
mwright@glancylaw.com

*Lead Counsel and proposed Class Counsel*

Jeremy A. Lieberman
Jonathan D. Park
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
jpark@pomlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
pdahlstrom@pomlaw.com

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
peretz@bgandg.com

Frank R. Cruz
THE LAW OFFICES OF FRANK R. CRUZ
1999 Avenue of the Stars
Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
info@frankcruzlaw.com

26

Lesley Portnoy
THE PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: 310-692-8883
lesley@portnoylaw.com

*Additional Counsel*

## PROOF OF SERVICE

I hereby certify that on this 19th day of April, 2024, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Kara M. Wolke*
Kara M. Wolke

**Appendix A – Public statements indicating Alibaba was not practicing merchant exclusivity during the Class Period**

| Date | Event/Document | Statement/Relevant Quote | Record Cite |
|---|---|---|---|
| July 6, 2020 | Goldman Sachs analyst report titled "Takeaways from meeting with CFO: The market leader remains well positioned and committed" | "**Alibaba's key strengths remain unchallenged with its top league services/solutions, despite competition**<br><br>On competition, management acknowledges that merchants and brands will ***always*** try new sales channels, while BABA will remain focused on driving value-add across the whole Alibaba Economy, providing comprehensive solutions to both merchants and consumers." | Ex. P-21 at 4 (bold and bold/italic emphasis in original). |
| July 9, 2020 | Alibaba's Fiscal Year 2020 Form 20-F | "On several recent occasions, including at administrative guidance meetings attended by internet platform companies including our Company, the SAMR has indicated its view that certain business arrangements adopted by ecommerce platforms, including arrangements seen as exclusivity arrangements, may constitute violation of the anti-monopoly and unfair competition laws. The SAMR also indicated its intention of initiating investigations into these arrangements.<br><br>The PRC Anti-monopoly Law provides a private right of action for competitors, business partners or customers to bring anti-monopoly claims against companies. In recent years, an increased number of companies have been exercising their right to seek relief under the PRC Anti-monopoly Law.  Some of these companies, including our competitors, business partners and customers, have resorted to and may continue making public allegations or media campaigns against us, submitting complaints to regulators or initiating private ligation that targets our prior and current business practices, such as our market approach with traffic resource allocation on our ecommerce platforms, which we base on multiple factors, and our ***prior narrowly-deployed exclusive partnerships***. Although ***we believe that our business practices do not violate anti-monopoly or unfair competition laws***, due to our large scale of business and close media attention, there can be no assurance that regulators will not | Defs. Ex. 1 at 39. |

| | | initiate antimonopoly investigations into specific business practices we have adopted."[1] | |
|---|---|---|---|
| July 17, 2020 | "20 Internet platform companies jointly promise to maintain a good market order and promote the healthy development of the industry," published by SAMR and The Paper | Reporting that Alibaba signed the Commitment Letter with SAMR, wherein Alibaba committed to "[f]ollow the basic principles of voluntary participation, equality, fairness, and honesty, *respect the independent choice of platform operators within the platform, do not compel platform operators to engage in 'exclusive cooperation' or 'exclusive authorization,' and do not impose unreasonable restrictions or attach unreasonable conditions on platform operators' choice of platforms*." | Ex. P-22 at 2.[2] |
| October 24, 2020 | "Internet Platform Enterprises Fulfill Their Commitments, Compete Fairly, and Regulate Development \| Assume Responsibilities, Starting from Upholding Their Commitments," published by China Market Regulation News | "Reporter: During the symposium on 'Maintaining a Healthy Market Order of the Platform Economy and Promoting the Industry's Sound Development' hosted by the State Administration for Market Regulation, Alibaba and other 20 Internet platform enterprises signed the "Commitment of Internet Platform Enterprises to Maintain a Healthy Market Order and Promote Industry's Sound Development,'" . . . "Regarding the six aspects of the commitment, what specific measures has Alibaba taken primarily to fulfill them?"<br><br>Alibaba's VP of Public Affairs, Hongbin Gao, stated, in relevant part:<br><br>"*Alibaba consistently adheres to laws and regulations…. Following the signing of the commitment letter, Alibaba has conducted multiple training sessions and assessments of laws and regulations such as the Anti-Unfair Competition Law, the E-commerce Law, and the Anti-Monopoly Law within the Group*, while | Ex. P-24 at 1, 2-3. |

---

[1] Unless otherwise noted, emphasis is added. The same statements were made in Alibaba's Form 6-K filed with the SEC on November 13, 2019 (Ex. D-6 at 22), in Alibaba's Global Offering Listing Documents, filed with Hong Kong Stock Exchange on November 15, 2019 (Ex. D-23 at 102-03), and in a Form 6-K filed with the SEC on July 13, 2020 attaching Alibaba's Hong Kong Annual Report for FY 2020 (Ex. D-5 at 250).

[2] The SAMR published the Commitment Letter on its website and it was thereafter reported on by The Paper, a leading Chinese digital media outlet (Ex. P-22). In the Complaint, Plaintiffs alleged based on information and belief that the meeting wherein the Commitment Letter was signed occurred "in or around early July 2020." ¶114. Defendants subsequently clarified during discovery that the meeting in fact took place on or about June 22, 2020.

| | | continuously enhancing its management system and review processes, ***and refusing to tolerate any acts of unfair competition, whether participated directly or indirectly by internal personnel***. For example, Alibaba has launched the 'Fat Boy Says Compliance' campaign within the company, which simplifies the relevant provisions of the Anti-Monopoly Law in plain language and widely promotes and publicizes them within the company." <br><br> * * * <br><br> "Alibaba has consistently upheld the fundamental principles of voluntariness, equality, fairness, and good faith***, vehemently opposed the use of technical means to compel or coerce merchants into signing exclusive agreements***, ensured that merchants maintain equal bargaining positions in ecommerce activities, and ***preserved their rights to independent operation and choices. Alibaba has also adamantly opposed unfair competition tactics on the platform that prohibit catering merchants from using other online takeaway platforms, fully respects merchants' right to make their own choices, and refrains from forcing or imposing interference in their business activities across different platforms***."[3] | |
|---|---|---|---|
| November 11, 2020 | KeyBanc analyst report titled "China Internet – ALERT: Initial Thoughts on New Regulatory Guideline about Anti-Monopoly" | "Recently, the Chinese government issued a new anti-trust guideline (but not a law) for the internet platform economy, which specifies details about compliance of business practice in competition. This appears to create market concern on potential impact to leading internet companies such as BABA, Tencent, Meituan, Trip.com, to lesser extent on JD, PDD, VIPS, BIDU etc. That said, we believe the intention of regulators is to assure development of innovations through fair environment for competition instead of breaking up the internet giants. Despite potential impact on their business if those internet companies fully comply with the guideline, we don't expect significant changes in either those companies' core business or the industry landscape as we believe core competence of the leading companies is not replying on unfair competition, but on management of business operation, technology, | Ex. P-31 at 1. |

---

[3] Similar reports were made in two additional publications on October 28, 2018. *See* Ex. P-25 ("Assuming Responsibility Starts with Fulfilling Commitments: An Exclusive Interview with Hongbing Gao, the Vice President of Alibaba Group and the President of Alibaba Research Institute" published by China Consumer News Network); Ex. P-26 ("Hongbing Gao: Assuming Responsibility Starts with Fulfilling Commitments!" published by Chinese media outlet Sohu.com)

| | | | |
|---|---|---|---|
| | | product development, strategic investment, and so on. This is supported by our quick conversations with a few brand merchants on the e-commerce side. ***All of our interviewees are positive about the guideline as they can cooperate with other platforms without potential pressure from Alibaba***; that said, they also believe it will create incremental sales rather than share shift from Alibaba to other platforms as customers are different and Alibaba still remains the top choice channel given its topnotch capabilities of digital marketing, data analytics, and business operation. Therefore, we think there is more headline risk than real risk to the core business for those leading companies." | |
| November 20, 2020 | Morgan Stanley analyst report titled "Virtual Asia Pacific Summit Feedback" | "Market concerns around the draft appear to be less of a concern for Alibaba: 1) Concentration risk: eCommerce is one of the least concentrated sectors (vs. social, travel, food delivery, etc); 2) Exclusivity: ***Alibaba highlights it does not operate business on exclusivity. Most brands/merchants have multi-platform strategy*** but it creates more value add to them by means of continuous innovation in user engagement and supporting tools. In addition, ***it sees the proposed guidelines as re-enforcement of existing rules and it already has the most stringent self-regulation in place vs. peers***." | Ex. P-33 at 1. |
| November 25, 2020 | Goldman Sachs analyst report titled "Alibaba Group (BABA): A compliant BABA, aligned with China's LT goals; reiterate Buy (CL)" | "Alibaba Group (BABA): ***A compliant BABA***, aligned with China's LT goals; reiterate Buy (CL)"<br><br>We hosted Alibaba for investor meetings on Nov. 23, 2020. Alibaba **remains compliant with all rules** in the Draft Guidelines published on Nov 11, 2020 (see note here), and management expects limited impact on their growth trajectory.<br>* * *<br>**Key Takeaways from conference call**<br>**1) Anti-monopoly law: Alibaba is compliant, and aligned with China's long-term goals**<br>***BABA remains compliant with rules***, with its continuous efforts toward eliminating fraudulent/misconduct behavior on its platform, e.g. brushing, fake products. ***Further, no merchants are being restricted on their platform***. | Ex. P-35 at 1 (bold only emphasis is in original; bold/italic emphasis is added). |

| November 25, 2020 | J.P. Morgan analyst report titled "8th Global TMT conference takeaways" | "China Internet 8th Global TMT conference takeaways"<br><br>"While smaller companies are generally excited about introduction of the anti-trust law in the Internet space, *platform leaders (i.e. Alibaba and Tencent) are not too concerned* about it as: 1) *their core-core businesses operate in a highly competitive environment*, and 2) *their business model and key competitive advantages are not built on misuse of dominant market position*." | Ex. P-36 at 1. |
|---|---|---|---|
| November 27, 2020 | Goldman Sachs analyst report titled "This Week in Global Research – November 27, 2020" | "**BABA.** Piyush Mubayi believes the Chinese internet company is compliant with China's new anti-monopoly rules, limiting regulatory overhangs, and expects upside from accelerating Livestreaming and cloud in 'Reiterate Buy (CL).'"[4] | Ex. P-37 at 3 (emphasis in original). |
| December 16, 2020 | Goldman Sachs analyst report titled "Takeaways from meeting with CFO: Business on track; reiterate Buy (on CL)" | "In view of the recent spotlight on **<u>anti-trust regulation</u>**, the CFO noted the relatively fragmented ecommerce market vs. other verticals (Exhibit 1), and believes BABAs development roadmap *remains well aligned with China's long-term goals of encouraging innovation and fostering domestic demand*."<br><br>* * *<br><br>"Key takeaways from the meeting<br>**1) Regulatory developments: Alibaba's strategy is aligned with China's long-term goals; will work with regulators to ensure development stability**<br>*Overall, BABA views the recent anti-trust regulation as posing industry-wide implications instead of targeting specific players*, with the purpose of better aligning the internet industry with the country's goals, where BABA believes it is well positioned." | Ex. P-38 at 1, 3 (bold and bold/underline emphasis in original; bold/italic emphasis added). |

---

[4]Piyush Mubayi was a Goldman Sachs Managing Director and head of Asia Internet, Telecom, and Media Research.

**Appendix B – Alibaba's denials of exclusivity practices alleged by JD.com and others**

| Date | Event/Document | Statement/Relevant Quote | Record Cite |
|---|---|---|---|
| November 3, 2015 | Reuters article, "*Alibaba 'strongly denies' accusations in JD.com complaint*" | "China's Alibaba Group Holding Ltd 'strongly denies' accusations that the country's second-largest e-commerce company JD.com Inc made in a letter of complaint it sent to a Chinese anti-trust regulator. <br><br> '***We strongly deny the accusations***,' Alibaba spokesman Rico Ngai said. '***Alibaba welcomes competition as it benefits consumers, merchants and service providers***.' <br><br> JD.com's complaint concerned a State Administration for Industry and Commerce (SAIC) regulation which forbids e-commerce platforms from limiting or barring their merchants from participating in promotions on other platforms. <br><br> The regulation came into effect on Oct. 1." | Ex. P-14 |
| September 28, 2017 | Women's Wear Daily article, "*Alibaba Denies Pressuring 44 Brands to Leave JD.com*" | "HONG KONG – ***Alibaba has denied pressuring brands to leave JD.com*** in the wake of a report that 44 brands have closed their flagships on Alibaba's biggest rival at the behest of the Tmall-owner. <br><br> '***Brands have full autonomy*** to maximize their ROI ***in choosing their distribution platforms***,' Alibaba said. <br><br> 'The more than 100,000 brands who do business with Alibaba make the decision to be on our platform because they see Alibaba's unique value proposition,' it continued. 'With Alibaba, brands reach more than half a billion consumers, own the data and the analytics that provide robust consumer insights, and they get access to superior technologies that enable deep consumer engagement, both online and offline.'" | Ex. P-15 |
| June 26, 2019 | Nomura analyst report, "*China e-commerce – Signs of upcoming regulatory* | "[Alibaba] was accused by Galanz (a leading domestic microwave manufacturer), on its Weibo account, of inappropriately diverting traffic away from Galanz's Tmall-based flagship store during the 6.18 promotion period, which Galanz attributed to the fact that it has recently cooperated with Pinduoduo (PDD US, not rated) and launched its flagship store on the latter's platform. ***Tmall has denied any wrongdoing***. This incident broke out at a bad time for Alibaba, as it coincided with | Ex. P-16 |

| | | | |
|---|---|---|---|
| | *headwinds – Quick Note"* | regulators' increased scrutiny on ecommerce practices. If regulators eventually intervene in the Galanz incident and if, unfortunately, Alibaba is deemed by regulators to have misused its market dominance, Alibaba's grip on brands and merchants could be weakened, which may give an opportunity to its competitors like JD (JD US, Buy) and PDD to woo those desired brands to open flagship stores on their marketplaces, in our view. Nevertheless, we think Alibaba's expertise on operating online marketplace and its advanced infrastructure (in both IT and big data marketing services) are still far ahead of any competitors." | |
| January 6, 2020 | Bloomberg News article, *"China Targets Internet Giants in Antitrust Law Overhaul"* | "(Bloomberg) -- China has included the internet industry for the first time in an envisioned overhaul of its anti-monopoly laws, potentially giving regulators the power to rein in the country's increasingly dominant technology giants. Proposed revisions to the Anti-Monopoly Law, published last week, included language that accords regulators responsibility to monitor the impact that internet companies have on the online sector, their scale and their ability to control products and services.<br><br>* * *<br><br>'This definitely casts a spotlight on the internet sector and how it does business,' Ning wrote. 'As we understand it, singling out the internet sector signals a new-found focus on the industry's unique characteristics and is intended to ensure room for its expansion. Also, it signals a renewed focus on the internet, and on internet platforms in particular.'<br><br>***JD.com Inc., for instance, has accused bigger rival Alibaba of unfairly locking in exclusive agreements with merchants, which Alibaba has denied***." | Ex. P-19 |
| January 13, 2020 | Financial Times article, *"Sellers asked to choose in battle between Alibaba and Pinduoduo"* | "Alibaba is fighting back against Pinduoduo, which has rapidly built an annual customer base of 536m people, three-quarters of Alibaba's 693m total in China, through heavy discounts, games and group-buying promotions. It is now Alibaba's main competition, displacing JD.com, which has 334m customers.<br><br>In response, merchants say they are being asked by Alibaba to 'erxuanyi', or 'pick one of two', a tactic that has already drawn two lawsuits for anti-competitive behaviour. | Ex. P-20 |

| | | One of those has come from the world's largest microwave oven maker, Galanz Group, one of the few companies brave enough to speak out publicly against Alibaba's pressure campaign.<br><br>* * *<br><br>This autumn Galanz filed a complaint in a court in Guangzho. A company spokeswoman said that Tmall was abusing its dominant market position and violating China's antitrust law. 'It's caused massive economic harm to our company,' she said.<br><br>Pinduoduo claimed in a call with analysts in November that more than 10,000 sellers on its site had seen their business affected by a rival 'forcing merchants to take sides'.<br><br>A spokesperson for Alibaba said: '***It's understandable that smaller platforms with fewer and limited resources and services, who can't match what we offer, feel overwhelmed. Some have chosen to 'cry foul' as a business tactic, appealing to regulators and the courts, trying to slow the market down. That ultimately won't work***.'<br><br>The spokesperson added: '***If a brand's product offering is relevant, and their price is competitive on our marketplace, it will organically show up. It's not about other platforms***.'" | |
| November 11, 2020 | Macau Daily Times article, "*China clampdown on big tech puts more billionaires on notice*" | "Representatives from Alibaba, Tencent, TikTok-owner ByteDance Ltd. and 24 other tech giants attended a meeting with regulators from the antitrust and cyberspace authorities earlier this month to discuss issues ranging from unfair competition to counterfeiting. 'Internet platforms are not outside the reach of antitrust laws, nor are they the breeding ground for unfair competition,' the regulators said in a subsequent statement.<br><br>* * *<br><br>***JD.com, for instance, has accused bigger rival Alibaba of unfairly locking in exclusive agreements with merchants, which Alibaba has denied***. Regulators have investigated the legality of Cheng Wei's Didi Chuxing acquiring Uber Technologies Inc.'s Chinese business. And Tencent's WeChat dominates many | Ex. P-30 |

| | | aspects of daily Chinese life from payments to gaming, though ByteDance, co-founded by Zhang Yiming, has in recent years begun to eat into its advertising business through video service Douyin and news platform Toutiao." | |
|---|---|---|---|