# EXHIBIT 11

**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Alibaba Group Ltd. Securities Litigation | Master File No. 1:20-CV-09568-GBD-JW |

# EXPERT REPLY REPORT OF DAVID I. TABAK, PH.D.

## I.     SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.   This report concerns "a federal securities class action on behalf of all purchasers of Alibaba's American Depositary Shares ('ADS') during the period July 9, 2020 through and including December 23, 2020 (the 'Class Period'), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the 'Exchange Act') and Rule 10b-5 promulgated thereunder (the 'Class')."[1]  Because the first alleged misstatement is a Form 20-F filed after the close of the trading day on July 9, 2020, the Class Period is assumed to start on July 10, 2020, which is the period that Plaintiffs seek to certify.[2]

2.   On October 5, 2023, I submitted a report ("Tabak Report") in this matter in which I opined that Alibaba's ADSs traded in an efficient market and that it would be possible to calculate damages for investors in Alibaba's ADSs through a common methodology. On January 19, 2024, Glenn Hubbard submitted a report ("Hubbard Report") that did not challenge either of the two opinions that I provided but argued that "the alleged

---

[1]Amended Consolidated Class Action Complaint dated April 22, 2022 ("Complaint"), ¶1. (Closing footnote omitted.)

[2] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, p.1.

misrepresentations did not have an impact on, and thus did not cause inflation in, Alibaba's ADS price."[3]  On March 21, 2024, Dr. Hubbard was deposed ("Hubbard Depo.").

3.   In this report, I dispute the conclusions in the Hubbard Report, specifically its conclusion that there is a lack of price impact from the alleged omissions and misrepresentations in this matter.  As discussed below, I find that the Hubbard Report's conclusion is incorrect because it repeatedly ignores, or Dr. Hubbard rejects, evidence that contradicts its conclusion.

## II.    QUALIFICATIONS AND REMUNERATION

4.   My qualifications and remuneration are as set out in the Tabak Report.  Exhibit 1 lists my additional testimony since the Tabak Report.

## III.    MATERIALS CONSIDERED

5.   Materials considered for the purposes of this report beyond those already listed as considered for the purposes of the Tabak Report are listed in Exhibit 2.

## IV.    SUMMARY OF THE RELEVANT THEORY AND CLAIMS IN THE HUBBARD REPORT

6.   The Hubbard Report suggests that there are two theories that could be consistent with a finding of price inflation during the Class Period: (1) a theory in which there was new information leading to price inflation at the start of the Class Period that created a positive price reaction and (2) a theory in which there was a positive price reaction before the Class Period due to new information and that the associated inflation was maintained

---

[3] Hubbard Report, ¶12.

during the Class Period.[4]  In this report, I focus on the second of Dr Hubbard's theories, i.e., that inflation was introduced into Alibaba's ADS price before the Class Period and then maintained during the Class Period.  Dr. Hubbard refers to this as a "price-maintenance" theory, and I will use the same nomenclature.

7.   One can think of Dr. Hubbard's price-maintenance theory as proceeding based on four claims:

i.   The first evidence of the "Prior Practices Statement" occurs on November 13, 2019.[5]  However, there was no observed statistically significant increase in Alibaba's ADS price following this disclosure.[6]

ii.  There is no evidence that market participants believed that Alibaba was not engaging in exclusivity practices during the Class Period.

iii. There was a statistically significant decrease in Alibaba's ADS price after the SAMR's announcement of draft guidance on November 10, 2020 (the "November Draft Guidelines").[7]  The November Draft Guidelines included, among other provisions, a provision prohibiting forced exclusivity.  Dr. Hubbard interprets the decline in Alibaba's ADS price following the release of the November Draft Guidelines as proof that the market knew that Alibaba was practicing exclusivity and therefore would be negatively affected by the draft guidance as a result of its publicly known, ongoing exclusivity practices.

iv.  No portion of the decline in Alibaba's ADS price following the December 23, 2020 announcement of the SAMR investigation was driven by the revelation

---

[4] See Section IV of the Hubbard Report.  Dr. Hubbard admitted in his deposition that another potential theory is that a misrepresentation or omission prevented Alibaba's ADS price from falling.

[5] Hubbard Report, ¶76.

[6] Hubbard Report, ¶76.

[7] Hubbard Report, ¶82.

of Alibaba exclusivity practices or by the materialization of risks due to Alibaba's undisclosed exclusivity practices.[8]

As discussed below, these claims are speculative and/or unsupported because Dr. Hubbard was either unaware of or rejected contrary evidence.

## V.    DR. HUBBARD WAS UNAWARE OF NEGATIVE CONFOUNDING NEWS THAT COULD EXPLAIN ALIBABA'S ADS-PRICE DECLINE ON NOVEMBER 13, 2019

8.    Chronologically, the first part of Dr. Hubbard's analysis under the price-maintenance theory is his claim that when the Prior Practices Statement was first made on November 13, 2019, there was no statistically significant increase in Alibaba's ADS price.[9]  Dr. Hubbard's analysis fails to consider that a stock (or ADS) price can become inflated as a result of a statement that prevents a stock-price decrease by omitting relevant information or by providing false or misleading information to the market that is consistent with the market's prior beliefs.[10]  Even if one ignored this issue, there would

---

[8] Hubbard Report, ¶108.

[9] Hubbard Report, ¶76.

[10] For example, if some portion of the market already had come to believe that Alibaba was not practicing exclusivity, then the Prior Practices Statement would not have been expected to cause that portion of the market to increase its valuation of Alibaba, but instead would have maintained that valuation (i.e., kept it from falling, as would have occurred if Alibaba had informed those market participants of activities that could lead to higher regulatory risk).  Notably, on November 5, 2019, it was reported that SAMR pointed out that the "behaviors of 'Choose One of Two' and 'exclusive trading' in the Internet sector, which break the order of fair competition and harm the rights and interests of consumers, are clearly prohibited[.]"  ("State Administration for Market Regulation Interviews Platform Enterprises and Will Conduct Anti-Monopoly Investigations into 'Choose One of Two' Behaviors in Accordance with the Law," *Xinhua News Agency*, November 5, 2019; filed as Document 55-2.)  If informed market participants believed that Alibaba would follow this guidance, then the November 13, 2019 Prior Practices Statement would not have been a surprise to them and would not have been expected to have caused an increase in Alibaba's ADS price.

be no observed increase in Alibaba's ADS price if any positive effect from the Prior Practices Statement was offset by negative confounding news.

9.   On November 13, 2019, *Reuters* published an article titled "Alibaba's Jack Ma says Singles' Day shopping results miss expectations."  Singles Day, November 11 (or 11/11, two sets of 1's or "singles") is a major sale day for Alibaba and results on that day are followed closely by market participants.  Later that day, *Barron's* published an article titled "Alibaba Stock Is Down Because Jack Ma Reportedly Was Disappointed With Singles Day Results."  The *Barron's* article begins, "Alibaba Group Holding shares fell Wednesday afterReuters [sic] reported that founder Jack Ma said that this year's Singles Day online shopping event had missed the company's expectations."  A November 14 *Barron's* article titled "Alibaba Stock Dropped After Jack Ma's Comments on Day Singles Sales. Now the Company Is Clarifying What He Said[,]" affirms *Barron's* continuing view that Jack Ma's statements were the cause of the November 13 Alibaba stock-price decline, a view that is supported by the company's decision to "clarify[]" those statements, an indication that Alibaba also likely felt that the statements had hurt its stock price.

10. Not only is the *Reuters* article an example of confounding news, but a contemporaneous financial publication explicitly described it as the cause of Alibaba's ADS-price decline on November 13, 2019.  Thus, any increase in Alibaba's ADS price that one might have hoped to observe from the Prior Practices Statement could have been overshadowed by the negative news regarding Jack Ma's view of Alibaba's Singles Day results.  Thus, the first claim in Dr. Hubbard's analysis of price impact (i.e. that the price-maintenance theory does not apply in this case because he did not observe an increase in Alibaba's ADS price on November 13, 2019) fails because Dr. Hubbard did not examine relevant evidence that would explain why Alibaba's ADS price did not rise, and instead fell, on November 13, 2019.

11. To be complete, we know that Dr. Hubbard did not review the *Reuters* or *Barron's* articles because he testified, "I didn't personally read the news articles, no" when presented with these two articles in deposition.[11]

12. This seems to conflict with a statement in the Hubbard Report, where Dr. Hubbard stated, "Based on my review of 67 analysts' reports in the Alibaba Analysts' Report Universe that were published from November 13, 2019 to December 6, 2019 (three weeks after the November 15, 2019 effective date of the Hong Kong IPO Prospectus), as well as 536 news articles in the Alibaba News Article Universe that were published from November 13, 2019 to November 19, 2019 (two business days after the November 15, 2019 effective date of the Hong Kong IPO Prospectus), there was no discussion of the 'prior narrowly-deployed' language."[12] Dr. Hubbard explained that when he wrote "my review" he was referring to the "corporate me. So it's my direction of the team."[13]

13. Dr. Hubbard testified that the team was his support staff at Analysis Group ("AG") that consisted of a core team of three people and some additional number of staff working under them ("AG Team").[14] Dr. Hubbard also testified that the AG Team rejected potential confounding news without bringing it to his attention.[15] Since Dr.

---

[11] Hubbard Depo., 128:3-4. See also Hubbard Depo., 129:2-5 ("Q And to your knowledge, were these news articles brought to your attention by your team? A To my recollection, no.").

[12] Hubbard Report, ¶77. Internal footnote omitted.

[13] Hubbard Depo., 128:20-22.

[14] Hubbard Depo., 17:20-25. ("There was a core team with whom I worked with regularly. But a fairly substantial number of analysts assisting on some of the tasks that I mentioned before, so I don't have an exact number there.") He further testified that the core team had three members. Hubbard Depo., 18:2-5.

[15] Hubbard Depo., 123:23-124:7. ("So how were you able to reject it as a potential confounding event without reading what the news actually said? A Again, the team did that on each and every one of these. Q So the team rejected it as a potential confounding event, not you? A Correct.")

Hubbard never read the *Reuters* or *Barron's* article, either the AG Team did not believe that they were supposed to identify confounding news for November 13, 2019 or the AG Team failed to identify obvious confounding news on that date. Either way, Dr. Hubbard's conclusion regarding November 13, 2019 is vitiated by his lack of knowledge of confounding news.

14. In deposition, Dr. Hubbard testified as follows:[16]

> Q Would you consider a news report that says "Alibaba stock is down because Jack Ma reportedly was disappointed with Singles' Day" as potential confounding news that could explain the stock price movement that day?
>
> A Likely not. I'm assuming the team read all of these. You know, any given analyst or news article can say anything. Whenever a stock price goes up or down, somebody writes a news story. Doesn't mean that's right. So I'd have to look at the totality.
>
> Q But here, you did not look at the totality?
>
> A Not personally. But the team did and came to this conclusion.

15. First, it is not clear why one would say that a contemporaneous news article specifically pointing out the cause of a stock-price movement that references a plausible explanation for that decline would "[l]ikely not" be considered even "potential confounding news[.]" While the article should certainly be investigated to see if it is merely potential or actual confounding news (and my review of the news stories indicates that it was, in fact, confounding news), Dr. Hubbard's dismissal of the article as "likely not" "potential confounding news" is problematic because it turns out that that dismissal is based on an even deeper lack of knowledge of the relevant facts.

16. Dr. Hubbard's stated basis for rejecting the *Barron's* article is, "I'm assuming the team read all of these" articles and that "the team did [read the totality of the articles] and came to this conclusion." First, since Dr. Hubbard did not even directly supervise the non-core members of the AG Team, it's not clear if any individual on the AG Team read the totality of the articles. And, as Dr. Hubbard testified, "I'd have to look at the

---

[16] Hubbard Depo., 129:6-25.

totality." Second, even if one or more members of the AG Team read the totality of the articles, this means that Dr. Hubbard's opinions regarding November 13, 2019 are not really his own, but are the opinion of his team. This is relevant because of the following testimony from Dr. Hubbard:[17]

> Q Typically, when there's potential confounding news, would you -- would you make an attempts [sic] to either -- you know, to state your opinions as to why it matters or why it doesn't?
>
> A It varies. By making the statement that there's no price impact, I'm -- from someone like me, that meant I considered everything and rejected it.
>
> Q Yet you did not personally consider at least these two news articles?
>
> A I didn't read the news articles, no.

17. I understand there to be an appeal to Dr. Hubbard's expertise in his testimony: "[T]he statement that there's no price impact, I'm -- *from someone like me*, that meant I considered everything and rejected it." (Emphasis added.) However, as pointed out above, Dr. Hubbard did not consider everything personally in order to reject any contrary evidence; the AG Team made the decision to reject the *Reuters* or *Barron's* news articles and never presented them to Dr. Hubbard.[18] To the extent that Dr Hubbard is asking the reader to rely on his personal expertise when he says "from someone like me," he is actually asking the reader to rely on the expertise of an unquantified team that rejected potential explanations for ADS-price movements central to Dr. Hubbard's ultimate opinion on price impact.

18. Ultimately, not only is there a credible explanation for the lack of an increase in Alibaba's ADS price on November 13, 2019, but Dr. Hubbard was not aware of that explanation, and it was rejected or perhaps not even considered by others either in a core

---

[17] Hubbard Depo., 130:24-131:15.

[18] This assumes that the AG Team was looking for confounding news. In footnote 134, the Hubbard Report states, "Based on my review, there were no other notable news events on November 10, 2020." No similar statement is made regarding the news search on November 13, 2019.

or non-core group of support staff, the AG Team, who did not even inform Dr. Hubbard of this issue.[19]

## VI.    THE HUBBARD REPORT FAILS TO CITE EVIDENCE THAT MARKET PARTICIPANTS BELIEVED THAT ALIBABA WAS NOT PRACTICING EXCLUSIVITY DURING THE CLASS PERIOD, RENDERING ITS SECOND AND THIRD CLAIMS SPECULATIVE

19.    To reach his determination of whether the market believed that Alibaba was engaged in exclusivity practices during the Class Period, Dr. Hubbard opines, first, "I found that *none* of the 76 analysts' reports [he identifies as in what he considers to be a relevant time period] mentioned or discussed the 'prior narrowly-deployed' language contained in the Prior Practices Statement. This indicates that the Prior Practices Statement was not material information that changed the analysts' beliefs regarding Alibaba's business practices."[20]  He further opines, "I found that *none* of the [news] articles [he identifies in what he considers to be a relevant time period] quoted, paraphrased, or otherwise referenced the 'prior narrowly-deployed' language, or other terms that could be interpreted as related to the 'prior narrowly-deployed' language."[21]

20.    The most serious problem with this analysis in the Hubbard Report is that it fails to cite analysts indicating that they believed that Alibaba was complying with the SAMR and not engaging in exclusivity practices.  For example, Goldman Sachs wrote:[22]

---

[19] For clarity, I have no issues with an expert using support staff to perform calculations or to review documents.  However, I disagree with Dr. Hubbard's use of the phrase "my review" or his phrasing of "from someone like me, that meant I considered everything and rejected it" in reference to documents that he had not personally seen.

[20] Hubbard Report, ¶54. Emphasis in original.

[21] Hubbard Report, ¶55. Emphasis in original.

[22] "Alibaba Group (BABA): A compliant BABA, aligned with China's LT goals; reiterate Buy (CL)," *Goldman Sachs*, November 25, 2020. Emphasis in original.

> Alibaba **remains compliant with all rules** in the Draft Guidelines published on Nov 11, 2020 (see note here), and management expects limited impact on their growth trajectory. … BABA remains compliant with rules, with its continuous efforts toward eliminating fraudulent/misconduct behavior on its platform, e.g. brushing/fake products. Further, no merchants are being restricted on their platform.

21.     Goldman Sachs thus expressed a belief—and informed the market of its belief—that Alibaba was not engaged in exclusivity practices that would render it not "compliant with all rules in the Draft Guidelines[.]"  In the same report, Goldman Sachs even more explicitly informed the market of its belief that "no merchants are being restricted on [Alibaba's] platform."

22.     Though his report never cites this Goldman Sachs analyst report, when he was presented with it in deposition, Dr. Hubbard said, "I am familiar with this."[23]  He further testified, "And the same analyst team, two weeks before this, had a very different story about exclusivity.  So you can look that up if you like.  And, of course, all this report says is what Alibaba says."[24]

23.     While this Goldman Sachs report does refer to discussions with Alibaba, the title of the report begins, "A compliant BABA[.]"  This is a view held by Goldman Sachs that Goldman Sachs was reporting to the market.  Goldman Sachs also reported to the market that Alibaba "**remains compliant with all rules** in the Draft Guidelines[.]"[25]  The use of the word "remains" indicates a belief that Alibaba was already compliant (i.e., not practicing exclusivity) and that it continued to be compliant.

[23] Hubbard Depo., 149:11.

[24] Hubbard Depo., 149:18-23.  To the extent that it is not clear from that Goldman Sachs report, with lead analyst Piyush Mubayi, that the Goldman Sachs analysts believed that Alibaba was in compliance with China's anti-monopoly laws, as opposed to just stating that Alibaba said it was in compliance, see "GS TWIG Notes: This Week in Global Research – November 27, 2020," *Goldman Sachs*, November 27, 2020.  ("Piyush Mubayi believes the Chinese internet company is compliant with anti-monopoly rules, limiting regulatory overhangs[.]")

[25] Emphasis in original.

24.     Dr. Hubbard's testimony about the Goldman Sachs report from two weeks earlier is also relevant here:[26]

> Q And I believe you testified to saying that the same Goldman analyst team had, approximately two weeks earlier, issued a different report that, in your opinion, stated a very different view on whether Alibaba was using exclusivity during the class period; is that right?
>
> A It was certainly different, yes.
>
> Q Is this the other Goldman Sachs analyst report that you were referring to?
>
> A Yes, it is.
>
> Q Where in this report does it say that Alibaba was continuing to practice exclusivity during the class period?
>
> A This report really just refers to the JD and Alibaba problem over exclusive agreements on the second page. I think the Morgan Stanley predecessor report is probably stronger.
>
> Q And in this report, when does it say those alleged exclusive agreements were at issue? What year?
>
> A 2015.

25.     In other words, the "very different story about exclusivity" that Dr. Hubbard said that the earlier (November 11, 2020) Goldman Sachs report[27] had presented was in fact "really just refer[ing] to the JD and Alibaba problem over exclusive agreements" that were at issue in 2015, roughly four years before the start of the Class Period.  Thus, the Goldman Sachs reports support Plaintiffs' view of the case: the market knew that ***prior*** to the Class Period, Alibaba was alleged to hadvebeen engaged in exclusivity practices, but thought it was "compliant" with SAMR rules, including not practicing exclusivity, during the Class Period.

26.     The history of Dr. Hubbard's review of the Goldman Sachs reports further indicates why any reliance on the Hubbard Report's review of public information is

---

[26] Hubbard Depo., 160:4-161:7.

[27] "China Technology: Internet: Draft Anti-Monopoly rules guide competition in digital platform economy for sustainable development," *Goldman Sachs*, November 11, 2020.

problematic.  Dr. Hubbard does not describe contrary information that he is aware of in the Hubbard Report, but rather rejects such information for reasons that are not provided in his report.  And, in this case, the reason that he rejects the November 25, 2020 Goldman Sachs Report (i.e., his claim that the November 11, 2020 Goldman Sachs report told a "very different story about exclusivity") was wrong, leading to his attempt to shift to the Morgan Stanley report.

27.     By simply rejecting to present evidence against his views that he knew of (or that only the AG Team knew of), Dr. Hubbard presents an incomplete view of the market evidence in this case, one that cannot even be properly evaluated on its face because he effectively asks readers to trust that he (or the AG Team) have properly determined what evidence against his position they need not even consider.[28]  Yet, here, and with the *Reuters* and *Barron's* articles discussed above, Dr. Hubbard's position is readily disputable at worst and, more likely, simply wrong.

28.     I also find Dr. Hubbard's testimony to deflect from Goldman Sachs to Morgan Stanley to be unavailing.  On November 20, 2020, Morgan Stanley stated, "Exclusivity: Alibaba highlights it does not operate business on exclusivity"[29] while on November 11, 2020, Morgan Stanley indicated that Alibaba may be harmed by the November Draft

---

[28] Earlier in his deposition, Dr. Hubbard was asked if there was any evidence relevant to his opinions that was not discussed in his report and he replied, "None of which I'm aware."  (Hubbard Depo., 10:15-19.)  Even if Dr. Hubbard ultimately rejected the November 25, 2020 Goldman Sachs report as evidence that market participants were informed that Alibaba had stopped practicing exclusivity during the Class Period, it should still be considered evidence relevant to Dr. Hubbard's opinion, as he later essentially agreed to by calling it "a data point" (Hubbard Depo., 153:11-12) and "a piece of information" (Hubbard Depo., 178:5-8) that was communicated to the market. Similarly, Dr. Hubbard testified that he considered and rejected potential confounding news other than the news of Jack Ma's disappointment in Singles Day sales in relation to the November 13, 2019 ADS price movement (Hubbard Depo., 120:3-17 ("My recollection is there were two things. … But that's what I considered and rejected.")) but did not mention that information in his report.

[29] "Virtual Asia Pacific Summit Feedback," *Morgan Stanley*, November 20, 2020.

Guidelines' exclusivity provisions.[30]  Notably, in the deposition excerpt above, Dr. Hubbard testified, "I think the Morgan Stanley **predecessor** report is probably stronger."[31] At best, Dr. Hubbard is pointing out that Morgan Stanley expressed one view during part of the Class Period and then presented another, potentially conflicting view in a different report. And even to the extent that Dr. Hubbard is correct that **some** market participants appear to have believed that Alibaba was continuing at least some exclusivity practices, that does not mean that one should ignore contrary evidence that other market participants believed that Alibaba was not engaging in exclusivity.  As the title of the November 25, 2020 Goldman Sachs report demonstrates, other market participants believed that Alibaba was "compliant" with SAMR's rules, meaning that they believed that the company was not engaging in exclusivity practices during the Class Period. Moreover, the November 25, 2020 Goldman Sachs report stated, "BABA **remains compliant with all rules**[.]" (Emphasis in original.)  Thus, the Goldman Sachs report indicates a belief that Alibaba was already compliant even before November 25, 2020.

29.     In an efficient market, it is not sufficient to argue that the Goldman Sachs reports that discredit Dr. Hubbard's opinions should be ignored because other reports are supposedly "stronger."  Instead, one must consider that an efficient market incorporates **all** public information and that conflicting information may lead the market to an intermediate position between the extremes where all analysts supported one view or the other (i.e., the views that Alibaba was or was not practicing exclusivity).

30.     The relevant question is then whether the price of Alibaba's shares would be inflated if some market participants were misled by the Prior Practices Statement.  In his deposition, Dr. Hubbard was presented with a scenario in which half the market thought that a company's shares were worth 20 and half thought that the shares were worth 40.

---

[30] "Government Seeks Opinions on New Antitrust Regulations," *Morgan Stanley*, November 11, 2020.

[31] Hubbard Depo., 161:25-162:3. (Emphasis added.)

He agreed that one would expect the market price to "settle somewhere between the middle [sic]" or "[s]omewhere higher than 20; somewhere lower than 40[.]"[32]  I agree.

31.        There is academic literature on the topic of "heterogeneous beliefs" in asset markets, meaning how market prices are set when investors have different beliefs.  Some of the literature finds that the average beliefs of investors matter for stock prices and returns.  See, for example, Brandon, Rajna Gibson and Songtao Wang, "Earnings Belief Risk and the Cross-Section of Stock Returns," *Review of Finance*, 2020, discussing some of this literature.  Other literature shows, for example, that if "investors 'agree to disagree' or have 'differences of opinions'" about what investors believe, then "the price vector $P_1$ [or set of prices today] is a weighted average of what agents believe the value of the assets is and what they expect next period's prices to be."[33]  Another paper references older work to argue that if different fractions of the investing public only see different information, then, for a stock that will liquidate and pay out D at a point in the future (i.e., for simplicity, the model assumes the company will liquidate and not live forever), then, at any earlier point in time "the price is nothing more than the weighted average of investors' expectations of *D* at this time."[34]  See also another academic paper presenting a model in which "[w]hen opinions differ regarding the value of a security, and investors can costlessly short-sell that security, the security price will reveal only the weighted mean of the distribution of beliefs, and nothing about the dispersion of agents' beliefs."[35]  While these models often have particular assumptions for tractability (e.g., the firm will

---

[32] Hubbard Depo., 54:12-21.

[33] Banerjee, Snehal, Ron Kaniel, and Ilan Kremer, "Price Drift as an Outcome of Differences in Higher-Order Beliefs," *The Review of Financial Studies*, 2009, pp. 3708 and 3714.

[34] Hong, Harrison and Jeremy C. Stein, "Disagreement and the Stock Market," *Journal of Economic Perspectives*, p. 121.

[35] Daniel, Kent, Alexander Klos, and Simon Rottke, "The Dynamics of Disagreement," *The Review of Financial Studies* 36.6 (2023): 2431-2467, p. 2432.

liquidate) or to set up other analyses (e.g., investors "agree to disagree"), they tend to demonstrate that average beliefs matter for stock prices.

32.     Dr. Hubbard testified to his opinion that the "marginal investor" matters for setting the price of a stock.[36]  Dr. Hubbard's testimony is a reasonable description that is consistent with the literature that leads to the question of what value the marginal investor would place on Alibaba's ADSs.[37]  Dr. Hubbard testified to a view that even if half the market was aware that Alibaba was continuing to practice exclusivity and half was unaware of this, there still might be a complete lack of price impact.[38]  Dr. Hubbard based this claim on his view that the half that were aware of Alibaba's continuing practice of exclusivity would be the informed market participants who were "driving that bus" in determining the price of Alibaba's ADS.[39]

33.     However, this ignores that Goldman Sachs told investors that Alibaba "remain[ed]" compliant with the SAMR rules, meaning that it was not practicing exclusivity and that Morgan Stanley reported that "Alibaba highlights it does not operate business on exclusivity."[40]  Moreover, Dr. Hubbard testified:[41]

> Q Generally speaking, are there some firms who are given more
> weight by market participants?
> A Depends on the participant. But the large wirehouse firms would
> typically have a larger following than, say, some idiosyncratic post
> on Seeking Alpha or something like that.

---

[36] See, for example, Hubbard Depo., 54:7-15.

[37] Because investors can either have a net positive (i.e., own shares or ADSs) or negative position (i.e., have a short position) in a security, the marginal investor will generally be the one in the middle, whereas many investors have a more positive view of a security as have a more negative view.  This also describes the average view in many models in the academic literature.

[38] Hubbard Depo., 175:15-25.

[39] Hubbard Depo., 177:9-13.

[40] "Virtual Asia Pacific Summit Feedback," *Morgan Stanley*, November 20, 2020.

[41] Hubbard Depo., 108:9-21.

Q By "large wirehouse firms," you mean --

A The ones we talked about this morning. So Morgan Stanley, Goldman Sachs, and so on.

34.     As discussed above, Goldman Sachs told the market that Alibaba was "compliant" with the SAMR guidelines and "no merchants are being restricted on [Alibaba's] platform" (but that it was alleged to have engaged in exclusivity practices back in 2015) and Morgan Stanley stated, "Exclusivity: Alibaba highlights it does not operate business on exclusivity."[42]  As these are the two firms that Dr. Hubbard described as being given more weight by the market, Goldman Sachs' and Morgan Stanley's statements would be expected to have a large reach, including to informed market participants who were "driving that bus."

35.     Dr. Hubbard's testimony when this was pointed out is instructive:[43]

Q And in this case, some of the market was informed by things like the Goldman Sachs analyst report on November 25 that we looked at earlier, right, that said Alibaba was not practicing exclusivity during the class period, correct?

MR. BLAKE: Object to form.

A It's certainly a data point.

Q It informed the market, right?

MR. BLAKE: Object to form.

A It's a piece of information. Whether it informs you depends on how you react to it, but it's definitely a piece of information.

36.     Here, Dr. Hubbard concedes that the only way to conclude that the market, including informed market participants, was not told by Goldman Sachs that Alibaba was not practicing exclusivity during the Class Period is to treat Goldman Sachs as "a data point" or "a piece of information" and to conclude that "[w]hether it informs you depends on how you react to it[.]"  However, an efficient market incorporates all public information, including the November 25 Goldman Sachs report, and one cannot avoid the

---

[42] "Virtual Asia Pacific Summit Feedback," *Morgan Stanley*, November 20, 2020.

[43] Hubbard Depo., 177:17-178:8.

implications of the Efficient Market Hypothesis by simply speculating that perhaps the market is not informed by certain new information because of how market participants react to it. Dr. Hubbard presents no reason why this particular data point or piece of information did not inform the market (including the marginal investor who may be "driving that bus" on pricing) other than speculation that it depends on "how you react to it[.]" But, if that is the basis for Dr. Hubbard's ultimate opinion that there is a complete lack of price impact, that opinion could be simplified to a claim that if one **assumes** that the market (or the marginal investor) may not be informed by any information inconsistent with a complete lack of price impact, then perhaps there is a complete lack of price impact.

37.  The Goldman Sachs reports are indeed a data point or a piece of information, but one that clearly supports that there was price impact. And it is not at all clear why market participants would react to Goldman Sachs' headline of "A complaint BABA" by not at least placing some weight on the possibility that Alibaba was no longer practicing exclusivity. Put simply, Dr. Hubbard's response to this evidence of price impact is to admit that it is a data point and a piece of information and to suggest that perhaps the market would ignore it based on "how you react to it." There is no evidence that the market's reaction was to ignore the Goldman Sachs report and thus there is a failure to demonstrate a complete lack of price impact.

38.  The other large wirehouse firm mentioned by Dr. Hubbard was Morgan Stanley. On November 11, 2020, in a section of an analyst report focused on Alibaba, Morgan Stanley wrote, "[W]e have seen increasing overlap among brands, merchants, and products over time among platforms despite news reports on 2-choose-1."[44] This statement indicates a view that there was somewhere between a weakened degree or no degree of exclusivity practiced despite news reports of 2-choose-1. To the extent that this is the predecessor Morgan Stanley report that Dr. Hubbard thought was "probably

---

[44] "Government Seeks Opinions on New Antitrust Regulations," *Morgan Stanley*, November 11, 2020, p. 4.

stronger[,]" it is only stronger to the extent that one might infer that not all brands, merchants, and products are operating on multiple platforms and that one further infers that this is due to Alibaba requiring exclusivity as opposed to the brands choosing to sell on just one platform. Moreover, even if one made this inference following the November 11, 2020 Morgan Stanley report, that would be contradicted by a Morgan Stanley report published nine days later stating: "Exclusivity: Alibaba highlights it does not operate business on exclusivity."[45]

39.    Moreover, even if some portion of the market knew something about Alibaba's continuing practice of exclusivity, there is no indication that the market was aware of the nature and extent of all of those practices. When asked in his deposition, "Is it your opinion that prior to the announcement of the SAMR investigation, the market already knew the full extent of Alibaba's exclusivities that resulted in that investigation?," Dr. Hubbard replied, "I don't know one way or the other[.]"[46] Thus, even after completing his analysis, Dr. Hubbard was not able to testify that the market knew of all the exclusivity practices that led to the SAMR investigation. This means that he has not established that the investigation was not, at least in part, a materialization of an ***unknown*** risk, which is Plaintiffs' theory of liability.

40.    Additionally, Dr. Hubbard refused to accept that learning the truth about allegedly false information could be considered corrective unless one was the marginal investor. Dr. Hubbard was asked in deposition: "What if some proportion of the market was not already aware before the SAMR investigation announcement that Alibaba was continuing to practice exclusivity during the class period? [Objection] In your -- in your view, ***wouldn't this statement then be curative as to those investors?***"[47] Dr. Hubbard

---

[45] "Virtual Asia Pacific Summit Feedback," *Morgan Stanley*, November 20, 2020. See also "China Internet: 8th Global TMT conference takeaways," *J.P. Morgan*, November 25, 2020. ("Despite many accusing Alibaba for using forced exclusivity, the fact is that most brands also have stores on other platforms.")

[46] Hubbard Depo., 187:7-15.

[47] Hubbard Depo., 173:16-24. Emphasis added.

responded, "***No***. The market price is set in equilibrium by the marginal investor. … So what any investor -- individual investor does or doesn't understand is irrelevant."[48]  This answer is incorrect.  It is simply not reasonable to argue that investors who were "not already aware before the SAMR investigation announcement that Alibaba was continuing to practice exclusivity during the class period" could not find the SAMR's announcement to include corrective information.  Dr. Hubbard is free to argue that that is irrelevant to the market price (something with which I would disagree) and to speculate that the marginal investor is not among those who did not believe that Alibaba was practicing exclusivity before the SAMR announcement, but his view that the SAMR announcement could not be corrective even for investors who had believed that Alibaba was not practicing exclusivity during the Class Period makes no sense.

41.     Ultimately, what is clear is that some analysts told the market that Alibaba was "compliant" and reported without contradiction Alibaba's claims that it did not employ exclusivity practices or otherwise restrict merchants on its platforms, including the large wirehouse firms Goldman Sachs and Morgan Stanley.  Dr. Hubbard would have us reject these clear statements informing the market that Alibaba was not then practicing exclusivity because of either a reference to an alleged prior practice of exclusivity in 2015 (in the case of Goldman Sachs) or a statement that there were "news reports on 2-choose-1."[49]  " (in the case of Morgan Stanley), neither of which indicates a then-current practice of exclusivity by Alibaba.

---

[48] Hubbard Depo., 173:25-174:9. Emphasis added.

[49] "Government Seeks Opinions on New Antitrust Regulations," *Morgan Stanley*, November 11, 2020, p. 4.  The full sentence where this appears is "[W]e have seen increasing overlap among brands, merchants, and products over time among platforms ***despite*** news reports on 2-choose-1." (Emphasis added.)  That is, Morgan Stanley paired its reference to second-hand knowledge from news reports on an exclusivity practice with its own observation of increasing evidence that the practice had become more limited (without any indication of whether it still was being practiced at all).

42.    For clarity, I do not deny that *some* analysts made comments that could be interpreted as suggesting that Alibaba was engaged in some form of exclusivity practices (or, as Dr. Hubbard would put it, "[w]hether it informs you depends on how you react to it"). But it is my opinion that *some* analysts made comments stating that Alibaba was not engaged in exclusivity practices. This means that there were likely some investors supporting each of these views as well as likely some investors who were uncertain about whether Alibaba was engaged in exclusivity practices. The heterogeneous set of beliefs supports a conclusion that there was some degree of price impact from the alleged misstatements and omissions: not as much as if the entire market had uniformly believed the alleged misstatements, but not the zero price impact that one would expect if no market participants had believed the alleged misstatements.[50]

43.    To obtain a more complete understanding of what the market was told, I now do what Dr. Hubbard did not do: personally review all of the relevant analyst reports meeting Dr Hubbard's criteria (published within three weeks of the release of the November Draft Guidelines that discussed those guidelines and commented on Alibaba) that were available. In ¶84 of his report, Dr. Hubbard states:

> I reviewed the 148 analysts' reports in the Alibaba Analysts' Report Universe that were published from November 9, 2020 to December 1, 2020 (three weeks after the effective date of the November Draft Guidelines).[135]

---

[50] As noted above, Dr. Hubbard testified that the market price of a security is set by the marginal investor. He further argued that the investors who "drive the bus" of price-setting were likely informed by the large wirehouse firms such as Goldman Sachs and Morgan Stanley. Thus, adopting Dr. Hubbard's testimony on the price-setting mechanism, the marginal investor may very well have been exposed to Goldman Sachs and Morgan Stanley's statements that Alibaba was not engaged in exclusivity practices, and even if the marginal investor did not credit those statements fully, it may have assumed that there was some probability that Alibaba was not engaged in exclusivity practices. This would lead to a finding of price impact from the alleged misrepresentations and omissions. To the extent that we are not sure what the marginal investor was aware of or believed, then Dr. Hubbard's claim that he has demonstrated a complete lack of price impact is merely speculation.

Case 1:20-cv-09568-GBD-JW    Document 114-1    Filed 04/19/24    Page 22 of 37

[135] Note that the 148 analysts' reports include 75 that were found to (1) have identical commentary to other reports; (2) contain merely a presentation of previously released data; or (3) contain no Alibaba-specific commentary, such as a compilation of news. Of the remaining 73 analysts' reports that contained original Alibaba-specific commentary, 38 reports commented on the November Draft Guidelines. The remaining 35 reports discussed only events other than the November Draft Guidelines (*e.g.*, the "Double 11" promotional activities or earnings results).

44.    The "I" in this statement in the Hubbard Report again refers not to Dr. Hubbard personally, but includes the AG Team, and Dr. Hubbard testified that he did not personally review the 38 relevant analyst reports.[51]  Instead, he seems to have reviewed only the "approximately 10" analyst reports that were actually quoted in the Hubbard Report.[52]  Then, after reviewing only approximately 10 of the 38 relevant analyst reports, meaning those selected for him by the AG Team because they provided a quote that supported his position, Dr. Hubbard testified with respect to the analyst reports dealing with the November Draft Guidelines: "My recollection is all or close to all highlighted exclusivity"[53] and then expanded that opinion to testify, "That that's assuming that exclusivity is the featured part of it, which is what every analyst to a person comments on."[54]

45.    It should go without saying that if one reviews only approximately ten of 38 analyst reports, they cannot state based on their personal knowledge what "all or close to all" of those reports highlighted and certainly not that something is "what every analyst to a person comments on."  At best, this is a joint Hubbard/AG-Team opinion because Dr. Hubbard may be merely repeating the conclusion that the AG Team provided to him.

---

[51] Hubbard Depo., 140:23-25. ("Q Did you review all -- did you review those 38 reports personally? A I did not.")

[52] Hubbard Depo., 141:10-142:12.

[53] Hubbard Depo., 59:14-20.

[54] Hubbard Depo., 98:22-25.

Moreover, as discussed above, Dr. Hubbard was aware of, but decided not to mention in his report, at least two reports that specifically commented on Alibaba's exclusivity practices (or, to be more precise, the lack of exclusivity practices).

46.    Counsel for Plaintiffs and I were able to identify 36 analyst reports from within Dr. Hubbard's backup materials that appear to meet the criteria for the 38 reports purportedly considered by Dr. Hubbard (or, more precisely, the AG Team): published within three weeks of the November Draft Guidelines, containing Alibaba-specific commentary, and commenting on the November Draft Guidelines.[55]  I personally reviewed each of those reports.

47.    My review of these analyst reports determined that Dr. Hubbard's testimony that "every analyst to a person" commented on exclusivity is incorrect.  For example, on November 11, 2020, Jefferies' commentary on the November Draft Guidelines stated in full:[56]

> The government issued the draft proposals on anti-trust earlier this week advocating fair competition and limiting monopolistic behavior on internet platforms. The rules will be executed with the goal to foster innovations and protect the interests of all parties. It lays out a number of factors taking into consideration including market share, user base, no. of clicks and time spent, the power of the platform to control the market, as well as the resources and technology of the platform.
>
> It also lays out that companies with VIE structure are required to apply for special operating approval under certain circumstances. In our view, more color about implementation details is key, and we view the new rules as aiming to foster a healthy development of

---

[55] There is no listing of the 38 relevant analyst reports in the Hubbard Report.  To the extent that Dr. Hubbard or the AG Team is able to identify additional analyst reports beyond the 36 that counsel for Plaintiffs and I have identified, I would be happy to consider them.  When asked at his deposition if he was provided a list of the 38 reports the AG Team identified as meeting the criteria, Dr. Hubbard could not recall if he was provided with such a list.  (Hubbard Depo., 141:8-11.)

[56] "Strong Execution Key to Success," *Jefferies*, November 11, 2020.

the internet sector with win-win solutions among all partners in the value chain.

48.     There is no mention of exclusivity in this commentary.  At most, one could argue that exclusivity practices might help inform the SAMR about "the power of a platform to control the market," but if that is what Dr. Hubbard means by "what every analyst to a person comments on[,]" his definition would be so broad as to be nearly meaningless.  And this analyst report certainly does not "highlight[] exclusivity" or treat exclusivity as a "featured part" of the November Draft Guidelines.

49.     Next, consider a UBS analyst report from November 11, 2020.  Its discussion of the November Draft Guidelines is as follows:[57]

> On Nov 10, the State Administration for Market Regulation published a draft on anti-monopoly rules. The focus in this draft on online businesses and their use of data and algorithms creates risks for internet companies in particular, in our view. This draft also follows others on regulating user data, fintech (note), and live streaming recently (note). We believe there is a chance to "buy the dip" after a near term reset in valuation. First, these laws are unlikely to upend the current competitive landscape. The big tend to stay big, and network/scale advantages still apply in internet. Second, how the laws are implemented is important. For example, while mobile gaming regulation had a big temporary impact on Tencent/NetEase in 2018, SME tax policy changes ended up having less impact on Alibaba than some expected in 2019.

50.     Not only does this report not even mention exclusivity, it discusses the "focus in this draft on online businesses and their use of data and algorithms[.]"  Even analysts that mentioned exclusivity often focused on other areas of the November Draft Guidelines or the general risk of increased regulation or did not treat exclusivity as a

---

[57] "China Internet Sector: Regulation catching up to innovation: initial reaction to a wave of potential new regulation," *UBS*, November 11, 2020.

particular focus.[58] These analyst reports clearly refute Dr. Hubbard's testimony based on his review of only approximately ten of the relevant analyst reports.

51.      Ultimately, my comprehensive review of analyst reports following the issuance of the November Draft Guidelines shows that while Dr. Hubbard was correct in opining that there was analyst coverage of exclusivity, his opinion that all analysts (or at least all analyst reports) commented on exclusivity is incorrect and his opinion that analysts considered exclusivity to be the featured part of the guidelines ignores analysts that have contrary views.  Thus, there is a heterogeneity of beliefs among analysts, and presumably among market participants as well, including informed market participants. This would not support a claim of a complete lack of price impact, but instead indicates some degree of price impact. This is even more true because the informed investors, those who Dr. Hubbard says are "driving that bus" of price determination were told by Goldman Sachs and Morgan Stanley, the two wirehouse firms that Dr. Hubbard identified as carrying high weight among informed investors, that Alibaba was not practicing exclusivity.

## VII.    THE HUBBARD REPORT IGNORES OTHER REASONS FOR THE DECLINE IN ALIBABA'S ADS PRICE FOLLOWING THE NOVEMBER 10, 2020 DRAFT GUIDELINES

52.      The third claim in Dr. Hubbard's analysis is that the decline in Alibaba's ADS price following the release of the November 10, 2020 Draft Guidelines "indicates that the market was aware that Alibaba was practicing exclusivity and anticipated a potential adverse impact on Alibaba from the November Draft Guidelines. Had the market

---

[58] See, for example, "Internet Industry," *Founder Securities*, November 11, 2020. ("To summarize, we believe that the impact of the guidelines is controllable, and that the large drop on November 10th was due to a combination of factors."  This report also lists and briefly describes Articles 12-17 of the November Draft Guidelines under the first point under its "Antitrust Guidelines (Exposure Draft) Points of Concern[.]"  Article 15 is the only one of these described as dealing with forced exclusivity.

believed that Alibaba was not practicing exclusivity, the November Draft Guidelines should not have had any statistically significant impact on Alibaba's ADS price."[59]

53.     There are two flaws with this argument.  First, even if the entirety of Alibaba's ADS price decline on November 10, 2020 were attributable to the belief that Alibaba was practicing exclusivity (and thus could be affected by the guidelines), that would not prove that all market participants previously believed that Alibaba was practicing exclusivity.  An alternative explanation for the price decline would be that some market participants believed that Alibaba was practicing exclusivity and therefore reacted negatively to the November Draft Guidelines while others did not previously believe that and either (1) did not react negatively to the November Draft Guidelines or (2) reacted negatively because the SAMR's decision to issue the guidelines caused them to reassess their view of whether Alibaba was practicing exclusivity.

54.     Second, as discussed above, there were multiple aspects of the November Draft Guidelines that did not relate to exclusivity and that would be expected to have had a negative effect on Alibaba's ADS price.  For example, the November 11, 2020 Morgan Stanley report previously discussed says in its discussion of the effect of the November Draft Guidelines on Alibaba:[60]

> In addition, the draft mentions that the use of subsidies, discounts, and traffic support provided by platforms, despite favouring consumers, may potentially deter fair competition among market participants (i.e., by setting prices below costs). This could affect Alibaba's promotional activities, although to what extent such subsidies will be regarded as a violation of antitrust rules remains uncertain.
>
> Some investors are also concerned that the mentions regarding personalized targeting based on user behavioral data could affect the ramp-up of recommendation feeds. That said, we think

---

[59] Hubbard Report, ¶82. Internal footnote omitted.

[60] "Government Seeks Opinions on New Antitrust Regulations," *Morgan Stanley*, November 11, 2020, p.36.

> Alibaba's recommendations are based on individual preference for
> different product segments instead of discriminatory pricing.

55.    Dr. Hubbard did not deny that there were other aspects of the November Draft Guidelines that could affect Alibaba, but merely argued that exclusivity was "the featured part" of the guidelines, at least per analyst comments, after personally reviewing approximately ten analyst reports:[61]

> A … Of course, there is a significant -- very large and statistically significant negative response suggesting the market actually thought Alibaba was in the crosshairs of these draft guidelines. That's the kind of pattern to which I'm referring.
>
> Q But that's assuming the draft guidelines deal only with exclusivity, correct?
>
> A No. That that's assuming that exclusivity is the featured part of it, which is what every analyst to a person comments on.

56.    And while some analysts commented on the exclusivity aspect of the November Draft Guidelines, they did not necessarily treat exclusivity as the featured part of those guidelines, particularly as the November Draft Guidelines might apply to Alibaba. For example, Citi listed seven "[k]ey feature[s] of the guideline[,]" of which exclusivity was the third and also the one given the least amount of discussion in paragraph listing those key features.[62]  Citi specifically commented on how the guidelines regarding personal targeting to affect product recommendations for consumers might "affect all ecommerce platforms, specifically BABA and PDD[.]"  Next, it stated that the guidelines regarding forced exclusivity "could be [a] temporary negative for Meituan" without mentioning Alibaba.  The closest Citi gets to tying the exclusivity provisions to Alibaba would be its comment that those guidelines "could be positive for JD and PDD as both companies previously have voiced such concerns that some brands and merchants were forced to depart from their platforms because of competitive pressures."  While one could read this as potentially having some implications for Alibaba, that is of course far

---

[61] Hubbard Depo., 98:12-25.

[62] "China Internet: Alert: New Antitrust Guidelines for Marketplace Reforms," *Citi*, November 10, 2020.

from a claim that exclusivity was "the featured part" of the November Draft Guidelines in terms of its effect on Alibaba as far as Citi was concerned.[63]

57.    Analysts at Barclays stated, "[W]e think the guide might cause some near-term impacts to Alibaba, JD.com and PinDuoDuo. For example, *regarding the irrational competition and unregulated pricing schemes*, *we expect more government intervention over the platforms' subsidies and promotional programs*. As some of the platforms aggressively offer significant discounts on selected products and sell the products at prices even lower than cost, which has substantially impacted the market order. The '2-select-1' rules set up by some platforms are mentioned again in the guide, and more detailed judgement methods have been specified. Although *the '2-select-1' condition has been substantially improved in the eCom market in the past two years, it still exist [sic] in the online food delivery market*."[64]  Here, Barclays "featured" the November Draft Guidelines' potential impact on "platforms' subsidies and promotional programs" while noting the decreased importance of exclusivity practices.

58.    Again, I do not deny that some market participants viewed the exclusivity portion of the November Draft Guidelines to be a potential negative for Alibaba.  But, again, this does not mean that all relevant market participants believed that Alibaba was

---

[63] Other analysts included exclusivity as part of a list of features of the November Draft Guidelines without listing it first or otherwise indicating that it was "the featured part" in that listing.  See, for example, "Long term opportunities from China's new tech antitrust guidelines," *China Tonghai*, November 11, 2020 (listing "Access limitation" as second in a list of three practices the "new guidelines prohibit"); "New Anti-trust regulation: likely little operational impact but overhang into 1H21," *Credit Suisse*, November 12, 2020 (listing exclusivity as third in a list of four "key regulatory terms"); and "Morning Snapshot," *Sunwah Kingsway*, November 12, 2020 (listing exclusivity as second in a list of three "monopolistic practices" that the guidelines have addressed).

[64] "China Internet: Anti-trust Guide, More Like a Fair-Competition Instruction to eCom Market," *Barclays*, November 11, 2020. Emphases added.  See also "Morning Snapshot," *Sunwah Kingsway*, November 12, 2020, discussing "'[e]xclusivity on one platform' (by Meituan)" but not discussing Alibaba with regard to exclusivity despite previously mentioning Alibaba in the report.  Sunwah Kingsway thus also does not feature exclusivity practices as a key threat to Alibaba.

engaging in exclusivity during the Class Period before the issuance of those guidelines. Instead, given the discussions in the prior sections of this report, it is more plausible that some market participants did not believe or were uncertain if Alibaba was practicing exclusivity, and that the decline in Alibaba's ADS price on November 10, 2020 would have been even greater had they not been misled by the alleged misrepresentations and omissions. Those investors may have changed their views of Alibaba's exclusivity practices after the December 23, 2020 corrective disclosure. Put differently, those investors would have caused Alibaba's ADS price to be higher until the December 23, 2020 corrective disclosure because of the alleged misrepresentations and omissions that led them to believe that Alibaba was not practicing exclusivity or to be uncertain about whether Alibaba was practicing exclusivity.

**VIII. THE HUBBARD REPORT DOES NOT PROVE THAT THE ENTIRETY OF ALIBABA'S ADS PRICE DECLINE FOLLOWING THE DISCLOSURE OF THE SAMR INVESTIGATION WAS CAUSED BY FACTORS OTHER THAN A DISCLOSURE OF EXCLUSIVITY PRACTICES AND/OR A MATERIALIZATION OF UNDISCLOSED RISKS ASSOCIATED WITH EXCLUSIVITY PRACTICES**

59.     The fourth claim made by the Hubbard Report is that the decline in Alibaba's ADS price following the December 23, 2020 announcement of the SAMR investigation was caused exclusively by factors other than a disclosure of Alibaba's exclusivity practices and/or a materialization of undisclosed risks associated with exclusivity practices.[65] To support this argument, Dr. Hubbard does not quantify the effect of other potential causes of Alibaba's ADS price decline. In deposition, Dr. Hubbard stated that there "would be no reason for [him] to do so. Since there is no curative statement it's not a step [he] would need to take."[66] This demonstrates that these arguments in the Hubbard

---

[65] Hubbard Report, ¶115.

[66] Hubbard Depo., 190:3-7.

Report do nothing to prove an absence of price impact, which might be done by showing that summing the effects of the other factors would fully explain the decline in Alibaba's ADS price on December 24, 2020, the first trading day after the December 23, 2020 announcement. Instead, Dr. Hubbard's analysis simply assumes that "there is no curative statement."

60.    I do not dispute that there is news unrelated to Alibaba's exclusivity practices that could have contributed to Alibaba's ADS price decline on December 24, 2020. But the existence of such news (often called confounding news) does not mean that no portion of that price decline was caused by the SAMR's statement indicating that Alibaba was likely engaging in exclusivity practices.

61.    Because Dr. Hubbard did not quantify any effects of the purportedly confounding news affecting Alibaba's ADS price on December 24, 2020, the most he can say without assuming that there is no corrective disclosure is that that confounding news may have explained anywhere from none to all of that price decline. Again, Dr. Hubbard has no analysis that would quantify where in the range the correct answer lies, meaning that his analysis of the ADS price decline following December 23, 2020 announcement is entirely consistent with a finding of price impact.

62.    Moreover, given that some analysts told the market that Alibaba was not practicing exclusivity, the SAMR's statement that it was investigating Alibaba regarding its choose-one-of-two practices would be expected to have changed the views of some market participants regarding whether Alibaba had been engaged in exclusivity practices during the Class Period. This change of views would lead to downward pressure on Alibaba's ADS price, as observed in the market.[67] In other words, the observed price

---

[67] While one could argue that there would not necessarily be a decline in Alibaba's ADS price if the views of the marginal investor did not change, Dr. Hubbard has put forth no evidence that the marginal investor was not influenced by reports such as those by Goldman Sachs and Morgan Stanley, which indicated that Alibaba was not practicing exclusivity.

movement is consistent with, and therefore is evidence that supports a finding of, price impact.

63.     Dr. Hubbard also provides an analysis of the implied volatility in Alibaba options, a measure of the market's perception of risk, showing that the implied volatility increased after the December 2020 announcement and argues that the increase in volatility was "in response to the SAMR Investigation Announcement."[68]  I agree with this part of Dr. Hubbard's conclusion.  A regulatory investigation will often lead to heightened uncertainty and thus to an increase in implied volatility.  However, that is true whether the investigation is of a known practice (as Dr. Hubbard argues) or of one that was unknown, partially unknown, or doubted (as discussed above).

64.     When asked whether the investigation-related uncertainty would exist with respect to an investigation "whether investors believed or did not believe before the announcement that exclusivity was ongoing[,]" Dr. Hubbard testified, "To some extent it might, sure."[69]  In fact, the answer to that question should be a clear yes.  Put differently, Dr. Hubbard's volatility analysis is consistent with the market either knowing or not knowing about Alibaba's ongoing exclusivity practices before the SAMR Investigation Announcement.  If anything, the increase in volatility would likely be higher when the practice in question was not fully known earlier, because the market would have started with a view that an investigation was less likely.  In other words, the investigation would be more of a surprise if the potentially violative practices were less known to the market beforehand.  Thus, the fact that there was an increase in volatility is consistent with a finding of price impact and, therefore, cannot be evidence against a finding of price impact.

65.     Finally, Dr. Hubbard argues that the increase in Alibaba's ADS price after its April 2021 settlement with the SAMR is evidence that some portion of the prior price

---

[68] Hubbard Report, ¶121. Closing footnote omitted.

[69] Hubbard Depo., 186:19-187:5.

decline was caused by an increase in uncertainty.[70]  I agree with that portion of Dr. Hubbard's conclusion, but, once again, since a regulatory investigation would cause uncertainty whether or not the market had previously believed that Alibaba was engaged in exclusivity practices, the reduction of that uncertainty with the resolution of the investigation does not tell us anything that would help us know whether the market had previously believed that Alibaba was or was not engaging in exclusivity practices during the Class Period.

## IX.   CONCLUSION

66.    The arguments in the Hubbard Report in support of its claim of a lack of price impact fail because Dr. Hubbard was unaware of or rejected contrary evidence.  As discussed above, Dr. Hubbard was not even aware of a news article pointing to a reason why Alibaba's ADS price fell rather than rose after the initial release of the Prior Practices Statement in November 2019.  Dr. Hubbard also admitted in deposition that a Goldman Sachs analyst report with a headline about "A compliant BABA" and stating that Alibaba did not restrict merchants on its platform was "a data point" that was not included in his report.  Dr. Hubbard also admitted that even though he identifies potentially confounding news at the time of the December 23, 2020 corrective disclosure, he merely assumed that that potentially confounding news fully explained the associated decline in Alibaba's ADS price on December 24 and did not show (other than through an assumption that the disclosure was not indeed corrective) that there was no price impact from the allegedly corrective part of that disclosure.  Finally, the Hubbard Report presents other analyses regarding Alibaba's ADS price movements and volatility that all are consistent with the market either knowing or not knowing that Alibaba was engaged in exclusivity practices, which cannot prove a complete lack of price impact.

---

[70] Hubbard Report, ¶116.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.

David I. Tabak
April 19, 2024



**David I. Tabak**
Senior Managing Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 2176
david.tabak@nera.com
www.nera.com.

# EXHIBIT 1
# DAVID I. TABAK
## SENIOR MANAGING DIRECTOR

## Expert Reports and Testimony Since the Tabak Report

Deposition Testimony before the United States District Court for the Central District of California in *Charles Larry Crews et al. v. Rivian Automotive, Inc et al.*, April 11, 2024.

Expert Rebuttal Report of David I. Tabak, Ph.D. before the Southern District of New York in *Daniel Lee v. Richard Golaszewski and Stephen Swentzel*, April 10, 2024.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, February 29, 2024.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *Charles Larry Crews et al. v. Rivian Automotive, Inc et al.*, February 27, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, February 2, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of Ohio in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, February 2, 2024.

Deposition Testimony before the United States District Court for the Northern District of Ohio in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, December 20, 2023.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, November 20, 2023.

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of Ohio in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, November 16, 2023.

Deposition Testimony before the United States District Court for the Eastern District of New York in *In re Vale S.A. Securities Litigation*, November 8, 2023.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Ltd. Securities Litigation*, November 2, 2023.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of New York in *In re Vale S.A. Securities Litigation*, October 17, 2023.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Ltd. Securities Litigation*, October 5, 2023.

**Exhibit 2**
**Alibaba Group Holding Ltd.**
**Materials Considered**
**Beyond Those Already Listed in the Tabak Report**

*Academic Literature*

Banerjee, Snehal, Ron Kaniel, and Ilan Kremer, "Price Drift as an Outcome of Differences in Higher-Order Beliefs," *The Review of Financial Studies*, 2009.

Brandon, Rajna Gibson and Songtao Wang, "Earnings Belief Risk and the Cross-Section of Stock Returns," *Review of Finance*, 2020.

Daniel, Kent, Alexander Klos, and Simon Rottke, "The Dynamics of Disagreement," *The Review of Financial Studies* 36.6 (2023).

Hong, Harrison and Jeremy C. Stein, "Disagreement and the Stock Market," *Journal of Economic Perspectives*, 2007.Ex

*Analyst Reports*

"China Internet: Alert: New Antitrust Guidelines for Marketplace Reforms," *Citi,* November 10, 2020.

"China Internet: Anti-trust Guide, More Like a Fair-Competition Instruction to eCom Market," *Barclays*, November 11, 2020.

"China Internet Sector: Regulation catching up to innovation: initial reaction to a wave of potential new regulation," *UBS*, November 11, 2020.

"China Technology: Internet: Draft Anti-Monopoly rules guide competition in digital platform economy for sustainable development," *Goldman Sachs*, November 11, 2020.

"Government Seeks Opinions on New Antitrust Regulations," *Morgan Stanley*, November 11, 2020.

"Internet Industry," *Founder Securities*, November 11, 2020.

"Long term opportunities from China's new tech antitrust guidelines," *China Tonghai*, November 11, 2020.

"Strong Execution Key to Success," *Jefferies*, November 11, 2020.

"Morning Snapshot," *Sunwah Kingsway*, November 12, 2020.

"New Anti-trust regulation: likely little operational impact but overhang into 1H21," *Credit Suisse*, November 12, 2020.

"Virtual Asia Pacific Summit Feedback," *Morgan Stanley*, November 20, 2020.

**Exhibit 2**
**Alibaba Group Holding Ltd.**
**Materials Considered**
**Beyond Those Already Listed in the Tabak Report**

*Analyst Reports (cont.)*

"Alibaba Group (BABA): A compliant BABA, aligned with China's LT goals; reiterate Buy (CL)," *Goldman Sachs*, November 25, 2020.

"China Internet: 8[th] Global TMT conference takeaways," *J.P. Morgan*, November 25, 2020.

"GS TWIG Notes: This Week in Global Research – November 27, 2020," *Goldman Sachs*, November 27, 2020.

*Depositions in This Matter*

Deposition of Glenn Hubbard dated March 21, 2024.

*Expert Reports*

Expert Report of Glenn Hubbard dated January 19, 2024 and accompanying backup materials.

*News Articles*

"State Administration for Market Regulation Interviews Platform Enterprises and Will Conduct Anti-Monopoly Investigations into 'Choose One of Two' Behaviors in Accordance with the Law," *Xinhua News Agency*, November 5, 2019.

"Alibaba Stock Is Down Because Jack Ma Reportedly Was Disappointed With Singles Day Results," *Barron's*, November 13, 2019.

"Alibaba's Jack Ma says Singles' Day shopping results miss expectations," *Reuters*, November 13, 2019.

"Alibaba Stock Dropped After Jack Ma's Comments on Singles Day Sales. Now the Company Is Clarifying What He Said," *Barron's*, November 14, 2019.

*Pleadings in this Matter*

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel dated October 6, 2023.