# EXHIBIT 13

CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

IN RE: ALIBABA GROUP HOLDING LTD.

SECURITIES LITIGATION

                        Case No.:

                        1:20-cv-09568-GBD-JW

-------------------------------x

                * * * CONFIDENTIAL * * *

     VIDEOTAPED DEPOSITION of ROBERT GLENN HUBBARD, held at the law offices of Pomerantz LLP, 600 Third Avenue, New York, New York, on the above date and time, before Judith Thaten, a Certified Livenote Reporter and Notary Public of the State of New York, commencing at 9:21 a.m., Thursday, March 21, 2024.

JOB No. 6588696

PAGES 1 - 202

                                        Page 1

CONFIDENTIAL - HUBBARD

is a way of providing financial information to clients.

Whether that information is valuable or not is depending on what the bank wants or what the client wants. But that's the reason for having them.

(Pause.)

Q So in banks like that scenario that you were describing, they provide the information for the clients.

Do the banks in-house brokers also receive these analysts reports, correct?

A Of course.

Q Are you familiar with the phrase "consensus estimate"?

A Yes.

Q And what's your understanding of a "consensus estimate"?

A Well, they are a variety of analysts that may cover a stock.

So, for example, globally,

Page 40

CONFIDENTIAL - HUBBARD

there are, I think, more than that 100 that cover Alibaba stock.

A "consensus estimate" refers to taking a metric like earnings per share or something like that and looking at a summary statistic.  So it could be -- depending on who's reporting it, it could be a median, it could be an average.

But it's designed to be a summary statistic, as opposed to a range.

(Clarification by the reporter.)

Q    When you say "summary statistic," do you mean like an average view of the analysts?

A    Yes.  As I said, it could be a median and not an average, but something like that.

Q    And in your -- in your experience, does the market rely on such consensus estimates similarly as the market relies on individual analyst

Page 41

CONFIDENTIAL - HUBBARD

reports?

A    I'm not sure how to answer a question like that.  The market is an integral over millions of individual investors, each of whom, as an individual or an institution, is reading a lot of things.

So I would say that all of that is in the information set for investors.

I, as Glenn Hubbard, might think I only want to read the Morgan Stanley report.  Others may prefer something else; others may look at a consensus.

So it's all part of the information set for investors.

Q    And in an efficient market, all of that information would be baked into the stock price?

A    Correct.  Any publicly available information, of which that would be a category, should be in the stock price.

Page  42

CONFIDENTIAL - HUBBARD

Q    Do you consider yourself an expert on the topic of assessing market efficiency?

A    Yes.  I have done so many times.

Q    I would consider you an expert on that topic too.

A    Well, thank you.

Q    I have seen some work.

Expert on price impact?

A    Yes.

Q    Approximately how many expert reports have you submitted on the topic of market efficiency?

A    I'm not sure if I've answered that question.

In general, market efficiency is a question toward a bigger end.  I would rarely submit a report that centered on market efficiency.  It would be part of a securities case or a valuation case.

So I'm not -- if you mean that, a lot.  If you mean how many

Page 43

CONFIDENTIAL - HUBBARD

reports have I submitted solely on market efficiency, not so many.

Q    Would you say most of your market reports are on the topic of price impact?

A    I'm not sure I could say most.  Many reports I do that would involve market efficiency are valuation exercises as well, which I might do for appraisal cases, tax cases, and so on.

Q    So you saw Dr. Tabak's expert report on market efficiency in this case, correct?

A    Yes.  And I not only saw it, I read it.

Q    Did you opine on market efficiency in this case?

A    I did not.  I saw no reason to question Dr. Tabak's conclusions.  I replicated what he did.

Q    So do you agree that the market for Alibaba ADS was efficient during the class period in this case?

A    I do.

Page 44

CONFIDENTIAL - HUBBARD

Q    And in the Huntsman case, can you describe the work you did relevant to price impact?

A    This was a question of the lack of disclosure by a seller and the effects on Huntsman.

Q    Do you know the outcome of that trial?

A    Huntsman prevailed.  It's not a trial, it was an arbitration.  But Huntsman prevailed.

Q    And did you testify on behalf of Huntsman?

A    I did.

(Pause.)

Q    Can you tell me what your understanding of the phrase "market efficiency" is or "an efficient market"?

A    Well, depends on what version you use.

Mostly, when economists are doing event studies, particularly in litigation and for academic research,

Page 49

CONFIDENTIAL - HUBBARD

is on what we would call semi-strong versions of market efficiency, meaning that the market price incorporates all publicly available information.

Market efficiency, as a broader context, means incorporating some kind of information.  So a so-called weak form would just be that the knowledge of past prices of the security shouldn't be predictive of the current price.

And going the other direction, a strong form means the market price should incorporate all information, including private information.

So, again, it's the one in the middle that normally gets featured.

(Clarification by the reporter.)

Q    And it's the one in the middle, semi-strong market efficiency, that has been demonstrated here?

A    That's correct.

Page 50

CONFIDENTIAL - HUBBARD

Q    Are you familiar with the law on market efficiency from the Basic v Levinson case?

A    Not -- just as a layperson, my understanding is that that standard is a semi-strong -- what, in econ speak, would be a semi-strong version.

(Pause.)

Q    So I want to ask you some very basic questions about market efficiency, so please excuse me.

If you think about the very general, like the most basic theory of economic supply and demand, if supply goes up, prices go down.  Demand goes up, prices go up, generally, right?

A    Well, in economics, we always have this catch-all phrase, "all else equal."

Q    All else equal.

A    If you just pin that to everything you're saying, then yes.

Q    All else equal, does that same theory apply to stock prices?

Page 51

CONFIDENTIAL - HUBBARD

Q    Did you opine on price impact with respect to the alleged omissions?

A    I'm not sure what you mean by that.  I opined on price impact or lack thereof on a number of statements, so I am not sure what you mean.

Q    Well, earlier you testified, I believe, that you were aware that following the -- that -- excuse me, that Plaintiffs' allegations, in addition to alleging affirmative misstatements, alleged material omissions, correct?

A    Yes.

Q    So does your report specifically opine on the omissions?

A    Why don't you give me an example of an omission that you are curious about?

Q    An omission being the continued use of the exclusivity, for example.

A    That I view I have addressed there is no point at which that

Page 57

CONFIDENTIAL

CONFIDENTIAL - HUBBARD

information gets in the price.  And my evaluation of the November 10th draft guidelines puts a nail in the coffin of an alternative view.

Q    Sounds to me -- so you feel like November 10th is quite definitive?

A    I'm not sure what you mean about that.  I think November 10th certainly belies an argument that the market thought Alibaba was not practicing exclusivity.

Q    I guess -- I use the word "definitive" to react to your use of the phrase "the nail in the coffin."

Let me ask it a different way.

Do you feel like the market reaction as discussed in your report to the November 10th draft guidelines is the strongest evidence regarding a lack of price impact in this case?

A    I think there are a number of pieces of evidence that are strong. That is probably the clearest focus on

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - HUBBARD

inflation can come in and go out and come back in.

But like the price inflation theory, there would need to be some curative at the end.  And it would be a test of the price maintenance view as to whether or not market participants believed exclusivity was or was not happening over the period.

Q    So in a price maintenance theory, you don't expect to see the inflation reflected in a statistically significant price increase, correct?

A    Well, it may have already been.  It should have come in at some point prior to your class, so you need to identify that.

But it shares with price inflation theories that there is some back-end curative, but there is an additional prediction about whether market participants do or don't believe, at least in this case, that exclusivity is being practiced by

Page 82

CONFIDENTIAL - HUBBARD

Alibaba.

Q     Is price maintenance also sometimes referred to as "inflation maintenance"?

A     It could be.  One is just the derivative of the other.

Q     So you mentioned there that under an inflation maintenance theory, you would have to show, though, at some point, when the inflation enters the stock price before the class period.

Did you say that?

A     Yes.  You would need to do that.

Q     But that need not necessarily be in the form of a statistically significant price increase, right?

A     Other -- almost in all cases, yes, it should be.

The factory burning down, which has nothing to do with this case, but I would agree with you that would be an exception.

Q     And when you look for when

Page 83

CONFIDENTIAL - HUBBARD

to be.

If we think about November 10th, we have draft guidelines that clearly highlight exclusivity and exclusivity for dominant firms.

If the market believed that Alibaba was not practicing exclusivity, as called out by the draft guidelines, there would be no harm, no foul of the announcement of the draft guidelines.

Of course, there is a significant -- very large and statistically significant negative response suggesting the market actually thought Alibaba was in the crosshairs of these draft guidelines.  That's the kind of pattern to which I'm referring.

Q    But that's assuming the draft guidelines deal only with exclusivity, correct?

A    No.  That that's assuming that exclusivity is the featured part of it, which is what every analyst to a person comments on.

Page 98

CONFIDENTIAL - HUBBARD

Q    And why did you choose the November 10th, 2020, draft guidelines as your empirical or statistical test to assess the market's beliefs about exclusivity during the class period?

Why was that date important to you?

A    Well, of course, I looked at many dates.  That date is important to me for that proposition because of the importance of exclusivity in the draft guidelines.

The other dates, for example, in July, some of the ancillary dates in your complaint and the purported active curative date would be less directly on point.

Q    You consider the SAMR's announcement that it was investigating Alibaba's "choose one of two" practices as not on point?

MR. BLAKE:  Object to form.

A    For the purpose I just said, that's correct.

Page 99

CONFIDENTIAL - HUBBARD

It's not curative of anything because, A, the market already believed in the practicing of exclusivity;

B, the antitrust risks were known to the market.  The only thing not known to the market was the fact of a meeting;

And, C, the SAMR doesn't refer to things that in your other metric.  So it has nothing to do with your complaint.

Q    So you read the motion to dismiss order.

You're aware that the Court has rejected argument that the December 23rd announcement was not curative of anything, right?

MR. BLAKE:  Object to form.

A    I'm not aware of that in the motion to dismiss.  You can show it to me if it's important to you, and we can talk about it.

But I'm saying, from an economic perspective, which is only

Page 100

CONFIDENTIAL - HUBBARD

advice I can give the Court, nothing in there cures your allegations.

Q    And that opinion is premised on your other conclusion that the market was aware Alibaba was practicing exclusivity?

MR. BLAKE:  Object to form.

A    That's certainly important, yes.

Q    Is it premised on anything else?

A    Yes.  You have a family of allegations, some of which relate to antitrust risks, which, again, were known, some of which relate to these, what I refer to as other -- I can't remember your categories -- let's say, revenue metrics, value creation, so on, which didn't feature in the SAMR release.

Q    Do you know what a VIE, or "variable interest entity," is?

A    In this context, no.  You'd have to help me.

Page 101

CONFIDENTIAL - HUBBARD

Q   Are you aware that that's the business structure by which foreign investors are able to invest in Alibaba?

A   Maybe.  Again, I'm not that familiar with Chinese securities markets.

Q   In your analysis, do you recall reading any commentary about the market having a concern about potential VIE structure risk following the draft guidelines?

A   I don't recall that one way or the other.

Q   Are you aware of the ways in which Alibaba uses its algorithms to recommend products to potential purchasers?

A   That's not something I was asked to study, no, either on Tmall or Taobao.

        (Clarification by the
    reporter.)

Q   Following the draft

Page 102

CONFIDENTIAL - HUBBARD

guidelines, did you attempt to make any

assessment about the impact of

provisions in the guidelines about

algorithms and search recommendations,

about the impact that that could have

an Alibaba and its businesses?

A     No.

Q     What about with respect to

provisions about pricing discrimination

in the draft guidelines?

Did you make any attempt to

review the analyst commentary about how

that could impact Alibaba and its

business after the draft guidelines?

A     I don't recall that being

important in analyst reports, and I

recall no analyst report -- you'll

correct me, I'm sure, if I'm wrong --

that didn't highlight exclusivity when

it also highlighted something else.

Q     But if a report talked about

both exclusivity and some of these

other issues, like Alibaba's potential

pricing discrimination, did you make

Page 103

CONFIDENTIAL - HUBBARD

any attempt to discern whether the draft was more tied to one or the other?

A    If I'm understanding your question, I'm not quite sure how you would do that.

But if an analyst report is important to you, you should show it to me and we can look at it together.

Q    In talking about what the market is aware of about a company, I notice sometimes you use the word "aware" and sometimes you use the word "believe."

Is there any difference in your mind between a market's awareness and its beliefs?

A    You'd have to show me the language.

Q    Yeah.  So in paragraph 11, this is your during the -- on your "during the class period" summary, you say the market was aware.

A    Where is that?

Page 104

CONFIDENTIAL - HUBBARD

assess it.  The market has all of these.

And different market participants, as I think I said to you this morning, could be put different weight on different sources by a participant.  That's fine.

Q    Generally speaking, are there some firms who are given more weight by market participants?

A    Depends on the participant.

But the large wirehouse firms would typically have a larger following than, say, some idiosyncratic post on Seeking Alpha or something like that.

Q    By "large wirehouse firms," you mean --

A    The ones we talked about this morning.  So Morgan Stanley, Goldman Sachs, and so on.

Q    Okay.  And what about the analysts' access to the company?

Do investors -- or does the market put more weight on analyst

Page 108

CONFIDENTIAL - HUBBARD

if I picked two or four, the answer would be different.

Q    So that's just your assessment of the time period that would capture the relevant discussion?

A    That's correct.

Q    On page 47, in footnote 135, you describe some of the numbers here.

And I think we were talking about earlier about how your Analysis Group folks gave you certain counts of analyst reports based on your qualitative instructions, right?

Would this be an example of that?

A    Yes, it would.

Q    Okay.  And so it says that there were 38 reports that were both specific to Alibaba and commented on in November draft guidelines, correct?

A    Right, out of the 73.

Q    Did you review all -- did you review those 38 reports personally?

A    I did not.

Page 140

CONFIDENTIAL - HUBBARD

Q     Okay.  And who made the assessment of what those 38 reports were, meaning that they were Alibaba specific and discussed draft guidelines?

A     That's the review team.

Q     Were you provided a list of what those 38 reports were?

A     That's entirely possible.  I really don't recall.

Q     So of those 38 reports that -- again, we're talking about reports that were both specific to Alibaba and discussed the draft guidelines -- you quote from approximately ten reports in paragraphs 85 through 87; is that correct?

A     Correct.

Q     And did you read the entirety of these approximately 10 reports?

A     That is my practice, yes.

Q     Who provided you with those reports?

Page 141

CONFIDENTIAL - HUBBARD

A      The Analysis Group team.

Q      Did they provide you with -- on this topic, did they provide you with more than the ten that are quoted from here?

A      That, I don't recall.

Typically, if we're going to quote something, I would ask to read the entire report from which the quote is taken.  So it's probably that, but I really don't recall.

Q      So is it your opinion that these reports are the best evidence of what the market believed about Alibaba's exclusivity practices during the class period?

MR. BLAKE:  Objection to form.

A      I actually -- personally, because I'm a nerd economist, I would have looked at the statistical analysis.  But these are good pieces of corroborating evidence from the market, yes.

Page 142

CONFIDENTIAL - HUBBARD

Bates stamp is BABA_AML00002870, was marked Hubbard Exhibit 63, for identification, as of this date.)

MS. WOLKE:  For the record, this is a Goldman Sachs analyst report dated November 25, 2020. The Bates stamp is BABA_AML00002870.

Q    Have you had a chance --

A    I am familiar with this. This is one I'm thinking of.

I'm happy to chat with you about it.

Q    Have you reviewed this analyst report before -- personally read it?

A    I have.  And the same analyst team, two weeks before this, had a very different story about exclusivity.  So you can look that up if you like.

And, of course, all this report says is what Alibaba says.

Q    Is that all it says?

Can you read the headline of

Page 149

CONFIDENTIAL - HUBBARD

the title of the report?

     A     "A compliant Baba aligned with China's LT goals reiterate bond."

     Q     "A compliant Baba."

           What's your understanding of -- compliant with what?

     A     My understanding is Alibaba said that they believe they're complying with the rules in the draft guidelines.

     Q     What does the -- what does the second sentence of the analyst report say?

     A     "Alibaba remains compliant with all rules and the draft guidelines published, and management expects limited impact on their growth trajectory."

     Q     All right.  So is it your position that this is not a piece of evidence that would inform market beliefs as to Alibaba's practice of exclusivity?

     A     My judgment, because I did

Page 150

CONFIDENTIAL - HUBBARD

look at this one, is no.

The same analyst team, literally the same people, two weeks before, discuss exclusivity.  They're quite aware that it's a problem.

Here I think they're stating -- and I don't know the facts, of course, one way or other -- that Alibaba believes it is compliant with the rules.  Remember we're at the time of the draft guidelines, not -- not something else.

Q    Right.  But you just testified that it was important to understand the market's reaction for three weeks after, correct?

A    Correct.

Q    Right.  Because analysts can't immediately report everything. They're not like the news, filing reports every day.

A    That's why I look a period of time.

Q    And here, in fact, the

Page 151

CONFIDENTIAL - HUBBARD

analyst is providing more specific information as a follow-up to an earlier report that had -- that did not have this specific information from the company, correct?

A    I'm not sure you can connect those dots.

I'm merely making the point that these are analysts -- the same analysts who had believed in exclusivity two weeks prior.

Q    Is it your view that the market would not believe what Goldman Sachs had to say in this analyst report?

A    I'd say it's a piece of information for the market, people can decide if they believe or not.

You and I don't even agree on was being said here.

Q    And to that extent, the people who believed this information, their beliefs would be incorporated into the stock price, correct?

Page 152

CONFIDENTIAL - HUBBARD

A     Maybe yes; maybe no.  Depends what a marginal investor believes.

Q     Tell me why, in your opinion, this might not inform market beliefs as to Alibaba's actual compliance of -- or actual practices of exclusivity during the class period.

MR. BLAKE:  Objection to form.

A     I view it as simply a data point.  It's a piece of information.

It's relying on what Alibaba says and Alibaba's own perception of whether it is, in fact, in compliance, which is, of course, ultimately something a regulator would judge, not Alibaba itself.

So I view it as -- yes, it's a piece of information.

Q     And analysts commonly report on what companies tell them, right?

We talked about earlier today.

A     Correct.

Page 153

CONFIDENTIAL - HUBBARD

Q    And the market commonly relies on that, right?

MR. BLAKE:  Objection to form.

A    It's -- I don't know what you mean by "rely," but it's certainly a piece of information.

But I don't recall this being a general feature of analyst reports. That's why I was confident I might see this document.

Q    What do you mean by "a general feature of analyst reports," that?

A    In other words, this is the analyst report that I recall that might have had your point of view, which is why I am not surprised I'm seeing it.

Q    Do you recall any other ones?

A    Now I think I may recall one other.

Q    What's the other one that you recall?

A    I think there's a similar

Page 154

CONFIDENTIAL - HUBBARD

pattern of a Morgan Stanley report with the very same analyst, again, two weeks prior, at a specific alternative view.

We can talk about that one too if you'd like.

Q    Why did you not include a discussion of this Goldman Sachs analyst report in your discussion of the evidence that -- that you believe would have informed market knowledge during this period after publication of the draft guidelines?

A    I think I've answered to you that I don't think it does.  I think you and I are reading the document differently.

And I looked at what the analysts had just very recently said, so I didn't come to the same conclusion you do.

Q    So you rejected this subsequent report that provided more detail on Alibaba's use of exclusivity?

MR. BLAKE:  Objection to

Page 155

CONFIDENTIAL - HUBBARD

form.

A    Well, I'm not sure I would characterize it that way, but I did reject the report, yes.

Q    And you rejected the Morgan Stanley report that was similar to this?

MR. BLAKE:  Objection.

A    It's not quite similar.  But of the ones that you might consider useful, it's, in that sense, similar.

Q    Well, you brought it up.

A    Well, I'm sure you have it in your folder, and we can look at it. I'm just saying it suffers from the same flaw.

Q    So you rejected two analyst reports that had contrary opinions from what you have described as two of the biggest investment firms on Wall Street?

A    I think I cited both of those investment teams.

Q    But not these reports that

Page 156

CONFIDENTIAL - HUBBARD

are contrary to your view?

A    It's --

MR. BLAKE:  Objection to form.

A    It's not that they're contrary to my view.  I told you how I considered and read them.  I read them differently from you.

Neither one of us is the finder of fact, and we'll have to see.

MS. WOLKE:  Okay.  We can go off the record.

VIDEOGRAPHER:  The time is 12:27 p.m.  This marks the end of Media Unit Number 2.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  The time is 1:50 p.m., and this begins Media Unit Number 3.

Q    Dr. Hubbard, you understand you're still under oath, correct?

A    Correct.  Thank you.

Q    Prior to the lunch break, you

Page 157

CONFIDENTIAL - HUBBARD

testified that of the analyst reports

that you reviewed in that three-week

period following the draft guidelines,

that all, or almost all of them, talked

about exclusivity; is that correct?

A    Yes.

Q    And you also said that you

did not review all of the analyst

reports in the analyst report universe,

right?

A    I'm sorry.  You mean by that,

that I personally did not?

Q    That you personally.

A    That's correct.

Q    You had your team review and

filter them for you, based on searches

you asked them to look for, correct?

A    That's correct.

MR. BLAKE:  Objection to

form.

Q    And didn't you also testify

that you directed your team to look for

and give you analyst reports relating

to exclusivity?

Page 158

CONFIDENTIAL - HUBBARD

A    You're talking in the context of this particular date or just in general?

Q    In general.

A    Yes.

MS. WOLKE:  I'd like to mark another exhibit.  It's this one, please.

We're on Number 64.

(Goldman Sachs analyst report dated November 11th, 2020, was marked Hubbard Exhibit 64, for identification, as of this date.)

THE WITNESS:  Thank you.

MS. WOLKE:  You're welcome.

For the record, Exhibit 64 is a Goldman Sachs analyst report dated November 11th, 2020.

Q    Dr. Hubbard, before the break, we were talking about a Goldman Sachs analyst report that was dated November 25, 2020.

Do you recall that?

A    Yes.

Page 159

CONFIDENTIAL - HUBBARD

Q    Exhibit 63?

A    Yes.

Q    And I believe you testified to saying that the same Goldman analyst team had, approximately two weeks earlier, issued a different report that, in your opinion, stated a very different view on whether Alibaba was using exclusivity during the class period; is that right?

A    It was certainly different, yes.

Q    Is this the other Goldman Sachs analyst report that you were referring to?

A    Yes, it is.

Q    Where in this report does it say that Alibaba was continuing to practice exclusivity during the class period?

A    This report really just refers to the JD and Alibaba problem over exclusive agreements on the second page.  I think the Morgan Stanley

Page 160

CONFIDENTIAL - HUBBARD

predecessor report is probably

stronger.

Q    And in this report, when does

it say those alleged exclusive

agreements were at issue?  What year?

A    2015.

Q    Did you cite this analyst

report in your expert report?

A    I believe I did, actually.

Q    Paragraphs 85 through 87 --

A    That sounds about right.  I

know it's in the report.

Q    -- are your discussion of

analyst reports during this period.

I don't see it there, but if

you see it --

A    Somewhere -- maybe it was

Morgan Stanley I was thinking about.

Sorry.

It might not be this one.  It

may be the Morgan Stanley

November 11th.  Sorry.

Q    But you do recall reading

this Goldman Sachs report and also the

Page 161

CONFIDENTIAL - HUBBARD

before the announcement that exclusivity was ongoing?

A    To some extent, it might, sure.

MR. BLAKE:  Object to form.

Q    Is it your opinion that prior to the announcement of the SAMR investigation, the market already knew the full extent of Alibaba's exclusivities that resulted in that investigation?

MR. BLAKE:  Object to form.

A    I don't know one way or the other, because, of course, the announcement of the investigation doesn't even say what SAMR is looking for one way or the other.

So I wouldn't even know how to answer that question.

Q    Well, it does say.

It says it's looking at choose one of two, right?

A    But it doesn't say what it means by that -- as to what that

Page 187

CONFIDENTIAL

CONFIDENTIAL - HUBBARD

exactly means, so I wouldn't know how to answer the question.

Q    Are you able to say or have you formed an opinion on whether the market already knew the full extent of Alibaba's exclusivity practices that resulted in the SAMR investigation?

MR. BLAKE:  Object to form.

A    I don't know one way or the other.

Q    In paragraph 126 of your report...

A    Okay.

Q    So here this is -- the context here is after you've looked at the resolution of the investigation, there's a phrase in 126 I wanted to ask you about.

You say that "the price increase in April 2021 provides further support that a portion of the price decline following the SAMR announcement was attributable to uncertainty."

Uncertainty being the topic

Page 188