**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: ALIBABA GROUP HOLDING LTD.
SECURITIES LITIGATION

No.: 1:20-cv-09568-GBD-JW

## SUPPLEMENTAL EXPERT DECLARATION OF GLENN HUBBARD

I, GLENN HUBBARD, declare:

1.      I submit this declaration in response to certain opinions offered in the April 19, 2024 Expert Reply Report of David Tabak ("Tabak Reply Report")[1] which mischaracterizes my own opinions in the January 19, 2024 Expert Report of Glenn Hubbard ("Hubbard Report" or my "Initial Report") and my March 21, 2024 deposition ("Hubbard Deposition") testimony.  I make this declaration of my own personal knowledge and experience and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.      I opined in the Hubbard Report, based on extensive quantitative and qualitative review and analysis undertaken by myself and my team at Analysis Group, that none of the challenged misrepresentations (*i.e.*, affirmative misstatements and/or omissions) or their purported correction by the SAMR Investigation Announcement had an impact on Alibaba's ADS price.  The Tabak Reply Report does not change my opinions in my Initial Report.  Moreover, Dr. Tabak's critiques of my analysis are flawed as discussed below.[2]

---

[1]  All relevant materials regarding my background, qualifications, compensation, and the materials I considered in reaching my opinions can be found in the Hubbard Report and its Appendices.  The additional materials that I considered in preparing this declaration are listed in **Appendix A** of this declaration.

[2]  To the extent that I do not respond to certain issues in the Tabak Reply Report, that does not imply that I agree with Dr. Tabak.  For example, Dr. Tabak mischaracterizes my deposition testimony to support his claim there "likely" was a "heterogeneous set of beliefs" in the market regarding Alibaba's continued exclusivity practices during the Proposed Class Period.  I do not find it constructive to respond in detail to Dr. Tabak's argument, as he concedes market evidence shows "Alibaba was engaged in some form of exclusivity practices" during the Proposed Class Period.  *See* Tabak Reply Report, ¶ 42.

## I.    I CONSIDERED ALL POSSIBLE THEORIES POTENTIALLY LEADING TO A FINDING OF PRICE INFLATION

3.    Dr. Tabak states that: "Dr. Hubbard's analysis fails to consider that a stock (or ADS) price can become inflated as a result of a statement that prevents a stock-price decrease by omitting relevant information or by providing false or misleading information to the market that is consistent with the market's prior beliefs."[3]  This statement is false.  As I discussed in the Hubbard Report, I evaluated two possible scenarios where the alleged misrepresentations maintained the *status quo* and thus did not result in an increase in Alibaba's ADS price:

    a.    Alibaba *began* practicing exclusivity during the Proposed Class Period, but the alleged misrepresentations misled the market to believe that it continued to not practice exclusivity.  Stated differently, circumstances changed, but the misrepresentations misled the market into the belief that they had not changed.

    b.    False information and inflation were introduced to the market at an earlier date, and the alleged misrepresentations at the beginning of and during the Proposed Class Period maintained the price and inflation.[4]

4.    I rejected the first scenario because "the Complaint, Motion to Dismiss Order, and market commentary . . . all make clear that there was widespread market recognition that Alibaba was practicing exclusivity prior to the Proposed Class Period, which is inconsistent with the facts needed for such a theory to apply."[5]  Dr. Tabak fails to acknowledge this opinion.

5.    I also rejected the second scenario because there was no statistically significant price reaction or market commentary on November 13, 2019 or November 15, 2019, when the Previous Disclosures, containing similar language to the Prior Practices Statement, were made.[6]

---

[3]  Tabak Reply Report, ¶ 8.

[4]  Hubbard Report, ¶¶ 39-41, n. 67.

[5]  Hubbard Report, n. 67.

[6]  Dr. Tabak claims that my review of market commentary was "incomplete" due to my delegation of reviewing a vast volume of analysts' reports and news articles to the Analysis Group team.  *See*, *e.g.*, Tabak Reply Report, ¶¶ 11-14, 27, 43-45.  Dr. Tabak's criticism is curious, as he employed a similar methodology with his team at NERA. *See* Video Deposition of David Tabak. Ph.D., November 2, 2023 ("Tabak Deposition"), 119:20-121:3.  Moreover, this delegation is both reasonable and necessary because it would be physically and economically impractical for one single individual to comprehensively review every document.  My methodology was fully disclosed in the Hubbard Report.  *See* Hubbard Report, ¶ 8.  During my deposition, I further elaborated on the rigorous process that

Although Dr. Tabak quibbles with my analysis for November 13, 2019, to which I respond below, it is notable that he has not provided any opinion on when inflation purportedly entered Alibaba's ADS price. Plaintiffs and Dr. Tabak instead appear to ask the Court to infer inflation without direct evidence or even an expert-backed theory for how it entered the market.

## II.    DR. TABAK'S LIMITED CRITICISMS—WHICH DO NOT INCLUDE AN OPINION ON HOW ALIBABA'S ADS PRICE WAS INFLATED—ARE FLAWED

6.    Rather than offer an opinion on when inflation purportedly entered Alibaba's ADS price, Dr. Tabak speculates as to possible "credible explanation[s]" for how price impact might have existed despite evidence to the contrary.[7] His limited criticisms of my findings are flawed. **First**, Dr. Tabak claims that there was negative confounding news on November 13, 2019 because he identified two news articles that quoted Jack Ma saying that: "[Alibaba's Singles' Day sales] did not meet the expectations I had imagined."[8] Dr. Tabak posits that this news could have "offset" "any positive effect from the Prior Practices Statement."[9] For Dr. Tabak's claim to be true, *both* the Prior Practices Statement and the purported confounding news would need to be value-relevant (*i.e.*, the challenged statement had a positive price impact and was offset by the negative price impact from the confounding news). However, there was no evidence that either statement was considered value-relevant by market participants.

7.    As I showed in the Hubbard Report, there was no mention of the Prior Practices Statement in any of the market commentary, indicating that the market did not perceive it as

---

myself and the Analysis Group team employed to ensure that the review was as unbiased as possible. *See* Hubbard Deposition, 67:8-68:11. The Analysis Group team has provided the same assistance in preparing this declaration.

[7] Tabak Reply Report, ¶ 18.

[8] *Reuters News*, "Alibaba's Jack Ma Says Singles' Day Shopping Results Miss Expectations," November 13, 2019; *Barron's Online*, "Alibaba Stock Is Down Because Jack Ma Reportedly Was Disappointed With Singles Day Results," November 13, 2019.

[9] Tabak Reply Report, ¶ 8.

value-relevant.[10]  Dr. Tabak does not challenge this finding.

8.    Furthermore, Dr. Tabak's purported confounding news was not discussed by *any* of the 67 analysts' reports in the Alibaba Analysts' Report Universe published within three weeks after November 13, 2019.[11]  This is clear evidence that it was not value-relevant.[12]

9.    Given the absence of analyst commentary, Dr. Tabak relies instead on two news articles as the only supporting evidence for his claim of confounding negative news.[13]  For the Hubbard Report I previously reviewed the 536 news articles in the Alibaba News Article Universe that were published from November 13, 2019 to November 19, 2019.[14]  To consider Dr. Tabak's suggestion, I further re-reviewed these 536 news articles and identified nine articles reporting on Mr. Ma's comment,[15] including Dr. Tabak's two articles, which represents less than two percent of all media coverage.[16]  The limited mention and discussion of the purported confounding news selected by Dr. Tabak in the market commentary, and especially the complete

---

[10]  Hubbard Report, Section V.B.ii.  Dr. Tabak did not challenge my opinion that: "my review of market commentary […] suggests that the market did not consider [the Previous Disclosures] to be value relevant" and that there was no discussion of the "prior narrowly-deployed" language after the Previous Disclosures were made. Hubbard Report, ¶¶ 75, 77.  In fact, this observation is also true for the broader time period from October 1, 2019 to December 23, 2020.  None of the market commentary in the Alibaba Analysts' Report Universe mentioned the "prior narrowly-deployed" language before and during the Proposed Class Period.

[11]  I had previously reviewed these analysts' reports before opining that there was no evidence of price inflation on November 13, 2019.  Hubbard Report, ¶ 77.

[12]  Tabak Deposition, 78:13-80:11.

[13]  Tabak Reply Report, Section V (citing *Reuters News* and *Barron's Online*).

[14]  Hubbard Report, ¶ 77.

[15]  For my further review, I performed keyword searches on Factiva among both English and Chinese articles. English-language article keywords: ("Ma" OR "Jack" OR "Yun" OR "Zheshang" OR "Zhe" OR "Shang"). Chinese-language articles keywords: ("马云" OR "浙商" OR "大会"). The keyword searches resulted in 86 news articles. I then reviewed the full text of those news articles to determine whether they were related to Jack Ma's statement.

[16]  Furthermore, when analysts discussed Alibaba's Singles' Day performance at all, they overwhelmingly focused on the fact that sales beat or were in line with analysts' expectations, not that they missed Jack Ma's "imagined" expectation.  The *Barron's Online* article specifically mentioned that: "[a]nalyst comments from earlier this week, however, were mostly upbeat about this year's [Singles' Day] event." *See Barron's Online*, "Alibaba Stock Is Down Because Jack Ma Reportedly Was Disappointed With Singles Day Results," November 13, 2019. *Goldman Sachs* noted that the "Tmall GMV Growth from Singles Day" was: "ahead of [Goldman Sach's] estimate of Tmall 3QFY20E GMV growth (20.5% yoy)." *Goldman Sachs*, "Alibaba Group (BABA): Takeaways From 2019 Singles' Day Shopping Festival: Entertaining, 'E'nnovating and Engaging," November 12, 2019.

lack of analyst commentary, is consistent with my view that such news was not value-relevant and cannot explain the lack of statistically significant price increase on November 13, 2019.

10.    **Second**, in a footnote Dr. Tabak raises the possibility that SAMR's administrative guidance on November 5, 2019 could have led "some portion of the market […] to believe that Alibaba was not practicing exclusivity," so that: "the November 13, 2019 Prior Practices Statement would not have been a surprise to them and would not have been expected to have caused an increase in Alibaba's ADS price."[17]   However, Dr. Tabak provided no evidence to support this argument.  He does not point to a positive abnormal return in Alibaba's ADS on November 5, 2019 that is statistically significantly different from zero.  That is because there was no such return.[18]  He also does not point to any analyst coverage of SAMR's statements to suggest the market considered it value-relevant.  That is because none of the 91 analysts' reports published after November 5, 2019 discussed the SAMR news identified by Dr. Tabak.[19]

## III.    DR. TABAK'S CLAIM THAT I FAIL TO PROVIDE EVIDENCE OF MARKET BELIEFS DURING THE PROPOSED CLASS PERIOD IS INCORRECT

### A.    Dr. Tabak Mischaracterizes the Key Questions That I Examined

11.    Dr. Tabak claims that the "most serious problem" with the Hubbard Report is that: "it fails to cite [two] analysts indicating that they believe that Alibaba was complying with SAMR and not engaging in exclusivity practices."[20]  Dr. Tabak claims that a Goldman Sachs

---

[17]  Tabak Reply Report, n. 10.

[18]  Since November 5, 2019 falls within the estimation periods used in both the Tabak Event Study and the Hubbard Event Study (as defined in the Hubbard Report), I make a simple adjustment to the methodologies by excluding this date from the respective estimation period while keeping all other model specifications unchanged.  With this adjustment, I calculate the abnormal return on November 5, 2019 to be 1.87 percent and 1.83 percent under the adjusted Tabak and Hubbard Event Studies, respectively.  Neither was statistically significantly different from zero.

[19]  I follow the same approach as the Hubbard Report. *See* Hubbard Report, n. 80.  I review all 91 analysts' reports in the Alibaba Analysts' Report Universe published on November 5, 2019 or the following three weeks.  Alibaba announced its earnings on November 1, 2019 (*i.e.*, the Friday before the SAMR news identified by Dr. Tabak), held a Singles' Day event on November 11, 2019, and launched its Hong Kong Initial Public Offering on November 14, 2019.  Analysts' reports issued in the three-week period I reviewed generally discussed these events.

[20]  Tabak Reply Report, ¶ 20.

report[21] and a Morgan Stanley report support that the alleged misrepresentations had price impact because they: "told the market that Alibaba was 'compliant'" and there is "no evidence that the market's reaction was to ignore" the reports.[22]  This critique is flawed for two reasons.

12.    **First**, it is based on a fundamental misinterpretation of the analytical framework and objectives outlined in the Hubbard Report.[23]  The question I asked (*i.e.*, Price Maintenance Key Question #2) was whether there was evidence that market participants were aware that Alibaba engaged in exclusivity practices during the Proposed Class Period.  I asked this question because Plaintiffs' core theory was that the Prior Practices Statement misled the market to believe that Alibaba had ceased practicing exclusivity.[24]  To show that the Price Maintenance Theory is inconsistent with market commentary, I analyzed whether there was "substantial evidence that market participants discussed that Alibaba was practicing exclusivity during the Proposed Class Period" and not, as Dr. Tabak suggests, for affirmations of Alibaba's legal compliance.[25]  Dr. Tabak concedes that I have found such market evidence.[26]

13.    **Second**, Dr. Tabak appears to be arguing that the market was misled not by the Prior Practices Statement or other alleged misrepresentations, but by the two later analysts' reports.  Therefore, Dr. Tabak's critique and his claim regarding the influence of the Goldman Sachs and Morgan Stanley reports are irrelevant because the question I asked and investigated in the Hubbard Report was whether Alibaba's *alleged misrepresentations* had any price impact.[27]

---

[21] Dr. Tabak falsely claims I: "never cite[] this Goldman Sachs analyst report." *See* Hubbard Report Appx. C, p. 131.

[22] Tabak Reply Report, ¶¶ 37-38, 41.

[23] Hubbard Report, Section VI.B.

[24] Hubbard Report, ¶¶ 42, 71, and 80.

[25] Hubbard Report, ¶ 80.

[26] Tabak Reply Report, ¶ 42 ("For clarity, I do not deny that some analysts made comments that could be interpreted as suggesting that Alibaba was engaged in some form of exclusivity practices.")

[27] Hubbard Report, ¶ 6.

14.     Critically, the Goldman Sachs and Morgan Stanley reports were based on a discussion with Alibaba in mid-to-late November 2020, months after the Prior Practices Statement was made.[28]  Prior to this time, as I discussed in the Hubbard Report and testified in the Hubbard Deposition,[29] Goldman Sachs and Morgan Stanley both issued reports indicating their belief that Alibaba was engaged in exclusivity practices.  For example, a November 11, 2020 Morgan Stanley report that Dr. Tabak himself cites indicated that as of that date, Morgan Stanley believed Alibaba was practicing exclusivity.[30]  On the same date, Goldman Sachs reported: "there have been a number of alleged cases already encompassed in the [November Draft Guidelines]" including a "pending legal dispute with JD and Alibaba over alleged exclusive agreements."[31]  Goldman Sachs's connection of the November Draft Guidelines to allegations against Alibaba indicates its awareness of ongoing exclusivity practices.

15.     Because the question I considered was whether the alleged misrepresentations had price impact, the issue of whether there was price impact from two analysts' reports published on November 20, 2020 and November 25, 2020 that do not mention the Prior Practices Statement but report on information learned from Alibaba just days before does not change my opinion.

**B.      Empirical Findings Support that Alibaba Was More Negatively Affected by the November Draft Guidelines Due to Practicing Exclusivity**

16.     In my Initial Report, I showed that Alibaba's ADS price reaction and the market

---

[28]  The Morgan Stanley report paraphrased Alibaba's statements in the "Virtual Asia Pacific Summit." The Goldman report was based on "investor meetings" it hosted for Alibaba on November 23, 2020. *See Morgan Stanley*, "Virtual Asia Pacific Summit Feedback," November 20, 2020. *Goldman Sachs*, "Alibaba Group (BABA): A Compliant BABA, Aligned with China's LT Goals; Reiterate Buy (CL)," November 25, 2020.

[29]  Hubbard Report, ¶¶ 85, 87; Hubbard Deposition, 149:5-151:6, 154:25-155:4.

[30]  *See Morgan Stanley*, "Government Seeks Opinions on New Antitrust Regulations," November 11, 2020 ("we believe e-commerce (Alibaba, Pinduoduo, JD) and food delivery (Meituan, Alibaba) could be in focus [of the November Draft Guidelines], given the specific mentions of practices around [Choose One of Two] policy and aggressive subsidies, among others. Stricter scrutiny of '2-choose-1' policy to merchants could have a negative impact on Alibaba and Meituan").

[31]  *Goldman Sachs*, "China Technology: Internet: Draft Anti-Monopoly Rules Guide Competition in Digital Platform Economy for Sustainable Development," November 11, 2020. *See* Hubbard Report Appendix C, p. 131.

commentary following the November Draft Guidelines "indicate[] that the market was aware that Alibaba was practicing exclusivity."[32]  Dr. Tabak claims that I ignore "multiple aspects of the November Draft Guidelines that did not relate to exclusivity and that would be expected to have had a negative effect on Alibaba's ADS price"[33] and/or fail to attribute the drop to "the general risk of increased regulation."[34]  Yet Dr. Tabak again does not present any evidence that these "multiple aspects" or "general risk" related to the November Draft Guidelines explain Alibaba's outsized ADS price decline.  In failing to do so, he ignores the full spectrum of market commentary—including evidence presented by Plaintiffs—that clearly focus on exclusivity as the primary risk to Alibaba from the November Draft Guidelines.[35]

17.    For example, Dr. Tabak claims that my "opinion that all analysts (or at least all analyst reports) commented on exclusivity is incorrect" and then cites two short analysts' reports (from *Jefferies* and *UBS*) that do not expressly mention exclusivity.[36]  However, both *Jefferies* and *UBS* discuss exclusivity in more comprehensive reports issued in the same three-week window that I (and Dr. Tabak) examined.  A November 12, 2020 *Jefferies* report states: "China's regulatory bodies proposed new oversight guidelines on Tuesday… with the aim of protecting the business interests of SMEs through cracking down on monopolistic practices… [including]

---

[32]  Hubbard Report, ¶ 82.

[33]  Tabak Reply Report, ¶ 54. Dr. Tabak claims that: "[t]here is no listing of the 38 relevant analyst reports in the Hubbard Report" "purportedly considered by Dr. Hubbard." *See* Tabak Reply Report, ¶ 46 and n. 55. The reports are listed in the Hubbard Report Appendix C and can be identified using the "Analysts' Report Counts.xlsx" file in my backup materials, specifically by setting Column J ("Three Weeks (2020-11-09 to 2020-12-01)") and Column K ("Discusses Event"), both under a common header called "November Draft Guidelines," to "1."

[34]  Tabak Reply Report, ¶ 50.

[35]  For example, Plaintiffs state that the November Draft Guidelines: "[bolstered] the prohibition of anti-competitive practices on online platforms including Alibaba's 'Choose One of Two' and other restrictive dealing practices," and that the action "was viewed by the market as targeting Alibaba."  Complaint, ¶ 25. *See also* Hubbard Report, ¶ 81. Similarly, Plaintiffs state that: "[i]nvestors were thus stunned when on November 10, 2020... news outlets reported that Alibaba was the target of new rules governing restrictive trading."  Plaintiffs' Opposition to Alibaba Defendants' Motion to Dismiss, October 21, 2022, p. 1. These statements by Plaintiffs are consistent with my opinion (and inconsistent with Dr. Tabak's) that exclusivity was a major component of the November Draft Guidelines that the market believed would impact Alibaba's ADS price.

[36]  Tabak Reply Report, ¶¶ 47, 49, and 51.

platforms such as *Alibaba*, Meituan, JD, and PDD. *Small vendors and retail merchants are expected to benefit from the elimination of current 'either-or' clauses.*"[37]  A December 1, 2020 *UBS* report lists: "[r]estricted market activities: e.g. 2-choose-1 among e-commerce platforms" under heading "How to define 'monopolistic behaviors.'"[38]

18.    Furthermore, as I discussed in the Hubbard Report, after removing market and industry effects, Alibaba's negative abnormal return following the November Draft Guidelines was statistically significantly different from zero.[39]  This pattern suggests that Alibaba's ADS price decline following the November Draft Guidelines cannot be explained by industry-wide effects such as "the general risk of increased regulation" alone.

19.    To illustrate, I compare Alibaba's actual returns on November 10, 2020 with its competitors based in China, Hong Kong, or Taiwan, which are identified in the Alibaba Analysts' Report Universe.  As **Appendix B** shows, Alibaba's ADS price experienced a decline of 8.26 percent, making it the second largest decline of all 23 of Alibaba's competitors and approximately 2.35 percentage points higher than the next largest decline of 5.91 percent.

20.    Alibaba's ADS decline was only surpassed by Meituan, which declined by 10.50 percent.  Meituan, like Alibaba, was identified as at risk under the November Draft Guidelines due to its exclusivity practices.[40]  Thus, the large price declines experienced by both companies

---

[37] *See Jefferies*, "Internet Monopoly Disruption, & Policy Intervention," November 12, 2020 (emphasis added).

[38] *See UBS Equities*, "China Internet Sector: Takeaways From Expert Calls on Anti-Monopoly Guidelines," December 1, 2020.

[39] Hubbard Report, ¶ 82. As Dr. Tabak explained, an event study: "remov[es] the influence of general market and/or industry effects," including "the general risk of increased regulation," which one would expect to affect the industry rather than a single company.  *See* Expert Report of David I. Tabak, Ph.D., October 6, 2023, ¶ 32.

[40] *See*, *e.g.*, *Morgan Stanley*, *"*Government Seeks Opinions on New Antitrust Regulations," November 11, 2020 ("we believe e-commerce (Alibaba, Pinduoduo, JD) and food delivery (Meituan, Alibaba) could be in focus [of the November Draft Guidelines], given the specific mentions of practices around [Choose One of Two] policy and aggressive subsidies, among others."); *J.P. Morgan*, "China Internet: Implications from the Guidelines on Anti-Trust Activities Regarding Internet Platforms," November 10, 2020 ("We divide the related listed companies into three groups based on the potential impact from the [November Draft Guidelines]: 1) Potentially negative: Alibaba/Meituan, which have dominant positions in their respective market segments (e-commerce/local consumer services), and have been accused of forced exclusivity by merchants"). *See also* Hubbard Report, ¶ 85.

further supports that exclusivity was the "featured part" of the November Draft Guidelines, and that Alibaba was generally more negatively affected than its competitors due to its ongoing exclusivity practices.[41]

21.    To summarize, contrary to Dr. Tabak's claim, the empirical evidence in the Hubbard Report, which I elaborate on above, shows that Alibaba's ADS price decline was driven by concerns related to ongoing exclusivity practices, and not by "the general risk of increased regulation" or by other "areas" of the November Draft Guidelines.[42]

## IV.    DR. TABAK MISCHARACTERIZES MY ASSESSMENT OF NO PRICE IMPACT FROM THE SAMR INVESTIGATION ANNOUNCEMENT

22.    Dr. Tabak states that I: "d[o] not quantify the effect of other potential causes of Alibaba's ADS price decline," and therefore I: "do nothing to prove an absence of a price impact."[43]  However, as I explained in the Hubbard Report, I did not need to do so because: "the SAMR Investigation Announcement did not correct the alleged misrepresentations and, thus, cannot be used as evidence that the alleged misrepresentations caused inflation in Alibaba's ADS price."[44]  My analysis in the Hubbard Report was conducted to determine what did cause the price decline that day, given there was no corrective information disclosed.[45]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 17, 2024.

_____
Glenn Hubbard

---

[41] Hubbard Deposition, 98:22-25.

[42] Tabak Reply Report, ¶ 50.

[43] Tabak Reply Report, ¶ 59.

[44] *See* Hubbard Report, ¶ 115. *See also* Hubbard Deposition, 171:17-172:15.

[45] Dr. Tabak claims: "[a] regulatory investigation will often lead to heightened uncertainty and thus to an increase in implied volatility.  However, that is true whether the investigation is of a known practice (as Dr. Hubbard argues) or of one that was unknown, partially unknown, or doubted."  *See* Tabak Reply Report, ¶ 63.  This claim, combined with the fact that the SAMR Investigation Announcement was not corrective, is consistent with the Hubbard Report.