# EXHIBIT P-40

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x

IN RE: ALIBABA GROUP HOLDING LTD.

SECURITIES LITIGATION

Case No.:

1:20-cv-09568-GBD-JW

---------------------------------x

**PORTIONS OF THE TRANSCRIPT HAVE BEEN**

**DESIGNATED AS CONFIDENTIAL**

VIDEOTAPED DEPOSITION of ROBERT GLENN HUBBARD, held at the law offices of Pomerantz LLP, 600 Third Avenue, New York, New York, on the above date and time, before Judith Thaten, a Certified Livenote Reporter and Notary Public of the State of New York, commencing at 9:21 a.m., Thursday, March 21, 2024.

JOB No. 6588696

PAGES 1 - 202

Page 1

HUBBARD

it?

        A    I have not.

        Q    Okay.  Would you say this report contains your complete opinion and the bases for those opinions related to this action?

        A    Sitting here today, more or less.  If I'm asked to do additional work, I could do so.

        Q    Would you say the report discusses the most relevant evidence regarding your opinions?

        A    Yes.

        Q    Is there any evidence you are aware of that is relevant to your opinions that is not discussed in your report?

        A    None of which I'm aware.

        Q    Did you do anything else to prepare for today's deposition?

        A    Yes.

        Q    What else did you do?

        A    I met with counsel on Tuesday and met with the team that worked with

Page 10

HUBBARD

Q    So on paragraph 84, you say "I reviewed the 140 analyst reports in the Alibaba analyst reports universe that were published from November 9th to December 1st, 2020 (three weeks after the effective date of the November draft guidelines)."

Why did you choose to look at analyst commentary for a period of three weeks after?

A    This, I do for all of events, I think I said this morning.

I have a convention for analysts at three weeks and two days for news.  And the reason is news just gets reported very quickly; an analyst requires thought.

There's no religious view why it has to be exactly three weeks.

Shortening it too much, maybe I didn't give them enough time for analysis.  If it's too long, I sweep in other things.  So I chose three.

I have no reason to believe,

Page 139

HUBBARD

if I picked two or four, the answer would be different.

Q    So that's just your assessment of the time period that would capture the relevant discussion?

A    That's correct.

Q    On page 47, in footnote 135, you describe some of the numbers here.

And I think we were talking about earlier about how your Analysis Group folks gave you certain counts of analyst reports based on your qualitative instructions, right?

Would this be an example of that?

A    Yes, it would.

Q    Okay.  And so it says that there were 38 reports that were both specific to Alibaba and commented on in November draft guidelines, correct?

A    Right, out of the 73.

Q    Did you review all -- did you review those 38 reports personally?

A    I did not.

Page 140

HUBBARD

Q    Okay.  And who made the assessment of what those 38 reports were, meaning that they were Alibaba specific and discussed draft guidelines?

A    That's the review team.

Q    Were you provided a list of what those 38 reports were?

A    That's entirely possible.  I really don't recall.

Q    So of those 38 reports that -- again, we're talking about reports that were both specific to Alibaba and discussed the draft guidelines -- you quote from approximately ten reports in paragraphs 85 through 87; is that correct?

A    Correct.

Q    And did you read the entirety of these approximately 10 reports?

A    That is my practice, yes.

Q    Who provided you with those reports?

Page 141

HUBBARD

A    The Analysis Group team.

Q    Did they provide you with -- on this topic, did they provide you with more than the ten that are quoted from here?

A    That, I don't recall.

Typically, if we're going to quote something, I would ask to read the entire report from which the quote is taken.  So it's probably that, but I really don't recall.

Q    So is it your opinion that these reports are the best evidence of what the market believed about Alibaba's exclusivity practices during the class period?

MR. BLAKE:  Objection to form.

A    I actually -- personally, because I'm a nerd economist, I would have looked at the statistical analysis.  But these are good pieces of corroborating evidence from the market, yes.

Page 142

HUBBARD

Q    Suppose that an analyst described Alibaba complaint with all rules in the draft guidelines.

Would that indicate that that analyst believed Alibaba was no longer practicing exclusivity?

MR. BLAKE:  Objection to form.

A    I don't know that I can make that inference.  If there's a particular report, we could look at it and read it together.  But I don't think you could make that inference.

Q    Why couldn't you?

You've already testified that in your view, the draft guidelines were primarily about exclusivity, right?

A    Correct.

Q    So if an analyst report comes out and says "Alibaba is in compliance with all rules and the draft guidelines," why -- why couldn't you then conclude that that analyst believed Alibaba to be in compliance

Page 143

HUBBARD

with the exclusivity prohibition?

    A   I'm not aware of any analyst that says that.  I am aware of some analysts saying Alibaba says that.

        If I've got it wrong, show me the report and we'll talk about it.

    Q   What's the distinction you're making there between Alibaba saying it's compliant or an analyst saying Alibaba is compliant?

    A   It's a big -- it's part of this case.  So the question is about belief, not statements.

        You have prior practices statements.  The question is what does the market actually think.

        I think the reports to which you're referring, if I can remember them in my head, are not saying what you're saying they're saying.  They say -- they simply say Alibaba said that.

        If I'm wrong, you'll show it to me and we can go over it.

Page 144

HUBBARD

Q    Would that not inform the market, though?

A    It's a piece of information. Whether it's informative depends on the filter of the person reading it.

Q    But it is a piece of information that would filter into the market?

A    Certainly information, yes.

Q    Okay.  So it sounds like you do have some that you're thinking of that you saw?

A    The only ones I recall seeing like that do not say what you say.

So if you want to push back, show them to me, because I don't think they say what you say.

Q    Well, I'm not assuming we're talking about the same thing.

First I want to know what you're recollecting that you saw.

A    My recollection is the only things I saw were repeating Alibaba statements.

Page 145

HUBBARD

But if it's important to you and you have something else, show it to me.

Q    Are you recalling a news article or an analyst report?

A    I don't -- I don't recall.

Q    How many pieces of information are you thinking of that you saw to this effect?

A    I only remember a couple out of the whole discussion I had with the team.

But I -- again, if you have them, you could make this conversation live by actually showing it to me.

Q    Well, no.  Again, I'm trying to -- because the things I have may not be the things you're thinking of.

I want to know first what you are thinking of.

A    That's my recollection.

But, again, let's not play cat-and-mouse.  If you think you have something, let's look at it.

Page 146

HUBBARD

Q    Sir, I'm not trying to play cat-and-mouse.  I am entitled to test your recollection and the work you did to draft this report.

I'm asking you a very simple question.

You testified to remembering having seen some pieces of information that were reporting that Alibaba was denying that it was practicing exclusivity, is that right?  Or Alibaba was saying it was in compliance with the draft guidelines?

A    That's my recollection, yes.

Q    And what I'm trying to test is you've said it was a couple of pieces of information that you can recall seeing.

A    Correct.

Q    And, first, I asked if you can recall if it was analyst report or a news article?

A    And I'll answer the question again.  No, I don't recall.

Page 147

HUBBARD

Q    Do you recall if you actually read the original reports?

Again, whether it was an article or an analyst report, did you read the original report?  Or are you recollecting information that was provided to you by a team member at Analysis Group?

MR. BLAKE:  Object to form.

A    That, I don't recall one way or the other.

Q    If somebody at Analysis Group said, "Dr. Hubbard, here's this piece of information communicating to the market that Alibaba was saying it was not engaged in exclusivity," as you're conducting this analysis of market beliefs, is that something you would have asked to review yourself?

A    In all likelihood, yes.  I just don't recall.

MR. BLAKE:  Objection.

(Goldman Sachs analyst report dated November 25, 2020.  The

Page 148

HUBBARD

Bates stamp is BABA_AML00002870, was marked Hubbard Exhibit 63, for identification, as of this date.)

MS. WOLKE:  For the record, this is a Goldman Sachs analyst report dated November 25, 2020. The Bates stamp is BABA_AML00002870.

Q    Have you had a chance --

A    I am familiar with this. This is one I'm thinking of.

I'm happy to chat with you about it.

Q    Have you reviewed this analyst report before -- personally read it?

A    I have.  And the same analyst team, two weeks before this, had a very different story about exclusivity.  So you can look that up if you like.

And, of course, all this report says is what Alibaba says.

Q    Is that all it says?

Can you read the headline of

Page 149

HUBBARD

the title of the report?

A    "A compliant Baba aligned with China's LT goals reiterate bond."

Q    "A compliant Baba."

What's your understanding of -- compliant with what?

A    My understanding is Alibaba said that they believe they're complying with the rules in the draft guidelines.

Q    What does the -- what does the second sentence of the analyst report say?

A    "Alibaba remains compliant with all rules and the draft guidelines published, and management expects limited impact on their growth trajectory."

Q    All right.  So is it your position that this is not a piece of evidence that would inform market beliefs as to Alibaba's practice of exclusivity?

A    My judgment, because I did

Page 150

HUBBARD

look at this one, is no.

The same analyst team, literally the same people, two weeks before, discuss exclusivity. They're quite aware that it's a problem.

Here I think they're stating -- and I don't know the facts, of course, one way or other -- that Alibaba believes it is compliant with the rules. Remember we're at the time of the draft guidelines, not -- not something else.

Q    Right. But you just testified that it was important to understand the market's reaction for three weeks after, correct?

A    Correct.

Q    Right. Because analysts can't immediately report everything. They're not like the news, filing reports every day.

A    That's why I look a period of time.

Q    And here, in fact, the

Page 151

HUBBARD

analyst is providing more specific information as a follow-up to an earlier report that had -- that did not have this specific information from the company, correct?

A    I'm not sure you can connect those dots.

I'm merely making the point that these are analysts -- the same analysts who had believed in exclusivity two weeks prior.

Q    Is it your view that the market would not believe what Goldman Sachs had to say in this analyst report?

A    I'd say it's a piece of information for the market, people can decide if they believe or not.

You and I don't even agree on was being said here.

Q    And to that extent, the people who believed this information, their beliefs would be incorporated into the stock price, correct?

Page 152

HUBBARD

A    Maybe yes; maybe no.  Depends what a marginal investor believes.

Q    Tell me why, in your opinion, this might not inform market beliefs as to Alibaba's actual compliance of -- or actual practices of exclusivity during the class period.

MR. BLAKE:  Objection to form.

A    I view it as simply a data point.  It's a piece of information.

It's relying on what Alibaba says and Alibaba's own perception of whether it is, in fact, in compliance, which is, of course, ultimately something a regulator would judge, not Alibaba itself.

So I view it as -- yes, it's a piece of information.

Q    And analysts commonly report on what companies tell them, right?

We talked about earlier today.

A    Correct.

Page 153

HUBBARD

Q    And the market commonly relies on that, right?

MR. BLAKE:  Objection to form.

A    It's -- I don't know what you mean by "rely," but it's certainly a piece of information.

But I don't recall this being a general feature of analyst reports. That's why I was confident I might see this document.

Q    What do you mean by "a general feature of analyst reports," that?

A    In other words, this is the analyst report that I recall that might have had your point of view, which is why I am not surprised I'm seeing it.

Q    Do you recall any other ones?

A    Now I think I may recall one other.

Q    What's the other one that you recall?

A    I think there's a similar

Page 154

HUBBARD

pattern of a Morgan Stanley report with the very same analyst, again, two weeks prior, at a specific alternative view.

We can talk about that one too if you'd like.

Q    Why did you not include a discussion of this Goldman Sachs analyst report in your discussion of the evidence that -- that you believe would have informed market knowledge during this period after publication of the draft guidelines?

A    I think I've answered to you that I don't think it does.  I think you and I are reading the document differently.

And I looked at what the analysts had just very recently said, so I didn't come to the same conclusion you do.

Q    So you rejected this subsequent report that provided more detail on Alibaba's use of exclusivity?

MR. BLAKE:  Objection to

Page 155

HUBBARD

form.

A    Well, I'm not sure I would characterize it that way, but I did reject the report, yes.

Q    And you rejected the Morgan Stanley report that was similar to this?

MR. BLAKE:  Objection.

A    It's not quite similar.  But of the ones that you might consider useful, it's, in that sense, similar.

Q    Well, you brought it up.

A    Well, I'm sure you have it in your folder, and we can look at it. I'm just saying it suffers from the same flaw.

Q    So you rejected two analyst reports that had contrary opinions from what you have described as two of the biggest investment firms on Wall Street?

A    I think I cited both of those investment teams.

Q    But not these reports that

Page 156