UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: ALIBABA GROUP HOLDING LTD. SECURITIES LITIGATION | Master File No. 1:20-CV-09568-GBD-JW |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
<u>AND THE PLAN OF ALLOCATION</u>**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT .................................................................................... 1

II.    STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e) ..................................... 5

III.   ARGUMENT .............................................................................................................. 7

       A.    The Settlement Is Fair, Reasonable, And Adequate And Warrants Final
             Approval ....................................................................................................... 7

             1.    Plaintiffs And Counsel Adequately Represented The Settlement Class..... 7

             2.    The Settlement Is The Result Of Arm's-Length Negotiations ................... 8

             3.    The Settlement Is A Fair And Reasonable Result For The Settlement Class In
                   Light Of The Benefits Of The Settlement And The Risks Of Continued
                   Litigation ................................................................................................ 9

                   (a)    Complexity, Expense And Duration Of Litigation ....................... 10

                   (b)    Risk Of Obtaining And Maintaining Class Action Status ............ 13

                   (c)    Risks Of Establishing Liability And Damages ............................. 14

                   (d)    Range Of Reasonableness In Light Of The Best Possible Recovery
                          And Attendant Risks Of Litigation .............................................. 17

             4.    Rule 23(e)(2)(C) Factors Either Support Final Approval Or Are
                   Neutral.................................................................................................. 19

             5.    The Settlement Treats All Members Of The Settlement Class Equitably
                   Relative To Each Other.......................................................................... 20

             6.    The Remaining *Grinnell* Factors Weigh In Favor Of Final Approval...... 21

       B.    The Notice Program Satisfies The Requirements Of Due Process And
             Rule 23 ...................................................................................................... 23

       C.    Certification Of the Settlement Class For Settlement Purposes Is Appropriate ... 24

       D.    The Plan Of Allocation Is Fair And Reasonable And Should Be Approved........ 24

IV.    CONCLUSION......................................................................................................... 25

## TABLE OF AUTHORITIES

CASES

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) .................................................................................. 13

*Becker v. Bank of New York Mellon Trust Co., N.A.*,
   2018 WL 6727820 (E.D. Pa. Dec. 21, 2018) .......................................................... 19

*Chatelain v. Prudential-Bache Sec., Inc.*,
   805 F. Supp. 209 (S.D.N.Y. 1992) ........................................................................ 14

*Christine Asia Co., Ltd. v. Yun Ma*,
   2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ........................................ 12, 13, 15, 20

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) .......................................................................... 6, 9, 17

*City of Providence v. Aeropostale, Inc.*,
   2014 WL 1883494 (S.D.N.Y. May 9, 2014) ........................................................... 10

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007) .................................................................................... 7

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ................................................................................. 8, 9

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .................................................................................. 7

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ....................................................................................... 15, 16

*Fleming v. Impax Labs. Inc.*,
   2022 WL 2789496 (N.D. Cal. July 15, 2022) ......................................................... 24

*Gordon v. Vanda Pharm. Inc.*,
   2022 WL 4296092 (E.D.N.Y. Sept. 15, 2022) ........................................................ 10

*In re 3D Sys. Sec. Litig.*,
   2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) ................................................................. 6

*In re "Agent Orange" Prod. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984) ....................................................................... 17

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ........................................................................ 2

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ....................................................................... 18

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ............................................................................. 9, 22

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) ....................................................................... 3

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................................................... 9

*In re Comverse Tech., Inc. Sec. Litig.*,
2010 WL 2653354 (E.D.N.Y. June 24, 2010) ..................................................................... 20

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ....................................................................... 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ............................................................................................ 16, 18

*In re GSE Bonds Antitrust Litig.*,
414 F. Supp. 3d 686 (S.D.N.Y. Nov. 7, 2019) ............................................................. *passim*

*In re Indep. Energy Holdings PLC Sec. Litig.*,
2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) .................................................................. 13

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................................................................... 16

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................................ 13

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................................................ 6

*In re PPDAI Grp. Inc. Sec. Litig.*,
2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ....................................................................... 10

*In re Scientific Atl., Inc. Sec. Litig.*,
754 F. Supp. 2d 1339 (N.D. Ga. 2010) ............................................................................... 18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................................................................ 18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........................................................................ 22

*In re Stable Road Acquis. Corp. Sec. Litig.*,
  2024 WL 3643393 (C.D. Cal. Apr. 23, 2024) ............................................................. 19, 24, 25

*In re Tenaris S.A. Sec. Litig.*,
  2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ................................................................... 22, 23

*In re Vitamin C Antitrust Litig.*,
  2013 WL 6858853 (E.D.N.Y. Dec. 30, 2013) ................................................................... 11, 12

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................................. 24, 25

*Jones v. Singing River Health Servs. Found.*,
  865 F.3d 285 (5th Cir. 2017) ....................................................................................................... 8

*Lea v. Tal Educ. Grp.*,
  2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021)................................................................... *passim*

*Lusk v. Five Guys Enters. LLC*,
  2022 WL 4791923 (E.D. Cal. Sept. 30, 2022)............................................................................ 9

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................................................... 21

*Mauss v. NuVasive, Inc.*,
  2018 WL 6421623 (S.D. Cal. Dec. 12, 2018)........................................................................... 23

*Mild v. PPG Indus., Inc.*,
  2019 WL 3345714 (C.D. Cal. July 25, 2019)............................................................................. 8

*Monsanto Int'l Sales Co., Inc. v. Hanjin Container Lines, Ltd.*,
  770 F. Supp. 832 (S.D.N.Y. 1991) .......................................................................................... 11

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012)........................................................................................ 8

*Pearlstein v. BlackBerry Ltd.*,
  2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)................................................................. *passim*

*Shapiro v. JPMorgan Chase & Co.*,
2014 WL 1224666 (S.D.N.Y. March 24, 2014) ........................................................................ 23

*Smith v. Dominion Bridge Corp.*,
2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) ............................................................................ 15

*Strougo v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...................................................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ...................................................................................................... 21

*Wei Su v. Sotheby's, Inc.*,
2019 WL 4053917 (S.D.N.Y. Aug. 28, 2019) ......................................................................... 12

*Jun Yan v. Libo Zhou*,
2021 WL 4059478 (E.D.N.Y. Sept. 7, 2021) ........................................................................... 11

*Yang v. Focus Media Holding Ltd.*,
2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ..................................................................... 10, 15

**STATUTES**

15 U.S.C. § 78u-4(a) .................................................................................................................. 23

**RULES**

Fed. R. Civ. P. 23 ....................................................................................................................... 23

v

Court-appointed lead plaintiff Salem Gharsalli and additional representative plaintiffs Laura Ciccarello, Dineshchandra Makadia, and Wusheng Hu (collectively, "Plaintiffs")[1] on behalf of themselves and the Settlement Class, respectfully submit this memorandum of law in support of their unopposed motion for final approval of the proposed Settlement and Plan of Allocation

## I.    <u>PRELIMINARY STATEMENT</u>[2]

After nearly four years of hard-fought litigation, Plaintiffs have obtained a $433,500,000 (the "Settlement Amount") all cash, non-reversionary settlement for the benefit of the Settlement Class. This is an exceptional result for the Settlement Class under the circumstances, and it was secured in a procedurally fair manner.

Substantively, the $433,500,000 recovery constitutes approximately 3.73% of the $11.629 billion of *maximum* damages *potentially* available in this case.  This is more than *triple* the median recovery of 1.2% of estimated damages in securities class actions in 2024, and more than *nine times* the median recovery of 0.4% in securities class action settlements during the past decade where investor losses exceeded $10 billion.  Ex. 6 (excerpts from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2024) ("NERA Report")) at 26 (Fig. 23), 27 (Fig. 24).  It is also the *largest ever* securities class action

---

[1] All capitalized terms, unless otherwise defined herein, have the meanings set forth in the Stipulation and Agreement of Settlement, dated October 25, 2024 (the "Stipulation"; ECF No. 136-1), or in the concurrently-filed Declaration of Kara M. Wolke in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Wolke Declaration"). Unless otherwise indicated, citations to "¶__" and "Ex." refer, respectively, to paragraphs in, and exhibits to, the Wolke Declaration.

[2] The Wolke Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the factual background and procedural history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; the services Plaintiffs' Counsel provided to the Settlement Class; and the terms of the Plan of Allocation of the Net Settlement Fund.

settlement against a company based in the People's Republic of China ("China" or "PRC") (*see* Ex. 14 (collecting cases)), and one of the 50 largest since the PSLRA was enacted thirty years ago. Ex. 8 (ISS Securities Class Action Services, *The Top 100 U.S. Class Action Settlements of All-Time as of December 31, 2023* (Institutional Shareholder Services 2023)) at 6-7.

The proposed Settlement is all the more noteworthy when juxtaposed against the significant risks that Plaintiffs overcame, and would have had to overcome, to prevail in this complex securities fraud litigation. While the case faced two motions to dismiss, Plaintiffs only partially prevailed. The Court dismissed: (i) an entire theory of liability relating to Ant Group, a fintech company in which Alibaba Group Holding Ltd. ("Alibaba" or the "Company") owned a significant equity interest (the "Ant Group IPO Claim"); (ii) Plaintiffs' loss causation allegations with respect to one of the two alleged corrective disclosure dates related to the surviving theory of liability (*i.e.*, Alibaba's alleged use of merchant exclusivity practices in violation of Chinese laws (the "Antitrust Claim")); and (iii) Alibaba founder Jack Ma from the Action. *See In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023).

Of course, the risks did not end at the pleading stage. For example, Plaintiffs faced an immediate material risk that the Court would deny their fully briefed motion for class certification. Defendants had forcefully argued that the one remaining alleged corrective disclosure relating to the Antitrust Claim would not survive class certification, as, according to Defendants, the market was well aware of Alibaba's continued deployment of exclusivity practices and the associated regulatory risks during the putative class period. *See, e.g.*, ECF No. 107 at p.3 ("Because the market was well aware of Alibaba's use of exclusivity during the putative Class Period, the stock drop lacks the requisite 'link' to the Challenged Misstatements to create an inference of price impact."). Had Defendants prevailed on their price impact argument, it would have effectively ended the Action. And, even if

Plaintiffs secured class certification, they would still have to gather enough evidence to prevail at summary judgment, prove their case at trial, and win any appeals. The risk of losing at any of these phases was very real, and it was greatly enhanced by the fact that Plaintiffs would be litigating against a corporate defendant represented by highly skilled defense counsel.

Moreover, the key documents and witnesses, including third-party witnesses, were all located in China, which significantly complicated discovery. While China signed onto the Hague Evidence Convention in 2023, it made significant reservations, including that service of process would be valid only through China's designated central authority. In short, Plaintiffs faced years of costly litigation ahead, with a very strong possibility that the case could yield little or no recovery in the future. *See In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at \*5 (S.D.N.Y. May 13, 2011) ("the Company's location in China would have posed a barrier that would have increased the difficulty and expense of discovery, and might have made it impossible to collect some of the evidence or take depositions necessary to prove Plaintiffs' claims.").[3] Given the many risks of continued litigation, there is no question that the Settlement is substantively fair.

The Settlement was also negotiated through a procedurally fair process. The attorneys for the Parties are experienced securities class action litigators, who were well-informed of the strengths and weaknesses of the case after years of vigorous litigation, and the Settlement is the product of mediator's proposal following a months-long mediation process overseen by the Honorable Layn R. Phillips, a former United States District Court Judge. Prior to signing the Stipulation, Plaintiffs' Counsel, *inter alia*:

- drafted the initial complaint in the Action;
- conducted a comprehensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Alibaba's SEC filings; (ii)

---

[3] Unless otherwise indicated, all emphasis is added and citations and quotations omitted.

public reports, blog posts, research reports prepared by securities and financial analysts, news and wire articles, and other information available on the internet concerning Alibaba, including many published in Mandarin Chinese; (iii) investor call transcripts; (iv) announcements by the Chinese State Administration for Market Regulation ("SAMR"); and (v) other publicly available material concerning Alibaba and related entities; (b) retaining and working with a bilingual private investigator based in Hong Kong to assist in the investigation relating to Plaintiffs' alleged claims, including, in particular, accessing and reviewing information filed by Alibaba and third parties with the SAMR in China, the Stock Exchange for Hong Kong, and the Shanghai STAR Market; (c) having relevant documents translated from Chinese to English; and (d) consulting with experts in the fields of loss causation and damages;

- utilized the comprehensive investigation and research to draft and file the 147-page Amended Consolidated Class Action Complaint (the "Complaint"), plus exhibits, asserting claims against Alibaba, Daniel Yong Zhang ("Zhang"), Maggie Wei Wu ("Wu"), and Jack Ma ("Ma") under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Zhang, Wu, and Ma under Section 20(a) of the Exchange Act;[4]

- researched and drafted oppositions to the two separate motions to dismiss filed by (a) Alibaba, Zhang and Wu; and (b) Ma; participated in oral argument on the motions; and ultimately prevailed in part (*see* ECF No. 83);

- engaged in significant discovery efforts, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) propounding six sets of requests for production of documents and one set of written interrogatories; (c) noticing the deposition of Alibaba pursuant to Fed. R. Civ. P. 30(b)(6); (d) participating in an initial Case Management Conference before Magistrate Judge Jennifer E. Willis; (e) responding to Defendants' requests for production and producing over 15,000 pages of documents; (f) meeting and conferring regarding the scope of discovery in this Action, including participating in numerous telephonic or video conferences, and exchanging approximately 40 meet and confer letters, as well as dozens of e-mails;[5] (g) strategically reviewing and analyzing more than 1.07 million pages of documents produced by Defendants and third parties over the course of the Action, many of which were written in Mandarin Chinese; and (h) preparing "deposition materials," containing summaries of each potential deponent's background, relevant documents, and potential lines of questioning for depositions, which depositions were contemplated to commence in September 2024 and continue through December 2024;

- negotiated a stipulation governing the treatment of confidential information and documents, which was endorsed by the Court;

- fully briefed Plaintiffs' motion for class certification, which entailed, *inter alia*:

---

[4] Exhibits 1 through 8 to the Complaint were copies of documents written in Chinese, with certified English translations.  *See* ECF No. 55.

[5] Following these substantial negotiations, the Parties agreed to the parameters for Defendants' search of Electronically Stored Information (or "ESI"), pursuant to which Defendants agreed to search the e-mail and DingTalk messages of 28 custodians by applying 465 search terms (155 discrete terms searched in each English, simplified Chinese, and traditional Chinese).  ¶41.

(a) assisting in the preparation and submission of expert and rebuttal reports on market efficiency by Dr. David Tabak and defending his class certification deposition; (b) preparing for and defending the four Plaintiffs' depositions; (c) deposing Defendants' expert, Dr. Glenn Hubbard, Ph.D.; and (d) moving to strike in part a sur-reply filed by Defendants;

- participated in an unsuccessful full-day, in-person mediation with former U.S. District Court Judge Phillips in Newport Beach, California, before which the Parties exchanged opening and supplemental mediation statements and exhibits on the issues of liability, damages and class certification;

- engaged in months of follow-up negotiations with Judge Phillips and Defendants' Counsel following the unsuccessful mediation that ultimately resulted in a mediator's recommendation to the settle the Action for $433.5 million;

- drafted and then negotiated the Term Sheet, Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel; and

- worked with Plaintiffs' damages expert to craft a plan of allocation. *See* ¶¶10, 19-69.

The Settlement is, therefore, the result of arms-length negotiations, conducted by informed and experienced counsel, in conjunction with an experienced neutral.

As discussed in greater detail below and in the Wolke Declaration, Plaintiffs and their counsel believe that the proposed Settlement meets the standards for final approval and is in the best interests of the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court grant final approval to the Settlement.

Plaintiffs also move for approval of the proposed Plan of Allocation of the Net Settlement Fund. The Plan of Allocation was developed in conjunction with Plaintiffs' damages expert and is designed to distribute the proceeds of the Net Settlement Fund fairly and equitably to Settlement Class Members. No Settlement Class Member is favored over another under the proposed Plan; rather, all Settlement Class Members—including Plaintiffs—are treated in the same manner. *See* Ex. 1-A at ¶¶53-76. Because the Plan of Allocation is fair and reasonable, it too should be approved.

## II.   STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e)

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval and should be approved if the Court finds it "fair, reasonable,

5

and adequate." Fed. R. Civ. P. 23(e)(2).  Rule 23(e)(2), which governs final approval, requires courts

to consider the following in determining whether a settlement is fair, reasonable, and adequate:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is
> adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the
> effectiveness of any proposed method of distributing relief to the class, including the
> method of processing class-member claims; (iii) the terms of any proposed award of
> attorneys' fees, including timing of payment; and (iv) any agreement required to be
> identified under Rule 23(e)(3); and (D) the proposal treats class members equitable
> relative to each other.

Fed. R. Civ. P. 23(e)(2).

Factors (A) and (B) "identify matters . . . described as procedural concerns, looking to the

conduct of the litigation and of the negotiations leading up to the proposed settlement," while factors

(C) and (D) "focus on . . . a substantive review of the terms of the proposed settlement" (*i.e.*, "[t]he

relief that the settlement is expected to provide to class members").  Advisory Committee Notes to

2018 Amendments (324 F.R.D. 904, at 919); *see also In re 3D Sys. Sec. Litig.*, 2024 WL 50909, at *5

(E.D.N.Y. Jan. 4, 2024) ("In conducting this inquiry, courts consider the substantive and procedural

fairness of a proposed settlement to determine whether the terms of the settlement and the negotiation

process leading up to it are fair.").  These factors "add to, rather than displace, the *Grinnell* factors"

traditionally considered by courts within the Second Circuit.  *In re Payment Card Interchange Fee &*

*Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019); *see also In re GSE Bonds*

*Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. Nov. 7, 2019) (evaluating settlement based on

factors set forth in Fed. R. Civ. P. 23(e)(2) and *Grinnell*).[6]

---

[6] The *Grinnell* factors are: (1) complexity, expense and likely duration of the case; (2) reaction of the
class; (3) stage of the proceedings and the amount of discovery completed; (4) risks of proving
liability; (5) risks of proving damages; (6) risks of maintaining the class through the trial; (7) ability
of defendants to fund a larger judgment; (8) range of reasonableness of the settlement fund in light of
the best possible recovery; and (9) range of reasonableness of the settlement fund in light of all
attendant risks.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

As set forth below, the proposed Settlement satisfies the criteria for final approval under the Rule 23(e)(2) factors, as well as the non-duplicative *Grinnell* factors.

### III.    ARGUMENT

#### A.    The Settlement Is Fair, Reasonable, And Adequate And Warrants Final Approval

##### 1.    Plaintiffs And Counsel Adequately Represented The Settlement Class

Rule 23(e)(2)(A) requires the Court to consider whether the "class representatives and class counsel have adequately represented the class." FED. R. CIV. P. 23(e)(2)(A). "Determination of adequacy typically entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007); *GSE Bonds*, 414 F. Supp. 3d at 692; *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.").

Here, Plaintiffs have no interests antagonistic to other class members; rather, Plaintiffs' interests are aligned with other Settlement Class Members' interests because they all suffered the same injuries—monetary losses resulting from Defendants' alleged violations of the federal securities laws. *See GSE Bonds*, 414 F. Supp. 3d at 692; *Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *6 (S.D.N.Y. Nov. 30, 2021) ("Plaintiffs interests are directly aligned with the interests of the Settlement Class as they all involved purchased TAL's ADSs during the Class Period and allegedly suffered harm as a result of Defendants' alleged misdeeds."). "Because of these injuries, plaintiffs have an interest in vigorously pursuing the claims of the class." *GSE Bonds*, 414 F. Supp. 3d at 692. Indeed, each Plaintiff has ***proven*** their commitment to the litigation by, *inter alia*, overseeing the litigation and regularly communicating with their counsel; providing written discovery responses and producing documents;

7

sitting for deposition; and participating in settlement discussions with Plaintiffs' Counsel. *See* Ex. 2, ¶¶3-5; Ex. 3, ¶¶3-5; Ex. 4, ¶¶3-5; Ex. 5, ¶¶3-5.

"Plaintiffs have [also] demonstrated their commitment to this litigation by retaining qualified and experienced counsel." *Tal Educ. Grp.*, 2021 WL 5578665, at \*6. Plaintiffs' Counsel have substantial experience in securities class actions, and have diligently litigated on behalf of the putative class throughout the litigation. *See* Exs. 9-C (Glancy Prongay & Murray LLP ("GPM") firm résumé) & 10-C (Pomerantz LLP firm résumé); *see also* ¶¶19-69 (detailing Lead Counsel's extensive investigation, briefing on the motions to dismiss and class certification, significant discovery efforts, and hard-fought mediation efforts). Plaintiffs and their counsel have, therefore, adequately represented the proposed Settlement Class. *See Mild v. PPG Indus., Inc.*, 2019 WL 3345714, at \*3 (C.D. Cal. July 25, 2019) (finding adequacy where "Plaintiff's … interest in obtaining the largest possible recovery is aligned with the interests of the rest of the Settlement Class members"; and "Lead Counsel [GPM] are highly experienced in securities litigation and have vigorously prosecuted the Settlement Class's claims by expending significant time and effort on the case.").

### 2. The Settlement Is The Result Of Arm's-Length Negotiations

Rule 23(e)(2)(B) evaluates whether the proposed settlement "was negotiated at arm's length." FED. R. CIV. P. 23(e)(2)(B). In conducting this analysis, courts recognize that a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *see also Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 295 (5th Cir. 2017) ("[t]he involvement of 'an experienced and well-known' mediator 'is also a strong indicator of procedural fairness.'") (quoting *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012)).

Here, the Parties' settlement negotiations were facilitated by former federal judge Layn R. Phillips through a formal in-person mediation session, and approximately two months of follow up

8

negotiations, that ultimately culminated in the Parties' accepting Judge Phillips' recommendation to settle the Action for $433,500,000. The arm's-length nature of the settlement negotiations, and the involvement of a mediator with substantial experience mediating complex securities class actions, supports the conclusion that the Settlement is fair and was achieved free of collusion. *See Deutsche Bank*, 236 F.3d at 85 (a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"); *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (settlement "procedurally fair" where the parties engaged in mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases"). Moreover, "[t]he fact . . . that the Settlement is based on a mediator's proposal further supports a finding that the settlement agreement is not the product of collusion." *Lusk v. Five Guys Enters. LLC*, 2022 WL 4791923, at *9 (E.D. Cal. Sept. 30, 2022).

**3.    The Settlement Is A Fair And Reasonable Result For The Settlement Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation**

Under Rule 23(e)(2)(C), when evaluating the fairness, reasonableness, and adequacy of a settlement, the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors. FED. R. CIV. P. 23(e)(2)(C).[7] As discussed below, each supports final approval.

---

[7] Rule 23(e)(2)(C)(i) essentially incorporates six of the *Grinnell* factors: complexity, expense, and likely duration of the litigation (first factor); risks of establishing liability and damages (fourth and fifth factors); risks of maintaining class action status through trial (sixth factor); and range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation (eighth and ninth factors). *See Grinnell*, 495 F.2d at 463; *see also GSE Bonds*, 414 F. Supp. 3d at 693 ("This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i).").

### (a)      Complexity, Expense And Duration Of Litigation

"As a general matter, the more complex, expensive, and time consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 381-82 (S.D.N.Y. 2013); *see also Gordon v. Vanda Pharm. Inc.*, 2022 WL 4296092, at *4 (E.D.N.Y. Sept. 15, 2022) ("settlement is favored when the alternative–litigating the case–will be long, complex, and expensive."). "[S]ecurities class actions are by their very nature complicated and district courts in this Circuit have long recognized that securities class actions are notably difficult and notoriously uncertain to litigate." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (it is "beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members."). This case was no exception; in fact, it was "significantly more complex, expensive, and risky by virtue of the fact that Defendants are based in China." *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *9 (E.D.N.Y. Jan. 21, 2022).

Although numerous obstacles have been overcome to get to this point, prevailing in continued litigation would require Plaintiffs to surmount many more. These obstacles include obtaining evidence sufficient to prove Plaintiffs' case, all of which is located in China. *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *6 (S.D.N.Y. Sept. 4, 2014) ("It can be difficult and sometimes impossible to obtain evidence from China because of its very different regulatory regime governing access to documents and witnesses."). Document discovery would have been hampered by China's state secrecy and data privacy laws, which Defendants argued limit the type of information that can be exported out of the country and produced to third parties, such as Plaintiffs. ¶41; *see also PPDAI Grp.*, 2022 WL 198491, at *9. As a result, Lead Counsel may have been restricted or forbidden from

10

reviewing certain documents, and there is no guarantee they would have been able to conduct the document discovery necessary to prove their case.

Furthermore, to the extent Plaintiffs obtained documents, the vast majority of the key documents were, and would be, written in Chinese. ¶¶42, 44. Prosecution of the Action required a team of attorneys who are fluent in Chinese, and review of the documents was, and would continue to be, protracted and expensive. It would also involve the review and translation of many more documents than what would ultimately be offered as evidence at trial. ¶¶80-82; *see also Monsanto Int'l Sales Co., Inc. v. Hanjin Container Lines, Ltd.*, 770 F. Supp. 832, 836 (S.D.N.Y. 1991) ("[T]hese records are also presumably in Chinese and . . . would have to be translated at significant cost. … Because English-speaking lawyers would try the case here, the parties would have to translate far more documents and deposition testimony in order for trial attorneys to ascertain what they should or should not offer at trial."). Additionally, translation accuracy can be contentious because a word or phrase may have multiple meanings or a different context-specific meaning, which can lead to evidentiary disputes and increased cost. *See In re Vitamin C Antitrust Litig.*, 2013 WL 6858853, at *2 (E.D.N.Y. Dec. 30, 2013) (noting that case involved "extensive Chinese documents that had to be translated with concomitant disputes over the accuracy of the translations"); *see also* ¶80.

Obtaining deposition testimony would also have proven extremely difficult and costly. *See Jun Yan v. Libo Zhou*, 2021 WL 4059478, at *3 (E.D.N.Y. Sept. 7, 2021) ("The law of China prohibits Defendants from being deposed while they are within the borders of People's Republic of China without permission from the authority of the People's Republic of China.") (citing Article 277 of Chinese Civil Law). Although there are cumbersome official approval procedures in China that could theoretically be used to request a deposition, it is Lead Counsel's understanding that very few such requests have been granted in recent decades. The probability of Plaintiffs being able to examine third

11

parties in this case was, therefore, almost non-existent. *See Tal Educ. Grp.*, 2021 WL 5578665, at \*9 ("The probability of Plaintiffs being able to examine third parties in this case, as well as take depositions in the People's Republic of China, or Hong Kong, would be extremely difficult and costly, if not outright unfeasible").[8]

Moreover, to the extent depositions do take place in cases with Chinese defendants, it is Lead Counsel's experience that they are almost always conducted in another jurisdiction outside of mainland China, such as Hong Kong or Singapore. ¶45; ECF No. 91 at 10 ("a significant number of depositions will occur in a mutually agreeable location in Asia (likely Hong Kong) and will require translation, necessitating extensive travel and coordination."). This is a costly and drawn-out endeavor, involving international flights and hotels, many hours of travel time, significant time changes, and the depositions themselves are more time-consuming and expensive given the need for a main interpreter and check interpreters. *Id.*; *see also Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at \*10 (S.D.N.Y. Oct. 16, 2019) (settlement supported where continued litigation "would necessarily require the expense of travelling to Hong Kong to depose Defendant's witnesses though interpreters, and the costly translation of many Chinese documents.").

The case was further complicated by its subject matter. Plaintiffs' federal securities claims arise from alleged conduct that implicates complex antitrust and regulatory issues under Chinese law. *See Vitamin C*, 2013 WL 6858853, at \*2 (case was complicated by, *inter alia*, "analysis of Chinese law"). Continued prosecution would have required extensive expert testimony in these areas and, as

---

[8] *See also Wei Su v. Sotheby's, Inc.*, 2019 WL 4053917, at \*3 (S.D.N.Y. Aug. 28, 2019) ("According to the United States Department of State, China does not permit attorneys to take depositions in China for use in foreign courts; such depositions, as a general matter, may only be accomplished through requests to its Central Authority under the Hague Evidence Convention; consular depositions would require permission from the Central Authority on a case by case basis; and participation in unapproved deposition activity could result in the arrest, detention or deportation of the American attorneys and other participants." (cleaned up)).

Defendants maintained, enforcement of Chinese antitrust laws and administrative guidance related thereto was not clear cut, especially as it pertained to the "platform economy sector" in China, thereby increasing Plaintiffs' risk of loss. *See* ECF Nos. 61 & 77; *see also*, *infra*, Sec. IV.A.3.(c) (discussing risks to proving liability).

Finally, this case has been pending for over four years. Assuming Plaintiffs' claims were certified under Rule 23 (and not reversed on a Rule 23(f) interlocutory appeal), and survived summary judgment, litigating the Action through trial and post-trial appeals would undoubtedly be a long and expensive endeavor that would consume substantial judicial and private resources with a potential recovery—if any—years from now. *GSE*, 414 F. Supp. 3d at 693 ("even if plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all."). By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class. The complexity, expense, and delay of continued litigation thus favors final approval. *See In re Indep. Energy Holdings PLC Sec. Litig.,* 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003) (possibility of continued litigation involving expert discovery, summary judgment motions, pre-trial orders, and trial "weighs heavily in favor of ... [s]ettlement"); *Christine Asia Co.*, 2019 WL 5257534, at *10 (approving settlement and recognizing that continued litigation against Chinese defendants would be "particularly onerous and expensive").

### (b)    Risk Of Obtaining And Maintaining Class Action Status

At the time the Parties agreed to settle Plaintiffs' class certification motion was pending. While Plaintiffs believe certification was warranted, Defendants vigorously opposed that motion, and success was not a forgone conclusion. *See* ECF Nos. 99-102, 107-110, 113-124, 129; Wolke Decl., ¶¶52-65. Indeed, this Court has declined to certify an investor class before. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480 (S.D.N.Y. 2011). Settlement Class Members would receive nothing if the Court

13

denied class certification, and even if the Court granted Plaintiffs' motion, the risk of decertification—in this Court or on a Rule 23(f) interlocutory appeal—was real.  *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) (decertifying a class of investors after 12 years of litigation); *see also Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification.").  "The risks attendant to certifying a class and defending any decertification motion supports approval of the settlement." *Tal Educ. Grp.*, 2021 WL 5578665, at *10.

**(c)      Risks Of Establishing Liability And Damages**

In considering these factors, "a court should balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation." *GSE*, 414 F. Supp. 3d at 694.  While Lead Counsel believes Plaintiffs' claims have merit, they also recognize substantial obstacles to proving liability and class-wide damages.  When compared to the certainty and significant benefits of the Settlement, these risks militate against further litigation and support final approval.

**Establishing Liability:** This Action is premised on anticompetitive "exclusivity practices" that Alibaba allegedly employed after being instructed to stop at a November 5, 2019, SAMR administrative guidance meeting, and the December 23, 2020, news that the SAMR had "started [an] investigation amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants or other users of its platforms."  ECF No. 55 (Complaint), ¶374.  The Complaint also alleged a separate series of misstatements concerning the planned November 2020 IPO of Ant Group, in which Alibaba had a 33% equity stake.  The Court dismissed the challenged Ant Group IPO statements, and Defendant Ma, from the Action entirely, substantially narrowing the case.  The Court also dismissed one of two alleged loss causation dates on the surviving Antitrust Claim.  *See* ECF No. 83; Wolke Decl. ¶¶34-35, 83.

14

The surviving Antitrust Claim involves complex economic and regulatory issues regarding the ecommerce market and Chinese antitrust law, among other potentially applicable laws and regulations. Proving these claims would present a significant challenge. Defendants argued at the pleading stage that Alibaba disclosed its "market approach with traffic resource allocation on our e-commerce platforms," in contrast to its "prior narrowly deployed exclusive partnerships," and that "prior to and during the putative Class Period, Chinese legal scholars noted the ambiguity and vigorous debate" regarding whether "traffic resource allocation" violated Chinese antitrust law. ECF No. 61 at 7. While Plaintiffs strongly believe the evidence supports their allegations, a jury may nevertheless agree with Defendants' argument, putting at risk Plaintiffs' ability to prove falsity, scienter, *and* loss causation—all required elements of their claims. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Defendants would likely argue, *inter alia*, that ambiguity as to whether Alibaba's practices violated Chinese antitrust law was incompatible with a finding of scienter. While Plaintiffs believe that they could establish scienter after the development of the evidentiary record, they also recognize that "[p]roving scienter is hard to do." *Christine Asia Co.*, 2019 WL 5257534, at *12; *see also Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *5 (S.D.N.Y. Sept. 29, 2022) ("proof of state of mind is inherently difficult"); *see also Smith v. Dominion Bridge Corp.*, 2007 WL 1101272, at *5 (E.D. Pa. Apr. 11, 2007) ("stockholders normally have little more than circumstantial and accretive evidence to establish the requisite scienter"). This is especially true here because Plaintiffs may be unable to compel the depositions of fact witnesses who could provide insight into Defendants' state of mind. *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *6 (S.D.N.Y. Sept. 4, 2014) ("the court is mindful of the fact that, because Focus Media is headquartered in the People's Republic of China, the litigation faces many other obstacles, such as the lack of subpoena power to compel the appearance of fact witnesses").

15

**Loss Causation and Damages:** Even if Plaintiffs established liability, they faced significant risks in proving loss causation and damages. *See Dura Pharm.*, 544 U.S. at 345-46 (plaintiffs bear "the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("It is well-established that plaintiffs alleging claims under Section 10(b) of the '34 Act must prove loss causation."). For example, in opposing class certification, Defendants argued that "the market believed during the putative Class Period that Alibaba's exclusivity practices were ongoing," and thus the SAMR's announcement of its investigation into Alibaba on December 23, 2020—the only alleged corrective disclosure to survive the pleading stage—did not reveal any new information about Alibaba's practices. ECF No. 107 at 15. Even if the Court certified Plaintiffs' proposed class, Defendants would likely make a similar argument at summary judgment and trial that, if accepted by the trier of fact, could fatally undermine Plaintiffs' claims.

Of course, to resolve all disputed issues regarding damages and loss causation, the Parties would have relied on expert testimony. This creates further risk because Plaintiffs could not be certain whether a jury would accept the view of their experts or of the well-qualified experts that Defendants would no doubt be able to present at trial. *See In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015) (settlement "generally favored" where "damages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses."); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) ("If there is anything in the world that is uncertain when a case like [a securities class action] is taken to trial, it is what the jury will come up with as a number for damages.").

16

**(d)      Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation**

"Courts typically analyze the last two *Grinnell* factors together."  *BlackBerry*, 2022 WL 4554858, at *6 (citing *Grinnell*, 495 F.2d at 463).  In so doing, the adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

Here, the proposed Settlement provides $433,500,000 for the benefit of the Settlement Class. This is an outstanding result in light of the significant risks of continued litigation.  Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed on all their claims at summary judgment and after a jury trial, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' *best case scenario*—the total *maximum* damages *potentially* available in this Action would be approximately $11.629 billion.  Thus, the $433,500,000 recovery equates to a recovery of approximately 3.73% of maximum potential damages.  This is more than *triple* the median recovery of 1.2% of estimated damages in securities class actions in 2024, and more than *nine times* the median recovery of 0.4% in securities class action settlements during the past decade where investor losses exceeded $10 billion. Ex. 6 (NERA Report at 26 (Fig. 23), & 27 (Fig. 24).  "Further, as in any securities class action, it is almost certain that less than 100% of eligible Class Members will file claims (despite efforts made to notify as many eligible claimants as possible); accordingly, the percentage of damages that claiming Class Members will recover will likely be higher—and could be significantly higher." *BlackBerry*, 2022 WL 4554858, at *7.[9]

---

[9] This is not a claims-made settlement.  If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted. *See* Stipulation ¶13.

17

Of course, no litigation is risk-free, and Defendants would have raised serious arguments relating to all aspects of Plaintiffs' case, including Plaintiffs' loss causation allegations. For example, at class certification, Defendants argued that confounding news unrelated to the Antitrust Claim caused or contributed to the price drop on December 24, 2020. ECF 107 at 18-20. Even if this argument did not defeat class certification, Defendants would no doubt argue at summary judgment and trial that Plaintiffs are required to disaggregate any losses unrelated to the Antitrust Claim. *See FLAG Telecom*, 574 F.3d at 36 ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) ("plaintiff[s] ultimately will need to disaggregate confounding factors to prove economic loss"). Had Defendants' arguments concerning loss causation been accepted in whole or in part, it could have eliminated or greatly reduced any potential recovery.[10] And, even if Plaintiffs were successful at trial, Defendants could have challenged the damages of each and every large class member in post-trial proceedings, substantially reducing any aggregate recovery. ¶84. A victory—much less one that exceeded $433,500,000—was far from assured.

Given the range of possible results in this litigation against PRC-based Defendants, there can be no question that the Settlement Amount constitutes a considerable achievement and weighs heavily in favor of the final approval.

---

[10] *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict based on plaintiffs' expert's failure to disaggregate certain negative information), *aff'd sub nom.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012); *In re Scientific Atl., Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379-80 (N.D. Ga. 2010) (granting motion for summary judgment because plaintiffs did not disentangle fraud-related and non-fraud-related portions of stock decline).

4.    **Rule 23(e)(2)(C) Factors Either Support Final Approval Or Are Neutral**

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." FED. R. CIV. P. 23(e)(2)(C)(ii)-(iv). Each either supports final approval of the Settlement or is neutral and does not suggest any basis for finding the Settlement inadequate.

**Rule 23(e)(2)(C)(ii):** The method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures for processing claims and efficiently distributing the Net Settlement Fund. Here, A.B. Data, the Claims Administrator selected by Lead Counsel and approved by the Court (*see* ECF No. 139, ¶7), will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any claim deficiencies or request the Court to review their claim denial, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation) after Court approval. Claims processing, like the method proposed here, is standard in securities class action settlements. *See Tal Educ. Grp.*, 2021 WL 5578665, at *11 (approving securities class action settlement with a nearly identical distribution process); *In re Stable Road Acquis. Corp. Sec. Litig.*, 2024 WL 3643393, at *7 (C.D. Cal. Apr. 23, 2024) (same). It is well established, and necessary, because neither Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund. *See Becker v. Bank of New York Mellon Trust Co., N.A.*, 2018 WL 6727820, at *7 (E.D. Pa. Dec. 21, 2018) ("The requirement that class members submit documentation to substantiate their holdings . . . will facilitate the filing of legitimate claims, yet is not overly demanding given the range of permissible documentation.").

19

**Rule 23(e)(2)(C)(iii):**  The Notice stated that Lead Counsel would apply for a percentage of the common fund fee award in an amount not to exceed 30% to compensate all Plaintiffs' Counsel for services rendered on behalf of the Settlement Class.  Lead Counsel is, however, only seeking an attorneys' fee of 25% of the Settlement Fund (which, by definition, includes interest earned on the Settlement Amount).  A requested fee of 25% is reasonable in light of the work performed and the results obtained.   It is also consistent with awards in similar complex class action cases.  *See* Fee Memorandum, Sec. III.C.1. (percentage of the fund analysis).[11]  More importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees.  *See* Stipulation, ¶16.

**Rule 23(e)(2)(C)(iv):** The Parties entered into a confidential agreement establishing certain conditions under which Defendants may terminate the Settlement if Settlement Class Members who collectively purchased or acquired a specific number of Alibaba ADS validly exclude themselves from the Settlement.  "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia Co.*, 2019 WL 5257534, at *15; *see also BlackBerry*, 2022 WL 4554858, at *7 ("To protect the Class, the specific terms of the Supplemental Agreement are confidential to avoid creating incentives for a small group of investors to opt out solely to leverage the threshold to exact an individual settlement.").

     **5.**     **The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other**

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another.  The Settlement easily satisfies this standard.  Under the proposed

---

[11] *See also In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) ("Lead Counsel's request for 25% of the [$225 million] Settlement Amount is consistent with, or lower than, the fee awards in other 'megafund' securities fraud actions in this Circuit."); Ex. 6 (NERA Report), at 30 (Fig. 27) (statistical review of all PSLRA settlements from 2015 to 2024 finding that 25% is the median fee award in cases with recoveries ranging from $100 million to $500 million).

Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. ¶103. Courts have repeatedly approved similar plans. *See Tal Educ. Grp.*, 2021 WL 5578665, at *11 (finding "methodology is appropriate and consistent with many other securities class action settlements' plans of allocation" where "Class Members will receive a *pro rata* share of the Net Settlement Fund in the proportion that the Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants."); *BlackBerry*, 2022 WL 4554858, at *8.

### 6. The Remaining *Grinnell* Factors Weigh In Favor Of Final Approval

**The Reaction of the Settlement Class:** The second *Grinnell* factor—the reaction of the class—overlaps with Rules 23(c)(2)(B)(vi), on the opportunity for exclusion, and 23(e)(5)(A), on the opportunity to object. As required by Rule 23(c)(2)(B)(vi) and (e)(5)(A), the Settlement affords Settlement Class Members the opportunity to request exclusion from, or object to, the Settlement. Ex. 1-A (Notice) at ¶¶78-80, 82-88. In total, as of February 10, 2025, notice of the Settlement has been disseminated to 1,088,190 potential Settlement Class Members and nominees, which includes 635,095 mailed Notice Packets (consisting of the Notice and Proof of Claim Form), and 453,095 emailed links to the Notice Packet. Ex. 1 at ¶11. As of February 10, 2025, A.B. Data has received only six (6) requests for exclusion, and not a single objection has been filed with the Court. *Id.* at ¶19; *see also* Wolke Decl. at ¶5.[12] The Settlement Class's positive reaction strongly supports final approval of the Settlement. *See, e.g.*, *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002)

---

[12] The deadline to request exclusion from, or object to any aspect of, the Settlement is March 6, 2025. Any objections or additional opt-outs received after the date of this filing will be addressed on reply.

("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *6 (S.D.N.Y. July 21, 2020) ("The absence of any objections and the small number of requests for exclusion support a finding that the Settlement is fair, reasonable, and adequate.").

**The Stage of the Proceedings and the Amount of Discovery Completed:** The third *Grinnell* factor examines "whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *Bear Stearns*, 909 F. Supp. 2d at 267. Here, at the time the Settlement was reached, Plaintiffs had opposed two motions to dismiss, had the benefit of the Court's decision on the motion to dismiss, engaged in extensive discovery, fully briefed Plaintiffs' hotly contested class certification motion, and had been preparing for months for fact depositions of Alibaba witnesses to begin in Hong Kong in September 2024. In addition, pursuant to the Term Sheet, Plaintiffs received confirmatory discovery, including further document discovery and interviews with two senior Alibaba officers, and did not execute the Stipulation until after assessing that discovery. In total, Plaintiffs reviewed and analyzed approximately 1.07 million pages of documents produced by Defendants, many of which were produced in Chinese. Because Plaintiffs and their counsel had sufficient information to evaluate the strengths and weaknesses of the case at the time of settlement, this factor supports final approval. *See In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *7 (E.D.N.Y. Apr. 22, 2024) ("Lead Plaintiffs' thorough investigation and witness interviews, the parties' settlement negotiations, and the interrogatories and document discovery obtained by Lead Plaintiffs provide the Court with sufficient

22

assurance that Lead Plaintiffs are likely to have obtained adequate information about their claims.").

**The Ability of Defendants to Withstand a Greater Judgment:** Alibaba's ability to withstand a greater judgment (*Grinnell* factor seven) does not counsel against final approval. Defendants no doubt ***could*** withstand a greater judgment, but "a defendant is not required to empty its coffers before a settlement can be found adequate." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. March 24, 2014). Defendants' financial wherewithal "do[es] not ameliorate the force of the other *Grinnell* factors, which lead to the conclusion that the settlement is fair, reasonable and adequate." *Id*. The more pertinent risk to consider in this regard is Plaintiffs' ability to ***collect*** on a greater judgment. Given the uncertainty around enforcement of U.S. judgments under Chinese law, Plaintiffs' ability to collect on a greater judgment—even if obtained—is far from clear. *See* ¶85.[13] This factor thus weighs in favor of granting final approval of the Settlement.

**B.      The Notice Program Satisfies The Requirements Of Due Process And Rule 23**

For any class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B). The Notice provides all the necessary information required by Rule 23(c)(2)(B) and satisfies the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7). This Court has already found that the proposed notice program is adequate and sufficient. *See* ECF No. 139, ¶¶7-9. Lead Counsel and A.B. Data carried out the notice program as proposed. In sum, the notice program detailed in ¶¶88-97 of the Wolke Declaration and the Walter Declaration (Ex. 1 at ¶¶2-12, 15-18) fairly apprises Settlement Class Members of their

---

[13] *See also Tenaris*, 2024 WL 1719632, at *8 ("Importantly, Tenaris has very few assets within the United States, which would significantly complicate enforcement efforts and could result in continued litigation in foreign courts arising out of enforcement efforts even if Tenaris's international operations are able to withstand judgment.").

rights with respect to the Settlement, and is the best notice practicable under the circumstances. *See Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at \*2-3 (S.D. Cal. Dec. 12, 2018) (combination of mailed notice, publication of summary notice in *Investor's Business Daily* and over *Globe Newswire*, and posting of notice on settlement website satisfied requirements of "Rule 23, the Private Securities Litigation Reform Act ('PSLRA'), and due process.").

C.      **Certification Of The Settlement Class For Settlement Purposes Is Appropriate**

In granting preliminary approval, the Court found this case appropriate for class certification for settlement purposes, and appointed Plaintiffs as class representatives and GPM as class counsel. *See* ECF No. 139 at ¶¶1-3.  Nothing has changed since preliminary approval that would undermine the Court's conclusion, and class certification for settlement purposes remains appropriate. *See Fleming v. Impax Labs. Inc.*, 2022 WL 2789496, at \*4 (N.D. Cal. July 15, 2022); *Stable Road*, 2024 WL 3643393, at \*11.

D.      **The Plan Of Allocation Is Fair And Reasonable And Should Be Approved**

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).  "This does not mean that the plan must be perfect; rather, an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *BlackBerry*, 2022 WL 4554858, at \*8 (cleaned up).

The Plan of Allocation, as detailed in ¶¶100-07 of the Wolke Declaration, and set forth in the Notice (Ex. 1-A (Notice) ¶¶53-76), is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Alibaba ADS was

24

artificially inflated during the Settlement Class Period due to Defendants' alleged material misrepresentations and omissions. The Plan of Allocation is based on the premise that the decrease in the price of Alibaba ADS that followed the alleged corrective disclosure that occurred on December 23, 2020, may be used to measure the alleged artificial inflation in the price of Alibaba ADS prior to the disclosure. ¶102; Ex. 1-A (Notice) ¶57.

An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including how many Alibaba ADS the Claimant purchased, acquired, or sold during the Settlement Class Period, when that Claimant bought, acquired, or sold the ADS, and the number of valid claims filed by other Claimants. If a Claimant purchased Alibaba ADS during the Settlement Class Period, but did not hold any of those ADS through the alleged corrective disclosure, the Claimant is not a Settlement Class Member and would have no Recognized Loss under the Plan of Allocation, as any loss suffered would not have been caused by the revelation of the alleged fraud. And, as noted above (*see* Sec. IV.A.5), each Authorized Claimant—including Plaintiffs—will receive, subject to a $10 *de minimis* provision, his, her or its *pro rata* share of the Net Settlement Fund, which will be their Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Lead Counsel believes that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members attributable to the conduct alleged in the Complaint. *See Stable Road*, 2024 WL 3643393, at *10-11 (approving substantially similar plan of allocation); *BlackBerry*, 2022 WL 4554858, at *8 (same). Approval of the proposed Plan of Allocation is, therefore, appropriate.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the request relief.

Dated: February 20, 2025                    **GLANCY PRONGAY & MURRAY LLP**

By: */s/ Kara M. Wolke*
Robert V. Prongay (*pro hac vice*)
Kara M. Wolke (*pro hac vice*)
Joseph D. Cohen (*pro hac vice*)
Jason L. Krajcer (*pro hac vice*)
Melissa C. Wright (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
        kwolke@glancylaw.com
        jcohen@glancylaw.com
        jkrajcer@glancylaw.com
        mwright@glancylaw.com
        rsulentic@glancylaw.com

*Lead Counsel for Plaintiffs and the Settlement Class*

Jeremy A. Lieberman
Jonathan D. Park
**POMERANTZ LLP**
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Email:  jalieberman@pomlaw.com
        jpark@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com

Peretz Bronstein
**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email:  peretz@bgandg.com

Frank R. Cruz
**THE LAW OFFICES OF FRANK R. CRUZ**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
Email:  info@frankcruzlaw.com

Lesley Portnoy
**THE PORTNOY LAW FIRM**
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone: 310-692-8883
Email:  lesley@portnoylaw.com

*Additional Counsel*

27

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 20th day of February, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Kara M. Wolke*
Kara M. Wolke