**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ALIBABA GROUP HOLDING LTD. SECURITIES LITIGATION | Master File No. 1:20-CV-09568-GBD-JW |

**DECLARATION OF KARA M. WOLKE IN SUPPORT OF: (I) PLAINTIFFS'
UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S
MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF
<u>LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 2

II.     PROSECUTION OF THE ACTION ................................................................ 11

        A.      Relevant Background Of The Litigation................................................. 11

        B.      Filing Of The Action And Appointment Of Lead Plaintiff And Lead Counsel ... 12

        C.      Plaintiffs' Substantial Pre-Filing Investigation And Preparation Of The
                Consolidated Amended Complaint ...................................................... 13

        D.      Defendants' Motions To Dismiss The Complaint, Plaintiffs' Responses, And The
                Court's Order Partially Dismissing Plaintiffs' Claims ......................... 15

        E.      Plaintiffs' Efforts To Obtain And Analyze Discovery From Defendants............. 19

        F.      Discovery Produced By Plaintiffs, Including Plaintiffs' Depositions .................. 24

        G.      Plaintiffs' Heavily Contested Motion For Class Certification............................ 25

        H.      The Mediation And Preliminary Approval Of The Settlement ........................... 31

III.    THE RISKS OF CONTINUED LITIGATION ................................................ 32

        A.      Risks Faced In Obtaining And Maintaining Class Certification ........................ 32

        B.      Risks To Surviving Summary Judgment And Facing An Inevitable Battle Of The
                Experts ........................................................................................... 33

        C.      Risks To Proving Liability And Damages In A Complicated Trial Involving
                Foreign Language Evidence And Testimony ..................................... 35

        D.      Risks Of Collecting A Judgment Against A Chinese Company.......................... 38

        E.      The Settlement Is Fair And Reasonable In Light Of The Risks And Maximum
                Potential Recovery Following Further Litigation Of The Action........................ 39

IV.     REPORT ON THE STATUS OF THE COMPREHENSIVE NOTICE PROGRAM...... 40

        A.      Notice Dissemination.......................................................................... 40

        B.      Requests For Exclusion And Objections ............................................ 43

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ......................... 43

VI.     THE FEE AND EXPENSE APPLICATION .................................................... 46

A.    The Requested Fee Is Fair And Reasonable ......................................................... 46

    1.    The Excellent Outcome Achieved Is The Result Of The Significant Time And Effort That Plaintiffs' Counsel Devoted To The Action................... 46

    2.    The Magnitude And Complexity Of The Action..................................... 48

    3.    The Significant Risks Borne By Plaintiffs' Counsel ............................... 48

    4.    The Quality Of Representation By Experienced Plaintiffs' Counsel And The Caliber of Defendants' Counsel......................................................... 50

    5.    The Requested Fee In Relation To The Settlement ................................. 51

    6.    Public Policy Interests Supporting Private Enforcement of Securities Laws, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Cases.................................................................... 51

    7.    The Reaction Of The Settlement Class Supports The Fee Request.......... 52

B.    A Lodestar Crosscheck Confirms The Reasonableness Of The Fee Request ...... 52

C.    The Requested Litigation Expenses Are Fair And Reasonable ........................... 54

D.    Plaintiffs' Request For An Award For Their Work On Behalf Of The Settlement Class........................................................................................................................ 57

VII.    CONCLUSION........................................................................................................... 58

**TABLE OF EXHIBITS TO DECLARATION**

| EX. | DESCRIPTION |
|-----|-------------|
| 1 | Declaration of Adam Walter Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; (C) Report on Claims Received to Date; and (D) Report on Requests for Exclusion Received to Date ("Walter Declaration") |
| 2 | Declaration Of Lead Plaintiff Salem Gharsalli In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 3 | Declaration Of Laura Ciccarello In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 4 | Declaration Of Dineshchandra Makadia In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 5 | Declaration Of Wilson Hu In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 6 | Excerpts of *NERA Recent Trends In Securities Class Action Litigation: 2024 Full-Year Review* (January 22, 2025) |
| 7 | Excerpts of Cornerstone Research, *Securities Class Action Settlements 2023 Review and Analysis* |
| 8 | ISS Securities Class Action Services, *The Top 100 U.S. Class Action Settlements of All-Time* (as of December 31, 2023) |
| 9 | Declaration of Kara M. Wolke In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses On Behalf Of Glancy Prongay & Murray LLP ("Glancy Fee Declaration") |
| 10 | Declaration of Jonathan D. Park, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses On Behalf Of Pomerantz LLP ("Pomerantz Fee Declaration") |
| 11 | Joint Declaration Of Professors Brian Fitzpatrick & Charles Silver Regarding The Reasonableness Of Lead Counsel's Request For An Award Of Attorneys' Fees |
| 12 | Chart of Peer Law Firm Billing Rates |
| 13 | Chart of Settlements of $100 Million or Greater and Awarding Attorneys' Fees of 25% or Higher |
| 14 | Chart of Settlements with China-based Defendants |
| 15 | Project Attorneys' Biographies and Work Summaries |

| 16 | The American Lawyer, *Senior Partners Approach $3,000 an Hour, As More Billing Rate Hikes Expected in 2025*, September 24, 2024 |
|----|------|
| 17 | *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222 (CLB), ECF No. 369 (S.D.N.Y. June 12, 2003) and 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003) |
| 18 | *Qsberg v. Foot Locker, Inc.*, No. 07-cv-1358, ECF No. 423 (S.D.N.Y. June 8, 2018) |
| 19 | *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, ECF No. 521 (D. Conn. Dec. 9, 2014) |
| 20 | *Anwar v. Fairfield Greenwich Ltd.*, 1:09-cv-00118, ECF Nos. 1099, 1233, 1457, and 1569 (S.D.N.Y. Mar. 28, 2013, Nov. 22, 2013, Nov. 20, 2015 and May 6, 2016) |
| 21 | *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, No. 12-MD-2335 (LAK) (JLC), ECF No. 637 (S.D.N.Y. Sept. 24, 2015) |
| 22 | *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) |
| 23 | *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al.*, No. 02 C-5893, ECF No. 2265 (N.D. Ill. Nov. 10, 2016) |
| 24 | *Dahl v. Bain Capital Partners, LLC,* No. 07 Civ. 12388, ECF Nos. 1051, 1095 (D. Mass. Feb. 2, 2015) |
| 25 | *In re Williams Sec. Litig.*, No. 02-cv-72-SPF, ECF No. 1638 (N.D. Okla. Feb. 12, 2007) |
| 26 | *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), ECF No. 117 (S.D.N.Y. July 18, 2011) |
| 27 | *In re Virgin Mobile USA IPO Litig.*, No. 07-cv-5619 (SDW), ECF No. 146 (D.N.J. Dec. 8, 2010) |

I, Kara M. Wolke, declare the following pursuant to 28 U.S.C. §1746:

1.      I am an attorney duly licensed to practice law before all of the courts of the State of California and I am admitted *pro hac vice* in the above-captioned action (the "Action").[1] I am a partner with the law firm Glancy Prongay & Murray LLP ("GPM"), Court-appointed Lead Counsel for Lead Plaintiff Salem Gharsalli, and additional plaintiffs Laura Ciccarello, Dineshchandra Makadia, and Wusheng Hu (collectively, with Lead Plaintiff, "Plaintiffs") in the above-captioned Action. I have personal knowledge of the matters stated herein and, if called upon, could and would competently testify thereto.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof ("Final Approval Motion"). As set forth in the Final Approval Motion, Plaintiffs seek final approval of the $433,500,000.00 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently-filed memorandum in support thereof ("Attorneys' Fee Motion"). As set forth in the Attorneys' Fee Motion, Lead Counsel seeks an award of attorneys' fees in the amount of 25% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $1,110,752.68, which includes Lead Counsel's out-of-pocket litigation costs of $1,025,752.68, and an award in the aggregate amount of $85,000 to

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated October 25, 2024 ("Stipulation"). ECF No. 136-1.

Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including for time spent, incurred in connection with their representation of the Settlement Class. *See* Exs. 9-10 ("Glancy Fee Declaration" and "Pomerantz Fee Declaration," respectively) and Exs. 2-5 (declarations of each of the four Plaintiffs).

4.      The Court preliminarily approved the proposed Settlement by Order dated October 28, 2024, and therein directed notice of the Settlement to be disseminated to the Settlement Class. ECF No. 139 (the "Preliminary Approval Order"). Pursuant to the Preliminary Approval Order, A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail, e-mail, and by publication. *See* ¶¶88-97, *infra* (detailing notice program). The details of the notice program are set forth in the Declaration of Adam Walter Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; (C) Report on Claims Received to Date; and (D) Report on Requests for Exclusion Received to Date ("Walter Decl."), a true and correct copy of which is attached hereto as Exhibit 1.

5.      In total, notice of the Settlement has been disseminated to 1,088,190 potential Settlement Class Members and their nominees, and as of February 10, 2025, only six (6) requests for exclusion have been received by the Claims Administrator and no objections have been filed with the Court or received by Plaintiffs' Counsel. *See* Ex. 1 (Walter Decl.) at ¶¶11, 19, 20.

## I.      <u>INTRODUCTION</u>

6.      Plaintiffs in this action alleged claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder against defendants Alibaba Group Holding Limited ("Alibaba"), Daniel Zhang, Maggie Wu, and former defendant Jack Yun Ma (collectively, "Defendants"). The proposed Settlement provides

for the resolution of all claims in the Action exchange for a cash payment of $433,500,000.00 (the "Settlement Amount") for the benefit of the Settlement Class of those who purchased or acquired Alibaba American Depositary Shares ("ADS"; NYSE ticker symbol: BABA) during the period November 13, 2019 through December 23, 2020, inclusive (the "Settlement Class Period").

7.     If approved by the Court, the Settlement would rank among the 50 largest securities class action settlements since the passage of the PSLRA (*see* Ex. 8), and would be the largest ever securities class action settlement against a company based in China. *See* Ex. 14 (collecting cases).

8.     The Settlement represents a recovery of approximately 3.73% of maximum damages potentially available in this case were Plaintiffs to prevail on all of their arguments pertaining to liability and damages, which is an excellent result as compared to recoveries in other securities litigation cases of a similar magnitude. Indeed, the median percentage recovery in cases alleging investor losses in excess of $10 billion during the period January 2015 through December 2024 was 0.4%. *See* Ex. 6 (Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025)) at p. 36, Fig. 23. The Settlement also greatly exceeds the 1.2% median percentage recovery of investor losses regardless of case size. Ex. 6 at p. 27, Fig. 24.

9.     The Settlement thus provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that class certification would be denied, effectively precluding any class-wide recovery, or that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay. Plaintiffs and Lead Counsel submit that the proposed Settlement represents an outstanding result for the Settlement Class in light of the significant risks overcome and remaining in the Action.

10.    The Settlement was achieved after approximately 4 years of contested litigation, during which time Plaintiffs' Counsel became well informed on the relative strengths and weaknesses of Plaintiffs' claims in the Action.  In prosecuting the Action, Plaintiffs' Counsel expended substantial efforts and resources on behalf of the Settlement Class, including, *inter alia*:

a.    Conducting a detailed and substantive investigation of Alibaba, the Individual Defendants, and the alleged material misrepresentations and fraudulent schemes alleged in the Action, including: (i) reviewing and analyzing Alibaba's public Securities Exchange Commission ("SEC") filings, press releases, earnings calls transcripts, investor day transcripts, investor presentations, and other public statements made by Defendants; (ii) researching, reviewing, and analyzing other publicly available documents, reports, announcements, and news articles in both English and Chinese concerning Alibaba and its affiliate, Ant Group; (iii) researching, reviewing, and analyzing public filings made by Ant Group with the Hong Kong Securities Exchange ("HKSE") in anticipation of the planned initial public offering of Ant Group in 2020 (the "Ant IPO" or "Ant Group IPO"); (iv) reviewing and analyzing research reports prepared by securities and financial analysts regarding Alibaba and Ant Group; (v) researching and analyzing relevant laws and regulations applicable to the e-commerce and fin-tech industries in the Peoples' Republic of China ("China" or "PRC"), including but not limited to the PRC anti-monopoly law (the "AML"), the E-commerce law and related regulations, the anti-unfair competition law and related regulations, and banking and insurance laws and regulations; (vi) researching, reviewing, and analyzing documents and statements published by China's State Administration of Market Regulation ("SAMR") relating to Alibaba's e-commerce business practices; (vii) retaining and working with a China-based private investigator who

assisted with substantial research into SAMR filings of Alibaba, Ant Group, and related parties; (viii) reviewing and analyzing publicly available material related to lawsuits filed against Alibaba for alleged violations of the PRC AML, including a case filed on or about November 28, 2017, in the Beijing Municipal High People's Court by JD.com against Alibaba, alleging that Tmall/Alibaba abused its dominant position in the online retail platform market in China by its "choose-one-of-two" exclusive dealing practices (the "JD.com Litigation"); and (ix) working with financial and economic experts to analyze price movements of Alibaba securities to inform topics of market efficiency, loss causation, and damages;

b.    Researching and drafting the initial complaint in this case, filed by Plaintiff Laura Ciccarello (ECF No. 1);

c.    Researching and drafting a motion for consolidation and litigating a contested motion for appointment of Salem Gharsalli as Lead Plaintiff pursuant to the PSLRA, including oral argument held on April 27, 2021 (ECF Nos. 6-8, 28, 30, 43);

d.    Drafting the detailed 155-page Consolidated Amended Complaint (the "Complaint") filed on April 22, 2022, the operative complaint in the Action, which incorporated the foregoing research and investigation efforts (ECF No. 55);

e.    Researching and opposing Defendants' two separate motions to dismiss (ECF Nos. 60-61 filed by Defendants Alibaba, Zhang, and Wu; ECF Nos. 62-63 filed by Defendant Ma), which opposition briefs Plaintiffs filed on October 21, 2022 (ECF Nos. 74-76). Opposing Defendants' motions to dismiss included analyzing and responding to the ninety-one (91) exhibits Defendants filed in support of their motions (ECF Nos. 64, 79), the submission of twenty-five (25) exhibits by Lead Counsel in support of Plaintiffs'

5

allegations (*see* ECF No. 76), and participating in a lengthy oral argument held on January 11, 2023 (ECF No. 81);

     f.     Meeting and conferring with counsel for Defendants to prepare a Rule 26(f) case management and discovery plan (ECF No. 87), and preparing for and participating in the discovery and scheduling conference with the Court on May 2, 2023 (ECF No. 88);

     g.     Reviewing and analyzing Defendants' Answer, filed on May 5, 2023 (ECF No. 90);

     h.     Researching and negotiating the proposed Protective Order regarding the handling of confidential material in the Action, filed on June 2, 2023, and entered on June 5, 2023 (ECF Nos. 95-96);

     i.     Researching and drafting the motion for class certification filed on October 6, 2023, which included, among other evidence, the submission of an expert report on market efficiency by Dr. David Tabak (ECF Nos. 99-102);

     j.     Preparing for and defending Dr. Tabak's deposition regarding class certification and market efficiency on November 2, 2023;

     k.     Reviewing, researching, and analyzing Defendants' opposition to the motion for class certification, including the expert report of Dr. Glenn Hubbard and thirty-four (34) additional exhibits Defendants submitted as evidence in support of the opposition (ECF Nos. 107-09);

     l.     Preparing for and taking the deposition of Defendants' class certification expert on the topic of price impact, Dr. Glenn Hubbard, on March 21, 2024;

m. Researching and drafting the reply in support of class certification, including the submission of twenty-eight (28) additional exhibits as evidence in response to Defendants' price impact arguments (ECF Nos. 113-14);

n. Reviewing, researching, and analyzing Defendants' sur-reply in further opposition to Plaintiffs' motion for class certification, including the supplemental expert report of Dr. Glenn Hubbard (ECF Nos. 117-18);

o. Researching and drafting Plaintiffs' motion to strike portions of Defendants' sur-reply and supplemental expert report in further opposition to Plaintiffs' motion for class certification (ECF Nos. 119-21);

p. Reviewing and analyzing Defendants' opposition to the motion to strike (ECF Nos. 122-23), preparing and filing Plaintiffs' submission of supplemental evidence in advance of the class certification hearing (ECF No. 124), and preparing and filing Plaintiffs' reply in further support of their motion to strike (ECF No. 129);

q. Propounding substantial requests for written, documentary, and deposition discovery, including drafting and serving: (i) six sets of Requests for Production of Documents; (ii) one set of written Interrogatories; (iii) a detailed Rule 30(b)(6) deposition notice containing sixty (60) topics directed at Alibaba; (iv) a Freedom of Information Act request to the SEC, which was initially denied by the SEC, which decision the SEC reversed after Lead Counsel's successful appeal; and (v) engaging in substantial meet and confer efforts with Defendants' counsel regarding the discovery requests propounded, including many dozens of exchanges of e-mails, letters, and telephonic and/or video conferences to negotiate the parameters of discovery;

r.      Conducting research into merchants selling on Alibaba's platforms that were allegedly subject to some form exclusivity agreements and/or exclusivity practices with Alibaba during the relevant time period;

s.      Conducting research into Alibaba's alleged use of algorithms and source code to implement exclusivity practices;

t.      Complying with Plaintiffs' obligations to provide written and documentary discovery, including preparing and serving Plaintiffs' Rule 26(a)(1) Initial Disclosures on April 28, 2023; preparing detailed responses and objections to Defendants' First Set of Requests for Production of Documents served on May 12, 2023; and preparing and producing over 15,000 of pages of documents to Defendants on behalf of Plaintiffs and their experts;

u.      Preparing for and defending the deposition of each of the four proposed class representatives, as follows: Salem Gharsalli in Tampa, Florida on November 15, 2023; Wusheng Hu in San Diego, California on December 5, 2023; Dineshchandra Makadia in Los Angeles, California on December 11, 2023; and Laura Ciccarello in New York, New York on December 15, 2023;

v.      Strategically reviewing and analyzing more than 1.07 million pages of documents produced by Defendants and third parties, of which many documents— including integral documents such as internal Alibaba e-mails, DingTalk messages, and merchant agreements—were produced in, or contained, Mandarin Chinese and thus required review by Mandarin Chinese-speaking attorneys;

8

w.      Substantially preparing to take at least twenty (20) fact depositions of Alibaba employees and witnesses, which depositions were contemplated to commence in September 2024 and continue through December 2024;

x.      Preparing for, traveling to, and conducting two interviews of representatives of Defendant Alibaba in Hong Kong on August 21, 2024, and in New York City on September 17, 2024;

y.      Retaining and working with a computer science expert on the topics of source code and algorithm programming;

z.      Retaining and working with economic experts on the topics of market efficiency, price impact, loss causation, and damages;

aa.      Preparing for and participating in a full-day private mediation session under the direction of former United States District Court Judge, Layn R. Phillips, on May 8, 2024, which ended without an agreement to settle. However, the discussions among the Parties and Judge Phillips further enabled Plaintiffs' Counsel to assess the strengths and weaknesses of Plaintiffs' case, including with respect to the risks faced in prevailing on class certification, and proving liability and damages;

bb.      Participating in substantial additional discussions and negotiations with the mediator's office in the weeks and months following the mediation, which ultimately culminated in Judge Phillips presenting a mediator's recommendation to settle the Action for $433,500,000.00, which the Parties accepted;

cc.      Negotiating and preparing the comprehensive Stipulation of Settlement and related exhibits and thereafter moving for and obtaining the Court's preliminary approval of the Settlement (ECF Nos. 134-36, 139); and

9

dd.    Finally, drafting the concurrently-filed motion for final approval of the Settlement and supporting papers.

11.    Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents an extremely favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

12.    Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed further below, Lead Counsel developed the Plan of Allocation with the assistance of a consulting damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. An Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Loss divided by the total Recognized Loss Amount of all Authorized Claimants, multiplied by the total amount of the Net Settlement Fund.

13.    Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses, as set forth in the Attorneys' Fee Motion.  The requested 25% fee is within the range of percentage awards granted by courts in this and other Circuits in comparable complex class actions, its fairness and reasonableness is confirmed by a lodestar cross-check, and it is warranted in light of the extent and quality of the work performed and the substantial result achieved. Accordingly, as set forth in the Attorneys' Fee Motion and for the additional reasons set forth herein below, I respectfully submit that Lead Counsel's request for

10

attorneys' fees and reimbursement of Litigation Expenses is fair and reasonable and should be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Relevant Background Of The Litigation

14.   Alibaba operates online marketplaces and mobile e-commerce platforms including Alibaba.com, Tmall.com, and Taobao.com. Prior to and during the Settlement Class Period, Alibaba employed business tactics known as "二选一" or "Er Xuan Yi"—which translated means "Choose One Of Two"—by which Alibaba required or coerced merchants to sell exclusively on Alibaba platforms, and/or punished the merchants if they sold on competitor platforms. On November 5, 2019, China's SAMR convened an official "Administrative Guidance Forum on Regulating Online Operating Activities," summoning several large internet companies, including Alibaba. During this meeting, the SAMR explicitly instructed that "Choose One of Two" practices requiring exclusive or restrictive selling violated Chinese law, including the AML.

15.   Also during the Settlement Class Period, Alibaba owned a 33% equity interest in Ant Group, a Chinese financial technology (or "fintech") company perhaps best known for operating Alipay, a mobile and online payment platform akin to PayPal. Ant Group originated as Alibaba's electronic payment and escrow services provider to facilitate payments across Alibaba's e-commerce platforms. Ant Group was spun off from Alibaba in 2011, but remained under the control of Jack Ma and Alibaba during the Settlement Class Period. On July 20, 2020, Alibaba filed a Form 6-K announcing that Ant Group was planning an initial public offering in a joint listing on the HKSE and the Shanghai STAR Market. Aiming to raise a record $35 billion, the Ant Group IPO was staked to be the world's largest ever IPO at the time, trumping Alibaba's own historic $25 billion IPO in 2014, which at that time was the largest IPO ever in the United States.

11

16.    On November 3, 2020, Alibaba announced that the Ant IPO had been suspended because Ant Group "may not meet listing qualifications or disclosure requirements due to material matters relating to the regulatory interview of its ultimate controller, executive chairman and chief executive officer by the relevant regulators…." Following this news, the price of Alibaba's ADS fell $25.27 per share (8.13%), to close at $285.57 per share on November 3, 2020.

17.    Then, on November 10, 2020, the SAMR published new draft rules pertaining to online e-commerce platforms, including rules prohibiting anti-competitive practices on online platforms. Bloomberg News reported the same day that Beijing was "seek[ing] to curtail the growing dominance of corporations like Alibaba Group Holding Ltd. and Tencent Holdings Ltd." Following the news, the price of Alibaba's ADS fell $23.99 per share (8.26%), to close at $266.54 per share on November 10, 2020.

18.    Finally, after the close of trading on December 23, 2020, the SAMR revealed it had launched an antitrust probe into Alibaba's alleged monopolistic practices. As *The New York Times* reported, "[i]n a terse statement, the State Administration for Market Regulation said it had started the investigation amid reports that Alibaba had engaged in monopolistic conduct such as placing unreasonable restrictions on merchants or other users of its platforms." In response to this news, Alibaba's ADS fell $34.18 per share (13%), to close at $222.00 per share on December 24, 2020.

**B.    Filing Of The Action And Appointment Of Lead Plaintiff And Lead Counsel**

19.    On November 13, 2020, Plaintiff Laura Ciccarello commenced an action in this Court styled *Ciccarello v. Alibaba Group Holding Ltd. et al.*, Case No. 1:20-cv-09568-GBD-JW (S.D.N.Y.) ECF No. 1. Two additional actions were subsequently filed: *Romnek v. Alibaba Grp. Holding Ltd. et al.*, No. 20 Civ. 10267 (GBD) (S.D.N.Y. December 4, 2020), and *Hess v. Alibaba Grp. Holding Ltd. et al.*, No. 21 Civ. 136 (GBD) (S.D.N.Y January 7, 2021).

12

20.    Movant Salem Gharsalli filed a motion for appointment of Lead Plaintiff on January 12, 2021, with GPM as his choice to serve as lead counsel. ECF Nos. 6-8. Mr. Gharsalli submitted further briefing on February 2, 2021. ECF No. 30.

21.    The Court entered an order consolidating the actions on April 20, 2021. ECF No. 43.

22.    The Court held a hearing on the contested lead plaintiff motions on April 27, 2021.

23.    On February 2, 2022, the Court appointed Salem Gharsalli to serve as Lead Plaintiff and approved his selection of GPM to serve as Lead Counsel. ECF No. 48.

**C.    Plaintiffs' Substantial Pre-Filing Investigation And Preparation Of The Consolidated Amended Complaint**

24.    Following its appointment as Lead Counsel, GPM conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (i) reviewing and analyzing Alibaba's SEC filings, press releases, earnings calls transcripts, investor day transcripts, investor presentations, and other public statements made by Defendants; (ii) researching, reviewing, and analyzing other publicly available documents, reports, announcements, and news articles in both English and Chinese concerning Alibaba and its affiliate, Ant Group; (iii) researching, reviewing, and analyzing public filings made by Ant Group with the HKSE in anticipation of the planned Ant Group IPO; (iv) reviewing and analyzing research reports prepared by securities and financial analysts regarding Alibaba and Ant Group; (v) researching and analyzing relevant laws and regulations applicable to the e-commerce and fin-tech industries in China, including but not limited to China's AML, E-commerce law and related regulations, anti-unfair competition law and related regulations, and banking and insurance laws and regulations; (vi) researching, reviewing, and analyzing documents and statements published by the SAMR relating to Alibaba's e-commerce business practices; (vii) retaining and working with a China-

based private investigator who assisted with substantial research into SAMR filings of Alibaba, Ant Group, and related parties; (viii) reviewing and analyzing publicly available material related to lawsuits filed against Alibaba for alleged violations of the PRC AML, including the JD.com Litigation; and (ix) working with financial and economic experts to analyze price movements of Alibaba securities to inform topics of market efficiency, loss causation, and damages.

25. On April 22, 2022, Plaintiffs filed and served the operative Consolidated Amended Complaint (the "Complaint"), asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. ECF No. 55. In addition to the Lead Plaintiff, Mr. Gharsalli, the Complaint included as additional named plaintiffs Laura Ciccarello, Dineshchandra Makadia, and Yan Tongbiao.[2] Among other things, the Complaint alleged that Alibaba and Ma violated the Exchange Act by misrepresenting and/or scheming to conceal certain material regulatory or political risks relating to the then-anticipated Ant Group IPO (the "Ant Group IPO Claim"). The Complaint also alleged that Alibaba, Zhang, and Wu violated the Exchange Act by misrepresenting and failing to disclose certain material facts relating to Alibaba's alleged use of merchant exclusivity practices in violation of Chinese laws (the "Antitrust Claim"). In particular, the Complaint alleged that during a November 5, 2019 SAMR administrative guidance meeting, the SAMR instructed Alibaba and other e-commerce platforms that the use of exclusive partnerships and/or restricting the operations of merchants on other e-commerce platforms violated Chinese e-commerce, anti-trust, and anti-unfair competition laws, and that despite the SAMR's instructions, Alibaba thereafter continued to use unlawful merchant exclusivity practices. Finally, the Complaint alleged that Ma violated SEC Rule 10b5-1 for selling Alibaba ADS owned or

---

[2] Yan Tongbiao did not move to be appointed as a class representative and subsequently withdrew from the Action. ECF No. 138.

beneficially owned by him while in possession of material non-public information relating to the Ant Group IPO and Alibaba's alleged exclusivity practices.

26.     The Complaint averred that as result of the alleged misrepresentations and omissions relating to the Ant Group IPO and Alibaba's ongoing use of exclusivity practices, the price of Alibaba ADS was artificially inflated. The Complaint alleged that the suspension of the Ant Group IPO on November 3, 2020, in response to which Alibaba's ADS price fell $25.27 per share (8.13%), constituted a materialization of Alibaba's undisclosed political and regulatory risks relating to Ant Group. The Complaint also alleged that undisclosed risks relating to Alibaba's ongoing use of merchant exclusivity practices partially materialized, and/or that the truth of Alibaba's ongoing use of such practices was partially revealed, when: (i) on November 10, 2020, multiple news outlets reported that the SAMR published new draft rules aimed at anti-competitive practices by online platforms, including merchant exclusivity practices like those allegedly used by Alibaba, in response to which Alibaba's ADS price fell $23.99 per share (8.26%) on November 10, 2020; and (ii) after the close of trading on December 23, 2020, the SAMR announced an investigation in response to reports regarding Alibaba's alleged use of exclusivity practices, in response to which Alibaba's ADS price fell $34.18 per share (13.34%) on December 24, 2020.

**D.     Defendants' Motions To Dismiss The Complaint, Plaintiffs' Responses, And The Court's Order Partially Dismissing Plaintiffs' Claims**

27.     On July 21, 2022, Defendants filed two separate motions to dismiss the Complaint for failure to state a claim, supported by 82 exhibits. ECF Nos. 60-64.

28.     The motion filed by Defendants Alibaba, Zhang, and Wu (the "Alibaba Defendants") argued, among other things, that: (i) Plaintiffs failed to state a claim regarding the failed Ant Group IPO because Alibaba Defendants had no duty to disclose any facts relating to the Ant Group IPO; (ii) Plaintiffs failed to allege a strong inference of scienter for the Ant Group IPO

15

claim; (iii) Plaintiffs failed to plead any actionable misstatement relating to Alibaba's exclusivity practices or anti-trust regulatory risks because Alibaba's exclusivity practices were arguably widely covered in the media and known to the market, and Plaintiffs could not show the Alibaba Defendants did not honestly believe Alibaba's practices complied with the AML; (iv) Plaintiffs failed to allege a strong inference of scienter for the statements relating to Alibaba's exclusivity practices or anti-trust regulatory risks; and (v) Plaintiffs failed to allege loss causation for each of the three alleged price drops following disclosures on November 3, 2020, November 10, 2020, and December 23, 2020. ECF Nos. 60-61.

29.    Defendant Ma filed a separate motion to dismiss, arguing, among other things, that: (i) the Court lacked personal jurisdiction over him; (ii) the alleged fraud relating to the Ant Group IPO fell outside the territorial limit of Section 10(b); (iii) Plaintiffs lacked standing to challenge statements relating to the Ant Group IPO; (iv) Ma was not the maker of the challenged statements relating to the Ant Group IPO; (v) the alleged risks relating to the Ant Group IPO were fully disclosed; (vi) Plaintiffs failed to allege facts sufficient to raise a strong inference of scienter as to Ma; and (vii) Plaintiffs failed to allege an actionable scheme in which Ma participated relating to the concealment of risks underlying the Ant Group IPO. ECF Nos. 62-63.

30.    On October 21, 2022, Plaintiffs filed their oppositions to the motions filed by Ma and the Alibaba Defendants. ECF Nos. 74-76. Regarding the Alibaba Defendants' motion, Plaintiffs argued, among other things, that: (i) the Alibaba Defendants' statement regarding Alibaba's "prior" use of "exclusive partnerships" (*i.e.*, the "Prior Practices Statement") was materially false and misleading because Alibaba had not, in fact, ceased using such partnerships; (ii) the Alibaba Defendants' statement that "we believe that our business practices do not violate anti-monopoly or unfair competition laws" was materially false and misleading because Alibaba

16

continued to use various exclusive dealing practices in violation of the AML; (iii) that, as a result of the foregoing, Alibaba's regulatory risk disclosures were materially misleading; and (iv) the Alibaba Defendants' statements about the source of Alibaba's core commerce revenue and merchant retention were materially misleading because they failed to disclose Alibaba's continued use of merchant exclusivity requirements. Plaintiffs further argued that a strong inference of scienter was alleged because: (i) the SAMR had told Alibaba in no uncertain terms that exclusive trading practices were illegal under Chinese law, including the AML, and Alibaba had signed a so-called "Commitment Letter" so attesting; (ii) Zhang and Wu knew about the practices because they were long-standing and deeply ingrained at Alibaba and had, in fact, enabled Alibaba to attain its market dominance; and (iii) the scienter of the corporate executive who attended the November 5, 2019, SAMR meeting was properly imputed to Alibaba. Finally, Plaintiffs argued that loss causation was alleged for the November 3, 2020 price drop relating to the cancellation of the Ant Group IPO, as well as for both the November 10, 2020 and December 23, 2020 disclosures relating to Alibaba's exclusivity practices. ECF No. 74.

31.    Regarding Mr. Ma's motion, Plaintiffs argued, among other things, that: (i) the Complaint alleged sufficient contacts between Ma and the U.S. to support the exercise of personal jurisdiction over him, including his sales of a substantial amount of Alibaba ADS on the NYSE; (ii) Plaintiffs' claims were within the territorial reach of Section 10(b) because their purchases were made through a U.S. exchange; (iii) Plaintiffs have standing to sue Ma for statements made in the Ant Group prospectus because there was a direct link between the securities Plaintiffs purchased and the statements in the prospectus; (iv) as the person with ultimate control over Ant Group, Ma was the maker of statements in the Ant Group prospectus; (v) Ma sold Alibaba ADS while in possession of material non-public information relating to both the Ant Group IPO and

17

Alibaba's exclusivity practices; and (vi) Ma's scienter was alleged based on his knowledge of allegedly concealed facts that posed risks to the Ant Group IPO, his motive to conceal information from Chinese regulators, and the size of his sales.

32.    On December 21, 2022, Ma and the Alibaba Defendants filed replies in support of their motions to dismiss. ECF Nos. 77-79.

33.    With the motions fully briefed, the Court held a lengthy oral argument on the motions on January 11, 2023.

34.    On March 22, 2023, the Court entered its Order granting in part and denying in part Defendants' motions. ECF No. 83. The Court dismissed the Ant Group IPO Claim and the insider trading claims against Defendant Ma in their entirety. Regarding the Ant Group IPO Claim, the Court held that Plaintiffs, as investors in Alibaba's ADS, did not purchase the securities about which the alleged misstatements were made (*i.e.*, Ant Group securities) and, therefore, lacked standing to challenge statements relating to Ant Group. *Id.* at 9-10. With the Ant Group IPO Claim dismissed, the alleged price drop on November 3, 2020, likewise was dismissed. Regarding the other claims against Mr. Ma, the Court held that it lacked personal jurisdiction over Ma and that Ma did not violate insider trading rules because Plaintiffs did not plausibly allege that Ma knowingly possessed material nonpublic information regarding Alibaba's exclusivity practices when he allegedly sold Alibaba ADS. *Id.* at 10-15.

35.    Meanwhile, the Court sustained the Antitrust Claim in part. The Court held that Plaintiffs sufficiently alleged that the challenged disclosures relating to Alibaba's exclusivity practices were materially false or misleading and that Defendants Wu and Zhang acted with scienter, which was also imputed to Alibaba. ECF No. 83 at 18-26. The Court, however, held that loss causation was not alleged for the November 10, 2020, price drop, stating: "that the SAMR

18

published new regulations impacting Alibaba's exclusivity practices" did not constitute a corrective disclosure, nor did "[t]he promulgation of new regulations" constitute a materialization of undisclosed risk, "because Alibaba had repeatedly warned investors of such a possibility." *Id.* at 27. Finally, the Court held that loss causation *was* sufficiently alleged for the third and final price drop following the December 23, 2020, SAMR investigation announcement, explaining that it was "plausible" that announcement of the investigation partially revealed to the market "that Alibaba had engaged in illegal exclusivity practices despite contrary disclosures." *Id*. at 28.

36.     On May 5, 2023, Defendants filed their Answer and Affirmative Defenses to the Complaint. ECF No. 90. In their Answer, Defendants continued to deny Plaintiffs' claims in their entirety, and asserted twenty-six (26) affirmative defenses, including, among other things, that: (i) Plaintiffs' claims were barred by investors' actual and/or constructive knowledge of the alleged misrepresented or concealed information regarding Alibaba's exclusivity practices due to the fact that the information was already disclosed in the public domain at the time the challenged statements were made; (ii) the alleged misstatements were made in good faith and were based on what the speakers believed to be true when the statements were made; (iii) the alleged misrepresentations were not material to reasonable investors; (iv) the alleged misrepresentations were not the cause of Plaintiffs' investment losses; and (v) Plaintiffs' claims were not properly maintained as a class action.

### E.    Plaintiffs' Efforts To Obtain And Analyze Discovery From Defendants

37.     Following the partial denial of Defendants' motions to dismiss, the Court ordered an initial case management conference to occur on May 2, 2023, before Magistrate Judge Jennifer E Willis. ECF No. 84. On or about April 11, 2023, counsel for Plaintiffs and Defendants met and

19

conferred to discuss the topics set forth in Rules 16 and 26(f) of the Federal Rules of Civil Procedure and to draft a proposed case schedule.

38.     On April 25, 2023, Plaintiffs filed the Parties' Joint Rule 26(f) Discovery Plan and Report. ECF No. 87. The Court held the case management conference on May 2, 2023, and entered the case management schedule on May 9, 2023. ECF Nos. 88, 91. Among other things, the case management order set a fact discovery cut-off of January 31, 2025.

39.     The Parties thereafter began negotiating the protective order that would govern the treatment of evidence designated confidential or highly confidential in the course of discovery. On June 2, 2023, the Parties filed the proposed Protective Order, and the Court entered the Protective Order on June 5, 2023. ECF Nos. 95-96.

40.     On May 15, 2023, Plaintiffs served their First Set of Requests for Production of Documents on Defendants Alibaba, Zhang, and Wu. On June 30, 2023, Defendants made their first production of documents in the Action. Productions continued thereafter on a rolling basis. Ultimately, Plaintiffs served six (6) Sets of Requests for Production of Documents totaling 140 individual document or document category requests. Plaintiffs also served their First Set of Interrogatories on Alibaba, Zhang, and Wu on November 22, 2023.

41.     Beginning in June 2023, the Parties began negotiating the parameters of Defendants' production of documents and other evidence. As indicated in the Parties' joint case management plan and Rule 26(f) report, "[d]iscovery in this case [was] particularly complex given the location of documents and witnesses in China." ECF No. 91 at 10. Indeed, the Parties engaged in extensive negotiations relating to the intersection of PRC law and Defendants' discovery obligations, as Defendants took the position that various PRC laws applied to Alibaba's exportation of data and documents out of China. *Id.* Throughout the discovery period, the Parties

20

exchanged approximately 40 meet and confer letters, as well as dozens of e-mails, and held numerous lengthy telephonic or videoconference meet-and-confer sessions. These negotiations continued throughout the pendency of the Action as Plaintiffs continued to press Defendants for documents based on information uncovered from reviewing documents as they were produced. Other topics negotiated through the Parties' extensive meet and confer efforts included, among other things: the scope of Alibaba's business practices and platforms at issue, including Tmall.com and Taobao.com; the sources of custodial ESI (including, for example, e-mail, DingTalk, and personal devices); the number and content of electronic search terms; the number and identity of document custodians; the relevant time period for Defendants' searches and production; the type of exclusivity agreements and practices and any exclusivity-related programs or promotions used by Alibaba during relevant search period; the production of documents Alibaba produced in the JD.com Litigation; the production of documents Alibaba produced to (or which were obtained by) the SAMR in connection with its investigation; and Alibaba's use of software algorithms to implement exclusivity practices. As a result of these substantial negotiations, Defendants agreed to search the e-mail and DingTalk messages of 28 custodians by applying 465 search terms (155 discrete terms searched in each English, simplified Chinese, and traditional Chinese). Ultimately, Defendants and their expert produced, and Plaintiffs' counsel strategically reviewed and analyzed, approximately 1.07 million pages of documents.

42.     Discovery in this case was complicated by the fact that the vast majority of the critical documents in this case—including Alibaba policies, merchant agreements, and e-mail and DingTalk chat communications—were produced in Chinese. As such, Plaintiffs' Counsel employed a team of project attorneys fluent in both Mandarin Chinese and English. The work performed by the document review team is summarized below and is further detailed in Exhibit

21

15 attached hereto, along with details on the experience and qualifications of each member of the document review team.

43.     In reviewing the documents produced in this case, members of the document review team were tasked with making several analytical determinations as to the relevance and relative importance of the documents. For example, they determined whether documents were "hot," "interesting," "adverse," or "non-responsive." They also analyzed which specific issues the documents were relevant to, including whether the document pertained to: Alibaba's AML compliance, its use of exclusivity practices, different types of exclusivity practices and programs, SAMR meetings or communications, merchant agreements and interactions, and/or investor relations communications, for example. Plaintiffs' Counsel also relied on the work of the project attorneys to assess the completeness of Alibaba's productions, to ensure Defendants produced the documents they had agreed to produce in response to Plaintiffs' document requests and in accordance with agreements made in ongoing meet-and-confer efforts.

44.     The review of documents produced in Mandarin Chinese involved a multi-step process including: (i) an initial review and analysis by a Mandarin Chinese-speaking project attorney to assess whether the document was relevant to Plaintiffs' claims and what issues were implicated; (ii) if relevant, determination in consultation with a senior member of Plaintiffs' Counsel team whether to obtain a certified translation of the document; (iii) creating certified translations of selected documents by a translation company; (iv) follow-up review by a Mandarin Chinese-speaking attorney of the translated documents to ensure the accuracy and consistency of translations; and (v) analyzing and annotating the translated documents for use in the litigation.

45.     Project attorneys also assisted with the preparation of deposition materials. Each set included a detailed witness memorandum summarizing the potential deponent's background

22

and experience at Alibaba, citations to the relevant documents with detailed annotations for each witness to use as potential exhibits, proposed questions and lines of questioning, and analyses of issues specific to each deponent. While depositions had not yet begun, Plaintiffs' Counsel were diligently preparing for no fewer than twenty (20) depositions to begin taking place in Hong Kong in the fall of 2024.

46.    As the document review progressed, Plaintiffs' Counsel created and maintained a central repository of key documents organized by timeline, by issue, and by custodian or potential deponent. This repository was regularly updated as additional key documents or witnesses were discovered. Creating this chronology of evidence and repository of key documents allowed attorneys to easily access and analyze the key documents related to any issue in the case or any potential deponent.

47.    Plaintiffs' Counsel also relied on the work of the project attorneys to aid in the review of documents in response to Defendants' opposition to the motion for class certification. As discussed further at ¶¶59-60, *infra*, this in-depth review of more than 5,000 news articles and analyst reports—again, many of which were produced in Mandarin Chinese—was critical to Plaintiffs' Counsel's ability to respond to Defendants' arguments in opposition to class certification, particularly regarding reporting and market commentary relevant to Defendants' argument that the market was widely aware of Alibaba's ongoing use of exclusivity practices.

48.    To coordinate all of the above-described work in the document review process, Plaintiffs' Counsel held regular weekly meetings with the attorneys engaged in the document review. During these meetings, attorneys summarized and shared information about documents that had been discovered, asked questions, and discussed how the documents they had reviewed pertained to the issues in the case. Through these meetings, Plaintiffs' Counsel ensured that all

23

attorneys were aware of the key developments in the document review and that the review team was properly focused on developing evidence in support of Plaintiffs' claims.

49.     In addition to pursuing discovery from Defendants, Plaintiffs' Counsel also submitted FOIA a request to the SEC seeking, *inter alia*, operating data from Alibaba's 11.11 (also referred to as "Singles Day") shopping festival. After an initial denial by the SEC, Plaintiffs' Counsel telephonically met and conferred with the SEC's Office of FOIA Services and filed a FOIA appeal in response to the denial. In a March 19, 2024, letter, the SEC informed Plaintiffs' Counsel that the claimed FOIA exemption no longer applied to the requested records, the SEC was "remanding your request to the FOIA Officer for further processing." In a May 1, 2024, letter, the FOIA officer explained that because the requested records were "voluminous" the request would be placed in the SEC's "Complex" track, and that "it may take thirty-six months or more before we can begin to process a request placed in our Complex track." While Plaintiffs' Counsel continued to confer with the SEC's FOIA officer about ways in which the production could be expedited, ultimately, Plaintiffs did not receive a production of documents from the SEC before the Settlement was filed.

**F.     Discovery Produced By Plaintiffs, Including Plaintiffs' Depositions**

50.     On May 12, 2023, Defendants served their First Set of Requests for Production of Documents, consisting of twenty-eight (28) distinct requests to each Plaintiff. Plaintiffs served their Responses and Objections to the requests on June 12, 2023. The Parties thereafter engaged in extensive meet and confer discussions regarding the scope of Plaintiffs' document productions. Pursuant to these negotiations, Plaintiffs Gharsalli, Ciccarello, Makadia, and Hu each searched for and produced documents responsive to Defendants' requests, including, for example, account statements, e-mails, and text messages. *See* Ex. 2 (Gharsalli Declaration) at ¶5(f); Ex. 3 (Ciccarello

24

Declaration) at ¶5(e); Ex. 4 (Makadia Declaration) at ¶5(e); and Ex. 5 (Hu Declaration) at ¶5(e). Plaintiffs' Counsel also produced approximately 2,700 pages of non-custodial documents relevant to Plaintiffs' claims and approximately 10,838 pages on behalf of Plaintiffs' class certification expert, Dr. David Tabak.

51.    Plaintiffs and Plaintiffs' Counsel also spent a significant amount of time preparing each Plaintiff and proposed class representative to sit for his/her deposition and defending the depositions, which took place on the following dates and locations: Salem Gharsalli in Tampa, Florida on November 15, 2023; Wusheng Hu in San Diego, California on December 5, 2023; Dineshchandra Makadia in Los Angeles, California on December 11, 2023; and Laura Ciccarello in New York, New York on December 15, 2023.

### G.    Plaintiffs' Heavily Contested Motion For Class Certification

52.    On October 6, 2023, Plaintiffs filed their motion for class certification. ECF Nos. 99-102. Plaintiffs' motion detailed, and was supported by evidence establishing, that each required element of Rule 23(a) and Rule 23(b)(3) was met. *See generally* ECF Nos. 100-01. For example, each proposed class representative filed a declaration attesting to his/her willingness, ability, desire, and adequacy to serve. *See* ECF No. 101-2 (Gharsalli class certification declaration), ECF No. 101-3 (Ciccarello class certification declaration), ECF No. 101-4 (Makadia class certification declaration); and ECF No. 101-5 (Hu class certification declaration). Plaintiffs also demonstrated that the predominance of common issues required by Rule 23(b)(3) was satisfied by their showing that Alibaba ADS traded in an efficient market, such that investors were entitled to rely on the "fraud-on-the-market" presumption of reliance for false statements under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"). ECF No. 100 at 16-21. In support of this showing, Plaintiffs submitted the expert report of Dr. David Tabak, in which Dr. Tabak analyzed the factors articulated

25

in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), which are routinely considered by courts in this District and around the country in assessing market efficiency. ECF No. 101-1. Among other things, Dr. Tabak concluded that Alibaba's ADS price responded to new, material information relating to Alibaba, providing direct evidence of market efficiency. *Id*. In their motion, Plaintiffs alternatively argued that class-wide reliance could be presumed pursuant to the presumption of reliance for alleged omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*"), because at its core, the Action alleged that Defendants omitted material facts that they had a duty to disclose.

53.     Defendants took the deposition of Dr. Tabak regarding his class certification and market efficiency expert report on November 2, 2023, in New York City. Defendants thereafter proceeded to take the deposition of each of the four proposed class representatives, as detailed in ¶51 above.

54.     On January 19, 2024, Defendants filed and served their opposition to Plaintiffs' motion for class certification. ECF Nos. 107-09. Notably, Defendants did not challenge the typicality or adequacy of any of the four proposed class representatives, Plaintiffs Gharsalli, Ciccarello, Makadia, and Hu, thus conceding that they were (and are) appropriate class representatives. Nor did Defendants dispute that Alibaba ADS traded in an efficient market, such that Plaintiffs properly invoked the *Basic* presumption of reliance. Instead, Defendants argued that they had rebutted the presumption of reliance by showing an absence of price impact associated with the alleged misrepresentations. More specifically, Defendants argued that price impact was lacking because, among other things: (i) there was "no statistically significant increase in Alibaba's ADS price when it used the phrase "alleged prior narrowly-deployed exclusive partnerships"—on July 10, 2020 or any other time"; (ii) there were "no analyst reports or news stories citing the Prior

26

Practices Statement to say that Alibaba had ceased using exclusivity practices" and, rather, Defendants' expert's review of "over 2,000 analyst reports and more than 3,000 news articles published before, during and after the putative Class Period" showed that the market was "well aware of Alibaba's use of exclusivity"; (iii) the price drop following the November 10, 2020, SAMR announcement of new regulations, including rules targeting exclusivity practices like Alibaba's, showed "the market was keenly aware of Alibaba's continued deployment of such practices and associated risks"; and (iv) following the announcement of the SAMR investigation on December 23, 2020, some analysts reported that they were not "surprised" about the investigation such that the associated price drop could not demonstrate price impact. ECF No. 107 at 1-3. Defendants also submitted the expert report of Professor Glenn Hubbard in support of their opposition. ECF No. 108-2.

55.    Further to the foregoing, Defendants argued that Plaintiffs could not proceed under a "price maintenance" theory of inflation because, according to Defendants, "the Court found that the Prior Practices Statement could plausibly have changed the *status quo*" and a "[p]rice maintenance theory only applies where a plaintiff claims an alleged misstatement preserved the *status quo* by maintaining market expectations and thereby perpetuating price inflation." ECF No. 107 at 11, 19 (emphasis omitted). Defendants further argued that "[f]or Plaintiffs to avail themselves of the price maintenance theory, assuming *arguendo* it applied, Alibaba's ADS price must have somehow become inflated when the market first believed that Alibaba had stopped practicing exclusivity, and the Challenged Misstatements must then have maintained that expectation along with the inflation. Pls' Br. at 7 (Alibaba's ADS price was "maintained" on July 10, 2020). Yet there is no evidence of any pre-putative Class Period disclosure that introduced such a belief and the accompanying inflation into Alibaba's stock price." ECF No. 107 at 21.

27

56.    Defendants claimed to have undertaken a "comprehensive analysis of market commentary" that supported their argument that there was no price impact because "[a]s Professor Hubbard's analyses of more than 2,000 analyst reports and more than 3,000 news articles published before, during and after the putative Class Period shows, the 'corrective' information that Plaintiffs allege was revealed on December 23, 2020 (Alibaba was practicing exclusivity during the putative Class Period) was known to the market prior to the SAMR Announcement." ECF No. 107 at 21-23.

57.    Plaintiffs' Counsel took the deposition of Professor Hubbard on the topic of price impact in New York City on March 21, 2024.

58.    On April 19, 2024, Plaintiffs filed and served their reply in further support of their motion for class certification, together with a reply report by Dr. Tabak and twenty-eight (28) additional exhibits relevant to Plaintiffs' and Defendants' arguments. ECF Nos. 113-14. Among other things, Plaintiffs argued that Defendants were required to show a complete lack of price impact to rebut the presumption of reliance, and they failed to do so because: (i) the absence of a price increase on the date an allegedly false statement is made is not evidence of the absence of inflation where, as here, Plaintiffs were entitled to proceed under a price maintenance theory; (ii) Defendants ignored evidence of a price increase following the alleged false statement made on September 30, 2020; (iii) Defendants' supposed "comprehensive analysis of market commentary" cherry picked and took snippets from news articles and analyst reports out of context, while ignoring other news articles and analyst reports contrary to Defendants' argument that showed the market did *not* believe Alibaba was continuing to practice exclusivity; and (iv) Defendants failed to address multiple analysts who reported on the November 10, 2020 draft guidelines that Alibaba *already* was in compliance, including, specifically, the provision prohibiting exclusivity and

28

stated, for example, "Alibaba highlights it does not operate business on exclusivity" and "no merchants are being restricted on [Alibaba's] platform." ECF No. 113 at 10, 19 (of 44).

59.    With the assistance of a dedicated team of approximately nine (9) Mandarin Chinese and English speaking project attorneys, Plaintiffs' Counsel performed their own comprehensive review and analysis of the more than 5,000 news articles and analyst reports referred to by Defendants and Professor Hubbard, as well as conducted substantial additional investigation and research of public reporting on the topic of Alibaba's use of exclusivity practices, in both Mandarin Chinese and in English. From this exhaustive review, Plaintiffs' Counsel were able to identify and compile numerous examples of public statements indicating Alibaba was *not* practicing exclusivity during the Class Period (Appendix A to the class certification reply, ECF No. 113 at 36-40 (of 44)) as well as Alibaba's own public denials about using exclusivity practices as alleged by JD.com and others (Appendix B to the class certification reply, ECF No. 113 at 41-44 (of 44)); *see also* ECF No. 114 at Exhibits 14-39. Compiling this evidence was critical to responding to Defendants' price impact arguments.

60.    In their reply, Plaintiffs also addressed Defendants' price maintenance argument that there was no evidence of any pre-putative class period disclosure that introduced a belief that Alibaba had ceased using exclusive partnerships, and thus gave rise to inflation, prior to the putative class period alleged in the Complaint. Specifically, Plaintiffs pointed out that on two occasions on November 13, 2019, and November 15, 2019, Alibaba had made the Prior Practices Statement and related misleading risk disclosures relating to Alibaba's exclusivity practices and anti-trust risk (ECF No. 113 at 13), such that Plaintiffs properly proceeded under a price maintenance theory of inflation.

29

61.    On May 17, 2024, Defendants filed and served their sur-reply in further opposition to Plaintiffs' motion for class certification, together with a supplemental expert declaration from Professor Hubbard. ECF Nos. 117-18. Among other things, Defendants argued that: (i) Plaintiffs' price maintenance theory constituted an abandonment of Plaintiffs' allegations; (ii) Plaintiffs admitted there was no direct evidence of price impact; (iii) Plaintiffs failed to refute Defendants' evidence demonstrating the absence of price impact; and (iv) Plaintiffs ignored that there was no price decline when the results of the SAMR investigation and fine was announced. ECF No. 117. Defendants cited excerpts of Dr. Tabak's expert report to argue that Plaintiffs conceded that "a portion of their putative class" did not believe the challenged misrepresentations, and that this defeated any class-wide presumption of reliance. ECF No. 117 at 6-7. In their sur-reply, Defendants addressed for the first time critical analyst reports from KeyBanc, Morgan Stanley, Goldman Sachs, and J.P. Morgan that Plaintiffs argued contradicted Defendants' arguments and Professor Hubbard's conclusions, all of which Plaintiffs' Counsel argued were in Defendants' possession and known to their expert prior to the filing of their opposition and thus inappropriately addressed for the first time in a sur-reply.

62.    On May 28, 2024, Plaintiffs filed and served a motion to strike portions of Defendants' sur-reply and the supplemental sur-reply declaration from Professor Hubbard addressing the analyst reports that Defendants failed to earlier address in their opposition. ECF Nos. 119-21. The motion also sought to strike a perceived change in Professor Hubbard's expert report testimony in his sur-reply report and to strike evidence attached to Professor Hubbard's sur-reply expert report, which Plaintiffs had no opportunity to address. ECF No. 120 at 5-6 (of 10).

63.    On June 11, 2024, Defendants filed and served their opposition to Plaintiffs' motion to strike. ECF Nos. 122-23.

64. Also on June 11, 2024, Plaintiffs filed and served a notice of lodging of supplemental evidence in advance of the class certification hearing, attaching additional excerpts from the deposition of Professor Hubbard which Plaintiffs argued were relevant to arguments Defendants made about "heterogeneous" market beliefs in their sur-reply. ECF No. 124.

65. Finally, on June 18, 2024, Plaintiffs filed and served their reply in support of their motion to strike. ECF No. 129.

**H. The Mediation And Preliminary Approval Of The Settlement**

66. While the Parties were conducting fact discovery and briefing class certification, they began discussing potential mediation to explore whether they could reach a settlement, ultimately agreeing to participate in a private mediation overseen by former U.S. District Court Judge, the Honorable Layn Phillips.

67. In advance of the May 8, 2024, mediation, Plaintiffs' Counsel dedicated substantial efforts to preparing comprehensive mediation briefing detailing the facts relevant to the alleged fraud, analyzing applicable laws, including China's AML, citing key documents uncovered in discovery, summarizing the substantial briefing and arguments made by both sides in connection with Plaintiffs' motion for class certification, and detailing alleged aggregate damages. The Parties exchanged opening and reply mediation statements and exhibits in advance of the mediation.

68. The mediation session ended without an agreement to settle. However, the discussions among the Parties and Judge Phillips further enabled Plaintiffs' Counsel to assess the strengths and weaknesses of Plaintiffs' case, including with respect to the risks faced in prevailing on class certification, and proving liability and damages. The Parties continued to participate in substantial additional discussions and negotiations with the mediator's office in the weeks and months following the mediation, which ultimately culminated in Judge Phillips presenting a

double-blind mediator's recommendation to settle the Action for $433,500,000.00, which the Parties accepted.

69.     The Parties thereafter began negotiating and preparing the comprehensive Stipulation of Settlement and related exhibits, exchanging multiple drafts of the documents, and ultimately executing the Stipulation on October 25, 2024. ECF No. 136-1. Plaintiffs moved for preliminary approval of the Settlement the same day. ECF Nos. 134-136. On October 28, 2024, the Court entered its Order Preliminarily Approving the Settlement and Providing for Notice. ECF No. 139.

## III.    THE RISKS OF CONTINUED LITIGATION

70.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $433.5 million. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by inevitable appeals.

### A.    Risks Faced In Obtaining And Maintaining Class Certification

71.     At the time the Settlement was reached, Plaintiffs' motion for class certification was fully briefed and pending. While Plaintiffs' Counsel are confident that certification would have been granted, Defendants raised strong challenges to rebut the presumption of reliance by showing a lack of price impact. *See* ¶¶52-65, *supra* (discussing Plaintiffs' motion for class certification and Defendants' substantial challenges thereto).

72.      Moreover, a recent ruling by the United States Supreme Court has increased the risk of obtaining class certification for Plaintiffs. In *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021), the Supreme Court held, in part, that when defendants are seeking

to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. More specifically, courts are directed to consider "*all* record evidence relevant to price impact" at the class certification stage. *Goldman Sachs*, 594 U.S. at 122-124 (emphasis in the original). Price impact and genericism challenges under *Goldman Sachs* were, in fact, arguments raised by Defendants in opposing class certification. *See generally* ECF No. 107.

73.     And even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Thus, class certification was, by no means, a forgone conclusion.

**B.      Risks To Surviving Summary Judgment And Facing An Inevitable Battle Of The Experts**

74.     In addition to the hurdle of obtaining and maintaining class action status, Plaintiffs faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motions to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the required elements of their Exchange Act claims.

75.     Defendants were certain to file a motion for summary judgment, raising substantial arguments that: (i) the alleged false statements were immaterial as a matter of law because the market was aware of Alibaba's ongoing exclusivity practices and, as a result, Plaintiffs could prove no actionable false or misleading statement; (ii) the opinion statement about Alibaba's compliance with the AML and other PRC laws was not actionable as a matter of law because Defendants honestly believed Alibaba's business practices complied with Chinese law, which was complicated

33

and evolving throughout 2019 and 2020; (iii) there was insufficient evidence upon which a jury could find a strong inference of scienter as a matter of law because Zhang and Wu were unaware of certain exclusivity practices enforced by line-level Alibaba customer service representatives; and (iv) loss causation was lacking as a matter of law with respect to the ADS price drop following the December 23, 2020, announcement of the SAMR investigation because, among other things, the investigation was the materialization of a known risk. If Defendants were able to convince the Court to rule in their favor on any one of these elements, Plaintiffs risked losing everything.

76.    Even if Plaintiffs' claims survived summary judgment, which was not guaranteed, Plaintiffs faced numerous additional risks in preparing their case for trial, including likely *Daubert* motions challenging Plaintiffs' expert testimony and other pre-trial motions *in limine*.

77.    As stated above, an integral element of Plaintiffs' case hinged on proving the materiality of the challenged statements as they relate to Alibaba's exclusivity practices. Plaintiffs also would have pointed to the materiality of meetings with the SAMR and administrative guidance provided by the SAMR, among other things, to establish both falsity and Defendants' scienter in this case. To prove their case, Plaintiffs would have had to engage several (more) experts to opine on topics related to, for example: the materiality of the SAMR's meetings and instructions in the context of the Chinese regulatory system; the mandatory nature of the administrative guidance provided by the SAMR; technical issues with respect to Alibaba's implementation of exclusivity practices in its algorithms and source code; the application of Chinese laws and regulations, including the AML, to Alibaba's business practices and Alibaba's compliance therewith; the risk and potential magnitude of a regulatory enforcement action by the SAMR; and the operational and financial impact of Alibaba's exclusivity practices and the rectification requirements imposed by the SAMR as a result of its investigation.

34

78.    For their part, Defendants surely would have proffered experts in an attempt to counter the various opinions from Plaintiffs' experts. For example, Defendants likely would have proffered experts to argue that: the market was well aware of Alibaba's ongoing use of exclusivity; the SAMR investigation was not the result of any illegal business practices by Alibaba, but, rather, was an example of the Chinese government's evolving regulatory enforcement over e-commerce companies; any exclusivity practices Alibaba continued to use during the relevant period were both voluntarily engaged in by merchants and immaterial to and had no effect on Alibaba's business or profitability; rather than admitting any wrongdoing, Alibaba voluntarily complied with the SAMR's suggested remedial changes; and, based on the SAMR's instructions and enforcement record during the relevant period, Defendants reasonably believed that Alibaba's business practices complied with the AML and other applicable laws and regulations.

79.    The above-described competing and complex expert opinions would have led to a risky battle of the experts, with Plaintiffs' success at trial potentially hinging on which expert(s) the jury decided were most persuasive. In a case such as this one, where liability could potentially turn on directly contradictory expert opinions, this inevitable battle of the experts posed real and substantial risks at trial.

### C.    Risks To Proving Liability And Damages In A Complicated Trial Involving Foreign Language Evidence And Testimony

80.    Winning at trial would have been no easy task for Plaintiffs. Many obstacles stood in Plaintiffs' way to obtaining a similar or better recovery after trial. Plaintiffs would have faced significant difficulty in securing the availability and willingness of Alibaba's employees and former employees to testify as witnesses at trial. With no practical way to compel these individuals, particularly the former employees, to travel to New York, Plaintiffs would have been forced to rely on their recorded deposition testimony—which is not a highly compelling form of evidence

35

to present to a jury. Moreover, a trial would necessarily involve the presentation of both testimony (whether previously recorded or live) and documentary evidence in Mandarin Chinese, a language that is highly nuanced and notoriously complicated to translate and interpret into English. Plaintiffs' Counsel knows by experience that, had the litigation continued, they would have faced many battles over the correct translation of documents and interpretation of testimony—the outcome of which could greatly impact the meaning or persuasiveness of the offered evidence, and ultimately the outcome of the case itself.

81.     For example, a June 18, 2024, article in *The Wall Street Journal* titled "Mandarin Leaves a Manhattan Courtroom Lost in Translation" with the byline "Trial of Guo Wengui shows how linguistic issues can trip up China-related cases" detailed the particular risks and complexities of conducting a U.S. trial based on documents and testimony in Mandarin Chinese. Reporting on the trial, the article recounted "Nearly everyone in the lower Manhattan courtroom appears frustrated by a halting process that requires translation of Chinese-language videos, documents and witness testimony." The report continued, "Chinese-language evidence is piling up, unintelligible to attorneys. Translations are slow, and sometimes wrong. There is a limited pool of top-tier Mandarin court interpreters, and they can disagree on English translations. And for both sides in a trial, the work of interpreters provides ammunition for legal wrangling, from gamesmanship to courtroom objections and possible appeals."[3]

82.     Plaintiffs' Counsel also know from direct experience that despite the most vigorous and competent of efforts, success in any trial, let alone complicated dual-language litigation, is never assured. For example, GPM received a negative verdict following a six-week antitrust jury

---

[3] https://www.wsj.com/us-news/law/mandarin-leaves-a-manhattan-courtroom-lost-in-translation-a0441dd1

trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard out-of-pocket costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115, ECF No. 920 (N.D. Cal. Dec. 17, 2018) (Jury Verdict Form).

83.    Even assuming that Plaintiffs overcame the above risks and established liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and damages. The Court already rejected loss causation with respect to two of the three dates on which Alibaba's ADS' price dropped as initially alleged (November 3, 2020 and November 10, 2020). With respect to the remaining December 24, 2020 ADS price drop following the announcement of the SAMR investigation on December 23, 2020, Plaintiffs continued to face significant risks. For example, Defendants forcefully argued at the motion to dismiss stage, and they surely would continue to argue through trial, that the news of the SAMR investigation did not reveal any previously misrepresented or concealed facts about Alibaba's exclusivity practices. Similarly, as Defendants argued at class certification, they would have continued to argue that because the market was aware of Alibaba's ongoing use of exclusivity, the SAMR investigation was the materialization of a *known* rather than a concealed risk. Finally, Defendants argued at class certification, and would have continued to argue, that the December 24, 2020 price movement was caused, at least in large part, by confounding news relating to the simultaneous announcement of a People's Bank of China investigation into Ant Group, creating additional uncertainty for Alibaba and signaling, generally, "the strongest enforcement action yet by Beijing against the country's biggest technology group." ECF No. 107 at 25-26 (of 38). Defendants also argued that rather than reacting to the facts relating to exclusivity revealed by the investigation (if any), the market was

37

in fact reacting to increased *future* uncertainty about the outcome of the investigation, potential fines, and the potential for increased regulatory crackdowns on Alibaba. If Defendants' arguments prevailed, Plaintiffs may fail to prove loss causation or, at least, Plaintiffs would be entitled to lower per share damages. The Parties would have developed and presented competing evidence on these issues, including competing expert evidence. While Plaintiffs believe they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages, for the sole remaining alleged corrective disclosure.[4]

84.     Even if Plaintiffs obtained a class-wide judgment at trial, Defendants almost certainly would have pursued post-trial motions to overturn the verdict and/or an appeal. Defendants are well funded and represented by experienced counsel who would be expected to continue to mount a zealous and thorough defense to the Settlement Class's claims for relief not only before and during a full trial on the merits, but afterwards, through post-trial motions and appeals.

**D.      Risks Of Collecting A Judgment Against A Chinese Company**

85.     Even if Plaintiffs were successful at establishing liability and damages at trial, and were awarded a substantial monetary verdict, there would have been additional risks related to the collectability of any monetary judgment. While Alibaba is a firmly established and reputable corporation, there is considerable risk that Chinese courts would not enforce U.S. court judgments, giving rise to legitimate collectability issues even if Plaintiffs were to eventually succeed in

---

[4] Even in shareholder cases where a jury enters a verdict finding liability against defendants, the jury may only award nominal, if any, damages.  Indeed, GPM recently served as co-lead counsel in a nine-day jury trial of a shareholder derivative action that resulted in the jury finding that three board of director defendants violated their fiduciary duties to the corporation but still only awarded nominal damages of $0.99. *See In re Franklin Wireless Corp. Derivative Litig.*, No. 3:21-cv-01837-BEN-MSB, ECF No. 160 (S.D. Cal. Dec. 19, 2024) (Jury Verdict).

obtaining a favorable judgment and damages award larger than the Settlement Amount. *See, e.g.*, Dan Harris, *Enforcing U.S. Judgments in China: What You Need to Know*, China Law Blog (April 15, 2024).[5] *See also* DLA Piper, Ernest Yang, Xiaoshan Chen, Edison Li, Lillian Duan, and Dewey Song, *Enforcing US Monetary judgments in China: Rules and Cases* (collecting cases with Chinese defendants between 2017 and 2022 and finding only four examples of U.S. court judgments fully or partially enforced in China).[6] Indeed, GPM, as co-lead counsel in another case against Chinese defendants obtained a default judgment against the corporate defendants and one individual defendant in the amount of $227,875,000. *In re Puda Coal Securities Inc. et a. Litig.*, Case No. 1:11-cv-2598-DLC, ECF Nos. 654, 669 (S.D.N.Y. February 8, 2017 and May 10, 2017). Counsel were never able to collect on the judgment.

### E.    The Settlement Is Fair And Reasonable In Light Of The Risks And Maximum Potential Recovery Following Further Litigation Of The Action

86.    Given the significant litigation risks described above, including the risks that the Settlement Class would recover a lesser amount—or nothing at all—if the Action were further litigated, Plaintiffs and Plaintiffs' Counsel believe that the Settlement represents an excellent result for the Settlement Class. The result is especially remarkable when considering that the $433.5 million Settlement far exceeded the amount of applicable D&O insurance available.

87.    Plaintiffs' expert estimated that *maximum* recoverable class-wide damages in the Action were approximately $11.629 billion. The Settlement thus represents approximately 3.73% of *maximum* damages *potentially available* if Plaintiffs were to prevail on proving each element of their claims and if no price disaggregation were required for the December 24, 2020 ADS price

---

[5] https://harris-sliwoski.com/chinalawblog/enforcing-u-s-judgments-in-china-what-you-need-to-know/

[6] https://www.dlapiper.com/en-us/insights/publications/2024/02/enforcing-us-monetary-judgments-in-china-rules-and-cases

drop. Of course, as noted above, Defendants contended that there were no provable damages at all, and that Plaintiffs would recover nothing if the litigation were to continue.

## IV.    REPORT ON THE STATUS OF THE COMPREHENSIVE NOTICE PROGRAM

### A.    Notice Dissemination

88.    The Preliminary Approval Order directed the dissemination of notice of the Settlement to potential Settlement Class Members. ECF No. 139. The Preliminary Approval Order also set a deadline of March 6, 2025, for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Attorneys' Fee Motion or to request exclusion from the Settlement Class, and set a final fairness hearing date of March 27, 2025 at 10:00 a.m. (the "Settlement Hearing"). *See generally id.*

89.    Pursuant to the Preliminary Approval Order, the Court-approved Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), implemented a comprehensive notice program whereby notice was disseminated to the members of the Class by U.S. mail, e-mail, publication, and posting on the Settlement Website (www.AlibabaClassActionSettlement.com). *See generally* Ex. 1 (Walter Decl.).

90.    The Court-approved Notice disclosed, among other things, the following information necessary to evaluate the benefits of the Settlement to the Settlement Class Members: (1) the amount of the Settlement Fund to be distributed to Authorized Claimants on a per share basis (estimated to be $0.63 per affected ADS before the deduction of any Court-approved fees, expenses and costs); (2) the Plan of Allocation; (3) that Lead Counsel would apply for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed 30% of the Settlement Fund, plus interest, and Litigation Expenses not to exceed $1,500,000, and that any Settlement Class Member could object to the requested fee or expense payment; (4) a detailed explanation of

40

the reasons for the Settlement; (5) that requests for exclusion from the Settlement must be received no later than March 6, 2025; (6) that objections to the Settlement, the Plan of Allocation, or the Attorneys' Fee Motion must be submitted to the Court and copies mailed to Lead Counsel and Defendants' Counsel such that the papers are received on or before March 6, 2025; and (7) that the deadline for filing Claim Forms is March 26, 2025. *See* Ex. 1-A (Notice).

91.    To disseminate the Notice, A.B. Data received from Defendants' Counsel a list containing the names and addresses of record holders ("Record Holder List") for the purchasers of Alibaba ADS during the Settlemetn Class Period. Ex. 1 (Walter Decl.) at ¶3. Further, as in most securities class actions of this nature, the large majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name" – *i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the respective nominees, on behalf of the beneficial purchasers. A.B. Data maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees (the "Broker Mailing Database"). Ex. 1 (Walter Decl.) at ¶4.

92.    On November 26, 2024, A.B. Data caused the Notice Packet (comprised of the Notice and Claim Form) to be sent by First-Class Mail to the combined 4,933 mailing records contained in the Record Holder List and the Broker Mailing Database. Ex. 1 (Walter Decl.) at ¶5.

93.    Following the initial mailing of the Notice Packet, A.B. Data received an additional 210,977 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees. Ex. 1 (Walter Decl.) at ¶9. A.B. Data has also received requests from Nominees for 413,805 Notice Packets to forward directly by the Nominees to their customers. *Id.* Additionally, A.B. Data received a request from Broadridge Financial Solutions ("Broadridge") to provide an email link to the Notice Packet to send to its list

41

of potential Settlement Class Members. Broadridge has confirmed that it disseminated the link to the Notice Packet to 453,095 individuals and entities that are potential Settlement Class Members. Ex. 1 (Walter Decl.) at ¶9.

94.    In total, as of February 10, 2025, notice of the Settlement has been disseminated to 1,088,190 potential Settlement Class Members and nominees, which includes 635,095 mailed Notice Packets and 453,095 emailed links to the Notice Packet. Ex. 1 (Walter Decl.) at ¶11.

95.    Contemporaneously with the initial mailing of the Notice Packet on November 26, 2024, A.B. Data posted downloadable copies of the Notice and the Claim Form online at the Settlement Website (www.AlibabaClassActionSettlement.com). Ex. 1 (Walter Decl.) at ¶6. The Settlement Website allows potential Settlement Class Members to file claims online. The Settlement Website also posted other important documents, including the Preliminary Approval Order, the Settlement Agreement, the Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, and the Consolidated Class Action Complaint. *Id*. at ¶¶15-18. As of February 10, 2025, there have been 29,939 unique visitors to the Settlement Website. *Id.* at ¶17.

96.    On December 9, 2024, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and released via *PR Newswire. See* Exs. 1-C and 1-D.

97.    On or about November 26, 2024, A.B. Data established a case-specific toll-free phone number, 1-877-869-0223, with an interactive voice response system that answers the calls and presents callers with a series of choices to respond to basic questions. Callers requiring further help have the option of being transferred to a live operator during business hours. To date, A.B. Data has received 1,229 calls. Ex. 1 (Walter Decl.) at ¶¶13-14.

B.      **Requests For Exclusion And Objections**

98.     The Notice informed potential Settlement Class Members that requests for exclusion must be received by the Claims Administrator no later than March 6, 2025, and also set forth the information that must be included to request exclusion.  Ex. 1 (Walter Decl.) at ¶19. As of February 10, 2025, A.B. Data has received six (6) requests for exclusion. *See* Ex. 1-E.

99.     The Notice also informed Settlement Class Members wishing to object to the proposed Settlement, the proposed Plan of Allocation, or the Attorneys' Fee Motion to submit their objection in writing to the Court and mail copies to Lead Counsel and Defendants' Counsel such that the papers were received on or before March 6, 2025. As of the date of this Declaration, no objections have been filed or received by the Claims Administrator or Lead Counsel. Ex. 1 (Walter Decl.) at ¶20.

V.      **ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT**

100.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $433.5 million Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information no later than March 26, 2025.

101.    The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to approval by the Court. The proposed Plan of Allocation is detailed in the Notice. *See* Ex. 1-A (Notice at pp. 8-10). The Plan of Allocation, developed by Plaintiffs' expert working in conjunction with Plaintiffs' Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects

43

an assessment of the damages that Plaintiffs contend could have been recovered under the sustained theory of liability and damages remaining in the Action.

102.    The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the remaining alleged violations of the Exchange Act, as opposed to losses caused by general market, industry, or other non-fraud-related factors. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Alibaba's ADS was artificially inflated as a result of Defendants' misstatements about Alibaba's exclusivity practices and related regulatory risks, including by statements first made by Defendants on November 13, 2019 (the first day of the Settlement Class Period) and the price remained inflated through and including December 23, 2020, when the SAMR announced its investigation. The Plan of Allocation is based on the premise that the decrease in the price of Alibaba ADS following the alleged corrective disclosure of announcement of the SAMR investigation may be used to measure the artificial inflation in the price of Alibaba ADS prior to this disclosure. *See* Ex. 1-A (Notice) at ¶¶56-57.

103.    Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Ex. 1-A (Notice) at ¶66.

104.    As described in the Notice, a Recognized Loss Amount calculation under the Plan of Allocation is not intended to be an estimate of, nor indicative of, the amount a Settlement Class Member might have been able to recover after a trial, nor an estimate of the amount that will be paid to an Authorized Claimant pursuant to the Settlement. Instead, the Recognized Loss Amount

calculation under the Plan of Allocation is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.

105.    The calculation of a Claimant's Recognized Claim will depend upon several factors including how many Alibaba ADS the Claimant purchased, acquired, or sold during the Settlement Class Period, when that Claimant bought, acquired, or sold the ADS, and the number of valid claims filed by other Claimants.  A Claimant's Recognized Loss Amount for each Alibaba ADS purchased or acquired during the Settlement Class Period is generally calculated as the difference between the estimated artificial inflation on date of purchase and the estimated artificial inflation on date of sale (with certain adjustments based on the 90-day average price following the end of the class period if the ADS was still held as of the end of the Settlement Class Period) or the difference between the actual purchase price and sales price of the ADS, whichever is less. *See* Ex. 1-A (Notice) at ¶¶57-62.

106.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. Ex. 1-A (Notice) at ¶66. In Lead Counsel's experience, sending a check for less than $10.00 is cost prohibitive.

107.    As noted above, as of February 10, 2025, more than 1,000,000 copies of the Notice, which details the Plan of Allocation and advises Settlement Class Members of their right to object to the Plan of Allocation, have been disseminated by mail or e-mail to potential Settlement Class Members. To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

108.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 25% of the Settlement Fund (*i.e.*, $108,375,000, plus interest accrued thereon) on behalf of all Plaintiffs' Counsel. Lead Counsel also request reimbursement in the amount of $1,025,752.68 for Litigation Expenses paid or incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action, an amount that is well below the maximum expense amount of $1,500,000 set forth in the Notice.

109.    The requested 25% award, and the resulting reasonable multiplier on Plaintiffs' Counsel's lodestar of approximately 3.22, are both within the range of fee awards in comparable securities class action settlements and are justified here in light of the extent and quality of counsel's work and the result achieved for the Settlement Class. The legal authorities supporting the requested fees and expenses are set forth in the accompanying Attorneys' Fee Motion. The primary factual bases for the requested fees and expenses are set forth below.

### A.    The Requested Fee Is Fair And Reasonable

#### 1.    The Excellent Outcome Achieved Is The Result Of The Significant Time And Effort That Plaintiffs' Counsel Devoted To The Action

110.    If approved, the Settlement will rank among the top 50 largest securities class action settlements since the passage of the PSLRA nearly 30 years ago. The result is undeniably excellent.

111.    The work undertaken by Plaintiffs' Counsel in investigating and prosecuting the Action and achieving the Settlement in the face of substantial risks has been time-consuming and challenging. Numerous attorneys, including partners, associates, and project attorneys, as appropriate, dedicated many thousands of hours of work to this case. Plaintiffs' Counsel battled doggedly to obtain discovery, meeting and conferring continuously with counsel for Defendants, to obtain the production documents. And once the documents were obtained, Plaintiffs' Counsel

46

methodically and strategically reviewed, analyzed, translated, catalogued, and prepared the documents for use in the litigation.

112.    Moreover, as detailed above, the battle over Plaintiffs' critical class certification motion was especially hard-fought and contentious. Plaintiffs' Counsel dedicated a substantial amount of time and resources to briefing and defending their motion for class certification, including addressing many legal complexities on the topic of price impact, navigating complex and in-depth expert reports and testimony, and conducting a thorough factual review of over 5,000 news articles and analyst reports to respond to Defendants' class certification opposition.

113.    At all times throughout the pendency of the Action for a period of approximately four years, Plaintiffs' Counsel were driven and focused on advancing the Action to bring about the most successful outcome for Alibaba's ADS investors. Attached as Exhibits 9 and 10 hereto are declarations from GPM and Pomerantz LLP ("Pomerantz") containing lodestar summary charts reflecting the time and effort expended by each firm in prosecuting this Action on behalf of the Settlement Class. A summary of the biographies and qualifications of, and the work conducted by, all project attorneys who contributed significant and integral work in connection with prosecution of the Action is attached hereto as Exhibit 15.

114.    As demonstrated in Plaintiffs' Counsel's lodestar charts (Exs. 9-A and 10-A), and as discussed in more detail at ¶¶129-32, *infra*, Plaintiffs' Counsel collectively have dedicated more than 58,000 hours to the prosecution of the Action to complete the significant work detailed herein above (*see* ¶¶10(a)-(dd) and ¶¶14-69, *supra*). Plaintiffs' Counsel's substantial efforts resulted directly in the extraordinary Settlement obtained for the benefit of the Settlement Class and, accordingly, this factor weighs strongly in favor of the requested 25% award of attorneys' fees.

47

**2.      The Magnitude And Complexity Of The Action**

115.    This magnitude of this case—involving $11.6 billion in alleged investor damages—is unquestionably large. Litigating this high-stakes Action has been a highly contentious, hard-fought, lengthy, and expensive endeavor.

116.    Securities class action cases are known for their "notorious complexity[.]" *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006). This case was no different. As detailed above, this Action presented numerous complex issues, including the need for Plaintiffs' Counsel to understand matters of, among other things: Chinese administrative law and regulatory process; realities and nuances of the Chinese political and regulatory systems; complex issues of technology and the operation of Alibaba's online platforms and Alibaba's use of algorithms to implement exclusivity requirements; Chinese anti-trust and e-commerce law; and the impact of exclusivity practices on Alibaba's business and operations, for example. As discussed above, the Action also presented unique logistical and language complexities, with tens of thousands of integral documents—including e-mails, DingTalk messages, merchant agreements, and SAMR reports—produced in the notoriously complicated and context-specific Mandarin Chinese.

**3.      The Significant Risks Borne By Plaintiffs' Counsel**

117.    In the more than four years this case has been pending, Plaintiffs' Counsel have received no compensation for their time or significant out-of-pocket expenses during the course of the Action. Any compensation for the substantial time spent litigating, or reimbursement for out-of-pocket expenses, to Plaintiffs' Counsel has always been at risk and is entirely contingent on the result achieved. Because of the contingent nature of the fees and expenses, the only certainties

48

from the outset were that there would be no compensation without a successful result, and that a successful result would be realized only after a lengthy and difficult effort.

118. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money required for the Action to be effectively prosecuted. In undertaking that responsibility, counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs that a case like this requires. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis, particularly during periods of high and increasing inflation as we are in now.

119. Moreover, this Action lacked some of the hallmarks of a relatively stronger securities action claim, such as a restatement of financial results. Cases involving GAAP violations, accounting irregularities, and restatements are generally associated with higher settlements as a percentage of damages compared to cases without such accounting issues. *See* Ex. 7 (2023 Cornerstone Report excerpts), at p. 10 & fig. 8. There were no such accounting issues or restatement of financials here. To the contrary, Defendants repeatedly argued that the subject exclusivity practices at the heart of this Action had *no* impact whatsoever on Alibaba's financial performance in 2020, let alone a material one.

120. Further highlighting the risks borne by Plaintiffs' Counsel is that there was no parallel SEC or other governmental investigation that led to any action being taken against any of the Defendants, which historically have been a hallmark of stronger cases and associated with higher percentage recoveries. *See* Ex. 7 (2023 Cornerstone Report excerpts), at p. 12

49

("Historically, cases with a corresponding SEC action have typically been associated with substantially higher settlement amounts.").

### 4. The Quality Of Representation By Experienced Plaintiffs' Counsel And The Caliber Of Defendants' Counsel

121. A number of considerations may be relevant to assessing the quality of counsel's representation of the Settlement Class, including the quality of the result obtained, counsel's experience and standing, and the quality of opposing counsel.

122. As explained above, the recovery obtained for the Settlement Class—a $433.5 million all cash payment—is truly an extraordinary result. It is among the top 50 securities class action settlements since the passage of the PSLRA, and the largest securities class action settlement ever with a Chinese company defendant. This extraordinary result for the Settlement Class is a direct reflection of the dedication and excellent quality of Plaintiffs' Counsel's prosecution of the litigation.

123. As demonstrated by the firm resumes included as Exhibits 9-C and 10-C hereto, Plaintiffs' Counsel are experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. Lead Counsel, Glancy Prongay & Murray, in particular has an established track record of successfully representing investors in securities litigation against Chinese defendants and this experience and expertise enabled them to effectively and efficiently litigate the Action and maximize the result.

124. Finally, the quality of the work performed by Plaintiffs' Counsel should be evaluated in light of the quality of the opposition. Defendants were represented by Simpson Thacher & Bartlett, an internationally renowned law firm that employed an army of securities litigators who vigorously represented the interests of Defendants, and battled Plaintiffs' Counsel formidably, throughout this Action. In the face of this experienced and formidable opposition,

Plaintiffs' Counsel were nonetheless able to persuade Defendants to settle the case on terms highly favorable to the Settlement Class.

### 5.      The Requested Fee In Relation To The Settlement

125.    The amount of the fee requested in relation to the Settlement Amount—25%—is fair and reasonable. According to the 2024 NERA Report, the median attorneys' fee award in cases settling between $100 million and $500 million over the past ten years is 25%. Ex. 6 (2024 NERA Report) at p. 30, fig. 27. Indeed, courts routinely award fees of 25% (or more) in large settlements valued at $100 million and greater. *See* Ex. 11 (Joint Declaration of Professors Fitzpatrick and Silver) at ¶20; Ex. 13 (compendium of more than 140 cases with settlements of $100 million or more where fees of 25% or more were awarded).

126.    Moreover, the requested 25% fee is less than the pre-litigation fee agreement agreed to by the Court-appointed Lead Plaintiff, who lost more than $2.9 million (ECF No. 8-3), which authorized counsel to seek up to 33%. Each of the other three Plaintiffs, including Dr. Makadia, who lost over $1.3 million (ECF No. 20-3), also previously authorized counsel to seek an attorneys' fee award of up to 33%. And, all four Plaintiffs endorse counsel's request for a 25% fee. *See* Ex. 2 at ¶8; Ex. 3 at ¶8; Ex. 4 at ¶8; Ex. 5 at ¶8.

### 6.      Public Policy Interests Supporting Private Enforcement Of Securities Laws, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Cases

127.    As recognized by Congress through the passage of the PSLRA, effective enforcement of the federal securities laws is ensured when private investors take an active role in protecting the interests of shareholders. And courts have consistently recognized that it is in the public interest to have experienced and able counsel pursue private enforcement of the securities laws. If this important public policy is to be carried out, the courts should award fees that

adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### 7. The Reaction Of The Settlement Class Supports The Fee Request

128. As noted above, notice has been provided to over 1,000,000 potential Settlement Class Members or their nominees informing them that Plaintiffs' Counsel would apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund. To date, no objections to the maximum potential attorneys' fees request set forth in the Notice have been received or entered on this Court's docket. Any objections will be addressed in Lead Counsel's reply papers to be filed by March 20, 2025.

### B. A Lodestar Crosscheck Confirms The Reasonableness Of The Fee Request

129. As described in the Attorneys' Fee Motion, not only is the requested fee percentage fair and reasonable under the percentage method but, based on the lodestar reported by Plaintiffs' Counsel, a lodestar cross-check confirms the reasonableness of the fee. Plaintiffs' Counsel dedicated a total of 58,323.45 hours to the investigation, prosecution, and resolution of the Action, with a resulting total lodestar of $33,635,813.50. The requested 25% fee (or $108.375 million, plus interest accrued thereon) thus equates to a lodestar multiplier of approximately 3.22x.

130. Below is a chart that summarizes lodestar information, by firm, listing the total reported hours, corresponding lodestar amounts, and litigation expenses for GPM and Pomerantz, based on data provided in each firm's declaration (*see* Exs. 9 and 10).[7]

---

[7] Attached hereto as Exhibits 9 and 10 are declarations from GPM and Pomerantz, respectively, in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Through the declarations, each firm is reporting its own attorneys' time and rates. These declarations report the amount of time spent on this case by each attorney and professional support staff employed by GPM and Pomerantz, and the lodestar calculations are based on their current billing rates. For attorneys or professional support staff who are no longer employed by the firms, the lodestar calculations are based upon the billing rates for such person in his or her final year of

| Firm | Hours | Lodestar | Expenses |
|------|-------|----------|----------|
| GPM | 46,480.45 | $27,290,486 | $848,569.55 |
| Pomerantz | 11,841.20 | $6,345,327.50 | $177,183.13 |
| **TOTAL:** | **58,323.45** | **$33,635,813.50** | **$1,025,752.68** |

131. At all times, I maintained control over and monitored the work performed on this case. While I personally devoted substantial time to this case, personally reviewing, researching, writing, and editing all pleadings, briefs, court filings, and other correspondence prepared on behalf of Plaintiffs, other experienced attorneys at each of the Plaintiffs' Counsel firms were involved in the litigation of the Action, settlement negotiations, and other matters. Throughout the litigation, I took care to maintain an appropriate level of staffing and assigned work best suited for each task based on the level of experience and skill of the various attorneys on the litigation team.

132. As set forth in the accompanying Glancy and Pomerantz Fee Declarations (Exs. 9 and 10, respectively), the rates for partners working on the Action range from $875 to $1,325 per hour; rates for Associates range from $395 to $725 per hour; and rates for project attorneys range from $425 to $500 per hour. These rates are consistent with hourly rates in securities class action and other complex contingent-fee litigation that have been previously approved by other courts in the context of lodestar cross-checks, including by courts in this Circuit. *See* Ex. 12 (Peer Law Firm Rate Chart (surveying Plaintiffs' firm billing rates)); *In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *10 (E.D.N.Y. April 22, 2024) (finding GPM's 2023 "billing rates, which range from

---

employment. No time expended in preparing the application for fees and reimbursement of expenses has been included.

Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court finally approve the proposed Settlement. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator, A.B. Data, to ensure the smooth progression of claims processing. Lead Counsel will also apply to the Court for a Distribution Order upon completion of claims processing.

53

$675 to $1,100 for partners, and $395 to $725 for non-partners are comparable to peer law firms in recent years."); *In re Cathode Ray Tube Antitrust Litig.*, 2016 WL 721680, *43 (N.D. Cal. Jan. 28, 2016) (finding rate of $400/hour for foreign language document review "reasonable and responsible" *nine (9)* years ago). Moreover, Plaintiffs' Counsel's rates are substantially below rates charged by large defense firms. *See* Ex. 12 (Peer Law Firm Rate Chart (surveying Defense firm billing rates)). As a recent article by *The American Lawyer* reports, "[m]ore big firms are going to approach hourly rates of $3,000 for partners and $1,000 for associates," while "16 of the Am Law 50 firms have third-year associates with rates of over $1,000," and first year associates of at least one large defense firm are being billed at a rate of $850 per hour. *See* Ex. 16 at pp. 2-4.

## C. The Requested Litigation Expenses Are Fair And Reasonable

133. As detailed in the Attorneys' Fee Motion and accompanying declarations, Plaintiffs' Counsel seek reimbursement of a total of $1,025,752.68 in out-of-pocket costs and expenses in connection with the prosecution of this Action. *See* Ex. 9-B (Glancy Fee Declaration), Ex. 10-B (Pomerantz Fee Declaration). These expenses were reasonably and necessarily incurred by counsel in connection with commencing and prosecuting the claims against Defendants. The combined expenses of both firms are set forth in the following table:

| COMBINED EXPENSES BY CATEGORY | |
| --- | --- |
| **CATEGORY OF EXPENSE** | **AMOUNT** |
| COURIER AND SPECIAL POSTAGE | $1,313.43 |
| COURT FILING FEES | $1,602.00 |
| COURT & DEPOSITION TRANSCRIPTS | $20,911.70 |
| E-DISCOVERY VENDOR CHARGES | $15,994.81 |
| EXPERTS - COMPUTER SCIENCE | $9,458.33 |
| EXPERTS - ECONOMETRICS (Market Efficiency, Loss Causation, Damages, Plan of Allocation) | $609,579.25 |
| INVESTIGATIONS | $24,695.14 |
| MEDIATOR | $110,470.00 |

| | |
|---|---|
| ONLINE RESEARCH | $73,048.69 |
| PHOTOCOPYING/IMAGING | $1,366.27 |
| PSLRA MANDATED PRESS RELEASES | $262.63 |
| SERVICE OF PROCESS | $902.55 |
| TELEPHONE/VIDEO CONFERENCING | $121.94 |
| TRANSLATION SERVICES | $82,813.38 |
| TRAVEL AIRFARE | $33,465.22 |
| TRAVEL AUTO | $4,359.85 |
| TRAVEL HOTEL | $30,867.35 |
| TRAVEL MEALS | $2,988.12 |
| TRAVEL PARKING | $1,532.02 |
| **Total** | **$1,025,752.68** |

134.    As indicated in the attached Glancy and Pomerantz Fee Declarations (Exs. 9-B and 10-B, respectively), each firm contributed to a joint litigation fund which was maintained by Lead Counsel to pay necessary out-of-pocket litigation expenses. GPM contributed a total of $663,918.70 in litigation fund expenses (*see* Ex. 9-B), while Pomerantz contributed a total of $165,979.67 to litigation fund expenses (*see* Ex. 10-B). The spending breakdown of this collective $829,898.37 in litigation fund expenses is set forth in the following table:

| LITIGATION FUND EXPENSES | |
|---|---|
| **CATEGORY OF EXPENSE** | **AMOUNT** |
| Court & Deposition Transcripts | $20,813.60 |
| E-Discovery Vendor Charges | $10,536.16 |
| Experts - Computer Science | $9,458.33 |
| Experts - Econometrics (Market Efficiency, Loss Causation, Damages, Plan of Allocation) | $609,579.25 |
| Mediators | $110,470.00 |
| Translations | $69,041.03 |
| **Total Litigation Fund Expenditures** | **$829,898.37** |

135.    GPM and Pomerantz were aware that they might not recover any out-of-pocket expenses in this matter and, at the very least, would not recover anything until the Action was successfully resolved. Counsel also understood that, even if the case was ultimately successful,

any expense reimbursement would not compensate them for the lost use of funds advanced while the Action was ongoing. Therefore, GPM and Pomerantz were motivated to, and did, take steps to control and minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the case.

136.    All of the expenses for which reimbursement is sought were reasonably necessary to the prosecution and resolution of the Action, and are all of a type that counsel typically incur in securities litigation of this type (and that, in our experience, courts award in class action cases). The largest expense items, collectively constituting over 85% of the total expenses for which reimbursement is sought, are summarized below:

> **Econometric expert fees:** The largest single category of expenses was econometric expert fees in the total amount of $609,579.25 (59.4% of total expenses). Plaintiffs' Counsel retained a number of economic experts to assist in the prosecution of this Action. Most notably, Plaintiffs' Counsel retained Dr. David Tabak of NERA to advise on market efficiency and price impact in connection with Plaintiffs' motion for class certification. Plaintiffs' Counsel also worked with both Dr. Tabak and experts from Stanford Consulting Group, as well as Financial Markets Analysis LLC, to analyze and advise on issues of loss causation and damages. Stanford Consulting Group also assisted Plaintiffs' Counsel in developing the Plan of Allocation.

> **Mediation fees:** Plaintiffs' Counsel were responsible for paying one-half of Judge Phillips' mediator fees in the Action, or $110,470.00 (10.7% of total expenses). This payment compensated Judge Phillips and his office for their work in reviewing the Parties' mediation briefs and exhibits, conducting a full-day in-person mediation session, and facilitating and participating in many weeks of continued telephonic communications and ongoing negotiations following the mediation.

> **Translation services:** Another large component of expenses, $82,813.38 (8.1% of total expenses), was expended on certified document translations from Chinese to English.

> **Computerized legal/factual research:** Plaintiffs' Counsel utilized digital research services (such as Westlaw) in connection with their legal and factual research, which was used both in the course of developing the facts underlying the claims asserted and in researching relevant law relevant to the motions brought in the Action. These charges totaled $73,048.69 (7.1% of total expenses).

137.    The Notice advised potential Settlement Class Members that Plaintiffs' Counsel would seek an award of expenses not to exceed $1,500,000, to which there were no objections.

The total amount sought – $1,110,752.68 (comprised of $1,025,752.68 in out-of-pocket expenses and $85,000 in PLSRA payments to the Plaintiffs, as discussed below) – is significantly less than the maximum amount stated in the Notice.

**D.    Plaintiffs' Request For An Award For Their Work On Behalf Of The Settlement Class**

138.    The Notice informed Settlement Class Members that Plaintiffs would apply for up to $85,000 in the aggregate pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(4), in connection with their representation of the Settlement Class.

139.    As set forth in their respective declarations (Exs. 2-5), each Plaintiff (Mr. Gharsalli, Ms. Ciccarello, Dr. Makadia, and Mr. Hu) spent considerable time reviewing pleadings, reading other litigation and mediation materials, producing discovery, preparing for and sitting for their depositions, considering and approving the Settlement, and generally communicating with counsel in order to understand and oversee the work in the Action. I personally communicated with each of the Plaintiffs on numerous occasions about the Action and the Settlement. Based on these interactions, I can attest that each of the Plaintiffs has actively overseen and participated in the prosecution of the Action, and each has taken his/her fiduciary duty to act in the best interest of the Settlement Class seriously. I believe that each Plaintiff faithfully fulfilled his/her duties and their participation helped to maximize the Settlement Amount for the benefit of the Settlement Class.

140.    For the reasons set forth in the accompanying Attorneys' Fee Motion and in Plaintiffs' attached declarations (Ex. 2, Mr. Gharsalli; Ex. 3, Ms. Ciccarello; Ex. 4, Dr. Makadia; and Ex. 5, Mr. Hu), I respectfully submit that the requested awards in the amount of $25,000 to Mr. Gharsalli, and $20,000 to each Ms. Ciccarello, Dr. Makadia, and Mr. Hu, are fully merited

based on Plaintiffs' substantial work and contributions to the Action for the benefit of the Settlement Class.

## VII.    CONCLUSION

141.    For all of the reasons set forth above, I respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate.  I further submit that the requested fee in the amount of 25% of the Settlement Fund (plus interest) should be approved as fair and reasonable, and the request for reimbursement of Litigation Expenses in the total amount of $1,110,752.68 (which includes $1,025,752.68 in out-of-pocket costs incurred by GPM and Pomerantz, and an aggregate of $85,000 for the four representative Plaintiffs) also should be approved.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct. Executed this 20th day of February, 2025 in Los Angeles, California.

<em>/s/ Kara M. Wolke</em><br>
Kara M. Wolke

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of February, 2025 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


*/s/ Kara M. Wolke*
Kara M. Wolke