# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: ALIBABA GROUP LTD. SECURITIES LITIGATION | Master File No. 1:20-CV-09568-GBD-JW |

**JOINT DECLARATION OF PROFESSORS BRIAN FITZPATRICK & CHARLES SILVER REGARDING THE REASONABLENESS OF LEAD COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES**

**I.      SUMMARY OF OPINIONS**

- Lead Counsel's request for a fee award equal to 25% of the recovery is reasonable.  It falls at the low end of the range of percentages that sophisticated clients pay when they hire counsel on contingency.  And it falls within the range of fees that judges have traditionally awarded in cases of this type and magnitude.

**II.      QUALIFICATIONS**

1.      Brian Fitzpatrick and Charles Silver are chaired professors at Vanderbilt University Law School and the School of Law, University of Texas at Austin, respectively.  We both have devoted significant portions of our academic careers to the study of attorneys' fees, with particular emphasis on fee awards in class actions.  Both of us have studied fee awards empirically.  Professor Fitzpatrick produced one of the most-cited studies by analyzing a comprehensive dataset of class actions of all types that resolved in federal court over a two-year period (2006-2007).  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "*Empirical Study*").  Professor Silver focused on securities fraud class actions that settled in federal district courts from 2007 to 2012.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Action*, 115 Columbia L. Rev. 1371 (2015) (hereinafter "*Is the Price Right?*").  Each of us also has prepared many expert reports and amicus briefs on fee-related matters, again with special focus on awards in class actions.

2.      Because we are leading figures in the field whose writings are often cited by other researchers and whose reports have been accepted by many courts, we do not believe that our credentials will seriously be disputed.  Therefore, in the interest of brevity, we set out our qualifications in exhibits to this Declaration.  Exhibit A describes Professor Fitzpatrick's background and publications.  Exhibit B contains Professor Silver's CV.

### III.    DOCUMENTS REVIEWED

3.    We have been asked by Lead Counsel, Glancy Prongay & Murray LLP, to opine on the reasonableness of their request for 25% of the settlement recovery as fees.  In the course of formulating our opinions, we reviewed the documents listed in Exhibit C.

### IV.    CASE BACKGROUND

4.    This settlement arises out of litigation against Alibaba and its officers and directors that alleges they committed securities fraud by misleading investors about whether Alibaba's practices were illegal under Chinese antitrust law, as well as about a future initial public offering involving one of its investments.  The first of three complaints was filed in November of 2020, and all of them were consolidated before this Court.  Since then, the Defendants' motions to dismiss have been granted in part and denied in part, the parties have exchanged extensive discovery—much of it in Chinese—and Plaintiffs' motion for class certification has been fully briefed.  Before that motion could be ruled upon, however, the parties reached a settlement.  The Court granted preliminary approval of the settlement and certified a settlement class on October 28, 2024.  The parties are now asking the Court to grant final approval and Lead Counsel is seeking an award of fees and expenses.

5.    The settlement class includes, with minor exceptions, "all persons and entities that purchased or otherwise acquired Alibaba American Depositary Shares . . . during the period November 13, 2019 through December 23, 2020, inclusive . . . ."  Stipulation and Agreement of Settlement ¶ 1(xx).  The class will release the Defendants from, with limited exception, "any and all" claims that were asserted or could have been asserted that relate to the allegations in the litigation and the "purchase, acquisition, holding, sale, or disposition of any Alibaba ADS."  *Id.* at ¶ 1(qq).  In exchange, the Defendants will pay $433.5 million in cash.  *See id.* at ¶ 1(ww).  After deducting various transaction costs, including attorneys' fees and expenses, the balance of

3

this money will be distributed *pro rata* in accordance with a plan of allocation that will be separately approved by the Court. *See id.* at ¶ 20 & Exhibit A-1. None of the money can revert back to the Defendants. *See id.* at 13.

6. Lead Counsel are seeking a fee award of 25% of the settlement. As we explain below, it is our opinion that a fee award of this amount would be reasonable in light of empirical analyses of class action fees, research on economic incentives in class action litigation, and market practices.

## V. ASSESSMENT OF THE REASONABLENESS OF THE REQUEST FOR ATTORNEYS' FEES

### A. The Percentage Method is the Superior Approach

7. When a class action reaches settlement or judgment and no fee shifting statute is triggered and the defendant has not agreed to pay class counsel's fees, class counsel is paid by the class members themselves pursuant to the common law of unjust enrichment. This is sometimes called the "common fund" or "common benefit" doctrine. It requires the court to decide how much of their class action proceeds it is fair to ask class members to pay to class counsel.

8. At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "*Class Action Lawyers*"). Under this approach, courts generally awarded class counsel a fee equal to the number of hours they worked on the case multiplied by a reasonable hourly rate. Judges also had discretion to apply a multiplier based on the risk of non-recovery and other factors. *See id.*

9. The lodestar approach eventually fell out of favor, for two reasons. First, it was difficult and time-consuming to apply because it required judges to review voluminous billing

4

records and to evaluate the reasonableness of thousands or even millions of entries. Second—and more importantly—judges learned that the lodestar method misaligned the interests of class counsel and class members because fee awards depended more heavily on time expended than on results obtained, even though class members cared mainly about the latter. *See id.* at 2051-52.

10. Studies of fee awards have documented the decline of courts using the lodestar approach for awarding attorneys' fees. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding that the lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is entirely or almost entirely injunctive in nature); Theodore Eisenberg *et al*., *Attorneys' Fees in Class Action Settlements: 2009-2013*, 92 N.Y.U. L. Rev. 937, 945 (2017) ("Eisenberg-Miller 2017") (finding lodestar method used less than 7% of the time since 2009); and Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 267 (2010) ("Eisenberg-Miller 2010") (finding lodestar method used only 13.6% of the time before 2002 and less than 10% of the time thereafter and before 2009).

11. Today, the dominant method for setting fee awards is the "percentage" approach, which bases fees on a fraction of the recovery thought to be reasonable under the circumstances. Support for percentage approach has grown because it harmonizes the interests of class counsel and class members, requires fewer subjective judgments, requires lawyers to bear the risks and costs associated with the delivery of legal services, and is easy to apply. *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052. These are the same reasons that motivate private parties, including sophisticated corporations, to use the percentage method when hiring lawyers on contingency. *See, e.g.,* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012) (studying contingent fee agreements used in

connection with patent litigation); Herbert M. Kritzer, RISKS, REPUTATIONS, AND REWARDS 39-40 (1998) (discussing contingent fee arrangements in general).[1]

12.    In the Second Circuit, courts have discretion to use either the lodestar method or the percentage method in awarding attorneys' fees in common fund class actions. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 45 (2d Cir. 2000) ("We hold that either the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases."). But "[t]he trend in this Circuit is toward the percentage method . . . ." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). The Private Securities Litigation Reform Act of 1995 ("PSLRA") also encourages judges to use the percentage approach. *See, e.g., Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012) ("Part of the reason behind the near-universal adoption of the percentage method in securities cases is that the PSLRA contemplates such a calculation. It states that '[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.'") (quoting 15 U.S.C. § 78u-4(a)(6))).

13.    In light of the well-recognized disadvantages of the lodestar method, the well-recognized advantages of the percentage method, and the uniform practice in the market where clients hire lawyers on contingency, it is our opinion that the percentage method should be used here. Other leading class action scholars also endorse the percentage approach. *See* American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.13 (2010) (cmt. b) ("Although many courts in common-fund cases permit use of either a percentage-of-the-fund

---

[1] We say more about contingent fee arrangements used by private clients below. *See* Part V.B.

6

approach or a lodestar . . . most courts and commentators now believe that the percentage method is superior.").[2]

14.    When deciding how large fee percentages should be, courts in the Second Circuit consider "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50; *see also* Fitzpatrick, *Empirical Study*, *supra*, at 832. In our opinion, the fee requested here is reasonable because it is supported by all six of these factors.

### 1.    *Public Policy Considerations*

15.    We first consider factor (6), "public policy considerations." As one of us (Fitzpatrick) has explained in book-length form, class action lawyers perform a critical law enforcement role in our country—which is why they are often referred to as "private" attorneys general. *See* THE CONSERVATIVE CASE FOR CLASS ACTIONS 4, 33-47 (2019). European countries rely mainly on their government to police the marketplace. In America, by contrast, we rely more heavily on self-help and the private sector to preserve the integrity of markets. In other words, we think it more desirable to rely on lawyers to seek justice for private clients than to have public attorneys general police all forms of financial wrongdoing. This belief rests partly on the fact that public attorneys general operate under significant resource constraints, and partly on the aggressiveness of private attorneys, who are generally believed to obtain better results for defrauded investors than public enforcers.

16.    Class action lawyers also solve a collective action problem that arises when victims' claims are small. To provide a sufficient financial inducement for litigation, small

---

[2] Professor Silver was an Associate Reporter on the PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION.

7

claims must be aggregated.  But because the claims are small, no wronged individual has an incentive to bear the cost of organizing a collective action or to invest the resources needed to prevail in litigation.  By performing these tasks, class action lawyers level the playing field between individual plaintiffs and defendants and close the enforcement gap that would otherwise exist.  *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2059.

17.    To incentivize lawyers to deliver these services, courts must award fee percentages that are large enough to offset the risks and costs class actions entail.  The difficult task is figuring out how large these percentages should be.  We believe that judges can handle this assignment best by mimicking the market, that is, by basing fee percentages in class actions on the amounts that sophisticated clients with large claims agree to pay.  We provide more information about fee arrangements used by such clients below.  *See*, *infra*, § V.B.

18.    Fundamentally, the reason for mimicking the market is that market rates are what class members would agree to pay if they could negotiate with their lawyers directly.  They would not rationally pay more because market rates are sufficient to persuade lawyers to deliver services.  They would not rationally pay less because offering rates below those that lawyers can earn by working for other clients is a sure way to lose the services of counsel of choice.  By offering market rates, class members can retain the lawyers they want without fear of overpaying.

19.    Here, we note that, at or near the time when litigation commenced, the lead plaintiff in this class action entered into an agreement providing for fees up to 33%.  We understand that each of the other three representative plaintiffs also entered into an agreement at or near the time of engagement providing for attorneys' fees up to 33%. We have repeatedly urged courts to take guidance from such *ex ante* fee agreements.  *See, e.g., Is the Price Right?*,

*supra*, at 1432; Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 Tex. L. Rev. 865 (1992).  Many courts agree that, in cases brought under the PSLRA, which charges lead plaintiffs with the responsibility to select and retain counsel for the class, judges should respect these agreements.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) ("[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel."); *In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable."); *see also In re Synthroid II*, 325 F.3d 974, 976 (7th Cir. 2003) (using fee contracts from large-stakes class members who "hired law firms to conduct this litigation" as evidence of what absent class members would have agreed to *ex ante*).  We believe that deference is appropriate when, as here, the agreements are entered into at arms' length and provide for fees in the prevailing market range.  We further note that even now the lead plaintiff and additional representative plaintiffs all affirmatively support Lead Counsel's 25% request.  This means that both *ex ante* and *ex post*, sophisticated plaintiffs—including some with multi-million-dollar losses—believe Lead Counsel's efforts have been worth the money.  In our opinion, that is often reason enough to approve a fee request.

### 2.    *The Requested Fee in Relation to the Settlement*

20.    We next consider factor (5), "the requested fee in relation to the settlement." According to virtually all empirical studies of class action fee awards, including the one done by one of us (Fitzpatrick), a fee award of 25% would be merely average.

- This is true if we examine fee awards nationwide.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 833-34, 838 (finding the most common percentages awarded by

federal courts nationwide using the percentage method were 25%, 30%, and 33%, with a mean award of 25.4% and a median award of 25%); *Eisenberg-Miller 2010, supra,* at 260 (finding mean and median of 24% and 25%, respectively). Indeed, the most recent Eisenberg-Miller study suggests that 25% might even be below average. *See Eisenberg-Miller 2017, supra,* at 951 (finding mean and median of 27% and 29%, respectively).

- This is true if we examine only fee awards in the Second Circuit. *See* Fitzpatrick, *Empirical Study*, *supra*, at 836 (finding Second Circuit mean and median of 23.8% and 24.5%, respectively); *Eisenberg-Miller 2010*, *supra*, at 260 (finding mean and median of 23% and 24%, respectively). Again, the most recent Eisenberg-Miller study suggests that 25% might even be below average in the Second Circuit, too. *Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median of 28% and 30%, respectively).

- This is true if we examine only fee awards in securities cases. *See* Fitzpatrick, *Empirical Study*, *supra*, at 835 (finding mean and median of 24.7% and 25%, respectively); *Eisenberg-Miller 2010*, *supra*, at 262 (finding mean and median of 23% and 25%, respectively); *Eisenberg-Miller 2017*, *supra*, at 952 (finding mean and median of 23% and 25%, respectively).

Thus, no matter how you slice it, this factor supports the fee request.

21.     It is true that the settlement here is unusually large; very few settlements are anywhere near as big as this one in a given year. While federal courts sometimes award lower percentages in cases where settlements are larger, *see* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44 (finding relationship statistically significant); *Eisenberg-Miller 2017, supra*, at 947-48

10

(same); *Eisenberg-Miller 2010*, *supra*, at 263-65 (same), we support the requested 25% fee here, for three reasons.

22.    First, the best available data suggests that the typical fee percentage even for settlements of this magnitude is still 25%.  The best reports on large settlements in cases of this type are the annual studies of securities class actions published by NERA Economic Consulting ("NERA").  NERA is very well regarded; it is frequently relied upon by academics and courts alike.  In its most recent study, NERA reports that the median fee percentage awarded (they don't report the average) over the last ten years in securities settlements between $100 million and $500 million was 25%.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2024) at p. 30 (fig. 27).

23.    Second, the practice of lowering fee percentages as recoveries rise is misguided because it creates terrible incentives for class counsel.  Indeed, it can actually make class counsel *better off* by resolving a case for less rather than more.  *See, e.g.*, *In re Synthroid I*, 264 F.3d 712, 718 (7th Cir. 2001) (Easterbrook, J.) ("This means that counsel for the consumer class could have received [more] fees had they settled for [less] but were limited . . . in fees because they obtained an extra $14 million for their clients . . . . Why there should be such a notch is a mystery.  Markets would not tolerate that effect . . . .").  Consider the following example: if courts award class action attorneys 25% of settlements at or below $400 million, but only 20% of settlements when they are over $400 million, then rational class action attorneys will prefer to settle cases for $400 million (*i.e.*, a $100 million fee award) than for $490 million (*i.e.*, a $98 million fee award)!  As Judge Easterbrook noted above, rational clients who want to maximize their own recoveries would never agree to such an arrangement.  This is why studies even of

sophisticated corporate clients do not report any such practice among them when they hire lawyers on contingency, even in the biggest cases like patent litigation. *See, e.g.,* Schwartz, *supra,* at 360; Fitzpatrick, *A Fiduciary Judge*, *supra*, at 1159-63.  In our opinion, courts should not force a fee arrangement on class members that would create bad incentives for their lawyers. To the contrary: courts are supposed to be serving as fiduciaries for absent class members.  *See* William B. Rubenstein, Newberg on Class Actions § 13.40 (5th ed. 2020) ("[T]he law requires the judge to act as a fiduciary" for class members); Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151, 1154-55 (2021) (hereinafter "*A Fiduciary Judge*") ("[A]bsent class members . . . would want to pay class counsel at the end of the case the amount they would have paid class counsel to take the case to begin with . . . .  As good fiduciaries, then, that is exactly what judges should do as well.").

24.     Third, while some courts have awarded lower fee percentages as settlement sizes increase, many other courts do not follow this practice.  *See, e.g.*, *Allapattah Srvcs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit ....  By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (quoting *Allapattah*); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS, 2013 WL 12327929, at 17 n. 16 (C.D. Cal., Jun. 17, 2013) ("The Court also agrees with … other courts, *e.g.*, *Allapattah Servs*., 454 F. Supp. 2d at 1213, which have found that decreasing a fee percentage

based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class"). Nothing in Second Circuit case law requires district courts to lower fee percentages simply because Lead Counsel did an excellent job and recovered more for the class. Accordingly, it is our humble opinion that the Court should not exercise its discretion to do so here, especially where the percentage of the fund being requested is so strongly supported by empirical research of awards in securities cases of a similar magnitude. *See Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2024) at p. 30 (fig. 27).

### 3. The Magnitude and Complexities of the Litigation, the Risk Incurred, and the Quality of Representation

25. Consider next the magnitude and complexity of the litigation and the risks Lead Counsel incurred (factors (2) and (3)), two factors that are related. The recovery here is very large, but whether or not it is a good recovery depends on the underlying damages the class might have recovered at trial discounted by the risks the class faced. According to Lead Counsel's damages theory, the maximum possible recoverable damages here were $11.6 billion. Thus, the class is recovering 3.73% of what they might have received at trial had everything gone their way. Although that number sounds low, it is much better than the number at which the typical securities fraud class actions settles.

26. Again, the best data here comes from the NERA studies. In its most recent study, NERA reports that the median percentage of damages recovered in a securities fraud settlement has varied from 1.2% to 2.5% over the last 10 years. *See Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review*, at p. 27 (fig. 24). The numbers are even lower in cases where potential damages are as high as they were here. According to NERA, the median recovered in cases with damages above $10 billion is only 0.4% of damages. *See id.* This means

13

that the recovery here is an order of magnitude greater than the typical recovery in a case presenting damages of this size.

27.     Similar ratios of recovery to losses incurred are common in investor class actions of other types.  In *In re Dell Technologies Inc. Class V Stockholders Litig.*, 300 A.3d 679, 724 (Del. Ch. 2023), *as revised* (Aug. 21, 2023), *aff'd*, 326 A.3d 686 (Del. 2024), which settled for $1 billion, Vice Chancellor Laster used "the magnitude of the recovery as a percentage of the equity value of the transaction" as a "proxy for the strength of a settlement in an M&A case." He described the recovery as a "home run" even though it constituted only 4.18% of the $23.9 billion deal value because the ratios in other cases with similarly enormous deals were smaller. In the most comparable case, the ratio of the $31.5 million recovery to the $26 billion deal was only 0.12%.  *Id.* at 725.

28.     Of course, an assessment of the quality of Lead Counsel's accomplishment must also be judged against the risks the class faced.  If this was a low-risk case, a large recovery might not be all that impressive.  But the facts indicate that this case was high-risk.  There was no SEC enforcement action for private counsel to piggyback upon; the company did not issue a restatement; and the claims involved only violations of Sections 10(b) and 20(a) of the Exchange Act, which would require proof of scienter and loss causation.

29.     Consider first the lack of SEC action.  It is well known that the lack of a parallel SEC action makes things much riskier for private counsel.  *See, e.g.*, Alexander I. Platt, *"Gatekeeping" in the Dark: SEC Control over Private Securities Litigation Revisited*, 72 Admin. L. Rev. 27, 48 (2020) ("[R]esearch has shown that [private securities class actions] are less likely to be dismissed, settle faster and for more money, and are more likely to have an institutional lead plaintiff, when there is a parallel SEC enforcement action.").  The reasons for this are fairly

obvious: government action sends a signal that the private suit has merit and the private suit may be able to use information or admissions secured by the government to its advantage. *See id.* at 48-49. Lead Counsel did not have any such advantages here.

30.    Consider next that there was also no restatement by the company here. It is equally well known that the lack of a restatement makes things much riskier for private counsel. *See id.* at 56-57 ("Research has shown that a significant portion of [private securities class actions] involve restatements, and that [private securities class actions] accompanied by restatements produce larger settlements."); Cornerstone Research, *Securities Class Action Settlements: 2023 Review and Analysis* at p. 10 (finding that restatement settlements recover 29% more of the class's damages than non-restatement settlements). The reasons for this are fairly obvious, too: restatements all but admit the company gave incorrect material information in the past. They are seen as "prox[ies] for fraud." John C. Coffee, *Understanding Enron: "It's About the Gatekeepers, Stupid"*, 57 Bus. Law. 1403, 1407 (2002). Lead Counsel did not enjoy such proxies here.

31.    Finally, the claims here involved only violations of Sections 10(b) and 20(a) of the Exchange Act; this required Lead Counsel to prove scienter and loss causation. These are two of the most difficult hurdles to surmount in securities litigation. By contrast, claims under the Securities Act of 1933—specifically Sections 11 and 12(a)—do not have such hurdles. Unsurprisingly, then, claims under Section 11 and 12 have become quite popular. Equally unsurprising, they tend to settle for a greater portion of the class's damages. *See, e.g.*, Cornerstone, *supra*, at 8 (finding that Section 11 and 12-only cases to recover 67% more than Section 10(b)-only cases). Lead Counsel had a tougher road here; Section 11 and 12 claims can

15

only be brought for offerings of new securities (*e.g.*, initial public offerings)—yet they still recovered an historic sum (*i.e.*, the largest recovery ever against a China-based company).

32.     The risks that remained to be faced when the settlement was negotiated were also considerable.  Lead Counsel had yet to prevail on its motion for class certification, to have expert testimony admitted for use at trial, to survive summary judgment, to prove that Defendants' practices violated Chinese antitrust law, to establish that the violation was clear enough to establish scienter, and to prove that the stock price drops were caused by relevant disclosures rather than other events.  Any one of these risks was significant; surmounting all of them would have been heroic.

### 4.     *The Time and Labor Expended*

33.     Consider finally factor (1), the time and labor expended by counsel.  The Second Circuit "encourage[s]" a quantitative approach to this factor known as the "lodestar crosscheck." *See, e.g.*, *Goldberger*, 209 F.3d at 50.  Many courts do not analyze this factor through the crosscheck, *see, e.g.*, *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) ("[I]n awarding attorneys' fees in a common fund case, the 'time and labor involved' factor need not be evaluated using the lodestar formulation . . . ."), and we agree that it undermines the public policy factor discussed above to do so because the lodestar crosscheck reintroduces the bad incentives of the lodestar method and contradicts market practices.  *See* Fitzpatrick, *A Fiduciary Judge, supra*, at 1157-58, 1167.  Nonetheless, because the Second Circuit encourages the lodestar crosscheck, we will briefly address whether Lead Counsel would reap some sort of "windfall" if their fee request were granted.  Plaintiffs' Counsel's lodestar has thus far summed to some $33,635,813.  If the fee request is granted, counsel would therefore receive a multiplier

of 3.22. Although run-of-the-mill class actions tend to have lower multipliers,[3] multipliers grow in size as recoveries increase,[4] and the requested multiplier is normal for settlements of this magnitude. *See Eisenberg-Miller 2010, supra,* at 274 (finding mean multiplier of 3.18 in settlements above $175.5 million).

### B.  Fee Practices of Sophisticated Clients

34.  Each of us has written extensively on the fee practices of sophisticated clients. We agree that when serving as plaintiffs in large lawsuits, such clients routinely pay contingent fees in the typical market range, which extends from 33% to 40% of the recovery.[5]  We also agree that such clients use flat or rising scales of contingent percentages far more often than declining scales, although fee agreements containing the latter are sometimes observed.

35.  Before getting into the evidence, we do acknowledge that we know less about fees paid in large commercial lawsuits than we would like.  No publicly available database collects information about this sector of the market, and businesses that sue as plaintiffs rarely reveal

---

[3] *See* Fitzpatrick, *Empirical Study, supra*, at 834 (finding multipliers ranging from 0.07 to 10.3, with a mean of 1.65 and median of 1.34); *see also Eisenberg-Miller 2017*, *supra*, at 965 (finding mean multiplier of 1.48 for cases between 2009 and 2013); *Eisenberg & Miller 2010*, *supra*, at 273 (finding mean multiplier of 1.81 for cases between 1993 and 2008).

[4] *See Eisenberg-Miller 2010, supra,* at 274 ("As the recovery decile increases, the multiplier also tends to increase, with the multiplier in the highest recovery decile more than triple that of the multiplier in the lowest recovery decile.").

[5] *See, e.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"); and *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018) ("a typical contingency agreement in this circuit might range from 33% to 40% of recovery").  The same range is known to prevail in high-dollar, non-class, commercial cases.  *See, e.g., Kapolka v. Anchor Drilling Fluids USA, LLC*, No. 2:18-CV-01007-NR, 2019 WL 5394751, at *10 (W.D. Pa. Oct. 22, 2019); and *Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017).

their fee agreements.  Consequently, most of what is known is drawn from anecdotal reports.[6]

That said, the evidence available on the use of contingent fees by sophisticated clients shows that

percentages tend to be high.

36.     We recently described the fee practices of sophisticated clients in a jointly

authored amicus curiae brief submitted in connection with the appeal of Vice Chancellor Laster's

fee award of $266.7 million on a $1 billion recovery (26.67%).  *See Brief of Amici Professors*

*Baker, Fitzpatrick, and Silver in Support of Appellee and Affirmance*, *In re Dell Technologies*

*Inc. Class V. Stockholders Litig*., Case No. 349, 2023, Filing ID. 71688879, Supreme Court of

Delaware (Dec. 26, 2023).[7]   Our amicus brief, which we draw upon in the discussion that

follows, is attached as Exhibit D.

37.     To our knowledge, no one has ever shown, or even suggested, that sophisticated

clients with sizeable stakes frequently pay lawyers on lodestar-like terms when serving as

plaintiffs in litigation.  Nor have we seen any evidence that would support this claim.  To the

contrary, the evidence with which we are familiar indicates that sophisticated clients do not use

the lodestar method.  It shows, in other words, that the market for legal services has *rejected* the

---

[6] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.  For example, when representing Caldera International, Inc. in a dispute with IBM, Boies, Schiller & Flexner LLP billed two-thirds of its lawyers' standard hourly rates and stood to receive a contingent fee equal to 20 percent of the recovery.  Letter from David Boies and Stephen N. Zack to Darl McBride dated Feb. 26, 2003, available at https://www.sec.gov/Archives/edgar/data/1102542/000110465903028046/a03-6084_1ex99d1.htm (visited Feb. 17, 2025).  According to Wikipedia, the damages sought in the lawsuit initially totaled $1 billion, but were later increased to $3 billion, and then to $5 billion. Wikipedia, *SCO Group, Inc. v. International Business Machines Corp*., https://en.wikipedia.org/wiki/SCO_Group,_Inc._v._International_Business_Machines_Corp. (visited Feb. 17, 2025).

[7] The Supreme Court of Delaware affirmed the $266.7 million award.  *See In re Dell Techs. Inc. Class V S'holders Litig.*, 326 A.3d 686 (Del. 2024).

lodestar approach, implying that it is an inferior way to incentivize attorneys. If absent class members had bargained with Lead Counsel directly, there is no reason to expect that the resulting agreement would have entitled Lead Counsel to lodestar-based compensation.

38.    Clients do agree to pay lawyers on lodestar-like terms in jurisdictions like England that prohibit percentage-based contingent fees. This demonstrates the inferiority of the lodestar method, because clients use it only when the option of paying contingent percentages is closed. And if the lodestar method is a bad way of paying lawyers, it must also be a bad way of evaluating the reasonableness of their fees. In other words, clients' preference for percentage-based compensation implies that lodestar cross-checks, which judges often apply to avoid awarding windfall fees, are a bad idea. If sophisticated clients do not care about lodestar multipliers when percentages are available, judges should not either.

39.    Instead, judges should award either flat percentages of 25% to 40% or percentages that increase with the procedural maturity of the litigation (*e.g.*, 25% of the recovery when a claim settles before a complaint is filed, one-third thereafter, and 40% in the event of an appeal).[8]    These are overwhelmingly the fee terms selected by real clients, including sophisticated clients, who hire lawyers on contingency. *See* Fitzpatrick, *A Fiduciary Judge,* at 1159-63. Of course, upward and downward deviations from these ranges should be allowed when evidence shows that, in similar matters, clients tend to pay more or less. But, in sum, a judge applying the "mimic the market" approach would review the evidence and do his or her

---

[8] Other authors also report that contingent fee run as high as 40%, with 45% fees prevailing in mass tort lawsuits, medical malpractice cases, and selected others that are especially risky. *See, e.g.*, Eric Helland & Seth A. Seabury, *Contingent-Fee Contracts in Litigation: A Survey and Assessment*, *in* RESEARCH HANDBOOK ON THE ECONOMICS OF TORTS 383, 387-88 (Jennifer Arlen ed., 2013).

best to estimate the terms that would have been agreed to had a sophisticated client, acting as an agent for all class members, negotiated with Lead Counsel directly at the start of litigation.

### 1. Fees Agreed to in Pharmaceutical Antitrust Cases

40.    Turning to the evidence, we start by observing that sophisticated business clients commonly agree to pay fees of 33% or greater when serving as lead plaintiffs in class actions. Here are a few examples.

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio – Court of Common Pleas), which settled for $420 million, seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3% of the gross recovery obtained by settlement as fees, with a bump to 35% in the event of an appeal. Expenses were to be reimbursed separately.

- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40%.

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35% of the gross class-wide recovery as fees, with expenses to be separately reimbursed. (The fee was initially set at over 40% but was later negotiated down to 35%.)

41.    Similar rates prevail in antitrust class actions in which businesses participate as plaintiffs. For example, one of us (Silver) studied and prepared expert reports in a series of

pharmaceutical cases bought against manufacturers that engaged in pay-for-delay settlements to patent challenges. The named plaintiffs in these cases were drug wholesalers. All were large companies, and several were of Fortune 500 size or bigger. All also had in-house or outside counsel monitoring the litigations. The potential damages were enormous. In one case, *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million. In the series as a whole, they won more than $2 billion. In most of the cases, these sophisticated businesses supported fees equal to one-third of the recovery. In one case, they endorsed a fee of 30% and in another of 27.5%.

42.     These cases were not exceptional. One of us (Fitzpatrick) gathered information on an even larger number of pharmaceutical antitrust cases—33 in all—that were resolved between 2003 and 2020. He found that "the fee requests ranged from a fixed percentage of 27.5% to a fixed percentage of one-third"; "one-third *heavily* dominated" the sample"; and "the average was 32.85%." And "in the vast majority of cases, one or more of these corporate class members—often the biggest class members—came forward to voice affirmative support for the fee request, and not a single one of these corporate class members objected to the fee request in any of the 33 cases." Brian T. Fitzpatrick, *A Fiduciary Judge, supra,* at 1162. Professor Fitzpatrick's table of cases appears in Exhibit E.

43.     In sum, when sophisticated business clients seek to recover money in risky commercial lawsuits involving large stakes, they typically pay contingent fees ranging from 30% to 40%, with fees of 33% or more being promised in most cases. As well, there is little variation in fee percentages across cases of different sizes.

### 2.     Patent Cases

44.     Now consider patent infringement cases, another context in which sophisticated business clients often hire law firms on contingency. There are many anecdotal reports of high

percentages in this area.  The most famous one relates to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a 33⅓% contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, D.C. *Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, Washington Post, March 18, 2006, D03.

45.    The fee percentage that WRF received is typical, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.

> There are two main ways of setting the fees for the contingent fee lawyer [in patent cases]: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 Ala. L. Rev. 335, 360 (2012).  In a case like this one that required the lawyers to bear significant litigation and trial preparation hours and expenses with no guarantee of payment or reimbursement, a high fixed percentage would apply.[9]

---

[9] Professor Schwartz's findings are consistent with reports found in patent blogs, one of which stated as follows.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation.  Instead, the law firm only gets paid from damages obtained in a verdict or settlement.  Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors.  This is strictly a results-based system.

46.    Clearly, in the segment of the market where sophisticated business clients hire lawyers to litigate patent cases on contingency, successful lawyers earn sizeable premiums over their normal hourly rates.  The reason is obvious.  When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.  Patent plaintiffs have the option of paying lawyers to represent them on an hourly basis, but still prefer a contingency arrangement, even at 30-40%, to bearing the risks and costs of litigation themselves.

### 3.    Other Large Commercial Cases

47.    Turning from patent lawsuits to business representations more generally, many examples show that compensation tends to be a significant percentage of the recovery.  A famous case from the 1980's involved the Texas law firm of Vinson & Elkins ("V&E").  ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  V&E took the case on contingency, "meaning that if it won, it would receive one-third of the settlement and, if it lost, it would get nothing."  David Maraniss, *Texas Law firm Passes Out $100 Million in Bonuses*, Washington Post, Aug. 22, 1990.[10]  After many years of litigation, a series of settlements and a $1 billion judgment against a remaining defendant yielded a gross recovery of $635 million, of which the firm received around $212 million in fees.  Patricia M. Hynes, *Plaintiffs' Class Action Attorneys Earn What They Get*, 2 Journal of the Institute for the

---

Matthew L. Cutler, *Contingent Fee and Other Alternative Fee Arrangements for Patent Litigation*, HARNESS DICKEY, (JUNE 8, 2020), https://www.hdp.com/blog/2020/06/08/contingent-fee-and-other-alternative-fee-arrangements-for-patent-litigation/.

[10] https://www.washingtonpost.com/archive/politics/1990/08/22/texas-law-firm-passes-out-100-million-in-bonuses/8714563b-10b8-4f85-b74a-1e918d030144/

Study of Legal Ethics, 243, 245 (1991).  It bears emphasizing that the clients who made up the plaintiffs' consortium, Panhandle Eastern Corp., the Bechtel Group, Enron Corp., and K N Energy Inc., were sophisticated businesses with access to the best lawyers in the country.  No claim of undue influence by V&E can possibly be made.

48.     The National Credit Union Administration's ("NCUA") experience in litigation against securities underwriters provides a more recent example of contingent-fee terms that were used successfully in large, related litigations.  After placing 5 corporate credit unions into liquidation in 2010, NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks.  To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-backed securities, NCUA retained two outside law firms, Korein Tillery LLP and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on a straight contingency basis.  The original contract entitled the firms to 25% of the recovery, net of expenses.  As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which NCUA had paid $1,214,634,208 in fees.[11]

49.     When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake.  The failed corporate credit unions had sustained $16 billion in losses, and NCUA's objective was to recover as much of that amount as possible.  It also knew that dozens of defendants would be sued and that multiple settlements were possible.  Even so, NCUA agreed to pay a straight contingent percentage fee in the standard market range on all the

_____

[11] The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations:  Legal Services Agreement dated Sept. 1, 2009, https://ncua.gov/files/publications/legal-services-agreement.pdf (last visited Feb. 17, 2025); ; National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx (last visited Feb. 17, 2025); Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://ncua.gov/files/oig/OIG20130206IssaResponse.pdf (last visited Feb. 17, 2025).

recoveries. It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones, nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers' compensation to the number of hours they expended.

50.     In *In re Merry-Go-Round Enterprises, Inc*., 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young. He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery. Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, *21 times* its lodestar. The bankruptcy judge granted the request, writing: "[v]iewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." *Id.* at 335.

51.     Based on what lawyers who write about fee arrangements in business cases have said, contingent fees of 33⅓% or more remain common. In 2011, The Advocate, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine." It included an article on alternative fee arrangements, which reported typical contingent fee rates of 33% to 40%.

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 The Advocate (Texas) 20 (2011).

52.     In sum, when seeking to recover money in class actions involving large stakes and in commercial lawsuits, sophisticated business clients typically pay contingent fees ranging from 30% to 40%, with fees of 33% or more being promised in most cases.  The fee request here is below those numbers and therefore, in our opinion, presumptively reasonable.

## VI.     COMPENSATION

53.     Our compensation for this declaration was a flat fee in no way dependent on the outcome of Lead Counsel's fee petition.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  February 19, 2025

Nashville, TN

_____

Brian T. Fitzpatrick

26

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  February 19, 2025

Austin, TX

_____

Charles Silver

EXHIBIT A

QUALIFICATIONS OF PROFESSOR BRIAN FITZPATRICK

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Milton R. Underwood Chair in Free Enterprise*, 2020 to present
- *FedEx Research Professor*, 2014-2015
- *Professor of Law*, 2012 to present
- *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts, Textualism & Originalism
- Hall-Hartman Outstanding Professor Award, 2008-2009 & 2023-2024
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

1

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (Cambridge University Press 2021) (ed., with Randall Thomas)

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press 2019) (winner of the Pound Institute's 2022 Civil Justice Scholarship Award)

## BOOK CHAPTERS

*Climate Change and Class Actions* in CLIMATE LIBERALISM: PERSPECTIVES ON LIBERTY, PROPERTY, AND POLLUTION (Jonathan Adler, ed., Palgrave Macmillan 2023)

*How Many Class Actions are Meritless?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021) (with Randall Thomas)

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC ARTICLES

*Agency Costs in Third Party Litigation Finance Reconsidered*, THEORETICAL INQUIRIES IN LAW (forthcoming 2025) (with Will Marra)

*Distributing Attorney Fees in Multidistrict Litigation*, 13 J. LEG. ANAL. 558 (2021) (with Ed Cheng & Paul Edelman)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORD. L. REV. 1151 (2021)

2

*Many Minds, Many MDL Judges*, 84 L. & CONTEMP. PROBLEMS 107 (2021)

*Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORD. L. REV. 437 (2020)

*Why Class Actions are Something* both *Liberals* and *Conservatives Can Love*, 73 VAND. L. REV. 1147 (2020)

*Deregulation and Private Enforcement*, 24 LEWIS & CLARK L. REV. 685 (2020)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 NW. J. INT'L L. & BUS. 203 (2020) (with Randall Thomas)

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017) (reprinted in THE ROMANIAN JUDGES' FORUM REVIEW, no. 2 (2023))

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*Originalism and Natural Law*, 79 FORD. L. REV. 1541 (2011)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

3

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

*Strict Scrutiny of Facially Race-Neutral State Action and the Texas Ten Percent Plan*, 53 Baylor L. Rev. 289 (2001)

## ACADEMIC PRESENTATIONS

*The Conservative Case for Private Antitrust Enforcement*, American Antitrust Institute Annual Private Enforcement Conference, National Press Club, Washington, DC (October 30, 2024) (panelist)

*Hot Topics in Class Action Settlement Approval,* National Institute on Class Actions, American Bar Association, Nashville, TN (October 24, 2024) (panelist)

*Non-Securities Class Action Settlements Since CAFA,* University of Missouri Law School (September 20, 2024)

*Do Representative Payments Matter? An Empirical Study*, University of Missouri Law School (September 20, 2024)

*Non-Securities Class Action Settlements Since CAFA,* University of California at Berkeley Law School (September 18, 2024)

*Do Representative Payments Matter? An Empirical Study*, University of California at Berkeley Law School (September 18, 2024)

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, Conference of the European Society for Empirical Legal Studies, Universidad Miguel Hernandez, Elche, Spain (June 21, 2024)

*Litigation Financing*, Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Mar. 7, 2024) (panelist)

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, George Mason Law School, Arlington, VA (Feb. 6, 2024)

*Agency Costs in Third Party Litigation Finance Reconsidered*, Third Party Litigation Funding: The Past, The Present, and The Future Conference, Tel Aviv University Buchmann Faculty of Law, Tel Aviv, Israel (June 14, 2023)

*Non-Securities Class Action Settlements in CAFA's First Eleven Years*, University of Florida Law School, Gainesville, FL (Feb. 6, 2023)

*Entrapment of the Little Guy: Resisting the Erosion of Investor, Employee and Consumer Protections,* Institute for Law and Economic Policy, San Diego, CA (Jan. 27, 2023) (panelist)

*A New Source of Data for Non-Securities Class Actions,* William & Mary Law School, Williamsburg, VA (Nov. 10, 2022)

*Can Courts Avoid Politicization in a Polarized America?*, American Bar Association Annual Meeting, Chicago, IL (Aug. 5, 2022) (panelist)

*A New Source of Data for Non-Securities Class Actions,* Seventh Annual Civil Procedure Workshop, Cardozo Law School, New York, NY (May 20, 2022)

*Resolution Issues in Class Actions and Mass Torts,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Mar. 11, 2022) (panelist)

*Developments in Discovery Reform*, George Mason Law & Economics Center Fifteenth Annual Judicial Symposium on Civil Justice Issues, Charleston, SC (Nov. 16, 2021) (panelist)

*Locality Litigation and Public Entity Incentives to File Lawsuits: Public Interest, Politics, Public Finance or Financial Gain?*, George Mason Law & Economics Center Symposium on Novel Liability Theories and the Incentives Driving Them, Nashville, TN (Oct. 25, 2021) (panelist)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, University of California Hastings College of the Law, San Francisco, CA (Nov. 3, 2020)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, The Judicial Role in Professional Regulation, Stein Colloquium, Fordham Law School, New York, NY (Oct. 9, 2020)

*Objector Blackmail Update: What Have the 2018 Amendments Done?,* Institute for Law and Economic Policy, Fordham Law School, New York, NY (Feb. 28, 2020)

*Keynote Debate: The Conservative Case for Class Actions,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Jan. 24, 2020)

*The Future of Class Actions,* National Consumer Law Center Class Action Symposium, Boston, MA (Nov. 16, 2019) (panelist)

*The Conservative Case for Class Actions,* Center for Civil Justice, NYU Law School, New York, NY (Nov.11, 2019)

*Deregulation and Private Enforcement*, Class Actions, Mass Torts, and MDLs: The Next 50 Years, Pound Institute Academic Symposium, Lewis & Clark Law School, Portland, OR (Nov. 2, 2019)

*Class Actions and Accountability in Finance,* Investors and the Rule of Law Conference, Institute for Investor Protection, Loyola University Chicago Law School, Chicago, IL (Oct. 25, 2019) (panelist)

5

*Incentivizing Lawyers as Teams,* University of Texas at Austin Law School, Austin, TX (Oct. 22, 2019)

*"Dueling Pianos": A Debate on the Continuing Need for Class Actions,* National Institute on Class Actions, American Bar Association, Nashville, TN (Oct. 18, 2019) (panelist)

*A Debate on the Utility of Class Actions,* Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Oct.16, 2019) (panelist)

*Litigation Funding,* Forty Seventh Annual Meeting, Intellectual Property Owners Association, Washington, DC (Sep. 26, 2019) (panelist)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* International Class Actions Conference, Vanderbilt Law School, Nashville, TN (Aug. 24, 2019)

*A New Source of Class Action Data,* Corporate Accountability Conference, Institute for Law and Economic Policy, San Juan, Puerto Rico (April 12, 2019)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, FL (Dec. 7, 2018) (panelist)

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (Nov. 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (Oct. 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (Sep. 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

6

*The Conservative Case for Class Actions—A Monumental Debate*, National Institute on Class Actions, American Bar Association, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*:  Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

7

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

9

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*Is the Fifth Circuit Really Too Conservative for the Supreme Court?* THE NATIONAL LAW JOURNAL (Aug. 15, 2024)

*Judicial Profile: Hon. Charles Breyer*, THE FEDERAL LAWYER (Summer 2024)

*Racial Preferences Won't Go Easily*, WALL ST. J. (June 1, 2023)

*Memo to Mitch: Repeal the Republican Tax Increase*, THE HILL (July 17, 2020)

*The Right Way to End Qualified Immunity*, THE HILL (June 25, 2020)

*I Still Remember*, 133 HARV. L. REV. 2458 (2020)

*Proposed Reforms to Texas Judicial Selection*, 24 TEX. R. L. & POL. 307 (2020)

*The Conservative Case for Class Actions?,* NATIONAL REVIEW (Nov. 13, 2019)

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)


**OTHER PRESENTATIONS**

*Ethics & Professionalism,* Class Action & Pharmaceutical and Medical Device Sections, American Association for Justice Annual Convention, Nashville, TN (July 21, 2024) (panelist)

*Abstention*, Tennessee Attorney General's Office Continuing Legal Education, Nashville, TN (Apr. 13, 2022)

11

*The Need for New Lower Court Judgeships, 30 Years in the Making*, Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Feb. 24, 2021)

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, LA (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

12

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

## PROFESSIONAL ASSOCIATIONS

Referee, Journal of Legal Studies
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Referee, Supreme Court Economic Review
Reviewer, Aspen Publishing
Reviewer, Cambridge University Press
Reviewer, University Press of Kansas
Reviewer, Palgrave Macmillan
Reviewer, Oxford University Press
Reviewer, Routledge
Member, American Law Institute
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association, 2012-2022
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia & California (inactive)

## COMMUNITY ACTIVITIES

Board of Directors, Beacon Center of Tennessee, 2018-present; Board of Directors, Nashville Ballet, 2011-2017 & 2019-2022; Nashville Talking Library for the Blind, 2008-2009

13

EXHIBIT B

QUALIFICATIONS OF PROFESSOR CHARLES SILVER

29

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## CONTACT INFORMATION

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-Present
  Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
  W. James Kronzer Chair in Trial & Appellate Advocacy
  Cecil D. Redford Professor
  Robert W. Calvert Faculty Fellow
  Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
  Assistant Professor

University of Michigan Law School, Fall 2018
  Visiting Professor

Harvard Law School, Fall 2011
  Visiting Professor

Vanderbilt University Law School, Fall 2003
  Visiting Professor

University of Michigan Law School, Fall 1994
  Visiting Professor

University of Chicago, 1983-1984
  Managing Editor, *Ethics: A Journal of Social, Political and Legal Philosophy*

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) (1979)

## PUBLICATIONS

### SPECIAL PROJECTS

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters) (American Law Institute 2010).

6/16/2024    1

## CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Class Action Litigation," 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Mass Tort Litigation," 42 Tort Trial & Insurance Practice Law Journal 105 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Medical Malpractice Litigation," 25 Rev. Litig. 459 (2006).

PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

### BOOKS

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (Cato Institute, 2021).

OVERCHARGED: WHY AMERICANS PAY TOO MUCH FOR HEALTH CARE (with David A. Hyman) (Cato Institute, 2018).

HEALTH LAW AND ECONOMICS, Vols. I and II (coedited with Ronen Avraham and David A. Hyman) (Edward Elgar 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, (coedited with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (Foundation Press, 2nd Ed. 2012) (updated annually through 2020).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (with William T. Barker) (LexisNexis 2012) (updated annually through 2017).

### ARTICLES AND BOOK CHAPTERS BY SUBJECT AREA (* INDICATES PEER REVIEWED)

### Health Care Law & Policy

1. "Leveraging Medicare: How to Deliver Affordable, High-Quality Health Care," Murphy St. Thomas Journal of Law & Public Policy (forthcoming 2024) (with David A. Hyman) (invited symposium contribution).

2. "Leveraging The Medicaid Expansion," 9 University of Pennsylvania Journal of Law and Public Affairs 217 (2024) (with David A. Hyman).

3. "Regulating Health Care: Perspectives From Government Failure During the COVID-19 Pandemic," 71 DePaul L. Rev. 361 (2022) (with David A. Hyman).

6/16/2024                                                                 2

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

4.    "Are We 'Paying Twice' for Pharmaceuticals?," Regulation 14 (Winter 2020-2021) (with David A. Hyman).

5.    "Paying Beneficiaries, Not Providers," Regulation, 34 (2020) (with David A. Hyman).

6.    "Pharmaceutical Pricing When Success Has Many Parents," 37 Yale J. Reg. 101 (2020) (with David A. Hyman).

7.    "Pricing and Paying for Cancer Drugs: Policy Options for Fixing A Broken System," 26:4 The Cancer Journal 298-303 (2020) (with David A. Hyman).*

8.    "Medicare For All: Four Inconvenient Truths," 20 Hous. J. of Health L. & Policy 133 (2020) (with David A. Hyman).

9.    "Health Care's Government Bureaucracy: A Comment on *Health Care's Market Bureaucracy*, by Allison K. Hoffman," (unpublished) (with David A. Hyman).

10.    "Surprise Medical Bills: How To Protect Patients and Make Care More Affordable," 108 Georgetown L. J. 1655 (2020) (with David A. Hyman and Ben Ippolito).

11.    "There is a Better Way: Make Medicaid and Medicare More Like Social Security," 18 Georgetown J. of L. & Pub. Pol'y 149 (2020) (with David A. Hyman).

12.    "Why Are We Being Overcharged for Pharmaceuticals? What Should We Do About It?" 39 J. Legal Med. 137 (2019) (with David A. Hyman).

13.    "Regulating Pharmaceutical Companies' Financial Largesse," 7:25 Israeli J. Health Policy Res. (2018), https://doi.org/10.1186/s13584-018-0220-5 (with Ronen Avraham).*

14.    "Medical Malpractice Litigation," (with David A. Hyman) OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2019), DOI: 10.1093/acrefore/9780190625979.013.365.*

15.    "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," (with David A. Hyman) OXFORD HANDBOOK OF AMERICAN HEALTH LAW, I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds. (2017).*

16.    "Compensating Persons Injured by Medical Malpractice and Other Tortious Behavior for Future Medical Expenses Under the Affordable Care Act," (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)25 Annals of Health Law 35 (2016).

17.    "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," (with David A. Hyman) 63 DePaul L. Rev. 574 (2014) (invited symposium).

18.    "Five Myths of Medical Malpractice," (with David A. Hyman) 143:1 Chest 222-227 (2013).*

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

19.    "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

20.    "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" (coauthored with David A. Hyman) MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (Ken Oliphant & Richard W. Wright, eds. 2013)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

21.    "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

22.    "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

23.    "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

24.    "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

25.    "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

26.    "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

27.    "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

28.    "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).*

### Studies of Medical Malpractice Litigation

29.    "Fictions and Facts: Medical Malpractice Litigation, Physician Supply, and Health Care Spending in Texas Before and After HB 4," 51 Tex. Tech L. Rev. 627 (2019). (with David A. Hyman and Bernard Black) (invited symposium on the 15th anniversary of the enactment of HB4).

30.    "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

31.    "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

6/16/2024                                                                                                        4

33

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

32.  "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

33.  "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

34.  "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

35.  "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

36.  "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

37.  "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

38.  "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

39.  "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

40.  "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

41.  "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

42.  "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

### Empirical Studies of the Law Firms and Legal Services

43.  "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

6/16/2024                                                                 5

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

44. "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

45. "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

46. "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

47. "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

### Attorneys' Fees—Empirical Studies and Policy Analyses

48. "Third Party Litigation Funding: Panacea or More Tsuris," Theoretical Inquiries in Law (forthcoming 2024) (with David A. Hyman).

49. "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (2018).

50. "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

51. "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

52. "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

53. "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

54. "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

55. "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

56. "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

57. "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

6/16/2024                                                                                      6

35

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

58.  "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

59.  "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

**Liability Insurance and Insurance Defense Ethics**

60.  "Liability Insurance and Patient Safety," 68 DePaul L. Rev. 209 (2019) (with Tom Baker) (symposium issue).

61.  "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 Rutgers U. L. Rev. 83 (2015) (with William T. Barker) (symposium issue).

62.  "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

63.  "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

64.  "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

65.  "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

66.  "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

67.  "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

68.  "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

69.  "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

70.  "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

71.    "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

72.    "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

73.    "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

74.    "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

75.    "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 Def. L. J. 1 (Spring 1997).

76.    "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

77.    "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

78.    "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

79.    "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 Va. L. Rev. 1585 (1991); reprinted in VI INS. L. ANTHOL. 857 (1992).

### Class Actions, Mass Actions, and Multi-District Litigations

80.    "The Suspect Restitutionary Basis for Common Fund Fee Awards in Multidistrict Litigations," 101 Texas L. Rev. 1653 (2023) (symposium issue).

81.    "The Unconstitutional Assertion of Inherent Powers in Multi-District Litigation," B.Y.U. L. Rev. (2023) (with Robert J. Pushaw).

82.    "In Defense of Private Claim Resolution Facilities," 84 J. of L. and Contemporary Problems 45 (2021) (with Lynn A. Baker).*

83.    "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation? A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

84.    "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

85.    "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

86.    "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

87.    "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

88.    "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

89.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

90.    "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

91.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

92.    "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

93.    "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

94.    "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

95.    "Justice in Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

96.    "A Private Law Defense of Zealous Representation" (in progress), available at http://ssrn.com/abstract=2728326.

97.    "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

98.    "The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations," 79 Fordham L. Rev. 1985 (2011).

99.    "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

6/16/2024                                                                                                    9

38

**CHARLES SILVER**
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

100. "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

101. "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

102. "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

103. "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

104. "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

105. "What's Not To Like About Being A Lawyer?" 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

106. "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

107. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

108. "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

109. "The Legal Establishment Meets the Republican Revolution," 37 S. Tex. L. Rev. 1247 (1996) (invited symposium).

110. "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

111. "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

112. "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

**Legal and Moral Philosophy**

113. "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).*

114. "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).*

115. "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).*

6/16/2024                                                                                          10

39

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

### Practice-Oriented Publications

116. "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

117. "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

118. "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

119. "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

120. "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

### Miscellaneous

121. "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

## PERSONAL

Daughter, Katherine

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.

EXHIBIT C

DOCUMENTS REVIEWED

When preparing this report, one or both of us reviewed the items listed below, which unless noted otherwise, were generated in connection with this case. We also reviewed other items including, without limitation, cases and published scholarly works.

- Amended Consolidated Class Action Complaint (ECF No. 55, filed 04/24/2022);

- Memorandum Decision and Order (ECF No. 83, filed 03/22/2023, granting in part, and denying in part, the motions to dismiss);

- Briefing related to the Plaintiffs' Motion for Class Certification, including, but not limited to: (a) Memorandum of Law in Support of Plaintiffs' Motion For Class Certification (ECF No. 100, filed 10/06/2023; (b) Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 107, filed 01/19/2024); (c) Plaintiffs' Reply in Further Support of Their Motion for Class Certification (ECF No. 113, filed 04/19/2024); (d) Defendants' Sur-Reply in Further Opposition to Plaintiffs' Motion for Class Certification (ECF No. 117, filed 05/17/2024); (e) Plaintiffs' Memorandum of Law in Support of Motion to Strike Portions of Defendants' Sur-Reply and Sur-Reply Declaration (ECF No. 120, filed 05/28/2024); (f) Defendants' Opposition to Plaintiffs' Motion to Strike Portions of Defendants' Sur-Reply and Sur-Reply Declaration (ECF No. 122, filed 06/11/2024); (g) Plaintiffs' Notice of Lodging Supplemental Evidence in Advance of Class Certification Hearing (ECF No. 124, Filed 06/11/2024); and (h) Reply in Further Support of Plaintiffs' Motion to Strike (ECF No. 129, filed 06/18/2024);

- Stipulation and Agreement of Settlement (ECF No. 136-1, filed 10/25/2024);

- Plaintiffs' Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement (ECF No. 135, filed 10/25/204); and

- Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 139, filed 10/28/2024).

43

EXHIBIT D

*BRIEF OF AMICI PROFESSORS BAKER, FITZPATRICK, AND SILVER IN SUPPORT OF APPELLEE AND AFFIRMANCE, IN RE DELL TECHNOLOGIES INC. CLASS V. STOCKHOLDERS LITIG.*, CASE NO. 349, 2023, FILING ID. 71688879, SUPREME COURT OF DELAWARE (DEC. 26, 2023)

EFiled:  Dec 28 2023 03:02PM EST
Filing ID 71706106
Case Number 349,2023

# IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| | ) |
| | ) No. 349, 2023 |
| | ) |
| IN RE DELL TECHNOLOGIES INC. | ) CASE BELOW: |
| CLASS V STOCKHOLDERS | ) |
| LITIGATION | ) COURT OF CHANCERY |
| | ) OF THE STATE OF DELAWARE, |
| | ) Cons. C.A. No. 2018-0816-JTL |
| | ) |

## BRIEF OF *AMICI* PROFESSORS BAKER, FITZPATRICK AND SILVER IN SUPPORT OF APPELLEE AND AFFIRMANCE

FRIEDLANDER & GORRIS, P.A.

Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500

*Counsel for* Amici Curiae *Professors Lynn A. Baker, Brian T. Fitzpatrick, and Charles Silver*

Dated: December 28, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ............................................................................ii

INTEREST OF AMICI CURIAE AND SUMMARY OF ARGUMENT ................1

ARGUMENT ..................................................................................................5

    I.      FEE AWARDS SHOULD ENCOURAGE LAWYERS TO MAXIMIZE STOCKHOLDERS' NET RECOVERIES ......................5

    II.     THE MARKET HAS REJECTED THE DECLINING PERCENTAGE APPROACH ...........................................................10

    III.    OPPOSING AMICI'S ANALYSIS IS BASED ON LODESTAR MULTIPLIERS AND THE MARKET HAS DECISIVELY REJECTED LODESTAR MULTIPLIERS AS A BASIS FOR FEES.............................................................................................15

CONCLUSION ..............................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Halley v. Honeywell Int'l, Inc.*,
861 F.3d 481 (3d Cir. 2017)......................................................................................6

*In re Dell Techs. Inc. Class V S'holders Litig.*,
300 A.3d 679 (Del. Ch. 2023).................................................................................1

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001)....................................................................................6

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974),
*overruled on other grounds by Blanchard v. Bergeron*,
489 U.S. 87 (1989)....................................................................................................6

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002)...................................................................................6

**Other Authorities**

Lynn A. Baker, Michael Perino, and Charles Silver,
*Is the Price Right? An Empirical Study of Fee-Setting in Securities
Class Actions*,
115 COLUM. L. REV. 1371 (2015) ....................................................................5, 12

Bernard S. Black *et al.*,
MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES,
AND WHY TORT REFORM HASN'T HELPED,
(Cato Institute 2021) ..............................................................................................17

Stephen J. Choi, Jessica Erickson & A. C. Pritchard,
*The Business of Securities Class Action Lawyering*,
99 IND. L. J. (forthcoming), https://ssrn.com/abstract=4350971 .....................18-19

Stephen J. Choi, Jessica Erickson & A. C. Pritchard,
 *Working Hard or Making Work? Plaintiffs' Attorney Fees in
 Securities Fraud Class Actions*,
 17 J. EMPIRICAL L. STUD. 438 (2020) ..................................................15

John C. Coffee, Jr.,
 *Accountability and Competition in Securities Class Actions:
 Why "Exit" Works Better Than "Voice,"*
 30 CARDOZO L. REV. 407 (2008) ..........................................................19

John C. Coffee, Jr.,
 *Understanding the Plaintiff's Attorney: The Implications of
 Economic Theory for Private Enforcement of Law Through
 Class and Derivative Actions*,
 86 COLUM. L. REV. 669 (1986) ...............................................................7

Declaration of John C. Coffee, Jr.,
 *In re High Fructose Corn Syrup Antitrust Litig.*,
 M.D.L. 1087 (C.D. Ill. Oct. 7, 2004) ....................................................13

John M. Connor & Robert H. Lande*,
 *Not Treble Damages: Cartel Recoveries are Mostly Less Than
 Single Damages,*
 100 IOWA L. REV. 1997 (2015) ..............................................................11

I.J. Alexander Dyck, *et al.*,
 *How Pervasive is Corporate Fraud?*
 (Feb. 17, 2021), https://ssrn.com/abstract=2222608............................16

Jill E. Fisch,
 *Lawyers on the Chopping Block: Evaluating the Selection of
 Class Counsel by Auction*,
 102 COLUM. L. REV. 650 (2002) ............................................................19

Brian T. Fitzpatrick,
 *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*,
 89 FORDHAM L. REV. 1151 (2021).................................................*passim*

iii

Brian T. Fitzpatrick,
  *An Empirical Study of Class Action Settlements and Their Fee Awards*,
  7 J. EMPIRICAL L. STUD. 811 (2010) .......................................................................2

Bruce L. Hay,
  *Contingent Fees and Agency Costs*,
  25 J. LEGAL STUD. 503 (1996) .........................................................................12

Bruce L. Hay,
  *Optimal Contingent Fees in a World of Settlement*,
  26 J. LEGAL STUD. 259 (1997) .........................................................................19

Eric Helland & Seth A. Seabury,
  *Contingent-Fee Contracts in Litigation: A Survey and Assessment*,
  RESEARCH HANDBOOK ON THE ECONOMICS OF TORTS 383
  (Jennifer Arlen ed., 2013) ...............................................................................8

4 Newberg and Rubenstein on Class Actions § 13:40 (6th ed.)...............................5

Charles Silver,
  *The Mimic-the-Market Method of Regulating Common Fund
  Fee Awards: A Status Report on Securities Fraud Class Actions*,
  RESEARCH HANDBOOK ON REPRESENTATIVE S'HOLDER LITIG.
  (Sean Griffith *et al.* eds., 2018)...............................................................................6

Declaration of Charles Silver,
  *In re Takata Airbag Product Liability Litig. (Economic Loss
  Track Cases Against Honda and Nissan)*,
  No. 15-md-02599 (S.D. Fla. Jan. 24, 2018).........................................................13

Texans for Lawsuit Reform, Timeline of Reforms,
  https://www.tortreform.com/timeline-of-reforms/...............................................17

**INTEREST OF AMICI CURIAE AND SUMMARY OF ARGUMENT**

In the proceeding below, a group of law professors submitted an amicus brief in which they addressed a question about court-awarded fees in common fund cases posed by Vice Chancellor Laster: "What do law professors say in favor or against the declining percentage method?" Corrected Brief of Law Professors as Amici Curiae ("Corrected Brief" or "CB"). Vice Chancellor Laster found that brief unpersuasive. *See In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679 (Del. Ch. 2023). The same group has now submitted a new brief in this Court urging reversal of Vice Chancellor Laster's opinion. *See* Brief of Law Professor *Amici* in Support of Objector-Appellant and Reversal ("Amicus Brief" or "AB").

We are also law professors with substantial bodies of scholarly work on fee awards and related matters. The Corrected Brief, the Amicus Brief, and Vice Chancellor Laster's opinion all cite us. We write separately because our views differ substantially from those of the opposing amici. In our opinion, Vice Chancellor Laster decided the issue below correctly.[1]

The question raised by Vice Chancellor Laster is whether a court should award a smaller fee percentage simply because plaintiffs' counsel recovered more money for their clients. Some courts do this. One of us (Professor Fitzpatrick) authored a

_____

[1] We have no financial interest in the outcome of this proceeding. We are submitting this amicus brief on our own initiative, with the sole object of bringing our views to the attention of the Court. No party engaged us or offered to pay us for our time.

1

leading empirical study of prevailing practices.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010).  But the way that most of these courts apply the declining percentage method is so indefensible that not even opposing amici defend it.  Most courts simply award a smaller percentage *of the entire recovery* as the recovery grows in size.  Thus, a court that might have awarded 20% of a $999 million settlement will award 10% of a settlement at $1 billion.  This approach can make counsel *worse off* for recovering *more money*.  In the example, recovering an additional $1 million reduces the fee from $199.8 million to $100 million.  No rational client would hire a lawyer on terms like this, and, to our knowledge, no actual client has.  Opposing amici agree that "*fixed* declining percentages . . . suffer from the problem" of encouraging lower net stockholder recoveries.  AB.20-21.

But the Amicus Brief argues that Vice Chancellor Laster should have done the same thing on a *marginal basis*.  Remarkably, the authors don't say what the marginal formula should be.[2]  This is a telling omission.  Setting declining marginal percentages is a tricky business.  Judges need to assign both fee percentages and inflection points.  For example, should it be 30% of the first $100 million, 25% of

---

[2] Opposing amici imply at various points that 15% is the correct percentage, but they nowhere explain what marginally declining formula led them to that number.  *See* AB.7,14; CB.8 ("[A] 15% fee []would be more appropriate here than a 28% award."); CB.15.

the next $100 million, 20% of the next $100 million, and so on?  Or should the percentages fall after every $200 million?  Every $300 million?  Should they step down 5% each time?  1%?  Opposing amici have no answers whatsoever to these questions.  Nor do we.  Without more, the recommendation to apply declining marginal percentages is worse than useless: it is likely to create perverse incentives that harm claimants by discouraging lawyers from maximizing recoveries.

Opposing amici contend otherwise because lawyers tend to be paid more per hour of work in bigger common fund cases.  From this, they infer that lawyers can be paid less in these cases without adverse consequences for investors because lawyers will continue to pursue them.  A glaring flaw mars this contention: it assumes that, once lawyers choose to file a case, they will work just as hard and expend resources just as willingly no matter how they are compensated.  This assumption is obviously false.  Someone who is paid 30% of all funds recovered obviously has a stronger incentive to litigate than someone who is paid 30% of the first $10 million, 25% of the second $10 million, 20% of the third $10 million, and so forth.

But our larger point is this: there is no need for courts to try to figure out which amicus brief is right or wrong about the likely effects of declining marginal percentages because the people who have the greatest interest in figuring all this out—real clients in real marketplaces for real legal representation—have already

rendered their verdict. All of the available empirical evidence suggests that, when people hire lawyers on contingency, they almost always either pay their lawyers with fixed percentages or with *increasing* percentages based on procedural maturity (e.g., higher percentages if a case goes to trial than if it is resolved before trial). As far as anyone can tell, marginally declining percentages are used only rarely—and there is reason to believe that even the few examples we know of are tainted by clients seeking to maximize something other than their own net recoveries.

In our view, when judges must award attorneys' fees for clients they should not adopt novel arrangements that clients themselves do not voluntarily use. They should instead follow what real clients do in the real world. In other words, they should "mimic the market." After all, clients know best how to maximize their own net recoveries. That is what Vice Chancellor Laster did here and his decision should be affirmed.

4

## ARGUMENT

## I.  FEE AWARDS SHOULD ENCOURAGE LAWYERS TO MAXIMIZE STOCKHOLDERS' NET RECOVERIES

In an article published in the *Columbia Law Review*, two of us (Professors Baker and Silver) urged trial judges to "keep uppermost in their minds that," when regulating fee awards,

> they are creating incentives for attorneys. Realizing this, [judges'] only object should be to select fee terms that motivate lawyers to maximize net recoveries for claimants. Choosing a fee arrangement for any other reason would disserve class members by discouraging their lawyers from representing them zealously, thereby creating a serious risk that class members would be denied due process of law.

Lynn A. Baker, Michael Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371, 1448 (2015) [hereinafter "*Is the Price Right?*"].

This is not just a policy prescription; it is a legal obligation.  As Professor Fitzpatrick has noted, judges who award attorneys' fees for clients say they sit in a fiduciary relationship to those clients.  *See* Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORDHAM L. REV. 1151, 1152 n.8 (2021) [hereinafter "*A Fiduciary Judge*"] (citing 4 Newberg and Rubenstein on Class Actions § 13:40 (6th ed.) ("[S]o central is the protection of absent class members' rights that the court is said to have a 'fiduciary duty' toward absent class members in assessing . . . the reasonableness of class counsel's fees.")).  Opposing

amici agree with this goal; they repeatedly emphasize the desire to put more dollars into stockholders' pockets.   *See, e.g.,* AB.8-10 (promoting "net stockholder recovery").

But what is the best way to maximize the net recoveries of lawyers' clients? One way to do it is to rely on economic models, but, as Professor Fitzpatrick has explained with regret, the models are "indeterminate."  Fitzpatrick, *A Fiduciary Judge*, at 1159.  The answer depends on too many variables, including difficult ones to quantify, such as how well lawyers can be monitored.

Instead of relying on models, many courts[3] and academic commentators, including us,[4] believe that judges should "mimic the market" when awarding fees.

---

[3] The Seventh Circuit makes the market rate the sole determination in awarding class fees, *see, e.g.*, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (holding that the district court must "estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case"), and most other Circuits make the market rate at least one factor in the determination *see, e.g.*, *Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 496 (3d Cir. 2017) ("the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained"); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (followed by many Circuits) (the attorney's "customary fee"), *overruled on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("the market rate").

[4] In addition to articles previously cited, see Charles Silver, *The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions*, *in* RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION (Sean Griffith et al. eds., 2018).

Professor John C. Coffee, Jr., perhaps the country's leading scholar of stockholder actions, urged this approach long ago:

> [T]he "law should mimic the market." In the class action context, that would mean attempting to award the fee that informed private bargaining, if it were truly possible, might have reached. The simplest way for the law to duplicate the bargain that informed parties would reach if agency costs were low is to look to fee award levels in actions brought by sophisticated private parties under the same or comparable statutes…. [I]f courts were to ask what fee structure an informed, sophisticated client would use to compensate his attorney when close monitoring is not feasible, they would at least have focused on the correct question.

John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 696-697 (1986).

The key insight supporting this development is that sophisticated plaintiffs with large claims can be expected to hire lawyers on terms that maximize their expected net recoveries—exactly the goal that judges, as absent class members' fiduciaries, should strive to achieve. Instead of "reinventing the wheel" and using novel compensation arrangements, judges can follow the lead of sophisticated plaintiffs and be reasonably confident of fulfilling their charge.

What does the market tell us about the optimal way to pay lawyers who work on contingency? First, it tells us that judges should adopt percentage-based fee formulas and reject lodestar formulas because real clients always use the former when engaging such attorneys. We have studied fee arrangements in the United

7

States for decades and we know of not a single instance in any type of litigation in which a sophisticated client used the lodestar method when hiring attorneys on contingency. To the best of our knowledge, they do so only in jurisdictions like England that prohibit percentage-based contingent fees. In view of this, the only plausible conclusion is that it is wrongheaded to evaluate the reasonableness of contingent lawyers' compensation in lodestar-based terms when percentage terms are an option. If the lodestar method was a good way of compensating lawyers for bearing costs and risks, sophisticated clients would have recognized this and agreed to pay lawyers a contingent hourly rate times a multiplier. Instead, clients prefer percentage-based contingency arrangements that eliminate the need to review monthly bills, discourage lawyers from dragging out cases, and reward lawyers for maximizing recoveries. Given that the lodestar method is a bad way of paying lawyers, it must also be a bad way of evaluating the reasonableness of their fees. If sophisticated clients do not care about lodestar multipliers when percentages are available, judges should not care about them either.

Second, the market tells us that judges should award either flat percentages of 25% to 40% or percentages that increase with the procedural maturity of the litigation (e.g., 25% of the recovery when a claim settles before a complaint is filed,

8

one-third thereafter, and 40% in the event of an appeal).[5]  These are overwhelmingly the fee terms selected by real clients, including sophisticated clients, who hire lawyers on contingency.  *See* Fitzpatrick, *A Fiduciary Judge,* at 1159-63.  Of course, upward and downward deviations from these ranges should be allowed when evidence shows that, in similar matters, clients tend to pay more or less.  But, in sum, a judge applying the "mimic the market" approach would review the evidence and do his or her best to estimate the terms that would have been agreed to had a sophisticated client, acting as an agent for all class members, negotiated with class counsel directly at the start of litigation.

Vice Chancellor Laster followed this prescription.  His percentage fell within the most common fixed-percentage range.  He even considered that the settlement took place at a "late stage"—only 19 days before trial was scheduled to begin—which, frankly, argues in favor of an even higher percentage than he awarded.

---

[5] Although 33.3% appears to be the high end in Delaware stockholder litigation, we are aware of many contingent fee agreements in other contexts in which the agreed fee is 40%. *See, e.g.*, Eric Helland & Seth A. Seabury, *Contingent-Fee Contracts in Litigation: A Survey and Assessment*, *in* RESEARCH HANDBOOK ON THE ECONOMICS OF TORTS 383, 387-88 (Jennifer Arlen ed., 2013).

## II.    THE MARKET HAS REJECTED THE DECLINING PERCENTAGE APPROACH

Opposing amici do not criticize the "mimic the market" approach. They offer no reason for thinking that sophisticated clients with large claims routinely, or even occasionally, prefer inferior compensation formulas to better ones. Yet, they urge the Court to endorse a fee formula that the market has rejected. With the exception of one context, which we address below, they do not show that sophisticated clients ever use their preferred approach. Instead, opposing amici ask the Court to have greater faith in them than in the lessons the market for legal services teaches about the advantages and deficiencies of various compensation structures. We are more cautious.

In *A Fiduciary Judge*, Professor Fitzpatrick examined the empirical evidence regarding how sophisticated parties pay lawyers they hire on contingency. His conclusion: "the data from sophisticated clients . . . did not find any marginally decreasing rates." *Id*. at 1170.[6] The reasons are easy to understand. Marginally

---

[6] This conclusion was based on a published study of corporations that hire lawyers on contingency to bring patent infringement cases and new data collected in corporate antitrust class actions, where, over nearly 20 years, large corporations never objected to large fee percentages even in the biggest class actions. Opposing amici argue that the antitrust data is distinguishable from this case because "M&A settlements rarely secure 100% of potential damages" while "antitrust cases typically allow for treble damages." AB.23. They think this is significant because antitrust plaintiffs can "settle for 50% of treble damages, give 33% of that award to their attorneys, and still recover actual damages." *Id*. In other words, they seem to think antitrust plaintiffs have money to burn, so why not give a little extra to the lawyers?

10

declining percentages mean marginally declining incentives to wrest more money from the defendant. That forces clients to monitor their lawyers even more to prevent them from shirking. But perhaps more importantly, marginally declining percentages require the parties to agree on when percentages should start declining and by how much. At what recovery should the rate start to fall? Should it fall to 30%? To 25%? At what recovery should it next fall? And so on. The answers to these questions are extremely difficulty to determine. For example, in order to construct declining percentages that maximize their own recoveries, clients would

---

We did not know corporations were so magnanimous. But the premise of the argument is flawed. Antitrust class actions do not settle for "50% of treble damages"; on average, they settle for 19% of single damages. *See* John M. Connor & Robert H. Lande*, Not Treble Damages: Cartel Recoveries are Mostly Less Than Single Damages,* 100 IOWA L. REV. 1997, 2010 (2015). Opposing amici also argue that the antitrust data is distinguishable because the representative plaintiffs in the antitrust cases received large incentive awards and these awards might have offset the gains they could have made by objecting to a fee request; they even attached a chart showing that they varied from four figures to perhaps as high as the low six figures. (It is difficult to tell precisely from their chart because they lumped together incentive awards to all representative plaintiffs in a given case.) *See* AB.23 & Ex. C. The flaws in this argument are many-fold. First, class members are allowed to object to fee requests without objecting to or otherwise impairing the underlying settlements and their incentive awards. Second, many of the representative plaintiffs in these cases had millions upon millions of dollars at stake; even an incentive award of six figures would not offset what they could have gained by shaving even a few percentage points off the fee award. Finally, incentive awards do not explain why *absent* corporate class members never objected any of these fee requests. Opposing amici also argue that the antitrust data actually supports their argument because the fee requests there "decline[d]" with size of recovery. AB.22. But the fee requests varied over a very narrow range—27.11% to 33.33%—*exactly* within the market range and *well above* the percentage they recommend.

11

need to know their lawyers' so-called "production functions"—essentially, what the outcome of the litigation would be at each additional unit of time invested by the lawyer. *See, e.g.*, Bruce L. Hay, *Contingent Fees and Agency Costs*, 25 J. LEGAL STUD. 503, 515-23 (1996). No one knows this, including the lawyer. For one thing, it depends on what the defendant will do in response to each additional unit of time invested by the lawyer. Moreover, even if the parties knew the production function, it would still be complicated to figure out where to set the inflection points in light of the other variables involved in the calculation. *See id.* All of this is so difficult that we are unaware of any academics who have attempted to calculate optimal declining percentages. Opposing amici realize all this, *cf.* CB.9 ("This approach, however, would require the investor to determine this baseline amount when selecting lead counsel and incorporate it into the retainer agreement."); not even they are willing to do it in this very case. *See supra* note 2.

The best that Professor Fitzpatrick could say about marginally declining rates is that they are "not unheard of in the marketplace." Fitzpatrick, *A Fiduciary Judge,* at 1170. Opposing amici base the portion of their brief entitled "Declining Percentages are Used in the Marketplace" on these "'not unheard of'" examples. AB.20 (quoting Fitzpatrick, *supra*). These examples are public pension funds that hire lawyers to bring securities fraud class actions. *See id.* (citing "sophisticated public-sector funds"). Opposing amici even cite *Is the Price Right?*, the *Columbia*

12

*Law Review* article that Professors Baker and Silver coauthored, to support them.

*See* AB.20 n. 11.  But opposing amici do not tell the rest of the story.

The rest of the story is politics.  Nearly twenty years ago, Professor Coffee

had this to say about these cases:

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context.  However, I have never seen . . . a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas).  My belief is that public pension funds prefer the "declining percentage" formula largely for political reasons, while private corporations disdain such formula for economic reasons.  That is, public pension funds are frequently administered by elected political officials who are potentially subject to media and political criticism for conferring "windfall" fees on their attorneys.  Necessarily, they seek to avoid criticism, and the declining percentage formula seems primarily a defensive strategy to protect political officials from such criticism.  Corroborating this conclusion is the rareness of its use by private corporations (as Coca-Cola, PepsiCo and Admiral Beverage have implicitly confirmed in this case [by paying straight percentage fees in the typical range]).

Declaration of John C. Coffee, Jr., ¶ 22, *In re High Fructose Corn Syrup Antitrust*

*Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004).  Professor Silver has endorsed this

conclusion as well.  *See* Declaration of Charles Silver, ¶ 53, *In re Takata Airbag*

*Product Liability Litigation (Economic Loss Track Cases Against Honda and*

*Nissan)*, No. 15-md-02599 (S.D. Fla. Jan. 24, 2018).  In other words, the examples

from public pension funds are tainted; the public officials in those cases may not be

trying to maximize the pension fund plaintiffs' net recoveries.  But, because

13

everyone agrees courts should try to maximize the plaintiffs' net recoveries here, it

follows that courts should not emulate these examples.

14

## III.    OPPOSING AMICI'S ANALYSIS IS BASED ON LODESTAR MULTIPLIERS AND THE MARKET HAS DECISIVELY REJECTED LODESTAR MULTIPLIERS AS A BASIS FOR FEES

What then recommends marginally declining percentages?  Opposing amici say their approach is recommended by an examination of class action lawyers' lodestar multipliers.  *See* AB.12 ("A lodestar cross-check could, and should, be used . . . ."); CB.6-9 (examining "average multiplier[s] to lodestar").  They argue that class action lawyers reap larger multipliers on their time from fee awards in bigger cases than in smaller cases, *see id*., and this makes class action lawyers "overcompensated" in bigger cases, CB.2 (arguing that eschewing "a declining-percentage fee" would lead to "overcompensating class attorneys" in "large settlements"); CB.7 ("attorneys are . . . overcompensated after [a motion to dismiss] in cases involving high-market capitalization firms like Dell").[7]  Given that lawyers are "overcompensated" in bigger cases, they argue that fees could be cut and the lawyers would still file these cases.  *See* CB.8 ("[T]he conjecture that plaintiffs' firms will not pursue meritorious cases under a declining-fee approach ignores the significant money that firms make in those cases.").

---

[7] They make the assertion more colorfully in one of the law review articles on which their amicus briefs are based: "[B]eing appointed as lead counsel in a securities class action that is likely to end with a large settlement is like receiving a winning lottery ticket."  Stephen J. Choi, Jessica Erickson & A. C. Pritchard, *Working Hard or Making Work? Plaintiffs' Attorney Fees in Securities Fraud Class Actions*, 17 J. EMPIRICAL L. STUD. 438, 464 (2020).

There are so many flaws in this logic that it is difficult to know where to begin. But let's start with the "overcompensation" point. The fact that one multiplier is bigger than another says nothing about which multiplier is too big and which multiplier is too small. For example, maybe lawyers are correctly compensated in big cases and undercompensated in smaller cases? Maybe lawyers are undercompensated in all cases but less so in big cases?[8] Without a theory for what the optimal lodestar multiplier is to begin with, comparing one lodestar multiplier to another tells us nothing.

Moreover, even if it were true that lawyers would *file* all the same cases if the courts awarded lower fee percentages, this does not tell us whether class members would be better off on net. Opposing amici argue that smaller fee awards for attorneys should leave larger net recoveries for stockholders, *see* AB.9 (providing a made-up example), and this is indeed possible. But is it *likely*? We think not. Net recoveries are a function of both the fee percentage *and* the number of dollars recovered. When lawyers receive declining percentages, their incentives also

---

[8] *See, e.g.*, I.J. Alexander Dyck, et al., *How Pervasive is Corporate Fraud?* (Feb. 17, 2021), https://ssrn.com/abstract=2222608 (finding that lawyers currently pursue less than half of all securities fraud). Indeed, Pentwater itself contends that counsel failed to maximize the recovery in this case. *See* A367-381 (arguing that the settlement, although enormous, is small by comparison to the losses incurred). If Pentwater is right, counsel was incentivized insufficiently despite the possibility of earning large profits.

diminish.  Even if a lawyer is willing to file a case, what they do or don't do after they file is driven by how they are paid.

One passage in particular demonstrates opposing amici's indifference to the quality of lawyers' efforts.  They praise a Texas rule that "restricts contingency fees in class actions to 400% of lodestar." AB.9.  Remarkably, they do so without noting that the rule was part of a sweeping package of lawsuit restrictions (also known as tort reforms) adopted in 2003 with the purpose to make many types of lawsuits unprofitable.[9]  Sadly, based on our experience and study of Texas litigation, the package has had its desired effect.[10]

But there is no need to try to figure out who is right and who is wrong about what will happen under opposing amici's proposal.  Real clients have already done this work and have flatly rejected opposing amici's lodestar-multiplier analysis.  As we explained above, the market has rejected lodestar-based formulas for contingent

---

[9]    *See*    Texans    for    Lawsuit    Reform,    Timeline    of    Reforms, https://www.tortreform.com/timeline-of-reforms/ (last visited Dec. 24, 2023) ("In 2003, TLR advocated our nation's most comprehensive tort reform bill . . . address[ing] several areas of Texas' legal system that were being abused[, including] . . . class action attorney fees.").

[10] Professor Silver studied the impact of the 2003 tort reforms on medical malpractice litigation and found that the frequency of lawsuits and payouts declined significantly.  *See* Bernard S. Black et al., MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED 11 (Cato Institute 2021).

17

legal representation.  In particular, it has rejected capping percentages by a multiple

of the lawyer's lodestar.    Again, Professor Fitzpatrick canvassed the empirical

evidence in *A Fiduciary Judge*; his conclusion: "I have never seen this method used

in the market for contingency representation, whether among sophisticated or

unsophisticated clients." *Id*. at 1167.  Indeed, opposing amici have not cited a *single*

example of any client anywhere that agreed to a fee contract that lowered

percentages based on the lawyer's lodestar multiplier—not even one tainted by

politics.  Yet, that is the very method they are recommending to the Court!  *See*

AB.12 ("A lodestar cross-check could, and should, be used . . . .").

     If there were any doubt that opposing amici's analysis has been flatly rejected

by the market, the death knell can be found in their backup argument: returning to

lodestar multipliers, they argue that lawyers' percentages should be reduced when

cases are resolved *after* a motion to dismiss is denied versus before.  *See* CB.7

("[A]ttorneys are undercompensated before a motion to dismiss, but

overcompensated afterwards . . . .").  In their companion law review article, they

argue this is warranted because risk has been mitigated once the case has survived a

motion to dismiss; less risk should mean lower lodestar multipliers and lower

lodestar multipliers should again mean lower fee percentages.  *See* Stephen J. Choi,

Jessica Erickson & A. C. Pritchard, *The Business of Securities Class Action*

*Lawyering*, 99 IND. L. J. (forthcoming), https://ssrn.com/abstract=4350971, at 62

(noting that "the riskiness of a case goes down as the litigation progresses" and arguing that, because, "the impact is largest in the cases against the largest companies," the "overcompensation (and thus incentive to overwork) is greatest for these cases"). As we noted above, real clients in the real marketplace do sometimes vary fee percentages on the procedural maturity the case achieved. But they do so in the exact opposite manner recommended by opposing amici! The market *increases* percentages as cases survive procedural stages, not decreases them.

Again, we have *never* seen a fee agreement that goes the other way, and, again, opposing amici cannot cite a *single* one. The reason is well known. As scholars have shown for many decades, the biggest drawback to the percentage-method is that lawyers will want to settle prematurely for too little. *See* Fitzpatrick, *A Fiduciary Judge,* at 1158-59 (citing over 50 years of scholarship). Clients mitigate this by *increasing* percentages as cases move along; decreasing percentages would only *exacerbate* the problem.[11] In other words, here again, opposing amici's recommendation only makes sense by assuming that case outcomes are not affected

---

[11] *See, e.g.*, Bruce L. Hay, *Optimal Contingent Fees in a World of Settlement*, 26 J. LEGAL STUD. 259, 260 (1997) (showing that percentages should increase with procedural maturity). Another way to mitigate the problem is to increase percentages with recovery size. *See, e.g.*, John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions: Why "Exit" Works Better Than "Voice,"* 30 CARDOZO L. REV. 407, 432 (2008); Jill E. Fisch, *Lawyers on the Chopping Block: Evaluating the Selection of Class Counsel by Auction*, 102 COLUM. L. REV. 650, 679 (2002).

by attorney effort after filing. Here again, that assumption is not based in reality. But, here again, there is no need to try to figure out who is right or who is wrong about what will happen if fee percentages decline as a case matures. Real clients have already done this work for us and they have rejected the idea. In our view, courts should not "experiment on" the stockholders here by subjecting them to novel theories of attorney compensation unknown in the real world.

## CONCLUSION

Scholars have spent many lifetimes trying to figure out the best way for clients to pay their lawyers. The answer is indeterminate because there are too many variables and too many of them are unknowable. Judges could play central planner and try to figure out the ideal fee formula in every case. But, with respect, we think that is a fool's errand. The better and safer course is just to ask what real clients do when they hire lawyers on contingency. That's what Vice Chancellor Laster did and his decision should be affirmed.

FRIEDLANDER & GORRIS, P.A.

*/s/ Jeffrey M. Gorris*
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500

Words: 4,963

*Counsel for* Amici Curiae *Professors*
*Lynn A. Baker, Brian T. Fitzpatrick,*
*and Charles Silver*

Dated: December 28, 2023

**EFiled: Dec 28 2023 03:02PM EST**
**Filing ID 71706106**
**Case Number 349,2023**



## IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| | ) |
| | ) No. 349, 2023 |
| | ) |
| IN RE DELL TECHNOLOGIES INC. | ) CASE BELOW: |
| CLASS V STOCKHOLDERS | ) |
| LITIGATION | ) COURT OF CHANCERY |
| | ) OF THE STATE OF DELAWARE, |
| | ) Cons. C.A. No. 2018-0816-JTL |
| | ) |

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE REQUIREMENT AND TYPE-VOLUME LIMITATION

1.      This brief complies with the typeface requirement of Supreme Court Rule 13(a)(i) because it has been prepared in Times New Roman 14-point typeface using Microsoft Word.

2.      This brief complies with the type-volume limitations of Supreme Court Rule 28(d) because it contains 4,963 words as counted by Microsoft Word.

FRIEDLANDER & GORRIS, P.A.

*/s/ Jeffrey M. Gorris*
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500

*Counsel for* Amici Curiae
*Law Professors Lynn A. Baker, Brian T. Fitzpatrick, and Charles Silver*

Dated: December 28, 2023

{FG-W0509730.}

EFiled: Dec 28 2023 03:02PM EST
Filing ID 71706106
Case Number 349,2023

## CERTIFICATE OF SERVICE

I, Jeffrey M. Gorris, hereby certify that on December 28, 2023, I caused a true

and correct copy of the foregoing **Brief of *Amici* Professors Baker, Fitzpatrick,**

**and Silver in Support of Appellee and Affirmance** to be served via File &

Serve*Xpress* upon the following counsel of record:

Kevin G. Abrams, Esquire
Michael A. Barlow, Esquire
April M. Ferraro, Esquire
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Stephen B. Brauerman, Esquire
Sarah T. Andrade, Esquire
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801

Anthony A. Rickey, Esquire
MARGRAVE LAW LLC
3411 Silverside Road
Baynard Building, Suite 104
Wilmington, DE 19810

Edward B. Micheletti, Esquire
Arthur R. Bookout, Esquire
Jessica R. Kunz, Esquire
Peyton V. Carper, Esquire
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square
920 North King Street
Wilmington, DE 19801

Peter B. Andrews, Esquire
Craig J. Springer, Esquire
David Sborz, Esquire
Jackson E. Warren, Esquire
ANDREWS & SPRINGER LLC
4001 Kennett Pike, Suite 250
Wilmington, DE 19807

Ned Weinberger, Esquire
Mark Richardson, Esquire
Brendan W. Sullivan, Esquire
Casimir O. Szustak, Esquire
LABATON SUCHAROW LLP
222 Delaware Avenue, Suite 1510
Wilmington, DE 19801

John D. Hendershot, Esquire
Susan M. Hannigan Cohen, Esquire
Kyle H. Lachmund, Esquire
Angela Lam, Esquire
RICHARDS, LAYTON &
   FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

{FG-W0509978.}

Martin S. Lessner, Esquire
Elena C. Norman, Esquire
James M. Yoch, Jr., Esquire
Lauren Dunkle Fortunato, Esquire
Kevin P. Rickert, Esquire
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801


/s/ Jeffrey M. Gorris
Jeffrey M. Gorris (Bar No. 5012)

{FG-W0509978.}

EXHIBIT E

PHARMACEUTICAL ANTITRUST CASES

89 Fordham L. Rev. 1151

| Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agreement | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|
| Hartig Drug Co. v. Senju Pharmaceutical Co.[90] | $9,000,000 | 33.33% | N/A | None | No |
| *In re* Blood Reagents Antitrust Litigation[91] | $41,500,000 | 33.33% | N/A | None | No |
| *In re* Lidoderm Antitrust Litigation[92] | $166,000,000 | 27.11% | 33.33% | None | Yes |
| *In re* Solodyn (Minocycline Hydrochloride) Antitrust Litigation[93] | $76,846,250 | 31.45% | N/A | None | No |
| American Sales Co. v. Pfizer, Inc.[94] | $94,000,000 | 32.69% | 33.33% | None | Yes |
| *In re* Aggrenox Antitrust Litigation[95] | $146,000,000 | 33.33% | 33.33% | None | Yes |
| *In re* Asacol Antitrust Litigation[96] | $15,000,000 | 33.33% | N/A | None | Yes |
| Castro v. Sanofi Pasteur, Inc.[97] | $61,500,000 | 33.33% | N/A | None | Yes |
| *In re* K-Dur Antitrust Litigation[98] | $60,200,000 | 33.33% | N/A | None | Yes |
| King Drug Co. of Florence v. Cephalon, Inc.[99] | $512,000,000 | 27.50% | N/A | None | Yes |
| *In re* Prograf Antitrust Litigation[100] | $98,000,000 | 33.33% | N/A | None | Yes |
| *In re* Prandin Direct Purchaser Antitrust Litigation[101] | $19,000,000 | 33.33% | N/A | None | Yes |
| Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.[102] | $15,000,000 | 33.33% | N/A | None | No |
| Louisiana Wholesale Drug Co. v. Pfizer, Inc.[103] | $190,416,438 | 33.33% | N/A | None | Yes |
| *In re* Skelaxin (Metaxalone) Antitrust Litigation[104] | $73,000,000 | 33.33% | N/A | None | Yes |
| *In re* Plasma-Derivative Protein Therapies Antitrust Litigation[105] | $64,000,000 | 33.33% | N/A | None | No |
| American Sales Co. v. Smithkline Beecham Corp.[106] | $150,000,000 | 33.33% | N/A | None | Yes |
| Louisiana Wholesale Drug Co. v. Becton Dickinson & Co.[107] | $45,000,000 | 33.33% | N/A | None | Yes |
| *In re* Wellbutrin XL Antitrust Litigation[108] | $37,500,000 | 33.33% | N/A | None | Yes |
| Rochester Drug Co-Operative, Inc., v. Braintree Laboratories Inc.[109] | $17,250,000 | 33.33% | N/A | None | Yes |
| *In re* Metoprolol Succinate Antitrust Litigation[110] | $20,000,000 | 33.33% | N/A | None | Yes |
| *In re* DDAVP Direct Purchaser Antitrust Litigation[111] | $20,250,000 | 33.33% | N/A | None | Yes |
| *In re* Wellbutrin SR Antitrust Litigation[112] | $49,000,000 | 33.33% | N/A | None | Yes |
| Meijer, Inc. v. Abbott Laboratories[113] | $52,000,000 | 33.33% | N/A | None | Yes |
| *In re* Nifedipine Antitrust Litigation[114] | $35,000,000 | 33.33% | N/A | None | Yes |
| *In re* Oxycontin Antitrust Litigation[115] | $16,000,000 | 33.33% | N/A | None | Yes |

| | | | | | |
|---|---|---|---|---|---|
| *In re* Tricor Direct Purchaser Litigation[116] | $250,000,000 | 33.33% | N/A | None | Yes |
| Meijer, Inc. v. Barr Pharmaceuticals, Inc.[117] | $22,000,000 | 33.33% | N/A | None | Yes |
| *In re* Remeron Direct Purchaser Antitrust Litigation[118] | $75,000,000 | 33.33% | N/A | None | Yes |
| *In re* Terazosin Hydrochloride Antitrust Litigation[119] | $74,572,327 | 32.41% | N/A | None | Yes |
| North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.[120] | $50,000,000 | 33.33% | N/A | None | No |
| *In re* Relafen Antitrust Litigation[121] | $175,000,000 | 33.33% | N/A | None | No |
| Louisiana Wholesale Drug Co. v. Bristol-Myers Squibb Co.[122] | $220,000,000 | 32.96% | N/A | None | Yes |
| | | N = 33 Median = 33.33% Mean = 32.85% | 3/33 | 0/33 | 26/33 |