EXHIBIT 24

PACER PRO®

# *Klein et al v. Bain Capital Partners, LLC et al (closed 09/30/2014)*

**Massachusetts District Court**

Case no. 1:07-cv-12388-WGY (D. Mass.)
Filed date: February 02, 2015
Docket entry no.: 1095

Docket text:

> Judge William G. Young: ELECTRONIC ORDER entered granting re 1051 MOTION for Attorney Fees
> Plaintiffs' Motion for an Award of Attorneys' Fees, Litigation Expenses, And Named Plaintiff Service
> Awards filed by City of Omaha Police and Fire Retirement System, Police and Fire Retirement
> System of the City of Detroit, Michael Wojno, Kirk Dahl (Paine, Matthew) (Entered: 02/02/2015)

This PDF was generated on August 27, 2020 by PacerPro for a text-only docket entry.

https://app.pacerpro.com/cases/190067

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRK DAHL, et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. BAIN CAPITAL PARTNERS, LLC, et al., Defendants. | Lead Case No. 1:07-cv-12388-WGY **MEMORANDUM IN SUPPORT OF AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND NAMED PLAINTIFF SERVICE AWARDS** |

## I.      Introduction

Attorneys from several law firms expended substantial time and resources over the last seven years with no guarantee of success in the diligent and dogged pursuit of this litigation. Plaintiffs' Counsel shepherded this case from pre-filing investigation in 2006 through 2014, when the Defendants ultimately agreed to pay settlements totaling more than half a billion dollars. In the process, Plaintiffs' Counsel brought some of the world's largest and most powerful financial firms – represented by some of the nation's foremost defense firms – to the brink of trial in order to secure a settlement fund of $590.5 million on behalf of the class.

Lead Counsel, on behalf of all Plaintiffs' Counsel, respectfully move for attorneys' fees of $194,865,000 plus accrued interest, equal to 33% of the common settlement funds – a percentage that is well within the range accepted by this Court and courts throughout the country. A 33% fee is particularly warranted here, where the Settlement was achieved without a parallel government action, and was based on a theory developed uniquely by Plaintiffs' Counsel and litigated effectively against sophisticated Defendants and their counsel. Prosecuting the matter from inception to the brink of trial has required more than $80 million dollars of attorney time and more than $12 million in litigation expenses, all of which Plaintiffs' Counsel advanced on a fully contingent basis. If the claims had failed for any reason, Plaintiffs' Counsel would have received nothing. Having incurred these substantial risks, and secured a very large settlement fund for the benefit of the Class, Plaintiffs' Counsel respectfully request the Court approve the fee they seek.

Lead Counsel, on behalf of Named Plaintiffs, also respectfully move the Court for service awards in the amount of $25,000 for Police and Fire Department Retirement System of the City of Detroit ("Detroit PFRS") and Omaha Police and Fire Department Retirement System (Omaha PFRS"), as well as $10,000 for Dr. Dahl and $5,000 for Mr. Wojno. As set forth in their declarations, Named Plaintiffs made significant time commitments on behalf of the Class during the seven-year litigation. Without them, no Settlement was possible. Accordingly, the Court should compensate Named Plaintiffs for their commitment and hard work.

2

## II.   Factual Background

The scope of this litigation is massive and described in detail in the accompanying Declaration of Co-Lead Counsel in Support of Named Plaintiffs' Motions for Final Approval of Settlements and Supplemental Plan of Allocation of Settlement Proceeds and for an Award of Attorneys' Fees and Expenses (hereinafter "Lead Counsel Decl."). Beginning in 2006 Plaintiffs' Counsel, among other things: (a) conducted an exhaustive factual investigation regarding their claims; (b) filed numerous amended complaints based on their investigation; (c) successfully opposed Defendants' motions to dismiss which raised multiple complicated legal challenges; (d) engaged in fact discovery over several phases lasting four years and covering 27 transactions; (e) reviewed and analyzed over 13 million pages of documents; (f) opposed Defendants' 30 motions for summary judgment, which challenged nearly all elements of liability, causation of damages, and the admissibility of nearly all evidence used to oppose the motions; (g) moved for class certification; (h) conducted and defended 58 depositions; (i) produced 11 expert reports and rebuttal reports from five testifying experts, defended two of their depositions, and deposed Defendants' class certification experts; and (j) prepared for and attended four formal mediation sessions and many settlement meetings and discussions among counsel. *See generally* Lead Counsel Decl.

## III.   Argument

### A.   Attorneys' Fees

#### 1.   Plaintiffs' Counsel are entitled to an award of attorneys' fees from the common fund.

The "equitable fund" doctrine provides that attorneys for plaintiffs in a class action may petition the court for compensation from any benefits the class receives as a result of their efforts. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995) (The equitable fund doctrine is "founded on the equitable principle that those who have profited

from litigation should share its costs."). In complex antitrust cases, these principles are

particularly important, as private enforcement furthers the policy goals of the federal antitrust

laws. *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983).

This Court enjoys broad latitude in how it chooses to calculate the share of a common fund

that will compensate attorneys and incentivize private enforcement of the federal antitrust laws.

*See id*; *United States v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st Cir. 1999) (citing *In re Thirteen*

*Appeals*, 56 F.3d at 307, 309). In this Circuit, the percentage-of-the-fund approach, as opposed to

the lodestar method, is the favored methodology for assessing requests for attorneys' fees. *In re*

*Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 458 (D.P.R. 2011) (citing *In re*

*Thirteen Appeals*, 56 F.3d at 307); *see also* Report of Professor Charles Silver on the

Reasonableness of Lead Counsel's Request for Payment of Attorneys' Fees and Expenses

(hereinafter "Silver Report") at 14-16; Declaration of Brian T. Fitzpatrick (hereinafter

"Fitzpatrick Decl.") at ¶¶ 8-10. Under the percentage-of-the-fund method, "the court shapes the

counsel fee based on what it determines is a reasonable percentage of the fund recovered." *In re*

*Relafen Antitrust Litig.*, 231 F.R.D. 52, 78-79 (D. Mass. 2005) ("*Relafen*") (quoting *In re*

*Thirteen Appeals*, 56 F.3d at 305).

As this Court explained in *Relafen*, "[t]he First Circuit has not endorsed a specified set of

factors to be used in determining whether a fee request is reasonable. The Second and Third

Circuits have described several factors district courts should consider in the decision as to

attorney's fees." 231 F.R.D. at 79; *see also In re Lupron(R) Mktg. & Sales Practices Litig.*, 2005

U.S. Dist. LEXIS 17456 at *12 (D. Mass. Aug. 17, 2005) (listing "typical considerations" in

assessing a common fund fee request). This Court in *Relafen* noted that factors bearing on the

reasonableness of a fee request include:

> (1) the size of the fund created and the number of persons benefitted; (2)
> the presence or absence of substantial objections by members of the
> class to the settlement terms and/or fees requested by counsel; (3) the
> skill and efficiency of the attorneys involved; (4) the complexity and
> duration of the litigation; (5) the risk of nonpayment; (6) the amount of

time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Relafen*, 231 F.R.D. at 79 (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)). In addition, this Court noted additional factors used in the Second Circuit including: (1) the risk of the litigation; (2) the fee request in relation to the settlement; and (3) public policy considerations. *Id*. (citing *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)); *see also* Fitzpatrick Decl. at ¶ 11.

### 2.     Plaintiffs' Counsel seek a reasonable portion of the common fund.

Courts in this Circuit assess each fee request by reviewing the individual circumstances of each case. *See, e.g., Relafen,* 231 F.R.D. at 79; *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d at 458. Plaintiffs' Counsel seek 33% of the common fund, which is reasonable under the circumstances of this case as analyzed under the factors described in *Relafen* and used by other courts in this Circuit. The common fund in this case is considerable, and it was hard won, requiring immense effort from Plaintiffs' Counsel against extremely sophisticated Defendants and defense firms contesting every inch of ground over the course of seven years.

### a.     The size of the common fund created and the number of persons benefitted support Counsel's request.

Consideration of the "net dollars and cents results achieved by counsel for their clients is often the most influential factor in assessing the reasonableness of any attorneys' fee award." *In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 458; Fitzpatrick Decl. at ¶ 21. The Manual for Complex Litigation provides that "[g]enerally, the factor given the greatest emphasis [in awarding a percentage of the fund] is the size of the fund created, because 'a common fund is itself the measure of success… [and] represents the benchmark from which a reasonable fee will be awarded." Manual for Complex Litigation (Fourth) § 14:121 (2004) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 14:6, at 547, 550 (4th ed. 2002)).

Both the size of the fund and number of class members here weigh in favor of approval. *See In re Puerto Rican Cabotage*, 815 F. Supp. 2d 448, 458-59 (concluding that a fund of $65,850,000 and a class size potentially as high as 61,854 were both "substantial" and "weigh[ed] in favor" of a fee request of 33%); *Relafen*, 231 F.R.D. at 79-82 (granting 33% fee request and noting among the supporting factors the fund size of $67 million and the class size of 272,229 consumers). The fund in this case is $590,500,000, and the number of class members who will benefit is potentially in the tens of thousands. Even the smallest of the individual settlements would have been in the top quintile of recoveries for securities class actions during the period from 2004 to 2013. Silver Report at 1-2. Compensating Plaintiffs' Counsel with 33% of the common fund will adequately protect the interests of the Class Plaintiffs by leaving them with nearly $400,000,000 of the recovery. *See Latorraca v. Centennial Techs., Inc.*, 834 F. Supp. 2d 25, 29 (D. Mass. 2011) (holding that an aggregate award which left class plaintiffs with "roughly two-thirds" of the amount recovered from the defendants was reasonable and protected the interests of the class).

### b.     The objections to the settlement are not "substantial."

The deadline for filing objections and requesting exclusion is December 29, 2014. As of the date of the present filing, Lead Counsel is aware of two objections to the attorneys' fee request,[1] and ten requests for exclusion from the settlement Class. A small number of objections to a fee request is strong evidence that the settlement is fair and reasonable. *See  In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 305 (3d Cir. 2005) (stating that the fact that only two class members objected to the fee request supports approval of the fee); *In re Rent-Way Sec. Litig.,* 305 F. Supp. 2d 491, 515 (W.D. Pa. 2003) ("[t]he absence of substantial objections by other class

---

[1] One objection to the fee request is based on the mistaken belief that small shareholders will not receive redress. In fact, all shareholders in the class not otherwise excluded are eligible to receive redress from the settlement fund. As this objector noted, the objection was made "without knowing the details." (Dkt. No. 1047.) The other objection expresses concern that the fee request is based on the maximum that the class could receive, not what is actually paid out. But as Class Counsel explained to the Court, a choice by some class members not to make a claim will not decrease the total paid to the class. (Tr. of H'rg of September 29, 2014 at 9; Dkt. Nos. 1048.)

members to the fee application supports the reasonableness of Lead Counsel's request").[2]

### c.   Counsel for Plaintiffs provided skillful and efficient representation.

Lead Counsel includes attorneys from three law firms with extensive experience in litigating complex antitrust and class action cases. This Court has noted previously the exceptional efforts of counsel on both sides of this case. Judge Harrington, who presided over the case from its inception in 2007 until the end of 2013, stated as much on the record after the second day of hearings on Defendants' motions for summary judgment. Tr. of H'rg of December 18-19, 2012 at 225-226 (noting the case "has been handled by the attorneys in a very professional manner" and "the arguments have been very elucidating and I have been well educated."). At the hearing in which the Court granted preliminary approval of the settlement, the Court reiterated its appreciation of the quality of counsel's work. Tr. of H'rg of September 29, 2014 at 10-11 ("I am pleased to see you all today and can say now, without equivocation, that I think this has been a fine bit of lawyering on all your parts.").

Plaintiffs' Counsel respectfully submit that their collective skill and experience, together with their aggressive and creative pursuit of the best possible outcome for the class in this case, support their fee request here. *See Relafen*, 231 F.R.D. at 80 (observing that the court had "consistently noted the exceptional efforts of class counsel"); *In re Lupron(R)*, 2005 U.S. Dist. LEXIS 17456, at *14 (noting, in granting class counsel's fee request, that counsel were "experienced in the handling of complex consumer class litigation" like the case at issue); Fitzpatrick Decl. at ¶ 27 ("the results here speak for themselves: had class counsel not been so skilled, it is doubtful they would have achieved the exceptional results that they did.").

### d.   The complexity of this litigation supports Counsel's fee request.

Several courts have noted that the "complexity of federal antitrust law is well known," and that "antitrust class actions 'are notoriously complex, protracted, and bitterly fought.'" *In re*

---

[2] If any objections or requests for exclusions are received after the date of this submission, Lead Counsel will address them in the reply brief, which will be filed with the Court by January 28, 2015.

*Puerto Rican Cabotage*, 815 F. Supp. 2d at 459 (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003)). This case is no exception. Counsel filed the case in 2007, after 15 months of investigation, and the parties settled in 2014. During the seven-year litigation, Defendants filed multiple rounds of motions to dismiss and for summary judgment. In addition to antitrust law, the litigation included complex federal preemption issues, releases from other litigation, statutes of limitations issues, and evidentiary issues such as the coconspirator exception to the hearsay rule. In addition to these complex and difficult legal issues, Plaintiffs' Counsel spent significant time and resources reconstructing the events at issue in 27 transactions from public filings and from correspondence and documents produced in discovery from 38 different parties and third parties. In doing so, Plaintiffs' Counsel was faced with understanding the intricate and technical details of the large and sophisticated transactions at issue in the case. Moreover, Plaintiffs' Counsel engaged five testifying and consulting experts on the case.  The long duration and complex nature of the litigation strongly supports Plaintiffs' Counsel's request for a reasonable portion of the common fund. *See, e.g.*, *Relafen*, 231 F.R.D. at 80 (case spanned four years and included complex legal and factual issues weighed in favor of the fee request); *In re Lupron*, 2005 U.S. Dist. LEXIS 17456 at *15 (presence of complex issues weighed in favor of fee request); Fitzpatrick Decl. at ¶¶ 23-24.

> e.  **Financial risks undertaken by Plaintiffs' Counsel Supports the fee request.**

Plaintiffs' Counsel invested significant contingent time and resources into this case with no guarantee of success and the significant possibility of no recovery whatsoever. Contingency risk is a factor that supports the requested fee. As the Fifth Circuit has stated, "[l]awyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981), *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO & Its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986). Here,

Plaintiffs' Counsel have invested $80,145,191.50 in time and approximately $12,028,514.99 in expenses into this case with no guarantee that they would get that money back. Declaration of Daryl F. Scott in Support of Co-Lead Counsel's Application for Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards ("Scott Decl.") at ¶¶ 10-12. Very few firms in this country are capable of carrying such costs and willing to take such a risk.

Further, the risk of loss in this case was not illusory. Courts have repeatedly recognized that "[a]ntitrust litigation in general, and class action litigation in particular, is unpredictable… [and] the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 475-476 (S.D.N.Y. 1998) (cited in *In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 460) (noting that "there are instances where diligent and experienced plaintiffs' attorneys pour thousands of hours and dollars into their class action case only to recover little or nothing at trial or on appeal."); *United States Football League v. Nat'l Football League,* 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) (jury awarded plaintiffs $1 in damages). Plaintiffs' Counsel took on this case with no assurances that any fees would be received, and they assumed the risk of the case being dismissed at the pretrial stage or of losing at trial or on appeal. In addition, they knew from the outset that their adversaries were elite members of the private equity industry, which is among the most lucrative, aggressive, and well-represented industries in the world. Fitzpatrick Decl. at ¶ 22 ("As far as I am aware, no one has ever won an antitrust case in this market before."). At multiple stages of the litigation, Plaintiffs' Counsel found itself arguing before the Court to keep the case alive. For example, at the summary judgment stage, after tens of millions of dollars in time and out-of-pocket expenses had been incurred, Judge Harrington expressed serious reservations about the case during oral argument and acknowledged as much in his subsequent Order. Lead Counsel Decl. at ¶¶ 117-129; Dkt. Nos. 757-758; 763 at 29-30. Nevertheless, Lead Counsel continued to aggressively litigate the case, and – as evidenced by the many mediation sessions and months of settlement

negotiations – refused to settle "on the cheap," even though doing so would have meant recouping their investment.

The risk of loss was substantially higher than in many antitrust cases because this was not a "follow-on" case where Plaintiffs' Counsel rode the coattails of earlier litigation or government investigations. *See In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 460-461 (noting that class counsel's risk was mitigated in that case because an earlier investigation by the DOJ included search warrants executed by the FBI, which indicated probable cause of antitrust violations); *Relafen*, 231 F.R.D. at 80 (rejecting objector's claim that class action was a "follow-on case riding the wake of" earlier litigation); *see also* Silver Report at 45-46; Fitzpatrick Decl. at ¶ 22.[3]

If the antitrust laws are to continue to benefit from private enforcement, then such risk must be well-compensated. Otherwise, counsel for plaintiffs will have no incentive to bring high-risk cases such as this, or to fight for that last dollar. *See Southeastern Milk Antitrust Litig.*, 2013 WL 2155387 at *5 ("failing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases. Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors.").[4]

Plaintiffs' Counsel's enormous investment of time and resources in this litigation, and the assumption of the massive risk associated with it, weighs in favor of the requested fee award.

---

[3] See also *Automotive Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *5 ("The risk of nonpayment is even higher when a defendants' *prima facie* liability has not been established by the government in a criminal action" and thus "warrants approval" of class counsel's one-third fee request.); *Linerboard Antitrust Litig.*, 2004 WL 1221350, at *11 (same); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112, at *1 (N.D. Ill. Feb. 10, 2000) ("This case was not marked by any governmental investigations or prosecutions, leaving the development of the facts in the hands of private litigants . . . Because of the uncertainty of the outcome of the case and the enormous amount of work necessary to the prosecution of the charges, counsel for the Class Plaintiffs had to invest a great deal of time and money even while faced with the risk of non-recovery.").

[4] *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ( "[w]ithout doubt, the private cause of action plays a central role in enforcing this [antitrust] regime."); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002) (same).

> f.   **The seven years and counting that Counsel have devoted to the case support the requested fee award.**

In *Relafen* this Court approved a 33.3% award of attorneys' fees in part because that litigation "advanced through various stages of litigation for four years," "Class counsel successfully countered a motion to dismiss and succeeded in part in defeating a summary judgment motion," and "[t]here was a mass of discovery… including 'hundreds of hours' consulting with experts, as well as the review of 'hundreds of boxes of documents.'" *Relafen* 231 F.R.D. at 80. This case required an even larger investment of time. While the litigation was only twice the length from start to final settlement, attorneys at Plaintiffs' Counsel firms devoted substantially more hours to the case. This necessity was due to, among other things: (i) the collection and review of more than thirteen million pages of documents; (ii) the need to oppose 15 motions to dismiss and 30 motions for summary judgment; (iii) the taking of 51 depositions and defending of 7; (iv) extensive motion practice related to class certification and discovery disputes; (v) the need to subpoena and collect and review documents from 19 third parties; (vi) extended and hard fought settlement negotiations, including four formal mediation sessions and a plethora of post-mediation settlement negotiations; and (vii) preparation for trial, which was only two months away at the time the final settlement was inked.[5]

In short, Plaintiffs' Counsel devoted – by necessity – over 186,000 hours to pursuing this complex, multiparty case to the brink of trial for the Class, and, as such, there can be no doubt that factor weighs in support of the requested fee. *See Relafen*, 231 F.R.D. at 80; *see also Puerto Rican Cabotage*, 815 F. Supp. 2d at 463 (maintaining that attorneys' fees in the realm of 33% may be appropriate "in cases which actually proceed to trial or settle on the eve of trial."); *see also* Fitzpatrick Decl. at ¶ 24.

---

[5] For a detailed description of the work performed by Plaintiffs' Counsel, the Court is respectfully referred to the Lead Counsel Decl. at ¶¶ 155-161.

11

###### g.      Awards in similar cases support Counsel's fee request.

Plaintiffs' Counsel's fee request of 33% here falls within the range of fee awards in other large, highly complex antitrust class actions.[6] This Court's opinion in *Relafen* is on point and highly instructive, as many similarities between that case and this one exist. As in this case, *Relafen* involved complex legal and factual issues and significant risk by class counsel. 231 F.R.D. at 80. In that case, class counsel "expended tens of thousands of hours," successfully countered a motion to dismiss, and succeeded in part in defeating summary judgment. *Id.* Similarly, Plaintiffs' Counsel here expended over 186,000 hours and fended off 15 motions to dismiss and 30 summary judgment motions before reaching the final settlement two months before trial. Both cases involved "a mass of discovery," including "hundreds of hours" consulting with experts. *Id*. However, while *Relafen* involved the review of "hundreds of boxes of documents," this case involved the review of more than 13 million pages of documents. *Id*.; Lead Counsel Decl. at Ex. A.

The settlement fund in *Relafen* was significantly smaller than the fund in this case. This Court acknowledged in its opinion that 33% is a high percentage for a large settlement fund, and that some authorities suggest that the percentage of a common fund awarded as attorneys' fees

---

[6] *See In re Southeastern Milk Antitrust Litig*., No. 2:08–MD–1000, 2013 WL 2155387, *8 (E.D. Tenn. May 17, 2013) (one-third fee from settlements totaling $158.6 million); *In re Titanium Dioxide Antitrust Litig*., 10–CV–00318(RDB), 2013 WL 6577029, *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund); *In re Plasma-Derivative Protein Therapies Antitrust Litig*., 1:09-cv-07666, Dkt. Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) (awarding one-third fee from settlements totaling $128 million); *In re Skelaxin (Metaxalone) Antitrust Litig*., MDL No. 2343, 2014 WL 2946459 at *1 ("one third fee is fair and reasonable and fully justified" and "within the range of fees ordinarily awarded" in case involving $73 million settlement fund) (collecting cases); *In re Flonase Antitrust Litig*., 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) (noting that "in the last two-and-a- half years, courts in eight direct purchaser antitrust actions approved one-third fees" and awarding one-third fee from $150 million fund); *In re Fasteners Antitrust Litig*., CIV.A. 08-md-1912, 2014 WL 296954, *7 (E.D. Pa. Jan. 27, 2014) ("Co–Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions."); *In re Tricor Direct Purchaser Antitrust Litig*., No. 05-340-SLR, Dkt. No. 543 (D. Del. 2009) (one-third fee from $250 million settlement fund); *Automotive Refinishing Paint*, 2008 WL 63269, *1 ($34.5 million attorneys' fee from settlements totaling $105.75 million); *In re Ready- Mixed Concrete Antitrust Litig*., 1:05-CV-00979-SEB-TAB, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) (approving one-third fee); *In re Vitamins Antitrust Litig*., No. Misc. 99-197(TFH), 2001 WL 34312839, *10, 14 (D.D.C. July 16, 2001) (34% fee from $359 million settlement fund); *In re Lithotripsy Antitrust Litig*., No. 98 C 8394, 2000 WL 765086, *2 (N.D. Ill. June 12, 2000) ("33.3% of the fund plus expenses is well within the generally accepted range of attorneys['] fees in class-action antitrust lawsuits"); *Standard Iron Works v. Arcelormittal,et al.*, No. 08-C-5214, Dkt. No. 539  (N.D. Ill. 2014) (33% fee from $163.9 million settlement fund).

generally decreases as the size of the fund increases. *Id*. at 81.[7] Nevertheless, the Court noted that the requested fee was "not out of proportion with large class actions." *Id*. Ultimately, this Court concluded that a 33% fee was "not unreasonable as a matter of law, when there is such a large fund, though it may be at the high end in this type of litigation." *Id*. at 82. Under the circumstances, and in light of the work undertaken by class counsel, the exceptional result attained by those efforts, and following a lodestar cross check, this Court granted the requested fee of 33% of the common fund. *Id*. The same factors support a similar award in this case.

In another similarly long-running, large-scale, and highly complex class action against a powerful sector of the financial industry, Judge Scheindlin of the Southern District of New York awarded class counsel a fee of one-third of a net settlement fund totaling over $510 million. *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009). That case also involved hundreds of thousands of hours expended by plaintiffs' counsel over eight years of litigation, the review of millions of pages of documents, numerous procedural and substantive motions, and serious risk on the part of plaintiffs' counsel. *Id*. at 508-10. The court acknowledged that the fee was high, and that in some cases involving huge settlements it would be appropriate to follow a sliding-scale with the fee percentage bearing an inverse relationship to the size of the fund. *Id*. at 514. Nonetheless, the court held that that principle could not "be considered in isolation without also reviewing the amount of work and time spent by counsel in this litigation." *Id*. at 514-15. The court noted that the high percentage fee requested by counsel still represented a reasonable multiplier to the lodestar as calculated by the court. *Id*. at 515.

Professors Silver and Fitzpatrick undertook an empirical examination of class action fee awards to determine whether the request in this case is reasonable and within the range approved by other federal courts in similar cases. Silver Report at 30-32, Exh. B; Fitzpatrick Decl. at ¶¶ 13-19. Professor Silver examined 50 "megafund" cases with attorneys' fees ranging from 25-

---

[7] *But see* Fitzpatrick Decl. at ¶¶ 16-19 (noting that nothing in First Circuit law requires that fee percentages decline as settlement sizes increase and presenting policy arguments against the sliding-scale approach).

40%. Silver Report at Exh. B. Professor Fitzpatrick, in summarizing a study that he conducted across many circuits, noted that in 2006 and 2007 the most common percentages awarded to counsel were 25%, 30%, and 33%, and nearly two thirds of awards were between 25% and 35% of the fund. Fitzpatrick Decl. at ¶ 13.  In the First Circuit during the same period, the most common percentages were 25% and 33%. *Id*. at ¶ 15.

### h.    Public policy considerations support Counsel's fee request.

It is in the public interest to encourage counsel to take cases of this type on behalf of classes. Public policy considerations are a factor in the *Goldberger* Test employed in the Second Circuit and referenced in by this Court in *Relafen*. *Relafen*, 231 F.R.D. at 79 *citing Goldberger*, 209 F.3d at 50. Class actions serve an important function to police antitrust violations and ensure efficient, competitive financial markets. *See id*. at 515 (observing that "class actions serve as private enforcement tools when the Securities and Exchange Commission or other regulatory entities fail to adequately protect investors"); *In re Southeastern Milk Antitrust Litig*., No. 2:08–MD–1000, 2013 WL 2155387, *5 (E.D. Tenn. May 17, 2013). Accordingly, "plaintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who engage in misconduct will suffer serious financial consequences." *Id*.; see also Fitzpatrick Decl. at ¶ 20 (suggesting that "courts should set fee awards such that future lawyers will make the best decisions about what cases to file and how to resolve them."). Through this litigation, Plaintiffs' Counsel have exposed previously private communications among Defendants related to the purchase and sale of common stock and those communications have now been reported in the popular and financial press.[8] By bringing these behaviors to light, Plaintiffs' Counsel has provided the Class Members and all other investors in the stock market

---

[8] *See, e.g.,* Peter Lattman & Eric Lichtblau, *E-Mails Cited to Back Lawsuit's Claim That Equity Firms Colluded on Big Deals*, NEW YORK TIMES DEALBOOK (Oct. 10, 2012); Josh Kosman, *E-mail drama in price-rig case*, NEW YORK POST (Dec. 20, 2012); Mike Spector, *Buyout Firms Settle Suit Alleging Collusion over Deals*, WALL ST. J. (Aug. 7, 2010).

with a better understanding of the backroom dealing that had previously depressed prices in the market for securities.

Only a small number of law firms have the expertise, resources, and willingness to adequately prosecute cases such as this one on behalf of a plaintiffs' class. The overwhelming majority of the law firms with the expertise necessary to take on complex cases such as this one are unable or unwilling to do so because they are oriented toward defense work, and often count among their clients some of the private equity firms and investment banks that were Defendants in this action. Those firms not prevented from taking a case like this by virtue of their orientation or conflicts of interest are often dissuaded by the upfront investments and the very high risk of no return whatsoever. *See In re Initial Pub. Offering*, 671 F. Supp. 2d at 511 (courts have noted that in considering public policy concerns, "[t]he fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future." ) (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003)).

Moreover, a settlement of the type reached in this case rests in large part on the prospect of the case reaching trial, and the number of plaintiffs' firms who are willing and able to carry a case of this size and complexity through trial is smaller still. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."). Each of the Lead Counsel in this case was ready, willing, and able to go to trial. Lead Counsel Decl. at ¶ 160.

### 3. A Lodestar Cross-Check Confirms the Requested Fee's Reasonableness.

#### a. The Lodestar Cross Check

Although "[t]he First Circuit does not require a court to cross check the percentage of fund against the lodestar," doing so "may provide a useful *perspective* on the reasonableness of a given percentage award." *Relafen*, 231 F.R.D. at 81. (emphasis in the original, citation omitted);

15

Fitzpatrick Decl. at ¶¶ 24-26. The lodestar is calculated by "multiplying the hours reasonably expended on the matter by the reasonable hourly billing rate." *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d at 465. The "calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient . . . ." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859-61 (E.D. La. 2007); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d at 465 ("Based upon the Court's common sense, experience, and familiarity with this case, the Court finds that expending over 30,000 billable hours is reasonable in the instant matter."); *Rite Aid I*, 396 F.3d at 306-07 ("[t]he district courts may rely on summaries submitted by the attorneys and need not review actual billing records."). The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel's associated lodestar. *See Burford*, 2012 WL 5471985, at *6 n.1. The total lodestar in this case through August, 2014, as calculated by Lead Counsel, is $80,145,191.50. Scott Decl. at ¶ 10. This yields a multiplier of 2.43. *Id.* As demonstrated below, the lodestar is reasonable and the multiplier confirms the propriety of the requested award.

### b.    Counsel Efficiently Prosecuted the Case

Lead Counsel began this case with the understanding that without a substantial case-management effort, the many talented attorneys working on behalf of the class could duplicate work and expenses and inefficiently distribute the effort required by the massive undertaking before them. To address this concern, Lead Counsel established guidelines for billing, collected monthly time and expense reports, and reviewed those reports regularly. Scott Decl. at ¶¶ 5-7. Even before preliminary approval, Lead Counsel asked each firm representing Plaintiffs to audit their own time submissions to ensure that the firms' efforts advanced the interest of the Class in an efficient manner. *Id.* at ¶¶ 8-10. Lead Counsel then reviewed time records from every firm and made downward adjustments where appropriate, based on criteria established by Lead Counsel. *Id.* The purpose of this effort was to ensure that Named Plaintiffs and the Class would

only pay for valuable representation rendered on their behalf, and to provide the Court with a reliable lodestar figure.

### c. Current hourly rates are reasonable

Plaintiffs' Counsel's lodestar is based on the current hourly rates charged by billing attorneys in this case. *See In re Schering-Plough Corp. Enhance Sec. Litig.*, CIV.A. 08-397 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013), appeal dismissed (Apr. 17, 2014) (lodestar "derived by multiplying each firm's hours by the current hourly rates for attorneys, paralegals and other professional[s]").[9] In the aggregate for all timekeepers, the average hourly rate is $430.

### d. Multiplier is reasonable

Lead Counsel's fee request represents a multiple of 2.43 over the total lodestar expected to prosecute this case. This multiple falls well within the range of reasonable multiples for a case of this type. Silver Report at 47-48. In light of the risk taken by Plaintiffs' Counsel, the substantial commitment of time and money, the novel issues presented throughout the litigation, and the complexity of the legal issues and subject matter, such a multiple is appropriate. See, e.g., *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (awarding a fee that led to a multiplier of 5.2); *Tricor Antitrust Litig.*, No. 05-340-SLR, Dkt. No. 543 (D. Del. 2009) (one-third fee and 3.93 multiplier from $250 million fund); *Flonase Antitrust Litig.*, 951 F. Supp. 2d at 750-51 ([m]ultipliers of 1-4 are common in antitrust cases, and awarding one-third fee and 2.99 multiplier); *Newberg on Class Actions* §14.6 (4th ed. 2009) ("multiples ranging from one to four frequently are awarded in common fund cases when the

---

[9] "[C]ourts allow the use of current billing rates at the time the calculation is made rather than the billing rates actually in effect at the time the hours were recorded. Although counterintuitive, this is intended to compensate for delay in receiving fees." *In re Schering-Plough Corp. Enhance Sec. Litig.*, CIV.A. 08-397 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013), *appeal dismissed* (Apr. 17, 2014); *see also Missouri v. Jenkins*, 491 U.S. 274, 283–8, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 779 (S.D. Tex. 2008) ("To compensate for delay in receiving fees, counsel have properly used their current billing rates."); *In re Rent–Way Securities Litigation*, 305 F. Supp. 2d 491, 517, n. 10 (N.D. Pa. 2003); *In re Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 194 (E.D. Pa. 2000).

17

lodestar method is applied.")]. Such a multiplier is necessary to compensate Plaintiffs' Counsel who are willing to take complex cases and commit to pursuing them through a multi-year litigation process culminating in a trial and perhaps even appeals. For the attorneys with the expertise and resources to prevail in a case of this type, there are many opportunity costs that they forego in order to pursue a long and risky contingent litigation. To incentivize Plaintiffs' Counsel to secure benefits for class members, the award must meet or exceed the opportunity cost of the litigation multiplied by a factor representing the significant risk of loss or negligible recovery. In light of the benefits achieved on behalf of the Class, the qualifications necessary for Plaintiffs' Counsel to achieve these benefits, and the substantial risks specific to this litigation, the proposed multiplier is reasonable.

## IV. Plaintiffs' Counsel Incurred Reasonable Expenses to Achieve the Benefit Obtained

Counsel whose efforts create a common fund for the benefit of a class are entitled "not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax." *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999); *Ikon*, 194 F.R.D. at 192; *In re Synthroid*, 264 F.3d 712, 722 (7th Cir. 2001).To be recoverable, the expenses must be "adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Safety Components, Inc. Sec. Litig.,* 166 F. Supp. 2d 72, 108 (D.N.J. 2001).

Here, Plaintiffs' Counsel expended more than $12,000,000 in expenses, which are divided into categories and itemized in the declarations submitted by each individual firm. *See* Scott Decl. These expenses are well-documented, based on the books and records maintained by each firm, and reflect the costs of prosecuting this litigation, and include, among other things, fees for experts; costs associated with creating and maintaining an electronic document database; online legal research costs; travel and lodging expenses; copying; mail; telephone; and deposition transcripts. Courts routinely authorize similar expenses. *See In re Remeron End-Payor Antitrust Litig.,* No. Civ. 02-2007, 2005 WL 2230314, at *32 (D.N.J. Sept. 13, 2005) (approving "costs

18

expended for purposes of prosecuting this litigation, including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs; and the costs of deposition transcripts").[10]

The Notice of Class Action Settlement informed Class Members that Lead Counsel would seek payment of expenses up to $15,000,000, and, to date, no objection to the expense application has been filed. The requested expenses should, therefore, be awarded. *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) ("plaintiffs seek reimbursement of expenses . . . which they have detailed in their submissions to us. These out-of-pocket expenses . . . are compensable . . . they are also unobjected to and, in our judgment, reasonable").

## V.    The Named Plaintiffs' Requested Service Awards are Reasonable in Amount

Named Plaintiffs also request that the Court approve service awards for Detroit PFRS and Omaha PFRS in the amount of $25,000 each and $5,000 for Mr. Wojno and $10,000 for Dr. Dahl. These awards are justified and reasonable owing to the individual and collective efforts of the Named Plaintiffs in prosecuting this litigation and serving as representatives of the classes.

Service awards for named plaintiffs, such as those requested here, serve an important function in advancing class action suits. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005). This is especially true where the named plaintiffs actively participated in the litigation. *Id.* Another function of such incentive awards is reimbursement for the time and effort expended by named plaintiffs in pursuing claims on behalf of an entire class. *In re Celexa and Lexapro Mktg. and Sales Practices Litig.*, MDL No. 09-2067-NMG, 2014 WL 4446464, at *9

---

[10] *See also Brown v. Pro Football, Inc.*, 839 F. Supp. 905, 916 (D.D.C. 1993) ("Plaintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, electronic case law research, secretarial overtime, and counsel's travel expenses are routinely billed to fee-paying clients, and thus are all compensable") (citations omitted), *rev'd on other grounds*, 50 F.3d 1041 (D.C. Cir. 1995); *In re Am. Bus. Fin. Services Inc. Noteholders Litig.,* No. 05-232, 2008 WL 4974782, at *18 (E.D. Pa. Nov. 21, 2008) (approving reimbursement of expenses for "delivery and freight, class notice costs, duplication costs, online legal research, travel, meals, experts, telephone, fax services, transcripts, postage, messenger, mediator, filing and court fees, service fees, [and] transportation" based on declarations of counsel); *Syngenta*, 904 F. Supp. 2d at 910.

(D. Mass. Sept. 8, 2014). As a result, courts routinely approve such awards. *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d at 468.

The $5,000 -$10,000 proposed incentive awards for the individual Named Plaintiffs and the $25,000 proposed incentive awards for the institutional investor Named Plaintiffs are justified due to the length and extent of their active participation in the litigation. Named Plaintiffs served responses to multiple sets of interrogatories, responded to multiple sets of requests for production of documents, produced documents, and some were deposed. In addition, all Named Plaintiffs were willing and prepared to testify at trial if necessary. *See* Declaration of Kirk Dahl at ¶ 4; Declaration of Michael Wojno in Support of Plaintiffs' Motion for Final Approval of Proposed Class Action Settlements and Request for Service Payment at ¶ 6; Declaration of Joseph Turner, Esq. at ¶ 5; Declaration of James Sklenar at ¶ 5.

The $65,000 in total incentive awards represents just 0.01% of the $590,500,000 total settlement. The amounts requested are reasonable, and in line with awards granted by other courts, both in absolute dollar amounts and as a percentage of the common recovery. *See, e.g., Savani v. URS Professional Solutions LLC,* C/A No. 1:06-cv-02805, 2014 WL 172503, at *10 (D.S.C. Jan. 15, 2014) (granting incentive award of $40,000 to named plaintiff and collecting cases approving awards of $7,500 to $60,000); *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085, 2005 WL 3008808, at *18 (D.N.J. Nov. 9, 2005) (granting incentive awards of $60,000 each to two named plaintiffs and collecting cases approving awards of $20,000 to $200,000); *see also Relafen*, 231 F.R.D. at 82 (approving total incentive award of $187,000, or 0.24% of settlement); and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) (approving incentive award of 1.5% of common benefit received by the class).

## VI.  Conclusion

For all the reasons detailed in this Memorandum, Plaintiffs' Counsel respectfully request that the Court grant Plaintiffs' Motion for an Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards.

Dated: November 13, 2014              Respectfully submitted,

*s/ Stacey P. Slaughter*
K. Craig Wildfang (admitted *pro hac vice*)
Thomas J. Undlin (admitted *pro hac vice*)
Stacey P. Slaughter (admitted *pro hac vice*)
George D. Carroll (admitted *pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
2800 LaSalle Plaza
800 LaSalle A venue South
Minneapolis, MN 55402-2015
(612) 349-8500
kcwildfang@rkmc.com
tjundlin@rkmc.com
spslaughter@rkmc.com
gdcarroll@rkmc.com

Lisa A. Furnald (BBO #631059)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
800 Boylston Street, 25th Floor
Boston, MA 02199
(617) 267-2300
lafurnald@rkmc.com

Patrick J. Coughlin (admitted *pro hac vice*)
David W. Mitchell (admitted *pro hac vice*)
Randi D. Bandman (admitted *pro hac vice*)
Phong L. Tran (admitted *pro hac vice*)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
patc@rgrdlaw.com
davidm@rdrdlaw.com
ptran@rdrdlaw.com

Christopher M. Burke (admitted *pro hac vice*)
Walter W. Noss (admitted *pro hac vice*)
Kristen M. Anderson (admitted *pro hac vice*)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
cburke@scott-scott. com
wnoss@scott-scott.com
kanderson@scott-scott. com

21

David R. Scott
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
(860) 537-3818

*Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2014, I caused the foregoing to be served via the Electronic Filing System on all of Settling Defendants' counsel of record and via email on all attorneys who have agreed to accept service via email at defendantsprivatequity@scott-scott.com.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 13, 2014.

*s/ Stacey P. Slaughter*
Stacey P. Slaughter (admitted *pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
2800 LaSalle Plaza
800 LaSalle A venue South
Minneapolis, MN 55402-2015
(612) 349-8500
spslaughter@rkmc.com

85244447.7

22